# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

KANAUTICA ZAYRE-BROWN,

         *Plaintiff*,

    v.

THE NORTH CAROLINA DEPARTMENT OF
PUBLIC SAFETY; EDDIE BUFFALOE JR., in his
official capacity as Secretary of the North Carolina
Department of Public Safety; TODD ISHEE, in his
official capacity as Commissioner of Prisons,
Division of Prisons, North Carolina Department of
Public Safety; GARY JUNKER, in his official
capacity as Director of Health and Wellness,
Division of Prisons, North Carolina Department of
Public Safety; BRANDESHAWN HARRIS, in her
official capacity as Assistant Commissioner of
Prisons, Division of Prisons, North Carolina
Department of Public Safety; ARTHUR
CAMPBELL, in his official capacity as Medical
Director, Division of Prisons, North Carolina
Department of Public Safety; TERRI CATLETT, in
her official capacity as Director of Healthcare
Administration, Division of Prisons, North
Carolina Department of Public Safety; JONATHAN
PEIPER, in his official capacity as Interim Director
of Behavioral Health, Division of Prisons, North
Carolina Department of Public Safety; BRIAN
SHEITMAN, in his official capacity as Chief of
Psychiatry, Division of Prisons, North Carolina
Department of Public Safety; VALERIE
LANGLEY, in her official capacity as Director of
Nursing, Division of Prisons, North Carolina
Department of Public Safety; ABHAY AGARWAL,
in his official capacity as Deputy Chief Medical
Officer, Division of Prisons, North Carolina
Department of Public Safety;

**COMPLAINT**

SARAH COBB, in her official capacity as Director of Rehabilitative Services, Division of Prisons, North Carolina Department of Public Safety; JOSH PANTER, in his official capacity as Director of Operations, Division of Prions, North Carolina Department of Public Safety; CHARLOTTE WILLIAMS, in her official capacity as Prison Rape Elimination Act Director, Division of Prisons, North Carolina Department of Public Safety; and ELTON AMOS, in his official capacity as a member of the Utilization Review Board, Division of Prisons, North Carolina Department of Public Safety.

*Defendants.*

## INTRODUCTION

1.     Plaintiff Kanautica Zayre-Brown ("Plaintiff") has been in the custody of the North Carolina Department of Public Safety ("DPS") since October 2017. Plaintiff is a transgender woman who has been diagnosed as suffering from gender dysphoria, a serious medical condition. Plaintiff has needed and requested treatment for gender dysphoria for several years. DPS and its officials sued herein (collectively, "Defendants") have a constitutional obligation to provide Plaintiff with the medically necessary care she requires. Defendants have failed and continue to fail to meet their constitutional obligations to Plaintiff.

2

2. Plaintiff was first diagnosed with gender dysphoria in 2010. Gender dysphoria is a condition involving clinically significant distress or impairment resulting from an incongruency between a person's gender identity and the sex they were assigned at birth. Plaintiff's gender dysphoria is a disability, because it is the result of a physical impairment causing severe distress and substantial limitations on her major life activities. In 2017, DPS confirmed Plaintiff's gender dysphoria diagnosis and her need for treatment.

3. Since entering DPS custody in 2017, Plaintiff has requested necessary treatment and accommodations for her gender dysphoria, including gender-affirming hormone therapy and use of her legal name and gender-consistent pronouns. Plaintiff's requests have been met with unjustified delays that have needlessly prolonged her suffering. Even when DPS has granted approval for these requests, it has failed to provide these necessary treatments and accommodations consistently.

4. Plaintiff's previous treatments have not adequately alleviated her gender dysphoria. She has suffered and continues to suffer severe physical, emotional, and psychological distress as a result.

5. Plaintiff needs gender-affirming surgery for the treatment of gender dysphoria. Plaintiff has requested gender-affirming surgery from DPS on numerous occasions. Medical providers to whom DPS referred Plaintiff agreed that gender-affirming surgery is medically necessary for her. Plaintiff meets the criteria for gender-affirming surgery under DPS's Policy and Procedure for the Evaluation and

3

Management of Transgender Offenders[1] ("DPS Policy for Transgender Prisoners")
and the recognized standards of care for the treatment of gender dysphoria.

6.    Defendants have known these facts for years. Acting with deliberate
indifference to Plaintiff's serious medical needs, Defendants have repeatedly rejected
Plaintiff's requests to be provided gender-affirming surgery, wrongfully deeming it as
"elective." Defendants have also repeatedly refused to act through their own
established internal protocols for this kind of care on Plaintiff's request. Defendants
have offered no medical justification for why Plaintiff's receipt of this care should be
denied or delayed.

7.    For these reasons and as alleged below, Defendants have violated Plaintiff's
rights under federal and state law. Plaintiff seeks declaratory and injunctive relief,
and damages.

## JURISDICTION AND VENUE

8.    Plaintiff brings this action under 42 U.S.C. § 1983; the Eighth Amendment to
the United States Constitution; Article I, Section 27 of the North Carolina
Constitution; the Americans with Disabilities Act ("ADA"), 42 U.S.C. §12101 *et seq.*;
and Section 504 of the Rehabilitation Act of 1973 ("Rehab Act"), 29 U.S.C. §794a.

9.    This Court has subject matter jurisdiction under 28 U.S.C. § 1331, which
provides federal district courts original jurisdiction in civil actions arising under the
U.S. Constitution and the laws of the United States, and § 1343(a)(3), which provides

---

[1] *See* N.C. Dept. of Pub. Safety Policy & Proc. Manual, Ch. E § .2700 (Aug. 22, 2019)
*reissued with amendments* at Ch. F § .4300 (March 31, 2021), https://files.nc.gov/ncdps/F-
.4300-03_31_21.pdf. All subsequent citations shall be to the version of the policy reissued on
March 31, 2021, unless otherwise indicated.

federal district courts original jurisdiction in civil actions to redress the deprivation, under color of any State law, of any right secured by the U.S. Constitution.

10.     This Court has supplemental jurisdiction over Plaintiff's state law claim under 28 U.S.C. § 1367(a) because it so related to Plaintiff's federal law claims that it is part of the same case or controversy under Article III of the U.S. Constitution.

11.     This Court has personal jurisdiction over Defendants as residents of North Carolina.

12.     Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in the Western District of North Carolina.

13.     Plaintiff has exhausted all available administrative remedies for the claims alleged herein.

## PARTIES

14.     Plaintiff Kanautica Zayre-Brown is a 40-year-old woman who is currently housed at Anson Correctional Institution ("Anson CI"). Plaintiff has been incarcerated in the custody of DPS since October 2017.

15.     Defendant DPS is a public entity as defined by Title II of the ADA and constitutes a program or activity receiving federal financial assistance under the Rehab Act. DPS is sued under the ADA, Rehab Act, and Article I, Section 27 of the state Constitution.

16.     Defendant Eddie Buffaloe Jr. is the Secretary of DPS. He is responsible for overall operation of DPS, including North Carolina's prisons. Defendant Buffaloe has

a legal duty to provide needed health care to all persons in DPS custody. Upon information and belief, Defendant Buffaloe is also the final reviewer and decision-maker of grievances submitted pursuant to DPS's Administrative Remedy Procedure. He is sued in his official capacity under §1983 for violations of Plaintiff's Eighth Amendment rights and under Article I, Section 27 of the state Constitution.

17.    Defendant Todd Ishee is the Prisons Commissioner for the Division of Prisons ("DOP") of DPS. He is responsible for the administration of North Carolina's prisons, including the creation and implementation of DPS policies and procedures. Defendant Ishee has a legal duty to provide needed health care to all persons in DOP custody. He is sued in his official capacity under §1983 for violations of Plaintiff's Eighth Amendment rights and under Article I, Section 27 of the state Constitution.

18.    Defendant Dr. Gary Junker is the Director of Health and Wellness for DOP. He is responsible for planning, organizing, and coordinating a Health and Wellness delivery system which includes medical, nursing, dental, behavioral health, mental health, pharmacy, quality assurance, and administration for all persons in DOP custody. As Director of Health and Wellness, Defendant Junker must approve all DOP Health and Wellness polices and directives. Defendant Junker has a legal duty to provide needed health care to all persons in DOP custody. Upon information and belief, Defendant Junker is one of the two final reviewers and decision-makers of requests for surgical intervention made to the Division Transgender Accommodation Review Committee ("DTARC"). He is sued in his official capacity under §1983 for

6

violations of Plaintiff's Eighth Amendment rights and under Article I, Section 27 of the state Constitution.

19. Defendant Brandeshawn Harris is the Assistant Commissioner of Prisons for DOP. She is responsible for the overall custody and security operations of DOP. Upon information and belief, Defendant Harris is one of two final reviewers and decision-makers for requests for surgical intervention made to DTARC. She is sued in her official capacity under §1983 for violations of Plaintiff's Eighth Amendment rights and under Article I, Section 27 of the state Constitution.

20. Defendant Dr. Arthur "Les" Campbell is the Medical Director for DOP. He is responsible for oversight of the day-to-day operations of medical services and for the quality of medical services provided to all persons in DOP custody. Defendant Campbell has a legal duty to provide needed health care to all persons in DOP custody. Upon information and belief, Defendant Campbell is a member of DTARC. He is sued in his official capacity under §1983 for violations of Plaintiff's Eighth Amendment rights and under Article I, Section 27 of the state Constitution.

21. Defendant Terri Catlett is the Director of Healthcare Administration for DOP. She is responsible for the oversight of the budget, staffing, and contracts for DOP medical services, as well as medical records, electronic records, and telehealth related to all persons in DOP custody, among other things. Defendant Catlett has a legal duty to provide needed health care to all persons in DOP custody. Upon information and belief, Defendant Catlett is a member of DTARC. She is sued in her official

capacity under §1983 for violations of Plaintiff's Eighth Amendment rights and under Article I, Section 27 of the state Constitution.

22.     Defendant Dr. Johnathan Peiper is the Behavioral Health Director for DOP. He is responsible for the approval of behavior health services provided to all persons in DOP custody. Defendant Peiper is also responsible for overseeing the day-to-day operation of behavior health services and ensuring their quality. Defendant Peiper has a legal duty to provide needed health care to all persons in DOP custody. Upon information and belief, Defendant Peiper is a member of DTARC. He is sued in his official capacity under §1983 for violations of Plaintiff's Eighth Amendment rights and under Article I, Section 27 of the state Constitution.

23.     Defendant Dr. Brian Sheitman is the Chief of Psychiatry for DOP. Defendant Sheitman has a legal duty to provide needed health care to all persons in DOP custody. Upon information and belief, Defendant Sheitman is a member of DTARC. He is sued in his official capacity under §1983 for violations of Plaintiff's Eighth Amendment rights and under Article I, Section 27 of the state Constitution.

24.     Defendant Valerie Langley, RN, is the Director of Nursing for DOP. Defendant Langley has a legal duty to provide needed health care to all persons in DOP custody. Upon information and belief, Defendant Langley is a member of DTARC. She is sued in her official under §1983 for violations of Plaintiff's Eighth Amendment rights and under Article I, Section 27 of the state Constitution.

25.     Defendant Dr. Abhay Agarwal is the Deputy Medical Director of DOP. Defendant Agarwal has a legal duty to provide needed health care to all persons in

8

DOP custody. Upon information and belief, Defendant Agarwal is a member of DTARC. He is sued in his official capacity under §1983 for violations of Plaintiff's Eighth Amendment rights and under Article I, Section 27 of the state Constitution.

26. Defendant Sarah Cobb is the Director of Rehabilitative Services of DOP. Defendant Cobb has a legal duty to provide needed health care to all persons in DOP custody. Upon information and belief, Defendant Cobb is a member of DTARC. She is sued in her official capacity under §1983 for violations of Plaintiff's Eighth Amendment rights and under Article I, Section 27 of the state Constitution.

27. Defendant Josh Panter is the Director of Operations for DOP. Upon information and belief, Defendant Panter is a member of DTARC. Defendant Panter has a legal duty to provide needed health care to all persons in DOP custody. He is sued in his official capacity under §1983 for violations of Plaintiff's Eighth Amendment rights and under Article I, Section 27 of the state Constitution.

28. Defendant Charlotte Williams is the Prison Rape Elimination Act ("PREA") Director for all of DPS Adult Correction and Juvenile Justice. She is responsible for developing, implementing, and overseeing DPS efforts to comply with PREA standards in all of its facilities. Defendant Williams has a legal duty to provide needed health care to all persons in DOP custody. Upon information and belief, Defendant Williams is a member of DTARC. She is sued in her official capacity under §1983 for violations of Plaintiff's Eighth Amendment rights and under Article I, Section 27 of the state Constitution.

29.     Defendant Dr. Elton Amos is a member of the Utilization Review Board for DOP. Defendant Amos has a legal duty to provide needed health care to all persons in DOP custody. He is sued in his official capacity under §1983 for violations of Plaintiff's Eighth Amendment rights and under Article I, Section 27 of the state Constitution.

## FACTUAL ALLEGATIONS

### I.     Gender Identity and Gender Dysphoria

30.     "Gender Identity" is a well-established medical concept, referring to a person's deeply felt, internal sense of their own gender, e.g., being male, female, or non-binary.

31.     All human beings develop and possess a gender identity. It is a core part of identity that cannot be altered by choice or by external factors.

32.     Typically, people who are assigned female at birth based on their external anatomy identify as girls or women, and people who are assigned male at birth based on their external anatomy identify as boys or men. Individuals with a gender identity congruent with the sex they were assigned at birth are cisgender. A cisgender man, for example, is a person who was assigned male at birth and who has a male gender identity.

33.     Transgender people have a gender identity that differs from the sex assigned to them at birth. A transgender woman is a woman who was assigned male at birth but who, like a cisgender woman, has a female gender identity. A transgender man is a man who was assigned female at birth but who, like a cisgender man, has a male gender identity.

34. "Gender dysphoria" is a medical diagnosis for a condition involving clinically significant distress and impairment that may result from the incongruence between one's gender identity and one's sex assigned at birth. "Gender identity disorder" was a diagnostic label used in the past to refer to people experiencing incongruence between their gender identity and their sex assigned at birth, but that term was abandoned to acknowledge that neither a transgender person's identity nor gender incongruence are "disordered."

35. Gender dysphoria is a serious medical condition codified in the Diagnostic and Statistical Manual of Mental Disorders, 5th Edition ("DSM-5") and the International Classification of Diseases-10 ("ICD-10").

36. If untreated or inadequately treated, gender dysphoria can lead to serious harms. These harms include clinically significant psychological distress, impairment of basic life activities, and debilitating depression. Untreated or inadequately treated gender dysphoria is also associated with higher risks of experiencing unemployment, homelessness, victimization, and involvement in the criminal legal system. For some individuals, not receiving necessary treatment for gender dysphoria results in self-harm, suicidal ideation, suicide, and death.

37. The widely accepted standards of care for treating gender dysphoria are published by the World Professional Association for Transgender Health ("WPATH"). WPATH is the leading international organization focused on transgender healthcare with a membership of physicians, psychiatrists, psychologists, social workers,

surgeons, and other health professionals who specialize in the diagnosis and treatment of gender dysphoria.

38.     WPATH publishes the Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People ("SOC"). The current version of the Standards of Care—Version 7—was released in September 2011 following a five-year process in which 18 gender dysphoria specialists submitted peer-reviewed papers to help identify the most effective treatments for gender dysphoria. The SOC are the prevailing standards of care used by mental health providers and medical professionals treating gender dysphoria.

39.     The SOC explicitly apply "in their entirety" to transsexual, transgender, and gender non-conforming people in "institutional environments such as prisons," and state:

> Health care for transsexual, transgender, and gender-nonconforming people living in an institutional environment should mirror that which would be available to them if they were living in a non-institutional setting within the same community. All elements of assessment and treatment as described in the [Standards of Care] can be provided to people living in institutions . . . . Access to these medically necessary treatments should not be denied on the basis of institutionalization or housing arrangements. If the in-house expertise of health professionals in the direct or indirect employ of the institution does not exist to assess and/or treat people with gender dysphoria, it is appropriate to obtain outside consultation from professionals who are knowledgeable about this specialized area of health care.[2]

---

[2] World Professional Association for Transgender Health, *Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People*, at 67 (7th Ed. 2012), https://www.wpath.org/publications/soc.

40.    There is broad agreement among leading medical and mental-health professional associations and organizations—including the American Medical Association, the American Psychological Association, the American Psychiatric Association, the American Academy of Family Physicians, the American Congress of Obstetricians and Gynecologists, the Endocrine Society, the National Association of Social Workers, and WPATH—that gender dysphoria is a serious medical condition and that treatment for gender dysphoria is medically necessary.

41.    The National Commission on Correctional Healthcare recommends that the medical management of prisoners with gender dysphoria "follow accepted standards developed by professionals with expertise in transgender health," citing the SOC.[3]

42.    The SOC are designed to help individuals live in accordance with their gender identity, eliminating the clinically significant distress often associated with an incongruence between a person's gender identity and sex assigned at birth. Treatment protocols include social transition (dressing, grooming, and living in accordance with one's gender identity in all facets of life), legal transition, and medical transition, including gender affirming hormone therapy and gender-affirming surgical care. The particular course of medical treatment varies based on the individualized needs of the person suffering from gender dysphoria.

---

[3] National Commission on correctional Health Care, Position Statement: Transgender Health Care in Correctional Settings (October 18, 2009; reaffirmed with revision April 2015), https://www.ncchc.org/filebin/Positions/Transgender-and-Gender-Diverse-Health-Care-in-Correctional-Settings-2020.pdf (last visited Dec. 12, 2021).

## II.   Mrs. Zayre-Brown's History of Gender Dysphoria

43.    Since she was a child, Mrs. Zayre-Brown has been aware of her female identity and understood herself to be female. From a young age, Mrs. Zayre-Brown felt repelled by and sought to hide her genitalia. Mrs. Zayre-Brown frequently dressed in a feminine manner despite disapproval from many of her family members. Because of her feminine presentation, Mrs. Zayre-Brown was targeted for violence and sexual harassment and ran away from home multiple times to avoid abuse.

44.    In or around 1996, when Mrs. Zayre-Brown was about 15 years old, she left home permanently. At that time, Mrs. Zayre-Brown began routinely dressing in a feminine manner and going by the name Kanautica, instead of the typically masculine name she was given at birth.

45.    Mrs. Zayre-Brown was under DPS supervision in programs for youth from 2001 until 2005, and under DPS supervision for adults from 2005 until January of 2010. Upon information and belief, Mrs. Zayre-Brown was held under only minimum security or less during these periods of DPS supervision, was permitted to hold a job in the community, and was permitted to express herself by wearing her own clothes.

46.    After being released from DPS supervision in 2010, Mrs. Zayre-Brown socially transitioned to live openly as the woman she knew herself to be in all aspects of her life.

47.    In or around 2010, Mrs. Zayre-Brown was diagnosed with gender dysphoria by psychologist Dr. Katrina Kuzyszyn-Jones at the UNC School of Psychiatry and began receiving psychotherapy for treatment of her gender dysphoria.

14

48. In May of 2012, with the support of Dr. Kuzyszyn-Jones, Mrs. Zayre-Brown began gender-affirming hormone therapy to treat her gender dysphoria at UNC Health Care. Upon information and belief, Mrs. Zayre-Brown began hormone therapy under the care of UNC endocrinologist Dr. Julie Sharpless.

49. In November of 2012, Mrs. Zayre-Brown legally changed her name from the typically masculine name she was given at birth to Kanautica Promises Zayre, to align with her female identity.

50. In 2012 and 2013, as part of treatment for gender dysphoria, Mrs. Zayre-Brown had gender-affirming mammoplasty and body contouring surgeries, resulting in a more typically feminine body shape.

51. In 2014, Mrs. Zayre-Brown married her long-time partner, Dionne Brown, and began going by Kanautica Promises Zayre-Brown.

52. On July 20, 2017, Mrs. Zayre-Brown underwent gender-affirming orchiectomy—removal of the testes—as part of treatment of her gender dysphoria. The orchiectomy was intentionally performed in a manner to facilitate later gender-affirming genital surgery, the next step in Mrs. Zayre-Brown's treatment plan prior to her incarceration by DPS.

## III.  DPS's Policy for Transgender Prisoners

53. On or around August 22, 2019, DPS rescinded its previous Health Services Policy regarding the care and treatment of incarcerated transgender people[4] and issued the DPS Policy for Transgender Prisoners.

---

[4] *See* N.C. Dept. of Pub. Safety Health Services Policy and Procedure Manual, Policy TX I-13 (Aug. 2018), https://files.nc.gov/ncdps/Transgender.pdf.

54. The DPS Policy for Transgender Prisoners establishes procedures for the "evaluation and management" of transgender people in DPS custody. These include procedures for housing assignments and health care.

55. Under the DPS Policy for Transgender Prisoners, "Routine Accommodation" requests include continuation of hormone therapy (if prescribed immediately before incarceration); male or female undergarments; hygiene/hair products, cosmetics, and other canteen items; private showering; and facility housing considerations.[5] Routine Accommodation requests are evaluated by a Facility Transgender Accommodation Review Committee ("Facility TARC" or "FTARC"), in consultation with the Warden of the facility.[6] Each Facility TARC "includes representatives from psychiatry (as needed), behavioral health, primary care provider, nursing administration (Associate Wardens for custody and operations/programs), unit manager, and the facility PREA Compliance Manager."[7]

56. "Non-Routine Accommodation" requests include, but are not limited to: initiation of hormone therapy; gender-consistent facility assignment; and gender-affirming surgical requests.[8]

57. "Non-Routine Accommodation" requests and appeals from decisions made by FTARC are considered by the Division Transgender Accommodation Review Committee ("Division TARC" or "DTARC").[9] The DTARC must include, "at a

---

[5] DPS Policy for Transgender Prisoners, § .4303(j)(3).
[6] Id., § .4303(j).
[7] Id., § .4302(j).
[8] Id., § .4303(j)(4).
[9] Id., § .4303(i), (j)(4).

16

minimum, the Medical Director, Chief of Psychiatry, Behavioral Health Director, Director of Rehabilitative Services, and the PREA Director."[10]

58.     Upon information and belief, the current members of the DTARC are Defendants Campbell, Catlett, Peiper, Sheitman, Langley, Agarwal, Cobb, Panter, and Williams.

59.     The DPS Policy for Transgender Prisoners requires that the DTARC refer its recommendations regarding surgical intervention or gender-identity-consistent facility transfer to the Assistant Commissioner of Prisons—Defendant Harris—and Director of Health and Wellness Services—Defendant Junker—for final determinations.[11]

60.     An interim policy issued on July 13, 2021 for the purpose of amending the policy "prior to the annual review date" clarified that "[a]fter gender-identity-consistent facility transfer, subsequent transfers will be managed according to Division guidelines."[12]

61.     Decision-making under the DPS Policy for Transgender Prisoners is supposed to require individualized review and consideration on a case-by-case basis.[13]

62.     The DPS Policy for Transgender Prisoners also enumerates training requirements and "respectful communication" requirements for DPS staff in relation

---

[10] *Id.*, § .4302(k).
[11] *Id.*, § .4303(j)(4).
[12] *See* Interim Policy and Procedure: Evaluation & Management of Transgender Offenders, N.C. Dept. of Pub. Safety Policy & Proc. Manual, Ch. F, § .4300(I) (July 13, 2021), https://files.nc.gov/ncdps/F.4300-Interim-Evaluation-Management-of-Transgender-Offenders.pdf.
[13] DPS Policy for Transgender Prisoners, § .4303(g), (j)(2)(G), (j)(4).

17

to transgender individuals in DPS custody. Staff are required to use either "gender preferred or gender-neutral" pronouns and names when interacting with a transgender person in DPS custody. Intentional misuse of gender pronouns is prohibited. DPS staff are required to "maintain the privacy and confidentiality" of people who are transgender.[14] Additionally, DPS staff are supposed to "receive training specific to the care and custody of LGBTI offenders," both initially and annually.[15]

63.　Upon information and belief, DPS has never provided any prisoner with gender-affirming surgery for the treatment of gender dysphoria.

## IV.　**Defendants' Delays and Denials of Mrs. Zayre-Brown's Requests for Gender Dysphoria Treatment**

64.　On October 10, 2017, Mrs. Zayre-Brown entered DPS custody. Immediately after her incarceration began, Mrs. Zayre-Brown informed DPS correctional officers that she is a transgender woman who needs to be treated consistently with her female identity and provided medical treatment for gender dysphoria. DPS medical and mental health staff obtained medical records from Mrs. Zayre-Brown's previous health care providers, which documented her treatment for gender dysphoria including hormone therapy and certain gender-affirming surgeries.

65.　On October 13, 2017, DPS mental health provider Susan Garvey evaluated Mrs. Zayre-Brown for gender dysphoria and noted that "[a]ccording to the DSM-V, [Mrs. Zayre-Brown] meets the criteria for a diagnosis of Gender Dysphoria in

---

[14] *Id.,* § .4306.
[15] *Id.,* § .4305.

Case 3:22-cv-00191-MOC-DCK　Document 1　Filed 04/28/22　Page 18 of 48

Adolescents and Adults[.]" On November 16, 2017, DPS medical provider Dr. Joseph J. Umesi confirmed Mrs. Zayre-Brown's gender dysphoria diagnosis.

66.    On November 27, 2017 Mrs. Zayre-Brown had her first interview with the FTARC panel at Harnett Correctional Institution ("Harnett CI") to formally request treatment of her gender dysphoria. At that time, Mrs. Zayre-Brown requested, among other things, that her legal name be used on all documents in the DPS system to prevent her from being misgendered by DPS staff, which exacerbates her gender dysphoria, and to be referred to an endocrinologist to restart hormone therapy. Mrs. Zayre-Brown also asked about receiving the gender-affirming genital surgery that she intended to undergo prior to her incarceration, as part of treatment for gender dysphoria.

67.    Despite the fact that DPS has known since the beginning of her term of incarceration that Mrs. Zayre-Brown is a transgender woman with gender dysphoria who has undergone hormone therapy and gender-affirming surgeries, DPS housed Mrs. Zayre-Brown in male facilities for almost two years. Mrs. Zayre-Brown was misgendered on a near-constant basis by both correctional and medical staff and other prisoners. Being a transgender woman in a male facility exacerbated Mrs. Zayre-Brown's gender dysphoria, caused her extreme mental and psychological distress, placed her at grave risk of physical assault and sexual assault, and led to Mrs. Zayre-Brown being placed on suicide-watch.

68.    After numerous attempts to obtain a transfer to a women's facility and after the added public pressure of community advocacy and media coverage, Mrs. Zayre-Brown was finally transferred to Anson CI, a women's facility on August 15, 2019.

69.    While at Anson CI, Mrs. Zayre-Brown has continued to face discrimination in the treatment of, and refusal to accommodate, her gender dysphoria.

70.    Although DPS's Policy for Transgender Prisoners requires respectful communication and training to that effect, DPS staff has persistently mis-gendered Mrs. Zayre-Brown–addressing her using masculine pronouns or her since-changed name–which has the known impact of worsening her gender dysphoria.

71.    Further, in implementing its Policy for Transgender Prisoners, DPS has erected onerous and medically unnecessary barriers which have delayed or prevented Mrs. Zayre-Brown from obtaining treatment for gender dysphoria, and which do not apply to the treatment of other disabilities.

72.    As detailed *infra*, Mrs. Zayre-Brown's requests for accommodation and necessary medical treatment of Mrs. Zayre-Brown's gender dysphoria have been unjustifiably delayed, provided inconsistently, and/or outright denied.

73.    On top of the harm from the unlawful discrimination Mrs. Zayre-Brown has experienced on the basis of her disability, Mrs. Zayre-Brown continues to suffer extreme psychological and emotional harm due to DPS's deliberate indifference to her need for necessary treatment of her gender dysphoria, including gender-affirming surgery.

74. The physical, psychological, and emotional distress caused by DPS's failure to provide needed treatment of Mrs. Zayre-Brown's gender dysphoria is persistent and severe. For Mrs. Zayre-Brown, her external genitalia fill her with feelings of disgust and unrelenting fear and anxiety that others will know that she is not "complete" in the way that she needs to be. DPS's repeated delay, interruption, and denial of treatment for Mrs. Zayre-Brown's gender dysphoria has placed and continues to place her at risk of serious harm.

A. *Denial and Delay of Hormone Therapy*

75. Despite extensive documentation in her pre-incarceration medical records of her history of receiving hormone therapy, DPS's confirmation of her diagnosis of gender dysphoria, and Mrs. Zayre-Brown requests for hormone therapy, DPS did not reinitiate Mrs. Zayre-Brown's hormone therapy for the treatment of her gender dysphoria until June of 2018, eight months after entering DPS custody.

76. In addition to DPS's eight-month delay in reinitiating Mrs. Zayre-Brown's hormone therapy, Mrs. Zayre-Brown has also experienced unwarranted and repeated interruptions of her hormone therapy, as well as inconsistent and inadequate monitoring of her hormone levels.

77. When taken consistently at an appropriate dosage, hormone therapy for transgender women like Mrs. Zayre-Brown suppresses androgens, which has feminizing effects, including body fat redistribution, decreased body and facial hair growth, and decreased erectile function. However, inadequate or interrupted

hormone therapy will not sufficiently suppress androgens to achieve the maximum possible feminizing effects.

78.     As a result of periods of interrupted and/or inadequate hormone therapy, Mrs. Zayre-Brown has suffered physical and emotional distress from hair growth, weight gain, and genital sensation that exacerbate her gender dysphoria, causing depression, anxiety, suicidal thoughts, and a dangerous attempt and ongoing desire to self-mutilate her genitals.

79.     On January 31, 2019, Mrs. Zayre-Brown had an appointment with Dr. Karla Pou, an endocrinologist with UNC Health that DPS referred her to for hormone therapy treatment. Dr. Pou discovered that the labs assessing Mrs. Zayre-Brown's hormone levels sent from DPS in advance of Mrs. Zayre-Brown's visit had been incorrectly calibrated to male hormone target ranges, resulting in mislabeling of the lab values, and that Mrs. Zayre-Brown's hormone levels were below the target female range.

80.     On or around January 26, 2019, Mrs. Zayre-Brown ran out of her prescribed hormone therapy medication and a refill was not issued. Upon information and belief, DPS did not administer Mrs. Zayre-Brown her prescribed hormone therapy for approximately five days prior to her appointment with Dr. Pou.

81.     Following the January 31, 2019 appointment, Dr. Pou informed DPS providers about the lab results and instructed that Mrs. Zayre-Brown's hormone therapy should not be withheld without a medical justification.

82. On April 15, 2019, Mrs. Zayre-Brown had an appointment with Dr. Pou for maintenance of her hormone therapy. Dr. Pou noted at this appointment that DPS failed to provide her with the requested labs necessary to evaluate the efficacy of Mrs. Zayre-Brown's hormone therapy regimen.

83. On July 9, 2020, Mrs. Zayre-Brown had a hormone therapy maintenance appointment at UNC Endocrinology with Dr. Donald Caraccio. Although Mrs. Zayre-Brown had routinely attended hormone therapy maintenance appointments roughly every three months to monitor and assess the efficacy of her hormone therapy, after this appointment, no further maintenance appointments were scheduled for Mrs. Zayre-Brown for the remainder of 2020.

84. Mrs. Zayre-Brown was transferred to Anson CI on August 15, 2020. Upon information and belief, Mrs. Zayre-Brown was not provided hormone therapy for at least two weeks following her transfer. Though Anson CI staff eventually reinitiated Mrs. Zayre-Brown's hormone therapy, the efficacy of her hormone therapy went unmonitored for several months.

85. As detailed further *infra,* from fall of 2020 through spring of 2021, Mrs. Zayre-Brown filed numerous requests for information as well as an emergency grievance to Defendant Ishee seeking, among other things, an endocrinology appointment to maintain her hormone therapy, and noting her worsening gender dysphoria as a result of the unwanted physical effects caused by her unregulated hormones.

86. On May 28, 2021, Mrs. Zayre-Brown's counsel issued a demand letter to DPS General Counsel seeking, among other things, an endocrinologist appointment for maintenance of Mrs. Zayre-Brown's hormone therapy.

87. On June 10, 2021, Mrs. Zayre-Brown had an appointment with Dr. Caraccio via telehealth to discuss the severe mental health symptoms she was experiencing because of her gender dysphoria. This was Mrs. Zayre-Brown's first hormone therapy maintenance appointment since July 9, 2020.

88. Mrs. Zayre-Brown expressed that she felt like she was not receiving adequate hormone therapy and the lack of adequate hormone therapy was contributing to her worsening mental health. Dr. Caraccio could make no determinations about the adequacy of hormone therapy, however, because DPS had not had labs drawn and sent them to Dr. Caraccio before the appointment.

89. In July 2021, after DPS finally sent labs to Dr. Caraccio, it was determined that Mrs. Zayre-Brown's hormone levels were again not within target range and that her hormone therapy treatment needed to be altered to be effective.

B. *Denial of Gender-Affirming Surgery*

90. Mrs. Zayre-Brown made her first inquiry to DPS about the gender-affirming genital surgery she required for treatment of her gender dysphoria on November 27, 2017, and Mrs. Zayre-Brown started requesting gender-affirming surgery from DPS through formal channels on November 7, 2018. Since then, DPS has repeatedly delayed, deferred, and denied Mrs. Zayre-Brown's requests for gender-affirming surgery without sufficient medical justification and on non-medical grounds.

24

91.    On November 7, 2018, Mrs. Zayre-Brown made her first request for gender-affirming surgery for the treatment of gender dysphoria through a sick call while housed at Harnett CI.

92.    On December 7, 2018, Mrs. Zayre-Brown submitted a request for gender-affirming surgery to the FTARC at Harnett CI.

93.    On January 7, 2019, in advance of a January 11, 2019 Harnett CI FTARC meeting, Mrs. Zayre-Brown was evaluated for gender-affirming surgery by Dr. Umesi, who submitted a Utilization Review ("UR") request for "[f]ull genital gender-affirming surgery," noting that this was the next step in her treatment plan prior to incarceration and that her previous genital surgery was performed in accordance with the SOC.

94.    Upon information and belief, on or around January 11, 2019, the Harnett CI FTARC reviewed Mrs. Zayre-Brown's request for gender-affirming surgery and indicated that gender-affirming surgery was "not recommended" but did not provide any rationale. The Harnett CI FTARC referred the request and its recommendation to the DTARC.

95.    Beginning in or around February of 2019, DTARC repeatedly "deferred" Mrs. Zayre-Brown's request for gender-affirming surgery for decision at a later date, and without referral for a consultation with a health care provider competent in the treatment of gender dysphoria.

96.    Mrs. Zayre-Brown made repeated inquiries and expressed distress to medical and mental health providers at Harnett CI and Warren Correctional Institution

("Warren CI"), where she was transferred in March of 2019, regarding the status of her request for gender-affirming surgery.

97.     On April 15, 2019, at a hormone therapy maintenance appointment with Dr. Pou, Mrs. Zayre-Brown expressed to Dr. Pou that she needed gender-affirming surgery.

98.     At this same appointment, Dr. Pou referred Mrs. Zayre-Brown to Dr. Brad Figler, a urologist with UNC Urology and surgical provider in the UNC Transgender Health Program. Dr. Figler performs a range of gender-affirming surgeries, including the gender-affirming genital surgery that Mrs. Zayre-Brown needs.

99.     Upon information and belief, Dr. Figler's office contacted Warren CI, but the facility declined his assistance, asserting lack of knowledge about the desire for a consultation.

100.    On July 8, 2019, Mrs. Zayre-Brown had another hormone therapy maintenance appointment with Dr. Pou. Following that appointment, Dr. Pou again referred Mrs. Zayre-Brown for consultation for gender-affirming surgery with Dr. Figler. Dr. Pou requested that DPS contact Dr. Figler's office directly and arrange a consultation for gender-affirming surgery "ASAP."

101.    Multiple DPS medical and mental health providers for Mrs. Zayre-Brown— including Physician's Assistant Gloria Harvey, Nurse Caroline Fleming, Defendant Agarwal, Dr. Anita Wilson, and Dr. Patricia Hahn—were aware of Dr. Pou's recommendations and referred Dr. Pou's recommendation for a consultation with Dr. Figler to DTARC for review.

102.     Mrs. Zayre-Brown expressed extreme distress to her mental health providers, including Dr. Hahn, caused by the lack of response from DTARC to her requests for gender-affirming surgery. The severity of Mrs. Zayre-Brown's distress culminated in her being taken to the emergency room on August 6, 2019. She was subsequently placed on suicide watch.

103.     On August 15, 2019, Mrs. Zayre-Brown was transferred to Anson CI. On August 21, 2019, DTARC again "deferred" Mrs. Zayre-Brown's December 7, 2018 request for gender-affirming surgery. The DTARC report stated that it was deferring Mrs. Zayre-Brown's request for gender-affirming surgery, inaccurately asserting both that Mrs. Zayre-Brown had "successfully completed gender reassignment surgically" and that "[v]aginoplasty is an elective procedure which is not medically necessary for reassignment." The DTARC report also asserted that "[c]urrent staffing and resources does [sic] not allow for the proper post-operative care of this procedure." While designating its decision as a deferral, DTARC's decision was a denial of Mrs. Zayre-Brown's request for gender-affirming surgery.

104.     After learning of DTARC's decision, Mrs. Zayre-Brown initiated the administrative remedy process to appeal DTARC's denial by filing a grievance using form DC-410 on October 27, 2019. In her Grievance Statement, Mrs. Zayre-Brown noted that gender-affirming care—including surgery—is medically necessary for the treatment of her gender dysphoria and cited to the DPS Policy for Transgender Prisoners regarding the appropriate procedure for review. On October 30, 2019, DPS

accepted this grievance for review and assigned it the Grievance No. 4575-2019-JPODA-13296.

105.   On November 22, 2019, DPS issued a Step One Unit Response to Grievance No. 4575-2019-JPODA-13296 stating that Mrs. Zayre-Brown's request for gender-affirming surgery had been "reviewed by the DTARC committee in compliance with the Transgender Accommodation policy and procedure. Decisions rendered have been based on current policy and relevant factors taken under consideration."

106.   Mrs. Zayre-Brown appealed Grievance No. 4575-2019-JPODA-13296 to Step Two on or around November 22, 2019.

107.   On December 3, 2019, DPS issued a Step 2 Area/Complex/Institution Response to Grievance No. 4575-2019-JPODA-13296 reiterating that Mrs. Zayre-Brown's request for gender-affirming surgery had been "reviewed by the D-TARC in compliance with the Transgender Accommodation policy and procedure. Decisions rendered have been based on current policy and relevant factors taken under consideration."

108.   Mrs. Zayre-Brown appealed Grievance No. 4575-2019-JPODA-13296 to the Secretary of DPS (Step Three) on December 3, 2019.

109.   On January 2, 2020, the Inmate Grievance Resolution Board ("IGRB") issued a Step Three Administrative Remedy Response dismissing the final step of Grievance No. 4575-2019-JPODA-13296 as resolved. The Findings and Disposition Order stated: "it appears that medical staff have seen and treated this offender within the parameters of the Health Care Policy. The disagreement of the offender with that of

28

trained medical professionals does not render the professionals' judgment incompetent nor does it signify any indifference to the offender's medical care." The IGRB found that because the most current iteration of the DPS Policy for Transgender Prisoners did not go into effect until August 22, 2020–the day after DTARC's decision was rendered—there was no requirement for any Director to review DTARC's decision.

110. On January 15, 2020, Mrs. Zayre-Brown submitted a request for re-consideration for gender-affirming surgery to the Anson CI FTARC under the then-current DPS Policy for Transgender Prisoners.

111. On or around February 7, 2020, the Anson CI FTARC construed Mrs. Zayre-Brown's request for re-consideration as a request for an Accommodation Update under the DPS Policy for Transgender Prisoners, noted Mrs. Zayre-Brown's desire to appeal DTARC's previous decision denying her gender-affirming surgery, and referred the request to DTARC.

112. On or around May 21, 2020, DTARC met to discuss Mrs. Zayre-Brown's January 15, 2020 request for reconsideration for gender-affirming surgery. Following re-consideration, the DTARC report stated that no determination would be made until after "an in-person consultation with an OBGYN surgical specialist with experience in gender affirming surgery." Defendant Junker and Defendant Harris concurred with DTARC's recommendation and directed DTARC "to review consultation results to reconsider the request for accommodation to include rationale that any proposed surgery is supported as medically necessary."

29

113.   Upon information and belief, a consultation with a provider outside of DPS has to be submitted and approved through a UR request by a DPS medical provider. Upon information and belief, DPS provider Jennifer Norris, NP and Medical Records Assistant Deloise Hildreth submitted UR Requests between July 1 and July 13, 2020 for a consult with Dr. Figler at UNC.

114.   Upon information and belief, on July 23, 2020, Mrs. Zayre-Brown's DPS provider Norris and Medical Records Assistant Hildreth submitted a UR Request for Mrs. Zayre-Brown to have a telephone interview with the coordinator for the UNC Transgender Health Program. This interview was required in order to schedule an in-person consultation for gender-affirming surgery with Dr. Figler. Mrs. Zayre-Brown had this telephonic interview on August 8, 2020. No in-person consultation with Dr. Figler was scheduled at that time, however.

115.   On or around August 27, 2020, DTARC met again to review Mrs. Zayre-Brown's January 2020 request for reconsideration and reissued its approval for a consultation with a specialist with experience in gender-affirming surgery. DTARC noted that Mrs. Zayre-Brown had spoken with the UNC coordinator by phone as necessary, and that an appointment for in-person consultation with the surgeon was "pending scheduling."

116.   Despite Mrs. Zayre-Brown's repeated inquiries, no surgical consultation was scheduled before the next DTARC meeting on November 12, 2020. At that meeting, DTARC noted that Defendant Catlett would seek to follow up with the UNC Transgender Health Program.

117. In December of 2020, Mrs. Zayre-Brown was admitted to the inpatient mental health facility at the North Carolina Institution for Women after expressing an urge to self-mutilate her genitals, suicidal ideation, and extreme hopelessness due to her persistent gender dysphoria and DPS's refusal to provide her with the gender-affirming surgery she needs. After returning to Anson CI in January of 2021, Mrs. Zayre-Brown renewed her inquiries about the consultation for gender-affirming surgery and also inquired about her hormone therapy maintenance appointments.

118. In or around February of 2021, Mrs. Zayre-Brown sent an emergency grievance to Defendant Ishee, per DPS Administrative Remedy Procedures, noting that she had made nearly 50 requests for medically necessary treatment for her gender dysphoria since July of 2020, that she had been without a hormone therapy maintenance appointment for more than 200 days, and that she was very concerned about her worsening mental health and resulting urges to self-mutilate her genitals.

119. Upon information and belief, Defendant Ishee did not respond to Mrs. Zayre-Brown's emergency grievance.

120. On or around February 25, 2021, DTARC again met to review Mrs. Zayre-Brown's January 2020 request for reconsideration for gender-affirming surgery. DTARC reported that Defendant Catlett had been notified that Mrs. Zayre-Brown would need to meet with the UNC Transgender Health Program Management Team prior to a surgical consultation with Dr. Figler and that Defendant Catlett had "requested additional details of what the meeting . . . would entail."

121. In or around March through around early May 2021, without any communications from DPS related to her requests for gender-affirming surgery, Mrs. Zayre-Brown became increasingly distressed and began to experience thoughts of self-harm more frequently.

122. Upon information and belief, Mrs. Zayre-Brown met with Katherine Croft of the UNC Transgender Health Program to discuss treatment options via telehealth on May 25, 2021, as the final prerequisite for a surgical consultation with Dr. Figler. Following this appointment, however, DPS did not schedule the surgical consultation with Dr. Figler for Mrs. Zayre-Brown.

123. On May 28, 2021, counsel for Mrs. Zayre-Brown issued a demand letter to the DPS general counsel seeking the requested surgical consultation with UNC Urology for evaluation for gender-affirming surgery and all medically necessary treatment for Mrs. Zayre-Brown's gender dysphoria.

124. On July 12, 2021, Mrs. Zayre-Brown finally had an in-person consultation with Dr. Figler at the UNC Transgender Health Program–two-and-a-half years after her initial request for gender-affirming surgery and more than a year after approval for the consultation by DTARC.

125. During her consultation, Dr. Figler and Mrs. Zayre-Brown further discussed gender-affirming genital surgical options for the treatment of gender dysphoria. Recognizing that treatment of gender dysphoria is individualized for each patient, and taking into account Mrs. Zayre-Brown's need for immediate relief of her extreme

and increasing distress related to her genitalia, Dr. Figler recommended that Mrs. Zayre-Brown receive a gender affirming vulvoplasty.

126.    Dr. Figler indicated that, but for a recommendation of weight loss prior to surgery, Mrs. Zayre-Brown satisfied the WPATH criteria for the gender-affirming surgery and he stated that a vulvoplasty was necessary in her case as the next step in Mrs. Zayre-Brown's treatment plan for her gender dysphoria, a plan with which Mrs. Zayre-Brown agreed.

127.    Upon information and belief, Dr. Figler's recommendation was communicated to DPS.

128.    In or around the first week of September of 2021, Mrs. Zayre-Brown met the goal weight recommended by Dr. Figler for gender-affirming surgery.

129.    Despite having achieved the goal weight recommended for surgery and despite the recommendations of health care providers directly involved in treating Mrs. Zayre-Brown's gender dysphoria—including Dr. Pou as early as July, 2019, Dr. Hahn, and the providers at UNC's Transgender Health Program—on September 8, 2021, Dr. Elton Amos deferred the UR request submitted by provider Norris and Medical Records Assistant Hildreth to schedule Mrs. Zayre-Brown's gender-affirming surgery. He noted in comments, "ELECTIVE PROCEDURES NOT APPROVED."

130.    On October 20, 2021, in a Transgender Accommodation Summary, DPS provider Jennifer Dula, MSW, noted:

> Based on the review of her records and the current assessment, it appears the next appropriate step for Ms. Brown is to undergo trans-feminine bottom surgery. The surgery will help her make significant progress in further

> treatment of her gender dysphoria. Ms Brown is psychologically stable to undergo this surgery and will be able to access post op care at an appropriate DPS facility . . . . Review of . . . all medical consultations with UNC Trans Health show that the risks, benefits and alternatives of this surgery have been reviewed with Ms. Brown, and she showed an excellent understanding during those consultations and this evaluation. She has demonstrated the ability to make an informed decision about undertaking surgery. In summary, Ms. Brown has met the WPATH criteria and is an appropriate candidate for surgery.

131.  In reference to a consultation on October 21, 2021, Dr. Caraccio noted, "Regarding desire for vulvaplasty [sic], this is medically necessary part of treatment for this patient. She has been treated with hormones since 2012 and orchiectomy in 2017, with persistent symptoms of gender dysphoria."

132.  On October 4, 2021, Ms Zayre-Brown filed another grievance seeking gender-affirming vulvoplasty and transfer to NCCIW to be closer to providers competent to treat her gender dysphoria, noting that she had achieved the weight loss recommended to undergo gender-affirming surgery, and reiterating that the surgery was medically necessary to treat her gender dysphoria, despite Dr. Amos's deferral inaccurately characterizing the procedure as "elective." In a Screening Response issued on October 11, 2021, DPS indicated that it received the grievance on October 7, 2021, that it had been accepted, and that it would begin a review process. The October 4, 2021 grievance was assigned Grievance No. 4575-2021-LPODF-19705.

133.  On October 15, 2021, despite the previous response indicating that Grievance No. 4575-2021-LPODF-19705 had been accepted for review, DPS issued another screening response indicating that Grievance No. 4575-2021-LPODF-19705 had been

rejected pursuant to Section .0306 of the Administrative Remedy Procedure because it "requested a remedy for more than one incident."

134.    On November 4, 2021, Mrs. Zayre-Brown submitted yet another grievance seeking gender-affirming surgery and transfer to NCCIW to be closer to providers competent to treat her gender dysphoria, that, upon information and belief, was substantially similar to Grievance No. 4575-2021-LPODF-19705. In a Screening Response issued on November 13, 2021, DPS indicated that it received the grievance on November 10, 2021, that it had been accepted, and that it would begin a review process. The November 4, 2021 grievance was assigned Grievance No. 4575-2021-LPODE-20189.

135.    On November 28, 2021, DPS issued a Step One Unit Response to Grievance No. 4575-2021-LPODE-20189 noting: "According to the electronic health record, the Utilization Review Request that was placed for this procedure on 8/18/21 was deferred on 9/8/2021." Upon information and belief, Mrs. Zayre-Brown received this response on November 29, 2021, and appealed Grievance No. 4575-2021-LPODE-20189 to Step Two on or around November 30, 2021.

136.    On December 16, 2021, DPS issued a Step Two Area/Complex/Institution Response to Grievance No. 4575-2021-LPODE-20189 stating that on September 28, 2021 "[i]t was indicated that the surgery was an elective procedure and not approved, however it was deferred. It was noted that your case is to be reviewed at the end of January 2022 at the next scheduled DTARC Meeting." The response further noted that Mrs. Zayre-Brown was "on the backlog" transfer to NCCIW, contingent on

35

"several factors." The response did not specify these factors, but simply noted "one of the main factors will be your behavior." Mrs. Zayre-Brown appealed Grievance No. 4575-2021-LPODE-20189 to Step Three on December 17, 2021.

137.    On January 18, 2022, the IGRB issued a Step Three Administrative Remedy Response to Grievance No. 4575-2021-LPODE-20189 stating that "prison staff have taken appropriate action to address and resolve the offender's concerns voiced in the grievance" and reiterating that Mrs. Zayre-Brown's surgical request was scheduled for review "at the end of January at the next DTARC meeting." The IGRB dismissed Grievance No. 4575-2021-LPODE-20189 as resolved.

138.    Upon information and belief, DTARC did not meet in January of 2022 and no explanation as to why has been provided to Mrs. Zayre-Brown.

139.    Upon information and belief, at some point between February 17 and April 26, 2022, DTARC recommended that Mrs. Zayre-Brown be denied gender-affirming vulvoplasty as not medically necessary, and Defendants Junker and Harris agreed, despite the contrary determinations of her direct providers, including Ms. Dula, MSW, Dr. Caraccio, and Dr. Figler. This denial was conveyed to Mrs. Zayre-Brown on April 26, 2022.[16]

140.    DTARC members have repeatedly deferred or declined to timely approve decisions on appropriate consultations for medically necessary treatment,

---

[16] These events were discovered or took place on the eve of filing, and following Mrs. Zayre-Brown's verification of the facts of this Complaint. Accordingly, Plaintiff's accompanying verification does not purport to verify any facts contained in this paragraph or that have occurred after her April 25, 2022 verification.

unnecessarily prolonging and worsening Mrs. Zayre-Brown's life-threatening mental and emotional distress as a result of her severe gender dysphoria.

141.    The DPS Policy for Transgender Prisoners allows the DTARC, Defendant Harris, and Defendant Junker to delay action on—or override entirely—determinations of medical necessity made by Mrs. Zayre-Brown's qualified medical and mental health providers. It also creates medically unjustified obstacles to the provision of care for individuals like Mrs. Zayre-Brown who are suffering from gender dysphoria, simply on the basis of their specific medical condition and disability. DPS's implementation of this policy has led and continues to lead to unnecessary suffering constituting cruel and unusual punishment.

142.    As a result of Mrs. Zayre-Brown's repeated requests and the recommendations from her medical providers both inside and outside DPS, Defendants have been deliberately indifferent to Mrs. Zayre-Brown's serious medical needs for treatment of gender dysphoria.

143.    Due to Defendants' discriminatory treatment of Mrs. Zayre-Brown on the basis of her disability and their deliberate indifference to Mrs. Zayre-Brown's serious medical needs, she has suffered, and will continue to suffer irreparable harm, including severe mental and emotional distress, anxiety, depression, suicidal ideation, and self-injury.

## COUNT I

## Cruel and Unusual Punishment
## in Violation of the Eighth Amendment to the U.S. Constitution

*Against Defendants Buffaloe, Ishee, Junker, Harris, Campbell,*
*Catlett, Peiper, Sheitman, Langley, Agarwal, Cobb, Panter, Williams,*
*and Amos in their official capacities for declaratory and injunctive*
*relief*

144.    Mrs. Zayre-Brown incorporates the allegations in all preceding paragraphs as if stated fully herein.

145.    Defendants Buffaloe, Ishee, Junker, Harris, Campbell, Catlett, Peiper, Sheitman, Langley, Agarwal, Cobb, Panter, Williams, and Amos are each responsible for providing adequate and necessary medical treatment for Mrs. Zayre-Brown's gender dysphoria.

146.    Each of these Defendants know of and enforce the DPS Policy for Transgender Prisoner's procedures.

147.    Mrs. Zayre-Brown's gender dysphoria is an objectively serious medical condition necessitating treatment.

148.    Consistent hormone therapy is, and for years has been, medically necessary to adequately treat Mrs. Zayre-Brown's gender dysphoria.

149.    Gender-affirming surgery including vulvoplasty is, and has long been, medically necessary to treat Mrs. Zayre-Brown's gender dysphoria.

150.    Each of these Defendants know that Mrs. Zayre-Brown is a transgender woman suffering from gender dysphoria, that her current and previous healthcare has failed to adequately treat her gender dysphoria, and that Mrs. Zayre-Brown has

not received the gender-affirming surgery she requires to alleviate her gender dysphoria.

151. Each of these Defendants know that Mrs. Zayre-Brown's medical providers—including providers to whom DPS referred Mrs. Zayre-Brown—have determined gender-affirming surgery to be medically necessary to treat Mrs. Zayre-Brown's serious medical condition, gender dysphoria.

152. Each of these Defendants have long known that failure to adequately treat Mrs. Zayre-Brown's gender dysphoria has caused her serious harm and that there continues to be a substantial risk of further serious harm for as long as her receipt of additional gender-affirming surgery is delayed or denied.

153. Each of these Defendants' conscious disregard for the past harms and the substantial risk of future harm facing Mrs. Zayre-Brown violates all standards of decency, is grossly deficient medical care, will only exacerbate or prolong her pain, and constitutes deliberate indifference to serious medical needs in violation of the Eighth Amendment.

154. Each of these Defendants, by engaging in the aforementioned acts and omissions and in ratifying such acts or omissions, acted with willful and conscious disregard of the rights, welfare, and safety of Mrs. Zayre-Brown.

## COUNT II

## Cruel or Unusual Punishment
## in Violation of N.C. Const. Art. I, Section 27

*Against Defendant North Carolina Department of Public Safety and Defendants Buffaloe, Ishee, Junker, Harris, Campbell, Catlett, Peiper, Sheitman, Langley, Agarwal, Cobb, Panter, Williams, and Amos in their official capacities for declaratory and injunctive relief and damages*

155.    Mrs. Zayre-Brown incorporates the allegations in all preceding paragraphs as if stated fully herein.

156.    North Carolina's constitutional prohibition on "cruel or unusual punishments" provides at least the same level of protection as the Eighth Amendment. *See State v. Jackson*, 348 N.C. 644, 648, 503 S.E.2d 101, 103 (1998). The North Carolina Supreme Court has stated that "[o]ur state constitutional provision emphasizes the importance of this interest in North Carolina." *Medley v. N.C. Dep't of Correction*, 330 N.C. 837, 844, 412 S.E.2d 654, 659 (1992).

157.    For the same reasons alleged in Count I of this complaint, Defendants have been deliberately indifferent to Plaintiff's serious medical need in violation the state Constitution.

158.    Plaintiff has no other adequate remedy under state law for the violation of her state constitutional right to be free from cruel or unusual punishment.

40

## COUNT III

## Discrimination on the Basis of Disability
## in Violation of the Americans with Disabilities Act, 42 U.S.C. §12101 *et seq.*

*Against Defendant North Carolina Department of Public Safety for declaratory and injunctive relief and damages*

159.   Mrs. Zayre-Brown incorporates the allegations in all preceding paragraphs as if stated fully herein.

160.   The Americans with Disabilities Act (ADA) prohibits public entities from discriminating against persons with disabilities in their programs, services, and activities and from excluding persons with disabilities from participation in, or denying them the benefits of, the services, programs, or activities of such a public entity. 42. U.S.C. §§ 12131-12134.

161.   Defendant DPS is a "public entity" as defined by the ADA.

162.   Based on her diagnosis of gender dysphoria, which has been recognized and documented by DPS, Mrs. Zayre-Brown is a person with a "disability" within the meaning and scope of 42 U.S.C. § 12102. Mrs. Zayre-Brown's gender dysphoria is the result of a physical impairment that has caused parts of her anatomy to be in conflict with her gender identity, resulting in severe distress and substantial limitations on her major life activities of interacting with others, social functioning, thinking, caring for herself, and ensuring her safety.

163.   DPS provides healthcare and accommodations to prisoners with disabilities other than gender dysphoria.

164. Mrs. Zayre-Brown is "a qualified individual with a disability" under the ADA because she is incarcerated in DPS's facilities. She is therefore "eligible" to participate in DPS's programs, services, and activities: indeed, she is required to participate in prison life because she is being held in prison against her will. However, DPS is failing to provide Mrs. Zayre-Brown equal access to prison life, on the basis of her disability and DPS's failure to accommodate it. DPS is failing to make reasonable modifications to its rules, policies, or practices, necessary to accommodate her disability and provide her an equal opportunity to participate safely, fully, and equally in prison life, including an equal opportunity to receive needed healthcare.

165. DPS has discriminated against and continues to discriminate against Mrs. Zayre-Brown in violation of both the ADA by maintaining policies, practices, and procedures that deny her access to treatment and support needed to treat and manage her disability, causing her ongoing harm solely because of her disability. By withholding medically necessary treatment that will likely cure her disability of gender dysphoria. DPS is violating the ADA because it excludes Mrs. Zayre-Brown from, and denies her the benefits of, the health care programs operated by DPS, because of her disability.

166. DPS further has discriminated against and continues to discriminate against Mrs. Zayre-Brown in violation of the ADA by failing to provide proper and reasonable training to custody and health staff in responding to persons diagnosed with gender dysphoria.

167.    DPS has acted and continues to act with intent to discriminate against Mrs. Zayre-Brown based on her disability. DPS knew and knows that the harms to Mrs. Zayre-Brown's federally protected rights under the ADA were substantially likely and failed and continues to fail to act to not infringe those rights, thereby acting with deliberate indifference toward Mrs. Zayre-Brown's federally protected rights.

168.    As a direct and legal result of DPS's actions and omissions, Mrs. Zayre-Brown has suffered and continues to suffer damages including, without limitation, pain and suffering and emotional, psychological, and physical distress.

## COUNT IV

### Discrimination on the Basis of Disability
### in Violation of Section 504 of the Rehabilitation Act, 29 U.S.C. §794a

*Against Defendant North Carolina Department of Public Safety for declaratory and injunctive relief and damages*

169.    Mrs. Zayre-Brown incorporates the allegations in all preceding paragraphs as if stated fully herein.

170.    Section 504 of the Rehabilitation Act of 1973 prohibits an otherwise qualified individual with a disability being excluded from participation in, being denied the benefits of, or being subjected to discrimination under any program or activity receiving Federal financial assistance, solely by reason of the individual's disability. 29 U.S.C. §794a.

171.    Defendant DPS receives federal financial assistance, as defined by the Rehab Act.

43

172.   Based on her diagnosis of gender dysphoria, which has been recognized and documented by DPS, Mrs. Zayre-Brown is a person with a "disability" within the meaning and scope of 29 U.S.C. § 705(9)(B). Mrs. Zayre-Brown's gender dysphoria is the result of a physical impairment that has caused parts of her anatomy to be in conflict with her gender identity, resulting in severe distress and substantial limitations on her major life activities of interacting with others, social functioning, thinking, caring for herself, and ensuring her safety.

173.   DPS provides healthcare and accommodations to prisoners with disabilities other than gender dysphoria.

174.   Mrs. Zayre-Brown is "a qualified individual with a disability" under the Rehab Act because she is incarcerated in DPS's facilities. She is therefore "eligible" to participate in DPS's programs, services, and activities: indeed, she is required to participate in prison life because she is being held in prison against her will. However, DPS is failing to provide Mrs. Zayre-Brown equal access to prison life, on the basis of her disability and DPS's failure to accommodate it. DPS is failing to make reasonable modifications to it rules, policies, or practices, necessary to accommodate her disability and provide her an equal opportunity to participate safely, fully, and equally in prison life, including an equal opportunity to receive healthcare.

175.   DPS has discriminated against and continues to discriminate against Mrs. Zayre-Brown in violation of the Rehab Act by maintaining policies, practices, and procedures that deny her access to treatment and support needed to treat and manage her disability, causing her ongoing harm solely because of her disability. By

withholding medically necessary treatment that will likely cure her disability of gender dysphoria, DPS is violating the Rehab Act because it excludes Mrs. Zayre-Brown from, and denies her the benefits of, the health care programs operated by DPS, solely because of her disability.

176.   DPS further has discriminated against and continues to discriminate against Mrs. Zayre-Brown in violation of the Rehab Act by failing to provide proper and reasonable training to custody and health staff in responding to persons diagnosed with gender dysphoria.

177.   DPS has acted and continues to act with intent to discriminate against Mrs. Zayre-Brown solely based on her disability. DPS knew and knows that the harms to Mrs. Zayre-Brown's federally protected rights under the Rehab Act were substantially likely and failed and continues to fail to act to not infringe those rights, thereby acting with deliberate indifference toward Mrs. Zayre-Brown's federally protected rights.

178.   As a direct and legal result of DPS's actions and omissions, Mrs. Zayre-Brown has suffered and continues to suffer damages including, without limitation, pain and suffering and emotional, psychological, and physical distress.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Kanautica Zayre-Brown respectfully requests entry of judgment in her favor and against Defendants, granting the following relief:

A. Preliminary and permanent injunctions requiring Defendants to provide Plaintiff with necessary medical care and accommodations for her gender dysphoria, including use of gender-consistent terminology, consistent hormone therapy maintenance, and prompt provision of gender-affirming vulvoplasty;

B. A declaration that Defendants' practices in obstructing and denying Plaintiff and other similarly situated prisoners adequate and necessary medical treatment and accommodations for gender dysphoria are unconstitutional and unlawful;

C. Nominal and compensatory damages, in an amount to be determined at trial;

D. Plaintiff's costs, including reasonable attorneys' fees; and

E. Any further relief to which Plaintiff may be entitled.

Respectfully submitted this the 28th day of April, 2022.

/s/ Jaclyn A. Maffetore
Jaclyn A. Maffetore
NC Bar No. 50849
Daniel K. Siegel
NC Bar No. 46397
Michele Delgado*
NC Bar No. 50661
ACLU OF NORTH CAROLINA

46

LEGAL FOUNDATION
P.O. Box 28004
Raleigh, NC 27611-8004
Tel: (919) 834-3466
Fax: (919) 869-2075
jmaffetore@acluofnc.org
dsiegel@acluofnc.org
mdelgado@acluofnc.org

*admission forthcoming

Christopher A. Brook
NC Bar No. 33838
PATTERSON HARKAVY LLP
100 Europa Drive, Suite 420
Chapel Hill, NC 27517
Tel: (919) 942-5200
Fax: (866) 397-8671
cbrook@pathlaw.com

Jon W. Davidson*
(admitted only in California)
Taylor Brown*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004-2400
Tel: (212) 519-7887
Fax: (212) 549-2650
jondavidson@aclu.org
tbrown@aclu.org

*pro hac vice admission
forthcoming

*Attorneys for Plaintiff
Kanautica Zayre-Brown*

47

## VERIFICATION

I, Kanautica P. Zayre-Brown, verify under penalty of perjury under the laws of the United States of America that the factual statements in the foregoing Complaint concerning myself, my activities, and my intentions are true and correct of my own personal knowledge.

Executed on 25 April , 2022.

_____
Kanautica P. Zayre-Brown