THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
NO. 3:22-cv-191

| | | |
|---|---|---|
| KANAUTICA ZAYRE-BROWN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **DEFENDANTS'** |
| | ) | **RESPONSE TO MOTION FOR** |
| NORTH CAROLINA DEPARTMENT OF | ) | **PRELIMINARY INJUNCTION** |
| PUBLIC SAFETY, et al., | ) | |
| | ) | |
| Defendant. | ) | |

Plaintiff's motion for preliminary injunction fails for two reasons. First, Plaintiff argues for the application of a standard that is not consistent with the constitutional deliberate indifference standard for evaluating the provision of prison medical care. The prison is already providing the gender-affirming medical care that the Constitution requires, including hormone therapy and mental healthcare. Adopting Plaintiff's position, however, would change the scope and standard of care in prisons for all cases. Second, Plaintiff's request is premature because the Court has not yet had the opportunity to fully consider the serious and complex issues in this case.

## STATEMENT OF THE FACTS

Defendants have described the complaint's allegations in their motion to dismiss. (DE 10 at 1-5) In addition, Defendants provide the following facts for purposes of this response.

*Plaintiff's Incarceration*

For her most current term of incarceration, Plaintiff entered the custody of the North Carolina Department of Public Safety ("the Department") on October 10, 2017. (Mingo Aff. ¶ 3) She was sentenced to a minimum term of 7 years and 5 months and a maximum term of 9 years and 11 months based on convictions for obtaining property by false pretenses, two counts of

insurance fraud, and being a habitual felon. Plaintiff is scheduled to be released no later than November 2, 2024 (or sooner if she receives available credits).[1]

From October 10, 2017, until August 15, 2019, Plaintiff was housed in male facilities. (Mingo Aff. ¶¶ 3-8) She was transferred to an all-female unit at Anson Correctional Institution on August 15, 2019, where she is currently incarcerated. (*Id.* ¶ 9) The Department's records do not indicate that Plaintiff has ever reported any physical or sexual assault. (Mingo Aff. ¶ 12; Richardson Aff. ¶ 10)

*Incidents During Incarceration*

On March 2, 2019, while housed at Harnett (an all-male facility), Plaintiff was transported to the local emergency room after she was discovered in her bunk yelling and screaming that she was going to die. (Mingo Aff. ¶ 13) Plaintiff was taken to the sergeant's office where she vomited, and then became combative with staff as they took her to the medical unit. (*Id.*) During a medical screening, Plaintiff mentioned, more than once, being high – stating that she smoked something out of a pipe. (*Id.* ¶ 14) The on-call physician ordered Plaintiff transferred to the local emergency room. (*Id.* ¶ 14)

During transport, EMS personnel reported that Plaintiff was hysterical, kicking, and screaming. (Mingo ¶ 15) At the emergency room, Plaintiff was given a sedative, at which point medical records indicate that she reported that she was "only doing this to get" transferred to a female facility. (*Id.*) Plaintiff then refused a medical work up, including a blood test, signed an "against medical authorization" and demanded to be sent back to the facility. (*Id.*) Upon her return to Harnett, Plaintiff denied any suicidal ideation. (Mingo Aff. ¶ 16) Plaintiff was charged with

---

[1] This information is publicly available at https://www.ncdps.gov/dps-services/crime-data/offender-search.

2

multiple serious prison disciplinary offenses—she pled guilty to the charge of possession of a substance and the other charges were dismissed. (*Id*.)

On August 6, 2019, Plaintiff was again sent to the local emergency room after she was found in her bunk unresponsive but breathing. (Mingo Aff. ¶ 17) Staff at the facility suspected that Plaintiff may have been using an illicit substance known as K2. (*Id*.) At the medical unit, Plaintiff appeared to have vomited and reported that her mind was gone. (*Id*.) Medical staff ordered her taken to the local emergency room. (*Id*.)

At the local emergency room, Plaintiff reported that she was more stressed than normal, and connected that stress to an impending transfer to a female facility. (*Id*. ¶ 18) The hospital staff surmised that Plaintiff had passed out after an episode of nausea and vomiting and discharged her back to the facility after evaluation. (*Id*.) Upon her return from the emergency room, Plaintiff threatened self-harm due to not wanting to be placed in restrictive housing since staff had suspected her of using K2. (*Id*. ¶ 19) Thus, Plaintiff was placed on self-injurious behavior precautions. (*Id*.) Plaintiff was taken off self-injurious behavior precautions the next day, after she reported that she had a breakdown due to her impending transfer, attributed her increased emotionality to her "hormones," and affirmed that she never attempted suicide and values her life. (*Id*.)

On December 8, 2020, Plaintiff was placed in restrictive housing after an apparent assault on another incarcerated person. (Mingo Aff. ¶ 21; Richardson Aff. ¶ 7) On December 11, 2020, Plaintiff was sent to an inpatient mental health unit at the North Carolina Correctional Institute for Women ("NCCIW") following a voluntary transfer form executed by Plaintiff and one of her mental health providers. (*Id*. ¶ 22) Plaintiff reported that she felt bad and was trying to mutilate herself. (*Id*.) Plaintiff's mental health provider noted that a recent episode had increased Plaintiff's dysphoria, which had been getting worse since August. (*Id*.) Plaintiff reported isolating from others

and having thoughts of self-harm. (*Id.*) Within one day of being admitted to the inpatient mental health unit, Plaintiff denied thoughts of self-harm. (Mingo Aff. ¶ 23) Suicide watch was discontinued on December 14, 2020. (*Id.*) Thereafter, Plaintiff remained in the inpatient unit until December 30, 2020, during which time her medical records contain no reports of distress. (*Id.*) Plaintiff described her major stressor as feeling bullied by staff and other inmates at Anson. (*Id.*)

When Plaintiff learned that she would be sent back to Anson (an all-female facility) because she was not an appropriate candidate for long-term admission into the inpatient mental health unit, she began to threaten to kill herself if she was transferred back to Anson. (Mingo Aff. ¶ 24) Plaintiff articulated her desire to remain at NCCIW or be transferred to a different male facility rather than go back to Anson. (*Id.*) Plaintiff repeatedly threatened self-harm if she was forced to go back to Anson. (*Id.*) Plaintiff was transferred back to Anson on January 5, 2021. (*Id.*) There is no record of that Plaintiff attempted to harm herself upon her return to Anson. (*Id.*) Moreover, Anson has taken steps to ensure Plaintiff is treated appropriately at Anson. (Richardson Aff. ¶¶ 4-10)

### *Plaintiff's Gender Dysphoria*

In July 2017 (prior to the most recent incarceration), Plaintiff had an orchiectomy— surgical removal of the testes. (DE 1 ¶ 52; DE 13-2 ¶ 15) Plaintiff was incarcerated just over two months later, on October 10, 2017, at which time she advised correctional staff of her situation, and medical staff confirmed her diagnosis of gender dysphoria. (DE 1 ¶¶ 64-5; DE 13-2 ¶ 16) When Plaintiff entered custody, she was not presently on hormone replacement therapy ("HRT"). (Junker Aff. ¶ 13) Under the then applicable policy, Plaintiff initiated her request to begin HRT on December 21, 2017. (*Id.*) Plaintiff's request for HRT was ultimately approved and she began

HRT on June 29, 2018. (*Id.*) Plaintiff continues to receive HRT and regularly meets with an endocrinologist who monitors her hormone levels and manages the HRT.[2] (*Id.*)

Plaintiff first requested transfer to a female facility on January 11, 2019. (Junker Aff. ¶ 14) That request was denied by the Facility Transgender Accommodation Review Committee ("FTARC") and forwarded to the Division Transgender Accommodation Review Committee ("DTARC") for further consideration. (*Id.*) Because such a housing assignment had never been made, the Department had to study the issue and take security and other factors into consideration. (*Id.*) Ultimately, the request to transfer Plaintiff to a female facility was approved and she was transferred to an all-female unit on August 15, 2019. (*Id.*)

Plaintiff has had access to mental and behavioral health services at each facility in which she has been housed. (Junker Aff. ¶ 15) Plaintiff has been on the mental health caseload since November 11, 2017. (*Id.*) As a patient on the mental health caseload, Plaintiff regularly sees a licensed mental health provider. (*Id.*) Plaintiff has also had access to, and on occasion has utilized, emergency mental health services. (*Id.*)

*Plaintiff's Request for Surgery*

Plaintiff's request for surgery was evaluated by the DTARC. (Junker Aff. ¶ 17 & Ex. A thereto) Ultimately, the DTARC recommended against approving the request for surgery as it determined that the surgery was not necessary at that time. (Ex. A to Junker Aff. at 2-3) Defendants Junker and Harris agreed with the recommendation. (Junker Aff. ¶ 19)

Making an informed and well-considered determination on the type of request at issue in this litigation takes time and consideration from many high-level Department stakeholders who

---

[2] Any delay in initiating HRT, or gaps in providing access to certain hormones or specialists appointments, were at most due to inadvertent oversights, communication issues, challenges due to the COVID-19 pandemic, and staffing shortages. Such circumstances, however, cannot support a deliberate indifference claim, and would at most support allegations of negligence. Moreover, there are no allegations that these issues currently remain a concern.

have substantial responsibilities within the prison system. (Junker Aff. ¶ 16) The DTARC meets quarterly. (*Id.* ¶ 9) Additionally, when the DTARC does meet it reviews and considers multiple requests by other incarcerated individuals. (*Id.* ¶ 16) Thus, requests, particularly novel requests such as the one at issue in this case, require significant deliberation, may require additional information, and time. (*Id.*)

### *Plaintiff's Request for Preliminary Injunctive Relief*

On April 28, 2022, two days after receiving the denial from DTARC for the requested surgery, Plaintiff filed her complaint. On June 28, 2022, exactly two months after filing this action, and after Defendants moved to dismiss the same, Plaintiff first filed this motion for preliminary injunction. Plaintiff submits two declarations in support of her request – one from herself and one from a retained expert, Randi Ettner, Ph.D., an advocate for transgender persons and longtime WPATH board member who regularly testifies on behalf of transgender plaintiffs.

## LEGAL STANDARD

"A preliminary injunction is 'an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief' and may never be awarded 'as of right.'" *Mt. Valley Pipeline, LLC v. W. Pocahontas Props. Ltd. P'ship*, 918 F.3d 353, 366 (4th Cir. 2019) (citing *Winter v. NRDC, Inc.*, 555 U.S. 7, 22, 24 (2008)). The test for issuance of a preliminary injunction turns on the balance of the four *Winter* factors: likelihood of success on the merits; irreparable harm in the absence of an injunction; equities to the parties; and the public interest.

Plaintiffs have the burden of proof on each factor. *Winter*, 555 U.S. at 20. Additionally, a plaintiff must show that success on the merits is likely regardless of whether the balance of hardships weighs in his favor. *The Real Truth About Obama, Inc.* v. *F.E.C.,* 575 F.3d 342, 346

(4th Cir. 2009), *vacated on other grounds*, 559 U.S. 1089 (2010). This burden requires more than simply showing that "grave or serious questions are presented." *Id*. at 347.

The demanding standard outlined above becomes even more exacting when a plaintiff seeks a preliminary injunction that mandates action, as contrasted with the typical form of preliminary injunction that merely preserves the status quo pending trial. *See E. Tenn. Natural Gas Co. v. Sage*, 361 F.3d 808, 828 (4th Cir. 2004) (*quoting Wetzel v. Edwards*, 635 F.2d 283, 286 (4th Cir. 1980)) (noting that "mandatory preliminary injunctions . . . normally should be granted only in those circumstances when the exigencies of the situation demand such relief"). Accordingly, mandatory injunctions are disfavored. *Mt. Valley Pipeline, LLC v. 6.56 Acres*, 915 F.3d 197, 216 n.8 (4th Cir. 2019). The more exacting standard applies in this case because Plaintiff seeks to alter the status quo by requiring Defendants to provide her with gender-affirming surgery prior to a full determination on the merits.

## ARGUMENT

## I.      PLAINTIFF IS NOT LIKELY TO SUCCEED ON THE MERITS.

### A.  The Issue Before the Court is Whether Plaintiff is Likely to Succeed on the Merits of Her Claim that Denying Her Requested Gender Affirming Surgery Constitutes Deliberate Indifference.

Plaintiff's complaint and affidavit contain multiple allegations regarding the provision of care, including alleged lapses in hormone therapy (including at the outset of the pandemic) and a change in her mental health provider. But there is no dispute that Plaintiff has received and is currently receiving hormone therapy and mental health counseling. (DE 13-2 ¶ 45) Thus, these issues do not provide any basis for injunctive relief. Accordingly, Plaintiff's request for injunctive relief centers solely on the decision to not approve her requested surgery at this time, and that is the issue for the Court. (DE 14 at 2)

7

**B. Defendants' Pending Motion to Dismiss Demonstrates that Plaintiff is Not Likely to Succeed on the Merits.**

Defendants have moved to dismiss Plaintiff's claims. For the reasons set forth in detail in Defendants' motion to dismiss memorandum ("MTD Memo") (*see* DE 10, which is expressly incorporated herein), Plaintiff's claims fail on multiple grounds. First, Plaintiff filed this action before completing the grievance process; thus, her claim is barred by the Prison Litigation Reform Act. Second, the Eleventh Amendment bars any claim against the Department for a federal constitutional violation and against State officials for damages. Third, Plaintiff's state constitutional claim under *Corum* fails because there are other adequate state remedies. Fourth, Plaintiff fails to state a claim for relief under the Eighth Amendment or equivalent provision of the North Carolina Constitution, because she cannot establish objectively unreasonable harm or subjective deliberate indifference through the denial of surgery. While Plaintiff does not appear to base her request for injunctive relief on her claim for disability discrimination, that claim also fails.

**C. Plaintiff Cannot Make a Clear Showing of Likelihood of Success on the Merits with No Controlling Precedent or Consensus of Authority in Her Favor.**

The Fourth Circuit has not held that the denial of gender affirming surgery constitutes deliberate indifference in the Eighth Amendment context. In *De'Lonta v. Johnson*, 708 F.3d 520, 521 (4th Cir. 2013), the Fourth Circuit reversed the dismissal of an Eighth Amendment claim based on the denial of evaluation for gender affirming surgery under different facts (including known self-mutilation), but it expressly declined to decide on the merits whether the plaintiff had a valid claim for deliberate indifference based on the denial of surgery. *Id* at 526. Since *De'Lonta*, the Fourth Circuit has not decided the issue.

As discussed in Defendants' MTD Memo, multiple circuits that have directly addressed a deliberate indifference claim premised on the decision to not approve surgery and have found that

the provision of other treatment short of surgery is constitutionally adequate. *See Kosilek v. Spencer*, 774 F.3d 63 (1st Cir. 2014) (en banc) (holding that the state's decision to continue treating the plaintiff's gender dysphoria through other treatments, rather than authorizing surgery was a choice between two alternatives and thus cannot support a deliberate indifference claim); *Lamb v. Norwood*, 899 F.3d 1159 (10th Cir. 2018) (finding no error in granting summary judgment to prison officials on the claim of deliberate indifference for not approving surgery because the combination of existing treatment and the sparseness of the summary judgment record precluded an inference of deliberate indifference); *Gibson v. Collier*, 920 F.3d 212 (5th Cir. 2019) (affirming summary judgment because it was indisputable that the necessity and efficacy of surgery was a matter of significant disagreement within the medical community, and it could not be cruel and/or unusual to deny treatment that no other prison had ever provided). *See also Campbell v. Kallas*, 936 F.3d 536, 537 (7th Cir. 2019) (reversing the district court's denial of qualified immunity because at the time of the inmate's request for surgery, no case clearly established a right to gender-dysphoria treatment beyond hormone therapy).[3]

The only circuit to reach a different result is the Ninth Circuit in *Edmo v. Corizon, Inc.*, 935 F.3d 757 (9th Cir. 2019), *cert. denied,* 141 S. Ct. 610 (2020). There, the Ninth Circuit affirmed injunctive relief directing the state of Idaho to provide the plaintiff with surgery because the inmate established that such treatment was medically necessary and that in failing to provide the surgery, the correctional facility authorities were deliberately indifferent to her serious medical needs. *Id.* at 767. However, as discussed in Defendants' MTD Memo, *Edmo* is distinguishable from the

---

[3] Other decisions support the denial of injunctive relief here. *See, e.g., Doe v. Snyder,* 28 F.4th 103 (9th Cir. 2022) (affirming the denial of injunctive relief in the form of gender affirming surgery where plaintiff failed to establish medical necessity); *Baker v. Aetna Life Ins. Co.*, 260 F. Supp. 3d 694 (N.D. Tex. 2017) (finding that an insurance company correctly determined that breast augmentation surgery as part of gender transition was not medically necessary).

instant case including because it involved multiple known self-castration attempts and other psychical forms of self-harm.

Plaintiff also cites a handful of district court cases, none of which are controlling here. At least two of the cited cases also are factually distinguishable. *Hicklin v. Precynthe*, No. 4:16-cv-01357-NCC, 2018 U.S. Dist. LEXIS 21516, at *50 (E.D. Mo. Feb. 9, 2018), for instance, did not involve gender affirming surgery at all. There, the district court granted an injunction requiring hormone therapy, access to permanent body hair removal, and access to gender-affirming canteen items – interventions that are not at issue in the instant case. *Iglesias v. Fed. Bureau of Prisons*, No. 19-CV-415-NJR, 2021 U.S. Dist. LEXIS 245517 (S.D. Ill. Dec. 27, 2021), also involved different facts. There, the district court granted injunctive relief where the prison had provided no hormone therapy for twenty years, transferred the plaintiff to a female facility only after the lawsuit was filed, provided no response to plaintiff on a surgery request, and had categorical requirements for authorizing surgery that did not appear to be medically based.

Overall, without any controlling authority or at least a strong consensus of authority, Plaintiff cannot make a clear showing of likelihood of success on the merits. Thus, preliminary relief is not appropriate.

> **D. Plaintiff is Not Likely to Succeed Because She Has Not Established that the Decision to Not Approve Surgery at the Current Time Deprives Her of Constitutionally Required Medical Care.**

Plaintiff and her expert contend that because Plaintiff continues to experience dysphoria, and because the surgery is an intervention that may provide some relief, the intervention is medically necessary. Thus, Plaintiff argues, the State is constitutionally obligated to provide for the intervention. (DE 14 at 19) Plaintiff appears to define medical necessity as something that has "a therapeutic effect" and is not experimental. (DE 13-1 ¶¶ 49, 57-58) The Court should reject

Plaintiff's argument because it is legally unsupported and fails to consider practical implications, like the creation of an unworkable standard moving forward. Simply put, it cannot be the case that a prison system is deliberately indifferent anytime it does not approve a course of treatment where therapeutic benefits are questionable, particularly when reasonable providers may disagree about necessity under the circumstances.

### 1. Plaintiff's Proposed Standard is Inconsistent with the Level of Care Required By The Constitution.

At least one circuit has rejected the notion that "the Eighth Amendment requires the government—which is to say taxpayers—to fund any medical treatment that is 'psychologically pleasing' . . . . Necessity, not pleasure, is the constitutional standard—and no amount of massaging can make those two things the same. . . . The possibilities are endless." *Keohane v. Florida Dep't. of Corr. Sec'y.*, 952 F.3d 1257, 1274 n.9 (11th Cir.), *en banc review denied*, 981 F.3d 994 (11th Cir. 2020) and *cert. denied*, 142 S. Ct. 81 (2021).

In the instant case, Plaintiff, and her expert assert that provision of the surgery at this present time is "medically necessary" because there is therapeutic benefit. But that is not the standard applied when deciding whether the government is constitutionally required to provide that care.

As explained by Dr. Penn, Plaintiff's definition of "medical necessity" does not match the analysis performed by a state correctional institution when it decides whether it must provide for a particular intervention at a given time. (*See* Penn Aff. ¶¶ 35-47) In the prison context, courts have declined to find that the constitution requires the State to provide care that has the mere possibility of aiding a person's well-being, at the taxpayers' expense, regardless of cost.

"[S]ociety does not expect that [incarcerated individuals] will have unqualified access to health care." *Hudson v. McMillian*, 503 U.S. 1, 9 (1992). Thus, "not 'every claim by a[n

incarcerated person alleging] that he has not received adequate medical treatment" is an Eighth Amendment violation. *Thompson v. City of Charlotte*, No. 3:20-cv-370-MOC-DSC, 2020 U.S. Dist. LEXIS 223513, at *9 (W.D.N.C. Nov. 30, 2020) (quoting *Estelle v. Gamble*, 429 U.S. 97, 105, (1976). Accordingly, "[t]o find the prison officials liable, the treatment given must be so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Hixson v. Moran*, 1 F.4th 297, 303 (4th Cir. 2021) (cleaned up). "Once prison officials are aware of a serious medical need, they only need to 'respond[] reasonably to the risk.' *Hixson v. Moran*, 1 F.4th 297, 302 (U.S. 4th Cir. 2021) (quoting *Farmer v. Brennan*, 511 U.S. 825, 844 (1994). And "a prisoner is not entitled to receive the treatment of his choice." *Thompson*, 2020 U.S. Dist. LEXIS 223513, at *9. Moreover, as set forth in the MTD Memo, a disagreement regarding the appropriate course of treatment, as a matter of law, cannot support a deliberate indifference claim. *See* DE 10 at 16-18.

### 2. Plaintiff's Standard Fails to Account for the Practical Considerations of Providing Medical Care in a Correctional Setting.

Presumably to rebut the fact that the WPATH standards do not take the correctional context into account, Dr. Ettner contends that there should be no difference between how care is provided in the community as compared to correctional settings. (*See* DE 13-1 ¶ 30) This contention ignores the realities of providing health services in the carceral setting. For this reason alone, the Court should reject Plaintiff's proposed standard.

In the correctional setting, whether to approve a particular medical intervention turns on a host of considerations. (*See* Penn Aff. ¶¶ 35-47) Such considerations include the availability of qualified medical professionals, rates of patient satisfaction, effectiveness of alternative interventions, short and long-term continuity of care issues, risks of complications, implications of postponing the procedure, pre-operative and post-operative concerns and logistics, the costs of

the procedure, informed consent, and more. (*Id*.) These considerations take on added layers in the correctional setting that are not present in community. These considerations include the reality of recovering from procedures in a communal setting, determining informed consent, the carceral environment, and access to specialty care. (*See Id.* ¶¶ 40, 42, 46) Additionally, given these considerations, careful thought must be given to the risks and benefits of delaying treatment until it can occur outside of the prison context. (*Id*. ¶ 47) As explained by Dr. Penn, each of these factors must be accounted for and balanced when making determinations on the provision of certain medical interventions. (*See Id*. ¶ 39-47) For the particular decision here, the realities of a major surgery now—in the correctional context—as opposed to postponing the surgery for a temporary period to allow it to occur at Plaintiff's discretion after release and other aspects of moving forward in the correctional context also must be taken into account. (*See Id*.)

Additionally, as explained by Dr. Boyd, an exploration of an individual's expectancy of how a given intervention may impact their condition, is critical, especially when evaluating the risks and benefits of proceeding with a given intervention while in custody as opposed to waiting until after release, and when multiple procedures are contemplated by the patient. (Boyd Aff. ¶¶ 7-10, 15) Indeed, Plaintiff's records suggest that her preferred surgical intervention was the vaginoplasty. (*Id*. ¶ 10) However, Plaintiff appears to have opted for a less desirable option, a vulvoplasty, evidently out of a sense of expediency and due to post-operative issues. (*See Id*.) Given this, there is cause for concern regarding how proceeding with the vulvoplasty now as opposed to waiting until Plaintiff is released and can pursue her preferred intervention might impact her expectancy of how the surgery would affect her dysphoria. (*See Id*. ¶¶ 10, 15) However, Plaintiff's expert, Dr. Ettner, does not address this issue at all. (*Id*. ¶ 11)

### 3. Plaintiff's Contention that a Correctional System is Constitutionally Obligated to Provide any Care that Could Provide Some Therapeutic Benefit Imposes an Unworkable Standard for Correctional Systems.

In essence, Plaintiff and her expert advance a constitutional standard that would require the State to approve any medical intervention which may potentially provide a therapeutic benefit. A simple example highlights the unworkability of such a standard.

Many incarcerated persons experience depressed mood, dysphoria, anxiety, insomnia, and other DSM-V recognized disorders. (Penn Aff. ¶ 64) Research indicates that massage may provide a therapeutic effect that benefits these patients. (*Id*.) Under Plaintiff's standard, state prisons systems would be constitutionally obligated to approve and provide for massages to incarcerated persons at public expense simply because there is some evidence of a therapeutic benefit to some patients. (*Id*.) Such an outcome would make the test for a medical necessity meaningless. This example is not offered to minimize Plaintiff's experience or create false equivalencies. Rather, this example is offered to highlight the unworkable nature of the standard pressed by Plaintiff. Plaintiff's proposed standard fails to focus on the actual necessity of a given intervention (*see* Penn Aff. ¶¶ 61-68) and would dramatically expand the nature of health services required in prison systems.

Despite arguing that this case is only about one person's request for one medical intervention, it is not. Fundamentally, this case challenges the Department's decision by articulating a new (and incorrect) constitutional standard, which if accepted would have a profound impact the provision of health services in prisons across the State. Plaintiff's theory of this case, if accepted, would potentially result in constitutional violations any time a requested medical intervention that may provide some benefit is not approved. This is not and cannot be the rule.

14

Furthermore, there is nothing improper about accounting for other relevant considerations when determining whether to approve a particular medical intervention in a correctional setting. (*See* Penn Aff. ¶¶ 35-47) Plaintiff asserts that Defendants denied her requested surgery for "nonmedical reasons." To the contrary, the DTARC appropriately determined the surgery was not medically necessary at the present time. (*See* DE 13-1 at 95-97 (noting that Plaintiff has received extensive treatment and finding that "[a]lthough [Plaintiff] has clearly communicated a desire for gender-affirming surgery, there is insufficient medical evidence to indicate such a complex and irreversible surgical intervention is medically necessary for her at the present time.")). Plaintiff's disagreement with DTARC's conclusion, does not make the decision "nonmedical" and it cannot support a claim for deliberate indifference.

### 4. The Fact that There is Reasonable Disagreement in the Field on the Necessity of Gender Affirming Surgery Under the Circumstances Precludes a Finding of Deliberate Indifference.

Plaintiff relies on the fact that some of her providers recommend surgery as well as on the WPATH standards to contend that the surgery is constitutionally required. But Plaintiff ignores significant dissent within the field. (*See* Penn Aff. ¶¶ 51-60) Because there is reasonable disagreement about the necessity of surgery under the circumstances, especially in the correctional setting, Plaintiff cannot establish deliberate indifference.

As an initial matter, Plaintiff's reference to and reliance on WPATH as determinative is unavailing. There continues to be significant debate in the medical community about WPATH's recommendations, particularly concerning matters related to surgical interventions. (*See* Penn Aff. ¶¶ 51-60) While WPATH may set out guidance that is to be referenced in making particular determinations it does not lay down hard and fast rules, particularly, not in the correctional setting. (*See id*.) As discussed above, the provision of health services in a correctional setting requires the

consideration of factors which are not present in the community. (*See* Penn Aff. ¶¶ 35-47) Thus, while WPATH may provide helpful standards as a reference, it does not address the implications of providing such care in the correctional stetting, (*see* Penn Aff. ¶¶ 51-60), and thus cannot set constitutional requirements.

Indeed, courts have expressed skepticism about the WPATH standards, particularly as they are applied to the correctional setting. In a case decided after *Edmo*, for example, the Ninth Circuit affirmed the district court's denial of a preliminary injunction mandating gender affirming surgery. *See Doe,* 28 F.4th at 109. In its decision, the Court acknowledged concerns raised by defense experts including that WPATH "represents a self-selected subset of the mental health professions . . . [and] does not capture the clinical experiences of others" and that WPATH's purported professional consensus regarding standard of care "exists only within its confines." *Id*.

Similarly, in *Kosilek*, 774 F.3d at 76, the First Circuit acknowledged defense expert testimony that many disagree with WPATH standards such that the defense expert did not consider them equivalent to "medically necessary." In that case, the court's independently appointed expert further testified that "WPATH is supportive to those who want [surgery] . . . . Skepticism and strong alternate views are not well tolerated." That independent expert further testified that WPATH "aspires to be both a scientific organization and an advocacy group for the transgendered," but that "[t]hese aspirations sometimes conflict." 774 F.3d at 78. The expert also noted limitations in the standards caused by the lack of rigorous research in the field. *Id*.

Likewise, in *Gibson*, 920 F.3d at 222-23, the Fifth Circuit followed the First Circuit's conclusion that "WPATH Standards of Care reflect not consensus, but merely one side in a sharply contested medical debate over sex reassignment surgery." The Fifth Circuit determined that surgery was medically controversial and reached an "unmistakable conclusion" that there is "no

medical consensus that sex reassignment surgery is a necessary or even effective treatment for gender dysphoria." *Id.* at 223. The court noted that the WPATH standards do not reflect consensus, with WPATH itself acknowledging that "this field of medicine is evolving." *Id.*

The Fourth Circuit has recognized the WPATH standards, but has not held that WPATH either sets the constitutional requirement under the Eighth Amendment; nor has the Fourth Circuit held that WPATH's standards mandate gender affirming surgery under the circumstances. In *De'Lonta*, the plaintiff relied on the WPATH guidance to argue that *evaluation* for surgery was the standard of care. *Id.* 708 F.3d at 523. In holding that the plaintiff's complaint plausibly stated a cause of action, the Court noted that the WPATH standards are "generally accepted protocols for treatment of [gender dysphoria]." *Id.* 708 F.3d at 523. More recently, the Fourth Circuit again noted that the WPATH standards "outline appropriate treatments for persons with gender dysphoria[.]" *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 596 (4th Cir. 2020). *Grimm*, involved an equal protection challenge to a school board's bathroom policy and its impact on transgender students. *Id.* 972 F.3d at 594-95. While the Fourth Circuit has acknowledged that the WPATH standards outline appropriate treatment, these cases cannot credibly be relied on to suggest that the WPATH standards represent inflexible rules which set out the constitutional standard for medical care in prison.

Indeed, the WPATH guidance itself acknowledges the limits of its applicability as some sort of constitutional standard. "The overall goal of the SOC is to provide clinical guidance for health professionals to assist transsexual, transgender, and gender-nonconforming people with safe and effective pathways to achieving lasting personal comfort with their gendered selves, in order to maximize their overall health, psychological well-being, and self-fulfillment." (*See* Penn Aff. ¶ 50). Similarly, Dr. Ettner recounts that gender affirming surgery "improves virtually every facet

17

of a patient's life, [including] satisfaction with interpersonal relationships and improved social functioning . . . improvement in self-image and satisfaction with body and physical appearance . . . greater acceptance and integration into the family" as well as "ability to initiate and maintain intimate relationships." (DE 13-1 ¶¶ 54-55) While these goals are meaningful, they do not represent a constitutional medical necessity.

Plaintiff claims that her expert and WPATH's perspectives are superior, because of their expertise in transgender health. And Plaintiff critiques the DTARC and other decisionmakers for not having this specific expertise. But the DTARC members include health and medical experts, and DTARC members have made appropriate efforts to understand and give fair, good faith consideration to the issues at hand. (*See* Junker Aff. ¶¶ 10-11) Regardless, courts have rejected the concept that a correctional treatment team was incompetent without specific expertise in transgender health care. *See Keohane,* 952 F.3d at 1278 n15.

Furthermore, as described by Dr. Penn, there is genuine disagreement within the field about the medical necessity of gender affirming surgery under various circumstances. (Penn Aff. ¶¶ 51-60) Accordingly, Defendants' determination that the surgery was not medically necessary at the present time did not constitute deliberate indifference.

### E. Plaintiff Cannot Justify a Preliminary Order Mandating Surgery at the Present Time.

Evaluating the appropriateness of a given medical intervention, particularly gender-affirming surgery, requires a comprehensive assessment of the patient. Dr. Ettner's evaluation appears to be lacking in several respects. First, Dr. Ettner did not probe issues related to informed consent in detail. (Boyd Aff. ¶ 7) Second, Dr. Ettner did not conduct collateral interviews of treatment providers, family members, friends, or other individuals who could provide observations of the Plaintiff's history, symptoms, and response to prior interventions. (*Id.*) Similarly, Dr. Ettner

did not explore the import of Plaintiff's decision as it relates to choosing vulvoplasty rather than vaginoplasty, while expressing a desire for further procedures in the future. (*Id*. ¶¶ 7, 9-11) Nor does Dr. Ettner describe a discussion with Plaintiff regarding her expectancy of the impact the surgery may have on her gender dysphoria given the many other factor which Plaintiff identifies as contributing to her distress. (*Id*. ¶¶ 16-17)

The lack of exploration whatsoever regarding Plaintiff's repeated desire for a vaginoplasty (as opposed to the vulvoplasty she now seeks) is particularly concerning. (*See Id*. ¶¶ 9-11) Plaintiff's medical records clearly indicate that vaginoplasty was and continues to be her ultimate goal. (*Id*. ¶10) However, Plaintiff chose to pursue the vulvoplasty while incarcerated due to concerns related to pre- and post-operative issues and a sense of expediency. (*Id*.) A comprehensive evaluation of the appropriateness of the requested intervention at present should have included an exploration of how the Plaintiff's decision to opt for the vulvoplasty instead of the vaginoplasty, while expressing a clear desire to pursue the vaginoplasty at a later date, affects her expectations. (*See Id*. ¶¶ 7-11) Dr. Ettner's declaration fails to mention any such discussion and does not contain any analysis of the issue. (*Id*. ¶¶ 20-1) This is especially concerning (see considering Dr. Ettner's surprising conclusion that the surgery would be curative. (*See* DE 13-1; Penn Aff. ¶ 48; Boyd Aff. ¶ 20)

Relatedly, Dr. Ettner did not discuss the relative risks and benefits of allowing Plaintiff to wait until her release in November 2024 (or sooner) to pursue her preferred surgery rather than moving forward with a less preferred surgery relatively close to the end of her incarceration,[4] likely necessitating recovery in a far less ideal setting. (Boyd Aff. ¶ 15) The potential importance of this

---

[4] Even if the Court were to order the Department to authorize the surgery now, it is possible that the surgery could not be scheduled and performed immediately. The requested procedure is highly specialized and only performed by a small number of surgeons within North Carolina. Wait times for the procedure may be many months, if not years. (*See* Penn Aff. ¶ 40)

is highlighted by the fact that Plaintiff had some post-operative healing issues when she entered custody in October 2017, within months of her orchiectomy. (*Id*. ¶ 8)

Additionally, Dr. Ettner does not appear to address two episodes of concern that warrant further evaluation. (*See* Boyd Aff. ¶¶ 12-14) Twice in 2019, Plaintiff was sent to the local emergency room following some sort of episode. (*See* Mingo Aff. ¶¶ 13-19) Custody staff suspected both instances were related to Plaintiff's use of an illicit substance. (*See* Mingo Aff. ¶¶ 17, 19) While Plaintiff reportedly admitted to smoking something out of a pipe in the first incident, and pled guilty to a related disciplinary offense, there is no definitive evidence of drug use. (Mingo Aff. ¶¶ 14, 16; Boyd Aff. ¶ 12) However, whether these two episodes were related to drugs or whether the episodes were caused by something else, the episodes and their initiating cause warrant further exploration. (*See* Boyd Aff. ¶ 13)

As explained by Dr. Boyd, if Plaintiff were self-medicating with substances, which then led to the episodes causing her to be sent to the local emergency room, this issue would need to be fleshed out through evaluation when assessing the appropriateness of a given intervention. (*Id*.) This is not necessarily because substance abuse should be considered a strict contraindication, but rather because these episodes may indicate additional contributory causes or at least exacerbating factors for the psychological symptoms that Dr. Ettner attributes exclusively to Gender Dysphoria. (*Id*.) And in the event that Plaintiff does have co-occurring mental health conditions, it will be vital to ensure that the contributing causes and major sources of exacerbation are identified. (*Id*.) And again, Dr. Ettner declaration fails to mention any such discussion and does not contain any analysis of the issue. (*Id*. ¶ 14) Given the failure to consider the issues discussed above, the court should be dubious of Dr. Ettner's assertion that the requested surgery would be curative. (*See* DE 13-1; Penn Aff. ¶ 48; Boyd Aff. ¶ 20)

In sum, Plaintiff cannot establish a likelihood of success on the merits. If her deliberate indifference claim is not dismissed, at a minimum, further discovery is necessary.

## II.    THE PUBLIC INTEREST, HARM ANALYSIS, AND EQUITIES WEIGH AGAINST AN INJUNCTION.

Plaintiff must make a clear showing that she will likely be irreparably harmed absent preliminary relief. *The Real Truth About Obama, Inc. v. F.E.C.*, 575 F.3d at 347. An averment that the plaintiff's harm might simply outweigh the defendant's harm is insufficient. *Id*. The showing of irreparable injury is mandatory even if the plaintiff has already demonstrated a strong showing on the probability of success on the merits. *Id.* Moreover, the Court must give "particular regard" to the "public consequences" of any relief granted. *Id*. Plaintiff fails to carry her burden on this irreparable harms and equities analysis.

There are several issues with Plaintiff's claim of irreparable harm. At least in some instances, Plaintiff's self-report of events appears to be inconsistent or incomplete when compared to the documentary record. Thus, there is material disagreement about facts related to Plaintiff's accounts of incidents she relies on to establish severe distress, and further discovery would be needed on these issues prior to any order requiring surgery.

As an example, in her declaration, Plaintiff asserts that in August 2019, she was so distressed due not hearing back from the DTARC about her requested surgery that she was sent to the local emergency department and was subsequently placed on suicide watch. (DE 13-2 ¶ 29) However, Plaintiff's records indicate that in August she was sent to the local hospital after being found unresponsive following what correctional staff suspected to be the use of an illicit substance. (Mingo Aff. ¶ 18) Then, upon her return from the hospital, Plaintiff threatened to harm herself due to not wanting to be placed in restrictive housing because of her suspected use of an illicit substance. (*Id*. ¶ 20) Plaintiff was removed from self-injurious protection the next day after

reporting that she had a breakdown over her impending transfer to a female facility and affirming that she had never attempted suicide. (*Id.*)

As another example, Plaintiff and her expert have provided two different accounts of an episode in December 2020. Plaintiff reports that she expressed a desire to self-mutilate, which resulted in her admission into an inpatient mental health unit at NCCIW. (DE 13-2 ¶ 33) Dr. Ettner states that in December 2020, Plaintiff's hospitalization "result[ed] from her attempt to amputate her penis." (DE 13-1 ¶ 78). But there do not appear to be any custody or operational records indicating that Plaintiff had attempted to self-mutilate (Mingo Aff. ¶ 26) and Plaintiff, despite presenting some medical records, has not put forward any documenting an attempt of self-harm.

Second, Plaintiff does not link her distress to the surgery denial. Plaintiff claims that she is suffering severe mental and emotional distress, but her records challenge the causal link between the lack of surgery and the distress. Specifically, Plaintiff's records indicate that much of her dysphoria seems to stem from what she has experienced as transphobic behavior and comments including by other incarcerated persons. (Boyd Aff. ¶16) Additionally, Plaintiff seems to be negatively affected by the sharp segregation of sexes in prison. (*Id.*) Surgical intervention, including the requested surgery, will not resolve these issues. (Boyd Aff. ¶ 16; Penn Aff. ¶ 46)

Third, Plaintiff's two-month delay in filing for preliminary injunctive relief after bringing this lawsuit weighs against granting the relief. Plaintiff has lived as a transgender woman for many years without the surgery and without documented self-harm, and Plaintiff has not demonstrated urgency of injunctive relief now, particularly with a release date within a reasonable time frame. Notably, Plaintiff is only subject to a time-limited delay before she can pursue the desired surgery on her own upon her release from custody in or before November 2024.

On the other hand, the public has a strong interest in the proper use of public funds. While

Plaintiff attempts to characterize this as just one surgery for her that will not have a significant fiscal impact on the State, changing the standard in the manner Plaintiff proposes would have a much broader impact. Significantly, each expenditure comes at the expense of another State priority. Within the state prison system, increased expenditures in one area often require difficult tradeoffs with funding for staffing, safety and security, and other critical priorities that affect the lives of incarcerated persons.

Plaintiff ignores the impact of a loosening of standards regarding when surgeries and other accommodations will be provided at the public's expense. For instance, Plaintiff herself has had several other surgeries and procedures in order to appear or feel more feminine as part of her treatment for gender dysphoria, including "bilateral orchiectomy, breast augmentation, facial feminization, Brazilian butt lift, forehead and chin fillers." (DE 13-1 p 75) By Plaintiff's logic, any of those procedures would have to be provided by the State if requested during incarceration. WPATH concurs. (*See* DE 13-1 ¶ 29) (standards contemplate "Surgery to change primary and/or secondary sex characteristics (e.g., breasts/chest, external and/or internal genitalia, facial features, body contouring)"). Dr. Ettner also demonstrates the expansive nature of "medical care" under this standard. (DE 13-1 ¶ 64) (stating that permanent hair removal, feminine deodorant, hair care, and makeup are "accoutrements" that are "critical" to the mental wellbeing of gender dysphoric people). Under the standard Plaintiff urges, the State may be constitutionally required to financially provide these accoutrements as well.

As the Eleventh Circuit recognized in *Keohane*, reading the constitution to "require prison officials to provide every convicted inmate – at taxpayer expense – with any treatment that is 'psychologically pleasing' . . . cannot possibly be the law." 952 F.3d at 1278. The Fifth Circuit also expressed this principle in *Gibson*, explaining that "[u]nder established precedent, it can be

cruel and unusual punishment to deny essential medical care to an inmate. But that does not mean prisons must provide whatever care an inmate wants." *Gibson*, 920 F.3d at 216.

In light of the challenging nature of these issues, the lack of clear limits and protocols, and the potential for abuse, Plaintiff cannot establish that the Department's determination constitutes deliberate indifference. Under the circumstances, the public interest is significant, and the Court should not order Defendants to provide the surgery, and particularly not without a full hearing on the merits.[5]

<u>**CONCLUSION**</u>

For the foregoing reasons, the Defendants respectfully request that Plaintiff's motion for preliminary injunction be denied.

Respectfully submitted this 19th day of July 2022.

JOSHUA H. STEIN
ATTORNEY GENERAL

<u>/s/ Orlando L. Rodriguez</u>
Orlando L. Rodriguez
Special Deputy Attorney General
Bar No. 43167
orodriguez@ncdoj.gov

Stephanie A. Brennan
Special Deputy Attorney General
Bar No. 35955
sbrennan@ncdoj.gov

***Attorneys for Defendants***

---

[5] Defendants do not oppose Plaintiff's request for a waiver of security.