IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
No. 3:22-CV-0191-MOC-DCK

| | |
|---|---|
| KANAUTICA ZAYRE-BROWN, | ) |
| Plaintiff, | ) |
| v. | ) **AFFIDAVIT OF SARA BOYD, PH.D.,** |
| | ) **IN SUPPORT OF DEFENDANTS'** |
| | ) **RESPONSE TO PLAINTIFF'S** |
| THE NORTH CAROLINA DEPARTMENT | ) **MOTION FOR PRELIMINARY** |
| OF PUBLIC SAFETY, et al., | ) **INJUNCTION** |
| Defendants. | ) |

I, Sara Boyd, Ph.D., ABPP, hereby declare the following:

1. I am a licensed clinical psychologist with experience conducting forensic mental health assessments of transgender and gender diverse people in correctional settings. As a psychologist specializing in forensic mental health assessments, I have conducted dozens of evaluations of incarcerated people housed in state and federal prisons and jails. I am familiar with procedures that departments of corrections use to assess and make determinations regarding gender-affirming treatment needs of transgender and gender diverse incarcerated people. I have conducted independent psychological evaluations related to gender-affirming care for incarcerated individuals at the request of correctional officials. I am also the co-author of a book chapter (in press) concerning psychological evaluation, management, and treatment of transgender and gender diverse people housed in correctional settings.

2. Additionally, I am a diplomate of the American Board of Professional Psychology, for the Forensic Specialty. This board-certification requires credential review, a written exam, work sample review, and a three hour-duration oral defense of work samples, in addition to ensuring that the candidate has not engaged in serious ethical and/or legal misconduct. This board

certification is one of the two post-doctoral specialty certifications recognized by the American Psychological Association Directory.

3. My qualifications and experienced are further detailed in my curriculum vita, which is attached to this declaration as Exhibit A.

4. I have not had an opportunity to personally examine the Plaintiff, Kanautica Zayre-Brown, as of the date of this declaration. However, I have reviewed her motion for preliminary injunction in case number 3:22-cv-00191, as well as the North Carolina Department of Public Safety's records for the Plaintiff. I also reviewed the declaration of Randi C. Ettner, Ph.D., which the Plaintiff included in support of her motion for preliminary injunction.

5. All statements herein are based on my education, training, and experience. Additionally, any conclusions or opinions stated herein are based upon my years of education, training, and professional experience, as well as my review of the Plaintiff's medical and mental health records, and are stated to a reasonable degree of psychological and mental health certainty.

6. It appears that Dr. Ettner personally examined the Plaintiff. In her declaration, Dr. Ettner provides information and opinions regarding a brief and recent general history of medical gender-affirming interventions, the World Professional Association for Transgender Health (WPATH) standards of care, the Plaintiff's personal history of gender-related treatment, the adequacy of treatment provided by the North Carolina Department of Public Safety to the Plaintiff, and the Plaintiff's need for surgery.

7. There were several evaluation tasks, which I expected to see referenced in Dr. Ettner's declaration, that were either not undertaken or not described in the declaration. For example, it does not appear that Dr. Ettner probed issues related to informed consent in detail, nor did Dr. Ettner conduct collateral interviews of treatment providers, family members, friends, or

Case 3:22-cv-00191-MOC-DCK   Document 18-6   Filed 07/19/22   Page 2 of 8

Exhibit 4 - Boyd Affidavit   2

other individuals who could provide observations of the Plaintiff's history, symptoms, and response to prior interventions. Likewise, Dr. Ettner did not identify what the Plaintiff's expectancies are regarding her options for medical intervention, especially her expectancies and considerations related to choosing vulvoplasty rather than vaginoplasty. Dr. Ettner did not describe how the Plaintiff had approached earlier surgical interventions in terms of her expectancies, costs and benefits, and why earlier surgical intervention proved to be inadequate for substantially mitigating her gender dysphoria symptoms.

8. This case is somewhat unusual in that the Plaintiff is relatively close to her release date, which I understand to be November 2, 2024.[1] This means that surgical interventions undertaken now could have significant implications for her ability to transition from the correctional environment to community-based care, particularly if she experiences surgical complications (as her records indicate that she did after her earlier orchiectomy surgery). Dr. Ettner does not address this factor or its possible implications.

9. Of particular significance was the absence of any discussion in Dr. Ettner's declaration of how the choice of pursuing a vulvoplasty over a vaginoplasty could have implications for the Plaintiff's ability to complete any additional surgeries in the future. This is significant because pursuing additional surgeries is something the Plaintiff's records indicate she desires.

10. The Plaintiff's records indicate that she initially requested a vaginoplasty. However, during a meeting with a nurse from the University of North Carolina Transgender Health Program, the Plaintiff opted to pursue a vulvoplasty instead. Importantly, the record from this

---

[1] This information is publicly available at https://www.ncdps.gov/dps-services/crime-data/offender-search.

meeting suggests that the choice of the vulvoplasty was not made because she believed the vulvoplasty would sufficiently alleviate her gender dysphoria, but rather because the vulvoplasty would entail less post-operative care, as compared to vaginoplasty. Additionally, during the same meeting with the nurse from the Transgender Health Program, the Plaintiff inquired about the possibility of pursuing additional surgery to create a vaginal canal after a vulvoplasty. The nurse advised her that while doing so is more difficult, operative techniques, such as robotic vaginoplasty, are available for revision at a later time. The Plaintiff also reported to one of her healthcare providers that as between the two procedures she would likely choose the vulvoplasty because she believed she could get the procedure done sooner.

11. Dr. Ettner's declaration does not contain any discussion of the potential implications of the Plaintiff choosing what appears to be her less preferred option now while intending to pursue her ultimate goal at a later date.

12. The Plaintiff's records also reflect two incidents in 2019, during which she was sent to the local emergency room following some type of crisis episode. Records indicated that correctional staff speculated that these episodes might be due to illicit drug use, specifically K2. However, the information to support this explanation was sparse in that there were no positive drug test results or contraband recovered that would shed light on (a) the likelihood that these episodes were the result of intoxication versus some other mental health issue, or (b) the type of substance, if any, that the Plaintiff ingested.

13. In any event, whether or not the episodes were caused by illicit drug use or some other cause, the records indicate that both events involved significant emotional distress for the Plaintiff, and could indicate additional contributory causes or at least exacerbating factors for the psychological symptoms that Dr. Ettner attributes exclusively to Gender Dysphoria. In the event

that the Plaintiff does have co-occurring mental health conditions, this is not necessarily a barrier for her to receive treatment. But if the objective of mental health and medical treatment for the Plaintiff is to alleviate acute mental health distress, it will be vital to ensure that the contributing causes and major sources of exacerbation are identified.

14. Dr. Ettner's report did not discuss these significant crisis events in detail and so it is not clear that Dr. Ettner considered these crisis events.

15. In the declaration, Dr. Ettner did not discuss relative benefits or disadvantages of pursuing the vulvoplasty (or as an additional option, vaginoplasty) in the community versus while incarcerated. Again, given the relatively short amount time remaining on her sentence and the potential implications of proceeding with the vulvoplasty now, while in custody, as opposed to that procedure or even what appears to be her preferred option, the vaginoplasty, after she returns to the community, the absence of such a discussion is notable.

16. Even aside from these considerations such as post-operative care, the Plaintiff's records include numerous comments about her experiences with being rejected, mistreated, and misgendered by other individuals in the prison setting. It also appears that her transfer to a female facility evidently worsened some of these issues, and she appeared to be experiencing increased distress while at the female facility, to the degree that she discussed transferring back to a male facility. Correctional facilities are one of the most sex-segregated settings in the United States, and this segregation can evoke more intense feelings of gender dysphoria even when the person is placed in a facility that matches their gender. Mixed gender community settings, particularly those where the Plaintiff has more opportunity to seek support, information, and guidance from other transgender and gender diverse people who have undergone similar procedures, potentially offers significant psychosocial advantages for amelioration of the Plaintiff's gender dysphoria as well as

access to more supportive social engagement (compared with a correctional setting). Surgery cannot reasonably be expected to have any impact on these sorts of factors.

17. Again, it is not evident in Dr. Ettner's report that these factors were considered or reviewed as part of an informed consent assessment.

18. Lastly, I would note that Dr. Ettner offered opinions regarding the adequacy of interventions offered to the Plaintiff by the North Carolina Department of Public Safety. Records do indicate that these interventions include hormone replacement therapy, mental health therapy, medications, a transfer to a female facility, and access to various other non-medical affirming items. While the records indicate that there may have been interruptions to certain aspects of the Plaintiff non-surgical affirming care, and that some requests were denied, it is my understanding that the quality of the past treatment is not presently at issue in the Plaintiff request for a preliminary injunction.

19. Thus, it is noteworthy that Dr. Ettner does not explain how the Plaintiff's past non-surgical affirming care, including any interruptions or denials factors into the Plaintiff's need for this particular surgical intervention, at this particular time, in this particular setting.

20. It is my opinion that a comprehensive evaluation in this context should include a thorough exploration of informed consent (with an emphasis on the patient's expectations of the potential impact of a given intervention), collateral interviews, an assessment of possible contributory causes or at least exacerbating factors of psychology distress, and considerations of factors which are unique to the setting in which the intervention is to be provided. As discussed above, Dr. Ettner's declaration does not indicate that such evaluative tasks were performed. The absence of these tasks and relevant information indicates that Dr. Ettner has an insufficient basis to offer the assertion that undergoing a vulvoplasty would cure the Plaintiff's gender dysphoria.

21. Accordingly, based on my review of the materials referenced above, my education, training, and professional experience, it is my opinion that Dr. Ettner's declaration fails to describe and evaluate several major factors which I believe to be critical to assessing the adequacy of a given intervention for the Plaintiff, at this time, in her current setting.

**THIS SPACE IS INTENTIONALLY LEFT BLANK**

**SIGNATURE PAGE TO FOLLOW**

Pursuant to 28 U.S.C.§ 1746, I declare that the foregoing is true and correct.

This the 15th day of July, 2022.

*Sara Boyd, Ph.D., ABPP*