THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
NO. 3:22-cv-191

| | |
|---|---|
| KANAUTICA ZAYRE-BROWN, | ) |
| Plaintiff, | ) |
| v. | ) **DEFENDANTS'** |
| | ) **REPLY IN SUPPORT OF THEIR** |
| NORTH CAROLINA DEPARTMENT OF | ) **MOTION TO DISMISS** |
| PUBLIC SAFETY, et al., | ) |
| Defendant. | ) |

Plaintiff's opposition to Defendants' Motion to Dismiss ("Response") does not present a basis for the case to survive the motion. Rather, the Response demonstrates that dismissal is appropriate in multiple ways. First, Plaintiff cannot refute that the face of the complaint demonstrates that she did not comply with the Prison Litigation Reform Act ("PLRA"), as she failed to exhaust her available administrative remedies related to the decision to not approve her request for a vulvoplasty as not medically necessary at this time. Second, Plaintiff fails to overcome the bar of sovereign immunity as to her deliberate indifference claims for damages. Third, Plaintiff's efforts to save her deliberate indifference claims from dismissal are not compelling. Fourth, Plaintiff's attempt to articulate how she has alleged a proper *Corum* claim misunderstands the adequacy of remedy analysis. Lastly, Plaintiff tries to manufacture an ADA/RA claim with circular and faulty reasoning.

### A. Plaintiff Did Not and Could Not Have Exhausted Available Administrative Remedies Related to the Decision to Not Approve Her Requested Vulvoplasty.

Plaintiff's response to the exhaustion issue raised by Defendants simply cannot be squared with the allegations in her complaint. In her Response, Plaintiff claims that she "satisfied the PLRA by diligently exhausting grievances that sought gender-affirming surgery, *including specific*

*requests for a vulvoplasty*." (DE 17 at 10) (emphasis added). Plaintiff doubles down on this assertion by stating that three of her grievances referenced surgery, and two of those grievances specifically requested a vulvoplasty. (*Id*. at 11-12) There are two related problems with Plaintiff's argument. First, the argument is not supported by the allegations in the complaint. Second, Plaintiff's argument fails to overcome a salient fact evident from the face of the complaint—she learned of the Department's decision to not approve her request for a vulvoplasty as not medically necessary on April 26, 2022, two days before filing this action.

Plaintiff does not allege that she exhausted available administrative remedies *concerning a denial* of her request for a vulvoplasty as not medically necessary—because she did not.

In her complaint, Plaintiff alleges that in August 2019, after her request for "gender-affirming surgery" was repeatedly "delayed and deferred," her request was denied. (DE 1 ¶¶ 95-103) Importantly, in the complaint, Plaintiff acknowledges that the Department "designat[ed] its decision as a deferral" but nonetheless she construed the decision as a denial. (*See Id*. ¶ 103). Plaintiff then alleges that in response, she initiated the grievance process, which was exhausted on January 2, 2020. (*Id*. ¶¶ 104-109) Importantly, in these paragraphs, Plaintiff does not specifically allege that she requested a vulvoplasty. (*See Id*. ¶¶ 103-109)

Plaintiff then alleges that in January 2020, she submitted a request for reconsideration of her request for surgery. (DE 1 ¶ 110) Plaintiff then alleges that this request made its way to the Division Transgender Accommodation Review Committee ("DTARC"), which decided to hold off on a decision until an in-person consultation could be completed. (*Id*. ¶¶ 110-112) The complaint then chronicles the timeline of scheduling the in-person consultation, including two required interviews with staff from the UNC Transgender Health Program, first in August 2020 and then in May 2021. (*Id*. ¶¶ 114-116, 120, 122) Then in July 2021, Plaintiff attended the in-

person surgical consultation with Dr. Figler, a urologist from UNC. (DE 1 ¶¶ 122, 124) Following this consultation, Dr. Figler, recommended that after Plaintiff met a weight loss goal, she should receive a vulvoplasty. (*Id.* ¶ 125) Importantly, this is the first time that Plaintiff's complaint specifically references that procedure.

Plaintiff then alleges that on October 4, 2021, after meeting the weight loss goal, she submitted a grievance concerning her request for a gender-affirming vulvoplasty. (DE 1 ¶¶ 128-132) However, Plaintiff also alleges that this grievance was "**rejected** pursuant to Section .0306 of the Administrative Remedy Procedure[.]" (*Id.* ¶ 133) (emphasis added). Then Plaintiff alleges that on November 4, 2021, she submitted another grievance "seeking gender-affirming surgery[.]" (*Id.* ¶ 134) Although she does reference a vulvoplasty in connection with this grievance, during the grievance process, Plaintiff was informed that a decision on her request had not yet been made and that the issue would be discussed at an upcoming DTARC meeting. (*Id.* ¶¶ 135-136) This grievance was exhausted on January 18, 2022. (*Id.* ¶¶ 134-137) Notably, Plaintiff does not allege that at the time this grievance was exhausted, that the Department had made any decision regarding her request for a vulvoplasty. This is because, as Plaintiff correctly alleges, on April 26, 2022, she was informed of the decision to not approve her request for a vulvoplasty as not medically necessary. (*Id.* ¶ 139)

Relatedly, Plaintiff's argument on this issue fails to overcome the indisputable fact that she only learned of the decision at the center of her deliberate indifference claim (related to the surgery) two days before she filed the complaint. (*See* DE 1 ¶ 139) The crux of Plaintiff's deliberate indifference claim as to the surgery is her contention that the vulvoplasty is medically necessary and that denial of the same constitutes deliberate indifference. (*See Id.* ¶¶ 149-153) However, as the complaint correctly notes, her request for a vulvoplasty was first deferred and only denied in

3

April 2022. (*See Id*. ¶¶ 129, 132, 135, 136). Thus, Plaintiff concedes, as she must, that she only learned of the decision to not approve her request for a vulvoplasty as not medically necessary on April 26, 2022, two days before filing this action. (*See Id*. ¶ 139) Critically, there are no allegations in the complaint that Plaintiff challenged that specific decision through the administrative remedy process—a point she appears to concede. (*See* DE 17 at 12) Instead, Plaintiff's contends that she should not have to submit another grievance "because Defendants *again* denied surgery[.]" (*Id*.) However, as explained above, this assertion is not supported by the allegations in her complaint, and as explained below, this assertion is not supported by the law. Plaintiff points to *Wilcox v. Brown*, 877 F.3d 161 (4th Cir. 2017) to support her position. Her reliance on *Wilcox* is misplaced.

In *Wilcox*, the Court wrote, in a footnote, that a plaintiff-prisoner is not required to "file multiple, successive grievances **raising the same issue**" to exhaust under the PLRA. *Id*. 877 F.3d at 167 n.4 (emphasis added). The "same issue" in *Wilcox* was indeed the same issue—the discontinuation of Rastafarian services. *Id*. 877 F.3d at 165. Thus, the Court noted that requiring multiple grievances on this same issue was not necessary because the "prison ha[d] received notice of, and an opportunity to correct, a problem[.]" *Id*. 877 F.3d at 167 n.4.

This logic, however, does not apply to the instant case. Plaintiff's deliberate indifference claim (as to her requested surgery) is premised on her contention that the surgery is medically necessary and the Department's decision to not approve the surgery as not medically necessary constitutes deliberate indifference. (*See* DE 1 ¶¶ 149-153) So it is that decision which Plaintiff must challenge through the grievance process before she is able to pursue a claim based on that decision in federal court. But the face of the complaint demonstrates that Plaintiff was only informed of the Department's decision to not approve the surgery as not medically necessary on April 26, 2022. Thus, any grievances that Plaintiff had previously exhausted could not have raised

4

the "same issue" of the Department's decision to not approve the surgery as not medically necessary because that decision was only made and communicated to her two days before filing.

As the federal courts have acknowledged, North Carolina's grievance process involves a detailed three-step process. *See Moore v. Bennette*, 517 F.3d 717, 721 (4th Cir. 2008). Because Plaintiff only learned of the key decision on April 26, 2022, two days before she filed this action, it was not possible to exhaust her remedies relative to that issue before filing. Indeed, Plaintiff effectively concedes the point by suggesting that she did not have to exhaust the decision to not approve the requested surgery as not medically necessary because she had exhausted other grievances. (*See* DE 17 at 11-12) However, those other grievances did not (and could not) relate to the decision to not approve the surgery as not medically necessary—that decision is at the heart of her deliberate indifference claim as to the surgery—thus, it is that decision which must be grieved and exhausted. Plaintiff did not do so. "There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court." *Jones v. Bock*, 549 U.S. 199, 211 (2007). Accordingly, Plaintiff's deliberate indifference claim based on the decision to not approve her requested surgery as not medically necessary must be dismissed.

### B. Any Claim for Damages Based on Alleged Deliberate Indifference is Barred by Sovereign Immunity.

Plaintiff acknowledges that she does not seek damages against the Department or the individual defendants in their official capacities for their alleged violation of the Eighth Amendment. (*See* DE 17 at 12-13) As argued in Defendants' motion to dismiss memorandum, any such claim would certainly be barred by sovereign immunity. (*See* DE 10 at 7-8) However, Plaintiff is seeking damages against the same defendants through her state constitutional claim. (*See Id*. at 40) As explained below, Plaintiff has not and cannot allege that such a claim falls within

5

the exception to sovereign immunity carved out in *Corum*. Thus, any claim for damages based on alleged deliberate indifference must be dismissed.

### C. The Allegations Plaintiff Highlights in Her Response Do Not Save Her Deliberate Indifference Claims.

In light of the arguments Defendants raised, Plaintiff makes several attempts to bolster her deliberate indifference claims. None are convincing.

Plaintiff argues that she has alleged facts sufficient to satisfy the objective prong of her deliberate indifference claim. (*See* DE 17 at 13-14) However, Plaintiff's conception of the allegations required under the objective prong is far too narrow. Under the objective prong "a plaintiff must produce evidence of a serious or significant physical or emotional injury resulting from the challenged conditions." *Strickler v. Waters*, 989 F.2d 1375, 1381 (4th Cir. 1993). As argued in Defendants' motion to dismiss memorandum, even taken as true, Plaintiff fails to set forth factual allegations that can support an inference that she has or will sustain some severe emotional or physical injury as a result of the challenged actions. (*See* DE 10 at 13)

Even if Plaintiff's allegations satisfied the objective component, which Defendants contend they do not, her Response demonstrates that the complaint fails to set forth factual allegations sufficient to support the subjective component of a deliberate indifference claim.

Plaintiff argues that Defendants cannot defeat her deliberate indifference claim by showing that they provided some treatment. (*See* DE 17 at 15) However, Defendants did not make such an argument. Rather, Defendants set out examples of cases where the Court found medical deliberate indifference, which often involved scenarios where no treatment was provided. (*See* DE 10 at 14) In any event, in assessing the strength of Plaintiff's allegations, it is certainly significant that she has received recognized treatments for her condition, including mental health care and hormone

therapy. (*See* DE 10 at 19-21 discussing the multiple circuit opinions finding the provision of other treatment short of surgery to be constitutionally adequate).

Plaintiff also argues that her complaint alleges that Defendants knew of the risks of harm because she filed numerous grievances concerning what she believed to be inadequate treatment and that many of the Defendants had access to her medical records and could see that certain other medical providers recommended the surgery. (DE 17 at 16) None of these points, either individually or collectively, amount to factual allegations sufficient to infer subjective knowledge of an excessive risk of serious harm. Plaintiff's grievances only set out her dissatisfaction with various aspects of her confinement and medical care. And as explained above, these grievances did not challenge the decision at the heart of the deliberate indifference claim as to the surgery. Similarly, simply referencing one's medical records does not establish that each Defendant possessed subjective knowledge of an excessive risk of serious harm. Lastly, that various other medical and health care workers recommended the surgery says nothing about the subjective knowledge of the fourteen individual Defendants. In short, individually, and collectively, such information falls far short of factual allegations sufficient to support an inference that Defendants were subjectively aware that Plaintiff faced some excessive risk of harm contingent on a particular course of action. (*See* DE 10 at 16)

Plaintiff also seems to be advancing a sort of supervisory liability theory as to the subjective knowledge component. She contends that, given the positions of Defendants Buffaloe and Ishee, they bear responsibility "for the provision of healthcare throughout the prison system[.]" (*See* DE 17 at 16) And the clear implication from her argument concerning access to her records seems to be that this is somehow sufficient to support the subjective knowledge element. (*Id.*) Any such arguments are unavailing.

7

Case 3:22-cv-00191-MOC-DCK   Document 21   Filed 07/22/22   Page 7 of 12

The doctrine of *respondeat superior* does not apply in constitutional tort litigation—defendants can only be held liable for their own misconduct. *Ashcroft v. Iqbal*, 556 U.S. 662, 676-77 (2009). Instead, supervisory liability for constitutional violations rests on "a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries[.]" *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984). Thus, a plaintiff "assumes a heavy burden of proof in supervisory liability cases […] [a plaintiff] must demonstrate […] a pervasive and unreasonable risk of harm from […] [and] show that the supervisor's corrective inaction amounts to deliberate indifference or tacit authorization of the offensive practices." *Id*. at 373. This burden cannot be demonstrated by a single incident or handful of incidents but requires supervisory inaction in the face of widespread and documented abuse. *Id*. Thus, "courts have appropriately required proof of multiple instances of misconduct before permitting supervisory liability to attach." *Randall v. Prince George's Cty.*, 302 F.3d 188, 207 (4th Cir. 2002). Even the most expansive reading of Plaintiff's complaint cannot support a conclusion that she has alleged any viable supervisory claim against any Defendant.

Moreover, and more fundamentally, any attempt by Plaintiff to impose some sort of blanket liability should be rejected. "In order for an individual to be liable under § 1983, it must be affirmatively shown that the official charged *acted personally* in the deprivation of the plaintiff's rights." *Wright v. Collins*, 766 F.2d 841, 850 (4th Cir. 1985) (emphasis added). As articulated in the motion to dismiss memorandum, Plaintiff's complaint lacks factual allegations concerning the subjective knowledge of Defendants and their actions in conscious disregard of the same. (*See* DE 10 at 16) Accordingly, any effort by Plaintiff to avoid her obligation to allege facts to support an inference of subjective knowledge of an excessive risk of serious harm and a conscious disregard

8

of that risk by relying on broad assertions about access to records or the positions of certain Defendants must be rejected.

Plaintiff also contends that there is no disagreement among medical professionals but rather a disagreement between prison administrators and *their own* subject matter experts. (*See* DE 17 at 18) This argument is flatly wrong as it ignores the numerous mental health and medical professionals that are part of the DTARC and part of the decision-making process. (*See* DE 1 ¶¶ 18-29) Additionally, Plaintiff does not allege that the subject matter experts (which she incorrectly refers to as the Department's "own" (*see* DE 17 at 18)) were agents of the Department or that their opinions represent some course of action that must be followed without regard to other considerations. Thus, Plaintiff's argument that there is no disagreement among medical professional is simply not correct.

Plaintiff also places too much emphasis on *De'Lonta*. In *De'Lonta*, the plaintiff relied on the World Professional Association for Transgender Health's guidance to argue that *evaluation* for surgery was the standard of care. *De'Lonta v. Johnson*, 708 F.3d 520, 523 (4th Cir. 2013) In that case, the Fourth Circuit reversed the dismissal of an Eighth Amendment claim based on the *denial of evaluation* for gender-affirming surgery. *Id* at 526. But the Court expressly declined to decide on the merits whether the plaintiff had a valid claim for deliberate indifference based on the denial of surgery. *Id*. Since *De'Lonta*, the Fourth Circuit has not decided that issue.

Of course, in the instant case, Plaintiff does not claim that Defendants have failed to evaluate her for surgery. Instead, the dispute centers on the outcome of that evaluation. Incidentally, this point reinforces Defendant's argument that at bottom Plaintiff's claim is a disagreement over the proper course of medical treatment, which as a matter of law cannot support a deliberate indifference claim. (*See* DE 10 at 17-18)

9

### D. Plaintiff's State Constitutional Claim Does Not Fit Into the *Corum* Exception.

Plaintiff's Response to the *Corum* issue raised in the motion to dismiss memorandum is ineffective. Plaintiff correctly points out that to be adequate, a state remedy must provide "the possibility of relief under the circumstances." *Craig ex rel. Craig v. New Hanover Cnty. Bd. of Educ.*, 678 S.E.2d 351, 355 (N.C. 2009). However, Plaintiff ignores that the law clearly provides that the possibility of relief does not have to mirror the relief that could be obtained in the purported direct constitutional claim. (*See* DE 10 at 9) Nor does Plaintiff address the point that adequacy requires only that a plaintiff have the opportunity to enter the courthouse doors. (*Id.*)

Plaintiff has that opportunity. She does not contest that she could have filed a case in the Industrial Commission alleging negligence in the provision of her medical care and that she could have asserted section 1983 claims in State court. (*See* DE 17 at 21-23) Instead, Plaintiff makes the circular argument that the Industrial Commission would not provide an adequate state remedy because it would not have jurisdiction over a state constitutional claim. (*See* DE 17 at 22) She also argues that there is no state case law on the issue of federal law and adequacy. Both points are true, and both miss the mark.

The adequacy of remedy analysis looks to a plaintiff's ability to recover for a particular harm. *See, e.g., Wilcox*, 222 N.C. App. at 301-02, 730 S.E.2d at 238-39 (holding that suit against a defendant in his individual capacity is sufficient to preclude the plaintiff from asserting a *Corum* claim); *Phillips* v. *Gray,* 163 N.C. App. 52, 57-58, 592 S.E.2d 229, 233 (2004) (holding that a plaintiff's rights were adequately protected by a wrongful discharge claim against a sheriff in his individual capacity). The alleged harm for which Plaintiff seeks to recover relates to the Department's treatment of her gender dysphoria. Plaintiff could seek relief for that alleged harm

through a negligence claim in the Industrial Commission. Likewise, Plaintiff could seek relief under Section 1983 against defendants in their individual capacities.

Plaintiff does not contest this. Instead, she argues that because she could not assert a state constitutional claim in those other scenarios, she must be able to assert a direct state constitutional claim here. This reasoning is circuitous and misunderstands the adequacy of remedy analysis. The adequacy of remedy test is not whether a plaintiff can assert a direct action under the state constitution in some other forum, but rather whether Plaintiff has some other avenue to pursue *a state remedy* for the alleged harm. Here, Plaintiff has two other adequate state remedies available and thus cannot state a *Corum* claim.

### E. Plaintiff's Response Fails to Point to Specific Factual Allegations Concerning any Denial of Benefits or Service on the Basis of an Alleged Disability.

In response to the arguments Defendants raised regarding her ADA/RA claim, Plaintiff does not point to specific factual allegations of some particular benefit that she has been denied because of her alleged disability. Instead, Plaintiff asserts that "the complaint details specific instances of Plaintiff being denied medical care for gender dysphoria." (DE 17 at 25) This assertion, which Defendants of course reject, cannot serve as the basis of an ADA/RA discrimination claim.

Plaintiff must allege that she had been denied a benefit or service that she would otherwise be entitled to receive, and that the denial was based on her alleged disability. Setting aside whether gender dysphoria is a disability[1], Plaintiff does not allege that she would be entitled to gender-affirming surgery *but-for* her gender dysphoria. To the contrary, Plaintiff alleges that she is entitled to gender-affirming surgery *because* of her gender dysphoria. It is difficult to understand how one

---

[1] See DE 10 at 23-24 noting that the law is currently unsettled as to whether gender dysphoria constitutes a disability under the ADA.

11

can claim to be entitled to gender-affirming surgery because of their gender dysphoria and be denied gender-affirming surgery because of their gender dysphoria. Accordingly, the Court should reject Plaintiff's circular reasoning and dismiss the ADA/RA claims.

## CONCLUSION

For the foregoing reasons, the Defendants respectfully request that their motion to dismiss be granted.

Respectfully submitted this 22nd day of July 2022.

> JOSHUA H. STEIN
> ATTORNEY GENERAL
>
> /s/ Orlando L. Rodriguez
> Orlando L. Rodriguez
> Special Deputy Attorney General
> Bar No. 43167
> orodriguez@ncdoj.gov
>
> Stephanie A. Brennan
> Special Deputy Attorney General
> Bar No. 35955
> sbrennan@ncdoj.gov
> ***Attorneys for Defendants***