# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA

KANAUTICA ZAYRE-BROWN,

       *Plaintiff,*

v.

THE NORTH CAROLINA
DEPARTMENT OF PUBLIC SAFETY,
*et al.,*

       *Defendants.*

No. 3:22-cv-00191

## PLAINTIFF'S REPLY IN SUPPORT OF
## MOTION FOR PRELIMINARY INJUNCTION

This case is about whether Defendants have unlawfully failed to provide Plaintiff with adequate medical care. The uncontroverted evidence shows that Plaintiff has a serious medical condition. Every healthcare provider with subject-matter expertise who has personally evaluated her—including those employed and engaged by Defendants—has found gender-affirming surgery necessary. Without this treatment, Plaintiff will needlessly suffer and face escalating risks of harm.

Before this case began, Defendants never provided a medical justification for their denial of gender-affirming surgery. Now, in all their filings, Defendants *still* have not provided one. The only Defendant to file an affidavit, Dr. Gary Junker, simply repeats his conclusion that surgery is medically unnecessary with no explanation of how he reached that conclusion.

Defendants rely primarily on the opinion of Dr. Joseph Penn that their decision was reasonable. But Dr. Penn—who has no relevant publications, prior expert

testimony, or prior experience evaluating patients for gender-affirming surgery—is unqualified to render an expert opinion, and he reaches his conclusions using unreliable methodology.

All told, nothing in Defendants' response justifies their failure to provide gender-affirming surgery. The Court should therefore grant Plaintiff's motion for preliminary injunction.

## I. Defendants' failure to provide gender-affirming surgery violates the Constitution based on well-established Eighth Amendment standards.

Defendants insist that the Court must adopt a novel and unworkable constitutional standard to conclude that Plaintiff will likely succeed on the merits of her Eighth Amendment claim. That is not the case. As explained in Plaintiff's briefs, she has shown—based on well-established Eighth Amendment standards—that she has an objectively serious medical need, and that Defendants' conscious failure to adequately address that need amounts to deliberate indifference.

Defendants ignore the plainly relevant evidence, medical consensus, and binding precedent in urging this Court to credit abstract criticisms that have no bearing on the questions at issue. As an initial matter, Defendants offer no justification specific to the facts of this case as to why gender-affirming surgery is not necessary to treat Plaintiff's gender dysphoria. Nor do Defendants mention the conclusions of their own health care providers or the UNC providers to whom they referred Plaintiff for specialized care. And neither Defendants nor their affiants can reliably contradict those conclusions, as none of them personally evaluated Plaintiff.

2

Junker Aff., Doc. 18-4 ¶ 19; Boyd Aff., Doc. 18-6 ¶ 4; Penn Aff., Doc. 18-8 ¶ 23.

Interestingly, Defendant Junker notes that he reviewed "guidance from the World Professional Association for Transgender Health (WPATH)" as the "lead policy developer" for DPS's Transgender Offenders Policy. Junker Aff. ¶ 6. But Defendant Junker fails to explain why he disregarded the conclusions of Plaintiff's providers based on the same WPATH standards. Additionally, Defendant Junker notes that "[t]o remain current, prisons' healthcare staff have frequently engaged with transgender specialists at the University of North Carolina for consultation and educational purposes," and that "[m]ost, if not all" members of DTARC have participated in trainings conducted by UNC Transgender Health Program. *Id.* ¶¶ 6, 10-11. However, Defendant Junker fails to explain why he disregarded the surgical recommendation of Dr. Figler—the specialist in gender-affirming surgery who founded those training programs[1] *and* personally evaluated Plaintiff.

In sum, this Court should reject Defendants' denial of gender-affirming surgery as without medical basis and contrary to law. Defendants cannot rely on irrelevant hypotheticals while turning a blind eye to the documented opinions of Plaintiff's treating providers and evidence of her ongoing suffering.

### A. Without gender-affirming surgery, Plaintiff will continue to face a substantial risk of serious harm.

The Eighth Amendment requires prison officials to provide adequate medical care for a patient's serious medical need. Prison officials cannot withhold a treatment

---

[1] *See* Brad Figler, MD, FACS, *UNC School of Medicine Directory*, at https://www.med.unc.edu/urology/directory/brad-figler-md-facs/ (last visited Aug. 2, 2022).

3

when a patient will otherwise face a substantial risk of serious harm. *See Farmer v. Brennan*, 511 U.S. 825, 828 (1994) (citing *Estelle v. Gamble*, 429 U.S. 97 (1976)).

Defendants cannot and do not dispute that Plaintiff's gender dysphoria is a serious medical need. Instead, Defendants argue that gender-affirming surgery is not medically necessary to address that need. That view is inconsistent, however, with binding precedent, the overwhelming weight of evidence before the Court, and the consensus of the medical community. This Court should reject Defendants' attempts to ignore the facts, contort the law, and invent post hoc rationalizations for their dangerous decision to withhold treatment.

### 1. Plaintiff's argument is entirely consistent with long-settled precedent.

Defendants assert that Plaintiff has asked this Court to adopt a "loosen[ed]" standard and define medically necessary treatment as "something that has 'a therapeutic effect' and is not experimental." Doc. 18 at 10, 23. According to Defendants, Plaintiff believes "that the constitution requires the State to provide care that has the mere possibility of aiding a person's well-being . . . ." *Id.* at 11. Not so.

Plaintiff asserts that once a serious medical need has been established, the State has a constitutional obligation to provide care that will meaningfully alleviate the patient's suffering. Medical standards of care are highly relevant to what treatment is required. *See* Doc. 14 at 17-18. This view is consistent with established federal law. *Id.; see also De'lonta v. Johnson*, 708 F.3d 520, 526 (4th Cir. 2013) (though "prisoner does not enjoy a constitutional right to the treatment of his or her choice, the treatment a prison facility does provide must nevertheless be adequate to address

4

the prisoner's serious medical need"); *United States v. Derbes*, 369 F.3d 579, 583 (1st Cir. 2004) (constitutionally adequate medical care must be on " a level reasonably commensurate with modern medical science and of a quality acceptable within prudent professional standards").[2]

Plaintiff does not seek gender-affirming genital surgery simply because it would be "psychologically pleasing" or would provide a "mere possibility of aiding [her] well-being[.]" Doc. 18 at 11 (cleaned up). She seeks surgery for a far more serious reason: it is the only viable intervention at this stage of her illness when other interventions have proven inadequate. Without surgery, she is suffering greatly and remains at risk of serious harm.

Plaintiff has testified to longstanding disgust with her genitalia stemming from childhood, which has now escalated to clinical levels of distress and a growing desire to self-mutilate. Zayre-Brown Decl., Doc. 13-2 ¶¶ 2, 33-34, 47, 53. It is clear that, even with her other treatments, Plaintiff will not experience relief from her gender dysphoria until she no longer has genitalia inconsistent with her gender identity. *Id.* ¶¶ 48-54. Both DPS providers Dr. Umesi and Dr. Figler prescribed

_____

[2] In his affidavit, Dr. Penn suggests that determining medical necessity for conditions like gender dysphoria that result in serious mental distress is different than for physical health conditions. He reasons that "there are no objective indicators or metrics" as there are in conditions "such as high blood pressure, diabetes, or glaucoma," or severe abdominal pain—for which interventions, he concludes, are "unquestionably 'medically necessary.'" Penn Aff. ¶¶ 62-68. As discussed below, this Court should not credit the testimony of Dr. Penn. Moreover, the Fourth Circuit has rejected the argument that effective treatment for serious mental distress is any less required by the Constitution than such treatment for serious physical distress. *See Bowring v. Godwin*, 551 F.2d 44, 47 (4th Cir. 1977) ("We see no underlying distinction between the right to medical care for physical ills and its psychological or psychiatric counterpart.").

gender-affirming genital surgery as treatment for Plaintiff's gender dysphoria. However, their prescribed treatments were blocked by Defendants. This raises an inference that Defendants knew that treatment was medically necessary. *See Jackson v. Lightsey*, 775 F.3d 170, 179 (4th Cir. 2014) (prescription of treatment raises inference that defendant believed that treatment was necessary).

Likewise, all health care providers who have since evaluated Plaintiff agree that her current course of treatment has not adequately alleviated her gender dysphoria, and that nothing short of gender-affirming genital surgery will. In a report to DTARC, Plaintiff's DPS mental health provider observed that despite previous surgeries, hormone therapy, and other gender-affirming care, she "continues to report clinically significant anxiety, depression, and distress associated with her gender dysphoria," and that "the next appropriate step . . . is to undergo trans-feminine bottom surgery." Ettner Decl., Doc. 13-1, at 83.[3] Additionally, the endocrinologist to whom DPS referred Plaintiff assessed that gender-affirming genital surgery "is [a] medically necessary part of treatment for this patient. She has been treated with hormones since 2012 and orchiectomy in 2017, with persistent symptoms of gender dysphoria." *Id.* at 86. Following her evaluation of Plaintiff, Dr. Ettner concluded that Plaintiff "cannot resolve the anatomical dysphoria resulting from having male genitalia and a female gender identity and an otherwise female body," that her dysphoria "will continue to intensify, with no means of relief," and thus she "urgently requires gender-affirming genital surgery." Ettner Decl. ¶¶ 89, 90, 92.

---

[3] Citations to records appended to Dr. Ettner's first declaration utilize the ECF-generated pagination.

For these reasons, Plaintiff has not advanced—and need not advance—a novel standard to succeed on her Eighth Amendment claim.[4] The record and binding precedent demonstrate that gender-affirming genital surgery is medically necessary to treat Plaintiff's gender dysphoria.

## 2. The authoritative standards of care for treatment of gender dysphoria apply with equal force in prison.

Defendants downplay Fourth Circuit caselaw regarding the relevant standards of care to assert that "significant dissent within the field" justifies their conduct. Doc. 18 at 15, 17. The argument is meritless.

In citing *Grimm v. Gloucester Cty. Sch. Bd.*, 972 F.3d 586, 596 (4th Cir. 2020), Defendants note the Fourth Circuit's recognition that the "WPATH standards are 'generally accepted protocols for treatment of [gender dysphoria].'" Doc. 18 at 17 (brackets original). But Defendants neglect to mention that the Fourth Circuit cited the WPATH standards as "the *authoritative* standards of care," explaining that "'[t]here are no other competing, evidence-based standards that are accepted by any nationally or internationally recognized medical professional groups.'" *Id.* at 595-96 (quoting *Edmo v. Corizon, Inc.*, 935 F.3d 757, 769 (9th Cir. 2019)) (emphasis added).

Defendants also acknowledge that the Fourth Circuit in *De'lonta* recognized the WPATH standards in the prison context, concluding that failure to evaluate a

---

[4] Defendants appear to cite the standard for qualified immunity, which is not at issue here, in claiming that "Plaintiff Cannot Make a Clear Showing of Likelihood of Success on the Merits with No Controlling Precedent or Consensus of Authority in Her Favor." Doc. 18 at 8. *See, e.g.*, *Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 538-39 (4th Cir. 2017). Defendants cite no case indicating that such a showing is required to show a likelihood of success on the merits.

7

prisoner for gender-affirming surgery could be deliberate indifference. 708 F.3d at 523. But Defendants then illogically dismiss these standards as irrelevant to whether gender-affirming surgery should be *provided* following an evaluation. Defendants rely largely on abstract criticisms of the WPATH standards and their applications in prison to allege "reasonable disagreement in the field" regarding the necessity for gender-affirming surgery. Defendants state that this "disagreement" supports their conclusion as to Plaintiff's medical needs. Doc. 18 at 15. This argument cannot square with the binding Fourth Circuit precedent,[5] nor the strong consensus of the medical community.

To dispute the applicability of the WPATH standards here, Defendants rely on the Fifth Circuit's decision in *Gibson v. Collier,* where the court upheld Texas's ban on gender-affirming surgery and held that an individualized assessment of a prisoner's need for such surgery was unnecessary. 920 F.3d 212, 222-23 (5th Cir. 2019). But that same conduct would plainly conflict with *De'lonta,* which held that failure to provide an individualized assessment gives rise to a claim of deliberate indifference. 708 F.3d at 526. Further, *Gibson*'s treatment of the WPATH SOC is an extreme outlier among courts that have addressed this issue. *See, e.g.*, *Flack v. Wis. Dep't of Health Servs.*, 395 F. Supp. 3d 1001, 1018 (W.D. Wis. 2019) (finding defendants' contentions that gender-affirming surgery is "inappropriate, unsafe, and ineffective" to be "unreasonable, in the face of existing medical consensus" and rejecting reliance on medical testimony in *Gibson* as outdated); *Edmo*, 935 F.3d at

---

[5] Other courts across the country have also endorsed the applicability of the WPATH SOC for the treatment of transgender prisoners. *See* Doc. 14 at 3-4.

795 (explaining why *Gibson* is an "outlier" among courts and the medical community).

Defendants' own policy, which was drafted with guidance from the WPATH standards, incorporates the requirement for individualized assessment that *De'lonta* mandates, but *Gibson* rejects as unnecessary. Junker Aff. ¶ 6; Doc. 10-1 at 3, 7. Thus, it defies logic to claim that an evaluation of medical necessity is required under the Eighth Amendment, but regardless of the evaluation's outcome, prisons may deny surgery without violating the Constitution. As discussed in Plaintiff's other briefing, the other cases Defendants cite for support are inapposite. *See* Doc. 17 at 18-20.

### 3. Dr. Penn is not qualified to provide expert testimony and his conclusions rest on unreliable methodology.

Defendants rely on an affidavit from Dr. Penn opining that "Plaintiff has received extensive and adequate treatment of her gender dysphoria" and that Defendants' "determination that the vulvoplasty was not medically necessary as of April 2022, was a reasonable determination." Penn Aff. ¶¶ 70-71.

At the preliminary injunction stage, this Court has applied a "relaxed" test for expert testimony to assess whether a proffered opinion has "indicia of reliability." *Parks v. City of Charlotte*, No. 3:17-CV-00670-GCM, 2018 WL 4643193, at *4 (W.D.N.C. Sept. 27, 2018). Here, even under this more forgiving standard, Dr. Penn is unqualified to render an opinion on the necessity of gender-affirming surgery for Plaintiff, and he reaches his conclusions using highly suspect methodology. Therefore, the Court should either exclude his testimony or afford it minimal weight.

Rule 702(a) allows expert testimony if "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or

to determine a fact in issue." "[G]eneral knowledge, skill, experience, training, or education is insufficient to qualify an expert[.]" *Cooper v. Lab'y Corp. of Am. Holdings, Inc.*, 150 F.3d 376, 380-81 (4th Cir. 1998) (holding that a witness who had "a general knowledge of chemistry" and "experience with breath alcohol testing" was not an expert in "the field of urine alcohol testing"). To qualify as an expert in cases about a specific course of medical treatment, physicians usually must have published relevant peer-reviewed research, given relevant prior expert testimony, or have experience evaluating patients for the treatment at issue. *See, e.g.*, *Kadel v. Folwell*, No. 1:19CV272, 2022 WL 2106270, at *9 (M.D.N.C. June 10, 2022).

Here, Dr. Penn does not claim to have *any* of these qualifications. He has not written any published articles—peer-reviewed or otherwise—on gender dysphoria. Penn Aff. ¶¶ 9-10 & Ex. A, Doc. 18-9, at 9-13. He does not claim to have ever provided expert testimony on the subject. Penn Aff. ¶ 16. Nor does he claim to have any experience evaluating patients for gender-affirming surgery.[6] *See id.* ¶¶ 5, 15. While Dr. Penn notes that he has some experience treating gender dysphoria, he does not mention how many patients he has treated, what clinical standards guided his practice, or what degree of success he achieved. *See id.* ¶ 15. Dr. Penn is therefore unqualified to opine on the specific issue before the Court: Plaintiff's individual need for gender-affirming surgery. *See* Ex. 1, Second Expert Declaration of Randi C.

---

[6] It is unsurprising that Dr. Penn mentions no experience evaluating patients for gender-affirming surgery, given that he practices predominately within the Texas prison system, for which the Fifth Circuit has upheld a policy imposing a blanket ban on gender-affirming surgery for prisoners. *See Gibson*, 920 F.3d at 228.

Ettner, Ph.D. ("Second Ettner Decl.") ¶¶ 8-13.

Even assuming that Dr. Penn qualifies as an expert, he must still establish that he used a reliable methodology to reach his conclusions. *See Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 203 (4th Cir. 2001). For several reasons, he cannot.

First, Dr. Penn has not personally examined or interviewed Plaintiff. Dr. Penn's affidavit contains virtually no discussion of Plaintiff's individual circumstances—at most, he has reviewed some of Plaintiff's medical records. Penn Aff. ¶ 23. This alone seriously diminishes the reliability of his opinion approving of Defendants' treatment decision—an issue that Dr. Penn agrees must involve a rigorous, highly individualized assessment. *See id.* ¶ 31; Ettner Decl. ¶¶ 29, 32; Second Ettner Decl. ¶ 21; *Cooper,* 259 F.3d at 203 (district court properly excluded testimony where doctor did not personally evaluate patient); *Grimm*, 972 F.3d at 596 (observing personalized inquiry necessary for treating gender dysphoria); *Edmo,* 935 F.3d at 769 (observing the same in prison case).

Relatedly, Dr. Penn's affidavit exclusively addresses hypothetical scenarios about why gender-affirming surgery might be improper for some patients, mostly because of "administrative" or other non-medical considerations. Penn Aff. ¶¶ 35-47. Like Defendants themselves, Dr. Penn never engages with these considerations to explain why gender-affirming surgery is not medically necessary or is otherwise improper *for Mrs. Zayre-Brown.*

For instance, Dr. Penn notes that "[b]ecause correctional agencies are publicly funded, these entities must consider the financial implications associated with

approving certain treatment modalities from the perspective of government leaders such as legislature, public policy leaders, and taxpayers." Penn Aff. ¶ 44. But there is no evidence that Defendants or Dr. Penn actually considered cost. Moreover, the Eighth Amendment severely constrains their ability to do so. *See Scott v. Clarke*, 64 F. Supp.3d 813, 841 (W.D. Va. 2014) (explaining that "'if necessary medical treatment has been delayed for non-medical [*i.e.,* cost-saving] reasons, a case of deliberate indifference has been made out" (brackets original) (quoting *Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 704 (11th Cir. 1985))); *Peralta v. Dillard*, 744 F.3d 1076, 1083 (9th Cir. 2014) (en banc) ("Lack of resources is not a defense to a claim for prospective relief because prison officials may be compelled to expand the pool of existing resources in order to remedy continuing Eighth Amendment violations.").

Additionally, Dr. Penn notes as relevant "the availability of qualified and willing surgical professionals" to perform vulvoplasty, but does not mention that Plaintiff has already been evaluated by one such surgeon, nor does he indicate that this concern weighs against approving surgery in her specific circumstances. Penn Aff. ¶ 40.[7] This complete lack of engagement with the circumstances surrounding Plaintiff's actual medical need renders Dr. Penn's views not only unreliable, but irrelevant. *See* Second Ettner Decl. ¶ 40.

---

[7] Despite his assertion that vulvoplasty is a "highly specialized" procedure, many of the considerations that Dr. Penn cites—such as planning and coordination of transportation, pre-operative tests, custody staff escorts and supervision, and post-operative follow-up—would apply to *any* surgical procedure, not just vulvoplasty. Dr. Penn fails to explain why such considerations would present a problem in Plaintiff's case in particular, or justify denial of this surgery in particular. *See* Second Ettner Decl. ¶ 29.

12

Dr. Penn's opinion also appears to rest on the idea that a patient's legitimate need for medical care changes depending on whether she is incarcerated, and relatedly, the idea that "the WPATH standards do not take the correctional context into account[.]" Doc. 18 at 12. Neither contention is true. As a matter of medical practice and common sense, an incarcerated patient needs adequate medical care just like any other patient. Second Ettner Decl. ¶ 15 ("Custodial status is not a medical justification to deviate from accepted standards of care or medically necessary treatment for any medical condition, including gender dysphoria"), *Id.* ¶ 19. And as Dr. Ettner notes, the WPATH standards consider the prison setting by their very text. Ettner Decl. ¶ 30 ("The treatment of incarcerated persons with gender dysphoria has been addressed in the SOC since 1998 . . . . the SOC expressly state that all elements of the prescribed assessment and treatment are equally applicable to patients in prison. . . .").

Further, as Dr. Penn acknowledges, "the National Commission on Correctional Health recommends treatment in accordance with the SOC for people in correctional settings." Ettner Decl. ¶ 30; Penn Aff. ¶ 26. And as discussed above, the Fourth Circuit has recognized that the WPATH SOC "represent the consensus approach of the medical and mental health community" in both community and carceral settings. *Grimm,* 972 F.3d at 595 (citing *De'lonta,* 708 F.3d at 522-23). That Dr. Penn's guidance conflicts with the precedent that binds this Court makes his opinion particularly unhelpful.

Dr. Penn also bases his conclusions on a grossly deficient and misleading

review of the scientific literature concerning the necessity and efficacy of gender-affirming surgery. A literature review may be an appropriate part of an expert report. However, the expert must conduct a thorough review in a reliable way. *See Doe v. Ortho-Clinical Diagnostics, Inc.*, 440 F. Supp. 2d 465, 472 (M.D.N.C. 2006) (literature review was unreliable because it "relied upon a number of disparate and unconnected studies . . . to reach a piecemeal conclusion").

Dr. Penn first states that there is no relevant research on gender-affirming surgery in the correctional context. Penn Aff. ¶ 53. But as discussed above, a patient's incarceration status does not change whether she will continue suffering without a particular course of treatment. Thus, the absence of research "in the correctional setting" has no bearing on whether a denial of gender-affirming surgery will subject Plaintiff to a substantial risk of serious harm. *See* Second Ettner Decl. ¶¶ 15, 19, 31-33.

Dr. Penn then offers a woefully incomplete review of relevant research. As discussed in Dr. Ettner's declarations, numerous studies show that gender-affirming surgery can be necessary to alleviate a patient's gender dysphoria when other therapies do not. Ettner Decl. ¶¶ 45-47, 50-57, 62; Second Ettner Decl. ¶ 38. She further discusses how medical organizations in the United States and around the world agree with that conclusion—including organizations of which Dr. Penn is a member. *See* Ettner Decl. ¶ 48 (noting that the American Psychological Association (APA), among others, supports "surgery in accordance with the SOC as medically necessary treatment for individuals with severe gender dysphoria"); Second Ettner

Decl. ¶37-38 (discussing same); Penn Aff. ¶¶ 8, 11 (noting contributions to and leadership work in the APA).

Dr. Penn, on the other hand, cites only two articles that he describes as reaching "highly conflicting conclusions." Penn Aff. ¶¶ 55-59. But these articles fail to support Dr. Penn's position. *See* Second Ettner Decl. ¶ 37 (noting first article cited by Dr. Penn relies on "questionable methodology" in conflict with "decades of methodologically sound and rigorous scientific research"); *id.* ¶ 39 (noting author of "Swedish Study" has "stated that this research has consistently been 'mischaracterized'" to support arguments akin to Dr. Penn's). Though he notes that "[t]here are multiple other studies on the topic," he fails to provide a bibliography or any other reference to such works. *Id.* ¶ 59 n.10. Such a cursory, highly selective literature review is inherently unreliable. *See Doe,* 440 F. Supp. 2d at 472; *see also McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1255 (11th Cir. 2005) (district court should have excluded expert testimony because "the medical literature does not support such opinions" and doctor "has simply substituted his own *ipse dixit* for scientific proof").

Accordingly, the Court should afford Dr. Penn's opinion little or no weight in deciding Plaintiff's motion.

### 4. In lieu of providing justification for Defendants' medical decision-making, Dr. Penn and Dr. Boyd make baseless criticisms of Dr. Ettner's report.

Instead of addressing whether gender-affirming surgery is necessary for Plaintiff given her circumstances, Defendants and their affiants focus on criticizing

15

Dr. Ettner's declaration. These attacks are baseless.

In addition to the affidavit of Dr. Penn, Defendants submit the affidavit of Dr. Sara Boyd. It is unclear if Defendants proffer Dr. Boyd as an expert—unlike Dr. Penn, she does not claim to have been engaged as such. In any event, Dr. Boyd's opinions are entitled to minimal weight for the same reasons as Dr. Penn's: she has not evaluated Plaintiff; says nothing about whether gender-affirming surgery is necessary for Plaintiff; and claims no relevant peer-reviewed publications, prior expert testimony, or evaluations of patients for gender-affirming surgery. *See* Boyd Aff. ¶ 4 &. Ex. A, Doc. 18-7, at 7-8; *see also* Second Ettner Decl. ¶¶ 45-50. Further, like Defendant Junker and Dr. Penn, Dr. Boyd does not mention the evaluations conducted by DPS providers and specialists to whom DPS referred Plaintiff for care, despite noting that she reviewed Plaintiff's records to prepare her affidavit. *Id.*

Defendants and their affiants criticize Dr. Ettner for failing to include an "exploration . . . regarding Plaintiff's repeated desire for a vaginoplasty (as opposed to the vulvoplasty she now seeks)," asserting that "[a] comprehensive evaluation of the appropriateness of the requested intervention at present should have included an exploration of how the Plaintiff's decision to opt for the vulvoplasty instead of the vaginoplasty . . . affects her expectations." *See* Doc. 18 at 19, Boyd Aff. ¶¶ 7-11; Penn Aff. ¶ 41. The assertion that Dr. Ettner did not explore these topics is incorrect. *See* Second Ettner Decl. ¶ 56 (noting discussion of vulvoplasty to alleviate "persistent, sever gender dysphoria" as a result of Plaintiff's "constant, visible primary sex characteristic that is incongruent with her gender").

16

Nevertheless, both Dr. Boyd and Dr. Penn fail to explain how this "exploration" should affect whether gender-affirming surgery is medically necessary for Plaintiff. Dr. Boyd and Dr. Penn ignore that Defendants had already denied Plaintiffs request for vaginoplasty, claiming that it was not medically necessary and that the prison could not provide "proper post operative care." Ettner Decl. at 91; Second Ettner Decl. ¶ 60. They also ignore that, after finally receiving a consultation with experts in gender-affirming surgery, Plaintiff was counseled twice about her surgical options, and decided on vulvoplasty in consultation with these experts.[8] Zayre-Brown Decl. ¶¶ 36-37; Second Ettner Decl. ¶¶ 25-26, 53, 55, 57, 60 (noting Plaintiff's discussion of surgical expectations and informed consent with Dr. Figler, her would-be surgeon). Plaintiff's willingness to move forward with a vulvoplasty following these consultations undermines Defendants' claim that this case is nothing more than a complaint from Plaintiff that she is being refused the treatment of her "choice."

Dr. Boyd also criticizes Dr. Ettner for not discussing two instances in 2019 when Plaintiff was sent to the emergency room and suspected of using an illicit substance while housed in men's facilities, claiming that these instances indicate there may be "additional contributory causes" or "co-occurring mental health conditions" other than gender dysphoria that may be contributing to Plaintiffs

---

[8] Dr. Boyd additionally critiques Dr. Ettner for failing to conduct "collateral interviews of . . . other individuals who could provide observations of Plaintiff's history, symptoms, and response to prior interventions." Boyd Aff. ¶ 7. Such interviews would be impracticable under the circumstances. *See infra* p. 23. But more importantly, Dr. Boyd provides no support that such interviews are typical or necessary in "the evaluation of gender-dysphoria and need for gender affirming surgery for an adult woman" or for "any other medical condition or procedure." Second Ettner Decl. ¶ 54.

distress. Boyd Aff. ¶ 13.

As an initial matter, Dr. Boyd acknowledges that "that there were no positive drug test results or contraband recovered . . . ." *Id.* ¶ 12; *see also* Mingo Aff. ¶¶ 15-19. But regardless, Dr. Boyd fails to explain how suspected "substance abuse" in 2019—with no documented recurrences in the nearly three years since—has any bearing on Plaintiff's need for gender-affirming surgery *now*. Further, Dr. Boyd again fails to acknowledge the facts in the medical records that she claims to have reviewed: Dr. Ettner is not the only mental health professional that has concluded Plaintiff has no co-occurring mental health conditions. Ettner Decl. ¶ 79; Second Ettner Decl. ¶ 61. The April 26, 2022 summary that accompanied DTARC's denial of gender-affirming surgery as not medically necessary also noted that Plaintiff's medical records "indicated no current evidence of any significant comorbid mental health issues." Doc. 18-5 at 2.

Most perplexingly, Dr. Boyd and Dr. Penn criticize Dr. Ettner for failing to "discuss relative benefits or disadvantages of pursuing [surgery] in the community versus while incarcerated," given that prison exacerbates her feelings of gender dysphoria. Boyd Aff. ¶¶ 15-16; Penn Aff. ¶ 47. Dr. Boyd notes that, in addition to better post-operative care, the "[m]ixed gender community setting[]" outside of prison would provide "more opportunity to seek support, information, and guidance," offering "significant psychosocial advantages for amelioration of Plaintiff's gender dysphoria." Boyd Aff. ¶ 16. Dr. Penn similarly notes that "[s]urgery in the community typically carries numerous interpersonal and social benefits over surgery in the

18

correctional setting." Penn Aff. ¶ 47.

But Plaintiff has made clear that the main source of her gender dysphoria, both in prison and elsewhere, is her genitalia. Zayre-Brown Decl. ¶¶ 2, 14, 53-54; *see also* Ettner Decl. at 83 (noting that, while Plaintiff's adjustment to incarceration has improved since transferring to a women's facility, "it seems to have made her more aware and dysphoric about the one part of her body that does not affirm her gender identity"). While leaving prison may ameliorate Plaintiff's gender dysphoria or provide a more comfortable environment to recover from surgery, that will not happen until November 2024. Defendants do not suggest that release is an available treatment option at this time. As Dr. Ettner notes, "[t]here are no benefits in such a lengthy delay, especially given how long [Plaintiff] as sought and required surgery." Second Ettner Decl. ¶24. Rather, "such a delay would perpetuate [Plaintiff's] acute distress and pose ongoing risks to her mental and physical health . . . ." *Id.*

For the rest of Plaintiff's incarceration, her health is Defendants' responsibility. Numerous medical conditions may be worsened by incarceration, but that does not obviate a prison's responsibility to prevent needless suffering and harm. *See, e.g., Adams v. Ferguson,* 884 F.3d 219, 228 (4th Cir. 2018) (deliberate indifference where defendant "declines to intervene to prevent a known substantial risk . . . of suffering serious harm.") (cleaned up). And Defendants cite no law to support their view that a prison can withhold medically necessary care for more than two years because providing that care may be more comfortable or provide greater benefit

outside of a carceral setting.[9] In fact, the law dictates the opposite: "Prison staff cannot bide their time and wait for an inmate's sentence to expire before providing necessary treatment" without violating the Eighth Amendment. *Mitchell v. Kallas,* 895 F.3d 492, 496 (7th Cir. 2018).

Accordingly, Dr. Boyd and Dr. Penn's criticisms of Dr. Ettner are baseless.

## B. Defendants confirm that they have consciously disregarded the substantial risk of irreparable harm Plaintiff faces without immediate relief.

By Defendants' own telling, they have not meaningfully altered Plaintiff's course of medical treatment for gender dysphoria since June of 2018. Doc. 18 at 4-5. Although hormone therapy remains necessary to maintain Plaintiff's basic functioning post-orchiectomy, she is now hormonally confirmed—hormone therapy will not provide any further alleviation of her gender dysphoria. Ettner Decl. ¶86 (noting that Plaintiff now has hormone levels "typical for females" and "the secondary sex characteristics of a woman"). Still, her severe emotional distress and desire to self-mutilate persist and worsen. Any competent physician would conclude that this initial course of treatment is no longer adequate. And "[g]overnment officials who ignore indications that a prisoner's . . . initial medical treatment was inadequate can be liable for deliberate indifference to medical needs." *Cooper v. Dyke,* 814 F.2d 941,

---

[9] The "nearness" of Plaintiff's release date to the time of this lawsuit is the result of Defendants' delays in considering Plaintiff medically necessary care. *See* Doc. 14 at 7 (noting first formal request for gender-affirming surgery in December 2018). Defendants cannot delay care for more than three years and then cite to the "closeness" of a release date more than two years in the future as a reason for denying surgery. Far from supporting their position, Defendants' apparent "run-out-the-clock" strategy strongly supports a finding of deliberate indifference.

945 (4th Cir. 1987).

To maintain that this medical treatment is adequate, Defendants attempt to contradict, explain away, or ignore Plaintiff's documented distress, attempts of self-harm, and suicidal ideation. But in the end, there can be no "material disagreement about the facts," Doc. 18 at 21, as the medical records available to all parties demonstrate the severe distress to which Plaintiff has testified in her declaration. Defendants' "disagreement" represents, at best, willful ignorance in an attempt to evade liability.

For instance, Defendants urge that "Plaintiff does not link her distress to the surgery denial" but rather that her dysphoria stems from transphobic comments and "the sharp segregation of the sexes." Doc. 18 at 22. Plaintiff's testimony shows otherwise. Zayre-Brown Decl. ¶¶ 26-27, 29, 33, 45, 52-54. Defendants disregard the testimony and records that reflect that the transphobic comments Plaintiff finds most distressing are those relating to the fact that she still retains her unwanted genitalia, *see* Zayre-Brown Decl. ¶ 33; Second Ettner Decl. App. at 1-2, and that "the sharp segregation of the sexes" exacerbates her dysphoria by reminding her of "the one part of her body that does not affirm her gender identity," Ettner Decl. at 83.

Alarmingly, Defendants seem to contend that Plaintiff cannot show deliberate indifference because she has not attempted or successfully inflicted self-harm. *See* Doc. 18 at 9-10, 22. As an initial matter, this is factually incorrect. Dr. Ettner notes in her second declaration that, while only documented desires of self-harm led to her hospitalization in December 2020, Plaintiff's medical records reflect an incident in

which she arrived to a mental health appointment with a band tied around her genitals that had been in place for over a week. Plaintiff agreed to remove the band after being "cautioned about the effects of impeding blood flow and risk of infection" and being reassured that scheduling for her consult for gender-affirming surgery was in progress. Second Ettner Decl. ¶ 5 & App. at 5.

However, even if Plaintiff had not attempted to self-mutilate, her ongoing desire to do so is well-documented, and apparently not disputed by Defendants. *See* Second Ettner Decl. ¶¶ 5-6 & App. at 1-10; *id.* ¶ 44 (noting "inadequately treated gender dysphoria leads inexorably to . . . emotional decompensation, surgical self-treatment . . . or suicide" and that these outcomes are "not uncommon in prison settings"). To the extent Defendants assert that anything short of an actual attempt at self-harm cannot expose them to Eighth Amendment liability, that assertion is incorrect. "[I]t is inconsistent with the Eighth Amendment for a prison official to withhold treatment from an inmate who suffers from a serious, chronic disease until the inmate's condition significantly deteriorates." *Gordon v. Schilling,* 937 F.3d 348, 359 (4th Cir. 2019).

## II. The balance of the equities and public interest weigh in Plaintiff's favor.

As discussed *supra* Section I.B., Defendants know of the risks Plaintiff faces absent relief from this Court. The deprivation of Eighth Amendment rights that Plaintiff has suffered, and the severe and ongoing emotional distress that follows, constitute irreparable harm sufficient to warrant a mandatory injunction. *See* Doc. 14 at 22; *Porter v. Clarke,* 290 F. Supp. 3d 518, 534 (E.D. Va. 2018) (noting that the

"emotional and psychological harm" underlying an Eighth Amendment violation is itself "paradigmatic irreparable harm."). Defendants' arguments to the contrary are baseless, and their asserted "harms" are illusory by comparison.

Defendants argue that "Plaintiff's two-month delay in filing for preliminary injunctive relief after bringing this lawsuit weighs against granting the relief," claiming that it demonstrates a lack of urgency. Doc. 18 at 22. But this delay was caused entirely *by Defendants*. Plaintiff's counsel arranged for Dr. Ettner to visit Anson CI to evaluate Plaintiff on March 30, 2022, nearly a month before filing suit. Ex. 2, Declaration of Jaclyn Maffetore ("Maffetore Decl.") ¶¶ 3-4. This visit was ultimately denied by Anson CI following consultation with DPS counsel, and Plaintiff's counsel was informed that no such visit would be approved without a pending lawsuit. Maffetore Decl. ¶¶ 10-16. On May 2, 2022, two business days after filing the complaint, Plaintiff's counsel again sought to schedule an in-person visit, or alternatively an evaluation by videoconference. Maffetore Decl. ¶ 19, 21. However, given DPS's refusal to allow an evaluation before filing the complaint, the purported lack of technological capability for a videoconference, and the scheduling constraints imposed by DPS, Dr. Ettner could not evaluate Plaintiff until May 25, 2022. Maffetore Decl. ¶¶ 20, 22-26. It was hardly unreasonable, then, that Plaintiff could not file a preliminary injunction motion until one month later given the time required for Dr. Ettner to prepare her expert report and for Plaintiff to finalize her brief relying on it.

Moreover, the public interest strongly weighs in favor of upholding the constitutional rights at issue in this case. Defendants contend that the public "has a

strong interest in the proper use of public funds." Doc. 18 at 22-23. But it is undoubtedly a proper use of public funds to provide incarcerated people the medically necessary health care required by the Constitution. *See* Doc. 14 at 23. Defendants argue that "changing" or "loosening" the standard for medical necessity would expose DPS to an excessive financial burden; but, as detailed *supra* Plaintiff has advocated for nothing of the sort. Rather, she asserts that gender-affirming genital surgery is medically necessary for her under longstanding Eighth Amendment precedent.[10]

However, to the extent that Defendants argue against preliminary relief because it might require them to provide medically necessary care to other transgender prisoners suffering from gender dysphoria, this is not a "harm" recognized by the Constitution. *See Watson v. City of Memphis,* 373 U.S. 526, 537 (1963) ("vindication of conceded constitutional rights cannot be made dependent upon any theory that it is less expensive to deny than to afford them"). Instead, what Defendants have articulated is their existing constitutional obligation. *See supra* p. 12; *see also Edmisten v. Werholtz,* 287 Fed.Appx. 728, 734 (10th Cir. 2008) (noting that even medical care amounting to "substantial burden" on prison's resources would not be "misplaced or undue" if required by the Constitution).

Even if this Court's order prompts Defendants to provide greater care to other gender-dysphoric transgender patients, Defendant Junker concedes that these

---

[10] Defendants' argument that a "lack of clear limits and protocols" to treat gender dysphoria would add to the hypothetical burden they identify is also unavailing. As many circuit courts recognize, the WPATH SOC, which Defendants considered in crafting their policy, do provide protocols for treatment, *see supra* Section I.A.2, Defendants have simply chosen to selectively disregard them.

individuals represent a small percentage of the total prison population. *See* Junker Aff. ¶ 12 (noting only 128 individuals self-identified as transgender or intersex in DPS custody). That is especially so compared to the percentage of prisoners suffering from other serious medical conditions that Defendants must treat. *See, e.g. Gordon*, 937 F.3d at 351 (noting that roughly between "16% to 41% of incarcerated individuals" are affected by hepatitis C). Further, Defendants cannot claim harm from providing a medical treatment that their own policy contemplates may be necessary for some patients.[11] *See* Doc. 10-1 at 7.

In short, Plaintiff's life is at risk without gender-affirming surgery. Ordering that Defendants provide her this care, by contrast, simply requires them to adhere to their existing constitutional obligation and their own policy. The balance of equities and public interest therefore weigh strongly in her favor.

## CONCLUSION

This Court should enter a preliminary injunction enjoining Defendants to provide Plaintiff with medically necessary gender-affirming surgery as soon as possible.

Dated: August 2, 2022                                   Respectfully submitted,

---

[11] Defendants state, without explanation, that this Court should deny the requested relief because of "the potential for abuse." Doc. 18 at 24. If by "abuse," Defendants mean to suggest malingering, this concern is mitigated by the requirement for qualified medical providers to make individualized assessments and prescribe those treatments considered medically necessary.

25

/s/ Jaclyn A. Maffetore
Jaclyn A. Maffetore
NC Bar No. 50849
Daniel K. Siegel
NC Bar No. 46397
Michele Delgado*
NC Bar No. 50661
ACLU OF NORTH CAROLINA
LEGAL FOUNDATION
P.O. Box 28004
Raleigh, NC 27611-8004
Tel: (919) 834-3466
Fax: (919) 869-2075
jmaffetore@acluofnc.org
dsiegel@acluofnc.org
mdelgado@acluofnc.org

Christopher A. Brook
NC Bar No. 33838
PATTERSON HARKAVY LLP
100 Europa Drive, Suite 4210
Chapel Hill, NC 27517
Tel: (919) 942-5200
Fax: (866) 397-8671
cbrook@pathlaw.com

Jon W. Davidson*
(admitted only in California)
Taylor Brown*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004-2400
Tel: (212) 519-7887
Fax: (212) 549-2650
jondavidson@aclu.org
tbrown@aclu.org

*admitted *pro hac vice*

*Counsel for Plaintiff*

26

## <u>CERTIFICATE OF SERVICE</u>

I certify that on August 2, 2022, I filed the foregoing with the Clerk of the Court using the CM/ECF system which will effect service on all counsel of record.

Dated: August 2, 2022                                Respectfully submitted,

*/s/ Jaclyn A. Maffetore*
Jaclyn A. Maffetore

*Counsel for Plaintiff*