# EXHIBIT 1

Second Expert Declaration of
Dr. Randi C. Ettner, Ph.D.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA

KANAUTICA ZAYRE-BROWN,

        *Plaintiff,*

v.

THE NORTH CAROLINA
DEPARTMENT OF PUBLIC SAFETY,
*et al.,*

        *Defendants.*

No. 3:22-cv-00191

## SECOND EXPERT DECLARATION OF RANDI C. ETTNER, PH.D., IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

1.      I am a clinical and forensic psychologist retained by counsel for Plaintiff Kanautica Zayre-Brown. I have expertise and decades of experience in the diagnosis and treatment of gender dysphoria, more fully set out in my initial declaration in this matter. *See* Declaration of Dr. Randi Ettner, Ph.D., ECF No. 13-1 ("Ettner Decl."). I am providing this second declaration primarily to address some of the statements, opinions, and conclusions made by Joseph Penn, MD and Sara Boyd, Ph.D., ABPP in their affidavits submitted by Defendants in this matter. *See* Affidavit of Joseph Penn, ECF No. 18-8 ("Penn Aff."); Affidavit of Sara Boyd, ECF No. 18-6 ("Boyd Aff."). This declaration is based on my review of those affidavits, Dr. Penn's curriculum vitae (ECF No. 18-9), Dr. Boyd's curriculum vitae (ECF No. 18-7), the complaint in this matter (ECF No. 1), my review of Mrs. Zayre-Brown's North Carolina Department of Public Safety's ("DPS") medical records, my clinical interview and assessment of Mrs.

Zayre-Brown, my decades of clinical experience in the evaluation, diagnosis, and treatment of individuals suffering from gender dysphoria, and the relevant literature on these topics.

2.     As an initial matter, I will first clarify what has been identified as an inaccuracy in my initial declaration, surrounding the events of Plaintiff's hospitalization in December 2020, and to clarify my understanding of Plaintiff's history of self-injurious thoughts and behaviors in general. A selection of the specific medical records upon which I rely for this clarification are attached to this declaration as an Appendix.

3.     In stating that Mrs. Zayre-Brown's December 2020 hospitalization resulted from "her attempt to amputate her penis," Ettner Decl. ¶ 78, I inadvertently conflated the facts of two separate incidents. The medical records pertaining to the December 2020 incident indicate that Mrs. Zayre-Brown was hospitalized after vocalizing suicidal ideation and a desire, rather than an attempt, to amputate her penis, following an incident in which her gender dysphoria was exacerbated. *See* App. at 1-2.

4.     However, Mrs. Zayre-Brown's medical records also note an incident in April of 2021 in which she informed her DPS mental health care provider that she had a band tied around her penis that had been in place for more than a week due to increased dysphoria from the lack of gender-affirming surgical care. App. at 5. The record of this incident indicates that Mrs. Zayre-Brown's mental health care provider convinced Mrs. Zayre-Brown to remove the band after cautioning her "about the

effects of impeding blood flow and risk of infection," and reassuring her that scheduling for her consult for gender-affirming surgery was in progress. *Id.* Based on the records, no hospitalization occurred following this incident.

5. As I noted in my initial declaration, my evaluation of Mrs. Zayre-Brown led me to conclude that she is currently struggling with thoughts of auto-penectomy as a result of her intensifying gender dysphoria. Ettner Decl. ¶ 89. Mrs. Zayre-Brown's medical records indicate that, in addition to the incident described above, she has expressed such thoughts to her DPS mental health care providers on multiple occasions since her December 2020 hospitalization. *See* App. at 3, 7-8.

6. Consideration of these records contributed to my conclusion that Mrs. Zayre-Brown urgently requires gender-affirming genital surgery, *see* Ettner Decl. ¶ 92. As noted below, there is no indication that either Dr. Penn or Dr. Boyd considered these records in formulating the deeply flawed opinions in their affidavits.

### A. Affidavit of Dr. Joseph Penn, MD

7. Having reviewed Dr. Penn's affidavit in full and his curriculum vitae, Dr. Penn's flawed opinions can likely be primarily attributed to his evident inexperience and lack of expertise in the evaluation, diagnosis, and treatment of gender dysphoria, specifically gender-affirming surgery treatment protocols for the treatment of gender dysphoria. While Dr. Penn proffers various qualifications, Penn Aff. ¶¶ 1-22, to suggest that he is qualified to render his expert opinions on these topics, *id.* ¶¶ at 22-23, and his conclusions, *id.* ¶¶ at 69-71, I respectfully but strongly disagree that he is qualified to offer expert opinions on these subjects. I further

respectfully but strongly disagree with his primary conclusions that the carceral setting somehow factors into the medical necessity criteria for gender-affirming surgery for the treatment of gender dysphoria, that gender-affirming surgery is not medically necessary for the treatment of gender dysphoria, and that gender-affirming vulvoplasty is not medically necessary for the treatment of Mrs. Zayre-Brown's gender dysphoria. I will first address Dr. Penn's lack of expert qualifications on the relevant subject-matter at hand and then his statements, opinions, and conclusions, in turn.

8.     Regarding Dr. Penn's qualifications as an expert in this subject-matter, I first note that Dr. Penn has never published on the topic of gender dysphoria or the psychological or medical treatment of gender dysphoria. *See* Penn Aff. ¶ 9. Additionally, Dr. Penn has never been found qualified to serve as an expert witness, served as an expert witness, or given expert testimony on these topics in any court proceedings. *See id.* at ¶ 16. In examining Dr. Penn's asserted qualifications on these topics, there appears to be a high-level of generality, lack of specificity, and notable deficiencies. I will identify a few illustrative examples.

9.     In describing his experience in treating transgender patients, Dr. Penn repeatedly offers examples of experience treating transgender patients with and *without* gender dysphoria. *Id.* at ¶¶ 5, 6, 9, 13-14. For transgender patients without gender dysphoria, it appears the treatments he has provided, supervised, provided consultations for, and made recommendations for include treatments like psychotropic medications and therapy for other diagnoses. *Id.* at ¶ 5. Dr. Penn's

experience treating transgender patients without gender dysphoria is irrelevant and does not support his qualifications to render expert opinions on the evaluation, diagnosis, and treatment of gender dysphoria or the medical necessity of gender-affirming surgery. Further, it is notable that he offers no total or approximate number of transgender patients in whose treatment he has been involved, whether it was direct clinical treatment and the scope, and most importantly, no figure for how many of the patients he has treated that had gender dysphoria nor how many patients he has evaluated for gender-affirming surgery.

10.     Dr. Penn points to specialized clinical training in the evaluation and treatment of transgender populations under the supervision of Dr. Walter Meyer. *Id.* at ¶ 13. While I agree that Dr. Meyer was a well-respected leader in the field of health care for transgender people, I must point out that Dr. Penn again provides no specificity as to what this clinical training involved, when this clinical training occurred, how long the clinical training lasted, the number of transgender patients with gender dysphoria he treated, or similar important details. Nor does Dr. Penn list this specialized clinical training on his curriculum vitae, where one might expect to find these details. *See* ECF No. 18-9.

11.     Like the deficiencies in Dr. Penn's clinical experience in the treatment of gender dysphoria, Dr. Penn is also vague regarding his knowledge of the treatment protocols and the relevant literature for the treatment of gender dysphoria. Dr. Penn states, "I am familiar with mental health and psychiatry best practices, including in the evaluation and treatment of gender dysphoria[.]" Penn Aff. ¶ 9; *see also id.* at

¶ 13.   It is important to note that mental health and psychiatric treatments are components of accepted treatment protocols for gender dysphoria, but central here is the surgical treatment of gender dysphoria. Dr. Penn has also provided no bibliography to identify what literature he has relied upon to form his statements, opinions, and conclusions. Based on Dr. Penn's asserted qualifications in his affidavit and curriculum vitae, it is unclear to me to what degree, if any, Dr. Penn is familiar with the surgical treatment options and protocols for the treatment of gender dysphoria.

12.   Finally, many of the qualifications and experiences that Dr. Penn identifies to support his expert qualifications on the treatment of gender dysphoria, have nothing directly to do with gender dysphoria, treatment protocols for gender dysphoria, or even incarcerated transgender patients in general. *Id.* at ¶¶ 1-4, 7-8, 10-12, 16-19.

13.   Dr. Penn's affidavit and curriculum vitae clearly demonstrate that he has a great deal of education, professional experience, and specialized knowledge in many subsets in the fields of psychiatry, psychology, and mental health care. But they do not demonstrate that he has any specialized expertise, experience, or knowledge in the evaluation, diagnosis, and treatment of gender dysphoria, and gender-affirming surgery treatment protocols for the treatment of gender dysphoria, required to competently render the expert opinions and conclusions that he does. Dr. Penn's qualifications, or lack thereof, actually demonstrate the exact opposite.

14.     I will first address Dr. Penn's premise that the carceral setting somehow factors into the medical necessity criteria for gender-affirming surgery for the treatment of gender dysphoria and/or necessitates different standards of care. Dr. Penn notes "that there are currently no published national correctional standards or correctional health standards concerning the policies and/or protocols for the evaluation, treatment, or clinical management of transgender individuals with or without gender dysphoria in the carceral setting." Penn Aff. ¶ 24. This is of no consequence, but it is important to point out because it underscores the primary flaw in almost all of Dr. Penn's purported expert opinions and conclusions.

15.     Dr. Penn's premise is that an individual's medical condition and treatment of that condition are somehow different *solely* because of their custodial status. Even more troubling are the notions that medical treatment must be dictated by custodial status and that custodial status can be a justification not to provide recognized medically necessary treatment. Dr. Penn is wrong. Custodial status is not a medical justification to deviate from accepted standards of care or medically necessary treatment for any medical condition, including gender dysphoria, and there is no need for separate "published national correctional standards or correctional health standards" for the medical treatment of gender dysphoria, because those standards are the same whether a person is in custody or not. Ettner Decl. ¶ 30. I am aware of no medical condition that requires deviation from accepted treatment protocols simply because a person is incarcerated and no treatment protocol that is rendered not medically necessary solely because the patient is incarcerated.

Case 3:22-cv-00191-MOC-DCK   Document 22-1   Filed 08/02/22   Page 8 of 43

16.     If Dr. Penn is in search of nationally accepted treatment protocols for the treatment of gender dysphoria, including gender-affirming surgery, he need look no further than the World Professional Association for Transgender Health Standards of Care ("WPATH SOC") and the endorsement of those standards of care by almost every mainstream medical and professional association in the United States, including the American Medical Association, the American Psychiatric Association, the American Psychological Association, The Endocrine Society, the American Academy of Pediatrics, and the National Commission on Correctional Health Care, which expressly cites to the WPATH SOC as accepted standards of care in their 2020 Position Statement on "Transgender and Gender Diverse Health Care in the Correctional Setting."[1]

17.     Dr. Penn devotes a great deal of time articulating what he describes as "[u]nique [c]onsiderations in the [c]orrectional [s]etting" and suggests I did not "meaningfully" consider these unique considerations in my declaration and/or evaluation of Mrs. Zayre-Brown. Penn Aff. ¶¶ 35-47. Again, Dr. Penn is wrong. First, Dr. Penn apparently misunderstands the purpose and scope of the evaluation that I conducted. Second, Dr. Penn apparently misunderstands the interdisciplinary nature of the treatment for gender dysphoria, including evaluations and recommendations for gender affirming surgery for the treatment of gender dysphoria. Again, both misunderstandings are likely attributable to his lack of expertise.

---

[1] NCCHC Position Statement, *Transgender and Gender Diverse Health Care in Correctional Settings* (2020), https://www.ncchc.org/transgender-and-gender-diverse-health-care-in-correctional-settings-2020/.

18.     While I disagree, for the sake of relevancy and clarity, I need not address Dr. Penn's flawed assertions in paragraphs 32-38 of his affidavit because as he acknowledges, those examples "concern housing considerations, which I understand are not at issue in this phase of the litigation[.]" *Id.* at ¶ 39. However, Dr. Penn yet again states the deeply flawed premise that "custody, housing and classification determinations and other custody related considerations, that are unique to the correctional setting, must also be seriously considered with regard to any other interventions, including medical (hormonal treatments) and/or surgical interventions." *Id.* Specifically, Dr. Penn identifies the following considerations that he insists must be considered when assessing surgical intervention for an incarcerated transgender person: a person's "legal or criminal history," *id.* at ¶ 37, "disciplinary history," *id.*, and the "trauma and victimization histories" of other incarcerated persons with whom the patient is housed. *Id.* at ¶ 38.

19.     I must again emphatically state that an individual's custodial status, housing status, and/or security classification are not *medical justifications* to deny medically necessary care, including surgical care, for the treatment of gender dysphoria or any other medical condition that I am aware of. I am aware of no literature that supports Dr. Penn's positions, nor has he provided citations to any such literature.

20.     Dr. Penn states this proposition generally but does not go into any detail in his affidavit on how exactly these specific factors affect the medical necessity of or the provision of gender affirming surgery for the treatment of gender dysphoria to an

incarcerated person. Instead, Dr. Penn quickly moves on to other more traditional surgical considerations. *Id.* at ¶ 39. Dr. Penn then discusses unique considerations related to his understanding of vulvoplasty. *Id.* at ¶ 40. Again, where these understandings come from is unclear based on Dr. Penn's education, background, and professional experience in his affidavit and curriculum vitae. Dr. Penn then states multiple times that my declaration does not appear to "meaningfully address these numerous important issues or considerations" relating to vulvoplasty. *Id.* at ¶¶ 40-43, 45-47.

21.     Before explaining why Dr. Penn is yet again wrong, I make the following important observations: Dr. Penn says that, in preparing his declaration, he reviewed Mrs. Zayre-Brown's medical and mental health records but does not specify which records, nor attach any records in support of his statements, opinions, or conclusions. *Id.* at ¶ 23. Dr. Penn did not evaluate Mrs. Zayre-Brown and offers no justification as to why an evaluation was unnecessary to reach his conclusions. Dr. Penn fails to address both the health records from the DPS providers supporting and/or recommending gender-affirming surgery for Mrs. Zayre-Brown and the health records from Dr. Brad Figler—the UNC Urologist, founder and director of the UNC Transgender Health Program, and the specialist in gender-affirming genital surgical care, including gender-affirming vaginoplasty and vulvoplasty, to whom DPS referred Mrs. Zayre-Brown for evaluation for gender-affirming surgery.

22.     Before I briefly outline why Dr. Penn is wrong when he repeatedly asserts that I did not meaningfully consider numerous important surgical

considerations, it is important to first address the issue of Dr. Penn failing to understand the interdisciplinary nature of the treatment of gender dysphoria and the roles of different providers in the treatment of gender dysphoria, specifically around recommendations for gender-affirming surgery. Dr. Penn notes that Mrs. Zayre-Brown has received "extensive" treatment for her gender dysphoria (though we disagree about the adequacy of that treatment). *Id.* at ¶ 71. While in DPS custody Mrs. Zayre-Brown has sought and advocated for psychotherapy, social transition, hormone therapy, and gender-affirming surgery for the treatment of her gender dysphoria. Ettner Decl. ¶¶ 80-81, 88. I have reviewed records related to her hormone therapy and psychotherapy for the treatment of gender dysphoria. Additionally, I reviewed Mrs. Zayre-Brown's records from Dr. Brad Figler and the UNC Transgender Health Program.

23. Dr. Penn is wrong when he says that I did not meaningfully consider Mrs. Zayre-brown's psychiatric/mental health stability. Penn Aff. ¶¶ 39-40. On top of reviewing her DPS mental health and medical records, I conducted my own clinical and psychometric assessment of Mrs. Zayre-Brown. Ettner Decl. ¶¶ 76-82. Dr. Penn is wrong when he says that I did not assess the effectiveness of alternative non-surgical interventions. In both my evaluation and Mrs. Zayre-Brown's DPS mental health and medical records, there is detailed history and discussion of Mrs. Zayre-Brown receiving other accepted treatments for gender dysphoria, namely, social transition, hormone therapy, and psychotherapy and counseling. Further there is

detailed history and discussion of why those treatments have not been effective and her ongoing symptomology.

24. Dr. Penn is wrong when he says that I did not meaningfully consider the potential benefits of postponing surgery until after Mrs. Zayre-Brown's projected release date, over two years from now. Penn Aff. ¶ 47. There are no benefits in such a lengthy delay, especially given how long Mrs. Zayre-Brown has sought and required surgery, and such a delay would perpetuate Mrs. Zayre-Brown's acute distress and pose ongoing risks to her mental and physical health, as documented in my evaluation and her DPS mental health and medical records.

25. Dr. Penn further asserts that I did not meaningfully consider these additional following factors: the availability of qualified in-state surgeons with competence and expertise in vaginoplasty and gender-affirming genital surgery, attainment of fully informed consent by Mrs. Zayre-Brown, patient surgical and surgeon satisfaction, risks of anesthesia and surgery and post-surgical complications, pre-operative procedures, post-operative care, and costs of the procedure. *Id.* at ¶¶ 39-40. Dr. Penn is wrong on all accounts. First, many of these considerations are for primary discussion with the surgeon, based on the interdisciplinary nature of the provision of gender-affirming surgery. These erroneous assertions only further highlight Dr. Penn's lack of expertise. Mrs. Zayre-Brown was referred, by Defendants, to a highly qualified in-state surgeon at a well-respected university-based hospital system, who founded and directs a specialty program for the provision of gender-affirming care and surgeries for the treatment of gender dysphoria, with specialized

training in gender-affirming genital surgery. Dr. Figler agreed to consult with Mrs. Zayre-Brown, evaluated her, recommend gender-affirming genital surgery, and agreed to perform the surgery following agreed upon pre-surgical weight loss, which Mrs. Zayre-Brown accomplished. Ettner Decl. at 76-82.

26.     Additionally, in the records from Mrs. Zayre-Brown's consultation with Dr. Figler, it states that Dr. Figler and Mrs. Zayre-Brown discussed the following: the surgical options and techniques in detail, pre-operative and post-operative management, and a detailed discussion of the numerous surgical risks.  In addition, Mrs. Zayre-Brown was provided with an informational packet from Dr. Figler related to gender-affirming genital surgery. *Id.* at 76-77. Further, Dr. Figler conducted his own medical and mental health historical evaluations, including an assessment of the WPATH criteria for gender affirming genital surgery; conducted a physical; and examined previous laboratory work, among other things. *Id.* at 76-82.

27.     Given that these facts are documented in her DPS medical records and that Mrs. Zayre-Brown is now in litigation in order to have surgery with Dr. Figler, it is curious that Dr. Penn suggests that I did not meaningfully consider these factors and that informed consent was not fully assessed. If Dr. Penn is questioning Dr. Figler's qualifications, expertise, evaluation, or willingness to operate on Mrs. Zayre-Brown, then he could raise these considerations with DPS. It appears that DPS had no issues referring Mrs. Zayre-Brown to Dr. Figler, given his expertise in the surgical treatment of gender dysphoria and providing gender-affirming surgical care.

28.     Dr. Penn continues expressing a laundry list of concerns over various considerations that he feels were not considered in the multiple evaluations of Mrs. Zayre-Brown by myself, Dr. Figler, and the multiple DPS providers that evaluated Mrs. Zayre-Brown and supported and/or recommended gender-affirming surgery for the treatment of her gender-dysphoria. Penn Aff. ¶ 40-47. I will not spend additional time addressing each and every incorrect assertion Dr. Penn makes regarding mainly irrelevant considerations. Just like the incorrect assertions and irrelevant considerations that I have identified thus far, my qualifications, first declaration, evaluation, and Mrs. Zayre-Brown's medical and mental health records from other providers refute all of them.

29.     I will note specifically, however, that Dr. Penn appears to be dissatisfied that the following considerations were not accounted for in my declaration: surgical cost, transportation to the surgeon's office, pre-operative bloodwork and other testing like an EKG, pre-operative bowel preparation and fasting coordination, prison staff escorts and supervision, any trepidation from Dr. Figler and/or his staff regarding DPS staff being onsite during and after the surgery, post-operative appointments, and potential communicable diseases. *Id.* at ¶ 40. Nearly all of these "considerations" are within the purview and the responsibility of DPS. As Dr. Figler accepted Mrs. Zayre-Brown as a patient and is prepared to perform surgery on her, many of these considerations are resolved. Further, yet again, none of these "considerations" are medical necessity criteria for gender-affirming surgery nor medical justifications to deny medically necessary gender-affirming care, nor any care for that matter.

Additionally, one would need a crystal ball to accurately assess many of the "considerations" that Dr. Penn insists must be taken into account, particularly around risks, complications, and revision. These considerations are not unique to gender-affirming surgical care; they apply to all surgical care as well as other kinds of care.

30. Dr. Penn's final primary conclusions that I address in this declaration are that gender-affirming genital surgery is not medically necessary in any instance, and that Defendants' denial of her most recent request, and her previous requests, therefore were correct. *Id.* at. ¶¶ 48-68. I will note, however, that Dr. Penn nowhere addresses Mrs. Zayre-Brown's multiple other requests for gender affirming surgery, Defendants' handling of those requests, and whether Defendants' repeated denials and delays of those requests were "appropriate." The pattern of ignoring the mountain of available evidence contrary to Dr. Penn's purported expert opinions and conclusions is telling.

31. To support his opinion that gender-affirming genital surgery is not medically necessary, in any instance, Dr. Penn first relies on arguments that the WPATH SOC are flawed and that there are no national *correctional* health care standards for the treatment of gender dysphoria. *Id.* at ¶¶ 48-53. Then Dr. Penn questions the effectiveness of gender-affirming surgery based on "data and research" in the non-correctional setting. *Id.* at ¶¶ 54-60. Finally, Dr. Penn attempts a semantic strategy to suggest that my formulation of the term "medical necessity" is flawed. *Id.* at ¶¶ 61-68. As described in turn, each assertion is profoundly flawed.

32.     I have already discussed at length why the "unique correctional considerations" that Dr. Penn discusses are neither medical justifications to deviate from accepted treatment protocols or deny medically necessary treatment, nor "unique" considerations. As such, I will move on to Dr. Penn's critiques of the WPATH SOC.

33.     Dr. Penn first begins with the previously debunked argument that the WPATH SOC have no "meaningful correctional specific guidance." Penn Aff. ¶ 49. The corrections-specific guidance Dr. Penn is apparently looking for is guidance regarding the same "unique considerations" already explained to be irrelevant to the question of medical necessity or not unique considerations at all. Next, Dr. Penn suggests that the WPATH SOC cannot be trusted because "however well intentioned, [the SOC] appear to direct their efforts in furtherance of advancing transgender health care advocacy." *Id.* at ¶ 50.

34.     It is not novel or controversial that a specialty health care organization, comprised of interdisciplinary experts in various aspects of the lives and health of target patient population, would seek to advance and advocate for the health care of that target patient population. Many other specialty health care organizations do the exact same thing.[2]

---

[2] E.g., the Endocrine Society describes itself as devoted to "advocating on behalf of the global endocrinology community," including patients with endocrine conditions. Endocrine Soc'y, *Who We Are*, https://www.endocrine.org/about-us; *see also* Endocrine Soc'y, *Advocacy*, https://www.endocrine.org/advocacy; Endocrine Soc'y, *Shaping Healthcare and Research Policy*, https.//www.endocrine.org/our-community/shaping-healthcare-and research-policy. Similarly, see the Am. Psychiatric Ass'n, *APA's*

35.     What Dr. Penn seemingly takes issue with is the interdisciplinary nature of the membership involved in this advocacy and a suggestion that, because the membership is not entirely health care providers, the research and evidence that the SOC supposedly is based on may be improperly influenced at best and unreliable at worst. While I take issue with this entire premise, I must point out that the WPATH SOC, which set forth the treatment protocols promulgated for the medical treatment of gender dysphoria, are developed exclusively by health care professionals with expertise across medical disciplines, including psychiatry, psychology, endocrinology, pediatrics, and surgery. Ettner Decl. ¶ 28.

36.     Next, Dr. Penn attacks the available research and evidence around the effectiveness of gender-affirming surgery in the non-correctional community to attempt to further support his conclusion that gender-affirming surgery is not medically necessary. Penn Aff. ¶¶ 53-60. Dr. Penn makes several general critiques, including that none of the empirical studies were done in the United States, his inability to locate original studies as compared to survey studies and re-analyses of survey studies, lack of longitudinal studies to gauge long-term effectiveness, and

---

*Vision, Mission, Values, and Goals*, https://psychiatry.org/about-apa/vision-mission-values-goals ("The mission of the American Psychiatric Association is to . . . promote universal and equitable access to the highest quality care for all people affected by mental disorders, including substance use disorders."); Am. Acad. of Pediatrics, *Advocacy*, https.//services. aap.org/en/advocacy/; American Board of Pediatrics, *About Us*, https://www.abp.org/content/about-us ("Certification by the ABP has one objective — to promote excellence in medical care for children and adolescents."); American College of Obstetricians and Gynecologists, *About Us*, https://www.acog.org/about ("ACOG's mission is to support our members to improve the lives of all people seeking obstetric and gynecologic care, their families, and communities.").

Case 3:22-cv-00191-MOC-DCK   Document 22-1   Filed 08/02/22   Page 18 of 43

critiques of particular studies' methodologies, concluding the WPATH SOC are thus unreliable, especially in the carceral setting. *Id.* at ¶ 54.

37.     Dr. Penn only directly cites two studies as part of his literature review on the efficacy of gender affirming surgery. *Id.*at ¶¶ 55-58. Dr. Penn first discusses at length one particular study with questionable methodology. *Id.* at ¶¶ 55-57. However, decades of methodologically sound and rigorous scientific research have demonstrated that gender affirming surgery is a safe and effective treatment for severe gender dysphoria and, indeed, for many patients, it is the only effective treatment. The American Medical Association, the Endocrine Society, the American College of Obstetricians and Gynecologists, the American Psychological Association, and the American Psychiatric Association all endorse surgical therapy, in accordance with the WPATH SOC, as medically necessary treatment for individuals with severe gender dysphoria.

38.     In 2018, Cornell University published a literature review called *What Does the Scholarly Research Say about the Effect of Gender Transition on Transgender Well-Being?*.[3] The researchers enumerated the following conclusions:

- The scholarly literature makes clear that gender transition is effective in treating gender dysphoria and can significantly improve the well-being of transgender individuals.

---

[3] What We Know Project, Cornell University (2018), https://whatweknow.inequality.cornell.edu/topics/lgbt-equality/what-does-the-scholarly-research-say-about-the-well-being-of-transgender-people/.

Case 3:22-cv-00191-MOC-DCK   Document 22-1   Filed 08/02/22   Page 19 of 43

- Among the positive outcomes of gender transition and related medical treatments for transgender individuals are improved quality of life, greater relationship satisfaction, higher self-esteem and confidence, and reductions in anxiety, depression, suicidality, and substance use.

- The positive impact of gender transition on transgender well-being has grown considerably in recent years, as both surgical techniques and social support have improved.

- Regrets following gender transition are extremely rare and have become even rarer as both surgical techniques and social support have improved. Pooling data from numerous studies demonstrates a regret rate ranging from .3 percent to 3.8 percent. Regrets are most likely to result from a lack of social support after transition or poor surgical outcomes using older techniques.

- Factors that are predictive of success in the treatment of gender dysphoria include adequate preparation and mental health support prior to treatment, proper follow-up care from knowledgeable providers, consistent family and social support, and high-quality surgical outcomes (when surgery is involved).

- Transgender individuals, particularly those who cannot access treatment for gender dysphoria or who encounter unsupportive social environments, are more likely than the general population to experience health challenges such as depression, anxiety, suicidality, and minority

stress. While gender transition can mitigate these challenges, the health and well-being of transgender people can be harmed by stigmatizing and discriminatory treatment.

39.     Dr. Penn then cites to a study, commonly called the "Swedish Study," authored in part by Dr. Cecilia Dhejne, as part of Dr. Penn's attempt to question the efficacy of gender-affirming surgery. *Id.* at ¶ 58. Dr. Dhejne, who is a colleague of mine, has in fact stated that this research has consistently been "mischaracterized" and that recent studies have shown that treatment in compliance with the WPATH SOC decreases gender dysphoria and improves mental health. According to Dr. Dhejne, only the transgender people who transitioned prior to 1989 had slightly higher rates of suicide attempts than the general public (but still far lower than pre-transition levels for transgender people). According to Dr. Dhejne:

> Researchers are happy if their findings are recognized and have an impact. However, once published the researcher loses control of how results are used. Our findings have been used to argue that gender-affirming treatment should be stopped. But the results have also been used to show the vulnerability of the group and that better transgender health care is needed (Arcelus & Bouman, 2015; Zeluf et al., 2016). . . . Most of the articles that use the study to argue against gender affirming health care are published in non-peer reviewed papers and the public media in general. . . . I am grateful to friends, colleagues . . . and journalists who have alerted me when the results of the study have been misinterpreted, giving me a possibility to respond to the authors.[4]

40.     Finally, Dr. Penn's last argument is one of semantics. Dr. Penn argues that my definition of "medical necessity" is incorrect and thus my conclusion that

---

[4] On Gender Dysphoria, Dep't of Clinical Neuroscience, Karolinska Institute, at 65 (Stockholm, Sweden 2017.)

gender-affirming vulvoplasty for the treatment of Mrs. Zayre-Brown's gender dysphoria is incorrect. *Id.* at ¶ 61. Specifically, Dr. Penn mischaracterizes the testimony in my declaration to suggest that my evaluation of medical necessity is premised on the belief that any intervention is medically necessary so long as it has the potential to provide some therapeutic relief. *Id.*

41.     Dr. Penn's characterization of my use of the term "medical necessity" is incorrect. Medical necessity for gender-affirming surgery is articulated in the WPATH SOC, and those are the criteria that I used in my evaluation of Mrs. Zayre-Brown. *See, e.g.*, Ettner Decl. ¶ 58. According to Mrs. Zayre-Brown's DPS medical and mental health records, these are the same medical necessity criteria used by Dr. Figler, Dr. Carcaccio, Dr. Umesi, and MSW Dula, in their conclusions that gender-affirming genital surgery is medically necessary for Mrs. Zayre-Brown. Ettner Decl. at 72-75, 76-77, 83, 86. As I have previously pointed out, however, Dr. Penn ignores the recommendations of those providers and their use of the same criteria.

42.     In paragraph 63 of his affidavit, Dr. Penn conflates gender dysphoria and body dysmorphia, two very different and distinct diagnoses, to further attempt to support his mischaracterization of my definition of and criteria used in assessing the medical necessity of gender-affirming surgery for the treatment of gender dysphoria. Penn Aff. ¶ 63.

43.     In paragraph 64, Dr. Penn compares apples and oranges. *Id.* at ¶ 64. I do not purport to possess any specific knowledge regarding therapeutic massage for individuals experiencing depressed mood, dysphoria due to being incarcerated and

away from family/loved ones, and/or anxiety, insomnia, or other mental health conditions. What I can say is that if research did in fact demonstrate that "therapeutic massage" was ameliorative or curative for those symptoms or conditions, then it *could* be medically necessary in some circumstances, perhaps where, among many other variables, other accepted treatments have not worked to ameliorate a patient's suffering. Dr. Penn does not discuss the traditional alternative treatments to many of the mental health symptoms and diagnoses he is hinting at, which may include psychotherapy and psychotropic medications. Dr. Penn does not discuss that many conditions have many treatment options, that many patients try various medically necessary treatments to ameliorate or cure their conditions or symptomologies, and that the nature of medicine, inherently, is always evolving and new treatments are always being explored and tested.

44. Dr. Penn further opines that the use of the term "medically necessity" is only applicable when failure to provide an intervention would result in a known high risk of "morbidity/mortality" or "death." *Id.* at ¶ 65. Consistent with this view, untreated or inadequately treated gender dysphoria leads inexorably to one of three trajectories: emotional decompensation, surgical self-treatment (i.e., auto-castration/auto-penectomy) or suicide. Indeed, these outcomes are not uncommon in prison settings where patients are denied medically indicated care for gender

dysphoria. *See Position Statement on Medical Necessity of Treatment, Sex Reassignment, and Insurance Coverage in the U.S.A.*, WPATH (Dec. 21, 2016).[5]

## B. Affidavit of Sarah Boyd, Ph.D., ABPP

45. Dr. Boyd's affidavit, which claims even fewer qualifications than Dr. Penn, largely contains recycled and restyled arguments proffered in Dr. Penn's Affidavit to support her opinions and conclusions that my first declaration was inadequate. Dr. Boyd mainly asserts that, because my evaluation purportedly lacked certain "evaluation tasks" Dr. Boyd expected, my opinion that gender-affirming genital surgery is medically necessary for Mrs. Zayre-Brown is insufficiently supported. Boyd Aff. ¶¶ 7, 20-21.

46. To begin, Dr. Boyd, faces many of the same problems as Dr. Penn regarding the requisite expertise, experience, and qualifications to render the opinions and conclusions that she offers. *See id.* at ¶¶ 1-5. These deficiencies unquestionably cast doubt on the validity of her opinions and render her conclusions unpersuasive at best and incompetent at worst.

47. Given the serious matter at the heart of this litigation and what Dr. Boyd is attempting to do—support the denial of medically necessary care for an individual in acute distress—her level of generality around the exact nature of her

---

[5] https://www.wpath.org/newsroom/medical-necessity-statement ("In some cases, [medical procedures attendant to gender affirming/confirming surgeries] [are] the **only** effective treatment for the condition, and for some people genital surgery is essential and life-saving.") (emphasis in original).

experience treating transgender patients with gender dysphoria is particularly concerning to me.

48.     Specifically, Dr. Boyd begins by saying that she has "experience conducting forensic mental health assessments of transgender and gender diverse people in correctional settings." *Id.* at ¶ 1. First, a mental health assessment is not the same as an evaluation for gender dysphoria. In theory, it could include a specific evaluation for gender dysphoria, but it is not apparent from Dr. Boyd's affidavit that that is the case. Dr. Boyd's curriculum vitae does mention experience "[c]onduct[ing] gender dysphoria evaluations for the Virginia Department of Corrections," among other clinical services, for one year, August 2013 to August 2014, during her time as a post-doctoral fellow. ECF No. 18-7, at 2. I will also point out that, according to her curriculum vitae, Dr. Boyd did not become a licensed clinical psychologist in any jurisdiction until July 2014, so presumably, much of that experience occurred before she was a licensed clinical psychologist. *See id.*, at 1. Like Dr. Penn, Dr. Boyd provides no figures regarding the number of transgender patients she has treated generally, the number she has evaluated for gender dysphoria, or most importantly the exact or approximate number of transgender patients with gender dysphoria she has treated, the scope of that treatment, or the number of evaluations she has conducted for gender-affirming surgery for the treatment of gender dysphoria.

49.     While it appears that Dr. Boyd is not expressly holding herself out as an expert in gender dysphoria, she is ultimately opining on and questioning the adequacy of my assessment of Mrs. Zayre-Brown. As such, I make the following

observations. Dr. Boyd references being a co-author of one forthcoming chapter, in an unknown book "concerning psychological evaluation, management, and treatment of transgender and gender diverse people housed in correctional settings." Boyd Aff. at ¶ 1. She does not claim to have ever been qualified to serve as, or served as, an expert witness in litigation on the subject matter at issue in this case or on any subject in any court.

50.     Dr. Boyd did not interview or evaluate Mrs. Zayre-Brown. *Id.* at ¶ 4. Dr. Boyd relies on Mrs. Zayre-Brown's motion for preliminary injunction, unspecified DPS records, none of which are attached to her affidavit or identified with any particularity, and my declaration. *Id.* Dr. Boyd states that, in addition to these sources, her education, training, and experience inform her statements, conclusions, and opinions. *Id.* at ¶ 5. Dr. Boyd's curriculum vitae demonstrates that her education, training, and experience primarily deal with intellectual and developmental disabilities, neither of which are at issue here. *See* ECF No. 18-7.

51.     I will now turn to the opinions and statements that Dr. Boyd makes in her affidavit to support her conclusion. Dr. Boyd takes issue with the adequacy of my evaluation of Mrs. Zayre-Brown. Dr. Boyd says there were several "evaluation tasks" that she expected to see referenced in my declaration that were either not undertaken or not described. Boyd Aff. at ¶ 7.

52.     As an initial matter, Dr. Boyd provides no sources regarding where her expectations for some of these evaluative tasks come from, specifically regarding assessing Mrs. Zayre-Brown's gender dysphoria and her need for gender-affirming

surgery for the treatment of her gender dysphoria. Like Dr. Penn, it appears that most of Dr. Boyd's expectations come from her lack of expertise in the subject matter at hand, particularly the interdisciplinary role of multiple providers in the treatment of gender dysphoria, and specifically the assessment and provision of gender-affirming surgical care. Like Dr. Penn, while Dr. Boyd takes issue with my evaluation and medical necessity determination, she never addresses the multiple other evaluations and medical necessity determinations by Mrs. Zayre-Brown's other internal DPS providers and external specialist providers that DPS referred her to. All of those providers, of course, came to the same or similar conclusions as me. *See* ¶ 41, *supra.* Lastly, and again like Dr. Penn, Dr. Boyd tellingly made no undertakings of her own to address her concerns regarding the purported deficiencies in my evaluation and conclusion and provides no justification as to why she did not or could not.

53. Turning to the specific "evaluation tasks" Dr. Boyd addresses, Dr. Boyd first says that informed consent was not described in detail. What additional detail Dr. Boyd expected is unclear. Boyd Aff. ¶ 7, 17, 20. More importantly, informed consent is typically obtained by the surgeon, as that is the provider performing the procedure for which consent is necessary. For that reason alone, and all of the reasons that I stated in response to the same argument from Dr. Penn, Dr. Boyd is also wrong. *See* ¶¶ 20-21, *supra.*

54. Next, Dr. Boyd says there were no "collateral interviews of treatment providers, family members, friends, or other [unidentified] individuals who could

provide observations of the Plaintiff's history, symptoms, and response to prior interventions." Boyd Aff. ¶ 7. I am unfamiliar with the requirement to do "collateral interviews with treatment providers, family members, friends, or other individuals" to obtain further observations for the purpose of evaluating Mrs. Zayre-Brown's gender dysphoria or need for gender-affirming surgery. Mrs. Zayre-Brown has voluminous medical and mental health records detailing her medical history, mental health history, gender dysphoria, previous treatment, continued symptomology, desire and advocacy for gender-affirming genital surgery for the treatment of her gender dysphoria, as well as the thoughts and impressions of her previous providers at DPS and the external specialist providers that DPS referred her to specifically for this care, who all either supported or recommended surgery. I am further unaware that the observations of family members and friends factor into the evaluation of gender-dysphoria and need for gender-affirming surgery for an adult woman. I am additionally unaware of any other medical condition or procedure requiring such inquiries.

55. Next, Dr. Boyd says that I did not identify Mrs. Zayre-Brown's expectations regarding her options for medical intervention, especially expectations and considerations related to choosing vulvoplasty rather than vaginoplasty. Boyd Aff. ¶ 7. Again, Dr. Boyd appears to be confused about which provider, on an interdisciplinary team of providers, is most appropriate to discuss this specific consideration with a patient. In this case, that would be the surgeon.

56.     In any event, Dr. Boyd is wrong on two other counts. First, I did identify Mrs. Zayre-Brown's expectations for surgical intervention in the form of gender-affirming genital surgery—namely, alleviation of her persistent, severe gender dysphoria that has not been sufficiently alleviated through her previous medically necessary psychological and medical interventions. Ettner Decl. ¶ 92. During my examination, we fully discussed her specific desire for vulvoplasty. Mrs. Zayre-Brown's penis—a constant, visible primary sex characteristic that is incongruent with her gender—is the source of extreme anatomical dysphoria and distress. She requires removal of the penis via gender-affirming vulvoplasty, creating typical-appearing gender-congruent genitals, and removing the source of her significant gender dysphoria and curing it.

57.     Second, Dr. Figler also had "extensive discussion of risks, benefits[,] and alternatives" with Mrs. Zayre-Brown regarding her desire for gender-affirming genital surgery and the differences between vulvoplasty and vaginoplasty, as well as the goal of s alleviation of Mrs. Zayre-Brown's significant gender dysphoria, as documented in those records. Ettner Decl. at 77.

58.     Dr. Boyd says that I did not discuss expectations, costs, and benefits, and why earlier surgical interventions proved to be inadequate for substantially mitigating her gender dysphoria symptoms. *Id.* at ¶ 7. Again, Dr. Boyd is wrong. First, Mrs. Zayre-Brown's records clearly identify her expectations regarding her previous gender-affirming surgery. Again, Mrs. Zayre-Brown's primary expectations were to alleviate gender-dysphoria by aligning her primary and secondary sexual

characteristics with her gender identity. Regarding why Mrs. Zayre-Brown's previous gender-affirming surgeries "proved to be inadequate" for substantially mitigating her gender dysphoria, as stated in my first declaration and in accordance with the WPATH SOC, gender-affirming care is patient-centric and the timing and number of gender-affirming interventions, including surgeries are different for each patient. *See* Ettner Decl. ¶¶ 29, 32. Dr. Boyd provides no rationale for, and thus I am unclear as to, why a retrospective evaluation of the "costs and benefits" of Mrs. Zayre-Brown's previous gender-affirming surgeries is necessary, relevant, or helpful in evaluating her current gender dysphoria and need for gender-affirming genital surgery.

59.     Dr. Boyd says that I did not discuss the implications of Mrs. Zayre-Brown having vulvoplasty so "relatively close" to her projected release date, over two years from now, and resulting implications for her transition back into the community. Boyd Aff. ¶ 8. Dr. Boyd is wrong for the same reasons Dr. Penn is wrong. *See* ¶ 19, *supra*.

60.     Finally, the last "evaluation task" Dr. Boyd says is missing from my evaluation is that I did not discuss the reasons why Mrs. Zayre-Brown chose vulvoplasty over vaginoplasty, when it appears that vaginoplasty was her preferred treatment option and resulting implications. Boyd Aff. ¶¶ 7, 9-11. Again, this expectation appears to be premised on Dr. Boyd's lack of expertise and understanding of the interdisciplinary nature and roles of the providers involved in this kind of care and treatment. First, it is curious that Dr. Boyd does not address the fact that in one of DTARC's denials of Mrs. Zayre-Brown's request for gender-affirming vaginoplasty,

the denial rationale—aside from stating that vaginoplasty is categorically not medically necessary—additionally said that the prison facility was not equipped for the proper post-operative care for vaginoplasty. Ettner Decl. at 91. Beyond this, Dr. Boyd's central premise is incorrect as both procedures, vaginoplasty and vulvoplasty, were discussed extensively with the relevant expert, Dr. Figler. This is documented in Dr. Figler's records and Mrs. Zayre-Brown's declaration, as is the basis for her choosing a vulvoplasty.

61. In her last attempts to support her opinion, Dr. Boyd suggests that I did not investigate potential drug use as a cause of Mrs. Zayre-Brown's inpatient hospitalizations or account for co-morbidities as factors in Mrs. Zayre-Brown's acute distress. Boyd Aff. ¶¶ 12-13. Dr. Boyd refutes the relevance of her first point in her own affidavit. "Records indicated that correctional staff speculated that these episodes might be due to illicit drug use, specifically K2. However, the information to support this explanation was sparse in that there were no positive drug test results or contraband recovered that would shed light on (a) the likelihood that these episodes were the result of intoxication versus some other mental health issue, or (b) the type of substance, if any, that the Plaintiff ingested." *Id.* at ¶ 12. Additionally, none of Mrs. Zayre-Brown's DPS medical and mental health records indicate illicit drug use, and I explicitly state in my evaluation that Mrs. Zayre-Brown reported no illicit drug use. Again, these same DPS records indicate no psychological comorbidities, and I stated as such in my evaluation. It is unclear to me what more Dr. Boyd expects. The cause of Mrs. Zayre-Brown's distress is clear: her need for

gender-affirming surgery to remove her penis and Defendants' repeated denials and refusals to provide her with that care without medical justification.

62.    Finally, and importantly, I must point out that while Dr. Boyd concludes that my evaluation was insufficient to make a medical necessity determination regarding Mrs. Zayre-Brown's need for gender-affirming surgery, she does not conclude that it is not medically necessary for Mrs. Zayre-Brown. *See* Boyd Aff. ¶ 20.

Pursuant to 28 U.S.C. § 1746, I declare the foregoing is true and correct.

Dated: August 2, 2022

Dr. Randi, Ettner, Ph.D.

31

# APPENDIX

| | | Off #: 0618705 |
|---|---|---|
| Offender Name: | | |
| Date of Birth: | 981 | Sex: F    Facility: ANSO |
| Date: | 12/11/2020 11:20 | Provider: Hahn, Patricia M Ph.D Asst. Dir. of Beh. Health |

Type of Housing:     Restrictive Housing

**FINDINGS**

This assessment and the resulting recommendations are based on the following sources of information:
Clinical Interview

**Reason for Referral**

Ms. has experienced a worsening of Gender Dysphoria due to recent events and currently expressed self-injurious and suicidal ideation.

**Treatment Setting**

Outpatient Program at Anson Cl.

**Current Self-Injurious Behaviors**

Ms. indicated she has thoughts of "ripping the skin off my pee-pee."

**Current Plan to Self-Injure**

Ms. currently has no plan to self-injure but is having very frequent thoughts of self-mutilation.

**Current Suicidal Ideation**

Ms. stated she wants to be given a medication that will "put me to sleep and keep me asleep." When asked for clarification, she stated "I don't want to die but I feel like it is the best thing for me."

**Current Suicidal Intent**

Ms. does not have a current plan to kill herself.

**Current Mental Status**

Level of Consciousness: Alert and Oriented

Psychomotor Activity: Normal

General Appearance: Normal

Behavior: Cooperative

Mood: Sad/depressed

Thought Process: Appropriate

Thought Content: Other

**RISK AND PROTECTIVE FACTORS ASSESSED:**

This writer screened the offender for a variety of empirically validated factors commonly associated with risk for self-harm.

The following **STATIC** risk factors were assessed to be present and may increase the inmate's risk for engaging in suicide related behaviors: Chronic Medical Condition, Family history of inpatient psychiatric treatment, Family history of suicide attempt, History of childhood abuse (physical or sexual), History of mental illness, History of self-injurious behavior

The following **DYNAMIC** risk factors were assessed to be present and may increase the inmate's risk for engaging in suicide related behaviors: Anxiety/Panic, Current suicidal ideation, Fear for own safety, Feeling hopeless/helpless, Feeling like a burden to others, Inability to feel pleasure, Sleep problems, Social isolation, Uncontrolled mental health symptoms

The following **PROTECTIVE** factors were assessed to be present and may decrease the inmate's risk of suicide: Able to cope with stress, Able to identify reasons to live, Adequate problem solving skills, Future orientation, Responsibility to loved ones/children, Supportive family relationships, Willingness to engage in treatment

Ms. has had an increase in symptoms of Gender Dysphoria since August, which have been addressed in therapy but not yet with medication because she was trying to stay off medication. She has had increasing problems coping with institution issues and on November 23 got in an altercation with another offender who implied Ms. still had a penis -- one of her greatest current fears is that someone will find out she still has part of a penis so it is an extremely emotionally arousing issue

Generated 12/11/2020 14:19 by Hahn, Patricia M Ph.D          NCDPS - ANSO          Page 1 of 2

| Offender Name: | ▮▮▮▮▮ | | | Off #: | 0618705 | |
| Date of Birth: | ▮▮▮▮1981 | Sex: F | Facility: ANSO | | | |
| Date: | 12/11/2020 11:20 | Provider: Hahn, Patricia M Ph.D Asst. Dir. of Beh. Health | | | | |

for her. Since that time, Ms. ▮▮▮▮ symptoms of depression have significantly increased, and she has had thoughts of ripping the skin of her penis and thinks she may be better off dead.

**RECOMMENDATIONS**
**Suicide Watch:** Place on Self-Injury Precautions.

Completed by Hahn, Patricia M Ph.D Asst. Dir. of Beh. Health on 12/11/2020 14:19

Case 3:22-cv-00191-MOC-DCK   Document 22-1   Filed 08/02/22   Page 35 of 43

## North Carolina Department of Public Safety
## Mental Health Progress Note

| | | | | |
|---|---|---|---|---|
| Offender Name: ███████ | | | Off #: | 0618705 |
| Date of Birth: ███/1981 | Sex: | F | Facility: ANSO | |
| Date: 02/19/2021 11:05 | Provider: | Hahn, Patricia M Ph.D Asst. Dir. | | |

### Treatment Setting
Outpatient Program at Anson CI.

### Reason for Services
Routine Follow-Up Session

### Violence Alerts
Ms. █████ denied any current thoughts of wanting to harm others.

### Escape Alerts
None currently noted.

### Self-Injury Alerts
Ms. █████ denied any current thoughts or plans of wanting to harm herself; however, at times she does have thoughts of self-mutilation to get rid of the remaining part of her penis.

### MSE/Behavioral Observations
Ms. █████ presented as a polite 39 year old Black -American female who appeared approximately her stated age. She was pleasant and cooperative during the therapy session. She displayed good eye contact and had no significant psychomotor agitation or retardation. Her speech was of normal rate, rhythm and volume. She was oriented to person, place, and time. Her attention and immediate memory appeared within normal limits. Her affect was somewhat dysphoric, ands he described her mood as "I don't know . . . I'm dull." She denied current suicidal or homicidal ideation. She did not currently show active symptoms of psychosis or a thought disorder. Her judgment and insight were at least fair.

### Progress Towards Goal(s)
Ms. █████ s main issue continues to be that her consult appointment with the urologist has not yet been scheduled. The barriers to this scheduling were discussed but it was unclear what has actually happened since there were some discrepancies between what each of us have been told. The main discrepancy is that it is unclear whether Ms. ████ is supposed to have her consult first or whether she is supposed to wait for her vaginoplasty to be approved by DPS. Ms. █████ stated one of her DTARC forms said Dr. Junker and Deputy Commissioner Harris agree with the disapproval of the vaginoplasty until the surgery consult was completed but HERO would not open the DTARC notes so this could not be immediately confirmed (and the undersigned wanted to finish her note). The undersigned will try to update Dr. Peiper before the 2/25/21 DTARC meeting. Ms. █████ would like the following to be considered: 1) she wants her UR approved urology consult, 2) she would like to have an endocrinologist appointment since she has not had one in eight months, and 3) she would like to be considered for compassionate release or ECL. Ms. █████ stated thoughts of self-mutilation are sometimes on her mind due to her gender dysphoria and not receiving her urology consult despite DTARC and UR approval. She expressed worry because she feels she is increasingly impulsive and her coping mechanisms have not been helping. Therapy focused on examining how the current generation is changing how transgender/non-binary issues are being addressed as to body image. Ms. █████ acknowledged that some transgender individuals she has met are not as focused on changing their physical characteristics and stated "I think I tried that but I don't think it's possible."

Ms. █████ t indicated her Zoloft did not seem to be working as well, and the undersigned indicated she would ask Mr. Messer about psychiatry clinic. The referral process was also discussed, especially given her concern that she has been "super-impulsive" lately. Ms. █████ and the undersigned briefly discussed the idea of trying to meet with the offender regarding the incident but it was decided that was not a good idea because the woman may have contacted lawyers.

### Plan/Diagnostic Changes
Ms. █████ has improved since her NCCIW admission but continues to be dysphoric.

### Follow-up/Next Appointment
Ms. █████ will be seen for her next individual therapy appointment in the next 30 to 45 days, if not sooner. She knows to submit a referral if she needs to be seen sooner.

**Co-Pay Required:**     No     **Cosign Required:**  No

**Telephone/Verbal Order:**  No

**Standing Order:**     No

Completed by Hahn, Patricia M Ph.D Asst. Dir. of Beh. Health on 02/19/2021 13:17

Generated 02/19/2021 13:17 by Hahn, Patricia M Ph.D Asst.        NCDPS - ANSO        Page 2 of  2

Case 3:22-cv-00191-MOC-DCK   Document 22-1   Filed 08/02/22   Page 37 of 43

## North Carolina Department of Public Safety
## Mental Health Progress Note

| | | | | | |
|---|---|---|---|---|---|
| Offender Name: | ███████ | | | Off #: | 0618705 |
| Date of Birth: | 1981 | Sex: | F | Facility: ANSO | |
| Date: | 04/28/2021 10:30 | Provider: | Hahn, Patricia M Ph.D Asst. Dir. | | |

### Treatment Setting
Outpatient Program at Anson CI.

### Reason for Services
Routine Follow-Up Session

### Violence Alerts
Ms. ███████ denied any current thoughts of wanting to harm others.

### Escape Alerts
None currently noted.

### Self-Injury Alerts
At the end of the session, Ms. ███████ denied any current thoughts of wanting to harm herself. As a protest, however, at the beginning of the session she had a band tied around her penis because she had not yet had her urology appointment at UNC. During the session, the undersigned called Ms. Catlett to get an update, and Ms. Catlett has been working with UNC to get everything set up so that Ms. ███████ can have her appointment. (It involves IT and getting credentialed to use WebEx so can take time.) Ms. ███████ was satisfied with this response and asked to be excused to remove the band from her penis, which she said she did.

### MSE/Behavioral Observations
Ms. ███████ presented as a polite 39 year old Black-American female who appeared approximately her stated age. She was pleasant and cooperative during the therapy session. She displayed good eye contact and had no significant psychomotor agitation or retardation. Her speech was of normal rate, rhythm and volume. She was oriented to person, place, and time. Her attention and immediate memory appeared within normal limits. She appeared initially dysphoric but after hearing some progress was being made on her appointment, her affect brightened. At the end of the session she described her mood as "mediocre." She denied current suicidal (see above) or homicidal ideation. She did not currently show active symptoms of psychosis or a thought disorder. Her judgment and insight are slightly impaired.

### Progress Towards Goal(s)
Ms. ███████ expressed many concerns about not having her appointment with the UNC-CH urologist scheduled yet. She gave a number of examples of how this is increasing her dysphoria, and she decided to put a band on her penis until her appointment is scheduled. She said she has had the band on for a week and a half. She was cautioned about the effects of impeding blood flow and risk of infection. As described above, the undersigned spoke with Ms. Catlett, and she was able to convey to Ms. ███████ how Ms. Catlett has been on top of it and has worked hard to facilitate this appointment. Ms. ███████ then agreed to take the band off her penis.

The rest of the session addressed her specific concerns about having part of a penis left and what defines a woman. She explained it does not bother her if she is called fat or ugly but stated if she is called a man "there is no tool in the [psychology] toolbox to manage that." She stated "I can't live with this any more," and said the situation was acute now and not chronic. She also stated she is not complete now and that "I'm ready to be complete."

### Plan/Diagnostic Changes
Ms. ███████ has increased dysphoric mood but her mood improved when she was provided information that she should have her appointment with the Program Manager of the UNC Transgender Health Program within the next week or the week after. The undersigned will follow-up next Thursday on the progress of this appointment.

### Follow-up/Next Appointment
Ms. ███████ will be seen for her next individual therapy appointment in the next 30 to 45 days. She knows to submit a referral if she needs to be seen by an Anson facility psychologist before then.

| | | | |
|---|---|---|---|
| **Co-Pay Required:** | No | **Cosign Required:** | No |
| **Telephone/Verbal Order:** | No | | |

**Standing Order:**     No

Completed by Hahn, Patricia M Ph.D Asst. Dir. of Beh. Health on 04/28/2021 12:29

## North Carolina Department of Public Safety
## Mental Health Progress Note

| | | | | | |
|---|---|---|---|---|---|
| Offender Name: | ████████ | | | Off #: | 0618705 |
| Date of Birth: | ████ 1981 | Sex: | F | Facility: | ANSO |
| Date: | 09/16/2021 14:10 | Provider: | O'Halloran, Maureen C MSW | | |

### Treatment Setting

Outpatient Program at Anson CI; Offender ████████ will be referred to as Ms. Brown in the remainder of this document.

### Reason for Services

Crisis Intervention

### Violence Alerts

There are no elevated risk factors presently noted for offender Brown.

### Escape Alerts

There are no elevated risk factors presently noted for offender Brown.

### Self-Injury Alerts

Ms. Brown currently denied suicidal ideation and thoughts of self-injurious behavior, both intent and plan.

### MSE/Behavioral Observations

Ms. Brown's mood appeared mildly dysphoric, and her affect was appropriate to content. She was neatly groomed, wearing prison-issued attire, makeup, and a face mask. She was tearful when discussing news that she had been denied gender-affirming surgery. She made comfortable eye contact. Her speech was relevant and goal directed. Her psychomotor activity was somewhat elevated. There was no overt evidence of psychotic or delusional thought processes. Her judgment and impulse control appeared adequate at this time. Ms. Brown voiced complaints regarding feeling emotionally overwhelmed. She appeared to be undergoing situational distress today regarding her medical treatment.

### Progress Towards Goal(s)

Progress was not assessed as this was the first encounter with the offender. Ms. Brown reported that she learned that she was denied surgery earlier this week. She stated that she felt emotionally overwhelmed as she has been advocating for this procedure for four years now. She discussed losing weight in order to meet criteria for the procedure. Supportive psychotherapy was provided as Ms. Brown discussed her frustrations and concerns. She denied any suicidal thoughts, plans, or intent. She admitted that she had briefly considered putting a rubber band around her phallus as a means of forcing surgical intervention. The writer explained that Ms. Brown would only undermine her chances for gender-affirming surgery if she was considered to be emotionally unstable for treatment. She acknowledged understanding.

She also reported that she has been eating approximately 700 calories per day and drinking 10 20-ounce bottles of water per day. We discussed a more balanced approach to meeting her nutritional needs. She was open to the writer's suggestions, and reported she would work on eating more. She appeared calmer by the session's conclusion.

### Plan/Diagnostic Changes

There are no changes to report at this time. Continue treatment as specified.

### Follow-up/Next Appointment

Follow up as previously scheduled with primary therapist.

**Co-Pay Required:** No     **Cosign Required:** No

**Telephone/Verbal Order:** No

**Standing Order:** No

Completed by O'Halloran, Maureen C MSW Clinical Social Worker on 09/16/2021 15:40

## North Carolina Department of Public Safety
## Psychiatric Progress Note

| | | | |
|---|---|---|---|
| Offender Name: | ███████ | Off #: | 0618705 |
| Date of Birth: | ███/1981 | Sex: F | Facility: ANSO |
| Date: | 10/27/2021 09:16 | Provider: | Younus, Syeda R MD |

### Treatment Setting
Outpatient Program at Anson CI.

### Violence Alerts
There is no apparent, current, significant risk of violence noted for inmate .

### Self-Injury Alerts
There is no apparent, current, significant risk of self-injury noted for inmate .

However, SIRA was performed on 02/16/21.

Pt reports one suicide attempt in 2019 by OD "to get away from men prison."
She was admitted to inpatient NCCIW in December 2020 due to self harming thoughts.

### Subjective
This is the 2nd incarceration for this 40 y.o. offender who was admitted to prison on 10/10/2017 on a primary charge of HABITUAL FELON with a project release date in 2024.

Pt was born biologically as a male but she identifies herself as female and going through transition of being female. She goes by Miss. Brown.

Pt was last seen by Dr. Younus in August, at that visit Zoloft dose was increased. Pt was seen today, she reports feeling stressed and overwhelmed. "I was told to lose weight then I can get my surgery but they denied it." She reports not able to focus as she is thinking about her surgery. She also feels that she is not getting the therapy which she needs. She wants "therapist who has knowledge about transgender." She reports recently "I walked out of the office " during her therapy session. She feels Zoloft is helping her. She denies depression. She feels she is not getting adequate therapy. She sleeps good. She has lost weight.
She reports sometimes she thinks she may need to do "self mutilating" behavior to get help. She is upset that her surgery was denied.

No SI,HI, AVH or manic symptoms.

She is taking two classes.

She is married and her husband is supportive.

She has an adult son and she talks to him regularly. She has a grand child.

Pt has tried only Zoloft.

### Objective
Identifying Information:40yrs old, biologically born as male but identified herself as female and is in the process of transitioning to a female
Appearance: fairly groomed, wearing mask
Behavior: cooperative

Thinking: Logical
Perception: Denies
Mood: "stressed"
Affect: appropriate
Orientation: no evidence of delirium or confusion
Suicidal/Homicidal Ideation: Patient denies both.
Judgment/Insight: fair

### Side Effects

Denied.

### Response to Treatment

Positive.

### Labs/Weights/AIMS/Vitals

Reviewed.

### Diagnosis

Gender Dysphoria
Unspecified Anxiety Disorder
Medical: █████████

### Plan

Target Symptoms: Anxiety and mood.

Medications:
- Cont Zoloft Risk/benefits reviewed.
- Discussed Buspar, pt deferred it for now.
-She feels her current symptoms will get better with the help of "adequate" therapy, she was advised to monitor her symptoms and continue mental health if needed.
Referrals: Therapy( staff will notify via email). Encouraged to continue therapy .
Other Treatment/Labs: None
Follow-Up: 2-3 months or sooner as needed.

**Renew Medication Orders:**

| Rx# | Medication | Order Date | Prescriber Order |
|---|---|---|---|
| A4530692 | SERTRALINE 100 MG TAB | 10/27/2021 09:16 | Take two (2) tablets (=200mg) by mouth daily at 11am ** Direct Observation Therapy ** x 120 day(s) Pill Line Only |
| | Indication: Gender Dysphoria in Adolescents and Adults, Unspecified Anxiety Disorder | | |

Schedule:

| Activity | Date Scheduled | Scheduled Provider |
|---|---|---|
| Psychiatric Progress Note f/u | 01/19/2022 00:00 | Younus, Syeda R Psychiatrist |

**Patient Education Topics:**

| Date Initiated | Format | Handout/Topic | Provider | Outcome |
|---|---|---|---|---|
| 10/27/2021 | Counseling | Compliance - Treatment | Younus, Syeda | Verbalizes Understanding |
| 10/27/2021 | Counseling | Medication Side Effects | Younus, Syeda | Verbalizes Understanding |

Case 3:22-cv-00191-MOC-DCK   Document 22-1   Filed 08/02/22   Page 42 of 43

| Date Initiated | Format | Handout/Topic | | Provider | Outcome |
|---|---|---|---|---|---|
| 10/27/2021 | Counseling | Access to Care | | Younus, Syeda | Verbalizes Understanding |

**Co-Pay Required:** No     **Cosign Required:** No

**Telephone/Verbal Order:** No

**Standing Order:** No

Completed by Younus, Syeda R MD Psychiatrist on 10/27/2021 17:44