IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA

KANAUTICA ZAYRE-BROWN,

    *Plaintiff*,

v.

THE NORTH CAROLINA
DEPARTMENT OF PUBLIC SAFETY,
*et al.*,

    *Defendants*.

No. 3:22-cv-00191-MOC-DCK

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION
FOR A RULE 35 EXAMINATION**

    Defendants have had total control over Kanautica Zayre-Brown's medical care for more than five years. They have had Mrs. Zayre-Brown evaluated multiple times, by providers of their choosing, for her gender dysphoria. The providers who evaluated her specifically for gender-affirming surgery agreed that surgery is medically necessary. But Defendants denied that treatment, giving no rationale specific to Mrs. Zayre-Brown's circumstances. This lawsuit followed.

    Now, still searching for a justification for their decision, Defendants wish to subject Mrs. Zayre-Brown to more than ten hours of invasive questions and tests by two examiners over three days. The proposed examiners appear to have never evaluated anyone for gender-affirming surgery, and they claim little experience treating gender dysphoria generally.

1

Defendants' burden on this motion is heavy. Given the immense privacy interests at stake, Rule 35 goes beyond the mere relevance standard of other discovery methods—it requires a showing of "good cause" and "discriminating application by the trial judge." *Schlagenhauf v. Holder*, 379 U.S. 104, 118 (1964). For multiple reasons, Defendants' motion should be denied.

First, Defendants have not justified why less invasive discovery measures are inadequate given the voluminous information they already have concerning Mrs. Zayre-Brown's health. They have repeatedly had her examined over the last five years, have complete access to her medical records, and may seek to depose her providers and expert. Defendants have already deposed Mrs. Zayre-Brown and served written discovery. Thus, there is no need to "level the playing field" for Defendants. Courts within the Fourth Circuit and elsewhere have denied Rule 35 motions under similar circumstances. *See, e.g.*, *Shumaker v. West*, 196 F.R.D. 454, 457 (S.D.W. Va. 2000).

Second, Defendants' proposed examiners are not qualified to examine Mrs. Zayre-Brown's need for gender-affirming surgery. Based on the affidavits they previously submitted in this case, it appears that Dr. Penn and Dr. Boyd have never evaluated any patient for that specialized treatment. Nor do they claim expertise with treating gender dysphoria more generally. And Dr. Penn has already endorsed Defendants' actions without examining Mrs. Zayre-Brown's specific medical needs. He should not be allowed to conduct an invasive examination of Mrs. Zayre-Brown if he considers her individual circumstances irrelevant.

2

Finally, Defendants must also show that Mrs. Zayre-Brown's health is "in controversy." But her diagnosis of gender dysphoria is not in controversy. This case is primarily about her individual need for a specific *treatment*. And discovery has confirmed that Defendants did not deny that treatment because of an individualized analysis, but because they believe it is never medically necessary for *anyone*. Further examination of Mrs. Zayre-Brown herself would have little if any relevance for defending a categorical ban on gender-affirming surgery for patients with gender dysphoria.

## BACKGROUND

Mrs. Zayre-Brown is a transgender woman—a woman who was assigned male at birth but has a female gender identity. Doc. 1 (Verified Complaint) ¶ 43. Before entering state custody in 2017, she was diagnosed with gender dysphoria. *Id.* ¶ 47. Gender dysphoria is a condition involving clinically significant distress and impairment that may result from the incongruence between one's gender identity and one's sex assigned at birth. *Id.* ¶ 34.

The medical community and many courts—including the Fourth Circuit—have recognized that, depending on an individual's needs, gender dysphoria may require treatment such as psychotherapy, hormone therapy, and gender-affirming surgery. *Id.* ¶¶ 37-42; *De'lonta v. Johnson,* 708 F.3d 520, 525 (4th Cir. 2013); *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 595 (4th Cir. 2020), *cert. denied,* 141 S. Ct. 2878 (2021). Gender-affirming surgery is not "experimental or cosmetic," but "an

accepted, effective, medically indicated treatment for" gender dysphoria. *De'lonta*, 708 F.3d at 523.

When Mrs. Zayre-Brown entered state custody in 2017, Defendants became entirely responsible for her medical care. Defendants confirmed her diagnosis of gender dysphoria and authorized various forms of treatment and living accommodations. *See, e.g.*, Doc. 1 ¶¶ 65-66, 68, 75. She was evaluated and treated by multiple providers for gender dysphoria, all of whom were employed by or engaged by Defendants. They included:

- Dr. Patricia Hahn, a psychologist employed by Defendants
- Dr. Joseph Umesi, a physician employed by Defendants
- MSW Jennifer Dula, a mental health care provider employed by Defendants
- Susan Garvey, a mental health care provider employed by Defendants
- Dr. Bradley Figler, a specialist in gender-affirming surgery at the UNC Transgender Health Program
- BSN Katherine Croft, a specialist at the UNC Transgender Health Program
- Dr. Donald Carraccio, an endocrinologist at UNC Health Care
- Dr. Karla Pou, an endocrinologist at UNC Health Care

*See id.* ¶¶ 65-66, 79-83, 87-89, 93, 97-98, 101-02, 122, 124-26, 129-31.

Mrs. Zayre-Brown repeatedly informed Defendants that her treatment was not alleviating her gender dysphoria. As contemplated by her providers before entering state custody, she requested gender-affirming genital surgery—specifically, a vaginoplasty or vulvoplasty. *See id.* ¶¶ 52, 103-12. Of the providers who specifically evaluated Mrs. Zayre-Brown for gender-affirming surgery, all agreed that it was medically necessary. *Id.* ¶¶ 93, 124-26, 130-31.

4

Case 3:22-cv-00191-MOC-DCK   Document 39   Filed 02/24/23   Page 4 of 19

Nevertheless, Defendants repeatedly denied that treatment. They communicated their most recent denial on April 26, 2022, claiming that surgery was not medically necessary. *Id.* ¶ 139. They did not, however, provide any analysis specific to Mrs. Zayre-Brown's medical needs. Ex. A. She filed this case shortly thereafter, seeking injunctive relief and damages. Doc. 1 at 46.

Defendants moved to dismiss and Mrs. Zayre-Brown moved for a preliminary injunction. Docs. 9, 13. The Court denied both motions. Doc. 25. The parties have since engaged in discovery.

Discovery has produced thousands of pages of Mrs. Zayre-Brown's medical records dating back to 2017. Defendants have access to even more records from before her incarceration. *See* Doc. 1 ¶ 93. Defendants' counsel deposed Mrs. Zayre-Brown on January 18. *See* Doc. 34. The deposition covered a wide range of topics including her transgender status, history of gender dysphoria, symptoms, treatment, emotional and physical well-being, other medical history, education, work history, experience while incarcerated, and family background.[1] Defendants have served document requests which Mrs. Zayre-Brown has responded to, and they served interrogatories just before this response was filed. Mrs. Zayre-Brown has disclosed her expert report from Dr. Randi Ettner to Defendants.

Discovery has confirmed that Defendants did not deny Mrs. Zayre-Brown surgery because of a careful, individualized assessment of her medical needs. Instead,

---

[1] The official deposition transcript has not yet been finalized, but the deposition was videotaped if the Court wishes to review any portion of it.

5

while considering her request, Defendants adopted the view that gender-affirming surgery is *never* medically necessary for *anyone*. A "medical analysis" prepared by Defendants last February acknowledges that Mrs. Zayre-Brown "met appropriate criteria for surgery." Ex. B, DAC 3399. But that document goes on to deny surgery without any analysis of Mrs. Zayre-Brown's medical needs whatsoever. *Id.* at DAC 3400-3403.

Removing any doubt on the matter, Defendant Campbell—the prison system's Chief Medical Officer who is also responsible for authorizing gender-affirming care—wrote a "Position Statement" in March. That document confirms Defendants' view that "gender reassignment surgery (GRS), as a treatment for gender dysphoria, is not medically necessary," regardless of a patient's individual circumstances. Ex. C at DAC 3404.

Defendants now seek to subject Mrs. Zayre-Brown to three more evaluations covering the same subject matter contained in her medical records and explored at her deposition. Specifically, Defendants wish to have two examiners spend up to 10.5 hours over three days examining her "psychosocial history, past medical history, past psychiatric history, past trauma history, educational, employment, family, and substance histories, developmental information, [] legal information," "current symptoms," "history of gender dysphoria, . . . and prior treatments of gender dysphoria," "psychosocial history, gender-related developmental history, adjustment to incarceration, and informed consent for gender-affirming interventions." Defs. Br. at 2-3.

6

## RULE 35 STANDARD

Rule 35 provides: "The court where the action is pending may order a party whose mental or physical condition—including blood group—is in controversy to submit to a physical or mental examination by a suitably licensed or certified examiner." Fed. R. Civ. P. 35(a)(1). The order "may be made only on motion for good cause . . . ." *Id.* (2)(A).

"Under Rule 35, the invasion of the individual's privacy by a physical or mental examination is so serious that a strict standard of good cause, supervised by the district courts, is manifestly appropriate." *E.E.O.C. v. Maha Prabhu, Inc.*, No. 3:07-CV-111-RJC, 2008 WL 2559417, at *2 (W.D.N.C. June 23, 2008) (quoting *Guilford Nat. Bank of Greensboro v. S. Ry. Co.*, 297 F.2d 921, 924 (4th Cir. 1962)). "[T]here must be greater showing of need under [Rule 35] than under the other discovery rules." *Guilford Nat. Bank*, 297 F.2d at 924. This "requires discriminating application by the trial judge, who must decide" whether the movant "has adequately demonstrated the existence of the Rule's requirements . . . ." *Schlagenhauf*, 379 U.S. at 118.

One of the purposes of Rule 35 is "to provide a 'level playing field' between the parties in their respective efforts to appraise" a party's condition. *Holland v. United States*, 182 F.R.D. 493, 495 (D.S.C. 1998) (quoting *Tomlin v. Holecek*, 150 F.R.D. 628, 632 (D. Minn. 1993)). However, a plaintiff being examined by her expert does not automatically entitle a defendant to a Rule 35 examination, especially if there are

7

less invasive ways to obtain the same information. *See Acosta v. Tenneco Oil Co.*, 913 F.2d 205, 210 (5th Cir. 1990).

## ARGUMENT

**I. Defendants have not shown good cause because they already possess extensive information about Plaintiff's health and have not exhausted less invasive means of discovery.**

Defendants have not exhausted regular discovery methods or explained why those methods are inadequate to evaluate Mrs. Zayre-Brown's medical status. The motion fails on this basis alone.

This Court has observed that a Rule 35 exam is only appropriate where "other means of obtaining information are exhausted." *E.E.O.C.*, 2008 WL 2559417, at *2. Courts regularly deny Rule 35 motions when movants already have significant information about a person's health and can obtain additional information through written discovery and depositions.

For example, in a disability discrimination case against the Department of Veterans Affairs, "a number of psychological tests and other information [about the plaintiff had] been provided to Defendant, some of which the Department . . . performed itself." *Shumaker*, 196 F.R.D. at 457. The court denied the Rule 35 motion because there was "ample evidence available from which Defendant can obtain the information he currently seeks." *Id.*

In another case, the plaintiff's expert performed a "comprehensive" evaluation of him, and the defendant wished to have its own expert do the same. *Acosta,* 913 F.2d at 207. The Fifth Circuit found a lack of good cause because the defendant had

8

deposed the plaintiff, deposed his expert, and obtained other information through written discovery. *Id.* at 209. *See also Stanislawski v. Upper River Servs., Inc.*, 134 F.R.D. 260, 262 (D. Minn. 1991) (denying Rule 35 motion where defendant had access to "all of plaintiff's medical records, ha[d] deposed plaintiff, and ha[d] been provided with information concerning plaintiff's education, experiences, and medical disability"); *Conforti v. St. Joseph's Healthcare Sys., Inc.*, No. 217CV00050CCCCLW, 2020 WL 365100, at *3 (D.N.J. Jan. 22, 2020) (same with transgender plaintiff); *Brennan v. Thomas*, 780 Fed. App'x 813, 819 (11th Cir. 2019) (similar); *Wrangen v. Pennsylvania Lumbermans Mut. Ins. Co.*, No. 07-61879-CIV, 2009 WL 151715, at *5-6 (S.D. Fla. Jan. 16, 2009) (similar).

Here, the lack of good cause is even more apparent. Since entering Defendants' custody in 2017, Mrs. Zayre-Brown has been repeatedly evaluated—by providers *chosen by Defendants*—for her gender dysphoria and requests for surgery. Defendants have full access to Mrs. Zayre-Brown's extensive medical records. Defendants have deposed Mrs. Zayre-Brown and could have sought their experts' assistance. *See Wrangen*, 2009 WL 151715, at *2 (denying Rule 35 motion where defendant's expert assisted counsel at plaintiff's deposition). Mrs. Zayre-Brown has produced documents responsive to Defendants' Rule 34 requests. She has disclosed her expert report and Defendants may seek to depose the expert. Defendants know the identities of Mrs. Zayre-Brown's providers and may seek to depose them as well. Defendants have served interrogatories and may serve more at any time.

9

Defendants' motion confirms the redundancy of the proposed examinations. Dr. Penn would address Mrs. Zayre-Brown's "psychosocial history, past medical history, past psychiatric history, past trauma history, educational, employment, family, and substance histories, developmental information, [] legal information," "current symptoms," "history of gender dysphoria . . . , and prior treatments of gender dysphoria." Defs. Br. at 2. Dr. Boyd would "focus[] primarily on psychosocial history, gender-related developmental history, adjustment to incarceration, and informed consent for gender-affirming interventions." *Id.* at 3. In other words, Defendants seek information that is already contained in Mrs. Zayre-Brown's voluminous medical records—which include evaluations and treatments ordered by Defendants themselves—and was covered in detail at her deposition.

Defendants offer little explanation of why they should be allowed to retread these sensitive topics through an invasive Rule 35 examination. They instead focus on "[t]he relevancy of the proposed examination[.]" *Id.* at 10. But relevance is not the standard under Rule 35—Defendants must also make a "greater showing of need." *Schlagenhauf*, 379 U.S. at 118. They have failed to do so.

Consider a case where a plaintiff with gender dysphoria sued for discrimination on the basis of sex and transgender status. The defendants moved for a Rule 35 exam, arguing that "Plaintiff's complex history of depression and anxiety, his gender dysphoria diagnosis, and potential contributing factors to Plaintiff's emotional distress other than Defendants' conduct are 'highly relevant' to both liability and damages." *Conforti*, 2020 WL 365100, at *3. The court denied the motion.

10

Much like Defendants here, those defendants "already had the opportunity to 'question the plaintiff on these issues, request psychological records, and depose [his therapist] on [her] treatment of the plaintiff.'" *Id.* (quoting *Bowen v. Parking Auth. of City of Camden*, 214 F.R.D. 188, 195 (D.N.J. 2003) (brackets original)).

Defendants argue that the examinations are necessary to rebut the report of Mrs. Zayre-Brown's expert, Dr. Ettner, who conducted an in-person examination. Defs. Br. at 11-13. But Defendants' handpicked providers have been examining Mrs. Zayre-Brown since 2017—the parties are already on equal footing in that respect. And again, Defendants offer zero explanation as to why depositions of Dr. Ettner, Mrs. Zayre-Brown, and her providers, along with full access to her medical records, should not suffice. Defendants cite no cases granting a Rule 35 motion where the movant had access to a comparable wealth of information.

Moreover, it is true that Dr. Ettner criticized Dr. Penn and Dr. Boyd for not basing their opinions on evaluations of Mrs. Zayre-Brown. The thrust of that criticism, however, was that Dr. Penn and Dr. Boyd did not address Mrs. Zayre-Brown's individual circumstances *at all*. *See* Doc. 22-1 ¶ 21. Defendants can still glean an extraordinary amount of information about her from their available sources. And, perhaps more importantly, such criticism does not automatically entitle a party to a Rule 35 examination where, as here, they otherwise cannot satisfy all of Rule 35's demanding criteria. *See Acosta*, 913 F.2d at 209 (defendant did not establish good cause even though plaintiff's expert had evaluated plaintiff and defendant's expert had not).

11

In sum, Defendants have ample information about Mrs. Zayre-Brown's health. They have not shown that "other means of obtaining information are exhausted" or that "a wide-ranging intrusion into her privacy is merited . . . ." *E.E.O.C.*, 2008 WL 2559417, at *2, *4. The motion should be denied.

## II. Defendants' examiners are not qualified because they have never evaluated anyone for gender-affirming surgery and have limited experience with gender dysphoria generally.

Even if Defendants can establish good cause, they must also show that their proposed examiners are sufficiently qualified. Dr. Penn and Dr. Boyd's credentials show that they are not.

Rule 35(a)(1) only permits "examination by a suitably licensed or certified examiner." Thus, the court must "assess the credentials of the examiner to assure that no person is subjected to a court-ordered examination by an examiner whose testimony would be of such limited value that it would be unjust to require the person to undergo the invasion of privacy associated with the examination." Fed. R. Civ. P. 35, Ad. Comm. Notes (1991). "The court's responsibility to determine the suitability of the examiner's qualifications applies even to a proposed examination by a physician. If the proposed examination and testimony calls for an expertise that the proposed examiner does not have, it should not be ordered[.]" *Id*.

This case is not about diagnosing gender dysphoria or treating that condition generally. Rather, as Defendants have put it, "Plaintiff's claims are centered on the Department's decision to not approve her request for surgery." Doc. 10 at 7. Defendants offer minimal information on their examiners' qualifications. But a

12

review of their previous affidavits reveal that they are grossly unqualified to opine on the core issue in this case: the medical necessity of gender-affirming surgery.

Dr. Penn claims some experience working with patients with gender dysphoria. But it is unclear how many patients he has worked with, what clinical guidelines he has used, or what treatments he has provided. *See* Docs. 18-8 at 1-6; 18-9. Most importantly here, Dr. Penn does not claim to have ever evaluated a patient for a vulvoplasty—or any other gender-affirming surgery—which he describes as "a highly specialized urologic surgical procedure." Doc. 18-8 ¶ 40. What's more, Dr. Penn has not published any articles on gender-affirming surgery or gender dysphoria generally. Nor does he claim to have ever provided expert testimony on these subjects. *See* Doc. 18-9. Thus, any opinion from Dr. Penn on this issue would have negligible value to the factfinder that cannot justify the heavy burden on Mrs. Zayre-Brown.

Those are not Dr. Penn's only problems. Earlier in this case, Dr. Penn endorsed Defendants' refusal to treat Mrs. Zayre-Brown, but did so based on general principles—he did not address her individual circumstances at all. Doc. 18-8 ¶¶ 69-71. Thus, Dr. Penn has already reached his conclusion on the main issue in this case. Any further examination of Mrs. Zayre-Brown would seem to be irrelevant in his view (and as discussed below, Defendants' view as well).

Finally, in a recent case concerning prison health care, the district court found that Dr. Penn's testimony was "simplistic," "deeply flawed," "erroneous," "not credible," "appalling," "ma[d]e[] no sense," used "circular logic," "ha[d] no merit," and was "ambiguous, inconsistent and of no value." *Jensen v. Shinn*, No. CV-12-00601-

PHX-ROS, 2022 WL 2911496, at *40, *49, *51-*52 (D. Ariz. June 30, 2022). The court went on: "It is difficult to overstate Dr. Penn's lack of credibility. He was evasive when asked direct, simple questions. . . . His ignorance of fundamental aspects of Defendants' health care system was obvious and his testimony contradicted the undisputed evidence at trial." *Id.* at *51 n.28. The court concluded that Dr. Penn's opinions were "unworthy of any weight." *Id.* at *53.

This damning assessment of Dr. Penn's testimony—on subjects he arguably has far more experience with than gender-affirming surgery—further shows how his testimony here "would be of such limited value that it would be unjust to require [Plaintiff] to undergo the invasion of privacy associated with the examination." Fed. R. Civ. P. 35, Ad. Comm. Notes (1991). To allow him to conduct a lengthy examination on deeply sensitive issues would only serve to cause Mrs. Zayre-Brown needless distress.

Defendants also propose that Dr. Sandra Boyd conduct a four-hour evaluation. Like Dr. Penn, Dr. Boyd's credentials on treating gender dysphoria are spare. She does not claim to have ever evaluated a patient for gender-affirming surgery. Nor does she have any relevant peer-reviewed publications or prior expert testimony on the topic. Dr. Boyd claims to have "[c]onducted gender dysphoria evaluations" between 2013 and 2014, but does not explain what that means or how it qualifies her to participate in this case. Doc. 18-7 at 2. Thus, any opinion she provides on that subject would offer minimal value.

14

Accordingly, Defendants' proposed experts are, at best, novices in the field of treating gender dysphoria. They are not qualified to examine Mrs. Zayre-Brown regarding her need for gender-affirming surgery.

### III. The proposed examinations are not necessary considering the limited extent Mrs. Zayre-Brown's health may be "in controversy."

Defendants say that a Rule 35 examination is appropriate because Mrs. Zayre-Brown's medical condition is "in controversy." But Defendants have never disputed her diagnosis. *See, e.g.*, Doc. 26 ¶ 65 (admitting diagnosis). Nor have they disputed her need for treatment such as hormone therapy or living accommodations. *See id.* ¶¶ 68, 75. Rather, as discussed above, the only aspects of Mrs. Zayre-Brown's health arguably in controversy are her need for gender-affirming surgery and the harm she has suffered without it.

Discovery has confirmed, however, that Defendants' decision to deny treatment had nothing to do with Mrs. Zayre-Brown herself. Instead, Defendants have instituted a blanket ban on gender-affirming surgery. First, Defendants' "medical analysis" of Mrs. Zayre-Brown prepared last February did not asses her individual circumstances at all. It denied surgery based on broad principles that would apply to any patient. Ex. B, DAC 3400-3403. Shortly thereafter, Defendant Campbell—the Chief of Medicine for state prisons—wrote a "Position Statement" concluding that "gender reassignment surgery (GRS), as a treatment for gender dysphoria, is not medically necessary," regardless of a patient's individual needs. Ex. C, DAC 3404. Consistent with these documents, Defendants gave no individualized

15

rationale when they communicated their decision to Mrs. Zayre-Brown last April. Ex. A.

With this in mind, *Plaintiff's* individual health status is not truly in controversy—Defendants would have denied gender-affirming surgery to anyone who requested it. To prevail in this case, Defendants will have to justify their blanket prohibition. Further examination of Mrs. Zayre-Brown herself would be irrelevant to Defendants' actual basis for their decisions.

A court recently addressed this scenario in a case about a Medicaid exclusion for gender-affirming care. *Dekker v. Weida*, 4:22-cv-00325-RH-MAF (N.D. Fla.). The plaintiffs opposed a Rule 35 motion, arguing that "[g]iven the categorical nature of the Challenged Exclusion," examination of their individual medical needs would be irrelevant. Ex. D, ECF. No. 92 at 2. The motion was denied. Ex. E, ECF No. 95.

For these reasons, the Court should not allow Defendants an obvious and burdensome fishing expedition that would not even yield evidence relevant to the core issue in this case. *Cf. Bowen*, 214 F.R.D. at 195 (explaining that defendants "may not engage in a fishing expedition" when examining a plaintiff's emotional injury).

### IV. If the Court grants Defendants' motion, it should limit the examination's duration, scope, and participants.

For all the reasons discussed above, Defendants have not established the necessity, propriety, or relevance of the proposed examinations. But if the Court grants Defendants' motion, any examination must still be proportional to the needs of the case under Rule 26. Fed. R. Civ. P. 26(b)(1).

16

Ten hours and thirty minutes of invasive tests covering well-trod subject matter is not proportional. If the Court allows any examination at all, it should give Defendants no more than five hours total, the same time taken by Dr. Ettner. The Court should not permit examination of Mrs. Zayre-Brown by Dr. Penn, who has already reached his conclusions on the necessity of gender-affirming surgery. The Court should also carefully limit the examination to subjects that are clearly disputed. *See Simon v. Bellsouth Advert. & Pub. Corp.*, No. CIV.A. 3:09-CV177RJC, 2010 WL 1418322, at *5 (W.D.N.C. Apr. 1, 2010) (limiting duration and subject matter of examination).

## CONCLUSION

Defendants have not carried their heavy burden of justifying a "serious" "invasion of [an] individual's privacy." *Guilford Nat. Bank of Greensboro v. S. Ry. Co.*, 297 F.2d 921, 924 (4th Cir. 1962). Nor have they shown that their examiners are qualified, or that Mrs. Zayre-Brown's unique medical needs are truly "in controversy" as contemplated by Rule 35. The motion should be denied. If the Court grants the motion, Mrs. Zayre-Brown asks the Court to limit the examination to be proportional to the needs of this case.

Respectfully submitted, this the 24th day of February, 2023.

*/s/ Daniel K. Siegel*
Jaclyn A. Maffetore
NC Bar No. 50849
Daniel K. Siegel
NC Bar No. 46397
Michele Delgado
NC Bar No. 50661
ACLU OF NORTH CAROLINA
LEGAL FOUNDATION
P.O. Box 28004
Raleigh, NC 27611-8004
Tel: (919) 834-3466
Fax: (919) 869-2075
jmaffetore@acluofnc.org
dsiegel@acluofnc.org
mdelgado@acluofnc.org

Christopher A. Brook
NC Bar No. 33838
PATTERSON HARKAVY LLP
100 Europa Drive, Suite 4210
Chapel Hill, NC 27517
Tel: (919) 942-5200
Fax: (866) 397-8671
cbrook@pathlaw.com

Jon W. Davidson*
(admitted only in California)
Li Nowlin-Sohl*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004-2400
Tel: (212) 519-7887
Fax: (212) 549-2650
jondavidson@aclu.org
lnowlin-sohl@aclu.org

*admitted *pro hac vice*

*Counsel for Plaintiff*

**CERTIFICATE OF SERVICE**

I certify that on February 24, 2023, I filed the foregoing using the Court's CM/ECF system which will effect service on all counsel of record.

*/s/ Daniel K. Siegel*
Daniel K. Siegel

*Counsel for Plaintiff*