# EXHIBIT B

████ ██████ (Kanautica Zayre-Brown, 0618705), referred to as offender and/or patient below

- admitted to prison 10/10/2017
- current projected release date 11/2/2024
- Anson CI (transferred from Warren on 8/15/02019)
- Medium Custody (promoted from Close on 1/4/2022)

Surgery Request and Case Summary:

- 2/20/2020, DTARC recommended receiving a consult from a specialist experienced in performing vaginoplasty surgeries to obtain information to further evaluate treatment options and required course going forward.
- 8/4/2020, patient participated in telehealth appointment with Kristia Vasilof from UNC Transhealth Program as part of initial review for consult referral
- 8/27/2020, DTARC reviewed and recommended UR approval for in-person consult with UNC Transhealth Program
- 2/25/2021, DTARC reviewed information regarding need to meet with UNC Transhealth Program Manager prior to scheduling in-person appointment.
- 5/25/2021, Katherine Croft (Transhealth Program Manager) completed a telehealth consult with Offender Brown as part of the planned surgical consult with the UNC Transhealth program. The consult noted "no primary concerns were identified that would interfere with surgery except for weight, which the patient indicated she was intending to lose for surgery."
- 7/12/2021, patient was transported for an in-person consultation with Dr. Figler with the UNC Transhealth Program on 7/12/2021. The consultation documentation was received on 7/20/2021 at Anson and entered into the offender's document manager. The consultation indicated the patient's desire for vulvoplasty (not vaginoplasty) and need for weight loss from the recorded weight of 288 at the time down to a maximum of 250 with an identified weight goal of 210.
- 7/29/2021, Dr. Peiper informed by UNC Telehealth Program that they will need two referral letters related to WPATH criteria
- 10/4/2021, new updated Transgender Accommodation Summary completed as part of the referral letter requirement summarizing history of transition, patient's continued commitment to surgery, current and recent psychological stability, absence of uncontrolled comorbid mental health conditions, and that the patient met appropriate criteria for surgery.

DTARC Review 2/17/2022:

Patient has maintained the minimum weight goal identified by UNC Transhealth program. Weight has been below 240 since 11/15/2021 and at the time of the DTARC was most recently (2/11) at 236. Patient is now eligible for review related to DTARC recommendation on requested vulvoplasty surgery.

Mental health and behavioral health case reviews indicated no current evidence of any significant comorbid mental health issues. Review of patient's related mental health and behavioral health record indicates the criteria identified by UNC Transhealth Program for appropriateness for surgery have been met. The patient has a well-documented, persistent transgender identity with a commitment for "bottom surgery." The patient has been educated on the surgical interventions by the UNC Transhealth Program and identified a preference for a vulvoplasty if performed. The patient has lived as a female in the community prior to this incarceration and has been housed in a female prison since 8/2019. The

patient has completed other gender-affirming surgeries (orchiectomy, breast implants) and has been on hormone replacement therapy since 2012. The patient's mood and anxiety symptoms appear well-controlled by psychiatric interventions, however, recent progress notes from supportive counseling and therapy sessions indicate the patient has been heavily focused on the status of the final decision regarding her requested/desired surgery and experiencing related anxiety/frustrated mood.

MEDICAL ANALYSIS:

Medical analysis for this case included a comprehensive review of the offender's medical and behavioral health history, as well as a comprehensive literature review. When treatments are considered for any patient, the most important imperative for physicians is to base recommendations on evidence-based medicine and consideration of that information in the context of the individual patient.

Based on this review, it is the determination of medical authority that gender reassignment surgery (GRS) as requested by this offender is not medically necessary. The rationale for this determination is several fold, particularly when the requested treatment for this offender (vulvoplasty), is compared to what are considered "medically necessary" surgeries for other medical conditions.

First, medically necessary treatments, and this is particularly true of surgical procedures, consist of a single, or at most a very discrete subset of surgeries. This is entirely not the case in the context of GRS, where there are a wide range of treatments, most notably absent surgery, but also including surgeries, which are presented as "options" in treatment, and are largely determined by the patient's desires. This would not be the case were the procedure truly "necessary", defined as treatment required in order to protect life, to prevent significant disability, or to alleviate pain. In these cases, barring any individual contraindications to surgery, almost all individuals suffering with these symptoms would indeed consent to surgery. This is clearly not the case with GRS, as, according to NIH data (2019), only 25-35% of transgender individuals ever undergo any form of GCS. (Demographic and temporal trends in transgender identities and gender confirming surgery (nih.gov)). This would not be true of any other "medically necessary" procedure in this country.

Almost universally, medically necessary procedures are by definition covered by insurance carriers. This too is not the case with GRS. In fact, 64% (32 States) of U.S. States' Medicaid programs do not offer coverage for GRS. (Issue brief: Health insurance coverage for gender-affirming care of transgender patients (ama-assn.org)). In fact, in N.C. the State Employees Health Plan, as with the majority of other US State health plans similarly do not cover the cost of GCS. This absolutely would not be the case were the procedure indeed "medically necessary".

Medically necessary treatments must be based on standards of practice, must be evidence-based, peer-reviewed and without bias or conflict of interest among the researchers or agency providing the recommendations, and there is almost always consensus among the medical community as to not only the necessity of the treatment/ procedure, but further, the preferred treatment. These factors establish standard of care, and physicians are derelict in their duties when they stray from these critical considerations. Unfortunately, in the case of GRS in the treatment of gender dysphoria, none of these factors are true. Most notably, the entity most often referred to for guidance regarding treatment of gender dysphoria, namely WPATH (World Professional Association for Transgender Health), simply does not meet these criteria.

WPATH remains under increasing scrutiny and continues to be mired in controversy for the very reasons cited above, calling into question its objectivity and the very real concern that it is not the typical professional organization that develops reliable clinical practice guidelines. WPATH is considered by many to instead be a hybrid professional and activist organization, where activists have become voting members, and even move on to lead the organization. In fact, it is argued by many that WPATH is "activist-led" rather than "evidence-led", and therefore are not a reliable agency in medical decision making for our patients.

Conflicts of interest among the organization are also of significant concern. The overwhelming majority of WPATH Committee members either receive income based on recommendations in the guidelines, work at clinics or universities who receive funds from advocacy groups, foundations, or pharmaceutical companies who heavily favor a certain treatment paradigm, or have received grants and published papers or research in transgender care.

The majority of the members of the WPATH Committee are from the U.S., and six of them have affiliations with the same university–the University of Minnesota Program in Sexuality, which is primarily funded by a transgender advocacy organization (Tawani Foundation).

As if the factors above were not concerning enough, the situation becomes more concerning when we consider another source we as practitioners use to develop treatment plans for our patients, namely specialty societies. In the case of WPATH, three of the same committee members for the WPATH Guidelines also served on the Endocrine Society guideline committee, which raises intellectual conflict of interest concerns, as recommendations based on faulty conclusions in the WPATH guidelines could potentially have been duplicated in the Endocrine Society guidelines.

When, as clinicians we encounter concerns related to objectivity or conflict of interest, for instance, a study recommending a particular pharmacologic treatment or prosthetic device wherein the study was funded by the pharmaceutical company or prosthetic manufacturer, we are then obligated to expand our research and consider other studies. To do otherwise as medical professionals would be negligent; we simply cannot rely solely on a single organization with these concerns at the forefront in making decisions for our patients. This is precisely the case here, where there is significant concern for objectivity and conflict of interest among WPATH, as well as the US Endocrine Society.

When further research is conducted, as we have done in this case, it becomes even more apparent why there is indeed not consensus among the medical community in the treatment of gender dysphoria, and particularly GCS.

Perhaps one of the most important considerations in developing treatment plans for our patients is the long term prognosis following the treatment. Most critically, the imperative *"Primum non nocere"*, ("First do no harm") must be at the forefront of consideration. This imperative is the underpinning of the oath all physicians take. In order to ensure the most appropriate, effective, and safest care to patients, clinicians must exercise due diligence in evaluating all available information in formulating recommendations to patients. The evidence regarding GRS does not provide sufficient confidence that the procedures should be undertaken without concern for having violated that oath.

Case in point is the 2016 CMS (Centers for Medicaid and Medicare) Decision Memo which summarizes the following: "Based on a thorough review of the clinical evidence available at this time, there is not

enough evidence to determine whether gender reassignment surgery improves health outcomes for Medicare beneficiaries with gender dysphoria". Further in the report, "When considering even the 'best studies', the conclusion was that there is no evidence of 'clinically significant changes' after sex reassignment surgery." (NCA - Gender Dysphoria and Gender Reassignment Surgery (CAG-00446N) - Proposed Decision Memo (cms.gov))

No studies conclusively demonstrate that GCS improves quality of life or sufficiently addresses gender dysphoria. In fact, in the largest and most thorough long term study looking at quality of life after GCS [Sweden; 324 individuals over a 30 year period (1973-2003)] (Long-Term Follow-Up of Transsexual Persons Undergoing Sex Reassignment Surgery: Cohort Study in Sweden (plos.org)), found evidence to the contrary. Specifically, 1-15 years after surgical reassignment, the suicide rate of those who had undergone sex reassignment surgery rose to 20 times that of comparable peers; there was notable increased mortality and psychiatric hospitalization (which was 2.8 times greater than in controls). As/ more interesting was the finding that death due to neoplasm and cardiovascular disease was increased 2-2.5 times in the surgical group, and this increased mortality was not realized for some 10 years after surgery.

There is a growing body of research into what seems to be an increasing number of transgender individuals who at some point "de-transition", or go back to living as their sex assigned at birth (or at least discontinue some or all aspects of gender affirmation).

The phenomenon of de-transition is critically important in considering treatment options for patients, particularly when treatment involves either irreversible or incredibly difficult/ poor outcomes, such as surgeries. This consideration is of even greater concern when the veracity of the patient is in question or there are other factors such as secondary gain to be considered.

A study recently (June 2021) published by the National Institutes for Health (National Center for Biotechnology Information-NCBI) found that among individuals who had undergone transition, more than 13% had undergone de-transition. Factors Leading to "Detransition" Among Transgender and Gender Diverse People in the United States: A Mixed-Methods Analysis (nih.gov)

Further analysis of this data demonstrated that of those who de-transitioned, 38% did so because transitioning had failed to resolve their psychological issues, so they concluded that "gender dysphoria wasn't the cause"; another 23% did so because they came to understand that they had in fact been struggling with sexual orientation issues rather than gender dysphoria. Why Some Transpersons Decide to Detransition | Psychology Today

A large sample, peer-reviewed study conducted in 2021 found that 70% of those who detransitioned did so after they realized their gender dysphoria was "related to other issues" and 50% did so because transition had failed to alleviate their dysphoria. Interestingly, 43% endorsed a "change in political views" as a reason for detransition. Importantly, 43% of those who detransitioned had previously undergone GCS. Full article: Detransition-Related Needs and Support: A Cross-Sectional Online Survey (tandfonline.com)

Another more recent study (Oct 2021) found that 70% were dissatisfied with their decision to transition. 61% of those who detransitioned had returned to their identifying with their birth sex, 14% identified as nonbinary, and 8% identified as transgender. The study goes on to emphasize the need for "alternative,

GENERAL CONFIDENTIAL INFORMATION    3:22-cv-191 (WDNC)    DAC 3402

non-invasive approaches for gender dysphoria management in young people".
Growing Focus on Detransition | SEGM

Having taken all these factors into consideration, it remains my medical determination that the surgical procedure requested by this offender is not medically necessary. Further, there is increasing evidence that GRS does not represent the definitive treatment for gender dysphoria, nor does the literature provide the confidence in long-term success required in order to undertake invasive procedures. There simply is not consensus among the medical community that GRS represents THE only acceptable nor THE most recommended treatment for gender dysphoria. In no other context would surgery be considered for a patient if at least one of these factors were not considered to be consensus among the medical community.

GENERAL CONFIDENTIAL INFORMATION     3:22-cv-191 (WDNC)     DAC 3403