# EXHIBIT D

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

AUGUST DEKKER, *et al.*,

                *Plaintiffs*,

        v.

JASON WEIDA, *et al.*,

                *Defendants*.

Case No. 4:22-cv-00325-RH-MAF

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS'
RENEWED MOTION FOR RULE 35 EXAMINATIONS
<u>OF PLAINTIFFS SUSAN DOE AND K.F.</u>**

The controversy in this case centers on whether the Challenged Exclusion's premise that gender-affirming medical care is experimental is valid and lawful. Plaintiffs, two adult and two adolescent transgender Medicaid beneficiaries, challenge Defendants' adoption of a rule, Florida Administrative Code 59G-1.050(7), prohibiting Medicaid coverage of services for the treatment of gender dysphoria, ***regardless of individual medical necessity*** (hereinafter the "Challenged Exclusion"). The Challenged Exclusion ***categorically*** bans coverage of gender-affirming medical care on the grounds that the care is ***never*** medically necessary. It makes no exception based on a particular patient's individual circumstances or condition. Accordingly, this Court has indicated that "the controlling substantive

1

issue" in the case is "whether [the] treatments at issue are experimental."  ECF 80 at 2.[1]

Yet, notwithstanding the categorical nature of the Challenged Exclusion and the nature of the controlling issues in the case, Defendants seek psychiatric examinations of only two of the Plaintiffs, selectively choosing to target the Minor Plaintiffs (Susan Doe and K.F.) for such an invasive intrusion.  But Defendants have not—and cannot—meet their stringent burden under Federal Rule of Civil Procedure 35, nor survive the "discriminating" scrutiny the Court must employ in considering their request.  Given the categorical nature of the Challenged Exclusion, the validity of an individual Plaintiff's diagnosis, or their individual need for a particular gender-affirming treatment, is not at issue.

As the Supreme Court has held:

> [T]he 'in controversy' and 'good cause' requirements of Rule 35 … are not met by mere conclusory allegations of the pleadings —nor by mere relevance to the case—but require an affirmative showing by the movant that each condition as to which the examination is sought is really and genuinely in controversy and that good cause exists for ordering each particular examination.

*Schlagenhauf v. Holder*, 379 U.S. 104, 118 (1964).  Defendants cannot show that the Minor Plaintiffs' mental condition is "in controversy" nor that they have "good cause" for the examinations.  Instead, their purpose in requesting these examinations

---

[1] The Court has also zeroed in on whether the process was fair and reasonable.  *See*, *e.g.*, ECF 62 at 90:1-91:3.

is to harass and intimidate the Minor Plaintiffs.  Not only have Defendants failed to make the requisite affirmative showing under Rule 35, but Defendants' proposed examiner is not qualified and does not meet this Court's instruction that the examiner not be a "transgender denier or skeptic."

For these and following reasons, the Court should deny Defendants' Renewed Motion for Rule 35 Examinations.

## LEGAL STANDARD

Rule 35 "requires discriminating application by the trial judge, who must decide, as an initial matter in every case, whether the party requesting a mental or physical examination or examinations has adequately demonstrated the existence of the Rule's requirements of 'in controversy' and 'good cause.'"  *Schlagenhauf*, 379 U.S. at 118–19. "The 'good cause' and 'in controversy' requirements of Rule 35 make it very apparent that sweeping examinations of a party who has not affirmatively put into issue his own mental or physical condition are not to be automatically ordered."  *Id.* at 121.[2]

---

[2] Defendants cite a district court case for the mistaken proposition that "Rule 35(a) is to be construed liberally in favor of granting discovery."  ECF 88 at 3 (quoting *Cody v. Marriott Corp.*, 103 F.R.D. 421, 422 (D. Mass. 1984)). This ignores unequivocal guidance from the Supreme Court that "Mental and physical examinations are only to be ordered upon a discriminating application by the district judge of the limitations prescribed by the Rule" and that having "such examinations [] be ordered routinely" would be "an untoward result."  *Schlagenhauf*, 379 U.S. at 121–22.

3

The "in controversy" and "good cause" requirements "are distinct and implicate different concerns." *Winstead v. Lafayette Cnty. Bd. of Cnty. Commissioners*, 315 F.R.D. 612, 616 (N.D. Fla. 2016).

## ARGUMENT

### I. The Minor Plaintiffs' mental condition is not in controversy.

Rule 35 demands "an affirmative showing by the movant that ***each condition*** as to which the examination is sought is ***really and genuinely in controversy***." *Schlagenhauf*, 379 U.S. at 118 (emphasis added). "[M]ost courts agree that for a plaintiff's mental status to be 'in controversy' requires more than 'garden variety' emotional distress allegations that are part and parcel of the plaintiff's underlying claim." *Bowen v. Parking Auth. of City of Camden*, 214 F.R.D. 188, 193 (D.N.J. 2003). As such, the collective view of courts, including this Court, is that:

> A court will order plaintiffs to undergo mental examinations when, in addition to a claim of emotional distress, one or more of the following elements are present: (1) a cause of action for intentional or negligent infliction of emotional distress; (2) an allegation of specific mental or psychiatric injury or disorder; (3) a claim of unusually severe emotional distress; (4) plaintiff's offer of expert testimony to support a claim of emotional distress; and/or (5) plaintiff's concession that his or her mental condition is 'in controversy within the meaning of Rule 35(a).

4

*Winstead*, 315 F.R.D. at 614 (quoting *Bowen*, 214 F.R.D. at 193) (cleaned up));[3] *see also Peltier v. Charter Day Sch., Inc.*, No. 7:16-CV-30-H(2), 2017 WL 4582459, at *1 (E.D.N.C. Jan. 6, 2017).  "The ultimate question is whether a plaintiff is making a claim for damages related to emotional distress that differs substantially from the typical claim in similar cases."  *Winstead*, 315 F.R.D. at 615.

Here, Defendants have not offered—and cannot offer—any plausible basis for the Court to find that the Minor Plaintiffs' mental condition is sufficiently "in controversy" to meet the high threshold for a Rule 35 mental examination.

Defendants hinge their request for intrusive, invasive, and harassing examinations of the Minor Plaintiffs on the allegations in the Complaint that the Minor Plaintiffs have gender dysphoria and suffered from anxiety in the past but "[a] claimant's medical condition is not necessarily placed in controversy simply by the language of the pleadings."  *E.E.O.C. v. Maha Prabhu, Inc.*, 2008 WL 2559417, at *3 (W.D.N.C. June 23, 2008).  Defendants point to the *parents'* fear of the *possible* repercussions of the Minor Plaintiffs not being able to access the care that their doctors have recommended.  But that is not enough.

Defendants cannot hang their request for a compelled mental examination of the minor Plaintiffs on so slender a thread.  Neither the pleadings nor the fears

---

[3] These factors, which have been adopted by most federal courts were first articulated in *Turner v. Imperial Stores*, 161 F.R.D. 89 (S.D. Cal. 1995).  This Court adopted these factors in *Winstead*, 315 F.R.D. at 614.

articulated in the parents' declarations relied upon by Defendants are sufficient to place the Minor Plaintiffs' mental condition "in controversy."

Moreover, while Defendants do not base their request on any claim for damages (and to be clear, Plaintiffs are not asserting any emotional distress damages),[4] no Plaintiff in this case is seeking to recover *damages* for any psychological or physical injury caused by Defendants, nor have they alleged any severe or particularized psychological harm because of Defendants' conduct.   In fact, it is *only* the Defendants' adoption of the categorical Challenged Exclusion (i.e., the Defendants' conduct) that is at issue in this suit; there is no issue before this Court regarding the Minor Plaintiffs' diagnoses or any dispute that they were previously receiving necessary medical treatments as recommended by their treating providers.

The information sought through the requested mental examinations as to the Minor Plaintiffs' mental states is thus entirely irrelevant to the claims and defenses in this case, which may be decided on the merits as a matter of law: either the facially sex-based Challenged Exclusion violates the law, or it does not.   Similarly, either

---

[4] Plaintiffs seek no monetary compensation from the Defendants other than that which they can obtain under Section 1557 of the Patient Protection and Affordable Care Act ("ACA"), 42 U.S.C. § 18116, which in this case is an award of nominal damages recognizing the violation of their civil rights and compensation for any out-of-pocket costs for their medical care that would have been covered by Medicaid but for the Challenged Exclusion.  *Cf. Cummings v. Premier Rehab Keller, P.L.L.C.*, 142 S. Ct. 1562, *reh'g denied*, 142 S. Ct. 2853 (2022).

the Challenged Exclusion was reasonably adopted through a a thoughtful and fair process or it was not.  These issues do not implicate the Plaintiffs' diagnoses.

One need only briefly look to the *Turner* factors—something Defendants have not done—to see that the Minor Plaintiffs' mental condition is not in controversy.

1. *A cause of action for intentional or negligent infliction of emotional distress*.

This basis is inapplicable.  None of the Plaintiffs have asserted a cause of action for intentional or negligent infliction of emotional distress.  *See*, *e.g.*, *Peltier*, 2017 WL 4582459, at *1-2 (denying mental examination where plaintiffs asserted causes of action for sex-based discrimination in violation of the Fourteenth Amendment and Title IX of the Education Amendment of 1972, 20 U.S.C. § 1681 et seq., among others).

2. *An allegation of specific mental or psychiatric injury or disorder*.

This basis is similarly inapplicable.  The Minor Plaintiffs have *never* alleged that Defendants' discriminatory actions caused a "specific mental or psychiatric injury or disorder," or that they have sought treatment for and/or were diagnosed with any "specific mental or psychiatric injury or disorder" ***as a result of Defendants' conduct***.  It is patently insufficient under Rule 35's "in controversy" requirement that the Minor Plaintiffs were *previously* diagnosed with gender dysphoria or other mental and physical health conditions.  The relevant inquiry is whether they have sought compensatory damages for a "specific mental or

7

psychiatric injury or disorder" caused by Defendants' conduct. As such, "[t]his case is similar to those in which courts have refused mental examinations in that there is no claim of **specific psychiatric injury**, but rather generalized feelings of distress." *Maha Prabhu, Inc.*, 2008 WL 2559417, at \*3; *see also Winstead*, 315 F.R.D. at 615; *Peltier,* 2017 WL 4582459, at \*2 (denying mental examination of minor plaintiffs after finding they "have pled no cause of action placing their mental state at issue").

### 3. *A claim of unusually severe emotional distress*.

This basis is likewise inapplicable. Defendants have not shown the Minor Plaintiffs have alleged that they have suffered unusually severe emotional distress as a result of Defendants' actions. Indeed, no cause of action in the Complaint involves arises or involves compensation for "unusually severe emotional distress." "Courts have consistently found that an allegation of ongoing mental distress exposes a plaintiff to **a Rule 35 examination only when the plaintiff intends to seek damages for symptoms or conditions that are more severe than general emotional distress**." *Conforti v. St. Joseph's Healthcare Sys., Inc.*, No. 2:17-CV-00050-CCC-CLW, 2020 WL 365100, at \*2 (D.N.J. Jan. 22, 2020) (emphasis added).[5] As such,

---

[5] Like the case at hand, *Conforti* involved a transgender plaintiff with gender dysphoria who claimed, inter alia, discrimination on the basis of sex under Section 1557 of the ACA. In *Conforti*, the Court found that "Defendants similarly have not demonstrated that Plaintiff's gender dysphoria diagnosis is 'in controversy' for purposes of adjudicating Plaintiff's discrimination claims and Defendants' affirmative defenses. … Rather, the liability determination in this matter turns on

a "[p]laintiff does not place her mental condition in controversy by alleging that her psychological well being, as well as the psychological well being of all reasonable individuals exposed to like circumstances, is seriously affected by defendants' behavior." *Robinson v. Jacksonville Shipyards, Inc.*, 118 F.R.D. 525, 531 (M.D. Fla. 1988); *see also Turner*, 161 F.R.D. at 97 ("This court concludes that 'emotional distress' is not synonymous with the term 'mental injury' as used by the Supreme Court in *Schlagenhauf v. Holder* for purposes of ordering a mental examination of a party under Rule 35(a), and specifically disagrees … that a claim for damages for emotional distress, without more, is sufficient to put mental condition 'in controversy' within the meaning of the Rule. If this were the law, then mental examinations could be ordered whenever a plaintiff claimed emotional distress or mental anguish.").[6] Likewise, a "[p]laintiff's history of depression and anxiety, no matter how extensive or complicated, cannot on its own sustain Defendants' burden under Rule 35." *Conforti*, 2020 WL 365100, at *2. Nor can a parent's fears of the consequences of the Minor Plaintiffs being denied care have bearing on the

---

whether Defendants denied Plaintiff treatment for impermissible discriminatory reasons." *Conforti*, 2020 WL 365100, at *2.

[6] Even if there were a sufficient basis to determine that unusually severe emotional distress as a result of Defendants' actions has been alleged (and there is not), "a claim of unusually severe emotional distress usually must be accompanied by another of the *Turner* factors in order to merit an independent examination." *Maha Prabhu, Inc.*, 2008 WL 2559417, at *3. Here, none of the factors are present.

"controlling" and much broader question in this case of whether the medical care targeted by the Challenged Exclusion is experimental.

4. *Plaintiff's offer of expert testimony to support a claim of emotional distress.*

This basis is also inapplicable.  Plaintiffs have not asserted a cause of action for emotional distress and therefore do not intend to submit expert testimony in support of such a claim.  And presenting generalized expert testimony is insufficient to place a party's mental condition in controversy. *See Peltier*, 2017 WL 4582459, at *2.

5. *Plaintiff's concession that his or her mental condition is 'in controversy within the meaning of Rule 35(a).*

This factor likewise cannot be met.  The Minor Plaintiffs clearly do not concede, and have never conceded, that their mental condition is in controversy.

In sum, Defendants have not shown that Plaintiffs' mental conditions are in controversy in this case.

## II.   Defendants have not shown good cause for the invasive psychiatric examination they request.

"The law requires the party seeking a Rule 35 order to make an affirmative showing of good cause." *Pearson v. Norfolk-S. Ry. Co.*, 178 F.R.D. 580, 582 (M.D. Ala. 1998).  Rule 35's "good-cause requirement is not a mere formality, but is a plainly expressed limitation on the use of that Rule." *Schlagenhauf*, 379 U.S. at 118. It is distinct from, and more stringent than, the general "relevance" standard

contained in Rule 26.  Thus, while "an allegation of emotional distress will make a plaintiff's mental state relevant to the proceedings," under Rule 35, a movant "must show necessity, which is the element that separates the procedures involving independent medical examinations and other tools of discovery." *Maha Prabhu, Inc.*, 2008 WL 2559417, at *2. Only "[w]here the average lay person would have difficulty evaluating **the nature, extent, and cause of the claimant's injuries**, there is good cause for an independent medical evaluation." *Id.* (emphasis added).

"To establish 'good cause,' the moving party generally must offer specific facts showing the examination is necessary and relevant to the case." *Robinson v. HD Supply, Inc.*, No. 2:12-CV-604 GEB AC, 2013 WL 3815987, at *6 (E.D. Cal. July 19, 2013).  "The good cause analysis is fact-sensitive, and 'what may be good cause for one type of examination may not be so for another.'" *Conforti*, 2020 WL 365100, at *3 (quoting *Schlagenhauf*, 379 U.S. at 118).  "Factors considered in assessing whether 'good cause' exists include, but are not limited to: (1) the possibility of obtaining desired information by other means; (2) whether plaintiff plans to prove her claim through testimony of expert witnesses; (3) whether the desired materials are relevant; and (4) whether plaintiff is claiming ongoing emotional distress." *Robinson v. HD Supply*, 2013 WL 3815987, at *6.  Here, Defendants have not shown there is good cause for the intrusive psychiatric examinations they request.

*First*, Defendants have not explained why the desired information can only be obtained through intrusive psychiatric examinations of two young adolescents.

Defendants contend they are "***entitled*** to confirm whether or not Plaintiffs suffer from gender dysphoria and whether Plaintiffs have undergone appropriate mental health treatment and whether reversal of their gender affirming treatment will negatively impact their mental health as alleged." ECF 88 at 4.  But not only is that not the case (again, the individual Plaintiffs' diagnoses are not at issue), but Defendants have not shown *why* an independent psychiatric examination would be necessary in any event.

"One factor that is relevant to the determination of 'good cause' is the possibility of obtaining the desired information by other means." *Marroni v. Matey*, 82 F.R.D. 371, 372 (E.D. Pa.1979) (citing *Schlagenhauf*, 379 U.S. at 118).  "When the 'desired information' is in essence a treating physician/therapist/psychologist's records and opinions about a party's mental injuries, disclosure of those records and opinions—together with the opportunity to depose the party and perhaps the treater—offers a less intrusive means of obtaining similar (if not the same) information." *Winstead*, 315 F.R.D. at 616; *see also Conforti*, 2020 WL 365100, at *4.  Here, Defendants have not even attempted to seek the information they claim to need through any of those means.  Without conceding whether it is appropriate, it is important to note for the Court that Defendants have not sought to depose the Minor

Plaintiffs, depose the Minor Plaintiffs' parents, nor depose any of the Minor Plaintiffs' treating health care providers.

"Defendants have not sustained their burden of specifically demonstrating that the extraordinary remedy of a Rule 35 examination is necessary here." *Conforti*, 2020 WL 365100, at *4. Defendants have not utilized or even attempted less intrusive means, instead seeking to subject two young adolescents to intrusive and invasive psychiatric examinations as a matter of first resort.

*Second*, Defendants have not shown why the desired information is not only relevant, but necessary. "Whether good cause is established depends on both relevance and need." *Pearson*, 178 F.R.D. at 582 (citing 7 Moore's Federal Practice § 35.04 [1] (Matthew Bender 3d Ed.); *see also Peters v. Nelson*, 153 F.R.D. 635 (N.D. Iowa 1994)). And as the Eleventh Circuit has explained, "[t]he scope of allowable discovery is determined by the claims (and defenses) raised in the case." *Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353, 1368 n.37 (11th Cir. 1997).

Indeed, this Court instructed Defendants that should they file a renewed motion, they should "address how any finding from an examination might affect a ruling on the controlling substantive issue of whether treatments at issue are experimental." ECF 80 at 2. Defendants have failed to do so. They have not explained how an individual Plaintiff's examination affects the controlling substantive issue before this Court.

13

By the Challenged Exclusion's explicit terms and Defendants' own admission, this case is not about whether medical treatment for gender dysphoria was necessary or appropriate for any plaintiff but rather the "controlling question of whether 'current medical knowledge' supports the State's conclusion that certain treatments for gender dysphoria are experimental." Defs.' Opp. to Non-Parties Joint Mot. to Quash, *In re subpoenas served on: Am. Acad. of Pediatrics, et al.*, No. 1:23-mc-00004-CJN (D.D.C. filed on Jan. 20, 2023) (ECF 11), at 18, https://tinyurl.com/2p8dp36n. Whether any provider selected by Defendants agrees or disagrees with the gender dysphoria diagnoses of the Minor Plaintiffs (as diagnosed by their treating providers) is wholly irrelevant. Further, it is immaterial whether or not any individual physician believes that these treatments are medically necessary for any singular person or, alternatively, appropriate for any particular given situation. This case is about whether coverage for such treatments can be categorically banned—*i.e.*, whether coverage for such treatments can be prohibited **without regard** to the individual circumstances of any transgender patient. Nor can a two-hour examination of a single plaintiff show whether other covered medical treatments could sufficiently treat a plaintiffs' gender dysphoria.[7]

---

[7] In this regard Defendants' proposed examiner has already reached a conclusion (*see* ECF 88-1 at ¶¶7, 9) making the examination all the more unnecessary.

In sum, psychiatric examinations of the Minor Plaintiffs cannot change the undeniable fact that the Minor Plaintiffs have been diagnosed with gender dysphoria by their medical providers, nor will such examination assist the Court in determining whether gender-affirming medical care is experimental or whether Defendants reasonably arrived at such determination.

*Third*, given the categorical nature of the Challenged Exclusion and the broad scope of the controlling question, Plaintiffs do not intend to present expert testimony specific to Plaintiffs in order to prove their claims.[8]   Because expert testimony specific to the Minor Plaintiffs is not at issue, no psychiatric examinations of the Minor Plaintiffs are warranted or necessary.  Both *Conforti* (involving a transgender plaintiff with gender dysphoria) and *Peltier* (involving minor plaintiffs alleging sex discrimination) are instructive on this point.  In both cases, the plaintiffs sought to present generalized expert testimony, where the experts had not met with or examined the plaintiffs, did not opine that the plaintiffs had suffered particularized psychological injuries from the defendants' actions or policies, and did not opine on the clinical diagnoses of the plaintiffs.  In both cases, the courts found that such expert testimony was insufficient to warrant Rule 35 psychiatric examinations.  *See Conforti*, 2020 WL 365100, at *2; *Peltier*, 2017 WL 4582459, at *2.

---

[8] To be sure, should the Court grant Defendants' request for independent psychiatric evaluations of the Minor Plaintiffs, Plaintiffs would then have their own experts meet with the Plaintiffs to ensure equal footing.

15

*Fourth*, Plaintiffs are not claiming, let alone asserting causes of action, for any ongoing emotional distress as a result of the Challenged Exclusion beyond what is typical in discrimination cases. "As a direct and proximate result of the discrimination" engendered by the Challenged Exclusion, Plaintiffs only allege that they have suffered "mental pain and suffering and emotional distress." *See*, *e.g.*, ECF 1 at ¶265. Such allegations of ongoing distress require no further investigation by psychiatrist or psychologist as they are "not unique" to the Minor Plaintiffs and "can be understood by the lay person." *Maha Prabhu, Inc.*, 2008 WL 2559417, at *3–4; *see also Montana v. Cty. of Cape May Bd. of Freeholders*, No. 09-0755, 2013 WL 5724486, at *4 (D.N.J. Oct. 18, 2013) ("Describing plaintiff's character traits or stating that he experienced stress and anger after experiencing alleged harassment neither raises plaintiff's emotional distress claims to a level of severe mental injury, nor does it highlight a specific mental injury."). "This case is similar to those in which courts have refused mental examinations in that there is no claim of specific psychiatric injury, but rather generalized feelings of distress." *Maha Prabhu, Inc.*, 2008 WL 2559417, at *3; *accord Nathai v. Fla. Detroit Diesel-Allison, Inc.*, 268 F.R.D. 398, 401 (M.D. Fla. 2010) ("The only evidence available to the Court are the allegations of emotional distress and mental anguish within the complaint. Beyond these garden variety claims of emotional distress, there are no allegations that Plaintiff suffered any permanent or severe psychological damage.").

16

*Fifth*, given that the good cause analysis is fact-sensitive, it is particularly relevant for the Court to understand the context of Defendants' request. As is evident on its face, Defendants' Rule 35 Motion (both the original and the renewed versions) targeted solely the two Minor Plaintiffs in the case; Defendants do not seek psychiatric examinations of the two Adult Plaintiffs. This discrepancy sheds light upon the harassing nature of the request.

Why is the information sought in this motion not necessary to obtain from the Adult Plaintiffs? The answer is simple: It is not necessary at all. And why target the more vulnerable and younger of the Plaintiffs for such intrusive examinations? Defendants do not explain such discrepancy, which one would think is necessary in order to carry their burden of demonstrating with specificity why there is good cause for the requested psychiatric examinations.

Indeed, Defendants' *own conduct* demonstrates that there is no need for psychiatric examinations of the Minor Plaintiffs and that their Motion is meant to harass rather than to elicit *relevant and necessary* information. In taking the depositions of the two Adult Plaintiffs, Defendants spent no more than 30 to 40 minutes examining each. That they have expended little to no time or effort seeking answers to the questions they contend necessitate the examinations of the Minor Plaintiffs significantly undercuts any argument that there is good cause for the examinations. And given that the possibility of obtaining desired information by

17

other means is a factor in determining good cause for a Rule 35 examination, the fact that Defendants have not attempted to ascertain even *some* of this information by other means (and have not sought to elicit similar information from the Adult Plaintiffs) demonstrates that there is no good cause here. *Accord Maha Prabhu, Inc.*, 2008 WL 2559417, at *4 ("[T]his Court is not convinced that a wide-ranging intrusion into her privacy is merited especially where the opportunity to have questioned Ms. Sullivan through deposition and interrogatories has passed.").

### III.    Granting Defendants' motion would be contrary to public policy and would chill the rights of all discrimination victims.

Here, Plaintiffs are facially challenging as unlawful and unconstitutional a broad, categorical policy denying coverage for medical treatment for gender dysphoria, regardless of individual medical necessity.   Defendants have failed to show that psychiatric examinations of the Minor Plaintiffs are warranted under the heightened requirements imposed by Rule 35, as Plaintiffs only assert generalized non-medical allegations of emotional distress and do not seek *any* compensation for any psychological injury caused by Defendants.

Yet, as Defendants would have it, any plaintiff bringing a standard discrimination claim with pre-existing mental health history could be forced to endure an invasive Rule 35 examination for merely exercising their right to seek redress in the judicial system for an act of discrimination.   Such a warrantless expansion of a highly invasive discovery mechanism is precisely what the

heightened requirements under Rule 35 are intended to prevent, as it would chill victims of discrimination from coming forward to assert their rights in court and would make unnecessary and invasive medical discovery a routine aspect of civil rights litigation. *See T.C on Behalf of S.C. v. Metro. Gov't of Nashville & Davidson Cnty., Tennessee*, No. 3:17-CV-01098, 2018 WL 3348728, at *10 (M.D. Tenn. July 9, 2018) ("Close adherence to Rule 35's requirements is particularly necessary in the context of claims brought under anti-discrimination statutes, where the prospect of being required to undergo a physical or mental evaluation to vindicate protected rights might cause plaintiffs to abandon their claims.").

Courts have recognized that these concerns are a "good reason for such restraint" in compelling a Rule 35 examination: "Extraordinarily intrusive as they invariably are, such orders would have an unwarranted chilling effect on persons who believe that they have been subjected to unlawful discrimination if they faced a physical or mental examination anytime they sought redress for such perceived discrimination." *Benham v. Rice*, 2007 WL 8042488, at *2 (D.D.C. Sept. 14, 2007) (reversing a magistrate judge's order granting a motion for a Rule 35 examination and for medical records for a plaintiff who "makes a claim for the same type of distress or humiliation attendant to any 'garden-variety' claim of discrimination"); *see also Robinson v. Jacksonville Shipyards*, 118 F.R.D. at 531 ("Because claims in this area are measured against an objective standard, a ruling in favor of a mental

examination in this case would endorse mental examinations in every Title VII hostile work environment sexual harassment case."). "This result is unacceptable and the price would be too high." *Robinson v. Jacksonville Shipyards*, 118 F.R.D. at 531 (cleaned up); *cf. Schlagenhauf*, 379 U.S. at 122 ("The plain language of Rule 35 precludes such an untoward result."); *Turner*, 161 F.R.D. at 97 ("Rule 35(a) was not meant to be applied in so broad a fashion.").

Defendants have offered no compelling basis or specific facts that would warrant subjecting the Minor Plaintiffs to the "sweeping examinations" of Rule 35. *Schlagenhauf*, 379 U.S. at 121. Defendants vague and conclusory statements are insufficient under existing case law to find either that the Plaintiffs' standard emotional distress allegations in the Complaint place their mental condition "in controversy" or that "good cause" was shown.

## IV. Defendants' chosen psychiatrist is not qualified to conduct the examination at issue and exhibits bias.

Under Rule 35, a court may only order a party to submit to a Rule 35 examination conducted by a suitably licensed or certified examiner. A court has the "responsibility to determine the suitability of the examiner's qualifications . . . even [for] a proposed examination by a physician":

> The court is thus expressly authorized to assess the credentials of the examiner to assure that no person is subjected to a court-ordered examination by an examiner whose testimony would be of such limited value that it would be unjust to require the person to undergo the invasion of privacy associated with the examination.

Fed. R. Civ. P. 35 advisory committee's note to 1991 amendment. A court order requiring a party to submit to a Rule 35 examination also "must specify the time, place, manner, conditions, and scope of the examination." Fed. R. Civ. P. 35(a)(2)(B). Thus, not only are neither the "in controversy" nor the "good cause" requirements met, but Defendants' proposed examiner, Dr. Joshua Sanderson, is also not qualified.

First, Dr. Sanderson, who has only six and half years of experience as a child and adolescent psychiatrist (ECF 88-1 at ¶3), has no real documented experience diagnosing and treating gender dysphoria. His claims in this regard seem to be intentionally misleading, if not outright false. Dr. Sanderson claims he has "examined **and treated** thousands of patients (of all ages) who either experience gender dysphoria or identify as something other than their gender assigned at birth." ECF 88-1 at ¶4. Such a claim is ludicrous.

Dr. Sanderson has spent the entirety of his medical studies and career in Louisiana. However, studies, based on data from the CDC's Behavior Risk Factor Surveillance System (BRFSS) and Youth Risk Behavior Survey (YRBS), show that there are only 4,000 transgender youth (ages 13-17) and 15,700 transgender adults in the state of Louisiana. *See* Jody L. Herman, et al., Williams Inst., *How many adults and youth identify as transgender in the United States?* (June 2022), at 9, https://tinyurl.com/33d6pduk. Dr. Sanderson's claim that he has examined and

21

treated **thousands** of patients with gender dysphoria or who do not identify with their gender assigned at birth would mean that he has examined and treated over 1,000 such patients, which would represent at least 5% of the entire transgender population of Louisiana. This is simply not possible.

To put a finer point on it, Dr. Sanderson is the medical director of Acadania Treatment Center ("Acadania"), which is a treatment center that provides long-term residential care for adolescents (ages 12-17) who have a primary psychiatric diagnosis (such as schizophrenia, delusional disorder, or oppositional defiant disorder) and adolescents struggling with substance use disorders and addiction. *See* Acadania Treatment Programs & Levels of Care, Acadania Treatment Ctr., https://www.acadianatreatmentcenter.com/programs (accessed Feb. 2, 2023). Acadania has only 50 licensed beds. *See* Acadiana Treatment Ctr., Rehab.com, https://tinyurl.com/2p8fc4m5 (accessed Feb. 3, 2023). And notably, Acadania does not list gender dysphoria amongst the conditions it treats, nor is it ever mentioned on its website. *See generally* https://www.acadianatreatmentcenter.com/ (accessed Feb. 3, 2023). Pinecrest Supports and Services Center, where Dr. Sanderson provides some services, is a state-run 1,222 bed intermediate care facility for people with intellectual and developmental disabilities. *See* Pinecrest Supports and Servs. Ctr., La. Dep't of Health, https://ldh.la.gov/index.cfm/directory/detail/675 (accessed Feb. 3, 2023); Pinecrest Supports and Services Center, CareListings.com,

https://tinyurl.com/2p89byh2 (accessed Feb. 3, 2023).  Dr. Sanderson's other work is forensic and not clinical in nature, meaning he does not diagnose and treat patients in his Deputy Coroner or Civil Court Testimony capacities.  If one were to take the bed capacity at Acadania (50) and Pinecrest (1,222) and multiply each by: (1) the years Dr. Sanderson worked there (2 years at Acadania and 5 years at Pinecrest); (2) a factor of four (generously assuming a full turnover of the patient population every quarter); and (3) the proportion of the population ages 13 and up that is transgender (0.6%),[9] Dr. Sanderson could have *at most* encountered 150 transgender patients (assuming no other providers and not accounting for other variables).[10]

By contrast, Plaintiffs' expert, Dr. Dan H. Karasic, has treated thousands of transgender patients over a career dedicated to this population and spanning over 30 years.  ECF 11-3 at ¶7.  Similarly, Dr. Randi C. Ettner, "a clinical psychologist with over 35 years of experience treating … people, almost one third of whom were minors, with gender dysphoria and issues related to gender variance," has worked with just "over 3,000 people."  *C.P. by & through Pritchard v. Blue Cross Blue*

---

[9] *See* Herman, *supra*, at 1.  To be sure, this is higher than the estimated proportion of the population that identifies as transgender in Louisiana, which is 0.44%.  *Id.* at at 9.

[10] For Acadania, 50 beds x 2 years x 4 (quarterly turnover) x 0.006 (proportion of pop. that is transgender) = 2.4 patients. For Pinecrest, 1,222 beds x 5 years x 4 (quarterly turnover) x 0.006 (proportion of pop. that is transgender) = 146.64 patients.

23

*Shield of Illinois*, No. 3:20-CV-06145-RJB, 2022 WL 17092846, at *2 (W.D. Wash. Nov. 21, 2022).  And Dr. Aron Janssen, a child and adolescent psychiatrist with over 12 years of experience, had seen approximately 300 transgender patients as of 2020. Expert Decl. of Aron Janssen, M.D., *D.H. v. Snyder*, No. 4:20-cv-00335-SHR (D. Ariz. filed Aug. 6, 2020) (ECF 5-4), at, https://tinyurl.com/46k3ct7f.  It is thus not credible that Dr. Sanderson, whose practice *does not* focus on this population, has examined and treated **thousands** of patients with gender dysphoria or who do not identify with their gender assigned at birth.  Such a falsehood shows his lack of credibility and competency to meet the rigorous and discriminating standard required for a Rule 35 examination.

Second, and equally as important, this Court has already noted that "no individual will be required to submit to an examination by a transgender denier or skeptic." ECF 67 at 2; ECF 80 at 2.  Nonetheless, Defendants have proposed a psychiatrist who is just that.  While Dr. Sanderson states in a self-serving manner: "I am not a 'gender dysphoria denier or skeptic,'" ECF 88-1 at ¶6, that is not the requirement the Court set forth and even then he goes on to make categorical statements that call his self-serving proclamation into question.[11]  Dr. Sanderson

---

[11] Notably, Dr. Sanderson does not affirm that he is not a "transgender denier or skeptic," instead misquoting this Court's language by affirming only that he is not a "gender dysphoria denier or skeptic." This intentional use of language that deviates from this Court's prior orders leaves open the possibility that he accepts the

categorically *believes* medical and surgical care should not be provided to *anyone* with gender dysphoria "until adulthood," regardless of whether they have a valid gender dysphoria diagnosis or the severity of their dysphoria.  *Id.* at ¶7.  Dr. Sanderson also *believes* "the focus of care for individuals with gender dysphoria should be to engage them in exploratory therapy," regardless of age or individual needs/circumstances.  *Id.*  Notably, Dr. Sanderson cites no authority for this *belief* because there is none to cite.  To be sure, Dr. Sanderson forthrightly notes that he is outside the mainstream of medical opinion.  *Id.* at ¶6 ("I disagree with the medical and surgical transition guidelines for gender dysphoria treatment.").

What is more, so-called "gender exploratory therapy" is an "underdefined paradigm" for which there is "scarce" "discussions of the parameters of this therapeutic mode."  Florence Ashley (2022), Interrogating Gender-Exploratory Therapy, *Perspectives on Psychological Science* 0(0), at 2, 7, https://doi.org/10.1177/17456916221102325.  It is built on "the premise that trans identities are suspect and often rooted in pathology" and opposes *both* social and medical transition for transgender youth.  *Id.* at 1, 7.  Indeed, the so-called "Gender Exploratory Therapy Association" submitted comments to the U.S. Department of Education opposing rules interpreting Title IX's sex discrimination prohibition to

_____

diagnosis of gender dysphoria but denies or is skeptical about the experiences of transgender people.

encompass gender identity in large part on the basis that it would allow transgender adolescents to be socially affirmed in schools and therefore "severely undermine[] the goals of exploratory therapy" such as "coming to terms with their sexed body." Letter from Lisa Marchiano, et al., Gender Exploratory Therapy Association, to Office of Civil Rights, U.S. Dep't of Educ., regarding Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, at 7 (Sept. 11, 2022), https://www.regulations.gov/comment/ED-2021-OCR-0166-195294.   As such, so-called "gender exploratory therapy" has been critiqued as "indistinguishable from conversion [therapy] practices." Ashley, *supra*, at 7.[12]

Having no documented experience working with this population except for an incredulous (and demonstrably false) claim based on his *ipse dixit* and having done no published research or peer-reviewed writing on the subject, Dr. Sanderson nevertheless opines categorically that "treatments for gender dysphoria—puberty blockers, cross-sex hormones, surgeries, etc.—are experimental." *Id.* at ¶9.

---

[12] In this context, conversion therapy refers to "interventions aimed at altering an individual's … gender identity, an/or gender nonconforming expression in order to promote … a gender expression/identity aligning with sex anatomy," "under the premise that a specific … gender identity, and/or gender expression is pathological." Am. Acad. of Child and Adolescent Psychiatry, Fact Sheet – Conversion Therapy (Sept. 2019), at 1, 3, https://tinyurl.com/2n5yk9xn.

26

Based on his own statements, Dr. Sanderson is both a "gender dysphoria denier or skeptic" and/or a "transgender denier or skeptic."

In sum, Defendants bear the burden of satisfying Rule 35's discriminating standard, including by proposing a suitably qualified examiner. They have not met their burden. Dr. Sanderson's qualifications, given his fantastical claims of experience, are questionable, if not wholly lacking, and his proffered categorical disagreements with the mainstream of medical opinion demonstrate his status as a "denier or skeptic." Simply put, Defendants have not shown that Dr. Sanderson can be trusted with conducting an intrusive and invasive examination of any of the Plaintiffs, let alone the two Minor Plaintiffs for which Defendants seek the examinations.

## V.     Defendants' motion is facially deficient.

Rule 35(a) requires that an order for examination "specify the time, place, manner, conditions, and scope of the examination." Defendants' motion fails to specify the time and conditions in which the examinations of the two Minor Plaintiffs would occur and provides vague and insufficient descriptions of the manner and scope of the proposed examinations.

As to the conditions, the motion offers no information, though it states it would "take place remotely." ECF 88 at 6. This lack of information is fatal. And

Plaintiffs would contend, that as to conditions, safeguards should be put in place to allow the two Minor Plaintiffs to feel safe.  *See* Section VII, *infra*.

As to the manner and scope of the examination, Defendants vaguely assert that the examinations would occur "in a manner consistent with generally accepted psychiatric methods of evaluation and testing."   ECF 88 at 6.   What are those methods?   The motion provides no guidance.   Moreover, Dr. Sanderson has explicitly stated that he "disagree[s] with the medical and surgical transition guidelines for gender dysphoria treatment."  ECF 88-1 at ¶6.  Yet, "medical care for gender dysphoria has been confirmed as standard care by every relevant medical organization in the United States, including the American Academy of Pediatrics, the American Psychological Association, and the American Academy of Child and Adolescent Psychiatry." Meredithe McNamara, et al., *A Critical Review of the June 2022 Florida Medicaid Report on the Medical Treatment of Gender Dysphoria* (July 8, 2022), at 5, https://perma.cc/XZV3-PBEA; *see also generally* ECF 34-1. So given his disagreement, what does Dr. Sanderson consider to be "generally accepted"?

The motion further states that the examinations will involve "comprehensive psychiatric evaluation" but does not specify if any psychological testing will be applied and if so, what those tests would be.  The motion states that "clinical scales *may* be used that are appropriate measures for gender dysphoria" but does not specify which scales.

28

Furthermore, the motion states that examinations will involve "a discussion surrounding understanding of consent for medical gender transition." ECF 88 at 6. But the Minor Plaintiffs are 13 years old. By law, minors that age cannot consent to medical treatment. Consent is provided by a minor's legal parent or guardian, and Rule 35 does not permit an examination of a minor plaintiffs' parent. *See P.S. v. The Farm, Inc.*, No. 07-2210-JWL-DJW, 2008 WL 4198597, at *3 (D. Kan. Sept. 11, 2008) (holding that Defendant cannot rely on Fed. R. Civ. P. 35 to force parent to provide information to medical examiner); *Caban ex rel. Crespo v. 600 E. 21st St. Co.*, 200 F.R.D. 176, 181 (E.D.N.Y. 2001) ("This Court therefore declines to expand the scope of Rule 35 to include representatives and natural guardians of infant-plaintiffs, particularly where a proposal to expand the Rule to encompass 'agents' was rejected."). It is therefore unclear what a discussion involving consent would entail or why it would be appropriate.

In sum, the motion lacks the necessary information *required* by Rule 35 and is therefore facially deficient.

## VI.   Defendants' motion is untimely and would cause undue prejudice to Plaintiffs.

The Court should also deny Defendants' motion because it is untimely and would cause undue prejudice to Plaintiffs. Defendants indicated they would seek Rule 35 examinations as far back as mid-October. *See* ECF 66 at 2, 5 (noting that Defendants intended to pursue Rule 35 motions, and the conference where they

29

indicated as such took place on October 17, 2022).   Nonetheless, Defendants waited until January 17, 2023 to first file a Rule 35 motion.   *See* ECF 79.   Their proposed examiner was so deficient that the Court denied the motion the next day, without prejudice.   *See* ECF 80.   Defendants then waited an additional two weeks before filing their renewed motion.   The renewed motion comes two weeks before the deadline for expert reports.   *See* ECF 71.

Notwithstanding their stated intention to seek Rule 35 examinations, Defendants have waited until days before the close of fact discovery and for Rule 26(a)(2) disclosures, as well as weeks after the deadline to serve written discovery (December 21, 2022, as per ECF 67), before making such a request.   Should this Court allow Rule 35 examinations of any Plaintiff (which Plaintiffs strongly contend it should not do as neither the "in controversy" nor "good cause" requirements are met), Plaintiffs should have the opportunity to have their own experts meet with the Plaintiffs as well as to conduct written discovery regarding Defendants' proposed examiner.   But the deadline for expert reports is coming in just a few days (February 14, 2023) and the deadline for written discovery requests (December 21, 2022) has long since passed.   Moreover, delay of the case, which is set for trial for May 9, 2023, would cause undue hardship to Plaintiffs and prolong the irreparable harms they are experiencing.

Plaintiffs urge the Court to not countenance Defendants' eleventh-hour tactics, especially not for examinations that are not meant to elicit information that is relevant, let alone necessary, to answer the ultimate questions in this case.

**VII. Should the Court allow the Rule 35 examinations—which it should not—it should order conditions in which they would occur that protect the Minor Plaintiffs' safety.**

As noted above, Defendants have not specified the conditions in which the Rule 35 examinations would take place, which should on its own be grounds to deny the motion. However, should the Court be inclined to allow Defendants' Rule 35 examinations of the Minor Plaintiffs (which it should not), Plaintiffs request that the Court order certain conditions:

1. <u>The Minor Plaintiffs should be accompanied by their parents.</u>

Not only would this occur normally during the course of routine treatment for minors the age of the Minor Plaintiffs, but Florida's rules regarding such examinations, which should be instructive, specify that:

> "Any minor required to submit to examination pursuant to this rule shall have the right to be accompanied by a parent or guardian at all times during the examination, except upon a showing that the presence of a parent or guardian is likely to have a material, negative impact on the minor's examination."

Fla. R. Civ. P. 1.360(a)(1)(C). This condition would also permit the Minor Plaintiffs to feel safe and supported during an examination.

31

2. <u>The examiner must respect the Minor Plaintiffs gender identity and refer to them by the pronouns consistent with that identity.</u>

Should the Court be inclined to permit Defendants' requested examinations to proceed, Plaintiffs request that the Court instruct that such examination be conducted in a "trans-affirmative" manner, respecting the Minor Plaintiffs' gender identity including by using their pronouns (she/her for Susan Doe and he/him for K.F.). *See* Am. Psychological Ass'n, *Guidelines for Psychological Practice with Transgender and Gender Nonconforming People*, 70 AMERICAN PSYCHOLOGIST 832, 837 (2015), https://www.apa.org/practice/guidelines/transgender.pdf ("Services that psychologists provide to TGNC people require a basic understanding of the population and its needs, as well as the ability to respectfully interact in a trans-affirmative manner."). Courts have imposed such conditions in the context of Rule 35 examinations. *See Eller v. Prince George's Cnty. Pub. Sch.*, No. CV TDC-18-3649, 2019 WL 13108488, at *2 n.2 (D. Md. Oct. 18, 2019) ("The Court directs that Dr. Cephus's examination shall be conducted in a 'trans-affirmative' manner and that Ms. Eller's gender identity be respected through the use of female pronouns.").

3. <u>Additional Conditions may be necessary.</u>

Aside from having the parents present, additional conditions may be necessary to protect the safety and comfort of the Minor Plaintiffs. For example, whether the Minor Plaintiffs' therapists should be also present. And similarly, whether the examination should in any way be recorded are questions that would need to be

addressed and resolved. Such conditions may be appropriate in this case considering Dr. Sanderson's, at best, exaggerations about his experience, his testimony that he deploys a treatment paradigm that has been critiqued as conversion therapy, and that he has already spelled out in his declaration his preconceived notions about the care appropriate for the Minor Plaintiffs.

Courts have permitted third-party observers in examinations of minor plaintiffs when appropriate. *See*, *e.g.*, C.*F.B. by & through Baker v. Hayden*, No. 16-CV-2645-CM-GLR, 2018 WL 420030, at *3 (D. Kan. Jan. 16, 2018); *Vreeland v. Ethan Allen, Inc.*, 151 F.R.D. 551, 551 (S.D.N.Y. 1993).   Courts have similarly permitted the recording of psychiatric examinations.  *See*, *e.g.*, *Sidari v. Orleans Cnty.*, 174 F.R.D. 275, 291 (W.D.N.Y. 1996) ("Being an interpersonal exchange between two persons, there is by definition, a subjective component to a psychiatric examination. Thus, although it may not be required as a matter of law, the Court will direct that the mental examination be recorded by a mechanical audio tape recorder."); *Di Bari v. Incaica Cia Armadora*, S.A., 126 F.R.D. 12, 14 (E.D.N.Y. 1989) ("The undersigned agrees with plaintiff's counsel that a psychiatric examination by defendant's doctor is in reality adversarial in nature. … As such, the plaintiff will be allowed to have a court reporter present during the examination."); *Zabkowicz v. W. Bend Co.*, 585 F. Supp. 635, 636 (E.D. Wis. 1984) ("The defendants' expert is being engaged to advance the interests of the defendants;

clearly, the doctor cannot be considered a neutral in the case. … In sum, I do not believe that the role of the defendants' expert in the truth-seeking process is sufficiently impartial to justify the license sought by the defendants. Accordingly, the plaintiffs, at their option, are entitled to have a third party (including counsel) or a recording device at the examination.").

## CONCLUSION

Defendants are not entitled to Rule 35 examinations of any Plaintiff.  And such examinations are not routine.  To the contrary, they are to be allowed under the most stringent of circumstances after a discriminating review.  Defendants have not their stringent burden here.  They have not shown that the Minor Plaintiffs' mental condition is "in controversy" or that they have "good cause" for the examinations. What is more, their proposed examiner is not qualified based on his demonstrably false representations and the fact that he is, in fact, a transgender denier or skeptic.

For all the aforementioned reasons, Plaintiffs respectfully request that the Court deny Defendants' Renewed Motion for Rule 35 Examinations.

Dated this 4th day of February 2023.

Respectfully Submitted,

/s/ Omar Gonzalez-Pagan

**PILLSBURY WINTHROP SHAW PITTMAN, LLP**

**Jennifer Altman** (Fl. Bar No. 881384)
**Shani Rivaux** (Fl. Bar No. 42095)
600 Brickell Avenue, Suite 3100
Miami, FL 33131
(786) 913-4900
jennifer.altman@pillsbury.com
shani.rivaux@pillsbury.com

**William C. Miller**\*
**Gary J. Shaw**\*
1200 17th Street N.W.
Washington, D.C. 20036
(202) 663-8000
william.c.miller@pillsburylaw.com

**Joe Little**\*
500 Capitol Mall, Suite 1800
Sacramento, CA 95814
(916) 329-4700
joe.little@pillsburylaw.com

**NATIONAL HEALTH LAW PROGRAM**

**Abigail Coursolle**\*
3701 Wilshire Boulevard, Suite 315
Los Angeles, CA 90010
(310) 736-1652
coursolle@healthlaw.org

**Catherine McKee**\*
1512 E. Franklin Street, Suite 110
Chapel Hill, NC 27541
(919) 968-6308
mckee@healthlaw.org

**LAMBDA LEGAL DEFENSE AND EDUCATION FUND, INC.**

**Omar Gonzalez-Pagan**\*
120 Wall Street, 19th Floor
New York, NY 10005
(212) 809-8585
ogonzalez-pagan@lambdalegal.org

**Carl S. Charles**\*
1 West Court Square, Suite 105
Decatur, GA 30030
(404) 897-1880
ccharles@lambdalegal.org

**SOUTHERN LEGAL COUNSEL, INC.**

**Simone Chriss** (Fl. Bar No. 124062)
**Chelsea Dunn** (Fl. Bar No. 1013541)
1229 NW 12th Avenue
Gainesville, FL 32601
(352) 271-8890
Simone.Chriss@southernlegal.org
Chelsea.Dunn@southernlegal.org

**FLORIDA HEALTH JUSTICE PROJECT**

**Katy DeBriere** (Fl. Bar No. 58506)
3900 Richmond Street
Jacksonville, FL 32205
(352) 278-6059
debriere@floridahealthjustice.org

\* *Admitted pro hac vice*

*Counsel for Plaintiffs*

35

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 4th day of February 2023, a true copy of the foregoing has been filed with the Court utilizing its CM/ECF system, which will transmit a notice of electronic filing to counsel of record for all parties in this matter registered with the Court for this purpose.

## **CERTIFICATE OF WORD COUNT**

As required by Local Rule 7.1(F), I certify that this Motion contains 7,991 words.

*/s/ Omar Gonzalez-Pagan*
Omar Gonzalez-Pagan

Counsel for Plaintiffs