EXHIBIT 2

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA**

| | |
|---|---|
| KANAUTICA ZAYRE-BROWN, | |
| *Plaintiff*, | |
| v. | Civil Action No. 3:22-cv-00191 |
| THE NORTH CAROLINA DEPARTMENT OF PUBLIC SAFETY, *et al.*, | |
| *Defendants*. | |

## EXPERT REPORT OF DR. RANDI C. ETTNER, PH.D.

### Table of Contents

I.      Introduction .........................................................................................2

II.     Qualifications .......................................................................................4

III.    Compensation .......................................................................................7

IV.     Materials Considered............................................................................7

V.      Gender Dysphoria .................................................................................8

VI.     Treatment of Gender Dysphoria .........................................................14

        A.    WPATH Standards of Care......................................................14

        B.    Hormone Therapy ...................................................................20

        C.    Gender-Affirming Surgery ......................................................22

1

    D.      Living Consistently with Gender Identity. ..................................29

    E.      Risks of Providing Inadequate Care ..............................................33

VII.    Clinical Interviews and Assessment ...................................................35

    A.      Relevant Medical History .............................................................35

    B.      Clinical and Psychometric Assessment .......................................38

    C.      Relevant Transition-Related History .........................................39

    D.      The Inadequacy of Defendants' Treatment of
             Mrs. Zayre-Brown's Gender Dysphoria ......................................41

VIII.    Deficiencies in the DTARC Zayre-Brown Case Summary ....................42

IX.    Deficiencies in the DTARC Position Statement that
      Gender-Affirming Care is Never Medically Necessary ........................58

X.    Erroneous Statements, Objections, and Conclusions
      By Joseph Penn, MD and Sara Body, Ph.D., ASPP .............................63

XI.    Conclusions and Opinions ...................................................................63

## I.    INTRODUCTION

1.      I am a clinical and forensic psychologist with expertise concerning the diagnosis and treatment of gender dysphoria. I am the past Secretary of, and I served as a member for more than 12 years on, the Board of Directors of the World Professional Association of Transgender Health ("WPATH"), the preeminent professional organization dedicated to the understanding and treatment of gender dysphoria worldwide. I have extensive experience treating transgender individuals with gender dysphoria in my clinical practice and have published numerous books and articles on the topic.

2.      I have actual knowledge of the matters stated herein and could and would so testify if called as a witness.

3.      I have been retained by counsel for Plaintiff Kanautica Zayre-Brown ("Mrs. Zayre-Brown" or "Plaintiff") to provide the Court with my expert evaluation and opinions regarding the appropriateness of the treatment for gender dysphoria provided to Mrs. Zayre-Brown by the Defendants. This report sets forth my opinions and conclusions, including (i) scientific information regarding gender dysphoria and its impact on the health and well-being of individuals living with gender dysphoria; (ii) information regarding best practices and the accepted standards of care for individuals with gender dysphoria; (iii) the results of my review of Mrs. Zayre-Brown's treatment for gender dysphoria and my in-person and telephonic interviews and assessment of Mrs. Zayre-Brown; (iv) the deficiencies in the justifications provided in the Division Transgender Accommodation Review Committee ("DTARC") case summary, dated February 17, 2022, regarding the denial of Mrs. Zayre-Brown's gender-affirming genital surgery (the "Zayre-Brown Case Summary" or "Case Summary," which was produced by Defendants in this case as DAC 3399-3403); (v) the deficiencies in the justifications for the conclusion in the DTARC Position Statement regarding Gender Reassignment Surgery dated March 23, 2022 (the "DTARC Position Statement" or "Position Statement," DAC 3404-3415) that gender-affirming surgery is never medically necessary; and (vi) certain of the erroneous statements, opinions, and conclusions made by Joseph Penn, MD and Sara Boyd, Ph.D., ABPP in their affidavits submitted in this matter, ECF No. 18-8, 18-6.

4. My conclusions and a summary of my opinions in this matter are set forth in Section XI (¶¶ 132-37) of this report, below.

## II. QUALIFICATIONS

5. I am a licensed clinical and forensic psychologist with a specialization in the diagnosis, treatment, and management of gender dysphoric individuals. I received my Doctorate in Psychology (with honors) from Northwestern University in 1979. I am a Fellow and Diplomate in Clinical Evaluation of the American Board of Psychological Specialties, and a Fellow and Diplomate in Trauma/Post-Traumatic Stress Disorder.

6. During the course of my career, I have evaluated, diagnosed, and treated between 2,500 and 3,000 individuals with gender dysphoria and mental health issues related to gender variance from 1977 to present.

7. I have published four books related to the treatment of individuals with gender dysphoria, including the medical text entitled *Principles of Transgender Medicine and Surgery* (co-editors Monstrey & Eyler; Routledge 2007) and the 2nd edition (co-editors Monstrey & Coleman; Routledge 2016). In addition, I have authored numerous articles in peer-reviewed journals regarding the provision of healthcare to the transgender population.

8. I have served as a member of the University of Chicago Gender Board, am on the editorial boards of *Transgender Health* and the *International Journal of Transgender Health* and am an author of the WPATH Standards of Care for the *Health of Transsexual, Transgender and Gender-Nonconforming People* (7th version),

published in 2011. I am also an author of the newly released WPATH Standards of Care Version 8, published in 2022, and chaired the chapter on Institutionalized Persons. WPATH is an international association of 2,700 medical and mental health professionals worldwide specializing in the treatment of gender diverse people. I chair the WPATH Committee for Institutionalized Persons and provide training to medical professionals on healthcare for transgender prisoners.

9.      I am on the Medical Staff at Weiss Memorial Hospital in Chicago, and I have lectured throughout North America, Europe, South America, and Asia on topics related to gender dysphoria and have given grand rounds on gender dysphoria at university hospitals. I am the honoree of the externally funded Randi and Fred Ettner Fellowship in Transgender Health at the University of Minnesota. I have been an invited guest at the National Institutes of Health to participate in developing a strategic research plan to advance the health of sexual and gender minorities, and in November 2017, I was invited to address the Director of the Office of Civil Rights of the United States Department of Health and Human Services regarding the medical treatment of gender dysphoria. I received a commendation from the United States House of Representatives on February 5, 2019, recognizing my work for WPATH and gender dysphoria in Illinois.

10.      I have been a consultant to news media and have been interviewed as an expert on gender dysphoria for hundreds of television, radio, and print articles throughout the country.

11.     I have been retained as an expert regarding gender dysphoria and the treatment of gender dysphoria in multiple court cases and administrative proceedings, including cases involving the treatment of individuals with gender dysphoria in prison settings. Over the past four years, I have given expert testimony at trial or by deposition in the following cases: *Diamond v. Ward*, No. 5:20-cv-00543 (M.D. Ga. 2022); *Stillwell v. Dwenger*, No. 1:21-cv-1452-JRS-MPB (S.D. Ind. 2022); *Letray v. Jefferson Cty.*, No. 20-cv-1194 (N.D.N.Y. 2022); *C.P. v. BCBSIL*, No. 3:20-cv-06145-RJB (W.D. Wash. 2022); *Kadel v. Folwell*, No. 1:19-cv-00272 (M.D.N.C. 2021); *Iglesias v. Connor*, No. 3:19-cv-00415-NJR (S.D. Ill. 2021); *Monroe v. Jeffreys*, No. 3:18-CV-00156-NJR (S.D. Ill. 2021); *Singer v. Univ. of Tennessee Health Sciences Ctr.*, No. 2:19-cv-02431-JPM-cgc (W.D. Tenn. 2021); *Morrow v. Tyson Fresh Meats, Inc.*, No. 6:20-cv-02033 (N.D. Iowa 2021); *Claire v. Fla. Dep't of Mgmt. Servs.*, No. 4:20-cv-00020-MW-MAF (N.D. Fla. 2020); *Williams v. Allegheny Cty.*, No. 2:17-cv-01556-MJH (W.D. Pa. 2020); *Gore v. Lee*, No. 3:19-CV-00328 (M.D. Tenn. 2020); *Eller v. Prince George's Cty. Pub. Schs.*, No. 8:18-cv-03649-TDC (D. Md. 2020); *Monroe v. Baldwin*, No. 18-CV-00156-NJR-MAB (S.D. Ill. 2020); *Gilbert v. Dell Technologies*, No. 19-cv-1938 (JGK) (S.D.N.Y. 2019); *Ray v. Acton*, No. 2:18-cv-00272 (S.D. Ohio 2019); *Soneeya v. Turco*, No. 07-12325-DPW (D. Mass. 2019); *Edmo v. Idaho Dep't of Corr.*, No. 1:17-CV-00151-BLW (D. Idaho 2018).

12.     A true and correct copy of my Curriculum Vitae, which provides a complete overview of my education, training, and work experience and a full list of my publications, is attached hereto as **Appendix A**.

### III. COMPENSATION

13.     My clinical consulting fee in this case is $375.00 per hour for any clinical services, records review, or report drafting in connection with this case; $475.00 per hour for any depositions or oral testimony in this case, and $2,500.00 per day for any necessary travel in conjunction with this case. A true and correct copy of my engagement agreement in this case is attached hereto as **Appendix B**. As provided in that agreement, my compensation does not depend on the outcome of this case, the opinions I express, or the testimony I may provide.

### IV. MATERIALS CONSIDERED

14.     I have considered information from various sources in forming my opinions enumerated herein, in addition to drawing on my extensive clinical experience and my review of the literature related to gender dysphoria over the past three decades. Attached as **Appendix C** is a bibliography of relevant medical and scientific materials related to transgender people and gender dysphoria. I generally rely on these materials when I provide expert testimony, in addition to the documents specifically cited in particular sections of this report.

15.     In preparing this report, I also reviewed and relied on Plaintiff's medical and mental health records, compiled by the North Carolina Department of Public Safety ("DPS"), which were provided to me by Plaintiff's counsel. Those that are referred to in this report are attached hereto as **Appendix D** ("App. D") through

**Appendix E.**[1] I also reviewed and relied on the Zayre-Brown Case Summary; the DTARC Position Statement; the complaint in this matter, ECF No. 1; the Affidavit of Joseph Penn, MD submitted in this matter, ECF No. 18-8 ("Penn Aff."); Dr. Penn's curriculum vitae, ECF No. 18-9; the Affidavit of Sara Boyd, Ph.D., ABPP also submitted in this matter ("Boyd Aff.), ECF No. 18-6; and Dr. Boyd's curriculum vitae, ECF No. 18-7, all of which were also provided to me by Plaintiff's counsel.

16.    I also relied on an extensive in-person clinical interview and assessment I conducted of Mrs. Zayre-Brown, as well as a subsequent follow-up telephonic interview I conducted of Mrs. Zayre-Brown, my decades of clinical experience in the evaluation, diagnosis, and treatment of individuals suffering from gender dysphoria, and the relevant literature on these topics.

## V.    GENDER DYSPHORIA

17.    The term "gender identity" is a well-established concept in medicine, referring to one's internal sense of oneself as belonging to a particular gender. All human beings develop this elemental internal conviction of belonging to a particular gender, such as male or female.

---

[1] Certain sensitive information in Mrs. Zayre-Brown's DPS medical records and included as appendices in this declaration has been redacted by Plaintiff's counsel. The categories of redacted information include Mrs. Zayre-Brown "deadname" (the typically masculine name given to her at birth and named utilized by DPS in their record keeping, despite Mrs. Zayre-Brown's legal name change in 2012) and sensitive health information, unrelated to Mrs. Zayre-Brown's gender dysphoria and need for gender-affirming surgery. Upon request, Plaintiff's counsel will readily provide the Court and Defendants' counsel with unredacted versions of these records, which Plaintiff's counsel obtained from Defendants.

18.     At birth, infants are typically classified as male or female. This classification becomes the person's birth-assigned sex. Typically, persons born with the external physical characteristics associated with males psychologically identify as men, and persons born with the external physical characteristics associated with females psychologically identify as women. However, for transgender individuals, this is not the case. For transgender individuals, the sense of one's gender—one's gender identity—differs from the birth-assigned sex, giving rise to a sense of being "wrongly embodied."

19.     For some, the incongruence between gender identity and assigned gender does not create clinically significant distress. However, for others, the incongruence results in gender dysphoria, a serious medical condition characterized by a clinically significant and persistent feeling of distress and discomfort with the gender they were identified as at birth (their "assigned gender" or "birth-assigned sex").

20.     In 1980, the American Psychiatric Association ("APA") introduced the diagnosis Gender Identity Disorder ("GID") in the third edition of the *Diagnostic and Statistical Manual of Mental Disorders* ("DSM-III"). The GID diagnosis was maintained in a revised version of DSM, known as DSM-III-R (1987), as well as in DSM-IV which was issued in 1994.

21.     In 2013, with the publication of the fifth edition of the DSM, the GID diagnosis was removed and replaced with a new diagnostic term: gender dysphoria. This new diagnostic term was based on significant changes in the understanding of

the condition of individuals whose birth-assigned sex differs from their gender identity. The change in nomenclature was intended to acknowledge that gender incongruence, in and of itself, does not constitute a mental disorder. Nor is an individual's identity disordered. Rather, the diagnosis is based on the distress or dysphoria that some transgender people experience because of the incongruence between birth-assigned sex and gender identity and the social problems that ensue. The fifth edition explained that the former GID diagnosis connoted "that the patient is 'disordered.'" American Psychiatric Association, "Gender Dysphoria," *Diagnostic and Statistical Manual of Mental Disorders* (5th ed. 2013) ("DSM-5"). But, as the APA explained, "[i]t is important to note that gender nonconformity is not in itself a mental disorder. The critical element of Gender Dysphoria is the presence of clinically significant distress associated with the condition." *Id.* By "focus[ing] on dysphoria as the clinical problem, not identity per se," the change from GID to Gender Dysphoria destigmatizes the diagnosis. *Id.*

22.    In addition, the categorization of gender dysphoria and its placement in the DSM system is different for gender dysphoria than it was for GID. In every version of the DSM prior to 2013, GIDs were a subclass of some broader classification, such as Disorders Usually First Evident in Infancy, Childhood, or Adolescence, or alongside other subclasses such as Developmental Disorders, Eating Disorders, and Tic Disorders. For the first time ever, DSM-5 categorizes the diagnosis separately from all other conditions. In the DSM-5, gender dysphoria is classified on its own. In 2018, the World Health Organization ("WHO") likewise reclassified the gender

incongruence diagnosis in the International Classification of Diseases-11. This is significant because the new classification removes gender incongruence from the chapter on mental and behavioral disorders, in recognition that it is not a mental illness.

23.     The diagnostic criteria for Gender Dysphoria in Adolescents and Adults in DSM-5 are as follows:

A. A marked incongruence between one's experienced/expressed gender and assigned gender, of at least 6 months' duration, as manifested by at least two of the following:

1. A marked incongruence between one's experienced/expressed gender and primary and/or secondary sex characteristics (or in young adolescents, the anticipated secondary sex characteristics).

2. A strong desire to be rid of one's primary and/or secondary sex characteristics because of a marked incongruence with one's experienced/expressed gender (or in young adolescents, a desire to prevent the development of the anticipated sex characteristics).

3. A strong desire for the primary and/or secondary sex characteristics of the other gender.

4. A strong desire to be of the other gender (or some alternative gender different from one's assigned gender).

5. A strong desire to be treated as the other gender (or some alternative gender different from one's assigned gender).

6. A strong conviction that one has the typical feelings and reactions of the other gender (or some alternative gender different from one's assigned gender).

B. The condition is associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning.

24.     In addition to renaming and reclassifying gender dysphoria, the medical research that supports the gender dysphoria diagnosis has evolved. Unlike DSM's treatment of GID, the DSM-5 includes a section entitled "Genetics and Physiology," which discusses the genetic and hormonal contributions to Gender Dysphoria. *See* DSM-5 at 457 ("For individuals with gender dysphoria . . . some genetic contribution is suggested by evidence for (weak) familiarity of transsexualism among nontwin siblings, increased concordance for transsexualism in monozygotic compared with dizygotic same-sex twins, and some degree of heritability of gender dysphoria[.]").

25.     There is now scientific consensus that gender identity is biologically based and a significant body of scientific and medical research that gender dysphoria has a physiological and biological etiology (cause or origin). It has been demonstrated that transgender women, transgender men, non-transgender women, and non-transgender men have different brain compositions, with respect to the white matter of the brain, the cortex (central to behavior), and subcortical structures. *See, e.g.*, Rametti et al., 45 J. Psychiatric Res. 199 (2011); Rametti et al., 45 J. Psychiatric Res. 949 (2011); Luders et al. (2006); Krujiver et al. (2000). Differences between transgender and non-transgender individuals primarily involve the right hemisphere of the brain. The significance of the right hemisphere is important because that is the area that relates to attitudes about bodies in general, one's own body, and the link between the physical body and the psychological self.

26.     In addition, scientific investigation has found a co-occurrence of gender dysphoria in families. Gomez-Gill et al. concluded that the probability of a sibling of

a transgender individual also being transgender was 5 times higher than someone in the general population. Gomez-Gil et al. (2010). And, in identical twins, there was a very high likelihood (33%) of both twins being transgender, even when reared apart, demonstrating the role of genetics in the development of gender dysphoria. *See* Diamond (2013) (abstract: "[t]he responses of our twins relative to their rearing along with our findings regarding some of their experiences during childhood and adolescence show their [gender] identity was much more influenced by their genetics than their rearing."); *see also* Green (2000).

27.     It is now believed that gender dysphoria evolves as a result of the interaction of the developing brain and sex hormones. For example, one study found that:

> [d]uring the intrauterine period a testosterone surge masculinizes the fetal brain, whereas the absence of such a surge results in a feminine brain. As sexual differentiation of the brain takes place at a much later stage in the development than sexual differentiation of the genitals, these two processes can be influenced independently of each other. Sex differences in cognition, gender identity . . ., sexual orientation . . ., and the risks of developing neuropsychiatric disorders are programmed into our brain during early development. There is no evidence that one's postnatal social environment plays a crucial role in gender identity or sexual orientation.

Bao & Swaab (2011).

28.     Similarly, Hare et al. found that "a decrease in testosterone levels in the brain during development might result in incomplete masculinization of the brain . . . resulting in a more feminized brain and a female gender identity." Hare et al. at 93, 96.

29.     Efforts to change a person's gender identity are unethical, harmful, and futile. Researchers have documented the risks and harms of attempting to coerce individuals to conform to their birth-assigned sex. These include, but are not limited to, the onset or increase of depression, suicidality, substance abuse, loss of relationships, family estrangement, and a range of post-traumatic responses. *See* Byne (2016); Green, et al. (2020); Turban, et al. (2019). Numerous professional organizations have endorsed the Unites States Joint Statement Against Conversion Efforts, including the American Medical Association, The American Academy of Family Physicians, The American Psychological Association, The American Psychoanalytical Association, The World Professional Association for Transgender Health, and many other professional organizations. Several countries throughout the world, and states and municipalities in the Unites States, have enacted laws prohibiting health care professionals from engaging in conversion attempts.

## VI.     TREATMENT OF GENDER DYSPHORIA

### A. WPATH Standards of Care

30.     Gender dysphoria can be ameliorated or even effectively cured through medical treatment. The standards of care for treatment of gender dysphoria are currently set forth in the *World Professional Association for Transgender Health (WPATH) Standards of Care* (8th version, 2022). The WPATH promulgated Standards of Care ("SOC") are the internationally recognized guidelines for the treatment of persons with gender dysphoria and inform medical treatment throughout the world. The American Medical Association, the Endocrine Society, the

American Psychological Association, the American Psychiatric Association, the World Health Organization, the American Academy of Family Physicians, the American Public Health Association, the National Association of Social Workers, the American College of Obstetrics and Gynecology and the American Society of Plastic Surgeons all endorse treatment protocols in accordance with the SOC. *See, e.g.*, American Medical Association Resolution 122 (A-08) (2008); Hembree et al. (2009); American Psychological Association, *Policy Statement on Transgender, Gender Identity and Gender Expression Nondiscrimination* (2009) ("APA Policy Statement"). In addition, numerous courts have recognized the Standards of Care promulgated by WPATH as the authoritative standards of care for transgender individuals and concluded that there are no other competing, evidence-based standards that are accepted by any nationally or internally recognized medical professional groups.

31.    Throughout this report, I make references to the 7th version of the SOC, with cites to that version referred to below in this report simply as "SOC." I refer primarily to that version because it is what was in effect until the 8th version of the Standards of Care was officially published by WPATH on September 15, 2022, and what was in effect during most of the period relevant to Mrs. Zayre-Brown's treatment by Defendants in this lawsuit. None of my opinions set forth below in this report that are based on the 7th version of the SOC are altered by what is in the 8th version.

32.    As set out in the SOC, many transgender individuals with gender dysphoria undergo a medically indicated and supervised gender transition in order

to ameliorate the debilitation of gender dysphoria and live life consistent with their gender identity. The SOC recommend an individualized approach to gender transition, consisting of one or more of the following protocol components of evidence-based care for gender dysphoria:

- Changes in gender expression and role (which may involve living part time or full time in another gender role, consistent with one's gender identity);

- Hormone therapy to feminize or masculinize the body;

- Surgery to change primary and/or secondary sex characteristics (e.g. breasts/chest, external and/or internal genitalia, facial features, body contouring);

- Psychotherapy (individual, couple, family, or group) for purposes such as exploring gender identity, role, and expression; addressing the negative impact of gender dysphoria and stigma on mental health; alleviating internalized transphobia; enhancing social and peer support improving body image; or promoting resilience.

SOC at 9–10.

33.     The treatment of incarcerated persons with gender dysphoria has been addressed in the SOC since 1998. As with protocols for the treatment of diabetes or other medical disorders, medical management of gender dysphoria for incarcerated individuals does not differ from protocols for non-institutionalized persons. Custodial status is not a medical justification to deviate from accepted standards of care or medically necessary treatment for any medical condition, including gender dysphoria. An individual's custodial status, housing status, and/or security classification are not *medical* justifications to deny medically necessary care, including surgical care, for the treatment of gender dysphoria or any other medical condition that I am aware of.

I am aware of no medical condition that requires deviation from accepted treatment protocols simply because a person is incarcerated and no treatment protocol that is rendered not medically necessary solely because the patient is incarcerated. For these reasons, the SOC expressly state that all elements of the prescribed assessment and treatment are equally applicable to patients in prison (Section XIV), and the National Commission on Correctional Health (NCCHC) recommends treatment in accordance with the SOC for people in correctional settings. *See* NCCHC Position Statement, *Transgender and Gender Diverse Health Care in Correctional Settings* (2020), https://www.ncchc.org/transgender-and-gender-diverse-health-care-in-correctional-settings-2020/.

34.     Under the SOC, while it is true that "[r]easonable accommodations to the institutional environment can be made in the delivery of care consistent with the [SOC]," it is also true that "[d]enial of needed changes in gender role or access to treatments, including sex reassignment surgery, on the basis of residence in an institution are not reasonable accommodations." SOC at 68.

35.     Once a diagnosis of gender dysphoria is made, a treatment plan should be developed based on an individualized assessment of the medical needs of the particular patient.

36.     The development of any treatment plan and all subsequent treatment must be administered by clinicians qualified in treating patients with gender dysphoria. The SOC specify the qualifications that professionals must meet in order to provide care to gender dysphoric patients. *See* SOC at Section VII. In particular,

the SOC provide that all mental health professionals should have certain minimum credentials before treating patients with gender dysphoria, including a master's degree (or equivalent) in a clinical behavioral science field; competencies in using the DSM-5 and/or the International Classification of Diseases for diagnostic purposes; ability to recognize and diagnose co-existing mental health concerns and to distinguish these from gender dysphoria; documented supervised training and competence in psychotherapy or counseling; knowledge of gender nonconforming identities and expressions, and the assessment and treatment of gender dysphoria; and continuing education in the assessment and treatment of gender dysphoria. SOC at 22.

37.     Importantly, the SOC require that "[m]ental health professionals who are new to the field (irrespective of their level of training and other experience) should work under the supervision of a mental health professional with established competence in the assessment and treatment of gender dysphoria." SOC at 22–23. Self-study cannot substitute for first-hand clinical experience in treating the range of clinical presentations of gender dysphoria, or the mentorship and supervision of an expert in this field.

38.     In addition to these minimum credentials, clinicians working with gender dysphoric patients should develop and maintain cultural competence to provide optimal care. A growing body of scientific literature underlies this specialized area of medicine and presents advances in treatment that inform care.

39.     Treatment plans generated by providers lacking the requisite experience can result in inappropriate care and can place patients at significant risk.

40.     Notably, psychiatric medications are not efficacious in a treatment for gender dysphoria. In addition, while psychotherapy or counseling can provide support and help with the personal and social aspects of a gender transition and may to some extent lessen conditions such as depression and anxiety, psychotherapy and counseling cannot resolve underlying distress due to the incongruence between a person's gender identity and birth-assigned sex. There are no psychotherapeutic interventions that have been demonstrated to be effective in alleviating the gender dysphoria itself and such interventions are not a substitute for medical intervention where medical intervention is needed, nor are they preconditions for such intervention. By analogy, in Type One diabetes, counseling might provide psychoeducation about living with a chronic condition and information about nutrition, but it does not obviate the need for insulin.

41.     For many individuals with gender dysphoria, changes to gender expression and role to feminize or masculinize one's appearance, often called "social transition," are an important part of treatment for the condition. This involves dressing, grooming, and otherwise outwardly presenting oneself through social signifiers of gender consistent with one's gender identity. This is an appropriate and necessary part of identity consolidation. Through this experience, the shame of growing up living as a "false self" and the grief of being born into the "wrong body"

can be ameliorated. *See, e.g.*, Greenberg & Laurence (1981); Ettner (1999); Devor (2004).

**B. Hormone Therapy**

42.     For almost all individuals with persistent, well-documented gender dysphoria, hormone therapy is essential and medically indicated treatment to alleviate the distress of the condition. The SOC specify that "feminizing/masculinizing hormone therapy—the administration of exogenous endocrine agents to induce feminizing or masculinizing changes—is a medically necessary intervention for many transsexual, transgender, and gender non-conforming individuals with gender dysphoria." SOC at Section VIII, p. 33.

43.     Hormone therapy is a well-established and effective means of treating gender dysphoria. The American Medical Association, the Endocrine Society, the American Psychiatric Association, and the American Psychological Association all agree that hormone therapy in accordance with the WPATH SOC is medically necessary treatment for many individuals with gender dysphoria. *See* AMA Resolution 122; Hembree et al. (2009); APA Policy Statement.

44.     The goals of hormone therapy for individuals with gender dysphoria are: (i) to significantly reduce hormone production associated with the person's sex assigned at birth and, thereby, the secondary sex characteristics of the individual's sex assigned at birth; and (ii) to replace circulating sex hormones associated with the person's sex assigned at birth with feminizing or masculinizing hormones, using the principles of hormone replacement treatment developed for hypogonadal patients

(i.e., non-transgender males born with insufficient testosterone or non-transgender females born with insufficient estrogen). *See* Hembree et al. (2009).

45.     The therapeutic effects of hormone therapy are twofold: (i) with endocrine treatment, the patient acquires congruent sex characteristics, *i.e.*, for transgender women, breast development, redistribution of body fat, cessation of male pattern baldness, and reduction of body hair; and (ii) hormones act directly on the brain, via receptor sites for sex steroids, which produces an attenuation of dysphoria and attendant psychiatric symptoms, and the promotion of a sense of well-being. *See, e.g.*, Cohen-Kettenis & Gooren (1993).

46.     The efficacy of hormone therapy to treat gender dysphoria is observed clinically and is well documented in the literature. For example, in one study, researchers investigated 187 transgender individuals who had received hormone therapy and compared them with a group of transgender individuals who did not. Untreated individuals showed much higher levels of depression, anxiety, and social distress than those who received hormone therapy. *See* Rametti, et al. (2011); *see also* Colizzi et al. (2014); Gorin-Lazard et al. (2014); Gorin-Lazard et al. (2011).

47.     Transgender women who have undergone gender-affirming orchiectomy or other gender-affirming genital surgeries resulting in removal of the testicles, like Mrs. Zayre-Brown, must receive consistent gender-affirming hormone therapy at the appropriate therapeutic levels to avoid adverse health effects. Interruption of this essential treatment can result in a lack of lymphocyte production and impaired immunity, hypertension, hypoglycemia, depression, and electrolyte imbalance.

Appropriate laboratory monitoring of hormone therapy should occur every three months for the first year of treatment to validate the efficacy of treatment. Once stability is attained, laboratory monitoring can be done twice a year. Laboratory work should include tests for liver function, complete blood counts, lipid panel, and electrolyte values.

### C. Gender-Affirming Surgery

48.     For some individuals with severe gender dysphoria, hormone therapy alone is insufficient. For these individuals, relief from their dysphoria cannot be achieved without surgical intervention to modify primary and/or secondary sex characteristics, *i.e.*, genital reconstruction. Under the contemporary understanding of gender identity, transition-related medical treatments confirm, rather than "change," an individual's sex by aligning primary and secondary sex characteristics with a person's gender identity. The WPATH Standards of Care state:

> While many transsexual, transgender, and gender-nonconforming individuals find comfort with their gender identity, role, and expression without surgery, for many others surgery is essential and medically necessary to alleviate their gender dysphoria. . . . For the latter group, relief from gender dysphoria cannot be achieved without modification of their primary and/or secondary sex characteristics to establish greater congruence with their gender identity.

SOC at 54–55. *See also Position Statement on Medical Necessity of Treatment, Sex Reassignment, and Insurance Coverage in the U.S.A.*, WPATH (Dec. 21, 2016).[2]

---

[2] *https://www.wpath.org/newsroom/medical-necessity-statement* ("In some cases, [medical procedures attendant to gender affirming/confirming surgeries] [are]

49.     Gender-affirming genital surgery for transgender women has two therapeutic purposes. First, removal of the testicles eliminates the major source of testosterone in the body. Second, through gender-affirming genital surgery, the patient attains body congruence as a result of uro-genital structures appearing and to some extent functioning in ways that are more typical for non-transgender women. Both are critical in alleviating or eliminating gender dysphoria.

50.     Decades of careful and methodologically sound scientific research have demonstrated that gender-affirming surgeries are safe and effective treatments for severe gender dysphoria and, indeed, for many people suffering from gender dysphoria, the only effective treatment. *See, e.g.*, Pfäfflin & Junge (1998); Smith et al. (2005); Jarolím et al. (2009).

51.     WPATH, the American Medical Association, the Endocrine Society, and the American Psychological Association all support surgery in accordance with the SOC as medically necessary treatment for individuals with severe gender dysphoria. *See* AMA Resolution 122; Hembree et al., at 3148 (2009) ("For many transsexual adults, genital [gender-affirming] surgery may be the necessary step towards achieving their ultimate goal of living successfully in their desired gender role."); APA Policy Statement at 26 (recognizing "the efficacy, benefit and medical necessity of gender transition treatments" and referencing studies demonstrating the effectiveness of gender- affirming surgeries).

---

the **only** effective treatment for the condition, and for some people genital surgery is essential and life-saving.") (emphasis in original).

52.     Surgeries are considered "effective" from a medical perspective if they "have a therapeutic effect." *See* Monstrey et al. at 95 (2007). More than three decades of research confirms that gender-affirming surgery is therapeutic and therefore an effective treatment for gender dysphoria. As discussed further *infra* ¶¶ 55, 119, regret following gender-affirming surgery is an extremely rare event, with multiple studies indicating it occurs at a rate of less than 1.0%.

53.     In a 1998 meta-analysis, Pfäfflin and Junge reviewed data from 80 studies, spanning 30 years, from 12 countries. They concluded that "reassignment procedures were effective in relieving Gender Dysphoria. There were few negative consequences and all aspects of the reassignment process contributed to overwhelmingly positive outcomes." Pfäfflin & Junge (1998) (terminology like "sex reassignment surgery," "sex change surgery," and "transsexual surgery" are obsolete terms referring to the current and more accurate term, gender-affirming surgery.)

54.     Numerous subsequent studies confirm this conclusion. Researchers reporting on a large-scale prospective study of 325 individuals in the Netherlands concluded that after gender-affirming surgery there was "a virtual absence of gender dysphoria" in the cohort and "results substantiate previous conclusions that [gender-affirming] surgery is effective." Smith et al. at 94, 89 (2005). Indeed, the authors of the study concluded that the surgery "appeared therapeutic and beneficial" across a wide spectrum of factors and "[t]he main symptom for which the patients had requested treatment, Gender Dysphoria, had decreased to such a degree that it had disappeared." *Id.* at 96.

55.     In 2007, Gijs and Brewayes analyzed 18 studies published between 1990 and 2007, encompassing 807 patients. The researchers concluded: "Summarizing the results from the 18 outcome studies of the last two decades, the conclusion that [gender-affirming surgery] is the most appropriate treatment to alleviate the suffering of extremely gender dysphoric individuals still stands: Ninety-six percent of the persons who underwent [surgery] were satisfied and regret was rare." Gijs & Brewayes (2007).

56.     In 2018, Cornell University published a literature review called *What Does the Scholarly Research Say about the Effect of Gender Transition on Transgender Well-Being?*[3] The researchers enumerated the following conclusions:

- The scholarly literature makes clear that gender transition is effective in treating gender dysphoria and can significantly improve the well-being of transgender individuals.

- Among the positive outcomes of gender transition and related medical treatments for transgender individuals are improved quality of life, greater relationship satisfaction, higher self-esteem and confidence, and reductions in anxiety, depression, suicidality, and substance use.

- The positive impact of gender transition on transgender well-being has grown considerably in recent years, as both surgical techniques and social support have improved.

_____

[3]  What We Know Project, Cornell University (2018), https://whatweknow.inequality.cornell.edu/topics/lgbt-equality/what-does-the-scholarly-research-say-about-the-well-being-of-transgender-people/.

- Regrets following gender transition are extremely rare and have become even rarer as both surgical techniques and social support have improved. Pooling data from numerous studies demonstrates a regret rate ranging from .3 percent to 3.8 percent. Regrets are most likely to result from a lack of social support after transition or poor surgical outcomes using older techniques.

- Factors that are predictive of success in the treatment of gender dysphoria include adequate preparation and mental health support prior to treatment, proper follow-up care from knowledgeable providers, consistent family and social support, and high-quality surgical outcomes (when surgery is involved).

- Transgender individuals, particularly those who cannot access treatment for gender dysphoria or who encounter unsupportive social environments, are more likely than the general population to experience health challenges such as depression, anxiety, suicidality, and minority stress. While gender transition can mitigate these challenges, the health and well-being of transgender people can be harmed by stigmatizing and discriminatory treatment.

57.     Studies conducted in countries throughout the world likewise conclude that gender-affirming surgery is an extremely effective treatment for gender dysphoria. For example, a 2001 study published in Sweden states: "The vast majority of studies addressing outcome have provided convincing evidence for the benefit of

[gender-affirming] surgery in carefully selected cases." Landen (2001). Similarly, urologists at the University Hospital in Prague, Czech Republic, in a Journal of Sexual Medicine article concluded, "Surgical conversion of the genitalia is a safe and important phase of the treatment of male-to-female transsexuals." Jarolím (2009).

58.     Patient satisfaction is an important measure of effective treatment. Achieving functional and normal physical appearance consistent with gender identity alleviates the suffering of gender dysphoria and enables the patient to function in everyday life. Studies have shown that by alleviating the suffering and dysfunction caused by severe gender dysphoria, gender-affirming surgery improves virtually every facet of a patient's life. This includes satisfaction with interpersonal relationships and improved social functioning, *see, e.g.*, Rehman et al. (1999); Johansson et al. (2010); Hepp et al. (2002); Ainsworth & Spiegel (2010); Smith et al. (2005); improvement in self-image and satisfaction with body and physical appearance, *see, e.g.*, Lawrence (2003); Smith et al. (2005); Weyers et al. (2009); and greater acceptance and integration into the family, *see, e.g.*, Lobato et al. (2006).

59.     Studies have also shown that gender-affirming surgery improves patients' abilities to initiate and maintain intimate relationships. *See, e.g.*, Lobato et al. (2006); Lawrence (2005); Lawrence (2006); Imbimbo et al. (2009); Klein & Gorzalka (2009); Jarolím et al. (2009); Smith et al. (2005); Rehman et al. (1999); De Cuypere et al. (2005).

60.     Multiple long-term studies have confirmed these results. *See, e.g.*, Vujovic et al. (2009); Weyers et al. (2009); Hepp et al. (2002); Johansson et al. (2010); Imbimbo et al. (2009); Lobato et al. (2006).

61.     Given the extensive experience and research supporting the effectiveness of gender-affirming surgery spanning decades, it is clear that such surgery is a medically necessary, not experimental, treatment for severe gender dysphoria as demonstrated by, among other things, its inclusion as a medically necessary treatment in the SOC.

62.     In 2008, WPATH issued a "Medical Necessity Statement" expressly stating: "These medical procedures and treatment protocols are not experimental: decades of both clinical and medical research show they are essential to achieving well-being for the transsexual patient."

63.     Similarly, Resolution 122 (A-08) of the American Medical Association states: "Health experts in GID, including WPATH, have rejected the myth that these treatments are 'cosmetic' or 'experimental' and have recognized that these treatments can provide safe and effective treatment for a serious health condition."

64.     On September 25, 2013, the Department of Health Care Services of the State of California Health and Human Services Agency issued All Plan Letter 13-011, which makes clear that gender confirmation surgery was a covered service for Medi-Cal (California Medicaid) beneficiaries when the surgery was not cosmetic in nature and referred providers to the WPATH SOC for the "criteria for the medical necessity of transgender services."

65.     On May 30, 2014, the Appellate Division of the Departmental Appeals Board of the United States Department of Health and Human Services issued decision number 2576, in which the Board determined that a Medicare regulation denying coverage of "all transsexual surgery [outdated terminology for gender-affirming surgery] as a treatment for transsexualism [outdated terminology for gender dysphoria]" was not valid under the "reasonableness standard." The Board specifically concluded that "transsexual surgery is an effective treatment option for transsexualism in appropriate cases."

66.     The corpus of studies increases yearly as access to gender affirmation surgery increases. For example, a group at Cornell University conducted a review of 56 studies from 1991 to June 2017 on the outcomes of gender-affirming surgeries for transgender individuals. The results verify the efficacy of surgery: 52 studies (93%) reported beneficial effects, 4 studies reported mixed or null effects, and no studies demonstrated that gender-affirming surgeries cause harm. *What does the scholarly research say about transition on transgender well-being?* Cornell University What We Know: The Public Policy Research Portal (2019), https://whatweknow.inequality.cornell.edu/topics/lgbt-equality/what-does-the-scholarly-research-say-about-the-well-being-of-transgender-people/.

**D. Living Consistently with Gender Identity**

67.     The SOC establish the therapeutic importance of changes in gender expression by means of social signifiers that align with gender identity. Gender dysphoria, like many medical conditions, often requires more than a single

intervention for effective treatment. For example, clothing and grooming that affirm one's gender identity, such as bras for transgender females, and the use of pronouns congruent with an individual's gender identity are critically important components of treatment protocols. *See* Greenberg & Laurence (1981); Ettner (1999); Devor (2004).

68.     The SOC also specifically provide that permanent hair removal of hair from certain parts of the body and especially the face, which eliminates a particularly visible secondary sex characteristic, is significant in alleviating gender dysphoria for transgender women. Other gender-appropriate grooming items for transgender women such as feminine deodorant, moisturizer, hair care, and make-up may also be necessary for treatment. These accoutrements are critical to the social transition and mental wellbeing of gender dysphoric people.

69.     The most commonly pursued gender-affirming medical intervention in transgender women is facial hair removal, as facial hair is an obvious source of distress. Electrolysis and/or laser hair removal are typically required to live safely and comfortably in the affirmed female gender. The removal of hair is an ongoing process for most transgender women, particularly those with dark and coarse hair, and may require numerous treatments. A recent study explored satisfaction with hair removal in relation to gender dysphoria and psychological symptoms in a group of 281 transgender women. Bradford, Rider & Spencer (2019). Results found satisfaction with hair removal correlated with less body dysphoria, less depression and anxiety, and an overall enhanced sense of wellbeing. The authors conclude that

"[t]hese findings cast significant doubt on the assertion that hair removal services for transfeminine people are cosmetic" *Id.*

70. "Misgendering"—the act or referring to a transgender person by the incorrect gender—is harmful to the mental health of transgender persons. It threatens their identity and exacerbates the mental health problems attendant to gender dysphoria. It is therefore important, especially for those charged with the medical treatment and mental health care of transgender persons to use the correct, gender-affirming names and pronouns for them. *See* Bauer et al. (2015); Frost et al. (2015); Bockting (2014).

71. Gender dysphoric prisoners are at heightened risk for depression, anxiety, suicidal ideation, and self-harm without appropriate treatment and care. In addition to the concerns outlined above, it is important for correctional facilities to consider appropriate housing and shower/bathroom facilities for transgender individuals. Each individual's gender identity and role, dignity, and personal safety should be taken into account in housing and other assignments. *See* SOC at 68. If the institution fails to do so, there can be serious consequences for mental and physical health. *See* Seelman (2016).

72. Moreover, incarcerated transgender women with feminine characteristics are at elevated risk for harm when housed in male prisons. Verbal harassment, physical abuse, sexual assault, and sexual coercion of these women occur at an alarming rate, and too often there is inadequate protection.

73.     Gender consistent clothing and grooming items are particularly important to provide to transgender patients with gender dysphoria, especially for those individuals who have initiated hormone therapy. The physical changes facilitated by hormones in these patients make gender-affirming clothing and grooming items necessary not only for the mental health of these patients, but also for their basic physical comfort and dignity. For example, for transgender women, female undergarments allow genitals to be tucked and less visible, reducing symptoms of gender dysphoria. Likewise, regardless of breast development, a bra may be an important and affirming symbol of femininity for gender dysphoric transgender women.

74.     Social role transition—the ability for a transgender person to appear and live consistent with their gender—has an enormous impact in the treatment of gender dysphoria. An early seminal study emphasized the importance of aligning gender presentation and identity and the benefits of doing so to mental health. Greenberg and Laurence compared the psychiatric status of gender dysphoric individuals who had socially transitioned with those who had not. Those who had implemented a social transition showed "a notable absence of psychopathology" compared to those who were presenting in their birth-assigned sex role. Greenberg & Laurence (1981). In addition, social transition should include use of facilities (restrooms, showers, etc.) that are consistent with one's gender identity. More recently, Sevelius (2013) proposed a "gender affirmation model" which demonstrated that access to gender-affirming components of social role transition equated with

better mental health, fewer suicide attempts, and lower levels of depression and posttraumatic stress disorder (PTSD) symptoms.

**E. Risks of Providing Inadequate Care**

75.     Without adequate treatment, adults with gender dysphoria experience a range of debilitating psychological symptoms such as anxiety, depression, suicidality, and other attendant mental health issues. They are frequently socially isolated as they carry a burden of shame and low self-esteem, attributable to the feeling of being inherently "defective." This leads to stigmatization, and over time proves ravaging to healthy personality development and interpersonal relationships. Without treatment, many gender-dysphoric people are unable to adequately function in occupational, social, or other areas of life. Many gender dysphoric women without access to appropriate care are often so desperate for relief that they resort to life-threatening attempts at auto-castration (the removal of one's testicles) or auto-penectomy (the removal of one's penis). Brown & McDuffie (2009). A recent survey found a 41% rate of suicide attempts among this population, which is far above the baseline suicide attempt rates for North America. Mak et al. (2020).

76.     Gender dysphoria intensifies with age. As cortisol (the body's "stress hormone") rises with normal aging, the ratio of dehydroepiandrosterone ("DHEA," a precursor hormone involved in the production of sex hormones—testosterone and estrogen—which decreases with normal aging) to cortisol is affected, which acts to alter brain chemistry and intensify gender dysphoria. With the passage of time, prisoners who require surgical treatment will experience greater distress, and no

means of relief. *See* Ettner (2013); Ettner & Wiley (2013). This is particularly deleterious for transgender prisoners serving long sentences. Because gender dysphoria entails clinically significant and persistent feelings of distress and discomfort with one's assigned gender, if it is not treated, those feelings intensify with time and can become critical. The results are serious and debilitating symptoms of anxiety, depression, and hopelessness. Without adequate, appropriate treatment, these individuals may not be capable of accomplishing simple everyday tasks, and may become increasingly socially withdrawn and isolated, which only serves to further exacerbate their symptoms.

77.    Gender dysphoria left untreated or inadequately treated, will result in serious psychological and physical harm. The depression and hopelessness associated with the condition causes suicidal ideation, which will result in actual suicide for many individuals. *See* SOC at 67. Research shows that the risk of suicide can be significantly diminished with prompt and effective treatment. *See, e.g.*, Bauer (2015).

78.    Moreover, gender dysphoric individuals have a profound discomfort or disgust of their genitalia. Without effective treatment as outlined above, this often leads to attempts at surgical self-treatment (SST), which can result in lasting physical trauma or death. *See* Brown & McDuffie (2009). Some incarcerated individuals with severe, inadequately treated gender dysphoria have gone so far as to amputate their penis and flush it down a prison toilet as they experience blood loss and possible death from their auto-penectomy. It is also common for prisoners with

severe, inadequately treated gender dysphoria to surreptitiously bind their penis in an attempt to sever it.

79.     In sum, the results of providing inadequate treatment are predictable and dire, and take one of three paths: profound psychological decompensation, attempts at surgical self-treatment, or suicidality and suicide.

## VII.    CLINICAL INTERVIEWS AND ASSESSMENT OF PLAINTIFF KANAUTICA ZAYRE-BROWN

80.     Kanautica Zayre-Brown is a 41-year-old transgender woman, assigned male at birth. On May 25, 2022, I conducted an in-person psychological assessment of Mrs. Zayre-Brown at Anson Correctional Institution in Polkton, North Carolina, to evaluate her current psychological and emotional status and the adequacy of the treatment she is receiving for her gender dysphoria. I met with Mrs. Zayre-Brown in a private area and was afforded all the necessary courtesies by the prison staff. My assessment, which lasted approximately four hours, included the administration of three statistically reliable and valid psychometric tests and an extensive clinical interview.

### A.    Relevant Medical History

81.     At 5 feet 11 inches, and 236 pounds, Mrs. Zayre-Brown makes an authentic female presentation. She has long, neatly arranged hair, and tastefully applied make-up. She wore prison issued garments and several tattoos were visible.

82.     Mrs. Zayre-Brown has no psychiatric diagnoses. She has been repeatedly diagnosed with gender dysphoria (302.85, DSM-5). Prior to her incarceration, Mrs. Zayre-Brown began her gender transition and underwent several

gender-affirming surgeries beginning in 2011, including breast augmentation, body contouring, ear lobe surgery, and chin implantation. She has also had feminizing surgical facial fillers. Mrs. Zayre-Brown met the WPATH criteria for bilateral orchiectomy (surgical removal of the testes) and underwent the procedure in 2017.[4]

83.     Mrs. Zayre-Brown does not smoke cigarettes nor use any illicit substances. She takes no psychotropic medications. Mrs. Zayre-Brown's medical records indicate that, in December 2020, she received sertraline, an anti-depressant medication, during a month-long hospitalization resulting from vocalizing suicidal ideation and a desire to amputate her penis, following an incident in which her gender dysphoria was exacerbated. *See* App. D, at 6-7 Anti-depressants and/or anxiolytics are not efficacious when depression or anxiety are symptoms of gender dysphoria, rather than the result of primary co-occurring mood disorders. Mrs. Zayre-Brown eventually discontinued this medication. In addition, Mrs. Zayre-Browns medical records note that, in April of 2021, Mrs. Zayre-Brown informed her DPS mental health provider that she had a band tied around her penis that had been in place for more than a week due to increased dysphoria from the lack of gender-affirming surgical care. App. D, at 10. These records indicate that Mrs. Zayre-Brown's mental health provider convinced Mrs. Zayre-Brown to remove the band after cautioning her "about the effects of impeding blood flow and risk of infection"[5] and reassuring her

---

[4] Bilateral orchiectomy was performed in a tissue sparing manner. When this is done, incisions are carefully placed so as not to disrupt future genital reconstruction.

[5] Binding of the penile shaft can result in far worse harms—hydronephrosis (a condition where one or both kidneys became stretched and swollen as the result of a build-up of urine inside them) and kidney failure.

that scheduling for her consult for gender-affirming surgery was in progress. Mrs. Zayre-Brown's medical records further indicate that, in addition to the incident described above, she has expressed similar thoughts regarding auto-penectomy to her DPS mental health care providers on multiple occasions since her December 2020 hospitalizations. *See* App. D, at 8, 12-13. The penis is the essential and, for transgender women, detested evidence of masculinity. Its presence kindles gender dysphoria and creates cognitive dissonance in those who live in their affirmed female gender, yet nevertheless retain this incongruent organ.

84.     In 2012, Mrs. Zayre-Brown initiated medically indicated and supervised gender-affirming hormone therapy. However, when she entered DPS custody in 2017, she was denied the essential estrogen she required for eight to nine months. Due to the surgical removal of her testicles, which are responsible for the majority of male testosterone production, Mrs. Zayre-Brown's body is no longer capable of producing endogenous gonadotrophic hormones and she requires regular, sufficient, and gender appropriate prescription hormone therapy. Hormones are essential to the function and maintenance of every organ system in the human body. Absent these crucial endocrine compounds, individuals are physiologically and psychologically at extreme risk for a number of catastrophic occurrences, including lack of lymphocyte production and impaired immunity, hypertension, hypoglycemia, depression, and electrolyte imbalance. During that eight-to-nine-month period, Mrs. Zayre-Brown gained weight, had a marked diminution of energy, and attempted suicide.

85.     In addition to the initial unjustified interruption of Mrs. Zayre-Brown's hormone therapy, in January 2019 it was discovered that DPS had not ordered the correct laboratory work for Mrs. Zayre-Brown's hormone therapy appointment with an external provider. Subsequently, the appropriate laboratory work showed that her hormone levels were below the therapeutic range. In April 2019, DPS again failed to provide the required laboratory work for an external endocrinology appointment that Mrs. Zayre-Brown was scheduled for in order to monitor her hormone therapy. From July 2020 until June 2021, Mrs. Zayre-Brown hormone therapy was not being monitored through routine laboratory work. When she was finally seen by an endocrinologist, the laboratory work showed her hormone levels were again not within the therapeutic range. Mrs. Zayre-Brown has also experienced unjustified delays in the timely administration of her hormone therapy, in January 2019 and August 2020, with those delays ranging from days to weeks. In January 2023, Mrs. Zayre-Brown related that she had been waiting for a follow-up appointment with endocrinology for five months, despite concerns about her estradiol levels.

**B.     Clinical and Psychometric Assessment**

86.     Mrs. Zayre-Brown was completely cooperative throughout the evaluation process, and I am confident that the opinions I hereafter render are reliable and valid to a reasonable degree of medical certainty. Mrs. Zayre-Brown was able to attend to the entire, lengthy in-person interview with me without agitation or restlessness. She engaged with ease, maintained eye contact throughout, and her affect was appropriate to content. She has no disorders of thought, and thought

processes are logical, goal-directed, and without distortion. Memory and abstract reasoning are well within normal limits. Insight and judgment are good. Language is fluent, speech is natural, and intelligence is above average (by estimation). Mrs. Zayre-Brown has obtained several advanced degrees. She is married and has raised three foster children.

### C.    Relevant Transition-Related History

87.    Born in North Carolina, Mrs. Zayre-Brown was raised by her grandmother. Both biological parents are deceased, and she has a younger half-sister. As early as 5 or 6 years of age, Mrs. Zayre-Brown would wear her grandmother's shoes and put a skirt on her head, pretending it was long, female hair. She never played with boys or engaged in competitive sports as a child.

88.    Mrs. Zayre-Brown ultimately left school at 15 or 16 years of age. She wrote worthless checks to purchase female items and was committed to the juvenile justice system. As a teen, Mrs. Zayre-Brown and her family assumed she was "gay." Growing up in an era prior to the existence of "social media" or other readily accessible sources of information, she was unaware that she suffered from a treatable medical condition, namely, gender dysphoria. Although she never felt "masculine," she had no knowledge that there was a name for her persistent feeling of being female. Ultimately, Mrs. Zayre-Brown learned about the concept of being "transgender" from a gay friend, and about the impact of feminizing hormones. In 2010, while working at Humana, Mrs. Zayre-Jones received medically indicated

hormone therapy under the care of a provider at the University of North Carolina at Chapel Hill.

89.     While hormone therapy is an essential element of treatment of gender dysphoria, that treatment alone is not sufficient for patients like Mrs. Zayre-Brown, who suffer from severe gender dysphoria. As with all medical conditions, treatment for gender dysphoria must be individualized. Patients who have severe gender dysphoria require both medical and surgical interventions. Individuals with early-onset gender dysphoria that persists into adolescence, like Mrs. Zayre-Brown, typically suffer the most severe symptoms associated with gender dysphoria. By analogy, type-one diabetes appears in childhood and differs from type-two diabetes, which typically is a disease arising in adulthood. The treatment of the conditions can differ, with the latter often being less severe and not necessarily requiring insulin.

90.     After years of hormone therapy, Mrs. Zayre-Brown has *been hormonally confirmed*. This means that she has the circulating sex steroid hormones typical for females. Her testosterone levels are in the reference range appropriate for females and indistinguishable from her female peers. She has the secondary sex characteristics of a woman: female breasts, softened skin, diminution of body hair, absence of male pattern baldness, redistribution of body fat consistent with a female-shaped body, loss of muscle mass, and genital changes.

91.     On January 9, 2023, I had a follow-up phone consultation with Mrs. Zayre-Brown. At that time her affect was sad, but congruent with content. She was oriented in all spheres. Her though processes were logical and goal directed, without

distortion. Mrs. Zayre-Brown related persistent distress over DPS's continued denial of hair removal, failure to provide counseling competent to address her gender dysphoria, and denial of her needed surgery. She stated that she is constantly "fighting for herself and others" and appears increasingly despondent over DPS's lack of attention to her medical needs.

### D. The Inadequacy of Defendants' Treatment of Mrs. Zayre-Brown's Gender Dysphoria

92. I have serious concerns about the adequacy of treatment provided by DPS and its employees for Mrs. Zayre-Brown's gender dysphoria, which falls far outside of what is recommended by the SOC. DPS personnel have been aware of Mrs. Zayre-Brown's gender dysphoria diagnosis and need for treatment, including gender-affirming surgery, since her incarceration, as evidenced by the October 2017 "Mental Health Assessment" by DPS provider Susan Garvey, App. D, at 1-3, and the November 2017 Division Transgender Accommodation Review Committee ("DTARC") "Gender Dysphoria Treatment Plan," App. D, at 4-7.

93. Despite their awareness of Mrs. Zayre-Brown's gender diagnosis and need for treatment, DPS personnel have repeatedly delayed and/or denied providing her with medically necessary treatment. She was inappropriately housed in a male facility for years and denied female clothing and grooming items. Her essential hormone therapy was also inordinately delayed and interrupted, without medical justification or explanation. Since receiving hormone therapy, treatment has been inconsistent and inappropriately evaluated, and follow-up monitoring has been insufficient. Her recent medical consultations have been via teletherapy, which does

not allow palpation to diagnose potential abnormalities secondary to hormonal affirmation. Most egregiously, DPS continues to ignore her serious, urgent, and longstanding medical need for gender-affirming surgery.

94.     Mrs. Zayre-Brown has persistently advocated for the surgical treatment she requires. In addition, numerous medical and mental health providers have stated that surgery is a medical necessity for Mrs. Zayre-Brown, including DPS providers Dr. Joseph Umesi (January 2019) and Jennifer Dula (October 2021) and specialty external providers DPS referred Ms. Zayre-Brown to for gender-affirming care, Dr. Brad Figler (July 2021) and Dr. Donald Caraccio (October 2021). Attached as **Appendix E** is a compilation of Mrs. Zayre-Brown's DPS medical records from these four providers, organized chronologically. Nevertheless, DPS officials have repeatedly delayed and denied Mrs. Zayre-Brown's requests for gender-affirming surgery. Attached at **Appendix F** is a compilation of DPS's considerations and denials, organized chronologically. Most recently, in response to Mrs. Zayre-Brown's latest request for gender-affirming surgery (specifically, vulvoplasty) DTARC in a final determination issued on February 17, 2022, wrote "DTARC does not recommend Gender Affirmation surgery. This surgery is not medically necessary."

## VIII.  DEFICIENCIES IN THE DTARC ZAYRE-BROWN CASE SUMMARY

95.     Since the submission of my declarations in this litigation, I have now been provided the DTARC Zayre-Brown Case Summary denying gender-affirming surgery.  The Case Summary is attached as **Appendix G**. There are numerous deficiencies in that document.

96.     The Case Summary concludes that a vulvoplasty is not medically necessary for Mrs. Zayre-Brown, even though it recognizes that: (a) her "mental health and behavior case reviews indicated no current evidence of any significant comorbid mental health issues"( DAC 3399);(b) review of Mrs. Zayre Brown's "related mental health and behavioral health record indicates the criteria identified by the UNC Transhealth program for appropriateness for surgery have been met," including maintenance of "the minimum weight goal identified by UNC Transhealth program" (DAC 3399); (c) Mrs. Zayre-Brown "has a well-documented, persistent transgender identity," including having "lived as a female in the community" prior to her incarceration, "and has been housed in a female prison since 8/2019" (DAC 3399); (d) she "has completed" a number of "gender-affirming surgeries," including "orchiectomy" and "breast implants," "and has been on hormone replacement therapy" (DAC 3400); (e) on October 4, 2021, a "Transgender Accommodation Summary was completed" that summarized Mrs. Zayre-Brown's "history of transition," as well as her "continued commitment to surgery, current and recent psychological stability, absence of uncontrolled comorbid mental health conditions" and that concluded that Mrs. Zayre-Brown "met appropriate criteria for surgery" (DAC 3399); (f) Mrs. Zayre-Brown "has been educated on the surgical interventions by the UNC Transhealth Program and indicated a preference for vulvoplasty" (DAC 3399); and (g) Mrs. Zayre-Brown is experiencing "anxiety" regarding not having received the surgery she has long sought (DAC 3400).

97.     The Case Summary correctly explains, "When treatments are considered for any patient, the most important imperative for physicians is to base recommendations on evidence-based medicine and consideration of that information in the context of the individual patient." (DAC 3400.) Even so, the Case Summary fails to base its conclusion that gender-affirming surgery is not medically necessary for Mrs. Zayre-Brown on evidence-based medicine. Nor does the Case Summary consider that information in Mrs. Zayre-Brown's individual context whatsoever. The latter point is confirmed by the DTARC Position Statement's conclusion that gender-affirming surgery as a treatment for gender dysphoria is *never* medically necessary.

98.     The Case Summary does not base its conclusion that a vulvoplasty is not medically necessary for Mrs. Zayre-Brown on anything relating specifically to her medical condition or her individual medical needs, but rather on an incorrect understanding of medical necessity.

99.     "Medical necessity" is a term used by the insurance industry and government health care programs to describe treatment that a physician considers to be vital for a particular patient. As DPS was aware, the external providers to whom DPS referred Ms. Zayre-Brown for evaluation of her need for gender-affirming surgery and for gender-affirming care, Dr. Brad Figler and Dr. Donald Caraccio, determined this to be the case for Mrs. Zayre-Brown.

100.    According to the American Medical Association ("AMA"), health care is medically necessary when a "prudent physician" selects it for the purpose of preventing, diagnosing or treating an illness, injury, disease or its symptoms in a

manner that is: (a) in accordance with generally accepted standard of medical practice; (b) clinically appropriate in terms of type, frequency, extent, site, and duration; and (c) not primarily for the convenience of the patient, physician, or other health care provider." AMA Policy H-320.953 (2016). The AMA specifically has recognized that "medical and surgical treatments for gender dysphoria, as determined by shared decision making between the patient and physician, are medically necessary as outlined by generally-accepted standards of medical and surgical practice." AMA Policy H-185.927 (2021). Likewise, the authoritative SOC conclude that, for many transgender individuals, gender-affirming "surgery is essential and medically necessary to alleviate their gender dysphoria."

101. The Case Summary reaches its conclusion that gender-affirming surgery is not medically necessary for Mrs. Zayre-Brown on falsehoods and faulty reasoning. Before discussing those, it is important to note that nowhere in the section of the Case Summary entitled "Medical Analysis" is there any discussion at all of Mrs. Zayre-Brown's medical history, prior treatments, recommendations of health care providers who have examined or treated Mrs. Zayre Brown, her current condition, or the risks to her of not providing gender-affirming summary. (DAC 3400-3403.)

102. Instead, the Case Summary first asserts that "medically necessary treatments, and this is particularly true of surgical procedures, consist of a single, or at most a very discrete subset of surgeries" and that this is not the case of gender-affirming surgery "where there are wide range of treatments … which are presented as 'options' in treatment, are largely determined by patient's desires." (DAC 3400.)

103. Whether treatment of a condition consists of a single or discrete subset of procedures is irrelevant to determining medical necessity. This assertion ignores that different treatments may be medically necessary for different patients and particularly depend on the severity of the condition in a particular patient, the patient's response to other attempted treatments, any comorbidities, contraindications, and risks to the patient of not providing the treatment.

104. In addition, treatment of other medical conditions recognized as medically necessary often include a wide range of treatments. For example, treatments for various forms of cancer may include hormone therapy, chemotherapy, hyperthermia (heating of the body to help damage and kill cancer cells with little or no harm to normal tissue), immunotherapy, photodynamic therapy (using a drug activated by light to kill cancer and other abnormal cells), radiation therapy, and a range of surgeries. In addition, particularly for patients with severe gender dysphoria like Mrs. Zayre-Brown, gender-affirming surgery may be the only available option and its need is determined by medical professionals who have examined a patient, not simply "a patient's desires."

105. Second, the Case Summary describes a procedure being necessary as "treatment required in order to protect life, to prevent significant disability, or to alleviate pain." (DAC 3400.) My examination of Mrs. Zayre-Brown and her medical history demonstrate that gender-affirming surgery actually is necessary to protect her life given the risks of suicide in failing to provide such surgery, to prevent the

ongoing disability she is suffering from due to her extreme gender dysphoria, and to alleviate the psychological pain she has long experienced and continues to experience.

106.     Third, the Case Summary asserts that, barring complications to surgery, for it to be medically necessary, most individuals suffering from gender dysphoria would have to seek to have such surgery, whereas only 25-35% of transgender individuals ever undergo any form of gender-affirming surgery. (DAC 3400.) This reasoning is faulty as well. Like all medical conditions, gender dysphoria exists on a continuum. By analogy, patients can have glucose intolerance, metabolic syndrome, type 2 diabetes, or the most severe, type 1 diabetes. The most severe forms tend to have early onset and treatment decisions vary depending on severity. The same is true for Mrs. Zayre-Brown. She has exhausted treatments that might be sufficient for individuals who have a less severe condition and yet she continues to have surgical self-treatment ideation, which is a symptom of severe gender dysphoria. The statement that only 25-35% of individuals with gender dysphoria undergo gender-affirming surgery is consistent with the fact that not all individuals *require* such surgery, whereas Mrs. Zayre-Brown does. Moreover, some individuals whose severe gender dysphoria would be alleviated by gender-affirming surgery may have medical issues that preclude surgery or may not have sources to pay for such surgery. These facts align with the Case Summary's recognition that treatment of any patient must be based on "the context of the individual patient." (DAC 3400.)

107.     Fourth, the Case Summary asserts, "Almost universally, medically necessary procedures are by definition covered by insurance carriers" and that this is

not the case regarding gender-affirming surgery. Even were this assertion true even in other contexts, it fails to consider the historical, medically unjustified and discriminatory conclusion of many insurance carriers that gender-affirming surgery is cosmetic or experimental.

108.     In addition, the largest insurance companies and nonprofit health care plans in the United States now have policies that include coverage of gender-affirming surgery when medically necessary, including Aetna, Alliant, Anthem, Assurant, Blue Cross, Brown & Toland HMO, Cigna, Excellus (Blue Cross/Blue Shield of New York), Health Net, Hills Physicians (HMO), Humana, Kaiser Permanente, and United Health Insurance. For example, Aetna considers gender-affirming surgery medically necessary when guidelines derived from the WPATH Standards of Care have been met. Likewise, the corporate policy of Blue Cross/Blue Shield is to provide such coverage, recognizing and referencing the WPATH SOC (see BCBS Corporate Medical Policy) and Blue Cross Blue Shield of North Carolina now covers gender-affirming surgeries. Similarly, Kaiser Permanente, one of the largest nonprofit healthcare plans in the United States, "supports members pursuing gender-affirming surgeries through established pathways of care."

109.     The Case Summary also asserts that "64% (32 States) of the U.S. Medicaid programs do not offer coverage" for gender-affirming surgeries. This information is outdated. A Journal of Sexual Medicine (2021) article reports that 25 of the 51 state Medicaid programs do cover gender-affirming surgery. For example, MassHealth *Guidelines for Medical Necessity Determination for Gender Affirming*

*Surgery* (which applies to both the state's Medicaid program) states that such surgery "may be part of the therapeutic treatment to better align physical characteristics with gender identity."[6]

110.     The Case Summary also falsely asserts that the North Carolina State Employees Health Plan does not cover the cost of gender-affirming surgery. (DAC 3400.) While that plan previously ceased covering such care, which it had provided in 2017, it resumed doing so last year after a federal court held the denial of such coverage unconstitutional. Similar changes have occurred over the last several years in other state employee health insurance plans as a result of federal lawsuits, including in Georgia and Wisconsin.

111.     In addition, at the federal level, the Veterans Health Administration, the largest health care system in the United States, treats veterans largely based on guidelines set forth in the SOC and references those standards in their national training practices. Likewise, a previous Medicare exclusion of gender-affirming surgery was eliminated in 2014 following the Appellate Division of the Departmental Appeals Board of the United States Department of Health and Human Services decision number 2576, referred to above in this report, which concluded that "transsexual surgery is an effective treatment option for transsexualism in appropriate cases," and there is now no national exclusion for transition-related health care under Medicare. Instead, coverage for gender-affirming surgery is

_____

[6] MassHealth, Guideline for Medical Necessity Determination for Gender-Affirming Surgery at 1 (Sept. 1, 2021), https://www.mass.gov/doc/gender-affirming-surgery/download.

decided on a case-by-case basis, as with Medicare handles coverage for most other medical treatments, based on whether gender-affirming surgery is medically necessary for the individual beneficiary after considering the individual's specific circumstances.

112.     Fifth, the Case Summary states, that "Medically necessary treatments must be based on standards of practice, must be evidence-based, peer-reviewed, and without bias or conflict of interest among the researchers or agency providing the necessity of the treatment, and there is almost always consensus among the medical community as to not only the necessity of the treatment/ procedure, but further, the preferred statement" (see DAC 3400). The Case Summary then states that, in the case of gender-affirming surgery in the treatment of gender dysphoria, "none of these factors are true." (DAC 3400.) That is demonstrably false. As explained elsewhere in this report, the medical necessity of gender-affirming surgery for certain patients suffering from gender identity actually is supported by nearly universally accepted standards of practice, which rest on evidence-based, peer-reviewed research.

113.     The Case Summary discussion of WPATH in particular is riddled with erroneous assertions. For example, as noted above, AMA, the Endocrine Society, the American Psychological Association, the American Psychiatric Association, the World Health Organization, the American Academy of Family Physicians, the American Public Health Association, the National Association of Social Workers, the American College of Obstetrics and Gynecology and the American Society of Plastic Surgeons all endorse treatment protocols in accordance with the SOC, and numerous courts

have recognized the SOC as authoritative. In addition, the team that conducted the evidence review for the 8th version of the SOC was not composed of WPATH members, but other professionals at Johns Hopkins University. Further, the Case Summary asserts that "[t]he majority of the members of the WPATH Committee are from the U.S., and six of them have affiliations with the same university—the University of Minnesota Program in Sexuality, which is primarily funded by a transgender advocacy organization (Tawani Foundation)." (DAC 3401). This statement is particularly puzzling. There is no one WPATH Committee. WPATH has many committees, including Bylaws, Policies & Procedures, Child and Adolescent, Disorders of Sex Development (previously Intersex), Ethics, Institutionalized Persons, Legal Issues, Member Communication and Technology, Public Policy Advocacy and Liaison, Standards of Care Revision, Voice and Communication, and the Global Education Institute. WPATH has more than 2,700 members, representing 49 countries, with chapters throughout the world, including EPATH (Europe), and ASIAPATH. Moreover, the Tawani Foundation is not a "transgender advocacy organization," but rather a grantmaking foundation that focuses on numerous issues, including education, the environment, cultural institutions and historical preservation, and health and human services, in addition to gender and human sexuality.

114.     Finally on these points, the Case Summary's suggestion that the Endocrine Society Guidelines are questionable (DAC 3401) is refuted by the fact that those evidence-based guidelines were co-sponsored by, among others, the American

Association of Clinical Endocrinologists, the American Society of Andrology, the European Society for Endocrinology, and the Pediatric Endocrine Society.[7]

115.    Sixth, the Case Summary's reliance on the 2016 Centers for Medicaid and Medicare Decision Memo (DAC 3401-3402) ignores the research of the last six years; the United States Department of Health and Human Services rejection of Medicare's previous exclusion of gender-affirming surgery and conclusion that such surgery is "an effective treatment option" in appropriate cases; and Medicare's determination that coverage for gender-affirming surgery should be decided on a case-by-case basis, based on whether gender-affirming surgery is medically necessary for the individual. As noted elsewhere in this report, research demonstrates that, contrary to the assertions in the Case Summary, individuals who have had gender-affirming surgery experience long-term mental and behavioral health benefits and improved quality of life; complications of gender-affirming surgery are infrequent; and regret after gender-affirming surgery and detransition are rare.

116.    The Case Summary's assertion that "[n]o studies conclusively demonstrate that [gender-affirming surgery] improves quality of life or sufficiently addresses gender dysphoria" (DAC 3402) is contradicted by the literature addressing

---

[7] The Clinical Guidelines Subcommittee of the Endocrine Society deemed the diagnosis and treatment of individuals with gender dysphoria/gender incongruence a priority area for revision and appointed a task force to formulate evidence-based recommendations. The task force followed the approach recommended by the Grading of Recommendations, Assessment, Development and Evaluation group, an international group with expertise in the development and implementation of evidence-based guidelines. The task force commissioned two systematic reviews to support the guidelines.

such surgery and particularly recent studies substantiating the health outcomes and benefits of gender-affirming surgery. For example, in a 2021 study published in *JAMA Surgery* involving 27,715 transgender individuals from across all 50 states (the largest existing data set containing information on the benefits of gender-affirming surgery), researchers compared transgender individuals who underwent gender-affirming surgeries during the prior two years with a reference group that desired surgery but had not yet undergone any. After controlling for sociodemographic factors, those who had undergone surgery had significantly less psychological distress, tobacco use, and suicidal ideation than those with no history of surgery. The authors conclude: "These findings support the provision of gender affirming surgeries for TGD (transgender and gender diverse) people who seek them." In addition, a systematic meta-analysis on publications performed by German researchers included 1,100 post-surgery participants. Seven different measures of quality of life were employed. The researchers concluded that gender-affirming surgery positively affects well-being, sexuality, and quality of life in general. Weinforth, et al., 2019. This is consistent with other research that has shown that transgender individuals who undergo gender-affirming surgery experience long-term mental health benefits. In one study, a person's odds of needing mental health treatment declined by 8% each year after receiving gender-affirming surgery. Indeed, most people who have such surgery experience an improvement in their quality of life. Depending on the procedure, 94% to 100% of people report being satisfied with their surgery results.

117. The Case Summary also distorts the research it cites. For example, it mischaracterizes the results of the *Long-Term Follow-Up of Transsexual Persons Undergoing Sex Reassignment Surgery: Cohort Study in Sweden* (commonly referred to as "the Swedish study") regarding suicide rates, mortality, and psychiatric hospitalization after gender-affirming surgery. Dr. Dhenje, the study's primary researcher, has publicly disavowed mischaracterization of her investigation.[8] I have a professional relationship with Dr. Dhenje and she has informed me that her study should not be interpreted to mean that gender-affirming surgery leads to an increase in suicide rates. In addition, Dr. Dhenje has stated publicly that the study was not designed to evaluate the outcome of gender transition and does not say that transition causes people to commit suicide. According to Dr. Dhejne, only the transgender people who transitioned before 1989 had slightly higher rates of suicide attempts than the general public (but still far lower than pre-transition levels for transgender people). Any observed trend in suicide rates following gender-affirming surgery cannot be held as evidence that surgery leads to increased rates of suicide without a comparison to rates of suicide pre-surgery, which is generally not studied due to ethical issues of internationally withholding treatment for purposes of research. Indeed, Dr. Dhejne's

---

[8] *On Gender Dysphoria*, Dep't of Clinical Neuroscience, Karolinska Institute, at 65 (Stockholm, Sweden 2017) ("Our findings have been used to argue that gender-affirming treatment should be stopped. But the results have also been used to show the vulnerability of the group and that better transgender health care is needed (Arcelus & Bouman, 2015; Zeluf et al., 2016). . . . Most of the articles that use the study to argue against gender affirming health care are published in non-peer reviewed papers and the public media in general. . . . I am grateful to friends, colleagues . . . and journalists who have alerted me when the results of the study have been misinterpreted[.]").

study states, "For the purpose of evaluating whether sex reassignment is an effective treatment for gender dysphoria, it is reasonable to compare reported gender dysphoria pre and post treatment. Such studies have been conducted either prospectively or retrospectively, and suggest that sex reassignment of transsexual persons improves quality of life and gender dysphoria." Dr. Dhenje also has stated that "recent studies conclude that WPATH Standards of Care compliant treatment decrease gender dysphoria and improve mental health."

118.    The Case Summary also relies on highly questionable sources of information. Its reliance on a study by the Society for Evidence-Based Gender Medicine ("SEGM"), asserting that 70% of those who transitioned were dissatisfied with their decision to do so (DAC 3402-3403) is particularly suspect. SEGM is not recognized as a scientific organization, but rather is an activist organization known for mischaracterizing standards of care for transgender individuals. Researchers at the Yale School of Medicine issued a report which described SEGM as a small group of anti-trans activists. Boulware, S., Komody, R., et al. (2022) Biased Science: The Texas and Alabama Measures Criminalizing Medical Treatment for Transgender Children and Adolescents Rely on Inaccurate and Misleading Scientific Claims, Yale Law School Public Law Research. SEGM lacks transparency in its membership, membership criteria, and the identity of its board of directors. A commentary published in the journal *Clinical Practice in Pediatric Psychology* described them as outside the medical mainstream.  Kuper, L., Cooper, M., Mooney, M. (2022) Supporting and advocating for transgender and gender diverse youth and their

families within the sociopolitical context of widespread discrimination legislation and policies," Clinical Practice in Pediatric Psychology, **10** (3): 336-345, *doi:10.1037/cpp000456. ISSN 2169-4834.* A spokesperson for the Endocrine Society also described them as outside the medical mainstream.

119. Contrary to the assertions in this SEGM "study," research indicates that regret in adults who transition is extremely low, at about 1%. A recent study found regret rates of 0.2-0.3%. The authors characterized the nature of regret and found much of it was due to social exclusion and/or poor surgical outcomes. Narayan et al. (2021). Complications of gender-affirming surgeries are comparatively low. A recent study found that fewer than 6% of more than 1,000 patients who underwent gender-confirming surgeries suffered some complications. Lane, et al. 2018. By comparison, women who underwent the common procedure of breast reduction had a complication rate of 43%. Salim & Poh (2019). Vulvoplasty has an even lower complication rate than vaginoplasty. According to the Cleveland Clinic, the most common complications are bleeding from the incision for a day or two, itching at the cite, bruising, and swollen labia. Recovery usually takes no more than two weeks. The therapeutic effects of vulvoplasty include, most importantly, genitals that appear normal (resulting in attenuation or cure of gender dysphoria), as well as the ability to urinate when sitting and the possibility of orgasm. At a recent meeting of the American Society for Reconstructive Microsurgery, at which I delivered a presentation for the Society of Gender Surgeons, surgeons estimated that approximately 30% of surgeries performed to treat gender dysphoria are vulvoplasty rather than vaginoplasty.

120.     The assertions in the Case Summary regarding detransition (DAC 3402) are especially questionable and are not relevant to whether gender-affirming surgery is medically necessary for Mrs. Zayre-Brown. Most of that research was done on minors before current standards for diagnosis of gender dysphoria among children and adolescents existed and reflects minors who may have been mischaracterized as transgender when they actually were simply displaying gender-nonconforming behaviors, such as preferring toys traditionally associated with a sex different than they were assigned at birth. More current research has found that only 2.5% of transgender minors go through detransition, while the majority of young people keep their gender identity after five years.

121.     In summary, the Case Summary fails to provide any medically-valid justification for concluding that a vulvoplasty is not medically necessary for Mrs. Zayre-Brown, as the medical providers to whom DPS sent Mrs. Zayre-Brown for evaluation and treatment concluded and as my examination of Mrs. Zayre-Brown has confirmed. Quite troublingly, the Case Summary fails to consider at all the consequences for Mrs. Zayre-Brown of not receiving gender-affirming surgery, including the existing and ongoing risks to her life from suicide or surgical self-treatment, as well as to her mental health and well-being and her ongoing, extreme suffering. DPS presents no discussion of alternative treatments for alleviating Mrs. Zayre-Brown's severe gender dysphoria, which persists notwithstanding the treatment she has received to date for her condition.

# IX. DEFICIENCIES IN THE DTARC POSITION STATEMENT THAT GENDER-AFFIRMING SURGERY IS NEVER MEDICALLY NECESSARY.

122. The DTARC Position Statement, which is attached hereto as **Appendix H** and which was issued by DPS shortly after the Zayre-Brown Case Summary, is plagued with most of the same defects as the Case Summary. .

123. The Position Statement states, "As with all treatments, including procedures and surgeries provided to offenders, the first consideration is whether the treatment is medically necessary," and adds, "This consideration is precisely the same as that utilized by every managed care system and health insurance agency in the Country." (DAC 3405.)

124. The Position Statement asserts that "GRS procedures fail to satisfy the criteria and characteristics evidenced by" "other procedures and surgeries which are broadly considered medically necessary" because "there are concerns that the risk, as defined by failure of the procedure to correct the underlying problem or the need for subsequent reversal of the procedure outweigh any potential benefit of the procedure." (DAC 3405.) As shown *supra* ¶¶ 50-66, 111, and 116-17, however, gender-affirming surgery has been shown to be extremely effective in alleviating and, in many cases, eliminating gender dysphoria. In nearly all cases of individuals who undergo gender-affirming surgery, there is no need for reversal of the procedure. It thus cannot be said that the potential benefit of the procedure is categorically outweighed by its risks for every single patient.

125. Like the Case Summary, the Position Statement asserts that, for a procedure to be medically necessary, there needs to be consensus among the medical community that not undertaking the procedure will fail to alleviate the symptoms of the condition—and could result in death, severe disability, or significant worsening of the condition. (DAC 3407.) There *is* such a consensus among the medical community with respect to patients suffering from severe gender dysphoria like Mrs. Zayre Brown. As explained *supra* ¶¶75-79, withholding recommended gender-affirming surgery from someone with severe gender dysphoria could result in death due to suicide or surgical self-treatment, as well as severe disability resulting from ongoing gender dysphoria and significant worsening of gender dysphoria that occurs as individuals with that condition age.[9]

126. The Position Statement reiterates the fallacy in the Case Summary that surgical treatment for gender dysphoria is unlike medically necessary surgeries for other conditions because there is a wide spectrum of options to treat gender dysphoria. (DAC 3409.) As discussed *supra* ¶ 104, treatment of gender dysphoria is no different in this regard than numerous other conditions that may require different surgeries depending on the severity of the condition, previous attempted treatments for the condition that have failed to adequately address it, and other factors. While

---

[9] The studies referred to in the Position Statement regarding these issues (DAC 3407-3408) are largely the same as those relied on in the Case Summary and reliance on them suffers the same defects as already discussed *supra* ¶¶ 116-19, including the Position Statement's mischaracterization of the Swedish study, its assertions regarding detransition research, and its assertions regarding purported regret after gender-affirming surgery.

there are no tests resembling a CT Scan, MRI, or biopsy to determine indications for particular gender-affirming surgeries, there are widely-accepted diagnostic criteria that do not rest on patient "choice" that must be met before gender-affirming surgery is recommended. That some advocacy groups may want gender-affirming surgery to be available "without the requirement of external evaluations or therapy by mental health professionals," (DAC 3410) is irrelevant. Gender-affirming genital surgeries are not done in the United States without such external evaluations and prior efforts to treat gender dysphoria.

127.    As explained regarding the Case Summary, *see supra* ¶ 106, the assertion in the Position Statement that "only 25-35% of individuals with gender dysphoria" undergo gender-affirming surgery (DAC 3410) does not show it is not medically necessary for particular individuals with severe gender dysphoria, such as Mrs. Zayre-Brown. Likewise, as further explained *supra* ¶¶ 108-11 of this report with regard to the Case Summary, the Position Statement's assertions regarding the health plans of insurance carriers, Medicare, state Medicaid, and state employees' health plans (specifically including North Carolina's) asserted lack of coverage for gender-affirming surgeries (DAC 3410) are seriously inaccurate.

128.    As to the Position Statement's assertions regarding the number of individuals who have received gender-affirming surgeries in prison (DAC 3411), whether a treatment is medically necessary is not determined by prison practices, regardless of how widespread violations of prisoners' rights to obtain medically necessary care may be. Moreover, the federal Bureau of Prisons recently settled

litigation brought by an incarcerated transgender woman by agreeing to provide her gender-affirming surgery and has contracted with a surgeon to perform a vaginoplasty and breast augmentation for another incarcerated transgender woman and, as the Position Statement admits (see DAC 3411), some states have provided such surgeries to prisoners. Contrary to the assertions in the Position Statement that the only provisions of gender-affirming surgery were "very discrete circumstances in court settlements," between August 8, 2015 and November 8, 2019, the California Department of Corrections and Rehabilitation ("CDCR") granted 17 requests of prisoners for gender-affirming surgery. Moreover, in July 2021, the CDCR updated its care guidelines to provide that "Gender affirming surgery may be considered for those individuals who are diagnosed with Gender Dysphoria and demonstrate significant distress not attributable to conditions of confinement, mental illness or other factors, but are due to lack of reasonable response to available nonsurgical treatments and there are no available, additional treatments other than surgery that are likely to improve or alleviate their symptoms." In addition, in Illinois, gender-affirming surgery has been performed on at least one transgender prisoner and several more such surgeries have been scheduled; and a prisoner serving a life-sentence in Massachusetts underwent vaginoplasty while incarcerated, under the state's Medicaid policy.

129.    The Position Statement's critique of the evidence supporting gender-affirming surgery as a treatment for gender dysphoria (DAC 3412-3414) lacks validity, again making numerous assertions already rebutted above. *See supra* ¶¶ 30,

111-17. As with the Case Summary, this critique relies on unwarranted criticisms of WPATH that belie the consensus among the nation's leading medical and mental health professional organizations and the courts that look to WPATH and the SOC for authoritative guidance about the treatment of gender dysphoria. It also relies extensively on SEGM, which is an outlier, anti-transgender organization, as discussed above. The Position Statement's assertions that the evidence base for treatment for gender dysphoria is of low quality belies knowledge of research methodology. "Low quality evidence" refers to certain types of studies and does not mean that the evidence is poor or should not be relied upon. Indeed, a significant portion of medical treatment decisions are made in reliance upon "low quality" evidence. Many common surgical and medical interventions reported by the Cochrane Review (a collection of high quality, independent evidence to inform healthcare decision-making) have the same level of evidence as gender-affirming surgery, including, for example: rotator cuff surgery, which 4,600 Americans undergo yearly; appendectomy; early versus delayed surgery; exercise-based cardiac rehab post heart valve surgery, and many more.

130. The Position Statement's assertion that performance of gender-affirming surgeries may violate physicians' obligation to "do no harm" (DAC 3414) demonstrates how distorted the Position Statement is. It has been estimated that approximately 9,000 gender-affirming surgeries are done in the United States annually, with the number increasing each year, and such surgeries are done at some of the nation's leading medical institutions. To suggest that all of those who have

conducted the tens of thousands of such surgeries in our nation alone may be violating their ethical obligations is an extremist and unwarranted claim. Moreover, the Position Statement altogether ignores the harm that is done by failing to provide gender-affirming surgery to those experiencing severe gender dysphoria.

## X.   ERRONEOUS STATEMENTS, OPINIONS, AND CONCLUSIONS MADE BY JOSEPH PENN, MD AND SARA BOYD, PH.D., ABPP

131.    Earlier in this case, the Defendants submitted affidavits from Dr. Joseph Penn and Dr. Sarah Boyd critiquing my initial declaration and indicating support for the Defendants' refusal to provide Mrs. Zayre-Brown gender-affirming surgery. I then submitted a second declaration explaining why Dr. Penn and Dr. Boyd's views were incorrect, irrelevant, or both. ECF No. 22-1. I incorporate my second declaration here by reference.

## XI.   <u>CONCLUSIONS AND OPINIONS</u>

132.    There is broad consensus in the medical community that, for some individuals diagnosed with gender dysphoria, gender-affirming surgery is medically necessary when other treatment is unlikely to alleviate the patient's symptoms, prevent further emotional and psychological pain, and prevent associated physical harm.

133.    Mrs. Zayre-Brown has severe and persistent gender dysphoria. She continues to struggle with thoughts of auto-penectomy, the "last resort" to eliminate gender dysphoria. She consolidated her female identity long ago but cannot resolve the anatomical dysphoria resulting from having male genitalia and a female gender

identity in an otherwise female body. Her previous treatments for gender dysphoria, many of which have been inconsistently or inadequately provided by DPS, have been ineffective in significantly alleviating or resolving that condition.

134.    With normal aging, cortisol levels increase. For gender dysphoric individuals, elevated cortisol alters brain chemistry and intensifies gender dysphoria. Mrs. Zayre-Brown's gender dysphoria will continue to intensify, with no means of relief. Her immediate need for surgery is great and will only accelerate.

135.    Mrs. Zayre-Brown is unusually well-adjusted and has shown remarkable resilience given my understanding of her experiences in DPS custody. But her resilience is rapidly eroding. She has met, and exceeded, all the requirements of the WPATH SOC for surgical intervention, which is medically necessary to treat her severe gender dysphoria. My understanding is that decisions regarding gender-affirming surgery for DPS prisoners are made by the DTARC and are subject to the approval of the Deputy Commissioner and the Director of Health and Wellness. But medical decisions, and especially decisions about whether a patient should receive or be denied treatment, are rarely proper for committees, especially committees composed of individuals without expertise in the condition being treated. In this case, the records I have reviewed indicate that the healthcare providers with expertise in treating gender dysphoria were overridden by DTARC members for non-medical reasons.

136.    In sum, having reviewed Mrs. Zayre-Brown's medical records, assessed her in-person, and followed up with her by phone, I conclude that Mrs. Zayre-Brown urgently requires gender-affirming genital surgery to treat her gender dysphoria.

137.    In denying Mrs. Zayre-Brown gender-affirming surgery, the Defendants do not appear to have provided any consideration for her individual circumstances, which they concede is a critical step for evaluating medical necessity. Instead, the Defendants appear to believe that gender-affirming surgery is never medically necessary for anyone, regardless of individual circumstances. That view is totally inconsistent with the modern understanding of gender dysphoria. It also is inconsistent with the understanding of any number of medical conditions—simply because one treatment is not medically necessary for one patient, or even most patients, does not mean it is never necessary.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 2nd day of February, 2023.

Dr. Randi Ettner, Ph.D.

Dr. Randi Ettner, Ph.D.

## CERTIFICATE OF SERVICE

I hereby certify that on February 3, 2023, as agreed upon by the parties, I served the foregoing **EXPERT REPORT OF DR. RANDI C. ETTNER, PH.D.** on Defendants' counsel of record via email as follows:

Orlando L. Rodriguez
Special Deputy Attorney General
orodriguez@ncdoj.gov

Stephanie A. Brennan
Special Deputy Attorney General
sbrennan@ncdoj.gov

*/s/ Jaclyn A. Maffetore*
Jaclyn A. Maffetore
American Civil Liberties Union of
North Carolina Legal Foundation
P.O. Box 28004
Raleigh, NC 27611
Tel: (919) 256-5891
Fax: (919) 869-2075
jmaffetore@acluofnc.org

# APPENDIX A

# RANDI ETTNER, PHD
## 1214 Lake Street
## Evanston, Illinois 60201
## 847-328-3433

## POSITIONS HELD

Clinical Psychologist
Forensic Psychologist
Fellow and Diplomate in Clinical Evaluation, American Board of
    Psychological Specialties
Fellow and Diplomate in Trauma/PTSD
President, New Health Foundation Worldwide
Past Secretary, World Professional Association for Transgender Health
    (WPATH)
Chair, Committee for Institutionalized Persons, WPATH
Global Education Initiative Committee Curriculum Development, WPATH
University of Minnesota Medical Foundation: Leadership Council
Psychologist, Center for Gender Confirmation Surgery, Weiss Memorial
    Hospital
Adjunct Faculty, Prescott College
Editorial Board, *International Journal of Transgender Health*
Editorial Board, *Transgender Health*
Television and radio guest (more than 100 national and international
    appearances)
Internationally syndicated columnist on women's health issues
Private practitioner
Medical staff; Department of Medicine: Weiss Memorial Hospital, Chicago,
    IL
Advisory Council, National Center for Gender Spectrum Health
Global Clinical Practice Network; World Health Organization
Harvard Law School LGBTQ Clinic Leadership Council

## EDUCATION

| | |
|---|---|
| PhD, 1979 | Northwestern University (with honors) Evanston, Illinois |
| MA, 1976 | Roosevelt University (with honors) Chicago, Illinois |
| BA, 1969-73 | Indiana University<br>Bloomington, Indiana<br>Cum Laude<br>Major: Clinical Psychology; Minor: Sociology |
| 1972 | Moray College of Education<br>Edinburgh, Scotland<br>International Education Program |
| 1970 | Harvard University<br>Cambridge, Massachusetts Social Relations Undergraduate<br>Summer Study Program in Group Dynamics and Processes |

## CLINICAL AND PROFESSIONAL EXPERIENCE

| | |
|---|---|
| 2016-2022 | Psychologist: Weiss Memorial Hospital Center for Gender Confirmation Surgery |
| | Consultant: Walgreens; Tawani Enterprises |
| | Private practitioner: clinical and forensic practice |
| 2011 | Instructor, Prescott College: Gender-A multidimensional approach |
| 2004-2009 | Consultant to Wisconsin Public Schools |
| 2000 | Instructor, Illinois School of Professional Psychology |
| 1995-present | Supervision of clinicians in counseling gender non-conforming clients |
| 1993 | Post-doctoral continuing education with Dr. James Butcher in MMPI-2 Interpretation, University of Minnesota |
| 1992 | Continuing advanced tutorial with Dr. Leah Schaefer in psychotherapy |
| 1983-1984 | Staff psychologist, Women's Health Center, St. Francis Hospital, Evanston, Illinois |
| 1981-1984 | Instructor, Roosevelt University, Department of Psychology: Psychology of Women, Tests and Measurements, Clinical Psychology, Personal Growth, Personality Theories, Abnormal Psychology |
| 1976-1978 | Research Associate, Cook County Hospital, Chicago, Illinois, Department of Psychiatry |
| 1975-1977 | Clinical Internship, Cook County Hospital, Chicago, Illinois, Department of Psychiatry |
| 1971 | Research Associate, Department of Psychology, Indiana University |
| 1970-1972 | Teaching Assistant in Experimental and Introductory Psychology Department of Psychology, Indiana University |
| 1969-1971 | Experimental Psychology Laboratory Assistant, Department of Psychology, Indiana University |

## INVITED PRESENTATIONS AND HOSPITAL GRAND ROUNDS

*Shifting Sands: Challenges in Providing Surgical Care* American Society of Reconstructive Microsurgery, Miami, FL 2023

*The Standard of Care for Institutionalized Persons* WPATH 27th Scientific Symposium, Montreal, Canada 2022

*Healthcare for Transgender Prisoners* Rush University, Department of Plastic and Reconstructive Surgery, Chicago, IL 2022

*Sexual Function: Expectations and outcomes for patients undergoing gender-affirming surgery.* Whitney, N., Ettner, R., Schechter, L. Rush University, Department of Plastic and Reconstructive Surgery, Chicago, IL 2022

*Care of the Older Transgender Patient,* Weiss Memorial Hospital, Chicago, IL, 2021

*Working with Medical Experts,* The National LGBT Law Association, webinar presentation, 2020

*Legal Issues Facing the Transgender Community,* Illinois State Bar Association, Chicago, IL, 2020

*Providing Gender Affirming Care to Transgender Patients,* American Medical Student Association, webinar presentation, 2020

*Foundations in Mental Health for Working with Transgender Clients;* Center for Supporting Community Development Initiatives, Vietduc University Hospital, Hanoi, Vietnam, 2020

*Advanced Mental Health Issues, Ethical Issues in the Delivery of Care,* Development Initiaves, Vietduc University Hospital, Hanoi, Vietnam, 2020

*The Transgender Surgical Patient,* American Society of Plastic Surgeons, Miami, FL 2019

*Mental health issues in transgender health care,* American Medical Student Association, webinar presentation, 2019

*Sticks and stones: Childhood bullying experiences in lesbian women and transmen,* Buenos Aires, 2018

*Gender identity and the Standards of Care,* American College of Surgeons, Boston, MA, 2018

*Expectations of individuals undergoing gender-confirming surgeries* Schechter, L., White, T., Ritz, N., Ettner, R. Buenos Aires, 2018

*The mental health professional in the multi-disciplinary team, pre-operative evaluation and assessment for gender confirmation surgery,* American Society of Plastic Surgeons, Chicago, IL, 2018; Buenos Aires, 2018

*Navigating transference and countertransference issues,* WPATH Global Education Initiative, Portland, OR; 2018

*Psychological aspects of gender confirmation surgery* International Continence Society, Philadelphia, PA 2018

*The role of the mental health professional in gender confirmation surgeries,* Mt. Sinai Hospital, New York City, NY, 2018

*Mental health evaluation for gender confirmation surgery,* Gender Confirmation Surgical Team, Weiss Memorial Hospital, Chicago, IL 2018

*Transitioning; Bathrooms are only the beginning,* American College of Legal Medicine, Charleston, SC, 2018

*Gender Dysphoria: A medical perspective,* Department of Health and Human Services, Office for Civil Rights, Washington, D.C, 2017

*Multi-disciplinary health care for transgender patients*, James A. Lovell Federal Health Care Center, North Chicago, IL, 2017

*Psychological and Social Issues in the Aging Transgender Person,* Weiss Memorial Hospital, Chicago, IL, 2017

*Psychiatric and Legal Issues for Transgender Inmates,* USPATH, Los Angeles, CA, 2017

*Transgender 101 for Surgeons,* American Society of Plastic Surgeons, Chicago, IL, 2017

*Healthcare for transgender inmates in the US,* Erasmus Medical Center, Rotterdam, Netherlands, 2016

*Tomboys Revisited: Replication and Implication;* Amsterdam, Netherlands, 2016

*Orange Isn't the New Black Yet-* Care for incarcerated transgender persons, WPATH symposium, Amsterdam, Netherlands, 2016

*Can two wrongs make a right? Expanding models of care beyond the divide*, Amsterdam, Netherlands, 2016

*Foundations in mental health;* WPATH Global Education Initiative, Chicago, IL 2015

*Role of the mental health professional in legal and policy issues,* WPATH Global Education Initiative, Chicago, IL 2015

*Healthcare for transgender inmates;* WPATH Global Education Initiative, Chicago, IL 2015

*Children of transgender parents;* WPATH Global Education Initiative; Atlanta, GA, 2016

*Transfeminine genital surgery assessment:* WPATH Global Education Initiative, Columbia, MO, 2016

*Foundations in Mental Health;* WPATH Global Education Initiative; Ft. Lauderdale, FL, 2016; Washington, D.C., 2016, Los Angeles, CA, 2017, Minneapolis, MN, 2017, Chicago, IL, 2017; Columbus, Ohio, 2017; Portland, OR, 2018; Cincinnati, OH, 2018, Buenos Aires, 2018.

*Pre-operative evaluation in gender affirming surgery-*American Society of Plastic Surgeons, Boston, MA, 2015

*Gender affirming psychotherapy; Assessment and referrals for surgery-Standards of Care-*Fenway Health Clinic, Boston, 2015

*Transgender surgery-* Midwestern Association of Plastic Surgeons, Chicago, 2015

*Adult development and quality of life in transgender healthcare-* Eunice Kennedy Shriver National Institute of Child Health and Human Development, 2015

*Healthcare for transgender inmates-* American Academy of Psychiatry and the Law, Chicago, 2014

*Supporting transgender students: best school practices for success-* American Civil Liberties Union of Illinois and Illinois Safe School Alliance, 2014

*Addressing the needs of transgender students on campus-* Prescott College, Prescott, AZ, 2014

*The role of the behavioral psychologist in transgender healthcare –* Gay and Lesbian Medical Association, 2013

*Understanding transgender-* Nielsen Corporation, Chicago, 2013

*Role of the forensic psychologist in transgender care; Care of the aging transgender patient* University of California San Francisco, Center for Excellence, 2013

*Grand Rounds: Evidence-based care of transgender patients-* North Shore University Health Systems, University of Chicago, Illinois, 2011

*Grand Rounds*: *Evidence-based care of transgender patients* Roosevelt-St. Vincent Hospital, New York, 2011

*Grand Rounds*: *Evidence-based care of transgender patients* Columbia Presbyterian Hospital, Columbia University, New York, 2011

*Hypertension: Pathophysiology of a secret.* WPATH symposium, Atlanta, GA, 2011

*Exploring the Clinical Utility of Transsexual Typologies* Oslo, Norway, 2009

*Children of Transsexual Parents*-International Association of Sex Researchers, Ottawa, Canada, 2005

*Children of Transsexual Parents*- Chicago School of Professional Psychology, Chicago, 2005

*Gender and the Law*- DePaul University College of Law, Chicago, Illinois, 2003

*Family and Systems Aggression against Providers,* WPATH Symposium, Ghent, Belgium 2003

*Children of Transsexual Parents*-American Bar Association annual meeting, New York, 2000

*Grand Rounds: Gender Incongruence in Adults,* St. Francis Hospital, 1999.

*Gender Identity, Gender Dysphoria and Clinical Issues* –WPATH Symposium, Bangkok, Thailand, 2014; Argosy College, Chicago, Illinois, 2010; Cultural Impact Conference, Chicago, Illinois, 2005; Weiss Hospital, Department of Surgery, Chicago, Illinois, 2005; Resurrection Hospital Ethics Committee, Evanston, Illinois, 2005; Wisconsin Public Schools, Sheboygan, Wisconsin, 2004, 2006, 2009; Rush North Shore Hospital, Skokie, Illinois, 2004; Nine Circles Community Health Centre, University of Winnipeg, Winnipeg, Canada, 2003; James H. Quillen VA Medical Center, East Tennessee State University, Johnson City, Tennessee, 2002; Sixth European Federation of Sexology, Cyprus, 2002; Fifteenth World Congress of Sexology, Paris, France, 2001; Illinois School of Professional Psychology, Chicago, Illinois 2001; Lesbian Community Cancer Project, Chicago, Illinois 2000; Emory University Student Residence Hall, Atlanta, Georgia, 1999; Parents, Families and Friends of Lesbians and Gays National Convention, Chicago, Illinois, 1998; In the Family Psychotherapy Network National Convention, San Francisco, California, 1998; Evanston City Council, Evanston, Illinois 1997; Howard Brown Community Center, Chicago, Illinois, 1995; YWCA Women's Shelter, Evanston, Illinois, 1995; Center for Addictive Problems, Chicago, 1994

*Psychosocial Assessment of Risk and Intervention Strategies in Prenatal Patients*- St. Francis Hospital, Center for Women's Health, Evanston, Illinois, 1984; Purdue University School of Nursing, West Layette, Indiana, 1980

*Psychonueroimmunology and Cancer Treatment*- St. Francis Hospital, Evanston, Illinois, 1984

*Psychosexual Factors in Women's Health*- St. Francis Hospital, Center for Women's Health, Evanston, Illinois, 1984.

*Grand Rounds: Sexual Dysfunction in Medical Practice*- St. Francis Hospital, Dept. of OB/GYN, Evanston, Illinois, 1990

*Sleep Apnea* - St. Francis Hospital, Evanston, Illinois, 1996; Lincolnwood Public Library, Lincolnwood, Illinois, 1996*The Role of Denial in Dialysis Patients* - Cook County Hospital, Department of Psychiatry, Chicago, Illinois, 1977

## PUBLICATIONS

Coleman, E., Radix, A., Bouman, W., Brown, G., deVries, A.L., Deutsch, M., Ettner, R., et. al. Standards of Care for the Health of Transgender and Gender Diverse People, Version 8. *International Journal of Transgender Health*, 23:sup1S1-S259.

Robles, C., Hamidian, A., Ferragamo, B., Radix, A., De Cuypere, G., Green, J., Ettner, R., Monstrey, S., Schechter, L. Gender affirmation surgery: A collaborative approach between the surgeon and the mental health professional. *Journal of Plastic and Reconstructive Surgery* in press.

Ettner, R. Healthcare for transgender prisoners. In Garcia (Ed.) Gender Affirming Surgery: An Illustrated Guide and Video Atlas. Springer: in press.

Narayan, S., Danker, S Esmonde, N., Guerriero, J., Carter, A., Dugi III, D., Ettner, R., Radix A., Bluebond-Langner, R., Schechter, L., Berli, J. (2021) Guiding the conversation: Types of regret after gender-affirming surgery and their associated etiologies. *Annals of Translational Medicine,*9(7):605.

Ettner, R., White, T., Ettner, F., Friese, T., Schechter, L. (2018) Tomboys revisited: A retrospective comparison of childhood behaviors in lesbians and transmen. *Journal of Child and Adolescent Psychiatry.*

Ettner, R. Mental health evaluation. Clinics in Plastic Surgery. (2018) Elsevier, 45(3): 307-311.

Ettner, R. Etiology of gender dysphoria in Schechter (Ed.) Gender Confirmation Surgery: Principles and Techniques for an Emerging Field. Elsevier, 2017.

Ettner, R. Pre-operative evaluation. In Schechter (Ed.) Surgical Management of the Transgender Patient. Elsevier, 2017.

Berli, J., Kudnson, G., Fraser, L., Tangpricha, V., Ettner, R., et al. Gender Confirmation Surgery: what surgeons need to know when providing care for transgender individuals. *JAMA Surgery*; 2017.

Ettner, R., Ettner, F. & White, T. Choosing a surgeon: an exploratory study of factors influencing the selection of a gender affirmation surgeon. *Transgender Health*, 1(1), 2016.

Ettner, R. & Guillamon, A. Theories of the etiology of transgender identity. In <u>Principles of Transgender Medicine and Surgery</u>. Ettner, Monstrey & Coleman (Eds.), 2nd edition; Routledge, June, 2016.

Ettner, R., Monstrey, S, & Coleman, E. (Eds.) <u>Principles of Transgender Medicine and Surgery, 2nd edition</u>; Routledge, June, 2016.

Bockting, W, Coleman, E., Deutsch, M., Guillamon, A., Meyer, I., Meyer, W., Reisner, S., Sevelius, J. & Ettner, R. Adult development and quality of life of transgender and gender nonconforming people. *Current Opinion in Endocrinology and Diabetes*, 2016.

Ettner, R. Children with transgender parents in <u>Sage Encyclopedia of Psychology and Gender</u>. Nadal (Ed.) Sage Publications, 2017.

Ettner, R. Surgical treatments for the transgender population in <u>Lesbian, Gay, Bisexual, Transgender, and Intersex Healthcare: A Clinical Guide to Preventative, Primary, and Specialist Care</u>. Ehrenfeld & Eckstrand, (Eds.) Springer: MA, 2016.

Ettner, R. Etiopathogenetic hypothesis on transsexualism in <u>Management of Gender Identity Dysphoria: A Multidisciplinary Approach to Transsexualism.</u> Trombetta, Liguori, Bertolotto, (Eds.) Springer: Italy, 2015.

Ettner, R. Care of the elderly transgender patient. *Current Opinion in Endocrinology and Diabetes, 2013, Vo*l. 20(6), 580-584.

Ettner, R., and Wylie, K. Psychological and social adjustment in older transsexual people. *Maturitas,* March, 2013, Vol. 74, (3), 226-229.

Ettner, R., Ettner, F. and White, T. Secrecy and the pathophysiology of hypertension. *International Journal of Family Medicine* 2012, Vol. 2012.

Ettner, R. Psychotherapy in <u>Voice and Communication Therapy for the Transgender/Transsexual Client: A Comprehensive Clinical Guide</u>. Adler, Hirsch, Mordaunt, (Eds.) Plural Press, 2012.

Coleman, E., Bockting, W., Botzer, M., Cohen-Kettenis, P., DeCuypere, G., Feldman, J., Fraser, L., Green, J., Knudson, G., Meyer, W., Monstrey, S., Adler, R., Brown, G., Devor, A., Ehrbar, R., Ettner, R., et.al. Standards of Care for the health of transsexual, transgender, and gender-nonconforming people. World Professional Association for Transgender Health (WPATH). 2012.

Ettner, R., White, T., and Brown, G. Family and systems aggression towards therapists. *International Journal of Transgenderism,* Vol. 12, 2010.

Ettner, R. The etiology of transsexualism in <u>Principles of Transgender Medicine and Surgery</u>, Ettner, R., Monstrey, S., and Eyler, E. (Eds.). Routledge Press, 2007Ettner, R., Monstrey, S., and Eyler, E. (Eds.) <u>Principles of Transgender Medicine and Surgery</u>. Routledge Press, 2007.

Monstrey, S. De Cuypere, G. and Ettner, R. Surgery: General principles in <u>Principles of Transgender Medicine and Surgery</u>, Ettner, R., Monstrey, S., and Eyler, E. (Eds.) Routledge Press, 2007.

Schechter, L., Boffa, J., Ettner, R., and Ettner, F. Revision vaginoplasty with sigmoid interposition: A reliable solution for a difficult problem. The World Professional Association for Transgender Health (WPATH), 2007, *XX Biennial Symposium,* 31-32.

Ettner, R. Transsexual Couples: A qualitative evaluation of atypical partner preferences. *International Journal of Transgenderism,* Vol. 10, 2007.

White, T. and Ettner, R. Adaptation and adjustment in children of transsexual parents. *European Journal of Child and Adolescent Psychiatry,* 2007: 16(4)215-221.

Ettner, R. Sexual and gender identity disorders in <u>Diseases and Disorders</u>, Vol. 3, Brown Reference, London, 2006.

Ettner, R., White, T., Brown, G., and Shah, B. Client aggression towards therapists: Is it more or less likely with transgendered clients? *International Journal of Transgenderism,* Vol. 9(2), 2006.

Ettner, R. and White, T. in <u>Transgender Subjectives: A Clinician's Guide</u> Haworth Medical Press, Leli (Ed.) 2004.

White, T. and Ettner, R. Disclosure, risks, and protective factors for children whose parents are undergoing a gender transition. *Journal of Gay and Lesbian Psychotherapy,* Vol. 8, 2004.

Witten, T., Benestad, L., Berger, L., Ekins, R., Ettner, R., Harima, K. Transgender and Transsexuality. <u>Encyclopeida of Sex and Gender</u>. Springer, Ember, & Ember (Eds.) Stonewall, Scotland, 2004.

Ettner, R. Book reviews. *Archives of Sexual Behavior,* April, 2002.

Ettner, R. <u>Gender Loving Care: A Guide to Counseling Gender Variant Clients</u>. WW Norton, 2000.

*Social and Psychological Issues of Aging in Transsexuals*, proceedings, Harry Benjamin International Gender Dysphoria Association, Bologna, Italy, 2005.

*The Role of Psychological Tests in Forensic Settings*, *Chicago Daily Law Bulletin,* 1997.

<u>Confessions of a Gender Defender: A Psychologist's Reflections on Life amongst the Transgender</u>. Chicago Spectrum Press. 1996.

*Post-traumatic Stress Disorder*, *Chicago Daily Law Bulletin*, 1995.

*Compensation for Mental Injury, Chicago Daily Law Bulletin*, 1994.

*Workshop Model for the Inclusion and Treatment of the Families of Transsexuals,* Proceedings of the Harry Benjamin International Gender Dysphoria Symposium; Bavaria, Germany, 1995.

*Transsexualism- The Phenotypic Variable,* Proceedings of the XV Harry Benjamin International Gender Dysphoria Association Symposium; Vancouver, Canada, 1997.=*The Work of Worrying: Emotional Preparation for Labor* in <u>Pregnancy as Healing. A Holistic Philosophy for Prenatal Care</u>, Peterson, G. and Mehl, L. Vol. II. Chapter 13, Mindbody Press, 1985.

## **PROFESSIONAL AFFILIATIONS**

University of Minnesota Institute for Sexual and Gender Health–Leadership Council

American College of Forensic Psychologists

World Professional Association for Transgender Health

New Health Foundation Worldwide

World Health Organization (WHO) Global Access Practice Network

TransNet national network for transgender research

American Psychological Association

American College of Forensic Examiners

Society for the Scientific Study of Sexuality

Screenwriters and Actors Guild

Phi Beta Kappa

**AWARDS AND HONORS**

University of Minnesota, Institute for Sexual and Gender Health; 50 *Distinguished Sex and Gender Revolutionaries* award, 2021

Letter of commendation from United States Congress for contributions to public health in Illinois, 2019

WPATH Distinguished Education and Advocacy Award, 2018

*The Randi and Fred Ettner Transgender Health Fellowship*-Program in Human Sexuality, University of Minnesota, 2016

Phi Beta Kappa, 1972

Indiana University Women's Honor Society, 1970-1972

Indiana University Honors Program, 1970-1972

Merit Scholarship Recipient, 1970-1972

Indiana University Department of Psychology Outstanding Undergraduate Award
    Recipient, 1970-1972

Representative, Student Governing Commission, Indiana University, 1970


**LICENSE**

Clinical Psychologist, State of Illinois, 1980

# APPENDIX B

JON L. STRYKER AND SLOBODAN
RANDJELOVIĆ
LESBIAN GAY BISEXUAL
TRANSGENDER QUEER
& HIV PROJECT

JAMES D. ESSEKS
DIRECTOR



**ACLU**
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION

National Office
125 Broad Street, 18th floor
New York NY 10004
(212) 549-2500
aclu.org

February 24, 2022

**By Email**
Randi Ettner, PhD.
rettner@aol.com

Re: Expert witness engagement for the matter of Kanautica
Zayre-Brown

Dear Dr. Ettner:

This will memorialize the terms of the agreement under which
you have been retained by the American Civil Liberties Union
("ACLU") and the American Civil Liberties Union of North
Carolina ("ACLU of NC") to perform professional services in
connection with the above-referenced matter.

We have retained you for services in connection with the
above-referenced matter from time to time. We may request
these services orally or in writing. This assignment shall
potentially include, but not be limited to, preparing a
declaration and/or expert report, which may be used in
connection with the lawsuit. We expect that you will apply
your professional judgment, knowledge, expertise, and
expertise to assist us. You shall undertake no work under this
agreement unless specifically requested to do so by us.
Whenever you believe additional work that we have not
requested is necessary or appropriate, you will let us know so
we can decide whether to authorize it.

Your work under this agreement will be personally directed
and supervised by Taylor Brown of the ACLU, Jon W.
Davidson of the ACLU, Jaclyn Maffetore of the ACLU of NC,
and other attorneys at the ACLU and/or the ACLU of NC.

Compensation shall be computed on an hourly rate for actual
time devoted, at:
- $375.00 per hour for any clinical services, records
  review, or report drafting in conjunction with this
  matter;
- $475.00 per hour for any deposition or trial testimony.

You should submit bills on a regular basis directly to ACLU by emailing bills to Jon W. Davidson at jondavidson@aclu.org. Such bills should generally describe the activities performed in the time for which you are billing and the dates on which those activities were performed, as the time spent on each activity (rounded up to the nearest 1/10 of an hour). For example:

| 8/2/22 | Draft expert report | 1.3 hours |
|--------|---------------------|-----------|
| 8/2/22 | Phone conversation with Attorney X. Smith related to drafting report | .5 hours |



The ACLU and the ACLU of NC agree to pay $2,500.00 per day for any necessary travel in conjunction with this matter. Additionally, the ACLU and the ACLU of NC agree to pay any reasonable out-of-pocket expenses incurred. Any out-of-pocket expenses including copying and mailing costs paid by you for the purpose of completing your obligations under this agreement will be promptly reimbursed upon submission of an invoice, receipts, or other valid statements of expense, provided that, in order for any single expense of over $200.00 to be reimbursable by counsel, that expense must be approved by us prior to being incurred. Any change in compensation rates must be agreed upon in writing. Your compensation does not depend on the outcome of this litigation, the opinions you express, or the testimony you provide.

Any and all studies, reports, or other data or information gathered, collected, or prepared by or for you in fulfillment of this retention shall be our property and shall be delivered to us upon our request or upon completion of your services under this agreement.

You understand that your work under this agreement is for us and is done at our request as attorneys in aid of litigation, and that all work performed by you under this agreement, including but not limited to all communications, whether written or oral, between you and any attorney or employee of the ACLU or the ACLU of NC, are confidential and privileged communications which you will not reveal to any other person, except as authorized by us in advance or required by law, with

prior notice to us. In this regard, you agree to inform each of your employees or agents performing services under this agreement of the confidentiality obligations set forth herein.

You also understand that you need to preserve any written materials, including e-mails, generated or received by you in connection with this engagement, as such materials are potentially discoverable in litigation, and, by entering into this retention, you agree that you will do so.

It is understood that during the course of your engagement you will adhere to all applicable ethical and legal standards.



This agreement shall not be assigned, or transferred, in whole or in part by either party without the previous written consent of the other party, and any attempt to do so shall be void and unenforceable.

Counsel may decide, in their discretion, to terminate their engagement of you and/or withdraw the request that you serve as a witness at deposition or trial. Additionally, you may terminate your engagement. If you terminate your engagement, you will provide notice of termination in writing to counsel at least thirty (30) days prior to the termination of engagement.

If either party exercises its right of termination, you shall, if requested by counsel, bring to an orderly conclusion any project or projects on which you are then working in connection with this agreement and deliver your work product to counsel within thirty (30) days of the notice of termination. In the unlikely event that you terminate your engagement less than sixty (60) days before trial, you will deliver your work product to counsel within five (5) days of the notice of termination.

This agreement shall be governed and interpreted according to the laws of the State of New York. This letter agreement, when signed by you, shall constitute the entire agreement between you and us with respect to this matter.

If you agree to the terms set forth above, please print and sign and return this agreement to me electronically.

Very truly yours,

/s/ Jon W. Davidson
Jon W. Davidson
Senior Staff Attorney
ACLU LGBTQ & HIV Project
jondavidson@aclu.org | P: 323-536-9880

APPROVED AND AGREED TO:

By: _Randi Ettner PhD_

Randi Ettner, PhD.

# APPENDIX C

**BIBLIOGRAPHY**

Ainsworth, T. & Spiegel, J. (2010) Quality of life of individuals with and without facial feminization surgery or gender reassignment surgery. *Quality of Life Research, 19(7),* 1019–24.

American Medical Association. (2008). *Resolution 122 (A-08), Removing Financial Barriers to Care for Transgender Patients.*

American Psychiatric Association (1980). *Diagnostic and Statistical Manual of Mental Disorders (DSM-III).* Washington, D.C.: American Psychiatric Publishing.

American Psychiatric Association (1987). *Diagnostic and Statistical Manual of Mental Disorders (DSM-III-R).* Washington, D.C.: American Psychiatric Publishing.

American Psychiatric Association (1994). *Diagnostic and Statistical Manual of Mental Disorders (DSM-IV).* Washington, D.C.: American Psychiatric Publishing.

American Psychiatric Association (2013). *Diagnostic and Statistical Manual of Mental Disorders (DSM-5).* Washington, D.C.: American Psychiatric Publishing.

American Psychiatric Association, *Gender Dysphoria* (2013), http://www.dsm5.org/documents/gender%20dysphoria%20fact%20sheet.pdf.

Bao, A.M. & Swabb, D.F. (2011). Sexual differentiation of the human brain: Relation to gender identity, sexual orientation and neuro-psychiatric disorders, *Frontiers in Neurology, 32(2)*, 214–26.

Byne W. (2016). Regulations restrict practice of conversion therapy. *LGBT Health*, 3(2):97-99.

Bauer, G., Scheim, A., Pyne, J. *et al.* (2015). Intervenable factors associated with suicide risk in transgender persons: a respondent driven sampling study in Ontario, Canada. *BMC Public Health*, 15:525.

Beck, A. *et al.* (1990). Relationship between hopelessness and ultimate suicide: A replication with psychiatric outpatients. *American Journal of Psychiatry*, 147(2).

*Bennet, K., Qi, J, Kim, H., Hamill, J. et al. (2018). Comparison of* 2-year complication rates among common techniques for post-mastectomy breast reconstruction. *JAMA Surgery.*

Bentz, E.K., Hefler, L.A., Kaufman, U. *et al.* (2008). A polymorphism of the CYP17 gene related to sex steroid metabolism is associated with female-to-male but not male-to-female transsexualism. *Fertility and Sterility, 90(1),* 56–59.

Berli, J., Kudnson, G., Fraser, L., Tangpricha, V., Ettner, R., *et al.* (2017). Gender Confirmation Surgery: what surgeons need to know when providing care for transgender individuals. *JAMA Surgery, 152(4),* 394–400.

Bockting, W. (2013). Transgender identity development. In Tolman & Diamond (Eeds.), *American Psychological Association's Handbook of Sexuality and Psychology.* Washington, D.C.: American Psychological Association.

Bockting, W. (2014). The impact of stigma on transgender identity development and mental health. In Kreukels, Steensma, and De Vries (Eds.), *Gender dysphoria and disorders of sex development: Progress in care and knowledge.* New York: Springer.

Boulware, S., Komody, R., et al. (2022) Biased science: The Texas and Alabama measures criminalizing medical treatment for transgender children and adolescents rely on inaccurate and misleading scientific claims, *Yale Law School Public Law Research.*

Bradford, N., Rider, CN. & Spencer, K. (2019). Hair removal and psychological well-being in transfeminine adults: associations with gender dysphoria and gender euphoria. *Journal of Dermatological Treatment*, 32(6):635-642.

Brown, G. (2010) Auto-castration and auto-penectomy as surgical self-treatment in incarcerated persons with Gender Identity Disorder. *International Journal of Transgenderism, 12: 31-39*.

Brown, G. & McDuffie, E. (2009) Health care policies addressing transgender inmates in prison systems in the US. *Journal of Correctional Health.*

Chivers-Wilson, K. (2006) Sexual assault and posttraumatic stress disorders: A review of the biological, psychological and sociological factors and treatments. *Mc Gill Journal of Medicine*, (2):111-118.

Chung, W., De Vries, G., Swaab, D. (2002). S
exual differentiation of the bed nucleus of the stria terminalis in humans may extend into adulthood. *Journal of Neuroscience, 22(3),* 1027–33.

Cohen-Kettenis, PT. and Gooren, LJ. (1993). The influence of hormone treatment on psychological functioning of transsexuals. *Journal of Psychology and Human Sexuality, 1993(4),* 55–67.

Colborn, T. Dumanoski, D. & Meyers, W. (1997). *Our Stolen Future*. New York: Penguin.

Coleman, E., Bockting, W., Botzer, M., Cohen-Kettenis, P., DeCuypere, G., Feldman, J. … Zucker, K. (2011). WPATH Standards of care for the health of transsexual,

transgender, and gender-nonconforming people, version 7. *International Journal of Transgenderism, 13*, 165–232.

Coleman, E., Radix, A., Bouman, W., Brown, G., DeVries, A., Deutsch, M., Ettner, R., et al. (2022) Standards of Care for the Health of Transgender and Gender Diverse People, Version 8, *International Journal of Transgender Health, 23.*

Colizzi, M. , Costa, R., & Todarello, O. (2014). Transsexual patients' psychiatric comorbidity and positive effect on cross-sex hormonal treatment on mental health: results from a longitudinal study. *Psychoneuroendocrinology*, 39: 65-73.
Cornell University What We Know: The Public Policy Research Portal (2019), *What does the scholarly research say about transition on transgender well-being?* https://whatweknow.inequality.cornell.edu/topics/lgbt-equality/what-does-the-scholarly-research-say-about-the-well-being-of-transgender-people/.

Devor, A. (2004). Witnessing and mirroring: A fourteen stage model of transsexual identity formation. *Journal of Gay and Lesbian Psychotherapy, 8(1-2),* 41–67.

De Cuypere, G., T'Sjoen, G., Beerten, R., Selvaggi, G., *et al.* (2005). Sexual and physical health after sex reassignment surgery. *Archives of Sexual Behavior, 34(6),* 679–90.

Dhjene, C., Lichtenstein, P., Boman, M., et al. Long-term follow-up of transsexual persons undergoing sex reassignment surgery: cohort study in Sweden. PLOS ONE. 2011; 6(2).

Diamond, M. (2013). Transsexuality among twins: identity concordance, transition, rearing, and orientation. *International Journal of Transgenderism, 14(1),* 24–38.

Diamond, L., Pardo, S., Butterworth, M. (2011). Transgender experience and identity. In Schwartz *et al.* (Eds.), *Handbook of Identity Theory and Research.* New York: Springer.

Edgerton, M.T., and Meyer, J. K. (1973). Surgical and psychiatric aspects of transsexualism. In Horton, C. (Ed.), *Surgery of the External Genitalia* (pp. 117–61). Boston: Little, Brown.

Erickson, E. (1956). The problem of ego identity. *Journal of the American Psychoanalytic Association*, 4(1), 56–121.

Ettner, R. (1999). *Gender Loving Care.* New York: Norton.

Ettner, R. (2007) The etiology of transsexualism. In Ettner, R., Monstrey, S. & Eyler, A. (Eds.) *Principles of Transgender Medicine and Surgery* (pp. 1-14). New York: Haworth.

Ettner, R., Ettner, F. & White, T. (2012). Secrecy and the pathophysiology of hypertension. *International Journal of Family Medicine*, 2012.

Ettner, R. Care of the elderly transgender patient. *Current Opinion in Endocrinology and Diabetes, 2013*, 20(6), 580-584.

Ettner, R. & Wylie, K. (2013) Psychological and social adjustment in older transsexual people. *Maturitas, 74(3),* 226–29.

Ettner, R. (2015). Etiopathogenetic hypothesis on transsexualism. In Trombetta, Luguori & Bertolotto (Eds.) *Management of Gender Identity Dysphoria: A Multidimensional Approach to Transsexualism* (pp. 47–54). Italy: Springer.

Ettner, R. (2016). Surgical treatments for the transgender population. In Eckstrand, K. & Ehrenfeld, J. (Eds.) *Lesbian, Gay, Bisexual and Transgender Health Care.* (pp. 363–77). New York: Springer.

Ettner, R. & Guillamon, A. (2016). Theories of the etiology of transgenderism. In Ettner R., Monstrey, S. & Coleman E. (Eds.). *Principles of Transgender Medicine and Surgery* (pp. 3–15)*. New York: Routledge.

Ettner, R., Monstrey, S., & Eyler, A. (Eds.) (2007). *Principles of Transgender Medicine and Surgery* (1st ed.)*. New York: Routledge.

Ettner, R. Monstrey S., & Coleman, E. (Eds.) (2017). *Principles of Transgender Medicine and Surgery* (2nd ed.). New York: Routledge.

Fernandez, R., Esteva, I., Gomez-Gil, E., Rumbo, T. *et al.* (2014b) The (CA) in polymorphism of ER*b* gene is associated with FtM transsexualism. *Journal of Sexual Medicine, 11(3),* 720–28.

Fernandez, R., Ramirez, K., Gomez-Gil, E. (2020)  Gender-affirming hormone therapy modifies the CpG methylation pattern of the ESR1 gene promoter after six months of treatment in transmen. *Journal of Sexu*al *Health,* 17(9):1795-1806.

Frost, D., Lehavot, K., & Meyer, I. (2015). Minority stress and physical health among sexual minority individuals. *Journal of Behavioral Medicine. Journal Behavioral Medicine, 38(1)*, 1–8.

Galis, F., Ten Broek, C., Van Dongen, S., *et al.* (2010). Sexual dimorphism in the prenatal digit ratio (2D:4D). *Archives of Sexual Behavior, 39(1),* 57–62.

Garcia-Falgueras, A. & Swaab, D (2008). A sex difference in the hypothalamic uncinate nucleus: relationship to gender identity. *Brain, 131(12),* 3132–46.

Garcia-Falgueras, A. & Swaab, D (2010). Sexual hormones and the brain: As essential alliance for sexual identity and sexual orientation. *Pediatric Neuroendocrinology, 17,* 22–35.

Garn, S., Bundi, A., Babler, W., *et al*. (1975). Early prenatal attainment of adult metacarpal-phalangeal rankings and proportions. *American Journal of Physical Anthropology, 43*, 327-32.

Giordano, S. (2018). Understanding  the emotion of shame in transgender individuals – some insight from Kafka. *Life Sciences, Society and Policy,* 14, 23.

Gijs, L., & Brewaeys, A. (2007). Surgical treatment of gender dysphoria in adults and adolescents: recent developments, effectiveness, and challenges. *Annual Review of Sex Research, 18(1),* 178–224.

Goffman, E. (1969). *The Presentation of Self in Everyday Life.* London: Allen Lane.

Gomez-Gil, E., Esteva, I., Almaraz, M,C. *et al.* (2010). Familiarity of gender identity disorder in non-twin siblings. *Archives of Sexual Behavior, 39(2),* 265–69.

Gomez-Gil, E., Zubiaurre-Elorza, L., Esteva, I., Guillamon, A. *et al.* (2012). Hormone-treated transsexuals report less social distress, anxiety and depression. *Psychoneuroendocrinology, 37(5),* 662–70.

Gooren, L.J. (2011). Care of transsexual persons. *New England Journal of Medicine, 364,* 1251–57.

Gorin-Lazard, A., Baumstark, K., Boyer, L., Maguigneau, A., *et al*. (2012). Is hormonal therapy associated with better quality of life in transsexuals? A cross-sectional study. *Journal of Sexual Medicine*, 9(2): 531-534.

 Green, A. *et al*. (2018).Self-reported conversion efforts and suicidality among US LGBTQ youths and young adults. *American Journal of Public Health*, 110: 1221-1227.

Green, R. (2000). Family co-occurrence of "gender dysphoria": Ten siblings or parent-child pairs. *Archives of Sexual Behavior, 29(5),* 499–507.

Greenberg, R. & Laurence, L. (1981). A comparison of MMPI results for psychiatric patients and male applicants for transsexual surgery. *Journal of Nervous and Mental Disease, 169(5),* 320–23.

Guillamon, A., Junque, C., & Gomez-Gil, E. (2016). A review of the status of brain structure research in transsexualism. *Archives of Sexual Behavior, 45(7)*, 1615–48.

Haas, A. *et al.* (2014). *Suicide Attempts among Transgender and Gender Non-Conforming Adults*, http://williamsinstitute.law.ucla.edu/wp-content/uploads/AFSP-Williams-Suicide-Report-Final.pdf.

Halim, M.L., & Ruble, D. (2010). Gender identity and stereotyping in early and middle childhood. In Chrisler, J.C. & McCreary, D.R. (Eds.), *Handbook of gender research in psychology* (Vol. 1, pp. 495–526). New York: Springer.

Hare, L., Bernard, P., Sanchez, F. *et al.* (2009). Androgen receptor length polymorphism associated with male-to-female transsexualism. *Biological Psychiatry, 65(1),* 93–96.

Hatzenbuehler, M., Bellatorre, A., Lee, Y., *et al.* (2014). Structural stigma and all-cause mortality in sexual minority populations. *Social Science & Medicine*, 103; 333-41.

Hembree, W., Cohen-Kettenis, P., et al. (2009). Endocrine Treatment of Transsexual Persons: An Endocrine Society Clinical Practice Guideline. Journal of Clinical Endocrinology and Management,  94, (9): 3132–3154.

Henningsson, S., Westberg, L, Nilsson, S. *et al.* (2005). Sex steroid-related genes and male-to-female transsexualism. *Psychoneuroendocrinology, 30(7),* 657–64.

Hepp U, Klaghofer R, Burkhard-Kubler R, Buddeberg C. (2002). Treatment follow-up of transsexual patients. A catamnestic study. *Nervenarzt.* 2002;73:283–288.

Hines, M. (2011). Gender development and the human brain. *Annual Review of Neuroscience 34*, 69-88.

Imbimbo, C., Verze, P., Palmieri, A., et al (2009). A report from a single institute's 14-year experience in treatment of male-to-female transsexuals. *Journal of Sexual Medicine*, 6, (10):2736–2745,

Jarolím, L., Šedý, J., Schmidt, M., Ondřej, N., Foltán, R., & Kawaciuk, I. (2009). Gender reassignment surgery in male-to-female transsexualism: A retrospective 3-month follow-up study with anatomical remarks. *Journal of Sexual Medicine, 6*, 1635–44.

Johansson, A., Sundbom, E., Ho¨jerback, E., et. al. (2009). A five-year follow-up study of Swedish adults with gender identity disorder. *Archives of Sexual Behavior*, DOI 10.1007/s10508-009-9551-1

Kuiper, A. J., & Cohen-Kettenis, P. T. (1998). Gender role reversal among postoperative transsexuals. *International Journal of Transgender-ism,* 2. Available at http://www.symposion.com/itj/itjc0502.htm.

Kerlin, S. (2004). The presence of gender dysphoria, transsexualism, and disorders of sex differentiation in males prenatally exposed to diethylstilbestrol: initial evidence from a 5-year study. DES Sons International network. TransAdvocate.org.

Klein, C. & Gorzalka, B. (2009). Sexual functioning in transsexuals following hormone therapy and genital Surgery: A Review. *Journal of Sexual Medicine* 6(11):2922-2939

Kruijver, F.P. *et al.* (2000), Male-to-female transsexual have female neuron numbers in a limbic nucleus. *Journal of Clinical Endocrinology & Metabolism, 5(1),* 2034–41.

Landen, M. *et al.* (2001). Done is done – and gone is gone: Sex reassignment surgery is presently the best cure for transsexuals. *Lakartidningen*, 98(30-31), 3322–26.

Landen, M. et al. (2011). Long-term follow-up of transsexual persons undergoing sex reassignment surgery: cohort study in Sweden. *PloS One, 6(2):* e16885.

Lane, M., Graham, C., Sluiter, E., et al. (2018). Trends in gender-affirming surgery in insured patients in the United States. *Plastic and Reconstructive Surgery*, 6(4).

Lawrence, A. (2003). Factors associated with satisfaction or regret following male-to-female sex reassignment surgery. *Archives of Sexual Behavior, 32(4),* 299–315.

Lobato, M., Koff, W, Manenti, C., Seger, D. *et al.* (2006). A follow-up of sex reassignment surgery in transsexuals: A Brazilian cohort. *Archives of Sexual Behavior, 35(6),* 711–15.

Longo, M., Azanon, E. & Haggard, P. (2010). More than skin deep: Body representation beyond primary somatosensory cortex. *Neuropsychologia, 48(3),* 665–68.

Luders, E., Narr, K., Thompson, P., Rex, D. *et al.* (2006). Gender effects on cortical thickness and the influence of scaling. *Human Brain Mapping, 27(4)*, 314–24.

Majid, D. S. A. *et al.* (2020). Neural systems for own-body processing align with gender identity rather than birth-assigned sex. *Cerebral Cortex,* 30, 2897–2909.

Mak, J. et al (2020). Suicide attempts among a cohort of transgender and gender diverse people. *American Journal of Preventative Medicine,* 59, (4):469-620.

Manning, J., Fink, B. Neave. N. *et al.* (1998). The ratio of 2nd to 4th digit length, a predictor of sperm numbers and concentrations of testosterone, luteinizing hormone and oestrogen. *Human Reproduction, 13*, 3000-04.

Marique, O., Odabi, K., Martinez-Jorge, J., Ciudad, P., *et al*. (2018) Complications and patient-reported outcomes in male-to-female vaginoplasty-where we are today:  A systematic review and meta-analysis. *Annals of Plastic Surgery 80(6)*: 684-91.

Miranda, R., Scott, M., Hicks, R., Wilcox, H., Munfakh, J.L.H., & Shaffer, D. (2008). Suicide attempt characteristics, diagnoses, and future attempts: Comparing multiple attempters to single attempters and ideators. *Journal of the American Academy of Child and Adolescent Psychiatry, 47(1)*, 32–40.

Monstrey, S., Selvaggi, G. & Ceulemans, P. (2007). Surgery: male-to-female patients in Ettner, R., Monstrey, S., & Eyler, A. (Eds.) (2007). *Principles of Transgender Medicine and Surgery* (1st ed.)*.* New York: Routledge.

Mora, JJ., Guillamon, A., & Pasaro, E. (2014a). Association study of *ERb*, *AR*, and *CYP19A1* genes and MtF transsexualism. *Journal of Sexual Medicine, 11(12),* 2986–94.

Narayan, S., Danker, S., Esmonde, N., et al. (2021). Guiding the conversation: types of regret after gender-affirming surgery and the associated etiologies. *Annals of Translational Medicine,* 9(6):605.

Nuttbrock, L, Rosenblum, A. & Blumenstein, R. (2002). Transgender identity affirmation and mental health. *International Journal of Transgenderism, 6(4).*

Phelps, V. (1952). Relative index finger as a sex-influenced trait in man. *American Journal of Human Genetics, 4*, 72-89.

Pfäfflin, F., & Junge, A. (1998). Sex reassignment: Thirty years of international follow-up studies after sex reassignment surgery, a comprehensive review, 1961–1991 (Jacobson, R., & Meier, A., Trans.). Retrieved from http://www.symposion.com/ijt/pfaefflin/1000.htm (Original work published 1992).

Rehman, J., Lazar, S., Benet, A., Schaefer, L, & Melman, A. (1999). The reported sex and surgery satisfaction of 20 postoperative male-to female transsexual patients. *Archives of Sexual Behavior, 28(1),* 71–89.

Rametti, G., Carillo, B., Gomez-Gil, E., Junque, C. *et al.* (2011) White matter microstructure in female to male transsexuals before cross-sex hormonal treatment: A diffusion tensor imaging study. *Journal of Psychiatric Research, 45(2),* 199–204.

Rametti, G. *et al.* (2011). The microstructure of white matter in male to female transsexuals before cross-sex hormonal treatment: A DTI study, *Journal Psychiatric Research, 45(7),* 949–54.

Rodriguez, M. Granada, M. & Gonzalez, V. (2018). Gender incongruence is no longer a mental disorder, *Jorunal of Mental Health and Clinical Psychology*, 2(5):6-8.

Ruble, D., Taylor, L., Cyphers, L., Greulich, F., Lurye, L., Shrout, P. (2007). The role of gender constancy in early gender development. *Child Development 78(4),* 1121-1136.

Salim, A. & Poh, M. (2018). Gender-affirming penile inversion vaginoplasty. Clinics in Plastic Surgery, 45:343-350.

Savic, I. & Arver, S. (2011). Sex dimorphism of the brain in male-to-female transsexuals. *Cerebral Cortex, 23(11),* 2855–62.

Schneider, H., Pickel, J., Stalla, G. (2006). Typical female 2nd-4th finger length (2D:4D) ratios in male-to-female transsexuals-possible implications for prenatal androgen exposure. *Psychoneuroendocrinology, 31(2),* 265–69.

Seelman, K. (2016). Transgender adults' access to college bathrooms and housing and the relationship to suicidality. *Social Work Faculty Publications*, 64.

Sevelius, J. (2013). Gender affirmation: A framework for conceptualizing risk behavior among transgender women of color. *Sex Roles*, 68(11-12): 675-689.

Shaw, P., Kabani, N., Lerch, J. Eckstrand, K. *et al.* (2008). Neurodevelopmental trajectories of the human cerebral cortex. *Journal of Neuroscience, 28(14)*: 3586–94.

Singh, A., Hays, D. & Watson, L.S. (2011). Strengths in the face of adversity: Resilience strategies of transgender individuals. *Journal of Counseling and Development, 89(1)*, 20–27.

Smith, Y., van Goozen, S., Kuiper, A., & Cohen-Kettenis, P. (2005). Sex reassignment: Outcomes and predictors of treatment for adolescents and adult transsexuals. *Psychological Medicine, 35(1)*, 8999.

Steensma, T., Biemond, R., de Boer, F. & Cohen-Kettenis, P. (2011). Desisting and persisting gender dysphoria after childhood: a qualitative follow-up study. *Clinical Child Psychology and Psychiatry 16(4*), 499-516.

Steensma, T., McGuire, J., Kreukels, B., Beekman, A. & Cohen-Kettenis, P. (2013). Factors associated with desistance and persistence of childhood gender dysphoria: a quantitative follow-up study. *Journal of American Academy of Child and Adolescent Psychiatry 52(6)*, 582-590.

Steensma, T., van der Ende, J. Verhulst, F. & Cohen-Kettenis, P. (2013). Gender variance in childhood and sexual orientation in adulthood: A prospective study. *Journal of Sexual Medicine 10(11*), 2723-2733.

Taziaux, M., Swaab, D., Bakker, J. (2012). Sex differences in the neurokin B system in the human infundibular nucleus. *Journal of Clinical Endocrinology and Metabolism*, *97(12),* 2010–20.

Turban JL, Beckwith N, Reisner SL, Keuroghlian AS. (2020). Association between recalled exposure to gender identity conversion efforts and psychological distress and suicide attempts among transgender adults. *JAMA Psychiatry,* 7(1):68-76.

Uribe, C., Junque, C. Gomez-Gil, *et al.* (2020).Brain network interactions in transgender individuals with gender incongruence. *Neuroimage*, 1:(211).

Uribe, C., Junque, C., Gómez-Gil, E. *et al.* Brain connectivity dynamics in cisgender and transmen people with gender incongruence before gender affirmative hormone treatment. *Scientific Reports* 11**,** 21036 (2021). https://doi.org/10.1038/s41598-021-00508-y

Verbeek, M., Hommes, M., Stutterheim, S. et al. (2020). Experiences with stigmatization among transgender individuals after transition: A qualitative study in the Netherlands. *International Journal of Transgender Health*, 21:2, 220-223.

Vujovic S, Popovic S, Sbutega-Milosevic G, Djordjevic M, Gooren L. (2009).Transsexualism in Serbia: a twenty-year follow-up study. *Journal of Sexual Medicine,* 6:1018–1023.

Weinforth, G., Fakin, R., Giovanoli, P. et al. (2019). Quality of life following male-to-female sex reassignment Surgery. *Deutsches Arzteblatt* 116(15): 253–260.

Wiepjes C., Nota N., de Blok C, et al. (2018) The Amsterdam cohort of gender dysphoria study: Trends in prevalence, treatment, and regrets. *Journal of Sexual Medicine 15*:582-90.

Weyers, S. *et al.* (2009). Long-term assessments of the physical, mental and sexual health among transsexual women. *Journal of Sexual Medicine*, 6(3), 752–-60.

World Health Organization. (1992). International Classification of Diseases (10th ed.).

World Professional Association for Transgender Health, Inc. (2008). WPATH clarification on medical necessity of treatment, sex reassignment, and insurance coverage U.S.A., http://www.wpath.org/documents/Med%20Nec%20on%202008%20Letterhead.pdf

Zeluf, G., Dhejne, C., Orre, C., et al. (2916). Health, disability and quality of life among trans people in Sweden–a web-based survey. *BMC Public Health* 16.

Zhou, J., Hofman, M., Gooren, L. *et al.* (1995). A sex difference in the human brain and its relation to transsexuality. *Nature, 378,* 68–70.

Zubiaurre-Elorza, L., Junque, C., Gomez-Gil, E., Segovia, S., Carrillo, B., Rametti, G. & Guillamon, A. (2013). Cortical thickness in untreated transsexuals. *Cerebral Cortex 23*, 2855-62.

Zubiaurre-Elorza, L., Junque, C., Gomez-Gil, E., Segovia, S., Carrillo, B., Rametti, G. & Guillamon, A. (2013). Cortical thickness in untreated transsexuals. *Cerebral Cortex 23,* 2855-62.

Zubiaurre-Elorza, L., Junque, C., Gomez-Gil, E. & Guillamon, A. (2014). Effects of cross-sex hormone treatment on cortical thickness in transsexual individuals. *Journal of Sexual Medicine, 11(5),* 1248–61.

# APPENDIX D

# North Carolina Department of Public Safety
## Mental Health Assessment

| Offender Name: | ▉▉▉▉ | | Off #: | 0618705 |
|---|---|---|---|---|
| Date of Birth: | ▉▉▉/1981 | Sex: | M | Facility: CRAV |
| Date: | 10/13/2017 09:30 | Provider: | Garvey, Susan C M.A. Staff | |

### Treatment Setting

Outpatient Program at CRAVEN CI.

### Referral

Nursing

### Violence Alerts

There are no elevated risk factors presently noted for inmate CHESTNUT.

### Escape Alerts

There are no elevated risk factors presently noted for inmate CHESTNUT.

### Self-Injury Alerts

There are no elevated risk factors presently noted for inmate CHESTNUT.

### Current Problems

Inmate ▉▉▉▉ is a 36 year old, African American male who reports he identifies as transgender, male to female. He reports he has undergone breast augmentation, hormone replacement therapy, and an orchiectomy (removal of testicles). He reports he had the orchiectomy on August 25, 2017. He reports prior to beginning the surgeries for transformation, he participated in counseling at UNC Chapel Hill School of Psychiatry.

Inmate ▉▉▉▉ reports he was around the age of 17 when he "came out" as gay. He states "I lived a gay lifestyle until I was 29." He reports it has been within the last 5 years he has begun his transition to becoming a female. When asked about how he saw himself as a child, he replies "I acted boyish but presented as feminine. I was confused. I fought a lot." He then states "I always had an inclination to change."

Inmate ▉▉▉▉ reports he legally changed his name to Kanautica Zayre in 2011, through Wake County. He states he would like to be referred to by his legal name while incarcerated instead of the name he provided at the time of his arrest. He reports in December 2012, he began seeing a psychologist through UNC Healthcare, so he could be approved to begin his transition to becoming a woman. He reports after eight months in counseling, he was approved to begin having surgeries and to receive hormones. He states he began hormones prior to surgeries which include estrogen, progestin, and spermalactin (blocks testosterone and is described is required pre-castration). Prior to his orchiectomy, he reports he was seen again by his psychologist at UNC Healthcare, for approval and/or clearance to undergo this surgery. He states he was given two letters by his psychologist stating he was ready to have these surgeries completed. He reports his psychologist's name was Neffateria Hans.

Inmate ▉▉▉▉ reports he began having surgery in May 2017 with a Brazilian Butt Lift. He reports in October 2013, he had breast implant surgery. He reports his third surgery involved a facial fat transfer in which fat was transferred to his forehead jaw, chin, and cheeks. He reports this process also concealed his Adam's Apple. He notes this surgery, as well as a surgery to feminize his ear lobes, were completed in July 2017. He reports just prior to being incarcerated, he had an orchiectomy, in which his testicles were removed. He notes his last surgery is to have a vagioplasty. He reports he has spent approximately $57,000 on surgeries.

Inmate ▉▉▉▉ reports he feels more like a woman with each surgery, which he notes is comforting to him. When asked how he would describe himself to others, he replies "A breath of fresh air. I always try to smile."

### History

Inmate ▉▉▉▉ reports his mother was 13 years old when she gave birth to him so he was primarily raised by his maternal grandparents, ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ He states after this occurred, he often ran away from home to avoid any further abuse. He reports after he first ran away, he was placed in the Kennedy Home for two years. He states shortly after he returned home, he ran away again, and then was sent to Samarkand for a few months and then was transferred to Eckerd Youth Camp. He reports he returned home after he completed the youth camp. He states shortly after he returned home, he stole his teacher's car. He reports he did not receive any charges but was sent to Dobbs Training

1

School for four months. He reports after he returned to his grandparents after being released from Dobbs, he was sent to live with his mother in Raleigh. He reports his mother then "disappeared" and he returned to his grandparents. He reports at this point, his grandparent were told if they did not legally adopt him, he would be placed in a foster home. He states despite being adopted, he was sent back to the Kennedy Home. He reports he was sent back to his grandparents after being sexually harassed while at the Kennedy Home.

Inmate       states his mother is gay and describes her as a "stud." He reports she recently passed away from breast cancer. He reports his mother was hospitalized once after an unsuccessful suicide attempt.

Inmate       reports he has been with his spouse, Dionne Brown, since August 2011. He reports he and his spouse were married shortly after the court ruling on same sex marriages, on October 24, 2014. He notes since he began having surgeries to change his body, he and his spouse have "grown apart." He reports his spouse believes he is changing too fast. Inmate Chestnut reports the rapidness of his changes have boosted his self-esteem.

Inmate       reports he completed the 11th grade and then did not return to school to graduate. He denies being held back any grades. He reports he was in honor's classes and part of the school's Honor's Society. He reports a history of suspension for fighting. He denies any history of expulsion. He indicates continuing his education in 2004 through Mayland Community College in Spruce Pines, NC. He reports from 2005 through 2009, he took courses through University of North Carolina and earned an Associate's Degree in Sociology. He reports he began working on his Bachelor's of Social Work while incarcerated at Avery-Mitchell CI. He reports he completed his Bachelor's of Social Work after his release, through an online program with Michigan State University in 2013.

Inmate       reports from 2009 through 2013, he worked began as a direct care employee and moved to a Qualified Professional for Supreme Love Inc, group homes owned by a family member. He reports from 2013 through 2016, he worked as a Program Supervisor for Holly Hill Hospital. He reports he was an instructor for NCI and CPI. He reports he also worked part time for the Autism Society during this period. He reports from 2016 through September 2017, he worked "nightlife and dancing" at "exotic" strip clubs.

Inmate       denies any significant medical conditions at this time. Please refer to medical encounters regarding recent medical diagnoses. He denies any significant history of head injury. He reports a family history of hypertension and cancer.

Inmate       denies any mental health treatment history outside of what is required for a transgender individual to have treatments or surgeries. He denies any history of inpatient mental health treatment. He denies any history of taking psychotropic medications. He denies any history of engaging in self-injurious or suicidal behavior.

Inmate       reports a history of alcohol and marijuana use. He states his last use was approximately four years ago. He denies any history of substance abuse treatment.

Inmate       is currently serving a 7 year, 5 month to 9 year, 11 month sentence for charges of Habitual Felon, Obtaining Property by False Pretense, and Insurance Fraud. Per OPUS, he has 125 days of jail credit towards his sentence. Per OPUS, his projected release date is currently unaudited.

### Interview/MSE

Inmate       was informed of the limits of confidentiality as they pertain to the state prison system. He is appropriately dressed in prison attire and demonstrates proper personal hygiene. Alert and oriented in all spheres. Inmate denies current or recent suicidal or homicidal ideation or intent. He denies any current or recent self-injurious behaviors or destructive ideations. Inmate       did not present with any paranoid or delusional ideation. His speech was normal in rate and volume. No flight of ideas, loose associations, or pressure was noted. Mood and affect are unremarkable.

### Assessment

According to the DSM-V, inmate       meets the criteria for a diagnosis of Gender Dysphoria in Adolescents and Adults (302.85) based on the following markers...

Inmate        has expressed an interest in openly living as a female since the age of 29. He notes the incongruence between his expressed gender and primary and/or secondary sex characteristics are of significant distress to him, especially given he has one more surgery to complete his full transition to becoming a female. He reports he has undergone several treatments and surgeries already to have his male primary and secondary characteristics changed to meet his expressed gender.

**Diagnosis**

302.85   Gender Dysphoria in Adolescents and Adults

**Plan**

Per Health Services policy (TX I-13), a multidisciplinary treatment team will be formed and will interview inmate and review all available records. This will occur at his receiving facility. Once this psychologist is aware of the unit he will transfer, they will be informed of the need to bring together a treatment team. The treatment team will develop an individualized treatment plan. The mental health assessment and psychiatric assessment will be made available to the treatment team to the extent necessary for treatment decisions and recommendations.

**Diagnosis:**

Gender Dysphoria in Adolescents and Adults, 302.85 - Current, Chronic, Initial

**Schedule:**

| Activity | Date Scheduled | Scheduled Provider |
|---|---|---|
| Mental Health Progress Note F/U | 11/10/2017 00:00 | Garvey, Susan C Staff Psychologist |

| | | |
|---|---|---|
| **Co-Pay Required:** | No | **Cosign Required:** No |
| **Telephone/Verbal Order:** | No | |
| **Standing Order:** | No | |

Completed by Garvey, Susan C M.A. Staff Psychologist on 11/01/2017 10:37
Requested to be reviewed by Peiper, Lewis J Ph.D Asst. Dir. of Beh. Health.
Review documentation will be displayed on the following page.


Roy Cooper, Governor
Erik A. Hooks, Secretary

W. David Guice, Commissioner
George T. Solomon, Director

## GENDER DYSPHORIA TREATMENT PLAN

**Inmate:**
**OPUS #:** 0618705
**DOB:** /1981 (age 36)
**Facility:** Harnett Correctional Institute, 3805

**Review Panel Date:** 11/27/2017
**Review Panel Members:**
Joseph Umesi, MD, primary care provider who completed physical examination
Phillip Graham, Predoctoral Intern, inmate's assigned clinician under the supervision of:
Marcia L. Brumbaugh, PhD, Psychological Program Manager
Tammy Black, RN, Nursing Supervisor
Melanie Shelton, Assistant Superintendent of Programs

The panel interviewed inmate          on the above date and reviewed relevant records, including the 10/18/2017 Psychiatric Evaluation by Dr. Hamra; the 10/12/2017 History and Physical records by Dr. Engleman; and the 10/13/2017 Mental Health Assessment by Ms. Garvey (all are attached).

**Diagnosis:** 302.85 (F64.1) Gender Dysphoria in Adolescents and Adults

**Accommodations Requested:** Inmate          requested the following accommodations during his panel interview:
-Privacy during showers, with a request to shower during count time if possible. He also requested that not as many staff be present during his showers. (He was informed that these requests are consistent with the facility SOP, which will be followed henceforth.)
-That he receive mail under his alias name Kanuatica Zayre. (He reports that he legally changed his name in 2011; community records scanned into HERO confirmed this alias.)
-He requested that records that contain his aforementioned alias be included with his recognized name (          ) in the NCDPS system.
-Inmate requested documents to have his name legally changed, noted and included in the NCPDS system with a badge to reflect his name change. (He was informed of how to complete the process.)
-He inquired about why his UR request for hormones treatment was cancelled. (Inmate was informed that policy only allows for continuation of hormone treatment that was active immediately prior to incarceration, which records verify is not the case for this inmate, and so he does not meet criteria for pursing UR approval during processing. He was further informed that the purpose of the current meeting is to seek approval for endocrinologist consultation.)



**MAILING ADDRESS:**
Post Office Box 1569
Lillington, N.C. 27546
COURIER: 14-70-02
www.ncdps.gov

**OFFICE LOCATION:**
Harnett Correctional Institution, #3805
1210 E. McNeill Street
Lillington, N.C. 27546
Telephone: (910) 893-2751
Fax: (910) 893-6432

- Bras (Please note that he currently has 5 bras but reported that he has "gained weight" and requires bras to accommodate the changes in his body. He was informed that he would need to have his measurements updated and placed on the list for the next clothing shipment.)
-Inmate requested the grooming and hygiene policy for women. (Inmate was informed that panel members are not aware of such gender specific polices but will check.)
-Inmate inquired about how to move forward with completing his gender reassignment surgery. He inquired if it would be possible. (Dr. Umesi informed the inmate that he will need to follow up and let him know at a later date.)

**Psychiatric Referral:** Not indicated, as inmate ███████ was already seen in Psychiatry Clinic, most recently by Dr. Badri Hamra for a Psychiatric Evaluation. Neither psychiatric medication nor psychiatry appointments were indicated.

**Other Appropriate Referrals:** The panel recommends referring inmate ██████ to Endocrinology for consideration of cross-sex hormone treatment. Inmate stated his goal is to have a "more feminine appearance," and he inquired if the "State" will follow up with his request to continue with gender reassignment surgery.

**Education Resources to Make Available:** None. Inmate reports being familiar with the process due to having done "extensive research."

**Management Recommendations:** The panel recommends housing inmate ██████ in a single cell environment. This recommendation was made in consideration for the well-being of the inmate's safety due to his vulnerable status as a trans-female housed in a male facility.

Submitted by:

*Phillip Graham*                    7/28/2017
Phillip Graham, B.A.                    Date
Predoctoral Intern, Harnett Correctional Institute
*M.B. PhD*                    11/28/17
Marcia L. Brumbaugh, PhD            Date
Psychological Program Manager, Harnett Correctional Institute


cc: Central Office Transgender Review Committee, Facility Review Panel and Administrators
Ms. Tammy Black, Nurse Manager, Harnett Correctional Institute
Ms. Terri Catlett, Health Services Deputy Director
Mr. Jamie Cobb, Assistant Superintendent of Custody, Harnett Correctional Institute
Dr. Patricia Hahn, Assistant Director of Behavioral Health, Triangle Region
Dr. Bryan Harrelson, Acting Chief of Psychiatry
Dr. Gary Junker, Director of Behavioral Health
Ms. Melanie Shelton, Assistant Superintendent of Programs, Harnett Correctional Institute
Dr. Paula Smith, Director of Health Services
Ms. Cynthia Thornton, Correctional Administrator I, Harnett Correctional Institute
Dr. Joseph Umesi, Physician

# North Carolina Department of Public Safety
## Self-Injury Risk Assessment

| Offender Name: █████ | | | | Off #: 0618705 |
|---|---|---|---|---|
| Date of Birth: █████ 1981 | Sex: F | Facility: ANSO | | |
| Date: 12/11/2020 11:20 | Provider: Hahn, Patricia M Ph.D Asst. Dir. of Beh. Health | | | |

**Type of Housing:** Restrictive Housing

### FINDINGS

This assessment and the resulting recommendations are based on the following sources of information:
Clinical Interview

#### Reason for Referral

Ms. █████ has experienced a worsening of Gender Dysphoria due to recent events and currently expressed self-injurious and suicidal ideation.

#### Treatment Setting

Outpatient Program at Anson CI.

#### Current Self-Injurious Behaviors

Ms. █████ indicated she has thoughts of "ripping the skin off my pee-pee."

#### Current Plan to Self-Injure

Ms. █████ currently has no plan to self-injure but is having very frequent thoughts of self-mutilation.

#### Current Suicidal Ideation

Ms. █████ stated she wants to be given a medication that will "put me to sleep and keep me asleep." When asked for clarification, she stated "I don't want to die but I feel like it is the best thing for me."

#### Current Suicidal Intent

Ms. █████ does not have a current plan to kill herself.

#### Current Mental Status

**Level of Consciousness:** Alert and Oriented

**Psychomotor Activity:** Normal

**General Appearance:** Normal

**Behavior:** Cooperative

**Mood:** Sad/depressed

**Thought Process:** Appropriate

**Thought Content:** Other

### RISK AND PROTECTIVE FACTORS ASSESSED:

This writer screened the offender for a variety of empirically validated factors commonly associated with risk for self-harm.

The following **STATIC** risk factors were assessed to be present and may increase the inmate's risk for engaging in suicide related behaviors: Chronic Medical Condition, Family history of inpatient psychiatric treatment, Family history of suicide attempt, History of childhood abuse (physical or sexual), History of mental illness, History of self-injurious behavior

The following **DYNAMIC** risk factors were assessed to be present and may increase the inmate's risk for engaging in suicide related behaviors: Anxiety/Panic, Current suicidal ideation, Fear for own safety, Feeling hopeless/helpless, Feeling like a burden to others, Inability to feel pleasure, Sleep problems, Social isolation, Uncontrolled mental health symptoms

The following **PROTECTIVE** factors were assessed to be present and may decrease the inmate's risk of suicide: Able to cope with stress, Able to identify reasons to live, Adequate problem solving skills, Future orientation, Responsibility to loved ones/children, Supportive family relationships, Willingness to engage in treatment

Ms. █████ has had an increase in symptoms of Gender Dysphoria since August, which have been addressed in therapy but not yet with medication because she was trying to stay off medication. She has had increasing problems coping with institution issues and on November 23 got in an altercation with another offender who implied Ms. █████ still had a penis – one of her greatest current fears is that someone will find out she still has part of a penis so it is an extremely emotionally arousing issue

for her. Since that time, Ms. ███████ symptoms of depression have significantly increased, and she has had thoughts of ripping the skin of her penis and thinks she may be better off dead.

## RECOMMENDATIONS

**Suicide Watch:** Place on Self-Injury Precautions.

Completed by Hahn, Patricia M Ph.D Asst. Dir. of Beh. Health on 12/11/2020 14:19

## North Carolina Department of Public Safety
## Mental Health Progress Note

| | | | | | |
|---|---|---|---|---|---|
| Offender Name: | ██████ | | | Off #: | 0618705 |
| Date of Birth: | █/1981 | Sex: | F | Facility: ANSO | |
| Date: | 02/19/2021 11:05 | Provider: | Hahn, Patricia M Ph.D Asst. Dir. | | |

### Treatment Setting
Outpatient Program at Anson CI.

### Reason for Services
Routine Follow-Up Session

### Violence Alerts
Ms. ████ denied any current thoughts of wanting to harm others.

### Escape Alerts
None currently noted.

### Self-Injury Alerts
Ms. ████ denied any current thoughts or plans of wanting to harm herself; however, at times she does have thoughts of self-mutilation to get rid of the remaining part of her penis.

### MSE/Behavioral Observations
Ms. ████ presented as a polite 39 year old Black -American female who appeared approximately her stated age. She was pleasant and cooperative during the therapy session. She displayed good eye contact and had no significant psychomotor agitation or retardation. Her speech was of normal rate, rhythm and volume. She was oriented to person, place, and time. Her attention and immediate memory appeared within normal limits. Her affect was somewhat dysphoric, ands he described her mood as "I don't know . . . I'm dull." She denied current suicidal or homicidal ideation. She did not currently show active symptoms of psychosis or a thought disorder. Her judgment and insight were at least fair.

### Progress Towards Goal(s)
Ms. ████ s main issue continues to be that her consult appointment with the urologist has not yet been scheduled. The barriers to this scheduling were discussed but it was unclear what has actually happened since there were some discrepancies between what each of us have been told. The main discrepancy is that it is unclear whether Ms. ████ is supposed to have her consult first or whether she is supposed to wait for her vaginoplasty to be approved by DPS. Ms. ████ stated one of her DTARC forms said Dr. Junker and Deputy Commissioner Harris agree with the disapproval of the vaginoplasty until the surgery consult was completed but HERO would not open the DTARC notes so this could not be immediately confirmed (and the undersigned wanted to finish her note). The undersigned will try to update Dr. Peiper before the 2/25/21 DTARC meeting. Ms. ████ would like the following to be considered: 1) she wants her UR approved urology consult, 2) she would like to have an endocrinologist appointment since she has not had one in eight months, and 3) she would like to be considered for compassionate release or ECL. Ms. ████ stated thoughts of self-mutilation are sometimes on her mind due to her gender dysphoria and not receiving her urology consult despite DTARC and UR approval. She expressed worry because she feels she is increasingly impulsive and her coping mechanisms have not been helping. Therapy focused on examining how the current generation is changing how transgender/non-binary issues are being addressed as to body image. Ms. ████ acknowledged that some transgender individuals she has met are not as focused on changing their physical characteristics and stated "I think I tried that but I don't think it's possible."

Ms. ████ t indicated her Zoloft did not seem to be working as well, and the undersigned indicated she would ask Mr. Messer about psychiatry clinic. The referral process was also discussed, especially given her concern that she has been "super-impulsive" lately. Ms. ████ and the undersigned briefly discussed the idea of trying to meet with the offender regarding the incident but it was decided that was not a good idea because the woman may have contacted lawyers.

### Plan/Diagnostic Changes
Ms. ████ has improved since her NCCIW admission but continues to be dysphoric.

### Follow-up/Next Appointment
Ms. ████ will be seen for her next individual therapy appointment in the next 30 to 45 days, if not sooner. She knows to submit a referral if she needs to be seen sooner.

Generated 02/19/2021 13:17 by Hahn, Patricia M Ph.D Asst.     NCDPS - ANSO     Page 1 of 2

8

**Co-Pay Required:**     No     **Cosign Required:** No

**Telephone/Verbal Order:**   No

**Standing Order:**       No

Completed by Hahn, Patricia M Ph.D Asst. Dir. of Beh. Health on 02/19/2021 13:17

Generated 02/19/2021 13:17 by Hahn, Patricia M Ph.D Asst.     NCDPS – ANSO     Page 2 of 2

9

# North Carolina Department of Public Safety
## Mental Health Progress Note

| | | | | | |
|---|---|---|---|---|---|
| Offender Name: | [redacted] | | | Off #: | 0618705 |
| Date of Birth: | [redacted]1981 | Sex: | F | Facility: | ANSO |
| Date: | 04/28/2021 10:30 | Provider: | Hahn, Patricia M Ph.D Asst. Dir. | | |

**Treatment Setting**

Outpatient Program at Anson CI.

**Reason for Services**

Routine Follow-Up Session

**Violence Alerts**

Ms. [redacted] denied any current thoughts of wanting to harm others.

**Escape Alerts**

None currently noted.

**Self-Injury Alerts**

At the end of the session, Ms. [redacted] denied any current thoughts of wanting to harm herself. As a protest, however, at the beginning of the session she had a band tied around her penis because she had not yet had her urology appointment at UNC. During the session, the undersigned called Ms. Catlett to get an update, and Ms. Catlett has been working with UNC to get everything set up so that Ms. [redacted] can have her appointment. (It involves IT and getting credentialed to use WebEx so can take time.) Ms. [redacted] was satisfied with this response and asked to be excused to remove the band from her penis, which she said she did.

**MSE/Behavioral Observations**

Ms. [redacted] presented as a polite 39 year old Black-American female who appeared approximately her stated age. She was pleasant and cooperative during the therapy session. She displayed good eye contact and had no significant psychomotor agitation or retardation. Her speech was of normal rate, rhythm and volume. She was oriented to person, place, and time. Her attention and immediate memory appeared within normal limits. She appeared initially dysphoric but after hearing some progress was being made on her appointment, her affect brightened. At the end of the session she described her mood as "mediocre." She denied current suicidal (see above) or homicidal ideation. She did not currently show active symptoms of psychosis or a thought disorder. Her judgment and insight are slightly impaired.

**Progress Towards Goal(s)**

Ms.[redacted] expressed many concerns about not having her appointment with the UNC-CH urologist scheduled yet. She gave a number of examples of how this is increasing her dysphoria, and she decided to put a band on her penis until her appointment is scheduled. She said she has had the band on for a week and a half. She was cautioned about the effects of impeding blood flow and risk of infection. As described above, the undersigned spoke with Ms. Catlett, and she was able to convey to Ms. [redacted] how Ms. Catlett has been on top of it and has worked hard to facilitate this appointment. Ms. [redacted] then agreed to take the band off her penis.

The rest of the session addressed her specific concerns about having part of a penis left and what defines a woman. She explained it does not bother her if she is called fat or ugly but stated if she is called a man "there is no tool in the [psychology] toolbox to manage that." She stated "I can't live with this any more," and said the situation was acute now and not chronic. She also stated she is not complete now and that "I'm ready to be complete."

**Plan/Diagnostic Changes**

Ms. [redacted] has increased dysphoric mood but her mood improved when she was provided information that she should have her appointment with the Program Manager of the UNC Transgender Health Program within the next week or the week after. The undersigned will follow-up next Thursday on the progress of this appointment.

**Follow-up/Next Appointment**

Ms. [redacted] will be seen for her next individual therapy appointment in the next 30 to 45 days. She knows to submit a referral if she needs to be seen by an Anson facility psychologist before then.

**Co-Pay Required:** No **Cosign Required:** No

**Telephone/Verbal Order:** No

**Standing Order:** No

Completed by Hahn, Patricia M Ph.D Asst. Dir. of Beh. Health on 04/28/2021 12:29

Generated 04/28/2021 12:29 by Hahn, Patricia M Ph.D Asst.          NCDPS - ANSO          Page 2 of 2

11

## North Carolina Department of Public Safety
## Mental Health Progress Note

| | | | | | |
|---|---|---|---|---|---|
| Offender Name: | ████████ | | | Off #: | 0618705 |
| Date of Birth: | 1981 | Sex: | F | Facility: | ANSO |
| Date: | 09/16/2021 14:10 | Provider: | O'Halloran, Maureen C MSW | | |

### Treatment Setting

Outpatient Program at Anson CI; Offender ████████ will be referred to as Ms. Brown in the remainder of this document.

### Reason for Services

Crisis Intervention

### Violence Alerts

There are no elevated risk factors presently noted for offender Brown.

### Escape Alerts

There are no elevated risk factors presently noted for offender Brown.

### Self-Injury Alerts

Ms. Brown currently denied suicidal ideation and thoughts of self-injurious behavior, both intent and plan.

### MSE/Behavioral Observations

Ms. Brown's mood appeared mildly dysphoric, and her affect was appropriate to content. She was neatly groomed, wearing prison-issued attire, makeup, and a face mask. She was tearful when discussing news that she had been denied gender-affirming surgery. She made comfortable eye contact. Her speech was relevant and goal directed. Her psychomotor activity was somewhat elevated. There was no overt evidence of psychotic or delusional thought processes. Her judgment and impulse control appeared adequate at this time. Ms. Brown voiced complaints regarding feeling emotionally overwhelmed. She appeared to be undergoing situational distress today regarding her medical treatment.

### Progress Towards Goal(s)

Progress was not assessed as this was the first encounter with the offender. Ms. Brown reported that she learned that she was denied surgery earlier this week. She stated that she felt emotionally overwhelmed as she has been advocating for this procedure for four years now. She discussed losing weight in order to meet criteria for the procedure. Supportive psychotherapy was provided as Ms. Brown discussed her frustrations and concerns. She denied any suicidal thoughts, plans, or intent. She admitted that she had briefly considered putting a rubber band around her phallus as a means of forcing surgical intervention. The writer explained that Ms. Brown would only undermine her chances for gender-affirming surgery if she was considered to be emotionally unstable for treatment. She acknowledged understanding.

She also reported that she has been eating approximately 700 calories per day and drinking 10 20-ounce bottles of water per day. We discussed a more balanced approach to meeting her nutritional needs. She was open to the writer's suggestions, and reported she would work on eating more. She appeared calmer by the session's conclusion.

### Plan/Diagnostic Changes

There are no changes to report at this time. Continue treatment as specified.

### Follow-up/Next Appointment

Follow up as previously scheduled with primary therapist.

| | | | |
|---|---|---|---|
| **Co-Pay Required:** | No | **Cosign Required:** No | |
| **Telephone/Verbal Order:** | No | | |
| **Standing Order:** | No | | |

Completed by O'Halloran, Maureen C MSW Clinical Social Worker on 09/16/2021 15:40

## North Carolina Department of Public Safety
## Psychiatric Progress Note

| | | | | |
|---|---|---|---|---|
| Offender Name: | | | Off #: | 0618705 |
| Date of Birth: | /1981 | Sex: | F | Facility: ANSO |
| Date: | 10/27/2021 09:16 | Provider: | Younus, Syeda R MD | |

### Treatment Setting

Outpatient Program at Anson CI.

### Violence Alerts

There is no apparent, current, significant risk of violence noted for inmate .

### Self-Injury Alerts

There is no apparent, current, significant risk of self-injury noted for inmate .

However, SIRA was performed on 02/16/21.

Pt reports one suicide attempt in 2019 by OD "to get away from men prison."
She was admitted to inpatient NCCIW in December 2020 due to self harming thoughts.

### Subjective

This is the 2nd incarceration for this 40 y.o. offender who was admitted to prison on 10/10/2017 on a primary charge of HABITUAL FELON with a project release date in 2024.

Pt was born biologically as a male but she identifies herself as female and going through transition of being female. She goes by Miss. Brown.

Pt was last seen by Dr. Younus in August, at that visit Zoloft dose was increased. Pt was seen today, she reports feeling stressed and overwhelmed. "I was told to lose weight then I can get my surgery but they denied it." She reports not able to focus as she is thinking about her surgery. She also feels that she is not getting the therapy which she needs. She wants "therapist who has knowledge about transgender." She reports recently "I walked out of the office " during her therapy session. She feels Zoloft is helping her. She denies depression. She feels she is not getting adequate therapy. She sleeps good. She has lost weight.
She reports sometimes she thinks she may need to do "self mutilating" behavior to get help. She is upset that her surgery was denied.

No SI,HI, AVH or manic symptoms.

She is taking two classes.

She is married and her husband is supportive.

She has an adult son and she talks to him regularly. She has a grand child.

Pt has tried only Zoloft.

### Objective

Identifying Information:40yrs old, biologically born as male but identified herself as female and is in the process of transitioning to a female
Appearance: fairly groomed, wearing mask
Behavior: cooperative

Thinking: Logical
Perception: Denies
Mood: "stressed"
Affect: appropriate
Orientation: no evidence of delirium or confusion
Suicidal/Homicidal Ideation: Patient denies both.
Judgment/Insight: fair

**Side Effects**

Denied.

**Response to Treatment**

Positive.

**Labs/Weights/AIMS/Vitals**

Reviewed.

**Diagnosis**

Gender Dysphoria
Unspecified Anxiety Disorder
Medical:

**Plan**

Target Symptoms: Anxiety and mood.

Medications:
- Cont Zoloft Risk/benefits reviewed.
- Discussed Buspar, pt deferred it for now.
-She feels her current symptoms will get better with the help of "adequate" therapy, she was advised to monitor her symptoms and contact mental health if needed.
Referrals: Therapy( staff will notify via email). Encouraged to continue therapy .
Other Treatment/Labs: None
Follow-Up: 2-3 months or sooner as needed.

**Renew Medication Orders:**

| Rx# | Medication | Order Date | Prescriber Order |
|---|---|---|---|
| A4530692 | SERTRALINE 100 MG TAB | 10/27/2021 09:16 | Take two (2) tablets (=200mg) by mouth daily at 11am ** Direct Observation Therapy ** x 120 day(s) Pill Line Only |

Indication: Gender Dysphoria in Adolescents and Adults, Unspecified Anxiety Disorder

Schedule:

| Activity | Date Scheduled | Scheduled Provider |
|---|---|---|
| Psychiatric Progress Note f/u | 01/19/2022 00:00 | Younus, Syeda R Psychiatrist |

**Patient Education Topics:**

| Date Initiated | Format | Handout/Topic | Provider | Outcome |
|---|---|---|---|---|
| 10/27/2021 | Counseling | Compliance - Treatment | Younus, Syeda | Verbalizes Understanding |
| 10/27/2021 | Counseling | Medication Side Effects | Younus, Syeda | Verbalizes Understanding |

| Date Initiated | Format | Handout/Topic | Provider | Outcome |
|---|---|---|---|---|
| 10/27/2021 | Counseling | Access to Care | Younus, Syeda | Verbalizes Understanding |

**Co-Pay Required:** No  **Cosign Required:** No

**Telephone/Verbal Order:** No

**Standing Order:** No

Completed by Younus, Syeda R MD Psychiatrist on 10/27/2021 17:44

# APPENDIX E

# North Carolina Department of Public Safety
## Clinical Encounter

| Offender Name: | | | | | Off #: | 0618705 |
|---|---|---|---|---|---|---|
| Date of Birth: 1981 | | Sex: M | Race: BLACK | | Facility: HARN | |
| Encounter Date: 01/07/2019 09:03 | | Provider: Umesi, Joseph J MD | | | Unit: GDM- | |

Provider Evaluation encounter performed at Clinic.

## SUBJECTIVE:

**COMPLAINT 1**    Provider: Umesi, Joseph J MD

**Chief Complaint:** Other Problem

**Subjective:** Patient is a 37 year transgender female who started gender reassignment surgery prior to incarceration. Prior surgeries include bilateral orchiectomy, breast augmentation, facial feminization, Brazilian butt lift, forehead and chin fillers. Per Dr. Hope Sherrie, Cosmetic Concierge, the reassignment surgery was performed according to the guidelines of World Professional Association for Transgender Health Standards of Care. The next stage for patient prior to incarceration was full genital gender-affirming surgery. Patient is therefore requesting this surgery.

Patient is also working towards being transferred to a female camp. He is requesting female undergarment. According to patient, policy TX 1 through 13 subject evaluation and management for transgender offenders (section care of treatment for patients), requires accommodation including having female under garments if desired by patient.

Patient is requesting renewal of his medications. Patient's TARC (Transgender Accommodation Review Committee) meeting is scheduled for January 11, 2019.

**Pain Location:**
**Pain Scale:**
**Pain Qualities:**
**History of Trauma:**
**Onset:**
**Duration:**
**Exacerbating Factors:**
**Relieving Factors:**
**Comments:**

## OBJECTIVE:

Temperature:

| Date | Time | Fahrenheit | Celsius | Location | Provider |
|---|---|---|---|---|---|
| 01/07/2019 08:59 HARN | | 98.4 | 36.9 | Oral | Sansone, Kaneisia E RN |

Pulse:

| Date | Time | Rate Per Minute | Location | Rhythm | Provider |
|---|---|---|---|---|---|
| 01/07/2019 08:59 HARN | | 75 | Via Machine | | Sansone, Kaneisia E RN |

Respirations:

| Date | Time | Rate Per Minute | Provider |
|---|---|---|---|
| 01/07/2019 08:59 HARN | | 18 | Sansone, Kaneisia E RN |

Blood Pressure:

| Date | Time | Value | Location | Position | Cuff Size | Provider |
|---|---|---|---|---|---|---|
| 01/07/2019 08:59 HARN | | 110/77 | Left Arm | Sitting | Adult-large | Sansone, Kaneisia E RN |

SpO2:

| Date | Time | Value(%) | Air | | Provider |
|---|---|---|---|---|---|

| Date | Time | Value(%) | Air | | Provider |
|------|------|----------|-----|---|----------|
| 01/07/2019 | 08:59 HARN | 99 | Room Air | | Sansone, Kaneisia E RN |

**Height:**

| Date | Time | Inches | | Cm | Provider |
|------|------|--------|---|-----|----------|
| 01/07/2019 | 08:59 HARN | 70.0 | | 177.8 | Sansone, Kaneisia E RN |

**Weight:**

| Date | Time | Lbs | Kg | Waist Circum. | Provider |
|------|------|-----|-----|---------------|----------|
| 01/07/2019 | 08:59 HARN | 255.0 | 115.7 | | Sansone, Kaneisia E RN |

**Exam:**

**General**

**Affect**

Yes: Pleasant, Cooperative

**Appearance**

Yes: Apparent Distress

**Head**

**General**

Yes: Symmetry of Motor Function, Atraumatic/Normocephalic

**Eyes**

**General**

Yes: PERRLA, Extraocular Movements Intact

**Periorbital/Orbital/Lids**

Yes: Normal Appearing

**Conjunctiva and Sclera**

Yes: Normal Appearing

**Neck**

**General**

Yes: Supple, Symmetric, Trachea Midline

**Thyroid**

No: Diffuse Enlargement, Multinodular, Nodule, Tenderness

**Musculoskeletal**

Yes: Full ROM

No: Tenderness, Muscle Spasms, Trauma

**Pulmonary**

**Auscultation**

Yes: Clear to Auscultation

**Cardiovascular**

**Auscultation**

Yes: Regular Rate and Rhythm (RRR), Normal S1 and S2

No: M/R/G

**Genitourinary**

Previously evaluated and with presence of signs of reported surgeries.

**Musculoskeletal**

**Wrist/Hand/Fingers**

Yes: Normal Exam, Full Range of Motion

**Ankle/Foot/Toes**

Yes: Normal Exam, Full Range of Motion

**Breast**

## Exam:

Female appearing breast. Did not perform brace exam.

**Neurologic**

**Sensory And Motor Reflexes**
Yes: Normal Exam

**Cranial Nerves (CN)**
Yes: CN 2-12 Intact Grossly

**Motor System-General**
Yes: Normal Exam

**Mental Health**

Patient is alert, oriented, cooperative, appropriate. Patient has no signs of higher cognitive deficits and appears confident and decisive as to what she wants to do.

## ASSESSMENT:

Gender Dysphoria in Adolescents and Adults, 302.85 - Current, Chronic, Recurrence

## PLAN:

**Renew Medication Orders:**

| Rx# | Medication | Order Date | Prescriber Order |
|---|---|---|---|
| A3554227 | ESTRADIOL 2 MG TAB | 01/07/2019 09:03 | Take one (1) tablet by mouth daily *UR approved until 1-20-19 x 180 day(s) |
| | Indication: Gender Dysphoria in Adolescents and Adults | | |
| A3517861 | CYANOCOBALAMIN 250 MCG TAB | 01/07/2019 09:03 | Take one (1) tablet by mouth daily x 365 day(s) |
| | Indication: Other fatigue | | |
| A3517863 | VITAMIN D3 1000 U TAB | 01/07/2019 09:03 | Take one (1) tablet by mouth daily x 365 day(s) |
| | Indication: Other fatigue | | |

**New Laboratory Requests:**

| Details | Frequency | Due Date | Priority |
|---|---|---|---|
| Lab Tests-E-Estradiol | One Time | 01/08/2019 00:00 | Routine |
| Lab Tests-L-Luteinizing Hormone (LH) | | | |
| Lab Tests-T-Testosterone, Total | | | |

**New Consultation Requests:**

| Consultation/Procedure | Due Date | Priority | Translator | Language |
|---|---|---|---|---|

Offender Name:
Date of Birth: /1981
Encounter Date: 01/07/2019 09:03

Sex: M   Race: BLACK
Provider: Umesi, Joseph J MD

Off #: 0618705
Facility: HARN
Unit: GDM-

UR Request                                          Routine (review within    No
                                                    30 days)

**Reason for Request:**

Full genital gender-affirming surgery. Patient started surgeries prior to incarceration. Prior surgeries include bilateral orchiectomy, breast augmentation, facial feminization, Brazilian butt lift, forehead and chin fillers. Per Dr. Hope Sherrie, Cosmetic Concierge, the reassignment surgery was performed according to the guidelines of World Professional Association for Transgender Health Standards of Care. The next stage for patient prior to incarceration was full genital gender-affirming surgery. Patient has TARC hearing 1/11/2019 and patient's endocrinology appointment has been scheduled. Patient has been followed by endocrinologist and mental health physician.

**Provisional Diagnosis:**

Transgender.

UR Request                                          Rush (review within 7      No
                                                    days)

**Reason for Request:**

Estradiol 2 mg daily x 6 months. Patient is transgender under care by endocrinologist who has approved continuing Estradiol which patient was on before incarceration.

**Provisional Diagnosis:**

Transgender.

UR Request                                          Rush (review within 7      No
                                                    days)

**Reason for Request:**

Five female undergarments every six months (size 8). Patient requesting this for accommodation following policy treatment 1 through 13, section care and treatment for patient, subject evaluation and management for transgender offenders.

**Provisional Diagnosis:**

Transgender.

**Disposition:**

Follow-up at Sick Call as Needed

**Patient Education Topics:**

| Date Initiated | Format | Handout/Topic | Provider | Outcome |
|---|---|---|---|---|
| 01/07/2019 | Counseling | Plan of Care | Umesi, Joseph | Verbalizes Understanding |

| | | | |
|---|---|---|---|
| **Co-Pay Required:** | No | **Cosign Required:** No | |
| **Telephone/Verbal Order:** | No | | |
| **Standing Order:** | No | | |

Completed by Umesi, Joseph J MD on 01/07/2019 09:47



### 07/12/2021 - Office Visit in UNCH UROLOGY HILLSBOROUGH

#### Abstract Notes

#### Progress Notes

**Bradley David Figler, MD at 7/12/2021 1100**

| | | |
|---|---|---|
| Author: Bradley David Figler, MD | Service: — | Author Type: Physician |
| Filed: 07/18/21 0652 | Encounter Date: 7/12/2021 | Status: Signed |
| Editor: Bradley David Figler, MD (Physician) | | |

## ASSESSMENT:
Transgender adult, interested in vaginoplasty

## DISCUSSION:

We had an extensive discussion re: vaginoplasty.

We discussed indications for the procedures. She is aware that we follow the World Professional Association for Transgender Health (WPATH) standards of care (SOC), and has access to the latest standards of care. Criteria for genital surgery, according to WPATH SOC:
- Pesistent, well documented gender dysphoria
- Capacity to make fully informed decisions and to consent to treatment
- Age of majority in a given country
- If significant medical or mental health concerns are present, they must be well controlled
- 12 continuous months of hormone therapy as appropriate to the patient's gender goals (unless the patient has a medical contraindication or is otherwise unwilling or unable to take hormones)
- 12 continuous months of living in a gender role that is congruent with their gender identity
- Two referrals, at least one from a qualified mental health professional

We discussed rationale for referrals. The purpose of these assessment letters is to assess emotional stability and confirm these three primary categories:
- Presence of persistent gender dysphoria
- If any mental health issues are present, they are reasonably well controlled
- Someone has lived in their identified gender for at least one year.

We discussed penile inversion vaginoplasty in detail, including our technique, pre-operative and post-operative management. We discussed peri-operative hormone management, and I requested that she consult with her hormone provider re: peri-operative dosing.

We discussed risks of the procedure. General risks of the procedure include heart attack, stroke, pneumonia, blood clots, pulmonary embolus, and others. Estrogen has been associated with venous thromboembolism through multiple mechanisms, though there is considerable variability in practice patterns related to perioperative estrogen and there are currently no guidelines. Risks specific to the procedure include bleeding, tissue necrosis, wound dehiscence, poor cosmesis, pelvic pain, poor graft take, granulation tissue, neovaginal/labial hair, urge incontinence, stress incontinence, urethral stricture, post-void dribbling, urinary tract infections, weak, splayed and non-directable urine stream, adhesions, inability to orgasm or change in orgasm, pain/scarring, prolapse, vaginal stenosis/shortening, injury to surrounding tissue (including bowel, rectum, bladder, urethra) and possible development of fistula.

Because of the risk of neovaginal hair, we discussed the need for hair removed pre-operatively and we provided a template.

We discussed risks related to high lithotomy position, including lower extremity paresthesias or pain (the vast majority of which would resolve in 24 hours), compartment syndrome (requiring emergency surgery to decompress), and



UNCH
500 Eastowne Drive
Chapel Hill NC 27514-2244

MRN: 000015493026, DOB: /1981, Sex: F
Visit date: 7/12/2021

## 07/12/2021 - Office Visit in UNCH UROLOGY HILLSBOROUGH (continued)

### Abstract Notes (continued)

rhabdomyolysis. These complications are more likely with longer times in the lithotomy position, and this surgery will require a prolonged lithotomy time.

We discussed importance of bolster and limited activity for graft take, and the importance of post-operative dilation and pelvic floor physical therapy.

We also discussed alternative approaches to vaginoplasty, including robotic peritoneal flap and bowel interposition.

A copy of "What You Need Before Vaginoplasty" from the UNC Transgender Health Program was provided.

After extensive discussion of risks, benefits and alternatives, decision was made to move forward with vaginoplasty.

**PLAN:**
- Proceed with **vulvoplasty** per WPATH criteria pending
  - o Weight loss. Goal 215 (BMI 30), max 250 (BMI 35)
- Will order case request & notify surgery scheduler when approved by THP

----

### HISTORY OF PRESENT ILLNESS:

A 39 y.o.-year-old transgender adult seen today in consultation at the request of Umesi, Joseph for bottom surgery.

Assigned male at birth
Pronouns: she/her
Living full time in current gender role since: 2012
On gender affirming hormones since: 2012
Hair removal: Face/chest only

Are you sexually active? No
Preferred gender of sexual partner(s)? Male
Do you use your penis for penetrative sex? No
Are you seeking a vaginal canal (vaginoplasty) or limited depth vulvoplasty? Vulvoplasty

Goals of surgery, ranked:
1. Dysphoria

PMH:
PSH: Orchiectomy (hope sherry), brazilian butt lift, top surgery
Meds: Currently on transdermal estrogen 0.1mg biweekly for hormone therapy
Family Hx: No familial hx of bleeding or clotting disorders. No personal or family hx of DVT, PE.

Any tobacco use previous or current: No
IDU previous or current: No
Genital injury, surgery, UTIs, dysuria, hematuria, stricture, scrotal pain, elevated PSA, history of prostate biopsy, prostatitis, pelvic radiation: No
Circumcised: no
Children/interest in future fertility: No



UNCH
500 Eastowne Drive
Chapel Hill NC 27514-2244

MRN: 000015493026, DOB: ███/1981, Sex: F
Visit date: 7/12/2021

## 07/12/2021 - Office Visit in UNCH UROLOGY HILLSBOROUGH (continued)

**Abstract Notes (continued)**

PMHX: ███████████████████████
No hx of clotting disorders in family

Height: 5'10 3/4"
Weight: (approx) 275lbs

I review history elements and review of systems on new patient intake form.

## PAST MEDICAL HISTORY:
**Past Medical History:**

| Diagnosis | Date |
|---|---|
| • Goiter | |
| • Male-to-female transgender person | |
| • Testosterone deficiency | |
| • Thyroid nodule | 07/27/2018 |
|   *Left lobe complex nod* | |

## PAST SURGICAL HISTORY:
**Past Surgical History:**

| Procedure | Laterality | Date |
|---|---|---|
| • BUNIONECTOMY | | 2018 |
| • ORCHIECTOMY | Bilateral | |
| • TRANSUMBILICAL AUGMENTATION MAMMAPLASTY | | 10/2012 |

## MEDICATIONS:
**Current Outpatient Medications**

| Medication | Sig | Dispense | Refill |
|---|---|---|---|
| • ████████████████ | Take 1 tablet by mouth daily. | | |
| • estradioL (VIVELLE) 0.1 mg/24 hr | Place 1 patch on the skin Two (2) times a week. | | |
| • sertraline (ZOLOFT) 100 MG tablet | Take 150 mg by mouth daily. | | |
| • biotin 5 mg tablet | Take one tablet daily as directed by Dr. Pou<br><br>Medically necessary for transition | 90 tablet | 1 |
| • cholecalciferol, vitamin D3, (VITAMIN D3) 1,000 unit capsule | Take 1,000 Units by mouth daily. | | |
| • cyanocobalamin (VITAMIN B-12) 100 MCG tablet | Take 250 mcg by mouth daily. | | |
| • MINERAL OIL- | Apply 120 g topically | | |



UNCH
500 Eastowne Drive
Chapel Hill NC 27514-2244

MRN: 000015493026, DOB: ███/1981, Sex: F
Visit date: 7/12/2021

**07/12/2021 - Office Visit in UNCH UROLOGY HILLSBOROUGH (continued)**

**Abstract Notes (continued)**

PETROLAT,WHT-WATER TOP every thirty (30)
days.

No current facility-administered medications for this visit.

## ALLERGIES:
No Known Allergies

## FAMILY HISTORY:
Family History

| Problem | Relation | Age of Onset |
|---|---|---|
| • Cancer | Mother | |

## SOCIAL HISTORY:
Social History

**Socioeconomic History**
| | |
|---|---|
| • Marital status: | Single |
|    Spouse name: | Not on file |
| • Number of children: | Not on file |
| • Years of education: | Not on file |
| • Highest education level: | Not on file |

**Occupational History**
• Not on file

**Tobacco Use**
| | |
|---|---|
| • Smoking status: | Never Smoker |
| • Smokeless tobacco: | Never Used |

**Substance and Sexual Activity**
| | |
|---|---|
| • Alcohol use: | No |
| • Drug use: | Not on file |
| • Sexual activity: | Not on file |

**Other Topics**
• Not on file    Concern

**Social History Narrative**
• Not on file

Social Determinants of Health

**Financial Resource Strain**
• Difficulty of Paying Living Expenses:

**Food Insecurity**
• Worried About Running Out of Food in the Last Year:
• Ran Out of Food in the Last Year:

**Transportation Needs**
• Lack of Transportation (Medical):
• Lack of Transportation (Non-Medical):

**Physical Activity**



UNCH
500 Eastowne Drive
Chapel Hill NC 27514-2244

MRN: 000015493026, DOB: ▮/1981, Sex: F
Visit date: 7/12/2021

**07/12/2021 - Office Visit in UNCH UROLOGY HILLSBOROUGH (continued)**

**Abstract Notes (continued)**

- Days of Exercise per Week:
- Minutes of Exercise per Session:

**Stress:**

- Feeling of Stress :

**Social Connections:**

- Frequency of Communication with Friends and Family:
- Frequency of Social Gatherings with Friends and Family:
- Attends Religious Services:
- Active Member of Clubs or Organizations:
- Attends Club or Organization Meetings:
- Marital Status:


**REVIEW OF SYSTEMS:**
10-system review of systems negative other than what is mentioned above.
The patient was asked to review all abnormal responses not pertinent to today's visit with their primary care physician.

**PHYSICAL EXAM:**
GENERAL: Pleasant adult in no acute distress.
VITAL SIGNS: Blood pressure 125/85, pulse 62, temperature 36.4 °C (97.6 °F), temperature source Temporal, resp.
rate 18, height 180.3 cm (5' 11"), weight (!) 130.6 kg (288 lb), SpO2 100 %.
Estimated body mass index is 40.17 kg/m² as calculated from the following:
  Height as of this encounter: 180.3 cm (5' 11").
  Weight as of this encounter: 130.6 kg (288 lb).
HEENT: Normocephalic, atraumatic, extraocular muscles intact
NECK: Supple, no lymphadenopathy
CARDIOVASCULAR: No peripheral edema
PULMONARY: Normal work of breathing, no use of accessory muscles
ABDOMEN: Soft, non-tender, non-distended. No organomegaly or hernias.
BACK: No costovertebral angle tenderness, no spiny bone tenderness.
EXTREMITIES: No clubbing, cyanosis or edema.
NEUROLOGIC: Cranial nerves II-XII grossly intact
PSYCHOLOGIC: Normal affect, normal mood
SKIN: Warm and dry. No lesions.
**GU: nl non-circ phallus**
**Penis size: Adequate**
**Scrotal size: Adequate**


**LAB RESULTS:**
Results for orders placed or performed in visit on 03/06/20
TSH

| Result | Value | Ref Range |
|---|---|---|
| TSH | 0.907 | 0.600 - 3.300 uIU/mL |

Estradiol (Estrogen) Level

| Result | Value | Ref Range |
|---|---|---|
| Estradiol | 277.4 | pg/mL |

Luteinizing hormone

| Result | Value | Ref Range |
|---|---|---|



UNCH
500 Eastowne Drive
Chapel Hill NC 27514-2244

MRN: 000015493026, DOB: ▮▮1981, Sex: F
Visit date: 7/12/2021

## 07/12/2021 - Office Visit in UNCH UROLOGY HILLSBOROUGH (continued)

### Abstract Notes (continued)

| | | |
|---|---|---|
| LH | 6.8 | mIU/mL |

**Vitamin B12 Level**

| Result | Value | Ref Range |
|---|---|---|
| Vitamin B-12 | 653 | 193 - 900 pg/ml |

**Vitamin D 25 Hydroxy (25OH D2 + D3)**

| Result | Value | Ref Range |
|---|---|---|
| Vitamin D Total (25OH) | 26.5 | 20.0 - 80.0 ng/mL |

Ordered at this visit: No orders of the defined types were placed in this encounter.

No results found for: PSASCRN, PSADIAG

### Lab Results

| Component | Value | Date |
|---|---|---|
| WBC | 6.8 | 10/17/2012 |
| HGB | 14.7 | 10/17/2012 |
| HCT | 44.8 | 10/17/2012 |
| PLT | 308 | 10/17/2012 |

### Lab Results

| Component | Value | Date |
|---|---|---|
| NA | 138 | 12/02/2019 |
| K | 4.1 | 12/02/2019 |
| CL | 102 | 12/02/2019 |
| $CO_2$ | 27.0 | 12/02/2019 |
| BUN | 20 | 12/02/2019 |
| CREATININE | 1.12 | 12/02/2019 |
| GLU | 89 | 12/02/2019 |
| CALCIUM | 9.4 | 12/02/2019 |

### Lab Results

| Component | Value | Date |
|---|---|---|
| BILITOT | 0.6 | 12/02/2019 |
| BILIDIR | 0.20 | 12/02/2019 |
| PROT | 7.6 | 12/02/2019 |
| ALBUMIN | 4.3 | 12/02/2019 |
| ALT | 17 | 12/02/2019 |
| AST | 28 | 12/02/2019 |
| ALKPHOS | 66 | 12/02/2019 |

No results found for: LABPROT, INR, APTT

UNC
HEALTH

UNCH
500 Eastowne Drive
Chapel Hill NC 27514-2244

MRN: 000015493026, DOB: /1981, Sex: F
Visit date: 7/12/2021

**07/12/2021 - Office Visit in UNCH UROLOGY HILLSBOROUGH (continued)**

**Abstract Notes (continued)**

Electronically signed by Bradley David Figler, MD at 07/19/21 0652

# End of Document

# North Carolina Department of Public Safety
## Transgender Accommodation Summary

| | | | | |
|---|---|---|---|---|
| Offender Name: ▮▮▮▮▮▮ | | | Off #: | 0618705 |
| Date of Birth: ▮▮/1981 | Sex: | F | Facility: ANSO | |
| Date: 10/20/2021 09:00 | Provider: | Dula, Jennifer L MSW Clinical | | |

### Review of Mental Health History

Ms. Brown is a transgender female receiving mental health services while currently housed at Anson Correctional Institution for Women. She has actively engaged with mental health services since October 2017.

Prior to incarceration, Ms. Brown endorses engaging in mental health services as part of the requirements for trans-affirming medical care such as cross-hormonal therapy and various gender-affirming surgical interventions. Specifically, Ms. Brown reports engaging in eight months of psychotherapy in 2012 prior to initiating gender-affirming medical procedures and care. She denies engaging in any other mental health services outside of addressing her gender dysphoria.

Since incarceration, Ms. Brown has engaged in mental health services to access transgender accommodations and to address and manage her feelings of gender dysphoria and the subsequent anxiety and depression associated with it. Review of the records shows mostly routine psychotherapy and treatment in support of her transitional care. There has been some crisis intervention required including four SIRA's and one in-patient placement since 2017. The acute events have been connected to Ms. Brown's distress over her gender identity and the process of addressing her transitional needs within a multi-level medical system.

### Accommodation Requests

Ms. Brown expresses a persistent desire for trans-feminine bottom surgery. After consulting with outside medical providers at UNC Trans Health, Ms. Brown determined vulvoplasty was the next step in her transitional care. Her goals of surgery are to alleviate her gender dysphoria. She wants to feel comfortable in her own body and feel that it matches who she is on the inside. She feels others will see her as the woman she knows herself to be which will reduce her anxiety and depressive symptoms.

### Review of Transgender History

Ms. Brown identifies as a transgender female and uses female pronouns (she, her hers). Ms. Brown endorses feelings of gender incongruence since the age of around the age 7 or 8 years old. She began the process to socially transition in 2011. She has changed pronouns, legally changed her name, engages in tucking and is currently housed in a female facility. She has been successfully living in a gender role congruent with her affirmed gender since at least 2014. She has been consistently on hormone therapy since 2012. Ms. Brown has also undergone several other gender affirming surgeries as part of her transition such as an orchiectomy, breast augmentation and facial feminization.

Despite these interventions, Ms. Brown continues to report clinically significant anxiety, depression and distress associated with her gender dysphoria that has been documented consistently throughout her mental health treatment. My clinical evaluation and the existing mental health documentation for Ms. Brown meets the criteria for a diagnosis of Gender Dysphoria.

Based on the review of her records and the current assessment, it appears the next appropriate step for Ms. Brown is to undergo trans-feminine bottom surgery. The surgery will help her make significant progress in further treatment of her gender dysphoria. Ms. Brown is psychologically stable to undergo this surgery and will be able to access post op care at an appropriate DPS facility. She has no issues with illicit drug use or abuse. Review of the all medical consultations with UNC Trans Health show that the risks, benefits and alternatives of this surgery have been reviewed with Ms. Brown, and she showed an excellent understanding during those consultations and this evaluation. She has demonstrated the ability to make an informed decision about undertaking surgery. In summary, Ms. Brown has met the WPATH criteria and is an appropriate candidate for surgery.

### Adjustment to Incarceration

Ms. Brown has struggled at times with being incarcerated as a transgender female. Her adjustment has improved since being transferred to a female facility. For the most part, the other inmates and staff have been inclusive and supportive. However, now that the issue of housing has been addressed and is affirming, it seems to have made her more aware and dysphoric about the one part of her body that does not affirm her gender identity. Ms. Brown demonstrates a desire to use her coping strategies but is expressing increased frustration with the process.

12

**Co-Pay Required:** No     **Cosign Required:** No

**Telephone/Verbal Order:** No

**Standing Order:** No

Completed by Dula, Jennifer L MSW Clinical Social Worker on 10/26/2021 11:55

13

| Offender Name: ▮▮▮▮▮▮▮ | | Off #: | 0618705 |
| Date of Birth: ▮▮▮/1981 | Sex: F    Race: BLACK/AFRI | Facility: | ANSO |
| Encounter Date: 10/21/2021 08:24 | Provider: Caraccio, Donald MD | Unit: | LPODE |

Endocrinology encounter performed at Telehealth.

**SUBJECTIVE:**

COMPLAINT **1**       Provider:  Caraccio, Donald MD

Chief Complaint:    Other Problem

Subjective:    This is 40yo transgender woman seen for continued hormonal treatment.  She is s/p orchiectomy and has been on estrogen since 2012.  She is seeking vulvoplasty as part of her treatment of Gender dysphoria (DSM V diagnosis).

Tolerating estradiol 20mg Q 14 days.  She is now at 245lbs (from ~275lbs).  She saw Dr. Figler and was cleared from him for surgery (vulvoplasty) is she could get weight to under 250lbs.  She was then denied by prison.  She is working with ACLU on this.

Hair growth is less.  Having less frequent erections, which has had a very big impact on her mental health status.  No leg swelling.  No chest pain/SOB.  Her mood is excellent.

Her first estradiol measurement was 309 on day 13 after injection.  Her next level was 1082 on day 8.

**Pain Location:**

Pain Scale:

Pain Qualities:

History of Trauma:

Onset:

Duration:

Exacerbating Factors:

Relieving Factors:

Comments:

**OBJECTIVE:**
**Temperature:**

| Date | Time | | Fahrenheit | Celsius | Location | | Provider |
|---|---|---|---|---|---|---|---|
| 10/16/2021 | 14:23 ANSO | | 98.3 | 36.8 | Oral | | Crump, Alison F LPN |

**Pulse:**

| Date | Time | | Rate Per Minute | Location | | Rhythm | | Provider |
|---|---|---|---|---|---|---|---|---|
| 10/16/2021 | 14:23 ANSO | | 76 | Via Machine | | | | Crump, Alison F LPN |

**Respirations:**

| Date | Time | | Rate Per Minute | Provider |
|---|---|---|---|---|
| 10/16/2021 | 14:23 ANSO | | 18 | Crump, Alison F LPN |

**Blood Pressure:**

| Date | Time | | Value | Location | | Position | | Cuff Size | Provider |
|---|---|---|---|---|---|---|---|---|---|
| 10/16/2021 | 14:23 ANSO | | 114/77 | Left Arm | | Sitting | | Adult-large | Crump, Alison F LPN |

**SpO2:**

| Date | Time | | Value(%) | Air | | Provider |
|---|---|---|---|---|---|---|
| 10/16/2021 | 14:23 ANSO | | 100 | Room Air | | Crump, Alison F LPN |

**Height:**

14

Offender Name: ███████████
Date of Birth: ████/1981
Encounter Date: 10/21/2021 08:24

Sex: F    Race: BLACK/AFRI
Provider: Caraccio, Donald MD

Off #: 0618705
Facility: ANSO
Unit: LPODE

| Date | Time | Inches | Cm | Provider |
|------|------|--------|-----|----------|
| 10/16/2021 | 14:23 ANSO | 71.0 | 180.3 | Crump, Alison F LPN |

**Weight:**

| Date | Time | Lbs | Kg | Waist Circum. | Provider |
|------|------|-----|-----|---------------|----------|
| 10/16/2021 | 14:23 ANSO | 240.8 | 109.2 | | Crump, Alison F LPN |

**Exam:**

**General**

    **Appearance**

        Yes: Appears Well

        No: Apparent Distress

    **Nutrition**

        Yes: Normal, Excellent food intake

**Pulmonary**

    **Observation/Inspection**

        Yes: Normal

**Cardiovascular**

    **Observation**

        No: Painful Distress

**Abdomen**

    **Inspection**

        Yes: Normal

           Significant reduction in central obesity

**Mental Health**

    **Mood**

        Yes: Normal

    **Thought Process**

        Yes: Normal

**ASSESSMENT:**

Gender Dysphoria in Adolescents and Adults, 302.85 - Current, Chronic, Marked Improvement - *Patient responding well to IM estradiol. Her levels are above goal (mid cycle 200-350pg/ml).*

*Plan: reduce to 10mg estradiol IM every 14 days.*

*Check estradiol level on day 7 after injection in December. Also check fasting lipid panel and hepatic function panel.*

*We discussed perioperative hormone reduction. There is no established guidelines in this area. Given her age and obesity, she has some risks for VTE. Given that she is on a hormone replacement with longer duration of action, I would recommend holding any estradiol injections two weeks prior to surgery and restarting and standard dose one week after surgery.*

*Did review recent literature on this "Effect of cross-sex hormone therapy on VTE risk in M-F gender affirming surgery" Annals of Plastic Surgery 1/2021.*

*Regarding for desire for vulvaplasty, this is medically necessary part of treatment for this patient. She has been treated with hormones since 2012 and orchiectomy in 2017, with persistent symptoms of gender dysphoria. Will communicate my plans with Dr. Figler.*

15

**PLAN:**

Schedule:

| **Activity** | **Date Scheduled** | **Scheduled Provider** |
|---|---|---|
| Provider Clinic | 10/21/2021 00:00 | Physician |

   follow up 2 months (around 12/21) with caraccio telehealth endo for transgender

**Disposition:**

   General Population

**Patient Education Topics:**

| Date Initiated | Format | Handout/Topic | Provider | Outcome |
|---|---|---|---|---|
| 10/21/2021 | Counseling | Access to Care | Caraccio, Donald | Verbalizes Understanding |

**Co-Pay Required:** No   **Cosign Required:** No

**Telephone/Verbal Order:** No

**Standing Order:** No

Completed by Caraccio, Donald MD on 10/21/2021 09:35

Requested to be reviewed by Norris, Jennifer L. NP.

Review documentation will be displayed on the following page.

16

| Offender Name: | ████████ | | | Off #: | 0618705 |
| Date of Birth: | ████ /1981 | Sex: | F | Race: | BLACK/AFRIC |
| Encounter Date: | 10/21/2021 08:24 | Provider: | Caraccio, Donald MD | Facility: | ANSO |

**Reviewed with New Encounter Note by Norris, Jennifer L. NP on 10/21/2021 13:08.**

# APPENDIX F

# NORTH CAROLINA DEPARTMENT OF PUBLIC SAFETY
## Facility Transgender Accommodation Review Committee (TARC) Report

Offender Name: _____     OPUS Number: 0618705

Facility at Time of TARC: Harnett 3805     Date of TARC: 1/11/19

Name and Title of TARC Members Present: Melanie Shelton ASP, Marshall Pike ASC, Dr. Hahn Assistant Director of MH,

Mrs. Hendricks PA, Tammy Black Nursing Supervisor, Cpt. Guiterrez PREA Compliance Manager, Patience Thomas Social Worker, Megan

Deloatch Staff Psychologist, Jessica Laub Staff Psychologist.

Offender Present: <sup>x</sup>___ Yes _____ No

Related medical evaluations completed (specify if not applicable, otherwise list date and provider for each): _____
1/7/19: Provider Evaluation For Gender Dysphoria in Adolescents and Adults, Dr. Joseph Umesi

Related mental health evaluations completed (specify if not applicable, otherwise list date and provider for each): _____
10/13/17: MHA, Susan Garvey MA LPA, 12/18/18: Administrative Gender ID Committee Report, Dr. Brumbaugh

Transgender accommodations requested (specify if none were requested, otherwise list requests): Gender reassignment
surgery, to be housed at female facility, women's undergarments, name change in HERO, transfer to another facility (Warren CI), housing
closet to officers desk, private showers, bras

Routine Accommodations (per policy):

Approved: Continued hormone treatment, bras, private shower, housing closest to officer's desk, inmate is currently backlogged
for Warren CI, Inmate informed name changes cannot be completed due to the operating system not allowing it

Not Approved and Rationale: 1) Female undergarments due to safety and security concerns which could put the inmate
at risk for being targeted by sexual deviants of which HCI has a larger concentration than most facilities.

Non-Routine Accommodations for Division TARC Review (per policy):

. Recommended: _____

Not Recommended and Rationale: Gender reassignment, housing at female facility (offender still has intact penis with no
testicles),

Scan into HERO as "TARC/Facility Report."
Attach to HERO Scanned Document Type "Facility Transgender Accommodation Committee Report."

DC - 411F (07/18)     This form is not to be amended, revised, or altered without approval of the Medical Records Committee.

1

# NORTH CAROLINA DEPARTMENT OF PUBLIC SAFETY
## Division Transgender Accommodation Review Committee (TARC) Report

Offender Name: _____     OPUS Number: __0618705__

Facility TARC Date: __7/11/2019__     Division TARC Date: August 21, 2019

Names and Titles of TARC Members Present: Anita Wilson, Medical Director; Charlotte Williams, PREA Director;

Gary Junker, Director of Behavioral Health; Anita Myers, Director of Nursing; Sarah Cobb, Deputy Director

Rosemary Jackson, UR physician; Terri Catlett, Director of Administration

Transgender Accommodation Requests Under Review: _____

Request vaginoplasty

Approved Accommodations: _____

Accommodations Not Approved and Rationale: _____

Request for vaginoplasty - Deferred as offender has successfully completed gender reassignment surgically. Vaginoplasty is an elective procedure which is not medically necessary for reassignment. Current staffing and resources does not allow for the proper post operative care of this procedure

Other: _____

Scan into HERO as "TARC/Division Report."
Attach to HERO Scanned Document Type "Division Transgender Accommodation Committee Report."

DC – 411D (07/18)     This form is not to be amended, revised, or altered without approval of the Medical Records Committee.

# NORTH CAROLINA DEPARTMENT OF PUBLIC SAFETY
## Division Transgender Accommodation Review Committee (TARC) Report

Offender Name: ███████ Kanautica Zayre-Brown          OPUS Number: 0618705

Facility TARC Date: 2/7/2020          Division TARC Date: 5/21/2020

Names and Titles of TARC Members Present: Lewis Peiper (Interim Dir. BH), David Snell (Chief Medical Ofc),

Brian Sheltman (Chief Psychiatrist), Rosemary Jackson (UR Physician), Valerie Langley (Interim Dir. Nursing), Josh Panter (Operations)

Sara Cobb (Dir. Rehab. Services), Terri Catlett (Health Services Administration), Charlotte Williams (PREA Dir.)

Transgender Accommodation Request(s) Under Review: Gender affirmation surgery. Vaginoplasty.

Approved Accommodation(s):

Accommodation(s) Not Approved and Rationale: Determination on surgery pending in-person consultation with surgical specialist.

Accommodation(s) Referred for Final Determination: DTARC recommends an in-person consultation with an OBGYN surgical specialist with experience in gender affirmation surgery.

Other:

## Final Determination of Referred Accommodation(s)

This case was reviewed by G. Junker, Director of Health and Wellness and B. Harris, Asst. Commissioner of Prisons per policy. After review of the record, we concur with the DTARC to not approve the requested accommodation. After an in-person consultation with an OBGYN surgical specialist with experience in gender affirmation surgery occurs, the DTARC is directed to review consultation results to reconsider the request for accommodation to include rationale that any proposed surgery is supported as medically necessary.

Scan Type: "TARC/Division Report."
Attach: "Division Transgender Accommodation Committee Report."

This form is not to be amended, revised, or altered without approval of the Behavioral Health Documentation Committee.
DC – 411D (05/20)

3

# NORTH CAROLINA DEPARTMENT OF PUBLIC SAFETY
## Division Transgender Accommodation Review Committee (TARC) Report

Offender Name: ▓▓▓▓▓▓▓ (Kanautica Zayre-Brown)      OPUS Number: 0618705

Facility TARC Date: _____      Division TARC Date: 2/25/2021

Names and Titles of TARC Members Present: Lewis Peiper (Dir. of BH), Arthur Campbell (Chief Med. Ofc.),

Brian Sheitman (Chief Psychiatrist), Valerie Langley (Dir. of Nursing), Terri Catlett (Dir. Health Serv. Admin), Charlotte Williams (PREA Director),

Josh Panter (Dir. Operations), Sarah Cobb (Dir. Rehab. Services), Cynthia Bostic (Asst. Dir. Rehab. Services)

Transgender Accommodation Request(s) Under Review: In-person consultation with UNC surgical specialist

Approved Accommodation(s): Attempts to schedule in-person consultation with UNC Urology had been unsuccessful. Ms. Catlett

provided a follow-up in an effort to get appointment scheduled. The appointment would be informational for both the offender and prison

system. The information would then be reviewed by DTARC for further consideration.

Accommodation(s) Not Approved and Rationale: _____

Accommodation(s) Referred for Final Determination: _____

Other: Ms. Catlett was informed prior to the offender being seen by a Specialist for an in-person appointment, offender will need to meet

with the UNC Transgender Health Program Management Team. Ms. Catlett has requested additional details of what the meeting with the

UNC Transgender Program Management Team would entail.

## Final Determination of Referred Accommodation(s)

_____

_____

Scan Type: "TARC/Division Report."
Attach: "Division Transgender Accommodation Committee Report."

This form is not to be amended, revised, or altered without approval of the Behavioral Health Documentation Committee.
DC – 411D (05/20)

================================================================

COMMENTS: HAIR LOSS IS TO BE TREATED, SHOULD ENDOCRINOLOGY BE
          CONSULTED?  LJ
          MALE PATTERN BALDNESS IS CONSIDERED PRIMARILY COSMETIC.


UR REQUEST DATE: 08/18/21   TIME: 09:01    LOCATION: 4575 -ANSON CI
UR REQUEST TYPE: C-RUSH                    02-PROCEDURE
UR REQUEST BY  : MD/DDS/DO: NJL18-NORRIS,JENNIFER LEIGH
               NURSE    : HDL68-HILDRETH, DELOISE LISA
DIAGNOSIS/COMPLAINT: F64.9 -GENDER IDENTITY DISORDER UNS
CPT/HCPCS/VE REQ.  : 57291 -CONSTRUCTION OF VAGINA
PROVIDER REQUESTED : UNC16-UNC PHYS/NON-CONTRAC   AT G1680 UNC HOSPITALS
DRUG REQUESTED :                               EMER/CO-PAY EXEMPT?


ACTION  : 08/18/21 09:48 BY DAF03-CAMERON, ALICE L.    ACTION:CARE/PENDED
          REASON(S)  EVL - FURTHER EVALUATION
          PENDED TO: AEX06- AMOS, ELTON
          AUTHORIZATION NO.                    EXPIRATION DATE :
          LENGTH OF STAY  :     DAYS           TOTAL APPROVED:     DAYS
          BEGIN DATE/TIME :        AT
          STOP PAYMENT DATE:            ACTUAL DISCHARGE DATE :


ACTION  : 09/08/21 14:54 BY AEX06-AMOS, ELTON       ACTION:CARE/DEFERRED
          REASON(S)  GNM - GUIDELINES NOT MET
          PENDED TO: UNIT - UNIT UR NURSE
          AUTHORIZATION NO.                    EXPIRATION DATE :
          LENGTH OF STAY  :     DAYS           TOTAL APPROVED:     DAYS
          BEGIN DATE/TIME :        AT
          STOP PAYMENT DATE:            ACTUAL DISCHARGE DATE :


COMMENTS: RECORDS FROM UNC UROLOGY REVIEWED.  RECOMMENDATIONS FOR
          VULVOPLASTY.  PATIENT WITH 40 POUND WEIGHT LOSS IN 3 MONTHS
          AND A BMI OF 36.4.  REQUEST UR APPROVAL FOR SURGERY.
          9.8.21 ELECTIVE PROCEDURES NOT APPROVED. EA


UR REQUEST DATE: 10/22/21   TIME: 08:00    LOCATION: 4575 -ANSON CI
UR REQUEST TYPE: D-ROUTINE                 01-CONSULT
UR REQUEST BY  : MD/DDS/DO: NJL18-NORRIS,JENNIFER LEIGH
               NURSE    : HDL68-HILDRETH, DELOISE LISA
DIAGNOSIS/COMPLAINT: F64.9 -GENDER IDENTITY DISORDER UNS
CPT/HCPCS/VE REQ.  : UNLIS -UNLISTED CONSULT
PROVIDER REQUESTED : TEND2-TH ENDO-CARACCIO     AT 4575  ANSON CI
DRUG REQUESTED :                               EMER/CO-PAY EXEMPT?

# NORTH CAROLINA DEPARTMENT OF PUBLIC SAFETY
## Division Transgender Accommodation Review Committee (TARC) Report

Offender Name: ███████ (Kanautica Zayre-Brown)    OPUS Number: 0618705

Facility TARC Date: review by DTARC    Division TARC Date: 2/17/2022

Names and Titles of TARC Members Present: Dr. Lewis Peiper, Behavioral Health Director; Dr. Arthur Campbell, Chief Medical Officer;

Dr. Brian Sheitman, Chief of Psychiatry; Terri Catlett, Dir. Health Services Admin; Charlotte Williams, PREA Director; Sarah Cobb, Dir. Rehabilitative Srvcs;

Josh Panter, Director of Operations

Transgender Accommodation Request(s) Under Review: Gender Affirmation Surgery/ Vulvaplasty

Approved Accommodation(s):

Accommodation(s) Not Approved and Rationale:

Accommodation(s) Referred for Final Determination: DTARC does not recommend Gender Affirmation surgery. This surgery is not medically necessary.

Other:

## Final Determination of Referred Accommodation(s)

The Deputy Commissioner and Director of Health and Wellness reviewed documents related to this accommodation request. After review and discussion we concur with the DTARC recommendation. The requested accommodation is not supported.

Scan Type: "TARC/Division Report."
Attach: "Division Transgender Accommodation Committee Report."

This form is not to be amended, revised, or altered without approval of the Behavioral Health Documentation Committee.
DC – 411D (05/20)

6

# North Carolina Department of Public Safety
# Division Transgender Accommodation Committee Report

| | | | | | |
|---|---|---|---|---|---|
| Offender Name: | | | | Off #: | 0618705 |
| Date of Birth: | 1981 | Sex: | F | Facility: ANSO | |
| Date: | 04/26/2022 12:00 | Provider: | Peiper, Lewis J Ph.D Dir. of | | |

## Comment

The following note is a summary of related input and considerations from the 2/17/2022 Division Transgender Acommadation Review Committee and concludes with a medical analysis from the Division of Prisons Medical Authority related to ▓▓▓▓▓▓▓ (Kanautica Zayre-Brown, 0618705), referred to as Offender Brown and/or patient below with she/her pronouns used where applicable.

Offender Brown was admitted to prison 10/10/2017 with a current projected release date of 11/2/2024. She is currently housed at Anson CI where she was transferred from Warren CI on 8/15/02019. Offender Brown is currently assigned to Medium Custody after being promoted from Close Custody on 1/4/2022.

In response to Offender Brown's request for vaginoplasty or vulvoplasty surgery, the DTARC recommended receiving a consult from a surgical specialist experienced in performing vaginoplasty surgeries to obtain information to further evaluate treatment options and proposed course going forward. Offender Brown participated in a telehealth appointment with Kristia Vasilof from the UNC Transhealth Program as part of the initial review for consult and Katherine Croft (UNC Transhealth Program Manager) completed a telehealth consult with Offender Brown as part of the planned surgical consult with the UNC Transhealth program. An in-person consultation with Dr. Figler from the UNC Transhealth Program on 7/12/2021 indicated the patient's desire for vulvoplasty (versus vaginoplasty) and the need for weight loss from the recorded weight of 288 at the time down to a maximum of 250 with an identified weight goal of 210.

DTARC Review 2/17/2022:
Offender Brown has maintained the minimum weight goal identified by the UNC Transhealth program. Weight has been below 240 since 11/15/2021 and at the time of the DTARC was most recently (2/11) at 236. Patient is now eligible for review related to DTARC recommendation on requested vulvoplasty surgery.

Review of patient's related mental health and behavioral health record, and the baseline criteria identified by UNC Transhealth Program could make her a candidate for surgery. The patient has a well-documented, persistent transgender identity with a desire for "bottom surgery." The patient has been educated on the surgical interventions by the UNC Transhealth Program and identified a preference for a vulvoplasty if performed. The patient had completed other gender-affirming surgeries (orchiectomy, breast implants) prior to incarceration and has been on hormone replacement therapy since 2012. Mental health and behavioral health case reviews indicated no current evidence of any significant comorbid mental health issues. Patient continues to demonstrate emotional and psychological stability with evidence of adequate coping skills. The patient's mood and anxiety symptoms appear well-controlled by psychiatric interventions, however, recent progress notes from supportive counseling and therapy sessions indicate the patient has been heavily focused on the status of the final decision regarding her requested/desired surgery and experiencing related anxiety/frustrated mood.

Offender Brown has been housed in a female prison since 8/2019 and her adjustment to being housed in a female prison has been generally acceptable apart from a period of time in the fall / winter of 2020 related to reports of this offender having engaged in assaultive and extortive behavior against female offenders. Although she has largely adapted well to her current facility assignment, continued vigilance is necessary in order to ensure the offender's continued stability and to protect other offenders.

MEDICAL ANALYSIS:
This offender has received and continues to receive extensive treatment while incarcerated. As with all treatments in medicine, ongoing re-evaluations are conducted and regimens adjusted based on the clinical course, with further interventions based on findings from those reevaluations.

Medical analysis for this case included a comprehensive review of the offender's medical and behavioral health history, as well as a comprehensive literature review. When treatments are considered for any patient, the most important imperative for physicians is to base recommendations on evidence-based medicine and consideration of that information in the context of the individual patient. Although the offender has clearly communicated a desire for further

gender-affirming surgery, there is insufficient medical evidence to indicate such a complex and irreversible surgical intervention is medically necessary for her at this time.

Based on this review, it is the determination of the medical authority that gender reassignment surgery (GRS) as requested by this offender is not medically necessary.

**Co-Pay Required:** No          **Cosign Required:** No

**Telephone/Verbal Order:** No

**Standing Order:** No

Completed by Peiper, Lewis J Ph.D Dir. of Beh. Health on 04/26/2022 12:12

Requested to be reviewed by  Dula, Jennifer L MSW Clinical Social Worker.

Review documentation will be displayed on the following page.

# APPENDIX G

█████ ██████ (Kanautica Zayre-Brown, 0618705), referred to as offender and/or patient below

- admitted to prison 10/10/2017
- current projected release date 11/2/2024
- Anson CI (transferred from Warren on 8/15/02019)
- Medium Custody (promoted from Close on 1/4/2022)

Surgery Request and Case Summary:

- 2/20/2020, DTARC recommended receiving a consult from a specialist experienced in performing vaginoplasty surgeries to obtain information to further evaluate treatment options and required course going forward.
- 8/4/2020, patient participated in telehealth appointment with Kristia Vasilof from UNC Transhealth Program as part of initial review for consult referral
- 8/27/2020, DTARC reviewed and recommended UR approval for in-person consult with UNC Transhealth Program
- 2/25/2021, DTARC reviewed information regarding need to meet with UNC Transhealth Program Manager prior to scheduling in-person appointment.
- 5/25/2021, Katherine Croft (Transhealth Program Manager) completed a telehealth consult with Offender Brown as part of the planned surgical consult with the UNC Transhealth program. The consult noted "no primary concerns were identified that would interfere with surgery except for weight, which the patient indicated she was intending to lose for surgery."
- 7/12/2021, patient was transported for an in-person consultation with Dr. Figler with the UNC Transhealth Program on 7/12/2021. The consultation documentation was received on 7/20/2021 at Anson and entered into the offender's document manager. The consultation indicated the patient's desire for vulvoplasty (not vaginoplasty) and need for weight loss from the recorded weight of 288 at the time down to a maximum of 250 with an identified weight goal of 210.
- 7/29/2021, Dr. Peiper informed by UNC Telehealth Program that they will need two referral letters related to WPATH criteria
- 10/4/2021, new updated Transgender Accommodation Summary completed as part of the referral letter requirement summarizing history of transition, patient's continued commitment to surgery, current and recent psychological stability, absence of uncontrolled comorbid mental health conditions, and that the patient met appropriate criteria for surgery.

DTARC Review 2/17/2022:

Patient has maintained the minimum weight goal identified by UNC Transhealth program. Weight has been below 240 since 11/15/2021 and at the time of the DTARC was most recently (2/11) at 236. Patient is now eligible for review related to DTARC recommendation on requested vulvoplasty surgery.

Mental health and behavioral health case reviews indicated no current evidence of any significant comorbid mental health issues. Review of patient's related mental health and behavioral health record indicates the criteria identified by UNC Transhealth Program for appropriateness for surgery have been met. The patient has a well-documented, persistent transgender identity with a commitment for "bottom surgery." The patient has been educated on the surgical interventions by the UNC Transhealth Program and identified a preference for a vulvoplasty if performed. The patient has lived as a female in the community prior to this incarceration and has been housed in a female prison since 8/2019. The

GENERAL CONFIDENTIAL INFORMATION     3:22-cv-191 (WDNC)                    DAC 3399

patient has completed other gender-affirming surgeries (orchiectomy, breast implants) and has been on hormone replacement therapy since 2012. The patient's mood and anxiety symptoms appear well-controlled by psychiatric interventions, however, recent progress notes from supportive counseling and therapy sessions indicate the patient has been heavily focused on the status of the final decision regarding her requested/desired surgery and experiencing related anxiety/frustrated mood.

MEDICAL ANALYSIS:

Medical analysis for this case included a comprehensive review of the offender's medical and behavioral health history, as well as a comprehensive literature review. When treatments are considered for any patient, the most important imperative for physicians is to base recommendations on evidence-based medicine and consideration of that information in the context of the individual patient.

Based on this review, it is the determination of medical authority that gender reassignment surgery (GRS) as requested by this offender is not medically necessary. The rationale for this determination is several fold, particularly when the requested treatment for this offender (vulvoplasty), is compared to what are considered "medically necessary" surgeries for other medical conditions.

First, medically necessary treatments, and this is particularly true of surgical procedures, consist of a single, or at most a very discrete subset of surgeries. This is entirely not the case in the context of GRS, where there are a wide range of treatments, most notably absent surgery, but also including surgeries, which are presented as "options" in treatment, and are largely determined by the patient's desires. This would not be the case were the procedure truly "necessary", defined as treatment required in order to protect life, to prevent significant disability, or to alleviate pain. In these cases, barring any individual contraindications to surgery, almost all individuals suffering with these symptoms would indeed consent to surgery. This is clearly not the case with GRS, as, according to NIH data (2019), only 25-35% of transgender individuals ever undergo any form of GCS. (Demographic and temporal trends in transgender identities and gender confirming surgery (nih.gov)). This would not be true of any other "medically necessary" procedure in this country.

Almost universally, medically necessary procedures are by definition covered by insurance carriers. This too is not the case with GRS. In fact, 64% (32 States) of U.S. States' Medicaid programs do not offer coverage for GRS. (Issue brief: Health insurance coverage for gender-affirming care of transgender patients (ama-assn.org)). In fact, in N.C. the State Employees Health Plan, as with the majority of other US State health plans similarly do not cover the cost of GCS. This absolutely would not be the case were the procedure indeed "medically necessary".

Medically necessary treatments must be based on standards of practice, must be evidence-based, peer-reviewed and without bias or conflict of interest among the researchers or agency providing the recommendations, and there is almost always consensus among the medical community as to not only the necessity of the treatment/ procedure, but further, the preferred treatment. These factors establish standard of care, and physicians are derelict in their duties when they stray from these critical considerations. Unfortunately, in the case of GRS in the treatment of gender dysphoria, none of these factors are true. Most notably, the entity most often referred to for guidance regarding treatment of gender dysphoria, namely WPATH (World Professional Association for Transgender Health), simply does not meet these criteria.

WPATH remains under increasing scrutiny and continues to be mired in controversy for the very reasons cited above, calling into question its objectivity and the very real concern that it is not the typical professional organization that develops reliable clinical practice guidelines. WPATH is considered by many to instead be a hybrid professional and activist organization, where activists have become voting members, and even move on to lead the organization. In fact, it is argued by many that WPATH is "activist-led" rather than "evidence-led", and therefore are not a reliable agency in medical decision making for our patients.

Conflicts of interest among the organization are also of significant concern. The overwhelming majority of WPATH Committee members either receive income based on recommendations in the guidelines, work at clinics or universities who receive funds from advocacy groups, foundations, or pharmaceutical companies who heavily favor a certain treatment paradigm, or have received grants and published papers or research in transgender care.

The majority of the members of the WPATH Committee are from the U.S., and six of them have affiliations with the same university–the University of Minnesota Program in Sexuality, which is primarily funded by a transgender advocacy organization (Tawani Foundation).

As if the factors above were not concerning enough, the situation becomes more concerning when we consider another source we as practitioners use to develop treatment plans for our patients, namely specialty societies. In the case of WPATH, three of the same committee members for the WPATH Guidelines also served on the Endocrine Society guideline committee, which raises intellectual conflict of interest concerns, as recommendations based on faulty conclusions in the WPATH guidelines could potentially have been duplicated in the Endocrine Society guidelines.

When, as clinicians we encounter concerns related to objectivity or conflict of interest, for instance, a study recommending a particular pharmacologic treatment or prosthetic device wherein the study was funded by the pharmaceutical company or prosthetic manufacturer, we are then obligated to expand our research and consider other studies. To do otherwise as medical professionals would be negligent; we simply cannot rely solely on a single organization with these concerns at the forefront in making decisions for our patients. This is precisely the case here, where there is significant concern for objectivity and conflict of interest among WPATH, as well as the US Endocrine Society.

When further research is conducted, as we have done in this case, it becomes even more apparent why there is indeed not consensus among the medical community in the treatment of gender dysphoria, and particularly GCS.

Perhaps one of the most important considerations in developing treatment plans for our patients is the long term prognosis following the treatment. Most critically, the imperative "*Primum non nocere*", ("First do no harm") must be at the forefront of consideration. This imperative is the underpinning of the oath all physicians take. In order to ensure the most appropriate, effective, and safest care to patients, clinicians must exercise due diligence in evaluating all available information in formulating recommendations to patients. The evidence regarding GRS does not provide sufficient confidence that the procedures should be undertaken without concern for having violated that oath.

Case in point is the 2016 CMS (Centers for Medicaid and Medicare) Decision Memo which summarizes the following: "Based on a thorough review of the clinical evidence available at this time, there is not

enough evidence to determine whether gender reassignment surgery improves health outcomes for Medicare beneficiaries with gender dysphoria". Further in the report, "When considering even the 'best studies', the conclusion was that there is no evidence of 'clinically significant changes' after sex reassignment surgery." (NCA - Gender Dysphoria and Gender Reassignment Surgery (CAG-00446N) - Proposed Decision Memo (cms.gov))

No studies conclusively demonstrate that GCS improves quality of life or sufficiently addresses gender dysphoria. In fact, in the largest and most thorough long term study looking at quality of life after GCS [Sweden; 324 individuals over a 30 year period (1973-2003)] (Long-Term Follow-Up of Transsexual Persons Undergoing Sex Reassignment Surgery: Cohort Study in Sweden (plos.org)), found evidence to the contrary. Specifically, 1-15 years after surgical reassignment, the suicide rate of those who had undergone sex reassignment surgery rose to 20 times that of comparable peers; there was notable increased mortality and psychiatric hospitalization (which was 2.8 times greater than in controls). As/ more interesting was the finding that death due to neoplasm and cardiovascular disease was increased 2-2.5 times in the surgical group, and this increased mortality was not realized for some 10 years after surgery.

There is a growing body of research into what seems to be an increasing number of transgender individuals who at some point "de-transition", or go back to living as their sex assigned at birth (or at least discontinue some or all aspects of gender affirmation).

The phenomenon of de-transition is critically important in considering treatment options for patients, particularly when treatment involves either irreversible or incredibly difficult/ poor outcomes, such as surgeries. This consideration is of even greater concern when the veracity of the patient is in question or there are other factors such as secondary gain to be considered.

A study recently (June 2021) published by the National Institutes for Health (National Center for Biotechnology Information-NCBI) found that among individuals who had undergone transition, more than 13% had undergone de-transition. Factors Leading to "Detransition" Among Transgender and Gender Diverse People in the United States: A Mixed-Methods Analysis (nih.gov)

Further analysis of this data demonstrated that of those who de-transitioned, 38% did so because transitioning had failed to resolve their psychological issues, so they concluded that "gender dysphoria wasn't the cause"; another 23% did so because they came to understand that they had in fact been struggling with sexual orientation issues rather than gender dysphoria. Why Some Transpersons Decide to Detransition | Psychology Today

A large sample, peer-reviewed study conducted in 2021 found that 70% of those who detransitioned did so after they realized their gender dysphoria was "related to other issues" and 50% did so because transition had failed to alleviate their dysphoria. Interestingly, 43% endorsed a "change in political views" as a reason for detransition. Importantly, 43% of those who detransitioned had previously undergone GCS. Full article: Detransition-Related Needs and Support: A Cross-Sectional Online Survey (tandfonline.com)

Another more recent study (Oct 2021) found that 70% were dissatisfied with their decision to transition. 61% of those who detransitioned had returned to their identifying with their birth sex, 14% identified as nonbinary, and 8% identified as transgender. The study goes on to emphasize the need for "alternative,

GENERAL CONFIDENTIAL INFORMATION      3:22-cv-191 (WDNC)                    DAC 3402

non-invasive approaches for gender dysphoria management in young people".
Growing Focus on Detransition | SEGM

Having taken all these factors into consideration, it remains my medical determination that the surgical procedure requested by this offender is not medically necessary. Further, there is increasing evidence that GRS does not represent the definitive treatment for gender dysphoria, nor does the literature provide the confidence in long-term success required in order to undertake invasive procedures. There simply is not consensus among the medical community that GRS represents THE only acceptable nor THE most recommended treatment for gender dysphoria. In no other context would surgery be considered for a patient if at least one of these factors were not considered to be consensus among the medical community.

GENERAL CONFIDENTIAL INFORMATION        3:22-cv-191 (WDNC)        DAC 3403

# APPENDIX H

# Division Transgender Accommodations Review Committee (DTARC) Position Statement

## Gender Reassignment Surgery

## NCDPS-Prisons

23 March 2022

Dr Arthur L Campbell, III, M.D.

Chief Medical Officer, NC Prisons

1

## SUMMARY POSITION STATEMENT:

*As with all treatments, including procedures and surgeries provided to offenders, the first consideration is whether the treatment is medically necessary. This consideration is precisely the same as that utilized by every managed care system and health insurance agency in the Country.*

*After extensive and objective review and analysis of hundreds of studies and other publications, it has been determined that gender reassignment surgery (GRS), as a treatment for gender dysphoria, is not medically necessary.*

*When GRS is considered with and compared to other procedures and surgeries which are broadly considered medically necessary, GRS procedures fail to satisfy the criteria and characteristics evidenced by those broadly accepted procedures. Specifically, there are concerns that the risk, as defined by failure of the procedure to correct the underlying problem or the need for subsequent reversal of the procedure outweigh any potential benefit of the procedure. GRS simply does not represent an objective "standard of care" and there are grave concerns with significant conflict of interest and the lack of evidence-based, peer-reviewed criteria utilized in developing criteria.*

GENERAL CONFIDENTIAL INFORMATION     3:22-cv-191 (WDNC)     DAC 3405

## ANALYSIS/ DISCUSSION

There continue to be variable, and at times discrepant definitions of "medical necessity" between medical professionals, insurance providers, legislators, legal authorities, and activists. Across the country, the Courts continue to be somewhat inconsistent in their interpretations of what constitutes "medical necessity". These discrepancies become even more complex in the context of medical care for the prison population.

Broadly speaking, at the most basic level, a medically necessary procedure is one which is reasonable and necessary to protect life, to prevent significant illness or significant disability, or to alleviate severe pain. More specifically, there are fairly standard characteristics which most in the medical community would agree either constitute or are associated with a "medically necessary" treatment or procedure, and in the context of gender reassignment surgery (GRS), these characteristics can be applied to reach a determination.

Some prominent characteristics of "medically necessary" procedures include:

- The risk to the patient of not performing the surgery exceed the potential risks of the surgery itself (includes intraoperative, postoperative and long term risks).
- The procedure has been determined to constitute "standard of care", which leads to the following:
  - Overwhelming majority of individuals with the condition undergo the procedure
  - Majority of health insurance carriers provide coverage for the procedure, particularly when the procedure is not costlier than an alternative service or sequence of treatments that are at least as likely to produce equivalent therapeutic results.
- Treatment recommendations are developed through evidence-based medicine/ practice and are modified based on findings from continuous future studies.

When gender reassignment surgery is considered utilizing the general principles outlined above, it becomes apparent that the procedure(s) are indeed not "medically necessary". What follows is a summary analysis and explanation.

3

- **For medically necessary procedures, the risk to the patient of not performing the surgery exceeds the potential risks of the surgery itself.**

  *From the definition above, it follows that for a "medically necessary" procedure, the consensus among the medical community would be that not undertaking the procedure (surgery) will of course fail to alleviate the symptoms associated with the condition, but most importantly, could also result in one/ more of the following: (1) Death, (2) Severe disability, or (3) Significant worsening of the condition. A procedure which is unlikely to improve symptoms, carries with it increased risk of worsening symptoms, or those that disproportionately jeopardize a patent's well-being would not be considered "medically necessary". In fact, they would instead likely not be recommended at all.*

  In the case of GRS, it is far from consensus among the medical community that individuals with gender dysphoria who do not undergo the procedure(s) are at increased risk of any of the sequelae outlined above. In fact, there are studies which cause great concern that a not insignificant portion of individuals who undergo the procedure(s) not only fail to improve, but in many cases, experience worse symptoms with quite concerning consequences.

  One example: The largest and longest term study looking at quality of life after GCS, conducted in Sweden with 324 individuals over 30 years (1973-2003), actually demonstrated a 20-fold increase in suicides and 2.8 times greater rate of psychiatric hospitalization. individuals also had a 2-2.5 times greater rate of neoplasm and cardiovascular disease. Importantly, many of these quite concerning outcomes did not occur until 10 years or more after surgery. [1]

  Studies demonstrating findings such as those above are not isolated. Another study in 2017, incidentally sponsored by a group that was clearly pro-transition, found that "suicide attempts were lower before transition than over most other periods". For example, the study found that suicidal ideation was 50.6% after transition compared with a 36.1% rate before transition. [2]

  Another important consideration in any surgical treatment is outcomes, including analysis of the need for further surgeries, etc. There is a growing body of research into what seems to be an increasing number of transgender individuals who at some point "de-transition", the act of stopping or reversing gender transition, often going back to living as their sex assigned at birth.

  This phenomenon of de-transition is critically important in considering treatment options for patients, particularly when treatment involves either irreversible or incredibly difficult/ poor outcomes, such as surgeries.

  A study published in the Archives of Sexual behavior in October 2021 found a 24% rate of de-transition. This study uncovered some interesting, and frankly concerning statistics. For example, 60% of those who de-transitioned did so at least partly because they had become more comfortable with their natal(birth) sex. A quite significant mount (49%) did so as a result of concerns about the potential medical complications from transitioning. Perhaps most

4

significantly, 55% expressed concerns that they had "not received adequate evaluations from a doctor or mental health professional before starting transition". [3]

Further analysis of this data and other studies demonstrated that of those who de-transitioned, 38% did so because transitioning had failed to resolve their psychological issues, so they concluded that "gender dysphoria wasn't the cause"; another 23% did so because they came to understand that they had in fact been struggling with sexual orientation issues rather than gender dysphoria. [4]

A large sample, peer-reviewed study conducted in 2021 found that 70% of those who de-transitioned did so after they realized their gender dysphoria was "related to other issues" and 50% did so because transition had failed to alleviate their dysphoria. Interestingly, 43% endorsed a "change in political views" as a reason for de-transition. Importantly, 43% of those who de-transitioned had previously undergone GCS. [5]

Another more recent study (Oct 2021) found that among individuals who de-transitioned, 70% did so due to being dissatisfied with their decision to transition. 61% of those who de-transitioned had returned to their identifying with their birth sex, 14% identified as non-binary, and 8% identified as transgender. The study goes on to emphasize the need for "alternative, non-invasive approaches for gender dysphoria management in young people". [6]

Findings such as these raise serious concerns and tip the "risk-benefit" analysis away from the support for surgery among objective medical observers, thereby refuting its "medical necessity".

- **"Medically necessary" procedures are by definition considered to constitute "standard of care".**

  *If a procedure (surgery in this case) were the "standard of care", there would be a single, or at most a discrete subset of procedures which have been determined by the medical community to be most appropriate to treat the condition.*
    - *There are specific criteria which indicate not only the "qualification" for surgery, but also the specific procedure or approach would be best*
    - *There are specific criteria which determine relative or absolute contraindications to surgery*
    - *Based on these standards, the overwhelming expectation would be that (excluding patients who decline surgery against medical advice), that virtually every patient with this condition (and without contraindications) would indeed be provided the procedure.*
    - *Majority of health insurance carriers provide coverage for the procedure, particularly when the procedure is not costlier than an alternative service or sequence of treatments that are at least as likely to produce equivalent therapeutic results.*

When evaluating and researching these factors in the context of GRS, it becomes readily apparent that GRS indeed does not satisfy the requirements necessary for it to be considered "standard of care".

The justification used by those who advocate for surgeries is that they are "necessary" in order to alleviate the "dysphoria" associated with the condition. However, unlike other "medically necessary" surgeries, where there is single or at most a very discrete set of established procedures, in the case of GRS, there is a wide spectrum of continually expanding surgical options designed to treat gender dysphoria.

While not all inclusive, these potential surgical options include (not all inclusive) mastectomy, mammoplasty, orchiectomy, penectomy, metoidioplasty, scrotoplasty, vulvoplasty, vaginoplasty, phalloplasty, voice feminization surgery (anterior glottal web formation; cricothyroid approximation; laser reduction glottoplasty), chondrolaryngoplasty, facial feminization/ masculinization surgery, hip augmentation/ enhancement, gluteal augmentation/ reduction, body contouring and fat transfer, and others.

What this list makes very evident is that there is clearly no established specific (or even series of surgeries) which is the "standard" in the treatment of gender dysphoria. Instead, clinicians and advocates involved in the care of patients with gender dysphoria believe that the extent, type and number of surgeries an individual "needs" ("upper" and/ or "lower") are quite literally determined by what makes the patient feel "complete" (or what they "choose"). Unlike pre-operative evaluations for other surgeries (such as a CT scan, MRI, biopsy, etc), in the case of gender dysphoria, there are no objective studies of any kind that can be performed to either determine indications for surgery or to develop specific surgical recommendations; these

6

determinations are purely subjective on the part of the individual. These facts alone make it clear that none of these surgeries can in any way be considered "necessary".

Over time, for most every surgical procedure, criteria and pre-operative evaluations are continually refined in order to ensure the procedures are offered only to those patients who are most likely to benefit from the procedure. Data is collected continuously and that data helps to not only identify the best candidates for a particular surgery, but also to determine those who are not likely to benefit, and most importantly, those who have risk factors which would contraindicate the surgery.

In the case of GRS, the opposite is true. Treatment advocacy groups continue to significantly relax criteria to the point where it is simply a matter of the individual "asking" for the procedure(s). In fact, their approach to individuals with gender dysphoria has just recently been updated to an "informed consent model"/ "affirmation only" model, which "seeks to better acknowledge and support patient's right of, and their capability for, personal autonomy in choosing care options without the requirement of external evaluations or therapy by mental health professionals" [7]

Another important consideration is the fact that for traditional "medically necessary" surgeries, the overwhelming majority of patients with the condition (unless there are specific contraindications or the patient declines), will indeed end up undergoing the procedure. This too is not the case at all with GRS. In fact, only 25-35% of individuals with gender dysphoria ever undergo any GRS. [8]. This further substantiates the case that GRS for the treatment of gender dysphoria is indeed not "medically necessary", as the vast majority of individuals never undergo these procedures. That is not the case at any truly "medically necessary" surgeries.

Another factor with "medically necessary" procedures (again, which equates to being the "standard of care") is that due to these procedures being established as the "standard of care", the majority of health insurance carriers provide coverage for the procedure, particularly when the procedure is not costlier than an alternative service or sequence of treatments that are at least as likely to produce equivalent therapeutic results. This too is not true when evaluating the current state of health insurance coverage for GCS.

At the federal level, CMS (Centers for Medicare and Medicaid), after an exhaustive review of hundreds of studies in 2016, concluded that the procedures would not be mandated as part of Medicare plans due to the conclusion that there is a "lack of evidence that the procedures benefits patients". More specifically, the Decision Memo stated the following: "Based on a thorough review of the clinical evidence available at this time, there is not enough evidence to determine whether gender reassignment surgery improves health outcomes for Medicare beneficiaries with gender dysphoria", and went on to conclude that there is no evidence of "clinically significant changes" after GRS. [9]

Similarly, at the State level, while there are expected variations, 64% (32) of States' Medicaid Programs also do not provide GRS coverage. [10] Further, most State Employees' Health Plans (including North Carolina) do not provide coverage for GRS.

7

When specifically considering GRS in prisons, it is important to note that there have been no Federal inmates who have received GRS and only two states to date have provided for the procedure, both of which were very discrete circumstances in court settlements. Were GRS indeed "medically necessary", not providing the procedure would bolster court cases regarding the 8th Amendment to the US Constitution. However, this has not been the case. Recent court rulings on this have been inconsistent to say the least. In fact, cases in both the First and Fifth Circuit Courts of Appeal have concluded that the State prison systems did not violate inmate's rights (did not inflict "cruel and unusual punishment") by declining provision of GRS for inmates.

More specifically, in the Fifth Circuit Court of Appeals case (March 2019; Gibson v Collier), in its findings, the Court confirmed that "*it is indisputable that the necessity and efficacy of sex reassignment surgery is a matter of significant disagreement within the medical community. As the First Circuit has noted—and counsel here does not dispute—respected medical experts fiercely question whether sex reassignment surgery, rather than counseling and hormone therapy, is the best treatment for gender dysphoria.*"
Further, the Court provided the following explanation:
"*Under established precedent, it can be cruel and unusual punishment to deny essential medical care to an inmate. But that does not mean prisons must provide whatever care an inmate wants. Rather, the Eighth Amendment "proscribes only medical care so unconscionable as to fall below society's minimum standards of decency.*" Interestingly, the Court went on to point out that something (in this case, GRS) cannot be "unusual" if doing so is not the "usual" treatment, which is clearly the case in the context of GRS in either prisons or across the country as a whole. [11]

None of these would be the case were GRS indeed the "standard of care" and the procedures were "medically necessary", which further bolsters the case that these procedures are indeed not medically necessary.

8

- **Treatment recommendations are developed through evidence-based medicine/ practice and are modified based on findings from continuous future studies.**

  *Surgical procedures are determined using evidence-based, peer-reviewed medical studies which are free of bias or conflict of interest, leading to near consensus among the medical community as to not only the necessity of the treatment/ procedure, but further, the preferred treatment.*
    - *Critically important is that these studies continually evaluate (and modify based on the data obtained) the pre-operative, intra-operative, post-operative, and long term approaches and prognosis associated with the procedure.*

This factor associated with evaluating medical necessity for any procedure is critical in order to ensure the best care for our patients, and in the case of GRS, is perhaps one of the most concerning factors. Unfortunately, in the case of GRS in the treatment of gender dysphoria, this level of scrutiny is simply not present. Most notably, the entity most often referred to for guidance regarding treatment of gender dysphoria, namely WPATH (World Professional Association for Transgender Health), simply does not utilize these criteria in developing their "standards of care". This realization has led to individuals/groups, who are supportive of treatments for gender dysphoria but who lack confidence in WPATH, establishing other organizations in order to ensure the level of scrutiny needed in undertaking these procedures.

For example, the Society for Evidence-Based Gender Medicine (SEGM) has recently been established by a physician in Oregon who has grown increasingly concerned with the lack of objectivity displayed by WPATH, stating that the organization "remains captured by activists". "We need a serious organization to take a sober look at the evidence and that is why we have established the Society for Evidence-Based Gender Medicine [SEGM]," she noted. "This is what we do — we are looking at all of the evidence. "She specifically recommends the WPATH SOC not be "the new gold standard going forward, primarily because it is not evidence-based". Instead, she points out that "WPATH utilizes the 'Delphi consensus process' to determine their recommendations, but this process is designed for use with a panel of experts when evidence is lacking". Instead of a panel of experts, she and an increasing number of other physicians across the country view WPATH as a "panel of activists" instead of a panel of experts. [12]

Medically necessary treatments must be based on standards of practice, must be evidence-based, peer-reviewed and without bias or conflict of interest among the researchers or agency providing the recommendations, and there is almost always consensus among the medical community as to not only the necessity of the treatment/ procedure, but further, the preferred treatment. These factors establish standard of care, and physicians are derelict in their duties when they stray from these critical considerations.

Unfortunately, the literature often relied upon is fraught with study design problems, including convenience sampling, lack of controls, cross-sectional design, small sample sizes, short study lengths, and enormously high drop-out rates among participants. Very few studies on transition escape these issues. For example, a 2018 systematic review of quality-of-life studies of transitioned adults rated only two out of twenty-nine studies as high-quality. [13]

9

WPATH remains under increasing scrutiny and continues to be mired in controversy for the very reasons cited above, calling into question its objectivity and the very real concern that it is not the typical professional organization that develops reliable clinical practice guidelines. WPATH is considered by many to instead be a hybrid professional and activist organization, where activists have become voting members, and even move on to lead the organization. In fact, it is argued by many that WPATH is "activist-led" rather than "evidence-led", and therefore are not a reliable agency in medical decision making for our patients.

Conflicts of interest among the organization are also of significant concern. The overwhelming majority of WPATH Committee members either receive income based on recommendations in the guidelines, work at clinics or universities who receive funds from advocacy groups, foundations, or pharmaceutical companies who heavily favor a certain treatment paradigm, or have received grants and published papers or research in transgender care. [14]

The majority of the members of the WPATH Committee are from the U.S., and six of them have affiliations with the same university–the University of Minnesota Program in Sexuality, which is primarily funded by a transgender advocacy organization (Tawani Foundation). In fact, the current chairman of WPATH has his very position at the University of Minnesota funded by Jennifer Pritzer, a trans person and head of Tawani. In fact, there are press releases of Eli Coleman in 2017 thanking Jennifer Pritzer profusely for a generous donation, which adds up to 6.5 million dollars that Tawani has given to the university. Tawani also funded WPATH SOC development. Another advocacy group, Gender Identity Research and Education Society (GIRES) funded the translation of the SOC into various languages. [14]

As if the factors above were not concerning enough, the situation becomes more concerning when we consider another source we as practitioners use to develop treatment plans for our patients, namely specialty societies. In the case of WPATH, three of the same committee members for the WPATH Guidelines also served on the Endocrine Society guideline committee, which raises intellectual conflict of interest concerns, as recommendations based on faulty conclusions in the WPATH guidelines could potentially have been duplicated in the Endocrine Society guidelines.

This concern is supported by the fact that ECRI (Emergency Care Research Institute), the DHHS-appointed Agency for Healthcare Research and Quality (AHRQ) for the National Guideline Clearinghouse (NGC), has failed to provide Trust Ratings for either WPATH or the Endocrine Society guidelines for the treatment of gender dysphoria. The reason for this lack of inclusion was because "only a few of the recommendations were supported by the systematic review; the majority were not", and that the agencies "did not use a systematic review process" in developing their guidelines. [14]

When, as clinicians we encounter concerns related to objectivity or conflict of interest, for instance, a study recommending a particular pharmacologic treatment or prosthetic device wherein the study was funded by the pharmaceutical company or prosthetic manufacturer, we are then obligated to expand our research and consider other studies. To do otherwise as medical professionals would be negligent; we simply cannot rely solely on a single organization with these concerns at the forefront in making decisions for our patients. This is precisely the

GENERAL CONFIDENTIAL INFORMATION    3:22-cv-191 (WDNC)                                    DAC 3413

case here, where there is significant concern for objectivity and conflict of interest among WPATH, as well as the US Endocrine Society.

When further research is conducted, as we have done in this case, it becomes even more apparent why there is indeed not consensus among the medical community in the treatment of gender dysphoria, and particularly GCS.

In summary, based on the extensive and objective review of hundreds of studies and other publications, it is quite clear that gender reassignment surgery as a course of treatment for gender dysphoria is indeed not a medical necessity. When GRS is considered with and compared to other procedures and surgeries which are broadly considered medically necessary, the procedures fail to satisfy the criteria and characteristics evidenced by those procedures. Specifically, there are concerns that the risk, as defined by failure of the procedure to correct the underlying problem or the need for subsequent reversal of the procedure outweigh the potential benefit of the procedure. GRS simply does not represent an objective "standard of care" and there are grave concerns with significant conflict of interest and the lack of evidence-based, peer-reviewed criteria utilized in developing criteria.

Accordingly, to support these procedures given all these concerns would be in conflict with the most critical imperative in medicine, "*Primum non nocere*" (First, do no harm"). This imperative is the underpinning of the oath all physicians take. In order to ensure the most appropriate, effective, and safest care to patients, clinicians must exercise due diligence in evaluating all available information in formulating recommendations to patients. The evidence regarding GCS does not provide sufficient confidence that the procedures should be undertaken without concern for having violated that oath.

11

# CITATIONS

[1] Long-Term Follow-Up of Transsexual Persons Undergoing Sex Reassignment Surgery: Cohort Study in Sweden (plos.org)

[2] Varied Reports of Adult Transgender Suicidality: Synthesizing and Describing the Peer-Reviewed and Gray Literature | Transgender Health (liebertpub.com)

[3] Individuals Treated for Gender Dysphoria with Medical and/or Surgical Transition Who Subsequently Detransitioned: A Survey of 100 Detransitioners | SpringerLink

[4] Factors Leading to "Detransition" Among Transgender and Gender Diverse People in the United States: A Mixed-Methods Analysis - PMC (nih.gov)

[5] Why Some Transpersons Decide to Detransition | Psychology Today

[6] Full article: Detransition-Related Needs and Support: A Cross-Sectional Online Survey (tandfonline.com)

[7] Demographic and temporal trends in transgender identities and gender confirming surgery (nih.gov)

[8] Growing Focus on Detransition | SEGM

[9] Informed Consent in the Medical Care of Transgender and Gender-Nonconforming Patients | Journal of Ethics | American Medical Association (ama-assn.org)

[10] NCA - Gender Dysphoria and Gender Reassignment Surgery (CAG-00446N) - Proposed Decision Memo (cms.gov)

[11] Issue brief: Health insurance coverage for gender-affirming care of transgender patients (ama-assn.org)

[12] Gibson v. Collier, No. 16-51148 (5th Cir. 2019) :: Justia

[13] WPATH Draft on Gender Dysphoria 'Skewed and Misses Urgent Issues' (medscape.com)

[14] Quality of life of treatment-seeking transgender adults: A systematic review and meta-analysis | SpringerLink

[15] Bias, not evidence dominates WPATH transgender standard of care - CANADIAN GENDER REPORT

GENERAL CONFIDENTIAL INFORMATION     3:22-cv-191 (WDNC)                    DAC 3415