```
        IN THE UNITED STATES DISTRICT COURT
     FOR THE WESTERN DISTRICT OF NORTH CAROLINA
               CHARLOTTE DIVISION


            Civil Action No. 3:22-cv-0191


   KANAUTICA ZAYRE-BROWN,       )
                                )
        Plaintiff,               )
                                )
             v.                 )
                                )
   THE NORTH CAROLINA           )
   DEPARTMENT OF PUBLIC         )
   SAFETY, et al.,              )
                                )
        Defendants.              )
                                )
```
_____
           DEPOSITION OF TERRI CATLETT
_____

              (Taken by plaintiff.)

              Raleigh, North Carolina

              May 18, 2023, 8:59 a.m.


Reported By:
SUSAN GALLAGHER, CA CSR, CVR-CM

**CONTAINS GENERAL CONFIDENTIAL INFORMATION** 1

1　　　　A　I don't want to speculate, but I would think
2　that that would have been information Dr. Peiper
3　shared.
4　　　　Q　So your role of scheduling appointments for
5　incarcerated people, how do you decide how urgent they
6　need an appointment?
7　　　　A　Well, the provider would indicate that, whether
8　it's urgent, routine, rush.
9　　　　Q　Okay.  And after they indicate that to you,
10　help do you go about, I guess, organizing those
11　logistics?
12　　　　A　So someone in medical records would call.  I
13　would have the staff at medical records at the local
14　facility call and make that appointment, and they would
15　at that point, based on availability of officers and
16　whatnot, you know, they would make that appointment,
17　and then they would -- again, as I stated before,
18　there's a process.
19　　　　　　They initiate the appointment, and then they
20　initiate the paperwork, and then custody at that point
21　is informed as to, we have a trip.  How may officers
22　need to go?  Maybe two officers, maybe four officers,
23　maybe six officers depending on security level of the
24　offender.  So it's done locally.
25　　　　Q　If there's multiple people that have

44

1  appointments, how do you go about organizing the order
2  of these people getting to their appointments?
3      A  Again, it's based on the clinical provider.  If
4  it's urgent, if it's routine, and again, you've got to
5  remember during this time UNC wasn't seeing our
6  patients.  So telehealth was the primary means of
7  medical care, specialty medical care.  Primary care is
8  done at the facility, Specialty care through UNC, and
9  telehealth was the primary means of care during this
10 whole entire time.
11     Q  Once someone indicates that an appointment's
12 either urgent, routine, whatever classification they
13 give it, are you required to report that to anyone?
14     A  No.
15     Q  Are there ever times where there's delays in
16 getting people to their appointments?
17     A  Again, during this particular time period, from
18 March of 2020 until even now, the primary means of
19 providing care is through telehealth.  We are dependent
20 upon the availability of the providers at the local
21 level, at the local UNC, Blue Ridge, Vidant, wherever
22 they are, to give us appointments.
23         So we can call and ask for the first available
24 appointment, which is routinely what we do, but it may
25 not be until three months or six months or nine months

45

1 until we get to the appointment.

2   Q  Have you ever had an appointment and then on
3 your end had to reschedule?

4   A  For security reasons that happened from time to
5 time.  If the facility is locked down for security
6 reasons, nobody moves.  So it's rare, but from time to
7 time there is a cancellation based on the operation of
8 the facility.  It isn't based on anything clinical or
9 anything I have control over.  It's clearly a security
10 issue.

11   Q  Okay.  And once you're notified that an
12 appointment has to be canceled for a lockdown, how
13 quickly do you try to reschedule that --

14   A  That very day.  We call and see when can we get
15 the next appointment.  There's been a -- whether it's a
16 security breach or an escape or whatever has happened,
17 we call -- we call the provider's office and let them
18 know that the inmate won't to be coming to the
19 appointment for whatever security reason.  Can they
20 please provide us the next appointment.

21   Q  Outside of security reasons, would there be any
22 other possible reasons why an appointment would have to
23 be canceled?

24       MR. RODRIGUEZ:  Object to speculation.

25       You can answer.

46

1  my emails every day, but if I'm out of the country,
2  like I was this week, I don't have access to email.
3      Q  Okay.  On the last exhibit with the email we
4  just discussed, did you take any other further action
5  regarding this email?
6      MR. RODRIGUEZ:  Asked and answered.
7      You can answer.
8      THE WITNESS:  I don't recall.
9  BY MS. DELGADO:
10     Q  And did you ever follow up with Dr. Hahn to see
11 if she received this email?
12     A  Actually, Dr. Hahn and I had a conversation.
13     Q  Can you tell me about that conversation?
14     A  She called me.
15     Q  And what was that?
16     A  She was wanting to know when the date of the
17 appointment for Ms. Kanautica Brown.
18     Q  Okay.  And were you able to give her that date?
19     A  No.  I had to check the telehealth schedule.  I
20 told her I'd get back with her.
21     Q  Did you raise your concerns about what you read
22 in that email?
23     A  Dr. Hahn expressed to me what Kanautica was
24 doing and that she was onsite and was managing her
25 care, but she wanted to know when the appointment was

61

1　scheduled, and I didn't have access to the telehealth
2　schedule at the time.  I told her I would get back with
3　her.
4　　　　Q  Did you get back with her?
5　　　　A  I got back with the facility to let them know
6　so they could schedule it.  Dr. Hahn isn't at the
7　facility every day.  So when I had access to the
8　scheduler, I made sure that Kanautica had the first
9　available appointment, even though I had to move other
10　people around, and then I notified the facility.
11　　　　Q  Okay.  All right.  Moving on to the next
12　document that I would like to be marked as Exhibit 11.
13　　　　(Exhibit 11 marked for identification.)
14　BY MS. DELGADO:
15　　　　Q  Ms. Catlett, if you'll let me know when you're
16　ready.
17　　　　A  I'm ready.
18　　　　Q  Okay.  Do you recognize this?
19　　　　A  Yeah, I'm familiar with the discussion.
20　　　　Q  What was this discussion about?
21　　　　A  Ms. Brown's distrust or concerned that she had
22　to speak to somebody right away at UNC, and they were
23　just trying to find out when the appointment has been
24　made, and as you can see by the email chain, I don't
25　make the appointments.  I call.  I call.  I call, and I

62

1   wait for UNC to respond, and at the end, the facility
2   said no.
3           But this was, again, in the midst of lockdown
4   COVID, and they weren't seeing patients, not only in
5   the community, but certainly not our offender
6   population.  So many specialities said, "Don't send any
7   of your inmates to us at all."  I had to be diligent in
8   calling, calling, calling to get appointments.  I
9   didn't always get them every time I called.
10          So this was just kind of like "Hey, Ms. Catlett
11  is going to follow up," which I did.  "She'll let us
12  know as soon as the appointment," et cetera.  So that's
13  kind of what it is.  You can see that I called.  I
14  haven't received confirmation.  I called again.  I
15  didn't get confirmation, and Kanautica was being -- was
16  impatient with all that.
17      Q  You said that "Kanautica was impatient with all
18  that."  How did you determine that?
19      A  Well, it appears that she -- based on what the
20  psychologist wrote, that she was experiencing dysphoria
21  because of the length of time that had passed.
22      Q  Which psychologist said that?
23      A  Shannon Lutz (phonetic) lots.  She was a
24  psychological services coordinator.
25      Q  So you said that she said that Ms. Kanautica

63

```
 1   Zayre-Brown was experiencing dysphoria because of the
 2   length of time?
 3        A    Yes.
 4        Q    And you understood that to mean she was
 5   impatient?
 6        A    No.  Just inmates want an appointment the next
 7   day.  If they don't get it, they get very impatient.
 8   It appears that she was experiencing dysphoria.
 9        Q    Drawing your attention to page 2 under Shannon
10   Lutz's response, if you count six lines up from the
11   bottom, there is a sentence that starts with "from an
12   emotional health."
13        A    Uh-huh.
14        Q    Okay.  I'm going to read that.
15             "From an emotional health standpoint, it does
16   appear that Ms. Brown continues to experience acute
17   dysphoria secondary to the length of time that has
18   passed, which has yet to resolve medically necessary
19   treatment."
20             Was that the sentence you were referring to
21   when you mentioned length of time?
22        A    No.  I was referring to, she provided this --
23   the first two or three sentences.  That's what I was
24   referring to.  "She expressed strong distrust in the
25   accuracy of information in referencing upcoming
```

64

1       You can answer.

2       THE WITNESS: I think it would be certainly a
3 training for all staff.
4 BY MS. DELGADO:
5       Q All right. We'll move onto the next exhibit --
6 All right. Drawing your attention to page 3, Ms.
7 Catlett, there is an email in the center of the page
8 that's from Joy Baugham. Who is that?
9       A She is the admin support for the telehealth
10 department.
11       Q Okay. And what date did she send this email to
12 you?
13       A June 21, 2021.
14       Q And it says, "There is a UR" or urology
15 "consult with Dr. Figler, Re: Vaginoplasty approved
16 8/4/20, Authorization No. 001710079."
17       Did I read that correctly?
18       A You did.
19       Q Okay. Does this refresh your recollection
20 regarding how long Mrs. Zayre-Brown had been waiting
21 for a consult?
22       A Well, she was waiting for multiple consults, so
23 this was just one of them apparently.
24       Q And it appears that -- well, this urology
25 consult was approved on 8/4/20; is that correct?

73

1        A   Right, that's correct.

2        Q   And the date of this email is June 21, 2021; is
3    that correct?

4        A   That's correct.

5        Q   What was the reasoning for such a long gap in
6    time?

7        A   You have to remember this is in the heat of
8    COVID.  We weren't sending anyone out of the facility,
9    anyone, unless it was life-threatening.  UNC didn't
10   want to see any of our patients at all, period.  So
11   this was -- all of their staff were doing hands-on work
12   on the floor.

13           So none of the patient's went out unless it was
14   life-threatening.  Telehealth was launched around the
15   same time, and we were able -- the only way we were
16   able to get specialty services done is through the
17   process of telehealth.  It wasn't until just last year
18   that routine appointments started going out of the
19   facility for appointments.

20           And it wasn't anything to do with DPS.  It had
21   to do with the fact that the providers were not seeing
22   patients in their offices because of this "all hands on
23   deck" at UNC, and the providers were working shifts
24   taking care of COVID patients.  So if there was a
25   delay, it was because anything that -- it had nothing

74

1  to do with DPS.  It had everything to do with --
2  patients were not being seen in the hospital because
3  COVID was -- there was no vaccine at this point.
4  Patients were dying, and all the doctors were focused
5  on taking care of the dying patients.
6      MS. DELGADO:  If I could have a moment.
7      (Recess.)
8  BY MS. DELGADO:
9      Q  Ms. Catlett, we are actually going to go back
10 to the most recent exhibit, No. 12.  Okay.  Still on
11 the page of the symptoms I recently read, there is a UR
12 urology, that page.  Are you there?
13     A  Uh-huh.
14     Q  Okay.  When we were discussing this email, you
15 stated that this was during the height of COVID; is
16 that correct?
17     A  Yes.
18     Q  And that there were no vaccines out during this
19 time; is that correct?
20     A  I did say that, yes.
21     Q  Now that we've taken a break, do you still,
22 like, keep the same sentiment, that there were no
23 vaccines during that time of June 2021?
24     A  I don't recall when the first vaccine became
25 available.

75

1  Q  Okay. You also mentioned that there were no --
2  you guys were not letting anyone in and out for
3  appointments outside of the prison; is that correct?
4  A  Typically. Unless it was life-threatening,
5  patients typically did not go out into the community
6  for care. Specialty care was managed primarily through
7  the telehealth process.
8  Q  You say "life-threatening," back to Exhibit 10,
9  if you can pull that out, and if you go to page 2 and
10 line 4 at the end that starts at the last sentence, "As
11 a direct result of the continued denial of care, her
12 family, including myself, has had to be in receipt of
13 the voicing desires to commit suicide and engage in
14 self mutilation."
15    Does that not sound like life-threatening to
16 you?
17    MR. RODRIGUEZ: I'm going to object to the
18 vagueness and form.
19    You can answer.
20    THE WITNESS: Again, I wasn't onsite with Ms. Brown
21 during this particular time so I wouldn't have been --
22 I'm not the clinician. I wouldn't be able to determine
23 if it was life-threatening or not. I think a
24 life-threatening situation would be, from a medical
25 perspective, say a cardiac arrest or difficulty

GENERAL CONFIDENTIAL INFORMATION                    76

Case 3:22-cv-00191-MOC-DCK   Document 65-6   Filed 10/19/23   Page 12 of 12
DISCOVERY COURT REPORTERS   www.discoverydepo.com   1-919-424-8242