UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF NORTH CAROLINA

CHARLOTTE DIVISION

KANAUTICA ZAYRE-BROWN,           )

    Plaintiff                 )

                              )

      vs.                       )

                              )

THE NORTH CAROLINA DEPARTMENT    )

OF PUBLIC SAFETY, et al.         )

    Defendants                )


DEPOSITION


OF


JOSEPH V. PENN, M.D.


August 8, 2023 - 9:12 A.M.


NORTH CAROLINA DEPARTMENT OF JUSTICE

114 WEST EDENTON STREET

RALEIGH, NORTH CAROLINA


PREPARED BY: Susan A. Hurrey, RPR

Discovery Court Reporters

and Legal Videographers, LLC

4208 Six Forks Road

Suite 1000

Raleigh, North Carolina 27609

919-424-8242

www.discoverydepo.com

**CONTAINS GENERAL CONFIDENTIAL INFORMATION**

1

1  or impairment?

2    A.  Yes.

3    Q.  I'd now like to hand you what I would ask the court

4  reporter to mark as Exhibit-10.

5               -  -  -

6        (Document marked as Exhibit-10 for

7  identification.)

8               -  -  -

9  BY MS. MAFFETORE:

10    Q.  The court reporter has handed you Exhibit-10 which is

11  a document bates stamped DAC 728.  I will represent to you that

12  it is a North Carolina Department of Public Safety Mental

13  Health Progress Note dated 4/28/2021 pertaining to Mrs.

14  Zayre-Brown.

15        Do you recognize this document?

16    A.  Yes.

17    Q.  Under Progress Towards Goals -- do you see where I'm

18  referring to?

19    A.  Yes.

20    Q.  It notes Mrs. Zayre-Brown expressed many concerns

21  about not having her appointment with UNC-CH urology scheduled

22  yet.  She gave a number of examples of how this is increasing

23  her dysphoria, and she decided to put a band on her penis until

24  her appointment is scheduled.  She said she has had the band on

25  for a week and a half.  She was cautioned about the effects of

1  impeding blood flow and risk of infection.  As described above,

2  the undersigned spoke with Ms. Catlett, and she was able to

3  convey to Mrs. Zayre-Brown how Ms. Catlett has been on top of

4  it and has worked hard to facilitate this appointment.  Ms.

5  Zayre-Brown then agreed to take the band off her penis.  The

6  rest of the session addressed her specific concerns about

7  having part of a penis left and what defines a woman.  She

8  explained it does not bother her if she is called fat or ugly

9  but stated if she is called a man there is no tool in the

10  toolbox to manage that.  She stated I can't live with this

11  anymore, and said the situation was acute now and not chronic.

12  She also stated she is not complete now and that I'm ready to

13  be complete.

14      Did I read that correctly?

15   A.  Yes.

16   Q.  Did you review this medical record before concluding

17  that Mrs. Zayre-Brown does not have significant mental distress

18  and impairment?

19   A.  Yes.

20          MS. MAFFETORE:  I'm now going to hand you what

21  I will ask the court reporter to mark as Exhibit-11.

22                  -  -  -

23          (Document marked as Exhibit-11 for

24  identification.)

25                  -  -  -

**CONTAINS GENERAL CONFIDENTIAL INFORMATION**

BY MS. MAFFETORE:

Q.  Exhibit-11 is a document that was produced in discovery bates marked DAC 695.  I will represent it's the North Carolina Department of Public Safety Mental Health Progress Note dated September 16, 2021 pertaining to Mrs. Zayre-Brown.

Have you seen this document before?

A.  Yes.

Q.  Under Progress Towards Goals, the last two sentences note she admitted that she had briefly considered putting a rubber band around her phallus as a means of forcing surgical intervention.  The writer explained that Ms. Brown would only undermine her chances for gender-affirming surgery if she was considered to be emotionally unstable for treatment.  She acknowledged understanding.

Did I read that correctly?

A.  Yes.

Q.  Is this one of the documents that you reviewed before concluding that Ms. Zayre-Brown does not have significant mental stressor impairment?

A.  Yes.

MS. MAFFETORE:  I'm now going to hand the court reporter what will be marked as Exhibit-12.

- - -

(Document marked as Exhibit-12 for

CONTAINS GENERAL CONFIDENTIAL INFORMATION

192

1    identification.)

2                              -  -  -

3    BY MS. MAFFETORE:

4        Q.  Exhibit-12 is a document produced to us in discovery

5    bates marked DAC 680.  I will represent to you it is a North

6    Carolina Department of Public Safety General Administrative

7    Note dated November 2, 2021 regarding Mrs. Kanautica

8    Zayre-Brown.

9            Do you recognize this document?

10       A.  Yes.

11       Q.  The document notes under comments, Offender Brown made

12   a statement of self-harm during today's FTARC, indicating that

13   if she did not receive an update about progress on the decision

14   regarding DTARC determination re: requested surgery, she would

15   mutilate her phallus, referred to in earlier documentation as

16   taking matters into her own hands.

17           Did I read that correctly?

18       A.  Yes.

19       Q.  Did you review this medical record or this

20   administrative note before concluding that Mrs. Zayre-Brown

21   does not have significant mental distress or impairment?

22       A.  Yes.

23           MS. MAFFETORE:  I'm now going to hand you what

24   I ask the court reporter to mark as Exhibit-13.

25

**CONTAINS GENERAL CONFIDENTIAL INFORMATION**

193

DISCOVERY COURT REPORTERS     www.discoverydepo.com     1-919-424-8242

1                          -  -  -

2                  (Document marked as Exhibit-13 for

3      identification.)

4                          -  -  -

5      BY MS. MAFFETORE:

6          Q.  Exhibit-13 is a document that was produced to us in

7      discovery which is bates stamped DAC 666 on the first page.  I

8      will represent to you that it is a North Carolina Department of

9      Public Safety Mental Health Progress Note, December 6, 2021,

10     relating to Kanautica Zayre-Brown.

11             Do you recognize this document?

12         A.  Yes.

13         Q.  On page two of the document at the top.  Document

14     notes under the subheading Progress Towards Goals, which is at

15     the bottom of the previous page, reduced feelings of dysphoria,

16     measured by rating dysphoric feelings on a scale from zero to

17     10.  Zero equals no dysphoria.  10 equals extreme dysphoria.

18     By being five or below at least three days a week.  Today

19     Offender Brown reported a Level of 11, it's high.

20             Did I read that correctly?

21         A.  Yes.

22         Q.  Did you review this medical record before concluding

23     that Mrs. Zayre-Brown does not have severe mental distress or

24     impairment?

25         A.  Yes.

1      Q.  You can set that to the side.  I'm done with that

2   document.  Can someone be close with their family members and

3   still experience significant distress?

4      A.  Yes.

5      Q.  You note that Mrs. Zayre-Brown doesn't suffer from

6   distress because she worked in the commissary.  Are you aware

7   of whether that employment ended in 2020?

8              MR. RODRIGUEZ:  Objection.  Mischaracterization

9   of testimony.  You can answer.

10             THE WITNESS:  I don't know the specific reason,

11  if she asked to terminate her employment or if it was because

12  of her disciplinary.  But the review of these documents does

13  recall and refresh my memory that all of these threats of

14  self-harming her phallus were conditional.

15             MS. MAFFETORE:  I'm going to object to that

16  answer as non-responsive because I asked you whether or not the

17  employment at the commissary ended in 2020.

18             MR. RODRIGUEZ:  And he answered that and then

19  he was proceeding to discuss the exhibits that you just gave

20  him to.

21             MS. MAFFETORE:  I asked if he reviewed them.

22  That was my question.

23             MR. RODRIGUEZ:  Right.

24             MS. MAFFETORE:  Right.

25             THE WITNESS:  So what I was answering was that

CONTAINS GENERAL CONFIDENTIAL INFORMATION

195

1  she had received a major disciplinary case and was placed in

2  restrictive housing because she assaulted a peer who had

3  allegedly teased her about her phallus or made some statement

4  about her phallus.  So all of these suicidal or talk of

5  self-harm to her phallus were all conditional.  The first set

6  that you showed me had to do with she was facing restrictive

7  housing disciplinary status --

8           MS. MAFFETORE:  I'm just once again going to

9  object to this as nonresponsive.  Your counsel will have

10  opportunity to ask you follow-up questions, if he wishes.  But

11  I have a limited amount of time with you today, so I need you

12  to be responsive to the questions that I'm asking.

13           MR. RODRIGUEZ:  Hold on, Dr. Penn.  So he

14  answered the question --

15           MS. MAFFETORE:  Should we go off the record for

16  a second?

17           MR. RODRIGUEZ:  No.  No.  We're going to stay

18  on the record.  He answered your question and now he's giving

19  some testimony about the documents that you gave to him.

20           MS. MAFFETORE:  Right.  But I didn't ask him

21  any other questions about the documents that he gave to me.  If

22  you would like to ask him questions about those documents

23  you're more than welcome to.

24           MR. RODRIGUEZ:  Oh, I know that I can ask

25  questions.  But are you telling him that you would no longer

CONTAINS GENERAL CONFIDENTIAL INFORMATION

196

Case 3:22-cv-00191-MOC-DCK   Document 65-10   Filed 10/19/23   Page 8 of 23
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

1  like for him to speak about the exhibits that you gave to him?

2        MS. MAFFETORE:  If I have follow-up questions

3  about the exhibits I would be very happy for him to answer

4  those questions.

5        MR. RODRIGUEZ:  Fair enough.  So we'll let her

6  ask her next question and then you can answer.

7  BY MS. MAFFETORE:

8    Q.  Can someone pursue educational opportunities and still

9  be experiencing significant distress?

10    A.  Yes.

11    Q.  In your opinion, is Mrs. Zayre-Brown considered

12  stable?

13    A.  So I have to clarify my response to answer your

14  question.  And in my -- what was the question again?

15    Q.  In your opinion, is Mrs. Zayre-Brown considered

16  stable?

17    A.  Yes.  Because all of these were conditional suicidal

18  statements of self-harm, putting a rubber band around her

19  phallus because she was unhappy with the delay in getting

20  referred to the surgeon, and then two, the other situation had

21  to do with she was facing restrictive housing.  It probably had

22  an affect on her maybe losing her job, her employment, but she

23  was hopeful and future oriented.  In the documents you

24  presented to me she talks about working in cosmetology, talking

25  about losing weight to meet the criteria for the surgery, and

Case 3:22-cv-00191-MOC-DCK   Document 65-10   Filed 10/19/23   Page 9 of 23
DISCOVERY COURT REPORTERS     www.discoverydepo.com          1-919-424-8242

 1    other things that were hopeful and future oriented.  So yeah, I

 2    mean, anything is possible.  But based on my review of these

 3    documents, to answer your question, Ms. Brown was stable,

 4    clinically stable.

 5        Q.  In your opinion, does Mrs. Zayre-Brown have any

 6    comorbid medical conditions or mental health conditions rather?

 7        A.  In my opinion, yes.

 8        Q.  And what is that based on?

 9        A.  So again, I requested the opportunity to perform an

10    evaluation of Ms. Brown and that was declined or refused.  But

11    based on my video review -- sorry, my review of the videotaped

12    deposition Mr. Rodriguez performed and the transcript, based on

13    review of all the medical records and prison records, based on

14    my review of Dr. Boyd's evaluation, based on -- and testing,

15    based on my review of Dr. Ettner's report and records, Ms.

16    Brown potentially has -- I can't definitively say, but she

17    probably has significant trauma from childhood neglect and

18    abuse because she had been raised in foster care.  I think her

19    mom was 13 when she gave birth to her.  She was pretty much

20    estranged from her mother, was put into Child Protective

21    Services, had been in the Department of Public Safety for

22    juvenile offending behaviors for I think five years.  So she

23    clearly had a trauma history.  There's some allegations or --

24    sorry, not allegations.  There are some references in records

25    to possible ███████████.  So I don't have enough as we sit

CONTAINS GENERAL CONFIDENTIAL INFORMATION

                                                                  198

1   here today to say definitively she has PTSD, but she definitely

2   has features that are strongly suggestive of past trauma, abuse

3   and neglect.  There's also -- I can't remember.  I believe Dr.

4   Boyd on some of her testing there's the possibility of bipolar

5   disorder symptoms or traits, and similarly there's a

6   possibility of some antisocial versus borderline personality

7   traits.  And then from a medical perspective I understand the

8   main issue is she's obese.  She's overweight.  I don't recall

9   any other chronic medical diseases.  And I think that's it.

10      Q.  Is it your opinion that any comorbid condition from

11  which Mrs. Zayre-Brown suffers is not well controlled?

12      A.  What I would say is when Mrs. Brown doesn't get --

13  doesn't get or perceive to get what she thinks she should or is

14  entitled to, she reacts very impulsively and puts herself at

15  risk and that is strongly suggestive of a personality disorder

16  and untreated trauma.  I would say her comorbid complaints are

17  stable at present but could definitely -- she definitely could

18  benefit from additional counseling and therapy.  It appears, in

19  my opinion, that she has been focused a hundred percent on her

20  gender surgery to the exclusion of seeking counseling or

21  therapy to deal with impulse control, affect regulation,

22  dealing with bad news or when things don't go her way impulse

23  control, making better choices, social skills training, how to

24  deal with individuals who might misgender her or make negative

25  comments about her genitalia.  So those are definite treatment

1   services that she would benefit from that would further help

2   her achieve clinical -- further clinical stability.

3       Q.  What is your understanding of whether under the WPATH

4   standards an individual needs to be considered stable in order

5   to be a candidate for gender-affirming surgery?

6       A.  I'm not sure if there's language about stable.  What I

7   understand, the WPATH has changed.  WPATH SOC 7 used to have a

8   requirement that there had to be two, either psychologist

9   and/or psychiatrist, or two psychiatrists or two psychologists,

10  but they had to be both doctoral level and they had to

11  essentially clear the individual and say there was no mental

12  health contraindication to surgery.  I understand in WPATH SOC

13  8 that that's been reduced.  And I think now it's not

14  necessarily a clearance or do they have the capacity for the

15  surgery or there are not any mental health contraindications,

16  but it's more of a referral.  If a referring treating source

17  mental health clinician refers -- I think only one letter is

18  needed now and I could be wrong on that.  But that's what my

19  understanding of the new WPATH is.  It's less prescriptive

20  about the two evaluations done by doctoral level mental health

21  staff.

22      Q.  Is your understanding that someone needs to ascertain

23  that an individual's comorbid mental health conditions are

24  sufficiently under control for them to be a candidate for

25  surgery?

1      A.  I would say that's fair.

2      Q.  On page 32 of your report, Exhibit-1.  You note the

3  lack of such indications of distress in a patient's medical

4  chart is an important consideration when determining whether a

5  given intervention is medically necessary.  This is because if

6  there is reason to believe that the intervention is necessary

7  to prevent, and will be effective at ameliorating, such severe

8  distress, harm, or disability, then the intervention might be

9  said to be medically necessary.

10      Did I read that correctly?

11      A.  I would say yes.  But the sentence in front of that

12  has to be read in conjunction with that last sentence that you

13  said about that my review of Mrs. Kanautica Brown's medical

14  records demonstrate that whatever distress she may have had as

15  a result of her gender dysphoria, it was and is well managed,

16  not severe, and is not causing any impairments to her daily

17  living activities in a correctional setting.

18      Q.  How frequently do you believe gender-affirming surgery

19  has been ineffective in ameliorating gender dysphoria?

20          MR. RODRIGUEZ:  Objection.

21  BY MS. MAFFETORE:

22      Q.  Based on your expertise.

23          MR. RODRIGUEZ:  Same objection.  You can

24  answer.

25          THE WITNESS:  So my review of the Dhejnee

                                                              201

1    article -- I think it's D-h-e-j-n-e-e -- is that in that study

2    -- it's the only study that I'm aware of that was published

3    longitudinally looking at individuals who have undergone

4    gender-affirming genital surgery -- had mixed results.  And in

5    fact some individuals engaged and completed suicide and others

6    had other similar types of distress and I believe there was

7    some regret.  Some individuals recounted regret in having

8    undergone the surgery.  So to the best of my knowledge, based

9    on my literature review, and I think Dr. Li also referenced

10   that in her report, there is that real risk of the surgery not

11   necessarily being curative or helpful and actually potentially

12   being harmful.

13      Q.  So I asked you how frequently do you believe that

14   gender-affirming surgery has been ineffective at ameliorating

15   gender dysphoria?

16             MR. RODRIGUEZ:  Same objection.  Speculation.

17   You can answer.

18             THE WITNESS:  Because it hasn't been formally

19   studied in a prospective, controlled manner I'm not able to

20   answer your question.  I would say it's highly variable.

21   BY MS. MAFFETORE:

22      Q.  Do you have reason to believe that gender-affirming

23   surgery would be ineffective in ameliorating Mrs. Zayre-Brown's

24   gender dysphoria?

25      A.  My testimony would be that Mrs. Brown has some other

1  chronic mental health conditions.  I mentioned the trauma,

2  possible PTSD, possible personality disorder that the surgery

3  will not do anything to correct or ameliorate.  So it's

4  possible that the surgery might help her gender dysphoria, but

5  the other conditions will likely -- the surgery doesn't address

6  or treat any of those other primary mental disorders, in my

7  opinion.

8      Q.  And so my question was do you have any reason to

9  believe gender-affirming surgery would be ineffective in

10 ameliorating specifically Ms. Zayre-Brown's gender dysphoria?

11         MR. RODRIGUEZ:  Asked and answered.  You can

12 answer.

13         THE WITNESS:  So I would say, as I testified to

14 earlier, her whole focus to date has now been on the gender

15 dysphoria and on the surgery.  That's her whole life.  In fact,

16 as I understand it, she is -- there's some media coverage.

17 There's some -- which is an additional stressor.  At this

18 point, as we sit here today, in my professional opinion, it's

19 not -- it is not clear or definitive that she would -- that her

20 gender dysphoria would be completely ameliorated by the surgery

21 because there's other physical findings that she presents with

22 that the gender genital surgery would not address.

23     Q.  What are those findings?

24     A.  Her physical presentation.  She has several secondary

25 sex characteristics, her body frame, her body appearance, her

CONTAINS GENERAL CONFIDENTIAL INFORMATION

203

Case 3:22-cv-00191-MOC-DCK   Document 65-10   Filed 10/19/23   Page 15 of 23
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

1  habitus, her voice, her jawline, jaw structure, the breadth of

2  her shoulders, her hand size, her size in general.  I could go

3  on and on, but there's multiple physical features that whether

4  she has the surgery or not, people are probably going to

5  continue to misgender her.  And she has identified herself,

6  repeatedly she stated that her biggest fear is that somebody

7  will misgender her and whether she has a phallus or not.  It's

8  my professional opinion that she will likely continue to

9  probably be misgendered, whether she has the surgery or not.

10  And will then continue to demonstrate gender dysphoria, in my

11  professional opinion.

12      Q.  In any of the records that you reviewed did Mrs.

13  Zayre-Brown identify her voice as a source of gender dysphoria?

14      A.  I don't recall.

15      Q.  In any of the records that you reviewed did Mrs.

16  Zayre-Brown identify her height as a source of her gender

17  dysphoria?

18      A.  I don't recall.

19      Q.  In any of the records that you reviewed did Mrs.

20  Zayre-Brown identify the size of her hands as a source of her

21  gender dysphoria?

22      A.  I don't recall.

23      Q.  In any of the records that you reviewed did Mrs.

24  Zayre-Brown identify the width of her shoulders as a source of

25  her gender dysphoria?

CONTAINS GENERAL CONFIDENTIAL INFORMATION

204

1      A.  Not that I recall.

2      Q.  In any of the records that you reviewed did Mrs.

3  Zayre-Brown identify any physical feature other than her

4  genitals as a source of her gender dysphoria?

5      A.  Well, she has had -- she reported and I saw that in

6  her medical chart, she's had multiple surgeries to date.  A

7  breast augmentation, fillers, body contouring, she had some

8  chin procedure I can't recall the name of.  She's had multiple

9  surgeries, but I don't recall in the health care records or

10  other records that I reviewed if she reported any other

11  distress from any of those past surgeries.  Sorry, I -- I'm

12  trying to -- I thought I recalled that she did have distress

13  from one of the surgeries.  Yes, when she had the orchiectomy,

14  the removal of the testicles, she experienced some postsurgical

15  complications according to the medical chart, even though she

16  was in the prison system and they were giving her wound care

17  and dressings.  I recall that she had pain and distress from

18  that.

19      Q.  So now I'll just reiterate that my question was other

20  than her genitalia.

21      A.  To the best of my recollection I don't recall any

22  other distress from body appearance or both features in the

23  records that I reviewed.

24      Q.  Okay.  Thank you.  Are you aware of whether Dr. Boyd

25  testified that surgery would be psychologically beneficial for

CONTAINS GENERAL CONFIDENTIAL INFORMATION

205

Case 3:22-cv-00191-MOC-DCK   Document 65-10   Filed 10/19/23   Page 17 of 23
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

Mrs. Zayre-Brown in the treatment of her gender dysphoria?

A. I don't recall.

Q. Do you agree with Dr. Boyd that surgery would be psychologically beneficial to Mrs. Zayre-Brown in the treatment of her gender dysphoria?

A. I can't answer that yes or no because there's a risk that she might have a serious complication from the anesthesia or surgery and whether the surgery is successful or not, she could have significant complications. And it could worsen her overall life with or without affecting her gender dysphoria.

Q. So in your opinion, what are the risks of Kanautica specifically undergoing surgery?

A. Well, there's a laundry list. I would be happy to refer to Dr. Figler's evaluation where he lists them. But as I understand, and again, I'm not a surgeon or anesthesiologist, but there's a risk of death, heart attack, pneumonia, infection, paralysis, scarring, compartment syndrome. There's a term called cosmesis or something to that effect where one is not happy with the surgical -- their perception of how it's going to turn out doesn't match with how it turns out. And there's several other complications. Nerve injury. I used paralysis earlier. Fistula. There's a risk of hair is in the vaginal cavity. That could be problematic.

Q. Is your understanding that the procedure that Mrs. Zayre-Brown is seeking would create a vaginal cavity?

206

A. What I understand is she's seeking a vulvoplasty, but originally had been thinking of a vaginoplasty. But that's a whole separate issue because there's still ambivalence about what surgery would be best for her. According to Dr. Figler's report or his note there was some question about which would be appropriate for her. I am not a surgeon. I can't speak to this, but I believe that either when the vulvoplasty or vaginoplasty -- there's a risk of hair cells being in the vulva -- sorry, in the vaginal canal and that could cause problems. So the point I'm trying to make -- I'm getting away from the main things, infection, death, scarring, disfigurement. Those are all real conditions of anesthesia, to include death from cardiac arrythmia. Ms. Kanautica Brown is obese. She could have surgical complications for her weight. Pneumonia. So there's a laundry list of risks of surgery.

Q. Are the risks that you just identified unique to gender-affirming surgery?

A. I believe there are several risks that are specialized to gender-affirming surgery, but they also would apply to any kind of general anesthesia or alternatively being placed into the lithotomy position for extended periods of time. And I understand from Dr. Figler's note that she would have to be in that position for several hours to undergo the surgery.

Q. So you stated that Mrs. Zayre-Brown's weight is a concern. Are you aware of whether Mrs. Zayre-Brown was

207

1    required to lose a certain amount of weight in order to be

2    considered a candidate for surgery by Dr. Figler's office?

3        A.  Yes.

4        Q.  Are you aware of whether she lost that weight?

5        A.  I recall that she had lost -- I think she went from

6    275 to 240.  But the videos that I reviewed both of the

7    deposition and of the interview with Dr. Boyd -- again, I'm not

8    trying to be insensitive, but Ms. Brown appeared obese, in my

9    training as a physician.  So I didn't see anywhere where a

10   recent weight had been recorded.  So I don't know her weight

11   status as of today or the last week or so.

12       Q.  Are you aware of whether at the time that the DTARC

13   denied Mrs. Zayre-Brown's surgery whether or not she had

14   achieved the weight goal set forth by Dr. Figler's office for

15   her to receive the surgery?

16       A.  I don't recall if they made a determination of that.

17   I think she had dropped down to like 245.  But whether that met

18   their criteria, I don't recall, as we sit here today.

19       Q.  If Mrs. Zayre-Brown had achieved the weight

20   recommended by Dr. Figler's office to make her a candidate for

21   surgery, do you have any other reason to believe that she is at

22   high risk for complications for surgery?

23       A.  Yes.

24       Q.  What are those reasons?

25       A.  Well -- and I already listed it earlier and I think

                                                                208

1    you interrupted me.  I said she had a complication before when

2    she had her orchiectomy.  It didn't heal well and she had some

3    pain.  The wound dehisced, it spread.  And so the best

4    predictor of past is future -- I'm sorry, the best predictor of

5    future is the past.  Sorry, I got that backwards.  So she has

6    had a history of postsurgery complications and healing.  Anyone

7    is subject to surgical risks regardless of one's weight.

8    Everyone theoretically could have risk from general anesthesia

9    and surgery.

10       Q.  In your opinion, is there any risk of Mrs. Zayre-Brown

11   regretting the procedure?

12       A.  Certainly.

13       Q.  What is your basis for that opinion?

14       A.  Well, it's based on the Dhejnee article that I

15   mentioned earlier that the literature is limited, but the one

16   study that shows longitudinal followup of individuals that have

17   had the type of surgery that Mrs. Brown is seeking, there was

18   some patients that experience complications and -- and I have

19   read of other articles by urology -- in urology journals that

20   describe the risks of complications with the surgery also.

21       Q.  What specific to Mrs. Zayre-Brown's circumstances lead

22   you to believe that she is at risk of regretting the procedure?

23       A.  Because she's the only one that -- when she -- if and

24   when the phallus is removed, she will be the only one that can

25   identify that she no longer has a phallus.  She still appears

CONTAINS GENERAL CONFIDENTIAL INFORMATION

209

Case 3:22-cv-00191-MOC-DCK   Document 65-10   Filed 10/19/23   Page 21 of 23
DISCOVERY COURT REPORTERS    www.discoverydepo.com        1-919-424-8242

typically as a male -- sorry, transgendered female.  But she

still has several secondary sex characteristics that would

suggest her being transgendered.  So in my professional opinion

having genital surgery is not going to cure all of her gender

dysphoria.  Plus, she has the comorbid likely mental health

conditions that I described earlier, that I testified to

earlier.

Q.  What risk, if any, do you think there is that Mrs.

Zayre-Brown's gender dysphoria will worsen if she is not

provided gender-affirming surgery before her release date?

A.  Anything is possible.  She has stated that she's put a

rubber band around her phallus.  She stated that she plans to

scratch or rub the skin off her phallus.  So it's possible that

she could develop a skin infection, or alternatively, if she

does in fact amputate or auto amputate her phallus, that could

occur.  So there are some risks that she will further attempt

to self-harm her genitalia.  That's fair.

Q.  In your opinion, do you think Mrs. Zayre-Brown's

gender dysphoria will improve if she is not given

gender-affirming surgery, if she retains her phallus?

A.  What I would testify to is that she is totally a

hundred percent focused on this one surgery to the neglect of

her other lifelong issues.  I would say I don't currently have

an opinion because my opinion is guarded without -- without

knowing that she is making an effort to begin to work on her

CONTAINS GENERAL CONFIDENTIAL INFORMATION

210

1   other trauma and abuse and neglect issues and relational

2   issues, in my professional opinion, my opinion is guarded.  I

3   don't have an opinion regarding what the surgery or not having

4   the surgery, what impact it would have on her gender dysphoria.

5       Q.  Understood.

6           MS. MAFFETORE:  Can we go off the record for

7   just one second?

8                   -  -  -

9           (Discussion held off the record, 4:13 p.m. 4:13

10  p.m.)

11                  -  -  -

12  BY MS. MAFFETORE:

13      Q.  I would now like to look at your report, Exhibit-1 at

14  page 33.  So you state on page 33 at the top it is my opinion,

15  based on my education, training, and experience, that there is

16  a lack of high-quality scientific and medical literature

17  indicating the long-term efficacy of gender-affirming surgery

18  as a treatment for gender dysphoria.

19          Did I read that correctly?

20      A.  Yes.

21      Q.  Are you holding yourself out as an expert in the

22  quality of scientific evidence in this case?

23      A.  No.

24      Q.  Are you holding yourself out as an expert in

25  statistical methodology in this case?

211