```
                IN THE UNITED STATES DISTRICT COURT

          FOR THE WESTERN DISTRICT OF NORTH CAROLINA

                 CIVIL ACTION NO. 3:22-cv-00191


KANAUTICA ZAYRE-BROWN,       )
                             )
          Plaintiff,         )
                             )
     vs.                     )
                             )
THE NORTH CAROLINA           )
DEPARTMENT OF PUBLIC         )
SAFETY, ET AL.,              )
                             )
          Defendants.        )




                     DEPOSITION OF

                   SARA BOYD, PH.D.
    _____
                       9:08 A.M.

                 FRIDAY, AUGUST 4, 2023

    _____


          NORTH CAROLINA DEPARTMENT OF JUSTICE


               114 WEST EDENTON STREET


               RALEIGH, NORTH CAROLINA
```

**CONTAINS GENERAL CONFIDENTIAL INFORMATION**

1

1        the -- the vulvoplasty or vaginoplasty that

2        she wants.  So those are the four primary

3        opinions that I offered.

4   Q.   Okay.  You say primary opinions.  Are there

5        other opinions in here?

6   A.   Well, the -- you know, for example, when I

7        say that the con- -- Dr. Ettner's process was

8        undermined by deficiencies, there's, like,

9        secondary, you know, critiques to that that

10       are --

11  Q.   Uh-huh.

12  A.   -- covered under that umbrella is what I

13       mean.

14  Q.   Okay.  All right.  I'm going to flip to Page

15       33 and I'm looking at Conclusion Number

16       (1)(a).  You write, A psychologist who lacks

17       formal medical education and training should

18       not offer medical opinions, e.g., medical

19       necessity, or state that their opinions are

20       reliable and valid to a reasonable degree of

21       medical certainty.

22            Did I read that right?

23  A.   Yes.

24  Q.   All right.  What is your basis for this

25       opinion?

1    A.    Ethically, we're obligated not to offer

2          opinions that are outside the bounds of our

3          competence and our training.  If you're not a

4          medical provider, you shouldn't be giving a

5          medical opinion.  So, for example, if I'm

6          testifying in court and someone asks me to

7          give an opinion that's fundamentally a

8          neurological opinion --

9    Q.    Uh-huh.

10   A.    -- or a -- a question about, well, if we gave

11         this person this medicine, do you think it

12         would make them feel better, I can't answer

13         that question because I'm not a medical

14         doctor and that's what I would say is, that's

15         a medical question.  You need a medical

16         doctor to answer that.  It's outside the

17         bound of my com- -- bounds of my competence

18         as a psychologist.

19   Q.    Okay.  And you said it -- it -- it's an

20         ethical matter.  Is there a -- you know, a

21         published ethical code that you follow?

22   A.    Yes.  So there's APA ethics code and then

23         there's -- they call them guidelines.

24         They're all guidelines, but the -- there's a

25         forensic specialty guideline ethics code as

                                                      81

1      well.

2    Q.   Okay.  So are -- are you providing an opinion

3         in this case on medical necessity?

4    A.   No.

5    Q.   All right.  In your view, can a psychologist

6         like yourself or Dr. Ettner ethically provide

7         an opinion on whether something is

8         psychologically necessary or perhaps, as you

9         put it, can provide a psychological benefit?

10   A.   Yes.

11   Q.   All right.  I'd like to spend a little bit

12        more time on that term.  What does -- what

13        does it mean for something to have a

14        psychological benefit or to be

15        psychologically beneficial?

16   A.   Right.  So --

17             MR. RODRIGUEZ:  Objection.

18   A.   -- typically, we're talking about treatment

19        in this context, right, some kind of

20        intervention that would be delivered to the

21        person.  So beneficial generally refers to

22        either we're managing the person's symptoms

23        so that they don't get worse or we're

24        actually ameliorating the symptoms so that

25        they improve, which might not mean that

                                                    82

1       they're cured and it might not even mean that

2       they no longer meet diagnostic criteria for

3       it, but they might have a significant relief

4       in terms of the emotional pain that they're

5       experiencing or cognitive limitations or

6       behavioral problems that they're having.  In

7       some cases it can, you know, kind of at the

8       extreme be essentially curative whereby the

9       symptoms are ameliorated to the point that

10      you fall below the diagnostic threshold.  You

11      may still have some persisting symptoms that

12      are bothersome to you, but you no longer meet

13      criteria.  Occasionally, there are

14      interventions that can be essentially

15      curative, but for many psychological

16      conditions, we often don't necessarily think

17      of them as being cured but, rather, in

18      remission because of the tendency that a lot

19      of psychological conditions have to come

20      back.

21   Q.  Uh-huh.  And so psychologically beneficial

22      would encompass all of those things that you

23      just mentioned; is that right?

24   A.  Yes.

25   Q.  Okay.

83

1    A.    But it's still important to make the

2          distinction because we don't want to assume

3          that because something is psychologically

4          beneficial that that also makes it curative.

5    Q.    Okay.  And I think you told me what curative

6          means a moment ago, but can you tell me again

7          what -- what does it mean to be curative?

8    A.    Well, curative is not a technical term.

9    Q.    Uh-huh.

10   A.    But essentially, what we mean is that there's

11         either a condition where the person's

12         symptoms drop below the level that's

13         required -- the threshold that's required for

14         a diagnosis, right.  We use this Diagnostic

15         and Statistical Manual.  It has criteria that

16         you have to satisfy in order to have a --

17         meet criteria to have a certain condition.

18         You know, let's say that you have to have

19         four of those criteria.  With significant,

20         you know, benefit from psychological

21         treatment, you may drop down to only having

22         two of them.  You still have those two

23         things.  They might be bothersome to you, but

24         because you don't have four, you don't

25         qualify for the disorder anymore.  So I would

                                                              84

1    not consider that curative; I would still

2    consider that to be an amelioration.

3    Curative would be you have no symptoms of the

4    condition.

5  Q.   Understood.  So is there a difference between

6       a treatment being psychologically beneficial

7       and medically necessary or medically

8       beneficial, whatever the correct term is?

9            MR. RODRIGUEZ:  Objection, medical

10       opinion, but you can answer.

11  A.   Yeah.  There is a difference and that's why I

12       don't -- that's why I can give an opinion

13       about benefit without giving a medical

14       opinion.  So, you know, if somebody asked me,

15       you know, if this person has electroshock

16       therapy, will their depression be cured, I

17       wouldn't be able to give an opinion about

18       that.  What I could give an opinion about is,

19       here's what seems to be contributing to their

20       depression.  Here's what parts of it appear

21       to be biological or sort of mechanical issues

22       with their brain.

23  Q.   Uh-huh.

24  A.   But here are the other things that may not

25       be.  And so here's why we have reason to

85

1　　　believe that the person may need more than

2　　　ECT.

3　　Q.　　Okay.  When it comes to gender-affirming

4　　　surgery, in your view, can that ever be -- or

5　　　could it ever be psychologically beneficial

6　　　but not medically necessary?

7　　　　　MR. RODRIGUEZ:  Objection, medical

8　　　opinion.  You can answer.

9　　A.　　So saying something's not medically necessary

10　　　would be giving an opinion about medical

11　　　necessity so I would not give that opinion.

12　　　What I would endeavor to do instead would --

13　　　to be very clear about for psychological

14　　　benefit, you know, what does that mean, when,

15　　　how, who, what.

16　　Q.　　Uh-huh.

17　　A.　　What are the circumstances where the person

18　　　is most likely to achieve the best

19　　　psychological benefit that they can get.  I

20　　　wouldn't give an opinion about, you know,

21　　　this surgical technique versus that surgical

22　　　technique or this medication versus that

23　　　medication.

24　　Q.　　In your experience, in your training, are you

25　　　aware of any patient who was seeking

86

1         gender-affirming surgery and their providers

2         determined that, yes, it's psychologically --

3         it would be psychologically beneficial, but,

4         no, it wouldn't be medically necessary?

5  A.   I'm not typically privy to how the internal

6         committees within the Virginia -- for

7         example, Virginia DOC make those kind of

8         determinations so I don't usually even know

9         what necessarily happens in terms of the

10        endpoint of those cases.  So I'm not sure

11        what kind of determination was made by those

12        kinds of panels.

13  Q.   Okay.  So in your view, who would be

14        qualified to make a determination on medical

15        necessity for gender-affirming surgery?

16        MR. RODRIGUEZ:  Objection, medical

17        opinion, outside the scope of this expert's

18        opinions.  You can answer.

19  A.   So if some were to -- someone were to ask me

20        for a referral for that, I would say it would

21        need to be a medical professional, but the

22        type of medical professional could depend

23        largely on the individual person, what their

24        needs were and what they were asking for.  So

25        a lot of times, an interdisciplinary approach

87

1   is a pretty helpful one for that where you've

2   got a couple of different kinds of medical

3   doctors so you might have an endocrinologist

4   as well as a surgeon and a psychiatrist, for

5   example.

6 Q. And do you have a sense of how a medical

7   provider would go about determining whether

8   surgery's medically necessary?

9     MR. RODRIGUEZ:  Objection, medical

10   opinion, speculation.  You can answer.

11 A. I don't feel enough -- I don't feel that I

12   know enough to say whether or not I know

13   enough about that.  I'm not -- I'm not

14   familiar enough with the decision-making

15   processes that they utilize for medical

16   necessity to be able to give an opinion about

17   that.

18 Q. Okay.  Are you familiar at all?

19 A. I've certainly read depositions where

20   physicians were discussing medical necessity.

21   The -- I don't think that I'm an expert on

22   medical necessity.  I wouldn't give an

23   opinion about medical necessity.

24 Q. Okay.  Let's flip to Page 5 of your report.

25 A. Uh-huh.

88

1    Q.   So I am in the second paragraph, last

2         sentence, and you write, I know other

3         psychologists like Dr. Ettner and I who also

4         perform similar evaluations related to

5         gender-affirming care for transgender and

6         gender-nonconforming individuals and, in my

7         experience, it would not be typical for them

8         to offer medical opinions.

9              Did I get that all right?

10   A.   Yes.

11   Q.   All right.  Who were the other psychologists

12        you're referring to?

13   A.   So one would be Dr. Olezeski and her

14        colleagues at the Yale clinic.  These are

15        the -- some of the folks that I was thinking

16        of in particular because they conduct a lot

17        of trainings.  The last one they did was for

18        the APA last year and although they don't

19        offer medical opinions, they work

20        collaboratively with medical doctors so

21        they're not completely siloed off.

22   Q.   Uh-huh.  Anyone other than Dr. Olezeski, if

23        I'm pronouncing that correctly?

24   A.   Yes, you are pronouncing that correctly.  So

25        Sarah Miller, my coauthor.  I don't believe

89

1        Dr. Campbell has offered those opinions,

2        who's also my coauthor on that chapter.

3   Q.   What is Dr. Campbell's first name?

4   A.   Walter.

5   Q.   Okay.  So you say it's not typical for them

6        to offer medical opinions.  Do they ever

7        offer medical opinions?

8   A.   I can't say that I know enough about all of

9        those individuals and everything they've ever

10      said or did to be able to say they have never

11      offered an opinion that I would not consider

12      to be a medical opinion.  So I can't -- I

13      don't think I have the foundation and

14      knowledge to answer that, but my

15      understanding in my interaction with those

16      folks is that they would -- their ethical

17      principle would be not to offer one because

18      it's outside the scope of their competence --

19  Q.   Uh-huh.

20  A.   -- and I've never known them to do that.

21  Q.   Okay.  So for this assertion in your

22      report -- excuse me, your report concerning

23      offering medical opinions when you're a

24      psychologist, are you relying on anything

25      beyond your personal professional experience?

90

1   A.   Well, so we have authoritative texts that

2       provide guidance on these topics.  We --

3       there's a -- Mental Health Evaluations for

4       the Courts by Melton and colleagues is sort

5       of one of our foremost texts that we would

6       cite to that talks specifically about the

7       importance of maintaining -- staying within

8       the bounds of your competency as a

9       psychologist.  This is reiterated in our

10      ethics code broadly, in our forensic

11      guidelines more narrowly.  Additionally,

12      you'll see this in virtually any discussion

13      of forensic psychological practice because

14      it's not just that we shouldn't give medical

15      opinions -- that's one pitfall, one kind of

16      potential land mine for us.

17   Q.   Uh-huh.

18   A.   -- but also that we ought not offer legal

19       opinions.  That's the other area where we're

20      significantly cautioned is not to offer legal

21      opinions unless we are -- you know, like I

22      said, I have colleagues who are J.D./Ph.D.s.

23      that they might, but if you're just a

24      psychologist, you would not.  So it's not

25      specific just to medicine.

91

1   Q.   Okay.  And these authoritative texts, do they

2        say specifically something along the lines

3        of, you know, forensic psychologists cannot,

4        should not make recommendations concerning

5        medical necessity?

6   A.   I don't have a specific recollection that

7        that -- the exact language regarding medical

8        necessity.  I would have to look at the text

9        and see if that's an accurate representation

10       of what they say.

11  Q.   Yeah.  Well, I mean, I don't expect you to

12       remember offhand exactly what it says.

13  A.   Uh-huh.

14  Q.   Do you recall that it says something like

15       that?

16  A.   No.

17  Q.   Okay.

18  A.   I don't have a recollection.

19  Q.   Okay.  So can a psychologist, in your view,

20       refer a patient -- can a psychologist refer a

21       patient seeking gender-affirming surgery to a

22       medical provider?

23  A.   Yes.

24  Q.   Okay.  That's permitted by WPATH standards?

25  A.   Well, in fact, WPATH talks about an

                                                        92

1     interdisciplinary approach at times.  But an

2     interdisciplinary approach could come because

3     somebody goes to a clinic and the clinic

4     takes an interdisciplinary approach or they

5     could come to an individual psychologist or

6     other mental health care provider or even

7     their doctor and that person could refer them

8     for intervention.

9     Q.     Okay.  So in terms of just what a -- a

10     patient's care looks like --

11     A.     Uh-huh.

12     Q.     -- in your view, it's appropriate for a

13     psychologist to conduct an evaluation, say, I

14     think this treatment, surgery, or whatever

15     would have psychological benefit, and I'm

16     going to refer you along to a surgeon,

17     endocrinologist, whoever?

18     A.     Right.  You -- I mean, you would also

19     typically discuss whether or not a diagnosis

20     of gender dysphoria is present or absent.

21     Q.     Okay.  All right.  So still on Page 5.  Bear

22     with me just one moment.  All right.  I'm

23     sorry.  So this is second paragraph and it's

24     four lines down.  Thus, my role in such cases

25     is not to make determinations regarding

93

1       whether a person should or should not receive

2       a given intervention.

3            Did I read that correctly?

4  A.   Yes.

5  Q.   All right.  And then let's flip to Page 2.

6       And you say that part of your role is to

7       offer recommendations with respect to

8       gender-affirming interventions; is that

9       right?

10  A.   Right.

11          MR. RODRIGUEZ:  Can you --

12          MR. SIEGEL:  I'm sorry.

13          MR. RODRIGUEZ:  Where are you -- yeah,

14       where are you reading?

15          MR. SIEGEL:  I'm sorry.  Where is it?

16       I don't have it highlighted on my copy.

17  BY MR. SIEGEL:

18  Q.   Sorry.  Bear with me just one moment, y'all.

19          MS. MAFFETORE:  It's the first line --

20          MR. SIEGEL:  Okay.

21          MS. MAFFETORE:  -- on the second page,

22       to offer recommendations with respect to --

23          MR. SIEGEL:  Okay.  Thank you.

24          MS. MAFFETORE:  -- gender-affirming --

25  BY MR. SIEGEL:

94

1    Q.    All right.  So it's -- yeah.  It's the very

2          first line after the comma, Part of your role

3          is to offer recommendations with respect to

4          gender-affirming interventions or building

5          capacity to provide informed consent.

6    A.    Uh-huh.

7    Q.    All right.  So did those statements that I

8          just read, the one on Page 2 and the one on

9          Page 5 -- is there any contradiction between

10         those statements?

11   A.    I think part of the difficulty that we're

12         having here is that we're maybe confusing

13         making recommendations with respect to

14         gender-affirming interventions with

15         recommending specific gender-affirming

16         interventions.

17   Q.    Okay.

18   A.    So what I don't do is I don't say, this

19         person needs to have this surgery or this

20         person should not have this surgery.  I

21         don't --

22   Q.    Uh-huh.

23   A.    -- say either one of those things.

24   Q.    Okay.

25   A.    But what I might say is, you know, what this

95

1   person has articulated is that they would

2   like to -- you know, for example, I might

3   say, I think they should be provided with

4   information about what their options would be

5   for bottom half surgery because what they've

6   described in terms of their ultimate goal

7   might necessitate that based on how they've

8   described the presentation that they want.

9   So I might recommend, for example, like, they

10  should be provided with more information

11  about that and here's how they should be

12  provided with that information.  I might say,

13  they would learn best -- if they're a bright

14  person who likes to read, maybe give them a

15  book.  If they're not or they have literacy

16  problems, I might make recommendations that

17  are different.  So it's not that I'm

18  recommending what interventions they should

19  have, but I'm providing recommendations

20  related to gender-affirming interventions

21  without saying that they should or should not

22  have them.

23  Q.   And so in this case, you -- are you providing

24      an opinion whether Mrs. Zayre-Brown should or

25      should not receive a certain treatment?

96

1    A.   I haven't given an opinion about whether or

2         not she should -- from my perspective she

3         should or should not receive a given

4         treatment, but what I have done and can do is

5         describe what she has said she wants.

6    Q.   Okay.

7             MR. SIEGEL:  Let's take a short break,

8         if that's all right with y'all.

9             MR. RODRIGUEZ:  Yeah.

10          (Whereupon, there was a recess in the

11         proceedings from 11:00 a.m. to 11:09 a.m.)

12   BY MR. SIEGEL:

13    Q.   Welcome back, Dr. Boyd.

14    A.   Uh-huh.

15    Q.   All right.  Changing gears somewhat.  Are you

16         familiar with the Division Transgender

17         Accommodations Review Committee or DTARC?

18    A.   I am familiar with their existence.  I'm

19         familiar with them to the extent that their

20         activities were documented in the records

21         that I reviewed, but I don't have independent

22         knowledge of them outside of the information

23         I reviewed in this case.

24    Q.   Okay.  So based on what you reviewed, excuse

25         me, what is the DTARC?

97

1   A.   It's a committee that I believe reviews

2       requests and then provides approvals for

3       various stages of the process.  So there are

4       administrative processes for approving

5       evaluations, scheduling consultations, and

6       then approving procedures.

7   Q.   Do you know who's on it?

8   A.   No.

9   Q.   Are you familiar with their decision last

10       year to deny Mrs. Zayre-Brown's request for

11       gender-affirming surgery?

12   A.   Yes.

13   Q.   Do you have an understanding of how DTARC

14       reached that decision?

15   A.   No.  My primary focus was about how

16       Mrs. Zayre- -- Zayre-Brown received the news

17       and responded to it --

18   Q.   Okay.

19   A.   -- more than the deliberation.

20   Q.   Okay.  I'm going to hand you another exhibit.

21       I think this is Exhibit Number 3 that we're

22       on.

23           (BOYD EXHIBIT 3, Division Transgender

24       Accommodation Review Committee (TARC) Report,

25       2/17/2022, was marked for identification.)

98

BY MR. SIEGEL:

Q.   Dr. Boyd, have you seen this document before?

A.   This actually may have been included in the records that I reviewed.  This front page does not look fam- -- as familiar, but the -- the second and third page does.

Q.   Okay.

A.   Although it's possible that it looks familiar because it was cut and pasted from another section of the records.  That often happens.

Q.   Okay.  So take another moment to review if you'd like --

A.   Sure.

Q.   -- and then just let me know what this document is --

A.   I will tell --

Q.   -- or appears to be.

A.   Yes.  So this appears to be a report that documents a determination that was made by the -- the Division Transgender Accommodation Review Committee.  So it documents what information they reviewed.  It provides a brief narrative and a medical analysis is the latter portion.  It details who was in attendance at the time of the meeting and on

99

1     the front -- on the cover sheet there's an

2     indication that the purpose of the review was

3     related to gender-affirmation

4     surgery/vulvoplasty and the accommodations

5     referred for final determination includes the

6     decision that says, DTARC does not recommend

7     gender-affirmation surgery stating, This

8     surgery is not medically necessary.

9  Q.   Okay.  I think that sums it up.  Are you

10    familiar at all with the professional

11    background of the -- the individual

12    defendants in this case?

13  A.   No.  Be- -- not beyond what their title is as

14    reflected in records.

15  Q.   Okay.  Do you -- do you know if any of them

16    have medical training?

17  A.   I believe some do.  I believe your -- that,

18    for example, your chief medical officer is a

19    physician.

20  Q.   All right.  Any of the others to your

21    knowledge?

22  A.   My -- well, typically, the chief of

23    psychiatry would be a psychiatrist, who's

24    also a medical doctor, so it's likely that

25    person is also a physician.

100

Q.    Okay.  So based on this document, the DTARC
      recommended that gender-affirming surgery was
      not medically necessary, correct?

A.    That's what the form states, yes.

Q.    Okay.  So if any of the members of the DTARC
      who participated in this recommendation did
      not have medical training, would that have
      been appropriate in your view?

            MR. RODRIGUEZ:  Objection to form.  You
      can answer.

A.    So that's a -- this is a good example of why
      the interdisciplinary approach is important.
      So you can see there's a medical analysis
      section that -- there's a heading specific to
      that.  I would suggest that someone without a
      medical degree should not be involved in the
      decision-making regarding, like, the
      deter- -- the actual determination as far as
      saying this is medically necessary or not.
      However, it may benefit the folks who have
      the background to men- -- make the medical
      determination to have the input from folks
      who have a background in mental health and/or
      who are administrative folks who know more
      about what the internal regulations and

                                                      101

1     requirements are so they can have input and

2     they may provide information that the folks

3     who make the medical determination find

4     relevant and necessary.  But as far as who

5     signs off on the medical analysis and who

6     drafts it, in my opinion, that should be a

7     physician -- it should be someone with a

8     medical degree.

9  Q.   Understood.  Okay.  You can set this aside if

10    you'd like.  So a lot of your report is

11    talking about informed consent and you've

12    spoken about that some today.  I'll just ask

13    a very basic question of what is informed

14    consent and why does it matter?

15  A.   Right.  So informed consent, broadly

16    speaking, refers to the necessity for

17    individuals who are participating in

18    treatment or evaluation to knowledgeably

19    agree to participate or receive that

20    treatment or evaluation.  So that's, like, in

21    the very broadest sense.  And informed

22    consents in our practice as psychologists

23    means that people are knowingly participating

24    in -- whether it's an evaluation or

25    treatment, that they are a -- given the

1    opportunity to be provided with the

2    information that they need to understand the

3    risks and the benefits, the costs, and, you

4    know, have a reasonable and reality-based

5    appraisal of that before they are asked to

6    make a decision.  There's two parts to it.

7    One is making sure they have the information.

8    The other part is the autonomy of the

9    individual to choose to participate or not.

10         Informed consent in terms of providing

11    care to folks who are transgender has -- is

12    slightly different.  So we still have the

13    core informed consent obligations that we're

14    required to maintain ethically in terms of

15    our practice, doing evaluations or -- or

16    doing treatment, but informed consent is

17    also, somewhat confusingly, the name of a

18    different kind of approach to assessing

19    individuals and providing treatment to

20    individuals who are transgender, whether

21    they're in the community or a carceral

22    setting.  It's not specific to a setting.

23    And what it means is that instead of saying

24    that our role is to decide if somebody is

25    trans or not, instead, our role is to make

103

1    sure that the person not only has the

2    capacity, right -- which capacity doesn't

3    mean you already have all the information; it

4    just means you have the ability to understand

5    and process that information, make decisions.

6    Not only do they have the capacity, but have

7    they been provided with the information that

8    they need?  Are they in a position to make a

9    decision about it and do they have the

10   support that they need to do that?  So an

11   informed consent approach to conducting these

12   evaluations is different even though it uses

13   the same terminology as informed consent in

14   terms of an ethical obligation on the part of

15   psychologists when they're conducting

16   activities involving patients, clients, or

17   research participants.

18   Q.   Okay.  So when you are evaluating patients

19        for informed consent meaning, I think --

20        well, let -- I'll let you answer that.  When

21        you're evaluating a patient for informed

22        consent, which one of those do you mean --

23   A.   Right.

24   Q.   -- and how do you do it?

25   A.   Right.  Well, unfortunately, another

                                                    104

1     complicated answer.

2  Q.   Okay.  Great.

3  A.   So one version of looking at this could be,

4       like, a Miran- -- a competency to waive

5       Miranda evaluation, which is retrospective

6       and it's looking at whether or not the person

7       knowingly, intelligently, and voluntarily

8       waived their rights to a custodial

9       interrogation so you might look at their

10      capacity.  Do they have an intellectual

11      disability, do they have a severe psychiatric

12      problem, were they under severe stress,

13      things like that.  So that's one area where

14      it's -- you know, that's one area where it's

15      different.

16           But informed consent in this process

17      refers more to positioning the individual

18      who's seeking treatment in such a way that

19      they can access the support that they need,

20      have the information that they need delivered

21      in -- to them in a way that they understand

22      so that they can make a decision

23      collaboratively with their treating

24      professionals about what treatment they need,

25      when they should get it, how it should be

                                                      105

1       delivered.

2    Q.   In this case did you assess

3       Mrs. Zayre-Brown's ability to provide

4       informed consent?

5    A.   I used an informed consent approach and part

6       of that was assessing her capacity to provide

7       informed consent and I did ultimately come to

8       an opinion regarding that.

9    Q.   Okay.  How did you go about making that

10      assessment?

11   A.   I looked for the presence of any conditions

12      that could potentially interfere with her

13      capacity to provide informed consent and then

14      I just asked her direct questions to

15      ascertain her fund of knowledge and her

16      beliefs about different kinds of scenarios

17      and options.

18   Q.   Okay.  Could you be a bit more specific on --

19   A.   Certainly.

20   Q.   -- how you did that.

21   A.   Yes.  So in reviewing her records, for

22      example, I looked for conditions that could

23      be expected to potentially, even just in a

24      time-limited way, impair her capacity to

25      provide informed consent.  So I looked at

106

1     mood issues, cognitive issues.  Those are

2     the -- those issues and psychosis are the

3     most common kind of barriers to that.

4          After you see whether or not those

5     things are present, if they are present, then

6     you look to see, are they relevant?  In other

7     words, are they active now when the person --

8     or during the relevant time period when

9     you're looking at the decision-making, which

10     for Mrs. Zay- -- Zayre-Brown is now.

11          So she does have some cooccurring

12     conditions.  You know, in my view, though, at

13     the time that I saw her, those symptoms were

14     not so active or impairing that they would

15     impair her capacity to understand what her

16     options are and make decisions.

17  Q.   Okay.  Does that mean you concluded that she

18     can provide informed consent?

19  A.   I believe she has the capacity to provide

20     informed consent in that, you know, narrow --

21     more narrow kind of ethical obligation of

22     ensuring that she's not, for example,

23     agreeing to a procedure when -- in a --

24     without a reality-based understanding.

25  Q.   Okay.  If you could flip to Page 31 of your

107

1    report.  And this is beginning of Section E.

2    Sorry.  I'll wait till -- for you get there.

3  A.    Yes.

4  Q.    Oh, I'm sorry.  It's actually the -- the

5    first full paragraph on the page, which

6    reads, Mrs. Zayre-Brown's expectancies for

7    the surgical aftercare that would be

8    available to her in prison were less

9    realistic in light of history.

10        What does that mean?

11  A.    So this interview was -- was video recorded.

12  Q.    Uh-huh.

13  A.    And this is a reference in part to the

14    discussion that Mrs. Zayre-Brown and I had

15    about her experience when she initially

16    entered custody and had had surgery about a

17    month before that -- be- -- before her

18    sentencing.  And so she was still recovering

19    from a surgical procedure and that's where

20    the -- part of where that relevant

21    conversation started.  We discussed what care

22    she had already received and that's why I say

23    in light of the history.  When I say that her

24    expectancies for surgical aftercare that

25    would be available to her in prison were less

108

1    realistic, I say that because what she was

2    describing in terms of what she expected to

3    receive in terms of aftercare was a radical

4    departure from what -- the care she described

5    actually receiving.

6  Q.   Okay.  And the care that she described

7    receiving with respect to recovering from the

8    orchiectomy --

9  A.   Yes.

10 Q.   -- in 2017; is that correct?

11 A.   Yes.

12 Q.   All right.  Was there a -- anything else in

13   your assessment that contributed to your

14   statement here that her views were less

15   realistic about aftercare?

16 A.   So here we're talking about surgical

17   aftercare specifically --

18 Q.   Uh-huh.

19 A.   -- so not other elements of aftercare.  And,

20   yeah, so that particular statement is related

21   to that discussion.

22 Q.   Okay.  And so my question is, was there any

23   other statement that she made or any other

24   part of your assessment that contributed to

25   that observation you made?

                                                109

1    A.   The result of her formal testing by me --

2    Q.   Uh-huh.

3    A.   -- indicate that she has a personality style

4         where she is -- she has a tendency to, like,

5         idealize situations sometimes that are

6         prospectively positive so that can cause her

7         to be a little bit like a cork on the ocean

8         where a good thing happens or something seems

9         like it's going to be really promising and

10        relieving and her mood goes up significantly.

11        At the same time, when she gets news that

12        something is not going to happen, her mood

13        can drop down really dramatically.  And in my

14        view, that affects her ability -- when she's

15        in those states, that does affect her ability

16        to accurately appraise and anticipate what's

17        going to happen in the future, but that could

18        happen in either direction depending on the

19        circumstance.  I think this is an example of

20        her idealizing what would be available to

21        her.  And I say idealizing it because she is

22        com- -- I'm comparing it to what she has told

23        me about her own experiences prior to that.

24   Q.   Uh-huh.

25   A.   And she was not able to provide me with

                                              110

1    information that was -- would indicate that

2    there were -- there was an evidence base for

3    believing that the circumstances that she

4    described as ideal for her and most likely to

5    give her relief and benefit would actually

6    happen in a prison setting.

7    Q.    And what would be ideal?

8    A.    So she articulated it herself and I describe

9    it on that same page, the last paragraph

10    before Section E.  Her idea -- her view of an

11    ideal surgery context would include, A,

12    receiving medical care in the community,

13    including aftercare and wound care

14    management; B, the opportunity to receive

15    care and support from her husband, friends,

16    and family; and, C, participating in

17    meaningful personal and professional

18    development opportunities while she is

19    preparing for surgery and recovering from

20    surgery.

21    So this is her statement about what she

22    sees as an ideal surgery context.  Now, when

23    I say she idealized things, I'm -- here

24    that's not what I'm talking about.  This is

25    her -- just her self-report, her description

111

1    of what she thinks would be optimal for

2    her --

3  Q.  Okay.

4  A.  -- clinically.  What she described as far as

5    what -- how she thought recovery -- what

6    recovery from this procedure could look like

7    in a prison setting, she described having

8    more access to physicians, more regular care

9    than she described having at the time that

10   she initially entered prison in 2017.

11 Q.  Got it.  Do you have an understanding of what

12   postsurgical care is like for a vulvoplasty?

13 A.  I have some familiarity, but I can't give a

14   medical opinion.

15 Q.  Okay.  I'm not a asking for a medical

16   opinion, just to your knowledge.  Is -- is it

17   anything more complicated than basic wound

18   care?

19 A.  It depends on the individual.  The

20   vulvoplasty differs from vaginoplasty in that

21   most individuals, you know, there wouldn't be

22   a reason to use dilators, for example, but

23   depending on how the procedure is done, how

24   skillfully it's done, what the individual's

25   history is -- she did have complications

112

1    through her wound care before from the

2    orchiectomy but -- you know, it can be

3    complicated for individuals, but it -- you

4    know, it depends on the person.  All I can

5    rely on for her -- from her is what she tells

6    me about what her prior experiences were with

7    her ability to manage wound care.  And I

8    think it is fair to say that it's certainly a

9    risk, probably a more significant risk for

10    vaginoplasty compared to vulvoplasty, but

11    both of them would carry risks and a

12    physician would have to be the person -- a

13    surgeon would have to be the person to give

14    you an opinion.

15  Q.   Okay.  So other -- other than her experience

16    in 2017, do you have any other reason to be

17    concerned about the quality of aftercare

18    provided in the state prison system?

19  A.   I'm re- -- again, I'm relying on her report.

20  Q.   Okay.

21  A.   I'm relying on what she has personally

22    experienced and the aftercare that's

23    available in one facility or for one

24    individual could be different even within the

25    same prison system.

113

1    Q.   Speaking very generally, do you have concerns

2         about the quality of care offered in the

3         prison setting versus the community setting?

4    A.   With respect to mental health care, which is

5         really what I'm able to comment on, yes.

6    Q.   Okay.  Could you tell me why.

7    A.   Prisons are inherently stressful

8         environments.  Restrictive housing in

9         particular is a highly stressful environment.

10        It's well documented that it's incredibly

11        psychologically stressful.

12   Q.   Uh-huh.

13   A.   The analogy I sometimes give is that

14        depending on where you're at in the prison is

15        the psychological equivalent of getting hit

16        in the head -- or getting -- yeah, getting

17        hit in the head with a hammer every day and

18        wondering why your skull isn't recovering.

19        You know, you could get medical treatment --

20   Q.   Uh-huh.

21   A.   -- you could get stitches, but if you're

22        still getting hit in the head with a hammer

23        every day, you're not going to get a lot

24        better.  And that's part- -- partly an issue

25        of confinement.  It's partly an issue of who

114

1    you're around, what your population is and --

2    and who your social community and your peer

3    group is and whether they're dangerous to you

4    or not.  But from a mental health perspective

5    it is -- you know, we would most -- I don't

6    know any psychologist who would say that it's

7    not a -- a psychologically stressful

8    environment.

9  Q.   Uh-huh.

10  A.   So there's that aspect to it.  Doesn't mean

11    the community can't also be stressful.  Being

12    unhoused --

13  Q.   Uh-huh.

14  A.   -- for example -- you know, there are all

15    kinds of ways that the community can also be

16    stressful, but just as a baseline, it's a

17    more stressful environment.  Sometimes people

18    have access to services in there that they

19    don't have access to in the community, but

20    overall just as a baseline, it's a different

21    environment from a psychological perspective.

22  Q.   Okay.  So I'm going to give you a

23    hypothetical.  In your view, assuming that a

24    treatment would be psychologically beneficial

25    for a patient and is medically ne- -- excuse

115

1    me, medically necessary, would the quality of

2    aftercare available be a valid reason to deny

3    that treatment?

4          MR. RODRIGUEZ:  Objection to form,

5    medical opinion.  You can answer.

6  A.  Denying the treatment would be an

7    administrative decision.  It's not -- and

8    that's not a process that I'm part of.  I

9    also think that the individual's perspective

10    on whether they feel they could tolerate, you

11    know, those circumstances would be something

12    to take into account.  It's difficult to

13    answer that hypothetical just because it is

14    somewhat broad.

15  Q.  Okay.  Well, I'll narrow it a little bit.  So

16    you can also assume that this person has

17    requested the surgery and has been seeking it

18    for years.  And I'm not talking about really

19    the administrative decision.  I'm talking

20    about a decision by the healthcare providers

21    treating the patient.  So assuming all of

22    that -- so we've got patient who wants a

23    treatment.  Assume that it's psychologically

24    beneficial.  Assume that it's medically

25    necessary.  Patient has been advocating for

116

1     herself for years.

2          In that case, would the quality of

3     aftercare available be a valid reason to deny

4     the treatment?

5          MR. RODRIGUEZ:  Objection, medical

6     opinion, legal opinion, speculation, form.

7     You can answer.

8  A.   I wouldn't say -- I wouldn't say that

9     exactly, but I would direct you to, actually,

10    Ettner's second declaration, Paragraph 38

11    where she describes a Cornell study regarding

12    outcomes for transgender folks after they've

13    had procedures done and one of the things

14    that predicts outcomes is the quality of the

15    surgical procedure and, I believe also, the

16    aftercare that's available to that

17    individual.  That does affect the outcomes

18    that people have.

19         Now, you know, there's critique --

20    there's different ways to talk about that and

21    think about that.  Regret rates are also

22    related to the fundamental effectiveness of

23    the surgical procedure and whether or not the

24    person ends up with the outcome that they

25    want.  Now, as I'm sure you know, regret

117

1    rates are very, very low, but even within

2    that group, one of the things that does

3    predict it is if you don't get the surgical

4    outcome that you want physically.

5    Q.   All right.  So getting back to Kanautica and

6         informed consent --

7    A.   Uh-huh.

8    Q.   -- were there any aspects of informed consent

9         that you assessed and haven't mentioned yet

10        today?

11   A.   Yes.  I discuss in my report -- and forgive

12        me one second.  I want to locate it, the

13        section.  Okay.  On Page 10 in the section

14        that has a header that starts with,

15        Dr. Ettner discounts the importance of a

16        psychologist's role in informed consent, the

17        second full paragraph, A prospective

18        patient's understanding of the likely

19        outcomes of a procedure and the timing of

20        these outcomes is key to their ability to

21        make decisions while also weighing the risks

22        and costs.  Skipping down a little bit to the

23        second-to-last sentence, for example, a

24        patient who believes an intervention will be

25        curative may accept more serious or higher

                                                    118

1    probability risks compared to a patient who

2    believes that an intervention will alleviate

3    but not cure their symptoms.  Communicating

4    to a prospective patient, continuing on to

5    the next page, Page 11, that a surgical

6    procedure will be curative carries

7    significant risk of misleading the individual

8    and influencing their decision-making with

9    inaccurate information leading to exaggerated

10   proc- -- expectancies.

11           And so here what I'm speaking about, and

12   I continue to talk about in the report, is

13   the narrative -- is the information

14   essentially that Dr. Ettner provided to

15   Mrs. Zayre-Brown saying, this will cure your

16   gender dysphoria.  That is something that I

17   did get into and I discussed with

18   Mrs. Zayre-Brown because of my concern that

19   if doctors are -- authority figures are

20   coming in and telling her, this will cure

21   your gender dysphoria, and that's not true or

22   at least we can't say it with that degree of

23   confidence that that's definitely what's

24   going to happen, then that person may decide

25   to undertake procedures under riskier

119

1    circumstances, less optimal circumstances

2    that are likely to produce less benefit

3    because they think, this is what's going to

4    fix the pain that I'm experiencing.  And so I

5    do certainly have that concern and I discuss

6    it in my report with respect to informed

7    consent, wanting to ensure that

8    Mrs. Zayre-Brown has accurate, reality-based

9    information so that -- so that she can make

10   her own decision.

11   Q.   Are you expressing an opinion in this case as

12        to whether Mrs. Zayre-Brown has actually

13        provided informed consent for

14        gender-affirming surgery?

15   A.   I gave the opinion that I don't believe her

16        capacity to provide informed consent was

17        significantly compromised at the time of my

18        evaluation of her so her capacity to provide

19        informed consent to most surgical procedures

20        at this point, I think, is probably intact.

21            I mentioned the information that I think

22        has been provided to her that is misleading

23        and I -- you know, obviously, I want to make

24        sure she knows that that is my perspective so

25        she has that information, too, in making her

                                                      120

1       such as gender dysphoria, which has a diverse

2       manifestation and is inextricably bound up in

3       aspects of the person's life and

4       circumstances that go far beyond the physical

5       appearance of their genitals.

6           Did I read that right?

7  A.   Yes.

8  Q.   All right.  So big picture question.  Like,

9       can gender dysphoria be cured?

10  A.   I think there are certainly people who could

11       get to the point that they would be

12       subthreshold, right.  That's an -- I -- I've

13       talked before about how there's difference

14       between subthreshold and having no symptoms.

15       I think certainly for most people, there's

16       the possibility of bringing somebody

17       subthreshold for gender dysphoria, but it's

18       usually not the case that there's a single

19       intervention that's sort of like a magic

20       bullet.  It's usually a combination of things

21       that deal with, you know, as I allude to

22       here, not just what their genitals look like

23       or their secondary sex characteristics but

24       also what their social environment is, what

25       their supports are --

156

1  Q.   Uh-huh.

2  A.   -- what their access to care -- all kinds of

3       care is.

4  Q.   Okay.  So why is it that a -- a psychologist

5       can't predict that a certain intervention

6       will be curative of gender dysphoria?

7  A.   Because of the fact that it -- there's so --

8       there's other contributing causes.  I mean,

9       like, really just what I said there.  It's

10      not just about the -- the appearance of

11      somebody's physical body.  There are other

12      factors there.  So it's more like I'm saying

13      there's not one thing most of the time.  And

14      for her specifically -- getting into her

15      specifics, she articulates repeatedly that

16      there are other factors that contribute

17      significantly to her gender dysphoria,

18      specifically transphobia that she encounters

19      from other people and also to some degree, I

20      think, internalized transphobia when she

21      feels that she's been recognized and

22      identified and then treated differently

23      because she's a trans woman.

24 Q.   In your view, can a psychologist predict with

25      confidence that a certain intervention

157

1      wouldn't be curative but that -- but that

2      it's necessary to achieving a cure?

3              MR. RODRIGUEZ:  Objection to form.  You

4      can answer it.

5  A.   We would call that necessary but not

6      sufficient --

7  Q.   Uh-huh.

8  A.   -- in -- in our terminology.  So it's a piece

9      of it, but it's not going to get you all the

10      way there is the idea.  That's one way of

11      looking at that, yeah.

12  Q.   Okay.  Would that be true for any clinical

13      psychologist?

14  A.   I'm sorry.  I -- can you ask that question in

15      a different way?

16  Q.   Would it be true for any clinical

17      psychologist --

18  A.   That --

19  Q.   -- that you cannot predict that a certain

20      intervention will be curative?

21  A.   I think it depends on the intervention and it

22      depends on the individual.

23  Q.   Okay.  Well, how -- how about yourself, would

24      that apply to you?

25  A.   Well, yes.  I mean, I think it would depend.

158

1       If I have somebody that it's a very

2       straightforward presentation and they --

3       let's say they have very physiological

4       depression symptoms, in other words, they

5       feel very tired, they have very little

6       motivation, they can't -- just can't move

7       their body to do the things that they need to

8       do.  Provided that there isn't an underlying

9       medical condition and that's been ruled out

10      through interdini- -- disciplinary practice

11      or referral, then I would say we have good

12      reason to believe that probably about 80

13      percent of people would achieve remission is

14      what we would call it for -- for a condition

15      like that.  So I could tell -- I wouldn't

16      tell somebody, I'm absolutely confident this

17      will cure you.

18   Q.   Uh-huh.

19   A.   You know, something else could happen.  Their

20      parent could die.  They -- you know, any

21      number of things could happen that could

22      interfere with their progress, you know, but

23      I could say, you know, given the evidence

24      base for the success rate of this

25      intervention, given the complexity or lack of

159

1  complexity in your presentation, you know,

2  here's how likely I think it is you would

3  benefit, but I would never tell somebody, I

4  am certain that this will cure you.

5 Q. Okay.  Let's flip to Page 20.  So I'm going

6  to -- the last sentence of Subsection B you

7  say, Likewise, surgical intervention alone is

8  not likely to be curative and may not

9  substantially ameliorate her suicidality --

10 A. Uh-huh.

11 Q. -- is that right?

12 A. Right.

13 Q. Okay.  So are you making a prediction here

14  about whether a certain treatment would be

15  curative?

16 A. I think it's not likely it would be curative.

17  I do -- I think it's likely she would achieve

18  a benefit from it.  It's really -- I think

19  the debate is sort of the degree of that

20  benefit.  Secondarily, you know, the question

21  of, like, substantially ameliorating her

22  suicidality, I mean, it might, you know, but

23  I don't think that we have confidence to say

24  it will.

25 Q. Do you see any tension between your assertion

1      here and the assertion we spoke about a

2      moment ago that a psychologist cannot predict

3      with confidence that a certain treatment will

4      be curative?

5  A.  Yes, but that's basically making -- that's

6      saying, this is -- this is how this is going

7      to go.  What I -- what I'm saying instead

8      here when I'm saying it's not likely to be

9      curative is -- what I'm saying is the most

10     likely outcome is that it's going to fall

11     short of that particular benchmark of being

12     curative.  Doesn't mean -- I'm not saying

13     surgical intervention alone is not likely to

14     provide psychological benefit or amelioration

15     of the symptoms, but it's not -- I don't

16     think it's likely to be curative

17     specifically.  That's a very high bar.

18 Q.  Okay.  But do you think that gender-affirming

19     surgery would provide psychological benefit

20     to Kanautica?

21 A.  I think depending on the circumstances, if

22     it's provided in the way that she details,

23     which I described in my report on Page 31,

24     receiving medical care in the community

25     including aftercare and wound management,

                                                    161

1      receiving care and support directly from her

2      support network, participating in meaningful

3      personal and professional development

4      opportunities both while she's preparing for

5      it and while she's recovering from it, then,

6      yeah, I think she -- I have no problem at all

7      saying I think it's likely she would benefit

8      from that and probably, I think, get

9      significant relief both with respect to

10     gender dysphoria and with respect to

11     suicidality.

12  Q.   Okay.  Are you familiar with the treatments

13       for gender dysphoria she has received so far?

14  A.   I don't want to misrepresent my level of

15       understanding.  I have some understanding of

16       what she's already undertaken, but I don't

17       have a medical professional's level of

18       knowledge.

19  Q.   Okay.  Do you know that she has been on

20       hormone therapy?

21  A.   Yes.

22  Q.   Okay.  Do you know that she has un- --

23       undergone social transitioning?

24  A.   Yes.

25  Q.   Okay.  To your knowledge, have those

GENERAL CONFIDENTIAL INFORMATION        162

1    treatments cured her of gender dysphoria?

2    A.    No.

3    Q.    Okay.  Other than surgery, is there any

4          treatment that you're familiar with for

5          gender dysphoria that she has not received?

6    A.    So medical treatments, I couldn't speak

7          comprehensively to that because I'm not a

8          medical expert so I can't tell you what all

9          of those options would be.  I don't believe

10         that she's done voice training.  That's

11         something that she could do.  There might be

12         other kinds of sort of plastic surgery-type

13         interventions that she might want, but, you

14         know, those are -- you know, the -- the

15         surgery aspects are a medical intervention.

16         And additionally, there -- this is such an

17         evolving area of practice that there are new

18         procedures all the time so the options today

19         might not be the options next year.  There

20         could be other things that would help her.

21              She had -- she -- and she has had

22         plastic surgery from what I understand in

23         terms of what I discussed with her in her

24         deposition, but when you read her description

25         of it and talked with her about it, she

                                              163

1    describes getting very, very limited gains

2    from these prior medical interventions.

3            Now, you know, one of the questions

4    would be if she got such limited benefit from

5    the prior interventions, why do we believe

6    we're going to make the jump to a hundred

7    with the -- one single intervention, you

8    know?  I don't think there's a -- I don't

9    think we have good reason to believe that

10   based on her own characterization and

11   recollection of her experiences with medical

12   intervention.

13   Q.   Uh-huh.  So zooming out somewhat, like, big

14   picture, what do you believe is causing her

15   gender dysphoria?

16   A.   So Mrs. Zayre-Brown has had a very -- from my

17   understanding she has not had an easy life.

18   She does have support in her marital

19   relationship and evidently her family

20   relationships, but living as a transgender

21   person in the United States at this point in

22   time is painful and difficult not only

23   because of constraints on access to services

24   or people not even knowing what's available

25   to them sometimes or not being able to afford

164

1     it, but also, obviously, there's a cultural

2     environment that's hostile to people and I

3     believe that that cultural environment is a

4     significant cause and contributor to her

5     gender dysphoria.

6          On top of that, frankly, our gender

7     binary is -- is highly, highly determined by

8     essentially the -- the ancestry's eugenics

9     and the beauty standards for women are

10    difficult for anybody to achieve and fairly

11    narrow.  And I think if the aim is to not be

12    identifiable as a trans woman, that's going

13    to -- that's difficult.  And if you are

14    identified, then it may be because of some

15    piece of your anatomy that somebody knows

16    about, but it could also be your height.  It

17    could be your shoulders.  It could be your

18    voice.  People who aren't even trans are

19    getting -- people are telling them that

20    they're trans because their shoulders are too

21    broad or their voice is too low.  There are

22    all kinds of ways in which she, I think,

23    experiences transphobia in ways that have,

24    frankly, nothing to do with her primary sex

25    characteristics, but I also believe that

165

1    there is a contribution that is coming from

2    her own internal discomfort with continuing

3    to have a phallus when that is not consistent

4    with her gender identity.  I do think that

5    contributes to her gender dysphoria and it

6    makes sense then rationally that coping with

7    that is going to be a sensible step for her

8    in terms of treatment.

9  Q.  And to be clear, what do you mean by coping

10     with that?

11 A.  Well, I mean having -- having a procedure

12     to -- you know, having bottom half surgery,

13     whether that's a vulvoplasty or vaginoplasty,

14     dealing with that component of it, of the

15     internalized transphobia.  And also, just the

16     discomfort, emotional and psychological

17     discomfort, with continuing to have a

18     phallus, that is its own contribution.  I

19     think that's valid.  I believe her when she

20     says that.

21 Q.  Do you have any reason to think that

22     Mrs. Zayre-Brown can be cured of her gender

23     dysphoria while she still has a penis or a

24     phallus as she calls it?

25 A.  Based on her statements, I think not.  I

166

GENERAL CONFIDENTIAL INFORMATION

Case 3:22-cv-00191-MOC-DCK   Document 65-12   Filed 10/19/23   Page 53 of 57
DISCOVERY COURT REPORTERS   www.discoverydepo.com   1-919-424-8242

1　believe her self-report has consistently been

2　that this is something that she sees as sort

3　of a keystone intervention.  I think the main

4　difference really is just that in my view,

5　she needs other things as well and that we

6　want to be careful and mindful about the

7　timing and the setting and the context of

8　intervention to maximize the benefit that

9　she's going to get so we can get as close to

10　the benefit as she anticipates as we possibly

11　can.

12　Q.　Okay.  You mentioned the -- the phrase

13　necessary but not sufficient a little while

14　ago.

15　　　Would you say that removing her phallus

16　and having genital surgery would be necessary

17　but not necessarily sufficient to cure her

18　gender dysphoria?

19　A.　Ultimately, yes.  The question of the timing,

20　I think, is a separate issue, but in the

21　long-term sense, yes.

22　Q.　Uh-huh.  Did you find any contraindications

23　for surgery?

24　A.　So I can't speak to medical contraindications

25　for surgery.  And surgery, broadly speaking,

GENERAL CONFIDENTIAL INFORMATION　　167

Case 3:22-cv-00191-MOC-DCK  Document 65-12  Filed 10/19/23  Page 54 of 57
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

1      no, but as far as what she described -- you

2      know, that's what I keep coming back to is

3      what she's describing as the set of

4      circumstances that are going to -- going to

5      give her the most relief.

6   Q.   Do you have any reason to think that if she

7      underwent a vulvoplasty, she would later

8      regret it?

9   A.   I think it's possible if the -- not in and of

10     its- -- not, like, per se.  Not only because

11     of, oh, I wish I had had another procedure.

12     It's possible depending how -- how the

13     procedure went that later on, she could have

14     some amount of regret, not that she had a

15     vulvoplasty but that she didn't have a

16     vaginoplasty instead.  I think that's

17     possible.  I don't think it's likely that she

18     would experience regret in terms of saying, I

19     wish I still had a phallus.

20   Q.   If someone undergoes a vulvoplasty, are they

21     able to also undergo vaginoplasty later?

22   A.   My understanding of it -- and I want to be

23     clear because I'm not a medical professional.

24     I can't give a medical opinion.  But my

25     in- -- understanding from consulting with

**GENERAL CONFIDENTIAL INFORMATION**      168

1    medical professionals who do the procedures

2    is that vulvoplasty is a less commonly done

3    procedure so it's -- most of the surgeons who

4    would do it will have less familiarity with

5    doing that compared to vaginoplasty and also

6    that with respect to both the orchiectomy and

7    vulvoplasty, there's the necessity of

8    maintaining a certain amount of tissue and

9    certain structures in order to be able to

10   later do a vaginoplasty, although there are

11   alternative procedures that can be done if

12   that tissue isn't there, and they may be more

13   or less desirable to the individual.  I think

14   it has to be a highly individualized medical

15   decision that's made between the doctor and

16   their patient.

17 Q.  Okay.  Let's turn to Page 29 of your report,

18     please.  And I'm -- it's the final sentence

19     of the third paragraph on the page.  In other

20     words, Mrs. Zayre-Brown's acute mental health

21     crises in recent years were indirectly rather

22     than directly related to her gender

23     dysphoria.  Additionally, by her account,

24     significant contributions to her distress

25     were associated with administrative processes

169

1    and delays related to her treatment.

2         Did I read all that correctly?

3    A.   Yes.

4    Q.   What does it mean for something to be

5         indirectly related to gender dysphoria?

6    A.   So the idea would be that there's a certain

7         amount of distress that comes from what I

8         just described as this sort of

9         compartmentalized -- it may be internalized

10        transphobia or may be some other

11        manifestation of just dis- -- emotional and

12        psychological discomfort with continuing to

13        have a body part that you don't want to have

14        or wishing you had one that you don't.  The

15        mental health crises appear to be in part --

16        again, it's like that cork on the ocean

17        thing.  The gender dysphoria is going to

18        be -- I think for her it has ebbed and flowed

19        to some degree, but I don't think there's a

20        time when it hasn't been present as far as I

21        can tell.  But the interactions with

22        authority figures who give her bad news, who

23        she perceives as delaying things, or when she

24        has feelings of abandonment, that also taps

25        into, I think, some trauma-related issues

170