IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF NORTH CAROLINA

CHARLOTTE DIVISION


Civil Action No. 3:22-cv-0191


KANAUTICA ZAYRE-BROWN,               )
                                     )
        Plaintiff,                   )
                                     )
            v.                       )
                                     )
THE NORTH CAROLINA                   )
DEPARTMENT OF PUBLIC                  )
SAFETY, et al.,                      )
                                     )
        Defendants.                  )
                                     )

_____

30(b)(6) DEPOSITION OF ARTHUR CAMPBELL, M.D.

THE NORTH CAROLINA DEPARTMENT OF PUBLIC SAFETY

_____

(Taken by plaintiff.)


Raleigh, North Carolina


April 18, 2023, 9:30 a.m.


Reported By:

SUSAN GALLAGHER, CA CSR, CVR-CM

1

1    through memorandums of agreement and other methods to

2    make sure that the offenders can receive the care that

3    they need, and that's the full spectrum.  There is

4    nothing that's excluded or not included in it that.

5         Q   Okay.  Does DPS require that the healthcare

6    decisions regarding individuals based on their own

7    individualized circumstances?

8         A   Yes, ma'am.

9         Q   Do decisions for each individual to be based on

10   individual determinations?

11        A   Yes, ma'am.

12        Q   Does DPS permit DPS healthcare providers'

13   personal views to factor into the delivery of health

14   and wellness services to people in custody?

15        A   No, ma'am.

16        Q   Does DPS permit DPS healthcare providers'

17   political views to factor into the delivery of health

18   services to people in their custody?

19        A   No, ma'am.

20        Q   I now want to have marked as Exhibit 3 a policy

21   entitled "Health and Wellness Services Organization."

22        (Exhibit 3 marked for identification.)

23   BY MS. MAFFETORE:

24        Q   Do you recognize this policy?

25        A   Yes, ma'am.

16

1          Q   And what is this policy, broadly speaking?

2          A   So this talks about the overarching philosophy

3     and the structure and authorities within -- they call

4     it health and wellness here.  That's since changed

5     since we're the Department of Adult Corrections.  So

6     the new name for this is the Division of Comprehensive

7     Health Services, but essentially the same policy

8     carries forward.

9          Q   And when would the policy have shifted title?

10         A   When DPS made the transition to DAC, which was

11    in the past 60 days, roughly.

12         Q   Okay.  And you've seen this policy before

13    today; correct?

14         A   Yes, ma'am.

15         Q   Who at DPS is responsible for drafting this

16    policy?

17         A   So this would be -- under the current structure

18    will be the deputy secretary for Comprehensive Health

19    Services.

20         Q   Okay.  And under the previous structure?

21         A   It would have been the director of Health and

22    Wellness.

23         Q   So is that or was that at the time Gary Junker?

24         A   It was and still is.

25         Q   Does Gary Junker have a -- his title is

17

1  slightly different now; is that correct?

2     A  Correct.  He's now the deputy secretary.

3     Q  Did you have any involvement in drafting this

4  policy?

5     A  No, ma'am.

6     Q  Have you ever been asked to contribute to any

7  revisions of the policy?

8     A  No, ma'am.

9     Q  If you could please look at page 1 of this

10  exhibit, Section 2C at the bottom, do you see a portion

11  that says, "In support of DOP's mission statement,

12  health and wellness professionals shall promote

13  excellence, provide community-consistent cost effective

14  quality healthcare throughout our system."

15     Did I read that accurately?

16     A  Yes, ma'am.

17     Q  What does DOP mean by "community consistent

18  healthcare"?

19     A  So, again, they -- well, we are expected to

20  provide our services that are consistent with standards

21  of care or community practice.  So there is a little

22  bit of a distinction between what's the standard of

23  care as opposed to following clinical practice

24  guidelines, but that's the consistency there.  So we

25  need to be consistent with what the community is doing.

18

1    In other words, offenders should receive the exact same

2    care they would get if they were on the outside.

3         Q    Okay.  You mentioned just now some distinction

4    between standards of care and clinical guidelines.

5    Could you elaborate on that?

6         A    Sure.  Standard of care is, quite frankly, more

7    of a legal term than a medical term.  So in the medical

8    community, what we rely on and what the vast majority

9    of all of the professional medical societies publish

10   are clinical practice guidelines.  They don't call them

11   standard of care, per se.

12        So the best medical definition of standard of

13   care would be the diagnostic or treatment procedures

14   that a clinician should follow in treating a particular

15   patient, illness, or a particular clinical

16   circumstance.  Legally it has a little bit different

17   twist, and my interpretation of a legal definition of

18   that would be that it's, how would the average the

19   prudent provider provide care for that specific patient

20   in those circumstances, or how would a similarly

21   qualified and trained clinician provide care for a

22   particular patient in those exact clinical

23   circumstances.

24        Q    Okay.  Now, when you say that folks that are

25   incarcerated should receive the same care in prison as

19

1   if they were in the community, what community are you

2   looking to to determine what constitutes community

3   consistent healthcare?

4        A  So in the broad context, it's outside the

5   prison.

6        Q  So would that be nationwide?

7        A  Well, not specifically because, again, states

8   have -- for instance, you know, Medicaid is a state-run

9   program.  So states have variations in what their

10  individual state provides and covers.  Within the

11  context of medical care though, the care should be the

12  same.  You know, if it is truly standard of care, it's

13  going to be fairly consistent across the country.

14       Q  Okay.  So if I'm understanding your testimony

15  correctly, in certain circumstances the community

16  against which you're judging would be the state, but

17  generally speaking it is nationwide?

18       A  Correct.

19       Q  Okay.  Where does the definition or the

20  explanation you just described, "community consistent

21  healthcare," come from?

22       A  I don't know what the origins of that is.

23       Q  How did you come to be familiar with that?

24       A  Again, by reading these policies and

25  understanding what the department's policy is and how

                                                        20

1   we are supposed to take care of these offenders.

2   That's where I became aware of what that standard is.

3       Q   Does DPS provide training to its health

4   services staff members regarding the meaning of

5   community consistent care?

6       A   I don't know if there's any specific training

7   for that.  You obviously review policies and

8   procedures, and you have orientation when you arrive at

9   the organization, and that's part of that, but I don't

10  know if there's a specific training dedicated to this

11  particular aspect of that.

12      Q   Okay.  From your understanding or from DPS's

13  understanding, is medically necessary care the same as

14  community consistent care?

15      A   Generally, yes.

16      Q   You said "generally, yes."  Are there

17  circumstances when that is not the case?

18      A   Well, I think the difference would be in the

19  community, individuals can pay for care that may be

20  elective.  Whereas, in the prison, we are responsible

21  for providing that care.

22      Q   I'm not sure I understand -- I'm not sure I

23  understand that answer.  So that's a situation where

24  medically necessary care and community consistent care

25  would not be similar is where elective procedures are

21

1    involved?

2         A   Well, not just elective, but individuals in the

3    community may not have, for instance, insurance.   So

4    it's different here.   We cover these individuals for

5    the care that's provided in the prison.

6         Q   Okay.   How does DPS define "medical necessity"?

7         A   That's a big answer.   So in its simplest terms,

8    when you look at medical necessity, it's probably best

9    defined as a procedure that is reasonable and

10   appropriate for a particular individual, really, to

11   either protect their life, to prevent significant

12   disability or illness, or to prevent significant pain

13   and suffering.   That is a very broad definition of

14   medical necessity, and quite honestly, it's been

15   through a lot of subjectivity, and so within prisons we

16   need to be a little more deliberate in how we define

17   that.

18             So what we need to be sure in prisons is that

19   every officer that has a similar clinical circumstances

20   that has a case submitted for review or a clinical

21   condition, it's evaluated in the exact same way as

22   objectively as possible as any other offender in the

23   prison, and that's for any medical condition that they

24   may see.

25             In my interpretation of medical necessity, in

22

order to get after that and to be able to come up with

a more clear understanding of what that means, you have

look at what factors would you see with medical

necessity that could be attributed to that, and there's

really three broad ones, I think, that fall under that

category.

First is a risk-benefit analysis.  Second is

standard of care, and third is evidence based medicine,

and I can certainly talk in more detail about each of

those.

So as we look at a particular case or

circumstance, those are the broad criteria we need to

use to evaluate that.  With risk-benefit analysis, it's

important to note that this is by far the most critical

piece of that evaluation.  What that means is that you

have to look at that particular patient and those

particular circumstances and their clinical condition,

and you need to determine whether the proposed

treatment, what would be the impact if you were to not

perform that procedure as opposed to performing the

procedure for the offender.  So you balance the risk of

performing the procedure versus the potential risk of

not performing that procedure, and what is the outcome

of that, and that involves, again, a very

individualized review of that particular patient and

23

1    those particular circumstances, and I think one of the

2    things about that balance is that you cannot perform

3    analysis without doing that individualized review of

4    that case, and that's to your other question you asked

5    about, that individualized review.  So we do that.

6         So, for instance, if a procedure is proposed

7    and you know the potential treatment for that, you look

8    at that particular patient, those circumstances, and

9    determine whether that procedure is appropriate and

10   it's going to do those things I mentioned.  Is it going

11   to protect their life?  Is it going to prevent

12   significant illness or disability, and is it going to

13   prevent significant pain and suffering?  And that's how

14   you do that risk-benefit analysis.

15       Q  So I just have one follow-up regarding

16   preventing significant pain and suffering.  Is your

17   understanding that emotional pain and suffering is also

18   relevant to whether or not something is medically

19   necessary?

20       A  Yes, ma'am.

21       Q  Psychological pain and suffering?

22       A  Yes, ma'am.

23       Q  And I believe a moment ago when you started

24   explaining this to me, you said, "at least in my view,"

25   and I just want to be clear we're in the 30(b)(6)

24

1  portion of your deposition so I'm asking for DPS's

2  position.  Is your understanding that everything you

3  just explained to me is DPS's position?

4     A  No. So I think that DPS does not have a medical

5  necessity definition, per se, or DAC.

6     Q  So where did the definition of medical

7  necessity as you just explained to me come from?

8     A  Well, I'm thought you were asking my opinion of

9  that.  I probably should have not answered that, but

10  that's --

11     MR. RODRIGUEZ:  It was asked in the context of the

12  30(b)(6), and your response was in the context of your

13  understanding of that as the representative, and then I

14  think you clarified that it is not written in a policy,

15  a departmental policy.

16     THE WITNESS:  Correct.

17  BY MS. MAFFETORE:

18     Q  And that's your understanding.  So is that the

19  definition that you use acting as medical director for

20  DPS, what you just explained to me?

21     A  The medical necessity for DPS would be what I

22  described initially, the generally accepted medical

23  definition of medical necessity.  So that first thing I

24  told you where it's basically those things that prevent

25  death, significant illness, and disability.  That is

25

1   the accepted standard, really, everywhere for what

2   medical necessity is.

3        Q   So you mentioned certain factors that are taken

4   into account regarding medical necessity.  Does DPS

5   ever take into consideration the cost of a procedure

6   when it's considering medical necessity?

7        A   No.

8        Q   How about security?

9        A   Security is always considered in every context

10  in our setting.

11       Q   So it's considered a medical necessity

12  determination?

13       A   It's not a medical necessity determination, no,

14  but security's always a determination.

15       Q   Okay.  How about logistics?

16       A   Again, not for medical necessity, if that's

17  what you're asking.

18       Q   What about the ability to provide postoperative

19  care?

20       A   Again, not for medical necessity.

21       Q   Is your interpretation as medical director on

22  behalf of DPS of medical necessity the same for all DPS

23  decisions about the provision of, for example, mental

24  health care?

25       MR. RODRIGUEZ:  Object to speculation.

26

1    You can answer.

2    THE WITNESS:  It's universal when it relates to

3 health care, regardless of the type of healthcare.

4 BY MS. MAFFETORE:

5    Q  So also all medical care, all sorts of care?

6    MR. RODRIGUEZ:  Same objection.  Speculation.

7    You can answer.

8    THE WITNESS:  Yes.

9 BY MS. MAFFETORE:

10    Q  And in evaluating the request from someone in

11 DPS custody for healthcare services, is there any kind

12 of care where DPS would consider an individual's legal

13 history in making a medical necessity determination?

14    A  No, ma'am.

15    Q  Is there any situation where DPS would consider

16 an individual's criminal record in making a medical

17 necessity determination?

18    A  No, ma'am.

19    Q  Is there any instance where DPS would consider

20 an individual's disciplinary history or history of

21 interactions in a medical necessity determination?

22    A  No, ma'am.

23    Q  If you to turn to page 2 of Exhibit 3, if

24 you'll look at Section 2G5, it states there that "one

25 of the goals of health and wellness is to engage in

27

1    sound healthcare practices that meet an acceptable

2    standard of care"; correct?

3        A   Correct.

4        Q   So I think that you started to get into this

5    when you were talking about medical necessity, but if

6    you could get into it now, what constitutes an

7    acceptable standard of care according to DPS?

8        A   So, again, within DPS we rely on the same

9    things I mentioned, which are clinical practice

10   guidelines, and that is across the board what we rely

11   on for standard of care.

12       Q   What are the sources of those clinical practice

13   guidelines?

14       A   They will vary.  It can be from the individual

15   professional medical associations and societies.  We

16   often develop our own clinical practice guidelines

17   specific for our individual setting.  Each one of those

18   references the pertinent medical society clinical

19   practice guidelines, and we'll adapt those as needed

20   for the prison environment.

21       Q   Are there any circumstances where DPS would not

22   look to individual medical associations and societies

23   for clinical guidelines?

24       MR. RODRIGUEZ WITNESS:  Object to speculation.

25       You can answer.

28

1          THE WITNESS:  No, ma'am.

2     BY MS. MAFFETORE:

3          Q   Okay.  So on the same page of this exhibit,

4     Section 2H, it states that "the provision of treatment

5     regarding clinical decisions that involve health and

6     wellness providers are the sole responsibility of the

7     managing health and wellness practitioner and are not

8     reversed by non-clinicians."

9          Did I read that correctly?

10         A   Yes, ma'am.

11         Q   What does DPS mean by this?

12         A   So it means that medical decisions are made by

13    medical authorities within the prison.

14         Q   Okay.  How does DPS define "clinician"?

15         A   It is a licensed independent provider.  So it's

16    a provider who is credentialed to practice within our

17    healthcare system.

18         Q   So you said is a licensed health provider.

19    What degrees of licensure does that encompass?

20         A   So it can be family nurse practitioners,

21    physician assistants, and physicians.

22         Q   Anyone else?

23         A   No.

24         Q   Would a mental health care provider be

25    considered a clinician?

                                                          29

1      A  Yes.

2      Q  And at what levels of medical health -- or

3   mental health licensure would be considered a

4   clinician?

5      A  Licensed clinical social workers,

6   psychologists, obviously psychiatrists are physicians,

7   but they all fall in that same spectrum.

8      Q  Does DP's definition of clinician have anything

9   to do with the degree of patient contact a medical

10  provider or mental health care provider has?

11     A  No.  They're licensed or credentialed based on

12  their qualifications.

13     Q  Okay.  So if somebody holds a licensure within

14  DPS but is in a position where they do not see patients

15  at all, that person is still considered a clinician

16  based on DPS's definition of clinician?

17     A  Yes, ma'am.

18     Q  Who, if anyone within Health and Wellness

19  Services, would not be considered a clinician by DPS?

20     A  So the registered nurses, the LPNs, the

21  certified nursing assistant, the certified medical

22  assistants.  There are lots of administrative staff,

23  both budgetary and accounting.  The section is very

24  large and includes not only clinical folks, but

25  clinical support folks as well.  There's respiratory

                                                        30

1  therapists.  There's a lot of folks that are not

2  considered credential providers.

3      Q  Is there anyone outside of health and wellness

4  who would be considered a clinician by DPS?

5      A  No.

6      Q  According to DPS, why shouldn't medical

7  decisions be reversed by non-clinicians?

8      MR. RODRIGUEZ:  Object to speculation.

9      You can answer.

10     THE WITNESS:  Again, the only folks trained and

11  qualified to make those medical decisions and

12  recommendations are medical providers.

13  BY MS. MAFFETORE:

14     Q  Are there any circumstances when DPS considers

15  it appropriate for decisions to be reversed by

16  non-clinicians?

17     MR. RODRIGUEZ:  Objection to speculation.

18     You can answer.

19     THE WITNESS:  Not that I'm aware of, no.

20  BY MS. MAFFETORE:

21     Q  If you could turn to page 5 of this exhibit and

22  look with me to Section -- you can't see a 3 on this

23  page, but it's 3H.  That section states, "Medical

24  services are provided under the direction of the

25  medical director/chief medical officer who maintains

31

1    responsibility for the quality of medical services

2    provided to offenders."

3          Did I read that correctly?

4      A  Yes, ma'am.

5      Q  The medical director/chief medical officer

6    referred to in this policy is currently you; correct?

7      A  Yes, ma'am.

8      Q  Still on page 5, still under H, Section 1

9    states that "services are provided in accordance with a

10   professionally identified evidence-based clinical

11   decision support resource."

12         Did I read that correctly?

13     A  Yes, ma'am.

14     Q  What is a clinical support -- clinical decision

15   support resource?

16     A  So it references, again, back to what I told

17   you, the clinical practice guidelines, the pertinent

18   medical societies, all of those entities provide input

19   into what's ultimately our clinical practice

20   guidelines, the way we practice medicine within the

21   prisons.

22     Q  So are there different resources based on

23   different conditions?

24     A  I'm not sure I understand the question.  I

25   think that any pertinent medical literature is going to

                                                    32

1    be appropriate to be considered when you're considering

2    medical problems.  So whether that's using resources

3    such as UpToDate or whether it's relying on, you know,

4    medical societies and those things.

5        Q  Okay.  So just to clarify on my end, a clinical

6    decision support resource is not something that DPS

7    drafts, essentially, to provide to clinicians as a

8    resource?

9        A  No, ma'am.

10       Q  Okay.  My understanding of your testimony is

11   that the, sort of, wide variety of sources related to

12   specific conditions, documents from medical societies,

13   various research, all of that is considered by DPS to

14   be a clinical decision support resource.  Am I

15   understanding correctly?

16       A  Yes, ma'am.

17       Q  In H-1, when DPS says "professionally

18   identified," by whom?

19       A  So, again, I think it goes back to what I said,

20   is that you rely on medical societies and organizations

21   that are recognized.  So in other words, they're well

22   recognized entities in the medical community.

23       Q  Is anybody within DPS Health and Wellness

24   Services responsible for vetting which sources are

25   credible enough to be utilized as a clinical decision

                                                        33

1  support resource?

2      A   No, ma'am.  I think that the reason they're

3  licensed as providers is we expect them to conduct that

4  analysis as they would in accordance with their

5  credentials.

6      Q   So what materials can be relied upon is left up

7  to the discretion of the individual provider?

8      A   Correct, assuming it doesn't violate any

9  policies and procedures within the department.

10     Q   How would the department know if the selection

11 of resources to rely on violated the policies of the

12 department?

13     A   Probably would not know until, you know -- I

14 can't even think of an example where that would be the

15 case, but -- yeah.  I can't think of an example right

16 now.

17     Q   And that same section that we're looking at,

18 what does DPS mean by "evidence based"?

19     A   So, again, that's critical.  What you want to

20 show is that the research that you're relying on, the

21 decisions you make in developing clinical practice

22 guidelines, are on based on the best available research

23 that has been evaluated over time longitudinally,

24 that's been studied very frequently and reproducible

25 across, you know, the medical community.

                                                      34

1    Q  How do you determine if a resource meets the

2    criteria that you just described?

3    A  So, again, I think that you can look to the

4    professional medical organizations that I talked about,

5    and they're going to reference a lot of those, and I so

6    I think you're already starting with reliable sources

7    when you do your analysis.

8    Q  So you generally consider those professional

9    medical associations to be reliable?

10   A  Yes, ma'am.

11   Q  You can set that aside for now.  Actually, I

12   don't think we'll come back to that.

13       Does DPS facilitate surgery for those in its

14   custody with outside specialists?

15   A  Yes, ma'am.

16   Q  How do DPS facilities typically coordinate the

17   logistics of surgical procedures to be performed on

18   those in custody that will be performed by outside

19   specialists?

20   A  The logistics?

21   Q  Yes.

22   A  So the logistics of -- so there's a referral

23   that's made, just like happens anywhere else in the

24   community.  There's a -- the primary care provider will

25   make a referral, in this case, to a surgical

35

1  it needs to be a DOT medication, direct observation

2  therapy.  So there are several examples where depending

3  on the medication there may need to be some changes to

4  how they are prescribed.

5    Q  Are there specific conditions for which

6  medication must always be approved through the

7  physician review process?

8    A  There is no conditions that I'm aware of.  It's

9  generally based on the medication itself.

10    Q  Okay.  Understood.  Is there a difference in

11  the approval process based on whether or not a

12  condition is considered chronic versus acute?

13    A  Not with the initial approval, but we do have

14  what's called a MRTS system.  So for a chronic

15  condition, those medications are automatically refilled

16  up to a period of time before that individual has a

17  reevaluation.

18    Q  Okay.  How does DPS determine whether a

19  condition is chronic?

20    A  So we have designated what we consider to be

21  chronic diseases or illnesses.

22    Q  So those are designations that are standard and

23  not specific to an individual?

24    A  Correct.  They're based on the condition.

25    Q  Does DPS consider gender dysphoria chronic or

69

1    acute?

2        A  It's a chronic condition, but not all

3    transgender or gender dysphoric patients are on

4    medications, obviously.

5        Q  If somebody is on, for example, hormone therapy

6    to treat their gender dysphoria, would that fall under

7    the chronic and thus automatically renew, or would

8    it -- or not?

9        A  No. Because when you're treating someone for,

10   in this case I assume for hormonal replacement, you

11   need to monitor levels.  So you don't want to

12   automatically refill medications without checking the

13   levels.  So that will apply to a lot of conditions.

14   Individuals that are on anticoagulants, if that

15   anticoagulant requires surveillance, then that won't be

16   an automatically refilled medication.  It needs to be

17   monitored accordingly.

18       Q  So my understanding is if it's chronic, it's

19   refilled automatically, but if it's not chronic, there

20   essentially needs to be another UR in order for that

21   person to continue on that medication if that's what's

22   necessary?

23       A  Generally, yes.  Again, it depends on -- these

24   are very medication-specific questions.  So it's going

25   to depend on whether there's -- thyroid's another

                                                          70

1   example.  So if you're giving Synthroid to a patient,

2   you need to monitor their TSH levels.  So you don't

3   want to just continue to refill that medication without

4   monitoring that.  So at each of those intervals, you'll

5   need to enter a new prescription.

6        Q   If DPS is unable to coordinate the monitoring

7   that is necessary before a UR expires, does that

8   medication continue in the interim?

9        MR. RODRIGUEZ:  Objection to form.

10       You can answer.

11       THE WITNESS:  So, again, that's going to be a

12  clinical decision by the provider.  So if a medication

13  is about to run out and we haven't had labs or whatever

14  surveillance is necessary performed, then that

15  individual provider, the primary care provider, will

16  need to make a decision, and it will be a risk-benefit

17  analysis like we've talked about before, to determine

18  whether we continue the current dose while we await

19  those labs.  If we hold the dose depending on the

20  medication until we get the labs, if there's some

21  clinical reason to believe that it's not an appropriate

22  dose, then we can hold it.  So, again, it's a very

23  specific, individualized determination that's made.

24  BY MS. MAFFETORE:

25       Q   If a UR for a specific medication has expired,

71

1  will a prisoner be able to receive that medication?

2      A  Not once the order has expired, no.

3      Q  Okay.  So if a physician does not take some

4  action on behalf of the prisoner before the UR expires,

5  that prisoner just won't receive that medication while

6  waiting for labs; is that right?

7      A  I mean, theoretically that could happen.  We

8  also put some personal responsibility on the offenders

9  as well to inform us that they need a refill of their

10  medication.  So there are fall backs.

11      Q  If the medication is not a carry-on-person

12  medication, how would the prisoner be able to tell

13  whether or not their medication was about to expire?

14      A  So they will know when their last prescription

15  was, and they're informed what the duration of the

16  prescription is when they receive the prescription.  So

17  they'll know they were prescribed 60 days, 90 days of

18  their medication.

19      Q  If somebody's given medication, it's not

20  carry-on-person, they're given medication once every

21  two weeks and it's administered to them and the UR

22  order is for, for example, six months, is it still the

23  responsibility of the offender to know when that

24  prescription would expire and need to seek physician

25  approval for a new prescription?

                                                    72