IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| KANAUTICA ZAYRE-BROWN, <br><br> Plaintiff, <br><br> v. <br><br> NORTH CAROLINA DEPARTMENT OF ADULT CORRECTION, *et al.*, <br><br> Defendants. | No. 3:22-cv-191 |

# PLAINTIFF'S REPLY BRIEF IN IN SUPPORT OF HER MOTION FOR PARTIAL SUMMARY JUDGMENT

Nothing in Defendants' opposition to Plaintiff's motion changes the fundamental dynamic in this case: every single health care provider in the record who has expertise in gender-affirming care, and every single health care provider who has personally examined Plaintiff, agrees that gender-affirming surgery is necessary to treat her gender dysphoria. Moreover, a non-incarcerated person in Plaintiff's shoes—which Defendants agree should be the standard—could undoubtedly obtain this treatment as a medically necessary, non-elective procedure. (*See* Doc. 63 at 6-7.)

Defendants' opposition largely boils down to this: Plaintiff has not experienced enough pain to need surgery. If only she had greater outward signs of distress or made greater efforts to harm herself, Defendants might change their minds. That view, however, finds zero support in any clinical criteria or standard of care. Under

1

the only standard of care recognized by the Fourth Circuit and the medical community, to qualify for surgery, a patient must have persistent gender dysphoria that does not abate with other therapies—Plaintiff's situation exactly. Nor does Defendants' view comport with the Eighth Amendment. Prison officials may not "withhold treatment from an inmate who suffers from a serious, chronic disease until the inmate's condition significantly deteriorates." *Gordon v. Schilling*, 937 F.3d 348, 359 (4th Cir. 2019).

When assessing all this evidence, a reasonable trier of fact would have to side with Plaintiff. It would take an *unreasonable* trier of fact to side with Defendants. Therefore, Plaintiff's motion should be granted.[1]

---

[1] On claims for equitable relief, the court is usually the trier of fact. There is no right to a jury trial for equitable relief, "which only the court can award." *Hanwha Azdel, Inc. v. C & D Zodiac, Inc.,* No. 6:12-cv.00023, 2013 WL 3989147, at *1 (W.D. Va. Aug. 2, 2013). At summary judgment, district courts can make credibility determinations on such claims because they would otherwise still be resolved by the court in a bench trial. *E.g., Porter v. Clarke*, 290 F. Supp. 3d 518, 531 n.10 (E.D. Va. 2018) (granting plaintiffs summary judgment on Eighth Amendment claim after weighing the "competing experts' opinions" in a way that "would be left to the Court" at a bench trial), *aff'd*, 923 F.3d 348 (4th Cir. 2019).

Defendants have demanded a jury trial, but they only have a right to a jury trial on Plaintiff's state constitutional claim for damages. *See Johnson v. Randle*, No. 10-cv-0135-SCW, 2013 WL 5647142, at *4 (S.D. Ill. Oct. 15, 2013) (bench trial was held on Eighth Amendment claim for injunctive relief and jury trial on damages claim). And as described below, the factual issues on Plaintiff's Eighth Amendment injunctive-relief claim and state damages claim are different: The former concerns whether Defendants are being deliberately indifferent *now*; the latter whether Defendants were deliberately indifferent when they denied surgery in February 2022, and if so, the amount of damages owed. Therefore, if necessary, the Court can resolve any factual disputes at this stage to resolve Plaintiff's claims for injunctive relief.

## I. Plaintiff's Medical Records and Testimony Establish an Objectively Serious Medical Need.

"The objective component of a deliberate indifference claim is satisfied by a serious medical condition. And a medical condition is serious when it has been diagnosed by a physician as mandating treatment or is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Id.* at 356 (citation and quotation marks omitted). Here, no one disputes that multiple doctors have diagnosed Plaintiff with gender dysphoria, prescribed treatment, and recognized the risks of harm she faces without adequate treatment. This uncontradicted evidence satisfies the objective prong of Plaintiff's Eighth Amendment claim.

Defendants disagree, but cannot cite a single case holding that gender dysphoria is not an objectively serious condition, or even that a reasonable trier of fact could reach that conclusion. (*See* Doc. 64 at 24-26.) They instead spend much of their opposition parsing Plaintiff's medical records. (*Id.* at 2-9.) Defendants say that these records "do not demonstrate any significant history of anxiety, depression, loss of interest, hopelessness, or other indications of significant or worsening symptoms, including suicidal ideation or thoughts of self-harm." (*Id.* at 3.)

Not so. Plaintiff's medical records, and the testimony of providers who treated Plaintiff directly, speak for themselves.[2] Much like the defendants in a recent case granting summary judgment to a plaintiff seeking gender-affirming surgery,

---

[2] Plaintiff's other briefing discusses this evidence in greater detail. (*See* Doc. 63 at 10-20; Doc. 66 at 9 & n.2.)

3

Defendants here focus exclusively on "occasional reports of feeling better" while ignoring "the many reports showing [Plaintiff] was suffering and demanding adequate treatment for her mental health condition." *Clark v. Quiros*, No. 3:19-cv-00575-VLB, 2023 WL 6050160, at *19 (D. Conn. Sept. 15, 2023).

Defendants also take issue with Plaintiff's testimony describing her painful symptoms. They say that her second declaration (Doc. 62-24) offers "personal beliefs, opinion, or conclusory statements" and contradicts her prior testimony. (Doc. 64 at 32.) That is wrong. Plaintiff is not offering opinions but sharing her personal experience. And tellingly, Defendants do not explain why that declaration contradicts her verified complaint, first declaration, and deposition testimony—all of which detail her ongoing pain and repeated pleas for Defendants to help her. (*See* Doc. 13-2, First Zayre-Brown Decl. ¶¶20, 25-30, 33-34, 45, 49, 51-54; Doc. 62-3, Zayre-Brown Dep. 143:20–144:20, 151:1-14, 156:9-157:7, 161:7-162:3, 164:12-22, 169:9-12, 170:5-171:10.)

Plaintiff has therefore satisfied the objective prong of her Eighth Amendment claim as a matter of law.

I.   **Defendants Know About Plaintiff's Need for Surgery but Continue to Deny That Care for Medically Unsound Reasons.**

On the subjective prong of Plaintiff's Eighth Amendment claim, the records show conclusively that Defendants are "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976). That action has "unnecessarily prolonged [Plaintiff's] pain." *Sharpe v. S.C. Dep't of Corr.*, 621 Fed. App'x 732, 734 (4th Cir.

4

2015) (quotation marks omitted). Defendants' opposition is meritless.

### A. The standard for injunctive relief is what Defendants know now— not what they perceived in the past.

Defendants continue to frame their Eighth Amendment argument in the past tense, asserting that they "were not subjectively aware of an excessive risk of harm that they consciously disregarded . . . ." (Doc. 64 at 16; *see also id*. at 14 n.4 (facts in Figler, Caraccio, and Dula declarations "were not known to, and thus could not have been considered by, Defendants, at the time they made their determination")).

As Plaintiff has explained, that is not the standard for injunctive relief. The test is what Defendants know right now—if "the evidence before a district court establishes that an inmate faces an objectively intolerable risk of serious injury, the defendants could not plausibly persist in claiming lack of awareness[.]" *Farmer v. Brennan*, 511 U.S. 825, 846 n.9 (1994). Therefore, by virtue of the vast record before the Court, Defendants cannot persist in claiming ignorance.

### B. Defendants and their experts are not qualified to assess Plaintiff's need for gender-affirming surgery.

When prison officials make medical decisions without adequate qualifications, they may violate the Eighth Amendment. For example, in *Edmo v. Corizon, Inc.*, which affirmed judgment for the plaintiff, the court explained that the defendants' experts "lack[ed] meaningful experience directly treating people with gender dysphoria," and "the more relevant experience for determining the medical necessity of [gender-affirming surgery] is having treated individuals with gender dysphoria, having evaluated individuals for [such surgery], and having treated them post-

5

operatively." 935 F.3d 757, 787-88 (9th 2019).

Here, Plaintiff's opening brief explains that even the Defendants who are doctors have never evaluated a patient for gender-affirming surgery and otherwise have minimal experience with gender-affirming medicine. (Doc. 63 at 9.) In response, Defendants do not argue otherwise. This uncontested dearth of qualifications strongly supports Plaintiff.

Defendants instead rely on expert reports from Dr. Sara Boyd, Dr. Joseph Penn, and Dr. Fan Li. However, as explained in Plaintiff's contemporaneously filed *Daubert* motions, their testimony is inadmissible under Federal Rule of Evidence 702. Like Defendants, Drs. Boyd, Penn, and Li have never evaluated a patient for gender-affirming surgery, have no expertise in gender-affirming care more generally, and offer opinions that are irrelevant or unreliable. Such inadmissible evidence cannot create a disputed fact issue precluding summary judgment. *See* Fed. R. Civ. P. 56(c)(2) (providing that "material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence"); *Kadell v. Folwell* 620 F. Supp. 3d 339, 392 (M.D.N.C. 2022) (striking defense expert testimony and granting summary judgment to plaintiffs).[3]

Even if Dr. Boyd's testimony is admissible, it helps Plaintiff, not Defendants. Defendants say that Dr. Boyd "absolutely does not agree that surgery is necessary to 'cure' Plaintiff's GD." (Doc. 64 at 19.) But here is her sworn testimony:

---

[3] Nor could these expert reports support Defendants' own motion for summary judgment, as Defendants did not rely on these reports in support of that motion. (*See* Docs. 60, 61.)

6

> Q. Do you have any reason to think that Mrs. Zayre-Brown can be cured of her gender dysphoria while she still has a penis or a phallus as she calls it?
>
> A. Based on her statements, I think not.
>
> . . .
>
> Q. Okay. You mentioned the -- the phrase necessary but not sufficient a little while ago. [] Would you say that removing her phallus and having genital surgery would be necessary but not necessarily sufficient to cure her gender dysphoria?
>
> A. Ultimately, yes. The question of the timing, I think, is a separate issue, but in the long-term sense, yes.

(Doc. 62-1, Boyd Dep. 166:21-25, 167:12-21.)

That testimony is consistent with Plaintiff's argument. Surgery—*in addition* to hormone therapy, psychotherapy, and social transitioning—is necessary to cure or significantly ameliorate her gender dysphoria. Therefore, denying surgery is not "adequate to address the prisoner's serious medical need." *De'lonta v. Johnson*, 708 F.3d 520, 526 (4th Cir. 2013).

Defendants also point out Dr. Boyd's opinion that surgery is not necessary as an "immediate intervention." (Doc. 64 at 19.) Dr. Boyd testified that Plaintiff would likely benefit from surgery while incarcerated, but the procedure would ideally happen outside of prison. (Doc. 62-1, Boyd Dep. 181:12-23.) No court has ever held, however, that prison officials may simply wait out the clock on a prisoner's sentence to avoid providing medical care. *See Mitchell v. Kallas,* 895 F.3d 492, 496 (7th Cir. 2018) ("Prison staff cannot bide their time and wait for an inmate's sentence to expire before providing necessary treatments."). Moreover, Dr. Boyd's concerns were

7

specifically about undergoing surgery in the prison environment. (Doc. 65-1, Boyd Rep. at 27, 31; Doc. 65-12, Boyd Dep. 108:4-112:10.) Though still incarcerated, Plaintiff is in a community transition center, not prison, making this particular concern especially irrelevant. (Doc. 62-24, 2nd Zayre-Brown Decl. ¶¶3-4.)

Dr. Ettner's rebuttal report further explains why this assertion does not make sense: "If an individual requires treatment, provision of treatment will be therapeutic regardless of where the patient resides. Would Dr. Boyd similarly claim that a diabetic patient who requires insulin should forego that treatment while incarcerated to receive the greatest benefit?" (Ex. 1, Ettner Reb. Rep. ¶13.)

All told, no one on Defendants' side of this case is remotely qualified to opine on the discrete medical question before the Court. Everyone who *is* qualified supports Plaintiff. Defendants try to diminish those opinions, but their efforts fall short.

Start with the UNC specialists. Defendants discount their opinions because DAC "did not refer Plaintiff to UNC for a medical necessity determination—that determination is for the Department to make." (Doc. 64 at 13.) Whether Defendants requested the evaluation or not, these providers—upon reviewing Plaintiff's medical records and personally evaluating her—saw that their patient was not receiving adequate care and needed surgery. (Doc. 62-17, Figler Decl. ¶10; Doc. 62-18, Caraccio Decl. ¶11; Doc. 62-16, Croft Decl. ¶18.) Simply because Defendants might not have wanted this information does not make it less true or compelling.

As for Dr. Ettner, Defendants cite Dr. Boyd's criticisms that psychologists are generally not qualified to make medical-necessity determinations. (Doc. 64 at 19.) But

8

Defendants do not argue that Dr. Ettner is unqualified as an expert witness under Rule 702. And multiple courts have expressly found that Dr. Ettner is qualified to opine on the medical necessity of gender-affirming care, including surgery. *See, e.g., Edmo*, 935 F.3d at 787 ("Dr. Ettner . . . [is] well-qualified to opine on the medical necessity of [gender-affirming surgery]"); *C.P. by and through Pritchard v. Blue Cross Blue Shield of Illinois*, 3:20-cv-06145-RJB, 2022 WL 17092846, at *2-3 (W.D. Wash. Nov. 21, 2022) (finding Ettner qualified as "an expert to testify about the medical necessity of gender-affirming care"); *see also Norsworthy v. Beard*, 87 F. Supp. 3d 1164, 1192 (N.D. Cal. 2015) (relying on Ettner's expert testimony in granting a preliminary injunction ordering gender-affirming surgery).

For these reasons, Defendants have not presented any admissible evidence that could tip the scales of this totally one-sided record.

**C. Defendants' bases for denying surgery are medically unsound.**

Defendants maintain that refusing surgery was justified for two reasons: Plaintiff was "doing well" and mentally stable, and the evidence on the efficacy of gender-affirming surgery is mixed. On their face, both reasons are medically unsound.

### i. Plaintiff "doing well" and being mentally stable

Defendants first maintain that surgery is not necessary because Plaintiff was "doing well" and mentally stable. On the issue of mental stability, Defendants say they denied surgery based on the "presentation of GD symptoms," and not "stability of any existing significant mental health conditions." (Doc. 64 at 14 (citations

9

omitted).)

This explanation is not persuasive. First, Defendants do not attempt to justify their reasoning under any clinical criteria, guidelines, standards of care, or professional experience with gender-affirming medicine. Rather, Defendants invoke their own personal criteria, and reject the recommendations of specialists who were applying the standard of care broadly accepted in North Carolina and elsewhere. That is strong evidence of deliberate indifference. *See Edmo*, 935 F.3d at 792 (defendants' "decision was based on inexplicable criteria far afield from the recognized standards of care").

Moreover, even if Plaintiff's gender dysphoria symptoms are "stable"—i.e., not getting worse—Defendants concede that does not mean she is well or has been getting better. (Doc. 62-5, Campbell 30(b)(6) Dep. 183:23-24 ("Q: Does stable imply good?" "A: No, it does not."). The evidence shows that Plaintiff continues to experience deep psychological pain and face longer term risks without gender-affirming surgery. (Doc. 66 at 9 n.2; Doc. 62-19, Dula Decl. ¶¶8-12; Doc. 61-2, Ettner Rep. ¶¶75-79, 133-35.) Moreover, under the WPATH SOC, a patient does not have to be on the brink of a mental breakdown to need surgery. The essential test is persistent gender dysphoria after other treatments prove ineffective. (Doc. 61-2, Ettner Rep. ¶¶48-50; Doc 62-17 Figler Decl. ¶¶9-10.)

In the end, it appears Defendants simply think that Plaintiff has not experienced enough pain to need surgery. Defendants also say, however, they are "not withholding treatment until Plaintiff's condition worsens." (Doc. 64 at 15.) But that

10

is *precisely* what Defendants are doing. In the very next sentence, Defendants say they could "approve [surgery] as medically necessary if conditions changed or the other treatments could no longer manage her condition." (*Id.*) And Defendants have repeatedly suggested that if Plaintiff suffered greater mental instability or made more efforts to harm herself, perhaps they might approve surgery. (*See* Doc. 18 at 10 (distinguishing *Edmo* "because it involved multiple known self-castration attempts and other physical forms of self-harm"); Doc. 66-1 at 1 (making same argument at hearing).)

Of course, that is not the law. The Supreme Court has held that "a remedy for unsafe conditions need not await a tragic event." *Helling v. McKinney*, 509 U.S. 25, 33 (1993). A reasonable trier of fact could not accept this medically unsound rationale for denying treatment.

### i. "Low Quality" Evidence

Defendants further try to justify withholding surgery by arguing that the literature on its efficacy is "mixed" and lacks "[h]igh-[q]uality [r]esearch." (Doc. 64 at 28.) Multiple courts have rejected this misleading argument. This Court should too.

For starters, this argument is irrelevant to the specific facts of this case. Defendants concede that, despite their opinions on the research, surgery can be medically necessary for some patients. (*See* Doc. 60 at 5; Doc. 10-1, EMTO Policy at 7.) And they offer zero evidence that surgery would be dangerous or ineffective *for Plaintiff*. Plaintiff's providers, on the other hand, do not speak in generalities, but detail why she herself needs surgery. (Doc. 61-2, Ettner Rep. ¶¶133-35; Ex. 1, Ettner

11

Reb. Rep. ¶¶25, 27; Doc. 62-17, Figler Decl. ¶10-11; Doc. 62-19, Dula Decl. ¶¶10-13.)

Defendants rely on the expert report of Dr. Fan Li, a statistician, to argue that studies cited by Dr. Ettner and WPATH "fail to provide rigorous and consistent statistical evidence on the benefits in quality of life and well-being of" gender-affirming surgery. (Doc. 64 at 29.) Dr. Li focuses on the research being "low quality" and lacking randomized control trials. (Doc. 65-15, Li. Rep. at 4.) Dr. Penn's report makes similar points. (Doc. 65-13, Penn Rep. at 24 n. 6, 32-34.)

Plaintiff explains in her contemporaneously filed *Daubert* motions why these reports and testimony are inadmissible under Rule of Evidence 702. But even if admissible, Plaintiff's rebuttal reports explain why these opinions are deeply misleading.

Dr. Armand Antommaria is a medical doctor and bioethicist. (Ex. 2, Antommaria Rep. ¶¶4, 8.) His rebuttal report explains why Dr. Li has imposed inappropriately high standards on the kinds of research that informs medical treatment decisions:

> Recommendations in clinical practice guidelines are not based solely on the quality of the evidence, or on "high" quality evidence. Recommendations may appropriately be justified by observational studies. While observational studies are characterized as "low" quality evidence, "low" is a relative term describing the different levels of evidence and should not be misinterpreted as meaning "poor or inadequate." While a statistician may hold randomized controlled trials up as the "gold standard" of for evidence (Li Report at 8), clinicians must make decisions based on the best, currently available evidence, which includes other types of studies. They cannot tell their patients to come back later after randomized controlled trials have been conducted. Furthermore, there are sound reasons why

12

> randomized controlled trials may not be available or, if available, may not provide "high" quality evidence in particular circumstances. In practice, only a minority of clinical practice guideline recommendations are based on "high" quality evidence. The lack of randomized controlled trials and reliance on "low" quality evidence does not mean that there is not reasonable support for a clinical practice guideline recommendation or that a treatment is not medically necessary.

(*Id.* ¶18.)

Dr. Ettner's rebuttal report addresses this issue as well: "[L]ess than one in ten medical treatments are supported by rigorous scientific research. . . . Despite a lack of strong evidence and based on national guidelines and clinical recommendation, surgeries such as rotator cuff repair and arthroscopic knee repair are routinely performed. Even vitamin D and aspirin lack what is referred to as 'high quality' evidence." (Ex. 1, Ettner Reb. Rep. ¶19.)

Courts have recognized this reality, rejecting the same misleading argument that Defendants make here. *See Flack v. Wisconsin Dep't of Health Servs.*, 395 F. Supp. 3d 1001, 1014 (W.D. Wis. 2019) (rejecting "low-quality evidence" argument because it "does not change the fact that the larger medical community considers these treatments to be acceptable"); *Dekker v. Weida*, No. 4:22cv325-RH-MAF, 2023 WL 4102243, at *15 (N.D. Fla. June 21, 2023) (same); *Brandt v. Rutledge*, No. 4:21CV00450 JM, 2023 WL 40373727, at *17 (E.D. Ark. June 20, 2023) (same).

For all these reasons, Plaintiff has established the subjective component of her Eighth Amendment claim as a matter of law.

## II. Plaintiff Could Not Allege the Facts in This Case in the North Carolina Industrial Commission.

Defendants maintain that "Plaintiff could seek relief based on [her] contentions in the North Carolina Industrial Commission, and therefore has an adequate state remedy and cannot pursue a State constitutional claim under *Corum*." (Doc. 64 at 34.) Apparently, Defendants think that Plaintiff could take her complaint in this case, simply call her claims "negligence" instead of constitutional violations, and file that document in the Industrial Commission where she could potentially recover damages.

Plaintiff has explained elsewhere why that is wrong. (Doc. 63 at 30-31; Doc. 66 at 22.) In short, the Industrial Commission lacks jurisdiction over torts that have a *mens rea* greater than ordinary negligence—that is, "allegations of gross negligence and wanton, reckless and malicious conduct[.]" *Collins v. N.C. Parole Comm'n*, 456 S.E.2d 333, 336 (N.C. Ct. App. 1995). Those are precisely what Plaintiff has alleged here: Defendants have intentionally or recklessly denied her medically necessary care. Therefore, a restyled complaint alleging the same facts would be dismissed for lack of jurisdiction. *See id.* (holding that "the Industrial Commission does not have jurisdiction to hear and award damages on plaintiff's claims" of gross negligence and malicious conduct).

For these reasons, Plaintiff may bring her state constitutional claim. The record establishes Defendants' liability on that claim as a matter of law. Unlike Plaintiff's claim for injunctive relief, what Defendants knew in the past is relevant here. And the record shows conclusively that when Defendants denied surgery in

14

February 2022, they did so (1) having reviewed medical records that demonstrated Plaintiff experiencing persistent gender dysphoria despite her prior treatments, (2) having sent Plaintiff to be evaluated by specialists at UNC specifically for gender-affirming surgery, (3) having reviewed the conclusions of those specialists and Plaintiff's other providers that she needed gender-affirming surgery, and (4) having knowledge of Plaintiff's repeated, urgent pleas for help. (*See* Doc. 63 at 16-19.) A reasonable trier of fact could only conclude that Defendants knew there was a substantial risk that Plaintiff would continue to experience painful symptoms of gender dysphoria.

### III. The Record Shows that Plaintiff Was Denied Surgery Because of Her Disability.

Defendants argue that Plaintiff cannot prove that she is "qualified for a government benefit or service[] but . . . was excluded from that benefit or service on the basis of her disability." (Doc. 64 at 34.) Not so.

First, medical care provided by a prison is obviously a government service. "State prisons fall squarely within the statutory definition of 'public entity,' and thus, must provide 'services, programs, or activities' in accordance with the ADA's requirements." *Doe v. Pennsylvania Department of Corrections*, 2021 WL 1583556, at *12 (W.D. Pa. Feb. 19, 2021) (quoting *Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998)), *report and recommendation adopted*, 2021 WL 1115373 (W.D. Pa. Mar. 24, 2021). Gender-affirming surgery is another form of government-provided medical care expressly contemplated by Defendants' policy for transgender accommodations. (Doc. 10-1, EMTO Policy at 7.)

15

Second, Plaintiff qualifies for that service for all the reasons she has given in support of her Eighth Amendment claim: she will continue to suffer the painful effects of gender dysphoria without it.

Third, at least one of the reasons Defendants have refused that service is "because of" the disability itself. *See Baird ex rel. Baird v. Rose*, 192 F.3d 462, 468 (4th Cir. 1999) (discussing ADA causation requirements). The record shows that Defendants have provided gender-affirming surgery to other prisoners—including genital reconstruction—just not to treat gender dysphoria. (Doc. 62-5, Campbell 30(b)(6) Dep. 144:2-19; Doc. 62-19; Dula Decl. ¶16 (patient was denied hysterectomy when recommended for treatment of gender dysphoria, but provided hysterectomy when recommended to treat uterine fibroids).) Indeed, Defendants have *never* approved gender-affirming surgery for gender dysphoria. (Doc. 62-5, Campbell 30(b)(6) Dep. 135:18-136:10.)

Moreover, the Case Summary explaining why Plaintiff should not receive surgery states: "The evidence regarding [gender-affirming surgery] does not provide sufficient confidence that the procedures should be undertaken without concern for having violated [the Hippocratic] oath." (Doc. 61-2, Ettner Rep., App'x G at 3.) Defendant Campbell—DAC's chief medical officer—wrote a position statement in March 2022 that "gender reassignment surgery (GRS), as a treatment for gender dysphoria, is not medically necessary." (*Id.* App'x H at 2.) He provided no exceptions to this rule. And the DTARC Defendants, Defendant Junker, and Defendant Harris

ultimately deferred to Dr. Campbell. (Doc. 62-8, Catlett Dep. 47:7-15; Doc. 62-22, Peiper Dep. 103:20-105:7, 116:1-20; Doc. 62-13, Sheitman Dep. 131:7-18.)

Defendants' arguments here simply rehash their Eighth Amendment arguments that surgery was not medically necessary, and Plaintiff was receiving *some* accommodation, just not the one she wanted. (Doc. 64 at 34.) The first point fails for all the reasons Plaintiff has offered in her briefing. The second point fails because denying a specific treatment may violate the ADA if doing so was discriminatory or a failure to provide a reasonable accommodation. *See Lewis v. N.C. Dep't of Pub. Safety*, No. 1:15-CV-284-FDW, 2018 WL 310142, at *11 (W.D.N.C. Jan. 4, 2018) (denial of specific hepatitis C medication may violate ADA).

Defendants also argue that the case law on this subject is not persuasive because it mostly deals with motions to dismiss. (Doc. 64 at 34.) The subject matter in this ADA claim is indeed relatively new, but the case law shows what kinds of facts, if proven, would establish an ADA violation. Plaintiff has proven those facts here: Defendants provide gender-affirming surgeries to some prisoners, but not to prisoners like Plaintiff who need it to treat gender dysphoria.

Finally, Defendants have not addressed Plaintiff's other ADA claim that surgery is a reasonable accommodation that DAC has failed to provide. (Doc. 1 ¶174 ("DPS is failing to make reasonable modifications to it rules, policies, or practices, necessary to accommodate [Plaintiff's disability.").) Defendants briefly addressed this claim in their opening brief in support of summary judgment, but did not argue that providing surgery would present an "undue hardship" in the form of administrative

17

or security concerns. (*See* Doc. 60 at 32, 34-35.) They only gave the conclusory statement that "Plaintiff cannot show that the requested surgery was necessary to allow her 'equal access to prison life.'" (*Id.* at 31.) The record demonstrates otherwise.

A critical aspect of being in DAC custody is rehabilitation. The evidence shows that Plaintiff has been fixated on obtaining medically necessary care, which has inhibited her rehabilitation. (Doc. 62-25, Penn Dep. 210:18-211:4 ("What I would testify to is that she is totally a hundred percent focused on this one surgery to the neglect of her other lifelong issues."); Doc. 62-3, Zayre-Brown Dep. 153:7-20, Doc. 62-1, Boyd Dep. 181:18-182:20; Doc. 62-23, Bowman Dep. 89:20-91:5; 118:5-21.)

Accordingly, a reasonable trier of fact could only find that Plaintiff was denied gender-affirming surgery because she sought that accommodation for gender dysphoria, and that providing surgery would be a reasonable accommodation.

## CONCLUSION

Last year, the Court denied Plaintiff's motion for a preliminary injunction because granting it "would effectively end this case without the benefit of a factual record," and a "well-developed record" was necessary to consider Plaintiff's claims. (Doc. 15 at 4-5.) After nearly a year of discovery, the production of thousands of pages of documents, fourteen depositions, and a Rule 35 examination, that record is now before the Court—and it overwhelmingly favors Plaintiff.

Consequently, Plaintiff's motion for partial summary judgment should be granted. The Court should immediately order Defendants to provide access to gender-affirming surgery as prescribed by Plaintiff's treating physicians at UNC. The Court

18

should also find Defendants liable under Plaintiff's state constitutional claim with the amount of damages to be determined at trial.

Respectfully submitted this 26th day of October 2023.

*/s/ Jaclyn A. Maffetore*
Jaclyn A. Maffetore
NC Bar No. 50849
Daniel K. Siegel
NC Bar No. 46397
Michele Delgado
NC Bar No. 50661
ACLU OF NORTH CAROLINA
LEGAL FOUNDATION
jmaffetore@acluofnc.org
dsiegel@acluofnc.org
mdelgado@acluofnc.org

Christopher A. Brook
NC Bar No. 33838
PATTERSON HARKAVY LLP
cbrook@pathlaw.com

Jon W. Davidson*
(admitted only in California)
L. Nowlin-Sohl*
(admitted only in Washington)
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
jondavidson@aclu.org
lnowlin-sohl@aclu.org

*admitted *pro hac vice*


*Counsel for Plaintiff*

**CERTIFICATE OF SERVICE**

I certify that on October 26, 2023, I electronically filed the foregoing document using the ECF system which will send notification of such filing to all counsel of record.

> */s/ Jaclyn A. Maffetore*
> Jaclyn A. Maffetore
> American Civil Liberties Union of
> North Carolina Legal Foundation
> P.O. Box 28004
> Raleigh, NC 27611
> Tel: (919) 256-5891
> Fax: (919) 869-2075
> jmaffetore@acluofnc.org