EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF NORTH CAROLINA

CIVIL ACTION NO. 3:22-cv-00191


KANAUTICA ZAYRE-BROWN,      )
                            )
          Plaintiff,        )
                            )
     vs.                    )
                            )
THE NORTH CAROLINA          )
DEPARTMENT OF PUBLIC        )
SAFETY, ET AL.,             )
                            )
          Defendants.       )



DEPOSITION OF

SARA BOYD, PH.D.

_____

9:08 A.M.

FRIDAY, AUGUST 4, 2023

_____


NORTH CAROLINA DEPARTMENT OF JUSTICE


114 WEST EDENTON STREET


RALEIGH, NORTH CAROLINA



**CONTAINS GENERAL CONFIDENTIAL INFORMATION**

1

```
 1                A P P E A R A N C E S
 2    Counsel for the Plaintiff:
 3          ACLU of North Carolina Legal Foundation
          BY:  Daniel K. Siegel
 4               Jaclyn A. Maffetore
                 Michele Delgado
 5                 (Appeared remotely)
          P.O. Box 28004
 6        Raleigh, North Carolina 27611-8004
          (919) 834-3466
 7        dseigel@acluofnc.org
          jmaffetore@acluofnc.org
 8        mdelgado@acluofnc.org
 9               -and-
10        American Civil Liberties Union Foundation
          BY:  Jon W. Davidson
11                 (Appeared remotely)
          125 Broad Street, 18th Floor
12        New York, New York 10004-2400
          (212) 519-7887
13        jondavidson@aclu.org
14    Counsel for the Defendants:
15        North Carolina Department of Justice
          BY:  Orlando L. Rodriguez
16               Stephanie A. Brennan
                   (Appeared remotely)
17        114 West Edenton Street
          Raleigh, North Carolina 27603
18        (919) 716-6516
          orodriguez@ncdoj.gov
19        sbrennan@ncdoj.gov
20
      Also Present:  Lauren Robbins, Paralegal, ACLU
21                     (Appeared remotely)
22
      Stenographically
23       Reported By:   Discovery Court Reporters and
                          Legal Videographers
24                       BY:  Lisa A. Wheeler, RPR, CRR
                         4208 Six Forks Road, Suite 1000
25                       Raleigh, North Carolina 27609
```

                                                          2

I N D E X

                                                      PAGE

EXAMINATION BY MR. SIEGEL                                4


E X H I B I T S

BOYD

NUMBER                  DESCRIPTION                   PAGE


EXHIBIT 1  Curriculum Vitae                             9

EXHIBIT 2  Expert Report of Sara E. Boyd,             47
           Ph.D., ABPP

EXHIBIT 3  Division Transgender                       98
           Accommodation Review Committee
           (TARC) Report, 2/17/2022

3

1                    P R O C E E D I N G S

2                          * * * *

3                      SARA BOYD, PH.D.,

4      having been first sworn or affirmed by the court

5      reporter and Notary Public to tell the truth, the

6      whole truth, and nothing but the truth, testified

7                         as follows:

8                          EXAMINATION

9    BY MR. SIEGEL:

10   Q.    All right.  Dr. Boyd, good morning.

11   A.    Good morning.

12   Q.    Thank you for being here.  We met just a

13         minute ago, but I'll reintroduce myself for

14         the record.  My name is Dan Siegel and I'm

15         one of the lawyers with the ACLU representing

16         Kanautica Zayre-Brown --

17   A.    Uh-huh.

18   Q.    -- who's the plaintiff in this lawsuit.  I'll

19         be taking your deposition today.  Before we

20         get started, just a few housekeeping items to

21         get out of the way.

22             First, just need to acknowledge for the

23         record that since this lawsuit began, the

24         North Carolina Department of Public Safety or

25         DPS had a -- a reorganization and now the

                                                            4

1     defendant in this case is known as the North

2     Carolina Department of Adult Corrections or

3     DAC.  So for purposes of this deposition, if

4     I refer to DPS or DAC, I'm referring to the

5     state prison system, the --

6  A.  Right.

7  Q.  -- defendant in this case.

8         Does that make sense?

9  A.  Yes.

10 Q.  Okay.  Have you ever been deposed before?

11 A.  Yes.

12 Q.  About how many times?

13 A.  I don't -- maybe -- over ten times, probably.

14 Q.  Okay.  So this will all just be review, but

15    I'm going to set out some --

16 A.  Uh-huh.

17 Q.  -- ground rules to help maybe move -- make

18    this go a little -- as smoothly as possible,

19    to make the court reporter's job a little

20    easier.  First, I would just ask that you

21    answer all of my questions verbally instead

22    of giving an uh-huh or an uh-uh or shaking or

23    nodding your head and any other kind of

24    nonverbal response.

25         Does that make sense?

5

1   A.   Yes.

2   Q.   Okay.  Great.  The court reporter is taking

3        everything down so I would just ask that you

4        allow me to finish my question before you

5        begin your answer and, likewise, I will do my

6        best to let you finish your answer before I

7        an- -- ask my next question.

8             Make sense?

9   A.   Yes.

10             THE WITNESS:  I would also note that

11        sometimes I have a tendency to speak quickly

12        so if at any point I'm speaking too quickly,

13        please let me know.

14  BY MR. SIEGEL:

15  Q.   If you do not understand a question that I

16        ask or you don't think you heard me quite

17        right or you need me to repeat it, please

18        just go ahead ask.  I do not mind at all.  If

19        you do answer my question, I will assume that

20        you heard it and understood it, okay?

21  A.   Okay.

22  Q.   We're going to be taking breaks throughout

23        the day.  If there's ever a point when it's

24        not a designated break time and you would

25        like to take a break, that's totally fine.

6

1       We can do that.  I would just ask that you

2       answer whatever question I had just asked

3       before we break.

4   A.  Yes.

5   Q.  Is that all right?  Okay.  During the

6       deposition your attorney is probably going to

7       object to some of the questions that I ask.

8       Unless he specifically instructs you not to

9       answer the question, once he finishes his

10      objection, you will need to go ahead and

11      answer the question.

12  A.  Yes.

13  Q.  Does that make sense?  Okay.  The court

14      reporter administered the oath to you a

15      moment ago.  You assented to that meaning you

16      are under oath for the entirety of this

17      deposition.  It's the same as if you were

18      testifying under oath in a courtroom, which

19      means you must testify -- excuse me, testify

20      truthfully.

21          Do you understand?

22  A.  Yes.

23  Q.  All right.  Is there any reason you cannot

24      testify truthfully today?

25  A.  No.

7

1  Q.   And if you recall additional information

2       responsive to any of my questions later on in

3       the deposition, please just let me know and

4       we can go over it, all right?

5  A.   Okay.

6  Q.   Okay.  So what did you do to -- if anything,

7       to prepare for this deposition today?

8  A.   I rereviewed some materials that I had

9       already reviewed prior just to refresh my

10      recollection.  The materials included the

11      materials that I listed in my report

12      including medical records; the deposition; my

13      own -- my own report; and, oh, Dr. Ettner's

14      declarations.

15 Q.   Did you bring any documents with you today?

16 A.   I have a copy of my own report that was

17      submitted.

18 Q.   Anything else?

19 A.   Not with me, no.

20 Q.   Okay.  Have you ever been sued before?

21 A.   No.

22 Q.   Other than expert witness work, have you ever

23      been involved in other lawsuits?

24 A.   No.

25 Q.   Okay.  All right.  So I'm going to go ahead

8

1          and give you an exhibit which we'll mark as

2          Exhibit 1, please.

3                     (BOYD EXHIBIT 1, Curriculum Vitae, was

4          marked for identification.)

5    BY MR. SIEGEL:

6    Q.    You'll see that this is your résumé or your

7          CV --

8    A.    Thank you.

9    Q.    -- that you provided earlier in this case.

10         Would you please just take a look at it and

11         let me know if this is up to date.

12   A.    I think there are -- so there have been two

13         updates to this, both of which are

14         publications, that I'm not seeing here.  One

15         is the book chapter which I think you --

16         which is, I think, going to be in press in

17         September.

18   Q.    Okay.

19   A.    And the other is a -- a journal article about

20         threat assessment that doesn't have anything

21         to do with trans folks --

22   Q.    Okay.

23   A.    -- or correctional settings specifically.

24   Q.    All right.

25   A.    Those are the only two things that I can

9

1          see --

2     Q.   Okay.

3     A.   -- are -- are updated.

4     Q.   All right.  Thank you.  Could you just walk

5          me through your educational background.

6     A.   Certainly.  I have a bachelor's degree in

7          psychology from the University of Illinois.

8          I have two master's degrees, one in

9          counseling psychology, one in clinical

10         psychology.  I have a certi- -- graduate

11         certificate in developmental disabilities.  I

12         have a Ph.D. in clinical psychology from the

13         University of Kentucky.  I did a -- a

14         postdoctoral fellowship in forensic

15         psychology at the University of Virginia and

16         I'm board-certified as a forensic

17         psychologist with the American Academy of

18         Professional -- sorry, American Academy of

19         Professional Psychology.

20    Q.   Okay.  In your academic studies, did you have

21         any particular focus on any particular

22         subject matter?

23    A.   Early on.  So the -- the focus was primarily

24         on folks with developmental disabilities and

25         interpersonal trauma so primarily sexual and

                                                    10

1    domestic violence work.  That was mostly in a

2    treatment capacity and I was also a direct

3    service provider, like a caregiver kind of

4    role.  Then in graduate school in the course

5    of my first master's program, I started doing

6    more forensic work specifically on the victim

7    side in criminal cases and then I shifted to

8    a forensic focus.  So midway through my first

9    master's degree was when I shifted to a

10   primarily forensic focus.

11           And then when I completed my Ph.D., my

12   dissertation and my master's were both about

13   intellectual disabilities and personality

14   functioning.  So those were the two areas was

15   personality and -- and intellectual

16   developmental disabilities, but I started

17   completing my forensic training in earnest

18   around the end of my Ph.D. when I was doing

19   training rotations in psychiatric units in

20   forensic hospitals.  Excuse me.  And then I

21   did forensic training in New York as part of

22   my predoctoral fellowship.  The postdoctoral

23   fellowship was entirely forensic.  It's not

24   required, but it's something that I did in

25   part to make sure that I had a sufficient

11

1          depth and breadth of knowledge to practice

2          competently as a forensic evaluator partly

3          because my early focus had not been forensic.

4          And since then, you know, I also completed

5          the board certification, again, to bolster my

6          knowledge in terms of the forensic area.

7                    So in recent years, it's been

8          primarily -- well, I'm exclusively forensic

9          in my practice.  Most of my work focuses

10         on -- sexual/gender minority populations,

11         intellectual developmental disabilities, and

12         interpersonal trauma I would say are the --

13         kind of the three big areas.

14    Q.   Okay.  And this is perhaps a dumb question,

15         but can you just define forensic for me.

16    A.   Yeah.  So forensic in -- in -- in psychology,

17         it means the application of psychological

18         science to help triers of fact answer

19         questions related to legal or quasi legal

20         matters.  So it's not always actually a --

21         like a criminal or civil context.  It could

22         be an administrative proceeding or something

23         like that as well.

24    Q.   Okay.  In your studies, did they involve

25         anything with transgender individuals or

                                                        12

1          gender dysphoria?

2    A.    Yes.  So when I was in my counseling

3          psychology program, one of my professors had

4          a specific interest in the fluidity of both

5          sexuality and gender over life span and so I

6          had a gender development coursework, which

7          is, you know, really kind of the framework

8          that a lot of us think within now as a gender

9          development kind of mind set about these

10         things.

11              Additionally, I -- when I was on my

12         forensic postdoctoral training at UVA, my

13         colleague was somebody -- Eugene Simopoulos,

14         who published extensively and was doing

15         evaluations for -- they were independent

16         evaluations for incarcerated transgender

17         folks in the Virginia DOC.  So they would

18         hire independent psychologists to come in and

19         do an evaluation and that is when I actually

20         became -- became involved in doing

21         evaluations of folks where it wasn't, like,

22         incidental, right.  It -- before that, I had

23         certainly encountered transgender and gender

24         diverse folks where that wasn't the central

25         question; that was just part of the -- their

                                                    13

1    identity when they came in for a competency

2    evaluation or something like that, but that's

3    when we began to -- I began to focus more on

4    doing the evaluations that are focused

5    specifically on gender.  Around that time,

6    you know, he was also publishing some papers

7    in that regard.  I did not publish with him,

8    but I was certainly reading up on it.  We

9    also have another individual in our area,

10   Michael Hendricks, who assisted in writing

11   the APA's gender treatment-related guidance

12   from 2015.

13       So I had the professional associations

14   with those folks and that's when I began

15   doing more of the evaluations that were

16   really -- where the question related to

17   the -- to somebody's gender and what they

18   wanted to do in terms of treatment.

19   Q.  And what year was that when you started doing

20       these evaluations?

21   A.  When I started doing the evaluations on

22       incarcerated people, specific to issues

23       related to gender would have been around, I

24       think, 2013.

25   Q.  Okay.  And that was part of your fellowship;

                                              14

1       is that right?

2   A.  Yes.

3   Q.  Okay.  And you said you were doing gender

4       dysphoria evaluations, I -- I think?

5   A.  Yeah.  So it's interesting.  The referral

6       questionnaire wasn't very clear a lot of the

7       time.  It was just, we need an independent

8       evaluation of this person.  And I noticed

9       that some of the evaluators were treating the

10      evaluation as a question of whether or not

11      the individual was, in fact, transgender and

12      that, in my view, is not an appropriate

13      question for that evaluation.  It was more

14      what does this person need and do they need

15      support.

16          So the evaluations that I wrote were

17      different from my colleagues.  I -- I don't

18      want to make it seem like I just, you know,

19      learned from their type of practice and

20      adopted that.  I started doing things

21      slightly differently around that time, but I

22      was doing my own independent evaluations

23      through the Virginia Department of

24      Corrections where they would contact me to do

25      those independent evaluations.  And

                                                    15

1    typically, I did make recommendations about

2    what kind of intervention I thought the

3    person ought to receive, but typically, it

4    was, you know, more looking at did the person

5    have issues with literacy or their cognitive

6    functioning or something like that where they

7    just might need help in understanding what

8    their options were.

9  Q.   What kinds of interventions would you

10       recommend?

11 A.   Most of the people that I was getting

12       referrals for were very early in terms of --

13       they were not seeking very difficult kinds of

14       modifications.  They wanted things like

15       access to boxer briefs or certain kinds of

16       deodorant so essentially cosmetic items.

17       There were some people who wanted to have --

18       ultimately described wanting to have surgical

19       procedures, access to hormone treatment --

20       endocrine management, I should say, and for

21       most of those folks, the question for me was

22       not should they have those things.  It was

23       just, you know, do they understand, do they

24       have the capacity to -- to reason about those

25       things and do they need support.

16

1          So, for example, one person did have an

2     intellectual disability, very low IQ and very

3     limited literacy, and all that person wanted

4     was the cosmetic kind of -- and -- and

5     garments, really.  So that was a very easy

6     one, you know, to say, well, this person is

7     going to need -- if they do want to do more

8     difficult interventions, they're probably

9     going to need more support and don't just

10    give them a written handout because they

11    can't read.  So it wasn't saying they

12    shouldn't get those things and my

13    understanding is they ultimately did get

14    those things.  But the -- the issue was more

15    how could this person be accommodated given

16    their impairments so that they could continue

17    to move through that process to seek whatever

18    accommodations they felt were appropriate and

19    good for them.

20 Q.   Okay.  Is there anything else about your

21    educational background that you think is just

22    important to know for, you know,

23    understanding your career?

24 A.   If you'll give me a moment to just glance

25    through my own CV to --

                                                        17

1   Q.   Sure.

2   A.   -- refresh my recollection.  I want to make

3        sure I'm thorough.  So the only other thing

4        that's potentially relevant related to my

5        educational history is that I was one of the

6        founding memer -- members of our graduate

7        school -- what they ended up calling a

8        diversity committee.  And my role

9        specifically on that panel was to be a

10       graduate student representative and my

11       particular area of diversity that they asked

12       me to offer input about was related to LGB

13       key -- LGBTQAI [sic] or what we call sexual

14       gender minority issues for that panel.  So in

15       that regard, I was advising my own graduate

16       program of how they might do a better job of

17       not just providing training to graduate

18       students but also recruiting sexual and

19       gender minority graduate students to

20       ultimately become students and practitioners.

21  Q.   Got it.  Anything else?

22  A.   No.

23  Q.   Okay.  I'd like to turn to -- there's a lot

24       here.  Where is it?  -- your publications,

25       which is on Page 7.

                                                        18

1    A.   Yes.

2    Q.   There's a -- a lot here so no need to take

3         you through all of them.  My question is, do

4         any of the publications listed here concern

5         gender dysphoria?

6    A.   I do not believe so.

7    Q.   Okay.  And please take a moment --

8    A.   Yes.

9    Q.   -- if you'd like.

10   A.   No, I do not believe so.

11   Q.   Okay.  You did reference you have a -- you're

12        a coauthor of a book chapter.

13   A.   Yes.

14   Q.   And I believe it's concerning Psychological

15        Evaluation, Management, and Treatment of

16        Transgender and Gender Diverse People in --

17        Housed in Correctional Settings; is that

18        right?

19   A.   Yes.

20   Q.   Okay.  Can you just tell me about what the --

21        what -- what is this book chapter?

22   A.   Yeah.  Yeah.  So I was invited to coauthor

23        this book chapter.  The author -- the other

24        authors include Walter Campbell, who is a

25        correctional psychologist in Idaho; Sarah

                                                     19

1    Miller, who's a forensic psychologist who

2    works for the State in Maine; Christy

3    Olezeski, who is one of the psychologists at

4    the Yale Pediatric Gender Clinic; excuse me,

5    and Dee Farmer of Farmer v. Brennan, who --

6    we all coauthored this book chapter and the

7    book chapter is written specifically for

8    forensic psychologists who practice either --

9    you're either employed in a correctional

10   setting like a prison or you provide services

11   to folks in those settings.  And so the book

12   chapter is part of a -- a manual -- sorry, a

13   textbook, I should say, about correctional

14   mental health care.  Ours is really -- so the

15   entire book is not about transgender folks;

16   it's a correctional textbook.

17   Q.   Uh-huh.

18   A.   Our chapter is the one that's about providing

19   assessment and treatment to transgender folks

20   who are in correctional settings.  So we

21   collaboratively wrote this chapter and it

22   provides a little bit of background, but it

23   mostly talks about ethical practice, areas of

24   competency to develop, and, you know,

25   considerations related to things like gender

20

1          testing norms and things like that.

2              So that's the book chapter.  It is

3          currently in sort of the final stages of -- I

4          think we just sent in some of our last

5          proofs, but I don't have the final, you know,

6          PDF version of the chapter that will be

7          published yet.  However, my understanding is

8          that they anticipate it will be published in

9          September.

10    Q.    Okay.  And what's the name of the book that

11          this is going to be in?

12    A.    I do not remember the name of the actual

13          book.  I --

14    Q.    Okay.

15    A.    -- only remember our book chapter, which is,

16          Incarcerated While Transgender.

17    Q.    Okay.  Was there a specific part of the

18          chapter that you were responsible for

19          drafting?

20    A.    Yes.  So I helped to write the parts about

21          informed consent.  I helped to write the

22          parts about -- I primarily wrote the sections

23          about informed consent.  I don't want to make

24          it sound like I entirely did it because we

25          all edited each other's pieces.  But I was

                                                    21

1          focused on the sections about informed

2          consent, about cooccurring mental health

3          conditions, and about -- a little bit about

4          the minority stress issues in prison, and

5          some of the testing and ethical

6          considerations.

7     Q.   Okay.  Does the book chapter address

8          evaluating transgender people with gender

9          dysphoria for surgery?

10    A.   Yes, as part of an interdisciplinary team.

11    Q.   Okay.  What does it say about that subject?

12    A.   Well, so there's a lot that we say about it.

13         So one of the things we talk about are the

14         ethical issues with gatekeeping with the

15         psychologist being the person who's in a role

16         of saying this person should or should not

17         have access to treatment.  And so in our book

18         chapter we take the position that that's not

19         an appropriate role for a psychologist to

20         take not because we believe other

21         professionals are the ones who should be

22         making that determination but because we

23         believe that most trans folks are the experts

24         on what they feel that would make them feel

25         best as a -- as a starting point to that

22

1    process.  So we did discuss that.

2            The testing part is really about, you

3    know, that -- that's a challenging area so

4    would probably be difficult to describe in

5    brief, but about the importance of knowing

6    the limitations of the current testing that

7    we have available but also the utility of

8    using testing and how we might offer caveats

9    about it.  So those are the sections that,

10   you know, off the top of my head I recall I

11   was primarily -- the primary author for.

12   Q.   Okay.  Does the book chapter address

13       evaluating medical necessity for surgery?

14   A.   Very briefly.  Not in a lot of detail at all

15       because none of us were medical doctors

16       authoring the book chapter.  Dr. Olezeski is

17       part of an interdisciplinary team at the Yale

18       Pediatric Gender Clinic and so in her -- in

19       her group there's -- you know, there's her

20       and then there's pediatrician

21       endocrinologists so they collaboratively

22       approach that and that was her input.

23   Q.   Okay.  And -- and what -- what is the input,

24       if you remember?

25   A.   Essentially, you know, that the -- the

                                                    23

1        medical aspects are best for the medical

2        folks to make determinations about and have

3        discussions with folks about but that the

4        medical aspect of informed consent, for

5        example, is not the only piece of informed

6        consent that's important.

7    Q.  Is there anything in the book chapter --

8        excuse me, book chapter about evaluating

9        whether any treatment, including surgery,

10       would be psychologically necessary?

11   A.  I don't know that we used the word necessary

12       so much as the word beneficial.  So we did

13       talk about that intervention is often

14       beneficial for trans people.  Obviously, it

15       has to be tailored and individualized, but I

16       think the fundamental, you know, gist of the

17       chapter is that as psychologists, in fact, we

18       should be advocates for trans folks receiving

19       treatment that's appropriate for them, but

20       part of that also means we're -- we're

21       usually referring to kind of broader advocacy

22       within our organizations, not advocating on

23       behart of -- behalf of one particular

24       individual just -- just because they're trans

25       but, rather, saying we need to do a good job

24

1       with our institutional culture of teaching

2       more about how to effectively treat and work

3       with folks who are sexual and gender

4       minority.

5  Q.   So the chapter is focused exclusively on

6       incarcerated people; is that right?

7  A.   Well, yes.  I think there may be readers who

8       are involved in parole or probation kind of

9       supervision, but that's not the primary

10      audience for the book.

11 Q.   Understood.  So does -- in your view does the

12      psychological evaluation of transgender

13      people in a carceral setting -- is that

14      different from the evaluation of -- of

15      transgender people in a community setting?

16 A.   Yes.

17 Q.   How so?

18 A.   Well, for one thing, there are a number of

19      constraints that are present in the carceral

20      setting and there's also a lot of points of

21      possible intervention starting from

22      sentencing before the person even enters that

23      particular setting.  There are a lot of ways

24      in which the individual trans person doesn't

25      have the kinds of choices in a carceral

                                                    25

1      setting that they would have in the

2      community.  That also includes access to

3      social support where -- the way that most

4      prisons are set up even geographically makes

5      it very difficult for people to have contact

6      with their family members.  So there are

7      aspects of the prison setting that are unique

8      and there are ways in which our opportunities

9      as psychologists are constrained as well

10     compared to community-based treatment.

11          There are also differences, too, in that

12     in the community, there isn't necessarily a

13     right to medical treatment the way that there

14     is in a prison.  And so that is also a

15     significantly different sort of configuration

16     of how we might think about accessing mental

17     health care.  There are many, many people in

18     the community who I'm sure wish they also had

19     the right to access medical and mental health

20     care, but the reality is that the way that

21     when we're looking at practicing, the

22     correctional setting is the one where people

23     are supposed to get it.

24  Q.  And what is your understanding of the -- the

25      right to receive healthcare in prison?

                                                   26

1    A.    My understanding of it is based on my

2          forensic training so it's not a legal

3          understanding; it's --

4    Q.    Sure.

5    A.    -- a forensic psychological understanding.

6          But most of the time, what we talk about is

7          the Estelle v. Gamble case and the idea that

8          because people have been dep- -- if someone

9          has been deprived of their liberty and

10         they're in a carceral setting, then that is

11         what creates the obligation to provide

12         medical care to them.

13   Q.    You talked about -- you used the term

14         psychologically beneficial; is that right?

15   A.    Right.

16   Q.    Does -- can someone's carceral status affect

17         whether any given treatment would be

18         psychologically beneficial?

19   A.    Yes.

20   Q.    How so?

21   A.    For example, with post-traumatic stress

22         disorder, one of the things that a lot of

23         people don't realize about post-traumatic

24         stress disorder is that the first step in

25         treating PTSD is achieving safety for the

27

1    person, not actual treatment or what most

2    people would think of as treatment.  In

3    carceral settings it actually pays to be

4    hypervigilant.  It is important for your

5    safety to monitor your environment for

6    threats.  Depending on the type of setting

7    that you're in, other people may have

8    incentives to mistreat you or try to gather

9    information from you or something like that.

10   So these are generally much higher-stress

11   settings for most people compared to a

12   community-based environment and certainly,

13   that's one thing that -- I'm just giving PTSD

14   as an example.

15          Another issue can be if you have a

16   condition like schizophrenia.  There are a

17   lot of options for treatment in the community

18   that are typically not available in the

19   carceral setting for a variety of reasons.

20   Some of the medications that people take

21   require frequent blood work and -- to make

22   sure they're not getting poisoned or that

23   their, you know, white blood cell count isn't

24   out of whack or something like that.

25          So there are treatments for medical --

                                                   28

1      or, sorry, psychological conditions that

2      are -- we have to adapt or sometimes they're

3      just completely unavailable in carceral

4      settings for a variety of reasons.

5   Q.  Does the unavailability of a treatment or

6      intervention mean that it -- it -- it

7      wouldn't be psychologically beneficial or

8      does it just mean for -- like, for practical

9      reasons, you can't do it?

10          MR. RODRIGUEZ:  Objection to form.  You

11     can answer.

12  A.  Do you mind re- -- repeating the question?

13  Q.  Sure.  So -- see if I can remember what I

14     said.  In -- so if you have a -- one of these

15     treatments or interventions and if -- if it's

16     not available, were -- did you mean to say

17     that that treatment wouldn't have a

18     psychological benefit for someone or simply

19     it just isn't available for practical

20     reasons?

21  A.  So that's a good question and the PTSD is a

22     pretty good example for that one.  So they do

23     have PTSD treatment in prisons including in

24     the federal prison system.  However, you

25     know, as I said, the first step in PTSD

29

1    treatment is actually ensuring that the

2    individual is safe.  And so you can -- you

3    can deliver interventions that might -- might

4    benefit -- that same intervention might

5    benefit that individual in the community if

6    they were safe and if they didn't have the

7    stressors associated with the carceral

8    environment where the exact same individual

9    and the exact same treatment produces a far

10   greater benefit because of the fact that when

11   they're in the carceral system, they have

12   factors that are actually actively

13   maintaining their illness because of the

14   stress and the threat of the environment,

15   even the social context of it.  So even for

16   the same individual, they might get a

17   different benefit in the community versus a

18   carceral setting with the exact same

19   treatment.

20   Q.   Is there any health condition you can think

21   of where the -- the benefit to the patient

22   would be maximized in a carceral set- --

23   excuse me, a carceral setting as opposed to a

24   community setting?

25   A.   I can't comment on medical conditions, but I

                                                    30

1          can say for mental health conditions --

2     Q.   Uh-huh.

3     A.   -- that's a difficult question because of the

4          fact that there are some people who will only

5          get care while they're incarcerated because

6          of the fact that they're so poor and they're

7          so limited in terms of their access in the

8          community.  I've certainly seen people where

9          I -- I frankly had anxiety about their

10         release because my concern was that they were

11         going to get no care in the community.

12         However, I can't think of a -- you know,

13         offhand of a psychological condition where I

14         would say that that's true.

15    Q.   Okay.  And so getting back to gender

16         dysphoria, is there any gender-affirming

17         treatment or intervention where a patient

18         would not receive psychological benefit

19         simply because they are incarcerated?

20    A.   I don't think there's enough information for

21         me to answer that question.  Like, it's -- it

22         would depend so much on the circumstance it's

23         hard for me to come up with an example of

24         one.

25    Q.   Okay.  Well, just -- I mean, the fact of

31

1        incarceration itself --

2    A.   Uh-huh.

3    Q.   Can the fact of incarceration itself mean

4        that a treatment will have no psychological

5        benefit to a patient?

6            MR. RODRIGUEZ:  Object as speculation.

7        You can answer.

8    A.   I think there are situations where it would

9        be less.  I don't -- I'd have to -- I'm not

10       sure if there would be a situation where I

11       would say there would be none.  I think it's

12       possible that that would -- would be, but it

13       would depend very much on the person's

14       circumstances.  So if they were in solitary

15       confinement or double solitary, for example,

16       and you're trying to give them a mental

17       health treatment, it's -- you know, or -- or

18       a treatment for something related to gender

19       dysphoria but they're in double solitary with

20       someone who's acutely transphobic, yeah, I

21       could absolutely see that almost no matter

22       what you did to help that person, unless you

23       resolved that issue, they're going to

24       continue to be acutely distressed.

25   Q.   Okay.  Anything -- we've gotten off track a

                                                    32

1          little bit.  Anything about the book chapter

2          that we haven't spoken about that you think

3          is interesting or that you're proud of?

4     A.   Well, one thing we are working on doing is

5          making the book available to folks -- we want

6          to make sure the book chapter is available to

7          incarcerated folks themselves and not just

8          the professionals.  So one of the things that

9          we are working on is making sure that not

10         just the book is available in prison

11         libraries for use by incarcerated people, but

12         we're also working on a version of our

13         chapter that will be available for folks who

14         have significantly limited literacy so

15         essentially like a multimedia presentation of

16         the chapter content so that incarcerated

17         tran- -- transgender folks themselves can

18         access all the information in our chapter.

19    Q.   I think that's great.  Not a -- that's a

20         comment, not a question.

21              All right.  Changing gears a little bit,

22         let's flip to your teaching and training

23         experience.  Sorry.  Having trouble finding

24         it.

25    A.   Page 8.

                                                        33

1   Q.   Thank you.  There we go.  Okay.  So I want to

2        ask you about the first item listed,

3        Conducting forensic mental health evaluations

4        with individuals who are transgender or

5        gender nonconforming.

6             Did I read that right?

7   A.   Yes.

8   Q.   Okay.  What -- is this a -- a training that

9        you did?

10  A.   Yes, through the University of Virginia.

11  Q.   Okay.  What did the training involve?

12  A.   So there were multiple presenters.  I'd have

13       to re- -- I'd have to go back and look to see

14       the names of everybody, but Dr. Olezeski was

15       one of them who coauthored the book chapter

16       and we had a panel discussion as well.  And

17       so the description in my CV is pretty

18       accurate about, you know, what the

19       considerations are for folks who are trans or

20       gender nonconforming in -- we say criminal

21       justice context, not correctional, because we

22       are also talking about evaluations that might

23       be conducted on folks who are in the

24       community, not presently in custody.  The

25       ethical considerations, we were talking about

                                                        34

1          things like gatekeeping, about not dead

2          naming and things like that that could be

3          harmful to the person.  Example language and

4          queries for taking a gender development

5          history, so that was basically how to query

6          these things in a respectful way and really

7          to some extent it was etiquette.  The case

8          law was covered by another presenter.  And

9          referral considerations, those were

10          primarily, like, medical referral

11          considerations.  At that time, we were still

12          under WPATH Standards of Care 7 where there

13          were requirements for -- more requirements in

14          terms of written letters and that sort of

15          thing so we also addressed the -- that is

16          what we're talking about when we're talking

17          about referral considerations.

18     Q.   You mentioned the -- the WPATH standards.

19          What did you mean -- I think you said you

20          were under the WPATH standards.  What --

21     A.   Oh, the -- yeah.

22     Q.   What -- what --

23     A.   The new ones had not been published yet so in

24          terms of -- I have -- I don't endorse the

25          WPATH standards, the 7 -- the Version 7.

                                                    35

1       That's why I'm not a member of WPATH and have

2       not been historically.  However, in terms of

3       the actual practice that you see most

4       psychologists having to engage in, if a

5       transgender comes into your office and they

6       say, I need a letter, usually what they mean

7       is, I'm in the process of getting the -- you

8       know, contacted an agency or an organization.

9       They've indicated, I need this letter so I'm

10      coming to you to get a letter.

11             And so most of the time, what's

12      happening is that the people who are actually

13      going to be providing the medical care to

14      them are operating under the WPATH standards

15      of care and require two letters then from

16      medical professionals.  And so we had to --

17      that -- you know, that was the understanding

18      and that's what you comply with.  Whether you

19      agreed with that provision or not, you knew

20      that their medical care providers were going

21      to require that.

22  Q.  Okay.  So I know that you don't endorse

23      WPATH.  I'll get to that in a moment.  Did

24      you say that most providers en- -- endorse it

25      or follow it?  I can't remember exactly what

                                                        36

1          you said.

2     A.   I would say that most of the medical care

3          providers that I -- that I've worked with are

4          utilizing those standards in terms of how

5          they determine somebody's appropriateness and

6          what kind of hoops they should have to jump

7          through before they can have --

8     Q.   Uh-huh.

9     A.   -- what they want.  I would say that's --

10         it's an -- like an informal organizing kind

11         of set of expectations for us as

12         psychologists is that that's -- what we're

13         going to do is what WPATH suggests we do in

14         terms of providing letters and the

15         requirements his- -- the historical

16         requirements that the person have socially

17         transitioned for a period of time before

18         they're allowed to have those interventions

19         and so forth.  And so it was mostly that we

20         ex- -- we believed that -- that the medical

21         professionals were going to expect that of us

22         in order to agree to do the procedures for

23         the person or prescribe medication.

24    Q.   Okay.  Are -- do you have, like, a wholesale

25         rejection of the WPATH standards or are there

                                                      37

1          specific parts of it that you disagree with?

2     A.   The newer version that just came out, I think

3          there are significant improvements there.  My

4          primary concern with WPATH is that it's

5          predicated on a -- what I view as a

6          binary-oriented medical essentialist model

7          and I don't think there's an -- that WPATH

8          has created enough room for nonbinary people

9          or people whose gender may be not -- people

10         who may not necessarily need or want surgical

11         procedures or hormonal intervention.  I also

12         think that most of this treatment has to be

13         highly individualized for the person.  And I

14         think WPATH describes themselves as these are

15         flexible guidelines, you know, not a -- set

16         in stone.  But that's -- yeah, that would be

17         my response to that question.

18    Q.   Okay.  So when it comes to the WPATH standard

19         for, let's say, evaluating someone for --

20         evaluating someone and referring them for

21         hormone therapy, what do you think of what

22         WPATH says?

23    A.   I think that most folks are able to make that

24         decision.  You know, my issue with it was

25         that I didn't believe that somebody should

                                                    38

1       have to have transitioned socially for a

2       period of time before they're permitted to

3       access hormonal intervention or surgery.

4    Q.  Uh-huh.

5    A.  That's really my primary issue with it.  I

6       also don't think they should have to have so

7       many letters from psychologists probably.

8    Q.  Okay.

9    A.  And that was my historical objection to WPATH

10      was really more about the ways in which I

11      felt that they actually prevented trans and

12      gender-nonconforming folks from receiving

13      care rather than facilitating it because my

14      view is WPATH has a -- like I said, a narrow

15      medical essentialist model historically,

16      although I do see an improvement in the

17      eighth version of the standards of care.

18   Q.  Okay.  So summing up, do you -- you think

19      the -- the seventh standards are too

20      restrictive with respect to you referring

21      someone for gender-affirming care?

22   A.  Yes.  I think there were a number of people

23      that were probably held back from receiving

24      care that they needed because those standards

25      were excessively restrictive.

39

Q.   Okay.  All right.  Back to your CV.  I'm
     looking at the third item down in your
     teaching and training experience --
A.   Yes.
Q.   -- University of Virginia health services
     panelist:  How experience might inform
     ethical practice, et -- et cetera.
          What -- what did this involve?
A.   This was a training that was set up by Janet
     Warren, who was our training director at the
     time.  The original focus that she wanted to
     have was on girls in the criminal justice
     system, but we wanted to expand that model
     for basically gender minority folks as well.
     We ended up having a panel.  It was myself,
     Christy Olezeski, and then I think it was
     Dallas -- I'm blanking on her last name.
     She's actually fairly well known.  I just
     can't remember her last name for some reason,
     but she is a service provider.  And so we
     were answering questions after folks had
     participated in a training on that topic.  So
     I wasn't involved in the training that
     preceded that; I was involved in the -- just
     the panel so just answering questions from

                                               40

1          the audience.

2    Q.    Okay.  Did this training have anything to do

3          with evaluating gender dysphoric patients for

4          gender-affirming care?

5    A.    Yes.  You know, like, for example, one of the

6          questions that we got was, you know, does

7          trauma cause somebody to be transgender?  Is

8          that something that needs to be resolved

9          before somebody can get care?  So those were

10         the kinds of questions that the attendees

11         had.  It was that kind of -- it was just

12         being available to answer questions.  But

13         I -- the questions that they asked were

14         pretty revealing of what the issues were with

15         the attendees --

16   Q.    Uh-huh.

17   A.    -- I think, too.

18   Q.    Uh-huh.  Was surgery addressed?

19   A.    That actually did not come up much at that

20         panel discussion, which is -- you know, we

21         were focused on younger kids at that -- you

22         know, adolescents at that time.

23   Q.    Okay.  Did any of the other entries under

24         your teaching and training experience concern

25         gender dysphoria?

                                                        41

1    A.   I think on Page 11 there's the Migrant

2         Network Coalition workshop coleader.  So at

3         this point in Lexington, they were

4         considering some very restrictive

5         anti-immigrant policies and we developed this

6         workshop to talk about issues with folks who

7         were sexual gender minority but also who had

8         cooccurring disabilities and were potentially

9         undocumented or -- or had other concerns

10        about their immigration status and how

11        aggressive anti-immigrant policies would

12        actually cause those people to be more likely

13        to be victims of crimes.

14   Q.   Anything else?

15   A.   Not -- I will tell you I do not recall if

16        Project Safe, which was the project related

17        to trying to promote excessive bil- --

18        disability accessibility from rape crisis and

19        domestic violence agencies -- I don't recall

20        if that included discussion of sexual and

21        gender minority folks who are transgender or

22        not.

23   Q.   Okay.  All right.  Well, if that's everything

24        there, let's turn to -- let's see -- your

25        presentations.  Once again, missed it.  I

                                                    42

1        know it's in here somewhere.

2   A.   Page 12.

3   Q.   Thank you.  All right.  So in these

4        presentations, did any of these concern

5        transgender people or people with gender

6        dysphoria?

7   A.   Yes.  In fact, one of them I'm very proud of.

8   Q.   Which one is that?

9   A.   Yes.  So the second entry, Boyd, Barretto,

10       and Zelle -- so this was myself, a

11       psychologist who is a J.D./Ph.D. and who

12       specializes in advanced directives for

13       Virginia and then another -- a -- a

14       transgender woman who had had some -- was,

15       you know, openly disclosing that she had had

16       some post-traumatic stress disorder.  And so

17       what we did was we created an advanced

18       directive for her and the whole point -- we

19       presented at the Philadelphia Trans Health

20       Conference that year and the point of it was

21       that, look, you can use an advanced directive

22       as a transgender person to communicate with,

23       like, for example, local hospitals about how

24       you want to be treated if you're

25       incapacitated.  So if you get in a car

                                                      43

1    accident, you have a mental health episode,

2    something happens and you go to the hospital,

3    you can specify in advance, here's how I want

4    my hormone therapy to be maintained, here's

5    who I want to visit or who I do not want to

6    be allowed to visit, here's how I feel about

7    the use of restraints or seclusion

8    techniques.  You can use all of that and you

9    can communicate in advance to help to protect

10   your rights and to document what your -- you

11   know, what your needs were in advance of, you

12   know, God forbid, an incapacitation.

13       So we developed an example one for my

14   copresenter and then we presented it at the

15   conference to -- to demonstrate primarily for

16   trans and gender-nonconforming folks about

17   how they can utilize advanced directives to

18   protect their rights in the event of

19   incapacitation.

20   Q.  Do you know if it's been used any time since

21   for -- by other folks?

22   A.  I do not know.  I -- I know we developed one

23   for -- you know, what we did partly was we

24   talked about how to do it and then we

25   presented the example one that we did --

44

1    Q.   Uh-huh.

2    A.   -- for my -- for my colleague.  I'm -- I'm

3         hoping that other people are using it and

4         Dr. Zelle is still very much involved in

5         advanced directive work and is, I believe,

6         spreading the good word about it.

7    Q.   Any of these other presentations, did they

8         concern gender dysphoria or transgender

9         people?

10   A.   No.

11   Q.   Okay.  Then in that case, let's turn to your

12        professional community service, which I'm

13        sure you'll beat me to again.  That's on Page

14        5.

15   A.   Oh, you know -- all right.  Yes.

16   Q.   All right.  In your professional community

17        service, have -- have you had any particular

18        focus?

19   A.   It's primarily been related to, you know, as

20        I mentioned earlier, my three primary areas,

21        which is sexual/gender minority populations,

22        intellectual and developmental disabilities,

23        and interpersonal violence.  So the diversity

24        committee founding member thing is what we

25        talked about before as a graduate student

45

1        representative and then the others relate to

2        intellectual and developmental disabilities

3        primarily.

4    Q.   Okay.  And in these activities do you ever

5        perform mental health evaluations?

6    A.   Oh, no.  These -- no.  These were, like,

7        advisory panels --

8    Q.   Okay.

9    A.   -- basically.

10   Q.   That being said, is there anything here that

11       you're parti- -- particularly proud of or

12       that you think is just important for

13       understanding your career?

14   A.   Well, it's more of a big picture thing,

15       but --

16   Q.   Uh-huh.

17   A.   -- you know, one of the things that you

18       probably see throughout this is that the

19       disability aspect is quite a strong component

20       of my training and I would say that

21       disability is sort of -- that framework is

22       the organizing set of principles around a lot

23       of what I do.

24            So, for example, you'll notice there's

25       no publications that I have or presentations

                                                    46

1      that I have about trans folks that don't

2      involve a coauthor -- another coauthor who is

3      also trans or gender nonconforming and that

4      comes from -- in disability we talk about

5      nothing about us without us and that is a,

6      you know, important value that we have coming

7      from that community, but I think it organizes

8      a lot of my other work even when the focus is

9      not specifically on disability status.

10  Q.    Okay.  All right.  I'm going to change gears

11      a little bit and hand you what we're calling

12      Number 2.  It's just your expert report in

13      this case.

14          (BOYD EXHIBIT 2, Expert Report of Sara

15      E. Boyd, Ph.D., ABPP, was marked for

16      identification.)

17  BY MR. SIEGEL:

18  Q.    All right.  And I want to flip to the

19      appendix, which is a list of cases.

20  A.    Yes.

21  Q.    And that's where -- these are cases that you

22      provided --

23  A.    Uh-huh.

24  Q.    -- expert testimony in; is that right?

25  A.    Yes.

47

1    Q.    Over the last four years?

2    A.    Yes.

3    Q.    All right.  So for the cases listed here, did

4          any involve a person with gender dysphoria?

5    A.    Let me take a look.  None of these do.  I

6          believe the last case that I testified in

7          that involved a transgender individual was a

8          criminal case and I don't think it's on this

9          list because it only covers the last four

10         years.

11   Q.    Okay.  Do you remember the name of that case?

12   A.    I believe the person's last name was Ernest.

13   Q.    Okay.

14   A.    They're deceased, unfortunately.

15   Q.    Do you remember the jurisdiction it was in,

16         the court?

17   A.    It was in Virginia.  I don't believe it was

18         in one of the jurisdictions that I typically

19         testify in so not northern Virginia.  I'd

20         have to go and look it up.

21   Q.    Okay.  Do you remember if it was State or

22         Federal Court?

23   A.    It was State Court.  It was a sentencing.

24   Q.    And what was your involvement in that case?

25   A.    This was an individual who had been convicted

                                                        48

1     of sex offenses and was up for sentencing.

2     She was a transgender woman who had a number

3     of mental -- significant mental health

4     problems.  At the sentencing what I spoke

5     about primarily was my concern about her

6     well-being and safety in the carceral

7     environment and why I believe that ought to

8     be a mitigating factor in terms of her

9     sentencing and what considerations they might

10     undertake to keep her safe if she were to

11     serve a custodial sentence.  The court did

12     not do what I suggested and she did

13     ultimately die by suicide.

14  Q.  Any other cases not listed here that involved

15     a person with gender dysphoria or

16     gender-affirming treatment?

17  A.  Well, I currently have, I think, three cases

18     right -- not counting this one, three cases

19     right now that involve folks with gender

20     dysphoria or who are transgender but not --

21     do not have gender dysphoria.  I will say,

22     though, that most of the -- in most of those

23     cases, their gender identity is relevant but

24     not the central question so those aren't

25     cases where I've been asked to give any kind

49

1         of opinion about their, you know, informed

2         consent for a procedure or something like

3         that.

4    Q.   Okay.  In those cases has the court qualified

5         you as an expert in any of them?

6    A.   Yes.

7    Q.   Okay.

8    A.   So in the sentencing I do not recall -- the

9         one that I just told you about, Ernest, I do

10        not recall it -- how I was qualified

11        specifically because it's usually either very

12        narrow or very broad.  I don't recall if I

13        was qualified specifically as an expert in

14        transgender and gender-nonconforming folks in

15        that case or not.  It would take me a minute

16        to think through past testimony regarding

17        other trans folks.  I've never had to testify

18        in a case -- it just hasn't occurred.

19        They've always been resolved.  -- involving a

20        incarcerated person where I was evaluating

21        them while they were incarcerated and then

22        giving an opinion about, for example,

23        informed consent-related issues.

24   Q.   Okay.  So in -- make sure I understand what

25        you're telling me.  The -- in the cases --

50

1        you have three cases pending --

2   A.   Yes.

3   Q.   -- that involve a transgender person or

4        someone with gender dysphoria; is that right?

5   A.   Well, they're either trans and they have

6        gender dysphoria or they're trans and they

7        don't have gender dysphoria.

8   Q.   Okay.  In any of those cases that -- that are

9        pending --

10  A.   Uh-huh.

11  Q.   -- has the court qualified you as an expert?

12  A.   Oh, no.  We haven't -- we're not to the point

13       of testifying in any of those.

14  Q.   Okay.

15  A.   And I haven't been appointed in any of them;

16       I was retained by counsel.

17  Q.   Okay.  Can you give me the names of those

18       cases?

19  A.   I cannot because they're confidential mental

20       health cases.  I could probably try to ask

21       the attorneys if I could disclose, but

22       because my work is in progress and I don't

23       even know if the other side has been notified

24       that I've been retained, it would potentially

25       be an issue for me to disclose that.

                                                              51

1  Q.   Okay.  Speaking generally without giving away

2       any confidential or sensitive information, do

3       those cases concern whether a person with

4       gender dysphoria should or should not receive

5       a certain treatment?

6  A.   Yes.  So -- but they're a little bit more

7       nuanced than, you know, is it, like,

8       gender-affirming treatment.  It's usually a

9       broader look at what is their -- what are

10      their mental health needs generally speaking

11      and what do they need and for a lot of those

12      folks, that may or may not include a

13      component of, you know, gender-affirming

14      care.

15 Q.   Okay.

16           MR. SIEGEL:  All right.  We've been

17      going for about an hour.  I think now is

18      probably a decent time to take a short

19      break --

20           MR. RODRIGUEZ:  Yeah.

21           MR. SIEGEL:  -- if that works for you

22      all.

23           MR. RODRIGUEZ:  Yeah.

24           (Whereupon, there was a recess in the

25      proceedings from 9:59 a.m. to 10:14 a.m.)

                                                    52

BY MR. SIEGEL:

Q.    Back on the record.  All right.  Dr. Boyd,
      welcome back.  I just have a couple follow-up
      questions from what we were just talking
      about.  Excuse me.  I want to briefly revisit
      the book chapter.

A.    Uh-huh.

Q.    Does the chapter discuss how prison
      administrators or prison officials should
      weigh an individual's determination that they
      need a gender-affirming intervention in -- in
      deciding whether to give them that
      intervention?

           MR. RODRIGUEZ:  Objection to form.  You
      can answer.

A.    We don't discuss sort of the administrative
      decision-making in there, but we do note that
      that's a factor that's present in that kind
      of setting or administrative decision-making
      and requirements that may not be present in
      the community in terms of making a
      distinction between care in prison and care
      in the community.

Q.    Okay.  So there's nothing about how that
      individual's self-determination affects

                                                        53

1        treatment decisions?

2    A.  We do talk about that in the informed consent

3        discussion but not --

4    Q.  Okay.

5    A.  -- with respect to how administrative folks

6        should take that into account.

7    Q.  Okay.  And this is maybe -- you may -- may

8        have already addressed that, but how -- what

9        do you say about that in the informed consent

10       discussion?

11   A.  I would have to have the chapter in front of

12       me to able to refresh my recollection.  I

13       think it's more of a discussion about the

14       idea of taking a problem-solving approach

15       even internally as a psychologist.

16   Q.  Okay.  Earlier, you also mentioned that in

17       your view, WPATH is too restrictive; is that

18       correct?

19   A.  Historically that it has been, yes.

20   Q.  Okay.  When you said it's historically too

21       restrictive, is that also in reference for

22       access to gender-affirming surgery?

23   A.  The -- the issue with the restrictiveness is

24       more about, like, a general concern that it's

25       not a very culturally competent approach,

                                                      54

1        that there's assumptions that people have the

2        ability, for example, to socially transition

3        for a period of time before they can have

4        those kinds of procedures done.  So that's

5        really more the critique --

6   Q.   Okay.

7   A.   -- whether it was hormones or surgery or some

8        other intervention.

9             THE WITNESS:  My apologies.

10  BY MR. SIEGEL:

11  Q.   All right.  And with respect to your expert

12       testimony, you said that you had not had to

13       testify about -- or testify in a case

14       concerning someone with gender dysphoria; is

15       that right?

16  A.   I've testified in cases that involve folks

17       who have gender dysphoria.  I -- the question

18       that I've testified about has usually not

19       been whether or not they should have access

20       to treatment specific to gender-affirming

21       care.  I have testified about access to

22       mental health treatment more broadly for

23       folks who happen to be trans, but the central

24       question wasn't related to their gender

25       identity.

                                                    55

1    Q.    Okay.  And so other than the cases that you

2          have pending, in the cases where you didn't

3          end up testifying, were you ever engaged to

4          write an expert report concerning

5          gender-affirming treatment?

6    A.    Yes.

7    Q.    Okay.

8    A.    Yes.  So typically, for the Department of

9          Corrections, for example, we would always

10         submit a report for that, but it's -- none of

11         those cases have gone to a point of any kind

12         of litigation where I've had to testify.

13   Q.    Okay.  Did you end up drafting a report in

14         those cases?

15   A.    I believe in all of the ones for DOC, I've

16         always written a report.

17   Q.    Okay.  And did any of those cases where you

18         drafted a report -- did they concern

19         gender-affirming care?

20   A.    Yes.

21   Q.    Which ones?

22   A.    For the -- I mean, all of the ones that I did

23         for the Virginia Department of Corrections

24         would have related to that, would have used

25         an informed consent approach, but it -- I

                                                        56

1          wouldn't have given an opinion about the

2          person should have this procedure or this

3          treatment.  I would talk about barriers to

4          those things or problem-solving that might be

5          done if there was an issue, but it wasn't the

6          case that I would write a report that -- you

7          know, where the recommendation was, they

8          should have this medical treatment.

9     Q.   Okay.  Can you give an example of -- just

10         walk me through one of those cases and how

11         you got involved and what your process was

12         and what your report looked like.

13    A.   So the director of medical services is

14         usually who makes the referral.  They provide

15         me with information and authorization to

16         enter the facility.  I meet with the

17         individual.  I go through an informed consent

18         process with them to make sure they actually

19         want to participate in it because even though

20         the referral came from the facility, they're

21         not obligated to participate in the

22         evaluation.  And then I would evaluate the

23         individual, meeting with them us- -- at least

24         once in person but often twice.  I conducted

25         testing if it was necessary and then I would

                                                    57

1        draft a report.

2              So I gave you the example earlier of the

3        individual who their initial asks were just

4        related to basic cosmetic items, but what my

5        report ended up focusing on was just their

6        need for accommodations where they want -- if

7        they wanted to pursue, for example, endocrine

8        treatment because of their limited literacy

9        and cognitive ability.  So that was more

10       talking about how we kind of remediate that

11       so that person can have treatment that they

12       want if they ultimately decide to pursue

13       that.

14   Q.  Okay.  And in the reports that you drafted,

15       did any of them concern gender-affirming

16       surgery?

17   A.  I believe so, at least a couple of them, but

18       it -- most of the people that I've gotten

19       those referrals for have wanted lower-order

20       kinds of intervention in terms of the risk

21       profile.  So it's usually been more of the

22       kind of physical, you know, clothing,

23       commissary items, or endocrine treatment as

24       opposed to surgery, although some -- at

25       lea- -- I think at least three individuals

                                                         58

1        did want surgery.

2   Q.   Okay.  Do you remember which cases those

3        were?

4   A.   Not off the top of my head.  I don't recall

5        the names, but they were not cases that I

6        testified in.  As I said, I just wrote

7        reports.

8   Q.   Uh-huh.  And you were -- you were not engaged

9        by a private plaintiff for that; you were

10       appointed by the court; is that right?

11  A.   Well, I was retained by the Virginia

12       Department of Corrections as --

13  Q.   Okay.

14  A.   -- an independent outside evaluator.

15  Q.   Okay.  And in these reports you didn't

16       provide a medical opinion --

17  A.   Correct.

18  Q.   -- right?  Were you providing an opinion as

19       to whether surgery would be psychologically

20       beneficial?

21  A.   I don't believe that for any of those folks I

22       did offer that opinion because, as I said,

23       even for the people who, I think, ultimately

24       wanted that, they were far earlier in the

25       process.  They weren't asking for it yet.

                                                    59

1   Q.   Uh-huh.

2   A.   But they described a kind of process that

3        they anticipated going through ultimately

4        where surgery would be part of that picture

5        for them.

6   Q.   And what surgeries were at issue in those

7        cases?

8   A.   I -- it was, you know, what people call

9        bottom half surgery for most of those folks.

10       I don't recall anybody wanting to have -- who

11       was specifically seeking breast augmentation

12       or removal, you know, chest surgery.  But,

13       yeah, I think it was all bottom half surgery.

14  Q.   Okay.  Any -- did any of those deal with

15       vulvoplasty or vaginoplasty?

16  A.   Not vulvoplasty.  That's less common than

17       vaginoplasty, but one person is a trans man

18       and I don't believe he was seeking bottom

19       half surgery.  The three people who were were

20       all trans women.

21  Q.   Okay.  In any of those cases involving bottom

22       half surgery, did you -- did you conclude

23       that surgery would be psychologically

24       beneficial?

25            MR. RODRIGUEZ:  Asked and answered.

                                                       60

1        You can answer.

2   A.   No.  I didn't give a medical opinion about,

3        you know, whether the -- well, I should

4        differentiate.  There's a medical opinion

5        about whether or not the procedure itself

6        will likely be physically/medically

7        successful.  The question of whether or not

8        it would provide them with psychological

9        relief, I believe I have offered the opinion

10       that endocrine intervention -- the things

11       that the person was asking for, that those

12       things were likely to confer a psychological

13       benefit.  I don't recall evaluating anybody

14       who was at the point of asking for surgery

15       where I gave an opinion about that.

16  Q.   Okay.  All right.  Let's turn then to your

17       clinical experience and employment.  First of

18       all, is this -- is there any work in your

19       career that you found particularly

20       interesting and gratifying?

21            MR. RODRIGUEZ:  Objection, vague.  You

22       can answer.

23  A.   Yeah.  That is a big question.

24  Q.   In your clinical experience and employment.

25  A.   I mean, as I said, you know, my primary areas

                                                      61

1       of focus have been developmental

2       disabilities, interpersonal violence, and

3       then sexual/gender minority populations.

4       Those are the areas that -- the reason I

5       focus on those are because those are the

6       areas that I find more interesting and

7       rewarding.

8   Q.  Okay.  So I'm looking at the first page of

9       your expert report.

10  A.  Yes.

11  Q.  And I'm in the second sentence in the second

12      paragraph.

13  A.  Yes.

14  Q.  You write, As a psychologist specializing in

15      forensic mental health assessments, I have

16      conducted more than 100 evaluations of

17      incarcerated people housed in state and

18      federal prisons and jails.  In particular, I

19      have conducted independent psychological

20      evaluations related to gender-affirming care

21      for incarcerated individuals.

22          Did I read all that correctly?

23  A.  Yes.

24  Q.  So how many evaluations related to

25      gender-affirming care have you done?

1    A.    Spe- -- where that was specifically the

2          referral question, I think I would say

3          somewhere around 20 --

4    Q.    20?  Okay.

5    A.    -- to 25.

6    Q.    And --

7    A.    I should -- oh, I should be clear, too.

8          Those are folks that I know were transgender

9          so it's certainly possible I've evaluated

10         people who were trans that I just didn't know

11         that they were.

12              MR. RODRIGUEZ:  Speak up.

13   A.    That I just didn't know that they were trans.

14         Apologies.

15   Q.    Okay.  And -- and these 20 or so evaluations,

16         you were evaluating them related to whether

17         they needed gender-affirming care?

18   A.    Yes.

19   Q.    Okay.  What does that mean?

20   A.    In my report I describe that.  So in that --

21         the sentence that says, In that ca- -- starts

22         with, In that --

23   Q.    Uh-huh.

24   A.    -- capacity, so there's the capacity to

25         provide informed consent part, which is

                                                        63

1    looking at do they have any conditions that

2    would impair their ability to understand the

3    information and make decisions.

4         To describe the nature and severity of

5    their gender dysphoria if present.  So that's

6    typ- -- that was required by the Virginia DOC

7    that the person have a diagnosis of gender

8    dysphoria.  So I would describe whether or

9    not they met criteria and, if so, what

10   symptoms they had.

11        To offer recommendations with respect to

12   gender-affirming interventions or building

13   capacity to provide informed consent.  So,

14   for example, you know, I would have no

15   problem recommending that somebody receive

16   access to boxers if that's what they want or

17   something like that that's not a medical

18   intervention.  So those kinds of things I

19   would often recommend.  When I say, building

20   capacity to provide informed consent, I gave

21   an example of that earlier, the individual

22   where I said, don't just give them a handout

23   that they're supposed to read and understand.

24   And then the last part says, Identify any

25   cooccurring psychological disorders that may

                                              64

1        require more active management or integration

2        into treatment planning for gender-affirming

3        interventions.  So that's the detailed

4        description of what I did.

5   Q.   Okay.  I'd like to focus on the part where

6        you say part of your job is to offer

7        recommendations with respect to

8        gender-affirming interventions.

9              In any of these cases, did you offer

10       recommendations with respect to

11       gender-affirming surgery?

12  A.   Not with regard to whether or not someone

13       ought to have it or not but, again, making

14       sure they understand.  That -- that the

15       information is delivered to them in a way

16       that they can comprehend and understand would

17       be more of my consideration in that regard.

18  Q.   So I'm not -- I'm trying to under- -- so --

19       beg your pardon.

20             So you're not offering a recommendation

21       in those cases that this patient needs or

22       doesn't need some kind of gender-affirming

23       surgery; is that right?

24  A.   I would usually convey what the individual

25       told me about what they wanted and needed --

                                                    65

1    Q.    Okay.

2    A.    -- rather than necessarily saying, you know,

3          that I think they should have surgery.

4    Q.    So then what kind of recommendations are you

5          offering?

6    A.    So if the -- if the person has, for example,

7          other psychological disorders that are

8          cooccurring with it, then I might offer

9          recommendations about how -- if there's a

10         relationship between those things and the

11         gender dysphoria, for example, but it's not

12         going to be treated -- the cooccurring

13         condition is not going to be treated solely

14         by gender-affirming intervention.  We need to

15         integrate those treatment recommendations

16         together.

17              And so that would be -- it would be more

18         of, like, a coordinating sort of -- there's

19         an interdisciplinary approach to it where I

20         address the issues that are appropriate for

21         me to address as a psychologist but the

22         medical folks are the ones who would say, you

23         know, physically or medically this person can

24         tolerate this or they understand the risks

25         and the benefits of the medical aspects of

                                                         66

1       it.  So my part was really only one piece of

2       it.  And then that was an independent

3       evaluation that would go to the Virginia DOC

4       and then their committee would take into

5       account my evaluation, the physician

6       recommendations, and then their in-house

7       folks who had usually already done their own

8       gender dysphoria-related evaluations that

9       were just diagnostic prior to my engagement.

10   Q.   Okay.  So just to make sure I understand

11       this, using the term psychologically

12       beneficial, in any of these evaluations were

13       you making a recommendation that

14       gender-affirming surgery would be or would

15       not be psychologically beneficial to the

16       plaint- -- excuse me, to the patient?

17   A.   I don't believe I have offered either of

18       those opinions.

19   Q.   Okay.  When you were conducting these

20       evaluations, were you using any clinical

21       guidelines?

22   A.   Well, so we have some -- as psychologists we

23       have some guidelines.  There were some that

24       were published in 2008 and there were some

25       that were published in 2015 by the American

                                                                67

1          Psychological Association task force.

2          However, those are general guidelines for

3          psychologists, not necessarily for forensic

4          psychologists, and I think it's important to

5          acknowledge the caveat that we don't have as

6          much guidance in the forensic setting in the

7          correctional setting.  It's part of the

8          reason -- it was part of the impetus behind

9          the book chapter.

10    Q.   Okay.  You've shared your views on WPATH.

11         Were you using or referring to the standards

12         of care when you were conducting these

13         evaluations?

14    A.   Not in the correctional setting because the

15         questions that are asked by Virginia DOC,

16         they don't necessarily -- at the time at

17         least, they hadn't necessarily deferred to

18         WPATH so they had their own requirements,

19         although, like I said, my -- mine was only

20         really one piece of it.  They had intern- --

21         an internal process with people and a panel,

22         I believe, that I was not involved with.

23    Q.   Okay.  To clarify, what do you mean deferred

24         to WPATH?

25    A.   Well, you mean -- I'm sorry.  You mean --

                                                        68

1    Q.   You said at the time, the system didn't defer

2         to WPATH.

3    A.   They had their own administrative

4         procedures --

5    Q.   Okay.  I see.

6    A.   -- that didn't necessarily map onto what

7         WPATH or -- or even reference WPATH at that

8         time.

9    Q.   Okay.  Do you know if they do now?

10   A.   I do not know.

11   Q.   Is there anything else in your employment and

12        clinical history that you think is important

13        to understand as relevant to this case?

14   A.   Not that I can think of.

15   Q.   Okay.  So in -- in light of what we've

16        discussed, when it comes to evaluating

17        patients with gender dysphoria for

18        gender-affirming surgery, do you consider

19        yourself to be an expert?

20            MR. RODRIGUEZ:  Objection to form.  You

21        can answer.

22   A.   I have expertise in that area.  If I were

23        qualified as an expert -- I would have no

24        issue with that if I were qualified by a

25        court.  I don't consider myself to be

69

1    somebody who is promoting myself as an expert

2    very broadly in that.  I'm really focused

3    specifically on the kinds of evaluations that

4    I do.  In the car- -- and it -- and it's

5    broader than carceral settings, too, because

6    it's other forensic settings outside of that.

7    But I would say that, yes, I -- I am an

8    expert in conducting evaluations related to

9    gender development and psychological aspects

10   of gender-affirming care.

11         So I think it -- you know, if there was

12   an area where somebody was asked me to --

13   asked me to give an opinion related to

14   expertise in that area and I felt I did not

15   have that more narrow expertise within that

16   area, I would choose not to answer that

17   question.

18 Q.  Okay.  Do you consider yourself to be an

19   expert in evaluating patients to determine

20   whether gender-affirming surgery would have

21   psychological benefit?

22         MR. RODRIGUEZ:  Objection to form.  You

23   can answer.

24 A.  Yes, I think I can give opinions about

25   whether or not somebody would achieve a

                                                      70

1          psychological benefit.

2     Q.   Okay.  And so can you tell me where -- in

3          your education, training, experience,

4          et cetera, where specifically does that

5          expertise come from?

6     A.   So as a psychologist, I -- well, I should say

7          clinical psychologist, I'm trained very

8          broadly in what psychological interventions

9          are likely to provide relief to indivi- --

10         individuals with various kinds of mental

11         disorders.  Now, within that field that

12         doesn't mean that every psychologist is an

13         expert in every disorder, but we do under- --

14         but we are trained in the process of

15         evaluating and treating those conditions.

16         When you're going to practice in a more

17         narrow area like the forensic area or an even

18         narrower area of forensic area with

19         transgender folks, then you have a

20         combination of treatment in -- or

21         treatment -- training in graduate school.

22         There's an experiential component of actually

23         inter- -- you know, working with trans folks

24         as opposed to simply reading about it in a

25         book and then there's also the publications

                                                        71

1      that I've done and the trainings that I've

2      created and co- -- cofacilitated.

3           I wouldn't say that that means that I

4      could be -- that I would be the right expert

5      for every case where that's the question.

6      There could certainly be factors in play that

7      would cause me to feel that I would not be

8      the right expert or that I lack the

9      appropriate expertise and in that case, I

10     simply would not take the referral and I

11     would do my best to make a tailored referral

12     to somebody who I felt did have that

13     expertise.  So, for example, there could be a

14     cultural minority group where I just don't

15     know enough about that and even though the

16     question relates to treatment in a carceral

17     environment for a transgender person, I might

18     still say, I'm not expert in this.

19  Q.  Uh-huh.  Anything else in your career,

20      training, or experience that gives you

21      expertise in evaluating a patient with gender

22      dysphoria for gender-affirming surgery?

23  A.  I don't recall if we've mentioned this yet,

24      but I did do some psychotherapy with folks

25      when I was still doing that with people who

72

1       were in the process of seeking

2       gender-affirming treatment and most of those

3       folks were still in the process of seeking

4       kind of -- you know, for most people, they do

5       endocrine treatment initially and most of

6       those folks were at that phase.  They were

7       younger folks, you know, typically, like,

8       late adolescents.

9   Q.   And did the psychotherapy ever involve

10      evaluation for surgery?

11  A.   So I wrote letters for folks do- --

12      documenting that they had a diagnosis of

13      gender dysphoria, that their other conditions

14      were relatively well managed, that they had

15      been socially transitioned for a period of

16      time.  I wrote those kinds of letters for

17      folks to utilize to seek services.

18  Q.   Okay.  Does services mean -- sorry.  What

19      does services mean?

20  A.   Yeah.  So if they were going to go to get

21      even endocrine management, they would

22      typically want -- their -- their doc- --

23      their physician would often want a letter

24      from someone like myself.  So those folks

25      could have approached me saying, I just want

                                                            73

 1          the letter, can we do an evaluation, but

 2          typically, what they wanted was

 3          psychotherapy, supportive psychotherapy,

 4          through that -- throughout that process as

 5          well.  So this is when I was still doing

 6          therapy.

 7     Q.   Uh-huh.

 8     A.   In recent years, I only do forensic

 9          evaluations so I don't do any of that

10          anymore.

11     Q.   Okay.  And did the services that you're

12          referring to ever include surgery?

13     A.   Nobody that I was working with was at the

14          point where surgery was the next step.  For

15          mo- -- for most of the ones that I recall, it

16          was part of their plan, but they weren't at

17          the point of that being the next step.

18     Q.   Okay.  And so just so I understand all of

19          your answers, has there ever been a time in

20          your career where you evaluated a patient

21          with gender dysphoria and you made a

22          recommendation that gender-affirming surgery

23          either would or wouldn't confer a

24          psychological benefit?

25               MR. RODRIGUEZ:  Objection to form.  You

                                                        74

1    can answer.

2    A.    It's possible that I may have said that, you

3          know, for somebody having a procedure that

4          they would get a psychological benefit from

5          it.  I don't remember enough detail about it

6          to provide you with more of an answer than

7          that.

8    Q.    Okay.  And I want to go back to something you

9          said a moment ago when you're writing

10         letters.

11   A.    Uh-huh.

12   Q.    You said that -- I think you said that their

13         other conditions had to be relatively well

14         managed; is that right?

15   A.    Right.

16   Q.    What does that mean?

17   A.    Well, historically, we -- you know, there's a

18         little bit of vagueness in the language.

19         That's from the WPATH Standards of Care 7.

20         The idea was that if the person has

21         cooccurring conditions like -- let's say if

22         they have schizophrenia or something like

23         that, that they need to be generally

24         stabilized on their medication treatment

25         regimen.  Their symptoms need to not be

75

1      fluctuating too much or so out of control

2      that they're, you know, frequently being

3      hospitalized or something like that.  That

4      was the guidance from the standards of care

5      at that time.

6  Q.  Pausing to take a drink of water.  Excuse me.

7      Okay.  Turning back to your report.

8  A.  Uh-huh.

9  Q.  Did you draft this report?

10  A.  Yes.

11  Q.  Okay.  Did anyone else draft this report?

12  A.  No one else has -- this is my writing.

13  Q.  Okay.  Oth- -- other than attorneys for the

14      defendants, did anyone else participate in

15      drafting this report?

16  A.  Oh, no.

17  Q.  Okay.  Did you speak to anyone other than

18      defendants' attorneys about drafting this

19      report?

20  A.  I believe I informed Kanautica that I would

21      be drafting a report when I met with her, but

22      she didn't see, like, a version of it

23      beforehand or anything.

24  Q.  Okay.  Anyone else?

25  A.  No.

76

1    Q.    Not -- Dr. Joseph Penn?

2    A.    No.

3    Q.    Okay.

4    A.    I've actually never spoken with Dr. Penn.

5    Q.    Okay.  Did you review documents in preparing

6          this report?

7    A.    Yes.

8    Q.    What documents were those?

9    A.    There were medical records which were cited

10         to in the report.  The earlier -- I think the

11         earlier declaration may have provided more

12         detail about the rec- -- the records that I

13         reviewed, but there were numerous medical

14         records that were provided to me.  I also

15         reviewed Ms. Zayre's -- Mrs. Zayre-Brown's

16         deposition, the video, and there was a

17         transcript that was provided to me as well.

18   Q.    Okay.  And I'll just point out it's -- it's

19         pronounced Zayre.

20   A.    Zayre?

21   Q.    I even was mispronouncing it for a while.

22         It's Zayre-Brown --

23   A.    Okay.

24   Q.    -- so for --

25   A.    Thank you.

77

1    Q.    Sure.

2    A.    Oh, and I also read Dr. Ettner's submissions.

3    Q.    Okay.  Did you request any other documents

4          for the purpose of preparing this report?

5    A.    I don't believe so.

6    Q.    All right.  Did the attorneys for the

7          defendants instruct you to make any

8          assumptions in preparing this report?

9    A.    Not that I recall.  I mean, I should say

10         there's a referral question, right, but

11         that -- nobody asked me to make any

12         assumptions about anything being true or not.

13   Q.    All right.  Was there any other information

14         provided to you for the purpose of preparing

15         this report?

16   A.    So Dr. Ettner's testing was provided to me,

17         most of the raw data for Beck Depression

18         Inventory, Beck Anxiety Inventory, and the

19         Trauma Symptom Inventory.  And then

20         obviously, there was the examination that I

21         did including testing.

22   Q.    And you said you'd never spoken to Dr. Penn.

23         Have you spoken to Dr. Li about the report

24         that she submitted in this case?

25   A.    No.

                                                    78

1    Q.    All right.  So what opinions have you reached

2          in this case?

3    A.    So on Page 3 of my report there's a section

4          called, Summaries of Opinion, and that's

5          where I identify the four primary opinions

6          and conclusions.  The first opinion is

7          essentially that in my view, there were

8          deficiencies in Dr. Ettner's assessment; that

9          secondly, I don't believe that a clinical

10         psychologist can reasonably predict with

11         confidence that a particular intervention

12         will be curative of gender dysphoria; and

13         that -- also, that my evaluation of

14         Ms. Zayre-Brown -- Mrs. Zayre-Brown did not

15         reveal significant find- -- findings from her

16         current mental status that would counsel in

17         favor of pushing the timing up so that it

18         would be -- the procedure would be done while

19         she's incarcerated based on her statements.

20         And then the fourth aspect of my opinion was

21         that based on the totality of information

22         that I've reviewed, Mrs. Zayre-Brown's gender

23         dysphoria is multifaceted and has multiple

24         contributions aside from the fact -- aside

25         from the contribution of not having had

                                                          79

1    the -- the vulvoplasty or vaginoplasty that

2    she wants.  So those are the four primary

3    opinions that I offered.

4  Q.  Okay.  You say primary opinions.  Are there

5    other opinions in here?

6  A.  Well, the -- you know, for example, when I

7    say that the con- -- Dr. Ettner's process was

8    undermined by deficiencies, there's, like,

9    secondary, you know, critiques to that that

10   are --

11 Q.  Uh-huh.

12 A.  -- covered under that umbrella is what I

13   mean.

14 Q.  Okay.  All right.  I'm going to flip to Page

15   33 and I'm looking at Conclusion Number

16   (1)(a).  You write, A psychologist who lacks

17   formal medical education and training should

18   not offer medical opinions, e.g., medical

19   necessity, or state that their opinions are

20   reliable and valid to a reasonable degree of

21   medical certainty.

22       Did I read that right?

23 A.  Yes.

24 Q.  All right.  What is your basis for this

25   opinion?

                                                      80

1    A.   Ethically, we're obligated not to offer

2         opinions that are outside the bounds of our

3         competence and our training.  If you're not a

4         medical provider, you shouldn't be giving a

5         medical opinion.  So, for example, if I'm

6         testifying in court and someone asks me to

7         give an opinion that's fundamentally a

8         neurological opinion --

9    Q.   Uh-huh.

10   A.   -- or a -- a question about, well, if we gave

11        this person this medicine, do you think it

12        would make them feel better, I can't answer

13        that question because I'm not a medical

14        doctor and that's what I would say is, that's

15        a medical question.  You need a medical

16        doctor to answer that.  It's outside the

17        bound of my com- -- bounds of my competence

18        as a psychologist.

19   Q.   Okay.  And you said it -- it -- it's an

20        ethical matter.  Is there a -- you know, a

21        published ethical code that you follow?

22   A.   Yes.  So there's APA ethics code and then

23        there's -- they call them guidelines.

24        They're all guidelines, but the -- there's a

25        forensic specialty guideline ethics code as

                                                81

1      well.

2  Q.  Okay.  So are -- are you providing an opinion

3      in this case on medical necessity?

4  A.  No.

5  Q.  All right.  In your view, can a psychologist

6      like yourself or Dr. Ettner ethically provide

7      an opinion on whether something is

8      psychologically necessary or perhaps, as you

9      put it, can provide a psychological benefit?

10 A.  Yes.

11 Q.  All right.  I'd like to spend a little bit

12     more time on that term.  What does -- what

13     does it mean for something to have a

14     psychological benefit or to be

15     psychologically beneficial?

16 A.  Right.  So --

17          MR. RODRIGUEZ:  Objection.

18 A.  -- typically, we're talking about treatment

19     in this context, right, some kind of

20     intervention that would be delivered to the

21     person.  So beneficial generally refers to

22     either we're managing the person's symptoms

23     so that they don't get worse or we're

24     actually ameliorating the symptoms so that

25     they improve, which might not mean that

                                                        82

1          they're cured and it might not even mean that

2          they no longer meet diagnostic criteria for

3          it, but they might have a significant relief

4          in terms of the emotional pain that they're

5          experiencing or cognitive limitations or

6          behavioral problems that they're having.  In

7          some cases it can, you know, kind of at the

8          extreme be essentially curative whereby the

9          symptoms are ameliorated to the point that

10         you fall below the diagnostic threshold.  You

11         may still have some persisting symptoms that

12         are bothersome to you, but you no longer meet

13         criteria.  Occasionally, there are

14         interventions that can be essentially

15         curative, but for many psychological

16         conditions, we often don't necessarily think

17         of them as being cured but, rather, in

18         remission because of the tendency that a lot

19         of psychological conditions have to come

20         back.

21    Q.   Uh-huh.  And so psychologically beneficial

22         would encompass all of those things that you

23         just mentioned; is that right?

24    A.   Yes.

25    Q.   Okay.

                                                        83

1    A.    But it's still important to make the

2          distinction because we don't want to assume

3          that because something is psychologically

4          beneficial that that also makes it curative.

5    Q.    Okay.  And I think you told me what curative

6          means a moment ago, but can you tell me again

7          what -- what does it mean to be curative?

8    A.    Well, curative is not a technical term.

9    Q.    Uh-huh.

10   A.    But essentially, what we mean is that there's

11         either a condition where the person's

12         symptoms drop below the level that's

13         required -- the threshold that's required for

14         a diagnosis, right.  We use this Diagnostic

15         and Statistical Manual.  It has criteria that

16         you have to satisfy in order to have a --

17         meet criteria to have a certain condition.

18         You know, let's say that you have to have

19         four of those criteria.  With significant,

20         you know, benefit from psychological

21         treatment, you may drop down to only having

22         two of them.  You still have those two

23         things.  They might be bothersome to you, but

24         because you don't have four, you don't

25         qualify for the disorder anymore.  So I would

84

1    not consider that curative; I would still

2    consider that to be an amelioration.

3    Curative would be you have no symptoms of the

4    condition.

5  Q.   Understood.  So is there a difference between

6    a treatment being psychologically beneficial

7    and medically necessary or medically

8    beneficial, whatever the correct term is?

9         MR. RODRIGUEZ:  Objection, medical

10    opinion, but you can answer.

11  A.   Yeah.  There is a difference and that's why I

12    don't -- that's why I can give an opinion

13    about benefit without giving a medical

14    opinion.  So, you know, if somebody asked me,

15    you know, if this person has electroshock

16    therapy, will their depression be cured, I

17    wouldn't be able to give an opinion about

18    that.  What I could give an opinion about is,

19    here's what seems to be contributing to their

20    depression.  Here's what parts of it appear

21    to be biological or sort of mechanical issues

22    with their brain.

23  Q.   Uh-huh.

24  A.   But here are the other things that may not

25    be.  And so here's why we have reason to

                                                    85

1    believe that the person may need more than

2    ECT.

3  Q.   Okay.  When it comes to gender-affirming

4       surgery, in your view, can that ever be -- or

5       could it ever be psychologically beneficial

6       but not medically necessary?

7            MR. RODRIGUEZ:  Objection, medical

8       opinion.  You can answer.

9  A.   So saying something's not medically necessary

10       would be giving an opinion about medical

11       necessity so I would not give that opinion.

12       What I would endeavor to do instead would --

13       to be very clear about for psychological

14       benefit, you know, what does that mean, when,

15       how, who, what.

16  Q.   Uh-huh.

17  A.   What are the circumstances where the person

18       is most likely to achieve the best

19       psychological benefit that they can get.  I

20       wouldn't give an opinion about, you know,

21       this surgical technique versus that surgical

22       technique or this medication versus that

23       medication.

24  Q.   In your experience, in your training, are you

25       aware of any patient who was seeking

86

1          gender-affirming surgery and their providers

2          determined that, yes, it's psychologically --

3          it would be psychologically beneficial, but,

4          no, it wouldn't be medically necessary?

5     A.   I'm not typically privy to how the internal

6          committees within the Virginia -- for

7          example, Virginia DOC make those kind of

8          determinations so I don't usually even know

9          what necessarily happens in terms of the

10         endpoint of those cases.  So I'm not sure

11         what kind of determination was made by those

12         kinds of panels.

13    Q.   Okay.  So in your view, who would be

14         qualified to make a determination on medical

15         necessity for gender-affirming surgery?

16              MR. RODRIGUEZ:  Objection, medical

17         opinion, outside the scope of this expert's

18         opinions.  You can answer.

19    A.   So if some were to -- someone were to ask me

20         for a referral for that, I would say it would

21         need to be a medical professional, but the

22         type of medical professional could depend

23         largely on the individual person, what their

24         needs were and what they were asking for.  So

25         a lot of times, an interdisciplinary approach

                                              87

1    is a pretty helpful one for that where you've

2    got a couple of different kinds of medical

3    doctors so you might have an endocrinologist

4    as well as a surgeon and a psychiatrist, for

5    example.

6  Q.  And do you have a sense of how a medical

7    provider would go about determining whether

8    surgery's medically necessary?

9         MR. RODRIGUEZ:  Objection, medical

10   opinion, speculation.  You can answer.

11 A.  I don't feel enough -- I don't feel that I

12   know enough to say whether or not I know

13   enough about that.  I'm not -- I'm not

14   familiar enough with the decision-making

15   processes that they utilize for medical

16   necessity to be able to give an opinion about

17   that.

18 Q.  Okay.  Are you familiar at all?

19 A.  I've certainly read depositions where

20   physicians were discussing medical necessity.

21   The -- I don't think that I'm an expert on

22   medical necessity.  I wouldn't give an

23   opinion about medical necessity.

24 Q.  Okay.  Let's flip to Page 5 of your report.

25 A.  Uh-huh.

Case 3:22-cv-00191-MOC-DCK   Document 70-1   Filed 10/26/23   Page 88 of 186
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

1    Q.   So I am in the second paragraph, last

2         sentence, and you write, I know other

3         psychologists like Dr. Ettner and I who also

4         perform similar evaluations related to

5         gender-affirming care for transgender and

6         gender-nonconforming individuals and, in my

7         experience, it would not be typical for them

8         to offer medical opinions.

9              Did I get that all right?

10   A.   Yes.

11   Q.   All right.  Who were the other psychologists

12        you're referring to?

13   A.   So one would be Dr. Olezeski and her

14        colleagues at the Yale clinic.  These are

15        the -- some of the folks that I was thinking

16        of in particular because they conduct a lot

17        of trainings.  The last one they did was for

18        the APA last year and although they don't

19        offer medical opinions, they work

20        collaboratively with medical doctors so

21        they're not completely siloed off.

22   Q.   Uh-huh.  Anyone other than Dr. Olezeski, if

23        I'm pronouncing that correctly?

24   A.   Yes, you are pronouncing that correctly.  So

25        Sarah Miller, my coauthor.  I don't believe

1          Dr. Campbell has offered those opinions,

2          who's also my coauthor on that chapter.

3     Q.   What is Dr. Campbell's first name?

4     A.   Walter.

5     Q.   Okay.  So you say it's not typical for them

6          to offer medical opinions.  Do they ever

7          offer medical opinions?

8     A.   I can't say that I know enough about all of

9          those individuals and everything they've ever

10         said or did to be able to say they have never

11         offered an opinion that I would not consider

12         to be a medical opinion.  So I can't -- I

13         don't think I have the foundation and

14         knowledge to answer that, but my

15         understanding in my interaction with those

16         folks is that they would -- their ethical

17         principle would be not to offer one because

18         it's outside the scope of their competence --

19    Q.   Uh-huh.

20    A.   -- and I've never known them to do that.

21    Q.   Okay.  So for this assertion in your

22         report -- excuse me, your report concerning

23         offering medical opinions when you're a

24         psychologist, are you relying on anything

25         beyond your personal professional experience?

90

A.    Well, so we have authoritative texts that

      provide guidance on these topics.  We --

      there's a -- Mental Health Evaluations for

      the Courts by Melton and colleagues is sort

      of one of our foremost texts that we would

      cite to that talks specifically about the

      importance of maintaining -- staying within

      the bounds of your competency as a

      psychologist.  This is reiterated in our

      ethics code broadly, in our forensic

      guidelines more narrowly.  Additionally,

      you'll see this in virtually any discussion

      of forensic psychological practice because

      it's not just that we shouldn't give medical

      opinions -- that's one pitfall, one kind of

      potential land mine for us.

Q.    Uh-huh.

A.    -- but also that we ought not offer legal

      opinions.  That's the other area where we're

      significantly cautioned is not to offer legal

      opinions unless we are -- you know, like I

      said, I have colleagues who are J.D./Ph.D.s.

      that they might, but if you're just a

      psychologist, you would not.  So it's not

      specific just to medicine.

                                                    91

1    Q.   Okay.  And these authoritative texts, do they

2         say specifically something along the lines

3         of, you know, forensic psychologists cannot,

4         should not make recommendations concerning

5         medical necessity?

6    A.   I don't have a specific recollection that

7         that -- the exact language regarding medical

8         necessity.  I would have to look at the text

9         and see if that's an accurate representation

10        of what they say.

11   Q.   Yeah.  Well, I mean, I don't expect you to

12        remember offhand exactly what it says.

13   A.   Uh-huh.

14   Q.   Do you recall that it says something like

15        that?

16   A.   No.

17   Q.   Okay.

18   A.   I don't have a recollection.

19   Q.   Okay.  So can a psychologist, in your view,

20        refer a patient -- can a psychologist refer a

21        patient seeking gender-affirming surgery to a

22        medical provider?

23   A.   Yes.

24   Q.   Okay.  That's permitted by WPATH standards?

25   A.   Well, in fact, WPATH talks about an

                                                    92

1    interdisciplinary approach at times.  But an

2    interdisciplinary approach could come because

3    somebody goes to a clinic and the clinic

4    takes an interdisciplinary approach or they

5    could come to an individual psychologist or

6    other mental health care provider or even

7    their doctor and that person could refer them

8    for intervention.

9  Q.  Okay.  So in terms of just what a -- a

10   patient's care looks like --

11 A.  Uh-huh.

12 Q.  -- in your view, it's appropriate for a

13   psychologist to conduct an evaluation, say, I

14   think this treatment, surgery, or whatever

15   would have psychological benefit, and I'm

16   going to refer you along to a surgeon,

17   endocrinologist, whoever?

18 A.  Right.  You -- I mean, you would also

19   typically discuss whether or not a diagnosis

20   of gender dysphoria is present or absent.

21 Q.  Okay.  All right.  So still on Page 5.  Bear

22   with me just one moment.  All right.  I'm

23   sorry.  So this is second paragraph and it's

24   four lines down.  Thus, my role in such cases

25   is not to make determinations regarding

93

1          whether a person should or should not receive

2          a given intervention.

3                    Did I read that correctly?

4      A.    Yes.

5      Q.    All right.  And then let's flip to Page 2.

6          And you say that part of your role is to

7          offer recommendations with respect to

8          gender-affirming interventions; is that

9          right?

10     A.    Right.

11                MR. RODRIGUEZ:  Can you --

12                MR. SIEGEL:  I'm sorry.

13                MR. RODRIGUEZ:  Where are you -- yeah,

14         where are you reading?

15                MR. SIEGEL:  I'm sorry.  Where is it?

16         I don't have it highlighted on my copy.

17     BY MR. SIEGEL:

18     Q.    Sorry.  Bear with me just one moment, y'all.

19                MS. MAFFETORE:  It's the first line --

20                MR. SIEGEL:  Okay.

21                MS. MAFFETORE:  -- on the second page,

22         to offer recommendations with respect to --

23                MR. SIEGEL:  Okay.  Thank you.

24                MS. MAFFETORE:  -- gender-affirming --

25     BY MR. SIEGEL:

                                                            94

1    Q.    All right.  So it's -- yeah.  It's the very

2          first line after the comma, Part of your role

3          is to offer recommendations with respect to

4          gender-affirming interventions or building

5          capacity to provide informed consent.

6    A.    Uh-huh.

7    Q.    All right.  So did those statements that I

8          just read, the one on Page 2 and the one on

9          Page 5 -- is there any contradiction between

10         those statements?

11   A.    I think part of the difficulty that we're

12         having here is that we're maybe confusing

13         making recommendations with respect to

14         gender-affirming interventions with

15         recommending specific gender-affirming

16         interventions.

17   Q.    Okay.

18   A.    So what I don't do is I don't say, this

19         person needs to have this surgery or this

20         person should not have this surgery.  I

21         don't --

22   Q.    Uh-huh.

23   A.    -- say either one of those things.

24   Q.    Okay.

25   A.    But what I might say is, you know, what this

                                                      95

DISCOVERY COURT REPORTERS   www.discoverydepo.com   1-919-424-8242

1    person has articulated is that they would

2    like to -- you know, for example, I might

3    say, I think they should be provided with

4    information about what their options would be

5    for bottom half surgery because what they've

6    described in terms of their ultimate goal

7    might necessitate that based on how they've

8    described the presentation that they want.

9    So I might recommend, for example, like, they

10   should be provided with more information

11   about that and here's how they should be

12   provided with that information.  I might say,

13   they would learn best -- if they're a bright

14   person who likes to read, maybe give them a

15   book.  If they're not or they have literacy

16   problems, I might make recommendations that

17   are different.  So it's not that I'm

18   recommending what interventions they should

19   have, but I'm providing recommendations

20   related to gender-affirming interventions

21   without saying that they should or should not

22   have them.

23   Q.  And so in this case, you -- are you providing

24       an opinion whether Mrs. Zayre-Brown should or

25       should not receive a certain treatment?

96

1   A.   I haven't given an opinion about whether or

2        not she should -- from my perspective she

3        should or should not receive a given

4        treatment, but what I have done and can do is

5        describe what she has said she wants.

6   Q.   Okay.

7             MR. SIEGEL:  Let's take a short break,

8        if that's all right with y'all.

9             MR. RODRIGUEZ:  Yeah.

10            (Whereupon, there was a recess in the

11       proceedings from 11:00 a.m. to 11:09 a.m.)

12  BY MR. SIEGEL:

13  Q.   Welcome back, Dr. Boyd.

14  A.   Uh-huh.

15  Q.   All right.  Changing gears somewhat.  Are you

16       familiar with the Division Transgender

17       Accommodations Review Committee or DTARC?

18  A.   I am familiar with their existence.  I'm

19       familiar with them to the extent that their

20       activities were documented in the records

21       that I reviewed, but I don't have independent

22       knowledge of them outside of the information

23       I reviewed in this case.

24  Q.   Okay.  So based on what you reviewed, excuse

25       me, what is the DTARC?

                                                    97

1    A.   It's a committee that I believe reviews

2         requests and then provides approvals for

3         various stages of the process.  So there are

4         administrative processes for approving

5         evaluations, scheduling consultations, and

6         then approving procedures.

7    Q.   Do you know who's on it?

8    A.   No.

9    Q.   Are you familiar with their decision last

10        year to deny Mrs. Zayre-Brown's request for

11        gender-affirming surgery?

12   A.   Yes.

13   Q.   Do you have an understanding of how DTARC

14        reached that decision?

15   A.   No.  My primary focus was about how

16        Mrs. Zayre- -- Zayre-Brown received the news

17        and responded to it --

18   Q.   Okay.

19   A.   -- more than the deliberation.

20   Q.   Okay.  I'm going to hand you another exhibit.

21        I think this is Exhibit Number 3 that we're

22        on.

23             (BOYD EXHIBIT 3, Division Transgender

24        Accommodation Review Committee (TARC) Report,

25        2/17/2022, was marked for identification.)

                                                        98

BY MR. SIEGEL:

Q.   Dr. Boyd, have you seen this document before?

A.   This actually may have been included in the
     records that I reviewed.  This front page
     does not look fam- -- as familiar, but the --
     the second and third page does.

Q.   Okay.

A.   Although it's possible that it looks familiar
     because it was cut and pasted from another
     section of the records.  That often happens.

Q.   Okay.  So take another moment to review if
     you'd like --

A.   Sure.

Q.   -- and then just let me know what this
     document is --

A.   I will tell --

Q.   -- or appears to be.

A.   Yes.  So this appears to be a report that
     documents a determination that was made by
     the -- the Division Transgender Accommodation
     Review Committee.  So it documents what
     information they reviewed.  It provides a
     brief narrative and a medical analysis is the
     latter portion.  It details who was in
     attendance at the time of the meeting and on

99

1       the front -- on the cover sheet there's an

2       indication that the purpose of the review was

3       related to gender-affirmation

4       surgery/vulvoplasty and the accommodations

5       referred for final determination includes the

6       decision that says, DTARC does not recommend

7       gender-affirmation surgery stating, This

8       surgery is not medically necessary.

9   Q.  Okay.  I think that sums it up.  Are you

10      familiar at all with the professional

11      background of the -- the individual

12      defendants in this case?

13  A.  No.  Be- -- not beyond what their title is as

14      reflected in records.

15  Q.  Okay.  Do you -- do you know if any of them

16      have medical training?

17  A.  I believe some do.  I believe your -- that,

18      for example, your chief medical officer is a

19      physician.

20  Q.  All right.  Any of the others to your

21      knowledge?

22  A.  My -- well, typically, the chief of

23      psychiatry would be a psychiatrist, who's

24      also a medical doctor, so it's likely that

25      person is also a physician.

                                                    100

1   Q.   Okay.  So based on this document, the DTARC

2        recommended that gender-affirming surgery was

3        not medically necessary, correct?

4   A.   That's what the form states, yes.

5   Q.   Okay.  So if any of the members of the DTARC

6        who participated in this recommendation did

7        not have medical training, would that have

8        been appropriate in your view?

9             MR. RODRIGUEZ:  Objection to form.  You

10       can answer.

11  A.   So that's a -- this is a good example of why

12       the interdisciplinary approach is important.

13       So you can see there's a medical analysis

14       section that -- there's a heading specific to

15       that.  I would suggest that someone without a

16       medical degree should not be involved in the

17       decision-making regarding, like, the

18       deter- -- the actual determination as far as

19       saying this is medically necessary or not.

20       However, it may benefit the folks who have

21       the background to men- -- make the medical

22       determination to have the input from folks

23       who have a background in mental health and/or

24       who are administrative folks who know more

25       about what the internal regulations and

                                                        101

1      requirements are so they can have input and

2      they may provide information that the folks

3      who make the medical determination find

4      relevant and necessary.  But as far as who

5      signs off on the medical analysis and who

6      drafts it, in my opinion, that should be a

7      physician -- it should be someone with a

8      medical degree.

9  Q.   Understood.  Okay.  You can set this aside if

10      you'd like.  So a lot of your report is

11      talking about informed consent and you've

12      spoken about that some today.  I'll just ask

13      a very basic question of what is informed

14      consent and why does it matter?

15  A.   Right.  So informed consent, broadly

16      speaking, refers to the necessity for

17      individuals who are participating in

18      treatment or evaluation to knowledgeably

19      agree to participate or receive that

20      treatment or evaluation.  So that's, like, in

21      the very broadest sense.  And informed

22      consents in our practice as psychologists

23      means that people are knowingly participating

24      in -- whether it's an evaluation or

25      treatment, that they are a -- given the

1    opportunity to be provided with the

2    information that they need to understand the

3    risks and the benefits, the costs, and, you

4    know, have a reasonable and reality-based

5    appraisal of that before they are asked to

6    make a decision.  There's two parts to it.

7    One is making sure they have the information.

8    The other part is the autonomy of the

9    individual to choose to participate or not.

10        Informed consent in terms of providing

11   care to folks who are transgender has -- is

12   slightly different.  So we still have the

13   core informed consent obligations that we're

14   required to maintain ethically in terms of

15   our practice, doing evaluations or -- or

16   doing treatment, but informed consent is

17   also, somewhat confusingly, the name of a

18   different kind of approach to assessing

19   individuals and providing treatment to

20   individuals who are transgender, whether

21   they're in the community or a carceral

22   setting.  It's not specific to a setting.

23   And what it means is that instead of saying

24   that our role is to decide if somebody is

25   trans or not, instead, our role is to make

103

1      sure that the person not only has the

2      capacity, right -- which capacity doesn't

3      mean you already have all the information; it

4      just means you have the ability to understand

5      and process that information, make decisions.

6      Not only do they have the capacity, but have

7      they been provided with the information that

8      they need?  Are they in a position to make a

9      decision about it and do they have the

10     support that they need to do that?  So an

11     informed consent approach to conducting these

12     evaluations is different even though it uses

13     the same terminology as informed consent in

14     terms of an ethical obligation on the part of

15     psychologists when they're conducting

16     activities involving patients, clients, or

17     research participants.

18  Q.  Okay.  So when you are evaluating patients

19     for informed consent meaning, I think --

20     well, let -- I'll let you answer that.  When

21     you're evaluating a patient for informed

22     consent, which one of those do you mean --

23  A.  Right.

24  Q.  -- and how do you do it?

25  A.  Right.  Well, unfortunately, another

1          complicated answer.

2     Q.   Okay.  Great.

3     A.   So one version of looking at this could be,

4          like, a Miran- -- a competency to waive

5          Miranda evaluation, which is retrospective

6          and it's looking at whether or not the person

7          knowingly, intelligently, and voluntarily

8          waived their rights to a custodial

9          interrogation so you might look at their

10         capacity.  Do they have an intellectual

11         disability, do they have a severe psychiatric

12         problem, were they under severe stress,

13         things like that.  So that's one area where

14         it's -- you know, that's one area where it's

15         different.

16              But informed consent in this process

17         refers more to positioning the individual

18         who's seeking treatment in such a way that

19         they can access the support that they need,

20         have the information that they need delivered

21         in -- to them in a way that they understand

22         so that they can make a decision

23         collaboratively with their treating

24         professionals about what treatment they need,

25         when they should get it, how it should be

                                                    105

1          delivered.

2     Q.   In this case did you assess

3          Mrs. Zayre-Brown's ability to provide

4          informed consent?

5     A.   I used an informed consent approach and part

6          of that was assessing her capacity to provide

7          informed consent and I did ultimately come to

8          an opinion regarding that.

9     Q.   Okay.  How did you go about making that

10         assessment?

11    A.   I looked for the presence of any conditions

12         that could potentially interfere with her

13         capacity to provide informed consent and then

14         I just asked her direct questions to

15         ascertain her fund of knowledge and her

16         beliefs about different kinds of scenarios

17         and options.

18    Q.   Okay.  Could you be a bit more specific on --

19    A.   Certainly.

20    Q.   -- how you did that.

21    A.   Yes.  So in reviewing her records, for

22         example, I looked for conditions that could

23         be expected to potentially, even just in a

24         time-limited way, impair her capacity to

25         provide informed consent.  So I looked at

                                                        106

1        mood issues, cognitive issues.  Those are

2        the -- those issues and psychosis are the

3        most common kind of barriers to that.

4             After you see whether or not those

5        things are present, if they are present, then

6        you look to see, are they relevant?  In other

7        words, are they active now when the person --

8        or during the relevant time period when

9        you're looking at the decision-making, which

10       for Mrs. Zay- -- Zayre-Brown is now.

11            So she does have some cooccurring

12       conditions.  You know, in my view, though, at

13       the time that I saw her, those symptoms were

14       not so active or impairing that they would

15       impair her capacity to understand what her

16       options are and make decisions.

17  Q.   Okay.  Does that mean you concluded that she

18       can provide informed consent?

19  A.   I believe she has the capacity to provide

20       informed consent in that, you know, narrow --

21       more narrow kind of ethical obligation of

22       ensuring that she's not, for example,

23       agreeing to a procedure when -- in a --

24       without a reality-based understanding.

25  Q.   Okay.  If you could flip to Page 31 of your

                                                    107

1    report.  And this is beginning of Section E.

2    Sorry.  I'll wait till -- for you get there.

3  A.    Yes.

4  Q.    Oh, I'm sorry.  It's actually the -- the

5    first full paragraph on the page, which

6    reads, Mrs. Zayre-Brown's expectancies for

7    the surgical aftercare that would be

8    available to her in prison were less

9    realistic in light of history.

10         What does that mean?

11 A.    So this interview was -- was video recorded.

12 Q.    Uh-huh.

13 A.    And this is a reference in part to the

14    discussion that Mrs. Zayre-Brown and I had

15    about her experience when she initially

16    entered custody and had had surgery about a

17    month before that -- be- -- before her

18    sentencing.  And so she was still recovering

19    from a surgical procedure and that's where

20    the -- part of where that relevant

21    conversation started.  We discussed what care

22    she had already received and that's why I say

23    in light of the history.  When I say that her

24    expectancies for surgical aftercare that

25    would be available to her in prison were less

                                                    108

1       realistic, I say that because what she was

2       describing in terms of what she expected to

3       receive in terms of aftercare was a radical

4       departure from what -- the care she described

5       actually receiving.

6   Q.  Okay.  And the care that she described

7       receiving with respect to recovering from the

8       orchiectomy --

9   A.  Yes.

10  Q.  -- in 2017; is that correct?

11  A.  Yes.

12  Q.  All right.  Was there a -- anything else in

13      your assessment that contributed to your

14      statement here that her views were less

15      realistic about aftercare?

16  A.  So here we're talking about surgical

17      aftercare specifically --

18  Q.  Uh-huh.

19  A.  -- so not other elements of aftercare.  And,

20      yeah, so that particular statement is related

21      to that discussion.

22  Q.  Okay.  And so my question is, was there any

23      other statement that she made or any other

24      part of your assessment that contributed to

25      that observation you made?

1    A.    The result of her formal testing by me --

2    Q.    Uh-huh.

3    A.    -- indicate that she has a personality style

4          where she is -- she has a tendency to, like,

5          idealize situations sometimes that are

6          prospectively positive so that can cause her

7          to be a little bit like a cork on the ocean

8          where a good thing happens or something seems

9          like it's going to be really promising and

10         relieving and her mood goes up significantly.

11         At the same time, when she gets news that

12         something is not going to happen, her mood

13         can drop down really dramatically.  And in my

14         view, that affects her ability -- when she's

15         in those states, that does affect her ability

16         to accurately appraise and anticipate what's

17         going to happen in the future, but that could

18         happen in either direction depending on the

19         circumstance.  I think this is an example of

20         her idealizing what would be available to

21         her.  And I say idealizing it because she is

22         com- -- I'm comparing it to what she has told

23         me about her own experiences prior to that.

24    Q.    Uh-huh.

25    A.    And she was not able to provide me with

110

1       information that was -- would indicate that

2       there were -- there was an evidence base for

3       believing that the circumstances that she

4       described as ideal for her and most likely to

5       give her relief and benefit would actually

6       happen in a prison setting.

7    Q.  And what would be ideal?

8    A.  So she articulated it herself and I describe

9       it on that same page, the last paragraph

10      before Section E.  Her idea -- her view of an

11      ideal surgery context would include, A,

12      receiving medical care in the community,

13      including aftercare and wound care

14      management; B, the opportunity to receive

15      care and support from her husband, friends,

16      and family; and, C, participating in

17      meaningful personal and professional

18      development opportunities while she is

19      preparing for surgery and recovering from

20      surgery.

21           So this is her statement about what she

22      sees as an ideal surgery context.  Now, when

23      I say she idealized things, I'm -- here

24      that's not what I'm talking about.  This is

25      her -- just her self-report, her description

                                                    111

1          of what she thinks would be optimal for

2          her --

3     Q.   Okay.

4     A.   -- clinically.  What she described as far as

5          what -- how she thought recovery -- what

6          recovery from this procedure could look like

7          in a prison setting, she described having

8          more access to physicians, more regular care

9          than she described having at the time that

10         she initially entered prison in 2017.

11    Q.   Got it.  Do you have an understanding of what

12         postsurgical care is like for a vulvoplasty?

13    A.   I have some familiarity, but I can't give a

14         medical opinion.

15    Q.   Okay.  I'm not a asking for a medical

16         opinion, just to your knowledge.  Is -- is it

17         anything more complicated than basic wound

18         care?

19    A.   It depends on the individual.  The

20         vulvoplasty differs from vaginoplasty in that

21         most individuals, you know, there wouldn't be

22         a reason to use dilators, for example, but

23         depending on how the procedure is done, how

24         skillfully it's done, what the individual's

25         history is -- she did have complications

                                                        112

1          through her wound care before from the

2          orchiectomy but -- you know, it can be

3          complicated for individuals, but it -- you

4          know, it depends on the person.  All I can

5          rely on for her -- from her is what she tells

6          me about what her prior experiences were with

7          her ability to manage wound care.  And I

8          think it is fair to say that it's certainly a

9          risk, probably a more significant risk for

10         vaginoplasty compared to vulvoplasty, but

11         both of them would carry risks and a

12         physician would have to be the person -- a

13         surgeon would have to be the person to give

14         you an opinion.

15    Q.   Okay.  So other -- other than her experience

16         in 2017, do you have any other reason to be

17         concerned about the quality of aftercare

18         provided in the state prison system?

19    A.   I'm re- -- again, I'm relying on her report.

20    Q.   Okay.

21    A.   I'm relying on what she has personally

22         experienced and the aftercare that's

23         available in one facility or for one

24         individual could be different even within the

25         same prison system.

113

1   Q.   Speaking very generally, do you have concerns

2        about the quality of care offered in the

3        prison setting versus the community setting?

4   A.   With respect to mental health care, which is

5        really what I'm able to comment on, yes.

6   Q.   Okay.  Could you tell me why.

7   A.   Prisons are inherently stressful

8        environments.  Restrictive housing in

9        particular is a highly stressful environment.

10       It's well documented that it's incredibly

11       psychologically stressful.

12  Q.   Uh-huh.

13  A.   The analogy I sometimes give is that

14       depending on where you're at in the prison is

15       the psychological equivalent of getting hit

16       in the head -- or getting -- yeah, getting

17       hit in the head with a hammer every day and

18       wondering why your skull isn't recovering.

19       You know, you could get medical treatment --

20  Q.   Uh-huh.

21  A.   -- you could get stitches, but if you're

22       still getting hit in the head with a hammer

23       every day, you're not going to get a lot

24       better.  And that's part- -- partly an issue

25       of confinement.  It's partly an issue of who

                                                    114

1        you're around, what your population is and --

2        and who your social community and your peer

3        group is and whether they're dangerous to you

4        or not.  But from a mental health perspective

5        it is -- you know, we would most -- I don't

6        know any psychologist who would say that it's

7        not a -- a psychologically stressful

8        environment.

9   Q.   Uh-huh.

10  A.   So there's that aspect to it.  Doesn't mean

11       the community can't also be stressful.  Being

12       unhoused --

13  Q.   Uh-huh.

14  A.   -- for example -- you know, there are all

15       kinds of ways that the community can also be

16       stressful, but just as a baseline, it's a

17       more stressful environment.  Sometimes people

18       have access to services in there that they

19       don't have access to in the community, but

20       overall just as a baseline, it's a different

21       environment from a psychological perspective.

22  Q.   Okay.  So I'm going to give you a

23       hypothetical.  In your view, assuming that a

24       treatment would be psychologically beneficial

25       for a patient and is medically ne- -- excuse

                                                      115

1       me, medically necessary, would the quality of

2       aftercare available be a valid reason to deny

3       that treatment?

4               MR. RODRIGUEZ:  Objection to form,

5       medical opinion.  You can answer.

6    A.  Denying the treatment would be an

7       administrative decision.  It's not -- and

8       that's not a process that I'm part of.  I

9       also think that the individual's perspective

10      on whether they feel they could tolerate, you

11      know, those circumstances would be something

12      to take into account.  It's difficult to

13      answer that hypothetical just because it is

14      somewhat broad.

15   Q.  Okay.  Well, I'll narrow it a little bit.  So

16      you can also assume that this person has

17      requested the surgery and has been seeking it

18      for years.  And I'm not talking about really

19      the administrative decision.  I'm talking

20      about a decision by the healthcare providers

21      treating the patient.  So assuming all of

22      that -- so we've got patient who wants a

23      treatment.  Assume that it's psychologically

24      beneficial.  Assume that it's medically

25      necessary.  Patient has been advocating for

116

1        herself for years.

2                In that case, would the quality of

3        aftercare available be a valid reason to deny

4        the treatment?

5                MR. RODRIGUEZ:  Objection, medical

6        opinion, legal opinion, speculation, form.

7        You can answer.

8    A.   I wouldn't say -- I wouldn't say that

9        exactly, but I would direct you to, actually,

10       Ettner's second declaration, Paragraph 38

11       where she describes a Cornell study regarding

12       outcomes for transgender folks after they've

13       had procedures done and one of the things

14       that predicts outcomes is the quality of the

15       surgical procedure and, I believe also, the

16       aftercare that's available to that

17       individual.  That does affect the outcomes

18       that people have.

19               Now, you know, there's critique --

20       there's different ways to talk about that and

21       think about that.  Regret rates are also

22       related to the fundamental effectiveness of

23       the surgical procedure and whether or not the

24       person ends up with the outcome that they

25       want.  Now, as I'm sure you know, regret

                                            117

1          rates are very, very low, but even within

2          that group, one of the things that does

3          predict it is if you don't get the surgical

4          outcome that you want physically.

5    Q.    All right.  So getting back to Kanautica and

6          informed consent --

7    A.    Uh-huh.

8    Q.    -- were there any aspects of informed consent

9          that you assessed and haven't mentioned yet

10         today?

11   A.    Yes.  I discuss in my report -- and forgive

12         me one second.  I want to locate it, the

13         section.  Okay.  On Page 10 in the section

14         that has a header that starts with,

15         Dr. Ettner discounts the importance of a

16         psychologist's role in informed consent, the

17         second full paragraph, A prospective

18         patient's understanding of the likely

19         outcomes of a procedure and the timing of

20         these outcomes is key to their ability to

21         make decisions while also weighing the risks

22         and costs.  Skipping down a little bit to the

23         second-to-last sentence, for example, a

24         patient who believes an intervention will be

25         curative may accept more serious or higher

                                                        118

1    probability risks compared to a patient who

2    believes that an intervention will alleviate

3    but not cure their symptoms.  Communicating

4    to a prospective patient, continuing on to

5    the next page, Page 11, that a surgical

6    procedure will be curative carries

7    significant risk of misleading the individual

8    and influencing their decision-making with

9    inaccurate information leading to exaggerated

10   proc- -- expectancies.

11        And so here what I'm speaking about, and

12   I continue to talk about in the report, is

13   the narrative -- is the information

14   essentially that Dr. Ettner provided to

15   Mrs. Zayre-Brown saying, this will cure your

16   gender dysphoria.  That is something that I

17   did get into and I discussed with

18   Mrs. Zayre-Brown because of my concern that

19   if doctors are -- authority figures are

20   coming in and telling her, this will cure

21   your gender dysphoria, and that's not true or

22   at least we can't say it with that degree of

23   confidence that that's definitely what's

24   going to happen, then that person may decide

25   to undertake procedures under riskier

119

1    circumstances, less optimal circumstances

2    that are likely to produce less benefit

3    because they think, this is what's going to

4    fix the pain that I'm experiencing.  And so I

5    do certainly have that concern and I discuss

6    it in my report with respect to informed

7    consent, wanting to ensure that

8    Mrs. Zayre-Brown has accurate, reality-based

9    information so that -- so that she can make

10   her own decision.

11 Q.  Are you expressing an opinion in this case as

12   to whether Mrs. Zayre-Brown has actually

13   provided informed consent for

14   gender-affirming surgery?

15 A.  I gave the opinion that I don't believe her

16   capacity to provide informed consent was

17   significantly compromised at the time of my

18   evaluation of her so her capacity to provide

19   informed consent to most surgical procedures

20   at this point, I think, is probably intact.

21       I mentioned the information that I think

22   has been provided to her that is misleading

23   and I -- you know, obviously, I want to make

24   sure she knows that that is my perspective so

25   she has that information, too, in making her

120

1    decision, but the critique of Dr. Ettner is

2    more related to, like, her approach, not

3    giving Mrs. Zayre-Brown accurate information,

4    not exploring no- -- as thoroughly I think as

5    should have been done what her reasoning was

6    and what her options were, really, all of her

7    options, what is going to be best for her.

8    And so that was my critique of -- of Ettner

9    and the concern that I had with respect to

10   informed consent.

11   Q.   Okay.  And so I'm -- I'm just trying to

12        bet- -- to understand exactly what you're

13        saying and what you're not saying.

14   A.   Uh-huh.

15   Q.   So Kanautica saw Dr. Figler at UNC, right?

16   A.   Yes.

17   Q.   And saw some other healthcare providers,

18        right?

19   A.   Yes.

20   Q.   So are you expressing an opinion in this case

21        as to whether she actually provided informed

22        consent to any of those providers?

23   A.   Oh, that's -- okay.  So that's a good

24        question.  I think it's -- when I saw her, I

25        did not see barriers to her having the

                                              121

1    capacity to perform -- to provide informed

2    consent to that kind of circumstance.  The

3    information that was provided in the records

4    regarding what Dr. Figler actually told

5    Ms. Zayre-Brown is very limited so it's hard

6    to ascertain whether or not she was actually

7    provided with enough information.

8         At the same time, there is a distinction

9    between the informed consent process for

10   surgery, which I believe she does have the

11   capacity -- like, I think she does understand

12   the risks and the benefits just purely from

13   the medical perspective.

14   Q.   Uh-huh.

15   A.   The informed consent issue for me primarily

16   relates to her psychologi- -- her

17   expectancies regarding the psychological

18   benefit that she will receive provided those

19   surgical procedure -- procedures are

20   effective.

21   Q.   Okay.  All right.  Well, let's get back to

22   Dr. Ettner so let's flip to Page 3 of your

23   report.  So this is summary of opinions.

24   Second sentence, First, the opinions and

25   conclusions of Dr. Ettner are undermined by

                                                122

1       multiple deficiencies in Dr. Ettner's

2       assessment, including the failure to apply an

3       informed consent approach.

4   A.   Uh-huh.

5   Q.   So some of this will be slightly repetitive,

6        but what -- what do you mean here by informed

7        consent approach?

8   A.   Right.  So -- and this is a useful point of

9        clarification.  I'm not making the assertion

10       that Dr. Ettner did not seek informed consent

11       from Mrs. Zayre-Brown to participate in the

12       psychological evaluation, but I do not know

13       if she did or she did not because it's not

14       documented.  The failure to apply an informed

15       consent approach here refers to the approach

16       that Dr. Ettner took to the evaluation by not

17       giving -- in my view not giving

18       Mrs. Zayre-Brown accurate information

19       regarding what her expectancies would be --

20       you know, should be for these procedures.

21       There's very little discussion of that.

22       That's what I'm referring to in that

23       particular clause.

24   Q.   Okay.  So when you're talking about the

25       informed consent approach, you make a

                                                    123

1     comparison -- I'm sorry.  I don't have the

2     exact page number -- but between what the

3     WPATH says about informed consent and a

4     different approach; is that right?

5   A.   So I -- I know this is tedious because it --

6     it is nuanced, but --

7   Q.   Uh-huh.

8   A.   -- there's informed consent for the surgery.

9     Do I know what they're going to do?  Do I

10     know what my alternatives are?  Do I know the

11     risks, the cost, the prospective benefits,

12     and the relative likelihoods of those things,

13     right?  So that's one issue.

14         Another issue is informed consent as an

15     approach to conducting these kinds of

16     evaluations related to somebody's access to

17     gender-affirming care, their capacity to

18     provide informed consent.  That's actually

19     described in the new version of the

20     standards --

21   Q.   Uh-huh.

22   A.   -- the eighth version.  They describe an

23     informed consent approach and that's what I'm

24     talking about is the informed consent

25     approach that's actually described in the new

124

1        version of the standards.  That's not what

2        I'm seeing in terms of Dr. Ettner's approach.

3   Q.   Uh-huh.  All right.  So does that, what's in

4        the new standards, require the involvement of

5        a mental health professional in order for a

6        patient to get gender-affirming care?

7   A.   You mean in the informed consent model?

8   Q.   Yes.

9   A.   I actually -- I think it would probably not

10       be responsible for me to answer that question

11       without rereviewing that section.  It's not a

12       terribly lengthy section of the standards,

13       but I -- I wouldn't want to inadvertently

14       misspeak.

15  Q.   Okay.  Do you know if there are any hospitals

16       or clinics that provide gender-affirming care

17       that follow this -- the informed consent

18       model?

19  A.   Yes.  So, for example, that -- the Yale

20       clinic --

21  Q.   Uh-huh.

22  A.   -- my coauthor and I -- Dr. Olezeski, we

23       discussed that in detail.  The other

24       coauthors, I believe, utilize elements of

25       that in their approach, but because

125

1        they're -- I'm not referring to Ms. Farmer;

2        I'm referring to Drs. Miller and Campbell.

3        They are functioning within systems where

4        they're constrained because the -- it's their

5        employer --

6    Q.   Uh-huh.

7    A.   -- whereas, I'm typically acting as basically

8        a contractor so I can do the evaluation in

9        the way that I feel is most appropriate.  I'm

10       not -- they can utilize it however they want

11       to use -- utilize it within their policies

12       and procedures, but I'm not constrained in

13       the same way that somebody who's actually

14       employed in the prison by the prison is in

15       terms of their practices.

16            So I use an informed consent approach.

17       The community-based clinics, some of them

18       including the Yale clinic do.  With my other

19       colleagues on the book chapter in particular,

20       I believe they utilize it, but they have to

21       defer to other kinds of requirements in terms

22       of giving opinions that would be outside of,

23       you know, what I might sometimes see as

24       appropriate.

25   Q.   Okay.  So do you believe that

                                                    126

1          gender-affirming care should be provided to

2          patients without the involvement of a mental

3          health professional?

4     A.   I think there are certainly people who could

5          absolutely have gender-affirming care without

6          the involvement of a mental health

7          professional.  If they want to have boxers, I

8          don't understand why you need to talk to a

9          psychologist about that, frankly.  You know,

10         that doesn't make any sense to me, but

11         they -- they do.  These are procedural kind

12         of --

13    Q.   Uh-huh.

14    A.   These are regulatory and internal

15         administrative processes.  So as a matter of

16         actual practice, yes, it is often the case

17         that we have to be involved.  As a matter of

18         clinical utility, do we need to be involved

19         all the time?  No, probably not.

20    Q.   And -- and so what about for surgery?

21    A.   I think it would depend on the individual,

22         but for most people, yes, you would have a

23         psychologist involved at least in terms of an

24         initial consultation and I would always

25         suggest that a psychologist be made available

                                                        127

1      to the person to ask questions and also to

2      check this particular aspect of informed

3      consent because in my experience, surgeons do

4      not typically get into the person's

5      expectancies, their social and psychological

6      expectancies, postsurgery and that is an

7      important part of decision-making.  If I have

8      a surgeon or a team of folks who are

9      knowledgeable about that and do undertake

10     that practice regularly, I think it probably

11     could be done by somebody who's not a mental

12     health professional, but generally speaking,

13     in practice, I don't see them doing much of

14     that.

15  Q.  All right.  So you applied several tests or

16     inventories in your assessment of Kanautica,

17     right?

18  A.  Yes.  Well, I don't -- I wouldn't say

19     several.  It was two.

20  Q.  Two.  Okay.  So let's start with the Trauma

21     Symptom Inventory.

22  A.  Okay.

23  Q.  I'm sorry.  Were you about to say something?

24  A.  It's not mine.  So I describe it be- -- I

25     didn't -- I didn't administer the Trauma

                                                    128

1          Symptom Inventory.

2     Q.   Okay.

3     A.   I didn't administer the Beck Depression

4          Inventory or the Beck Anxiety Inventory.

5     Q.   Uh-huh.

6     A.   Dr. Ettner administered those things.

7     Q.   Uh-huh.  Okay.

8     A.   However, because she did not provide the

9          results or even name what tests they were, in

10         her documents, once I obtained those, I

11         integrated them into my report because they

12         do contain useful information and it is

13         something also that -- Mrs. Zayre-Brown

14         should know the results of the testing.

15         So --

16    Q.   You're right.  I'm --

17    A.   -- to be clear, it wasn't my test

18         administration.

19    Q.   Right.  That was my mistake.  I'm sorry for

20         the confusion.  I'd still like to talk about

21         these, though --

22    A.   Sure.

23    Q.   -- and start with the Trauma Symptom

24         Inventory.

25              What is it?

                                                    129

1    A.    The Trauma Symptom Inventory is a self-report

2          inventory.  I believe it's 136 items and it

3          is aimed at assessing current trauma

4          symptomology so it's within the last six

5          months.  So it's not going to tell us what

6          somebody's trauma symptoms were ten years

7          ago.  It's not going to tell us what their

8          trauma symptoms are going to be in two years.

9          It's a snapshot of how they've been doing

10         recently.

11              The measure was developed using adults

12         so it's not appropriate for children, but

13         there are versions for children.  It is

14         widely used in the forensic context.  It's

15         certainly appropriate for this kind of case

16         and it includes validity scales that tell us

17         not just what the person reported but how

18         they approached the test.

19   Q.    All right.  And did you review the results of

20         this?

21   A.    Yes.

22   Q.    And what were the results?

23   A.    So the results are described beginning on

24         Page 18 continuing onto Page 19 and

25         concluding at the top of Page 20.  The

                                                    130

1    findings of this particular administration --

2    her -- the first thing to say is that her

3    validity scale results were within normal

4    limits meaning that there weren't indications

5    that she's either significantly, like, really

6    strongly denying symptoms that she likely has

7    or that's -- she's exaggerating symptoms

8    either to feign or malinger or as a cry for

9    help.  So it doesn't mean that everything

10   in -- that she reported is true or accurate,

11   but we don't have good reason to think that

12   those kinds of factors, significant denial or

13   exaggeration, are reflected in her results.

14        She had one clinical scale elevation

15   and -- it's also important to be clear.  When

16   we say clinical, what we actually mean is

17   statistical.  So it's just an unusually high

18   elevation compared to the samples of people

19   who are used to develop the test.  She had a

20   clinical elevation on the defensive avoidance

21   scale.  Defensive avoidance is when a person

22   who's been traumatized undertakes to avoid

23   internal recollections of the stressful

24   events.

25   Q.   Uh-huh.

131

A.    They don't like thinking about it.  They
      don't like remembering it.  But also external
      avoidance so it might be avoiding talking
      about their trauma.  It might be saying, you
      know, if I'm going to do this psychological
      evaluation, I absolutely do not want trauma
      to be part of that discussion, which is what
      happened.  It's very common because for most
      of us, if something terrible happens to us,
      we'd rather not dwell on it, right.  So she
      has an elevation on that.

            Her -- she had other scores that would
      be high but weren't statistically unusually
      high according to the demarcation that the
      test developers use.  So she had -- her
      post-traumatic stress factor, which is the
      one that's intended to indicate how closely
      the person's presentation adhered to the
      diagnostic criteria for PTSD -- what's the
      likelihood they have PTSD now?  So her score
      was high but not significantly elevated.  So
      she sort of -- there's a little bit of
      ambiguity about it.  Certainly, she has
      trauma symptoms, but do they cross the
      threshold into being diagnosable now is a

                                                     132

1    little bit of a question mark and would need

2    to be explored with more testing to get a

3    definitive answer.  She -- but she was at the

4    82nd percentile meaning 82 percent of the

5    other adults in the samples that were used to

6    develop this test had lower scores than that

7    so it's -- it is high.

8         Suicidality was similarly -- like, it

9    wasn't -- it didn't cross a threshold into

10   being statistically elevated, but it's

11   certainly at a level of, you know, probably

12   causing discomfort for her so that's 78th

13   percentile.

14        When we look at the results, there are

15   subscales for the suicidality that showed

16   that she's not reporting suicidal behaviors

17   like attempts or what we call parasuicidal

18   conduct, but she was reporting that she

19   think -- has thoughts about it at times.

20        As I stated in here, the score suggests

21   she has some degree of trauma-related

22   psychological symptomology which may have

23   been below threshold for formal diagnosis and

24   that her results suggested that she had not

25   made suicide attempts or engaged in

**GENERAL CONFIDENTIAL INFORMATION**

133

1       parasuicidal behavior, which is, like,

2       usually cutting, things like that, in the six

3       months prior to the -- to Dr. Ettner's May

4       2022 TSI-2 administration.

5   Q.  Do -- so do these results in any way indicate

6       that gender-affirming surgery would be

7       appropriate or inappropriate for Kanautica?

8   A.  No.  They're primarily relevant for figuring

9       out if there's potentially other contributors

10      to her distress aside from that and it also

11      helps us identify kind of what are the

12      prominent bothersome features of it for her

13      presently so more just kind of her overall

14      well-being.  It does suggest to me that she

15      probably would benefit from her treatment

16      being trauma informed, that there needs to be

17      a sensitivity to that, but it doesn't tell

18      us -- it does not enable us to make a

19      prediction about whether or not having

20      surgery would change these scores.

21  Q.  Okay.  Anything else about the TSI that you

22      think is important to note for Kanautica?

23  A.  No, I don't believe so.

24  Q.  Okay.  Then let's move on to the Beck Anxiety

25      and Depression Inventories.  What are these

GENERAL CONFIDENTIAL INFORMATION        134

1          tests?

2     A.   These are very brief tests.  They don't take

3          very long.  When I was still doing therapy,

4          if I had somebody who had depression or

5          anxiety, they might get -- they might fill

6          one of these out a week for me so they're

7          quick.  They are well-regarded tests.  They

8          have good psychometric data, but they're also

9          closely correlated.  Anxiety and depression

10         are kind of like peas in a pod and it's

11         always been hard for psychologists to really

12         extricate those things.  But they're not

13         really deep dives.  They are good for getting

14         just a brief snapshot of where somebody's

15         symptoms are, which symptoms are more or less

16         pronounced.  And on both of these, the scores

17         that she obtained were not in the normal

18         range.  They were elevated, but it was mild

19         elevation.

20    Q.   Okay.  And so same questions with TSI.  Do

21         these results in any way indicate that

22         gender-affirming surgery would be appropriate

23         or inappropriate for Kanautica?

24    A.   They could relate to not whether or not the

25         care would be appropriate but what kind of

                                                      135

1      support she might need as she moved through

2      that process.  But scores at this level

3      aren't indicative of particularly acute

4      distress and the acute distress could be

5      relevant to either something that you might

6      anticipate an intervention might alleviate or

7      it might be relevant to understanding if

8      somebody might have a temper or a limitation

9      in their capacity to provide informed

10     consent.  If they're extremely depressed, for

11     example, they may have trouble thinking

12     clearly and reasoning and that kind of thing.

13     So that's what they could be relevant to, but

14     these results don't suggest that.

15  Q.  Okay.  So I'm looking at the beginning of the

16     second paragraph in Part B and you say, Given

17     these findings, it appears that

18     trauma-related symptoms are a likely

19     contribute- -- excuse me, likely contributory

20     to her suicidality.

21         Did I read that right eventually?

22  A.  Yes.

23  Q.  Okay.  Can you -- so what is -- what is the

24     basis for this?

25  A.  Well, so her presentation during my interview

**GENERAL CONFIDENTIAL INFORMATION**

136

1    with her, the -- even the correspondence

2    about not wanting to talk about the trauma,

3    that's -- you know, nobody really wants to,

4    but that kind -- that was significant

5    avoidance even before we met.  And I can

6    understand wanting to protect your rights and

7    not wanting to say more than you have to say

8    about your personal history, but to me, it's

9    also indicative to some degree of avoidance.

10        And then, you know, she also has these

11   episodes in 2019, 2020, and, I believe, also

12   2021 where she's had really acute distress

13   and had to have kind of crisis care-type

14   intervention.  And in my view, it's likely

15   that her trauma history relates to that

16   because it's extremely common for people to

17   have those kinds of issues when they have a

18   significant trauma history especially if it

19   was repeated and it occurred in childhood and

20   it involved a disruption with their rela- --

21   with their caregivers.  My understanding is

22   that she was in foster care for a significant

23   amount of time as an adolescent.

24  Q.  How do you make a distinction between

25      trauma-related symptoms and gender dysphoria

137

1        symptoms?

2   A.   That's a good question and I do get asked --

3   Q.   Thank you.  I try.

4   A.   I do get asked this, actually, a fair amount.

5        Like I said, I get asked, doesn't trauma

6        cause somebody to become trans somehow?  And

7        the fact is, no.  The issue is that

8        transgender folks are at significantly

9        increased risk of any number of situations

10       that are likely to result in experiencing

11       traumatic stress or events and then

12       subsequently developing a condition like

13       PTSD.  So very high rates of victimization of

14       all kinds, exploitation, high rates of under-

15       and unemployment, high rates of being

16       unhoused, getting kicked out of your house

17       when you're a child because your family

18       rejects you.  These are things that are not

19       inherent to being trans.  There's nothing

20       about being trans that makes those things

21       okay or natural, but they happen at a

22       disproportionate rate to trans folks and they

23       do cause traumatic stress and injury to them

24       just the same way that they would cause

25       traumatic stress or injury to other people,

138

1       but they just have an increased risk of

2       encountering those kinds of circumstances.

3              And so it is something that commonly

4       cooccurs.  In Ms. -- in Mrs. Zayre-Brown's

5       case she acknowledged that she had a history

6       of significant trauma.  In my view, it's not

7       like it's fully explanatory.  I -- what I'm

8       not saying is, oh, this is all trauma, the

9       gender dysphoria doesn't have anything to do

10      with this.  But what I'm saying is that in

11      terms of significant relief from the -- the

12      suicidality and the distress that she is

13      experiencing, treating the gender dysphoria

14      is really only one piece of the puzzle.

15      There are other things that she's going to

16      need in terms of support and care in order to

17      get significant alleviation of those

18      symptoms.

19   Q.  Okay.  Anything else about the Beck

20      Inventories that you think are important to

21      know?

22   A.  Not that I can think of.

23   Q.  Okay.  Then let's move on to the Minnesota

24      Multiphasic Personality Inventory, second

25      edition.  And you -- you did administer this

                                                   139

1        test --

2    A.   Yes.

3    Q.   -- correct?  Okay.  Great.  I'll call it the

4        MMPI --

5    A.   Yes.

6    Q.   -- for brevity sake.  What is the MMPI?

7    A.   The MMPI is one of our oldest and most widely

8        used psychological inventories.  It's broad,

9        it's comprehensive, well researched, commonly

10       used in the forensic setting, has

11       correctional and forensic norms.  It's

12       probably the most commonly used psychological

13       test, period, aside from maybe IQ tests if we

14       looked at community as well.  It is lengthy,

15       but the 2-RF is called the restructured form.

16       It's actually slightly shorter so I -- I use

17       that to make it less painful and tedious

18       because the full-length version is 567 items.

19       The measure covers a broad range of

20       psychopathology so it covers identity.  It

21       covers -- excuse me, like -- I should say

22       self-concept, not identity, interpersonal

23       functioning.  It covers be- -- behaviors,

24       mood issues, anxiety issues, somatic issues.

25       I mean, it's got -- it's very, very broad

                                                        140

1    coverage for this measure and it was

2    constructed differently than other

3    psychological tests.  It's harder to trick

4    the MMPI or study the MMPI compared to other

5    measures.  It -- the nice thing about the

6    MMPI-2-RF, too, is that when you're looking

7    at testing -- doing psychological testing

8    with trans folks, it can be really difficult

9    because of the fact that if somebody is

10   nonbinary, they don't necessarily fit into

11   either of the gender norm groups and the

12   tests that were used to develop some of these

13   measures, they didn't ask people if they were

14   trans or not and so we don't necessarily know

15   if they have different results or the test

16   might work differently for them.

17        So the reason I chose the MMPI is

18   because it doesn't -- 2-RF does not use

19   gender norms, which is, to my way of

20   thinking, the best solution and also

21   consistent with the guidance that we see in

22   the literature on this topic.

23        Like the TSI, the MMPI contains embedded

24   validity scales that tell us how the person

25   approached the measure.  Those validity

141

1       scales are not all created equal.  Some of

2       them work better than others, but her

3       validity scale results were within normal

4       limits, again, consistent with the Trauma

5       Symptom Inventory that she wasn't faking or

6       exaggerating things or -- or engaging in a

7       significant amount of what we call faking

8       good, which is pretending to be more virtuous

9       and problem free than you really are.

10          As far as her results go, they're

11      detailed in my report on Page 24.  I provide

12      T-scores there, but, you know, we're looking

13      at scores -- 65 or greater, again,

14      statistically significant.  You could have a

15      score that's lower than that that's still

16      very bothersome to you.  It doesn't mean it's

17      not important if it's below that score.  But

18      she had some -- she had several elevations on

19      this scale -- or on this measure, I should

20      say, including externalizing dysfunction,

21      cynicism, antisocial behavior, ideas of

22      persecution, aberrant experiences, hypomanic

23      activation.  She had some mild elevation on a

24      scale that reflected suicidality, high --

25      high stress and worry and specific fears.

142

1        So with the MMPI we don't just talk

2   about individual scale results.  We -- we

3   integrate them and we talk about how these

4   things would work together and present in an

5   individual.  And so for people who have this

6   combination of results, I provide a narrative

7   that starts at the bottom of Page 24,

8   continues on to Page 25, and ends before the

9   discussion about the Personality Inventory

10  that starts at the bottom of Page 25.  So I

11  discuss a little bit more about the

12  suicidality and the relationship between

13  impulsivity and suicidality for her that -- I

14  also just provide a little bit of context

15  that it's not uncommon for incarcerated

16  individuals to have elevated risk factors for

17  suicidality and experience more of that.

18        The narrative part of it is, you know --

19  individuals who have this combination of

20  results tend to describe a lot of frequent,

21  intense, and ruminative worry.  They preo- --

22  preoccupy themselves worrying about things.

23  They're vulnerable to stress, which means --

24  I talked about her being like a cork on the

25  ocean, that, like, when stress happens, your

143

1     mood can drop very quickly and dramatically

2     more so than a typical person.

3           She has also some indications of

4     hypomania which could mean bipolar.  I did

5     not diagnose that.  I do think she deserves

6     to know that that did come up on the testing

7     and it's something that she should be mindful

8     about, but it wasn't present to such a degree

9     and she didn't present during the interview

10    with me in a way that would cause me to think

11    she was psychotic or something like that at

12    that time.

13         She had some persecutory ideation.  That

14    doesn't sound good, but it's actually pretty

15    normal in a carceral setting.  You're worried

16    that people are out to get you.  You're

17    probably not wrong.  Also, I contextualized

18    that finding given the circumstance of her

19    litigation.  The remainder of the findings

20    are described in detail in the report and I

21    don't want to belabor it since you have the

22    report.

23  Q.   Sure.  Okay.  So let me back up a little bit.

24  A.   Uh-huh.

25  Q.   And I'd like -- I'm curious to know more

144

1      about the -- the test itself.

2  A.   Uh-huh.

3  Q.   So I could probably parse this out from your

4      last answer, but what does this test measure?

5  A.   A very broad variety of what we call

6      psychopathology.

7  Q.   Okay.  And what is psychopathology?

8  A.   Things that can go wrong with your mental

9      health.

10 Q.   Okay.  And why did you have Kanautica

11     specifically take it?

12          MR. RODRIGUEZ:  Asked and answered, but

13     you can answer.

14 A.   Well, the instruments -- the tests that

15     Dr. Ettner had done were not, you know, these

16     kind of more comprehensive, sort of omnibus

17     almost style instrument.  They were more

18     narrowly focused and, you know, as I actually

19     heard in one of your questions, like, not all

20     that relevant really in some respects

21     ultimately given the findings.

22          The MMPI doesn't tell us if somebody is

23     trans or not.  It doesn't even tell us if

24     they have gender dysphoria or not.  It's not

25     a diagnostic instrument for that.  It look --

                                              145

1        it's more -- the aim of this is more to look

2        at cooccurring conditions that the person

3        might have and also what their strengths and

4        challenges are in terms of personality and

5        their interpersonal functioning because that

6        can be relevant for treatment planning and

7        capacity to provide informed consent.

8    Q.   Do you know who created the test?

9    A.   Yes.  So it was created at -- well, it was --

10       it was a couple of different people.

11   Q.   Uh-huh.

12   A.   Ben-Porath is the person who publishes the

13       most now about the MMPI, but it was created

14       at a hospital in Minnesota.  Many, many, many

15       people completed earlier versions of the

16       measure and, like I said, it was created very

17       differently from a lot of other psychological

18       tests but in, I think, a good way.  It's

19       called an atheoretical test development.

20   Q.   Do you know if the test was created for a

21       specific purpose?

22   A.   Well, originally, I'm not sure if they were

23       thinking of using it internally, but, I mean,

24       it was developed as a psychological test for

25       fairly broad use.  Now, they have updated the

                                                    146

1       instrument over time.  They've expanded the

2       norms to be more representative of the

3       population, but it's not appropriate for

4       everybody.  There are -- there are limits to

5       it.  The reading level, for example, can be

6       too high for some individuals so it's not a

7       test that is for everybody.  I certainly

8       don't want to make it seem like everybody

9       should have an MMPI no matter what they come

10      in for, that they're all suitable for it.

11      But it was commonly used in the forensic

12      setting not only because it gives you such

13      broad coverage but also because it includes

14      these validity scales and in forensic

15      settings, you want to be able to offer some

16      amount of, you know, I investigated whether

17      or not this person was providing a forthright

18      or accurate report with the information that

19      I have.  Measures like the MMPI permit you to

20      do that.

21  Q.  Okay.  And so is this a diagnostic tool?

22  A.  It's a diagnostic tool, but you can't rely on

23      it solely for the purpose of diagnosis.

24  Q.  Okay.  Is it also used for assessing a

25      patient's need for a specific treatment?

147

1   A.    It could be.  So, for example, if someone

2         elevated on the depression scale and that was

3         very, very high elevation and they elevate

4         on -- you know, they produce a pattern of

5         results consistent, for example, with

6         borderline personality disorder, that tells

7         us probably this person should have

8         dialectical behavior therapy.  Does the test

9         output say, dialectical behavior therapy?

10        No.  But it does tell you what the picture is

11        of their symptoms and then you can identify

12        the best fit in terms of treatment after

13        that.

14  Q.    Okay.  Did you have Kanautica take the MMPI

15        for the purpose of assessing her need for a

16        treatment?

17  A.    So not so much for her need for the treatment

18        but to get a -- an updated picture of what

19        her current symptoms are, the severity of

20        those symptoms, and then to be able to

21        ascertain how that might interface with the

22        likely benefit that she would receive from

23        gender-affirming care, under what

24        circumstances, and also if there was any need

25        for active management of cooccurring

148

1    conditions that could interfere with either

2    her ability to provide informed consent or

3    her ability to benefit in the longer term

4    from the procedure.

5  Q.   Have you used this test with any other

6    patients to assess a need for

7    gender-affirming care?

8  A.   Oh, I've given -- yeah, I've given MMPIs as

9    part of that process, but it's not a

10    situation where the MMPI gives me an answer

11    as far as, A, whether or not the person needs

12    gender-affirming care at all and it also

13    doesn't tell me if they do, what it -- what

14    specifically procedure or interventionwise

15    that they need and that's a big universe.

16    You know, it can be everything from voice

17    training to your underwear to surgery.  It's

18    a spectrum.

19  Q.   Uh-huh.

20        MR. SIEGEL:  Okay.  Can we go off the

21    record for a moment?

22        (Discussion off the record.)

23        (Whereupon, there was a lunch recess in

24    the proceedings from 12:06 p.m. to 12:44

25    p.m.)

149

1    BY MR. SIEGEL:

2    Q.   All right.  Back on the record.  Dr. Boyd,

3         welcome back.  Hope you were able to get

4         something to eat.  Before we move on to the

5         next subject, one follow-up question.

6    A.   Sure.

7    Q.   I believe you said that you had -- there

8         might be some concerns about complications

9         resulting from vulvoplasty.

10   A.   Uh-huh.

11   Q.   Do you have a sense of how common

12        complications are from that procedure?

13   A.   I don't know.  What I would typically suggest

14        is -- well, first of all, I would say that's

15        for a -- the medical provider to talk about

16        for Mrs. Zay- -- Zayre-Brown.  Given her

17        history, her collection of symptoms, her

18        presentation, what would be most helpful

19        would be to have an individualized prediction

20        about that.

21   Q.   Okay.

22   A.   And probably contingent on setting, too.  So

23        give one opinion about risks in carceral

24        environment and another one in the community.

25   Q.   Okay.  Got it.  All right.  Then looking back

                                                      150

1          to your report, I'm looking at Page 24.

2     A.   Yes.

3     Q.   And looking at the last sentence in the

4          second paragraph you write, In other words,

5          gender dysphoria is not necessarily the

6          primary and direct cause of

7          Mrs. Zayre-Brown's suicidality and urgent

8          surgical treatment for her gender dysphoria

9          will not necessarily reduce or eliminate her

10         risk of having suicidal ideation in the

11         future.

12              Did I get all that right?

13    A.   Yes.

14    Q.   Okay.  Are you providing an opinion that

15         something other than gender dysphoria is the

16         primary and direct cause of her suicidality?

17    A.   No.  I would say there are multiple

18         contributors and I don't think one could be

19         identified as the primary cause.

20    Q.   Okay.  And what are the other contributors in

21         your view?

22    A.   So certainly, one is the -- the carceral

23         status.  You know, people who are

24         incarcerated have roughly ten times the rate

25         of completed suicide regardless of their

                                                   151

1       gen- -- actually, cisgender women have a

2       slightly higher rate of completed suicide,

3       ten times the rate of the general population.

4       So the carceral status is one variable there.

5            Another one is, excuse me, that she does

6       have -- she does have trauma symptoms and I

7       do think those are contributing, but I also

8       would not say that if you treated -- if -- if

9       she is released from prison and she treats

10      her trauma symptoms that that means the

11      suicidality would go away.  I don't think --

12      I think she needs intervention for all of the

13      contributors.

14  Q.  Okay.  So you think that her gender dysphoria

15      is a contributor to her suicidality; is that

16      right?

17  A.  Yes.

18  Q.  Okay.  And you're -- but you're not saying

19      to -- you know, that's, like, 20 percent or

20      50 percent or whatever, are you?

21  A.  I don't think it's possible to extricate it

22      and provide a -- an opinion that would be

23      that precise.  So, you know, it could be 5

24      percent.  You know, I -- I don't think it's

25      possible -- I think it would be misleading to

**GENERAL CONFIDENTIAL INFORMATION**

                                                152

1          offer a number.

2     Q.   Uh-huh.  Okay.  So since -- since that is

3          a -- a contributor in your view, if

4          Mrs. Zayre-Brown were to undergo surgery,

5          would that at least reduce her risk -- or

6          would that reduce her levels of suicidality?

7     A.   I think it depends.  It depends on what --

8          how it's performed, under what conditions

9          with what amount of social support.  And

10         that's consistent, again, with -- going back

11         to the -- the declar- -- summary of the

12         findings from the Cornell study.  I mean,

13         that's consistent with what is also

14         demonstrated in that research literature.

15    Q.   Okay.  If it is performed in a carceral

16         setting, do you believe that would reduce her

17         suicidality?

18    A.   I think that if she -- I think that her

19         finding out that she has a date when she

20         knows that she will be able to get her

21         surgery done -- I think that will improve her

22         suicidality whether she's incarcerated or in

23         the community.  So I think there's different

24         kind -- and then getting the procedure itself

25         will offer a different -- will have

**GENERAL CONFIDENTIAL INFORMATION**          153

1      additional benefit.  I think at each step of

2      the way -- depending on where she's located,

3      each movement toward that process will likely

4      offer her a psychological benefit both

5      broadly speaking in terms of her mood

6      because, like I said, she's like a cork on

7      the ocean so good news will also lift her

8      mood --

9  Q.   Uh-huh.

10 A.   -- but also, at the same time, it's not a

11      solution.  It's not going to make it go away

12      and there are other things that could make

13      her suicide risk fluctuate acutely.  Even if

14      somehow we could wave a magic wand and the

15      gender dysphoria went away completely, that

16      would still be a concern and would need

17      active management.

18 Q.   Okay.  You mentioned additional benefits.

19      What would those be?

20 A.   I'm sorry.  Do -- can you remind me --

21 Q.   I -- I -- I think you said that if she were

22      to undergo surgery, aside from suicidality

23      there would be additional benefits.  If

24      that's not what you said or meant, please

25      correct me, but that's what I heard.

                                                       154

A.    Oh, well -- so, I mean, gender dy- --
      dysphoria, it can -- it can be associated
      with suicidality, but it's associated with
      other things, too.  And when I say benefits,
      I actually also mean, like, positive things,
      not just relief of negative experiences.

            So, for example, she indicated that
      one of -- the -- some of the things she'd
      like to do involve sports and, like, dancing,
      things like that that she feels she can't --
      in her deposition she talked about this a
      fair amount, that there are things she feels
      she cannot do because she hasn't had that
      bottom half surgery yet.  That -- those
      benefits are significantly more relevant and
      accessible to her in a community than they're
      going to be in a carceral setting based on
      her own reasoning and her -- and her own
      statements about that.  So that's what I mean
      when I say it could be different.

Q.    Got it.  All right.  I'd like to turn to Page
      34, please.  And this is Conclusion Number 2,
      A clinical psychologist cannot reasonably
      predict with confidence that a particular
      intervention will be curative of a condition

                                                    155

1          such as gender dysphoria, which has a diverse

2          manifestation and is inextricably bound up in

3          aspects of the person's life and

4          circumstances that go far beyond the physical

5          appearance of their genitals.

6                  Did I read that right?

7    A.   Yes.

8    Q.   All right.  So big picture question.  Like,

9          can gender dysphoria be cured?

10   A.   I think there are certainly people who could

11         get to the point that they would be

12         subthreshold, right.  That's an -- I -- I've

13         talked before about how there's difference

14         between subthreshold and having no symptoms.

15         I think certainly for most people, there's

16         the possibility of bringing somebody

17         subthreshold for gender dysphoria, but it's

18         usually not the case that there's a single

19         intervention that's sort of like a magic

20         bullet.  It's usually a combination of things

21         that deal with, you know, as I allude to

22         here, not just what their genitals look like

23         or their secondary sex characteristics but

24         also what their social environment is, what

25         their supports are --

                                                        156

1   Q.   Uh-huh.

2   A.   -- what their access to care -- all kinds of

3        care is.

4   Q.   Okay.  So why is it that a -- a psychologist

5        can't predict that a certain intervention

6        will be curative of gender dysphoria?

7   A.   Because of the fact that it -- there's so --

8        there's other contributing causes.  I mean,

9        like, really just what I said there.  It's

10       not just about the -- the appearance of

11       somebody's physical body.  There are other

12       factors there.  So it's more like I'm saying

13       there's not one thing most of the time.  And

14       for her specifically -- getting into her

15       specifics, she articulates repeatedly that

16       there are other factors that contribute

17       significantly to her gender dysphoria,

18       specifically transphobia that she encounters

19       from other people and also to some degree, I

20       think, internalized transphobia when she

21       feels that she's been recognized and

22       identified and then treated differently

23       because she's a trans woman.

24   Q.   In your view, can a psychologist predict with

25       confidence that a certain intervention

                                                    157

1          wouldn't be curative but that -- but that

2          it's necessary to achieving a cure?

3                  MR. RODRIGUEZ:  Objection to form.  You

4          can answer it.

5     A.   We would call that necessary but not

6          sufficient --

7     Q.   Uh-huh.

8     A.   -- in -- in our terminology.  So it's a piece

9          of it, but it's not going to get you all the

10         way there is the idea.  That's one way of

11         looking at that, yeah.

12    Q.   Okay.  Would that be true for any clinical

13         psychologist?

14    A.   I'm sorry.  I -- can you ask that question in

15         a different way?

16    Q.   Would it be true for any clinical

17         psychologist --

18    A.   That --

19    Q.   -- that you cannot predict that a certain

20         intervention will be curative?

21    A.   I think it depends on the intervention and it

22         depends on the individual.

23    Q.   Okay.  Well, how -- how about yourself, would

24         that apply to you?

25    A.   Well, yes.  I mean, I think it would depend.

                                                        158

1           If I have somebody that it's a very

2      straightforward presentation and they --

3      let's say they have very physiological

4      depression symptoms, in other words, they

5      feel very tired, they have very little

6      motivation, they can't -- just can't move

7      their body to do the things that they need to

8      do.  Provided that there isn't an underlying

9      medical condition and that's been ruled out

10     through interdini- -- disciplinary practice

11     or referral, then I would say we have good

12     reason to believe that probably about 80

13     percent of people would achieve remission is

14     what we would call it for -- for a condition

15     like that.  So I could tell -- I wouldn't

16     tell somebody, I'm absolutely confident this

17     will cure you.

18  Q.  Uh-huh.

19  A.  You know, something else could happen.  Their

20     parent could die.  They -- you know, any

21     number of things could happen that could

22     interfere with their progress, you know, but

23     I could say, you know, given the evidence

24     base for the success rate of this

25     intervention, given the complexity or lack of

159

1    complexity in your presentation, you know,

2    here's how likely I think it is you would

3    benefit, but I would never tell somebody, I

4    am certain that this will cure you.

5    Q.  Okay.  Let's flip to Page 20.  So I'm going

6        to -- the last sentence of Subsection B you

7        say, Likewise, surgical intervention alone is

8        not likely to be curative and may not

9        substantially ameliorate her suicidality --

10   A.  Uh-huh.

11   Q.  -- is that right?

12   A.  Right.

13   Q.  Okay.  So are you making a prediction here

14       about whether a certain treatment would be

15       curative?

16   A.  I think it's not likely it would be curative.

17       I do -- I think it's likely she would achieve

18       a benefit from it.  It's really -- I think

19       the debate is sort of the degree of that

20       benefit.  Secondarily, you know, the question

21       of, like, substantially ameliorating her

22       suicidality, I mean, it might, you know, but

23       I don't think that we have confidence to say

24       it will.

25   Q.  Do you see any tension between your assertion

                                                    160

1           here and the assertion we spoke about a

2           moment ago that a psychologist cannot predict

3           with confidence that a certain treatment will

4           be curative?

5    A.     Yes, but that's basically making -- that's

6           saying, this is -- this is how this is going

7           to go.  What I -- what I'm saying instead

8           here when I'm saying it's not likely to be

9           curative is -- what I'm saying is the most

10          likely outcome is that it's going to fall

11          short of that particular benchmark of being

12          curative.  Doesn't mean -- I'm not saying

13          surgical intervention alone is not likely to

14          provide psychological benefit or amelioration

15          of the symptoms, but it's not -- I don't

16          think it's likely to be curative

17          specifically.  That's a very high bar.

18   Q.     Okay.  But do you think that gender-affirming

19          surgery would provide psychological benefit

20          to Kanautica?

21   A.     I think depending on the circumstances, if

22          it's provided in the way that she details,

23          which I described in my report on Page 31,

24          receiving medical care in the community

25          including aftercare and wound management,

                                                          161

1       receiving care and support directly from her

2       support network, participating in meaningful

3       personal and professional development

4       opportunities both while she's preparing for

5       it and while she's recovering from it, then,

6       yeah, I think she -- I have no problem at all

7       saying I think it's likely she would benefit

8       from that and probably, I think, get

9       significant relief both with respect to

10      gender dysphoria and with respect to

11      suicidality.

12  Q.  Okay.  Are you familiar with the treatments

13      for gender dysphoria she has received so far?

14  A.  I don't want to misrepresent my level of

15      understanding.  I have some understanding of

16      what she's already undertaken, but I don't

17      have a medical professional's level of

18      knowledge.

19  Q.  Okay.  Do you know that she has been on

20      hormone therapy?

21  A.  Yes.

22  Q.  Okay.  Do you know that she has un- --

23      undergone social transitioning?

24  A.  Yes.

25  Q.  Okay.  To your knowledge, have those

1          treatments cured her of gender dysphoria?

2    A.    No.

3    Q.    Okay.  Other than surgery, is there any

4          treatment that you're familiar with for

5          gender dysphoria that she has not received?

6    A.    So medical treatments, I couldn't speak

7          comprehensively to that because I'm not a

8          medical expert so I can't tell you what all

9          of those options would be.  I don't believe

10         that she's done voice training.  That's

11         something that she could do.  There might be

12         other kinds of sort of plastic surgery-type

13         interventions that she might want, but, you

14         know, those are -- you know, the -- the

15         surgery aspects are a medical intervention.

16         And additionally, there -- this is such an

17         evolving area of practice that there are new

18         procedures all the time so the options today

19         might not be the options next year.  There

20         could be other things that would help her.

21              She had -- she -- and she has had

22         plastic surgery from what I understand in

23         terms of what I discussed with her in her

24         deposition, but when you read her description

25         of it and talked with her about it, she

                                                    163

1          describes getting very, very limited gains

2          from these prior medical interventions.

3               Now, you know, one of the questions

4          would be if she got such limited benefit from

5          the prior interventions, why do we believe

6          we're going to make the jump to a hundred

7          with the -- one single intervention, you

8          know?  I don't think there's a -- I don't

9          think we have good reason to believe that

10         based on her own characterization and

11         recollection of her experiences with medical

12         intervention.

13    Q.   Uh-huh.  So zooming out somewhat, like, big

14         picture, what do you believe is causing her

15         gender dysphoria?

16    A.   So Mrs. Zayre-Brown has had a very -- from my

17         understanding she has not had an easy life.

18         She does have support in her marital

19         relationship and evidently her family

20         relationships, but living as a transgender

21         person in the United States at this point in

22         time is painful and difficult not only

23         because of constraints on access to services

24         or people not even knowing what's available

25         to them sometimes or not being able to afford

164

1   it, but also, obviously, there's a cultural

2   environment that's hostile to people and I

3   believe that that cultural environment is a

4   significant cause and contributor to her

5   gender dysphoria.

6          On top of that, frankly, our gender

7   binary is -- is highly, highly determined by

8   essentially the -- the ancestry's eugenics

9   and the beauty standards for women are

10  difficult for anybody to achieve and fairly

11  narrow.  And I think if the aim is to not be

12  identifiable as a trans woman, that's going

13  to -- that's difficult.  And if you are

14  identified, then it may be because of some

15  piece of your anatomy that somebody knows

16  about, but it could also be your height.  It

17  could be your shoulders.  It could be your

18  voice.  People who aren't even trans are

19  getting -- people are telling them that

20  they're trans because their shoulders are too

21  broad or their voice is too low.  There are

22  all kinds of ways in which she, I think,

23  experiences transphobia in ways that have,

24  frankly, nothing to do with her primary sex

25  characteristics, but I also believe that

165

Case 3:22-cv-00191-MOC-DCK   Document 70-1   Filed 10/26/23   Page 165 of 186
DISCOVERY COURT REPORTERS   www.discoverydepo.com      1-919-424-8242

1      there is a contribution that is coming from

2      her own internal discomfort with continuing

3      to have a phallus when that is not consistent

4      with her gender identity.  I do think that

5      contributes to her gender dysphoria and it

6      makes sense then rationally that coping with

7      that is going to be a sensible step for her

8      in terms of treatment.

9    Q.   And to be clear, what do you mean by coping

10      with that?

11   A.   Well, I mean having -- having a procedure

12      to -- you know, having bottom half surgery,

13      whether that's a vulvoplasty or vaginoplasty,

14      dealing with that component of it, of the

15      internalized transphobia.  And also, just the

16      discomfort, emotional and psychological

17      discomfort, with continuing to have a

18      phallus, that is its own contribution.  I

19      think that's valid.  I believe her when she

20      says that.

21   Q.   Do you have any reason to think that

22      Mrs. Zayre-Brown can be cured of her gender

23      dysphoria while she still has a penis or a

24      phallus as she calls it?

25   A.   Based on her statements, I think not.  I

GENERAL CONFIDENTIAL INFORMATION

166

1    believe her self-report has consistently been

2    that this is something that she sees as sort

3    of a keystone intervention.  I think the main

4    difference really is just that in my view,

5    she needs other things as well and that we

6    want to be careful and mindful about the

7    timing and the setting and the context of

8    intervention to maximize the benefit that

9    she's going to get so we can get as close to

10   the benefit as she anticipates as we possibly

11   can.

12   Q.   Okay.  You mentioned the -- the phrase

13        necessary but not sufficient a little while

14        ago.

15            Would you say that removing her phallus

16        and having genital surgery would be necessary

17        but not necessarily sufficient to cure her

18        gender dysphoria?

19   A.   Ultimately, yes.  The question of the timing,

20        I think, is a separate issue, but in the

21        long-term sense, yes.

22   Q.   Uh-huh.  Did you find any contraindications

23        for surgery?

24   A.   So I can't speak to medical contraindications

25        for surgery.  And surgery, broadly speaking,

GENERAL CONFIDENTIAL INFORMATION                167

Case 3:22-cv-00191-MOC-DCK  Document 70-1  Filed 10/26/23  Page 167 of 186
DISCOVERY COURT REPORTERS    www.discoverydepo.com          1-919-424-8242

1        no, but as far as what she described -- you

2        know, that's what I keep coming back to is

3        what she's describing as the set of

4        circumstances that are going to -- going to

5        give her the most relief.

6    Q.  Do you have any reason to think that if she

7        underwent a vulvoplasty, she would later

8        regret it?

9    A.  I think it's possible if the -- not in and of

10       its- -- not, like, per se.  Not only because

11       of, oh, I wish I had had another procedure.

12       It's possible depending how -- how the

13       procedure went that later on, she could have

14       some amount of regret, not that she had a

15       vulvoplasty but that she didn't have a

16       vaginoplasty instead.  I think that's

17       possible.  I don't think it's likely that she

18       would experience regret in terms of saying, I

19       wish I still had a phallus.

20   Q.  If someone undergoes a vulvoplasty, are they

21       able to also undergo vaginoplasty later?

22   A.  My understanding of it -- and I want to be

23       clear because I'm not a medical professional.

24       I can't give a medical opinion.  But my

25       in- -- understanding from consulting with

**GENERAL CONFIDENTIAL INFORMATION**                    168

1        medical professionals who do the procedures

2        is that vulvoplasty is a less commonly done

3        procedure so it's -- most of the surgeons who

4        would do it will have less familiarity with

5        doing that compared to vaginoplasty and also

6        that with respect to both the orchiectomy and

7        vulvoplasty, there's the necessity of

8        maintaining a certain amount of tissue and

9        certain structures in order to be able to

10        later do a vaginoplasty, although there are

11        alternative procedures that can be done if

12        that tissue isn't there, and they may be more

13        or less desirable to the individual.  I think

14        it has to be a highly individualized medical

15        decision that's made between the doctor and

16        their patient.

17   Q.   Okay.  Let's turn to Page 29 of your report,

18        please.  And I'm -- it's the final sentence

19        of the third paragraph on the page.  In other

20        words, Mrs. Zayre-Brown's acute mental health

21        crises in recent years were indirectly rather

22        than directly related to her gender

23        dysphoria.  Additionally, by her account,

24        significant contributions to her distress

25        were associated with administrative processes

169

1      and delays related to her treatment.

2           Did I read all that correctly?

3   A.   Yes.

4   Q.   What does it mean for something to be

5        indirectly related to gender dysphoria?

6   A.   So the idea would be that there's a certain

7        amount of distress that comes from what I

8        just described as this sort of

9        compartmentalized -- it may be internalized

10       transphobia or may be some other

11       manifestation of just dis- -- emotional and

12       psychological discomfort with continuing to

13       have a body part that you don't want to have

14       or wishing you had one that you don't.  The

15       mental health crises appear to be in part --

16       again, it's like that cork on the ocean

17       thing.  The gender dysphoria is going to

18       be -- I think for her it has ebbed and flowed

19       to some degree, but I don't think there's a

20       time when it hasn't been present as far as I

21       can tell.  But the interactions with

22       authority figures who give her bad news, who

23       she perceives as delaying things, or when she

24       has feelings of abandonment, that also taps

25       into, I think, some trauma-related issues

                                                    170

1          that get at abandonment and rejection and I

2          think that also triggers these acute mental

3          health crises, which doesn't mean that, oh,

4          you just solve the trauma problems and you

5          won't have any more of those acute mental

6          health crises.  All it means is that we need

7          to have an integrated care/treatment plan

8          that accounts for both the gender dysphoria

9          and what's needed for that but also managing

10         the mood symptoms and the trauma symptoms.

11    Q.   And when you say delays here, what delays are

12         you referring to?

13    A.   So this is -- you know, it says, by her

14         account.

15    Q.   Uh-huh.

16    A.   So this is -- what she's telling me is that

17         she felt that there were times that she

18         wasn't getting enough information about what

19         the status was of things that were happening,

20         that it took too long to schedule

21         consultations or even find out whether one

22         would be scheduled, that she would get

23         anxious waiting for decisions to come in.  So

24         these are things that she was telling me were

25         the source of distress for her.

                                                    171

1    Q.   Okay.  Do you believe that those delays

2         happened?

3    A.   I don't have any reason to think that her

4         subjective perspect- -- perspective as

5         related to me is not accurate.  I don't think

6         she misrepresented her perspective.  Whether

7         or not it's objectively true that there were

8         delays I can't speak to because those are

9         administrative processes and I don't know if

10        they, you know, occurred in a -- according to

11        some set of time lines that they were

12        supposed to abide by.

13   Q.   Okay.  But you don't have any reason to not

14        believe Kanautica that those delays happened?

15   A.   I believe that from Kanautica's perspective,

16        it has absolutely been a process that has

17        been marked by delay and disappointment.

18   Q.   Right.  My question is more in terms of

19        whatever objectively happened.

20   A.   Uh-huh.

21   Q.   Do you have any reason to believe that

22        something other than what Kanautica told you

23        happened?

24   A.   Oh, no.

25   Q.   Okay.  Do you believe that those delays

                                                    172

1          caused her distress?

2    A.   So it's hard to differentiate between the

3         delays themselves and getting news about

4         things because when you look at the pattern

5         for her, it does appear that when she's

6         having the more acute distress, it's not

7         after some long period of time has gone by.

8         It's more like she got news from somebody is

9         often -- she described in her interview with

10        me, for example -- I think it was Dr. Hahn

11        came and told her bad news and so it wasn't

12        just that she had waited.  It wasn't the

13        delay.  It was the -- from her perspective

14        getting this news and also feeling

15        unsupported afterwards.  Same thing, I think,

16        when she had to go to the hospital and then

17        she came back and she had to go into

18        restrictive housing.

19             So some of that is certainly distress

20        about getting news that she didn't want,

21        feeling disappointed and hopeless, I think,

22        but also, she was distressed as well about

23        having to return and then go into restrictive

24        housing.

25    Q.   And the distress that she experienced, is

                                              173

1    that because she would continue to have a

2    phallus?

3    A.   I think some of it is -- yeah, I think that's

4         absolutely part of it for her.  I just don't

5         think it's a hundred percent of it.

6    Q.   Okay.  All right.  Let's turn back to Page

7         34, please.  All right.  I'm looking at

8         Conclusion Number 3.  My evaluation of

9         Mrs. Zayre-Brown did not reveal any

10        significant findings in her mental state that

11        would counsel in favor of the surgery as an

12        immediate intervention to be conducted in a

13        prison setting from a psychological

14        standpoint.

15             Did I get all that right?

16   A.   Yes.

17   Q.   Okay.  What do you mean by immediate

18        intervention?

19   A.   I would say as sort of like a -- something

20        that needs to happen in the next couple of

21        months in that setting given her set of

22        circumstances.  Now, that's separate from the

23        question of whether she'll benefit from it.

24        I think she would benefit from it, but in

25        terms of it needing to be an acute -- an

174

1          immediate intervention, we would typically be

2          thinking of that as more of an acri- -- a

3          crisis -- active crisis situation.

4    Q.   Okay.  Is there a time frame that you have in

5          mind that would be more appropriate than --

6          well, let me rephrase that question.

7                Did you have -- make any findings that

8          would counsel in favor of the surgery, you

9          know, if not a couple months from now, then,

10         I don't know, three or four months from now?

11               MR. RODRIGUEZ:  I'm going to object to

12         the form.  You can answer.

13   A.   So this is -- you know, if you read the

14         sentence it says, an immediate intervention

15         to be conducted in a prison setting from a

16         psychological standpoint.  So that's given

17         that she's going to continue to remain

18         incarcerated.  So it's that particular set of

19         in- -- of circumstances.  So in -- in a

20         prison setting immediately, like, in the next

21         couple of months, three months, four months,

22         that would still be fairly immediate because

23         there's a period of preparation she'll have

24         to undertake.  She -- she couldn't have it

25         tomorrow.  You know, she would have -- she

                                                        175

1    has a certain amount of preparation she would

2    have to undertake anyway.  But what she

3    indicated when I interviewed her is that

4    simply knowing either that she's going to

5    have surgery and it's scheduled -- and she

6    didn't give a time frame for that.  She

7    didn't say within the next year.  She just

8    said scheduled.  And then also the issue of,

9    you know, having a plan for the reentry

10   program that she wanted to enter into.  She

11   indicated that those things would really

12   significantly alleviate her distress and so

13   based on her account, that pushes back

14   against the notion that it needs to be

15   immediate.  What she's telling us is that

16   there are other things that we can do now

17   that would give her significant relief, plans

18   that we can make, you know, placements that

19   she could go to potentially based on her

20   account but that those are the kinds of

21   things that are going to factor into how

22   she's feeling.

23        So, in other words, it's not getting the

24   surgery.  It's having a future where she sees

25   herself being able to get the surgery that

176

1      she wants.  And the future that she describes

2      as being best for her and most

3      psychologically beneficial for her is the one

4      that -- I mean, I don't want to be redundant,

5      but we've already gone over it a couple of

6      times in the report.

7  Q.  So if Kanautica were out in the community

8      right now and you were treating her as -- as

9      your patient, would you recommend immediate

10     surgery?

11 A.  I don't know.  I mean, she would have -- I'd

12     have to evaluate her.  You know, the other

13     thing is that there is a -- the reentry is

14     not stress free for people.  Even though it's

15     a positive event, it's also highly stressful.

16     So, you know, I think she's anticipating it

17     in a positive way.  I think ultimately,

18     she'll have significant positive mental

19     health benefits from release, but I think

20     she'll also -- you know, when I assessed her

21     she was in prison and I think she would

22     probably just need a follow-up.  I would give

23     her a couple of weeks to -- to adjust so that

24     the assessment wasn't looking at just, like,

25     a -- you know, sort of disorientation from

177

1    reentering the community, but she also hasn't

2    been locked up for that long so I think that

3    could probably be a pretty brief discussion

4    with her just to make sure that her mood is

5    okay is the primary thing, that that's not

6    dysregulated in some way.  But as far as in

7    the community, I don't see any reason why she

8    wouldn't be suitable for surgery in whatever

9    time frame she and her treating providers

10   deemed appropriate.

11   Q.   Okay.  And in your view, is it her being

12        incarcerated that makes her unsuitable or

13        less suitable for surgery now?

14             MR. RODRIGUEZ:  Objection to form.  You

15        can answer.

16   A.   It's not the incarceration so much as the

17        timing.  So she is due for release in a

18        relatively short amount of time.  And it's

19        relevant also specifically with respect to

20        the suicidality benefit because people who

21        have less than 18 months left to serve on

22        their sentence -- that's kind of the dividing

23        line.  If you look at the research on suicide

24        in incarcerated folks, people who have less

25        than 18 months, then you see a decrease in

178

GENERAL CONFIDENTIAL INFORMATION

Case 3:22-cv-00191-MOC-DCK   Document 70-1   Filed 10/26/23   Page 178 of 186
DISCOVERY COURT REPORTERS   www.discoverydepo.com   1-919-424-8242

1          their suicide risk.  18 months forward you

2          have a -- what we call a dose-dependent

3          effect where the more time they have to

4          serve, the more suicidal they -- more likely

5          it is that they'll die by suicide.

6               So for her, it is an issue of timing in

7          the fact that she doesn't have a lot of time

8          left.  If she did have a lot of time left,

9          her mental state might also be different if

10         she wasn't anticipating release, you know, so

11         I think it's hard to sort of forecast how she

12         might look different if she had more time

13         ahead of her.

14    Q.   Do you know if there's any risk in delaying

15         gender-affirming care for someone with gender

16         dysphoria?

17    A.   Yes, I mean, absolutely.  But

18         gender-affirming care is a very broad

19         category.  Gender-affirming care can be using

20         somebody's name.

21    Q.   Okay.  Well, then I'll be more specific.

22         Gender-affirming surgery.  If someone is a

23         candidate for gender-affirming surgery, is

24         there -- specifically genital surgery, is

25         there any risk in delaying that treatment?

Case 3:22-cv-00191-MOC-DCK   Document 70-1   Filed 10/26/23   Page 179 of 186
DISCOVERY COURT REPORTERS    www.discoverydepo.com        1-919-424-8242

1                    MR. RODRIGUEZ:  I'm going to object,

2          vague, but you can answer.

3     A.   There are some individuals who I think would

4          be harmed by that, yes, but I also think it

5          has to be an individualized determination.

6     Q.   And what kind of person would be harmed by

7          that?

8     A.   So this gets -- this is a difficult kind of

9          question to answer because I think that there

10         are a lot of circumstances about

11         institutional environments that put trans

12         people in a difficult position.  If you say,

13         well, it's the people who are attempting

14         autocastration or autopenectomy, then what

15         that does is that incentivizes people to feel

16         like that's something I need to do in order

17         to be able to get care so I'm always very

18         cautious about talking about that.  But

19         certainly, people who are actively

20         self-mutilating, self-injuring, or making

21         attempts, which, you know, the -- that's

22         concerning.  The issue is always going to be,

23         though, how much benefit are they going to

24         get from purely the surgical intervention

25         versus a full treatment plan that encompasses

                                                      180

1      other components of whatever it is that

2      they're dealing with because, like I said,

3      most trans people, they have other things

4      going on in their life that are -- you know,

5      trauma in particular is so common that --

6      and -- and they're also at high risk in -- in

7      carceral facilities.  You know, PREA

8      acknowledges that.  So, you know, it's

9      complicated and make -- does make it very

10     difficult to answer these hypotheticals for

11     that reason.

12  Q.  Uh-huh.  Okay.  So I understand, and correct

13     me if I'm wrong, but that in your view,

14     undergoing surgery while she's in prison

15     would be far from ideal for Kanautica.

16         Is that fair to say?

17  A.  Yes, by her own account.

18  Q.  Okay.  If she were to undergo a vulvoplasty

19     in prison, do you think it is likely or

20     unlikely that she would receive psychological

21     benefit?

22  A.  I think it's likely she would get some degree

23     of psychological benefit.  I would definitely

24     fall short of saying it would be curative or

25     something close to curative because I think

                                                181

1       there are a number of other factors.  But

2       would she get some psychological benefit from

3       it?  Provided that it went okay and she

4       didn't have significant surgical

5       complications, which is entirely possible and

6       could cause all kinds of issues, then I think

7       she would get some benefit from it.  I think

8       that's likely.  I think even just finding out

9       that she's going to get the surgery, whe- --

10      you know, in the community or elsewhere, I

11      think that give -- also would give a benefit.

12   Q.  Does it give the same benefit?

13   A.  In the longer-term sense, likely, no.  But in

14      the short-term sense, probably, actually,

15      there wouldn't -- I don't know that there

16      would be that much difference.  And, in fact,

17      she might have more stability in terms of the

18      benefit of having something scheduled because

19      of the potential disruption that the medical

20      process itself could cause for her.

21   Q.  Okay.

22          MR. SIEGEL:  Let's go off the record.

23          (Whereupon, there was a recess in the

24      proceedings from 1:19 p.m. to 1:25 p.m.)

25          MR. SIEGEL:  All right.  We have no

                                                    182

1          more questions at this time.

2                    THE WITNESS:  Okay.

3                    MR. RODRIGUEZ:  All right.

4                    MR. SIEGEL:  Anything?

5                    MR. RODRIGUEZ:  No.  No, we're good.

6                      [SIGNATURE RESERVED]

7               [DEPOSITION CONCLUDED AT 1:25 P.M.]

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

183

1    A C K N O W L E D G E M E N T   OF   D E P O N E N T

2

3        I, SARA BOYD, PH.D., declare under the

4    penalties of perjury under the State of North

5    Carolina that I have read the foregoing 183 pages,

6    which contain a correct transcription of answers

7    made by me to the question therein recorded, with

8    the exception(s) and/or addition(s) reflected on

9    the correction sheet attached hereto, if any.

10            Signed this, the _____ day of

11    _____, 2021.

12

13

14                    _____

15                    SARA BOYD, PH.D.

16

17    State of:_____

18    County of:_____

19        Subscribed and sworn to before me this

20    _____ day of _____, 2023.

21

22                    _____

23                    Notary Public

24    My commission expires:_____

25

                                              184

1              E R R A T A   S H E E T

2    Case Name:  Kanautica Zayre-Brown vs. The North

3               Carolina Department of Public Safety,

4               et al.

5    Witness Name:  Sara Boyd, Ph.D.

6    Deposition Date:  August 4, 2023

7    Page/Line      Reads                Should Read

8    ____/____|_____|_____

9    ____/____|_____|_____

10   ____/____|_____|_____

11   ____/____|_____|_____

12   ____/____|_____|_____

13   ____/____|_____|_____

14   ____/____|_____|_____

15   ____/____|_____|_____

16   ____/____|_____|_____

17   ____/____|_____|_____

18   ____/____|_____|_____

19   ____/____|_____|_____

20   ____/____|_____|_____

21   ____/____|_____|_____

22   ____/____|_____|_____

23   ____/____|_____|_____

24   _____    _____

25     Signature                      Date

185

1    STATE OF NORTH CAROLINA    )

                                )  C E R T I F I C A T E

2    COUNTY OF WAKE             )

3

4              I, LISA A. WHEELER, RPR, CRR,

5    Stenographic Court Reporter and Notary Public, the

6    officer before whom the foregoing proceeding was

7    conducted, do hereby certify that the witness whose

8    testimony appears in the foregoing proceeding was

9    duly sworn by me; that the testimony of said

10   witness was taken by me to the best of my ability

11   and thereafter transcribed by me; and that the

12   foregoing pages, inclusive, constitute a true and

13   accurate transcription of the testimony of the

14   witness.

15             I do further certify that I am neither

16   counsel for, related to, nor employed by any of the

17   parties to this action and, further, that I am not

18   a relative or employee of any attorney or counsel

19   employed by the parties thereof, nor financially or

20   otherwise interested in the outcome of said action.

21             This the 17th day of August, 2023.

22

23             _____

24             Lisa A. Wheeler, RPR, CRR

25             Notary Public #19981350007

                                              186