## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA

KANAUTICA ZAYRE-BROWN,

*Plaintiff,*

v.

THE NORTH CAROLINA
DEPARTMENT OF PUBLIC SAFETY,
*et al.,*

*Defendants.*

Civil Action No. 3:22-cv-00191

## EXPERT REBUTTAL REPORT OF DR. RANDI C. ETTNER, PH.D.

1.     As stated in my Expert Report dated February 2, 2023 ("Expert Report") that was previously submitted in this action, I am a clinical and forensic psychologist with expertise concerning the diagnosis and treatment of gender dysphoria. I have actual knowledge of the matters stated herein and could and would so testify if called as a witness.

2.     I have been asked by counsel for Plaintiff Kanautica Zayre-Brown ("Mrs. Zayre-Brown" or "Plaintiff") to provide the Court with my expert opinions addressing the expert reports of Sara Boyd, Ph.D. ("Dr. Boyd") and Joseph Penn, M.D. ("Dr. Penn") submitted by defendants in Mrs. Zayre-Brown's lawsuit seeking gender-affirming surgery. While this expert rebuttal report

does not address all of the deficiencies in the expert reports of Dr. Boyd and Dr. Penn, I have tried to highlight below the most serious errors in them.

3.       In preparing this expert rebuttal report, I reviewed the Expert Reports of Sara Boyd, Ph.D., Joseph Penn, M.D., and Fan Li, Ph.D. that were served on Plaintiff's counsel in this action. I also reviewed Dr. Boyd's and Dr. Penn's affidavits in support of Defendants' response to Plaintiff's motion for a preliminary injunction, Dr. Boyd's recorded interview of Mrs. Zayre-Brown and the literature cited in this expert rebuttal report.

4.       Both Dr. Boyd and Dr. Penn attempt to diminish the conclusions I set forth in my Expert Report because I am not a medical provider. Their criticism is not warranted. My role is accurately described in *Fields v. Smith*, 712 F. Supp. 2d 830, 838 (E.D. Wisc. 2010): "As part of her role as clinician for clients with GID, Dr. R. Ettner examines clients, and recommends necessary medical treatments.... Her role is to collaborate with medical caregivers, endocrinologists, and surgeons who implement the treatment.... Dr. R. Ettner assesses the intensity of the GID in a given individual, and determines whether or not a particular treatment would be medically necessary." Given my extensive experience evaluating, diagnosing, and treating thousands of individuals with gender dysphoria and mental health issues related to gender dysphoria, my publication of several books related to the treatment of individuals with gender dysphoria, including the medical text Principles of Transgender Medicine and Surgery (co-editors Monstrey & Eyler; Routledge

2007) and the 2nd edition (co-editors Monstrrey & Coleman), and my other experience detailed in my Expert Report, I am more than qualified to provide the conclusions in my Expert Report, including with regard to the medical necessity of providing gender-affirming surgery to transgender individuals such as Mrs. Zayre-Brown. Courts have expressly so found. *See, e.g., Edmo v. Corizon, Inc.*, 935 F.3d 757, 788 (9th Cir. 2019) ("Dr. Ettner … [is] well-qualified to opine on the medical necessity of [gender-affirming surgery]"); *C.P. by and through Pritchard v. Blue Cross Blue Shield of Illinois*, 2022 WL 17092846 (W.D. Wash. Nov. 21, 2022) (finding me qualified as "an expert[] to testify about the medical necessity of gender-affirming care"); *see also Norsworthy v. Beard,* 87 F. Supp. 3d 1164, 1187-88, 1190, 1192 (relying on my expert testimony in granting a preliminary injunction requiring prison officials to provide an incarcerated individual gender-affirming surgery). I have never been found by a Court to not be qualified to opine on an issue concerning treatment for gender dysphoria, and I have been a court-appointed expert in a matter regarding surgery for an incarcerated transgender woman (*Soneeya v. Bender*, Case No. 07-12325-DPW (D. Mass.)).

## REBUTTAL TO THE EXPERT REPORT OF DR. BOYD

5.      Dr. Boyd attempts to buttress her qualifications with new assertions regarding her experience, not delineated in her prior declaration in opposition to Plaintiff's motion for a preliminary injunction. Dr. Boyd states that she performs mental health assessments on incarcerated gender dysphoric

and transgender patients, some for the purpose of assessing gender-affirming care. Glaringly, however, she neglects to specify the nature of the gender-affirming care she recommends. Given her emphatic view that psychologists cannot make "medical" recommendations (Boyd Expert Report, p. 5), one is left to conclude that Dr. Boyd has never recommended surgery for any gender dysphoric patient. Indeed, she does not disclose whether she has ever authored the surgical referral letters qualified mental health professionals transmit to surgeons, nor how many patients she has followed post-surgery, nor how many patients she has assessed who have undergone vulvoplasty (all of which I have done on numerous occasions).

6.    Since Dr. Boyd is, by her own admission, unable to opine on the medical necessity of Mrs. Zayre-Brown receiving gender-affirming surgery (Boyd Expert Report, pp. 2, 5), her opinions fall back on generic psychological statements, such as asserting that "The source of Mrs. Zayre-Brown's Gender Dysphoria appears multifaceted, with psychosocial, cultural, identity, environmental and interpersonal factors..." and that Mrs. Zayre-Brown's need for treatment is "significantly dependent on the setting where she is residing." The source of Mrs. Zayre-Brown's gender dysphoria is her status as a woman with a phallus. This remains an incontrovertible, distressing fact—in all settings in which she may reside. Despite Dr. Boyd's assertion that she is unable to opine on the necessity for surgical treatment, no compunction appears to prevent her from opining at pp. 3, 23, and 34 of her expert report that Mrs.-

Zayre Brown should wait for her release from prison to obtain surgery, without considering the harms and risks to Mrs. Zayre-Brown of such a delay.

7.         Dr. Boyd appears to believe that psychologists can opine on treatment for gender dysphoria being psychologically necessary, but not on it being medically necessary. This is a false dichotomy with regard to gender dysphoria treatments. By analogy, would she say that treatment of disfiguring facial burn wounds is "psychologically necessary" but not medically necessary, and the patient doesn't require skin grafting? If significant distress arises from an underlying medical condition, only adequate treatment of the medical condition provides relief. This explains why neither psychotropic drugs nor talk therapy alone are efficacious in treating gender dysphoria.

8.         In the area of gender dysphoria, psychologists are not prohibited from making recommendations concerning medical necessity, and to my knowledge, historically have always done so. Dr. Boyd has cherry picked some statements from the WPATH Standards of Care ("SOC"), but what she asserts reveals that she lacks familiarity with the document's guidelines. The SOC outlines the tasks of mental health professionals working with adults who present with gender dysphoria which include that they "assess eligibility, prepare, and refer for hormone therapy" and "[i]f applicable, assess eligibility, prepare and refer for surgery." SOC 7, pp. 25, 26. The guidelines have addressed the role of the mental health professional since first promulgated in 1979. I am an author of the two most recent SOC iterations (the 7th and 8th versions).

9. Much of Dr. Boyd's report is a critique of my assessment of Mrs. Zayre-Brown. Dr. Boyd is critical of the instruments I use, and instead administered personality tests to Mrs. Zayre-Brown, including the Minnesota Multi-Phasic Personality Inventory (MMPI). Psychologists who work with this population do not administer personality tests when assessing treatment needs, as such tests have no probative value regarding that assessment. A systematic review of the administration of psychometric tests in transgender individuals requesting surgical treatment questioned the utility in this patient population (Lehmann & Leavey, 2020). As Keo-Meier and Fitzgerald explain:

> "The most widely used personality instrument is the MMPI…. It is commonly used in evaluations that have an impact on personnel selection and custody hearings, areas where transgender people are typically discriminated against…. Those who are using assessment instruments [such as the MMPI] to help answer the question of whether or not a client is ready for medical transition are using tools that were not created for the purposes they are used for. This is akin to attempting to screw on a lightbulb with a hammer."

The only probative information in the personality tests administered by Dr. Boyd is that they show that Mrs. Zayre-Brown is not malingering. (Boyd Expert Report, p. 18.)

10. Most baffling is Dr. Boyd's lengthy discussion of informed consent. Dr. Boyd appears to be conflating the procedure-specific informed consent process that occurs between provider and patient (which includes discussion and the provision written materials outlining, among other things, potential risks, benefits, alternatives, and pre-procedure and post-procedure

6

instructions regarding a particular treatment, in accordance with AMA guidelines) with what is referred to as "the informed consent model of gender-affirming care." Dr. Boyd drastically misunderstands the latter. The informed consent model of gender-affirming care is offered in some clinics to *broaden* access to care for transgender patients. The model was created in the early 2000's to eliminate the necessity of mental health assessment, which some perceive as a barrier to care. Clinics such as Callan Lourde in New York City, Howard Brown Health Center in Chicago. and Fenway Clinic in Boston are examples of facilities that provide hormones to transgender patients eighteen years and older, typically at low cost, upon their consent and without the kind of mental health assessment required by WPATH. For example, Dr. Scott Mosser, a San Francisco surgeon, describes the implementation of the model:

> "Dr. Mosser follows the informed consent model and generally does not require letters for FTM/N or MTF/N top surgery, or other body masculinization or feminization procedures (except in the case of individuals 17 years of age or younger).... So, letters are welcome and valuable but often not required for surgery. If you are an insightful, mature individual 18 years or older, with an adequate support system and are capable of informed consent based on an educated experience of the risks and benefits of surgery, Dr. Mosser does not require a therapist letter."

https: www.genderconfirmation.com/about us/. Ironically, Dr. Boyd uses the Cavanaugh, Hopwood, & Lambert article, to buttress her flawed argument. However, the authors, who are affiliated with the Fenway Clinic, use this very article to endorse the informed consent model, as it "seeks to acknowledge and better support the patient's right to, and capability for, personal autonomy in

7

choosing care options without the required involvement of a mental health professional." In other words, under the informed consent model, surgical intervention is an option if the patient deems it necessary—which is not the approach WPATH or I follow.

11. Despite her protracted discourse regarding informed consent, Dr. Boyd ultimately concludes that Mrs. Zayre-Brown understands her options, the risks and benefits, and the potential functionality and cosmesis (resulting appearance) of surgically reconstructed genitalia. However, she asserts (at p. 31 of her expert report) that Mrs. Zayre-Brown has less than realistic expectations regarding post-surgical care in prison. This is not an indication of Mrs. Zayre-Brown's naivete, but rather, it is indicative of Dr. Boyd's lack of knowledge of what vulvoplasty surgery entails. The post-surgical care for vulvoplasty is simple wound care that prisons regularly are and should be able to easily provide: cleaning, changing of dressings, and surveillance, as with any surgical procedure.

12. Dr. Boyd repeatedly asserts unsupported conclusions as to what I did or did not consider (as well as what Dr. Figler discussed with Mrs. Zayre-Brown). For example, Dr. Boyd criticizes me for not referencing Mrs. Zayre-Brown's medical records, "one of which was serious enough to send her to an emergency room." I reviewed and considered all of Mrs. Zayre-Brown's medical records. My report acknowledges the telltale suicidal ideation and thoughts of surgical self-treatment known to portend risk in incarcerated patients. In

conflict with Dr. Boyd's recognition of the seriousness of Mrs. Zayre-Brown's condition requiring that she go to the emergency room, Dr. Penn dismisses this same incident as inconsequential. This is but one example of the "Catch-22" paradox of defendants' expert rebuttals: They ignore Mrs. Zayre-Brown's acute distress, insisting she is stable, even though stability is one of the criteria for providing gender-affirming surgery. I have described in detail in my Expert Report my opinions regarding Mrs. Zayre-Brown and the bases for them, and Dr. Boyd's viewpoint in no way alters or diminishes my opinions and conclusions.

13. Dr. Boyd's assertion that Mrs. Zayre-Brown "would not derive the greatest psychological benefit from delivering the surgical intervention in the carceral setting" is nonsensical. If an individual requires treatment, provision of treatment will be therapeutic regardless of where the patient resides. Would Dr. Boyd similarly claim that a diabetic patient who requires insulin should forego that treatment while incarcerated to receive the greatest benefit?

14. The SOC 8 makes clear (at S106) the importance of not withholding surgical care:

> "(Transgender) people with Gender Dysphoria should have an appropriate treatment plan to provide medically necessary surgical treatments with similar elements to those who reside outside institutions (Brown 2009; Adams v. Federal Bureau of Prisons, No. 09-10272 [D. MO June 7, 2010]; Edmo v. Idaho Department of Corrections, 2020). The consequences of denial or lack of access to gender affirming surgeries for residents of institutions who cannot access such care outside of their institutions may be serious, including substantial worsening of gender dysphoria symptoms, depression, anxiety, suicidality, and

the possibility of surgical self-treatment (e.g., autocastration or autopenectomy; Brown, 2010, Maruri, 2011; Edmo v. Idaho Department of Corrections, 2020). It is not uncommon for residents of institutions to be denied access to evaluation for gender affirming surgery as well as denial of the treatment itself, even when medically necessary (Kosilek v. Massachusetts/Dennehy, 2012; Edmo v. Idaho Department of Corrections, 2020). The denial of medically necessary evaluations for, and the provision of, gender affirming surgical treatments and necessary aftercare is inappropriate and inconsistent with these Standards of Care."

The WPATH SOC promote the highest standards of health care for individuals, based on the best available science and expert professional consensus. All major medical professional associations endorse treatment in accordance with the WPATH SOC. Notably, neither Dr. Boyd nor Dr. Penn assert that Mrs. Zayre-Brown does not meet these standards.

15. Having worked with thousands of gender dysphoric patients since 1978, having followed hundreds of patients pre- and post-surgery, and having had access to follow up data on patients at hospitals where I have been on staff or provide consultation, I can attest that surgical removal of primary sex characteristics inconsistent with an individual's gender identity is medically necessary for some individuals and can be curative for gender dysphoria.

## REBUTTAL TO THE EXPERT REPORT OF DR. PENN

16. Like Dr. Boyd, Dr. Penn's report contains additional experiences he has not previously disclosed. Despite this amplification, there is no indication that Dr. Penn has ever evaluated and supported any incarcerated or non-incarcerated transgender person's need for surgical intervention, nor does

he state having provided referral letters to, or consulting with, surgeons regarding patient surgical procedures or collaborating in post-surgical care, as instructed in the NCCHC guidelines to which Dr. Penn provides a link.

17.    Dr. Penn's critique that I do "not work in correctional settings" is of no relevance, given that I have evaluated a large number of gender dysphoric prisoners in jails, state correctional facilities throughout the US, immigration detention centers, federal prisons, US. Army correctional facilities, and custodial facilities for the criminally insane. I also have been a consultant to carceral institutions developing or revising policies for the care of transgender prisoners. In addition, I am the author of the SOC 8 chapter on Institutionalized Persons and the Chair of the WPATH committee on Incarcerated Persons.

18.    Dr. Penn's prior declaration, submitted in opposition to Plaintiff's motion for a preliminary injunction, raised objections based on cost, security concerns, and post-surgical care. In his Expert Report, however, he appears to abandon those arguments, instead raising new issues in a kitchen-sink attempt to support his forgone conclusion.

19.    Dr. Penn asserts the flawed premise that the determination of medical necessity depends on whether a proposed treatment "is supported by rigorous scientific evidence." (Penn Expert Report, pp. 8, 33.)  In fact, less than one in ten medical treatments are supported by rigorous scientific research. In a sample of 1,567 interventions studied within Cochrane reviews, Journal of Clinical Epidemiology found 94% were not supported by rigorous scientific

evidence.[1] Despite a lack of strong evidence and based on national guidelines and clinical recommendation, surgeries such as rotator cuff repair and arthroscopic knee repair are routinely performed. Even vitamin D and aspirin lack what is referred to as "high quality" evidence. Dr. Penn's assertion that high levels of evidence must undergird medical recommendations completely discounts clinical judgment and is even in opposition to the NCCHC 2020 position statement on transgender healthcare advising reliance on "*clinical decision making* to initiate or advance hormone medication treatment or candidacy for surgical interventions" (emphasis added) and indicating that such decisions should be made on a case-by-case basis.[2] Providers have relied on their training and clinical judgment to provide case-by-case recommendations regarding medical treatment long before the GRADE assessment rating system was established and continue to do so.

20.    Ultimately, Dr. Penn belies his expertise in gender dysphoria treatment by his offensive and dismissive comparison of genital surgery to, among other things, the removal of a mole or droopy eyelids (Penn Expert Report, p. 26). This egregious lack of understanding of the seriousness of gender

---

[1] Howick, J., Koletski, D., Joannidis, J. et al., Most healthcare interventions tested in Cochrane Reviews are not effective according to high quality evidence: a systematic review and meta-analysis. *Journal of Clinical Epidemiology*, 148; 2022.

[2] https://www.ncchc.org/transgender-and-gender-diverse-health-care-in-correctional-settings-2020-2/, at p. 3.

dysphoria, the consequences of failure to treat the condition adequately, and the suffering of individuals afflicted, is a priori evidence of Dr. Penn's lack of meaningful experience with this population.

21.     Dr. Penn's assertion that the definition of medical necessity differs based on how a procedure is paid for or whether an individual is incarcerated (Penn Expert Report, pp. 21-23) is incorrect. The need for and efficacy of surgery is the same regardless of these factors.  Dr. Penn also is incorrect in the accusation (at p. 23 of his expert report) that the WPATH positions regarding medical necessity are "dismissive of the need of an individual evaluation of each patient" or the patient's informed consent, both of which the SOC require. Dr. Figler, Dr. Caraccio, Dr. Umesi, MSW Dula, and I all used the appropriate medical necessity criteria in reaching conclusions regarding the provision of gender-affirming surgery for Mrs. Zayre-Brown. As I have pointed out previously, Dr. Penn ignores the recommendations of these providers and their use of this criteria. Moreover, the Federal Bureau of Prisons and numerous state prisons also rely on these same criteria when implementing gender-affirming surgery.[3]

22.     Dr. Penn resorts to rhetorical strategy in criticizing my use of the descriptor "severe." This is a fatuous argument, given that this determination

---

[3] *See Iglesias v. Federal Bureau of Prisons*, 2021 WL 6112790, at *3 (S.D. Ill. Dec. 27, 2021); *Monroe v. Baldwin*, 424 F. Supp. 3d 526, 532-33 (S.D. Ill. 2019); *Edmo v. Idaho Dept. of Corrections*, 358 F. Supp. 3d 1103, 1115-16 (D. Idaho 2018); *Norsworthy v. Beard*, 87 F. Supp. 3d 1164, 1171-72, 1176 (N.D. Cal. 2015).

is common among those who evaluate and treat gender dysphoria (and some other conditions, as well). Brown, in <u>Autocastration and Autopenectomy as Surgical Self-Treatment in Incarcerated Persons with Gender Identity Disorder</u> writes: "With no other viable options, *severe gender dysphoria* in prisons that do not provide transgender health care may lead to desperate measures of self-treatment through permanent removal of the testes and/or penis in the absence of comorbid psychosis or substance use disorders" (italics added) (2010). Dr. Penn himself uses the term to describe Mrs. Zayre-Brown's condition as "not severe." A study of phenomenology of gender dysphoric patients published in Clinical Psychology Review found: "for some participants, this feeling of disgust towards their body led to suicidal thoughts or self-harm; individuals felt that death was preferable to continuing to live in their body." It is not surprising that clinicians would characterize these feelings as "severe."

23.   Dr. Penn's critique that my expert report rested on whether "the contemplated intervention could provide [only] some therapeutic benefit to the patient" (Penn Expert Report pp. 8, 25-26) is wrong. Instead, it rests on the seriousness of Mrs. Zayre-Brown's gender dysphoria, the failure of prior treatments to attenuate that gender dysphoria, and the utility of surgical treatment in achieving this outcome.

24.   It is troubling that Dr. Penn objects to treatment suggesting that there may be other stressors in prison. This is not justification for withholding treatment that will alleviate an existing condition regardless of those stressors

nor is it a justification for prolonging the suffering of Mrs. Zayre-Brown or other individuals with her condition.

25.     It is not true that "there was a lack of any clinical indication that without the vulvoplasty Plaintiff was at serious risk of some severe distress, harm, or disability." (Penn Expert Report, pp. 28-29). For example, in addition to my own clinical assessment of Mrs. Zayre-Brown and that of Drs. Figler, Carcaccio, Umesi, and MSW Dula (all of whom were chosen by the defendants in this lawsuit to evaluate and/or treat Mrs. Zayre-Brown), medical records indicate that in December 2020, Mrs. Zayre-Brown was hospitalized for a month, resulting from voicing suicidal ideation and a desire to amputate her penis. In April of 2021, Mrs. Zayre-Brown informed her DPS mental health provider that she had a band tied around her penis that had been in place for more than a week. Dr. Penn brushes aside these incidents because they are self-reported and did not result in genital injury or completed suicide. Would he similarly brush aside a patient who describes panic disorder because the behavior is self-reported, and the patient did not sustain bodily harm when the alleged attack caused sensations of chest pain and feelings of choking?

26.     Although Dr. Penn is correct in delineating the criteria for *diagnosing* gender dysphoria (i.e., clinically significant distress that impairs some aspect of functioning), there is no controversy regarding Mrs. Zayre-Brown's *diagnosis*. At issue is her current *treatment* requirements. Mrs. Zayre-Brown had a ligature strangulating the blood supply to the penis, in order to

facilitate amputation. Dr. Penn ignores this and other indicia of harm, instead asserting that Mrs. Zayre-Brown's harmonious family relations and her ability to work in the commissary are a priori evidence that her suffering is insignificant—a conclusion that cannot be justified.

27. Dr. Boyd's and Dr. Penn's critiques notwithstanding, it is my opinion that the benefit to Mrs. Zayre-Brown of undergoing gender-affirming surgery is great, and far outweighs the very minimal risk of surgery. Given the suffering she has experienced—an anguish known to intensify with age—it is medically necessary for her to undergo surgery now, rather than prolonging the suffering she experiences as a woman with detested male genitalia.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 26 day of July, 2023.

Dr. Randi Ettner, Ph.D.

17

# REFERENCES

Lehmann, K. & Leavey, G. Accuracy of psychometric tools in the assessment of personality in adolescents and adults requesting gender-affirming treatments: A systematic review. *European Psychiatry*, January, 2020.

Howick, J., Koletski, D., Joannidis, J. et al. Most healthcare interventions tested in Cochrane Reviews are not effective according to high quality evidence: a systematic review and meta-analysis. *Journal of Clinical Epidemiology*, 148; 2022.

Blom, A., Donovan, R., Beswick, A., et al. Common elective orthopedic procedures and their clinical effectiveness: umbrella review of level 1 evidence. *British Medical Journal*, July, 2021.

Keo-Meir, C. & Fitzgerald, K. Affirmative psychological testing and neurocognitive assessment with transgender adults. *Psychiatric Clinics of North America Journal*, 40(1): 2017.