IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| KANAUTICA ZAYRE-BROWN,<br><br>Plaintiff,<br><br>v.<br><br>THE NORTH CAROLINA DEPARTMENT OF ADULT CORRECTION, *et al.*,<br><br>Defendants. | No. 3:22-cv-00191-MOC-DCK |

## **BRIEF IN SUPPORT OF PLAINTIFF'S *DAUBERT* MOTION TO EXCLUDE THE TESTIMONY OF DR. SARA E. BOYD**

## **INTRODUCTION AND BACKGROUND**

This case is about an incarcerated patient's need for gender-affirming surgery to treat her gender dysphoria. Even though Defendants' own healthcare providers concluded that surgery was necessary for Plaintiff, Defendants—prison administrators with no expertise on the issue—refused that care.

In opposition to Plaintiff's motion for partial summary judgment, Defendants proffer the expert report of Dr. Sara E. Boyd.[1] She is a psychologist whose role in evaluating patients "is not to make determinations regarding whether a person should or should not receive a given intervention." (Doc. 65-1, Boyd Rep. at 5.)

---

[1] Defendants did not file any reports from their designated experts in support of their own motion for summary judgment.

1

Nevertheless, Dr. Boyd testifies that she found no "significant findings in [Plaintiff's] mental state that would counsel in favor of the surgery as an immediate intervention, to be conducted in a prison setting, from a psychological standpoint." (*Id.* at 3.)

Under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), Dr. Boyd is not qualified to opine on this issue. She has never evaluated a patient with gender dysphoria for the purpose of determining a need for gender-affirming surgery. Nor has she ever offered expert testimony on that issue or published on it. While Dr. Boyd may qualify as an expert in other cases about mental health care, she lacks expertise on the specific issue in *this* case—the necessity of gender-affirming genital surgery. Her opinion should therefore be excluded. *See Cooper v. Laboratory Corp. of America Holdings, Inc.*, 150 F.3d 376, 380 (4th Cir. 1998) ("a general knowledge of chemistry" and experience with breath alcohol testing did not qualify witness to opine on the "particular scientific field" of urine alcohol testing).

Dr. Boyd further opines that Plaintiff would likely receive better care outside of prison. That opinion is irrelevant. Plaintiff is no longer in prison, but a community transition center. Moreover, none of the claims or defenses in this case contain an element of whether Plaintiff could receive better care outside of prison. Indeed, *most* patients would probably fare better receiving medical care outside of prison. If this argument could defeat an Eighth Amendment claim, prison officials could avoid providing medically necessary care simply by running out the clock on a prisoner's sentence.

2

Dr. Boyd also critiques Plaintiff's expert, Dr. Randi Ettner, for her understanding of informed consent. But Dr. Boyd ultimately concludes that Plaintiff's ability to provide informed consent is "probably intact" and that she understands the potential risks and benefits of the procedure. (Ex. 1, Boyd Dep. 120:20; Boyd Rep. at 30-31.) Thus, this opinion is also irrelevant—it is an academic critique with no bearing on Plaintiff's claims. *See Kadel v. Folwell*, 620 F. Supp. 3d 339, 369 (M.D.N.C. 2022) (excluding opinion on informed consent for gender-affirming care when there was no "dispute that [plaintiff's father] was able to (and did) give informed consent").

Finally, Dr. Boyd opines that Dr. Ettner's views are flawed because psychologists should not opine on issues of medical necessity. (Boyd Rep. at 33-34.) Dr. Boyd offers minimal basis for this opinion. And her report does not account for the fact that, when it comes to gender-affirming surgery, psychologists like Dr. Ettner can and do make recommendations on medical necessity. This opinion therefore lacks a sufficient factual basis and is unreliable. *See Raynor v. G4S Secure Solutions (USA) Inc.,* 3:17-cv-00160-FDW-DSC, 2018 WL 662483, at *2 (W.D.N.C. 2018) (excluding Dr. Boyd's opinion because it was "not based on sufficient facts or data or a reliable principal or method").

For these reasons, Dr. Boyd's report and testimony should be excluded.

## LEGAL STANDARD

Federal Rule of Evidence 702 "permits an expert to testify where the expert's 'scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue,' so long as the expert's

opinion is 'based on sufficient facts or data,' 'is the product of reliable principles and methods,' and the expert 'has reliably applied the principles and methods to the facts of the case.'" *In re Lipitor (Atorvastatin Calcium) Mktg.*, 892 F.3d 624, 631 (4th Cir. 2018) (quoting Fed. R. Evid. 702). "Rule 702 thus imposes a special gatekeeping obligation on the trial judge to ensure that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Sardis v. Overhead Door Corporation*, 10 F.4th 268, 281 (4th Cir. 2021) (quotation omitted).

Rule 702 applies with full force on a motion for summary judgment even when a plaintiff seeks injunctive relief to be ruled on by the court. A court cannot resolve summary judgment based on material that "cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). Thus, when the evidence related to a material question of fact comes in the form of expert testimony, "the propriety of summary judgment hinges on whether [the] expert evidence is admissible" under Rule 702. *Rover Pipeline LLC v. Rover Tract No(s). WV-MA-ML-056.500-ROW & WV-MA-ML-056.500-ATWS*, No. 18 Civ. 68, 2021 WL 3424270, at *3 (N.D.W. Va. Aug. 5, 2021); *see also Kadel*, 620 F. Supp. 3d at 392-93 (excluding defense expert testimony and granting plaintiffs partial summary judgment on claims concerning gender-affirming care).

## ARGUMENT

**I. Dr. Boyd Is Not Qualified to Opine on the Necessity of Gender-Affirming Surgery Because She Has Never Evaluated a Patient for That Treatment, Published on the Subject, or Qualified as an Expert on the Subject.**

Dr. Boyd opines that she did not make "any significant findings in [Plaintiff's] mental state that would counsel in favor of the surgery as an immediate intervention, to be conducted in a prison setting, from a psychological standpoint." (Boyd Rep. at 34.) She is not qualified to offer this opinion, and so it should be excluded.

An expert is qualified if they have "specialized knowledge that will assist the trier of fact in understanding the evidence or determining a fact in issue, and is both reliable and relevant." *United States v. Young*, 916 F.3d 368, 379 (4th Cir. 2019). "[A] person may qualify to render expert testimony in any one of the five ways listed" by Rule 702: "knowledge, skill, experience, training, or education." *Kopf v. Skyrm*, 993 F.2d 374, 377 (4th Cir. 1993). However, the expert must be qualified to testify "on the issue for which the opinion is proffered." *Id.* (quotation omitted). "'[G]eneral knowledge,' skill, experience, training, or education is insufficient to qualify an expert, and an expert qualified in one field may be unqualified to testify in others." *Kadel*, 620 F. Supp. 3d at 360 (quoting *Cooper*, 150 F.3d at 380-81).

In *Cooper*, for example, "a general knowledge of chemistry" and experience with breath alcohol testing did not qualify a witness to opine on the "particular scientific field" of urine alcohol testing. *Id.* at 380. Similarly, in *Smith v. Wyeth-Ayerst Laby's Co.*, this Court considered the qualifications of physicians who testified on the relationship between appetite suppressants and primary pulmonary hypertension.

5

278 F. Supp. 2d 684, 697 (W.D.N.C. 2003). Most of the physicians were unqualified because, while they were "surely experts in their specialty areas," they "lack[ed] the specialized knowledge or experience" with the specific drugs at issue. *Id.* at 698.

*Kadel* is especially instructive as it concerned a challenge to a state ban on gender-affirming care. One witness was an experienced plastic surgeon and was "thus qualified to opine on the risks associated with surgery used to treat gender dysphoria" and other issues related specifically to surgery. 620 F. Supp. 3d at 368. But he was *not* qualified to opine on diagnosing gender dysphoria, "non-surgical treatments," or "the efficacy of randomized clinical trials, cohort studies, or other longitudinal, epidemiological, or statistical studies of gender dysphoria." *Id.* at 369. Similarly, an endocrinologist was qualified to opine on hormone therapy, but not "the risks associated with surgery or the standard of care used by surgeons for obtaining informed consent for surgery." *Id.* at 365.

Here, Dr. Boyd's report states the following concerning her qualifications:

> As a psychologist specializing in forensic mental health assessments, I have conducted more than 100 evaluations of incarcerated people housed in state and federal prisons and jails. In particular, I have conducted independent psychological evaluations related to gender-affirming care for incarcerated individuals. In that capacity, my role is to evaluate incarcerated individuals with respect to their capacity to provide informed consent to gender-affirming interventions, to describe the nature and severity of their Gender Dysphoria (if present), to offer recommendations with respect to gender-affirming interventions or building capacity to provide informed consent, and identify any co-occurring psychological disorders that may require more active management or integration into treatment planning for gender-affirming interventions.

6

(Boyd Rep. at 1-2.) Dr. Boyd does not make determinations about medical necessity (*id.* at 2), but does assess whether a treatment would be "psychologically beneficial" for a patient. (Ex. 1, Boyd Dep. 27, 82, 86.)

At her deposition, however, Dr. Boyd could not identify a single instance in her career "when she evaluated a patient with gender dysphoria and . . . made a recommendation that gender-affirming surgery either would or wouldn't confer a psychological benefit." (*Id.* 74:18-24, 75:2-7; *see also id.* 74:13-17 ("Nobody that I was working with was at the point where surgery was the next step.").) Dr. Boyd also confirmed that she has never testified as an expert on whether gender-affirming surgery would be psychologically beneficial. (*Id.* 59:18-25, 60:21-61:15). Nor has she conducted research or published any peer-reviewed articles on that subject or gender dysphoria more broadly. (*Id.* 19:2-6; Doc. 18-7 at 6-8 (CV listing publications and research).)

Nevertheless, Dr. Boyd testified that she has expertise in "evaluating patients with gender dysphoria for gender-affirming surgery." (Boyd Dep. 69:15-.) But when asked where that expertise comes from, Dr. Boyd could not identify any specific education, training, or experience. (*See id.* 70:18-72:18.)

Accordingly, Dr. Boyd is not qualified to opine on the necessity of gender-affirming surgery for Plaintiff. Experience in psychology and knowledge of gender dysphoria generally do not make Dr. Boyd an expert on the discrete issue before the Court. *See Cooper*, 150 F.3d at 386.

## II. Dr. Boyd's Opinion Concerning the Benefits of Treatment Outside of Prison Is Irrelevant.

Dr. Boyd agrees that gender-affirming surgery in prison would likely be psychologically beneficial for Plaintiff, and that "removing her phallus and having genital surgery would be necessary but not necessarily sufficient to cure her gender dysphoria." (Boyd Dep. 167:15-21, 181:18-23.) Dr. Boyd further opines, however, that Plaintiff "would not derive the greatest psychological benefit from delivering the surgical intervention in the carceral setting." (Boyd Rep. at 32.) She has concerns "about the quality of [mental health] care offered in the prison setting versus the community setting," as "[p]risons are inherently stressful environments." (Boyd Dep. 114:7-8.) This opinion is not relevant to any of the claims or defenses in this case.

An expert's opinion is only relevant if it has "a valid scientific connection to the pertinent inquiry." *Belville v. Ford Motor Co.*, 919 F.3d 224, 232 (4th Cir. 2019) (quoting *Daubert*, 509 U.S. at 592). "This ensures that the expert helps the trier of fact to understand the evidence or to determine a fact in issue. Simply put, if an opinion is not relevant to a fact at issue, *Daubert* requires that it be excluded." *Sardis*, 10 F.4th at 281 (quotation marks and citation omitted).

As an initial matter, while Plaintiff is still in DAC custody, she is no longer in prison. Plaintiff now lives in a community transition center in Charlotte. (Doc. 62-24 ¶¶ 1, 4.) Thus, even if Dr. Boyd's concerns about the prison environment were relevant at some point, they are not relevant now.

More fundamentally, the Supreme Court and Fourth Circuit have never held that prison officials may deny medical care simply because a prisoner would

8

eventually be released and might obtain better care outside of prison. To the contrary, delaying necessary care violates the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (holding that "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed" may show deliberate indifference (footnote omitted)); *Smith v. Smith*, 589 F.3d 736, 739 (4th Cir. 2009) (same); *see also Mitchell v. Kallas,* 895 F.3d 492, 496 (7th Cir. 2018) ("Prison staff cannot bide their time and wait for an inmate's sentence to expire before providing necessary treatment.").

To be clear, no one disputes that a patient might obtain higher quality health care, or enjoy greater benefits from health care, outside of prison. But that does not excuse state officials from providing necessary treatment to someone in their custody. Otherwise, unless a prisoner has a life sentence, prison officials could simply point to an upcoming release date—and the possibility of better medical care—to avoid their constitutional obligations.

The same principle applies to Plaintiff's disability discrimination claims. Defendants have an obligation to provide reasonable accommodations for disabilities such as gender dysphoria and to refrain from withholding services because of disability. *See Williams v. Kincaid*, 45 F.4th 759, 771 (4th Cir. 2022), *cert. denied*, 143 S. Ct. 2414 (2023). Whether Plaintiff might obtain *better* accommodations when she is released over a year from now has nothing to do with this inquiry.

Accordingly, Dr. Boyd's opinion that Plaintiff "would not derive the greatest psychological benefit from delivering the surgical intervention in the carceral setting"

9

is irrelevant to her claims—it would not help the factfinder determine any facts at issue. This opinion should be excluded.

**III. Dr. Boyd's Critiques of Dr. Ettner Are Irrelevant.**

One of Plaintiff's expert witnesses is Dr. Randi Ettner, a specialist in gender-affirming care. Dr. Boyd critiques Dr. Ettner's understanding of informed consent. (Boyd Rep. at 6-10.) Ultimately, however, Dr. Boyd found that Plaintiff understood her treatment options well:

> She was able to articulate the pros and cons of each procedure, including considerations related to her options for an additional surgery later should she opt for vulvoplasty now. We discussed personal and sexual functioning considerations, and it appeared that she had a general understanding of her options and the associated risks and potential benefits. She did not report distorted expectancies regarding surgical outcomes, and she also had a fairly balanced view of the surgery's effects on both her self-concept as well are how she is likely to be perceived and treated in her close relationships.

(*Id.* at 30-31.)

Dr. Boyd confirmed this at deposition: "I don't believe [Plaintiff's] capacity to provide informed consent was significantly compromised at the time of my evaluation of her so her capacity to provide informed consent to most surgical procedures at this point, I think, is probably intact." (Boyd Dep. 120:15-20.) And Dr. Boyd is not offering an opinion as to whether Plaintiff actually provided consent to any of her providers at UNC who recommended surgery. (*See id.* at 121:20-122:2; Boyd Rep. at 30-31.)

Once again, *Kadel* is instructive. In that case, a defense expert opined that a plaintiff could not provide informed consent, but agreed that the plaintiff's "father

10

was able to (and did) give informed consent" on the plaintiff's behalf. 620 F. Supp. 3d at 368. The court therefore excluded that testimony as irrelevant. *Id.* Here, no one disputes that Plaintiff can provide informed consent for gender-affirming surgery. And Dr. Figler has provided a declaration confirming that Plaintiff did in fact provide informed consent for gender-affirming genital surgery. (Doc. 62-17, Figler Decl. ¶14.) Dr. Boyd's critique of Dr. Ettner is therefore irrelevant.

Dr. Boyd also writes that "Dr. Ettner's report lacks meaningful discussion of Mrs. Zayre-Brown's historical and current expectancies, which is striking considering the assertion that the intervention would be curative." (Boyd Rep. at 34.) Plaintiff disagrees. But even if this critique has merit, Dr. Boyd agrees that gender-affirming surgery is "necessary" to cure Plaintiff's gender dysphoria, even if other treatments are also necessary to cure the condition. (Boyd Dep. 167:15-19.) And treatment may be medically or psychologically necessary—and therefore constitutionally necessary—even if standing alone it would not be curative. *See Bowring v. Godwin*, 551 F.2d 44, 47 (4th Cir. 1977) (prisoners have right to treatment when serious condition "is curable or may be substantially alleviated" and delay would create potential for harm).

### IV. Dr. Boyd's Opinion That Psychologists Should Not Opine on Medical Necessity Is Not Based on Sufficient Facts and Is Not Reliable.

Dr. Boyd opines that "[a] psychologist" like Dr. Ettner "who lacks formal medical education and training should not offer medical opinions (*e.g.*, medical necessity) or state that their opinions are reliable and valid to a reasonable degree

11

of medical certainty." (Boyd Rep. at 33.) This opinion is not based on sufficient facts or data and is not reliable.

Rule 702(b) requires that an expert's testimony be "based on sufficient facts or data[.]" "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). In the same vein, an expert's opinion must also be reliable. "A reliable expert opinion must be based on scientific, technical, or other specialized *knowledge* and not on belief or speculation, and inferences must be derived using scientific or other valid methods." *Oglesby v. General Motors Corp.*, 190 F.3d 244, 250 (4th Cir. 1999). This Court has previously found Dr. Boyd's testimony to fall short of these requirements. *Raynor*, 2018 WL 662483, at *2.

Here, Dr. Boyd opines that psychologists should not make determinations on medical necessity. Her basis for this opinion is a single sentence: "I know other psychologists, like Dr. Ettner and I, who also perform similar evaluations related to gender-affirming care for transgender and gender non-conforming individuals, and in my experience, it would not be typical for them offer medical opinions." (Boyd Rep. at 5.) At deposition, when asked who these "other psychologists" are, Dr. Boyd named three individuals who she believed generally do not offer medical opinions. (Boyd Dep. at 89:11-90:20.) Dr. Boyd also made a passing reference to "authoritative

12

texts" that supported her view, but she could not recall the specifics of what they said. (*Id.* 91:1-92:18.)

Dr. Boyd appears unaware that psychologists like Dr. Ettner can and do regularly make determinations on medical necessity for gender-affirming care. Gender dysphoria is a condition where surgery may be necessary to ameliorate psychological suffering. (Doc. 68-1, Ettner Reb. Rep. ¶¶7, 8.) The WPATH SOC expressly authorize "mental health professionals" to recommend surgery. (Doc. 62-4 at 33.) And multiple federal courts have relied on Dr. Ettner when considering the medical necessity of gender-affirming care. *See, e.g., Edmo v. Corizon, Inc.,* 935 F.3d 757, 788 (9th Cir. 2019) ("Dr. Ettner . . . [is] well-qualified to opine on the medical necessity of [gender-affirming surgery.]"); *C.P. by and through Pritchard v. Blue Cross Blue Shield of Illinois,* 2022 WL 17092846 (W.D. Wash. Nov. 21, 2022) (qualifying Ettner as "an expert to testify about the medical necessity of gender-affirming care"); *Norsworthy v. Beard,* 87 F. Supp. 3d 1164, 1187-88, 1190, 1192 (2015) (relying on Ettner in granting a preliminary injunction requiring prison officials to provide gender-affirming surgery).

Thus, Dr. Boyd offers minimal facts or data for her sweeping assertion about what psychologists should and should not do. "[T]here is simply too great an analytical gap between the data and the opinion proffered." *General Elec. Co.*, 522 U.S. at 146. This opinion should be excluded for lack of sufficient facts or data.

Dr. Boyd's opinion is unreliable for similar reasons. She does not base her opinion on rules, norms, or guidelines that govern her profession. Nor does she base

13

the opinion on her own specialized knowledge. Instead, Dr. Boyd bases her opinion on what she thinks a handful of other providers probably do. That is "belief or speculation," not the kind of specialized knowledge required to establish reliability. *Oglesby*, 190 F.3d at 250. Her opinion should be excluded on this basis as well.

## CONCLUSION

The Court should exclude Dr. Boyd's report and testimony.

Respectfully submitted, this the 26th day of October, 2023.

*/s/ Jaclyn A. Maffetore*
Jaclyn A. Maffetore
NC Bar No. 50849
Daniel K. Siegel
NC Bar No. 46397
Michele Delgado
NC Bar No. 50661
ACLU OF NORTH CAROLINA
LEGAL FOUNDATION
jmaffetore@acluofnc.org
dsiegel@acluofnc.org
mdelgado@acluofnc.org

Christopher A. Brook
NC Bar No. 33838
PATTERSON HARKAVY LLP
cbrook@pathlaw.com

Jon W. Davidson*
(admitted only in California)
L. Nowlin-Sohl*
(admitted only in Washington)
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
jondavidson@aclu.org
lnowlin-sohl@aclu.org

*admitted *pro hac vice*

*Counsel for Plaintiff*

14

## CERTIFICATE OF SERVICE

I certify that on October 26, 2023, I electronically filed the foregoing document using the ECF system which will send notification of such filing to all counsel of record.

/s/ *Jaclyn A. Maffetore*
Jaclyn A. Maffetore
American Civil Liberties Union of
North Carolina Legal Foundation
P.O. Box 28004
Raleigh, NC 27611
Tel: (919) 256-5891
Fax: (919) 869-2075
jmaffetore@acluofnc.org