EXHIBIT 1

UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF NORTH CAROLINA

CHARLOTTE DIVISION

Case No. 3:22-cv-0191

KANAUTICA ZAYRE-BROWN,          )

                                )

Plaintiff,                      )

                                )

v.                              )

                                )

THE NORTH CAROLINA              )

DEPARTMENT OF PUBLIC            )

SAFETY, et al.,                 )

                                )

Defendants.                     )


Deposition of FAN LI, Ph.D.

(Taken by the Plaintiff)

Raleigh, North Carolina

Friday, August 11, 2023


Reported by:    Marisa Munoz-Vourakis -

                RMR, CRR and Notary Public

1

```
 1   APPEARANCE OF COUNSEL:

 2   For the Plaintiff:

 3           LI NOWLIN-SOHL, ESQ. (By Zoom)

 4           American Civil Liberties Union

 5           125 Broad Street, 18th Floor

 6           New York, NY 10004

 7           212-519-7887

 8           lnowlin-sohl@aclu.org

 9                       -and-

10           JACLYN MAFFETORE, ESQ.

11           American Civil Liberties Union

12           3801 Barrett Drive

13           Raleigh, NC 27609

14           jmaffetore@acluofnc.org

15

16   For the Defendants:

17           ORLANDO RODRIGUEZ, ESQ.

18           North Carolina Department of Justice

19           114 W. Edenton Street

20           Raleigh, NC 27603

21           919-716-6516

22           orodriguez@ncdoj.gov

23

24

25
```

2

1

2                              o0o

3

4

5              Deposition of FAN LI, taken by the

6   Plaintiff, at North Carolina Department of Justice, 114 W.

7   Edenton Street, Raleigh, North Carolina, on the 11th day

8   of August, 2023 at 10:12 a.m., before Marisa

9   Munoz-Vourakis, Registered Merit Reporter, Certified

10  Realtime Reporter and Notary Public.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                              3

1                          I N D E X

2    Examination of:                                    Page

3        FAN LI, Ph.D.

4            EXAMINATION BY MS. NOWLIN-SOHL . . . . . . 5

5                    DEPOSITION EXHIBITS

6    EXHIBIT NUMBER            DESCRIPTION        PAGE

7    Exhibit 1    Expert Report                    10

8    Exhibit 2    Dr. Antommaria's Rebuttal        48
                  Report
9

     Exhibit 3    GRADE Guidelines Article         89
10

     Exhibit 4    Pediatric Obesity Article        94
11

     Exhibit 5    Lindqvist study                  111
12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                          4

1                    P R O C E E D I N G S

2          Whereupon,  FAN LI, having

3          been first duly sworn, was examined

4          and testified as follows:

5                    EXAMINATION BY COUNSEL FOR PLAINTIFF

6                    BY MS. NOWLIN-SOHL:

7          Q.     Hi, good morning, Dr. Li.  My name is Li

8    Nowlin-Sohl.  I use she/her pronouns.  I am an attorney

9    with the ALCU.

10                   Would you mind stating your full name for

11   the record, please?

12         A.     My full name is Fan Li.

13         Q.     Can you spell that?

14         A.     F-A-N, that's first name.  Last name is

15   L-I, Li, happen to be your first name.

16         Q.     Yes.  Have you been deposed before, Dr. Li?

17         A.     Ten years ago.  So I think by the record is

18   like five years.  No, I haven't been deposed in five

19   years, but I was deposed ten years ago once.

20         Q.     Okay.  And what was that in relation to?

21         A.     Sorry?

22         Q.     What was that deposition for?

23         A.     Oh, that was for litigation, litigation for

24   Monsanto vs. a school.  It's so long time ago, I forgot

25   the details.

5

1      Q.      Okay.  Were you an expert witness in that

2   case?

3      A.      Yes, I was.

4      Q.      Okay.  And what were you providing

5   testimony about?

6      A.      Some statistical methods, statistics and

7   using the data that they provided.

8      Q.      Okay.  And did that case have anything to

9   do with transgender people or gender dysphoria?

10      A.      No.

11      Q.      So I'm going to go over some of the ground

12   rules about depositions, just because it's been a while

13   since you had one of these.

14              As the court reporter said, you are under

15   oath, and it's much better if you can answer my

16   questions verbally.  And it's important that we don't

17   talk over each other, and I don't anticipate any

18   issues, just to let everyone know about that.

19              Is there any reason why you are not able to

20   testify truthfully today?

21      A.      No.

22      Q.      Okay.  How did you prepare for this

23   deposition?

24      A.      Oh, I talked to Orlando, talked to him for

25   like one hour before yesterday, and we talked last

6

1   week.  And then I read through my report and, yeah,

2   that's how I, how I prepared.

3        Q.    Okay.  Did you discuss anything about this

4   deposition with anyone else?

5        A.    No.

6        Q.    And you mentioned reviewing your report.

7   Did you review any other documents?

8        A.    Oh, I also reviewed the rebuttal report,

9   the rebuttal that was sent to me on Monday, and what

10  else?  I think -- oh, yeah, of course in preparing my

11  documents, my report, I reviewed 80-some papers, that's

12  the bulk, of course, of my work, the bulk of the report

13  is about.  So I reviewed those documents.  And, of

14  course, Dr. Aetna's report and also WPATH, but not all

15  of it, because I focus on the, you know, the assertions

16  that Orlando pointed out to me.

17            So that's all the documents I have

18  reviewed.

19       Q.    And you mentioned the rebuttal report.  Do

20  you know whose rebuttal report that was?

21       A.    Oh, the name is long Dr. Antommaria.

22       Q.    Okay.  Did you also review Dr. Ettner's

23  rebuttal report?

24       A.    I reviewed very quickly, but it seems that

25  she didn't like that report, didn't really directly

7

1    counter my arguments.  So I just very quickly went

2    through that.

3         Q.    Any other documents that you reviewed to

4    prepare for this deposition?

5         A.    No.

6         Q.    Okay.  Did you conduct any additional

7    research to prepare for this?

8         A.    No.

9         Q.    Since you submitted your expert report?

10        A.    No.

11        Q.    So you mentioned that Monsanto case that

12   you were an expert in.  Have you been retained as an

13   expert in any other cases?

14        A.    Yes.  Currently there's another case at

15   NCDOJ, but that is, again, I mean, I'm still preparing

16   my report.

17        Q.    Who is the case for?  I missed that, I'm

18   sorry.

19        A.    I think it is -- I don't even know much

20   about the exact name.  It's about NC -- NJA, it's North

21   Carolina.  It's basically a prisoner talking about the

22   race versus the -- whether race is a part of the

23   division in the division of the legal procedure, and

24   then I would need to determine that whether race or use

25   data to determine that whether race is used as a

8

1    factor, whether it's a causal factor or whatever factor

2    in the legal decision.

3          Q.    Did that case have anything to do with

4    transgender people or gender dysphoria?

5          A.    No.

6          Q.    Are you currently serving as an expert in

7    any other matters?

8          A.    No.

9          Q.    And so other than the Monsanto case, this

10   case and that other one you just mentioned, are you --

11   have you ever served as an expert in another case?

12         A.    No.  Oh, I think I did.  That was long time

13   ago.  I wasn't even deposed.  That was over ten years

14   ago in another case.  It's technology.  It's about,

15   yeah, talking about -- it's a tech.  I don't even know

16   the exact name of the case, but that was a tech, yeah,

17   it's very -- that was very, all about numbers and

18   substantive methods.

19         Q.    Okay.  Any other?

20         A.    No.

21         Q.    Have you ever served as an expert in a

22   case, other than this one, that relates to medical

23   care?

24         A.    No.

25         Q.    Have you ever served as an expert in a

                                                              9

1  case, other than this one, that relates to gender

2  dysphoria or transgender people?

3      A.    No.

4      Q.    And you've never published on the topics of

5  gender dysphoria or transgender people, correct?

6      A.    Correct.

7      Q.    And you've never published on the topic of

8  gender affirming surgery?

9      A.    Correct, I never.

10      Q.    Okay.  I'm going to mark as Exhibit 1 your

11  expert report in this case.

12            (The document referred to was marked

13        Deposition Exhibit Number 1 for

14        identification.)

15        MS. MAFFETORE:  I am marking, just

16    because of awkward room setup, so here's the

17    one for the witness.

18        MR. RODRIGUEZ:  This would be for you.

19      Q.    Dr. Li, did you submit an expert report in

20  this case in Brown v. North Carolina DPS?

21      A.    Yeah, I submitted report.  So what is the

22  question?  Sorry, yeah, I submitted report, but is that

23  the question?

24      Q.    That was the question, yes.

25      A.    Oh, okay.

10

1          Q.      And my next question is, is this your

2     expert report?

3          A.      Yes, this is.

4          Q.      Okay.  And how did you come to be retained

5     as an expert in this matter?

6          A.      Oh, well, I was just one day I got a call

7     from -- well, actually Orlando emailed me and somehow

8     it went into spam and then took a while, and then he

9     called me, and then we talk about the case, and I

10    realized after I heard what he -- the background and

11    what he wanted, the opinion about, and I realized this

12    is my expertise.  So I said yes.

13         Q.      Okay.  And what did you do to prepare this

14    report?

15         A.      Oh, again, so Orlando gave me WPATH and

16    Dr. Ettner's, the report, and then he also gave me the

17    specific, the assertions that he picked out from the

18    WPATH and Dr. Ettner's report, and then asked me to

19    review the body of literature that was cited on

20    those -- by WPATH and Dr. Ettner, so asked me to review

21    that.

22                 So that's how I -- and then I went to

23    review the documents and that's how I prepared this, my

24    report.

25         Q.      Had you reviewed the WPATH, and by WPATH

                                                              11

1    are you referring to the WPATH standards of care needs?

2        A.    I believe so.

3        Q.    Have you reviewed that document before

4    Orlando gave it to you?

5        A.    No, I wasn't even aware of that document.

6        Q.    Okay.  And did anyone help you prepare this

7    report?

8        A.    No.

9        Q.    Did you discuss it with anyone, other than

10   counsel, in this case?

11       A.    No.

12       Q.    So you mentioned that Orlando gave you

13   these documents and kind of pointed you to the specific

14   assertions that are included in your report.  You

15   looked at those studies.  Is there anything else that

16   you did to prepare this report?  Did you look at any

17   other studies?  Any other literature?

18       A.    No, I didn't.

19       Q.    Okay.  Are you aware of any inaccuracies in

20   your report?

21       A.    Oh, I actually yesterday found two typos,

22   so I don't know whether that's called an inaccuracy,

23   but that's typos.

24             So let me -- one I think is page 5, page 5

25   on top, so B.  And so the first paragraph it say:  The

                                                          12

1   statistical methodology for quality of life belongs to

2   the, blah, blah.  So it's not for quality of life.

3   What I meant is for comparative effectiveness research.

4   So that was a typo, probably copy, paste wrong there.

5                So that was the first I noticed yesterday

6   when I reviewed.

7                The second one was on page 6, the bullet 2,

8   it say:  Types of biases in causal -- it should be

9   causal inference, not causal interference.  So that's a

10  typo.  That's probably Microsoft, maybe Word, just auto

11  corrected or whatever.  But that's a typo, yeah, yeah.

12               So other than that, I'm pretty sure there

13  are typos somewhere, but in terms of my opinion, the

14  bulk of my opinion, it's all accurate.  It's an

15  accurate reflection of my opinion.

16       Q.    Okay.  And then other than the typos that

17  you just flagged, is there anything about your report

18  that you'd like to amend or correct?

19       A.    Not at this point.

20       Q.    Okay.  Would you like to change any of your

21  opinions expressed in the report?

22       A.    No.

23       Q.    And are there any documents and materials

24  that you relied on that are not cited in the report?

25       A.    No.

13

1      Q.      Okay.  And does this report contain a

2  complete statement of the opinions you intend to

3  provide in this litigation?

4      A.      Yes.

5      Q.      Do you know what gender dysphoria is?

6      A.      Well, I think from the papers, I'm not

7  expert on that, from the papers, I reviewed it, yeah,

8  it's like someone has -- feel that his or her gender is

9  disaligned with his sex at born -- I guess, I mean,

10  that's how I understand it.  Again, I didn't do any

11  research on that.  And to me that is just one type of

12  outcome that we're dealing with.  I'm using the

13  terminology in my field.  It's just the one type of

14  symptom or outcome.  It's a variable to me.  Variable,

15  again, it's a statistical terminology.

16          So, yeah, that's all I know about gender

17  dysphoria.

18      Q.      Okay.  And so are you familiar with what

19  the DSM is?

20      A.      DSM?  Oh, yeah, DSM, I say again before

21  when I was a research assistant, it's a type of, I

22  believe it's a mental health or, you know,

23  psychological disease.  It's a code for that.

24      Q.      The Diagnostic and Statistical Manual, and

25  you said it's to diagnose certain conditions?

14

1        A.      Yes.

2        Q.      Are you aware that gender dysphoria is a

3    condition in the DSM?

4        A.      I didn't know until now you tell me.

5        Q.      Okay.  And so it's defined as the

6    psychological distress that results from an

7    incongruence between one's sex assigned at birth and

8    one's gender identity.

9                Is that consistent with your understanding

10   of what gender dysphoria is?

11       A.      Yes.

12       Q.      Now, I'd like to look at the CV that's

13   included as Appendix A in your report.  It's roughly

14   around page 27, I think.

15       A.      Page 27?

16       Q.      It's not numbered, but it's about a third

17   of the way through.

18       A.      Oh, I see.  I see.  Oh, yes, my CV, yes.  I

19   know my CV.  Go ahead.

20       Q.      And so I just want to walk through this a

21   little bit.

22               So it looks like you got a bachelor's in

23   science in 2001, is that accurate?

24       A.      Yes.

25       Q.      Okay.  And then you got a Ph.D. in 2006.

                                                          15

1   What is your Ph.D. in?

2        A.    Biostatistics.

3        Q.    And what is Biostatistics?

4        A.    So that's basically a branch of statistics,

5   kind of use statistics as a methodology or a theory to

6   solve problems, particularly in bioscience or health

7   studies, you know, medicine.  But it is, can also be

8   theoretical, but it's just a branch of statistics.

9        Q.    It is not a medical degree?

10       A.    It's not.

11       Q.    Okay.  Do you have a medical degree?

12       A.    I don't.

13       Q.    Okay.  Do you have any other degree that

14  would qualify you to provide healthcare to patients?

15       A.    No.

16       Q.    Do you have any degrees related to mental

17  health?

18       A.    No.

19       Q.    And I see that you had a post doc between

20  2006 and 2008.  What was that post doc?

21       A.    Oh, it was in the department of healthcare

22  policy, but it's really in statistics, because my

23  mentor, he was -- he is a statistician, but he works at

24  the healthcare policy.  So I just work there, and yeah.

25       Q.    Okay.  And so as part of that post doc, you

16

1  were doing statistics?

2       A.     Yes.

3       Q.     And not any sort of medical care?

4       A.     Yeah, I mean, most of the data from medical

5  care, yeah.  Sometimes we also work on like social

6  science, but, yeah, but the department was healthcare

7  policy, but I was doing statistics.

8       Q.     Were you involved in creating healthcare

9  policy?

10      A.     No.  I'm not important enough.  I was not

11  important enough.

12      Q.     Okay.  And so as part of your formal

13  education, have you ever taken any courses regarding

14  transgender people or gender dysphoria?

15      A.     No.

16      Q.     Have you ever taken any continuing

17  education classes regarding transgender people or

18  gender dysphoria?

19      A.     No.

20      Q.     Have you ever attended any presentations

21  about transgender people or gender dysphoria?

22      A.     No.

23      Q.     Have you ever conducted any research

24  concerning transgender people or gender dysphoria?

25      A.     No.

17

1        Q.    And do you have any other educational

2   training that I may be missing related to transgender

3   people or gender dysphoria?

4        A.    No.

5        Q.    And have you ever been a reviewer for any

6   academic journals with regard to issues relating to

7   transgender people or gender dysphoria?

8        A.    No.

9        Q.    So after your post doc, it looks like you

10  became an assistant professor at Duke, is that correct?

11       A.    Yes.

12       Q.    Okay.  And so -- and you've been at Duke

13  since then?

14       A.    Yes.

15       Q.    And so in layperson's terms, what do you do

16  for work?

17       A.    Oh, okay.  So I teach, and I also do

18  research.  That's kind of -- well, supposedly 50/50,

19  but I spend more time on research, and I also advise

20  Ph.D. students.

21             And thus -- oh, and also in my research, I

22  do statistical theory, but I also collaborate with

23  medical doctors, sometimes social scientists or

24  economists, again, on statistics or substantive field,

25  and, yeah, that's more or less what I do; teaching,

18

1   research, mentoring and, of course, service to the

2   community, again, to the academic community.  Like I

3   have been the editor, associate editor and editor for

4   multiple journals, including, for example, JAMA, like

5   also review papers for my own field statistics but also

6   for like medical field.  Like so I review for JAMA,

7   JAMA Cardiology, that kind of thing.

8        Q.     You mentioned you reviewed for JAMA.  What

9   does that entail?

10       A.     Oh, Journal of American -- Journal for

11  Medical Association of America, JAMA, Journal of

12  Association --

13       Q.     You don't have to define the acronym.

14       A.     No, it just a top medical journal.  It's a

15  top medical journal.  The other one is New England

16  Journal of Medicine.  I assume people know JAMA.  It's

17  just a top medical journal.

18       Q.     I'm familiar with JAMA.  I'm just curious

19  what your role is as a reviewer.  What do you do?

20       A.     So I usually serve as a statistical

21  reviewer.  So sometimes they have papers, so that they

22  want the editor or the AE want a statistical expert to

23  review the statistical method, the rigor of statistical

24  methodology analysis in the paper.  I'm not like in

25  charge of judging the clinical side of things, but

19

1   purely judging the rigor of the statistical

2   methodology.  So that's what I do.

3        Q.    And so looking at your CV, what's the

4   difference between an assistant professor, an associate

5   professor and a professor?

6        A.    Oh, just get more senior.  Paid more I

7   guess.  So -- and most universities when you assist --

8   this is the so-called tenure track position.

9              So when I assistant professor, you are on

10  the tenured track but you don't get tenured.

11             So at associate level you get tenured.

12  Basically they cannot fire you for, without reason, and

13  then full professor you get more senior.  Yeah, you get

14  paid more, and you are more senior.

15       Q.    And so in all of those roles, were you

16  teaching, doing research and advising Ph.D. students?

17       A.    Yes.  Yeah.

18       Q.    And what do you teach?

19       A.    Oh, I teach -- so I teach -- so a range of

20  classes, but like statistics, and, well, they are all

21  statistics, but they are different.

22             If you go to the -- further down my CV, I

23  list the classes I teach.  So I don't want to bother

24  you with this jargon.  So I teach probabilities,

25  statistical engineering, design and analysis of causal

20

1    studies, but because my research expertise is causal

2    inference, so I teach a lot of -- many classes in

3    causal interference, like specialized.  For example,

4    causal inference, I've been teaching almost every year

5    different versions of that.

6              So yeah, it's generally statistics.

7         Q.    And you say generally, are there any

8    classes that you teach that are not statistics?

9         A.    Oh, no, because I only know statistics.  I

10   don't have the expertise to teach topics not

11   statistics.

12        Q.    Okay.  And what is your role with the Duke

13   Clinical Research Institute?

14        A.    Oh, so it's, yeah, so it's like I am

15   affiliated.  So it's like when they have -- so how it

16   works is so they have projects or trials or studies,

17   observational study or clinical trials, and then

18   basically all of those studies they need statistics.

19   So they always need statistics experts.  So, of course,

20   they, you know, because I'm Duke faculty, so I have

21   natural connection at the people at the Duke Clinical

22   Research Institute.  And so they come to me, so when

23   they have projects, and I am on their projects, and I

24   provide statistical analysis or methodology guidance

25   for them.  So that's how I work with them.

                                                        21

1      Q.     And so are you involved at all in the

2  stages of a study from kind of in the preplanning, in

3  the post analysis and also the execution of the study?

4      A.     It depends.  So sometimes they come to me

5  when the study is already, like the data collection is

6  already done.  Then the data is messy.  Then they come

7  to me.  So that's -- sometimes it's like that.

8            And sometimes, sometimes it's like at the

9  beginning of the, even at the early planning stage,

10  like they want to write a grant to get money to get

11  funded for that study, so they need a priority

12  analysis, and they come to me.

13            So it highly depends on the specific

14  project or study, so I --

15      Q.     Okay.

16      A.     Yeah.

17      Q.     And you mentioned that you -- well, sorry

18  let me rephrase that.

19            So the institute conducts randomized

20  control studies and observational studies?

21      A.     Yes.  Well, again, it depends on the

22  specific project.  Yes, sometimes it's randomized

23  study.  Sometimes it's observational study.  Yeah, it's

24  individual investigators.  They write proposals and get

25  funded.  Once you get funded, you do the study.  So

                                                      22

1    it's a wider range of things.

2         Q.    And have you assisted with both types of

3    those studies?

4         A.    Yes.

5         Q.    Okay.  And I think we covered this a little

6    bit, but just to be clear, do you practice medicine?

7         A.    No.

8         Q.    Do you see patients?

9         A.    No.

10        Q.    Okay.  Do you know what a clinical practice

11   guideline is?

12        A.    No.

13        Q.    No, okay.  Have you ever been involved in

14   the development of one?

15        A.    No.

16        Q.    So going back to your CV on page 8 of the

17   CV, there are same grants listed.  Can you tell me just

18   a little bit about that first grant?

19        A.    Oh, the Innovative Biostatistical Methods

20   for Analysis and Assessment of Clinical Trials

21   Augmented by Real World Data, yeah, so this is funded

22   by the Burroughs Wellcome Fund Innovation.  So it's

23   a -- so it's funded by a private foundation, and this

24   is to study, again, to develop statistical methods for

25   clinical trials.  Well, it's basically --

                                                          23

1          Okay.  So what this study is proposed to do

2     is try to use real world data, real world data means

3     like observational study or the historical data,

4     historical clinical trial or current like electronic

5     health record, use that data to combine that data, this

6     clinical trial data, and that is, yeah, so there are a

7     lot of challenges, methodology challenges there, and

8     then that's what this grant is supposed to do to

9     develop those methods.

10         Q.    Okay.  So it's about finding methods to be

11    able to use that real world data?

12         A.    Well, combination, basically clinical

13    trials.  Like you can have clinical trials.  You can

14    also have external data.  How do you properly combine

15    them?

16         Q.    Okay.  And can you tell me about the second

17    grant that is listed?

18         A.    Oh, the second one, that's a funny one.  So

19    the second one is this Covid-19 Enhancement.  So this

20    actually is better to read it.  So second and fourth

21    actually kind of connected.

22              So the fourth one is my, again, I'm just --

23    I'm not the primary investigator there.  So if you look

24    at that it's called Co-I, it's a coinvestigator.

25              So the number four, that was the kind of

                                                        24

1    the mother grant with my collaborator Laine Thomas got

2    the grant from PCORI.  PCORI stand for Patient Centered

3    Outcome Reference Institute.

4            So that was the primary grant, and then

5    when Covid-19 hit, the agency had more money, and so

6    then we asked, like we basically ask for supplement to

7    do additional methodology work.  So that's why you have

8    this number two.  So that's actually just, again, a

9    supplement of the grant number four.

10   Q.    Okay.  And at a very high level, what was

11   grant number four?

12   A.    Oh, again --

13   Q.    What was the goal?

14   A.    The goal is try to develop statistical

15   methods to improve the design and the conduct of the

16   observational study, particularly this type of subgroup

17   analysis.  So high level is the observational study, so

18   the methodology and the design and the methodology.

19   There are challenges, and we propose new methods to

20   solve those challenges.

21   Q.    Okay.  So going back to the substance of

22   your report, can you summarize your conclusion in your

23   report for me?

24   A.    Absolutely.  Give me a minute.

25            So I will just read it.

25

1    Q.    Actually, I don't want you to read it.  Can

2    you summarize it for me?

3    A.    Yeah, I know.  So I think I should -- okay,

4    I should start with what my assignment was.  So I was

5    asked to assess whether the assertions made by

6    Dr. Ettner and WPATH, the specific assertions made by

7    them are supported by the reference they cited.  And my

8    conclusion is I do not believe that their assertion,

9    specific assertions point by point are supported by

10   those -- well, supported by the body of literature they

11   cited.

12          In other words, I will say that the

13   evidence cited by Dr. Ettner and WPATH do not provide

14   reasonable or sufficient support for the assertions,

15   specific assertions.

16   Q.    Okay.  And what do you mean by reasonable?

17   A.    What do I mean by reasonable is reasonable

18   judged by me, my expertise as an expert in the

19   so-called comparative effectiveness research.

20          Like I'm an expert, so as a statistician,

21   my expert is actually called inference.  Well, the

22   inference is essentially to determine what kind of

23   evidence needed to establish the effectiveness,

24   effectiveness or safety of a treatment, and that's my

25   expertise.  And based on my expertise, after I review,

26

1    the references cited by them and look at the specific

2    assertion, I don't think that they provide support,

3    provide -- it's just not enough.

4            Like if I'm a medical -- if I'm a reviewer

5    of a medical journal, if you submit a paper with those

6    assertions and those references, I would reject it on

7    the ground that the evidence is not enough.

8    Q.    Okay.  And so how much is enough?

9            MR. RODRIGUEZ:  Objection, vague.  You

10     can answer.

11   A.    Yeah, I think your question is very vague,

12   and it's beyond more than being vague, it's also this

13   is all very case by case.

14           So I read a paper, for example, if it says

15   if you want to establish the effectiveness of say a

16   vaccine, and then I would expect to see evidence,

17   clinical evidence from a randomized trial or

18   well-designed observational study, and if it does not

19   provide that, or the study does not have good quality,

20   for example, those retrospective study assay, then I

21   will judge it's not enough.  So it's highly case by

22   case.

23           So, again, that's why I was very specific.

24   So in my report, I provide not a blanket statement.  I

25   went case -- point-by-point the assertion and exam

27

1    one-by-one and say why I believe that is not enough.

2            So in order to answer that question, I

3    think it's better for you to actually go through the

4    details.

5        Q.    So at the bottom of page four in your

6    report, so at the end of the second line, you said:    I

7    conclude, to a reasonable degree of statistical

8    certainty, that these studies failed to provide

9    rigorous and consistent statistical evidence on the

10   benefits and quality of life and well-being of sex

11   reassignment surgery.  Do you see that?

12       A.    Yes.

13       Q.    What do you mean by statistical certainty

14   there?

15       A.    Oh, statistical certainty, again, because

16   I'm a statistician, right, I look at the papers, those

17   papers and the papers, that actually a big quantity of

18   papers, 80-some studies, and the statistical certainty

19   means that my statement is based on the kind of data,

20   the data of those 80-some papers I reviewed.

21           So that's what I meant by statistical

22   certainty.  It means that I -- my judgment or my

23   opinion is based on data, again, data in this case,

24   those papers.

25       Q.    And how did you calculate that statistical

                                                          28

1    certainty?

2         A.     I don't calculate that statistical

3    certainty.  That is a phrase, and, yeah, you cannot

4    calculate.  But I based on my expertise as a

5    statistician, my expertise in this field.

6         Q.     Okay.  So the phrase is not that there is

7    certainty supported by numbers, but rather that you are

8    confident and you relied on statistics?

9         A.     Yes.

10        Q.     Okay.  And what do you mean by rigorous and

11   consistent statistical evidence?

12        A.     Oh, rigorous and consistent, okay, so

13   rigorous is, again, rigorous is based on the strengths

14   of the study.  So my judgment of the strengths of the

15   design quality, the quality of the study, that means

16   rigorous.

17             So in science, we always say whether this

18   study is conducted with vigor.  So things with more

19   vagueness, or like with a lot of authenticity and

20   noise, we call that that's not rigorous.

21             And consistent, that is consistent means if

22   you read through my report, you will see that I review

23   this 80-some documents and I divided the papers into

24   different categories by design.  So they are -- one of

25   my studies, they are prospective studies, and they are

                                                    29

1    retrospective studies, and the prospective studies, I

2    cited many of them, there are not too many, there are

3    five of them.  They provide mixed results, mixed

4    results about the benefit of the sex reassignment

5    surgery on quality of life and well-being of the --

6    well, quality of life.

7                 So they are mixed results.

8                 And so, yeah, by consistent, I mean all the

9    studies suggest, point to the same thing, and I don't

10   see it here.

11                So that's what I meant by rigorous and

12   consistent, and the documents, the papers that I

13   reviewed do not provide rigorous or consistent

14   evidence.

15       Q.    Okay.  And only randomized control trials

16   qualified as rigorous?

17       A.    No, I didn't say that.  I never say that in

18   my opinion.  I mentioned in my opinion randomized study

19   is to establish the treatment -- effectiveness of a

20   treatment.  They are hierarchy of study designs.  The

21   gold standard is randomized study, but I didn't say

22   that's the only one or that it must.  I said is the

23   gold standard is randomized study, and then the second

24   one, when that is not available, you can resort to

25   observational study, but it need to be well designed.

                                                            30

1          The best quality of observational study

2    design is prospective study, this before and after

3    comparison, and that is doable, that is visible, and

4    that is reported in some of this 5 of these 80-some

5    studies.

6          And the last, the worst quality of all of

7    this is the retrospective study results, before/after

8    comparison, and that was the bulk of the study that was

9    cited.

10          So that was my argument.  I never said RCT,

11   randomized trial is the only -- is the only one that is

12   rigorous.

13   Q.    Okay.  And you mentioned kind of the mixed

14   results.  How many or what percentage of studies have

15   to show the same results for them to be considered

16   consistent?

17   A.    You cannot make that judgment.  That's not

18   a good question, because you can have a bunch of very

19   low quality ones, one hundred -- and all of them are

20   very deeply flawed methodology wise, and one hundred

21   percent of them point to -- point to one direction.

22          And then if you have a small bunch of high

23   quality study, they all point to the other one, other

24   direction.  In that case, I would take that small bunch

25   of quality over the large bunch of low quality studies.

31

1          So you can never say -- you can never say

2     that oh, how much, what the percentage has to be,

3     what's the percentage of the signals has to be in the

4     studies, then it can be regarded as enough.  You don't

5     do that.  You judge by the first, so their order in the

6     judgment, so their order in the criterion.  Well, the

7     first order of business or the criterion would be the

8     quality of the design.

9          So, yes, if there are two randomized study,

10    if there are only one of two randomized study, show me

11    one direction.  And then I have one hundred very

12    methodologically flawed low quality retrospect study

13    shows the treatment from the other direction, I

14    probably will trust -- well, not probably, I will

15    trust, and FDA will trust a randomized study, take the

16    randomized study result, which is much more -- consider

17    that is much more reliable or valid evidence.

18    Q.     Okay.  So stepping away from the quality of

19    the design, we're talking about consistency.  You've

20    concluded here that they are not consistent?

21    A.     Yes.

22    Q.     So I guess I'm trying to understand where

23    that line is?  What makes it consistent versus what

24    makes it not consistent?  And how do you know here to

25    conclude that it is not consistent?

                                                          32

1    A.    Yes.  If you go to my expert report,

2  consistent -- it's hard to find this, let me see.  I

3  think for the assertion -- let me see, the WPATH

4  assertion one.  So it's on page 12.

5    Q.    Okay.

6    A.    So I state very carefully, so first of all,

7  there's no RCT, but that is not end of the world,

8  because they are -- actually they do have five

9  prospective studies.  And so I wrote this very clear.

10  I don't need to read it, but I cited to see that, you

11  know, they have mixed results for them to Lindqvist --

12  if you read page 12, the second to the last paragraph:

13  Lindqvist, et al, found mixed results on the effects of

14  SRS on quality of life.  Specifically, they found that

15  comparing to before treatment, quality of life is

16  better one year after operation but worse three and

17  five years after operation.

18          So that is -- so that's one.  And also if

19  you flip to the next --

20    Q.    So is that finding sufficient for you to

21  find that there's not consistent statistical evidence?

22          MR. RODRIGUEZ:  Li, she's still

23    answering your question.

24    A.    Yeah, I'm not done yet.

25    Q.    Okay.

33

1    A.    Because that is several -- so there are

2    actually five prospective studies cited here, and those

3    are of higher quality than the retrospect study.

4          And then here, one-by-one I actually

5    specific tell what their findings.  And not -- the

6    Lindqvist one I read.  I don't know whether I should

7    read all of it, but you can read, you can read it

8    yourself to say that the other one, so let me see, like

9    the --

10   Q.    I don't need you to read the actual citing.

11   That's not my question.  So maybe I can rephrase.

12   Would that be helpful?

13   A.    Yeah, again, before you rephrase, I just

14   answer that you say not consistent, yes.

15         So what I wrote here is the five higher

16   quality of higher quality observational study, they

17   find mixed results.  They don't find all that it's

18   helpful for quality of life, and this is every paper is

19   like, and, yes, that's my answer.

20   Q.    Okay.  So stepping away from this report, I

21   guess I'm trying to understand how you determine when

22   it's consistent or when it's not.

23         And so is it that, you know, one study out

24   of five, is it -- you know, I don't need an exact

25   percentage, but is the expectation that all of the

34

1  studies are consistent?

2          MR. RODRIGUEZ:  I'm going to object to

3      form.  You can answer.

4      A.     Oh, again, this is same kind of problems I

5  have with your previous question is vague.  It's --

6  well, let me say this:  So consistent, again, so I

7  have -- so, again, you have -- so this is already you

8  cannot just take the consistent out of context.

9          So here there's five prospective studies,

10 right.  And I think at least three of them, the results

11 are saying that the result is not beneficial or some of

12 the result are beneficial, some of the outcomes are not

13 beneficial.  And so that is just -- that's

14 inconsistent.  I mean, there because you have five

15 different -- you have five studies, and the five

16 studies say -- have very different conclusions.  And

17 that is inconsistency.  I cannot name whether there's

18 one out of five or three out of five because that is

19 inconsistent.  Like here, at least three out of five

20 they are showing mixed result.  And also this is just

21 mixed result, and those result are different from the

22 direction that from the large body of low quality

23 retrospective studies.

24         So that's what I meant by not consistent,

25 because you have both retrospective study and

35

1    prospective study and observational studies, and they

2    are of different results.

3         Q.    Okay.  Going to page 25 of your report, to

4    the conclusion.

5         A.    Yes.

6         Q.    At the end, you state your opinion to a

7    reasonable degree of statistical certainty that the

8    studies cited by Ettner and/or WPATH and reviewed in

9    this report simply do not provide reasonable support

10   for the assertions made, and then it continues.

11        A.    Yes.

12        Q.    What do you mean by reasonable support?

13              MR. RODRIGUEZ:  Asked and answered.

14         You can answer.

15        A.    I think I answered your question before.

16              A reasonable -- I already said a formal

17   reviewer of a medical journal, and you submit things,

18   you make assertions of this, and then you submit

19   your -- and your paper or your report, you submit

20   evidences.  And based on like those -- the reference

21   they cited, I would reject it, because I don't -- I

22   already explain many times why I think that's -- the

23   quality is low.  The better quality of study that is

24   available show mixed results.  The lower quality ones,

25   they are subject to a lot of methodology flaws.  And

36

1   even their own expert, like even their own -- many of

2   the papers they cited, I reviewed, call for better

3   design studies.  In that instance, I would not think --

4   I would not regard the evidence that they showed or in

5   this case it's the reference they cited, provide

6   reasonable or provide support, sufficient support for

7   their argument.

8        Q.    Okay.  And this -- so the standard of

9   reasonable support that you're using is sufficiently

10  supported for you to accept it for publication in a

11  medical journal?

12            MR. RODRIGUEZ:  Objection,

13       mischaracterization of testimony.

14            You can answer.

15       A.    No, I use that as analogy, but I'm just

16  saying as a scientist, how do you establish evidence

17  for something?  Okay.  You actually go to the, like in

18  this case, you want to establish the effectiveness of

19  medical intervention.  And there are ways of study --

20  there are different ways, study designs you can do.

21  You can conduct those studies.  And then you can

22  analyze the data.

23            And, again, as an expert, I am involved in

24  many of like this type of study, not about gender

25  dysphoria, but just to kind of establish the

37

1    effectiveness of treatment.  And my expertise, my

2    experience tell me, based on that, I judge that what

3    they cited here do not support their assertions.  So

4    it's overstretched.

5         Q.    Okay.  Can prospective observational

6    studies provide reasonable support?

7         A.    So the answer to that is not black and

8    white.

9               So the best one, if possible, there would

10   be a randomized study that's gold standard, but that

11   is -- when that is not available, if you --

12        Q.    Okay.  Continue.

13        A.    So that's the gold standard.  I'm just

14   stating a consensus in the field.  When that is not

15   available, then you have, yes, then you try to do the

16   best quality observational study.

17              So, yeah, prospective study can be used,

18   prospective study can be used as part of the evidence,

19   but whether that can be viewed towards -- can be taken

20   as the foundation for treatment recommendation, that's

21   not a question that I can answer, because I'm not a

22   medical doctor.  But I can just tell you that the

23   prospective study, yes, it is well conducted.  If it's

24   repeated many times with consistent result, then, yes,

25   I believe that that would -- some medical doctors can

                                                        38

1    take that as a strong evidence.  But whether that

2    can -- again, who made that decision, I don't know, and

3    I'm not going to -- like that's not the question I'm

4    going to answer, like I'm supposed to answer, because

5    that's not my expertise.

6         Q.    Okay.  Just to clarify on that, you said

7    you're not opining on whether treatment recommendations

8    can be made from this?

9         A.    Well, yeah, so treatment recommendations,

10   so evidence needed to make treatment recommendation is

11   a different point, it's a different question from how

12   do you establish the effectiveness of a treatment?

13   Those two are different things.

14         So my assignment as a statistician, I can

15   answer the first.  I can answer the later question.  I

16   can answer the question of how do you establish the

17   effectiveness of a treatment, but that is not

18   equivalent to how do you make a treatment

19   recommendation, because making a treatment

20   recommendation, from my understanding, involves a lot

21   of, you know, other considerations.

22         So -- but my, again, my scope is on whether

23   the treatment, it's not treatment effectiveness.

24   Arguably, that's one of the most important point

25   consideration in making treatment recommendation.

39

1   Arguably that's the most important one, but that might

2   not be the only one.

3               But, again, my scope is to answer the

4   question, the more focused, specific question about

5   whether you can establish the treatment -- the

6   effectiveness of a treatment.

7       Q.    Okay.  So what is the significance of your

8   conclusion that the studies failed to provide

9   reasonable support for the assertions made by

10  Dr. Ettner and WPATH?

11              MR. RODRIGUEZ:  Objection, vague and

12       form.  You can answer.

13      A.    Yeah, what do you mean by what is the

14  significance?  The significance in what aspect?  In

15  terms of what?

16      Q.    So, okay.  So you're talking about -- your

17  question is about establishing the effectiveness of the

18  treatment.  So is your conclusion that the

19  effectiveness of the treatment has not been established

20  to a degree of statistical certainty?

21              MR. RODRIGUEZ:  Objection,

22       mischaracterization of the report, and her

23       previous testimony as to what her

24       conclusions are.  You can answer.

25      A.    So, again, I don't quite understand what

                                                          40

1    you are trying to ask here.

2              So my conclusion is, yes, based on my

3    expertise and the document I reviewed, I conclude that

4    the body of literature they cited do not support their

5    assertions.

6              And you asked me is that significant?

7    Again, sorry, I don't understand.  What do you mean?

8    What do you want me to say?  I mean, what do you mean?

9    Can you phrase this again?

10        Q.    Yeah.  Well, let me ask a follow-up

11   question on that, because you're saying that the

12   evidence does not support the assertion.  And in

13   layman's terms, I'm wondering if support has a

14   different meaning, right, because is it that they don't

15   support it with vigor, or that they don't support it at

16   all?

17        A.    Oh, okay.  Oh, it's just they make

18   assertion -- if you look at the assertions, some are

19   very -- okay, let's go to specifics.

20             So, for example, some of the assertions

21   I -- yeah, what do you mean by support?  You want me to

22   elaborate on that.  I can do that.

23             So, for example, page 11 on my report,

24   WPATH assertion one:  There is strong evidence

25   demonstrate the benefit of the quality of life.  And so

41

1    I focused on this strong evidence.

2            So they claim this is strong evidence.  I

3    don't think that has strong evidence, okay, so that's

4    what I meant by no support.

5            And the second, to give you another

6    example, I should probably go to Dr. Ettner's

7    assertion, let me see.

8        Q.    And we will go through these one-by-one

9    later, so you know.

10       A.    Okay.  That's even more fun.  But, yeah,

11   that's what I meant.  Like I was very specific in this

12   specific point-to-point discussion.

13           So when I say do not support, I meant,

14   yeah, point-by-point, yeah, it's better point-by-point,

15   then you go and see the problems.  I mean, they do not

16   support.  It's often exaggeration or overstatement or

17   sometimes just factually mistake, factual mistake.

18   Sorry, go ahead.

19       Q.    Are you saying that the WPATH standards of

20   care are wrong?

21           MR. RODRIGUEZ:  Objection,

22       mischaracterization of the report and the

23       testimony.  You can answer.

24       A.    No.  It's a long document with many

25   different opinions.  I cannot just say it's wrong, no

                                                            42

1    it's not.  I was talking about the assertions they made

2    are not supported by -- well, again, as I just

3    described not -- yeah, supported by their -- well, in

4    other words, that it's often an overstretch,

5    exaggeration, over characterization of the -- of

6    things, of opinions.  I didn't say it's strong.

7        Q.    Are you saying that the WPATH standards of

8    care should not be followed?

9            MR. RODRIGUEZ:  Objection,

10        mischaracterizes testimony.  You can answer.

11       A.    No, I didn't say that.  I don't have the

12   expertise to say things like that.

13           Again, my opinion is very focused on

14   specific -- the assertions to counter or to exam the

15   specific assertions, and I didn't make any statement

16   about whether they should follow WPATH.

17       Q.    Are you saying that WPATH should not rely

18   on the studies that are cited in your report?

19           MR. RODRIGUEZ:  Same objection,

20        mischaracterization of the evidence and the

21        report.  You can answer.

22       A.    I didn't say.  Again, WPATH, what kind of

23   document they want to decide on is they decide.  It's

24   not my opinion about.  My opinion is about they cite,

25   they decide, they cite a bunch of papers, references.

                                                          43

1    And, again, I try to judge that, whether the reference

2    they cited support their assertions.  So that's a

3    different concept.

4         Q.    Okay.  Dr. Ettner stated in her report that

5    the standards of care for treatment of gender dysphoria

6    are currently set forth in the WPATH standards of care.

7              Do you disagree with that statement?

8              MR. RODRIGUEZ:  Objection, outside of

9         the scope of this witness' opinion.  You can

10        answer.

11        A.    Yeah, yes, I agree with Orlando that is

12   outside my scope.

13             Again, my job is to exam the specific

14   assertions of Dr. Ettner and WPATH, and what you just

15   asked is not part of the assertions I was asked to

16   provide opinions on.

17        Q.    Okay.  So you are not providing an opinion

18   on whether the standards of care for the treatment of

19   gender dysphoria, or you are not providing an expert

20   opinion on the standards of care for treatment of

21   gender dysphoria?

22             MR. RODRIGUEZ:  You can answer.

23        A.    No, I was not -- I'm not providing opinions

24   on that.

25        Q.    Okay.  And Dr. Ettner also stated that the

44

1    WPATH standards of care are the internationally

2    recognized guidelines for the treatment of persons with

3    gender dysphoria and informed medical treatment

4    throughout the world.

5              Do you disagree with that statement?

6              MR. RODRIGUEZ:  Objection, outside of

7         the scope of the witness' opinions.

8              You can answer.

9    A.      Yeah, that's outside -- that's not what I'm

10   asked to write opinion on.  It's outside the scope of

11   my expert opinion.

12   Q.      Okay.  Dr. Ettner also stated that the

13   American Medical Association, the Endocrine Society,

14   the American Psychological Association, the American

15   Psychiatric Association and a host of other entities

16   all endorse treatment protocols in accordance with the

17   standards of care.

18             Do you disagree with that statement?

19             MR. RODRIGUEZ:  Same objection,

20        outside the scope of the witness' opinions.

21             You can answer.

22   A.      Same answer.  It's outside my opinion, my

23   report.

24   Q.      Do you think that all of those medical

25   associations should not endorse treatment protocols in

45

1    accordance with the standards of care by WPATH?

2              MR. RODRIGUEZ:  Objection, outside the

3         scope of the witness' opinions.

4              You can answer.

5         A.    Same answer as before.  That is outside of

6    my -- the scope of my report.

7              MS. NOWLIN-SOHL:  So we've been going

8         for about an hour now.  I'm at a good pause

9         place, if you'd like a break?

10             THE WITNESS:  Yes.

11             MS. NOWLIN-SOHL:  So we'll take five,

12        ten minutes Orlando?

13             MR. RODRIGUEZ:  Let's do ten, because

14        we have to walk across the other side of the

15        building, so let's do ten.

16             MS. NOWLIN-SOHL:  We'll be back at

17        11:20.

18             THE WITNESS:  Sounds good.

19             (Off the record at 11:10 a.m.)

20             (On the record at 11:22 a.m.)

21             BY MS. NOWLIN-SOHL:

22        Q.    Welcome back, Dr. Li.  You are aware that

23   you are still under oath?

24        A.    Yes.

25        Q.    Okay.  And okay, so I want to go to page

                                                        46

1    four of your expert report.

2         A.      Yes.

3         Q.      And in the middle of that last large

4    paragraph, you state that:  Most of the studies cited

5    in support of those assertions are of low quality in

6    terms of study design and statistical methodology.

7               What do you mean by low quality?

8         A.      Well, by low quality, again, I explained,

9    explain a lot in the later part of the report, but I

10   list a bunch of commonly known problems of study or

11   like biases in study can happen, like confronting bias,

12   selection bias, nonresponse bias, recall bias.

13              So by low quality, I meant that those

14   studies are very prone to those kind of biases of

15   deficiency in the -- or flaws, design flaws.

16        Q.      Okay.  Are you familiar with the GRADE

17   system?

18        A.      The GRADE system?  No.

19        Q.      Yes.  No, okay.

20              So when you say low quality, is that a term

21   that's used in statistics, or is that your own

22   phrasing?

23        A.      So of course it's my own phrasing, but I

24   actually borrow that from -- I reviewed those studies,

25   and quite a few of those studies, like a dozen or so,

47

1    they are literature review of the papers.  And this is

2    a phrase they repeatedly use themselves, low quality.

3              So I kind of borrow that phrase and, of

4    course, that's also known in English what low quality

5    means.

6         Q.    You say it's not the English of what low

7    quality means?

8         A.    No, I'm saying that it's first of all, they

9    themself call it low quality, and also to me that is

10   layman can understand low quality in English.  So

11   that's why I adopt that.

12        Q.    Okay.  And you said that you reviewed

13   Dr. Antommaria's rebuttal report in this matter

14   correct?

15        A.    Yes, quickly reviewed, yes, I reviewed it.

16        Q.    Okay.  I'd like to mark as Exhibit 2

17   Dr. Antommaria's rebuttal.

18                   (The document referred to was marked

19              Deposition Exhibit Number 2  for

20              identification.)

21        A.    Yes, I have it.

22        Q.    Okay.  And is this the rebuttal report that

23   you reviewed?

24        A.    Yes.

25        Q.    Okay.  And I'd like to direct you to page

                                                        48

1   9.

2          A.      Yes.

3          Q.      Okay.  And so there he talks about the

4   GRADE system as distinguishing four levels of evidence.

5   Do you see that?

6          A.      Yes, I see that.

7          Q.      Okay.  And those levels are high, moderate,

8   low and very low?

9          A.      Yes.

10         Q.      Have you encountered those ratings before?

11         A.      Again, I'm not familiar with the GRADE

12  system.  I don't know who decide the GRADE system, but

13  I look at high, moderate, low and very low, that sounds

14  like a reasonable, reasonable, you know, GRADE, yes,

15  and, yeah.

16         Q.      Okay.  And you said that you used the word

17  low because that was what was used in several of the

18  studies that you reviewed?

19         A.      Yes.

20         Q.      Okay.  And so Dr. Antommaria says these

21  levels are relative to one another, and low does not

22  necessarily mean poor or inadequate.

23                 Do you have any reason to disagree with

24  that statement?

25         A.      Per se, no.  Yes, right, low or very low

49

1    does not necessarily mean that it's complete garbage.

2    But on the other hand, who decide this study is low?

3    Like the papers I reviewed, there's no GRADE system

4    GRADE them as low or very low.

5              So, again, I just use their expert's own

6    terminology.  Per se, this sentence that Dr. Antommaria

7    said I have nothing to disagree.

8         Q.    Okay.  And so the GRADE system is used to

9    evaluate the evidence often in clinical practice

10   guidelines.  Do you have any reason to disagree with

11   that?

12             MR. RODRIGUEZ:  Objection, lacks

13        foundation.  You can answer.

14        A.    Again, I'm not familiar with that, so I'm

15   not familiar with the system.  Then I'm not going to --

16   so I don't have opinion to say that I agree or disagree

17   with that.

18        Q.    Okay.  Going down to page 10, paragraph 23.

19        A.    23, sorry, yeah, I got it.

20        Q.    Okay.  Dr. Antommaria said that

21   observational studies are additionally assigned to the

22   low category.

23        A.    Yes.

24        Q.    And so under the GRADE system, is it true

25   that observational studies are always, almost always

                                                          50

1    going to be considered low quality evidence?

2                    MR. RODRIGUEZ:  Objection, lacks

3          foundation.  You can answer.

4        A.    As I said I don't -- I'm not familiar with

5    the GRADE system.  So I don't know whether that is what

6    you just asked, whether observational study always

7    considered low or high.  I repeatedly said that my

8    expertise, my experience with observational study, even

9    with -- observational study is a very vast, a range of

10   studies.  Some designs are of higher quality.  Some are

11   lower quality.  But, again, where do they fall into the

12   GRADE system, now who decide that?  I don't know.

13       Q.    Give me one minute.

14             (Pause.)

15       Q.    Okay.  Do you always consider observational

16   studies as low quality evidence?

17       A.    No.  I said clearly in the world of

18   comparative effectiveness research, there's a

19   hierarchy, RCT randomized study is the best.

20   Observational study, there are good ones.  There are

21   bad ones.  There are high quality ones.  There are low

22   quality ones.  I don't blankedly(sic) say observational

23   study are all of low quality.  I never said that.

24       Q.    Okay.  Does a study being low quality, in

25   your opinion, mean that it does not have value?

                                                           51

1          MR. RODRIGUEZ:  Objection, vague and

2     ambiguous.  You can answer.

3     A.     That's not my opinion is about.  I don't

4  stretch anything.  I just purely say that when I say

5  low quality, I meant there are flaws.  There are

6  serious flaws in the study design, that has rendered

7  the conclusion be unreliable or subject to noise.  And

8  so more studies are needed.

9          So I didn't say that whether they have

10  value or not.  That's not up to me to judge.

11     Q.     Do you have an opinion on whether low

12  quality studies should be used in treatment

13  recommendations?

14          MR. RODRIGUEZ:  Objection, outside the

15     scope of the witness' testimony.  You can

16     answer.

17     A.     I don't have opinion on that.

18     Q.     Okay.  So going back to your report --

19     A.     My report?

20     Q.     Yes.

21     A.     Okay.

22     Q.     On page 9.

23     A.     Yes.

24     Q.     You discuss prospective studies and

25  retrospective studies.  Those are both types of

                                                    52

1  observational studies, correct?

2       A.    Oh, caveat, yes.  So observational study

3  can -- so randomized experiment also belong to the

4  broad spectrum of prospective study.  But -- well,

5  because prospect and retrospect means the time, the

6  timing of when you collect the data, yes.

7            But to answer your question so

8  observational study indeed can have both retrospective

9  study and prospective study.  They are just two

10 different designs.

11      Q.    Okay.  So you see the prospective

12 observational study is generally considered superior to

13 retrospective observational study, correct?

14      A.    Correct.

15      Q.    Okay.  And then on page 10, you also say

16 that the design of the lowest quality is a

17 retrospective observational study?

18      A.    Yes.

19      Q.    Do you see that?

20      A.    Did I say --

21      Q.    It's kind of at the bottom of page 10.

22      A.    Yes.  Okay.  So to be clear, here I say the

23 lowest quality that is of course I have a scope.  I

24 meant among, you know, if you have like three

25 categories, you can, of course, further define them,

                                                        53

1    refine them into more categories.  But I'm saying that

2    randomized study, prospective observational study and

3    retrospective observational study, this is -- among the

4    three, this is of the lowest quality.

5         Q.    Okay.  And does that mean that

6    retrospective observational studies do not have value?

7              MR. RODRIGUEZ:  Objection, vague and

8         outside the scope of the witness' opinions.

9              You can answer.

10        A.    Yeah, well, I think you asked a similar

11   question before saying whether this has value.  Again,

12   I don't provide opinion on that.  They are studies.

13   Those studies have, I call them low quality, because

14   they have flaws in the designs, renders the conclusion

15   to subject to be -- subject to all different biases.

16   So they might not be reliable.  But whether they have

17   value or not, that's not what I'm -- I'm not providing

18   opinion on that.

19        Q.    When you say unreliable, you mean that they

20   should not be relied upon?

21        A.    I think that's an English word, unreliable

22   has its obvious English meaning.  It means that -- when

23   I say unreliable, I mean that the conclusion is subject

24   to a lot of biases.

25              So if you want to interpret that as

64

1   something strong or interpret that, interpret that

2   those results -- you have to interpret the results with

3   much caution and caveats.  That's what I meant

4   reliable, and they are -- those caveats or like those

5   assumptions, if those are violated to any degree, then

6   the result invalid.

7           So that's what I meant unreliable.  They

8   are just more subject to all sorts of challenges and,

9   you know, biases.

10      Q.    Okay.  But you are not stating that they

11  should not be relied upon?

12      A.    I did not say that.  But, of course, from

13  common sense, if you have high quality, you want to

14  make your decisions on high quality studies rather than

15  low quality studies.

16      Q.    Okay.  So go to page 5 of your report.

17      A.    Yes, I'm there.

18      Q.    So in the second line under section 1, you

19  say that:  The main barrier to interpreting the

20  association between the treatment and the outcome as a

21  causal effect is the presence of factors that are

22  associated with both the treatment and the outcome.

23  These factors are commonly referred to as confounders

24  or confounding variables or confounding factors.

25      A.    Correct.

                                                        55

1      Q.      Is the presence of confounders called

2   confounding bias?

3      A.      Yes.  That's precisely why, again, as I

4   later said, that's precisely the presence of

5   confounding factors, that's precisely why retrospective

6   study resolved before/after this data is viewed as low

7   quality, because they cannot control at all the

8   confounding factors.

9      Q.      Okay.  And that inability to control the

10  confounding factors is inherent to a retrospective

11  observational study?

12     A.      It's inherent to -- so confounding bias is

13  inherent to all observational study, whether it's

14  prospective or retrospective.  But prospective study do

15  a better job in controlling those confounding bias by

16  providing the before and after comparison.

17     Q.      Okay.  In going to page 6, you have a

18  subsection called confounding bias.  You state that

19  randomized controlled trials eliminates all confounding

20  bias.

21             Are there situations where that would not

22  be true?

23     A.      Again, that's -- we can get to too

24  technical academic.

25             So, again, per se, if you have a study --

56

1   so raising the scope, if you do a randomized study that

2   is because you flip a coin, so that is -- so for that

3   specific study population, you're operating on the

4   randomized study, yes, it does take into account,

5   eliminate all the observed and unobserved confounding

6   bias.  So any confounding bias.  So that's true.  But

7   then, of course, there are other things, if you want to

8   put them a stretch, that a randomized study to a

9   different population, then that's a different matter.

10          So, yes, so for the study per se, if you do

11  a randomized study, operating on the population, the

12  target population that you are operating the randomized

13  study, yes, it eliminates all the confounding bias, and

14  that's why it is regarded as gold standard.

15      Q.      What if there's a very small sample size in

16  a randomized control trial?  Is it possible that would

17  not eliminate all confounding factors?

18      A.      Technically that's a different problem.  So

19  it still eliminate confounding bias just by design.

20          Small sample size is a different problem.

21  Small sample size will give you larger extended error,

22  or, in other words, the procedure, it will not be that

23  precise.  There is a statistical concept called

24  standard error or variance.  So that's a different one,

25  like that's a second other problem.

57

1          So in confounding bias, the study design,

2   randomized study design will admit no matter how small

3   the sample size is.  The small sample size, the key

4   question is it will erode the procession of the study.

5   So, again, statistically, it's like first order problem

6   second order problem.

7          Q.     Are there types of bias that can be present

8   in randomized controlled trials?

9          A.     Again, this is highly depend on the

10  specifics, what do you mean?  Like what type of bias?

11         As I mentioned, that if you want to

12  stretch -- so the -- so confounding bias -- no, so the

13  answer is so randomized study is subject to other type

14  of bias, but not for the treatment effect for this

15  population you study on.  It's subject to other type of

16  bias.  For example, the randomized study, the

17  population does not representing the general

18  population, but that's a whole different matter.

19         And -- but always your first, again, like

20  in FDA, if you want to have a new drug or treatment or

21  medical device, you always first -- first order you do

22  a randomized study.  But that is understandable that

23  it's not always feasible, but I won't go into that.

24         So your question, yeah, there are all sorts

25  of different biases, but that is, again, we're talking

58

1    about first order problem and second order problem.

2             So why randomized study is prized is

3    because the biggest problem to interpret the barrier

4    from association to causation is confounding bias, and

5    this randomized study is the most -- I mean, it's the

6    single most effective design to admit that.

7             So that's a first order problem.  Yeah,

8    there are all sorts of other type of bias, but the

9    second order problem and all the other observational

10   study also subject too.

11       Q.    Okay.  So on page 6 and 7 of your report,

12   you talk about different types of biases, and so

13   selection bias, is that -- can that be present in a

14   randomized controlled trial?

15       A.    Oh, yes, that can be presented in

16   randomized study or retrospect or prospective, but

17   that's a different -- again, I say that's a second

18   order problem, but yes.

19       Q.    What about nonresponse bias?

20       A.    Nonresponse bias, again, in randomized,

21   yes, all of this study can be subject to that.  But in

22   randomized study, usually the way it's conducted,

23   usually the nonresponse rate is controlled, because the

24   study is controlled.  So it's controlled by the --

25   highly controlled by investigated.

59

1          So it's usually subject to less of that

2    kind of bias than the observational studies.

3          Q.    Can recall bias be present in a randomized

4    control trial?

5          A.    Yeah, again, recall bias can present in all

6    of these studies.  But, again, because of the way that

7    the randomized study is conducted, is well controlled

8    by -- highly controlled by investigators, the

9    occurrence of that is, the chance of that is much less

10   than observational study, particularly for

11   retrospective study.  Because retrospective study

12   often, like you don't design, because at the time you

13   do the study, all these things already happened.  So

14   then that's a time lag.

15          That make it -- so in randomized study, you

16   conduct the study.  It's a prospective -- randomized

17   study is prospective study.  So you follow them.  So,

18   of course, there's much less chance of recall bias.

19          Q.    Okay.  What does it mean to mask or double

20   mask a study?

21          A.    Sorry, say it again, match?

22          Q.    Mask or double mask, also known as blinding

23   or double blinding?

24          A.    Oh, I didn't say it here, yeah, double

25   blinding, yeah, that is just a -- so that is you flip a

                                                      60

1   coin.  Yeah, double blind, that means you don't -- so

2   basically the treatment assignment, whether you get the

3   true, the control or treatment is not known -- it's not

4   revealed to the patient, and in some cases also not

5   revealed to the people who conduct the study.

6       Q.      So double masking means neither the

7   participant or the conductors know who --

8       A.      Correct.

9       Q.      So if a randomized control study is not

10  masked or double masked, can that induce bias?

11      A.      Well, that can.  I mean, I can give you a

12  statistical lesson.  Yes, it always -- like none of the

13  study is perfect.  Some are more imperfect.  Others are

14  less perfect.  Yeah, so you're talking about double

15  blindness.  Yeah, the studies are not double blind.

16  It's not always.  So the problem of a double -- okay,

17  so why do we want to do double blind study is try to

18  reduce the chance of the so-called placebo effect.  The

19  placebo effect, like the psychological placebo effect,

20  and, again, that is a possibility, like if you don't do

21  double blind, there's a possibility that there's a

22  placebo effect that will bias your result.  But, again,

23  comparing to other sorts of unmeasured confounding,

24  there's a bigger problem.  This is minor concern.

25      Q.      On page 6, when you're talking about

                                                        61

1  confounding bias, you say:  Therefore, in order to

2  interpret the association between treatments and

3  outcomes as causal effects in observational studies,

4  one must assume that there's no unmeasured confounding

5  factor.  Such an assumption is untestable and is almost

6  always untenable.

7           What do you mean by untenable here?

8      A.      That means just almost always violated.

9  There's always presence, in observational study, there

10  almost always unmeasured confounded.  And why I say

11  it's untestable, because there's no unmeasured

12  confounding.  So it's unmeasured.  How do you know

13  whether there is or not?  So, I mean, that's just

14  common sense.  That is like a standard in the

15  literature.

16      Q.      I'm not sure I followed.  Can you explain

17  it a little differently by what you mean?  I get the

18  untestable part, but can you tell me a little bit by

19  what you mean untenable?

20      A.      Untenable means, again, it's always

21  violated to a certain degree, because you are basically

22  saying -- so I'll give you an example.

23           If people say there's association between

24  smoking and lung cancer, and then you calculate the

25  association, so it's strongly correlated.  But then if

                                                        62

1    you say smoking indeed caused lung cancer from

2    observational study.  If you want to make that

3    statement, you basically say that well, then in my

4    analysis, all the confounding factors, all the

5    confounding factors that can affect both smoking and

6    lung cancer has been collected and controlled in my

7    analysis.  And that is almost always weighted, because

8    we can collect as much information about smoking and

9    lung cancer, but there's always something missing, for

10   example, like whether there might be genetic reasons,

11   like your parents' -- like your parents' genes, or your

12   parents' health, behavior, that kind of thing, you

13   don't collect it.

14              So that's why I say it's always -- almost

15   always they are -- you don't collect the whole universe

16   of data.

17              So that's always -- this all matching

18   confounding assumption in observational studies almost

19   always violated.  That's a consensus in the field, and

20   that's actually the whole point like why people like

21   me, a methodologist try to deal with this problem.

22        Q.    Okay.  So are you saying that observational

23   studies can never be used to support treatment

24   recommendations because there is a risk of confounding

25   bias?

                                                          63

1              MR. RODRIGUEZ:  Objection, asked and

2          answered.  Mischaracterization of testimony

3          and report.  And you can answer.

4      A.      I think you asked this question or similar

5  question many times.  So I'll answer again.

6              I didn't make -- I didn't -- I don't come

7  here or write my report to say that whether you can --

8  I didn't make the blanket statement to say that you

9  cannot use observational study as the evidence for

10  treatment recommendation.  I purely said that they are

11  different methods, different studies that can provide

12  -- establish the treatment effectiveness of a

13  treatment, and there are some better designs, some of

14  worse design, and there's a reason I clearly describe

15  here why there's a reason the confounding bias is the

16  reason.

17              But, again, the answer has always been the

18  same.  I didn't say that because they are -- I didn't

19  say that whether you should use it or not for your

20  treatment recommendation, and that's not my scope.  And

21  I say again, I hope you don't ask this again, because

22  my answer will always be the same.

23      Q.      Is the concern that an outcome is the

24  result of a confounding factor, rather than the

25  treatment, mitigated by the number of studies

                                                          64

1  evaluating the treatment?

2       A.      Can you say that again?

3       Q.      So is the concern that an outcome is the

4  result of a confounding factor, rather than the

5  treatment being validated, is that concern mitigated by

6  the number of studies evaluating the treatment?

7       A.      I think your question mixed a lot of -- why

8  I didn't first get it is I think you mixed a lot of

9  statistical concepts.

10           So a confounding factor, a confounder is,

11  by definition, is associated with both the treatment

12  and the outcome, okay.

13           So I vaguely understand your question

14  you're asking that whether this problem, this -- the

15  problems of the existence of confounding bias or

16  confounder is mitigated by the -- like the more study

17  you do, like you are less concerned about that.  Again,

18  the answer of that is it depends on the quality of the

19  study.

20           So if you give me one hundred studies, and

21  one hundred studies are all very low quality, don't do

22  a good job in controlling for confounders, if you give

23  me 101, it doesn't matter, because they are all subject

24  to the same problem.  But if you give me a few high

25  quality studies that did it good job in conjoining for

65

1  confounding bias then, yeah, it would be mitigated.

2  But the sheer number, the number of study does not have

3  nothing to do.  The quality trumps quantity -- the

4  quality trumps quantity here in terms of the studies.

5      Q.    Okay.  So you just gave the example it

6  doesn't matter if it's a hundred or a thousand, so if

7  you had a thousand observational studies with similar

8  outcomes, you're saying that's still not as useful as

9  having a few high quality studies?

10     A.    Well, to answer your question, let's just

11 look at the study I reviewed, right.  Here I reviewed

12 80-some studies.  So my -- based on my count, I think

13 probably like 50 or, I don't know, 50 of them, I mean,

14 not solvent.  There's no solvent studies, but 50 of

15 them are basically retrospective study resolved

16 before/after comparison, and there are five prospective

17 study that has the before/after comparison.  And I

18 explain why before after is important, because the

19 before/after study provide you the most important

20 confounder, which is the baseline measure of the

21 outcome.  So that's why it's regarded as better.

22           So I already said that, you know, you have

23 50, those 50 studies, even their own expert, even the

24 own literature review say that they are low quality,

25 and I'm calling for better prospective study, yeah, but

66

1    there are 50 of them providing the result.  I would

2    not, because they all have the same problem, they all

3    subject to the confounding bias of, in this particular

4    case, the confounding bias, particularly they're

5    lacking the baseline.  The most important confounder is

6    that's the baseline outcome.  They are basing that.

7              So they are all subject to that.  Then, of

8    course, you can do 50, you can do 100, you can do

9    1,000.  That is just all subject to the same problem.

10   Why do you repeat the mistake?

11             So that's why I don't -- I view that the

12   evidence provide by a few high quality studies is

13   better than 100 repeated, the studies low quality study

14   repeat the same problem.

15             That being said, I do believe that it's

16   better to have even -- the best would be to have both

17   quality and quantity, means the best would be I have a

18   high number of prospective studies.  If you cannot do

19   RCTs, that's fine.  But if you can have a high number

20   of high quality prospective study that all show

21   consistent result, that's the best.  But we don't have

22   that, and actually the only ones they have have mixed

23   results.

24        Q.    When you say high quality studies, are you

25   referring to randomized control trials?

                                                            67

1    A.    No.   I said that that's the best, but it's

2    not always available.  High quality, I meant that well

3    designed, before/after retrospective study, if it's

4    done nicely, done properly, yes, it can be viewed as

5    high quality.

6         But, again, this is not the -- what is high

7    quality or low quality is for any single study, of

8    course, it's a subjective concept.

9         But here when I'm using the high quality

10   and low quality I'm mostly talking about the, you know,

11   from the perspective of whether it control for

12   confounding bias.  And why I say that is because

13   confounding bias is the single most important barrier

14   between the association and the causation, or that's

15   the single most important barrier before you can

16   establish the effectiveness of the treatment.

17   Q.    So when you talk about high quality/low

18   quality, you are not using those terms as they are used

19   in the GRADE system?

20   A.    Again, I'm not very familiar with the GRADE

21   system.  I don't know who decide that, and I don't know

22   who decide that, and I'm not referring to GRADE system.

23        I already explained earlier in my case, I

24   said there's at least three broad class of designs; one

25   is randomized study, the other is prospective

68

1   observational study, and the last is retrospective

2   observational study.  And I say higher quality, low

3   quality and lower quality is missing that.  I have a

4   hierarchy, one, two three, and I don't need to repeat

5   that.

6        Q.     And your hierarchy is yours and is not the

7   GRADE system?

8             MR. RODRIGUEZ:  Asked and answered.

9        You can answer.

10       A.     Well, it's mine, but remember, I'm a

11  national leading expert in inference, in study designs.

12  So yes, it's mine.  So I -- it's mine, but also I can

13  tell you with confidence that is also the consensus in

14  the field in terms --

15       Q.     In terms of statistics?

16       A.     In the field of causal inference

17  comparative effectiveness research.  That also include

18  epidemiologist.

19            If you go out to any statistic,

20  statistician, epidemiologist, ask them rank these three

21  type of studies, they will give you exactly the same

22  order as I just gave you.  Randomized study is the top,

23  and prospect is the second, and the retrospective

24  third.  So that's what I meant.

25       Q.     I'm not trying to dispute that ranking.  I

69

1    think I'm trying to understand, make sure that we're

2    using the same language here.

3              And so my understanding from what you just

4    said is you consider high quality studies to be

5    randomized control trials or well designed prospective

6    before and after observational studies, is that

7    accurate?

8        A.    Yes.  Again, even there, yeah, randomized

9    is still better than the other, yes, higher quality.

10   But, again, even prospective before/after, you can

11   still mess it up.

12             But, yeah, if it's like well, well studied,

13   like it's well designed, yes, it can be considered as a

14   high quality.  But I didn't say every single

15   prospective study is high quality, but it's still

16   better than retrospective study.

17       Q.    Are there ever reasons why a randomized

18   control trial might not be ethical?

19             MR. RODRIGUEZ:  Objection, outside the

20       scope of this witness' opinions.

21             You can answer.

22       A.    Yeah, I -- I don't think that whether a

23   randomized study is ethical or not has anything to do

24   with my opinions.

25             My opinion is about like whether the

70

1    references cited supported the assertions.

2            So it has nothing -- didn't touch anything

3    about whether it's ethical or not.

4        Q.    Okay.  You've come into this case as an

5    expert, and I don't want to go beyond your expertise,

6    but I am permitted to ask questions that are related to

7    this report, even if they are not discussed in the

8    report.

9        A.    I understand.

10       Q.    Okay.  And so do you have any knowledge as

11   to whether there are situations where randomized

12   control trials might not be ethical?

13           MR. RODRIGUEZ:  Same objection,

14       outside the scope of the witness' report.

15           You can answer.

16       A.    I mean, we can -- offline, I can tell you a

17   lot of things.  But, again, this has nothing to do with

18   my opinion, and I don't think it's relevant.  So I'm

19   not going to answer.

20       Q.    Okay.  I'm still allowed to ask the

21   question, so you're not necessarily allowed to make a

22   determination on relevance, and so if you don't know or

23   if there are situations, then you can say that.

24       A.    I am fully aware of the situations that,

25   again, particularly in history, they are randomized

                                                              71

1    studies that were conducted that are unethical.

2          And so in modern -- if you ask me, that's

3    why in modern medicine or in health studies, like

4    especially when you conduct randomized study, it's very

5    important to have ethical -- like to be -- to be

6    ethical.  And then that's about the conduct ethical

7    part of the randomized study, has always been important

8    consideration.

9          And to answer your question, I'm aware in

10   the history, yes, they okayed this.  It was not well

11   regulated.  It was not ethical, yes, but that has

12   nothing to do with my opinion here.

13        Q.    And so to clarify, I think there are

14   situations where studies can be conducted unethically,

15   and I guess my question is:  Are there situations where

16   the actual act of conducting the study will be

17   unethical, and specifically maybe -- let me scratch

18   that.

19          Do you know what clinical equipoise is?

20        A.    Yes, I'm expert, and actually my signature

21   work is providing some, yeah, some methods actually

22   related to that.  So I know that very well.

23        Q.    Okay.  And so what is clinical equipoise?

24        A.    Well, clinical equipoise is means that you

25   have to -- so the subject of the patient population has

72

Case 3:22-cv-00191-MOC-DCK   Document 73-1   Filed 10/26/23   Page 72 of 165
DISCOVERY COURT REPORTERS   www.discoverydepo.com   1-919-424-8242

1    to be about the treatment benefit, has to be ambiguous.

2    Basically you don't know, a priority you don't know

3    whether this treatment is beneficial or not.  So only

4    in this situation you can conduct it on the patient,

5    because if you indeed know a treatment is beneficial or

6    harmful, then you shouldn't do randomized study.  You

7    shouldn't randomize on those patients. That's clinical

8    equipoise.

9         Q.    And so if there is not clinical equipoise,

10   it would be unethical to conduct a randomized control

11   trial?

12             MR. RODRIGUEZ:  Objection, beyond the

13        scope of this witness' testimony.

14             You can answer.

15        A.    Again, I know the concept.  I don't know

16   whether that's a clean cut, whether if it's not a

17   clinical equipoise, you cannot conduct, because that

18   might be, again, I don't know that.  I just know that

19   this is -- clinical equipoise is important criterion

20   principal in the conduct of randomized trial, but

21   whether that is always the -- always the clean cut

22   position, I don't know.

23        Q.    Okay.  Are there ever reasons why a

24   randomized control trial might not be feasible?

25             MR. RODRIGUEZ:  Objection to

                                                        73

1          vagueness, and outside the scope of this

2          witness' testimony, but you can answer.

3          A.     Oh, yeah, yes, that's so many examples of

4     that.  I mean, yes the randomized study is not always

5     feasible.

6               For example, you cannot randomize people

7     with smoking and nonsmoking, because that's like, yeah,

8     because that break the clinical equipoise, because

9     nowadays we know that smoking is harmful.  So you

10    cannot randomize people to smoking and nonsmoking.

11    That's one of the examples.  There are many of that

12    kind of examples.

13         Q.     And so you just said now nowadays we know

14    smoking is harmful, so we can't do a randomized control

15    trial.  Is that an example of a lack of clinical

16    equipoise?

17         A.     I would say it's lack of clinical

18    equipoise.

19         Q.     What are some other reasons that it might

20    not be feasible to conduct a randomized control trial?

21               MR. RODRIGUEZ:  Objection, beyond the

22         scope of this witness' report and ambiguous.

23               You can answer.

24         A.     Yeah, I do think that this is going too

25    far.  It's really beyond the scope of my witness -- my

                                                    74

1    expert, my report.

2            My report is about the study, the quality

3    of study needed, the type of study needed to establish

4    the treatment effect.  It's not about whether, how you

5    conduct a randomized study.  That's not what I'm -- I

6    can tell you offline, give you a whole class, but

7    that's not what I'm assigned to, and I'm not willing to

8    waste my time on that.

9        Q.    Okay.  Well, I get to ask the questions and

10   determine how we spend your time.  And you just said

11   your opinion is about the need for randomized control

12   studies, and so my question --

13       A.    Go ahead.

14       Q.    My questions are potential barriers to

15   randomized control studies, and so I think they are

16   directly to the scope, and if you don't know, you can

17   say that.  And so are you aware of barriers to

18   conducting randomized control trials?

19           MR. RODRIGUEZ:  I'm going object to

20       the form and beyond the scope and asked and

21       answered.  You can answer.

22       A.    Yes.  First of all, in your statement, you

23   mischaracterized what I said.

24           I didn't -- so I didn't, again, in my

25   report, I didn't say that randomized study is required.

                                                          75

1    So you mischaracterized that.

2              And second, yeah, okay, so I guess I --

3    maybe I'm hungry or whatever, but, yeah, so you can ask

4    me a question.  I can answer.  I just don't think it's

5    the best use of our time.  But you can say that, that's

6    your judgment, that's fine.

7              But now back to your question.  So your

8    question say that I am aware of any barriers to conduct

9    randomized study, of course, I do, of course, I'm

10   aware, and, of course, I understand what your next and

11   predict what your next question in this case, but I'm

12   not going to say that.  I'm aware of that, yes.

13       Q.    Okay.  And you probably predicted my next

14   question correctly.  What are some of those barriers?

15       A.    Yes.  Well, actually your third question.

16             But, yeah, the barriers, again, you already

17   talked about the lack of clinical equipoise, and

18   second, sometimes it's like a rare disease, and there

19   are a very small sample size.  Like there are very few,

20   basically there are very few patients available, and

21   another case it's like if it's an advanced disease,

22   then it's also from a practical perspective, doctors

23   are not waiting to randomize the very advanced, like

24   advanced cancer.  Because you don't want to randomize

25   patients.  They are all desperate to get the new

76

1    treatment.  It's very difficult to randomize patients

2    with advanced cancer into a control arm, for example.

3              So there are many of those kinds of things,

4    yeah.

5         Q.    Why is it difficult to randomize the

6    advanced care patients into a control arm?

7              MR. RODRIGUEZ:  Object, outside the

8         scope of the witness's witness.

9              She can answer.

10        A.    I'm not a doctor, but just to use your

11   common sense.  If those people drive -- like if you

12   have advanced pancreatic cancer, you have six months to

13   live, and then you drive three hours to Duke Clinic to

14   get, to attend the randomized trial, your hope is you

15   will get the treatment.  You will get the new

16   treatment.  So that's why doctors feel also it's not

17   ethical, or feel like it's very hard for them, just

18   psychologically to give that to the randomized patient

19   into control arm.  But I don't see -- that's all.

20        Q.    To make sure I'm understanding that

21   correctly, it would be challenging because patients

22   would be unlikely to sign up for a trial where they

23   might not get any treatment?

24        A.    No, it's not like unlikely.  The problem is

25   precisely they are likely, because they are

                                                      77

1  50/50 percent of chance being assigned to a control.

2  And then the doctors, just from, you know, from purely

3  just compassion perspective, the doctors don't want to

4  do that.

5      Q.    Okay.  And I heard another barrier that you

6  mentioned was kind of difficulty in recruiting a

7  sufficient number of patients, is that accurate?

8      A.    Yes.

9      Q.    Okay.  And the high cost of randomized

10  control trials is also a barrier?

11      A.    It can it cannot.  It depends on the -- it

12  can or cannot.  Its cost is one consideration, but

13  often I think a bigger -- the bigger barriers are the

14  ethical, clinical equipoise.

15          So yes, it can be, but it's not the only

16  one or it's not the most important one.  Maybe in some

17  cases it is, but I cannot give a blanket statement of

18  that.

19      Q.    Okay.  I'm aware that it's lunchtime on the

20  east coast.  I have just a few more questions, and then

21  maybe we can take a break for lunch.  Does that work

22  for people?

23      A.    Go ahead, yeah.  Again, I was just -- I

24  just used -- I'm probably more actually drinking too

25  much water, that's a bigger problem.  But go ahead.

78

1      Q.    What are some of the challenges that you

2  would anticipate in conducting a randomized control

3  trial on gender affirming surgery?

4            MR. RODRIGUEZ:  Objection, outside the

5       scope of the witness' knowledge and

6       testimony.  You can answer.

7      A.    Yeah, that's the third question I predict

8  you're going to ask, and I will not answer that

9  question, because this is really beyond the scope of my

10 opinions, because I'm not -- so that one I can talk

11 about statistical methodology, but I am not a medical

12 doctor.  And I don't conduct, I don't conduct,

13 physically conduct randomized study.

14          I can tell them about oh, when you collect

15 the data, what kind of consideration, what kind of

16 methodology considering you have to do.  I'm not in

17 charge of, or actually I'm not responsible, or I'm

18 never asked to consider this kind of practical issues,

19 clinical practical issues.  So it's for that reason I

20 will not -- like I will not provide an opinion.  I will

21 not answer your question.  And I have a reason.  That's

22 because that's beyond my expertise.

23     Q.    Okay.  So it's beyond your expertise to

24 know whether there are any barriers to conducting

25 randomized control trials for gender affirming surgery,

                                                    79

1   is that correct?

2        A.     From clinical aspect.  I do with the

3   barriers from statistical methodology perspective, from

4   clinical perspective, yes, it's beyond my knowledge,

5   beyond my expertise.

6        Q.     Can you tell me the barriers that you're

7   aware of from the statistical perspective?

8        A.     Statistical perspective, again, there's no

9   barrier.  If you can do it, like this should be the way

10  you do it.  You should do a randomized study.  And

11  that's like, I mean, then I will tell them pay

12  attention to like missing data, you know, that kind of

13  thing, whether you have missing data, or that is all

14  like in this case anticipating you might have small

15  sample size, and then how do you correct for that, and

16  how do you use corollary adjustment or regression that

17  kind of legal method to improve procedure, those kind

18  of things.  There's no barrier.  I mean, use barrier, I

19  would just say not barrier.  More means that the

20  methodology aspect of -- anticipate the type of data

21  you are going to get, and then like the challenges in

22  statistical analysis.  But that being said, randomized

23  study probably is the easiest to analyze, because,

24  again, the design is the best.  So that's why the

25  analysis is also easier.

                                                    80

1          Q.      So we were talking about barriers to

2    randomized control trials.  We talked about a

3    population sample size.  Do you think that that is a

4    barrier for conducting randomized control trials on

5    gender affirming surgery?

6                  MR. RODRIGUEZ:  Objection, beyond the

7           scope of this witness' report and testimony.

8                  You can answer.

9          A.      I don't know.  Because, again, some even

10   rare -- I don't know.  I mean, in this gender dysphoria

11   or like in advanced cancer, whatever, to me it's no

12   difference.  To me they are all like one condition that

13   you conduct a randomized experiment on.

14                 So I don't know whether it would be a

15   barrier or not.  It depends on this specific study.

16                 I suspect that you will have a small sample

17   size, yes, particularly for small, like for one single

18   medical center, that will be, I expect that you will

19   have small sample size.

20                 But, again, that is a separate question

21   from whether this is the best design or not.

22         Q.      Could a randomized control trial on gender

23   affirming surgery be masked?

24                 MR. RODRIGUEZ:  Objection, beyond the

25          scope of this witness' testimony and report.

                                                          81

1              You can answer.

2        A.      That's beyond my expertise.  I don't --

3    well, that's beyond my expertise.  But obviously not.

4    This is a surgery.  If it's a surgery, then, of course,

5    you know, how can you double blind that?  No, you

6    cannot.

7              MS. NOWLIN-SOHL:  Orlando, I'm going

8         to ask you to maybe limit the speaking

9         objections, just note the objections, but

10         it's almost guiding the witness.

11              MR. RODRIGUEZ:  So it's not guiding

12         the witness, and actually I'm obligated to

13         state the basis of my objection.  I'm doing

14         so as concisely as possible, and I'm

15         repeating the same phrase that I've been

16         repeating all morning.  So we are allowed to

17         agree to disagree on that point.

18              MS. NOWLIN-SOHL:  Okay.

19        Q.      So, okay.  You said it is not possible to

20    mask a randomized control trial for gender affirming

21    surgery?

22        A.      Yes.

23        Q.      Okay.  And do you know if there's clinical

24    equipoise for a randomized control study for gender

25    affirming surgery?

                                                              82

1              MR. RODRIGUEZ:  Same objection, beyond

2        this witness' testimony and report.

3              You can answer.

4        A.    I already answered no clinical equipoise on

5   a higher level, like a statistical level.  But whether

6   it's to a specific disease or specific -- to a specific

7   disease, whether it's a cancer or gender dysphoria, I

8   don't make the judgment.  I don't know, because I'm not

9   a medical doctor in that field.

10       Q.    So you do not know if there's clinical

11  equipoise for randomized control trials on gender

12  affirming surgery?

13       A.    I don't.

14             MS. NOWLIN-SOHL:  Okay.  I think that

15        this is a good place to take a break.  How

16        long do you all need for lunch?

17             MR. RODRIGUEZ:  Forty-five minutes.

18             MS. NOWLIN-SOHL:  We will come back at

19        1 p.m. eastern.

20             (Off the record at 12:14 p.m.)

21             (Luncheon recess.)

22             (Continued on next page.)

23

24

25

                                                             83

1          A F T E R N O O N   S E S S I O N

2          (On the record at 1:03 p.m.)

3          BY MS. NOWLIN-SOHL:

4     Q.     And Dr. Li, you're aware that you're still

5    under oath, correct?

6     A.     Yes.

7     Q.     Okay.  Earlier I had mentioned clinical

8    practice guidelines.  Do you know what a clinical

9    practice guideline is?

10    A.     Well, I know, I think I know from a lay

11   perspective, layperson perspective, yeah, they are sort

12   of these guidelines, but I don't know specific ones,

13   because that's not my expertise.

14    Q.     What is your lay understanding of them?

15    A.     Well, it's -- yeah, it's a document.  I

16   don't know whether it's binding or not, but it's a

17   document, usually kind of composed by the medical

18   society or, you know, a group of expert in one field,

19   and then talking about, you know, some guidelines of

20   what normal -- I don't know whether it's

21   recommendation, or just guideline about the clinical

22   practice of a certain condition, medical condition.

23    Q.     Okay.  And so they kind of provide

24   treatment and diagnosis recommendations?

25    A.     I don't know -- again, the details, it

                                                        84

1    depends on the -- you know, I don't know what it is

2    about treatment, diagnosis, but I would expect, I would

3    expect that that would be like, what I know a little

4    bit more about breast cancer, or like breast cancer,

5    that kind of thing, or you need to do mammogram like

6    every, every year at 40 or things like that.

7            So I think it's a general, kind of, yeah,

8    recommendations of what general practice, but I don't

9    know whether that's binding, yeah.

10       Q.    Okay.  And in his rebuttal report

11   Dr. Antommaria described or said medical

12   professionals -- sorry, Dr. Antommaria said in his

13   rebuttal report that medical professional organizations

14   develop clinical practice guidelines that provide

15   clinicians with helpful evidence-based recommendations

16   and improve patient care and outcomes.

17            Is that consistent with what your

18   understanding is of clinical practice guidelines?

19            MR. RODRIGUEZ:  I'm going to object to

20        scope and foundation.  You can answer.

21       A.    Well, I don't have an expert opinion,

22   because I'm not an expert.  But my understanding is,

23   yes, the existence of those recommendations, obviously

24   they try to improve the clinical practice.

25            But the one thing, at least I know is that

85

1    those kind of guidelines also keep changing according

2    to the emergence of new evidence.  And they like,

3    again, if you now look at the breast cancer management

4    from 40 years ago, the guidelines, I believe, have

5    changed quite a bit, yeah.

6         Q.    Okay.  Do you know who develops those

7    guidelines?

8         A.    I don't know.  Again, it's case -- I think

9    it's condition specific.  So I don't know.  It's

10   usually -- I know that it will be a big, like a group,

11   consortium, or something like that.  But it's not one

12   person comes up with that.  It's usually organization.

13        Q.    Like a medical association?

14        A.    Sometimes the CDC or sometimes -- I don't

15   know the details of this.

16        Q.    Okay.  Have you ever been involved in the

17   development of clinical practice guidelines?

18        A.    Not so far, no.

19        Q.    Okay.  And do you know how they're

20   developed?

21        A.    I don't.  I don't, but, again, because I

22   work a lot with the, you know, in clinical research, so

23   I know that like I work a bit with cardiologists and

24   people like, yeah, expert in cardiologist, and I know

25   that they, again, as new studies, they do new studies

86

1    or trials, clinical trials and new observational study.

2    As new information come in, they revise their

3    guideline, their clinical guideline, and they always --

4    yeah, they usually have a bunch of lay expert in that

5    field, and then they all have clinical research

6    background, know the research in that field, and then

7    they develop guideline.  And then, as I said, they keep

8    changing, according to the new evidence emerge.

9         Q.    I want to go back to Dr. Antommaria's

10   rebuttal report and specifically page 8:

11        A.    Yes.  Yes.

12        Q.    Okay.  And so in paragraph 20, he says

13   that, the first line I already read to you.  The second

14   line or the second sentence says:  Clinical practice

15   guidelines are developed using systematic reviews of

16   the literature-systematic processes to collect and

17   review relevant scientific evidence.  Do you see that?

18        A.    Yes, I see that.

19        Q.    Okay.  And then he says:  Systematic

20   reviews evaluate the evidence but do not make treatment

21   recommendations.  Clinical practice guidelines both

22   evaluate the evidence and make recommendations.

23             Do you see that?

24        A.    Yes, I see that.

25        Q.    Okay.  And your expert opinion here is

87

1   solely about the evaluation of the evidence and not

2   about treatment recommendations, correct?

3        A.     Correct.

4        Q.     Okay.  And are you providing any expert

5   opinion on the recommendations that are made by WPATH

6   in their standards of care?

7        A.     No, I don't.

8        Q.     Okay.  Do you know what quality levels of

9   evidence clinical practice guidelines can rely on?

10       A.     I don't, but I expect it's also case by

11  case, but I don't.

12       Q.     What do you mean that you expect it case by

13  case?

14       A.     Well, it's like -- for like for cardiology

15  it's probably different from cancer.  And like also for

16  like an advanced disease, a severe disease is probably

17  different from behavioral signs.  Like, again, there

18  are many different type of medical conditions.

19              So I -- just from a scientific perspective,

20  I expect that they not always follow exactly the same.

21  You know, the way they come up with the recommendation

22  is different, but, again, I'm not an expert on that, so

23  I guess my opinion will stop here.

24       Q.     You mentioned cardiology might be different

25  from another practice of medicine that I missed?

                                                        88

1      A.      Like cancer.

2      Q.      What do you mean?

3      A.      Well, I mean it's different conditions.  I

4  mean, they treat -- people are treated different, and

5  also like the severity and the consequence of the

6  disease, if remain untreated is different.  I mean,

7  that's, again, from my layperson's understanding, I

8  imagine it's different.

9      Q.      Okay.  Let's go ahead and mark as Exhibit 3

10  an article with the GRADE guidelines.

11                  (The document referred to was marked

12              Deposition Exhibit Number 3 for

13              identification.)

14      A.      Yes, I have it.

15      Q.      This is an article in the Journal of

16  Clinical Epidemiological.  Are you familiar with that

17  journal?

18      A.      I know this journal.  I never published on

19  it, but I know this journal.

20      Q.      Okay.  And can you read me the title of

21  this article?

22      A.      GRADE 3 guidelines:  3 Rating of the

23  Quality of Evidence.

24      Q.      And have you seen this article before?

25      A.      No.

89

1      Q.     Okay.  And so if you look at the abstract

2   it talks about the GRADE system, right, and that it

3   specifies four categories for rating the quality of

4   evidence:  High, moderate, low and very low.  And

5   earlier, I know you mentioned you are not familiar with

6   the GRADE system, but I just wanted to ask about that.

7          So on the second page, there's a section 4.

8   Do you see that?

9      A.     Yes, I do.

10     Q.     Okay.  And the first paragraph, the last

11  sentence it says that:  Sometimes low or very low

12  quality evidence can lead to a strong recommendation,

13  and this is in the context of clinical practice

14  guidelines.

15          Do you have any concerns about clinical

16  practice guidelines making recommendations on low or

17  very low quality evidence?

18          MR. RODRIGUEZ:  I'm going to object to

19       the scope and form.  You can answer.

20     A.     I don't have an opinion on that without

21  reviewing the -- well, first of all, this is -- this is

22  the first time I have seen this document, and I think I

23  would have a better opinion if I read through this

24  whole document.

25          For this single -- I actually haven't find

90

1    that, but I hear what you said for that argument, for

2    that sentence per se, yes, it is -- that sentence I

3    don't -- I don't disagree that might be a valid

4    sentence.  But, again, that is, in my view, it's

5    irrelevant from my expert opinion.

6        Q.    Okay.  So your expert opinion does not

7    include an opinion on what quality of evidence clinical

8    practice guidelines and recommendations can be made

9    upon?

10           MR. RODRIGUEZ:  Asked and answered.

11       You can answer.

12       A.    Correct.  My opinion is about whether the

13   assertions made there are made in Dr. Antommaria's

14   report is supported by the reference they cited.  My

15   opinion is not about what kind of evidence you have to

16   have in order to make treatment recommendation.  Again,

17   my opinion has nothing to do with whether you can make

18   treatment recommendation or not.

19       Q.    Okay.  Are you aware that it is very common

20   in medicine for clinical practice guidelines to make

21   recommendations based on solely on observational

22   studies?

23           MR. RODRIGUEZ:  Object to the scope.

24           You can answer.

25       A.    That I don't know.  I don't know.  I

                                                        91

1   would -- yeah, I don't know.  But I would expect that

2   the higher quality probably the better, but, yeah, I

3   don't know.  I cannot answer to that question.

4       Q.    Okay.  Is it your view that medical care

5   should not be provided to patients if the only evidence

6   available supporting recommendations in a clinical

7   practice guideline is low quality?

8            MR. RODRIGUEZ:  Objection, form and

9        scope.  You can answer.

10      A.    So I think your question is, again, is too

11  broad.  So you're saying medical care, should medical

12  care be provided?  But what kind of medical care?

13           So, again, it depends on what kind of

14  medical care.  It's very case specific.

15           So I don't have an answer to your general

16  question, because that's clearly that's case by case.

17           So your question is well should medical

18  care be provided to people based on, you know, like

19  when there's a lack of evidence of -- again, that's

20  case by case.  And, I mean, again, as a layperson or as

21  just a scientist, you would hope that, you know, or the

22  treatment recommendations based on high quality

23  studies, but, again, that's case by case, so.

24      Q.    Why is it case by case?

25      A.    Well, let's say -- okay, I will give you an

                                                    92

1    example.  Let's say pancreatic cancer, so advanced

2    pancreatic cancer, so that is a lethal, very severe

3    disease, right.  So let's say you have a new drug

4    developed, and at that time you still don't know like,

5    let's say, phase two trials.  You don't know whether

6    this drug is helpful, but there's no alternative,

7    because this patient, if they don't get, they don't get

8    it, they will die.  Because all the current available

9    things out there available, you know, will not -- the

10   patient will die.

11             So then they would, in that case, you know,

12   that's -- I think that -- I believe that an

13   extraordinary condition like this is that kind of cases

14   then(sic) the patient wanted.  And also there's no

15   alternative.

16             So this is like give you maybe 50 percent

17   of chance of improving, so people will take that, so

18   that's the case, yeah.  You don't have evidence, yeah,

19   you get it, but in other cases, like if you have flu,

20   and if you have flu, for example, that's not a lethal

21   disease.  And in that case, you know, if you want to

22   use some alternative medical care and then probably

23   unresolved evidence, that's probably not a good idea,

24   or that's probably likely your doctor can decline that.

25             So, again, that's what I'm saying.  Just in

93

1   this case, I give you two examples of flu, which is

2   like a -- it's not a too-sever disease, versus advanced

3   pancreatic cancer.

4        Q.    Okay.  And those opinions you just

5   provided, are those your expert opinions or

6   layperson's?

7        A.    Lay opinions.  Lay opinions.

8        Q.    Okay.  I'm going to mark as Exhibit 4 an

9   article on pediatric obesity.

10              (The document referred to was marked

11         Deposition Exhibit Number 4 for

12         identification.)

13        A.    Yes, I have it.

14        Q.    Okay.  What is this?

15        A.    This is a clinical practice guideline.

16        Q.    For pediatric obesity?

17        A.    Yes.

18        Q.    I'm assuming you had not seen this before,

19   but have you seen this before?

20        A.    No.

21        Q.    Okay.  And do you know who published this

22   guideline?

23        A.    I don't.

24        Q.    At the top of the title, it says:

25   Endocrine Society Clinical Practice Guideline.

                                                          94

1          Are you familiar with the Endocrine

2    Society?

3         A.    No.

4         Q.    Have you ever heard of it?

5         A.    No, I have not heard of it, but I'm not

6    surprised the existence of it.  Every field has a

7    society.

8         Q.    Okay.  On the page, the conclusion says:

9    Pediatric obesity remains an ongoing serious

10   international health concern.

11         Do you agree that pediatric obesity is a

12   serious health concern?

13         MR. RODRIGUEZ:  Objection, scope.

14         You can answer.

15        A.    I'm not an expert in obesity, and I hear

16   from news, but, yeah, but I don't -- again, I can give

17   you a layperson view on this, but I don't know how that

18   is related to what we're talking here.

19        Q.    Okay.  But in your lay opinion, would you

20   agree that pediatric obesity is a serious health

21   condition?

22         MR. RODRIGUEZ:  Scope.  You can

23      answer.

24        A.    So you asked me whether pediatric obesity

25   is a serious condition.  Well, again, I don't know what

                                                        95

1    do you define as serious?  And I guess it's not good,

2    but I don't know how serious that is.  And also I don't

3    know how the -- like here, the epidemic, like how

4    widespread it's got.  So again, it's just I lack

5    expertise in answering that.

6         Q.     Okay.  And if we go to page two, do you see

7    that there's a summary of recommendations?

8         A.     Yes, I do.

9         Q.     And each one is numbered?

10        A.     Yes, I do see that.

11        Q.     Okay.  So going to the end of this section,

12   which is, I think, on the page titled 712?

13        A.     Sorry, page what?  712.  Oh, okay, 712.

14        Q.     In the upper right paragraph in the middle

15   it says that the number one is for a strong

16   recommendation, and then number two is for a weak

17   recommendation.  Do you see that?

18        A.     Yeah, the number one, yes.  Yes, I see

19   that.

20        Q.     Okay.  And then it continues where it says:

21   Cross-filled circles indicate the quality of evidence.

22        A.     Yes.

23        Q.     So one filled circle is very low quality,

24   two is low quality, three is moderate, and four is high

25   quality?

                                                             96

1       A.      Yes.

2       Q.      Okay.  And I know you're not familiar with

3   the GRADE recommendations, but do you recall reading in

4   Dr. Antommaria's report that randomized controlled

5   trials are generally assigned high quality, and

6   observational studies are generally signs of low

7   quality?

8       A.      Yeah, I -- yes, I think I remember.

9       Q.      Okay.  But in the summary of

10  recommendations, do you see any recommendations that

11  are based on high quality evidence, which would be four

12  cross-filled circles?

13              MR. RODRIGUEZ:  Object to foundation.

14              You can answer.

15      A.      It goes through that.  I guess if you ask

16  my question like that, obviously, the answer is no, I

17  don't see any.  But I can go through that, right.  It's

18  like what they are doing here is high quality plus plus

19  plus.  No, I don't, but they do have a few -- three

20  process, and that I will call prospective study.

21              Yeah, well, to answer your question, no, I

22  don't see any.  I don't see any of this high plus plus

23  plus, a high quality one.  But I do see -- yeah, well,

24  I will stop there.

25      Q.      You mentioned three pluses suggests a

97

1    prospective study, is that what you said?

2         A.    No, I didn't.  I'm just saying that, again,

3    I don't know -- because I'm not familiar with the GRADE

4    system.  I don't know how that is equivalent to the --

5    how you would characterize or classify the prospective

6    study.  But I do relative like quality of the relative

7    or the order in terms of their quality.  Yeah, that's

8    what I want to say.

9         Q.    Okay.  So none of these recommendations do

10   they characterize as relying on high quality evidence,

11   correct?

12        A.    Well, again, I see where you're going, but

13   maybe I should -- so high quality, yeah, so it's a high

14   quality.  High quality in the GRADE system, yes.  I

15   don't see any of that.  But I do see a few of them

16   based on moderate quality.  And, again, I don't know

17   what do they -- what kind of study they call moderate

18   quality, but I do see they have moderate quality in

19   this, yeah, in this guideline.

20        Q.    Okay.  But there's no high quality?

21              MR. RODRIGUEZ:  Asked and answered.

22              You can answer.

23        A.    Yeah, there's no high quality.

24        Q.    Okay.  And does that mean that the studies

25   relied upon by these guidelines do not provide

                                                              98

1    meaningful support for the assertions and

2    recommendations made?

3              MR. RODRIGUEZ:  Object to the form and

4         foundation and scope.  You can answer.

5         A.    I don't think that that is -- again, that's

6    a different -- you're asking a different question,

7    because I -- so what you are showing me here is those

8    guidelines, and then they have -- they label the

9    evidence.  They label the evidence they rely upon, but

10   it didn't say -- I didn't inspect the evidence they

11   cited to decide whether that's supported.  They decide

12   to use those evidence and use it in their guideline to

13   support -- use those to basically to cite the support.

14             But I didn't, again, that's a different

15   question from what my assignment was, right, or my

16   argument.

17             My argument was whether you can establish

18   the treatment effectiveness, whether this -- about

19   treatment effectiveness, whether that can be supported

20   by the reference they cited.  But, again, this is here

21   your question, I think, it's a separate question.  It's

22   yeah, I mean, I don't know whether the things they

23   cited support their recommendation, because I didn't

24   review that.  So I don't have opinion on that.

25        Q.    Okay.  So the question of establishing

                                                         99

1    treatment effectiveness is separate from the question

2    of clinical recommendations?

3         A.    Correct.

4         Q.    Turning back to your report, how would you

5    decide which WPATH assertions to evaluate?

6         A.    How do I decide?

7         Q.    Yes.

8         A.    Oh, Orlando come to me and then he already,

9    he gave me this numbers of assertions, asked me to

10   examine that, and that's how I decide.  I examined them

11   one by one.

12        Q.    Okay.  Did you consider evaluating the

13   assertions by the Endocrine Society and its clinical

14   practice guidelines on the treatment of gender

15   dysphoria?

16        A.    Sorry.  Can you ask that again?

17        Q.    So the Endocrine Society also have clinical

18   practice guidelines on treatment for gender dysphoria.

19   Did you consider evaluating the assertions by the

20   Endocrine Society in that guideline?

21        A.    No, I didn't review.  I'm not aware of that

22   document, and I didn't review that.

23        Q.    Okay.  And in WPATH, in terms of care, are

24   there recommendations made in that document?

25        A.    I don't know.  I don't remember.  Again, I

100

1    focused on my opinion, or my expert report was focused

2    on the specific assertions that was presented by

3    Orlando to me, ask me to take a look.

4           So I didn't -- yeah, I glanced through that

5    document, but I didn't remember everything that was

6    said there or anything beyond that.

7    Q.    Did you read the sections of the assertions

8    that you were evaluating were in?

9    A.    Oh, yes, I read, but, I mean, that's --

10   basically that's bullet points.  Yes, I read those

11   sections very quickly, but I think I actually did a

12   good job in picking those assertions out is a good

13   summary of the -- yeah, I mean that's paragraph.

14   Q.    When you reviewed it, do you recall that

15   there were recommendations numbered similar to what we

16   just saw in the Pediatric Obesity Guideline?

17   A.    I don't.

18   Q.    Okay.  And so you were not providing an

19   opinion on the recommendations themselves?

20   A.    No.

21   Q.    Your chart at the end of your report lists

22   Assertions 1 through 11.  Are they numbered that way in

23   the standards of care?

24   A.    I don't know.  I guess not.  I mean, I

25   don't know, because I didn't pay attention to the

101

1    standard of care.

2         Q.    Okay.  Were they numbered that way when

3    Orlando gave them to you?

4              MR. RODRIGUEZ:  Object, borderline on

5         getting into communications between counsel

6          and the retained expert.

7         A.    I don't remember clearly.  I believe that

8    was the order he gave me, because I just then take it,

9    and then it's like dealing with, paper -- I mean, it's

10   dealing with one by one.  So I didn't change the order

11   or anything.

12        Q.    Okay.  In your report, you only include

13   your evaluation of Assertions 1, 2, 6, 10 and 11.  Why

14   only those ones?

15        A.    Say it again?  So I only -- I believe that

16   everything Orlando asked me to -- the assertion I

17   indeed reply.  Oh, 1 through 6?  Why the -- okay.  I

18   need to look at the -- let me take a look.

19             Oh, did I say -- again, I don't remember

20   clearly.  I think the -- again, this I need --

21   actually, if I have a computer, I can see what is the

22   original Assertion 7 to -- 7 to 9.  I need to look.  I

23   don't know.

24             So if I didn't respond to that, it's -- oh,

25   it's because --

                                                      102

1          THE WITNESS:  Do you have the charge?

2          MR. RODRIGUEZ:  Keep on looking

3     through the rest of that.

4          THE WITNESS:  Oh, okay.

5     A.     Just give me some time.  I look through the

6     charge, then I know.  Almost there.

7          So Assertion 7, so let me see, Assertion 7

8     says:  Too often the agency's structure and personnel

9     provide care are lacking in knowledge, training and

10    capacity of care for gender diverse people.

11         So the paper -- well, oh, I see.  So why I

12    didn't, because this has nothing to do with my

13    expertise, because my expertise was talking about -- it

14    established the effectiveness or the safety of a

15    medical intervention.

16         So for this assertion, I don't have opinion

17    to provide, because I don't have expertise on this.  So

18    that's why I didn't provide.

19         So I think the same thing for the 8 and 9.

20    So I provide the -- so there are a bunch of assertions,

21    but I provide the opinions on the assertion that I feel

22    that I have expertise on to judge.

23    Q.     Okay.  So you were not providing an opinion

24    on Assertions 3 through 5 or 7 through 9?

25    A.     I think -- yes.  Yes.

103

1      Q.      Okay.  Well, let's go to Assertion 1 in the

2   body of the report, not the chart.

3      A.      Let me get there.

4      Q.      I think that's page 11.

5      A.      Yes, I found it.

6      Q.      Okay.

7      A.      Yes.

8      Q.      Okay.  So what do you mean when you

9   conclude that studies failed to provide rigorous and

10  statistical evidence on the benefits of quality of life

11  and well-being of gender-affirming treatments?  And

12  apologies, I should have directed you to where that

13  quote is.  It's at the very end of your discussion of

14  Assertion 1.

15     A.      Okay.

16     Q.      Page 15.

17     A.      Yes.  Yeah, so the end I said:  I conclude,

18  yeah, contrary to the statement in the assertion, these

19  studies failed to provide rigorous and statistical

20  evidence on the benefit of life and quality and

21  well-being of gender-affirming treatments.  Yes.

22              So your question?  Can you repeat your

23  question, please?

24     Q.      Okay.  Yeah.  So I know earlier we talked

25  about rigorous, and in this context, what do you mean

                                                              104

1   by rigorous?

2        A.     Well, I explain that, okay.  So if you look

3   at the assertion, it says:  There is strong evidence

4   demonstrating the benefit, okay.  So what do I mean by

5   strong evidence?  Okay.  So I focused on that strong

6   evidence.  So as I go through my assertion, so I --

7   strong evidence, I show that they cited 21 studies, and

8   so there are five prospective studies, which, again, in

9   my GRADE, that is higher quality ones, and those have

10  mixed results.  And then they are now retrospective

11  studies and others of lower qualities, and they have

12  their lower qualities, and they are -- I describe all

13  sorts of flaws in the design.  And also I have, I said,

14  there are also seven literature reviews.

15            So the literature reviews point out

16  themselves that, you know, acknowledge the current

17  available research based mostly on cross-sectional

18  studies and call for -- so they acknowledge it's low

19  quality studies.

20            So, I mean, rigorous, again, it's not

21  rigorous.  So they have this retrospective studies, and

22  you would not cite those as rigorous, and the

23  consistency part I already mentioned, because the

24  higher quality prospective studies, actually the

25  results show mixed.  It's not always provide benefits

                                                            105

1    for that.

2              And 7, actually quite a sizable number of

3    literature reviews point out, acknowledge the

4    shortcomings and flaws in the current state of the

5    research.

6              So that's what I meant it's not rigorous or

7    consistent.

8         Q.    Would there have needed to be a randomized

9    control study here for you to find that there was

10   rigorous and consistent statistical evidence to support

11   this assertion?

12        A.    If there's one that will add to the

13   reader -- that will definitely add to the reader,

14   there's none, which, again, that's not the end of the

15   world, but they do have some higher quality ones,

16   prospective ones.  Unfortunately, they show the result

17   of the benefit on quality of life is mixed.  They find

18   some positive, some are negative.

19             So, again, I don't -- I mean, I don't have

20   an opinion.  Like, again, it would be great if they

21   have randomized study, but they don't have that, but I

22   don't think that's the end of the world.

23             So I judge, I judge this, because they say

24   that the assertions say there's a strong evidence.  By

25   my knowledge -- but by my examination of the literature

1    they reviewed, I find that's really a stretch, because

2    the higher quality ones states actually mixed results.

3              I'm not going to repeat, but, yeah, that's

4    what I meant.

5        Q.    So if there are no randomized control

6    studies, and the observational studies did not have

7    mixed results, would you find that their assertion was

8    supported by rigorous and consistent statistical

9    evidence?

10       A.    Can you say that again?  Can you say --

11   sorry, I didn't hear clearly.

12       Q.    Okay.  So my last question was, you know,

13   if there was a randomized control study, would you find

14   that there was rigorous and consistent statistical

15   evidence?  And you said the lack of a randomized

16   control study was not the end of the world.  And so my

17   next question is, you know, if there are no randomized

18   control studies, and the prospective observational

19   study has consistent results or not mixed results,

20   would you find that there was rigorous and consistent

21   statistical evidence to support this assertion?

22             MR. RODRIGUEZ:  Object to speculation.

23             You can answer.

24       A.    Yeah, this is speculation.  So this is

25   speculation.  So I can only speak to the five, like the

                                                      107

1    studies they cited.

2              But to answer your question, yes, if they

3    have like -- they have other prospective studies and

4    well done, and they described nicely, it described very

5    clearly the methodology and the result not mixed, I

6    would feel a bit more confidence in -- like then, yeah,

7    that definitely is some more strong evidence than what

8    is currently presented here.

9         Q.    And is there a set number of additional

10   prospected numbers that would be needed?

11        A.    No, I don't.  Again, the better, the higher

12   number, the better quality, it's better.  But there's

13   no number I can say well, you need five studies, you

14   need ten studies.  We don't have that.

15        Q.    Okay.  So I guess I'm trying to find where

16   the line is for you, right.  You've concluded that this

17   is not rigorous and consistent.  And so you must have

18   some sense of what is, and like how do you make that

19   determination?  And it sounds like there's some gray

20   areas.  There's a lot of factors.  How do you make that

21   determination?

22        A.    So the key thing, actually, I made my -- I

23   made my opinion or my opinion, not like what you're

24   saying that I don't need to make a line.  I examine

25   what is cited there, and what is cited there -- what

108

1    was cited there, the high quality ones already show you

2    a mixed result.  I don't think that I need to go

3    further and say how much evidence I need to make this

4    recommendation?  Because I examine what is presented to

5    me, what is cited by them.  They cite it for a reason.

6    They cite it for -- I assume they cite those papers to

7    support the opinion.  But what is cited there, if you

8    close exam, provide mixed result that I think is

9    enough.  I don't need to -- for your question, it's

10   beyond my scope to say oh, where should I draw that

11   line?  I judge -- I examine what is presented, what is

12   cited by them, and thus result is not consistent, and I

13   don't think that constitute a strong evidence for

14   the -- strong evidence for treatment effectiveness, and

15   that's what my opinion is about.

16        Q.    And you know that this is not enough

17   evidence to be considered rigorous and consistent, but

18   you don't know how much would be needed to be rigorous

19   and consistent?

20        A.    Correct.

21        Q.    Okay.  So in here, you're talking about

22   mixed results in the prospect area.  Are you talking

23   about is it the Lindqvist study?

24        A.    That's one of the studies.  I mention many.

25   I also -- not many.  I mean, there are just five,

                                                        109

1    right.

2                    So Lindqvist is one.  So, again, I went one

3    by one.  The other is before -- after.

4                    Okay, so the other one, that is the Cardosa

5    da Silva paper also find mixed results.  Specifically

6    they found that psychological side -- help and social

7    relationship was significantly improved after SRS, but

8    physical health and level of independence was

9    significantly worse.

10                   So that's another one.  And another one

11   is -- so another one, again, I don't know whether I

12   need to read through, I mean, this says very clearly

13   that the other one is a prospective study.  So they

14   focused on specific type of surgery, and they, the

15   study does not provide no information about the fact of

16   the surgery on general quality of life or well-being.

17                   So then the other one, again, the five

18   specific, the other one, the 2014 one, is focused on

19   the safety and side effects of intervention, not

20   quality of life.  And the other one is prospective

21   study, but that did not provide before/after comparison

22   of the same patients.

23                   So you can see that I list carefully there

24   are five studies.  There are five studies, and I

25   mention that some of them do result mix.  Some of them

110

1  simply do not provide information about quality of

2  life, which is -- in the assertion, they say assertions

3  about strong evidence of the quality of life or

4  well-being.

5            So I'm saying that, okay, so there are two

6  studies talk about that, the result is mixed.  And then

7  there are other studies that do not provide information

8  for quality of life.  So you cannot use that for

9  evidence.

10           And the other one, the last one did not

11  provide a before and after comparison of the same

12  patient.

13           So that's why I clearly examined them one

14  by one in five study, and then why I tell you that, you

15  know, they're essentially among the five studies, there

16  are two studies actually specifically talking about

17  quality of life, and they are of high quality and the

18  results are mixed.

19      Q.    Okay.  I'm trying to look at the document

20  quickly.  All right.  So let's mark Exhibit 5, the

21  Lindqvist study.

22                (The document referred to was marked

23           Deposition Exhibit Number 5 for

24           identification.)

25      A.    Yes, I have it.

111

1          Q.      And is this the study that you reviewed as

2    part of your expert report?

3          A.      Let me look at it.  I believe so.  It must

4    be this, yes.  Yes.

5          Q.      Okay.  And in the abstract, can you read

6    the last sentence or the second to last sentence that

7    starts with GRS?

8          A.      The last sentence says:  GRS -- so no, the

9    abstract, they have background, they have methods, they

10   have results, which one are you talking about?

11         Q.      On the very first page where it says

12   abstract, the last sentence of that section on the

13   upper right side it says GRS.

14         A.      Oh, GRS.

15         Q.      Gender --

16         A.      Yes, I read that:  GRS lead to an

17   improvement in general well-being as a trend, but over

18   the long term, quality of life decreased slightly in

19   line with that of comparison group.

20         Q.      Does GRS refer to gender reassignment

21   surgery?

22         A.      Yes.

23         Q.      Okay.  And so this study, the people who

24   conducted this study, did they conclude that gender

25   reassignment surgery leads to an improvement in general

                                                         112

1   well-being?

2        A.     Well, it said it proved as a trend but, but

3   the key thing is but over long term, quality of life

4   decreased slightly.

5        Q.     Right.  And what does it mean to decrease

6   in line with that of the comparison group?

7        A.     Well, he said that the comparison group

8   also decreased, and the quality of life, yeah, it's --

9   I need to read more carefully what the comparison

10  group, so who they compared to.  I mean, it's one of

11  the many papers.  But the comparison group, I don't

12  know what the comparison group is, without looking

13  carefully.  Is the comparison group -- I mean, they

14  have a comparison group.  I don't know that the

15  comparison group is -- actually, I don't know here.

16            Oh, okay.  So -- okay.  So I'm now on page

17  225, and so the last sentence:  Our findings on lower

18  quality of life in transgender woman compared to the

19  general population of women is in line with the same

20  previous studies, and in contrast to others.  However,

21  one of those were performed on transgender men only.

22            So, again, they have a comparison.  So I

23  guess it's a comparison compared to the general

24  population of women?  I assume.  Like that's my

25  understanding, just quickly reading through this.

113

1      Q.     Okay.  And so you've described this study

2    as having mixed results, why?

3      A.     Well, because the first -- again, by mixed,

4    I mean the initial, there's the increase, and then what

5    I describe here then over the years at three years and

6    five years, it's decreased.  So that's mixed.  It's not

7    like by mixed I mean the trend of direction, the

8    direction of the outcome is not one-sided, like

9    maintain the same over years.  That's what I meant,

10   mixed.

11     Q.     Okay.  And you conclude that even though

12   the comparison group had a similar decline with the

13   same timing?

14     A.     Again, that's their conclusion.  They say

15   it's similar.  But if you look at the numbers, I don't

16   know how similar that is, whether that's significant.

17            What they say is yes, that is in line,

18   basically the comparison group, like, it's the general

19   population, I assume, yes.

20     Q.     So is it possible to interpret this as not

21   mixed, because everyone is going to have a slight

22   decline in quality of life at that time?

23     A.     No, this is -- no, this is -- I cannot

24   interpret that way, because this is about -- because

25   the treatment in fact is on the population, on the

114

1    patient who received the treatment.

2              So you're talking about for this person,

3    for those patients who receive the treatment, so then

4    it's going up and then going down.  You cannot stretch

5    that to well, then there's -- like the fact is that

6    there's indeed decrease.  And what happened about the

7    general population, I don't know, and that's not

8    because they don't provide data for that.  They are

9    just saying oh, that is acknowledged by other, other

10   studies.

11        Q.    Okay.  So do you disagree with the

12   conclusion of this paper that gender reassignment

13   surgery needs improvement in general well-being as a

14   trend, but over the long term, the quality of life

15   decreases slightly in line with that of the comparison

16   group?

17        A.    Not the conclusion.  I take it at face

18   value.  I don't disagree.  I mean, that's what they

19   said, and then I just use that as one of the many

20   papers.  I mean, I don't know whether I agree.  I take

21   that at face value, this is what they said.

22        Q.    But do you agree with it?

23              MR. RODRIGUEZ:  Asked and answered.

24              You can answer.

25        A.    Well, according to their study, according

115

1    to what they described, I agree with the conclusion.

2    Again, they clearly try to spin it, make it sound more

3    positive than it is.  But that's what we all do when

4    you write papers, because you get published that way.

5              But, yes, I mean, I think what their

6    conclusion is supported by their data.

7         Q.    You said they clearly tried to spin it.

8    Where is that clear?

9         A.    Where is that clear?  So let's look at the

10   numbers.  Again, this is getting too details, but I can

11   try.

12             So there's a decrease of general health.

13   I'm looking at page 225.  Again, this is one of the

14   many studies.  So I'm now doing on cite examine the

15   paper for you.  Where I say the main clinical -- so

16   okay.  So this is what I -- let me see, this is year

17   one, okay.  So that's year one.

18             Let's look at table two.  So you have year

19   two, table two that's individuals in this study.  Okay,

20   all of that year 0, 1, 3, 5, okay, then let's look at

21   the general -- I see.  I see what -- okay.  Because

22   they didn't provide data actually about the general

23   population, so if you look at this study, is table two

24   is providing information about all individuals in the

25   study.  They are on this through, you know, the

116

1    treatment.  They didn't provide any information about

2    the general population.  There's nothing qualitative

3    about their decrease.  They purely just say oh, there

4    are other papers.  There's general decrease of the

5    quality of life, and I don't, at least as far as I can

6    see here, they don't provide information, quality of

7    information, don't provide data to talk about the

8    comparison group.  So that's why I say that it's really

9    a stretch, because they just say oh, there are other

10   studies, but this paper did not provide that data, and

11   they just say that it's inline, but there's no data

12   supporting their argument, so, but, yeah.

13        Q.    Do they --

14        A.    Sorry, keep going.

15        Q.    Go ahead.

16        A.    No, I was just saying, it was very clear

17   that -- but the trend talking about the patients in

18   this particular study, as far as increase then

19   decrease, that is clear.  That is supported by the data

20   by table 2.  But then saying that is in line with the

21   other general populations, that aspect, I don't see

22   data supporting them.  So that's why I see clear.

23        Q.    Did you read this paper in your entirety in

24   preparation for your expert report?

25        A.    Yes, I read through that question quickly.

117

1    I focused more on the design and the data points.  Yes,

2    I read through that.

3         Q.    Did you read fully all of the studies cited

4    in your expert report?

5         A.    Again, how do I define fully, right?  I

6    mean, I skim through them, and I focus -- I know the

7    abstract, the conclusion.  I skim through the -- very

8    quickly the paper, but I focus mostly on the

9    statistical methodology and the results and the

10   numbers, that aspect.  But, again, I guess that is

11   entirety, but there's no -- I didn't check all the

12   references and stuff, because that's -- that will take

13   an infinite of time.

14        Q.    So going back to WPATH Assertion 1 on page

15   11 of your report.

16        A.    Okay.  Yes, I'm there.

17        Q.    Okay.  So do you disagree that there are

18   benefits in quality of life and well-being of

19   gender-affirming treatment, including endocrine and

20   surgical procedures?

21             MR. RODRIGUEZ:  Objection, scope.

22             You can answer.

23        A.    So, I mean, again, my opinion is about

24   whether the references cited provide strong evidence

25   for, as they claimed, for the benefit of quality of

                                                        118

1    life, and that's all my opinion is about.

2              So sorry, what are you asking?

3        Q.    I was asking if you disagree that there are

4    benefits in quality of life and well-being of

5    gender-affirming treatment, including endocrine and

6    surgical procedures, properly indicated and performed,

7    and outlined by the standards of care?

8        A.    As I said, they are papers that they cite

9    that shows that -- again, those papers show, yeah,

10   there is benefit in quality of life, but unfortunately,

11   those studies are of low quality, and they are subject

12   to all sorts of biases and the design flaws.  So then

13   how reliable that evidence is, that's questionable.

14             And so that's why I disagree with these

15   assertions that say there's strong evidence, because

16   this is at best pretty flimsy evidence.

17       Q.    Okay.  So the scope of your opinion is just

18   as to whether or not there is strong evidence?

19       A.    Yes.

20       Q.    Okay.  And you are not providing an expert

21   opinion on whether there are benefits in quality of

22   life and well-being of gender-affirming treatment?

23       A.    No.

24       Q.    Okay.  Going to page 15, still in Assertion

25   1.

1      A.      Yes, I'm there.

2      Q.      On the fourth line down, oh, sorry, a

3   little bit further down, I think roughly the sixth

4   line, you said:  None of the studies compare sexual

5   assignment surgery with alternative treatment.

6           So what alternative treatment are you

7   thinking of?

8      A.      Oh, any.  Like, so -- there are, again, this

9   is also kind of academic in the sense that you compare.

10          So I say this it's because -- so they might

11  be, again, gender dysphoria, I'm not an expert on that,

12  but I'm saying that, for example, heart disease.  There

13  might be assorted different medications, right.  So

14  often we study -- in comparative effectiveness

15  research, often we kind of do studies or trials,

16  observational study, to see that among these different

17  alternative, like four different medications, which one

18  is the best?  So that's what I meant by alternative

19  treatments.

20          So here I say that, you know, this is --

21  they're not talking about, they're just talking about

22  one particular type of treatment.  And then I don't

23  know whether there are other alternative treatments,

24  but I'm just saying that in the statement, that here,

25  they don't talk about -- like maybe their hormone

120

1    therapy.  I don't know.  But they don't compare like

2    the surgery versus hormone therapy.  Because, again, I

3    over here, because later, in the later assertion there,

4    the reason I'm thinking Dr. Ettner's point she made

5    that, she made the one statement something like this is

6    the only effective treatment.

7              So I think that is -- when I wrote that

8    part, I was having that in mind.  It's like well, all

9    of these studies, particularly about having this

10   treatment versus, I guess, not having this treatment,

11   but not versus alternative treatment, for example,

12   hormone therapy, things like that.  So that's what I

13   meant.

14        Q.    But you're not aware of any alternative

15   treatments?

16             MR. RODRIGUEZ:  Object to the scope.

17        You can answer.

18        A.    Again, this is -- this depends on like,

19   yeah, I'm not an expert of that.  I don't know.  I

20   cannot say, have a blanket statement say that there's

21   no alternative treatments or I am aware of that,

22   because it obviously depends, there's different type of

23   surgeries out there.  I know that there's surgery

24   versus hormone therapy.  That's probably more or

25   less -- and I also know there's different types of

                                                    121

1    surgeries.

2            So that's what I have in mind when I wrote

3    that alternative treatment.  I'm just saying that they

4    are all -- all the studies here is comparing having

5    this versus not, but not different treatment.  You

6    know, that's what I meant.

7        Q.    So let's move on to WPATH Assertion 2 and

8    looking at the bottom of page 16.

9        A.    Yes.

10       Q.    So you summarize that because the studies

11   are all of low quality and they're subject to selection

12   bias, nonresponse bias and recall bias, that they fail

13   to provide rigorous and statistical evidence for the

14   assertion, is that correct?

15           MR. RODRIGUEZ:  Objection,

16       incomplete -- incomplete recitation of the

17       opinion.  You can answer.

18       A.    Yes, correct.  I mean, you were basically

19   reading out the rigorous and statistical sentence of

20   mine.  I reported on that point, yes.  Yes, that's my

21   opinion.

22       Q.    Okay.  And earlier we talked about

23   nonresponse bias and recall bias, both being present in

24   randomized control trials as well as observational

25   studies, correct?

122

1        A.        Correct.

2        Q.        Okay.  And so is it your opinion here that

3    because there are no high quality randomized control

4    trials, there could not be rigorous statistical

5    evidence to support the assertions?

6        A.        That's not my opinion.  My opinion, as I

7    said, that there are different -- there are different

8    classes of study.  Randomized control study is the

9    best.  If it's not available and not always available,

10   then you resort to observational study.  But even in

11   observational study, there are good quality and poorer

12   quality ones, higher quality or lower quality ones.

13   And that I didn't say, I didn't say like there's no

14   randomized study then -- like I didn't make my

15   statements or opinion based on, entirely based on the

16   lack of randomized study.  Yeah, it is one of the

17   weakness, but that is not the end of the world.  I am

18   more focused on actually the higher quality ones that

19   are there.  You know, there are very few high quality

20   ones, and the results are mixed, and most of them are

21   low quality ones.  And I explain that, why they are low

22   quality, what kind of bias they are subject to.

23       Q.        And is it your assertion that the studies

24   are subject to selection bias based on the fact that

25   they are not randomized control trials?

123

1          A.      No, that's not -- no, it's a different,

2     it's a different aspect.  So randomized, again, as I

3     explain earlier, so why do you want to randomize study?

4     All the classification of the quality of the study

5     including inference.

6               The big -- like there are all sorts of

7     considerations, but the biggest hurdle is confounding.

8               So randomized trial is good in dealing with

9     that, okay.  And so that was my point.  And then as I

10    said, the other type of bias, selection bias or

11    nonresponse bias, yeah, those are all the studies

12    subject to, but they are more of the second order

13    issue.  And also randomized subject is subject to

14    those, but because of the ways randomized study is

15    highly controlled by the investigators, the chance of

16    those biases are much smaller than the observational

17    studies.

18               So that's why randomized studies always

19    prized, but I repeatedly said that without that, it's

20    not the end of the world.  There's still plenty of good

21    well-designed observational study that, you know, can

22    be valuable.

23          Q.    You say that most of these studies are

24    subject to selection bias.  Why do you say that?

25          A.      Well, because that's just the way it is.

                                                          124

1   Okay.  I can go into details.

2              So one thing I can think of is many of the

3   studies are from like a single, like a patient -- like

4   a doctor from all the patients he has treated, or like

5   they are locally in one hospital, one medical center

6   over the years have done.

7              So again, in that case, then the patient,

8   the patient population they consider might not be

9   representative of the general population.

10             So that's what I meant.  I mean, that's

11  just a general, like if you read through the studies

12  and I found that most of them have that kind of issue.

13             But I do note that they are studies,

14  like -- I don't know whether it's here -- somewhere

15  there's a study of like the Danish study of all the

16  national registry over 20 years of the whole

17  population.  Yeah, that one I think, as I said, the

18  quality is higher, because it's a more general

19  population.  But even that, it's still like focused on

20  the Danish population.  Whether that is representing

21  the whole universe of transgender people, I don't know,

22  and most likely it's not.

23       Q.    Okay.  And is your assertion that most of

24  these studies are subject to recall bias based on the

25  fact that some of the studies are retrospective?

                                                    125

1        A.        Not some of them, yes.  If they're

2    retrospective, they are more likely subject to recall

3    bias.

4        Q.        Okay.  So retrospective studies inherently

5    have a degree of recall bias?

6        A.        Yes, because, again, because this happened.

7    You usually collect the data once things already

8    happened.  So that is -- you don't like collect the

9    data -- the happening of the thing.  Yes, it's

10   inherent.

11       Q.        And why do you conclude that these studies

12   are subject to nonresponse bias?

13       A.        Oh, well, nonresponse bias, as I mentioned,

14   that when you have -- there's some patients who just do

15   not provide data.  And it's pretty well-known

16   methodology that, you know, the people who do not

17   respond to -- there's a reason they don't respond.

18   They don't provide information.

19            So most likely they are different from the

20   people who respond, who provide information.

21            So, again, or if you want to make them --

22   if you -- like only if you make the assumption that

23   these two people, the people who respond versus people

24   who don't respond are exactly the same, like if you

25   want to say there's no nonresponse bias, basically you

1    are saying that the people who respond versus people

2    who don't respond, they are the same.  But that

3    assumption most likely is, you know, not plausible.

4              So that is why I say that they're all

5    subject to nonresponse bias.  And I read in many of the

6    studies, actually the nonresponse rate is pretty high,

7    like they send out the surveys to the patients, and

8    often the response rate is like 30 percent.  That's

9    really low.

10        Q.    Okay.  And are all types of study designs

11   subject to nonresponse bias?

12        A.    Yes, that's correct.  But as I said, that

13   some of the studies, like a randomized study, because

14   you are -- you closely monitor them.  Like you sign

15   agreement, I think.  So there are ways of improving

16   that, but among all of the -- like the retrospective

17   study, again, has the highest -- like is most

18   vulnerable to that, because you have very little

19   control over the response.

20        Q.    Looking at the assertion itself, do you

21   disagree with the statement that gender-affirming

22   interventions are not considered experimental, cosmetic

23   or for the mere inconvenience of a patient?

24              MR. RODRIGUEZ:  Object to incomplete

25         statement of the actual text.

127

1          You can answer.

2      A.      This is not -- again, my opinion is -- so

3  if you see that in what I wrote, I focused on the last

4  sentence:  They are safe and effective in reducing the

5  gender, the gender dysphoria.

6          So my statement was not about like whether

7  they are considered experimental, cosmetic for the

8  convenience of patients, because, again, I'm not an

9  expert in the medical practice of transgender people.

10  So I cannot make -- I don't think I have the expertise

11  to make a statement on that.  But my statement is more

12  about the second sentence, is they are safe and

13  effective in reducing gender dysphoria, because that

14  is -- fall into my expertise in comparative

15  effectiveness research.

16      Q.      And you are not providing an expert opinion

17  on whether gender-affirming interventions are safe and

18  effective at reducing gender incongruence and gender

19  dysphoria, correct?

20      A.      Well, I'm actually providing an opinion on

21  whether this statement is supported by the references

22  they cited, because they make this statement obviously

23  based on, based on those references.  And I want to

24  examine that.  And I find that statement is I disagree

25  with that statement.  Well, it's not I disagree with

                                                          128

1    the statement.  My opinion is about that statement is

2    not supported by the reference they cited.

3         Q.    Okay.  And so you are not providing an

4    opinion on the safety and efficacy of gender-affirming

5    interventions?

6         A.    I don't, but if you read the sentence, they

7    say they are safe and effective.  And I say that this

8    is not supported by the reference they cited.

9              So if you -- if you just not even stretch,

10   if you continue on that argument, I don't think there's

11   enough evidence to support that statement.

12             But, again, yeah, I'm not saying that

13   whether this is -- whether those are safe and

14   effective.  I can only say those papers they cite do

15   not provide evidence for this statement.

16             Myself don't have opinion on whether they

17   are safe and effective, because I don't have enough

18   evidence.  At least all the evidence they provided, I

19   would not make this kind of statement based on the

20   references they cited.  That's -- yeah.  That is my

21   opinion.

22             So based on the documents or the papers

23   they cited, I would not make this kind of statement.

24             MS. NOWLIN-SOHL:  Okay.  We've been

25        going for about an hour.  Are you good to

                                                          129

1      keep going?  Would you like a break?

2           THE WITNESS:  Maybe five-minute break.

3      Again, I drink too much water.

4           MS. NOWLIN-SOHL:  Five-minute break.

5      Sounds good.

6           (Off the record at 2:11 p.m.)

7           (On the record at 2:16 p.m.)

8           BY MS. NOWLIN-SOHL:

9      Q.     We're back on the record.  I'd like to move

10     on with the WPATH number 10, which is on page 17.

11     A.     Yes, I am there.

12     Q.     Okay.  So on page 18 in the middle

13     paragraph at the end, you see the last point:  Most

14     studies do not discuss quality of life outcomes?

15          What is the significance of the fact that

16     most studies do not discuss quality of life outcomes?

17     A.     Okay.  Let me look at the assertion first,

18     just to refresh my mind.

19          So it says:  Although different assessments

20     result from -- okay.  So the assertion says:  Although

21     different assessment measurements were used, the

22     results from all studies consistently reported both a

23     high level of patient satisfaction as well as

24     satisfaction with sexual function.  Although different

25     measures -- assessment measurements were used, the

                                                        130

1    results from all studies consistently reported both

2    high level -- oh, did I repeat?  I think this is --

3             MR. RODRIGUEZ:  Yes.

4        A.    It's a typo.

5             So this was especially evident when used

6    more recent surgical gender techniques.

7    Gender-affirming, this surgery was also associated with

8    low level -- low rate of complication and a low

9    incidence of regret.

10            So then I wrote -- so you mentioned that I

11   say most of the study is not -- which one -- did not

12   provide -- which sentence -- did not provide quality of

13   life.  Did I -- sorry, I was just trying to -- can you

14   repoint out like which sentence you are referring to?

15       Q.    Yes, it's on page 18, the bottom of the

16   middle paragraph.

17       A.    Oh, bottom of the middle paragraph.  Okay.

18   Okay.  Oh, most of the -- most studies use

19   self-reported outcomes, instead of standardized

20   instrument.  And lastly, most study do not discuss

21   quality of life.

22            Oh, so if you ask about the last sentence,

23   most of the studies do not discuss quality of life

24   specific to this assertion.  They -- so, yeah, they

25   talk about patient satisfaction and the satisfaction

                                                     131

1   with sexual functions.

2               So in that regard, yeah, they don't discuss

3   quality of life.  It's not a problem for this

4   assertion.  But also -- but I'm still reviewing the

5   whole thing in the context of also the general forming

6   my opinions.  My general, like my overall opinion then

7   in that case those studies that cited here don't talk

8   about quality of life, then that is a concern, because

9   my opinion was it was a part of that.  It was about

10  quality of life.  Specific to this, to this assertion,

11  this is not a concern.

12      Q.    Okay.  And then the bottom of page 18, the

13  last full sentence you say:  This body of literature

14  supports the high self-reported satisfaction rate among

15  the patients who underwent gender affirming

16  vaginoplasty.

17              And how do you conclude that it supports

18  that?

19      A.    Oh, so are you referring to my sentence

20  that says:  But does not provide any evidence for the

21  necessity or advantage of GAV comparing to alternative

22  treatments?  Are you asking me how I make that

23  conclusion?

24      Q.    It's that sentence, but I'm just asking

25  about the first half of it right now.

                                                    132

1    A.    Okay.  So the body supports high

2  self-reported among the patients who underwent -- yes,

3  that is a fact, yes.  That is a fact, yeah.  This body

4  of literature indeed support that, because that's a

5  fact.  And -- but the emphasis here is the

6  self-reported, as I earlier discuss, self-reported also

7  acknowledged by many of the expert in this field, in

8  these papers.

9         So the self-reported outcomes often have --

10  it's also subject to some methodology flaw.

11         So in terms of this sentence, yes, that's

12  just a state of fact, that's correct.

13    Q.    You said that's a fact?

14    A.    I mean, that's a fact that taking their

15  numbers and their numbers says that consistent report,

16  both a high level -- I'm saying the assertion, if you

17  go back to the assertion, page 17, it said that results

18  from all the studies consistently reported both a high

19  level of patient satisfaction, so 78 percent to

20  100 percent, yeah, I mean, if you take that at face

21  value, take that, then that is indeed a high

22  satisfaction rate.  I mean, that is a fact.  A fact in

23  the sense that the number stated there, and I trust

24  that they didn't make up that number.

25    Q.    Okay.  And so you find that that body of

133

1  literature can support the high satisfaction rate even

2  though there's no randomized control trial?

3            MR. RODRIGUEZ:  Object to the

4      mischaracterization of the actual text.

5            You can answer.

6      A.    Yeah, here the English, I probably

7  shouldn't say support.  The body of literature

8  basically just reports.  I would say the body of

9  literature report a high self-reported satisfaction.

10           So you can cross this supports, but I would

11 use it as a reports, and that's what I meant the

12 literature indeed reports that number.

13     Q.    All right.  And then the second half of

14 your sentence says:  But does not provide any evidence

15 for the necessity or advantage of gender-affirming

16 vaginoplasty comparing to alternative treatments.

17           Can you explain to me what you mean by that

18 conclusion?

19     A.    Yes.  So as I earlier discussed to you,

20 that -- so all of these studies is talking about this

21 one particular surgery, GAV.  So the study subjects are

22 all the people who underwent GAV, and then they go to,

23 as far as I remembered, the researchers surveyed those

24 patients and asked whether they are satisfied, and, you

25 know, their satisfaction and things like that.  But it

                                                      134

1    didn't compare to people who could take alternative

2    treatment, for example, hormone therapy or, you know,

3    other -- I don't know.  I only know hormone therapy.

4            So it did not compare GAV with anyone who

5    takes say hormone therapy.  Also, it didn't compare

6    people who take GAV versus people who didn't take GAV.

7            So that's what I meant.

8            So you are just saying the statement, the

9    study decided is focused on the people who indeed take

10   this surgery, right, and then ask them whether you are

11   satisfied.  But there's nothing comparing there,

12   because they didn't compare in the comparative world

13   that had this person not take the treatment or had the

14   person taken another treatment, like hormone therapy,

15   what it would be.

16           So in that regard, that's like you can say

17   oh, we've satisfied this, but there's no comparative

18   statement.  That's what I meant.

19           If there's no comparative statement, then

20   you cannot say oh, this is the only one, that you must

21   take this, because you don't know what will happen to

22   those people that had they taken different treatment.

23           So the key thing is what I -- to summarize

24   what I just said, it definitely means that these

25   studies does not -- did not provide like any

135

1    information about comparisons, comparisons of this

2    treatment versus control versus no treatment or other

3    treatment, so that's what I meant.

4         Q.    You mentioned hormone therapy as an

5    alternative.  Are you aware that the WPATH standards of

6    care and the Endocrine Society recommend that people

7    have at least 6 to 12 months of hormone therapy prior

8    to undergoing gender-affirming surgery?

9         A.    I'm not aware of that.  Again, that's not

10   my expertise.  I say hormone therapy, it's just because

11   when I review the literature, and I see people mention

12   hormone therapy.  I can -- I say hormone therapy, but

13   when I put my sinus hat on, it would be treatment A

14   versus treatment B.  So hormone therapy would be

15   treatment B.

16        Q.    And do you know if anyone undergoes

17   gender-affirming vaginoplasty or vulvoplasty without

18   having hormone therapy?

19        A.    I don't know.  That sounds like a medical

20   question that I cannot answer.  I don't know.

21        Q.    And your other conclusion does not provide

22   any evidence for the necessity of gender-affirming

23   vaginoplasty.  Where does it say that that is what it

24   is attempting to do?

25        A.    Oh, it didn't.  It's just, again, I just

1  rolled it.  Probably when I rolled that, again, I was

2  thinking -- well, okay.

3          So, yeah, it didn't, but I just make the

4  statement because based on the fact -- based on the

5  fact that none of this study comparing the treatment to

6  alternative or to no treatment.  So then once you don't

7  have that, you know, you cannot say anything about this

8  is necessary.  Yes, this is not on the assertion.  So

9  this is -- I just roll that as if you don't have

10  comparison, then you cannot, like there are a bunch of

11  possibles, then you cannot say this is must, this is

12  next.

13          I guess when I wrote that, I probably

14  crossed -- was still thinking about some point of like

15  this is the only effective thing or something like

16  that.

17          So yes, you are right.  In terms of in

18  this -- specific to this assertion, they didn't, in

19  this assertion, didn't say anywhere that it's

20  necessary, okay.  And I made -- yeah, I didn't -- well,

21  this assertion actually is, yeah, I didn't make that

22  statement.  But, again, I was just based on the -- on

23  the review I did, I add this -- I mean, I add this

24  phrase there.  That is accurate.  The phrase is

25  accurate.  But, yeah, it is not, it's not stated in the

137

1    assertion, that is correct.

2         Q.     Okay.  And for the women who have been

3    receiving hormone therapy and continue to have

4    significant gender dysphoria, are you aware of any

5    alternative treatments besides gender affirming

6    surgery?

7              MR. RODRIGUEZ:  Object to the scope.

8              You can answer.

9         A.     No, that's, again, that's not my expertise.

10   So I don't have answer to that.  I don't have enough

11   information about that.

12        Q.     But you don't know if there are alternative

13   treatments?

14        A.     I don't know.

15        Q.     Okay.  Let's go to page 19, which has

16   Ettner Assertion 1.

17        A.     Yes, I'm there.

18        Q.     Okay.  And so in that -- your first

19   paragraph after the assertion, about the fourth line

20   down you say:  As elaborated in my assessment of WPATH

21   Assertion 1, the statistical methodology in the field

22   of comparative effectiveness of SRS is not up to the

23   long-established standard in comparative effectiveness

24   research in medicine.

25        A.     Correct.

                                                      138

1          Q.      What is comparative effectiveness research?

2          A.      Oh, comparative effective research, as I

3    wrote in page 5 of my report, I said in medicine, the

4    type of research used to evaluate the effects and

5    safety of an intervention, it's broadly referred to as

6    comparative effectiveness research.  The statistical

7    methodology for, again, here's a typo, for the

8    comparative effectiveness research is generally --

9    belongs to the general statistics field of causal

10   inference, which I am an expert on.

11          So basically in medicine and health

12   studies, like the whole type of study I tried to

13   establish the effectiveness, the safety, or efficacy of

14   treatment is broadly referred to as comparative

15   effectiveness research.

16          Again, you can see that there's emphasis,

17   the two things:  One is effectiveness, the other is

18   comparative.  So it's a comparison, yeah.  That's what

19   I meant.

20          Q.      Okay.  And did you mention there was a

21   typo?

22          A.      Yeah, the typo was -- so the last sentence

23   says:  The statistical methodology for quality of life,

24   it shouldn't be quality of life.  It's statistical

25   methodology for comparative effectiveness research

                                                        139

1    belongs to the general statistical field called

2    inference.

3         Q.     Got it.  That's the one we identified

4    earlier?

5         A.     Yes.

6         Q.     Okay.  So going back to page 19, what is

7    the long-established standard that you're referring to

8    in comparative effectiveness research in medicine?

9         A.     Oh, well, as I said, that is -- that would

10   be in the best case scenario, when available, you do a

11   randomized experiment or maybe multiple randomized

12   experiment.  And when that is not available, you resort

13   to observational study but well-designed observational

14   study, and, for example, prospective before/after

15   studies, and this like a more represent -- like a large

16   study sample, things like that.  And then like the

17   other would be considered good or like acceptable.  And

18   then long-established, that, as I said, the consensus

19   is then this kind of retrospect study resolved

20   before/after measurement those -- and why you have also

21   a lot of nonresponse as more sample size those of low

22   quality.

23              So, again, that's what I meant by

24   long-established standard and comparative effectiveness

25   research in medicine.

                                                      140

1          Yeah, so like when you try to publish

2    something, like about comparative effectiveness of

3    treatment, then you expect to provide either randomized

4    study or high quality observational study.  So that's

5    what I meant.

6          Q.    And must that standard be met before a

7    treatment can be provided to a patient?

8                MR. RODRIGUEZ:  Objection to scope.

9                You can answer.

10         A.    Not necessarily, because there's a lot

11   of -- so, okay, different, different medical conditions

12   like FDA.  For example, if we are talking about new

13   drugs and new medical devices, FDA would almost

14   always -- well, most of the time would require a

15   randomized study, right, but that's not the end of it,

16   because they would do phase one, phase two, phase three

17   randomized study, and then after approval, they will

18   actually also do the post marketing, they call post

19   marketing analysis.

20              Like, for example, we now all use Covid

21   vaccine, right?  We use Covid vaccine.  So after Covid

22   vaccine is proved, then actually there will be

23   continuous study, actually to like in real world

24   scenario.  When Covid-19 vaccine is used, and then

25   what's the population?  So you go to continue.  In that

                                                        141

1    case, you cannot do an online study, right.  But you do

2    an observational study for a large population, and then

3    you calculate -- you study the effect in real life.

4              So, again, I think your question is like

5    whether you should have kind of treatment provided

6    before the -- sorry, can you rephrase?  I cannot -- can

7    you rephrase your question?

8        A.    Yes.  So you're talking about the

9    methodology in the field of comparative effectiveness

10   of sex reassignment surgery is not up to the

11   long-established standard in medicine.  And so I'm

12   asking if that standard must be met before treatment

13   can be provided?

14             MR. RODRIGUEZ:  Objection, scope.

15             You can answer.

16       A.    I think that's a different question from

17   what I tried to -- from what my opinion is about,

18   because I don't have -- I mean, I don't have answer to

19   that.

20             What I can just say is the current state on

21   the research on the sex reassignment surgery, at least

22   based on the document they cited that I reviewed, do

23   not -- because most of them are low quality, and the

24   better quality ones have mixed results.  Based on that,

25   I would not -- I don't think that would meet the high

                                                              142

1    standards -- the high standard that people expect in,

2    you know, he recommend -- I'm not going to recommend,

3    just in reporting the effectiveness of those surgeries.

4        Q.    So you are not providing an opinion on

5    whether the evidence meets the standard in comparative

6    effectiveness research, impacts whether treatment can

7    be provided?

8            MR. RODRIGUEZ:  Objection, scope.

9            You can answer.

10       A.    Correct.  I'm not providing opinion on

11   that.  I focused on Ettner's assertion.  I focused on

12   her assertion saying that studies show that

13   gender-affirming surgery as safe and effective, safe

14   and effective.  And also she said that indeed for many

15   people, this is the only effective treatment.

16           So my assertion is about whether she has

17   enough evidence from those references she cited to

18   support this two statement:  One is whether they are

19   safe and effective; the other is this is the only

20   effective.

21           As I mentioned earlier, the only effective,

22   that's kind of the necessity my understanding is.  But

23   when you say only effective, you have to compare, you

24   have to can see that there's a possibility of

25   alternatives.  And that's one thing.  And the first

143

1  sentence about safe and effective, I already said many

2  times why, why the studies they decided do not meet the

3  standard in providing rigorous and consistent evidence

4  for that statement.

5       Q.    Okay.  And you're also not providing an

6  opinion on what degree of statistical methodology is

7  needed for a treatment to be included in a clinical

8  practice guideline, correct?

9            MR. RODRIGUEZ:  Asked and answered and

10       scope.  You can answer.

11      A.    Correct.  I'm not providing opinion on

12 that.  Again, I provided opinion on whether those

13 assertions are supported or, yeah, by the documents

14 they cited.

15           As I said, I would not, based on -- if I'm

16 an expert in this field, which I am not in gender

17 dysphoria, and if I'm an expert, and if I read this

18 document -- no.

19           I'm a statistician, and I read those

20 documents.  I should say I'm a statistician.  I read

21 all the documents they cited, and then I would not make

22 the statement as they make it.  That's a better summary

23 of what I want to say.  Because I would say that there

24 would not be enough evidence.  I don't think there's

25 evidence strong enough for me to make this kind of

144

1   statement.

2        Q.    You disagree with Dr. Ettner's assertion

3   describing the research as methodologically sound?

4        A.    I disagree with that statement, and I think

5   I said I don't think it's methodologically sound, and I

6   already clarify why I think that many of the studies

7   are fraud.  And, again, that opinion has been -- that

8   statement has been made in multiple, in large

9   literature review in that field.  So it's not -- yeah.

10       Q.    Okay.  And your first sort of comment after

11  the sentence we were just talking about, comparative

12  effectiveness research is that:  There has not been a

13  single randomized control trial.  Is that the primary

14  reason that you view the research is not

15  methodologically sound?

16       A.    No.  As I said many times, that's not the

17  end of the world, but it's one thing you can easily

18  point out.

19            So my statement is -- my argument of --

20  basically my opinion consists of four things:  First is

21  there's no randomized study.  Second is that's not the

22  end of the world.  You can still do good quality

23  observational study, that is prospective before/after

24  study.  And then they don't -- and in the study they

25  cited, they indeed have a few of them and the result

                                                    145

1   are mixed.  And the third part of the argument is that

2   in the vast majority of the study they cite are low

3   quality retrospect study that subject to a lot of

4   confounding bias and all sorts of biases.  And the

5   fourth component of my argument is that even in

6   their -- many of their own large scale systematic

7   review, literature review, they -- the expert are

8   calling for better methodology or more prospective

9   studies and call the current state of many of the

10  studies of low quality.

11          So that's my -- like my statement has four

12  components, and they are all integral.

13          So the lack of randomized study, that's the

14  first component, but that's not the only component, and

15  also that's not the only reason I made my statement.

16          So I think it's -- those four components

17  are equally important.

18      Q.    Are all cross-sectional retrospective

19  studies methodologically unsound?

20      A.    Well, all retrospect -- again, as a

21  scientist, you don't make this kind of blanket

22  statement.  But what I can say, as I already repeatedly

23  said, that you can have a prospective study if it's

24  before/after data, that is far superior than

25  retrospective study without before/after data.  And the

146

1   reason of that is the confounding.  The reason of that

2   is the baseline measure of the outcome is often the

3   most important predictive, the most important

4   confounder out there.  But retrospect studies do not

5   control for that.  So that's why it's low quality.

6              But I would not say that, you know, I would

7   not blankedly(sic) say that every single retrospect

8   study is garbage.  No, that's not my point.

9        Q.    Okay.  But here, for this assertion, you're

10  saying that the cross-sectional retrospective studies

11  are not methodologically sound?

12       A.    Yes, correct.  In the studies they cite, I

13  look at their methodology.  They are, yeah, they're all

14  lacking the baseline -- they're all lacking baseline

15  measure of the outcomes, and they are subject to very

16  severe confounding bias and they are not

17  methodologically sound.

18              Yes, I stand by that statement in the

19  context of what I reviewed.

20       Q.    And are all retrospective studies subject

21  to severe confounding bias?

22       A.    Again, it depends on how much.  So the

23  answer is it depends on how many things you control

24  for, how many confounders you control for, right.  And

25  as I said, that if in retrospective study, that if they

                                                      147

1    could get the baseline measure, baseline outcome, then

2    they will have high quality, higher quality than those

3    ones without.

4            But -- so I'm not saying that they are all

5    bad, but I'm just saying all the studies they cited

6    here none of them provide that.  So because of that

7    this is of low quality, and I don't think that quality

8    is sound in that aspect, because they are missing the

9    single most -- often the most important confounders

10   there.

11       Q.    Okay.  Do you agree that the FDA approves

12   some treatment and medical devices without having

13   randomized control trials?

14            MR. RODRIGUEZ:  Objection, scope.

15            You can answer.

16       A.    Well, there must be some, but I cannot

17   think of off the top of my head, yeah.  I mean, as I

18   said, I think extraordinary cases they approve, but I

19   don't know.  I cannot give you a specific example.  But

20   I won't be surprised in some studies -- in some

21   conditions they do.  But I really don't know.

22       Q.    Okay.  Go to page 8 of your report.

23       A.    Which page?

24       Q.    8.

25       A.    8?

1        Q.      Yes.

2        A.      Yes, I'm there.

3        Q.      Do you see the header that says randomized

4    control trials versus observational studies?

5        A.      Correct.

6        Q.      Okay.  And the second sentence of that you

7    say that:  The FDA requires evidence of efficacy and

8    safety of a new product based on randomized controlled

9    trials in the approval of the vast majority of new

10   drugs and medical devices.

11       A.      Correct.

12       Q.      Did I read that correctly?

13       A.      Correct.

14       Q.      Okay.  And so the vast majority means that

15   it was not followed then, correct?

16       A.      Correct.

17       Q.      So would you agree that the FDA does

18   approve new products despite not having randomized

19   trials?

20       A.      Again, I cannot say -- give you example,

21   but I believe so, yeah.  I believe so.  So that's why I

22   say vast majority rather than all, because I didn't go

23   to do research about what the FDA, all of the scope.

24   It's just my experience with the FDA is, yeah, the vast

25   majority of new drugs and medical devices that's what

                                                              149

1    they use.

2         Q.    Let's go back to the Ettner assertion,

3    which is number 2 on page 20.

4         A.    Yes, correct.

5         Q.    In your report, you do not disagree with

6    this assertion, correct?

7         A.    Let me see.  I need to read the conclusion.

8    So I'm just reading it.  The conclusion that is the

9    gender-affirming surgery is the most appropriate

10   treatment to elevate suffering of extreme gender

11   dysphoria individuals still stands.  96 percent of

12   patients who underwent that surgery were satisfied, and

13   the regret was rare.

14             So what did I say?  I said that:

15   Immediately after the quote contained in this

16   assertion, the authors themselves acknowledged.

17   However, even today, this conclusion is based on

18   methodologically less than perfect design studies.

19   Okay.  I guess I don't need to read it.  But this is --

20   said very well what I think, right.  And then this

21   says, that this paper actually wrote that none of the

22   study was a controlled one.  So basically this paper

23   described what are the -- why they say this

24   methodologically less than perfectly -- less than

25   perfect, right.

150

1          So the authors also acknowledge a few other

2   methodological shortcomings, like attrition, or

3   selection bias of the patient sample, which echo my

4   critiques with respect to the WPATH Assertion 1.  Yes.

5          Again, mine was based on -- so this

6   particular assertion, so they analyzed that.  So

7   Ettner's assertion is -- yeah, so Ettner's assertion

8   say that those -- they conclude that, and then I say

9   that even as authors themselves that acknowledge the

10  methodology is not perfect or is less than perfect.

11       Q.    Okay.  But you're not disagreeing with the

12  statement?

13       A.    I didn't provide opinion on this.  Well, I

14  didn't assess, because, again, as an expert, I'm a

15  statistic expert, right.  So then I can judge on the,

16  again, from statistical aspect, whether this statement

17  is based on like what kind of statistical strengths --

18  statistical evidence they have.  And then I go to

19  say -- well, I go to acknowledge, I go to find that the

20  authors themselves acknowledge that those studies, you

21  know, it's not -- the foundation is not most perfect,

22  and I didn't direct -- in this assertion, I didn't

23  directly say that -- yeah, I didn't provide opinion on

24  whether that this is what I feel about this statement.

25  Again, that's not what my opinion is about.  My opinion

151

1    is about whether this is supported by the references,

2    yeah.

3         Q.    So looking at the Assertion 5 through 9,

4    which is on page 21.

5         A.    Correct.

6         Q.    In your conclusion at the end of that

7    section, does your use of the phrase rigorous and

8    consistent scientific evidence, does that have the same

9    meaning that we've discussed previously?

10        A.    Correct.

11        Q.    So if I were to tell you that 1 in 20 high

12   schoolers in America die by suicide, would you say that

13   America's high schoolers often die by suicide?

14             MR. RODRIGUEZ:  Objection,

15        speculation.  You can answer.

16        A.    That's how do we define often?  Like my

17   training is in mathematics, and you always say you need

18   to give me a definition.

19             So if my definition is below -- is

20   10 percent -- if often is 10 percent, then it's not.

21   If it's 5 percent, yes.  So it depends on how you

22   define often.

23             So my answer of this would be by definition

24   tied to the definition of often, so I'm not going to

25   speculate that.

                                                      152

1    Q.    Okay.  And how does one define often?  How

2    does one go about defining that?

3    A.    Does that have anything to do with what we

4    are talking about here?

5    Q.    Yes.

6    A.    So you're talking about a hypothetical

7    about the high school, this like 1 out of 20.  And as I

8    said -- so as I said that if, I mean, I don't know,

9    there's an English word, also if you want to go jargon,

10   you can define this 5 percent or 10 percent.  So --

11   Q.    Does the context matter whether something

12   is often or not?

13   A.    Again, the definition matters.  The

14   definition matters, not the context.  It's the

15   definition.

16   Q.    Okay.  So if we say 10 percent is often,

17   that would be often in every scenario that we can think

18   of?

19   A.    Again, you need to first define things.

20   Like as a mathematician, we always first define a

21   thing, especially if you want to attach, if you talk

22   about numbers, you talk about often, yeah, the

23   frequency.  So the frequency, if I define -- if I say

24   that by often I mean more than 10 percent, then that is

25   often.  But -- yeah, I really don't know how to further

153

1   elaborate this.

2       Q.     Okay.  How do you define often?

3       A.     As I said -- well, as I said, that it's --

4   okay.  So now I get to a point you say that depends on

5   the context.  I mean, I use this English word, and

6   usually when I say often, it probably means something

7   like over 50 percent.

8              So now I see your point.  So, okay, so

9   maybe it depend on the context.

10             So, again, this plain language or common

11  sense often versus if you're talking about

12  scientifically.  So that's why in papers we don't write

13  often, because this is like vague, non-defined terms,

14  yeah.

15      Q.     Okay.  So let's move forward to page 23 and

16  Assertion 11.

17      A.     Yes.

18      Q.     So midway through your paragraph, you

19  comment on the Brown study, which reports that

20  5 percent of transgender inmates report that they had

21  attempted or completed autocastration while

22  incarcerated.  And then you continue:  This percentage

23  supports the occurrence is relatively rare rather than

24  often.

25             How did you define often and rare in that

                                                    154

1    assertion?

2         A.    Well, okay, as I said, as common sense, I

3    think often is probably 2 percent or 1 percent is not

4    often, because that's 100 incidents.  Then 100 times 2

5    or 3 times happen.  I don't -- again, I don't -- I went

6    from a layperson just a common sense.  I would not say

7    that's often.

8              Often, I would feel that is, if you say

9    10 percent or 20 percent, that sounds often.

10             So now I see your point.  So you're going

11   through this one, okay.

12             But as I said, I would not -- I mean, from

13   a common sense perspective, regard 2 percent or

14   3 percent as often.

15        Q.    Okay.  Just a few minutes ago you said you

16   would consider often as generally more than 50 percent?

17        A.    No.  As I said -- as I said, that is --

18   there's like if you want to go statistically, that I

19   can say probably what you should write is probably

20   Dr. Ettner or whatever should say by often, I mean

21   this.  And she didn't provide any of the numbers there.

22   She just said often.  I don't know what she mean by

23   often.  I'm just using the numbers I see at 2 percent

24   or 3 percent, and I say that common sense, this is not

25   often.

                                                         155

1     Q.    But that assumes often is objective or

2   consistent, doesn't it?

3     A.    What do you mean by often is objective and

4   consistent?  Again, if you go to grab anyone on the

5   street and ask them something happened 2 percent of the

6   time, is it often?  I bet you'd probably 99 percent of

7   people tell you that's not often.  That count as not

8   often.

9     Q.    Okay.  We're talking about 5 percent here.

10  So if I told you that 1 in 20 high schoolers, which is

11  5 percent, die by suicide in America, would you think

12  that was often?

13            MR. RODRIGUEZ:  Objection, scope.

14            You can answer.

15    A.    Would I consider that often?  So that's

16  5 percent, so that's another thing, okay.  So high

17  schoolers is a large population.  So if you have say 10

18  million, let's say 1 million high schoolers, so

19  5 percent of that is, what, that would be 5,000, right?

20  That would be 5,000.  And then from that, yeah, that

21  is -- so that quantity that is often.

22    Q.    I think it would be 50,000.

23    A.    50,000 anyway, so that would be often in

24  terms of the number, okay.  But in rate wise, again,

25  5 percent, I don't know where to cut the line.  But I

                                                    156

1  can tell you 2 percent or 3 percent is just not by any

2  common sense would be viewed as common -- as often.

3       Q.    Do you know what the rate of attempted or

4  completed surgical treatment or autocastration is among

5  non-transgender adults?

6       A.    I do not, no.

7       Q.    All right.  Looking at Assertion 12, on the

8  fourth line you say that:  The WPATH study only

9  provided qualitative studies, not any formal

10 statistical meta-analysis.

11            Can qualitative evidence be useful in

12 medicine?

13            MR. RODRIGUEZ:  Objection, scope.

14            You can answer.

15      A.    Of course it can.  Of course they can be

16 useful.  But, again, this is -- what I wrote here is

17 just a pure statement.  It's -- of course qualitative

18 would be better, because they provide -- they quantify

19 things.  I didn't say this -- their qualitative is not

20 valuable.  I'm not saying that.

21      Q.    Okay.  And then moving forward to the top

22 of page 24, you are talking about other 9 studies.  You

23 say:  The methodological problems include retrospective

24 cross-sectional studies.

25            Is a retrospective cross-sectional study a

                                                      157

1   methodological problem?

2       A.    Yes, I mean, again, as I said,

3   retrospective cross-sectional means that there's no

4   baseline measure of the outcome of the low quality,

5   because it cannot control -- because it's subject to

6   severe confounding bias, yes.  So that is a problem.

7   That is of low quality.  And so the methodology did

8   include that.

9             So it's one of the many weaknesses those

10  studies are subject to.

11      Q.    Do you disagree that researchers -- in

12  looking at Ettner's assertion, do you disagree that

13  researchers concluded that gender-affirming surgery

14  positively affects well being, sexuality and quality of

15  life in general?

16      A.    As I said, that's not my opinion.

17            My opinion is that based on what they

18  cited, the reference they cited, that those references

19  they cited do not provide consistent or rigorous

20  support for their statement.

21            In other words, if I'm a researcher, I look

22  at those references.  I would not make this statement,

23  because I feel that the evidence is not strong enough.

24      Q.    But you're not providing an opinion on

25  whether the researchers conclude -- made that

158

1  conclusion?

2      A.    Well, some of the researchers themselves

3  said that they have called for -- again, they've called

4  for this literature review.  They called for better

5  studies, better designs, and acknowledge the low

6  quality of the current studies.  So I stop there.

7      Q.    So are you providing an opinion on whether

8  the researchers concluded that gender-affirming surgery

9  positively affects well-being, sexuality and quality of

10  life in general?

11          MR. RODRIGUEZ:  Asked and answered and

12      scope.  You can answer.

13      A.    No, I didn't provide an opinion on that.  I

14  provided opinion on the quality of the study decided,

15  and whether those studies that -- those studies would

16  support the assertions they make.

17      Q.    And so you are also not providing an

18  opinion on whether gender affirming surgery does

19  positively affect well-being, sexuality and quality of

20  life in general?

21          MR. RODRIGUEZ:  Scope, asked and

22      answered.  Go ahead.

23      A.    Again, it's all of my scope, but as I

24  repeated saying that, if I'm a researcher, and if I'm a

25  researcher, and then I look at those studies, look at

159

1    those studies and decided I would not go to make that

2    statement or those caveats, okay.  Or I would

3    acknowledge those assertions, or I would acknowledge

4    the current state of the studies in this field do not

5    provide consistent or rigorous conclusions and whether

6    that equivalent to what you just said.  That's not

7    my -- that's a different question.

8          Q.     Are you aware that the American Medical

9    Association, the Endocrine Society and the American

10   Psychological Association also put surgery in

11   accordance with the WPATH standards of care as

12   medically necessary treatments for individuals with

13   severe gender dysphoria?

14              MR. RODRIGUEZ:  Objection, scope,

15          medical opinion.  You can answer.

16         A.     I'm not aware of that, because that's not

17   my expertise.

18         Q.     Okay.  Do you think that they are wrong to

19   do so, given your view that there is no rigorous and

20   consistent statistical evidence on the benefits of

21   sexual reassignment surgery?

22              MR. RODRIGUEZ:  Objection,

23          mischaracterization of testimony, scope and

24          medical opinion.  You can answer.

25         A.     As I said, the treatment recommendations

160

1  goes -- there's a lot of things go into that, and

2  arguably the treatment, the effectiveness of a

3  treatment, and the safety of a treatment is one of the

4  important considerations.  And, yeah, my opinion is

5  focused on that part, the effectiveness, whether the

6  effectiveness has been established by the studies they

7  cited.  I don't have opinion on whether, you know,

8  they're wrong, any medical society whether it's wrong

9  or right for them to suggest, you know, to make their

10 recommendations.

11     Q.    Are you aware that the appellate division

12 of the Departmental Appeals Board of the United States

13 Department of Health and Human Services concluded in

14 2014 that transsexual surgery is an effective treatment

15 option of transsexualism in appropriate cases?

16           MR. RODRIGUEZ:  Objection, medical

17      opinion, scope.  You can answer.

18     A.    I don't know.  Again, that's not my

19 expertise, so I don't know.  I don't know.

20     Q.    Do you think that they were wrong to make

21 that conclusion, given your view that there is no

22 rigorous and consistent statistical evidence on the

23 benefits of sexual reassignment surgery?

24           MR. RODRIGUEZ:  Objection,

25      mischaracterization of testimony and report,

161

1    scope and medical opinion.  You can answer.

2         A.     Again, as I said before, that, yeah, I

3    don't have an opinion whether they are right or wrong.

4              As I said, that medical recommendations is

5    not my expertise, and many things go into that

6    decision, and treatment and effectiveness is one of the

7    important consideration, but it's not the only one.

8    And my scope, what my opinion is solely about whether

9    the statement or the statement about the treatment is

10   effective, is supported by the references as cited, and

11   the answer to that is no.

12        Q.     Have you looked at any studies on the

13   effects of not providing gender-affirming care to

14   people with gender dysphoria?

15        A.     No, I don't -- I didn't.

16        Q.     Why not?

17        A.     Oh, it's just because, again, the scope of

18   my study is to exam that those assertions and the

19   references cited, and if they don't cite it, then I

20   didn't review.

21        Q.     Do you know if such studies exist?

22        A.     I don't know.  I don't know whether they

23   exist or not.

24        Q.     Okay.  I'm just looking at some notes.

25             So -- and part of your expert report and

162

1  opinions are you providing an opinion on whether

2  gender-affirming surgery can be ethically provided to

3  treat gender dysphoria by a physician given the

4  existing body of evidence?

5         MR. RODRIGUEZ:  Objection, scope and

6     medical opinion you can answer.

7     A.    No, I don't provide opinion on that.  That

8  is beyond my expertise.

9     Q.    And are you providing an opinion on whether

10  gender-affirming surgery can be medically necessary to

11  treat gender dysphoria?

12         MR. RODRIGUEZ:  Objection, scope and

13     medical opinion.  You can answer.

14     A.    No, I don't have -- I don't provide opinion

15  on that.

16     Q.    And are you providing an opinion on whether

17  gender-affirming surgery is medically necessary for

18  Ms. Zayre-Brown, the plaintiff in this case?

19         MR. RODRIGUEZ:  Objection, scope and

20     medical opinion.  You can answer.

21     A.    No, I don't provide opinion on that.

22     Q.    Okay.  And are you providing an opinion

23  on -- let me rephrase that.

24         Are you providing an opinion on the

25  recommendations contained in the WPATH standards of

163

1    care?

2              MR. RODRIGUEZ:  Objection, scope.

3              You can answer.

4       A.     No, I don't provide opinion on that.

5              MS. NOWLIN-SOHL:  Okay.  Orlando,

6       maybe we can take a short break.  I think

7       that might be everything I have.  I just

8       want to take a look at my notes.

9              MR. RODRIGUEZ:  Yeah, we'll step out.

10      Five minutes good?

11             MS. NOWLIN-SOHL:  That sounds good.

12      Thank you.

13             (Off the record at 3:06 p.m.)

14             (On the record at 3:12 p.m.)

15             MS. NOWLIN-SOHL:  Dr. Li, we are back

16      on the record, and I have no further

17      questions.

18             MR. RODRIGUEZ:  No questions from us.

19             MS. NOWLIN-SOHL:  Thank you for your

20      time.

21             THE WITNESS:  Thank you for being

22      respectful.

23             (Whereupon the deposition was

24      concluded at 3:13 p.m.)

25             (Signature reserved.)

164

1                    C E R T I F I C A T E

2        I, Marisa Munoz-Vourakis, Stenographic Reporter, RMR,

3    CRR and Notary Public, the officer before whom the

4    foregoing proceeding was conducted, do hereby certify that

5    the witness whose testimony appears in the foregoing

6    proceeding, were duly sworn by me; that the testimony of

7    said witness were taken by me to the best of my ability

8    and thereafter transcribed under my supervision; and that

9    the foregoing pages, inclusive, constitute a true and

10   accurate transcription of the testimony of the witness.

11       I do further certify that I am neither counsel for,

12   related to, nor employed by any of the parties to this

13   action in which this proceeding was conducted, and

14   further, that I am not a relative or employee of any

15   attorney or counsel employed by the parties thereof, nor

16   financially or otherwise interested in the outcome of the

17   action.

18

19   IN WITNESS WHEREOF, I have hereunto subscribed my name

20   this    of     , 2023.

21

22                             MARISA MUNOZ-VOURAKIS

23   Notary #20032900127

24

25

                                                          165