EXHIBIT 1

UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF NORTH CAROLINA

CHARLOTTE DIVISION

KANAUTICA ZAYRE-BROWN,            )

    Plaintiff                     )

                             )

      vs.                           )

                             )

THE NORTH CAROLINA DEPARTMENT     )

OF PUBLIC SAFETY, et al.          )

    Defendants                    )


DEPOSITION


OF


JOSEPH V. PENN, M.D.


August 8, 2023 - 9:12 A.M.


NORTH CAROLINA DEPARTMENT OF JUSTICE

114 WEST EDENTON STREET

RALEIGH, NORTH CAROLINA


PREPARED BY: Susan A. Hurrey, RPR

Discovery Court Reporters

and Legal Videographers, LLC

4208 Six Forks Road

Suite 1000

Raleigh, North Carolina 27609

919-424-8242

www.discoverydepo.com

**CONTAINS GENERAL CONFIDENTIAL INFORMATION**

1

A P P E A R A N C E S:


        Plaintiff:


                        ACLU OF NORTH CAROLINA LEGAL FOUNDATIONS

                        P.O. Box 28004

                        Raleigh, North Carolina 27611-8004

                        919-834-3466

                        jmaffetore@acluofnc.org

                        Jaclyn A. Maffetore, Esquire,

                        Michele Delgado, Esquire, Dan Siegel,

                        Esquire, appearing




        Defendant:      NORTH CAROLINA DEPARTMENT OF JUSTICE

                        114 West Edenton Street

                        Raleigh, North Carolina 27603

                        919-716-6516

                        orodriguez@ncdoj.gov

                        Orlando L. Rodriguez, Esquire and

                        Stephanie Brennan, Esquire, appearing




        Also Present:


                        Jon Davidson (via Zoom)

                                                              2

I N D E X

E X A M I N A T I O N S

EXAMINATION                                        PAGE

Examination by Ms. Maffetore                         4

E X H I B I T S

NUMBER              DESCRIPTION                    PAGE

Ex-1                Expert Report of Dr. Penn        18

Ex-2                Curriculum Vitae                 19

Ex-3                Policy Manual G-51.11            46

Ex-4                Press Release                    54

Ex-5                Position Statement               60

Ex-6                Opinion - Jensen vs. Shinn      111

Ex-7                DAC 3421 - 3430                 116

Ex-8                DAC 3404 - 3415                 143

Ex-9                DAC 1182 - 1183                 188

Ex-10               DAC 728 - 729                   190

Ex-11               DAC 695 - 696                   191

Ex-12               DAC 680                         192

Ex-13               DAC 666 - 668                   194

Ex-14               Affidavit of Dr. Penn           217

Ex-15               Penn-1 - Penn-11                224

3

1                JOSEPH V. PENN, M.D., having been first duly

2  sworn, was examined and testified as follows:

3  BY MS. MAFFETORE:

4     Q.  Good morning.

5     A.  Good morning.

6     Q.  My name is Jaclyn Maffetore.  We just met a moment

7  ago.  I'm an attorney with the American Civil Liberties Union

8  of North Carolina and I represent the plaintiff Ms. Kanautica

9  Zayre-Brown in this case.  Is it okay if I call you Dr. Penn as

10  we move forward?

11     A.  Yes.

12     Q.  Can you please begin by stating and spelling your full

13  name for the record?

14     A.  Sure.  Joseph Vincent Penn, M.D.  It's J-o-s-e-p-h,

15  Vincent is V-i-n-c-e-n-t, and Penn is P-e-n-n.

16     Q.  Great.  And so I just want to acknowledge for the

17  record that since this lawsuit began, the North Carolina

18  Department of Public Safety underwent an organizational

19  transition.  The prison division of that department is now

20  called the Department of Adult Corrections and there's been a

21  caption change in this case since the very beginning.  For

22  purposes of this deposition we might refer to the Department of

23  Public Safety or the Department of Adult Corrections and by

24  that we mean the same thing.  So I just want to make sure that

25  we are on the same page about that given that it was the North

4

1  Carolina Department of Public Safety or DPS when this lawsuit

2  began.  So if I say NCDPS, I mean what now exists as the North

3  Carolina Department of Adult Corrections.  Do you understand?

4      A.  Yes.

5      Q.  Great.  Have you ever been deposed before?

6      A.  Yes.

7      Q.  Okay.  Roughly how many times would you say?

8      A.  I don't know the exact number.  If I had to give a

9  ballpark, 20.

10     Q.  Okay.  So while you're likely very familiar with

11 deposition mechanics, I'm still going to lay some ground rules

12 that I'm going to ask you to agree to just to ensure that the

13 deposition goes as smoothly as possible, and so that we are

14 operating on the same page as we move forward today.

15         Is that okay with you?

16     A.  Sure.

17     Q.  So first I ask that you answer each of my questions

18 verbally as opposed to nodding your head or shaking your head

19 or giving some other type of nonverbal response.  Along the

20 same lines, I ask that you try to answer any yes or no question

21 with yes or no rather than uh-uh or uh-huh as those can be

22 difficult for the court reporter to transcribe.

23         Do you agree to that?

24     A.  Yes.

25     Q.  So the court reporter, as you know, is taking

5

1    everything down, so I ask that you allow me to finish my

2    question before you begin your answer and I will also do my

3    best to allow you to finish your answer before I ask my next

4    question.  That's not natural for conversation, but it will

5    make things easier for the court reporter and help ensure that

6    we have a clean record.  Do you agree to that?

7        A.  Yes.

8        Q.  Okay.  And if you do not understand a question or need

9    me to repeat it, please don't hesitate to let me know.  But if

10   you do answer my question, I will assume that you heard and

11   understood it.  Do you agree to that?

12       A.  Yes.

13       Q.  If you need a break at any point please let me know.

14   While there will probably be natural breaking points in the

15   deposition and either I or your counsel will suggest a break,

16   if you feel like you need more water or a bathroom break please

17   do let us know.  I would just ask that if there's a question

18   pending that you answer that question and then we can take a

19   break.  Do you agree to that?

20       A.  You referred to him as my counsel and I'm not sure if

21   he's my counsel or not.  I'm a consultant to him.  I don't

22   believe I retained him.

23       Q.  Sure.  My understanding is that Orlando is

24   representing you for the purposes of the deposition.  Is that

25   your understanding as well?

6

1    A.  Mr. -- I'm sorry, go ahead.

2              MR. RODRIGUEZ:  Yeah.  So I'm defending the

3    deposition of Dr. Penn.  Yeah.  So in that context that's what

4    she means by the counsel or your counsel, not necessarily your

5    privately-retained counsel.

6              THE WITNESS:  Okay.  Thanks for clarifying

7    that.  Yes.

8              MS. MAFFETORE:  Great.

9    BY MS. MAFFETORE:

10    Q.  So during the deposition, Mr. Rodriguez, acting as

11    your counsel for the purposes of this deposition, might object

12    to some of the questions that I ask.  That is his right.  But

13    unless he specifically instructs you not to answer the

14    question, you still need to answer the question.  Do you

15    understand?

16    A.  Yes.

17    Q.  Dr. Penn, the court reporter administered an oath to

18    you earlier which you accented, meaning that you are under oath

19    during the entirety of this deposition.  It is the same oath

20    you would take if you were testifying in a court room.  You

21    must testify truthfully and not leave anything out.

22          Do you understand and agree to that?

23    A.  Yes.

24    Q.  Is there any reason you cannot testify truthfully

25    today?

7

1        A.  No.

2        Q.  Lastly, if you recall any additional information

3   responsive to a question that I have asked at a later point

4   during the deposition, I ask that you just let me know and we

5   can go over what you feel that you have left out.

6            Do you agree to that?

7        A.  Yes.

8        Q.  Great.  We can get started on real questions now, Dr.

9   Penn.  Did you talk to anybody beside the counsel in this

10  matter for the defendant in order to prepare yourself to

11  testify today?

12       A.  Yes.

13       Q.  Who was that?

14       A.  And I'm so sorry, Attorney Stephanie --

15               MS. BRENNAN:  Brennan.

16               THE WITNESS:  Brennan.  Yes.

17  BY MS. MAFFETORE:

18       Q.  Is it your understanding that Ms. Brennan also

19  represents the defendants in this matter?

20       A.  Yes.

21       Q.  Okay.  And is there anybody other than counsel for the

22  defendants that you spoke to to prepare for your deposition

23  today?

24       A.  No.

25       Q.  Okay.  Did you speak to -- or you did not speak to,

                                                              8

1    for example, Dr. Boyd, who is also a retained expert in this

2    matter to prepare for the deposition today?

3        A.  No.

4        Q.  How about Dr. Li?

5        A.  No.

6        Q.  Did you speak with any of the defendants to prepare

7    for this deposition today?

8        A.  No.

9        Q.  Did you review any documents to prepare for your

10   deposition today?

11       A.  Yes.

12       Q.  Which documents are those?

13       A.  I reviewed my initial declaration and my expert

14   report.  I also reviewed the declaration and expert report of

15   your plaintiff -- your expert.

16       Q.  Would that have been Dr. Randy Ettner?

17       A.  Thank you, Dr. Randy Ettner.  I'm going to refer to my

18   report just to look at which documents I reviewed to prepare

19   for the deposition.

20              (Pause.)

21       A.  I read the Department's EMTO, the Evaluation for the

22   Management and Treatment of Transgender Offenders, and the

23   Department's policy titled Utilization Management, the position

24   statement written by Dr. Campbell, the expert report of Dr.

25   Boyd.  I believe that's it.  I may have reviewed some other

9

1  documents, but as we sit here today I don't recall all the

2  other documents I reviewed to prepare for this deposition.

3      Q.  Understood.  Did you review any of Ms. Zayre-Brown's

4  medical records in anticipation of this deposition today?

5      A.  Yes.

6      Q.  Did you review any of the rebuttal expert reports that

7  were served on defendant's counsel yesterday before coming to

8  this deposition today?

9      A.  Yes.  And if I could clarify my response.  I did

10  review Dr. Figler when you asked about medical records.  Aside

11  from the North Carolina Department of Corrections or DAC, I

12  also reviewed the UNC health records, Dr. Figler.  I think it's

13  F-i-g-l-e-r.  His evaluation of Ms. Brown.  Mrs. Brown.  Sorry.

14      Q.  Sure.  I asked you if you reviewed any of the rebuttal

15  report.  I want to be more specific.  Did you review the

16  rebuttal report prepared by Dr. Randy Ettner in anticipation of

17  this deposition today?

18      A.  Yes.

19      Q.  Did you review the rebuttal report prepared by Dr.

20  Antamaria in preparation for your deposition today?

21      A.  No, I wasn't aware that -- sorry, let me clarify my

22  response.  I have not had a chance to review that rebuttal

23  report.

24      Q.  Understood.  You mentioned that you reviewed the

25  expert report of Dr. Boyd.  Did you also review the expert

10

1    report of Dr. Li in preparation for today's deposition?

2        A.  I think I skimmed it.  I don't recall reading it in

3    its entirety, but I did look at kind of the overall

4    conclusions.

5        Q.  Understood.  Did you review any rough transcript or

6    notes from the deposition of Dr. Boyd taken last week in this

7    matter?

8        A.  No.

9        Q.  I apologize if I do that a couple of times throughout

10   the deposition.  I have a cough I can't get rid of.

11           Did you bring any documents with you to your

12   deposition today?  And I see that you have brought something

13   there with you.

14       A.  Yes.

15       Q.  And what documents did you bring?

16       A.  This is my expert report dated July 5, 2023.

17       Q.  Have you made any notes in that copy of your expert

18   report?

19       A.  No.

20       Q.  Other than what we have discussed so far, what else

21   did you do to prepare for your deposition today?

22       A.  I think that was it.  I mentioned I may have skimmed

23   some other documents.  I did a continuing medical education

24   course last Friday on intersex conditions and disorders of

25   sexual development.  But it wasn't for purposes -- it was more

                                                              11

1    just for continuing medical education.  It wasn't necessarily

2    preparing for this deposition.  But the information that I

3    gleaned from that is relevant to this case.

4        Q.  Okay.  And we'll come back to your training in just a

5    little bit.  But you said that that was on intersex conditions

6    and disorders in sexual development, is that correct?

7        A.  Yes.

8        Q.  And you said that that was relevant to this case?

9    That you did not take that CME for the purposes of this case,

10   but that the content therein was relevant to this case?

11       A.  It might be.  It might be relevant.

12       Q.  Dr. Penn, have you ever been sued before?

13       A.  Yes.

14       Q.  Okay.  And how many times?

15       A.  I think just one time.  And to clarify, when you say

16   sued, could you clarify how you're defining sued to be?

17       Q.  Have you ever been named as a defendant in a lawsuit

18   in other federal or state court?

19       A.  Yes.

20       Q.  You said just one time.  Is that still your answer?

21       A.  Yes.

22       Q.  And when was that?

23       A.  I don't recall the exact date.

24       Q.  Approximately.

25       A.  Maybe five years ago.

12

1      Q.   Okay.  What was the nature of that lawsuit?

2      A.   Yes.  It's regarding my capacity as the director of

3  mental health services for the University of Texas medical

4  branch, Correctional Managed Care division.

5      Q.   What was the nature of the suit?

6      A.   Yes.  It had to do with gender dysphoria and items,

7  personal items, accommodations for an individual who is

8  incarcerated in the Texas prison testimony, the Texas

9  Department of Criminal Justice.

10     Q.   What were the allegations to you in that lawsuit?

11     A.   I don't recall the specifics, but it was something to

12 the effect that we had not -- sorry, when I say we, the

13 University of Texas medical branch had not provided

14 gender-affirming materials to this inmate.

15     Q.   When you say materials, what were the accommodations

16 being sought in that suit?

17     A.   Sure.  As I recall -- and this is the Hopkins case,

18 H-o-p-k-i-n-s.  Undergarments, makeup.  I think that's it,

19 undergarments and makeup.

20     Q.   You said it's Hopkins.  Do you recall, is it Hopkins

21 versus --

22     A.   Versus Collier, C-o-l-l-i-e-r.  It might have been

23 Livingston.  He was the former executive director.

24     Q.   Okay.

25     A.   But basically the Texas Department of Criminal Justice

                                                                   13

1   and UTMB Correctional Managed Care.

2       Q.  Is that case ongoing?

3       A.  Yes.

4       Q.  Is there any other instance in which you were named as

5   a defendant?

6       A.  I was named in a case but then I was dropped from the

7   case, so I don't know if I need to disclose that for purposes

8   of litigation.  I'm not currently a defendant in other cases

9   that I'm aware of.

10      Q.  You said you were initially named as a defendant in

11  that case but you were dropped from the case?

12      A.  Yes.

13      Q.  What was that case?

14      A.  That's the Haverkamp, H-a-v-e-r-k-a-m-p, versus

15  Lannette Linthicum.  That's L-a-n-n-e-t-t-e.  Linthicum is

16  L-i-n-t-h-i-c-u-m, M.D. and TDCJ.

17      Q.  Okay.  What was the nature of that case?  Is that case

18  ongoing?

19      A.  It's ongoing.

20      Q.  What is the nature of that case?

21      A.  I don't know if I can talk about it because it's in

22  active litigation right now.  I was a 30(b)(6) witness for that

23  case.

24      Q.  When you were initially named in the complaint as a

25  defendant, what were the allegations against you?

14

1      A.  Well, there was nothing against me.  It was against

2  the University of Texas Medical Branch and TDCJ.

3      Q.  What were those allegations?

4      A.  It had to do with alleged failure to provide

5  gender-affirming surgery.

6      Q.  What is your understanding of why you were dropped

7  from that lawsuit?

8      A.  Because -- well, I really probably shouldn't talk

9  about it because it's an ongoing case.  It would be pure

10  speculation.  I don't understand the legalities of how I was

11  dropped, to be honest.

12      Q.  Are you aware of whether your dismissal from the case

13  took place on the public court docket?

14      A.  I don't know.

15      Q.  Are you aware of whether that case is proceeding under

16  seal?

17      A.  I have no idea.  I don't know if there's a protective

18  order.  I don't know.  But I probably shouldn't talk about it

19  because it's ongoing litigation.

20      Q.  Are there any other lawsuits that we have not just

21  discussed in which you were named as a defendant whether

22  initially or throughout the entire litigation?

23      A.  Not that I recall.

24      Q.  Other than expert witness work or as a defendant, have

25  you ever been involved in any other lawsuits?

                                                              15

1     A.  Yes.

2     Q.  In what capacity?

3     A.  So I have testified as a 30(b)(6) witness several

4     times for the Department, again for the University of Texas

5     Medical Branch Correctional Managed Care on behalf of the Texas

6     Department of Criminal Justice.

7     Q.  And are those cases in which the Texas Department of

8     Criminal Justice had been sued?

9     A.  Yes.

10    Q.  And so while as acting 30(b)(6) witness, you were a

11    spokesperson for the defendant in that litigation, correct?

12    A.  Correct.

13    Q.  Is there any other context in which you have been

14    involved in a lawsuit aside from acting as a 30(b)(6) witness,

15    for a defendant, acting as a defendant yourself or acting as an

16    expert?

17    A.  Not that I recall as we sit here today.

18    Q.  Okay.  Approximately how many times would you say you

19    have testified as a 30(b)(6) witness?

20    A.  I think I have my list of testimony here.  I would say

21    -- if I can refer to it just to give a more accurate number --

22    Q.  And just to be clear, you're looking at the list of

23    testimony that's included as Exhibit B to your expert report

24    which we will subsequently mark as an exhibit in this case?

25    A.  Yes.  Correct.  And I neglected to mention, I have

16

1    testified before, not in a 30(b)(6) role, but when there's a

2    criminal defendant in a county jail and they're being sentenced

3    to the Texas Department of Criminal Justice, I have been asked

4    to come in and testify regarding what provision of mental

5    health and psychiatric services are available to that inmate

6    should they be sent to the Texas Department of Criminal

7    Justice.  And I have done that probably three or four times.

8       Q.  Okay.

9       A.  To answer your question about 30(b)(6), I would say --

10   sorry, could you clarify the time frame for that?  Because I'm

11   looking at this for the last four years and I don't think I

12   have done this except once.  I have done it once in the last

13   four years.  I may have done it two or three times before that.

14      Q.  I think that's sufficient for our purposes.  And just

15   for clarity's sake, for the record, I'm just going to go ahead

16   and ask the court reporter to mark the expert report of Joseph

17   W. Penn as Exhibit-1 in this case and you can continue to work

18   from your copy, but I'm going to go ahead and have that marked

19   as Exhibit-1.

20      A.  And I'm so sorry, did you say W?

21      Q.  Sorry, V.

22      A.  V, right.  V for Vincent.  And I think there's a typo

23   on one of the pages.  It has it Joseph O, but it should be V.

24      Q.  I happened to notice that.

25                              -  -  -

17

1          (Document marked as Exhibit-1 for

2     identification.)

3                    -  -  -

4     BY MS. MAFFETORE:

5          Q.  Dr. Penn, I'm going to refer to your expert report as

6     Exhibit-1 moving forward.  I don't know if you would like to

7     write it on there or anything like that or if you just want to

8     remember that your expert report moving forward is going to be

9     Exhibit-1.  But just for clarity's sake for the record, the

10    list that you were just looking at was Appendix B to what has

11    now been marked as Exhibit-1 to your expert report, which is a

12    list of testimony, is that correct?

13         A.  Correct.  A list of my expert testimony, that's fair.

14              MR. RODRIGUEZ:  For point of clarification,

15    it's a list of expert testimony that's required to be disclosed

16    by Rule 26a2VV, which is slightly different than just a list of

17    expert testimony.

18    BY MS. MAFFETORE:

19         Q.  And again, for the sake of clarity, in this list of

20    testimony required to be disclosed, you have also included

21    times when you have served or testified as a 30(b)(6) witness,

22    correct?  Or at least one time?

23         A.  Well, so 2023 I served as a 30(b)(6) witness

24    approximately two weeks ago.

25         Q.  Okay.

                                                              18

1    A.  And that was in the Haverkamp matter that I testified

2  to earlier.  So that's not reflected in this document.

3    Q.  Understood.  We'll talk about this a little bit more

4  in-depth later.  I just wanted to make sure we went ahead and

5  marked it as an exhibit given that we are already talking about

6  it now.

7         And just to make sure we put a bow on this, other than

8  what we have just discussed, are there any other times that you

9  have been involved in a lawsuit other than acting as an expert

10  witness as a defendant, as a 30(b)(6) witness, or giving sort

11  of qualification type of testimony that you just mentioned?

12    A.  No.

13    Q.  Okay.  Great.

14         MS. MAFFETORE:  So I'm just next going to hand

15  the court reporter what we'll have marked as Exhibit-2, which

16  is the C.V. that was filed in conjunction with defendant's

17  response in opposition to plaintiff's motion for preliminary

18  injunction at an earlier stage in this case.

19                        -  -  -

20         (Document marked as Exhibit-2 for

21  identification.)

22                        -  -  -

23  BY MS. MAFFETORE:

24    Q.  Dr. Penn, do you recognize this document?

25    A.  Yes.

19

1    Q.  Okay.  And did you prepare this as a -- a C.V. on or

2    about July 15, 2022 for submission in the defendant's materials

3    in opposition to plaintiff's preliminary injunction in this

4    case?

5    A.  No.  I would say -- I mean, I have a C.V. but it's

6    kind of a work in progress because it gets outdated like on a

7    weekly basis.  But this is my C.V. as of that date.  That's

8    fair.

9    Q.  You said it gets outdated on a weekly basis.  Given

10   that this was dated over a year ago, are there significant

11   updates that you need to provide to this C.V. as we sit here

12   today?

13   A.  When you say significant, could you clarify so I can

14   answer your question better?

15   Q.  Updates of note that you think are important for us to

16   know as we're sitting here for purposes of this deposition?

17   A.  So yes, I would say some of the articles that were

18   under review or in press have been published.  I have given

19   additional presentations.  I would say I have been asked to

20   serve on additional committees or in different capacities.  But

21   I would say in general this C.V. is pretty inclusive of my

22   education, background and training to date.

23   Q.  I can ask you about some of those more specific

24   aspects as we go, if that would make more sense given the

25   degree of updates that you seem to think are necessary to the

                                                              20

C.V.  First, can you just walk me through your educational

background?

A.  Sure.  So I got my undergraduate degree, a bachelor of

science in biology at the University -- sorry, it was Incarnate

Word College back then and now it's University of Incarnate

Word.  I received my medical degree at the University of Texas

Medical Branch in Galveston, Texas.  I did a four-year general

psychiatry residency at Brown University in Providence, Rhode

Island.  I did a two-year child psychiatry fellowship at Brown

University in Providence, Rhode Island.  I did a one-year

forensic psychiatry fellowship at Yale University in New Haven,

Connecticut.  So that's pretty much my undergrad, med school

and postgraduate training.  And then I have done CME and gone

to conferences ad nauseam ever since.

Q.  Sure.  So while receiving -- we're speaking

specifically about pre-graduate.  While receiving your

education, did you have any experience in the treatment of

gender dysphoria or what was then known as gender-identity

disorder?

A.  Sorry, can you say it again, please?

Q.  While receiving your education, did you get or did you

have any experience in the treatment of gender dysphoria or

what was then known as gender-identity disorder?

A.  I don't recall specifics, but I believe during

pediatrics rotation we got lectures about youth born with

1   ambiguous genitalia or intersex conditions.  In my psychiatry

2   residency training I did a lot of evaluations of individuals

3   with para -- sorry, evaluations and treatment of individuals

4   with paraphilias.

5       Q.  Can you describe what you mean by paraphilias, please?

6       A.  Sorry, I hadn't finished my answer to your question.

7   I can answer paraphilias in a second.  And then during my child

8   psychiatry training I did evaluate several youth and

9   adolescents that were referred that had gender confusion or

10  they weren't certain they had been -- back then it was referred

11  to as cross dressing or dressing in the other gender and the

12  parents were concerned and brought them in for evaluation.  So

13  I have had experience in medical school and residency and

14  fellowship.  Sorry, to answer your question, paraphilias is a

15  DSM mental disorder where individuals can engage in problematic

16  behavior such as exposing themselves, transvestic fetishes,

17  voyeurism, and other problems that are related to sexual

18  behaviors.

19      Q.  Okay.  So I had asked you about experience in the

20  treatment of gender dysphoria or gender-identity disorder.  Is

21  it your testimony today that the paraphilias you just

22  described, that provides you with experience in the treatment

23  of gender-identity disorder or gender dysphoria?

24              MR. RODRIGUEZ:  Objection.  Mischaracterization

25  of testimony.  You can answer.

22

BY MS. MAFFETORE:

Q.  I'm not seeking to mischaracterize your testimony.
I'm seeking to understand it.

A.  What I was clarifying was a youth was referred for
dressing -- either playing with dolls -- or let's say assigned
male at birth, playing with dolls or acting more feminine and
was dressing in female clothing, and they were referred for
further evaluation, diagnosis and treatment.  Similarly an
adolescent might be referred -- a male adolescent or assigned
male at birth and the dressing behaviors were identified as
problematic.  So yes, I did evaluations and management and
treatment.  And in some of those cases, like the adolescents
and adults, I was asked to evaluate and I had to look in the
differential whether there could be a gender dysphoria, back
then gender-identity disorder, or whether it was a paraphilia
or something else.  So I had to consider all of that in the
differential.

Q.  Understood.  So you also mentioned that you had
pediatrics rotation, lectures related to youth born with
ambiguous genitalia or intersex conditions.  Is it your
understanding that that is the profile of gender dysphoria or
gender-identity disorder?

A.  It's part of the differential.  It's not necessarily
-- as I understand it, the DSM-5 they included things to
consider because some individuals could have gender dysphoria.

23

1    But it's another separate medical condition to consider in the

2    differential and treatment of individuals with gender

3    dysphoria.

4        Q.  Understood.  And you noted that you also treated

5    individuals with gender confusion.  Is that, in your opinion,

6    the equivalent of gender dysphoria or gender-identity disorder?

7        A.  Could you define gender -- how you're defining -- I

8    don't recall about gender confusion.  I was talking about the

9    way they dressed, but I don't think I used the term gender

10   confusion.

11       Q.  My recollection -- and I don't know if the court

12   reporter has the ability to read back -- is you testified when

13   you were training in child psychology, people brought in their

14   children as a result of cross dressing or gender confusion.  Is

15   that not your testimony today?

16       A.  So I never trained in child psychology.  I trained in

17   child and adolescent psychiatry.  But yes, I think some youth

18   were brought to me under the general question about their

19   sexuality or their gender.  Yes, that's fair.

20       Q.  And so in any of the evaluation contexts that you just

21   discussed, did you have experience providing what is now

22   commonly referred to as gender-affirming care to those

23   patients?

24       A.  Not at that time, no.

25       Q.  So no experience providing or assisting patients

24

1    seeking specifically gender-affirming surgery?

2        A.  Not during my residency and training, that's fair.

3        Q.  Okay.  How about during your post-graduate training?

4    During that time did you have any experience in the treatment

5    of gender dysphoria or what was then known as gender-identity

6    disorder?

7        A.  Sorry, could you clarify, during what time period,

8    please?

9        Q.  So when you were -- when we were speaking, you sort of

10   distinguished between the time that you spent pre-fellowship

11   and the time that you spent in fellowships.  And so I guess

12   what I mean by postgraduate training are those fellowships that

13   you described to me.  Unless what you just described to me was

14   inclusive of those fellowships?

15       A.  It was inclusive of those.

16       Q.  Okay.  Understood.  So now I would like to turn to

17   page nine of your C.V., which is Exhibit-2.

18       A.  Page nine?

19       Q.  Yes.

20       A.  Okay.

21       Q.  At the bottom of page nine is the beginning of a list

22   of publications which carries over for several pages and

23   appears to conclude on page 16.  So first, the list of

24   publications you have on page nine a header that states

25   Publications, but then on page 11 you have a header that states

25

1    Other Peer-Reviewed Publications.  Are the publications that

2    are included under the heading entitled publications on page

3    nine peer reviewed?

4        A.  Yes, that's correct.

5        Q.  Okay.  So what is the purpose of the distinction

6    between the publications category and the other peer-reviewed

7    publications category, just for my understanding?

8        A.  What I understand is like the article on Child and

9    Adolescent Forensic Psychiatry, number three there, that

10   underwent a review by the journal of Medicine and Health Rhode

11   Island, but it wasn't a blinded where it was sent to like two

12   peer -- I'm sorry, peer reviewers.  It was pretty much

13   published as-is without -- I mean, my peers were physicians,

14   but I don't believe it underwent a child and adolescent

15   forensic psychiatry review by a blinded review.  And same thing

16   with the other two abstracts, number one and two, those were

17   presented at a conference.  So they were reviewed by the

18   education committee and they had the merit or the credibility

19   to be presented at a conference, and then they were published

20   in a journal.  But they didn't undergo a separate peer review.

21   So that's what I'm clarifying the peer review part there.

22       Q.  Okay.  Understood.  Well, to make sure that I

23   understand.  Is your testimony that while these three articles

24   included under Other Peer-Reviewed Publications were peer

25   reviewed, they were not as vigorously peer reviewed as those

26

1    that you elected to included under the heading of Publications

2    that begins on page?

3        A.  Yes, that's fair.

4        Q.  And so you have quite a few publications, but -- this

5    is a general question.  What are your general areas of research

6    and writing?

7        A.  So it's changed over time.  I would say it used to be

8    a lot more child and adolescent and juvenile corrections.  But

9    more recently it's been pretty much exclusively adult

10   corrections, with some occasional juvenile corrections.  And in

11   particular issues of psychotropic medication use in

12   correctional settings, suicide and special populations in

13   correctional settings such as geriatric inmates and -- recently

14   we have an article that we had an invited -- we were invited to

15   write for you one of the journals on gender dysphoria in

16   correctional settings.

17       Q.  You said you were recently invited to write an article

18   on gender dysphoria in correctional settings?

19       A.  Yes.

20       Q.  Who invited you to write that report?

21       A.  The editor of the journal of Correctional Healthcare.

22       Q.  When were you invited to write that article?

23       A.  Approximately a year ago.

24       Q.  Has that article been published?

25       A.  No.

                                                            27

1        Q.  What is its anticipated publication date?

2        A.  So it's still in draft form.

3        Q.  You said we were invited.  With whom were you invited

4    to write that article?

5        A.  Well, sorry, I shouldn't say we.  I was invited and

6    given my time and other demands, I didn't think I could write

7    it by myself so I reached out to two other colleagues.  So

8    that's what I was referring to as we.

9        Q.  Who are those colleagues?

10       A.  Sure.  One is Nathaniel Morris, M-o-r-r-i-s, M.D., and

11   the other is Joel, J-o-e-l, Andrade, A-n-d-r-a-d-e, Ph.D.

12       Q.  You said that that article is still in draft form.

13   What is the substance of the portion of the draft that you are

14   responsible for writing?

15       A.  Sorry, could you repeat that, please?

16       Q.  What is the substance of the portion of the draft that

17   you are responsible for writing?

18       A.  Sure.  So I'm kind of like the senior author reviewing

19   the entire article in its entirety.  But it has to do with

20   evaluation, management and treatment of gender dysphoria --

21   sorry, transgender, individuals with or without gender

22   dysphoria in correctional settings.

23       Q.  Do you draw any conclusions in that report?

24       A.  Did I draw any conclusions?

25       Q.  Yes.

                                                              28

1    A.  It's still in draft form.  I would say that the themes

2  are pretty consistent with the National Commission on

3  Correctional Healthcare and the opinions that I have written in

4  this case.

5    Q.  Okay.  Why did you select Dr. Nathaniel Morris, M.D.

6  to assist you in drafting that article?

7    A.  Sure.  He goes by Ned.  He is another correctional

8  forensic psychiatrist and he works in jail settings,

9  specifically San Francisco county jail and he's a prolific

10  writer.  He probably has written five times as much as I have.

11  So he's a really good writer.  So that's why -- in San

12  Francisco obviously there's a large population.  So I thought I

13  could bring the prison focus and he could bring the jail focus

14  to the article.

15    Q.  Is Dr. Nathaniel Morris, M.D. experienced in writing

16  on the topic of gender dysphoria or the treatment of

17  transgender individuals with and without gender dysphoria?

18    A.  I believe so.  I think he has an article that he has

19  published on that, yes.

20    Q.  What about Dr. Joel Andrade?

21    A.  Yes.  Same thing.  Joel is a -- he's a correctional

22  mental health clinician.  I think he's a social worker, but he

23  also has a Ph.D.  But he's been very active nationally in

24  corrections, both jails and prisons.  So I thought he -- and

25  he's done a lot of trainings to correctional officers.  So I

29

1   thought he would be another person that could really bring more

2   of the education and training both of health care staff and

3   correctional staff to this article.

4        Q.  So you mentioned that you had additional publications

5   since this C.V. was provided to us and I don't -- I won't ask

6   you to provide to us every single one of those updated

7   publications.  Is there any publication that is missing from

8   this list that you have provided to us that regards the

9   treatment gender dysphoria?

10       A.  No.

11       Q.  Are there any peer-reviewed publications that are not

12  contained in this list that you have provided to us that you

13  feel are of particular note that your C.V. is fully incomplete

14  without in your heart?  Like one that is significant enough to

15  you that want to make sure that it's updated for the record of

16  this deposition?

17       A.  No, not for purposes of this deposition.

18       Q.  Understood.  And so I asked you if you had any new

19  publications related to the treatment of gender dysphoria.  But

20  have you ever published on the treatment of gender dysphoria?

21       A.  No.

22       Q.  Have you ever published on the provision of gender

23  affirming care?

24       A.  No.

25       Q.  Have you ever published on the provision of

                                                              30

1    gender-affirming surgery specifically?

2        A.  No.

3        Q.  Okay.  Have you ever published on the issue of

4    treatment of trans prisoners generally?

5        A.  Sorry, have I ever --

6        Q.  The treatment of transgender prisoners generally.

7        A.  Have I ever published?

8        Q.  Published, yes, sir.

9        A.  Yes.

10       Q.  And what publication was this?

11       A.  Sure.  So one of the -- it's the American Psychiatric

12   Association -- I'm not finding it here.  Sorry.  It's -- oh,

13   here we go.  I'm sorry.  So it's the American Psychiatric

14   Association.  It's the psychiatric services -- item 21 on page

15   11.  Psychiatric services in correctional facilities, third

16   edition.  So I was one of the authors of that.  It's a little

17   book.  But it's a peer-reviewed publication.  And it has -- it

18   includes an entire section on LGTBQA and gender dysphoria

19   inmates.  Special populations.

20       Q.  Okay.  So your testimony is that item number 21 on

21   page 11 has a chapter regarding LGTBQAI+ populations which

22   includes the discussion of transgender prisoners, is that

23   correct?

24       A.  That's fair.  Yes.

25       Q.  Are there any other publications included here or not

                                                              31

1   included here that relate to the treatment of transgender

2   prisoners generally?

3        A.  I have written a couple of book chapters, but I don't

4   recall as we sit here today if I discussed transgender or

5   gender dysphoria.  But once in the textbook of -- it's Kaplan

6   and -- sorry, page 13, number 30.  I don't know -- I don't

7   recall as we sit here today if there's a separate section or

8   language about transgender or gender dysphoria in that.  But

9   that's -- it's kind of like the book for psychiatry for medical

10  students and residents is Kaplan and Sadoff, Comprehensive

11  Textbook of Psychiatry, 10th edition.

12       Q.  Item 21 on page with 11 that we were just discussing,

13  were you the primary author of that chapter?

14       A.  So the -- to answer your question, I have to clarify.

15  People had assigned sections to write, but we all had input

16  into the -- it was a consensus document.  So I don't recall.  I

17  don't think I was -- I was not the lead in that section, but I

18  did have input into the edits and final product.  But no, I was

19  not the lead author in that section.

20       Q.  Did you take a lead role in authoring the portion

21  related to transgender prisoners or did you just provide input

22  as you discussed?

23       A.  The latter, the input, yes.

24       Q.  And we will return to your C.V., so keep that handy.

25  But we're going to turn back to Exhibit-1, which is your expert

1   report.  So I want to go ahead and ask you a couple of

2   questions about the report generally.  Did you draft this

3   report?

4        A.  Yes.

5        Q.  Did anyone else assist you in drafting this report?

6        A.  No.

7        Q.  So the text in this report, you were the sole author

8   of all text in this report?

9        A.  Well, I think we have identified Mr. Orlando Rodriguez

10  helped with the appendix, A and B.  I think that's why there's

11  a typo with my middle -- initial of my name.  But other than

12  that, everything -- the content in this all was submitted by

13  me, except for the title of the appendix.

14       Q.  Understood.  Other than defendant's lawyers, did you

15  speak to anybody about drafting this report?

16       A.  No.

17       Q.  So you did not speak to Dr. Sarah Boyd about drafting

18  this report?

19       A.  I have never spoken to Sarah Boyd.  I wouldn't know

20  her if she walked in the room today.

21       Q.  And so you have also never spoken with Dr. Finley in

22  preparation of your report?

23       A.  Same.  I have never spoken to her ever and I wouldn't

24  know what she looked like if she walked in the room.

25       Q.  Understood.  And so exhibit A to this document is a

                                                            33

1   list of materials relied upon in drafting your report, correct?

2   Sorry, appendix A.

3       A.  I would say yes.  But the two additional things I

4   probably should have included or detailed were the psychometric

5   testing that was administered by Dr. Ettner and also the

6   psychometric testing that was administered by Dr. Boyd.  I

7   reviewed the actual raw data, if you will, and that's not

8   detailed on this.  But yes, otherwise those are the materials I

9   reviewed.

10      Q.  Okay.  Other than those materials listed in a appendix

11  A and the two that you just mentioned, the psychometric testing

12  administered by Dr. Ettner and Boyd, are there any other

13  documents that you have reviewed in preparing your report?

14      A.  Dr. Li, she included like a -- several tables with her

15  report.  I don't know if that's called an exhibit or how that

16  was referred to.  So I didn't just read her expert report.  I

17  also reviewed her statistical analysis of the evidence research

18  for the transgender studies.  So it wasn't just her expert

19  report, number 21.  I also reviewed the tables that she

20  prepared describing her research.

21      Q.  Understood.  Did you personally review all of the

22  materials that you have listed in appendix A?

23      A.  Yes.

24      Q.  And what was your process for reviewing and relying on

25  those materials?

34

1          A.  Well, Mr. Orlando Rodriguez's office mailed the

2     materials to me.  Either hard copies or uploaded as a share

3     file.  And I basically read them and -- so that's how I did

4     that.

5          Q.  Did you take any notes on the materials?

6          A.  Yes.

7          Q.  What were you noting?

8          A.  So I noted different things.  For example, during the

9     video deposition and Dr. Boyd's interview or evaluation of Mrs.

10    Brown.

11         Q.  Okay.  Are those the only things that you made notes

12    regarding in your material review?

13         A.  Yes.  I also took notes from phone calls with Orlando

14    Rodriguez, phone calls with him.

15         Q.  Okay.  Understood.  Did counsel instruct you to make

16    any assumptions in preparing the report?

17         A.  No.

18         Q.  Other than the materials that we just discussed, did

19    they provide you with any other information?

20         A.  Yes.

21         Q.  What was that information?

22         A.  I understand that there's some new declaration or

23    rebuttal report by a new expert.  And I understand that there's

24    some new information available regarding one of your experts

25    that just became available as of yesterday.

                                                              35

1    Q.  Understood.  But to be clear, they did not provide you

2  with any other information for the preparation of your report,

3  correct?

4    A.  No.

5    Q.  Okay.  So you have not spoken to Dr. Sarah Boyd or Dr.

6  Li regarding this case ever?  Was that your previous testimony?

7    A.  Yes.

8    Q.  Okay.  So not only did you not speak to them in

9  preparation of report, you have never spoken to them?

10   A.  That's correct.

11   Q.  So turning to your expert report on page two.  You

12  note at the top of page two, first full sentence, since 1999, I

13  have focused my clinical, administrative, and forensic work

14  primarily within correctional settings.

15       Did I read that correctly?

16   A.  Yes.

17   Q.  Where did you work prior to taking on your current

18  role?

19   A.  So I was an employee of Butler Hospital in Providence,

20  Rhode Island from 1992 through 1996.  And then I was an

21  employee of Lifespan Hospitals in Providence, Rhode Island from

22  1996 through 1998.  And then I was an employee of Yale

23  University from 1998 through 1999.  And then I was an employee

24  of Lifespan hospitals from 1999 through 2008.  And I have been

25  an employee of the University of Texas Medical Branch from 2008

                                                            36

1    to the present.

2        Q.  Understood.  So your time with Butler Hospital in

3    Rhode Island from 1992 to 1996, was that your time spent as a

4    fellow?

5        A.  So it was a resident, but I also did other things

6    aside from being a resident.

7        Q.  I'm just trying to ascertain whether it was a

8    component of your education or -- so that was still a component

9    of your educational requirements, correct?

10       A.  Correct.  But I was a licensed physician.  So I was

11   doing moonlighting, like doing competency evaluations at the

12   county jail and doing other things like that.

13       Q.  So your time spent at Butler Hospital in Rhode Island,

14   was that work within the correctional setting?

15       A.  I often went to -- like I said earlier, Rhode Island

16   has a combined jail and prison system.  So when I said county

17   jail, that's correct.  It's basically the Rhode Island

18   Department of Corrections is the county jail/prison system.

19       Q.  Did you do any work while at Butler Hospital that was

20   not within the correctional setting?

21       A.  Yes.

22       Q.  And what was the nature of that work?

23       A.  So I have worked across settings, both private

24   psychiatric hospitals, state hospitals, the VA, veterans

25   hospitals, HMOs, community mental health centers, emergency

37

1  rooms, children's psychiatric hospital, children's pediatric

2  hospital, and other community hospitals with psychiatric units

3  contained within the hospital.  I'm probably forgetting, but

4  that's kind of the extent of different places I have worked

5  with -- worked in as part of my training.

6      Q.  Sure.  And so in 1996 and 1998 you said that you

7  worked for Lifespan.  Again, was that a component of your

8  education?

9      A.  Yes.

10      Q.  So that would have been included in what we previously

11  discussed as your experience during like postgraduate

12  fellowship, is that right?

13      A.  Correct.

14      Q.  Was that in the correctional context?

15      A.  So I did moonlighting.  Again, like doing competency

16  evaluations.  I also did any kind of cases that involved

17  special education or adults that were questioned about

18  competency to stand trial.  I did that as moonlighting during

19  my training.

20      Q.  Understood.  How about your time at Yale?  That was,

21  again, within the context of your education and fellowship as

22  we had previously discussed?

23      A.  Yes.

24      Q.  And was that in or outside of the correctional --

25      A.  That was almost a hundred percent in correctional

                                                          38

1   settings.  Going into county jails, doing competency

2   evaluations, insanity defense evaluations, providing treatment

3   to individuals in forensic -- correctional forensic units and

4   other consultation.

5      Q.  Okay.  And I had asked you previously about your

6   experience in the treatment of gender dysphoria or what was

7   then known as gender-identity disorder and the experience that

8   you recounted for me at that time would have included your time

9   working at these three institutions, Butler Hospital, Lifespan

10  Hospital and Yale?

11     A.  Yes.  That's fair.

12     Q.  You also mentioned that from 1999 to 2008 you worked

13  for Lifespan Hospital in Rhode Island, is that correct?

14     A.  Yes.

15     Q.  And was that work within the correctional setting?

16     A.  Yes.

17     Q.  Was it exclusively within the correctional setting?

18     A.  No, it was -- I was halftime corrections and halftime

19  outpatient.

20     Q.  Did you treat any specific patient population in your

21  time outpatient?

22     A.  Yes.

23     Q.  What was that patient population?

24     A.  It was mainly children and adolescents and some adults

25  with developmental disabilities.

39

1          Q.  How about your -- in the portion that was corrections

2     did you treat any specific patient population?

3          A.  Yes.

4          Q.  What was that?

5          A.  It was incarcerated juveniles.

6          Q.  Any other patient populations?

7          A.  I consulted to several prison systems, Connecticut,

8     Massachusetts and Rhode Island during that period of time also.

9          Q.  Okay.  And we will return to your consulting work.  So

10    while you were working with Lifespan from 1999 to 2008 did you

11    have any experience in the treatment of gender dysphoria or

12    with what was then known as gender-identity disorder?

13         A.  I had some awareness, but I didn't have any firsthand

14    involvement.

15         Q.  Okay.  And so is it safe to say then that you did not

16    at that time have any experience treating patients any gender

17    affirming care?

18         A.  I mean, I treated a lot of patients for mental health,

19    mental disorders.  They may or may not have been undergoing

20    gender affirming care or -- but I was focused more on the

21    mental health treatment.

22         Q.  Okay.  So you did not treat anybody directly for the

23    purposes of your treatment assisting the individual in

24    receiving gender affirming care?

25         A.  That's fair.

40

1      Q.  So then nobody seeking gender-affirming surgery either

2  then?

3      A.  That's fair.

4      Q.  Did the correctional system that you worked for from

5  -- in association with Lifespan allow for the provision of

6  gender-affirming surgery?

7      A.  I don't recall.  I don't think they had any policy or

8  procedure regarding that specifically.

9      Q.  Are you aware of whether anybody received

10  gender-affirming surgery from that correctional system during

11  your time working with them?

12      A.  I don't believe so.  I don't recall.

13      Q.  So this is sort of a natural breaking point before we

14  get into a big chunk.  We have been going about an hour, if

15  folks would like a break, but I'm also happy to keep going.

16      A.  I'm good.

17      Q.  You mentioned that you have been the director of

18  mental health services for the UTMB Correctional Managed Care

19  since 2008, correct?

20      A.  Yes.

21      Q.  I apologize in advance if I flummox those acronyms,

22  but we'll try our best.  Can you describe your responsibilities

23  as the director of mental health services?

24      A.  Sure.  So it's really three different roles.  The main

25  role, I would say, is I oversee about 80 percent of the entire

41

1    Texas Department of Criminal Justice, the TDCJ, their state

2    prison system, which includes juveniles and adults.  So I

3    oversee all of the mental health care from the time somebody

4    hits the door to the time somebody leaves and the psychiatry,

5    psychology and other mental health care.  And then I'll say

6    something about my gender dysphoria work at the end.  But I

7    oversee all of the psychiatric and mental health care for

8    approximately 80 percent of the Texas prison system.

9         My other role is I oversee the psychiatric services

10   that are provided to youth that are sent to the Texas Juvenile

11   Justice Department, TJJD.  And that's statewide.  Similar to

12   the TDCJ, which is statewide.  TJJD is statewide.  And then I

13   oversee the psychiatric services to one county jail, Bexar

14   County, it's B-e-x-a-r, San Antonio, Texas.

15        And then lastly, and probably most relevant to the

16   purposes of today's deposition, is I oversee and have overseen

17   all of the gender dysphoria and gender affirming evaluation,

18   diagnosis and treatment systemwide within the whole state of

19   Texas.

20        Q.  Okay.

21        A.  Sorry.  I would say that's the main four things that I

22   do, but occasionally I get asked to consult when we have really

23   complicated patients that might be going, say, for bone marrow

24   transplant off to a different hospital or other unique really

25   high-profile cases.  But I would say those are the four main

                                                              42

1    things.  Those are the four main hats I wear.

2        Q.  Okay.  So you mentioned that UTMB CMC is responsible

3    for providing care to prisoners in the Texas Department of

4    Criminal Justice, correct?

5        A.  Yes.

6        Q.  And do you treat patients directly in your role?

7        A.  Yes.

8        Q.  How often do you do that?

9        A.  It varies.

10       Q.  On average how often would you say?

11       A.  Well, when you say treat, maybe if you clarify.  I'm

12   involved in the evaluation and treatment of patients on a daily

13   basis.  What unit they should go to, if they're stable to be

14   discharged, if they should be transferred to an emergency room,

15   what medications they're on, approval of special medication.

16   So that's how I would define treat.

17       Q.  Sure.  How often do you have clinical encounters with

18   patients?

19       A.  Again, it varies.  I would say it depends on the

20   patient and referral question.  But it varies from week to

21   week.

22       Q.  Okay.  What percentage of your time, I guess on an

23   average week, would you say you spend in clinical encounters

24   with patients, understanding that it varies from week to week?

25       A.  Sure.  10 to 20 percent.

                                                              43

1      Q.  Do you have clinical encounters specifically with

2   patients in gender-affirming care for gender dysphoria?

3      A.  Yes.

4      Q.  And of that 10 to 20 percent of your time that you

5   spend in clinical encounters on average with patients, how much

6   of that time is spent specifically with patients seeking

7   gender-affirming care for gender dysphoria?

8      A.  That would probably be the bulk of the clinical work

9   is overseeing directly the medications, approving and ordering

10  the medications, because all of them are non-formulary

11  medications, specifically the testosterone and other

12  medications like that.  Reviewing labs.  So yeah, I would say

13  10 to 20 percent is a fair number.

14     Q.  And so you just mentioned like seeking prescriptions,

15  labs and things like that.  What I'm talking about when I say

16  clinical encounters is time spent in a room interfacing with a

17  patient.  What portion of your time would you say is spent

18  actually having direct contact with a patient who is seeking

19  gender-affirming care?

20     A.  So during COVID we really backed off in-person

21  encounters.  We do more telemedicine.  We have done

22  telemedicine for about 15 years in our system.

23     Q.  We'll call it face-to-face, how about that?

24     A.  Sure.  When you say face-to-face, I occasionally do go

25  to prison units in person and see patients in person.  But I

44

1    would say it's maybe five percent of the time.

2        Q.  Okay.  What about virtual face-to-face?

3        A.  Well, I would include that.  In person and virtual,

4    like video conferencing, tele psychiatry, I would say about

5    five percent.

6        Q.  Is the provision of care through the UTMB CMC bound by

7    TDCJ policies?

8        A.  So I can't answer that with a yes or no.  I would have

9    to clarify my response.

10       Q.  Okay.

11       A.  So what UTMB Correctional Managed Care does is it's

12   actually bound by statute.  We have been doing this since like

13   1993, I think.  When I say we, Texas Tech on the west end of

14   the state and UTMB on the east part of the state.  Texas Tech

15   is about 20 percent of the patients, just males, that's all

16   they have on the Texas Tech side.  UTMB we have everything,

17   male, female.  So it's by -- it's codified in statute and the

18   Correctional Managed Healthcare Committee is the overarching

19   policy or -- like we have internal UTMB Correctional Managed

20   Care policies, but those committees are joint committees

21   between Texas Tech, UTMB and TDCJ.  And those policies and

22   procedures are vetted through and established under the

23   Correctional Managed Healthcare committee as policies.

24   Correctional Managed Healthcare policies.

25       Q.  Okay.  So to make sure I understand your testimony

45

1    correctly.  UTMB CMC, Texas Tech, and TDCJ collaborate in the

2    creation of the policies that bind treatment of patients who

3    are within the custody of TDCJ?

4        A.  So TDCJ has no clinical role.  UTMB Correctional

5    Managed Care, we provide all of the onsite care at all the

6    prison units.  We have a hundred prisons across the state and

7    we do 80 of those and Texas Tech 20.  We also provide all of

8    the specialty care onsite or offsite, surgery, all that.  We do

9    all of that.  UTMB handles that within our part of the state.

10   TDCJ has a health services division, but they're more of a

11   contract monitor and oversight and they handle grievances and

12   patient or family complaints.  So they don't do any direct

13   patient delivery.  All of the direct patient care delivery is

14   done by UTMB Correctional Managed Care or Texas Tech.

15       Q.  Okay.

16           MS. MAFFETORE:  Now, I'm going to go hand the

17   court reporter what I would be asked to be marked as Exhibit-3,

18   and this might help us clarify this point a little built to

19   make sure we're not talking past each other.

20                        -   -   -

21           (Document marked as Exhibit-3 for

22   identification.)

23                        -   -   -

24   BY MS. MAFFETORE:

25       Q.  Again, all of the ones with stickers on them the court

46

1    reporter will get back at the end of the day.

2        A.  Of course.

3        Q.  So I have just handed you a document which is titled

4    Correctional Managed Health Care Policy Manual, policy number

5    G-51.11, treatment of inmates with intersex conditions, or

6    gender dysphoria, formerly known as gender identity disorder.

7            Do you recognize this document?

8        A.  Yes.

9        Q.  And so what entity is responsible for the creation of

10   this document or entities?

11       A.  So I can only testify to my knowledge from my having

12   joined the organization in 2008.  I believe there was already

13   existing policy and I think at that time it was treatment of

14   inmates with intersex conditions or gender identity disorder.

15   So the entities would be UTMB Correctional Managed Care and me

16   in working on that, Texas Tech, and the TDCJ Health Services

17   through the joint -- sorry, joint gender dysphoria work group.

18   That's how this policy would be reviewed and revised and

19   updated would be through the joint gender dysphoria work group.

20       Q.  Okay.  And the Correctional Managed Healthcare policy

21   manual, is that a policy manual held by TDCJ?

22       A.  As I understand it, it's through the governor's office

23   and it's something that TDCJ is bound to follow.  So it's

24   actually a step up higher.  It's kind of like -- as I

25   understand it it's what -- the state governor -- or the

47

1   governor and the state of Texas asks TDCJ to handle because --

2   yeah, so that's fair.

3       Q.  You're familiar with this policy, correct?

4       A.  Yes.

5       Q.  Okay.  Generally speaking, what is the purpose of this

6   policy?

7       A.  I'm sorry?

8       Q.  The purpose of this policy?

9       A.  Sure.  So the purpose of this policy is this patient

10  population is considered a special population and this is to

11  provide clear guidance to explain the provision of how these

12  individuals might be referred, evaluated, diagnosed and treated

13  within a correctional setting.

14      Q.  And that's for gender dysphoria, correct?

15      A.  Well, it includes all three.  It includes individuals

16  who are transgender, individuals who might be transgender with

17  or without gender dysphoria, and individuals that might have

18  intersex or disorders of sexual development.

19      Q.  Understood.  Does this policy concerning the treatment

20  of incarcerated persons with intersex conditions and gender

21  dysphoria specifically allow for surgery as a treatment for

22  gender dysphoria?

23      A.  I understand the policy to not be prohibitive.  It's

24  moot on the issue.  It doesn't say -- it doesn't say it's

25  permissive, but it doesn't say it's not allowed or forbidden.

48

1    So it's moot on the issue.

2        Q.  So the text of the policy makes no mention of surgical

3    treatment for gender dysphoria, correct?

4        A.  The current policy as written does not, that's fair.

5        Q.  Understood.  So keeping your report handy.  At page

6    three of your report, which is Exhibit-1 in this case, you note

7    I also provided input and assisted with revisions to the State

8    of Texas's Correctional Health Care Committee policy entitled

9    Policy G-51.11 of the Correctional Managed Health Care Policy

10   Manual, which concerns the treatment of incarcerated persons

11   with intersex conditionals and gender dysphoria, correct?

12       A.  Yes.

13       Q.  Is that the same policy as we were just discussing in

14   Exhibit-3?

15       A.  Yes.

16       Q.  Did you ever discuss including the provision of

17   gender-affirming surgery in the time that you spent providing

18   input and assistance with this policy?

19       A.  I don't recall.

20       Q.  Why wasn't the provision of gender-affirming surgery

21   explicitly included in this policy?

22                MR. RODRIGUEZ:  Objection.  Speculation.  You

23   can answer.

24                THE WITNESS:  So I don't know.  I am part of

25   the joint -- I'm actually the cochair of the joint gender

                                                              49

1   dysphoria work group.  So that topic has not come up to date.

2   It's not been raised as an agenda item to date.

3   BY MS. MAFFETORE:

4       Q.  Have you ever sought to raise it as an agenda item?

5       A.  Not to date, no.

6       Q.  Based on your experience serving on this joint

7   committee, is the provision of gender-affirming surgery a

8   priority for the committee?

9               MR. RODRIGUEZ:  Objection.  Speculation.  You

10  can answer.

11              THE WITNESS:  I'm sorry, it's not a committee.

12  It's a work group.  It's a work group.  And I'm sorry, what was

13  the question, please?

14  BY MS. MAFFETORE:

15      Q.  Is the provision of gender-affirming surgery for the

16  treatment of gender dysphoria a priority for the work group?

17              MR. RODRIGUEZ:  Same objection.  You can

18  answer.

19              THE WITNESS:  How would you define a priority?

20  BY MS. MAFFETORE

21      Q.  Has it ever been discussed that it should be something

22  that the health care system is doing for patients with gender

23  dysphoria?

24      A.  So I can't answer as a yes or no, but I can clarify --

25  I would have to explain my response.  So in our system we have

50

the offender health care plan, which has language regarding

what is considered covered benefit versus not covered.  And if

we had a patient that had imminent risks of harm,

disfigurement, pain and suffering disability and other negative

sequelae and was felt to be a surgical candidate, we would

certainly review that patient's case and review the risks,

benefits and alternatives of gender-affirming surgery if and

when indicated.

    Q.  Has the system ever reviewed a request for

gender-affirming surgery, to your knowledge?

    A.  I'm sorry, has the who?  The question again, please.

    Q.  UTMB CMC.

    A.  So I'm not sure if I can answer the question because

one of the cases, the Haverkamp case involves this issue and

it's under current litigation, and it's the same issue about

gender-affirming surgery.

    Q.  I'm sorry.  And is that case under seal?

    A.  All I know is it's under current litigation and I

probably shouldn't be talking about the specifics of that case

because it's under a current litigation.

    Q.  Okay.  And so I'm not asking you to disclose any HIPAA

information or any information that would be, you know, private

or specific to an individual patient.  I'm asking you from a

systems perspective whether the UTMB CMC has ever considered a

request for gender-affirming surgical care for the treatment of

                                                          51

1    gender dysphoria.

2        A.  Not to the best of my ability, no.

3        Q.  Okay.  And so pursuant to the policy that we have just

4    discussed, gender-affirming surgery has never been considered

5    under this policy as a gender-affirming treatment for an

6    individual incarcerated in the Texas prison system who is

7    seeking caring for gender dysphoria, is that correct?

8                MR. RODRIGUEZ:  Object to the form.  You can

9    answer.

10               THE WITNESS:  I didn't understand your

11   question.  Sorry.

12   BY MS. MAFFETORE:

13       Q.  Following the procedures laid out in the policy we

14   were just discussing at Exhibit-3, Policy G-51.11, no

15   individual has ever been considered under this specific policy

16   for gender-affirming surgery for the treatment of gender

17   dysphoria, is that correct?

18       A.  When you say considered, that's where I'm getting hung

19   up.  If you can clarify how you mean considered.

20       Q.  Referred for treatment.

21       A.  We have had one or two individuals self injure their

22   penis and referred to the urology department on campus.  Again,

23   we're UTMB, they're UTMB.  But as far as what -- to the best of

24   my knowledge, and I can't get into specifics because of HIPAA,

25   I believe they did a surgical repair.  But I don't recall that

                                                              52

1    there was any further advancement of gender-affirming

2    surgeries.

3        Q.  So your understanding was that was a triage situation

4    to resolve a medical emergency and not specifically for the

5    treatment of an individual's gender dysphoria, is that correct?

6        A.  Well, the surgery was done as an emergency surgery and

7    the urology department did follow the patient.  But once the

8    patient was stabilized they were transferred to one of our

9    inpatient psychiatric units and received further psychiatric

10   evaluation and treatment.  So I would consider that to be part

11   of treatment for gender dysphoria.  We didn't turn a blind eye

12   to the fact that they had self-harmed.  We did treat the

13   patient and stabilize the patient.  I think that occurred on

14   two different occasions.

15       Q.  So I'm asking was the surgery performed in that

16   situation surgery for the specific purpose of treating an

17   individual's gender dysphoria?

18       A.  I believe it was more of a treating the acute

19   emergency, rather than specifically for the gender dysphoria,

20   that's fair.

21       Q.  Understood.  So in your role as mental health services

22   director, you mentioned that you also oversee the provision of

23   mental health services to those in the custody of the Texas

24   Juvenile Justice Department, correct?

25       A.  Yes.

53

1    Q.  And you spoke a bit about your responsibilities in

2    that role.  Isn't it the case that the United States Department

3    of Justice opened an investigation into the conditions of five

4    juvenile facilities under the auspices of the TDJJ?

5    A.  I'm sorry, the T -- what was that?

6    Q.  Under the -- sorry.  TDJJ.

7    A.  Yes, that's fair.

8    Q.  I'm now going to hand you --

9    A.  Sorry, could you repeat the question again?

10   Q.  Sure.  Isn't the case that the United States

11   Department of Justice opened an investigation into the

12   conditions of five juvenile facilities within the TJJD?

13   A.  Yes.  Correct.  It had nothing to do with medical or

14   psychiatric care.  It was strictly conditions of confinement.

15   That's correct.

16           MS. MAFFETORE:  I'd now like to hand you what I

17   would ask the court reporter to mark as Exhibit-4.

18                       -  -  -

19           (Document marked as Exhibit-4 for

20   identification.)

21                       -  -  -

22   BY MS. MAFFETORE:

23   Q.  So the court reporter has just handed you what has

24   been marked as Exhibit-4, which is a press release from the

25   Department of Justice titled Justice Department Announces

54

1    Investigation into Conditions at Five Juvenile Facilities in

2    Texas.  Do you recognize this document?

3        A.  No.  I mean, this is the first time I have seen it,

4    but I'm generally familiar with what the allegations are.

5        Q.  Okay.  So the second full paragraph on the first page

6    of Exhibit-4 notes the investigation will also examine whether

7    Texas provides adequate mental health care, is that correct?

8        A.  Yes.

9        Q.  And that would be in the context of the investigation

10   into these five facilities under the under the jurisdiction of

11   TJJD, correct?

12            MR. RODRIGUEZ:  Objection.  Lacks foundation.

13   You can answer.

14            THE WITNESS:  So to answer your question, I

15   have to clarify that we -- my role, we don't have anything to

16   do with the mental health care at the units.  That's provided

17   by TJJD.  They have psychology staff and other staff that do

18   the mental health care.  My role, we oversee and I provide

19   oversight of all the psychiatric care.  So that's different.  I

20   have nothing really to do with the mental health care.  My role

21   is strictly the psychiatric care.

22   BY MS. MAFFETORE:

23       Q.  Is psychiatric care considered mental health care?

24       A.  It depends.  In the purposes of the contract with TJJD

25   between UTMB, it's spelled out explicitly that we provide

55

1    psychiatric care and TJJD provides mental health care.

2         Q.  Does UTMB CMC collaborate with TJJD in the provision

3    of psychiatric care to individuals incarcerated within TJJD?

4         A.  Yes.

5         Q.  To your understanding is that investigation ongoing?

6              MR. RODRIGUEZ:  Objection.  Lacks foundation.

7    You can answer.

8              THE WITNESS:  I have no -- I don't know

9    anything about the status of it, if it's ongoing or what the --

10   I have never been interviewed so --- I would have thought if

11   there was concerns about anything psychiatric I would have been

12   directly interviewed, but I have not been interviewed to date.

13   So the short answer to your question is I don't know the status

14   of this.

15   BY MS. MAFFETORE:

16        Q.  Are you aware of whether or not there have been

17   inspections with respect to that investigation?

18        A.  I'm generally aware, yes.

19        Q.  Do you have any awareness of what those inspections

20   have revealed?

21        A.  No, I don't.  I have not seen a report.  Again, I was

22   never interviewed by anyone that was on part of those

23   inspection teams.  I offered to meet with those folks and

24   answer any questions that they had, but no one has come forward

25   and asked any questions of me to date.

                                                              56

1          Q.  Understood.  And so if a patient within one of these

2     five facilities was receiving not only psychology services but

3     also psychiatric services, that patient would be a patient of

4     the UTMB CMC, is that correct?

5          A.  I'm not sure I understand your question.  If you could

6     --

7          Q.  Sure.  So you mentioned that the contract is very

8     clear that TJJD provides mental health services, which I assume

9     would be psychology services, but that UTMB CMC provides

10    psychiatry services, is that correct?

11         A.  Well -- okay.  So we provide all health care.  When

12    someone comes into the facility they're seen by the nursing

13    staff, their immunizations are checked, they're checked to see

14    if they have any sexually transmitted diseases or any medical

15    history or what medications they're on.  If they're on

16    psychotropic medications I would get called or one of our other

17    staff.  They would be seen by nursing.  They have a physical --

18    so we handle all of the medical and -- if they cut or

19    self-harm, we handle that.  Psychology handles the counseling

20    and therapy and psychology testing and the treatment teams of

21    these youth and we're consultants -- I'm sorry, when I say we,

22    UTMB Correctional Managed Care psychiatry are consultants to

23    those treatment teams.

24         Q.  So if an individual engages in self-harm, that's

25    something you said that UTMB would be aware of?

57

1     A.  If it's reported to us, yes.

2     Q.  If an individual engages in suicide attempts, is that

3  something that UTMB would be made aware of?

4     A.  It's possible.  Hopefully they notify us, yes.

5     Q.  Are you aware of whether the investigation into these

6  five facilities at TJJD have revealed significant suicide

7  attempts?

8     A.  When you say suicide attempt, if you could clarify how

9  you're defining it so I can answer your question?

10     Q.  An attempt by an individual to end their life.

11     A.  So as I understand it, there have been investigations

12  into self-harm and my understanding, my review of the data

13  that's been presented, the majority of the self-harm was not

14  necessarily near miss or lethal suicide attempts, it was just

15  cutting or self-harm.  So the question -- it's not clear if

16  those were all suicide attempts or not or if they were

17  non-suicidal, self-injurious behavior.

18     Q.  Understood.  You can set those aside.  Again,

19  referring back to your report.  On page three you note and, I

20  assisted in revising and approving, the NCCHC's 2020 position

21  statement entitled:  Transgender and Gender Diverse Health Care

22  in Correctional Settings, is that correct?

23     A.  Yes.

24     Q.  What was your role in assisting in revising that

25  position statement?

58

1     A.  I'm a little foggy on the specifics.  I have been on

2     the NCCHC for like 20-plus years.  What I understand is back

3     then there was a policy and standards committee and the policy

4     and standards committee reviews and updates or creates new

5     position statements.  And there was an existing position

6     statement.  And so it was scheduled to be reviewed and I was

7     the only one that had correctional experience and direct

8     patient care and administrative experience with this

9     population.  So they asked me -- the Policy and Standards

10    Review committee asked me to review the document and provide

11    input into that.  So that's how I recall what happened.

12    Q.  What input did you provide?

13    A.  So I basically -- as I recall, I think it was sent to

14    me and I did like the track changes and sent it back to the

15    chair of the work group with my suggested edits.  That's to the

16    best of my recollection of how that worked.

17    Q.  What changes did you suggest?

18    A.  I don't recall the specifics.  That was several years

19    ago.

20    Q.  Do you recall generally what changes you suggested?

21    A.  No, not as we sit here today.  I think I looked at the

22    entire document.  I do think that -- there was one section that

23    I had direct -- that I can recall had to do with the

24    adolescents.  So I recall that I put in some wording or

25    language regarding adolescents.  I see it sitting there and I

1    would be happy to refer to that and explain to answer your

2    question.  But that's the one section that I distinctly recall

3    because it was -- it didn't have any -- there was no language

4    about adolescents.  So that I think that was one of the main

5    things that I contributed to the document.

6        Q.  So aside from the piece that you recall regarding

7    adolescents, you don't recall any input that you provided with

8    respect to any other aspect of the NCCHC's policy statement?

9        A.  I had some input into the evaluation and management

10   and treatment sections also, but without the document I can't

11   be more specific.

12       Q.  Sure.

13            MS. MAFFETORE:  I'm now going to hand the court

14   reporter what will be marked as Exhibit-5, which is the

15   position statement from the National Commission on Correctional

16   Health Care, which we have been saying as NCCHC, entitled

17   Transgender and Gender Diverse Health Care in Correctional

18   Settings.

19                         -  -  -

20            (Document marked as Exhibit-5 for

21   identification.)

22                         -  -  -

23   BY MS. MAFFETORE:

24       Q.  Do you recognize this document?

25       A.  Yes.

                                                              60

1    Q.  And is this the position statement we were just

2  discussing that you provided input on that is mentioned on page

3  three of your expert report?

4    A.  Yes.

5    Q.  And does flipping through this document provide you

6  with any refreshment of your recollection about any input that

7  you provided to support your statement on page three of your

8  report that you assisted in revising and approving this

9  position statement?

10   A.  Yes.

11   Q.  And other than the adolescent piece you had just

12  mentioned, what other input did you provide?

13   A.  I believe I had some input in number six about looking

14  for other mental health issues.

15   Q.  Can you please direct me to the page that your --

16   A.  I'm sorry, page three, number six.

17   Q.  Okay.

18   A.  And the point being that some of these individuals

19  might not be readily identified and so health care staff should

20  screen everyone who is incarcerated for mental health issues.

21  In particular transgender patients and to look for comorbid

22  conditions.  And then I think I included number seven about

23  psychotherapy and other mental health treatments, which is one

24  of the main pillars, if you will, for this patient population.

25  And then I think I added number eight also about hormone

                                                          61

1   medication treatment.  And then candidacy for surgical

2   interventions.

3       Q.  So to the best of your recollection, you added that

4   the clinical decision-making to initiate or advance hormone

5   medication treatment or candidacy for surgical interventions

6   while incarcerated or upon release needs to be based on

7   individual medical need, risks and benefits, analysis of

8   alternatives, ruling out contraindications, accepted standards

9   of care, and a thorough informed-consent process?

10      A.  I believe so, yes.

11      Q.  And do you agree with that statement as articulated

12  here in this final draft of this policy statement?  Or sorry,

13  position statement.

14      A.  I'm sorry, I hadn't finished going through the things

15  that I added or suggested be added to this document.  Should I

16  go through that and finish?

17      Q.  So I appreciate if you can answer the question that I

18  just asked and if there are additional things that you would

19  like to follow up regarding the answer, that's fine.

20      A.  Sure.  And I'm sorry, what was the question, please?

21      Q.  Do you agree with the number eight as it ultimately

22  ended up in this final draft?

23      A.  Yes.

24      Q.  Are there any other aspects that you recall providing

25  input on in this position statement?

                                                            62

1      A.  I think number nine on page three about the pubertal

2   suppression agents because again, getting at adolescents, there

3   might be pre-pubertal or beginning puberty.  And then I think I

4   added nine B, B like boy, because sometimes we see this a lot

5   in my clinical experience, a lot of patients come in and

6   there's no way to figure out who actually was prescribing the

7   hormones or if they were black market, you know, on the street.

8   And same with C, nine C.  And I think number 10.  I don't think

9   I added it, but I think I provided some language about a

10  careful -- sorry, on page four, number 10.  I think I added the

11  language about a careful risk, benefit, and alternatives

12  analysis.

13      Q.  Just number 10 states evaluations to determine the

14  medical necessity of gender-affirming surgical procedures will

15  be performed on a case-by-case basis, applying a careful risk,

16  benefits, and alternatives analysis.  Gender-affirming

17  procedures will be provided when determined to be medically

18  necessary for a patient according to accepted medical

19  standards, correct?

20      A.  Yes.

21      Q.  And your testimony is that you believe that you

22  suggested the addition of applying a careful risk, benefit, and

23  alternatives analysis?

24      A.  Yes.  And also medically necessary.  I think I made

25  some -- I think there was some language to that about surgical

63

1    procedures, gender-affirming surgical procedures, and I think I

2    just added some language to make it more clear.

3        Q.  And to the best of your understanding, is number 10 as

4    we just discussed it consistent with the policy we discussed at

5    Exhibit-3, G-51.11?

6        A.  I'm sorry, say it again, please.

7        Q.  Number 10, that criteria, we just discussed it.  Is

8    that consistent with the policy that we discussed as Exhibit-3,

9    policy G-51.11?

10       A.  So I think I testified to this earlier.  Texas G-51.11

11   is moot on there is no document -- sorry, documentation around

12   surgical procedures as I read that document.

13       Q.  Okay.  So in the prison system in which you

14   predominantly work, the policy is silent as to whether or not

15   it is compliant with number 10 from the NCCHC position

16   statement, is that correct?

17               MR. RODRIGUEZ:  Object to form.  You can

18   answer.

19               THE WITNESS:  When you say compliant, I'm not

20   sure I understand.  We're not NCCHC in Texas so we wouldn't

21   have to be compliant with this.  The position statement is

22   aspirational in nature.  So we're not NCCHC in Texas.

23   BY MS. MAFFETORE:

24       Q.  So Texas does not purport to incorporate this

25   aspiration into its written policy, is that correct?

                                                              64

1      A.  As I understand, Texas does not include that in their

2  policy.  That's fair.

3      Q.  Okay.  Thank you.  Do you agree with the entirety of

4  the NCCHC position statement?

5              MR. RODRIGUEZ:  Object to the form.  You can

6  answer.

7              THE WITNESS:  So I generally agree with the

8  content of it, but it's -- with the caveat that; one, it's

9  aspirational in nature; two, it's dependent upon a lot of

10  different variables.  For example, the duration that someone is

11  going to be confined.  If they're only going to be in a jail or

12  prison for a few weeks or a few months, it would be hard to

13  apply this -- sorry, would be difficult to apply this.  And if

14  there is some comorbid condition that hasn't been addressed or

15  treated.  Say, for example, an individual has had trauma, abuse

16  and neglect may have posttraumatic stress disorder or some

17  other mental disorder that hasn't been appropriately evaluated

18  or treated.  I would say I generally agree with this document,

19  but there has to be other considerations on a case-by-case

20  basis, and it has to include a multidisciplinary treatment

21  approach to include health care and custody staff.

22  BY MS. MAFFETORE:

23      Q.  Don't the aspects of this policy that we were just

24  discussing incorporate evaluation on a case-by-case basis?

25              MR. RODRIGUEZ:  Which policy?

65

1          MS. MAFFETORE:  NCCHC position statement.

2    Sorry.

3          THE WITNESS:  So it's not really a policy.

4    It's not -- there's no policy that I'm aware of that NCCHC has.

5    BY MS. MAFFETORE:

6    Q.  Sorry, I intended to say position statement.

7    A.  Okay.  And I'm so sorry, what was the question,

8    please?

9    Q.  Doesn't it incorporate the evaluation should be

10   performed on a case-by-case basis?

11   A.  That's fair.  I agree with that.

12   Q.  And so are there other aspects of this position

13   statement that you do not agree with?

14   A.  No.  I would just clarify that all this has to be

15   considered within a correctional context and this document was

16   predominantly written by health care staff, pediatricians,

17   family doctors, nurses, psychiatrists, psychologists and

18   others.  I don't recall that there was much custody or

19   correctional input and that always has to be at the table.  So

20   I would say that, again, this all has to be considered within a

21   custody or correctional context.

22   Q.  Understood.  And again, NCCHC stands for National

23   Commission on Correctional Health Care, correct?

24   A.  Yes.

25   Q.  So this was drafted with the intent that it would be

                                                            66

1    used in a correctional context, is that correct?

2        A.  It's a position statement and it's aspirational.  But

3    as we sit here today I'm not -- I don't recall if any custody

4    experts or custody staff were involved in this document

5    revision or creation.

6        Q.  Understood.  But to the extent that is an aspirational

7    document, it is aspirational for the custody content, correct?

8        A.  That's fair.  Yes.

9        Q.  Okay.  Thank you.

10               MS. MAFFETORE:  So we have been going for about

11   two hours.  I think it's probably a good time to take a break

12   before we jump into the next thing.

13               MR. RODRIGUEZ:  Sure.  10 minutes.

14                           -  -  -

15               (A break was taken, 10:59 a.m. - 11:11 a.m.)

16                           -  -  -

17   BY MS. MAFFETORE:

18       Q.  Dr. Penn, we are back on the record.  Just a reminder

19   that after that break we are -- you are still under oath.

20   Understood?

21       A.  Yes.

22       Q.  Great.  So turning back to your expert report, which

23   is Exhibit-1.  On page four you note that you oversaw -- wait

24   for you to get there.  Page four.  At the top you note that you

25   oversaw the development, implementation, and expansion of a

                                                              67

1   statewide specialized gender dysphoria referral and clinical

2   program, is that correct?

3       A.  Yes.

4       Q.  When was that clinic established?

5       A.  I don't recall the exact date.  It would be a guess.

6       Q.  What's your guess?

7       A.  2014/15.

8       Q.  And when did you begin to oversee that clinic?

9       A.  Again, I don't recall the exact date.

10      Q.  Would it have been since its inception?

11      A.  Yes.

12      Q.  Is provision of health care at that clinic bound by

13  the policy we have discussed as Exhibit-3, G-51.11?

14      A.  I'm not sure I understand when you say bound.

15      Q.  Is provision of health care at that clinic

16  administered in accordance with that policy?

17      A.  I would say generally speaking, yes.  But in health

18  care there's always exceptions and there's always unique

19  patient cases.  So I would say it's a framework, but I wouldn't

20  agree that we're bound to it or we have to or must.  We

21  generally follow it.

22      Q.  Okay.  Does that clinic evaluate patients for the

23  treatment of gender dysphoria through gender-affirming surgery?

24      A.  Not -- no.  No, we do not.

25      Q.  Why not?

                                                              68

1       A.  Well, in our system -- and again, our system is, as I

2   mentioned earlier or testified to earlier, it's university

3   based, systemwide, statewide.  So if an individual, whether

4   they had gender dysphoria or not, anyone that wants surgery it

5   would go through the typical or standard utilization review

6   process for a specialist consultation, specifically a surgery

7   consultant.  And so the gender dysphoria clinic, they're not

8   surgeons so they wouldn't be involved in that.  They would

9   refer -- or any unit-based provider could refer for surgical

10  consultation.

11      Q.  Does the clinic evaluate patients for referrals to

12  surgical consultations for gender-affirming surgery for the

13  treatment of gender dysphoria?

14      A.  Not to date, no.  Not that I recall.

15      Q.  Okay.  Why not?

16      A.  The majority of the treatment that's provided within

17  the state of Texas to date is -- the gender-affirming treatment

18  is hormone medication treatment and then there's some provision

19  of additional gender-affirming items.  But to date, surgery is

20  not part of the gender dysphoria clinic program.

21      Q.  Have individuals ever made a request to any provider

22  of the gender dysphoria clinic program for a referral to a

23  surgical consultant for gender-affirming surgery for the

24  treatment of gender dysphoria?

25      A.  Not that I'm aware of.

                                                              69

1      Q.  So no patients at the gender dysphoria clinic has ever

2   made a request for gender-affirming surgery?

3      A.  Correct.

4      Q.  Does the gender dysphoria clinic keep records of

5   patients' requests for gender-affirming surgery that are made?

6              MR. RODRIGUEZ:  Objection.  Mischaracterization

7   of previous testimony.  You can answer.

8              THE WITNESS:  So the short answer is no.  Any

9   patient chief complaint or sick call request would be scanned

10  into the medical chart.  Or alternatively if the patient went

11  to the gender dysphoria clinic, their subjective complaint

12  would be documented or memorialized in their evaluation, in

13  their documentation.  So that's how that would work.

14  BY MS. MAFFETORE:

15     Q.  Has a patient ever reported to the gender dysphoria

16  clinic where their chief subjective complaint was a request for

17  gender-affirming surgery to treat their gender dysphoria?

18              MR. RODRIGUEZ:  That's been answered.  You can

19  answer.

20              THE WITNESS:  I think I answered that, that to

21  date I don't recall any patients specifically seeking from a

22  health care provider in the gender dysphoria clinic -- no one

23  has requested surgery to date, to the best of my knowledge.

24  BY MS. MAFFETORE:

25     Q.  Understood.  And still on page four in the next

                                                          70

1    paragraph of your report you note that in total, I estimate

2    that I have treated more than 1,500 incarcerated transgender

3    patients with or without gender dysphoria.

4         Did I read that correctly?

5    A.   Yes.

6    Q.   What is that estimate based on?

7    A.   So it's based on our caseload numbers.  When we first

8    started up the program I was one of the three psychiatrists

9    that were seeing patients.  I had a weekly clinic -- and

10   actually, let me back up.  When I first did my training with

11   Dr. Walter Meyer I was going down to Galveston every week or

12   every other week and seeing patients with him in person.  Then

13   when the volume grew I was seeing patients via telemedicine,

14   video conference.  And I have been involved -- I carried a

15   caseload of patients that were predominantly Spanish speaking

16   only because I'm fluent in Spanish.  So I saw a lot of the

17   patients that -- that way we didn't have to use a translator

18   and I carried a caseload.  And then more recently our caseload

19   is about -- we have anywhere from five to 600 patients on the

20   current caseload.  So over the 10 years or 12 years, that's

21   where I came to the 1,500.

22   BY MS. MAFFETORE:

23   Q.   So are you including every patient that is on the

24   caseload of the gender dysphoria clinic as a patient that you

25   have seen in your estimate that you have treated more than

                                                              71

1    1,500 incarcerated transgender patients?

2        A.  No.

3        Q.  Okay.  So I'm sorry to say that I don't quite

4    understand how you arrived at the estimate of 1,500.

5        A.  Sure.  So the way that I came to that estimate and,

6    again, it's an estimate, would be anyone that I had any

7    handprint or footprint involvement with that patient, ordering

8    medications, reviewing their labs, cosigning a note, ordering a

9    non-formulary medication, doing a second opinion consultation,

10   discussing the case with one of our gender dysphoria

11   consultants or specialists.  I would count that towards the

12   1,500 patients.

13       Q.  Understood.  So you mentioned tasks such as cosigning

14   a note or ordering a non-formulary medication.  Those are tasks

15   that would not necessarily require you to have any interface

16   with the patient, is that correct?

17       A.  I would -- no -- sorry.  I would say no, because I

18   have to actually review the patient's chart and the medical

19   record.  So you're right, there wouldn't be a face to face, but

20   there would be a review of the clinical information.

21       Q.  Understood.  How many patients would you estimate that

22   you have had a face-to-face interaction with of the 1,500

23   incarcerated transgender patients that you have treated with or

24   without gender dysphoria?

25       A.  It would be a guess.

                                                              72

1      Q.  Okay.  What's your guess?

2      A.  I don't -- I mean, as we sit here today I don't have

3  my notes from clinics that I have held or dates.  So it would

4  be pure speculation.  But I would say 500.

5      Q.  So roughly a third of those folks?

6      A.  That's fair.

7      Q.  And you noted that these are transgender patients with

8  or without gender dysphoria.  How many transgender patients

9  have you treated specifically for gender dysphoria?

10     A.  I would say probably the majority of those have gender

11 dysphoria.  We have had some patients that don't meet the

12 criteria for gender dysphoria.  So that's why I was trying to

13 be more clear in spelling that out.  I would say the majority

14 of patients that I see or evaluated or treated meet the DSM

15 criteria for gender dysphoria.

16     Q.  When you say majority, do you mean 751 or -- could you

17 give me a rough percentage?

18     A.  Sorry.  Of the 1,500?

19     Q.  Yes.

20     A.  1,400.

21     Q.  How about of the roughly 500 that you might have seen

22 in person?

23     A.  450.

24     Q.  Thank you.  And how many transgender patients have you

25 treated who made any request for gender-affirming surgery?

1      A.  Say that again, please.  How many --

2      Q.  How many patients, transgender patients have you

3  treated who are seeking or had made a request for

4  gender-affirming surgery?

5      A.  Zero.

6      Q.  Okay.  And so you have not evaluated any patients of

7  those 1,500 for gender affirming treatment for the treatment of

8  gender dysphoria?  Is that your testimony?

9      A.  That's fair.

10     Q.  Okay.  And why have you not evaluated any patients for

11  gender-affirming treatment for the treatment of gender

12  dysphoria in your time at the gender dysphoria clinic?

13          MR. RODRIGUEZ:  Objection.  Asked and answered.

14  You can answer.

15          THE WITNESS:  Right.  As I testified to

16  earlier, in the clinic we're not surgeons so we don't have like

17  a urologist or an ob-gyn as part of the clinic.  So we strictly

18  focus on making the diagnosis, looking at other comorbid

19  diagnoses or conditions and then looking at the eligibility or

20  contraindications to hormonal treatment.  And in our experience

21  the majority of the patients that we're treating, they're very

22  satisfied with hormonal treatment and -- so that's the bulk of

23  what the current treatment within Texas -- that's the provision

24  of health care is gender-affirming hormonal treatment today.

25  BY MS. MAFFETORE:

74

1      Q.  You stated that one of the reasons that you have not

2   done any evaluation for referral for gender-affirming surgery

3   is because you in the clinic are not surgeons, is that correct?

4      A.  Correct.  We don't have any surgeons, to the best of

5   my knowledge, in the clinic.  And two, on campus, UTMB, we

6   don't have any, again, to the best of my knowledge, surgeons

7   that are qualified or trained to do this kind of surgery.  So

8   we don't have that skill set, if you will.

9      Q.  For any condition, does UTMB CMC ever refer people

10  within TDCJ custody out to specialist surgeons in the community

11  for the prevision of a surgical procedure that nobody within

12  the UTMB CMC system is competent to provide?

13     A.  As we sit here today, I don't know how to answer your

14  question because I'm not privy to that data or information.

15     Q.  Sitting here today, you do not know whether surgery is

16  ever provided for people incarcerated within the TDCJ system

17  outside of the context of UTMB CMC?

18     A.  To the best of my knowledge and ability, patients that

19  are referred for surgery, the surgery would occur at UTMB on

20  campus.  We're UTMB, they're UTMB.  So we refer to the

21  university and they have specialty surgeons for every kind of

22  -- orthopedics, cardiovascular, thoracic.  So all those would

23  occur within UTMB so they would be internal.  To the best of my

24  knowledge as we sit here today, I don't know of any outside

25  surgeries that have been referred to non-UTMB campus surgeons.

75

1      Q.  Okay.  And so to the best of your knowledge, UTMB CMC

2  has a surgeon competent to provide all other care necessary

3  within the TDCJ system?

4               MR. RODRIGUEZ:  Objection to the form.  You can

5  answer.

6               THE WITNESS:  I mean, we have surgeons that are

7  board certified, trained, qualified across, you know, every

8  type of surgery, urology, ob-gyn.  And they don't just do TDCJ.

9  They also do free world.  So it's an academic teaching center

10  probably similar to your UNC Health here.  It's the same.  It's

11  tertiary where they refer more complicated patients and cases.

12  So yes, they have the capacity, as I understand, pretty much to

13  do every kind of surgery under the sun.

14  BY MS. MAFFETORE:

15      Q.  Okay.  But they do not have the capacity to perform

16  gender-affirming surgery, I think was your testimony?

17      A.  I think it was my testimony that I'm not aware of any

18  current surgeons that have this specialized training or

19  qualifications, to the best of my knowledge.

20      Q.  Understood.  So also at the bottom of page four, and

21  you referred to this previously, you noted that you completed a

22  specialized clinical training program regarding the evaluation

23  and treatment of this patient population between December 2014

24  and December 2016 with Dr. Walter Meyer, is that correct?

25      A.  Yes.

                                                              76

1        Q.  Why did you seek that training with Dr. Meyer?

2        A.  My supervisor, my boss identified that this patient

3   population was a specialized patient population and he wanted

4   me to get additional knowledge because we anticipated this

5   population would grow in our system.  And I also was interested

6   in learning a lot more about this population.  Also Dr. Meyer

7   was in our backyard and he was one of the authors for WPATH and

8   one of the pioneers in this treatment population.  So I carved

9   out time to go down to Galveston and see patients with Dr.

10  Meyer, shadow him, meet with him additionally to discuss this

11  patient population.

12       Q.  Okay.  And you note at the top of page five that Dr.

13  Meyer is a respected international leader in transgender health

14  care.  What do you mean by that?

15       A.  Well, as I testified to earlier, he was one of the

16  first authors at WPATH.  I think not just the most recent

17  version seven -- I don't think he was in eight because he

18  retired.  But Dr. Meyer was one of the first people, as I

19  recall, from Johns Hopkins to be involved -- he was a

20  pediatrician and also an endocrinologist and then he went back

21  and did adult psychiatry and child psychiatry.  And he treated

22  patients -- he's treated patients for decades of

23  gender-affirming treatments.  So he's one of the pioneers

24  within endocrinology, to the best of my knowledge.

25       Q.  So your statement that he's a respected international

77

1    leader in transgender health care in part has to do with his

2    involvement in WPATH and the creation of the WPATH health care?

3        A.  Well, I think he published and presented and lectured

4    on this population.  He was a contributor to WPATH.  But I also

5    think he also was in the publication for the endocrine society.

6    It wasn't just WPATH.  He also did other things too and he also

7    published, I don't know, a hundred-plus articles.  So he's

8    basically very respected in the field.

9        Q.  So he's involvement with the endocrine society is

10   additionally something that you would point to that would make

11   him well respected in the field, is that correct?

12       A.  When you say well respected --

13       Q.  A respected international leader in transgender health

14   care, to use your words?

15       A.  Yeah, I think that's fair.

16       Q.  Understood.  The fact that he has treated patients in

17   this population for decades is also something that you would

18   point to to note that he is a respected international leader in

19   transgender health care?

20       A.  Well, to clarify my response.  Dr. Meyer was

21   relatively new to treating inmates.  He had never treated

22   inmates.  All his patients to date have been community, like

23   outpatients.  So part of my job was to help educate him to

24   corrections and how our setting is very different from other

25   settings.  So to clarify my response, Dr. Meyer had tremendous

78

1    experience with treating this population in the community, but

2    he didn't have any experience specifically within correctional

3    settings.

4        Q.  Okay.  So my question was simply that part of the

5    reason that you consider him a respected international leader

6    in transgender health care is because he has treated patients

7    who have gender dysphoria for decades, correct?

8        A.  That's fair.

9        Q.  Are you aware of whether he served on WPATH with

10   plaintiff's expert Dr. Randy Ettner?

11       A.  I recall seeing his name and maybe Dr. Ettner is

12   author or something on the WPATH, SOC.  Yes, for the seventh

13   version, as I recall.

14       Q.  Understood.  Was your time training with Dr. Meyer a

15   formal training program?

16       A.  How would you define formal?

17       Q.  Did you have to enroll in the program?

18       A.  No.

19       Q.  Were there any specific requirements to demonstrate

20   competency?

21       A.  No.

22       Q.  Was there any certification offered as a result of the

23   program?

24       A.  No.

25       Q.  Okay.  So what was the nature of your time training

79

1    with Dr. Meyer?

2        A.   Sure.  So the nature was for me to read WPATH, read

3    other articles that actually WPATH cited, to brush up on DSM --

4    it was four back then.  And to shadow him seeing patients,

5    actually doing physical examinations of patients that were

6    transgendered, with or without gender dysphoria.  Do

7    psychiatric evaluations of these patients.  Get informed

8    consent and review medications, risks, benefits and

9    alternatives.  And to answer other questions for these

10   patients.  And then Dr. Meyer and I presented at a couple

11   conferences together.  We discussed some research initiatives

12   or collaborations that we might consider doing.  And I

13   basically picked his brain.  I tried to get his, you know,

14   50-year-plus experience with this population to try to learn as

15   much as I could from him.  So that's what -- how I would

16   describe the training.

17       Q.  You mentioned that you attended a couple of

18   conferences together and did presentations together?

19       A.  Correct.

20       Q.  Are those presentations included in the presentations

21   section of your C.V.?

22       A.  Yes.

23       Q.  I'm going to turn to that in a moment.  And so in

24   terms of the clinical experience of the training, would you

25   categorize that as mostly shadowing Dr. Meyer?

80

1      A.  No.  I probably watched him do one or two patients --

2  or not do patients, but evaluate and assess and treat.  And

3  then I did several of my own and I would present the patient to

4  him and discuss the patient.  I would do the documentation on

5  pretty much most of the patients we saw.  So in the beginning,

6  yes, I watched him see one or two patients, but for the most

7  part it was like I was -- I wasn't just shadowing him.  I was

8  actually seeing patients and diagnosing and then presenting to

9  Dr. Meyer to see if he agreed with my recommendations and

10 management.

11     Q.  I believe you mentioned previously that you were

12 traveling to the clinic every week or every other week for a

13 time, is that accurate?

14     A.  Yes.

15     Q.  For how long did you travel to the clinic for every

16 week or every other week?

17     A.  Sure.  I have it here in my report on page four that I

18 completed that training between December of 2014 and December

19 of 2016.  So that would have been the timeline.

20     Q.  You testified previously that you were traveling to

21 the clinic every week or every other week for a time.  But then

22 the patient load got significantly higher and then you had to

23 transition to telehealth.  I guess my question is at what point

24 did you stop seeing patients in the clinic and transition

25 predominantly to telehealth during that period of time?

                                                              81

1      A.  I don't recall.

2      Q.  Approximately how many cases would you say you

3  shadowed before you began doing clinical evaluations on your

4  own?

5              MR. RODRIGUEZ:  Object to the form.  You can

6  answer.

7              THE WITNESS:  I think I testified to that

8  earlier.  I watched Dr. Meyer see one or two patients and then

9  from that point forward I did the psychiatric evaluation, and

10  then Dr. Meyer would do the physical exam.

11  BY MS. MAFFETORE:

12      Q.  Understood.  And just to be clear, this was all in the

13  same clinic that we were discussing that you stated in your

14  report that you oversaw the development of, implementation of

15  and expansion of, correct?  The gender dysphoria referral

16  program?

17      A.  Not necessarily.  This is just one component of that

18  program.

19      Q.  Okay.  So the gender dysphoria clinic is just that --

20  where you received training, it's just one component of the

21  program that you oversee in its entirety?

22      A.  Correct.

23      Q.  But while you were overseeing this program in its

24  entirety from 2014 to 2016, you were being trained on gender

25  dysphoria evaluation, is that correct?

                                                          82

1           MR. RODRIGUEZ:  Objection to form.

2    Mischaracterization of the report and prior testimony.  You can

3    answer.

4           THE WITNESS:  It wasn't just evaluation.  It

5    was evaluation, diagnosis and treatment.  And we -- because the

6    population grew, we went from just university-based, in-person

7    clinic, to incorporating telepsychiatry into this evaluation.

8    And that was one of the things we presented on at a national

9    conference, maybe two or three conferences.  But we grew it.

10   We expanded it from just a standalone clinic to utilizing

11   telemedicine, telepsychiatry also.

12   BY MS. MAFFETORE:

13     Q.  I understand.  So I guess what I was trying to get at

14   is you just testified a bit about your experience treating

15   patients under this program, the overall program where you

16   estimated that you had seen about 1500 patients.  And you

17   testified that during your time treating patients under that

18   program, that you had not had any patients seeking

19   gender-affirming surgery.  And so I was just trying to

20   understand if that includes your time working with Dr. Meyer at

21   the gender dysphoria clinic.

22          MR. RODRIGUEZ:  I'm going to object to the form

23   and the characterization.  Confusion between the testimony and

24   the reports.  You can answer.

25          MS. MAFFETORE:  Sure.  I can break it up.  And

83

1   I apologize because I think breaking it up means I'm going ask

2   you questions that you already answered.  But I just want to be

3   really clear so that we're not creating a confusing record.

4   BY MS. MAFFETORE:

5       Q.  During your training with Dr. Meyer, did you evaluate

6   any patients seeking gender-affirming surgery?

7       A.  No.

8       Q.  During your time training with Dr. Meyer at the gender

9   dysphoria clinic, did you evaluate any patients that you

10  ultimately referred to another provider for the provision of

11  gender-affirming surgery?

12      A.  No.

13      Q.  If someone presented to the clinic seeking

14  gender-affirming surgery, how did you and Dr. Meyer handle that

15  request?

16              MR. RODRIGUEZ:  Objection -- withdraw

17  objection.  You can answer.

18              THE WITNESS:  So that would be hypothetical

19  because no one asked for the surgery.  But if someone had asked

20  hypothetically for the surgery Dr. Meyer and I would have seen

21  the patient, we would have spent -- probably done a deeper dive

22  and a more detailed evaluation, maybe seeing the patient back

23  two or three times.  And then probably discussed it with my

24  supervisor, Dr. Murray, and then that would have probably been

25  referred similar to the North Carolina system where it

84

1    undergoes a multidisciplinary committee review.  Dr. Murray, my

2    boss, is a family physician.  Dr. Linthicum, the TDCJ medical

3    director, is an internal medicine.  And then Dr. Deshields from

4    Texas Tech is a family physician.  So undergo a review by the

5    joint medical directors.  And then Dr. Linthicum would review

6    with custody probably the correctional institution's department

7    division director.  So it would be very similar to how North

8    Carolina does what they do where it would undergo additional

9    multidisciplinary higher level review.

10   BY MS. MAFFETORE:

11       Q.  But your testimony to date is that that is

12   hypothetical because nobody has ever requested gender-affirming

13   surgery at the gender dysphoria clinic, is that correct?

14       A.  Correct.

15       Q.  Does the gender dysphoria clinic keep records of

16   requests made for gender-affirming surgery?

17              MR. RODRIGUEZ:  Asked and answered.  You can

18   answer.

19              THE WITNESS:  I'm trying to think.  The short

20   answer is no.  We keep medical records and we keep lists of

21   who's on the gender dysphoria caseload and who has a reminder

22   to be rescheduled or followed up and what time frame.  But we

23   don't keep lists of who seeks what or who requests what.  That

24   would be beyond the scope of our health care utilization.

25   BY MS. MAFFETORE:

85

1      Q.   Understood.  You mentioned that you would evaluate --

2  after your shadowing period concluded that you would evaluate

3  individuals, make your diagnosis and then present that to Dr.

4  Meyer, is that correct?

5      A.   So I would do a focus psychiatric evaluation and then

6  a review of system of the DSM-5 criteria for gender dysphoria.

7  And yes -- and then do a review of systems of any medical

8  conditions or contraindications to hormonal treatment.  And

9  then yes, then I would present it to Dr. Meyer.

10     Q.   Did you ever have any disagreements with Dr. Meyer?

11     A.   No.

12     Q.   You and Dr. Meyer were unanimous on each case that you

13  presented back to him?  Is that your testimony?

14     A.   I'm not sure when you say unanimous how --

15     Q.   You agreed on the correct course of treatment for each

16  patient that you presented to Dr. Meyer is your testimony

17  today?

18     A.   I mean, it's possible there were some cases that I

19  thought Dr. Meyer was being manipulated or patient was

20  exaggerating symptoms.  But he had much more experience in

21  gender dysphoria, so I defer to his clinical knowledge.  But as

22  a forensic psychiatrist I'm trained in the assessment,

23  evaluation and identification of malingering or exaggeration of

24  deficits.  But yes, I would defer to Dr. Meyer.

25     Q.   Understood.  Did you ever discuss with Dr. Meyer

86

1    whether or not the gender dysphoria clinic should evaluate

2    patients for gender-affirming surgery?

3        A.  No.

4        Q.  Did you ever discuss with Dr. Meyer whether UTMB CMC

5    should be providing transgender patients with gender dysphoria

6    gender-affirming surgery?

7        A.  No.

8        Q.  Did Dr. Meyer ever express to you that he believed a

9    patient seen at the clinic was a good candidate for

10   gender-affirming surgery?

11       A.  No.

12       Q.  Did Dr. Meyer ever express to you that he believed

13   gender-affirming surgery was medically necessary for any

14   patients in the clinic?

15       A.  No.

16       Q.  You also noted on page five at the bottom of the

17   paragraph that we were just referring to that subsequent to

18   2016 you continued your ongoing clinical collaboration and case

19   discussion with Dr. Meyer up through his retirement a few years

20   ago, is that correct?

21       A.  Yes.

22       Q.  Can you describe that collaboration?

23       A.  Sure.  So we had some more complicated patients that

24   had different endocrine conditions.  We also had some patients

25   that were seeking testosterone because they were assigned --

87

1    assigned female at birth but identified as male, so trans

2    males, who were seeking testosterone treatment.  And I

3    discussed medications and dosing and other things to watch for

4    like risks -- issues of risk or concern with him.  I think

5    that's the main thing I discussed with Dr. Meyer subsequent to

6    him departing in 2016.

7        Q.  Okay.  And how did you have discussions?  Were they

8    via phone, email, or other method?

9        A.  I think the way we would do it, we would schedule a

10   phone call and -- I don't recall emails.  I think we mainly

11   corresponded by telephone.

12       Q.  How frequently would you say you collaborated with Dr.

13   Meyer from the time between 2016 up through his retirement?

14       A.  Pure speculation.  Every couple of months.  Once a

15   year, once every couple of months.

16       Q.  So your testimony is that you collaborated with Dr.

17   Meyer every couple of months to once a year every year for six

18   years after 2016, is that your testimony?

19       A.  I think that's fair.

20       Q.  After he left the clinic did you ever discuss an

21   evaluation or recommendation of a patient for gender-affirming

22   surgery?

23       A.  Did I ever discuss...

24       Q.  The evaluation or recommendation of a patient for

25   gender-affirming surgery?

88

1      A.  I don't recall.

2      Q.  Other than your training with Dr. Meyer, have you

3  received any other training in the treatment of gender

4  dysphoria or the provision of gender affirming care that we

5  have not already discussed?

6      A.  Yes.

7      Q.  What is that?

8      A.  I don't recall the year, but I attended the course at

9  the American Psychiatric Association that was specifically on

10  transgender, gender dysphoria evaluation and treatment.  And

11  then I recently did one this past May in San Francisco at the

12  American Psychiatric Association annual meeting.  Same thing,

13  on -- by panel presenters on gender dysphoria, evaluation and

14  treatment.  I have done some additional reading, but those are

15  the main courses that I have done.

16      Q.  So the first course that you discussed that you can't

17  remember exactly when it took place offered by the -- I believe

18  you said the American Psychiatric Association on gender

19  dysphoria treatment, was that a continuing medical education

20  course?

21      A.  Yes.  I had to pay for it.  It was like a paid -- a

22  separate course that they have offered there at the annual

23  meeting.

24      Q.  How long was that training?

25      A.  It was an all-day training, eight hours.

1      Q.  In the course of that training, did you receive any

2   training on the evaluation of individuals for gender-affirming

3   surgery for the treatment of gender dysphoria?

4      A.  I don't recall.

5      Q.  And in the May panel that you discussed also offered

6   by the American Psychiatric Association in San Francisco, is

7   that correct?

8      A.  Yes.

9      Q.  How long was that training?

10      A.  I can't remember if it was an hour and a half, hour,

11   two hours.

12      Q.  And you described it as a panel, is that correct?

13      A.  Right.  There was like three different presenters.

14   One of the individuals was actually transgender.  And a

15   treating -- I can't recall.  I think one was a family

16   physician, the other was a psychiatrist, and I forget who the

17   third panelist was.

18      Q.  Was that also a continuing medical education?

19      A.  Yes.

20      Q.  And in the course of that one-and-a-half to two-hour

21   training, was there any training offered regarding the

22   provision of gender-affirming surgery or evaluation for the

23   provision of the gender affirming for the treatment gender

24   dysphoria?

25      A.  Yes.

90

1       Q.  Can you describe the nature of that training?

2       A.  They described, as I recall, the WPATH and the

3   different criteria and how that was translated to the real

4   world.  But again, this was all community -- there was no

5   mention of corrections or in carceral settings.  It was just

6   the provision of this evaluation and treatment within the

7   community.

8       Q.  So you mentioned that they discussed WPATH criteria.

9   Were there any other criteria or standards of care that they

10  relied on in giving that training?

11      A.  They referred to the Endocrine Society regarding

12  medications and treatments, as I recall.

13      Q.  So also on page five in the next paragraph you noted

14  that you have performed second opinion evaluations and

15  consultations in other states, correct?

16      A.  Yes.

17      Q.  Have you ever provided a second opinion evaluation or

18  a consultation regarding gender-affirming surgery in another

19  state?

20      A.  Yes.

21      Q.  Have you ever recommended gender-affirming surgery in

22  any of those evaluations or consultations?

23      A.  I'm not sure if I can answer that question because

24  it's HIPAA.  It involves patient care.

25      Q.  You don't have to give me any specifics.  A yes or no

                                                              91

1    will do.

2        A.  So yes, I did.  I opined -- or I responded to the

3    question and did indicate in my consultative note that the

4    individual would have been a surgical candidate that -- met the

5    criteria and would have been a candidate for surgery.

6        Q.  Was that just in one instance or have there been

7    multiple ones where that has taken place?

8        A.  Again, I don't know if I can answer that question.  I

9    can recall one specific situation where yes, I did.  But as we

10   sit here today, I don't recall with the other states.

11       Q.  Understood.  And again, without disclosing any

12   personal health information about a specific patient, what

13   gender-affirming surgical procedure did you recommend?

14       A.  I didn't recommend it, but I said that the individual

15   was a surgical candidate for the sexual reassignment surgery

16   now referred to as gender-affirming surgery.  Bottom surgery or

17   genital surgery.

18       Q.  Okay.  And which procedure was that?

19       A.  It would have been a neo -- I can't remember if it was

20   a neovulvoplasty or a neovaginoplasty.

21       Q.  Again, without disclosing any personal health

22   information regarding the patient at issue, when did you make

23   that recommendation?

24       A.  I don't recall the exact date.  Somewhere like three,

25   four years ago.  I believe it was before COVID.

                                                              92

1    Q.  When you say that you noted that that person was a

2  candidate and met the criteria for that surgery, what criteria

3  are you referring to?

4    A.  So I said that the individual met the diagnostic

5  criteria by DSM-5, was having significant distress, discomfort,

6  impairments in their activities of daily living as required by

7  DSM-5.  And then I also referenced the WPATH Endocrine Society

8  in my consultation.

9    Q.  Okay.  And you said that they met the criteria for the

10  DSM-5.  Are those the criteria for DSM-5 for gender dysphoria?

11    A.  Yes.

12    Q.  And just to be clear, was this consultation in the

13  context of the prison system?

14    A.  Yes.

15    Q.  Okay.  And in the prison system in which you gave this

16  recommendation, did that prison system allow for

17  gender-affirming surgery?

18    A.  I don't know.

19    Q.  Okay.  You don't know if that prison system explicitly

20  allowed for gender-affirming surgery in their written policies?

21    A.  It don't know if they allow it and I don't know the

22  status of where that is right now.

23    Q.  You testified previously that you are not a surgeon,

24  correct?

25    A.  Correct.

93

1      Q.  You testified previously that one of the reasons that

2   the gender dysphoria clinic does not provide recommendations

3   for gender-affirming surgery for the treatment gender dysphoria

4   is because the gender dysphoria clinic does not employ any

5   surgeons, correct?

6      A.  That's correct.

7      Q.  Why then did you provide a recommendation in your

8   consultation capacity regarding whether or not an individual

9   was a candidate for surgery for gender-affirming surgery in the

10  treatment of gender dysphoria?

11     A.  Because I was answering the question that was posed to

12  me by the correctional health care entity that retained me to

13  do this consultation.

14     Q.  Understood.  Have there been other situations where

15  you have been asked to evaluate whether or not an individual

16  was a candidate for gender-affirming surgery in your capacity

17  as a consultant?

18     A.  Yes.

19     Q.  And for each of those you ultimately concluded that

20  no, that person was not a candidate for surgery?

21     A.  No, that's not correct.

22     Q.  Okay.  So there are other situations other than the

23  one about which we were just discussing where you have

24  concluded that a patient is a candidate for surgery?

25     A.  So I can't get into the specifics because it's HIPAA

94

1    protected, but the case resolved -- I was retained.  I was

2    consulted specifically about gender-affirming surgery.  But the

3    patient's clinical situation changed and therefore there was no

4    pending question for me to answer.

5       Q.  Understood.  So at the bottom of the same paragraph on

6    page five, you note that you have presented nationally and

7    internationally regarding the evaluation and diagnosis,

8    clinical management, and treatment of transgender and gender

9    diverse individuals within correctional settings, correct?

10      A.  Yes.

11      Q.  So I'd like to turn back to your C.V., which is

12   Exhibit-1.  I believe your presentations begin on page 16 and

13   carry over to page 27.  Sorry, I think I said your C.V. was

14   Exhibit-1.  It's actually Exhibit-2.

15          Do you have any updates to provide to your

16   presentations which span from page 16 of Exhibit-2 to page 27

17   of Exhibit-2 that you think are especially relevant for

18   purposes of this deposition as we sit here today?

19      A.  Yes.

20      Q.  And what is that?

21      A.  So I need to update this.  I don't have -- so I did a

22   presentation on gender dysphoria within correctional settings

23   with Joel Andrade.  I don't recall the date or the conference.

24   That's one.  Number two, I gave a presentation a couple of

25   months ago.  The International Association of Correctional and

95

1    Forensic Psychologists and that was international.  There were

2    people from all over the world.  It was a virtual CME or CEU

3    program.  I also did a presentation to, I believe it was

4    Wexford in Colorado.  I think it was in Denver.  To all their

5    health care staff.  Both their medical and psychiatry and other

6    health care staff a couple years ago.  I don't recall the date.

7        Q.  Okay.  And so the first one that you said was a

8    presentation on gender dysphoria in correctional settings with

9    -- did you say Joel Andrade?

10       A.  Sorry, Andrade, A-n-d-r-a-d-e.  He's the one that I

11   testified to earlier that we were writing an invited manuscript

12   before --

13       Q.  Understood.  And you said you don't recall the date

14   and the conference in which that presentation took place?

15       A.  All I recall it was an NCCHC, a National Commission on

16   Correctional Health Care conference.  But I don't recall where

17   it was or when it was.

18       Q.  Do you recall whether it was after December of 2021,

19   which is the latest presentation provided on your list of

20   presentations?

21       A.  It would be a guess.  I think it was before COVID, but

22   I could be wrong.

23       Q.  Okay.  Did you present at that time regarding the

24   provision of gender-affirming surgery?

25       A.  That was a topic that was discussed in the

                                                                 96

1    presentation, yes.

2        Q.  Did you present on that topic?

3        A.  Yes.

4        Q.  What did you say about the provision of

5    gender-affirming surgery in your presentation?

6        A.  So I think pretty much what I testified -- or sorry,

7    what I wrote in my report here, which is that it has to be an

8    individualized, case-by-case, that the literature supporting

9    its use is very limited and lacks -- that there's limited

10   evidence to support it.  And that it has to be very carefully

11   considered, particularly in the correctional setting.  And

12   again, individualized, case-by-case, multidisciplinary

13   treatment team, risk, benefit analysis, alternatives, informed

14   consent, looking for comorbid pathology and contraindications.

15   So I included all of that in the presentation.

16       Q.  Okay.  And then the second one that you noted that is

17   not included here, I think you said it was to the International

18   Association of Correctional and Forensic Psychiatrists?  Did I

19   get that right?

20       A.  Close.  Psychologists.

21       Q.  Psychologists.  Okay.  What was that presentation

22   about?

23       A.  I'm sorry, what was --

24       Q.  What was that presentation about?

25       A.  So as I understand, it was an invited presentation to

                                                              97

1    showcase how different states in the United States are

2    grappling with the evaluation and treatment of gender

3    dysphoria.  I presented kind of the Texas model, and then my

4    colleague Dr. Mehta, M-e-h-t-a, from California presented how

5    California was addressing the current issue.

6        Q.  Okay.  Understood.  You said that was a few months

7    ago?

8        A.  Maybe last year.

9        Q.  Okay.  And the presentation you gave you said at

10   Wexford --

11       A.  Yes.

12       Q.  -- I believe?  A few years ago?

13       A.  Yes.

14       Q.  Would that have been after December of 2021, which is

15   the latest presentation date you have included in your list?

16       A.  I don't recall the exact date.  Sorry.

17       Q.  And what was that presentation about?

18       A.  It was an overall evaluation and management of inmates

19   or -- incarcerated individuals with transgender and gender

20   dysphoria.  Maybe I said gender nonconforming, I think is the

21   title of the presentation.

22       Q.  And now I want to ask you about the ones that you have

23   included in your report.  And so the first of those is on page

24   26.  It is item number 171.  The Development of a

25   University-Based Specialty Program for State Prisoners with

                                                              98

1   Gender Dysphoria.  The American Correctional Association, 2016.

2   Why were you asked to give this training?

3       A.  As I understand Dr. Linthicum, our TDCJ medical

4   director, she wanted us to showcase what we were doing at a

5   national level at the American Correctional Association

6   meeting.  So she asked that we put together a presentation.

7       Q.  And is this the presentation to which you're referring

8   that you did with Dr. Meyer?

9       A.  Yes.

10      Q.  Okay.  Did you discuss the provision of

11  gender-affirming surgery at this presentation?

12      A.  Did I?

13      Q.  Yes.

14      A.  No.

15      Q.  Did Dr. Meyer?

16      A.  I don't recall.

17      Q.  Did anyone else?

18      A.  I don't believe so.

19      Q.  Okay.  The next one is on the next page, page 27 of

20  Exhibit-2.  Item number 174.  LGBT Offenders:  Critical Issues

21  in Gender Dysphoria at the National Institute of Corrections,

22  2016.  Who were you asked to give this training?

23      A.  I'm sorry, say it again, please.

24      Q.  Why were you asked to give this presentation or

25  training?

                                                              99

1       A.   What I recall is -- I can't recall if it's Dr.

2    Linthicum or someone else basically thought that this topic was

3    very important, that many states were struggling -- sorry,

4    states, when I refer to states I'm talking about departments of

5    corrections and county jail also, large county jails were

6    struggling with this issue.  And so she encouraged me to -- I

7    think the NIC, the National Institutes of Corrections, invited

8    me and then I presented this talk.

9       Q.   And this presentation, did this discuss the provision

10   of gender-affirming surgery?

11      A.   I believe so, yes.

12      Q.   And did you discuss anything different than what you

13   just described as having discussed at your presentation on

14   gender dysphoria in the correctional setting with Joel Andrade?

15      A.   No, I think it was pretty similar.

16      Q.   And then number 183 on page 27 of Exhibit-2.

17   Diagnosis and Treatment of Individuals with Gender Dysphoria

18   (GD) within Correctional Settings, Developments in Correctional

19   Psychiatry Course, American Psychiatry and the Law -- American

20   Academy of Psychiatry and the Law, December of 2021.

21           Why were you asked to give this training?

22      A.   Yeah.  So as I recall the AAPL, the American Academy

23   of Psychiatry and the Law is composed of forensic

24   psychiatrists, but many forensic psychiatrists work in jails

25   and prisons and we had done this course before, and it was felt

                                                            100

1   that there was a lot of emerging topics and new issues that

2   needed to be reviewed and treatment approaches needed to be

3   reviewed with psychiatrists that worked in these settings.  So

4   they specifically asked me to do the gender dysphoria portion

5   over other topics, unrelated topics also.  So that course was

6   like a half day, if I'm not mistaken, four hours.

7       Q.  Did you discuss the provision of gender-affirming

8   surgery in this talk?

9       A.  Yes.

10      Q.  Did you discuss anything, aside from what you had

11  previously discussed as included in your presentation on gender

12  dysphoria and correctional settings with Dr. Joel Andrade?

13      A.  I probably expanded more because the audience deals

14  with legal systems, and I probably spent more time talking

15  about landmark cases and how there's been diametrically opposed

16  rulings in different states; Idaho, California, and Texas by

17  way of example.  So I basically described the different cases

18  and how the courts have not really come to any one conclusion

19  and how it has not been brought up to the U.S. Supreme Court to

20  date.  Again, I'm not a lawyer, but I spent time because the

21  psychiatrists who do this do a lot of work with the legal

22  system.

23      Q.  Understood.  Aside from these three presentations that

24  are listed that we have just gone over and the other three that

25  we discussed that are not included on this list, are there any

                                                            101

1   other presentations that I have overlooked that relate to

2   gender dysphoria or the treatment gender dysphoria?

3       A.  I don't believe so.

4       Q.  Okay.  Have you presented on how correctional systems

5   can avoid legal liability in the provision of their health care

6   services?

7       A.  I think I presented -- or that's a topic area that I

8   have discussed or presented, but I don't recall that being an

9   entire lecture, unless if you can show that to me.  I presented

10  on that topic, but I don't recall a specific talk to that

11  theme.

12      Q.  Okay.  But you recall that you have presented on that

13  topic?

14      A.  Yes.

15      Q.  Do you recall if you have presented on how

16  correctional systems can avoid legal liability, specifically in

17  the provision of health care services with transgender

18  individuals suffering from gender dysphoria?

19      A.  No.

20      Q.  Looking next to page eight of your C.V., which is

21  Exhibit-3.  So this is a portion of your C.V. that relates to

22  committees that you have served on and I'm looking at the --

23  specifically at the state and local committees section.  Under

24  Texas Department of Criminal Justice, you have listed that from

25  2012 to 2017 you were involved in the Joint Gender Identity

102

1   Disorder Committee.  And then lower down it says from 2017 to

2   present Joint Gender Identity Disorder Committee cochair.  Did

3   I read that correctly?

4       A.  Yes.  I'm sorry, just to clarify, I think the

5   committee has changed now from DSM-4 to DSM-5.  It's no longer

6   gender identity.  It's now Gender Dysphoria Joint Work Group.

7       Q.  Understood.  So the term gender identity sort of was

8   eliminated in 2013, correct?

9       A.  Whenever -- policy changes can take a while.  So I

10  don't recall the specific date.  But I think once we realized

11  the DSM-4, the terminology had changed, I think that's when we

12  updated the title of -- or the name of the committee.

13      Q.  Okay.  But the date on the C.V. that you have

14  submitted is July 15, 2021, correct?  And we can turn to the

15  first page if you don't recall.

16      A.  I'm sorry, July --

17      Q.  15, 2021 -- or sorry, 2022?

18      A.  Right.

19      Q.  As of July 15, 2022 was it still called the Joint

20  Gender Identify Disorder Committee?

21      A.  I don't believe so.  I think it was the Joint Gender

22  Dysphoria Work Group.

23      Q.  And so this is a legacy item that had -- you neglected

24  to update on your C.V. that it was called the Joint Gender

25  Identity Disorder Committee?

1      A.  That's fair.

2      Q.  Okay.  Do you recall approximately when the name

3  change took place within the system?

4      A.  Probably six months to a year after DSM changed from

5  gender identity disorder to gender dysphoria.

6      Q.  Understood.  So now looking at page nine of your C.V.,

7  which is Exhibit-3 -- or Exhibit-2.  Sorry.  Under memberships

8  and societies, you note that from 1987 to 1999 you were a

9  member of the American Medical Association, and then again from

10  2002 to 2003 you were a member of the American Medical

11  Association, is that correct?

12      A.  Actually I need to update that.  I'm currently a

13  member.  I apologize.  I don't know when I reinstated my

14  membership.  But I'm a current American Medical Association

15  member.

16      Q.  Would you have reinstated your membership after

17  submitting this version of your C.V. July 15, 2022?

18      A.  I don't recall.  All I know is -- it's been a couple

19  of years.  I'm going to say pre -- prior to submitting my

20  report I was again a member of the AMA.  And I would be happy

21  to explain the reason why.

22      Q.  That's okay.  I just wanted to get that squared away.

23  Are there any other committees that are not included or

24  societies that are not included on this list that you are now a

25  member of and you need to provide updates as to?

                                                              104

1      A.  There probably are, but I -- with relevance to my

2  academic and clinical work, probably not.  I have gotten

3  invited to some justice-related consortiums and some other

4  thing -- it's like a judges and psychiatrists train the trainer

5  thing.  I guess at the end of the day I probably need to update

6  my C.V.

7      Q.  Understood.  Thank you.  So I now want to turn back to

8  your report which is marked as Exhibit-1, and I want to look

9  specifically at appendix B which we discussed a little bit

10  previously, but that's appendix B to your expert report.

11      A.  Sure.

12      Q.  So this is a list of expert testimony for the last

13  four years, correct?

14      A.  Correct.  And it doesn't include the one -- the

15  30(b)(6) witness case Haverkamp.  That would have occurred this

16  year.

17      Q.  Are there any other updates that you need to provide

18  to this list aside from the Haverkamp matter that we have

19  already discussed?

20      A.  Yes.  I testified in Dallas County Court.  I don't

21  recall the name of the case, but it was a criminal trial and it

22  was -- like I testified to earlier, it was an inmate who was

23  going to be coming to the TDCJ, the Texas prison system, and I

24  was asked to give testimony about the availability of different

25  mental health services were that individual to come to TDCJ.

105

1      Q.  Anything else?

2      A.  I think that's it.

3      Q.  Okay.  In which of these cases did you provide expert

4   testimony related to the treatment of gender dysphoria?

5      A.  Well, the Haverkamp case that I testified just a

6   second ago I was a 30(b)(6) witness and that case was regarding

7   gender dysphoria and surgery.

8      Q.  Understood.  So the question that I'm asking you is in

9   which cases did you provide expert testimony related to the

10  provision of treatment for gender dysphoria?

11     A.  Oh, sorry.  I believe this is -- so none.  I think

12  this case here, the Kanautica Brown I think is the first case.

13     Q.  So in none of these cases have you provided expert

14  testimony regarding the provision of gender-affirming surgery,

15  is that correct?

16     A.  That's fair.

17     Q.  Have you ever been qualified as an expert by any court

18  in litigation involving the treatment of gender dysphoria?

19     A.  No.

20     Q.  And so never either about the provision of

21  gender-affirming surgery?

22     A.  No.

23     Q.  Have you ever written a report in litigation involving

24  the treatment of gender dysphoria for which you did not

25  ultimately give testimony?

106

1    A.  Yes.

2    Q.  And what case was that?

3    A.  So it's not listed here because I was not deposed at

4    deposition or trial.  But I have written -- I can't recall if

5    they were declarations or -- I think they were declarations for

6    the Raven, R-a-v-e-n, versus Colorado or Department of

7    Corrections Colorado.

8    Q.  And when was that?

9    A.  Sorry, I'm trying to think if there's any others.  I'm

10   sorry, your question again was?

11   Q.  Have you ever written a report in litigation involving

12   the treatment of gender dysphoria for which you did not

13   ultimately give testimony?

14   A.  Yes.  So aside from the Raven V Colorado, I was a

15   consultant to the Moss Group, M-o-s-s Group, involving cis

16   gendered women in the California prison system who had brought

17   a suit against the California Department of Corrections and

18   Rehabilitation.  I provided input, but I wasn't the first

19   author of that report.

20   Q.  Okay.  Again, the question was involving the treatment

21   of gender dysphoria.  Did that case pertain to the treatment of

22   gender dysphoria?

23   A.  Well, it had to do with housing.  So yes, I would

24   think that that would fall under gender dysphoria, the housing

25   accommodations to transgendered inmates in female facilities,

107

1   yes.

2       Q.  Understood.  Okay.  I thought that your testimony was

3   that you were retained on behalf of a group of cis women?

4       A.  No.  No.  I was a consultant for Moss Group.  They

5   were consulting to the California Attorney General's office

6   because litigation had been brought forward by the cis -- by a

7   group -- I think they had a class action and they were -- they

8   brought a suit against trans females being moved in with the

9   cis females.  That's what I recall was the legal issue.

10      Q.  Okay.  So when was the Raven versus Colorado Case that

11  you just mentioned?

12      A.  That's ongoing.

13      Q.  So have you not testified in that case because that

14  case has not reached that stage in the litigation?

15      A.  I don't know enough about where -- because it's

16  ongoing I don't know if I should say anything.  But I have not

17  been asked to testify to date.

18      Q.  Understood.  And what did your report in that case

19  involve?

20      A.  What I understand was similar to this case, I was

21  asked to comment upon or give opinions about the Colorado

22  Department of Corrections, their policies and procedures

23  regarding transgendered individuals with or without gender

24  dysphoria who come into the Department of Corrections.  I think

25  that was the main question about that case.  Policy review and

108

1    onsite review of their intake facility.

2        Q.  And in that case were you asked to opine on the

3    provision of gender-affirming surgery?

4        A.  I don't believe so.  I don't recall.

5        Q.  Okay.

6        A.  I don't think so, no.

7        Q.  Were you asked to provide an evaluation of a specific

8    individual or group of individuals seeking gender affirming

9    care?

10       A.  Yes.

11       Q.  Okay.  And what was the care that was being sought?

12       A.  The named plaintiffs, they were, I think, like eight

13   or nine and they were seeking class certification and I

14   reviewed all of their medical records.

15       Q.  And what was the gender-affirming care being sought?

16       A.  I don't know if I can testify to that because it's

17   HIPAA.  It's their health care.

18       Q.  Okay.  Are you aware of whether the allegations in

19   that case were filed under seal?

20       A.  I'm sorry, if the allegations were --

21       Q.  Filed under seal?

22       A.  Yes.  There's a protective order.  I had to sign a

23   protective order because of the health care records.

24       Q.  Okay.  Understood.  In the case where you were a

25   consultant to the Moss Group, when was that case?

109

1      A.  Last year.

2      Q.  Do you know the name of that case?

3      A.  No.

4      Q.  And what were you asked about or what were you asked

5   to opine in that case?

6      A.  What I recall was they were seeking my psychiatric

7   expertise or knowledge regarding what type of review or

8   evaluation should occur -- what kind of questions and steps the

9   California Department of Corrections, CDCR, should utilize when

10  considering a trans female to move from a male facility to a

11  cis gender female facility, like cis female.  Like a female

12  facility.  That's what I understood.  It was coming up with

13  criteria and questions of what should be looked at or

14  identified.

15     Q.  And were you asked to opine at all in that case

16  regarding the provision of gender-affirming surgery?

17     A.  I don't recall.

18     Q.  Why didn't you ultimately testify in that case?

19     A.  As I understand, I was a consultant to the Moss Group

20  and the Moss Group wrote a report that they sent to the

21  attorney general's office.  I have no idea where that report

22  went, if it was submitted or if it was just used internally for

23  policy and procedure development.  I don't -- as a consultant I

24  just gave a recommendation and that's as far as it went.

25     Q.  Understood.  Have you either in any of the cases that

                                                        110

1    are included here or in older cases that would not be included

2    here, have you ever been disqualified by a court as an expert

3    witness?

4        A.  No.

5        Q.  Has a court ever held that your testimony was not

6    credible?

7        A.  No.

8        Q.  Thank you.  So your testimony today is that no court

9    has ever held that your testimony is not credible?

10       A.  That's correct.

11       Q.  Okay.

12               MS. MAFFETORE:  So I'm going to hand the court

13   reporter what will be marked as Exhibit-6.  This is very large

14   so unfortunately I only have the one.  I don't even have one

15   for myself.  So I'm going to hand this to the court reporter

16   now.

17                       -   -   -

18               (Document marked as Exhibit-6 for

19   identification.)

20                       -   -   -

21   BY MS. MAFFETORE:

22       Q.  Dr. Penn, do you recognize Exhibit-6?

23       A.  Yes.

24       Q.  Okay.  And what is Exhibit-6?

25       A.  This looks like it's the opinion for the holding of

111

1    the judge in the Jensen V Shinn, S-h-i-n-n, case in Arizona.

2        Q.  Thank you.  And were you an expert for the defendants

3    in Jensen versus Shinn?

4        A.  Yes.

5        Q.  Does this opinion -- or does flipping through this

6    opinion refresh your recollection at all to whether or not a

7    court has ever held that your testimony is not credible?

8        A.  It refreshes my recollection, but as I testified

9    earlier, court has never held that my opinion is not credible.

10       Q.  So again, I apologize for the volume of this exhibit.

11   I would like if you can turn with me to page 49 of Exhibit-6.

12       A.  (Witness complies.)

13       Q.  So looking at the top of page 49, the first full

14   sentence on the first line.  That line reads Dr. Penn's

15   methodology is further flawed because his access to care

16   standard does not carefully analyze if the care was medically

17   acceptable.  In essence, it was ambiguous, inconsistent and of

18   no value.

19           Did I read that correctly?

20       A.  Yes.

21       Q.  And then if you look with me to the bottom of page 49,

22   the last paragraph, second to last sentence.  It states it is

23   unclear whether Dr. Penn truly believed that not a single

24   prisoner other than the one he discussed received deficient

25   care or whether Dr. Penn believed he was hired to convey that

                                                                112

1    unsupported opinion.  But, either way, that obstinance, and

2    indifference, was devastating to his credibility and renders

3    his opinion unworthy of any weight.

4         Did I read that correctly?

5    A.  Yes.

6    Q.  If you also turn with me to page 54.

7    A.  (Witness complies.)

8    Q.  The second to last paragraph states in general, Dr.

9    Penn's testimony on the topic of language interpretation was

10   unreliable and incredible.

11        Did I read that correctly?

12   A.  Yes.

13   Q.  And then finally, please turn with me to page 110 of

14   Exhibit-6.

15   A.  (Witness complies.)

16   Q.  Note 28.  States it is difficult to overstate Dr.

17   Penn's lack of credibility.  He was evasive when asked direct,

18   simple questions.  He failed to take a single note during his

19   medical records review.  His ignorance of fundamental aspects

20   of defendants' health care system was obvious and his testimony

21   contradicted the undisputed evidence at trial.

22        Did I read that correctly?

23   A.  Yes.

24   Q.  Does this refresh your recollection as to whether a

25   court has ever held that your testimony was not credible?

113

1      A.  Yes.

2      Q.  Okay.  Thank you.  You can set that aside.

3      A.  (Witness complies.)

4      Q.  So turning to your expert report, Dr. Penn.

5      A.  (Witness complies.)

6      Q.  You stated that the expertise that you offered for --

7      A.  I'm sorry, what page?

8      Q.  I believe this is on the first page.

9      A.  Thank you.

10     Q.  On the expertise that you offered in this case, you

11 have described as the provision of psychiatric, mental health

12 and certain other medical and health care services across

13 correctional settings, correct?

14     A.  Yes.

15     Q.  Do you purport to have expertise in the evaluation and

16 treatment of gender dysphoria?

17     A.  Yes.

18     Q.  Okay.  And what is that expertise based on?

19     A.  Well, my medical education, my psychiatry residency

20 and training and fellowship, my triple board certification in

21 adult psychiatry, child and adolescent psychiatry and forensic

22 psychiatry.  And in my experience working in corrections 15

23 years in Texas and 10 years before in Rhode Island.  All of

24 that helps provide me the requisite knowledge and expertise in

25 this field.

1    Q.  Do you purport to have expertise in the evaluation and

2    provision of gender-affirming surgery?

3    A.  I don't have specific knowledge with regard to the

4    exact surgical procedures.  But my reading in the field helps

5    guide me with -- to be able to weigh the risks, benefits, and

6    alternatives and possible complications and contraindications

7    as noted in Dr. Figler's document with Ms. Brown -- or Mrs.

8    Brown, sorry.  So even though I don't have requisite knowledge

9    in the surgery, the technical part of it itself, I would say I

10   have the knowledge and skill set and experience and training to

11   evaluate who would be an appropriate candidate and who would

12   not be an appropriate candidate for this type of surgery from a

13   psychiatric perspective.

14   Q.  Would you say you have expertise in the evaluation for

15   gender-affirming surgery?

16   A.  Yes.

17   Q.  Okay.  And what is that expertise based on?

18   A.  That expertise is based, as I testified earlier, my

19   background and training in general psychiatry, child,

20   adolescent psychiatry and forensic psychiatry, my direct work

21   in correctional settings and in forensic capacities since 1999.

22   And my continuing education, attending conferences, discussion

23   with other colleagues and review of the literature.  That's

24   what I would base it on.

25   Q.  Okay.

                                                              115

1           MS. MAFFETORE:  I'm now going to hand you what

2    I will ask the court reporter to mark as Exhibit-7.

3                        -  -  -

4           (Document marked as Exhibit-7 for

5    identification.)

6                        -  -  -

7    BY MS. MAFFETORE:

8        Q.  Do you recognize Exhibit-7?

9        A.  Yes.

10       Q.  What is it?

11       A.  This is the EMTO, Evaluation and Management of

12   Transgender Offenders, as developed by the State of North

13   Carolina, formerly the Department of Public Safety Prisons, now

14   I believe it's referred to as the DAC, Department of Adult

15   Corrections.  And this is their policy, specifically F.4300

16   with regard to the evaluation and management of transgender

17   offenders.

18       Q.  So on page 10 of your report, you note in the first

19   paragraph that based on your experience it is your opinion that

20   the Department's policy comports with or exceeds what you would

21   consider to be an acceptable standard for a comprehensive set

22   of correctional health care protocols for transgender patients

23   with gender dysphoria, is that correct?

24       A.  Yes.

25       Q.  And when you say the Department's policy, is Exhibit-7

                                                            116

1    the policy to which you're referring?

2        A.  Yes.

3        Q.  Why did you render this opinion in your report?

4        A.  Because I was specifically asked -- that was one of

5    the three things I was specifically asked to comment or

6    address.

7        Q.  What is your understanding of how that opinion relates

8    to this case?

9                MR. RODRIGUEZ:  I'm going to object.

10   Speculation, legal opinion.  But you can answer.

11               THE WITNESS:  I have no idea.  All I know is

12   that's what I was -- Mr. Rodriguez and his office asked me to

13   give them an opinion regarding.

14   BY MS. MAFFETORE:

15       Q.  Is it your understanding that the plaintiff in this

16   case is challenging this policy on its face?

17       A.  I have no idea.

18       Q.  When you say that you would -- that the Department's

19   policy comports with or exceeds what you would consider to be

20   an acceptable standard for a comprehensive set of correctional

21   health care protocols, what do you mean by acceptable standard?

22       A.  First of all, there's no published standards specific

23   to gender -- sorry.  Specific to transgender and gender

24   dysphoria except things like PREA, Prison Rape Elimination Act,

25   and other things, how to keep individuals that might be

                                                            117

1    transgender safe.  The American Correctional Association does

2    not have a specific policy on the evaluation and management of

3    transgender or gender dysphoria inmates.  And similarly NCCHC,

4    all they have is the physician statement that we discussed

5    earlier or I testified to earlier.  But there's no set

6    standard.  And so my review of this policy in my professional

7    opinion based on my evaluation, training and study, is that it

8    does meet and exceeds what other health care systems in other

9    similar sized states or larger states have promulgated for the

10   evaluation, management of these patients.

11       Q.  When you say that it comports with or exceeds an

12   acceptable standard, you're referring to what other

13   correctional systems across the country have done and that's

14   what you're pointing to to determine what is an acceptable

15   standard?  Is that your testimony?

16       A.  No.  Sorry.  What I testified to was there is no

17   health care standard in NCCHC and there's no correctional

18   standard in ACA.  Looking at where the bar should be set from a

19   correctional health perspective, looking at different states

20   and large county jails, my professional opinion is that the

21   North Carolina system meets or exceeds those safeguards,

22   referral processes, multidisciplinary review, review of

23   evidence-based protocols, all of that is how I came to that

24   opinion that it's an acceptable standard.

25       Q.  So an acceptable standard then is based on a review of

                                                              118

1    other systems and a review of protocols and a review of -- I'm

2    trying to understand what you mean when you say here an

3    acceptable standard.  What is your acceptable standard that you

4    are articulating when you say an acceptable standard in your

5    report?

6         A.  So what I'm referring to is what should be health care

7    policy or procedure for referral, evaluation and management of

8    a transgendered individual in a correctional setting.  That's

9    what I'm referring to as an acceptable standard.

10        Q.  Okay.  And so that is your subjective understanding of

11   what constitutes an acceptable standard given your testimony

12   that there is no nationwide set of standards?

13        A.  No, I wouldn't say subjective standard.  That's my --

14   again, I testified to this earlier.  NCCHC -- looking at kind

15   of the big three players, if you will, ACA, the American

16   Correctional Association, NCCHC, the PREA standards, all of

17   those -- and maybe even the Joint Commission if you want to

18   throw that in there, looking at all of those established

19   standards of corrections for correctional health, for national

20   health care standards, that's the standards, the bar, if you

21   will, where I'm opining that it's an acceptable standard.

22   These correctional health care policies meet or exceed what a

23   similarly sized state or county jail, that these meet or exceed

24   that.

25        Q.  Understood.  Do you consider Texas's policy that we

1    discussed, Exhibit-3, to comport with an acceptable standard?

2        A.  Yes.

3        Q.  What is your understanding of whether the text of

4    North Carolina's policy allows for gender-affirming surgery?

5        A.  I'm sorry, I didn't understand the question.

6        Q.  What is your understanding of whether the text of

7    North Carolina's policy that we were just discussing,

8    Exhibit-7, allows for gender-affirming surgery?

9        A.  I'm so sorry, the text?

10       Q.  The policy that's before you, what is your

11   understanding of whether the plain text of that policy allows

12   for the provision of gender-affirming surgery?

13       A.  Yeah.  So there's a process and it's documented in the

14   procedures section, I believe, where they talk about the

15   referral for a nonroutine -- sorry, let me make sure I get this

16   right.

17                (Pause.)

18       A.  Yes.  Sorry.  On page seven the division TARC, the

19   Transgender Accommodation Review Committee, I think, is the

20   acronym, they have specific language in here regarding

21   nonroutine requests or accommodations and it's on page seven --

22   I don't know the exact number, but it's C for gender affirming

23   surgical request.  That's considered a nonroutine request.  And

24   then they detail the policy for how that would be referred

25   through the facility TARC, T-A-R-C, all capital, and then the

                                                        120

1    division TARC, and then I believe there's a third layer where

2    it's reviewed by the -- I'm sorry, I'm blanking on the name.

3        Q.  That's okay.  I'm going to ask you some specific

4    questions about that in just a second so it's certainly not a

5    memory test and we can get to that in just a second.

6        A.  Okay.  Thank you.

7        Q.  So you note on page 11 of your report, back to

8    Exhibit-1, your report, at the top, that the Department's

9    review process as articulated in the policy relies on input

10   from multiple clinical and nonclinical disciplines, correct?

11       A.  Yes.

12       Q.  Do you consider it appropriate for non-clinicians to

13   consider and decide upon requests for surgical care?

14       A.  Yes.

15       Q.  Why?

16       A.  Because this is all within a correctional context or

17   correctional setting.  And so regardless of what kind of

18   surgery we're talking about, it could have programming, unit

19   transfer, custody classification, housing, disciplinary --

20   there's a myriad of different custody or correctional things

21   that are really nonclinical that would have all of those

22   implications.

23            MR. RODRIGUEZ:  Before your next question,

24   we're passing lunchtime.  I don't know -- I'm sure you have a

25   good bit left.

121

1          MS. MAFFETORE:  I have one more question before

2     we sort of switch gears, so how about I finish up this line and

3     we can take a break.

4          MR. RODRIGUEZ:  That's works.

5          MS. MAFFETORE:  Okay.

6     BY MS. MAFFETORE:

7     Q.  So your testimony is that, yes, it is appropriate for

8     nonclinicians to consider and decide requests for surgical

9     care.  Am I understanding that correctly?

10    A.  No, that's not what I testified to.  To clarify,

11    having a multidisciplinary review is actually the best of both

12    worlds because if you just have medical people or nursing or

13    mental health with no custody you're working within a vacuum.

14    So you really need custody at the table because of the issues I

15    just testified to earlier about day-to-day programming,

16    education, employment, showering, single cell versus having a

17    cellmate, housing, custody classification, all those different

18    processes, where they eat, where they recreate, all of those

19    are relevant and that's why you need to have custody at the

20    table.  Custody is not going to opine on should they have the

21    surgery, yes or no.  But if and when an inmate has any kind of

22    surgery, hip replacement surgery, back surgery, eye surgery,

23    that has ramifications for custody and keeping that inmate safe

24    while they're recovering from the surgery.

25    Q.  Okay.  Understood.  So on page 12 of your report at

                                                      122

1    the bottom of the first full paragraph.

2        A.  Sorry, page 12?

3        Q.  Yes.  This goes to some of the information that you

4    were looking for in the policy.  You note with respect to

5    requests regarding surgical intervention or gender-identity

6    consistent facility transfers, the recommendation of the

7    Division TARC is referred to the Assistant Commissioner of

8    Prisons and the Director of Health and Wellness Services for

9    final review and determination.

10           Did I read that correctly?

11       A.  Yes.

12       Q.  So what is your understanding of whether the Assistant

13   Commissioner of Prisons is a health care provider?

14       A.  I'm so sorry, the Assistant Commissioner of Prisons?

15       Q.  Yes?

16       A.  Are they a health care provider?

17       Q.  Yes.

18       A.  I don't know.  I don't know what the qualifications --

19   if you have a job description or minimum job qualifications I

20   would be happy to answer your question.  But I don't know if

21   they are or are not a health care provider.

22       Q.  So you have opined on the appropriateness of this

23   policy without an understanding of whether or not one of the

24   final two reviewers for gender-affirming surgery is or is not a

25   clinician.  Is that --

123

1      A.  Sorry, that's not what I testified to.  It's possible

2   that the Assistant Commissioner of Prison -- my assumption is

3   that they're probably a custody person.  But it's possible and

4   I have seen this before in my 30 years of corrections, where

5   someone can be a custody person but they're also a social

6   worker or a licensed professional counselor or some other

7   health care provider.  I would assume that the assistant

8   commissioner is a non-clinician a non-health care provider.

9   But, again -- what I understood at the time I wrote this report

10   was that it was like the deputy commissioner.  That's what I

11   understand the term was and was not a clinician.

12      Q.  Okay.  So with the assumption that that role is not

13   filled by a clinician, do you think it's an appropriate role

14   for the assistant commissioner to opine on whether or not an

15   individual should receive gender-affirming surgery?

16            MR. RODRIGUEZ:  Objection.  Mischaracterization

17   of the report and the policy that it references.  You can

18   answer.

19            THE WITNESS:  Correct.  It's my understanding

20   that the facility TARC, they do the initial and then it's

21   reviewed.  Because it's a non-routine request it goes to the

22   division TARC and they ultimately make the recommendation of

23   yes or no is the surgery appropriate, is it evidence based and

24   all that.  What I understand, my review of these documents and

25   policies and procedures is that the assistant commissioner is

124

1    purely to make sure that custody did their due diligence, all

2    the procedural things that they were supposed to do have been

3    -- all the check boxes have been checked, if you will, from a

4    custody perspective, PREA, ombudsman's office, safekeeping,

5    custody and classification, they don't have any known enemies

6    or other things that would affect their custody housing.

7    That's my understanding of this with regard to the assistant

8    commissioner.

9    BY MS. MAFFETORE:

10       Q.  So my question is do you think it is an appropriate

11   role for the assistant commissioner of Prisons to serve as a

12   final reviewer and final determiner on questions of

13   gender-affirming surgery?  Yes or no?

14       A.  Yes.

15       Q.  Thank you.

16           MS. MAFFETORE:  Now is a natural breaking

17   point.  So we can go off the record.

18                -  -  -

19           (Lunch break - 12:47 p.m. - 1:39 p.m.)

20                -  -  -

21   BY MS. MAFFETORE:

22       Q.  Dr. Penn, we are back on the record after that lunch

23   break and just a reminder after that longer break that you are

24   still under oath.  I'd like to turn now to page 19 of your

25   report, which is Exhibit-1.  At the bottom of the first full

125

1    paragraph on page 19 you note that the determination of medical

2    necessity requires a patient-specific risk, benefit calculus

3    and assessment of whether the proposed intervention has been

4    demonstrated through vigorous medical research or other

5    scientific evidence to be an effective treatment of the target

6    condition.

7         Did I read that correctly?

8    A.  Yes.

9    Q.  In your opinion, what is a patient-specific risk,

10   benefit calculus?

11   A.  So for every health care condition, a child that has

12   strep throat, you need to think about that the antibiotic you

13   might prescribe for them could cause some acute allergic

14   reaction and/or death.  It could also cause drug resistance if

15   you prescribe too much antibiotics for nonbacterial like viral

16   infections.  So everything in health care, whether it involves

17   invasive diagnostic test, medication, or a surgery, you have to

18   look at the risks, benefits and alternatives to the proposed

19   intervention.  And to review that with the patient to make sure

20   that they're able to provide informed consent about the risks,

21   benefits and alternatives.

22   Q.  Okay.  What does conducting a patient-specific risk,

23   benefit calculus with that patient consist of?

24   A.  So it would really be helpful for me if you could --

25   because there's so many different patient/doctor interactions,

126

1    if you could help me understand like are you referring to in

2    this case gender-affirming surgery?  Are you referring to

3    medications?  I'm having trouble getting my head around because

4    I think of a lot of different things right now.

5        Q.  Right.  So I'm just trying to get at what you meant

6    when you stated on page 19 of your report inherent in this

7    determination is a patient-specific risk, benefit calculus.

8        A.  Sure.  So when I'm referring to patient, I'm referring

9    to could be an outpatient, could be an inpatient, could be an

10   incarcerated patient.  There's different settings in which the

11   patient might be.  Whether the patient is going to stay short

12   term, or long term.  Like if the inmate were to be released in

13   the next week or two or year, that's another thing you have to

14   look at.  The patient's compliance or cooperation with

15   interventions.  And if there's other possibly secondary gain or

16   other intentional events outside of the health care focus.  And

17   then lastly from a purely health care issue would be the risks

18   of pain, suffering, death, disfigurement, complications.

19       Q.  What do you mean when you say secondary gain?

20       A.  So within a correctional setting, one always needs to

21   consider either faking good or faking bad or someone using

22   health care or health care resources for a transfer under the

23   guise of the health care reason for other purposes.

24       Q.  And so you also state that it -- that medical

25   necessity requires rigorous medical research or other

127

1    scientific evidence showing that it's an effective treatment of

2    the target condition.  In your opinion, what is required for

3    medical research to be considered rigorous?

4         A.  So what I would say is rigorous would be that it's --

5    we refer to, for example, a medication study or a vaccination

6    or surgery, that it's evidence based, that it has been -- for

7    example in a medication that it's been double lined, placebo

8    controlled, that there's some gold standard methodology to show

9    that it works.  And rigorous means that because the

10   implications are when you're talking about say gender-affirming

11   surgery that's permanent and largely irreversible, you want to

12   make sure that it's safe and that it's evidence based.

13        Q.  What do you mean by evidence based?

14        A.  So evidence based, my definition would be that there's

15   been literature, clinical trials, randomized clinical trials,

16   multisite as opposed to just anecdotal in my experience this

17   works.  Where you actually have proof, if you will, that's

18   undergone clinical and research methodologies.  That it's not

19   just due to random, it's not just due to luck or chance.  That

20   the intervention truly does what it's supposed to do without

21   causing bad outcomes or side effects.

22        Q.  What is that opinion based on?

23        A.  So it's based upon my education, training, experience

24   and review of the literature.

25        Q.  And so looking at the same sentence, you note to be an

128

1   effective treatment of the target condition.  What do you mean

2   when you say effective treatment in this context?

3        A.  Well, effective would be that it either cures or

4   ameliorates or reduces the pain or suffering or inflammation or

5   distress.

6        Q.  So something could be an effective treatment if it

7   simply makes the symptom less severe?

8        A.  I think I testified it could be curative.  For

9   example, if you have a bacterial infection, you have strep

10  throat, if you get put on an antibiotic it should cure your

11  strep throat infection.

12       Q.  Understood.  You stated that it either cures or

13  ameliorates or reduces.  So what I'm asking you is something

14  considered an effective treatment if it simply makes a symptom

15  less severe?  Is that an effective treatment?

16       A.  Well, it depends on how you identify effective.  For

17  example, the example that comes to mind immediately would be

18  chemotherapy for cancer.  That you can give someone

19  chemotherapy or radiation or surgery, but it might have severe

20  consequences and the treatment is worse than the original

21  cancer and it could actually kill somebody.  So effective has

22  to do with again, that the intended effect of cure or relief

23  outweighs the pain and suffering from the consequences of the

24  treatment.

25       Q.  So you said the intended effect of cure or relief

                                                              129

1   outweighs the pain and suffering of consequences of treatment,

2   is that correct?

3        A.  That's one hypothetical example, yes.

4        Q.  Okay.  In your opinion, what scientific evidence can

5   demonstrate the efficacy of a treatment?

6        A.  So it really depends.  And I think in this particular

7   case Dr. Li probably did the most detailed comparative

8   effectiveness research looking at the literature specific to

9   the main issue in this case of the gender surgery.  But

10  scientific evidence could be in some situations anecdotal.

11  Like doctors haven't done a research study but they see an

12  effect and it works, all the way to the most rigorous which

13  would be like a double line, placebo-controlled study.  Ideally

14  multisite with randomization and done prospectively as opposed

15  to retrospectively, that would really be the most rigorous type

16  of research study and a large sample size.  You have to have --

17  you just can't have one or two patients.  You would want

18  thousands of patients across multiple sites.

19       Q.  So on page 20 of your report at the very top you note,

20  I concur with Dr. Campbell's formulation of medical necessity

21  in the context of reviewing and approving requests for medical

22  services, correct?

23       A.  Yes.

24       Q.  But back on page 19 you note in the last paragraph on

25  that page, that Dr. Campbell writes a medically necessary

                                                               130

1    procedure is one which is reasonable and necessary to protect

2    life, to prevent significant illness or significant disability,

3    or to alleviate severe pain, correct?

4        A.  Well, he writes that -- he gives a caveat.  He says

5    broadly speaking and then two, at the most basic level.  So he

6    kind of gives those two caveats.

7        Q.  In your opinion, is gender dysphoria a serious medical

8    need?

9        A.  I would say it would depend.  It could be and it could

10   possibly not be.

11       Q.  Okay.  Do you know whether the Fourth Circuit Court of

12   Appeals, the court of appeals under which North Carolina sits

13   has held that gender dysphoria constitutes a serious medical

14   need?

15               MR. RODRIGUEZ:  Objection.  Legal opinion.  You

16   can answer.

17               THE WITNESS:  It would be presumptuous for me

18   to give any kind of legal opinion or interpretation.  I mean,

19   I'll accept that that's what the court opined and I don't know

20   the case or the facts or the issues in that particular case.

21   But I'll accept that as fact if that's accurate.

22   BY MS. MAFFETORE:

23       Q.  In your opinion, can gender dysphoria endanger

24   someone's life?

25       A.  When you say gender dysphoria, I think I know what

                                                              131

1  you're talking about but I would need more context of the

2  clinical scenario.  For example, a kid with strep throat, that

3  could threaten their life.  But it's not very common.  So I

4  just need to know more of the context of in which context of

5  gender dysphoria are you referring to and what comorbidities.

6  Is it just pure gender dysphoria or do they have some comorbid

7  medical or psychiatric condition?  Like do they have cancer?

8  Do they have aplastic anemia?  Do they have some other

9  condition that could threaten their life?

10      Q.  I'm speaking in generalities.  In your opinion, have

11  there been -- is it possible for gender dysphoria as that

12  diagnosis, is it possible for gender dysphoria to rise to a

13  level of severity such that it would threaten someone's life?

14      A.  So I would say if there's comorbid untreated

15  depression or another mental disorder that's not being treated,

16  it is possible that someone could self-harm their genitalia or

17  might engage in self-injury or self-harm or possibly a suicide

18  attempt.  But outside of those scenarios, I'm not aware of any

19  other conditions where gender dysphoria would do something

20  worse than that.

21      Q.  So is it your testimony that somebody has to have a

22  comorbid diagnosis of depression in order for a gender

23  dysphoria to rise to the level of becoming life threatening?

24          MR. RODRIGUEZ:  Objection.  Mischaracterization

25  of the testimony.  You can answer.

132

1              THE WITNESS:  No.  What I was saying -- I was

2    trying to answer your question because when you say gender

3    dysphoria, that's nonspecific.  And to date, the ICD-10 or 11

4    and gender -- sorry, the DSM, they have not quantified gender

5    dysphoria into severity levels.  So I would need more

6    clarification on what has been done to evaluate, diagnose and

7    treat the gender dysphoria, what's the clinical context, what

8    other comorbid conditions are going on, what's the precipitant

9    or stressor, what does the person have access to, do they have

10   guns, do they have a lethal, meaning like clothing or something

11   they could use to hang themselves.  I would need to know the

12   legal -- sorry, the clinical context to answer your question.

13   BY MS. MAFFETORE:

14      Q.  Are you aware of whether individuals carrying a

15   diagnosis of gender dysphoria alone have ever, in your

16   experience, attempted self-mutilation?

17      A.  Yes, I testified to that earlier.  I think we have had

18   at least two cases in Texas that I described earlier.

19      Q.  And did you treat those individuals?

20      A.  I didn't treat them directly, but I was involved in

21   their treatment plan and where they were housed, and what

22   services and evaluation they received subsequent to the

23   self-harm.

24      Q.  Are you aware of whether those individuals had been

25   previously diagnosed with gender dysphoria?

133

1          A.  I don't recall.

2          Q.  Are you aware of whether they carried any other

3     comorbid mental health conditions?

4          A.  I would say in my experience, a majority of patients

5     that I have seen it's the exception just to have gender

6     dysphoria.  The majority of the patients that I have seen or

7     treated have multiple mental health comorbidities and multiple

8     medical comorbidities.  So it would be exceedingly rare for one

9     just to have gender dysphoria alone in the correctional

10    population that I'm used to treating.

11         Q.  Can the distress associated with gender dysphoria

12    result in a comorbid mental health condition?

13         A.  I'm sorry, say it again, please.

14         Q.  Can the distress associated with gender dysphoria

15    result in a comorbid mental health condition?

16         A.  Yes.

17         Q.  Okay.  In your opinion, can gender dysphoria rise to a

18    level of severity to be considered significant illness or

19    disability?

20         A.  Yes.

21         Q.  Can severe pain be mental or psychological?

22         A.  I'm sorry, can severe pain --

23         Q.  Be mental or psychological?

24         A.  Yes.

25         Q.  Can gender dysphoria cause severe pain?

                                                                    134

1       A.  How are you -- if you could clarify how you're

2    defining severe pain.  Because I think I know what you mean,

3    but I would need to know if you're referring to physical pain,

4    emotional pain or what kind of pain you're referring to.

5       Q.  Can gender dysphoria cause severe mental or

6    psychological pain?

7       A.  Yes.  And by the diagnostic criteria there has to be

8    that experienced distress.  Yes, that's fair.

9       Q.  So does it follow then that if somebody carries a

10   diagnosis for gender dysphoria they must be experiencing a

11   clinically-significant level of distress?

12      A.  Yes, to meet the DSM criteria there has to be a marked

13   elevation in the distress due to what their experienced or

14   expressed gender is from their perception of their self gender,

15   and there has to be associated impairment in their activities

16   of daily living and relationships and other levels of

17   functioning.

18      Q.  So also on page 19 you note that Dr. Campbell

19   described some core components of medical necessity, the second

20   of which he notes that the procedure has been determined to be

21   the standard of care.

22          Did I read that correctly?

23      A.  I'm so sorry, where are you, please?

24      Q.  At the bottom of page 19 there's a sentence that has

25   some numbers in it in parentheses.

135

1     A.  Yes.  Thank you.

2     Q.  You said Dr. Campbell describes some core components

3  of medical necessity, namely.  And the second one that's listed

4  there is that the procedure has been determined to be the

5  standard of care, correct?

6     A.  And again, I'm not an attorney, but my understanding

7  of standard of care is a legal term and that's something that's

8  used in the courts.  And so a judge or jury would make a

9  determination of -- you could pull in an expert to give

10  opinions, but at the end of the day the factfinder would make a

11  determination that the standard of care was met or if there was

12  a deviation below the standard of care.  So I'm not sure if I

13  necessarily agree with Dr. Campbell on that specific point.

14     Q.  Okay.  So when you say on the following page, page 20,

15  I concur with Dr. Campbell's formulation of medical necessity

16  in the context of reviewing and approving requests for medical

17  services, you are not saying that you concur with his stated

18  belief that one of the core components of medical necessity is

19  that the procedure has been determined to be the standard of

20  care?

21     A.  No, that's not what I testified to.  You'll note I put

22  quotation marks around standard of care to emphasize that I

23  generally agree with that, that most interventions in medicine

24  should be standard of care.  But I was just making the

25  clarification that the standard of care is a legal term and not

                                                              136

1    a medical term.

2        Q.  And so when Dr. Campbell used the term standard of

3    care he was using a legal term, is that your testimony?

4                MR. RODRIGUEZ:  Objection, speculation.  You

5    can answer.

6                THE WITNESS:  I don't know what Dr. Campbell

7    was using.  I think given what I understand Dr. Campbell's

8    methodology was he was trying to come to a framework for what

9    is the literature with regard to gender-affirming surgery in

10   the entire, you know, universe, if you will.  And so he was

11   looking at literature, but he was also looking at it within the

12   legal context.  But again, this would be pure speculation.  I

13   never talked with Dr. Campbell.  I don't understand why he used

14   the term standard of care.  But I generally do agree that if

15   you're going to do an invasive procedure such as surgery,

16   gender-affirming surgery, you probably want to do something

17   that has been opined or determined to be the standard of care

18   due to the risks involved.

19   BY MS. MAFFETORE:

20       Q.  Understood.  And like I said, I'm trying to fully

21   understand what you mean when you say on page 20 that you

22   concur with Dr. Campbell's formulation of medical necessity in

23   the context of reviewing and approving requests for medical

24   services.  So my understanding of what you have laid out here

25   on page 19 is what you understand to be his definition or

                                                          137

1   formulation of medical necessity, is that correct?

2       A.  That's fair.  I would put more weight and emphasis on

3   the protecting life, preventing significant illness or

4   disability, alleviating severe pain, more so than just the

5   standard of care description there.

6       Q.  So you agree with that portion more than the standard

7   of care portion, is that your testimony?

8       A.  Well, I would say I take all of them -- I don't know

9   if I assign them weights.  I would say they're all important.

10      Q.  Okay.  What is your understanding of the standard of

11  care for the treatment of gender dysphoria?

12      A.  So my understanding, as I have listed in my report,

13  the entire third section where I refer to my review of the

14  literature, my reading of Dr. Li's report and her independent

15  review of the literature, is that the current literature is

16  mixed and contradictory and thus, necessitates what North

17  Carolina is doing, which they're looking at on a case-by-case

18  basis.  They're looking for that risk, benefit analysis.

19  They're looking to ensure protecting life and preventing

20  disability or illness and alleviating severe pain.  So that

21  would be my opinion.

22      Q.  So that's your opinion on your understanding of the

23  standard of care for the treatment of gender dysphoria?

24      A.  Well, again, the empirical research that's been done,

25  the qualitative research is mixed and the studies in particular

138

1   for long-term outcomes of gender-affirming surgery are mixed,

2   at best.

3      Q.  Are you aware of any authoritative standard of care

4   for the treatment of gender dysphoria?

5      A.  I understand that WPATH has created a document that

6   they have titled standards of care, SOC.  But I don't hold that

7   to be a standard of care, nor authoritative with respect to

8   this patient population.

9      Q.  Do you consider WPATH to be reputable?

10     A.  How do you define reputable, please?

11     Q.  Worthy of respect in consideration of the

12  appropriateness of treatment for individuals, trustworthy,

13  evidence based?

14     A.  So I think I put in my report and I do recall reading

15  it in Dr. Boyd's report.  I think the goals of WPATH are

16  admirable.  They're trying to advocate for transgender and

17  gender nonconforming individuals to try to get them health care

18  needs and services they need and all that.  But there appear to

19  be several issues that call into question if they're more a

20  deliberate, specific medical and mental health organization

21  that's strictly evidence based versus more of an advocacy group

22  or alternatively, if members that have written any of the WPATH

23  SOC, the standards of care, might have conflicts of interest

24  from their litigation work or their clinical work.  So those

25  are some of the concerns that I have that would answer your

1    question about reputable or reputability, if that's a word.

2        Q.  We'll talk a little bit more specifically about WPATH

3    later.  Are you aware of any other standard of care for the

4    provision of treatment for gender dysphoria or gender-affirming

5    surgery?

6        A.  So I understand the Endocrine Society has some

7    guidelines, but they're not -- to the best of my knowledge

8    they're not -- they have not been determined to be standards of

9    care or promulgated as standards of care.  Those are the two

10   main things that I'm aware of, the WPATH SOC and the Endocrine

11   Society.

12       Q.  Do you consider the Endocrine Society reputable?

13       A.  So I would say the Endocrine Society, as I understand

14   it, is comprised of mainly endocrinologists.  So it's much more

15   of a medical group.  As we sit here today, I haven't looked at

16   the Endocrine Society's documents or the composition of the

17   people that wrote the Endocrine Society guidelines.  And so I

18   can't comment -- or I don't have an opinion today because I

19   don't know, one, the members of the Endocrine Society document;

20   and two, if they had any potential conflicts or if they're

21   largely plaintiffs' expert sort of work.  I think that would be

22   an important thing to take into consideration also.

23       Q.  What do you mean by largely plaintiffs' expert sort of

24   work?

25       A.  There are some individuals in my experience within --

                                                              140

1    I'll say within correctional settings that pretty much just do

2    plaintiffs' expert work.  They're not balanced.  They don't do

3    both.  So that's what I was referring to as plaintiffs' expert

4    work.

5        Q.  Do you consider yourself as doing mostly defendants'

6    expert work?

7        A.  So I don't do either.  When I come into a case I'm

8    neutral.  I'm objective and I strive for objectivity.  I don't

9    seek out cases.  It's all word of mouth.  I don't have a

10   Website.  I have done plaintiffs' work.  I have done defense

11   work.  And as noted in my report, I have also been a qualified

12   expert by the court in criminal and civil cases.  So I try to

13   be balanced.  So I don't consider myself plaintiff's expert or

14   plaintiff's defense.  I consider myself to be as neutral and

15   objective as possible whenever I'm looking at a new case.

16       Q.  Are you a defense expert in this case?

17       A.  Yes.

18       Q.  Were you a defense expert in Jensen versus Shinn?

19       A.  I'm sorry, say it again.  Which case?

20       Q.  Jensen versus Shinn.

21       A.  Yes.

22       Q.  Are you the defense expert in Raven versus Colorado?

23       A.  Yes.

24       Q.  Your concurrence with Dr. Campbell, as we discussed on

25   the top of page 20, is in the context of reviewing and

                                                              141

1    approving requests for medical services.  Are there other

2    contexts in which you do not concur with Dr. Campbell's

3    formulation of medical necessity?

4        A.  Sorry.  Page 20?

5        Q.  Yes.  The top of page 20 you note, I concur with Dr.

6    Campbell's formulation of medical necessity in the context of

7    reviewing and approving requests for medical services.

8            Are there contexts in which you do not concur with Dr.

9    Campbell's formulation of medical necessity?

10       A.  Well, in an emergency situation.  If someone was

11   acutely psychotic or acutely suicidal or imminent risk of harm

12   to self or others, you don't have time to submit and review and

13   approve those kind of requests.  You manage the emergency then

14   and there just like in an emergency room situation.  So I would

15   say that would -- I'm not disagreeing with Dr. Campbell.  I'm

16   just saying -- you asked me the question, so I'm just trying to

17   be very precise in answering your question.  But I would say an

18   emergency you don't have the time for all this conditional

19   review.

20       Q.  Are there any other contexts in which you do not agree

21   or concur with Dr. Campbell's formulation of medical necessity?

22       A.  No.

23       Q.  Okay.

24           MS. MAFFETORE:  I would like to now hand the

25   court reporter what is going to be marked as Exhibit-8.

                                                          142

1                        -  -  -

2                (Document marked as Exhibit-8 for

3    identification.)

4                        -  -  -

5    BY MS. MAFFETORE:

6        Q.  Have you seen Exhibit-8 before?

7        A.  Yes.

8        Q.  What is it?

9        A.  My understanding is this is a document that Dr.

10   Campbell, Arthur Campbell, the chief medical officer, medical

11   director for the North Carolina Prison System, that he created

12   this document based on a review of several articles that he

13   reviewed.

14       Q.  And what do you understand this document to be?

15       A.  That's right.  And not articles, but he also referred

16   to a couple of -- at least one legal ruling on page 12 of the

17   document.  I'm sorry, what was the question?

18       Q.  What is this document?

19       A.  As I understand it, this is a document where he is

20   writing essentially a position statement where I believe he is

21   the sole author, and he is giving his overview of his reading

22   of the literature in this gender-affirming surgery and his

23   conclusions from that and recommendation.

24       Q.  Do you understand this document to be providing an

25   opinion on whether or not gender-affirming surgery is necessary

                                                              143

1   for the treatment of gender dysphoria, medically necessary?

2        A.  I'm sorry, opinion?  Could you ask that again, please.

3        Q.  Do you understand this document to be providing what

4   I'll say an ultimate conclusion on the medical necessity of

5   gender-affirming surgery for the treatment of gender dysphoria?

6        A.  No.  My interpretation this is purely clinical

7   guidance both for custody staff and for health care staff who

8   probably know very little other than the training that they

9   get.  So it's kind of a primer or an overview to help them

10  think through these issues.  That's my interpretation on this.

11  But I wouldn't call it all -- I don't believe this was like his

12  testimony or something for court.

13       Q.  Right.  No.  So all I said was reaching an ultimate

14  conclusion.  So do you understand this document to be reaching

15  an ultimate conclusion that gender-affirming surgery is not

16  medically necessary for the treatment of gender dysphoria?

17                 MR. RODRIGUEZ:  Asked and answered.

18                 MS. MAFFETORE:  No court context.

19                 MR. RODRIGUEZ:  Same objection.  You can

20  answer.

21                 THE WITNESS:  Well, when you say reaching a

22  conclusion, we don't really use that term in medicine.  My

23  interpretation of this is this is Dr. Campbell's clinical

24  guidance to health staff and custody staff in the North

25  Carolina prison system.

                                                              144

BY MS. MAFFETORE:

Q.   Understood.  If you'll turn with me to page two of this document, Exhibit-8.  If you'll look at the second little paragraph there under summary position statement.  It reads after extensive and objective review and analysis of hundreds of studies and publications, it has been determined that gender reassignment surgery (GRS), as a treatment for gender dysphoria, is not medically necessary.

Did I read that correctly?

A.   Yes.

Q.   Great.  Now I'd like to ask you if you agree with various aspects of Dr. Campbell's position statement.  Could you turn with me first to page six.

A.   (Witness complies.)

Q.   Okay.  So at the top of page six under the bullet there, the first main paragraph under that first bullet.  If a procedure (surgery in this case ) were the standard of care, there would be a single, or at most a discrete subset of procedures which have been determined by the medical community to be the most appropriate to treat the condition.

Did I read that correctly?

A.   Yes.

Q.   Do you agree with Dr. Campbell when he says in his position statement that if a procedure were the standard of care, there would be a single, or at most a discrete subset of

                                                              145

1    procedures which have been determined by the medical community

2    to be the most appropriate to treat the condition?

3        A.  So again, the issue I have with the standard of care,

4    that that's a legal concept or term.  The only issue I would

5    have, I would probably say clinically indicated or when

6    clinically indicated.  By putting standard of care in quotation

7    marks, that's kind of putting a legal spin on this.

8        Q.  Okay.  So if we -- if it said -- is your only issue

9    with this statement here the fact that it uses the term

10   standard of care rather than clinically indicated or some other

11   term of that nature?

12       A.  Well, the question I have -- I'm not sure which

13   surgery Dr. Campbell is referring to because I know -- I'm

14   aware that there's a lot of different types of surgery that are

15   called gender-affirming surgery.  So I'm not sure which

16   specific one he's referring to in this paragraph.

17       Q.  Under.  Are there other conditions other than gender

18   dysphoria for which there are a variety of medical options for

19   treatment depending on the severity of the condition?

20       A.  Yes.

21       Q.  Which ones?

22       A.  Well, I would say -- for example, I can speak

23   immediately to depression, clinical depression, that you could

24   treat with counseling, psychotherapy, there's different types

25   of psychotherapy you could treat with.  You could treat with

                                                              146

1    medications, antidepressants.  There's three, four, five

2    different classifications of antidepressant medications.  Some

3    patients with severe depression might need electroconvulsive

4    therapy, ECT.  Some patients might need an antipsychotic.  Some

5    night need hospitalization.  Some patients that are not taking

6    care of themselves and pose imminent risk to themselves or

7    others might need civil commitment or hospitalization against

8    their will or a guardianship.  So yes, I think there's a lot of

9    different options to a pretty straightforward thing like

10   depression.

11       Q.  So do you agree with Dr. Campbell when he says in his

12   position statement on page six that the overwhelming

13   expectation would be that excluding patients who decline

14   surgery against medical advice?

15       A.  I'm so sorry, where are you, please?

16       Q.  I'm at the third bullet point now.

17       A.  Thank you.

18       Q.  The overwhelming expectation would be that excluding

19   patients who decline surgery against medical advice, that

20   virtually every patient with this condition and without

21   contraindications would need to be provided the procedure in

22   order for it to be considered medically necessary.

23       A.  So what I would say, in medicine, it depends.  There

24   would always be -- there's no always or everyone.  There's

25   always an exception.  So I slightly disagree with Dr. Campbell

147

1    here in that there can be alternatives to surgery.  For

2    example, psychotherapy or individual or group therapy.  There's

3    a lot of different things that could be considered prior to or

4    in addition to advancing treatment before going to surgery.

5        Q.  You just spoke previously about some of the different

6    ways that depression is treated based on severity, and one of

7    the things, you know, was electroconvulsive therapy, correct?

8        A.  Yes.

9        Q.  In your opinion is it sometimes medically necessary

10   for individuals with depression to receive electroconvulsive

11   therapy to treat their depression?

12       A.  Yes.

13       Q.  In your experience, what percentage of individuals

14   with depression go on to require electroconvulsive therapy in

15   order to treat the depression?

16       A.  I don't know the number off the top of my head.  I

17   would say it depends on population you're talking about.  If

18   you're talking about like geriatric patients that are in

19   nursing homes or if you're talking about medically compromised

20   individuals.  You would have to clarify what patient population

21   you're speaking of.  I wouldn't be able to give you a ballpark

22   number.

23       Q.  In any of those patient populations, would you say

24   that the ballpark number is higher than 25 percent?

25       A.  I would say it's probably rare.  It's not common

148

1  unless if the patient has a history of chronic

2  treatment-resistant or treatment-refractory depression that has

3  not responded to multiple past medication trials and individual

4  therapy and other therapies.  Only like protracted treatment

5  resistant then, yes, ECT would probably be used.

6      Q.  So in any patient population would that be more than

7  25 percent of the cases?

8              MR. RODRIGUEZ:  Asked and answered.  You can

9  answer.

10             THE WITNESS:  I think I said it's pretty rare.

11 It's not a common, except if perhaps if you're talking about a

12 hospitalized patient population.  Again, it would be a

13 hypothetical, but I don't think it would exceed 25 percent.

14 BY MS. MAFFETORE:

15     Q.  Is the fact that fewer than 25 percent of individuals

16 with depression ever require electroconvulsive therapy make it

17 any less medically necessary for those who do require

18 electroconvulsive therapy for the treatment of their

19 depression?

20             MR. RODRIGUEZ:  Object to the form.  You can

21 answer.

22             THE WITNESS:  So there's lots of different

23 variables to consider with electroshock therapy or

24 electroconvulsive therapy.  I use the word shock.

25 Unfortunately that's still pejorative.  People think One Flew

149

1    Over the Cuckoo's Nest.  So it's very negative and a lot of

2    family members and advocacy groups are very anti-ECT.  So a lot

3    of it has to do with informed consent, getting the patient or

4    their family member to consent.  So I would say ECT is very

5    complicated and it's -- there's no always or -- I would say

6    it's particularly complicated because of the stigma and

7    societal issues also.

8                    MS. MAFFETORE:  Understood.

9                    THE WITNESS:  Sorry.  And also because in some

10   locations you may not have psychiatrists.  There's a national

11   shortage of psychiatrists and you may not have a psychiatrist

12   who knows and is competent to do ECT and a hospital or

13   anesthesia service.  So it's complicated.  You have to have

14   additional layers, which makes it more complicated.

15   BY MS. MAFFETORE:

16     Q.  Sure.  Are there any other conditions of which you're

17   aware where a certain procedure or treatment is only necessary

18   for an individual if their condition reaches a certain level of

19   severity?

20                    MR. RODRIGUEZ:  Object to the form.  You can

21   answer.

22                    THE WITNESS:  Well, again, I'm not a surgeon.

23   So I would say if someone has an appendicitis, they are --

24   that's an emergency and they need surgery and it's not

25   something you would wait until, you know, they rupture or --

                                                              150

1   because we know from experience that if you don't do something

2   that they're going to have a bad outcome.  They could

3   potentially if they get septic.  So --

4   BY MS. MAFFETORE:

5       Q.  I think that was actually the inverse of the question

6   that I asked.  What I asked is are there other conditions -- we

7   were just discussing depression and electroconvulsive therapy

8   being an option for individuals with particularly severe

9   depression.  But I was asking are there other conditions for

10  which surgery only becomes necessary for an individual or a

11  procedure only becomes necessary for an individual if their

12  condition reaches a certain level of severity?

13          MR. RODRIGUEZ:  Objection to form.  You can

14  answer.

15          THE WITNESS:  What I would say -- again, the

16  caveat is I'm not a surgeon, but with some back conditions the

17  orthopedic surgeon might encourage the person to get physical

18  therapy, to do physical therapy.  And then only if the physical

19  therapy is not improved or it doesn't resolve or improve the

20  condition or there's additional nerve damage or nerve

21  impingement then surgery would be -- it has to occur.

22  Otherwise there will be continued pain suffering and

23  disfigurement.

24  BY MS. MAFFETORE:

25      Q.  Understood.  So turning backwards to page four of Dr.

151

1    Campbell's position statement.  I'm looking at the second to

2    last paragraph.  Dr. Campbell states here that this phenomenon

3    of de-transition is critically important in considering

4    treatment options for patients, particularly when treatment

5    involves either irreversible or incredibly difficult/poor

6    outcomes, such as surgeries.

7         Did I read that correctly?

8         A.  Yes.

9         Q.  Do you agree with Dr. Campbell when he said in his

10   position statement that de-transition is critically important

11   in considering treatment options for patients, particularly

12   when treatment involves either irreversible or incredibly poor

13   outcomes, such as surgeries?

14        A.  So I wasn't asked to look at this issue,

15   de-transitioning, and I don't have an opinion on this issue.

16        Q.  What is your understanding of how common de-transition

17   is among transgender adults?

18        A.  Again, I was not asked to give an opinion or to look

19   in that, so I don't have an opinion on that.

20        Q.  So to the extent that this discussion factors into Dr.

21   Campbell's articulation of medical necessity, you have no

22   opinion one way or the other as to this particular aspect of

23   that definition?

24             MR. RODRIGUEZ:  Object to form and speculation.

25   You can answer.

152

1          THE WITNESS:  Again, like I testified earlier,

2    I was not asked by Mr. Rodriguez or the legal team here to look

3    at that.  But if this is an issue of concern or they want me

4    to, I would gladly do a literature review, look at the

5    literature, look at -- maybe even request or recommend that Dr.

6    Li look at that literature because she's really the expert in

7    the comparative research literature.  But no, as we sit here

8    today I was not asked to look at that and I'm not prepared to

9    give an opinion about that.

10   Q.  But you did testify that you reviewed Dr. Campbell's

11   position statement in preparation of your expert report,

12   correct?

13   A.  Yes.

14   Q.  And you reviewed -- or your report states that you

15   reviewed the literature that Dr. Campbell relied upon, correct?

16   A.  I don't recall reading the article about de-transition

17   or the Psychology Today De-Transition.  So some of these

18   articles I did not read and I -- I have read the Gibson Collier

19   ruling.  Some of these are not medical articles.  They're like

20   -- like more lay press.  Like Psychology Today is not a

21   peer-reviewed.  So what I would say is I generally agree with

22   Dr. Campbell and this position statement.  But I would need to

23   do a deeper dive to be able to answer any questions from a

24   reasonable -- to be a better expert on de-transitioning.

25   Q.  Understood.  So sitting here today, you can't testify

153

1    to how common de-transition is among transgender individuals

2    who have had gender-affirming surgery?

3        A.  That's fair.

4        Q.  And you can't testify to how common de-transition is

5    among transgender individuals who have been on hormone therapy

6    for 10 years or more?

7        A.  That's fair.

8        Q.  Okay.  So turning to page nine.  At the top of page

9    nine, Dr. Campbell writes treatment recommendations are

10   developed through evidence-based medicine/practice and are

11   modified based on findings from continuous future studies.

12        Did I read that correctly?

13       A.  Yes.

14       Q.  He then goes on to note -- it is the third sentence of

15   the first real paragraph -- the entity most often referred to

16   for guidance regarding treatment of gender dysphoria, namely

17   WPATH (World Professional Association for Transgender Health),

18   simply does not utilize these criteria in developing their

19   standards of care.

20        Did I read that correctly?

21       A.  Yes.

22       Q.  Do you agree with Dr. Campbell when he says in his

23   position statement that treatment recommendations should be

24   developed through evidence-based medicine and practice and are

25   modified based on findings from continued future studies, but

154

1  that WPATH simply does not utilize these criteria in developing

2  their standard of care?

3              MR. RODRIGUEZ:  Object to the form.  You can

4  answer.

5              THE WITNESS:  So I generally agree with some of

6  that.  But I would say that my opinion was strengthened when I

7  read Dr. Li's report and her actual -- because she's actually a

8  trained -- she has a Ph.D. in comparative effectiveness of

9  studies.  And no disrespect to Dr. Campbell, but I don't

10  believe he has that.  So Dr. Campbell is more of a clinician

11  and health care leader, but Dr. Li has devoted her career to

12  statistical analysis.  So based on Dr. Li's report and her

13  literature review I do agree with that.

14  BY MS. MAFFETORE:

15     Q.  So your testimony today is that based on your review

16  of Dr. Li's report, you agree that WPATH does not utilize

17  evidence-based medicine or practices in developing their

18  standards of care?

19     A.  No, that's not what I testified to.  What I said is

20  they over -- in my opinion, in my professional opinion, at

21  times WPATH over generalizes or overstates the existing

22  literature and they don't provide -- most practice parameters

23  that I have been involved in and published or been aware of

24  practice guidelines or practice parameters, they will list what

25  is the evidence to support this.  Is it tremendous, moderate,

                                                              155

1    mild?  Like what's the level of data to support this?  In my

2    opinion, WPATH doesn't provide that, that data specifically

3    with regard to gender-affirming surgery.

4        Q.  Okay.

5        A.  Sorry.  And the long-term outcomes related to

6    gender-affirming surgery.

7        Q.  So my question is, do you agree with Dr. Campbell when

8    he says in his position statement that WPATH does not utilize

9    evidence-based medicine practices in developing their standards

10   of care?

11            MR. RODRIGUEZ:  Object to the form.

12   Mischaracterization of the text of the exhibit.  You can

13   answer.

14            THE WITNESS:  So what I understand is WPATH is

15   a group of -- it's a membership organization and the people

16   that write these -- that wrote the most recent SOC don't kind

17   of check what they do or their potential conflicts at the door.

18   And if you're going to write any kind of an article for a

19   scientific publication you have to disclose if you're an

20   investor or you own stock, you have been funded by drug company

21   money or what have you.  If you have a copyright or you have a

22   patent to a procedure or equipment.  And same thing -- so my

23   opinion is that WPATH, they may have some evidence-based

24   literature in their studies, but they don't disclose

25   inconsistencies or the degree of variability in the studies

1    that they cite.

2    BY MS. MAFFETORE:

3        Q.  Okay.  So turning to page 10 then.  The last sentence

4    of the first paragraph there.  Dr. Campbell states, in fact, it

5    is argued by many that WPATH is activist-led rather than

6    evidence-led.  Did I read that correctly?

7        A.  Yes.

8        Q.  Do you agree with Dr. Campbell's assertion in the

9    position statement that WPATH is activist-led rather than

10   evidence-led?

11       A.  I don't have an opinion.

12       Q.  Did you consider Dr. Meyer to be an activist?

13       A.  So I consider Dr. Meyer to be an advocate for his

14   patients, which I think is noble and forth while and worthy.

15   In his effort to try to help people that have gender dysphoria

16   is noble.  But I'm not prepared, as we sit here today, to say

17   whether I think Dr. Meyer is an activist or a non-activist

18   because I don't -- I don't understand how you're defining

19   activist.

20       Q.  So I'm not defining activist.  I'm asking you if you

21   agree with the statements that Dr. Campbell has made, to be

22   clear.  During your time working with Dr. Meyer, did you feel

23   that he was not lead by evidence?

24       A.  No.  I think that the thing that I learned the most

25   from Dr. Meyer, he appreciated and taught me that gender

1   dysphoria is a spectrum, transgendered individuals a spectrum.

2   And not every one that is transgendered or gender dysphoria

3   necessarily wants hormones or needs hormones.  And vice versa,

4   not everyone that has been on hormones wants or needs surgery.

5   That some people are perfectly -- do very well and he's

6   followed patients from childhood to adulthood.  So I really

7   sense that Dr. Meyer, he gets it, he has the whole picture.

8   And to the best of my knowledge Dr. Meyer has not been doing a

9   lot of litigation work.  So yes, I do respect what Dr. Meyer

10  has to say and his opinions.

11      Q.  Did you feel that he was lead by evidence?

12      A.  Yes.

13      Q.  Lower down on -- actually the next sentence on page 10

14  Dr. Campbell notes conflicts of interest among the organization

15  are also of significant concern.

16          You touched on this a little bit a moment ago, but do

17  you agree with Dr. Campbell's assertion that conflicts of

18  interest among WPATH are of significant concern?

19      A.  I would say yes.  If they haven't disclosed -- every

20  time I give a presentation I have to disclose all my conflicts.

21  Every time I write a book or book chapter or article I have to

22  disclose all of that.  So yes, I would say if it's not listed

23  in their SOC, that's a problem.

24      Q.  Do you know whether their conflicts of interests are

25  listed in their SOC?

1    A.  I haven't looked at it recently, but I think that that

2    should be -- that should be an important thing for the reader

3    to have any potential issues of objectivity or conflict of

4    interest should be listed at the beginning of the article.

5    Q.  Sitting here today, do you know whether or not that is

6    included?

7    A.  I haven't read the WPATH in a couple of weeks, so no.

8    Q.  Do you agree that the Endocrine Society has

9    significant conflicts of interest that should be of concern?

10   A.  I would say it's possible because physicians often get

11   grant support or research funding.  So again, I would say yes,

12   that that's -- they would need to disclose any potential

13   conflicts in the article.

14   Q.  Do you think that the American Medical Association has

15   any conflicts of interest that are of concern?

16   A.  Yes.

17   Q.  What about the American Academy of Family Physicians?

18   A.  It's possible they could.

19   Q.  The American Academy of Pediatrics?

20   A.  Yes.

21   Q.  The American College of Obstetricians and

22   Gynecologists?

23   A.  Yes.

24   Q.  The American Psychiatric Association?

25   A.  Yes.

159

1          Q.  The American Psychological Association?

2          A.  Yes.

3          Q.  The Pediatric Endocrine Society?

4          A.  Yes.

5          Q.  So are all of those medical organizations less

6      reputable by virtue of the fact that they may or may not have

7      conflicts of interest?

8                  MR. RODRIGUEZ:  Objection to form.

9      Mischaracterization of testimony.

10                 THE WITNESS:  That's not what I'm testifying

11     to.  I'm basically saying -- I have given talks for

12     psychologists and for pediatricians and family physicians and

13     other groups, and every time I gave a talk if it's sponsored or

14     under the auspices of those accrediting organizations I have to

15     disclose if I own stock or if I'm going to present objective,

16     neutral, non-biased information.  So any time any kind of

17     publication or lecture, grand rounds, I have to disclose, you

18     know, if I own stock or if I own intellectual property or what

19     have you.  So yes, I think all of those professional groups,

20     it's incumbent on them to do that when they have anything that

21     they're putting out as endorsed by those groups.

22     BY MS. MAFFETORE:

23         Q.  Sitting here today, do you have any reason to believe

24     that WPATH has a conflict of interest that would somehow

25     undermine the credibility of their standards of care?

                                                              160

1          MR. RODRIGUEZ:  Asked and answered.  You can

2    answer.

3          THE WITNESS:  So I testified to this earlier.

4    It's unclear to me how many people in WPATH -- because we're a

5    member organization -- have or stand to gain benefits --

6    similar to what Dr. Campbell wrote in his report, stand to gain

7    referrals, patient referrals, or legal cases serving as experts

8    or standing to gain or profit from this.  And so the question

9    is potential bias or potential conflict of interest.

10   BY MS. MAFFETORE:

11       Q.  Okay.  So looking down the second to last paragraph.

12       A.  Sorry.  On page --

13       Q.  On the same page, page 10 where we were.

14       A.  Thank you.

15       Q.  This paragraph states this concern is supported by the

16   fact that ECRI (Emergency Care Research Institute), the

17   DHHS-appointed Agency for Healthcare Research and Quality

18   (AHRQ) for the National Guideline Clearinghouse (NGC), has

19   failed to provided Trust Ratings for either WPATH or the

20   Endocrine Society guideline for the treatment of gender

21   dysphoria.  The reason for this lack of inclusion was because

22   only a few of the recommendations were supported by the

23   systematic review; the majority were not, and that the agencies

24   did not use a systematic review process in developing their

25   guidelines.

                                                        161

1          Do you agree with Dr. Campbell that WPATH and the

2     Endocrine Society did not use a systematic review process in

3     developing their guidelines in the treatment of gender

4     dysphoria?

5          A.  I don't have an opinion.  I'm not familiar with any of

6     those.  I mean, I'm generally familiar with one of them, but I

7     need to read the documents to form my own opinions.  I don't

8     have an opinion today as we sit here.

9          Q.  I understand.  Looking back at page two, the sentence

10    that we referenced previously.  Do you agree with Dr.

11    Campbell's ultimate assertion that as a general principle,

12    gender reassignment surgery (GRS) as a treatment for gender

13    dysphoria is not medically necessary?

14              MR. RODRIGUEZ:  Object to this characterization

15    of the text of the document.  You can answer.

16              THE WITNESS:  So I would respectfully disagree.

17    I think that there may be a condition or a situation or a

18    patient case where gender-affirming surgery, formally known as

19    sexual reassignment surgery, might be medically necessary.

20    BY MS. MAFFETORE:

21         Q.  Understood.  If you look with me at page 11.  The last

22    paragraph of the report.

23         A.  (Witness complies.)

24         Q.  Dr. Campbell states accordingly, to support these

25    procedures given all these concerns would be in conflict with

                                                              162

the most critical imperative in medicine, primum non nocere

(First, do no harm).  The imperative is the underpinning of the

oath all physicians take.  In order to ensure the most

appropriate, effective, and safest care to patients, clinicians

must exercise due diligence in evaluating all available

information in formulating recommendations to patients.  The

evidence regarding GCS does not provide sufficient confidence

that the procedures should be undertaken without concern for

having violated that oath.

        Did I read that correctly?

   A.  Yes.

   Q.  Do you agree with Dr. Campbell that the provision of

gender-affirming surgery based on the evidence available would

violate the oath First, do no harm?

            MR. RODRIGUEZ:  I'm going to object to the form

and mischaracterization of the text.  You can answer.

            THE WITNESS:  Right.  Dr. Campbell writes

gender-confirming surgery and I think you asked me about

gender-affirming surgery, and I'm not clear which one

specifically you're referring to.  Because I have opinions -- I

potentially have opinion depending on which kind of surgery

you're talking about.

BY MS. MAFFETORE:

   Q.  Throughout this document is it the case that Dr.

Campbell uses GRS and GCS interchangeably with no definition to

1    differentiating either?

2        A.  On page two of the report I read gender reassignment

3    surgery, parens, GRS, close parens.

4        Q.  Does he provide a definition for that?

5        A.  I don't see a definition provided.

6        Q.  Do you believe that doctors who provide gender

7    reassignment surgery would violate medical ethics by doing so?

8        A.  No.

9        Q.  Do you believe that doctors who provide gender

10   confirmation surgery are violating medical ethics by doing so?

11       A.  Please, how are you defining gender confirming

12   surgery?

13       Q.  I am not.  I am merely referring to the words that are

14   -- the acronyms that are used by Dr. Campbell in the document

15   that they are referencing.

16               MR. RODRIGUEZ:  I'm going to object to the

17   characterization of the text embedded in that question.

18               THE WITNESS:  Without knowing what GCS -- what

19   he's referring to and what specific inclusion or exclusion

20   criteria and type of surgery, I don't have an opinion.

21   BY MS. MAFFETORE:

22       Q.  As you understand the term gender-affirming surgery,

23   do you believe that doctors who provide gender-affirming

24   surgery are violating their medical ethics by doing so?

25               MR. RODRIGUEZ:  Asked and answered.  You can

                                                              164

1    answer.

2              THE WITNESS:  I would say it would depend on if

3    they've done a true risk, benefits -- risk, benefit analysis

4    with the patient and truly provided similar to what Dr. --  I'm

5    so sorry.  I'm blanking on his name, the surgeon in this case.

6    The urology surgeon, Dr.  -- it will come to me.  But he listed

7    a bunch of medical complications and risks.  So I think it's

8    incumbent upon the surgeon and/or the anesthesiologist to

9    review all of those risks, benefits, and alternatives.  And I

10   do agree with Dr. Boyd that it's not just the surgery, but it's

11   the patient's perception of what the surgery will or won't do

12   for them because if they have had trauma, abuse, neglect or

13   PTSD, no amount of surgery is going to fix that, as in this

14   case.  So I would say it all depends on the patient and the

15   comorbidities.  But provided that the surgeon, the

16   anesthesiologist or the other individuals involved, provided

17   they truly get informed consent from the patient with that

18   risk, benefit, alternatives analyses, then in my opinion they

19   would not be violating their medical oath and duty to the

20   patient.

21   BY MS. MAFFETORE:

22      Q.  Great.  Thank you.  Going back to your report,

23   Exhibit-1, on page 20.  You note at the bottom of page 20 under

24   the heading three, Dr. Ettner's formulation of medical

25   necessity, that Dr. Ettner and WPATH refer to the AMA's

                                                              165

1   definition of medical necessity, correct?

2       A.  Correct.

3       Q.  Do you know whether the AMA endorses the WPATH

4   standards?

5       A.  When you say endorse, could you clarify what you mean

6   by endorse so I can answer your question?

7       Q.  They have stated an endorsement of the WPATH

8   standards.

9       A.  So to answer your question I would say the AMA House

10  of Delegates, which is a bunch of individuals that

11  self-identify and seek to be placed into this house of

12  delegates, that in the reference committee they've referred to

13  WPATH, but it's not clear to me that the American Medical

14  Association as a group has essentially given full endorsement

15  to the WPATH SOC 7 or SOC 8 to date.

16      Q.  So your testimony is that it's not clear to you

17  whether the AMA has endorsed the WPATH standards?

18      A.  That's correct.

19      Q.  Are you aware of any other -- of whether any other

20  medical societies of which you are a member have endorsed the

21  WPATH's standards?

22      A.  Again, going back to the issue of endorse, I think

23  several groups, the American Psychiatric Association, NCCHC,

24  other organizations reference WPATH, but that doesn't mean --

25  in my interpretation that doesn't mean they endorse everything.

166

1    And if provided with the literature review that Dr. Li

2    performed that, in my professional opinion, could likely change

3    many opinions of individuals if that were to come to light.

4         Q.  You further note at the bottom of page 21, moving onto

5    page 22, that the definition of medical necessity referred to

6    from the AMA is maintained in the medical review category and

7    concerns physician reimbursement issues, correct?

8         A.  So that's where medical necessity is most commonly

9    promulgated would be AMA.  That's fair.

10        Q.  You state that it is maintained in the medical review

11   category and concerns physician reimbursement issues?

12        A.  I'm sorry, I didn't understand the question.

13        Q.  Is that what your report states, that it is maintained

14   -- that the definition of medical necessity is maintained in

15   the medical review category and concerns physician

16   reimbursement issues?

17        A.  So as I have stated in my report here, specifically on

18   page 21, the AMA is the art and science of medicine and their

19   mission statement has to do with public health.  And doctors

20   have complained to the AMA for many years that insurance

21   companies are denying care or not approving or funding care.

22   So the AMA took on -- has taken on insurance companies and

23   other commercial insurance groups.  And so the AMA came up with

24   this definition more reactive based on insurance companies

25   denial of health care services.

167

1    Q.  I understand.  So regarding the resolution, you state

2  that the express intention of the resolution is to articulate a

3  basis for obtaining insurance coverage or reimbursement for

4  certain types of care.

5         Did I read that correctly on page 22, the bottom of

6  the first full paragraph?

7    A.  Yes.

8    Q.  You then go on to state, these coverage and

9  reimbursement issues are not applicable within jails and

10  prisons and other correctional settings.

11         Did I read that correctly?

12    A.  That's correct.

13    Q.  Why would the AMA be focused on removing financial

14  barriers for this particular type of care?

15         MR. RODRIGUEZ:  Objection, speculation.  You

16  can answer.

17         THE WITNESS:  My sense is that the AMA is all

18  about removing financial barriers for all care, whether you're

19  transgender or not transgender.  And that's again admirable.

20  They are trying to make it easier for patients to get the

21  health care that they need.  So again, they're trying to remove

22  these insurance or financial barriers.  So that's my

23  interpretation of why the AMA wrote this.

24  BY MS. MAFFETORE:

25    Q.  Is that because the care is medically necessary

1   regardless of the financial implications in certain

2   circumstances?

3                   MR. RODRIGUEZ:  Objection to form.  You can

4   answer.

5                   THE WITNESS:  No.  I would say again, the AMA

6   doesn't opine on medical necessity.  That's up to the

7   individual physician based on an evaluation, a review of

8   records, and actually seeing the patient and again, weighing

9   the risk, benefits, and analysis and alternatives with the

10  patient.

11  BY MS. MAFFETORE:

12     Q.  Right.  But in the context where a physician has

13  decided that care is medically necessary, the AMA is seeking to

14  remove financial barriers that would inhibit access to that

15  care?

16                  MR. RODRIGUEZ:  Objection to form and

17  speculation.  You can answer.

18                  THE WITNESS:  They're trying to do that in the

19  community where there's third-party payment.  In a jail or a

20  prison there's not third-party payment so it's not -- you're

21  comparing apples and oranges.  They're totally different

22  funding streams and health care is funded a whole different

23  way.  It's funded by state or county tax dollars or tax

24  revenue.

25  BY MS. MAFFETORE:

169

1    Q.  Right.  But in a prison setting isn't the prison

2    responsible for providing access to care that would typically

3    be afforded through insurance coverage?

4    A.  No.

5    Q.  No?  Okay.  So on page 24 of your report --

6    A.  Sorry, could I clarify my response?  I couldn't answer

7    that a yes/no.  The no -- it has nothing to do with insurance

8    reimbursement or what insurance -- it has to do with what is a

9    constitutional level of care, is the health care medically

10   necessary.  And we have a constitutional duty to provide access

11   to care and continuity of care as determined by medical need,

12   irrespective of insurance reimbursement.

13   Q.  Right.  And so my question was in a prison setting

14   isn't the prison responsible for providing access to care that

15   would typically be afforded through insurance coverage?

16            MR. RODRIGUEZ:  Objection to form.  You can

17   answer.

18            THE WITNESS:  No.  Because we do a lot of

19   things in prisons that commercial insurance wouldn't do.  We

20   actually provide probably more care to inmates that commercial

21   insurance companies would never pay for.  Mental health, I can

22   speak to that directly.  We do a lot of things that if we try

23   to bill insurance companies they would not be reimbursed, but

24   they're still services that we provide.

25   BY MS. MAFFETORE:

                                                              170

1      Q.  Are there any services provided that would be covered

2  by insurance companies that the carceral setting does not

3  provide?

4      A.  I don't have enough knowledge of all the different

5  medical or surgical procedures that our system does or the

6  North Carolina system does.  So without that data, I wouldn't

7  be able to answer your question.

8      Q.  Okay.  Now I'd like to move on to page 24 of your

9  report.  Looking to note six at the bottom.  You state that the

10  studies referenced by Dr. Ettner are low-quality studies and

11  that there is a lack of high-quality long-term research

12  demonstrating the efficacy of gender-affirming surgery in

13  treating gender dysphoria in the United States, is that

14  correct?

15      A.  That's what I wrote in my report.

16      Q.  What do you mean by low quality?

17      A.  So I testified earlier what you really want is kind of

18  gold standard research that's double-blind, placebo-controlled

19  or multi-center randomized clinical trials.  Some sort of a

20  control group, having baseline measures, using validated

21  baseline measures, using validated outcome measures.  There has

22  to be some sort of empirical research and good statistical

23  methodology and unfortunately to date -- and hopefully they do

24  more -- but the studies that have been done are -- they lack

25  all of the above.

171

1      Q.  Are you aware of whether there are any other

2  widely-accepted treatments that are supported by only

3  low-quality evidence?

4      A.  Probably, yes.

5      Q.  Do you know what any of those are?

6      A.  I don't -- as we sit here today, off the top of my

7  head, I can't think of any immediately that come to mind.  But

8  I can say that in child psychiatry we don't have as much

9  literature or data as we do in adult psychiatry, so a lot of

10  times medications are used off label, but they're based on some

11  type of study that's been done in adults.  So that would be an

12  example of -- you still have to have some consensus by

13  professionals in the field and there's a larger organization

14  and there's board certification, so there's some quality

15  measures in place.  And then obviously there's the medical

16  board that reviews issues of practitioners that fall below the

17  standard of care.  But I would say child psychiatry is probably

18  the best example that immediately comes to mind compared to

19  adult psychiatry where there's much less research studies

20  compared to the adult population.

21      Q.  Why are there fewer research studies in the context of

22  children or adolescents?

23      A.  It's multifactorial.  One, there's less child

24  psychiatrists -- there's a national shortage of adult

25  psychiatrists.  There's even less child psychiatrists.  There's

172

1   less child psychiatrists that want to do research.  Doing

2   research with psych meds in children and adolescents is seen as

3   kind of controversial.  So there's a variety of reasons why

4   getting consent from a youth, a minor is an issue.  You have to

5   convince the parent or legal guardian.  There's a lot of media

6   coverage of like the risk of psych meds and the damages they

7   can do to kids.  So those are some of the reasons why it's

8   really hard to do randomized, double-blind, placebo-controlled

9   studies in kids and adolescents.

10       Q.  But nonetheless, treatment is provided to those

11  populations you stated based on studies done with adult

12  populations?  Is that --

13       A.  There's actually clinical practice guidelines.  The

14  American Academy of Child and Adolescent Psychiatry which is a

15  U.S.-based organization.  They write or disseminate practice

16  guidelines.  There's physician statements.  There's literature

17  reviews of management or treatment of depression or ADHD or --

18  pick your condition.  So that's the difference is that there is

19  some clinical guidance given to the field and always under the

20  caveat of do no harm and be careful.  So I would say child

21  psychiatrists, those are the overarching safety is having

22  clinical guidelines and practice parameters both by the

23  American Academy of Child and Adolescent Psychiatry, and then

24  their journal and then their CME programs and that's how they

25  kind of make sure that things are safe.  But still medicines

173

1   can be called black box and get black box warnings in spite of

2   all of the above.

3       Q.  So you also note in the same footnote that there is no

4   published literature demonstrating the efficacy of

5   gender-affirming surgery in treating gender dysphoria in

6   incarcerated individuals.

7       Did I read that correctly?

8       A.  Yes.

9       Q.  Are you aware of whether the North Carolina Department

10  of Adult Corrections has adopted a community standard for the

11  provision of health care to its prisoners?

12          MR. RODRIGUEZ:  Object to form and speculation.

13  You can answer.

14          THE WITNESS:  I'm not sure what the community

15  standard -- how you're defining that.

16  BY MS. MAFFETORE:

17      Q.  Are you aware of whether any policy by the North

18  Carolina Department of Adult Corrections, previously the North

19  Carolina Department of Public Safety, states that they apply

20  community standards in the provision of health care to

21  incarcerated people within their system?

22      A.  I'm not aware of that.  I would be very -- I would

23  need to see that document to respond to your question because

24  just because something is done in the community doesn't mean

25  that it's standard of care.  And corrections have to be very

174

1    careful because there are inherently coercive settings.  So we

2    have to be even more careful in corrections because we don't

3    want to hurt anyone or harm anyone.

4        Q.  So as you sit here today, you're not aware of whether

5    or not the North Carolina Department of Public Safety, the

6    North Carolina Department of Adult Corrections have adopted

7    community standards in any of their policies?

8        A.  I would have to review that -- I don't recall -- I

9    reviewed a lot of documents, but I don't recall referring to

10   that.

11       Q.  Understood.  Does a treatment method need to be

12   studied specifically within the carceral setting before you

13   accept it as medically necessary for treatment of a condition

14   in that setting, even if it has been studied to be advantageous

15   outside of that setting?

16       A.  I would say there needs to be at least some research

17   to provide guidance in the field because corrections is very

18   different from the free world.

19       Q.  For all of the various conditions and treatments that

20   you provide in your role as director of mental health services

21   at UTMB, have all of those conditions and treatments for all of

22   those conditions been studied in the carceral setting as well

23   as in the community setting?

24       A.  As I understand it, yes, they're done -- the hormone

25   treatment -- gender-affirming hormone treatment is done in the

                                                              175

1    community and yes, we provide pretty much the same thing in our

2    setting.

3        Q.  Understood.  Have there been studies specifically as

4    to the carceral setting is my question for each thing that you

5    provide?

6        A.  Dr. Meyer and I had discussed looking at that because

7    we have one of the largest state -- no.  We are the largest

8    prison state system in the country.  I think we have looked at

9    -- because we have a robust quality review process, we have

10   looked for adverse outcomes and to date we have not had any.

11   So we rely on our clinical practice in addition -- even though

12   we're not doing research, we look for any side effects or

13   patient complications to help guide us.

14       Q.  So why would it make a difference then whether there

15   have been -- there has been published literature demonstrating

16   efficacy of gender-affirming surgery specifically within the

17   carceral setting?

18       A.  Because the intervention is permanent.  It's largely

19   irreversible.  And individuals that are incarcerated, like I

20   testified to earlier, they're thinking the here and now.

21   They're not necessarily thinking long term and they're prone to

22   talk to their cellmate or others and get bad advice and make

23   impulsive decisions.  So they really need to think about the

24   long-term picture.  So that's why there needs to be additional

25   safeguards in place, in my opinion.

1      Q.  Have you ever approved the provision of medical care

2  to an incarcerated prisoner where there is not high-quality,

3  long-term research demonstrating it's efficacy in U.S. prison

4  settings?

5              MR. RODRIGUEZ:  Object to the form.  You can

6  answer.

7              THE WITNESS:  No.

8  BY MS. MAFFETORE:

9      Q.  Have you ever approved the provision of medical care

10  to an incarcerated prisoner where there is not high-quality,

11  long-term research demonstrating its efficacy in a carceral

12  setting?

13              MR. RODRIGUEZ:  Objection to form.

14              THE WITNESS:  Yes.

15  BY MS. MAFFETORE:

16      Q.  When?

17      A.  We have had a handful of patients that had severe

18  self-harm, head banging, cutting, self-injuring, inserting

19  items, and I have approved the use of a medication -- an opiate

20  type of medication blocker for those patients.  And the

21  literature -- and that is extremely limited and there's no

22  literature at all in correctional settings -- and I have

23  approved that medication non-formulary for both juveniles and

24  for adults in our systems.

25      Q.  Why did you consider it appropriate to do so absent

                                                          177

1    that literature?

2         A.  Because I personally reviewed the literature.  I

3    reached out to colleagues in the field and discussed the risks,

4    benefits and alternatives.  I also spoke to our pharmacy

5    leadership and our psychiatric pharmacist and got -- similar to

6    the North Carolina case, multidisciplinary approach, talked to

7    nursing staff and talked to custody staff.  And so all of that

8    together, the opinion was that the potential benefit of the

9    medicine outweighed the potential risks.  And so we did utilize

10   that medication in those circumstances.

11        Q.  So you concluded that that degree of literature was

12   not necessary for you to appropriately utilize that medication

13   for those patients in that circumstance?

14        A.  So not necessarily -- there is literature, but the

15   literature is in a different type of patient population.  It's

16   not an incarcerated population.  It's individuals in the free

17   world with intellectual impairments, formerly known as mental

18   retardation, and folks with autism and autistic spectrum

19   disorders.  And also there's separate literature on people with

20   borderline personality disorder that cut or self-harm.  So I

21   looked at both set of literature to help guide the use of that

22   medication in a carceral setting.

23        Q.  Understood.  On page 26 of your report you note in the

24   first full paragraph under the formulation of the phrase

25   medically necessary as used by Dr. Ettner and WPATH, an

178

1    intervention which may provide some benefit vis- -vis a

2    patient's gender dysphoria becomes medically necessary.  The

3    implication of such a formulation goes beyond interventions to

4    treat gender dysphoria.  The same logic make a host of other

5    interventions medically necessary to treat other conditions.

6    For example, a patient with a perception of a large or crooked

7    nose, small breasts, skin wrinkles, droopy eyelids, acne

8    scars/scarring, a large mole, or facial sagging or other

9    distress or discomfort due to perceived facial or body features

10   may derive a benefit from procedures targeting that body

11   feature.  I'm going to skip to the next sentence.  Similarly,

12   someone who experiences distress or discomfort from a mole,

13   skin tag, birthmark, scar or tattoo, may derive a benefit from

14   a dermatological procedure such as mole, skin tag, birthmark,

15   scar or tattoo removal utilizing laser treatments or the latest

16   surgical technology or procedure.  Under Dr. Ettner's logic

17   these procedures would be medically necessary because they may

18   well benefit the patient by alleviating, to some degree, their

19   perceived distress from their physical appearance or

20   characteristics or otherwise improving their lives.

21        Did I read that correctly?

22   A.  Well, other than those parts that you didn't say, yes,

23   that's generally true.

24   Q.  In your opinion are droopy eyelids a serious medical

25   condition?

                                                          179

1      A.  I would say it would depend.  It could be a sign of

2   someone having myoasthenia gravis.  It could be a sign of

3   multiple sclerosis.  It could be a sign of a lot of different

4   autoimmune.  So it would depend.

5      Q.  Is that the situation that you're discussing in this

6   paragraph is a situation where somebody has droopy eyelids as a

7   consequence of one of those other impairments?

8      A.  It's possible.

9      Q.  Are skin tags a serious medical condition akin to

10  gender dysphoria on their own?

11     A.  It would depend.

12     Q.  On their own?

13     A.  I'm sorry.  I was saying it would depend on the amount

14  and severity and where the skin tags are and if people stare at

15  that individual or if that individual feels like people stare

16  at them.  So I would say it would really depend, the context.

17     Q.  Okay.  So in your opinion, do droopy eyelids or skin

18  tags cause the same degree of distress on their own without any

19  underlying condition as gender dysphoria?

20         MR. RODRIGUEZ:  Objection to form, speculation.

21  You can answer.

22         THE WITNESS:  So I would say it would really

23  depend on the individual and what other comorbid issues are

24  going on in their life.  If they have any comorbid medical or

25  mental health conditions, if there's trauma, abuse or neglect.

180

1    If they're incarcerated or not.  So there's a lot of additional

2    stressors.  I can't just compare a mole to gender dysphoria.

3    You really have to have the context to be able to assign weight

4    to distress or impairment.

5    BY MS. MAFFETORE:

6        Q.  Is there a clinical diagnosis for the distress someone

7    experiences related to droopy eyelids?

8        A.  It's possible.  There's a condition called body

9    dysmorphic disorder, which I used to work with and treat

10   individuals.  Yes, individuals could truly have a real body

11   feature but then they magnify it a hundred or a thousandfold

12   and they are quite impaired by that.  So yes, you can have

13   significant impairment from either a real body feature or a

14   perceived body feature that's distressing.

15       Q.  What about is there clinical diagnosis for the

16   distress someone experiences related to skin tags?

17       A.  There could be.  It could be an adjustment disorder.

18   Could be major depression.  Someone could become suicidal.

19   Yes.  So there's a variety of sequelae that could happen from

20   someone who has one or multiple distressing skin tags or other

21   dermatologic conditions.

22       Q.  I guess I'm not a hundred percent understanding your

23   critique of Dr. Ettner here.  So based on the conditions that

24   you just described then, would you consider it medically

25   necessary to provide surgery to treat those conditions under --

                                                              181

1   those conditions of severity that you just explained?

2              MR. RODRIGUEZ:  Object to the form as

3   mischaracterization of the text.

4              THE WITNESS:  First of all, Dr. Ettner in my

5   opinion is not -- she's not qualified to opine on medical

6   necessity because she's not a physician.  She's a psychologist.

7   So it just seems like she's throwing out all these terms but

8   it's -- I would need more of the actual -- similar to what

9   North Carolina does in their policies and procedures and

10  practices, they look at the patient, they look at all of the

11  history, the custody issues, the mental health issues, they

12  look at comorbidities, they look at their adjustment, how

13  they're progressing, how they're doing in their carceral

14  setting.  And that's what Dr. Ettner lacks.  She doesn't

15  consider any of the other -- she just says automatically gender

16  dysphoria, medical necessity, and that's not how the real world

17  works for physicians that deal with this sort of stuff through

18  our training and on a day-to-day basis.

19     Q.  I understand.

20             MR. RODRIGUEZ:  Do you want to take a break?

21             MS. MAFFETORE:  I was going to say, this is a

22  natural break in my outline.

23                        -  -  -

24             (A break was taken, 3:13 p.m. - 3:28 p.m.)

25                        -  -  -

182

Case 3:22-cv-00191-MOC-DCK   Document 75-1   Filed 10/26/23   Page 182 of 243
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

1    BY MS. MAFFETORE:

2        Q.  Dr. Penn, after that brief break, just another

3    reminder that you are still under oath.  I want to pick up at

4    page 29 of your report.  In the second paragraph under the

5    heading The Risk-Benefit Analysis in Plaintiff's Case.  You

6    concluded that there was little to no clinical indications that

7    plaintiff was or would be at risk of some severe distress, harm

8    or disability absent the vulvoplasty.

9        Did I read that correctly?  Second paragraph under the

10   heading of The Risk-Benefit Analysis in Plaintiff's Case.

11   Second paragraph under that heading.

12       A.  Oh, yes.  Thank you.  Yes, that's correct.

13       Q.  What do you mean by severe distress?

14       A.  Well, that's what I was testifying to earlier when you

15   were asking about like skin tags and all those different

16   things.  It's not just the finding of a physical abnormality or

17   genitalia that one doesn't want to have or experiences as ugly

18   or hideous or what have you.  It's more the severe distress as

19   evidenced by psychosocial impairments across settings.  So it's

20   the emotional distress.  To answer your question about severe

21   distress would be impairments in their activities to function,

22   ability to work.  For example, Kanautica -- Mrs. Brown, sorry,

23   she has gainful employment.  She works in the commissary.  She

24   has maintained relationships with family and her husband.  So

25   she's not showing the objective distress where she is suicidal,

                                                            183

1   requiring suicide watch, requiring emergency psychotropic

2   medications, requiring inpatient psychiatric hospitalization.

3   She's clinically stable in a female prison setting.

4       Q.  And is it your understanding that Mrs. Zayre-Brown is

5   currently employed by the prison system?

6       A.  I understood she was working in commissary.  I'm

7   sorry, canteen, or she had some job.  She may have had the job

8   changed when she moved.  I understand she's moved to different

9   facilities.  But she was gainfully employed and was also taking

10  college courses and some other courses, as I understand from

11  the record and from her testimony in her deposition.

12      Q.  Just to make sure that I understand your testimony,

13  you believe that hallmarks of severe distress are suicidal

14  ideation, suicide attempts, being placed on suicide watch,

15  requiring emergency psychotropic medications, requiring

16  emergency hospitalization?

17      A.  Those would be the manifestations of severe distress.

18  But the day-to-day would be things like problems with sleep,

19  either sleeping too much or not sleeping enough, your

20  interests, your former areas of interest are diminished, guilt

21  or rumination over different things in your life, decreased

22  energy, or in Ms. Brown's case, the possibility of too much

23  energy.  Concentration could be impaired.  Her appetite could

24  be too much or too low.  Weight gain or weight loss.  And

25  again, preoccupation with distress and frustration and feeling

184

1    overwhelmed.  And then lastly, suicidal thoughts, yes.

2        Q.  Is severe distress a prerequisite, in your opinion, to

3    receiving care to treat a serious medical condition in the

4    carceral setting?

5        A.  No.

6        Q.  Later on page 29, A, the heading, you said Plaintiff's

7    Medical Records Do Not Demonstrate Clinically Significant

8    Mental Or Emotional Distress.

9            Did I read that correctly?

10       A.  Yes.

11       Q.  You then go on to write in the first sentence of that

12   paragraph the hallmark of gender dysphoria is clinically

13   significant distress or impairment in social, occupational, or

14   other important areas of functioning.

15           Did I read that correctly?

16       A.  Yes.

17       Q.  Do you contend Mrs. Zayre-Brown's gender dysphoria

18   diagnosis?

19       A.  No.

20       Q.  If not, what do you mean by plaintiff does not

21   demonstrate clinically significant mental or emotional

22   distress?

23       A.  According to my review of her deposition with Mr.

24   Rodriguez, the evaluation with Dr. Boyd she presented as

25   euthymic, euphoric, good eye contact, animated.  She described

1    she was hopeful in future, oriented about wanting to work as a

2    paralegal while she attended law school once she was released.

3    All again suggesting that she's hopeful and future oriented.

4    She doesn't have a diminished or shortened sense of the future.

5    So I would say all of those are examples showing that her

6    gender dysphoria currently is not impairing or causing distress

7    at this time.

8         Q.  But you stated that gender dysphoria in and of itself

9    is clinically significant distress or impairment, correct?

10        A.  Well, the DSM criteria -- and I know there's been

11   controversy about the diagnosis, whether it should be in the

12   DSM or ICD or what have you.  But to make the criteria you have

13   to have clinically-significant distress or impairment.

14   Kanautica Brown, by my understanding from records, because I

15   was not allowed to evaluate her and I would have very much

16   liked to have had the opportunity to do so, at this time her --

17   she has gender dysphoria.  It's kind of chronic and low grade,

18   but she's not having current acute distress from her gender

19   dysphoria to the best of my ability from what I have seen or

20   read or visualized.

21        Q.  Are you aware of whether Mrs. Zayre-Brown is

22   experiencing clinically significant distress related to her

23   genitalia?

24        A.  She has reported that and she's done things in the

25   past, such as allegedly or reportedly putting a rubber band

CONTAINS GENERAL CONFIDENTIAL INFORMATION

186

Case 3:22-cv-00191-MOC-DCK   Document 75-1   Filed 10/26/23   Page 186 of 243
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

1    around her phallus in the condition that she was not getting

2    what she wanted, a referral in a timely manner.  She saw it

3    being not timely.  And she has made conditional statements of

4    wanting to rub the skin off her phallus as a threat.  But

5    outside of those two incidents, there were two incidents, one

6    -- I believe both of those where there was a question about K2

7    use or some other substance.  But outside of those four

8    incidents my record review does not reveal anything at least in

9    the last year or two where she's presented as distressed,

10   despondent, needing emergency mental health evaluation,

11   psychiatric admission or transfer, emergency psychotropic

12   medications, placement on a suicide watch or suicide

13   precautions, or transfer to the medical clinic for self-harm or

14   self-injurious behavior.

15       Q.  Okay.  And so you mentioned your review.  And so on

16   page 30 of your report, first full paragraph, the beginning you

17   note based on my review of plaintiff's medical records,

18   including her mental health visits, routine checkups, sick

19   calls, endocrinology appointments, and other medical records,

20   the typical indicators of significant mental distress or

21   impairment of the activities of daily living are not present.

22          Did I read that correctly?

23       A.  Yes.

24          MS. MAFFETORE:  Now I'm now going to hand you

25   what I will ask the court reporter to mark Exhibit-9.

CONTAINS GENERAL CONFIDENTIAL INFORMATION

187

1                    -  -  -

2              (Document marked as Exhibit-9 for

3    identification.)

4                    -  -  -

5    BY MS. MAFFETORE:

6       Q.  The court reporter has just handed you what's been

7    marked as Exhibit-9, which is was a document produced in this

8    case with the bates stamp DAC 1182.

9              Do you recognize this document?

10      A.  Yes.

11      Q.  And is this document a North Carolina Department of

12   Public Safety Self-Injury Risk Assessment dated December 11,

13   2020?

14      A.  Yes.

15      Q.  And I will represent to you if you see where it says

16   offender number and it says 0618705 that other witnesses in

17   this case have identified that that is Mrs. Zayre-Brown's

18   offender number.  Fair?

19      A.  So I do recognize that offender number and I have

20   memorized that during review of these charts.  Yes, that's

21   fair.

22      Q.  Is this one of the -- well, first, do you see under

23   current self-injurious behaviors where it says Ms. Blank

24   indicated she has thoughts of ripping the skin off my pee-pee?

25      A.  Yes.

CONTAINS GENERAL CONFIDENTIAL INFORMATION

188

1    Q.  Okay.  And moving forward I will fill in those blanks

2    which are a redaction of Mrs. Zayre-Brown's dead name with Mrs.

3    Zayre-Brown, just for clarity sake.  Is that all right with

4    you?

5    A.  Or the plaintiff is fine.  Sure.  Whatever is easier.

6    Q.  Under current suicidal ideation it states Mrs.

7    Zayre-Brown stated she wants to be given a medication that will

8    put me to sleep and keep me asleep.  When asked for

9    clarification, she stated I don't want to die but I feel like

10   it is the best thing for me.

11       Did I read that correctly?

12   A.  Yes.

13   Q.  Looking at the bottom of this page, the last paragraph

14   states Mrs. Zayre-Brown has had an increase in symptoms of

15   gender dysphoria since August.  And it goes on to state after

16   the double dash, one of her greatest current fears is that

17   someone will find out she still has part of a penis so it is an

18   extremely emotionally arousing issue for her.  Since that time,

19   Mrs. Zayre-Brown's symptoms of depression have increased, and

20   she has had thoughts of ripping the skin off her penis and

21   thinks she may be better off dead.

22       Did I read that correctly?

23   A.  Yes.

24   Q.  Did you review this medical record before concluding

25   that Mrs. Zayre-Brown does not have significant mental distress

1    or impairment?

2         A.  Yes.

3         Q.  I'd now like to hand you what I would ask the court

4    reporter to mark as Exhibit-10.

5                            -  -  -

6              (Document marked as Exhibit-10 for

7    identification.)

8                            -  -  -

9    BY MS. MAFFETORE:

10        Q.  The court reporter has handed you Exhibit-10 which is

11   a document bates stamped DAC 728.  I will represent to you that

12   it is a North Carolina Department of Public Safety Mental

13   Health Progress Note dated 4/28/2021 pertaining to Mrs.

14   Zayre-Brown.

15             Do you recognize this document?

16        A.  Yes.

17        Q.  Under Progress Towards Goals -- do you see where I'm

18   referring to?

19        A.  Yes.

20        Q.  It notes Mrs. Zayre-Brown expressed many concerns

21   about not having her appointment with UNC-CH urology scheduled

22   yet.  She gave a number of examples of how this is increasing

23   her dysphoria, and she decided to put a band on her penis until

24   her appointment is scheduled.  She said she has had the band on

25   for a week and a half.  She was cautioned about the effects of

CONTAINS GENERAL CONFIDENTIAL INFORMATION

190

Case 3:22-cv-00191-MOC-DCK   Document 75-1   Filed 10/26/23   Page 190 of 243
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

1   impeding blood flow and risk of infection.  As described above,

2   the undersigned spoke with Ms. Catlett, and she was able to

3   convey to Mrs. Zayre-Brown how Ms. Catlett has been on top of

4   it and has worked hard to facilitate this appointment.  Ms.

5   Zayre-Brown then agreed to take the band off her penis.  The

6   rest of the session addressed her specific concerns about

7   having part of a penis left and what defines a woman.  She

8   explained it does not bother her if she is called fat or ugly

9   but stated if she is called a man there is no tool in the

10  toolbox to manage that.  She stated I can't live with this

11  anymore, and said the situation was acute now and not chronic.

12  She also stated she is not complete now and that I'm ready to

13  be complete.

14        Did I read that correctly?

15     A.  Yes.

16     Q.  Did you review this medical record before concluding

17  that Mrs. Zayre-Brown does not have significant mental distress

18  and impairment?

19     A.  Yes.

20            MS. MAFFETORE:  I'm now going to hand you what

21  I will ask the court reporter to mark as Exhibit-11.

22                       -  -  -

23            (Document marked as Exhibit-11 for

24  identification.)

25                       -  -  -

CONTAINS GENERAL CONFIDENTIAL INFORMATION

191

1    BY MS. MAFFETORE:

2        Q.  Exhibit-11 is a document that was produced in

3    discovery bates marked DAC 695.  I will represent it's the

4    North Carolina Department of Public Safety Mental Health

5    Progress Note dated September 16, 2021 pertaining to Mrs.

6    Zayre-Brown.

7            Have you seen this document before?

8        A.  Yes.

9        Q.  Under Progress Towards Goals, the last two sentences

10   note she admitted that she had briefly considered putting a

11   rubber band around her phallus as a means of forcing surgical

12   intervention.  The writer explained that Ms. Brown would only

13   undermine her chances for gender-affirming surgery if she was

14   considered to be emotionally unstable for treatment.  She

15   acknowledged understanding.

16           Did I read that correctly?

17       A.  Yes.

18       Q.  Is this one of the documents that you reviewed before

19   concluding that Ms. Zayre-Brown does not have significant

20   mental stressor impairment?

21       A.  Yes.

22               MS. MAFFETORE:  I'm now going to hand the court

23   reporter what will be marked as Exhibit-12.

24                   -  -  -

25               (Document marked as Exhibit-12 for

         **CONTAINS GENERAL CONFIDENTIAL INFORMATION**
                                                          192

 1   identification.)

 2                         -  -  -

 3   BY MS. MAFFETORE:

 4       Q.  Exhibit-12 is a document produced to us in discovery

 5   bates marked DAC 680.  I will represent to you it is a North

 6   Carolina Department of Public Safety General Administrative

 7   Note dated November 2, 2021 regarding Mrs. Kanautica

 8   Zayre-Brown.

 9           Do you recognize this document?

10       A.  Yes.

11       Q.  The document notes under comments, Offender Brown made

12   a statement of self-harm during today's FTARC, indicating that

13   if she did not receive an update about progress on the decision

14   regarding DTARC determination re: requested surgery, she would

15   mutilate her phallus, referred to in earlier documentation as

16   taking matters into her own hands.

17           Did I read that correctly?

18       A.  Yes.

19       Q.  Did you review this medical record or this

20   administrative note before concluding that Mrs. Zayre-Brown

21   does not have significant mental distress or impairment?

22       A.  Yes.

23           MS. MAFFETORE:  I'm now going to hand you what

24   I ask the court reporter to mark as Exhibit-13.

25

CONTAINS GENERAL CONFIDENTIAL INFORMATION

1                        -  -  -

2              (Document marked as Exhibit-13 for

3   identification.)

4                        -  -  -

5   BY MS. MAFFETORE:

6      Q.  Exhibit-13 is a document that was produced to us in

7   discovery which is bates stamped DAC 666 on the first page.  I

8   will represent to you that it is a North Carolina Department of

9   Public Safety Mental Health Progress Note, December 6, 2021,

10  relating to Kanautica Zayre-Brown.

11          Do you recognize this document?

12     A.  Yes.

13     Q.  On page two of the document at the top.  Document

14  notes under the subheading Progress Towards Goals, which is at

15  the bottom of the previous page, reduced feelings of dysphoria,

16  measured by rating dysphoric feelings on a scale from zero to

17  10.  Zero equals no dysphoria.  10 equals extreme dysphoria.

18  By being five or below at least three days a week.  Today

19  Offender Brown reported a Level of 11, it's high.

20          Did I read that correctly?

21     A.  Yes.

22     Q.  Did you review this medical record before concluding

23  that Mrs. Zayre-Brown does not have severe mental distress or

24  impairment?

25     A.  Yes.

                                                         194

1      Q.  You can set that to the side.  I'm done with that

2   document.  Can someone be close with their family members and

3   still experience significant distress?

4      A.  Yes.

5      Q.  You note that Mrs. Zayre-Brown doesn't suffer from

6   distress because she worked in the commissary.  Are you aware

7   of whether that employment ended in 2020?

8              MR. RODRIGUEZ:  Objection.  Mischaracterization

9   of testimony.  You can answer.

10             THE WITNESS:  I don't know the specific reason,

11  if she asked to terminate her employment or if it was because

12  of her disciplinary.  But the review of these documents does

13  recall and refresh my memory that all of these threats of

14  self-harming her phallus were conditional.

15             MS. MAFFETORE:  I'm going to object to that

16  answer as non-responsive because I asked you whether or not the

17  employment at the commissary ended in 2020.

18             MR. RODRIGUEZ:  And he answered that and then

19  he was proceeding to discuss the exhibits that you just gave

20  him to.

21             MS. MAFFETORE:  I asked if he reviewed them.

22  That was my question.

23             MR. RODRIGUEZ:  Right.

24             MS. MAFFETORE:  Right.

25             THE WITNESS:  So what I was answering was that

**CONTAINS GENERAL CONFIDENTIAL INFORMATION**

1    she had received a major disciplinary case and was placed in

2    restrictive housing because she assaulted a peer who had

3    allegedly teased her about her phallus or made some statement

4    about her phallus.  So all of these suicidal or talk of

5    self-harm to her phallus were all conditional.  The first set

6    that you showed me had to do with she was facing restrictive

7    housing disciplinary status --

8              MS. MAFFETORE:  I'm just once again going to

9    object to this as nonresponsive.  Your counsel will have

10   opportunity to ask you follow-up questions, if he wishes.  But

11   I have a limited amount of time with you today, so I need you

12   to be responsive to the questions that I'm asking.

13             MR. RODRIGUEZ:  Hold on, Dr. Penn.  So he

14   answered the question --

15             MS. MAFFETORE:  Should we go off the record for

16   a second?

17             MR. RODRIGUEZ:  No.  No.  We're going to stay

18   on the record.  He answered your question and now he's giving

19   some testimony about the documents that you gave to him.

20             MS. MAFFETORE:  Right.  But I didn't ask him

21   any other questions about the documents that he gave to me.  If

22   you would like to ask him questions about those documents

23   you're more than welcome to.

24             MR. RODRIGUEZ:  Oh, I know that I can ask

25   questions.  But are you telling him that you would no longer

CONTAINS GENERAL CONFIDENTIAL INFORMATION

196

1    like for him to speak about the exhibits that you gave to him?

2              MS. MAFFETORE:  If I have follow-up questions

3    about the exhibits I would be very happy for him to answer

4    those questions.

5              MR. RODRIGUEZ:  Fair enough.  So we'll let her

6    ask her next question and then you can answer.

7    BY MS. MAFFETORE:

8       Q.  Can someone pursue educational opportunities and still

9    be experiencing significant distress?

10      A.  Yes.

11      Q.  In your opinion, is Mrs. Zayre-Brown considered

12   stable?

13      A.  So I have to clarify my response to answer your

14   question.  And in my -- what was the question again?

15      Q.  In your opinion, is Mrs. Zayre-Brown considered

16   stable?

17      A.  Yes.  Because all of these were conditional suicidal

18   statements of self-harm, putting a rubber band around her

19   phallus because she was unhappy with the delay in getting

20   referred to the surgeon, and then two, the other situation had

21   to do with she was facing restrictive housing.  It probably had

22   an affect on her maybe losing her job, her employment, but she

23   was hopeful and future oriented.  In the documents you

24   presented to me she talks about working in cosmetology, talking

25   about losing weight to meet the criteria for the surgery, and

1    other things that were hopeful and future oriented.  So yeah, I

2    mean, anything is possible.  But based on my review of these

3    documents, to answer your question, Ms. Brown was stable,

4    clinically stable.

5        Q.  In your opinion, does Mrs. Zayre-Brown have any

6    comorbid medical conditions or mental health conditions rather?

7        A.  In my opinion, yes.

8        Q.  And what is that based on?

9        A.  So again, I requested the opportunity to perform an

10   evaluation of Ms. Brown and that was declined or refused.  But

11   based on my video review -- sorry, my review of the videotaped

12   deposition Mr. Rodriguez performed and the transcript, based on

13   review of all the medical records and prison records, based on

14   my review of Dr. Boyd's evaluation, based on -- and testing,

15   based on my review of Dr. Ettner's report and records, Ms.

16   Brown potentially has -- I can't definitively say, but she

17   probably has significant trauma from childhood neglect and

18   abuse because she had been raised in foster care.  I think her

19   mom was 13 when she gave birth to her.  She was pretty much

20   estranged from her mother, was put into Child Protective

21   Services, had been in the Department of Public Safety for

22   juvenile offending behaviors for I think five years.  So she

23   clearly had a trauma history.  There's some allegations or --

24   sorry, not allegations.  There are some references in records

25   to possible ▓▓▓▓▓▓▓▓  So I don't have enough as we sit

1   here today to say definitively she has PTSD, but she definitely

2   has features that are strongly suggestive of past trauma, abuse

3   and neglect.  There's also -- I can't remember.  I believe Dr.

4   Boyd on some of her testing there's the possibility of bipolar

5   disorder symptoms or traits, and similarly there's a

6   possibility of some antisocial versus borderline personality

7   traits.  And then from a medical perspective I understand the

8   main issue is she's obese.  She's overweight.  I don't recall

9   any other chronic medical diseases.  And I think that's it.

10       Q.  Is it your opinion that any comorbid condition from

11  which Mrs. Zayre-Brown suffers is not well controlled?

12       A.  What I would say is when Mrs. Brown doesn't get --

13  doesn't get or perceive to get what she thinks she should or is

14  entitled to, she reacts very impulsively and puts herself at

15  risk and that is strongly suggestive of a personality disorder

16  and untreated trauma.  I would say her comorbid complaints are

17  stable at present but could definitely -- she definitely could

18  benefit from additional counseling and therapy.  It appears, in

19  my opinion, that she has been focused a hundred percent on her

20  gender surgery to the exclusion of seeking counseling or

21  therapy to deal with impulse control, affect regulation,

22  dealing with bad news or when things don't go her way impulse

23  control, making better choices, social skills training, how to

24  deal with individuals who might misgender her or make negative

25  comments about her genitalia.  So those are definite treatment

CONTAINS GENERAL CONFIDENTIAL INFORMATION

199

Case 3:22-cv-00191-MOC-DCK   Document 75-1   Filed 10/26/23   Page 199 of 243
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

1    services that she would benefit from that would further help

2    her achieve clinical -- further clinical stability.

3        Q.  What is your understanding of whether under the WPATH

4    standards an individual needs to be considered stable in order

5    to be a candidate for gender-affirming surgery?

6        A.  I'm not sure if there's language about stable.  What I

7    understand, the WPATH has changed.  WPATH SOC 7 used to have a

8    requirement that there had to be two, either psychologist

9    and/or psychiatrist, or two psychiatrists or two psychologists,

10   but they had to be both doctoral level and they had to

11   essentially clear the individual and say there was no mental

12   health contraindication to surgery.  I understand in WPATH SOC

13   8 that that's been reduced.  And I think now it's not

14   necessarily a clearance or do they have the capacity for the

15   surgery or there are not any mental health contraindications,

16   but it's more of a referral.  If a referring treating source

17   mental health clinician refers -- I think only one letter is

18   needed now and I could be wrong on that.  But that's what my

19   understanding of the new WPATH is.  It's less prescriptive

20   about the two evaluations done by doctoral level mental health

21   staff.

22       Q.  Is your understanding that someone needs to ascertain

23   that an individual's comorbid mental health conditions are

24   sufficiently under control for them to be a candidate for

25   surgery?

1      A.  I would say that's fair.

2      Q.  On page 32 of your report, Exhibit-1.  You note the

3  lack of such indications of distress in a patient's medical

4  chart is an important consideration when determining whether a

5  given intervention is medically necessary.  This is because if

6  there is reason to believe that the intervention is necessary

7  to prevent, and will be effective at ameliorating, such severe

8  distress, harm, or disability, then the intervention might be

9  said to be medically necessary.

10     Did I read that correctly?

11     A.  I would say yes.  But the sentence in front of that

12  has to be read in conjunction with that last sentence that you

13  said about that my review of Mrs. Kanautica Brown's medical

14  records demonstrate that whatever distress she may have had as

15  a result of her gender dysphoria, it was and is well managed,

16  not severe, and is not causing any impairments to her daily

17  living activities in a correctional setting.

18     Q.  How frequently do you believe gender-affirming surgery

19  has been ineffective in ameliorating gender dysphoria?

20          MR. RODRIGUEZ:  Objection.

21  BY MS. MAFFETORE:

22     Q.  Based on your expertise.

23          MR. RODRIGUEZ:  Same objection.  You can

24  answer.

25          THE WITNESS:  So my review of the Dhejnee

                                                        201

1   article -- I think it's D-h-e-j-n-e-e -- is that in that study

2   -- it's the only study that I'm aware of that was published

3   longitudinally looking at individuals who have undergone

4   gender-affirming genital surgery -- had mixed results.  And in

5   fact some individuals engaged and completed suicide and others

6   had other similar types of distress and I believe there was

7   some regret.  Some individuals recounted regret in having

8   undergone the surgery.  So to the best of my knowledge, based

9   on my literature review, and I think Dr. Li also referenced

10  that in her report, there is that real risk of the surgery not

11  necessarily being curative or helpful and actually potentially

12  being harmful.

13      Q.  So I asked you how frequently do you believe that

14  gender-affirming surgery has been ineffective at ameliorating

15  gender dysphoria?

16          MR. RODRIGUEZ:  Same objection.  Speculation.

17  You can answer.

18          THE WITNESS:  Because it hasn't been formally

19  studied in a prospective, controlled manner I'm not able to

20  answer your question.  I would say it's highly variable.

21  BY MS. MAFFETORE:

22      Q.  Do you have reason to believe that gender-affirming

23  surgery would be ineffective in ameliorating Mrs. Zayre-Brown's

24  gender dysphoria?

25      A.  My testimony would be that Mrs. Brown has some other

                                                              202

1    chronic mental health conditions.  I mentioned the trauma,

2    possible PTSD, possible personality disorder that the surgery

3    will not do anything to correct or ameliorate.  So it's

4    possible that the surgery might help her gender dysphoria, but

5    the other conditions will likely -- the surgery doesn't address

6    or treat any of those other primary mental disorders, in my

7    opinion.

8         Q.  And so my question was do you have any reason to

9    believe gender-affirming surgery would be ineffective in

10   ameliorating specifically Ms. Zayre-Brown's gender dysphoria?

11              MR. RODRIGUEZ:  Asked and answered.  You can

12   answer.

13              THE WITNESS:  So I would say, as I testified to

14   earlier, her whole focus to date has now been on the gender

15   dysphoria and on the surgery.  That's her whole life.  In fact,

16   as I understand it, she is -- there's some media coverage.

17   There's some -- which is an additional stressor.  At this

18   point, as we sit here today, in my professional opinion, it's

19   not -- it is not clear or definitive that she would -- that her

20   gender dysphoria would be completely ameliorated by the surgery

21   because there's other physical findings that she presents with

22   that the gender genital surgery would not address.

23        Q.  What are those findings?

24        A.  Her physical presentation.  She has several secondary

25   sex characteristics, her body frame, her body appearance, her

CONTAINS GENERAL CONFIDENTIAL INFORMATION

1  habitus, her voice, her jawline, jaw structure, the breadth of

2  her shoulders, her hand size, her size in general.  I could go

3  on and on, but there's multiple physical features that whether

4  she has the surgery or not, people are probably going to

5  continue to misgender her.  And she has identified herself,

6  repeatedly she stated that her biggest fear is that somebody

7  will misgender her and whether she has a phallus or not.  It's

8  my professional opinion that she will likely continue to

9  probably be misgendered, whether she has the surgery or not.

10 And will then continue to demonstrate gender dysphoria, in my

11 professional opinion.

12     Q.  In any of the records that you reviewed did Mrs.

13 Zayre-Brown identify her voice as a source of gender dysphoria?

14     A.  I don't recall.

15     Q.  In any of the records that you reviewed did Mrs.

16 Zayre-Brown identify her height as a source of her gender

17 dysphoria?

18     A.  I don't recall.

19     Q.  In any of the records that you reviewed did Mrs.

20 Zayre-Brown identify the size of her hands as a source of her

21 gender dysphoria?

22     A.  I don't recall.

23     Q.  In any of the records that you reviewed did Mrs.

24 Zayre-Brown identify the width of her shoulders as a source of

25 her gender dysphoria?

CONTAINS GENERAL CONFIDENTIAL INFORMATION

1        A.  Not that I recall.

2        Q.  In any of the records that you reviewed did Mrs.

3   Zayre-Brown identify any physical feature other than her

4   genitals as a source of her gender dysphoria?

5        A.  Well, she has had -- she reported and I saw that in

6   her medical chart, she's had multiple surgeries to date.  A

7   breast augmentation, fillers, body contouring, she had some

8   chin procedure I can't recall the name of.  She's had multiple

9   surgeries, but I don't recall in the health care records or

10  other records that I reviewed if she reported any other

11  distress from any of those past surgeries.  Sorry, I -- I'm

12  trying to -- I thought I recalled that she did have distress

13  from one of the surgeries.  Yes, when she had the orchiectomy,

14  the removal of the testicles, she experienced some postsurgical

15  complications according to the medical chart, even though she

16  was in the prison system and they were giving her wound care

17  and dressings.  I recall that she had pain and distress from

18  that.

19       Q.  So now I'll just reiterate that my question was other

20  than her genitalia.

21       A.  To the best of my recollection I don't recall any

22  other distress from body appearance or both features in the

23  records that I reviewed.

24       Q.  Okay.  Thank you.  Are you aware of whether Dr. Boyd

25  testified that surgery would be psychologically beneficial for

CONTAINS GENERAL CONFIDENTIAL INFORMATION

205

Case 3:22-cv-00191-MOC-DCK   Document 75-1   Filed 10/26/23   Page 205 of 243
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

1    Mrs. Zayre-Brown in the treatment of her gender dysphoria?

2        A.  I don't recall.

3        Q.  Do you agree with Dr. Boyd that surgery would be

4    psychologically beneficial to Mrs. Zayre-Brown in the treatment

5    of her gender dysphoria?

6        A.  I can't answer that yes or no because there's a risk

7    that she might have a serious complication from the anesthesia

8    or surgery and whether the surgery is successful or not, she

9    could have significant complications.  And it could worsen her

10   overall life with or without affecting her gender dysphoria.

11       Q.  So in your opinion, what are the risks of Kanautica

12   specifically undergoing surgery?

13       A.  Well, there's a laundry list.  I would be happy to

14   refer to Dr. Figler's evaluation where he lists them.  But as I

15   understand, and again, I'm not a surgeon or anesthesiologist,

16   but there's a risk of death, heart attack, pneumonia,

17   infection, paralysis, scarring, compartment syndrome.  There's

18   a term called cosmesis or something to that effect where one is

19   not happy with the surgical -- their perception of how it's

20   going to turn out doesn't match with how it turns out.  And

21   there's several other complications.  Nerve injury.  I used

22   paralysis earlier.  Fistula.  There's a risk of hair is in the

23   vaginal cavity.  That could be problematic.

24       Q.  Is your understanding that the procedure that Mrs.

25   Zayre-Brown is seeking would create a vaginal cavity?

206

1      A.  What I understand is she's seeking a vulvoplasty, but

2   originally had been thinking of a vaginoplasty.  But that's a

3   whole separate issue because there's still ambivalence about

4   what surgery would be best for her.  According to Dr. Figler's

5   report or his note there was some question about which would be

6   appropriate for her.  I am not a surgeon.  I can't speak to

7   this, but I believe that either when the vulvoplasty or

8   vaginoplasty -- there's a risk of hair cells being in the vulva

9   -- sorry, in the vaginal canal and that could cause problems.

10  So the point I'm trying to make -- I'm getting away from the

11  main things, infection, death, scarring, disfigurement.  Those

12  are all real conditions of anesthesia, to include death from

13  cardiac arrythmia.  Ms. Kanautica Brown is obese.  She could

14  have surgical complications for her weight.  Pneumonia.  So

15  there's a laundry list of risks of surgery.

16      Q.  Are the risks that you just identified unique to

17  gender-affirming surgery?

18      A.  I believe there are several risks that are specialized

19  to gender-affirming surgery, but they also would apply to any

20  kind of general anesthesia or alternatively being placed into

21  the lithotomy position for extended periods of time.  And I

22  understand from Dr. Figler's note that she would have to be in

23  that position for several hours to undergo the surgery.

24      Q.  So you stated that Mrs. Zayre-Brown's weight is a

25  concern.  Are you aware of whether Mrs. Zayre-Brown was

1    required to lose a certain amount of weight in order to be

2    considered a candidate for surgery by Dr. Figler's office?

3        A.  Yes.

4        Q.  Are you aware of whether she lost that weight?

5        A.  I recall that she had lost -- I think she went from

6    275 to 240.  But the videos that I reviewed both of the

7    deposition and of the interview with Dr. Boyd -- again, I'm not

8    trying to be insensitive, but Ms. Brown appeared obese, in my

9    training as a physician.  So I didn't see anywhere where a

10   recent weight had been recorded.  So I don't know her weight

11   status as of today or the last week or so.

12       Q.  Are you aware of whether at the time that the DTARC

13   denied Mrs. Zayre-Brown's surgery whether or not she had

14   achieved the weight goal set forth by Dr. Figler's office for

15   her to receive the surgery?

16       A.  I don't recall if they made a determination of that.

17   I think she had dropped down to like 245.  But whether that met

18   their criteria, I don't recall, as we sit here today.

19       Q.  If Mrs. Zayre-Brown had achieved the weight

20   recommended by Dr. Figler's office to make her a candidate for

21   surgery, do you have any other reason to believe that she is at

22   high risk for complications for surgery?

23       A.  Yes.

24       Q.  What are those reasons?

25       A.  Well -- and I already listed it earlier and I think

                                                                    208

1   you interrupted me.  I said she had a complication before when

2   she had her orchiectomy.  It didn't heal well and she had some

3   pain.  The wound dehisced, it spread.  And so the best

4   predictor of past is future -- I'm sorry, the best predictor of

5   future is the past.  Sorry, I got that backwards.  So she has

6   had a history of postsurgery complications and healing.  Anyone

7   is subject to surgical risks regardless of one's weight.

8   Everyone theoretically could have risk from general anesthesia

9   and surgery.

10      Q.  In your opinion, is there any risk of Mrs. Zayre-Brown

11  regretting the procedure?

12      A.  Certainly.

13      Q.  What is your basis for that opinion?

14      A.  Well, it's based on the Dhejnee article that I

15  mentioned earlier that the literature is limited, but the one

16  study that shows longitudinal followup of individuals that have

17  had the type of surgery that Mrs. Brown is seeking, there was

18  some patients that experience complications and -- and I have

19  read of other articles by urology -- in urology journals that

20  describe the risks of complications with the surgery also.

21      Q.  What specific to Mrs. Zayre-Brown's circumstances lead

22  you to believe that she is at risk of regretting the procedure?

23      A.  Because she's the only one that -- when she -- if and

24  when the phallus is removed, she will be the only one that can

25  identify that she no longer has a phallus.  She still appears

CONTAINS GENERAL CONFIDENTIAL INFORMATION

209

1   typically as a male -- sorry, transgendered female.  But she

2   still has several secondary sex characteristics that would

3   suggest her being transgendered.  So in my professional opinion

4   having genital surgery is not going to cure all of her gender

5   dysphoria.  Plus, she has the comorbid likely mental health

6   conditions that I described earlier, that I testified to

7   earlier.

8        Q.  What risk, if any, do you think there is that Mrs.

9   Zayre-Brown's gender dysphoria will worsen if she is not

10  provided gender-affirming surgery before her release date?

11       A.  Anything is possible.  She has stated that she's put a

12  rubber band around her phallus.  She stated that she plans to

13  scratch or rub the skin off her phallus.  So it's possible that

14  she could develop a skin infection, or alternatively, if she

15  does in fact amputate or auto amputate her phallus, that could

16  occur.  So there are some risks that she will further attempt

17  to self-harm her genitalia.  That's fair.

18       Q.  In your opinion, do you think Mrs. Zayre-Brown's

19  gender dysphoria will improve if she is not given

20  gender-affirming surgery, if she retains her phallus?

21       A.  What I would testify to is that she is totally a

22  hundred percent focused on this one surgery to the neglect of

23  her other lifelong issues.  I would say I don't currently have

24  an opinion because my opinion is guarded without -- without

25  knowing that she is making an effort to begin to work on her

CONTAINS GENERAL CONFIDENTIAL INFORMATION

210

Case 3:22-cv-00191-MOC-DCK   Document 75-1   Filed 10/26/23   Page 210 of 243
DISCOVERY COURT REPORTERS   www.discoverydepo.com   1-919-424-8242

1    other trauma and abuse and neglect issues and relational

2    issues, in my professional opinion, my opinion is guarded.  I

3    don't have an opinion regarding what the surgery or not having

4    the surgery, what impact it would have on her gender dysphoria.

5        Q.  Understood.

6            MS. MAFFETORE:  Can we go off the record for

7    just one second?

8                      -  -  -

9            (Discussion held off the record, 4:13 p.m. 4:13

10   p.m.)

11                     -  -  -

12   BY MS. MAFFETORE:

13       Q.  I would now like to look at your report, Exhibit-1 at

14   page 33.  So you state on page 33 at the top it is my opinion,

15   based on my education, training, and experience, that there is

16   a lack of high-quality scientific and medical literature

17   indicating the long-term efficacy of gender-affirming surgery

18   as a treatment for gender dysphoria.

19           Did I read that correctly?

20       A.  Yes.

21       Q.  Are you holding yourself out as an expert in the

22   quality of scientific evidence in this case?

23       A.  No.

24       Q.  Are you holding yourself out as an expert in

25   statistical methodology in this case?

211

1      A.  No.

2      Q.  Study design?

3      A.  No.

4      Q.  Biostatistics?

5      A.  No.

6      Q.  Bioethics?

7      A.  No.

8      Q.  Further down on page 33 in a sentence beginning with

9  moreover you note that the studies pertaining to

10  gender-affirming surgery suffer from many basic design

11  problems, such as small sample sizes, lack of baseline

12  psychological testing to identify baseline and pre-existing

13  mental disorders and personality disorders in particular, lack

14  of baselines and outcome measures, lack of validated measures,

15  lack of a control group, lack of multiple sizes, lack of

16  standardization for controlling outside variables, various

17  relational and psychosocial stressors, substance abuse, and

18  other conflicts unrelated to the surgery, sample bias and more,

19  correct?

20      A.  You said substance abuse, but it's substance use.

21      Q.  I wrote substance abuse here and said substance abuse

22  anyway.  Otherwise correct?

23      A.  Yes.

24      Q.  What is your understanding of whether it would be

25  ethical to conduct a study regarding the efficacy of

212

1    gender-affirming surgery with a control group?

2        A.  I think it could be done in a community.  It might be

3    a little more challenging in a correctional setting, but I

4    think it could be done.

5        Q.  What is that opinion based on?

6        A.  Well, I was trained in research and clinical research

7    and how to actually do research.  I have published some

8    articles and I have gotten grant funding before.  I would say

9    working as part of a team of other Ph.D.s such a study could be

10   designed.  It would be complicated and getting enough samples

11   would be challenging, but I think it could be done.

12       Q.  Do you think it could be done ethically?

13       A.  Yes.

14       Q.  A little higher up, two sentences, you say that you

15   are generally familiar with the research referenced by the

16   division TARC.  To which research are you referring there?

17       A.  I would have to refer to the division TARC document.

18   I don't recall specifically -- if they're referring to Dr.

19   Campbell's position statement or if they refer to other

20   documents.

21       Q.  Are you referring there to the research from Dr.

22   Campbell's position statement?

23       A.  I would have to review the document.  I can't -- I

24   don't know off the top of my head what I was referring to here.

25       Q.  Understood.  Are you generally familiar with the

1    research from Dr. Campbell's position statement?

2        A.  I think I testified to that earlier, that there was

3    some documents that I wouldn't necessarily hold the same weight

4    as a peer-reviewed study like the Psychology Today and some of

5    the other studies -- sorry, it's not a study.  It's just an

6    article.  Those are just like lay press articles.  I would need

7    to be able to go through each one of these and actually read

8    the study and look at the methodology to answer your question.

9        Q.  So sitting here today your testimony is that you have

10   not gone through each of these studies and looked at the

11   methodology, is that correct?

12       A.  I don't recall.  I know Gibson V Collier is not a

13   study.  It's a case we had in Texas.  It's a legal ruling.  But

14   no, I haven't -- maybe better than saying studies, these are

15   citations.  That's how they're referenced here in the article.

16   Sorry, referenced in the position statement.  Sorry.

17       Q.  So sitting here today you have not reviewed all of the

18   citations in this -- that are cited?

19       A.  That's fair.

20       Q.  Okay.  What is your understanding of the

21   comprehensiveness of Dr. Campbell's research in support of his

22   position statement?

23       A.  So I don't know if I would call it research.  It

24   sounds like he did a literature review and he did his own

25   analysis of that literature review.  But I wouldn't really call

214

1   it research.

2       Q.  So that's not what you're referring to then when you

3   say you are generally familiar with the research referenced by

4   the division TARC?

5       A.  I think when I'm referring to research I'm referring

6   to like peer-reviewed articles that might have been referred to

7   by the division TARC.

8       Q.  Okay.  What is your understanding of Dr. Campbell's

9   qualifications to conduct research comprehensively in support

10  of his conclusions related to Mrs. Zayre-Brown?

11      A.  So I don't really have an opinion.  All I know is Dr.

12  Campbell is a medical director.  I don't know what -- if he's a

13  family doctor or internal medicine doctor.  I don't know if he

14  has any research background or training.  So I don't really

15  have an opinion right now.

16      Q.  Okay.  To your knowledge did Dr. Campbell refer to any

17  studies that indicated that gender-affirming surgery may be

18  medically necessary?

19      A.  May be?

20      Q.  Yes.

21      A.  It may be?  Sorry.  I'd have to review the article

22  itself.  The first one, the Swedish study just -- again, it's

23  possible that that study showed some benefit.  But I would want

24  to read the article itself to be able to answer your question.

25      Q.  I understand.  So on page 34 of your report in the

                                                            215

1  first full paragraph you also mention your own literature

2  review.  You state as Dr. Li's comprehensive report

3  demonstrates, and as the literature review of Dr. Campbell (see

4  DAC 3412) and that of my own (see DE-18-8) indicates, there is

5  a lack of high-quality research on the topic of the long-term

6  efficacy of gender-affirming surgery in treating gender

7  dysphoria.  Is that correct?

8      A.  Yes.

9      Q.  And just to close the loop on this.  Is DAC 3412 the

10  bates number on the position statement that we were just

11  discussing on the bottom right-hand corner?  Exhibit-8.

12      A.  I'm sorry, say that again.

13      Q.  Exhibit-8, is the number on the bottom right-hand

14  corner of Exhibit-8 DAC3412?  On the first page.

15      A.  3412?

16      Q.  On the first page, bottom right-hand corner underneath

17  your exhibit sticker.

18      A.  3404.

19      Q.  3404.  Okay.  What is the page number on the last

20  page?

21      A.  3415.

22      Q.  So does 3412 fall somewhere within this document that

23  we were just discussing Dr. Campbell's position statement?

24      A.  Yes, 3412 -- so he refers to on 3412 evidence-based

25  peer-reviewed medical studies free from bias or conflict of

216

Case 3:22-cv-00191-MOC-DCK   Document 75-1   Filed 10/26/23   Page 216 of 243
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

1  interest, leading to near consensus among the medical

2  community, and it goes on and on.  But that's what I'm

3  referring to here.

4      Q.  Okay.  But you also refer to your own literature

5  review and you point us to a document DE-18-8.

6           MS. MAFFETORE:  I'd like now to hand to the

7  court reporter document DE-18-8, which was your affidavit that

8  you filed in support of defendant's opposition to plaintiff's

9  motion for summary judgement.

10                     -  -  -

11           (Document marked as Exhibit-14 for

12  identification.)

13                     -  -  -

14  BY MS. MAFFETORE:

15      Q.  So you refer us to paragraphs 53 through 60 in your

16  affidavit as your literature review, is that correct?

17      A.  Yes.

18      Q.  So turning first to page -- or to paragraph 53.  So

19  you note that in searching for literature regarding surgical

20  intervention as the treatment for gender dysphoria in the

21  correctional setting you input the following search terms:

22  "Gender-affirming surgery (GAS)", and "corrections",

23  "correctional settings", "incarcerated patients", "incarcerated

24  individuals ", correct?

25      A.  Yes.

217

Case 3:22-cv-00191-MOC-DCK   Document 75-1   Filed 10/26/23   Page 217 of 243
DISCOVERY COURT REPORTERS    www.discoverydepo.com        1-919-424-8242

1        Q.  Putting terms in quotation marks requires the search

2    yield that complete and exact term, correct?

3        A.  I believe so.

4        Q.  So a search for open quotation marks, gender hyphen

5    affirming surgery, parentheses, GAS, close parentheses

6    quotation marks would not yield just gender hyphen affirming

7    surgery, correct?

8        A.  I haven't done one of these in a while.  I do them

9    fairly often.  But that's kind of how I was taught when I did

10   my research, clinical research methodology both during my adult

11   psychiatry training and also my child psychiatry training.

12       Q.  Okay.  And so a search for gender -- open quotation

13   marks, gender hyphen affirming surgery, parentheses, GAS, close

14   parentheses, would also not yield a search result for gender

15   confirmation surgery, correct?

16       A.  I mean, it's possible if you put -- because of gender

17   surgery you might get a match because there's two words and

18   maybe not the third word.  I would have to do it actually to

19   test that.

20       Q.  But your understanding is that, again, using quotation

21   marks requires that the search yield a complete and exact term?

22       A.  I don't know.  I mean, I think the PubMed is actually

23   pretty -- sometimes I'll actually mistype something and it will

24   pull something up.  So as we sit here today I can't be

25   definitive yes or no, it does or it doesn't.

218

1      Q.  Did you utilize any other search terms that aren't

2   provided here?

3      A.  I don't believe so, but I have done this kind of

4   search -- it wasn't like a one-time and that's it.  I have done

5   it numerous times over the last 10 years.

6      Q.  You did not search for the word prison or prisoner in

7   your search?

8      A.  I don't believe so.

9      Q.  Do you have confidence that the search you ran

10  provided for the most comprehensive possible search results?

11     A.  I would say generally, yes.  I mean, it's possible

12  that some esoteric journal, you know, some non-U.S. or

13  non-United Kingdom or non-Swedish study could pop up.

14     Q.  You then note at paragraph 54 of your affidavit,

15  Exhibit-14, that you reviewed the available literature

16  concerning the effectiveness of surgery as an intervention in

17  the community, correct?

18     A.  Yes.

19     Q.  How did you go about conducting that review?

20     A.  I believe -- and I probably should have written it.  I

21  believe I looked at WPATH, what the studies -- and that's how I

22  came to the study that I cite in 55 below and 56.  Because

23  those were community studies, as I testified to earlier.

24  There's not been any correctional studies.  Most of the studies

25  that have been done have been in like Sweden or I think Denmark

                                                              219

1  and maybe Belgium, as I recall.

2      Q.  Did you utilize any search terms to conduct your own

3  independent search?

4      A.  And I'm so sorry, Holland or Amsterdam was the other

5  one.  Sorry.  I apologize.  Say that again, please.

6      Q.  Did you utilize any search terms to conduct your own

7  independent search?

8      A.  I mean, it's possible.  Like I said, I have done

9  several of these before.  But that's generally how I do it,

10  looking for gender-affirming surgery, genital surgery.  I think

11  I may have used sexual reassignment surgery in the past also.

12      Q.  Do you have confidence that your review was

13  comprehensive?

14      A.  I mean, anything is possible and that's why I defer to

15  Dr. Li because she's actually a Ph.D. in comparative research

16  effectiveness and has dedicated her life.  And so I probably

17  have more -- I feel like I have done my due diligence as a

18  practicing, you know, psychiatrist.  But I think Dr. Li is

19  obviously much more qualified and so I would put more weight on

20  her studies.

21      Q.  At the time that you submitted this affidavit, had you

22  reviewed Dr. Li's --

23      A.  No.  And that's a great question.  Dr. Li, as I

24  understand it, had not been retained or disclosed as an expert

25  until recently.  I think this year, maybe the spring of this

                                                                220

1   year.  So I prepared this affidavit based on information

2   available to me at that period in time and now, as we sit here

3   today, my opinion is strengthened based on -- aside from my

4   previous reviews, but from what Dr. Li has done and her

5   exhaustive review.

6       Q.  So speaking specifically about the literature review

7   that you conducted to support your affidavit and subsequently

8   your report, you mentioned only two studies in what you have

9   called your review of the literature, correct?  The reduction

10  in mental health treatment, utilization among transgendered

11  individuals after gender-affirming surgery, a total population

12  study.  And then later, long-term followup of transsexual

13  persons undergoing sex reassignment surgery, cohort study in

14  Sweden, is that correct?

15      A.  Yes.

16      Q.  Why did you opt to only include those two studies to

17  support your conclusion that the existing research is

18  conflicting and limited?

19      A.  Those were the two studies that I found that met the

20  criteria for the search engine that I utilized.

21      Q.  So in footnote 10, which is on page 27, you state the

22  studies noted herein are not intended to be exhaustive but only

23  representative.  There are multiple other studies on the topic

24  that reach conflicting conclusions, correct?

25      A.  Yes.

1      Q.  Did you review other studies that reached conflicting

2  conclusions?

3      A.  Sorry, I'm looking for where 10 -- the footnote is --

4      Q.  Page 27 at the very bottom.

5      A.  Yes.  I looked at the Dhejnee study that I've

6  testified to earlier and I was very surprised when I read the

7  Branstrom study that that actually had to be redacted.  They

8  had to publish a redaction.  Specifically the Branstrom,

9  B-r-a-n-s-t-r-o-m, his group had to publish a redaction in the

10  American Journal of Psychiatry because they had received a lot

11  of criticism that they had over generalized their findings and

12  they had to publicly redact and say we overstated our findings

13  and the generalized ability of her findings and results.  And

14  so anyway, I looked at those.

15      Q.  Right.  So the question I asked you was did you review

16  other studies other than the two that you explicitly mentioned

17  in your affidavit?

18      A.  Yes.

19      Q.  Which ones?

20      A.  Well, I don't recall.  But they're the ones that I

21  tried to search when I use that search engine in the PubMed in

22  gender-affirming surgery.

23      Q.  Did you generate a complete list of all of the sources

24  that you reviewed in your literature review to come to the

25  conclusion that there are multiple studies on the topic that

222

1  reach conflicting conclusions?

2      A.  No, I did not.

3      Q.  Why didn't you provide a list?

4      A.  One, I wasn't asked to do that.  Two, the time frame.

5  I think there was a deadline for this report.  Three, sure, now

6  looking at Dr. Li's I can see that probably I could do a better

7  job with it.  This is, again, not my area of expertise.  So

8  again, I defer to Dr. Li and I -- her results strengthen my

9  opinions on these topics.

10     Q.  Do you feel confident that you interpreted the studies

11 that you did correctly?

12     A.  Yes.

13     Q.  Do you feel that you interpreted them consistently

14 with the intent to the authors?

15             MR. RODRIGUEZ:  Objection, speculation.  You

16 can answer.

17             THE WITNESS:  I'm sorry, what was the question

18 again?

19 BY MS. MAFFETORE:

20     Q.  Do you feel that you have interpreted them consistent

21 with the intent of the authors?

22             MR. RODRIGUEZ:  Objection, speculation.  You

23 can answer.

24             THE WITNESS:  I have no idea what the intent of

25 the authors was or were.  I did read, you know, the title of

223

1    the article, the abstract, the data, the findings, the results

2    the methodology and all that, but I don't know what the intent

3    of the authors were.

4    BY MS. MAFFETORE:

5        Q.  Understood.

6                MS. MAFFETORE:  I would now like to hand you

7    what the court reporter will mark as Exhibit-15.

8                        -  -  -

9                (Document marked as Exhibit-15 for

10   identification.)

11                       -  -  -

12   BY MS. MAFFETORE:

13       Q.  I will represent to you that Exhibit-15 is a

14   compilation of documents that were provided to us by your

15   counsel in response to a subpoena that was issued to you.

16        Do you recognize Exhibit-15?

17       A.  Is there a way to redact my phone number on here?

18                MR. RODRIGUEZ:  There is.  I didn't catch that.

19   Yes.

20                MS. MAFFETORE:  I will not be reading your

21   phone number into the record, just for your peace of mind.

22                THE WITNESS:  The answer to your question, yes,

23   I do recognize this.

24   BY MS. MAFFETORE:

25       Q.  Great.

                                                            224

1        A.   Yes.

2        Q.   Okay.  So I would like to ask you specifically about

3   the pages marked Penn 10 and Penn 11 of Exhibit-15.

4        A.   Okay.

5        Q.   So what is this page, Penn 10?

6        A.   This is an invoice.

7        Q.   And is this invoice for work done in the case of

8   Kanautica Zayre-Brown?

9        A.   Yes.

10        Q.   And was this work performed or related to the

11   affidavit that you filed in this case?

12        A.   Well, it's -- it pretty much speaks for itself.  It's

13   dated February 9, 2023 and it goes through from June 9, 2022

14   and lists affidavit drafting and edits and whatnot, and it goes

15   all the way up through February 3, 2023.

16        Q.   So at the bottom of Penn 10 there is -- the very last

17   entry.  It's dated 7/17/22 and is states literature

18   review/research and the hours listed there are 2.5.

19   Two-and-a-half hours, is that correct?

20        A.   Yes.

21        Q.   And then on the next page, the next entry on 7/18

22   states declaration edits and additional literature review, 3.5

23   hours or three-and-a-half hours, is that correct?

24        A.   Yes.

25        Q.   And none of the other entries on this invoice mention

1    research or literature review, is that correct?

2        A.  That's fair.

3        Q.  So is it fair to say that you spent some amount of

4    time, between two-and-a-half and five-and-a-half hours,

5    conducting your research and literature review in this case?

6        A.  Specific to this case, yes.  But as I testified to

7    earlier, in my work on the gender dysphoria -- sorry, on the

8    joint gender dysphoria work group I have had to review this

9    literature previously.  So I was basically looking to see if

10   any new articles had come up and review of existing articles

11   that I previously had pulled and looked at.

12       Q.  And in your experience is two-and-a-half to

13   five-and-a-half hours a sufficient time to conduct a thorough

14   and comprehensive literature review?

15       A.  Yes.

16       Q.  You testified previously that you felt that Dr. Li's

17   report demonstrated that you could have done a more thorough

18   job, is that accurate?

19       A.  Yes.

20       Q.  Did you review those studies that Dr. Li cited in

21   conjunction with her literature review in the preparation of

22   your expert report?

23       A.  Yes.

24       Q.  Did you review all of the sources that Dr. Li cited in

25   preparation for your expert report?

226

1      A.  I believe I looked at the abstract, but I don't

2   believe I read the entire article in its entirety.  But I did

3   look at the abstracts, yes.

4      Q.  How many articles would you say that you read in their

5   entirety?

6      A.  I don't know.  I would have to refer Dr. Li's reports

7   and her graphs -- or tables rather.  But I would say I pretty

8   much reviewed them all.

9      Q.  The abstract?

10      A.  Yes.

11      Q.  What is an abstract?

12      A.  The abstract is kind of like the description of the

13   problem or issue, what they sought to study, the methodology,

14   the data, and then the results or conclusions.  That's kind of

15   what the abstract is.  It's kind of like a Cliffs Notes version

16   to the entire article.

17      Q.  On average, how long would you say an abstract is,

18   generally speaking?

19      A.  It varies.  It could be a couple hundred words or

20   more.

21      Q.  So generally a couple hundred words?

22      A.  Uh-huh.

23      Q.  Sticking with your affidavit or going back to your

24   affidavit rather, which was Exhibit-14.  I'd like to discuss

25   with you some other things that you included in your affidavit.

1    So starting on page 12, paragraph 35.  This is under a heading

2    titled Unique Considerations in the Correctional Setting.  And

3    paragraph 35 you note that the correctional setting is

4    different than the community is obvious.  However, there are a

5    host of considerations regarding the delivery of health care,

6    in general, and in particular the management of transgender

7    health care in the correctional setting which are not so

8    obvious.

9        Did I read that correctly?

10   A.  Yes.

11   Q.  Turning then to paragraph 37.  You note, for example,

12   in the community, a person's legal or criminal history is not

13   factored into an analysis of whether to proceed with a

14   particular intervention, or even whether certain decisions are

15   even considered interventions.  That is not the same in the

16   correctional context.

17       Did I read that correctly?

18   A.  Yes.

19   Q.  Is it your opinion that Mrs. Zayre-Brown's legal or

20   criminal history is relevant to determining whether

21   gender-affirming surgery is medically necessary to treat her

22   gender dysphoria?

23   A.  Yes.

24   Q.  In what way?

25   A.  So I don't recall that she ever had a history of

228

1    sexual offending.  And she's done very well, to the best of my

2    knowledge, other than that one altercation where she seriously

3    injured her -- one of her -- another inmate that had to go

4    offsite to an emergency room.  But other than that, I don't

5    recall any types of sexual offending behaviors.  But that would

6    be an important issue if you were going to move a -- say a

7    transgender -- a trans female into a female facility and they

8    had a history of being a serial rapist or a sex offender, or

9    sexually violent predator.  So that's an example of why it

10   would be important to look at their legal history.

11        Q.  Okay.  So I'm asking you not for an example, but

12   specifically as to Mrs. Zayre-Brown, is her legal or criminal

13   history relevant to determining whether gender-affirming

14   surgery is medically necessary?

15        A.  I would say it would be one part of her

16   biopsychosocial history to consider, but it wouldn't be the

17   ultimate decision-making variable or factor.

18        Q.  What is your understanding of whether Mrs.

19   Zayre-Brown's legal or criminal history was relevant to the

20   North Carolina Department of Public Safety's determination that

21   gender-affirming surgery was not medically necessary for her?

22        A.  I don't recall at any of the facility TARC -- T-A-R-C

23   or the division TARC, that her legal history was -- other than

24   just factual, what she was incarcerated for, I don't recall it

25   weighing into the decision-making, as I recall.

1          Q.  On page 14, paragraph 39, you also note custody,

2     housing and classification determinations and other

3     custody-related considerations, that are unique to the

4     correctional setting, must also be seriously considered with

5     regard to any other interventions, including medical, hormonal

6     treatments, and/or surgical interventions.  And then you go on

7     to state surgical considerations include, but are not limited

8     to, the psychiatric/mental health stability of the patient, the

9     availability of qualified in-state surgeons with particular

10     knowledge and expertise in performing various surgeries for

11     transgender individuals and who are comfortable and are willing

12     to provide surgery to incarcerated individuals, rates of

13     patient acceptance and satisfaction with the particular

14     proposed surgeon or surgical practice, effectiveness of

15     alternative nonsurgical intervention, short and long term

16     clinical outcomes, risks of anesthesia and surgery and

17     post-surgical complications, potential benefits versus the

18     patient's perception of harm from postponing the procedure,

19     until it can be performed in the community, preoperative

20     procedures, postoperative care, costs of the procedure,

21     attainment of fully informed consent, e.g., the patient's

22     ability to weigh the various risks, benefits, alternatives and

23     provide truly voluntary informed consent and more.

24          Did I read that correctly?

25          A.  Yes.

230

1      Q.  Is it your position that these considerations are

2   unique to the correctional setting?

3      A.  Some of those are.  For example, the issue of

4   qualified in-state that would be willing to do that for an

5   incarcerated individual.  And then two, the hospital willing to

6   have correctional officers, you know, there either in the

7   operating suite and/or the post -- you know, the recovery room

8   and then in the postsurgical suites and in the regular rooms.

9   I would say that's definitely different.  What I would say is

10  there's probably a perception by inmates that they're not

11  getting the best surgeons.  They're getting kind of like the

12  people that are not the A-team, but maybe the B- or C-team.

13  And so -- and maybe a resident or fellow, as opposed to an

14  attending.  So that certainly could happen in a correctional

15  setting.

16     Q.  Are you aware --

17     A.  Sorry.  I was looking through all this.  Sorry.  The

18  issue of postponing the procedure, obviously that could be

19  postponed in the community too.  But in a correctional setting,

20  a release date, that's a big deal and it's been my experience

21  that some inmates will decline a variety of surgeries or

22  medical interventions and they'll say I'll get that done when I

23  get out because of the hassle or perceived hassle.  And then I

24  think I've testified to this earlier, the issue of fully

25  informed consent in a correctional setting because it's

231

Case 3:22-cv-00191-MOC-DCK   Document 75-1   Filed 10/26/23   Page 231 of 243
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

1   inherently coercive.  You really have to ascertain that the

2   patient is able to give full informed -- voluntary informed

3   consent.  I think that's it.

4       Q.  Are you aware that there is an in-state provider for

5   vulvoplasty who had already consented to perform the procedure

6   on Mrs. Zayre-Brown?

7       A.  I'm aware that there is a faculty member, Dr. Figler.

8   But as I recall there was some -- what I understand from the

9   note that Dr. Figler wrote, there was some confusion or

10  discrepancy whether vulvoplasty or vaginoplasty was the

11  preferred -- or recommendation for Mrs. Brown.  That's what I

12  recall from the note.

13      Q.  Okay.  And so are you aware that there is an in-state

14  provider of vulvoplasty and vaginoplasty who had already

15  consented to perform a gender-affirming surgical procedure for

16  Mrs. Zayre-Brown?

17      A.  That's not what I understand according to the

18  documents.  What I understand is that Dr. Figler was asked to

19  assess if she was a surgical candidate.  Dr. Figler wouldn't be

20  able to or wouldn't be authorized to do the surgery with North

21  Carolina Department of Adult Corrections's funding unless --

22  until it was subsequently reviewed by the FTARC, the DTARC, and

23  then finally the last two individuals that I testified to

24  earlier.  So I don't -- to clarify, Dr. Figler, as I understand

25  it, did not determine or did not say this was medically

1    indicated or medically necessary.  He simply said that Mrs.

2    Brown was a potential candidate for the surgery.

3        Q.  Nevertheless, Dr. Figler is a qualified physician in

4    state who if approved was willing to provide surgery to an

5    incarcerated patient, is that correct?

6        A.  I don't know Dr. Figler's qualifications or his

7    background so I'm not prepared to testify if he's qualified.  I

8    would need to know how you define qualified.  I mean, he's

9    probably a very good surgeon, but as we sit here today without

10   me knowing his medical board, how many lawsuits he has against

11   him, if he's ever been reprimanded by the medical board, if he

12   has any peer issues or issues within his department, as we sit

13   here today I'm not prepared to say yes, he's a qualified person

14   to do this.

15       Q.  Understood.  To what extent did you consider the

16   effectiveness of alternative nonsurgical interventions in

17   treating Ms. Zayre-Brown's gender dysphoria?

18       A.  I did consider that and it's my understanding that she

19   has had an orchiectomy and that she's currently on hormone --

20   gender-affirming hormone treatment.  And it appears again that

21   she's not manifesting any current emotional distress, pain or

22   suffering, and is certainly not engaging in any self-harm in

23   the last two years.

24       Q.  So is it your opinion that the interventions that she

25   has already undergone have cured her gender dysphoria?

233

1      A.  No, that's not my opinion.  My opinion is that her

2   gender dysphoria is currently stable because she's had the

3   orchiectomy, she's had the ability to move to a female facility

4   where she's been for several years in spite of being assaultive

5   and a major assault.  My experience is that some custody staff

6   might have moved her back or moved her into -- given her

7   history.  But no, she's doing very well.  I'm not aware of any

8   -- if you have them, I would love to look at them, but any

9   recent self-harm, threats of self-harm, threats to hurt her

10  genitalia for the last two years.  I'm not aware of any --

11  other than her exclusive focus on this surgery.  That appears

12  to what -- her whole life is focused in on right now.

13     Q.  Understood.  You mentioned informed consent as one of

14  the things that requires special consideration in the

15  correctional context.  Do you have any reason to believe that

16  Mrs. Zayre-Brown cannot provide informed consent to receive

17  gender-affirming surgery?

18     A.  Yes.

19     Q.  What is that reason?

20     A.  Well, the concern I have, and Dr. Boyd flushed this

21  out more, is that I think both Dr. -- sorry, your expert.  I'm

22  blanking on her name.  Dr. --

23     Q.  Dr. Ettner?

24     A.  Thank you.  Dr. Ettner.  It's like cause and effect.

25  If she has the surgery she's going to be magically cured -- and

CONTAINS GENERAL CONFIDENTIAL INFORMATION

234

Case 3:22-cv-00191-MOC-DCK   Document 75-1   Filed 10/26/23   Page 234 of 243
DISCOVERY COURT REPORTERS   www.discoverydepo.com   1-919-424-8242

1    I'm sorry, I don't mean to be -- she will be cured or improved

2    from her gender dysphoria.  But I think Dr. Boyd, and I do

3    agree with this, that the trauma, abuse and neglect that she's

4    had in the past as a child and adolescent will not be cured by

5    any gender-affirming surgery and is clinically important.  And

6    I think I testified to this earlier, she will benefit from

7    psychotherapy to help her with misgendering and with

8    individuals either in the correctional setting or in the

9    community who provoke her or set her off by making negative

10   comments about her appearance or her genitalia or what have

11   you.  So that's my opinion.

12       Q.  Are you aware of whether Dr. Boyd ultimately concluded

13   that Mrs. Zayre-Brown has the capacity to provide informed

14   consent?

15       A.  I believe I recall that, yes.

16       Q.  Do you recall whether Dr. Boyd ultimately concluded

17   that while she might -- Mrs. Zayre-Brown might have some

18   co-occuring conditions they were not so active or occurring as

19   to distort her ability to make decisions?

20       A.  That's fair, yes.

21       Q.  Turning then to paragraph 44 of your declaration which

22   is on page 19.  You state correctional systems must assess the

23   costs of approving various medical and other health care

24   interventions for any disease state.  And then you go on to say

25   at the very end of this paragraph, which is on the next page,

CONTAINS GENERAL CONFIDENTIAL INFORMATION

235

Case 3:22-cv-00191-MOC-DCK   Document 75-1   Filed 10/26/23   Page 235 of 243
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

1    thus, a correctional agency, like the Department, must utilize

2    its dollars in a way that allows it to provide for the health

3    care needs of all persons in its care and custody most

4    efficiently and fairly.

5         Did I read that correctly?

6    A.  Yes.

7    Q.  Is it your opinion that the cost of surgery is

8    relevant to determining whether gender-affirming surgery is

9    medically necessary for Mrs. Zayre-Brown?

10   A.  No.

11   Q.  Turning then to paragraph 46, which actually begins on

12   the same page.  Actually, never mind.  We already talked about

13   this.  Paragraph 47.  So at paragraph 47, which is on page 21

14   of Exhibit-14, you note given the plethora of considerations in

15   assessing the appropriateness of any given surgical

16   intervention in the correctional setting, the potential impact

17   of postponing the procedure until it can be performed in the

18   community must also be evaluated.

19        Did I read that correctly?

20   A.  Yes.

21   Q.  Is it your opinion that this surgery cannot be

22   provided competently in the prison setting?

23   A.  Can you clarify when you say competently?  I'm not

24   sure I understand what you mean by that.

25   Q.  How would you define competently?

236

1      A.  My opinion would be yes, this surgery could be

2  performed, but my testimony would be that ideally, given her

3  history of having complications before, she was I think a month

4  or two out -- sorry, she was somewhere between that, one and

5  two months from having the orchiectomy, she had complications

6  from the orchiectomy in the prison setting and had problems and

7  it took some time for those issues to be addressed and managed.

8  My opinion is that the prison probably could do this and -- you

9  know, if they found an appropriate, qualified, competent, to

10  use your words, surgeon who could do the surgery, the question

11  would be provided that she didn't have any significant

12  postoperative complications, which is certainly possible, yeah,

13  she could have this and return to her prison setting.  I think

14  that's fair.

15      Q.  Is it your opinion that Mrs. Zayre-Brown's release

16  date impacts the medical necessity of the surgery?

17      A.  No.

18      Q.  Okay.  Are you aware of when Mrs. Zayre-Brown first

19  requested surgery from NCDPS?

20      A.  So I recall that she came in -- I don't have the exact

21  dates.  It would be a guess to the exact dates.  Something

22  tells me she came in 2012, October 2012, and then for the first

23  year or two she was wanting her hormones.  And then subsequent

24  to that, I think it was maybe '15 was when she first asked for

25  the surgery, but I could be wrong on that.

237

1      Q.  So by your estimation Mrs. Zayre-Brown has been

2   requesting this surgery for at least seven years?

3      A.  That's fair.

4              MS. MAFFETORE:  We can go off the record real

5   quick.

6                      -  -  -

7              (A break was taken, 4:56 p.m. - 5:05 p.m.)

8                      -  -  -

9              MS. MAFFETORE:  I just want to state for the

10  record that we have identified that pages seven and nine of

11  Exhibit-15 do contain general confidential information.  And so

12  for purposes of designating any exhibits as confidential, pages

13  seven and nine contain a phone number under Dr. Penn's

14  signature.  That should be -- the parties will redact and

15  should be treated as general confidential information.

16              I just have a couple of questions and then I

17  can turn you over to counsel representing you in this

18  deposition or we'll be done.

19  BY MS. MAFFETORE:

20     Q.  You previously testified that you have reason to

21  believe that Mrs. Zayre-Brown might regret the procedure and I

22  believe that you testified primarily that that could be related

23  to her surgical outcomes, is that correct?

24     A.  Yes.  And also it's possible that she doesn't get the

25  intended effect that she thinks she's going to get.  So kind of

                                                         238

1    really assessing what is she going for, what does she hope is

2    going to happen.

3        Q.  Do you have any reason to believe that Mrs.

4    Zayre-Brown will regret the removal of her phallus

5    specifically?

6        A.  One of the complications that I read in Dr. Figler's

7    -- he wrote -- he writes as a standard risk is the issue of

8    urine stream and that there's a problem like -- I hate to use

9    the term, but like dribbling.  Instead of having a straight

10   urine it's possible there could be dribbling.  Sure, it's

11   possible there may be some regret.  I know that Mrs. Brown has

12   not stated about deriving any sexual pleasure from her phallus.

13   It's certainly possible.  So yeah, as we sit here today I don't

14   have an opinion of whether she will or will not.  It's

15   possible.

16       Q.  Do you have any reason to believe that she will one

17   day wish that she has a phallus based on everything that you

18   have reviewed in this case?

19       A.  To this date she stated how horrified and how ugly and

20   hideous and how she wants it gone, but it's possible that there

21   might be regret.

22       Q.  Do you have any reason to believe that she would

23   regret?  I understand that you're saying that it's possible.

24   Anything is possible.  Do you have any reason to believe that

25   that is the case?

CONTAINS GENERAL CONFIDENTIAL INFORMATION

1        A.   No.

2              MS. MAFFETORE:   I don't have any further

3   questions.

4              MR. RODRIGUEZ:   I don't have any questions.

5              MS. MAFFETORE:   Okay.

6                         -   -   -

7              (Witness excused.)

8                         -   -   -

9              (Deposition concluded 5:08 p.m.)

10                        -   -   -

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          CERTIFICATE OF REPORTER

2     STATE OF NORTH CAROLINA        )

3     COUNTY OF ALAMANCE             )

4                 I, Susan A. Hurrey, RPR, the officer before

5     whom the foregoing deposition was taken, do hereby certify that

6     the witness whose testimony appears in the foregoing deposition

7     was duly sworn by me; that the testimony of said witness was

8     taken by me to the best of my ability and thereafter reduced to

9     typewriting under my direction; that the witness reserves the

10    right to read and sign the transcript of the deposition prior

11    to filing; that I am neither counsel for, related to, nor

12    employed by any of the parties to the action in which this

13    deposition was taken; and further, that I am not a relative or

14    employee of any attorney or counsel employed by the parties

15    thereto, nor financially or otherwise interested in the outcome

16    of the action.

17                This the 21st day of August, 2023.

18

19                            _____

                              SUSAN A. HURREY, RPR

20                            Notary Public #201826800211

21

22

23

24

25

                                                                    241

1          I, JOSEPH V. PENN, M.D., do hereby state under

2     oath that I have read the above and foregoing

3     deposition in its entirety and that the same is

4     a full, true and correct transcript of my

5     testimony, subject to the attached list of

6     corrections, if any.

7

8

9                              _____

10                             JOSEPH V. PENN, M.D.

11

12   STATE OF_____

13   COUNTY OF_____

14

15        Sworn to and subscribed before me this_____day

16   of_____, 20_____.

17

18                        _____

19                        Notary Public

20

21        My commission expires:_____

22

23

24

25

242

DISCOVERY COURT REPORTERS      www.discoverydepo.com           1-919-424-8242

1                          E R R A T A   S H E E T

2    _____    ___

3    PAGE        LINE                              CORRECTION

4    _____

5    _____

6    _____

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18

19        I, _____, after having read the

20   foregoing transcript of my deposition, wish to make the above

21   corrections.

22        SIGNATURE_____

23        DATE_____

24

25

243