UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
DOCKET NO. 3:22-cv-191-MOC-DCK

| | | |
|---|---|---|
| **KANAUTICA ZAYRE-BROWN**, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | ORDER |
| | ) | |
| **NORTH CAROLINA DEPARTMENT OF PUBLIC SAFETY, et al.,** | ) | |
| | ) | |
| Defendants. | ) | |

**THIS MATTER** is before the Court on the parties' cross motions for summary judgment. (Doc. Nos. 59, 62). The Court heard argument on the motions in November 2023. Upon careful review of the pleadings, the Court finds unresolved questions of material fact and will deny both summary judgment motions without prejudice. The Court will hold an evidentiary hearing to resolve the disputed questions of fact identified in this order. After the evidentiary hearing, the parties may renew their summary judgment motions.

I.     **BACKGROUND**

Plaintiff, Kanautica Zayre-Brown, is a transgender woman. In 2010, Plaintiff was diagnosed with gender dysphoria ("GD").[1] Since then, Plaintiff has lived socially as a woman, received GD-related psychotherapy, and transitioned gender presentation and sex characteristics to female. In 2012, Plaintiff started hormone therapy and began a course of surgeries related to

---

[1] Gender Dysphoria is defined in the Diagnostic and Statistical Manual of Mental Disorders ("DSM") as "marked incongruence between one's experienced/expressed gender and assigned gender." Gender Dysphoria, Diagnostic & Statistical Manual of Mental Disorders, 5th ed. S2H14. The condition is characterized by "(1) a marked incongruence between an individual's sex assigned at birth and the individual's gender identity, (2) strong cross-gender identification, and (3) clinically significant distress or impairment of functioning." (Doc. No. 63 at 2–3).

1

her transition process. Although these procedures somewhat alleviated Plaintiff's GD, Plaintiff remained dysphoric about the lower body. Plaintiff's course of surgeries culminated—for the time being—with a 2017 orchiectomy.[2] Shortly after the orchiectomy, Plaintiff began a 119-month sentence in the North Carolina Department of Adult Corrections ("DAC"). In December 2018, while in DAC custody, Plaintiff formally requested a gender-affirming genital surgery.

### a. The DAC's Review Process

The DAC reviews all inmate requests for surgery through its "utilization review process," which evaluates the medical necessity of the requested procedure. In 2019, the DAC established its policy for the Evaluation and Management of Transgender Offenders ("ETMO Policy"). The ETMO policy provides for a Division Transgender Accommodation Review Committee ("DTARC"), which reviews transgender inmates' requests for medical interventions. When inmates suffering from GD request treatment from the DAC, the DTARC serves as the utilization review authority with the power to approve or deny requested treatments.

The DTARC is comprised of clinical staff, including Arthur L. Campbell, M.D. (Chief Medical Officer), Brian Sheitman, M.D. (Chief of Psychiatry), and Lewis Jonathan Peiper, Ph.D. (Director of Behavioral Health), as well as non-clinical staff like the DAC's Director of Operations (Josh Panter) and Director of Rehabilitative Services (Sarah Cobb). Defendants Panter and Cobb, and other non-clinical DTARC members, are not medical professionals and have no experience treating GD. When it comes to clinical requests, the non-clinical members of DTARC "generally defer to the clinical members." (Doc. No. 60 at 4). Even the clinical DTARC members, however, have limited training and experience with respect to GD.

The DTARC's recommendations are subject to approval by the Director of Health and

---

[2] An orchiectomy is the surgical removal of the testes.

Wellness Services (Defendant Junker) and Assistant Commissioner of Prisons (Defendant Harris). Neither decisionmaker has experience or training in treating GD. The DAC does not require such high-level approval for any procedure besides gender-affirming genital surgery. Despite having received over thirty such requests, the DTARC has never recommended approval of gender-affirming surgery for an inmate's GD. (Doc. No. 60 at 5; Doc. No. 63 at 10).

Dr. Campbell, a DTARC member and the DAC's Chief Medical Officer, authored a document titled "DTARC medical necessity position statement on gender reassignment surgery." In the position statement, Dr. Campbell asserts that gender-affirming surgery is <u>never</u> medically necessary to treat GD. Despite the document's title, Defendants claim that "Dr. Campbell's position paper was never adopted by DTARC or the [DAC]." (Doc. No. 60 at 5).

### b. The DAC's Efforts to Treat Plaintiff's GD

Following Plaintiff's incarceration, DAC psychologist Susan Garvey confirmed Plaintiff's GD diagnosis. Plaintiff formally requested gender-affirming surgery in December 2018, and the facility referred that request to the DTARC in January 2019. During the pendency of the DTARC review, Plaintiff experienced distress related to GD and the DTARC's delays.

In mid-August 2019, the DTARC deferred Plaintiff's surgical request. Plaintiff submitted a request for reconsideration in early 2020. In response, the DTARC sought information from the UNC Transgender Health Program (UNC THP) regarding the nature of the procedure, number of visits required, and cost. Five months after Plaintiff submitted the reconsideration request, the DTARC indicated it would only resolve Plaintiff's request after an in-person consultation with an OBGYN surgical specialist experienced in gender-affirming surgery. (Doc. No. 63 at 12).

Plaintiff's first step towards in-person consultation—a telehealth interview with the UNC THP coordinator—did not occur for twelve months. Between the DTARC's May 2020 report

3

Case 3:22-cv-00191-MOC-DCK   Document 92   Filed 02/02/24   Page 3 of 15

and Plaintiff's May 2021 telehealth interview with UNC, Plaintiff's mental health deteriorated. In December 2020, Plaintiff expressed to DAC provider Dr. Patrician Hahn suicidal thoughts and an urge to mutilate Plaintiff's genitals. In April 2021, Plaintiff tied a band around the genitals, which Dr. Hahn deemed a self-harm attempt designed to more quickly obtain gender-affirming surgery. In May 2021, the DAC's Director of Healthcare Administration (Defendant Terri Catlett) forwarded an email to DAC mental health staff indicating Plaintiff had expressed a desire to mutilate and kill herself.

On May 25, 2021, Plaintiff had a telehealth interview with the UNC THP Coordinator, Nurse Katherine Croft. Ms. Croft concluded that weight loss was Plaintiff's only obstacle to surgery. Croft then informed the DAC that the next step in UNC THP's surgical assessment would be an in-person consultation. That assessment occurred in July 2021. Plaintiff was evaluated by Dr. Bradley Figler, a surgeon selected by the DAC who has expertise in gender-affirming surgery. Dr. Figler concluded that Plaintiff met the requirements for gender-affirming genital surgery. Based on Plaintiff's persistent GD, Dr. Figler further concluded that gender-affirming surgery was medically necessary for Plaintiff.

Dr. Figler was not alone in concluding that Plaintiff was an appropriate candidate for gender-affirming surgery and that such surgery was medically necessary. Dr. Donald Caraccio, Plaintiff's endocrinologist, wrote in a clinical encounter note that vulvoplasty was a "medically necessary part of treatment for this patient." (Doc. No. 60 at 8). Jennifer Dula, Plaintiff's treating therapist, wrote in a clinical note that Plaintiff met the criteria for gender-affirming surgery and that surgery would "make significant progress in further treatment of [Plaintiff's GD]." (Id.).[3]

---

[3] Additionally, Dr. Hahn testified that she believed gender-affirming surgery was necessary from a mental health perspective. (Doc. No. 63 at 20). And Dr. Marvella Bowman, a psychologist who treated Plaintiff for six months beginning in August 2021, testified that Plaintiff was unlikely to

### c. The 2022 DTARC Meeting and Case Summary

In Autumn 2021, Plaintiff met the weight loss goal. DAC healthcare providers submitted a utilization review request for gender-affirming vulvoplasty.[4] On February 17, 2022, the DTARC met to consider Plaintiff's request. Before the meeting, doctors Campbell, Sheitman, and Peiper reviewed Plaintiff's medical records. That review apparently included the recommendations of Dr. Figler, Dr. Carccio, and Ms. Dula. During the meeting, doctors Campbell, Sheitman, and Peiper provided input based on their pre-meeting review. No other DTARC members reviewed Plaintiff's medical records before the meeting: they deferred to doctors Campbell, Sheitman, and Peiper. Doctors Sheitman and Peiper in turn deferred to Dr. Campbell with respect to medical necessity. Nonetheless, Defendants maintain that the DTARC did not rely on Dr. Campbell's position paper concluding that gender-affirming surgery is never medically necessary for the treatment of GD. (Doc. No. 60 at 5).

The DTARC ultimately recommended denial of Plaintiff's request for two reasons. First, the DTARC concluded that Plaintiff was well-adjusted and benefitting from existing treatment. Specifically, the DTARC concluded that Plaintiff did not present a risk of self-harm or suicide absent gender-affirming surgery. The DTARC dismissed contrary evidence (e.g., Plaintiff's statements regarding her desire to self-mutilate) as "an attempt to force the [DAC] to provide the desired surgery." (Doc. No. 60 at 13). Second, the DTARC found the medical literature was mixed on the efficacy of gender-affirming surgery as treatment for GD. The DTARC largely based this second conclusion on Dr. Campbell's research and analysis. Dr. Campbell concluded that the Standards of Care published by the World Professional Association for Transgender

---

stop experiencing GD absent surgery. (Id.).
[4] A vulvoplasty is a genital reconstruction surgery that creates a neo-vulva but does not create a vaginal cavity.

Health ("WPATH")—according to which Doctor Figler assessed Plaintiff's request—were not evidence-based. The DTARC's analysis was condensed into a Case Summary and provided to Defendants Junker and Harris for final decision.

Dr. Campbell was the sole author of the medical analysis section of the Case Summary. Dr. Campbell admitted that his medical analysis was based largely on his position statement. Defendants Junker and Harris deferred to Dr. Campbell's judgment on medical necessity.

In April 2022, Plaintiff received the DTARC's denial of her request for gender affirming surgery. This lawsuit followed.

### d. Procedural History

Plaintiff filed this action in April 2022, raising claims under the U.S. and North Carolina Constitutions, the Americans with Disabilities Act ("ADA"), and Section 504 of the Rehabilitation Act ("RA"). Plaintiff moved for preliminary injunction on the Eighth Amendment claim, requesting the Court order Defendants to "provide Ms. Zayre-Brown the gender-affirming surgery that she urgently needs." (Doc. No. 14). Both parties moved for summary judgment. This Court heard argument on the parties' cross motions in November 2023.

## II. LEGAL STANDARD

The Court grants summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A fact is "material" if it could affect the outcome of the suit under governing law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

The movant for summary judgment bears the burden of persuasion. That burden requires the movant to identify "those portions of the pleadings, depositions, answers to interrogatories,

and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal citations omitted). For issues on which the non-movant bears the burden of proof, the movant discharges the burden of persuasion by showing "that there is an absence of evidence to support the nonmoving party's case." Id. at 325.

If the movant meets their burden, the burden shifts to the non-movant. To meet their burden, the non-movant "must set forth specific facts showing that there is a genuine issue for trial." Id. at 322 n.3. More specifically, the non-movant must adduce sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248; accord Sylvia Dev. Corp. v. Calvert Cnty., Md., 48 F.3d 810, 818 (4th Cir. 1995). Naked allegations or denials are insufficient. Celotex, 477 U.S. 317, 324.

Considering a motion for summary judgment, the Court views the evidence and any inferences therefrom in the light most favorable to the non-movant. Anderson, 477 U.S. at 255. "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" Ricci v. DeStefano, 129 S. Ct. 2658, 2677 (2009) (quoting Matsushita v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

### III. ANALYSIS

#### a. Eighth Amendment (Deliberate Indifference) Claim

The Eighth Amendment obligates states to "provide medical care for those whom it is punishing by incarceration." Estelle v. Gamble, 429 U.S. 97, 103 (1976). States disappoint this obligation where they act with "deliberate indifference" to inmates' "serious medical needs." Id. at 103. The Eighth Amendment's scope is not static but draws from "evolving standards of decency that mark the progress of a maturing society." Trop v. Dulles, 356 U.S. 86, 100–01

7

(1958). For that reason, before deciding whether a practice "comports with the fundamental dignity that the Amendment protects," courts must consider "objective evidence of contemporary values." Ford v. Wainwright, 477 U.S. 399, 406 (1986).

To state a deliberate indifference claim, Plaintiff must establish two elements. Thorpe v. Clarke, 37 F.4th 926, 933 (4th Cir. 2022). First, she must show that she has a "serious medical need." DePaola v. Clarke, 884 F.3d 481, 486 (4th Cir. 2018). Second, she must show that officials knew of her need and related risks, but nevertheless disregarded them. Id.; see Farmer v. Brennan, 511 U.S. 825, 837 (1994). The first prong of the test is objective; the second is subjective. Hixson v. Moran, 1 F.4th 297, 302 (2021).

To satisfy the objective element, Plaintiff must show that Plaintiff has "suffered serious or significant physical or mental injury as a result of" Defendants' denial of the request for gender-affirming surgery. Strickler v. Waters, 989 F.2d 1375, 1381 (4th Cir. 1993). Even viewing the evidence in the light most favorable to Defendant, Plaintiff clears this hurdle comfortably.[5] That Defendant's denial caused Plaintiff to suffer significant injury is beyond genuine dispute.[6]

---

[5] Defendants contend that "after her surgery request was not approved, [Plaintiff] repeatedly denied having any concerns with sleep, appetite, energy level, or thoughts of self-harm or suicidal ideation." (Doc. No. 60 at 19). Plaintiff convincingly responds that Defendants cherry-pick evidence: "while Plaintiff has at times felt better than others, she has repeatedly reported severe anxiety, depression, and thoughts of self-harm and suicide." (Doc. No. 66 at 4). Indeed, Plaintiff could not have been diagnosed with GD unless she suffered "clinically significant distress or impairment." (Doc. No. 63 at 24). That is precisely why so many courts recognize GD as an objectively serious medical need. De'lonta v. Johnson, 708 F.3d 520, 525 (4th Cir. 2013); Edmo v. Corizon, Inc., 935 F.3d 757, 785 (9th Cir. 2019); Kosilek v. Spencer, 774 F.3d 63, 86 (1st Cir. 2014) (en banc); Soneeya v. Spencer, 851 F. Supp. 2d 228, 244–45 (D. Mass. 2012) (citing De'lonta v. Angelone, 330 F.3d 360, 634 (4th Cir. 2003)). Viewing the evidence in the light most favorable to Defendants does not require the Court to ignore contrary evidence that favors Plaintiff's case.

[6] As the Ninth Circuit noted in Edmo, "[f]ailure to follow an appropriate treatment plan [for GD] can expose transgender individuals to a serious risk of psychological and physical harm." 935

8

To prevail on the subjective component of the Eighth Amendment claim, Plaintiff must show that Defendants knew of and disregarded her objectively serious medical condition. See De'lonta v. Johnson, 708 F.3d 520, 525 (4th Cir. 2013) (quoting Farmer, 511 U.S. at 837). Where—as here—a deliberate indifference claim arises from prison officials' decision not to provide a course of treatment, "the essential test is one of medical necessity." Bowring v. Godwin, 551 F.2d 44, 48 (4th Cir. 1977). If prison officials knowingly refuse to provide medically necessary treatment—even if they provide other treatment consistent with the applicable standards of care—they fail to provide constitutionally adequate treatment. De'lonta, 708 F.3d at 526.[7]

Defendants knew the risks of denying Plaintiff's request for gender-affirming care. Even where prisoners have no symptoms—hardly the case here—"prison officials may not ignore medical conditions that are 'very likely to cause serious illness and needless suffering' in the future." Smith v. Carpenter, 316 F.3d 178, 188 (2d Cir. 2003) (quoting Helling v. McKinney, 509 U.S. 25, 33 (1993)).[8] Defendants accept that (1) Plaintiff suffers from GD and (2) the DAC is familiar with the WPATH Standards. The WPATH Standards dictate that GD—an objectively serious medical condition—will in some cases not resolve without gender-affirming surgery. Edmo v. Corizon, Inc., 935 F.3d 757, 770 (9th Cir. 2019) (quoting WPATH Standards of Care at 55). What's more, Plaintiff's medical records "document her history of distress, anxiety, hopelessness, self-harm, and suicidal ideation." (Doc. No. 63 at 26). Defendants reviewed those

---

F.3d at 771 (quoted in Williams v. Kincaid, 45 F.4th 759, 768 n.3 (4th Cir. 2022)).

[7] Where prison officials deny, delay, or interfere with an inmate's access to medical care, despite their knowledge of the attendant risks posed by the inmates' objectively serious medical needs, they act with deliberate indifference. Estelle, 429 U.S. at 104–05; Sharpe v. S.C. Dep't of Corr., 621 Fed. App'x 732, 734 (4th Cir. 2015).

[8] See Gordon v. Schilling, 937 F.3d 348, 359 (4th Cir. 2019) ("[I]t is inconsistent with the Eighth Amendment for a prison official to withhold treatment from an inmate who suffers from a serious, chronic disease until the inmate's condition significantly deteriorates.").

9

records, as well multiple expert recommendations concluding that gender-affirming surgery was medically necessary for Ms. Zayre-Brown. No reasonable jury could find that Defendants lacked subjective awareness that denying Ms. Zayre-Brown's request carried some risk of harm.

Plaintiff's deliberate indifference claim thus boils down to a single factual question: whether gender affirming surgery was medically necessary. This dispositive question is subject to two genuine disputes: (1) whether the DTARC applied the appropriate standard of care; and (2) whether the DTARC's medical necessity analysis afforded Plaintiff individualized consideration. These disputes prevent the Court from granting summary judgment at this time.

Courts rely on "[a]ccepted standards of care and practice within the medical community" to determine whether treatment is medically necessary. Edmo, 935 F.3d at 786; accord United States v. Derbes, 369 F.3d 579, 583 (1st Cir. 2004); Campbell v. Kallas, 936 F.3d 536, 549 (7th Cir. 2019). Accepted standards of care furnish the "objective evidence of contemporary values" that courts must consider in evaluating deliberate indifference claims. See Ford, 477 U.S. at 406. In the Fourth Circuit, requests for gender-affirming care are analyzed according to the WPATH standards. De'lonta, 708 F.3d at 526.[9] Where gender-affirming surgery is medically necessary for an inmate according to the WPATH Standards, but a prison official consciously disregards the risk of failing to provide that surgery, the prison official is deliberately indifferent. Id.[10]

Here, as in Edmo, a reasonable jury could find that Defendants did not credibly apply the

---

[9] The Circuit more recently reaffirmed its recognition of the WPATH Standards as "authoritative" in Grimm v. Gloucester Cnty. School Bd., 972 F.3d 586, 595. The Grimm Court adopted the Ninth Circuit's conclusion that besides WPATH, "[t]here are no other competing, evidence-based standards that are accepted by any nationally or internationally recognized medical professional groups." Id. at 595–96 (quoting Edmo, 935 F.3d at 769); see also Williams v. Kincaid, 45 F.4th 759, 768 n.3 (4th Cir. 2022).

[10] See also Campbell, 936 F.3d at 553 (Wood, J., dissenting) (citing Rosati v. Igbinoso, 791 F.3d 1037, 1040 (9th Cir. 2015); De'lonta, 708 F.3d at 525–26); Edmo, 935 F.3d at 794; Clark v. Quiros, 2023 WL 6050160, at *18 (D. Conn. 2023); Iglesias v. Federal Bureau of Prisons, 2021 WL 6112790 (S.D. Ill. 2021).

10

WPATH Standards. See 935 F.3d at 787. Dr. Campbell, a DTARC Member and the DAC's Chief Medical Officer, drafted the "DTARC medical necessity position statement on gender reassignment surgery," in which he concluded that gender-affirming surgery is never medically necessary for GD patients. Dr. Campbell's position is plainly at odds with the WPATH Standards. While Defendants maintain that the DTARC did not rely on Dr. Campbell's position paper, a reasonable jury could disagree and find that the DTARC's decision to deny gender-affirming care to Ms. Zayre-Brown contradicted the WPATH Standards.

A reasonable jury could also find that the DAC's ETMO policy, especially Dr. Campbell's role on the DTARC, operates in practice as an unconstitutional de facto ban on gender-affirming surgery. The DTARC has denied every request for gender-affirming surgery it has ever received—over thirty in total. Dr. Campbell's conclusion, and DTARC members' apparent deference thereto, that gender-affirming surgery is never medically necessary for GD offers more evidence of a sub rosa ban. A "blanket, categorical denial of medically indicated surgery . . . is the paradigm of deliberate indifference." Colwell v. Bannister, 763 F.3d 1060, 1063 (9th Cir. 2014); see Gordon v. Schilling, 937 F.3d 348 (4th Cir. 2019).[11] While the DTARC purports to conduct individualized reviews of surgical requests, (Doc. No. 60 at 4–5), a categorical ban need not be de jure to be unconstitutional. The Eighth Amendment is violated where an administrative policy—though it could theoretically approve a surgery—functions in practice as a de facto denial.[12]

---

[11] Decisions regarding the medical necessity of gender-affirming surgery must be based on an "individualized medical evaluation" and not a "blanket rule." Kosilek, 221 F. Supp. 2d at 193 (quoting Allard v. Gomez, 9 F. App'x 793, 785 (9th Cir. 2001)); see Fields v. Smith, 653 F.3d 550 (7th Cir. 2011).

[12] "The majority of Courts hold that a blanket policy (or de facto ban) [on gender-affirming care for GD-afflicted inmates], which does not allow for the consideration of an inmate's particular medical needs, could violate the Eighth Amendment." Fisher v. Federal Bureau of Prisons, 484

11

### b. North Carolina Constitutional Claim

Article I, Section 27 of the North Carolina Constitution prohibits "cruel or unusual punishments." Section 27's protection is at least as broad as the Eighth Amendment's. State v. Green, 348 N.C. 588, 603 (1998); State v. Kelliher, 2022-NCSC-77, ___ N.C. ___, ¶¶ 48, 51 (Jun. 17, 2022). But a direct cause of action under the North Carolina Constitution—known as a Corum claim—arises only where the Plaintiff has no other "adequate state remedy." Davis v. Town of S. Pines, 116 N.C. App. 663, 675, 449 S.E.2d 240, 247 (1994); Corum v. UNC, 413 S.E.2d 276, 289 (N.C. 1992).

Plaintiff concedes that the State Tort Claims Act permits prisoners to sue North Carolina in the Industrial Commission for ordinary negligence. (Doc. No. 66 at 31) (citing N.C. GEN. STAT. § 143-291). But the Industrial Commission lacks jurisdiction over allegations of reckless conduct. (Id.) (quoting Collins v. N.C. Parole Comm'n, 456 S.E.2d 333, 336 (N.C. Ct. App. 1995). The Supreme Court has long held that the subjective component of Eighth Amendment deliberate indifference claims is assessed according to a recklessness standard. Farmer, 511 U.S. at 836. Recognizing the recklessness standard applicable to deliberate indifference claims, the Middle District of North Carolina found in Jarvis v. Joyner that a § 1983 deliberate indifference claim would be jurisdictionally barred from the Industrial Commission. No. 1:14CV254, 2020 WL 956801, at *6 n.2 (M.D.N.C. Feb. 27, 2020). The same is true here.

### c. Disability (ADA and RA) Claims

Title II ADA and Section 504 RA claims—like those brought by Plaintiff—"can be combined for analytical purposes." Seremeth v. Bd. of Cnty. Comm'rs Frederick Cnty., 673 F.3d

---

F. Supp. 3d 521, 543 (N. D. Ohio 2020) (citing Kosilek, 774 F.3d at 91; Fields, 653 F.3d at 550, 552, 556; Rosati, 791 F.3d at 1040; Keohane v. Fl. Dep't of Corr. Sec'y, 952 F.3d. 1257, 1266–67 (11th Cir. 2020)); see also Nosworthy v. Beard, 87 F. Supp. 3d 1164, 1191 (N.D. Cal. 2015); Edmo, 358 F. Supp. 3d at 1127; Iglesias, 2021 WL 6112790 at *18–19, *27 (S.D. Ill. 2021).

12

333, 336 n.1 (4th Cir. 2012) (cleaned up). The ADA and RA prohibit public entities from discriminating against individuals with disabilities or excluding disabled persons from the benefits of services, programs, and activities to which they are otherwise entitled. Williams v. Kincaid, 45 F.4th 759 (4th Cir. 2022), cert. denied, 143 S. Ct. 2414 (2023). GD is a disability, and GD-afflicted persons are protected by the ADA. Id. at 766, 768.

There are three species of ADA claim: intentional discrimination, disparate impact, and failure to accommodate. Richardson, 52 F.4th at 619. Each species of ADA claim includes an element reducible to the disputed medical necessity question identified above. Consequently, the Court will deny summary judgment on Plaintiff's ADA claims.

To state an intentional discrimination claim, Plaintiff must show that "(1) they have a disability; (2) they are otherwise qualified to receive the benefits of a public service, program, or activity; and (3) they were denied the benefits of such service, program, or activity, or otherwise discriminated against, on the basis of their disability." Nat'l Fed'n of the Blind v. Lamone, 813 F.3d 494, 503 (4th Cir. 2016). Whether Plaintiff is being "denied" care or requesting treatment for which she is "unqualified" boils down to the predicate question of medical necessity.

To state a disparate impact claim, Plaintiff must (i) "identify the challenged [] practice or policy, (ii) demonstrate that the practice or policy had an adverse impact on the plaintiff with a disability, and (iii) demonstrate a causal relationship between the identified practice and the disparate impact." Williams, 296 F. Supp. 3d at 789. Whether the DAC's policy of subjecting GD-specific healthcare requests to the DTARC as opposed to the mainstream utilization review process—i.e., whether the ETMO policy constitutes a de facto ban on gender-affirming surgery—likewise remains a disputed question of material fact.

Finally, to state a failure to accommodate claim, Plaintiff must "propose a reasonable

13

modification to the challenged public program that will allow them the meaningful access they seek." Lamone, 813 F.3d at 507. Defendants contend Plaintiff fails to establish that gender-affirming surgery is <u>necessary</u> for Ms. Zayre-Brown to fully participate in prison life or services. Defendants thus restate a key factual dispute: the medical necessity of gender-affirming surgery.

## IV. CONCLUSION

Two disputes define this case. Although they preclude resolution on summary judgment, a full bench trial on these narrow questions is unnecessary. Instead, in the interest of judicial economy, the Court will hold an evidentiary hearing on February 20, 2024.[13] The Court identifies the questions presented for the hearing as follows:

1. Whether gender-affirming surgery is medically necessary for Ms. Zayre-Brown according to the WPATH Standards of Care.[14]

2. Whether the ETMO policy, specifically the DTARC and Dr. Campbell's role therein, amounts to a <u>de facto</u> ban on gender-affirming surgery for GD patients.

North Carolina recognizes gender dysphoria as a mental disorder. It says that it further recognizes that gender reassignment surgery can be medically necessary in some cases. In determining medical necessity, it cannot then set up a sham process where the answer is always no.

---

[13] This procedural approach, originally adopted by the District of Idaho, was blessed by the Ninth Circuit in Edmo.

[14] Mere disagreement between prison officials and an inmate—or an inmate's private doctor or medical expert—falls short of deliberate indifference. Hixson v. Moran, 1 F.4th 297 at 303; Jackson v. Lightsey, 775 F.3d at 174; Grimm, 972 F.3d at 596 n.2 (quoting Kosilek, 774 F.3d at 90). But the Eighth Amendment does not demand that courts defer to prison doctors or administrators, nor does it allow a single dissenting medical opinion to carry the day for Defendants. Edmo, 935 F.3d at 786; Kosilek, 774 F.3d at n.12. While "cases involving dueling medical experts will typically not support an Eighth Amendment claim," Fisher, 484 F. Supp. 3d at 541, a district court may discredit "the contrary opinions of the State's treating physician and medical experts" who "lacked expertise and incredibly applied . . . the WPATH Standards of Care." Edmo 935 F.3d at 787.

After the evidentiary hearing, the Court will permit both sides to renew their summary judgment motions. The Court will then assess Plaintiff's likelihood of success on the merits and resolve her request for injunctive relief.

## V. ORDER

**IT IS, THEREFORE, ORDERED** that the parties' cross motions for summary judgment, (Doc. Nos. 59, 62), are **DENIED WITHOUT PREJUDICE**.

**IT IS FURTHER ORDERED** that the parties **SHALL** meet and confer, and no later than February 13, 2024, file a consent motion stipulating to a procedure for the evidentiary hearing in this matter.

The Clerk is respectfully instructed to set an evidentiary hearing in this matter for February 20, 2024.

The Clerk is further instructed to continue the trial in this matter to the April 2024 Term.

Max O. Cogburn Jr
United States District Judge