IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| KANAUTICA ZAYRE-BROWN,<br><br>    Plaintiff,<br><br>v.<br><br>THE NORTH CAROLINA DEPARTMENT OF ADULT CORRECTION, *et al.*,<br><br>    Defendants. | No. 3:22-cv-00191-MOC-DCK |

## BRIEF IN SUPPORT OF PLAINTIFF'S RENEWED MOTION FOR PARTIAL SUMMARY JUDGMENT

The Court recently issued an order on the parties' cross-motions for summary judgment. It held that Plaintiff had satisfied the objective prong of her Eighth Amendment claim as a matter of law—"[t]hat Defendant's denial caused Plaintiff to suffer significant injury is beyond genuine dispute." *Zayre-Brown v. N.C. Dep't of Pub. Safety*, No. 3:22-CV-191-MOC-DCK, 2024 WL 410243, at *4 (W.D.N.C. Feb. 2, 2024) (Doc. 92). On the subjective prong, the Court held that "Defendants knew the risks of denying Plaintiff's request for gender-affirming [surgery]." *Id.* at *5.

The Court ultimately denied the motions without prejudice, however, because an evidentiary hearing was necessary to resolve two issues of fact: "Whether gender-affirming surgery is medically necessary for Ms. Zayre-Brown according to the WPATH Standards of Care," and "[w]hether the ETMO policy, specifically the DTARC and Dr. Campbell's role therein, amounts to a de facto ban on gender-

1

affirming surgery for [gender dysphoria] patients." *Id.* at *7. The order explains that "[a]fter the evidentiary hearing, the Court will permit both sides to renew their summary judgment motions. The Court will then assess Plaintiff's likelihood of success on the merits and resolve her request for injunctive relief." *Id.* at *8.

That hearing occurred on February 20. (*See* Ex. 6, Hearing Transcript). The evidence presented confirmed that under the WPATH Standards, gender-affirming surgery is medically necessary to treat Plaintiff's gender dysphoria. She meets the WPATH eligibility criteria and has exhausted all other treatment options; surgery will likely alleviate her severe distress; and that distress will persist while Plaintiff has male genitalia. Defendants did not seriously dispute any of this. That is enough for Plaintiff to prevail on her Eighth Amendment claim—prisoners seeking gender-affirming care, or any other kind of medical treatment, need not prove a blanket ban on that treatment. *See Edmo v. Corizon, Inc.*, 935 F.3d 757, 797 (9th Cir. 2019); *Clark v. Quiros*, No. 3:19-CV-00575-VLB, 2023 WL 6050160, at *18 (D. Conn. Sept. 15, 2023).

But the evidence does indeed show a *de facto* ban. Defendants have never approved gender-affirming surgery to treat gender dysphoria. Dr. Campbell, who is DAC's chief medical officer, believes that gender-affirming surgery is never medically necessary for anyone. He committed that view to paper twice before this case began, hoping that "no further consideration would be given to [gender-affirming surgery] within our system." (Ex. 5, Defs. Hearing Ex. 10 at 1). Defendants testified at the hearing that they *would* authorize surgery if a patient's symptoms became "extreme,"

"severe," and "debilitating." But even if sincere, that position flouts the WPATH Standards, and the Eighth Amendment does not allow Defendants to ignore a prisoner's treatable medical condition until it culminates in serious harm. *Helling v. McKinney*, 509 U.S. 25, 33-34 (1993).

Accordingly, Plaintiff now renews her motion for partial summary judgment (Doc. 62) and incorporates by reference her briefing in support of that motion (Docs. 63, 68). She offers the additional following argument, and respectfully asks the Court to (1) grant her summary judgment on her Eighth Amendment and ADA claims, (2) issue a permanent injunction, and (3) grant her summary judgment as to Defendants' liability for damages under her state constitutional claim.

## FACTS

"In the Fourth Circuit, requests for gender-affirming care are analyzed according to the WPATH standards." *Zayre-Brown*, 2024 WL 410243, at *5 (citing *De'lonta v. Johnson*, 708 F.3d 520, 526 (4th Cir. 2013)). At the evidentiary hearing, the Court heard expert testimony from Dr. Randi Ettner; she is a co-author of the two most recent editions of the WPATH Standards who has treated thousands of patients with gender dysphoria and published extensively on the subject. (Tr. 102-05; Ex. 1, Pl. Hearing Ex. 1). Dr. Ettner also personally examined Plaintiff and reviewed her medical records. (Tr. 105:18-106:8).

Dr. Ettner explained that under the WPATH Standards, a patient becomes eligible for gender-affirming genital surgery by meeting certain criteria. (*Id.* 107:13-108:5). Those are:

3

1. Persistent, well documented gender dysphoria;

2. Capacity to make a fully informed decision and to consent for treatment;

3. Age of majority in a given country;

4. If significant medical or mental health concerns are present, they must be well controlled;

5. 12 continuous months of hormone therapy as appropriate to the patient's gender goals (unless the patient has a medical contraindication or is otherwise unable or unwilling to take hormones).

6. 12 continuous months of living in a gender role that is congruent with their gender identity.

(Ex. 2, Pl. Hearing Ex. 2 at 106). Dr. Ettner testified that Plaintiff meets these criteria. (Tr. 108:6-12). Defendants have never asserted otherwise.

As to medical necessity, Dr. Ettner explained that the WPATH Standards reference the definition used by the American Medical Association, which is "a broad umbrella term encompassing all forms of treatment." (Tr. 110:14-17). It reads:

> Health care services that a physician and/or health care professional, exercising prudent clinical judgment, would provide to a patient for the purpose of preventing, evaluating, diagnosing or treating an illness, injury, disease or its symptoms, and that are: (a) in accordance with generally accepted standards of medical practice; (b) clinically appropriate, in terms of type, frequency, extent, site and duration, and considered effective for the patient's illness, injury, or disease; and (c) not primarily for the convenience of the patient, physician, or other health care provider, and not more costly than an alternative service or sequence of services at least as likely to produce equivalent therapeutic or diagnostic results as to the diagnosis or treatment of that patient's illness, injury or disease.

4

(Ex. 3, Pl. Hearing Ex. 3 at S16-17).

Dr. Ettner testified that this definition is "consistent with how the term 'medical necessity' is generally understood in the field of medicine[.]" (Tr. 111:1-4). And for gender-affirming surgery to be medically necessary to treat gender dysphoria, a patient does not need to be suicidal, engage in self-harm, or otherwise have "debilitating" or "severe" symptoms. (*Id.* 114:16-22).

Turning to Plaintiff's circumstances, Dr. Ettner agreed that providing Plaintiff with gender-affirming genital surgery is medically necessary as defined by the AMA and under the WPATH Standards. (*Id.* 111:14-112:12). Dr. Ettner further explained why, at this point in Plaintiff's treatment, there is no alternative treatment available:

> Mrs. Zayre-Brown is a woman. She lived as a woman in the community for years before her incarceration. She is a wife. She is a mother. She lives among women now, and she has the same hormones as women who are of her same age, her peers, her female peers. [] And yet she has this male organ, this detested organ, which causes her intractable distress. And nothing other than removal of the phallus and the creation of typical, female-appearing genitals, which would be accomplished with vulvoplasty, would not only attenuate her gender dysphoria, but it would cure her gender dysphoria.

(*Id.* 112:12-22).

As the Court previously found, other clinicians who examined Plaintiff also consider gender-affirming surgery medically necessary for her: "Plaintiff was evaluated by Dr. Bradley Figler, a surgeon selected by the DAC who has expertise in

gender-affirming surgery. Dr. Figler concluded that Plaintiff met the requirements for gender-affirming genital surgery. Based on Plaintiff's persistent GD, Dr. Figler further concluded that gender-affirming surgery was medically necessary for Plaintiff." *Zayre-Brown*, 2024 WL 410243, at *2. The same is true for Plaintiff's treating endocrinologist, Dr. Donald Caraccio, and mental health provider, Jennifer Dula. *Id.* Even Defendants' expert psychologist testified at deposition that gender-affirming surgery is "necessary" to treat Plaintiff's gender dysphoria, which will persist so long as Plaintiff has a phallus. (Doc. 62-1, Boyd Dep. 166:21-25, 167:12-21).

At the hearing, Defendants offered no expert testimony. They instead had Drs. Campbell, Peiper, and Sheitman testify. All three confirmed that they lack experience in evaluating and treating gender dysphoric patients. (Tr. 25:17-21, 64:6-9, 85:15-86:6). The Court also observed that "nobody is an expert in this particular area" for Defendants. (*Id.* 121:12-13). Defendants did not assert that denying Plaintiff gender-affirming surgery was appropriate under the WPATH Standards.

Dr. Campbell discussed the "Position Statement" he authored in March 2022. There he wrote, "After extensive and objective review and analysis of hundreds of studies and other publications, it has been determined that gender reassignment surgery (GRS), as a treatment for gender dysphoria, is not medically necessary." (Ex. 4, Defs. Hearing Ex. 11 at 2). The document offers no exceptions to this rule. Dr. Campbell further wrote that "to support these procedures given all these concerns would be in conflict with the most critical imperative in medicine, '*Primum non nocere*' (First, do no harm')." (*Id.* at 11). He also attacks WPATH as "'activist-led'

6

rather than 'evidence-led.'" (*Id.* at 10).

Dr. Campbell circulated this document to the DTARC to provide "a common operating picture or a common baseline understanding of the medical literature as it exists today." (Tr. 53:25-54:1-3). "If approved," he wrote, "the position statement would be forwarded to our FTARCs and no further consideration would be given to GRS within our system." (*Id.* 59:3-6 (quoting Defs. Hearing Ex. 10 at 1)). Other DTARC members supported the Position Statement. (*Id.* 97:1-23). Defendants did not formally adopt this document as policy, but they did not make that decision until after denying Plaintiff's request for surgery. (*See id.* 122:20-22).

Dr. Campbell testified that he still thinks the concerns discussed in his Position Statement "are valid." (*Id.* 60:6-14). He also confirmed that he wrote the medical analysis portion of the "Case Summary," which explains the DTARC's rationale for denying Plaintiff surgery. (*Id.* 70:14-16). There Dr. Campbell repeats his view that gender-affirming surgery is never medically necessary to treat gender dysphoria; that providing such surgery risks violating the Hippocratic Oath; and that the WPATH Standards are illegitimate. (Ex. 5, Defs. Hearing Ex. 6 at 2-5). His medical analysis did not address Plaintiff's circumstances at all. (*Id.*; Tr. 72:16-19).

Dr. Campbell also claimed, however, that he did not intend for these documents to serve as a blanket prohibition on gender-affirming surgery. (*Id.* 54:19-22). Rather, he *would* approve surgery if a patient's symptoms were "extreme" or "debilitating." (*Id.* 55:15-21; 56:11-13). He did not ground this view under the WPATH Standards or any other clinical guideline.

7

As for Drs. Sheitman and Peiper, the Court has already found that they "deferred to Dr. Campbell with respect to medical necessity." *Zayre-Brown*, 2024 WL 410243, at *3. Dr. Peiper agreed that "[n]obody on the DTARC disagreed with Dr. Campbell's interpretation of the literature" on gender-affirming surgery. (Tr. at 40:23-25). Dr. Peiper's hearing testimony further echoed Dr. Campbell's: he would vote to approve gender-affirming surgery if a patient's symptoms were "severe" and "debilitating." (*Id.* 19:25-20:11; 25:2-7). Dr. Sheitman testified that he did not think symptoms had to be "severe and debilitating," but that a patient had to exhibit "persistent dysphoria" for surgery to become medically necessary. (*Id.* 100:21-22).

## LEGAL STANDARD

In its recent order, the Court noted that it would adopt the procedure used by the district court in *Edmo*, holding an evidentiary hearing before "assess[ing] Plaintiff's likelihood of success on the merits and resolv[ing] her request for injunctive relief." *Zayre-Brown*, 2024 WL 410243, at *8. A permanent injunction is appropriate when a plaintiff achieves actual success on the merits; faces irreparable injury without an injunction; damages alone are inadequate; and the balance of equities and public interest favor injunctive relief. *See eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

## ARGUMENT

Under the Eighth Amendment, prison officials show deliberate indifference by "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976)

(footnote omitted). "'A delay in treatment may constitute deliberate indifference if the delay exacerbated the injury or unnecessarily prolonged an inmate's pain.'" *Sharpe v. S.C. Dep't of Corr.*, 621 Fed. App'x 732, 734 (4th Cir. 2015) (quoting *McGowan v. Hulick,* 612 F.3d 636, 640 (7th Cir. 2010)).

At the evidentiary hearing, the Court stated that this case hinges on whether Defendants have a "legitimate process" for approving gender-affirming surgery. (Tr. at 2:12-4:13). A sham process imposing a *de facto* ban on medical care will indeed violate the Eighth Amendment. Plaintiff must respectfully point out, however, that prison officials also violate the Eighth Amendment by denying medically necessary care even if not because of a blanket ban. *See, e.g.*, *Edmo*, 935 F.3d at 794; *Clark*, 2023 WL 6050160, at *28. Courts must conduct an individualized medical necessity analysis, which often involves assessing the soundness of medical judgments. *See De'lonta*, 708 F.3d at 526 & n.4; *Gordon v. Schilling*, 937 F.3d 348, 361 (4th Cir. 2019). The Court acknowledged this in its recent order. *See Zayre-Brown*, 2024 WL 410243, at *7 n.14 ("[A] district court may discredit 'the contrary opinions of the State's treating physician and medical experts' who 'lacked expertise and incredibly applied . . . the WPATH Standards of Care." (quoting *Edmo*, 935 F.3d at 787)).

Under either approach, the record overwhelmingly favors Plaintiff. Every clinician in the record who has expertise in treating gender dysphoria, and everyone who personally evaluated Plaintiff, agrees that surgery is medically necessary for her. (*See* Doc. 66 at 6-7). At the same time, Defendants' method for evaluating patients

9

like Plaintiff flouts the WPATH Standards and amounts to "a sham process where the answer is always no." *Zayre-Brown*, 2024 WL 410243, at *8.

### I. Under the WPATH Standards of Care, gender-affirming surgery is medically necessary to treat Plaintiff's gender dysphoria.

The Court's summary judgment order explained that an unresolved issue is "[w]hether gender-affirming surgery is medically necessary for Ms. Zayre-Brown according to the WPATH Standards of Care." *Id.* at *7. The issue depends on "(1) whether the DTARC applied the appropriate standard of care; and (2) whether the DTARC's medical necessity analysis afforded Plaintiff individualized consideration." *Id.* at *5. The answer to each question is no.

#### A. Defendants failed to apply the appropriate standard of care.

Under the Eighth Amendment, prison medical care must be "adequate to address the prisoner's serious medical need." *De'lonta*, 708 F.3d at 526. While any deviation from a standard of care might not violate the Eighth Amendment, these standards are highly relevant to Eighth Amendment claims. *See Zayre-Brown*, 2024 WL 410243, at *5 (citing cases).

As detailed above, Plaintiff meets the WPATH criteria for gender-affirming surgery. Despite years of talk therapy, hormone therapy, living as a woman, and an orchiectomy, she continues to experience the painful effects of gender dysphoria. (*See* Doc. 63 at 14-17,19-22). Her treating providers unanimously agree that surgery is medically necessary and appropriate for her. (*See* Doc. 68 at 6-9). Defendants agree that Plaintiff had gender dysphoria when they denied her surgery, which means she was experiencing clinically significant distress at the time. (*See* Tr.

10

31:17-23). They have never disputed that Plaintiff meets the WPATH criteria for surgery, nor have they identified other treatment that could cure or substantially alleviate her condition.

Instead, Drs. Campbell and Peiper testified that they would have approved surgery if Plaintiff's symptoms were "extreme," "debilitating," and "severe." (Tr. at 55:15, 20, 24; 56:11-13; 60:21-25).[1] Plaintiff's gender dysphoria has been severe for years. (*Id.* 115:9-116:9). But the WPATH Standards do not require a patient to suffer so greatly before surgery becomes necessary. (*Id.* 114:16-115:8). Indeed, mental instability may disqualify someone for surgery under the WPATH Standards. (Tr. 100:23-101:1). And "it is inconsistent with the Eighth Amendment for a prison official to withhold treatment from an inmate who suffers from a serious, chronic disease until the inmate's condition significantly deteriorates." *Gordon*, 937 F.3d at 359.[2]

For these reasons, the evidence conclusively demonstrates that gender-affirming surgery is medically necessary under the WPATH Standards to treat Plaintiff's gender dysphoria. Defendants either imposed requirements that are

---

[1] Dr. Sheitman testified that the standard is "persistent dysphoria," which is consistent with the WPATH Standards. (Tr. 100:21-22). As noted above, Defendants have never disagreed that Plaintiff continues to have persistent gender dysphoria.

[2] Defendant Gary Junker, who is one of the final decision-makers for gender-affirming surgery requests, previously testified that Plaintiff being "stable from a mental health standpoint was a factor in favor of her being a good candidate for surgery." (Doc. 62-10, Junker Dep. 113:5-9).

11

inconsistent with the WPATH Standards, consider the Standards illegitimate, or both.

### B. Defendants did not afford Mrs. Zayre-Brown individualized consideration for gender-affirming surgery.

Plaintiff has proven that she has an objectively serious medical condition, and that Defendants have long known of this condition yet refused to provide medically necessary care. That is all Plaintiff must show to succeed on her Eighth Amendment claim. *De'lonta*, 708 F.3d at 525.

The record further shows, however, that Defendants have imposed a *de facto* ban on gender-affirming surgery to treat gender dysphoria. They have never authorized such treatment. Shortly before this litigation began, Dr. Campbell *twice* wrote why he thinks gender-affirming surgery is never medically necessary for anyone. Indeed, Dr. Campbell thought that providing that surgery would violate the Hippocratic Oath. Other DTARC members supported the Position Statement, and while Defendants eventually decided against formally adopting it, that did not happen until *after* they denied Plaintiff's surgery request. Today, Dr. Campbell still believes that his views expressed in the Position Statement are "valid." And the medical analysis in the Case Summary—which explains the basis for denying Plaintiff surgery—parrots the Position Statement nearly word for word while not analyzing Plaintiff's individual needs at all. (*Supra* at 6-8).

Yet Dr. Campbell also testified that he did not mean what he wrote—he really thinks gender-affirming surgery can be medically necessary for some patients. (Tr. at 54:19-22). That testimony is not credible. Dr. Campbell is an intelligent person

12

who put significant time into crafting the Position Statement and Case Summary. (*See id.* 65:5-23). If he truly meant to provide exceptions to his rule, he would have done so. But he did not. Dr. Campbell hoped that "no further consideration would be given to [gender-affirming surgery] within our system." (*Id.* 59:1-6 (quoting Defs. Ex. 10 at 1)). As the Court observed, "[I]t's obvious Dr. Campbell has a problem with" gender-affirming surgery. (*Id.* 122:1).

As for Drs. Peiper and Sheitman, the Court already found that they deferred to Dr. Campbell on the medical-necessity determination. *Zayre-Brown*, 2024 WL 410243, at *3. And even if they were not influenced by the Position Statement itself, they were undoubtedly influenced by Dr. Campbell's views. Dr. Peiper agreed that "[n]obody on the DTARC disagreed with Dr. Campbell's interpretation of the literature" on gender-affirming surgery. (Tr. 40:23-25).

But assume that Dr. Campbell's testimony is sincere and Drs. Peiper and Sheitman reached the same conclusions about Plaintiff independently. The record still shows that Plaintiff did not receive meaningful, individualized consideration. The Case Summary gives the medical analysis from the full DTARC—not just Dr. Campbell—for denying surgery, and that analysis provided zero individualized consideration for Plaintiff. (*Id.* 70:14-16; 72:16-21). No defendant had any concern that Plaintiff specifically would regret surgery or otherwise face risks that weighed against surgery. (*E.g., id.* 72:4-15). Defendants did not even bother to contact Plaintiff's treating clinicians about why they considered surgery necessary. (*Id.* 70:4-7).

13

Accordingly, the evidence shows that Defendants did not provide Plaintiff with meaningful, individualized consideration for surgery.

### C. Plaintiff should also prevail on her ADA claims.

The Court addressed Plaintiff's ADA intentional discrimination claim in its recent order: "Whether Plaintiff is being 'denied' care or requesting treatment for which she is 'unqualified' boils down to the predicate question of medical necessity." *Zayre-Brown*, 2024 WL 410243, at *5. Likewise, Plaintiff's failure-to-accommodate claim hinges on "the medical necessity of gender-affirming surgery." *Id.* As discussed above, Plaintiff has proven the medical necessity of gender-affirming surgery. Therefore, she should prevail on her ADA claims as well as her Eighth Amendment claim.

## II. A permanent injunction is warranted.

To obtain a permanent injunction, Plaintiff must achieve "actual success" on the merits of a claim. *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 546 n.12 (1987). She must also demonstrate "irreparable injury"; "that remedies available at law, such as monetary damages, are inadequate to compensate for that injury"; the "balance of hardships" favor equitable relief; and "the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

Plaintiff satisfies all factors. If the Court grants her summary judgment on her Eighth Amendment or ADA claims, she will have achieved actual success on the merits. Proving a civil rights violation "constitutes irreparable harm for purposes of

14

equitable jurisdiction." *Ross v. Meese*, 818 F.2d 1132, 1135 (4th Cir. 1987). This harm is ongoing, so money damages alone are inadequate. *See Edmo*, 935 F.3d at 797. Defendants will suffer no harm by complying with civil rights law and their own policies. *See Leaders of a Beautiful Struggle v. Baltimore Police Dep't*, 2 F.4th 330, 346 (4th Cir. 2021) (en banc). And "upholding constitutional rights is in the public interest." *Legend Night Club v. Miller*, 637 F.3d 291, 303 (4th Cir. 2011).

Accordingly, a permanent injunction is necessary. The Court should order Defendants to immediately arrange for Plaintiff to be provided gender-affirming genital surgery as prescribed by her treating physicians.

### III. Defendants are liable to Plaintiff under the North Carolina Constitution for denying her medically necessary care.

The Court held that Plaintiff may bring her claim for damages under Article I, Section 27 of the North Carolina Constitution. *Zayre-Brown*, 2024 WL 410243, at *6. "Section 27's protection is at least as broad as the Eighth Amendment's." *Id.* Therefore, Plaintiff will prevail on her Section 27 claim if she establishes a serious medical need, and that Defendants "knew of her need and related risks, but nevertheless disregarded them." *Id.*

The Court has already held that Plaintiff satisfies the Eighth Amendment's objective component: "Even viewing the evidence in the light most favorable to Defendant, Plaintiff clears this hurdle comfortably. That Defendant's denial caused Plaintiff to suffer significant injury is beyond genuine dispute." *Id.* at *4. On the subjective component, the Court held that "Defendants knew the risks of denying Plaintiff's request for gender-affirming care." *Id.* at *5. And the testimony from the

15

evidentiary hearing confirmed that gender-affirming surgery is medically necessary to treat Plaintiff's gender dysphoria.

Accordingly, Plaintiff has satisfied all elements of her Section 27 claim as a matter of law. The Court should grant summary judgment as to Defendants' liability, with the amount of damages to be determined at trial.

## **CONCLUSION**

The Court should grant summary judgment on Plaintiff's claims for injunctive relief and enter a permanent injunction requiring Defendants to immediately arrange for Plaintiff to undergo gender-affirming genital surgery as prescribed by her treating physicians at UNC. The Court should further grant summary judgment as to Defendants' liability on Plaintiff's state constitutional claim for damages.

Respectfully submitted, this 29th day of February, 2024.

>*/s/ Daniel K. Siegel*
>Jaclyn A. Maffetore
>NC Bar No. 50849
>Daniel K. Siegel
>NC Bar No. 46397
>Michele Delgado
>NC Bar No. 50661
>ACLU OF NORTH CAROLINA
>LEGAL FOUNDATION
>jmaffetore@acluofnc.org
>dsiegel@acluofnc.org
>mdelgado@acluofnc.org
>(919) 592-4630
>
>Christopher A. Brook
>NC Bar No. 33838
>PATTERSON HARKAVY LLP
>cbrook@pathlaw.com

Jon W. Davidson*
(admitted only in California)
L. Nowlin-Sohl*
(admitted only in Washington)
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
jondavidson@aclu.org
lnowlin-sohl@aclu.org

*admitted *pro hac vice*


*Counsel for Plaintiff*

**CERTIFICATE OF SERVICE**

I certify that on February 29, 2024, I electronically filed the foregoing document using the ECF system which will send notification of such filing to all counsel of record.

*/s/ Daniel K. Siegel*
Daniel K. Siegel

*Counsel for Plaintiff*
