1          UNITED STATES DISTRICT COURT
      FOR THE WESTERN DISTRICT OF NORTH CAROLINA
2               CHARLOTTE DIVISION

3    KANAUTICA ZAYRE-BROWN,          )
                                     )
4              Plaintiff,            )
                                     )
5              vs.                   )    DOCKET NO. 3:22-cv-191
                                     )
6                                    )
     NORTH CAROLINA DEPARTMENT OF    )
7    ADULT CORRECTIONS, et al.,      )
                                     )
8              Defendants.           )

9

10              TRANSCRIPT OF MOTION HEARING
         BEFORE THE HONORABLE MAX O. COGBURN, JR.
11           UNITED STATES DISTRICT COURT JUDGE
                   FEBRUARY 20, 2024
12

13   APPEARANCES:

14   On Behalf of the Plaintiff:

15       Jon W. Davidson
         Li Nowlin-Sohl
16       American Civil Liberties Union Foundation
         125 Broad Street, 18th Floor
17       New York, New York 10004

18       Jaclyn Maffetore
         Daniel Kohle Siegel
19       American Civil Liberties Union of North Carolina
         P.O. Box 28004
20       Raleigh, North Carolina  27611

21
     On Behalf of the Defendants:
22
         Stephanie Ann Brennan
23       Orlando Luis Rodriguez
         North Carolina Department of Justice
24       114 West Edenton Street
         Raleigh, North Carolina  27602
25

Deborah Cohen-Rojas, R.D.R., C.R.R., F.C.R.R.
Official Court Reporter
Deborah_CohenRojas@ncwd.uscourts.gov  704.350.7497
*Proceedings recorded by mechanical stenography, transcript
produced by computer-aided transcription.*

THE COURT:  Okay.  I want to disabuse everybody about what this case is about.  This case is not about which side has the best medical evidence.  This case is about whether or not there is a legitimate hearing process being done by the State of North Carolina.  If there is a legitimate disagreement between parties, the courts are not going to step into the middle of this because that's all we'll be doing, doctors on this side, doctors on that side, and making a call.

I thought, when I gave out my order, that it was pretty clear what this case was about.  If the answer -- if -- if North Carolina has a procedure where the only person that really is important in that procedure says, in spite of the fact that this is a medical disability and may rise to the level of medical necessity, and that person goes, no, that can never happen and that's the decision-maker, that is not a legitimate procedure.  And if that's what North Carolina is doing, they better change the procedure.

This is not about the plaintiff bringing in a bunch of witnesses that say, well, we think that we ought to be cutting these things off and fixing this thing up because that's what we do.  This -- and then North Carolina says, well, we've looked at it and, at a legitimate hearing, we have decided this

1  is not a medical necessity.  Then North Carolina is going to

2  win if that happens.

3       But if the -- if -- if, every time, the answer is no

4  because the head of this thing says it is always no and the

5  people that are brought in on the committee look to that

6  person, that is not a legitimate process, and North Carolina

7  would lose because it does not yet have a legitimate process on

8  this issue.

9       I understand this issue is a little odd for some people.

10 There are some people who cannot -- who under no circumstances

11 would ever realize that this happens, that people are born with

12 one body and the mind of somebody else.  But apparently that

13 occurs.  Science tells us that is occurring, and we're going to

14 have to get our arms around it, whether we like it or not.

15      So when I issued this order, it was not my belief that

16 everybody understands that.  But I understand the plaintiffs

17 want to bring in a bunch of physicians to say this kind of

18 thing is a medical necessity and our side is better than their

19 side.  That doesn't matter.

20      What I'm looking at is whether North Carolina's side is

21 even legitimate today on this issue or is Dr. Campbell the

22 decider.  And Dr. Campbell has written a paper that says it is

23 never a medical necessity.  You can't have a real process if

24 that's it.

25      And I think it's going like 36 for nothing.  Nobody's ever

1  been found to do it in North Carolina.  I got a problem with

2  that.  I got a real problem with that.  Not with the way North

3  Carolina normally does these things, but on this issue -- on

4  this issue.

5       That's the Court -- so I want somebody -- if there's

6  somebody who can get up here and tell me North Carolina has a

7  legitimate procedure, I want to hear what it is, and I want to

8  hear that it happened because I got a problem.  I got a real

9  problem with what I've heard.  That is, it's never been given,

10 and the person that is the head of it says it can never happen.

11      And North Carolina is saying, oh, that's wrong, he didn't

12 do that this time.  No.  If you put that person in charge, you

13 have really swung and missed, North Carolina.

14          MR RODRIGUEZ:  Good afternoon, your Honor.  We have

15 witnesses here today prepared to address that very issue.

16          THE COURT:  That's what I wanted -- I want to know, is

17 that a legitimate hearing?  And I want to know, if there's a

18 legitimate hearing, why it's never found to be a medical

19 necessity.  And does somebody have to kill themselves or come

20 close to killing themselves to do that?  I got a problem with

21 that, too.

22      And somebody needs to open this up and figure this out,

23 but it's not about whether -- I'm sure we got plenty of people

24 where this operation is done which will say, oh, it's

25 absolutely a necessity all the time.  We can't get into the

middle of that kind of battle because otherwise North Carolina

will be fighting on everything on medical necessity.  There

will be somebody coming in on the issue of medical necessity,

and then judges will have to decide this.

What this judge is going to decide is whether this

procedure is real or not.  And, you know, you're going to have

to overcome a hurdle when you have a head person that says it's

never that way and it's never been given.  Makes it hard for

North Carolina to say, oh, we -- we understand that it's real,

but the guy we put in charge of it doesn't believe in it.

I might do it -- I might go a different way than that, and

I -- and I think the lawyers on your side would do it -- would

do it, too, if you had to.  But you got to play it the way you

got to play it.  So go ahead and put what you got on.

But this is not about you guys coming in and bringing a

bunch of people to say we think differently about this.  I

understand that it's in your papers.  I understand that's what

you're saying.

The question is, is their procedure legitimate?  If it is,

you're going to lose because I can't -- the courts can't sit

here and put the State to have to fight this every single time

somebody comes up with a medical problem.  We can't have people

on both sides doing this.

But if North Carolina is not -- if it's not been a fair

procedure, if the balance was already leaning heavily in one

1  way, then the Court's got a problem.  Fire away.

2          MR RODRIGUEZ:  Your Honor, we would call -- the first

3  witness would be John Lewis Peiper.

4          MR. DAVIDSON:  Excuse me, your Honor.  I thought

5  plaintiff was going to go first.

6          MR RODRIGUEZ:  Well, we were until your Honor asked us

7  to do so.

8          MR. DAVIDSON:  Your Honor, Jon Davidson, representing

9  the plaintiff.

10          THE COURT:  Who are we going to put up?  I don't want

11  three hours of doctors saying -- I don't want three hours of

12  doctors doing this because that's not what this case is about.

13  This hearing is about whether this process is a fair process.

14  If it's a fair process and they come out with a different idea,

15  you lose.  You lose because I'm not -- the Court's not going to

16  get in the middle of that kind of thing.

17          MR. DAVIDSON:  I understand that, your Honor.  In your

18  Honor's last order, one of the questions that your Honor

19  identified was whether gender-affirming surgery is medically

20  necessary for Ms. Zayre-Brown according to the WPATH standards

21  of care.  And we have an expert to talk about the WPATH

22  standards of care and what they require.

23          THE COURT:  Well, I think the first thing you need to

24  do is question about them first as to whether they followed

25  what they're supposed to.  If they followed the Fourth

1  Circuit -- because this is going to go up to the circuit.  I

2  mean, it's going to go up to the circuit when this is over

3  with -- and if they followed what the Fourth Circuit says

4  they're supposed to be doing.  So we got to figure -- we got to

5  figure all this out.

6      So I want them to put on something to rebut it.  So you've

7  got one witness, one expert, or are you going to put on a pile

8  of experts?

9          MR. DAVIDSON:  One witness, one expert.

10          THE COURT:  All right.  That's fine, but let's let

11  them go first.

12          MR RODRIGUEZ:  Your Honor, while I go retrieve the

13  witness, who's waiting outside, we have binders that we'd like

14  to hand up for your Honor with the exhibits that we'll be using

15  for the witnesses.

16          THE COURT:  Good.

17          MR RODRIGUEZ:  We have one for the witness, one for

18  your Honor, and one for the --

19          THE COURT:  Hopefully there's something in there where

20  you've been able to find something where this has been found to

21  be because my understanding is North Carolina, first of all,

22  says that it understands that this is a mental issue -- a

23  mental issue -- and that North Carolina recognizes it can be to

24  the level of medical necessity.  So North Carolina says that.

25          MR RODRIGUEZ:  That's correct, your Honor.

EXAMINATION OF LEWIS JONATHAN PEIPER

1    THE COURT:  And then the head of it says no way.

2    MR RODRIGUEZ:  Well, that's what we hope to address --
3  address with --

4    THE COURT:  That's what I got to hear.

5    MR RODRIGUEZ:  I'll be right back.

6    May the witness approach the stand, your Honor?

7    THE COURT:  Yes, sir.

8    THE CLERK:  Please come forward and be sworn.

9    (Witness sworn.)

10    MR RODRIGUEZ:  Does your Honor have a preference as to
11  what counsel does when examining a witness, seated or standing?

12    THE COURT:  No, no.  Whatever makes you comfortable.
13  It's hard enough to try cases without changing things around.
14  So whatever you're comfortable doing, as long as you don't
15  scare the witness.

16    MR RODRIGUEZ:  Thank you.

17  **LEWIS JONATHAN PEIPER, DEFENDANTS' WITNESS, DIRECT EXAMINATION**

18  **BY MR. RODRIGUEZ:**

19  Q    Good afternoon, Dr. Peiper.  Can you please introduce
20  yourself to the Court.

21  A    Sure.  Lewis Jonathan Peiper.  I go by John.  I'm a
22  correctional psychologist.  Personal note, father of two, live
23  just outside of Raleigh, grew up in Georgia.

24    Prior to coming to North Carolina, I was working in the
25  juvenile justice field in Georgia and in Virginia doing

EXAMINATION OF LEWIS JONATHAN PEIPER

1 diversion work, working with folks that were in school-based

2 care.  Also worked in juvenile justice confinement areas.

3      Been in North Carolina since 2012.  Been in a few

4 different positions.  Current position, director of behavioral

5 health for the North Carolina prison system.

6 Q    Thank you.  And you should have a binder there in front of

7 you.  Do you have a binder on the witness stand?

8           THE CLERK:  Oh, sorry.

9           MR. RODRIGUEZ:  That's all right.

10      You will soon have a binder in front of you.

11           THE WITNESS:  No worries.

12 Q    If you flip to the document behind that first tab there,

13 it should be a copy of your CV.  Do you see that?

14 A    Yes, I see it.

15 Q    And is that an accurate copy of your CV at the time that

16 you produced it?

17 A    Yeah.  Yeah, at the time, this would be accurate.

18 Q    Okay.  Now, if you flip to the document that's marked --

19 oh.

20           MR. RODRIGUEZ:  And, your Honor, we had previously --

21 before I continue, we had previously discussed with counsel

22 stipulating to the admissibility of the exhibits that we had

23 exchanged.

24           THE COURT:  Okay.

25           MR. RODRIGUEZ:  So I'd like to move them, Defendants'

EXAMINATION OF LEWIS JONATHAN PEIPER

1 Exhibits 1 through 14, into evidence based on that stipulation

2 if your Honor permits.

3          THE COURT:  If there's no objection.

4          MS. MAFFETORE:  No objection, your Honor.

5          THE COURT:  Then let them be admitted.

6          MR. RODRIGUEZ:  Thank you.

7     (Defendants' Exhibit Nos. 1 through 14 were received in

8 evidence.)

9 Q    Dr. Peiper, can you turn to the document that's behind

10 Tab 4 there.

11 A    I'm there.

12 Q    And this document is titled the "Evaluation and Management

13 of Transgender Offenders."  Is this the policy that the

14 Department utilizes when reviewing requests for various

15 gender-affirming interventions?

16 A    Yeah.  This is our Department's policy.

17 Q    Okay.  Can you turn to page 5 of that exhibit.

18 A    I'm there.

19 Q    And can you read to the Court and point out to the Court

20 where on page 5 it explains the process for --

21 A    Sorry.  I went to No. 5.

22 Q    Sorry.  Page 5 of the exhibit.

23 A    Page 5 of No. 4.

24 Q    And if you can, can you explain to the Court how it's

25 articulated in the policy what the Department's practice is for

EXAMINATION OF LEWIS JONATHAN PEIPER

1 evaluating certain requests?

2 A    Yes.  So each request is evaluated on a case-by-case

3 basis, and there are different considerations for routine

4 versus nonroutine accommodations.

5 Q    And can you read in subparagraph G there at the bottom?

6 A    "All accommodation requests will be reviewed on a

7 case-by-case basis, considering the offender's medical and

8 mental health history, as well as risk safety profile."

9 Q    Okay.  And can you explain to the Court, how is it that

10 the DTARC accomplishes that dictate there?

11 A    Well, the DTARC is inter-disciplinary in nature, but each

12 discipline brings forth its own individualized review, and then

13 there's like a comprehensive review of all the records by the

14 DTARC.

15 Q    Okay.  And now, with respect to the plaintiff's request,

16 Mrs. Zayre-Brown's request --

17 A    Yeah.

18 Q    -- did the DTARC follow that process?

19 A    Yes, we did.

20 Q    Okay.  Now, in the lead up to the February 17, 2022,

21 meeting wherein the DTARC considered Mrs. Zayre-Brown's

22 request, did you review records in anticipation of that

23 meeting?

24 A    Yeah.

25 Q    Can you turn to the exhibit behind Tab 8, Defendants'

EXAMINATION OF LEWIS JONATHAN PEIPER

1  Exhibit DX8.

2  A    All right.  I'm there.

3  Q    And are you familiar with this set of records?

4  A    Yeah.  This would be a set of records from our electronic

5  medical records, and it looks like it goes from 2017 through

6  like 2022.

7  Q    When you -- when you testified earlier about the review

8  process, reviewing records, what sorts of records would you

9  review in preparation for a DTARC meeting?

10  A    There are some documents that are created specifically

11  based off of the TARC process.  We'd review those, we'd review

12  evidence for crisis response, mental health assessments, mental

13  health assessment updates, any instances of referral request.

14  We would look at areas that related to maybe even outside care.

15  You know, we'll request records with a release of information.

16  Q    And were those sorts of records contained in the records

17  that you reviewed for Mrs. Zayre-Brown's request?

18  A    Yes.  Oh, yeah.

19  Q    And in flipping through DX8, are these records that

20  you would have had access to and reviewed prior to the

21  February 17th, 2022, DTARC meeting?

22  A    Yes.  These are from her records, would have had access to

23  it and would have reviewed records of this sort during that

24  process.

25  Q    And do you recognize some of those records as records that

EXAMINATION OF LEWIS JONATHAN PEIPER

1 you actually did review?

2 A    Yes.  It's -- it's been a little while since 2022, but

3 there are some that I specifically recognize and remember.

4 Q    And when you're reviewing these records, what is it that

5 you're looking for as a director of behavioral health?

6 A    Well, behavioral health, we're -- we're looking broadly

7 about mental health symptoms, an individual's functioning -- in

8 this regard, for the diagnostic criteria for gender dysphoria

9 for Ms. Zayre-Brown -- and then the impact any of those mental

10 health symptoms are having on her general functioning.

11 Q    And how would -- how would those impacts manifest

12 themselves in the record?  How would you discern that to be the

13 case by reviewing records?

14 A    We'd see evidence over time, aspects of impairment.  You

15 would see it coming across -- an impairment can come across in

16 some of the activities the person's engaged in, sleeping,

17 eating patterns.  Severe impacts, you might see a person lose

18 -- we have this term in psychology, anhedonia.  So they kind of

19 lose interest in things that they otherwise would have interest

20 in.  So you really start to see that impairment and the impact,

21 but you see it across multiple domains.

22 Q    All right.  And so in reviewing -- or after you reviewed

23 Mrs. Zayre-Brown's records, did you arrive at a conclusion

24 about the overall state of her mental health?

25 A    Overall state, yeah.  We concluded that, you know, there

EXAMINATION OF LEWIS JONATHAN PEIPER

1 were moments of crisis, moments of instability.  Overall,

2 general stability.  And any of the mental health symptoms

3 appeared reasonably well-controlled.

4 Q     When you say "we concluded," are you referring to the

5 DTARC?

6 A     We, the DTARC, and myself in reviewing the record.

7 Q     Okay.  So this was a conclusion that you arrived at on

8 your own?

9 A     This was information I brought to the DTARC.

10 Q     And at the DTARC, did you share your assessment with the

11 other members of the DTARC?

12 A     Yes.

13 Q     And so you did not defer to anyone else with respect to

14 what your conclusion was as to the state of Mrs. Zayre-Brown's

15 mental health?

16 A     No, not about that.

17 Q     Now, in addition to assessing Mrs. Zayre-Brown's overall

18 mental health, which is what you just discussed, during the

19 February 17, 2022, DTARC, were there other factors discussed or

20 considered by the DTARC?

21 A     Yeah.  In addition to that, aspects about the review for

22 medical necessity, and then there was the information about the

23 medical literature review.

24 Q     Okay.  And what was the -- what was the conclusion about

25 the medical literature review that was presented at the DTARC?

EXAMINATION OF LEWIS JONATHAN PEIPER

1 A    In short, that it was mixed, inconclusive.

2 Q    And who provided that information?

3 A    Our chief medical officer, Dr. Campbell, brought that

4 information.

5 Q    Did you conduct any of your own review of the literature?

6 A    No, not for that.

7 Q    Did Dr. Campbell's discussion of the medical literature

8 in any way impact your assessment of the state of

9 Mrs. Zayre-Brown's mental health?

10 A    No, no.  Not the state of Ms. Zayre-Brown's mental health.

11 Q    Did the DTARC document its review process in its

12 conclusion?

13 A    Yes.

14 Q    Can you turn to -- flipping backward now to Exhibit 5 --

15 and if you'll flip 5, 6, and 7 briefly, I want to ask you some

16 question -- one question about all three of those exhibits.

17 A    Okay.  I see them.

18 Q    Are these documents that were created by the Department to

19 reflect the considerations done by the DTARC?

20 A    Yeah.  These three documents -- one's kind of a form-based

21 capturing the request itself and what the decision was.

22 Q    And which document are you referring to?

23 A    No. -- the thing behind No. 5.

24 Q    Okay.  So that would be DX5?

25 A    DX5.  And then there's also a -- we call it a case summary

1  internally, but it's a document that summarizes the findings of

2  the DTARC shared as part of that administrative review process

3  and also for the larger record.  That's DX6.  DX7, this is the

4  clinical note that we enter into the medical record.

5  Q    Okay.  And on DX5 -- 6 -- excuse me.  Is there a portion

6  of DX6 that you can point out to the Court that reflects your

7  assessment and the DTARC's assessment of Mrs. Zayre-Brown's

8  mental health?

9  A    Yeah.  There's aspects where -- in the paragraph at the

10 end of the first page talking about the mental health and

11 behavioral health, case reviews.  There's a description towards

12 the end of that that's talking about the new anxiety symptoms.

13 Q    Well, I'm going to pause you there, Dr. Peiper.  If you

14 could look at that first hanging paragraph, I guess, on page 2

15 of that exhibit.  Can you read in the last sentence there of

16 that paragraph?

17 A    Which paragraph again?

18 Q    Excuse me.  The paragraph that appears in the first -- the

19 top of page 2 --

20 A    The top of page 2?

21 Q    -- the last sentence of that paragraph.

22 A    Thanks.  "The patient's mood and anxiety symptoms appear

23 well-controlled with psychiatric intervention, however recent

24 progress notes from supportive counseling and therapy sessions

25 indicate the patient has been heavily focused on the status of

EXAMINATION OF LEWIS JONATHAN PEIPER

1 the final decision regarding her requested, desired surgery and

2 experiencing related anxiety, frustrated mood."

3 Q    And is that language familiar to you --

4 A    Yeah.

5 Q    -- that you just read?

6 A    Yeah.

7 Q    Does that encapsulate or capture the assessment of her

8 mental health that you had testified to earlier?

9 A    Correct, yes.

10 Q    If you'd turn then to the next exhibit, DX 7.  Is there a

11 portion in this document that similarly reflects the

12 Department's assessment of Mrs. Zayre-Brown's individual mental

13 health?

14 A    Yeah.  There's a -- there's a similar section in this one,

15 as well.  And --

16 Q    If you look at the --

17 A    In the middle of the page, there's a review of patient's

18 mental health and behavioral health record.

19 Q    Okay.  So that's one, two, three -- are you saying the

20 fifth paragraph down?

21 A    Correct, yes, the fifth down.

22 Q    Can you read the -- I guess it's the last two sentences --

23 three sentences of this paragraph, please.

24 A    Sure.  Similar to the case summary, "Mental health and

25 behavioral health case reviews indicate no current evidence of

EXAMINATION OF LEWIS JONATHAN PEIPER

1 any significant, comorbid mental health issues.  Patient

2 continues to demonstrate emotional and psychological stability

3 with evidence of adequate coping skills.

4     "The patient's mood and anxiety symptoms appear

5 well-controlled.  The psychiatric interventions, however,

6 recent progress notes from supportive counseling and therapy

7 sessions indicate the patient has been heavily focused on the

8 status of the final decision regarding her requested, desired

9 surgery and experiencing related anxiety, frustrated mood."

10 Q     And what was the basis of those statements?

11 A     The record review.

12 Q     Now, after reviewing a patient's chart --

13 A     Uh-huh.

14 Q     -- in the theoretical sense, not talking specifically

15 about Mrs. Zayre-Brown --

16 A     Okay.

17 Q     -- but as your -- in your role as co-chair of the DTARC,

18 if you're evaluating a request by a particular patient for

19 gender-affirming intervention, if your assessment of the

20 patient's mental health indicates that the patient is

21 experiencing symptoms that are severe, debilitating, and

22 interfering with activities, the daily living activities, and

23 that are not well-controlled by existing interventions --

24 A     Okay.

25 Q     -- what would assessment have been or what would it be?

EXAMINATION OF LEWIS JONATHAN PEIPER

1  A    From the perspective of a psychologist and what I would

2  bring and what we do bring into this discussion, that would be

3  a necessary component for an increase in intervention.

4  Q    So would your assessment be different if your -- your

5  conclusion be different if your assessment of the mental health

6  record indicated symptoms that exceeded and surpassed the types

7  of symptoms you saw in Mrs. Zayre-Brown's case?

8  A    Oh, yeah.

9  Q    And in Mrs. Zayre-Brown's case -- in this case, the

10 February 17, 2022, DTARC --

11 A    Okay.

12 Q    -- what was your overall assessment as to whether, from a

13 psychological perspective, additional intervention was

14 warranted?

15 A    The assessment was that there was not additional

16 intervention warranted.

17 Q    And if your -- if the patient that you were reviewing,

18 those records indicated that it were warranted, would that be

19 true regardless of the state of medical literature?

20 A    Oh, yeah.

21 Q    Now, after you completed your review of Ms. Zayre-Brown's

22 mental health records, did you conclude that she had severe

23 symptoms associated with gender dysphoria that were not

24 responsive to other interventions?

25 A    No, we did not conclude that she had severe symptoms.

EXAMINATION OF LEWIS JONATHAN PEIPER

1  Q    And again, those symptoms -- can you describe to the Court

2  what types of symptoms you're looking for when you're assessing

3  that?

4  A    So alluded to earlier, we're looking broadly across the

5  individual's areas of functioning, different aspects of

6  impairment.  Some that were mentioned earlier might relate to,

7  you know, like sleep, eating habits.  Other areas might relate

8  to the general impact on activities, social relational

9  functioning.  But generally, when you start to see the mental

10 health symptoms impacting the individual severely, you're going

11 to see multiple areas across their functioning.

12 Q    I did not hear you reference suicidal ideation or

13 self-harm attempts.  Is it fair to say, then, that's not the

14 metric you're applying?

15 A    No, that's not the metric.  Those do occur and, when they

16 do, they're noted.  But, no, that's not the only thing you

17 would look for.

18 Q    Do you recall ever seeing a copy of Dr. Campbell's

19 position statement before the February 17, 2022, DTARC meeting?

20 A    No, not before.

21 Q    If you flip to Exhibit 9, you recognize this e-mail?

22 A    Sorry.  I'm getting there.

23 Q    I'm sorry.

24 A    There's a lot of medical records.  All right.  I'm there.

25 Q    Do you recognize this e-mail?

EXAMINATION OF LEWIS JONATHAN PEIPER

1  A    Yes.  Yes, I do.

2  Q    And can you state the date and timestamp that's on this

3  e-mail?

4  A    February 17th, it's at 2107, so that's roughly 9:00 p.m.

5  Q    2107 p.m. is 9:00 p.m. military time.  The attachment to

6  this e-mail, if you flip to the next page, what is that?

7  A    This would be a draft copy of that position statement that

8  was referenced.

9  Q    So this would have been the evening after the DTARC met to

10 consider Ms. Zayre-Brown's request?

11 A    Yes, sir, that's correct.

12 Q    And is this the first time, to the best of your

13 recollection, you would have seen a copy of Dr. Campbell's

14 position statement?

15 A    Yeah, yeah.  This is the first time I saw this.  This is

16 when it was sent to me.

17 Q    And Dr. Campbell eventually shared that position statement

18 with other members of the DTARC?

19 A    That is correct.

20 Q    If you turn to page -- excuse me -- the next exhibit, 10,

21 and do you recognize this e-mail?

22 A    Yes.  Yes, I do.

23 Q    And this is dated when?

24 A    March 22nd, 2022.

25 Q    Now, after -- and what's attached here to this -- this

EXAMINATION OF LEWIS JONATHAN PEIPER

1  e-mail?

2  A    This is the position statement that was submitted.

3  Q    Another draft?  And who are the other recipients listed

4  here on this e-mail?

5  A    These were the active members of the DTARC.

6  Q    Now, after this position statement was circulated to other

7  members of the DTARC, what was the outcome of that?

8  A    Frankly, it was pointed out that the statement might

9  appear as a blanket ban, the terminology that was used, and it

10 was immediately discarded at that point.

11 Q    Okay.  Was it -- would a blanket ban have been consistent

12 with the practice of the DTARC?

13 A    No, no, no.  We were -- it was all individualized

14 assessment up to that point on that day, in February of 2022,

15 was moving forward, it still has been.  So no, not consistent.

16 Q    So has Dr. Campbell's position statement had any impact on

17 whether the Department reviews requests for gender-affirming

18 interventions on an individualized basis?

19 A    No.  No, we still do.

20 Q    Can you turn to Exhibit 13 -- 12.  Excuse me.

21 A    I'm there.

22 Q    Do you recognize this exhibit?

23 A    Yeah.  This looks like a list that was prepared during

24 depositions, and it would have been related to other

25 accomodation requests that were surgical in nature.

EXAMINATION OF LEWIS JONATHAN PEIPER

1  Q    Did you assist in preparing the information contained in
2  this report?

3  A    Yeah, I did.

4  Q    And it looks like there's, by my count, 15 requesters
5  listed here.  Is that right?

6  A    Yeah, it looks that way.

7  Q    And a handful of the individuals making requests made
8  multiple requests; is that right?

9  A    Yes.

10 Q    So by my count, the total is 25 requests.  Does that seem
11 right?

12 A    Seems right, yeah.

13 Q    Now, are there any prerequisites to making a request for
14 gender-affirming surgery?

15 A    No.  No, there are not.

16 Q    And can you describe to the Court how these requests were
17 evaluated by the DTARC?

18 A    Uh-huh.  Yeah.  In the -- the process I described.  So
19 there's the individual evaluations.  Information is moved
20 forward to the DTARC.  There's the comprehensive review at the
21 DTARC level.  And any decision the DTARC makes would -- that
22 relates to surgery would have to have an administrative review.

23 Q    The far right column of this document there, it's titled
24 "DTARC Recommendations."  Can you describe some of the reasons
25 why the DTARC declined to approve other requests for surgery?

EXAMINATION OF LEWIS JONATHAN PEIPER

1  A    Yeah.  There -- there are a variety.  We do get

2  individuals that are making the requests for other purposes,

3  not for gender-affirming purposes.  So some of those would be

4  individuals that would be like contraindicated for that

5  purpose.

6       There were be some other individuals we've seen that have

7  some very significant co-morbidities, so large amounts of

8  psychiatric instability, emotional -- compounded with some

9  significant, uncontrolled personality disorders.  We do see

10 a -- we see a different mix of the population within the prison

11 system than you see in the community.  But, yeah, there's a

12 variety of considerations, and those all come out through the

13 assessment process.

14 Q    And so with respect to each request that appears in this

15 document, was the DTARC's review an individualized review?

16 A    Yeah, yeah.

17 Q    Were you ever pressured by Dr. Campbell or anyone else at

18 the Department of Adult Correction to not approve for a

19 gender-affirming surgery?

20 A    To not approve?  No.

21 Q    Do you feel -- have you felt comfortable as a co-chair of

22 the DTARC expressing yourself to the committee?

23 A    Yeah.  Yeah.  It's a -- there's a portion in the flow to

24 where it's even specifically said.  So all that information is

25 brought forward, and then there's an area where it's

EXAMINATION OF LEWIS JONATHAN PEIPER

1  specifically reviewed.

2  Q     In the list of other requests that were made, were any of

3  these requests the hypothetical patient that we talked about

4  before, where the record review indicated, in your mind as a

5  psychologist, a patient with severe, debilitating symptoms that

6  were not adequately controlled by other interventions?

7  A     We have not actually seen a case that presented that yet.

8         MR. RODRIGUEZ:  I don't have any further questions,

9  your Honor.

10        THE COURT:  Thank you.

11        Cross-examination.

12        **CROSS-EXAMINATION BY MS. MAFFETORE:**

13  Q     Good afternoon, Dr. Peiper.

14  A     Hey.

15  Q     My name is Jaclyn Maffetore.  I'm counsel for plaintiff,

16  Ms. Zayre-Brown.

17        Is it fair to say that your experience personally treating

18  transgender patients with gender dysphoria is fairly limited?

19  A     You said personally treating?

20  Q     Yes.

21  A     Yes, that would be fair to say.

22  Q     And you have been discussing that you considered

23  Mrs. Zayre-Brown's request for vulvoplasty on February 17,

24  2022, correct?

25  A     Can you repeat that again?

EXAMINATION OF LEWIS JONATHAN PEIPER

1  Q    You considered Mrs. Zayre-Brown's request for vulvoplasty

2  on February 17th of 2022, correct?

3  A    Yes.  That was the request before the DTARC.  That was the

4  meeting of the DTARC, and it was considered then.

5  Q    Thank you.  And you stated that you participated in

6  development of the case summary for that meeting, as well,

7  correct?

8  A    Yes, I did.

9  Q    Okay.  And is it correct that that case summary was

10 developed both before and after that DTARC meeting?

11 A    The case summary?  So the process includes individuals

12 submitting information as part of the review.  So the case

13 summary itself would not have been created until after, but

14 aspects of what people bring in -- you're preparing what you

15 bring in prior.

16 Q    Okay.  And just to be clear, when I'm saying "case

17 summary," I'm discussing what is referred to as Defendants'

18 Exhibit No. 8.

19      And so you testified that you prepared the mental and

20 behavioral case-review portion of that case summary, correct?

21 A    You said Exhibit 8?

22 Q    Sorry.  Exhibit 6.

23 A    Okay.  Sorry.  Sorry.  These are some thick pages.  All

24 right.  I'm here.

25          MS. MAFFETORE:  Can you -- Jon, will you switch me to

EXAMINATION OF LEWIS JONATHAN PEIPER

1 the overhead?

2      Okay.  Can the Court see the overhead projector?

3 Q    Okay.  And so the second paragraph encompasses the

4 beginning of the mental health and behavioral health case

5 review --

6 A    Okay.

7 Q    -- that you were discussing, correct, at the bottom of the

8 page?

9 A    Yes.

10 Q    Beginning with "mental health and behavioral health case

11 reviews indicated"?

12 A    Yes, I see it.

13 Q    Okay.  And in compiling this mental health and behavioral

14 health case review, you reviewed Mrs. Zayre-Brown's records,

15 correct?

16 A    Correct.

17 Q    You have never met Mrs. Zayre-Brown yourself, correct?

18 A    I had never treated or evaluated her.

19 Q    You've never spoken with her, correct?

20 A    Not to any significant degree.

21 Q    And so you relied on the evaluations of others in

22 considering Mrs. Zayre-Brown's request; is that correct?

23 A    I relied on the complete record.

24 Q    Which consists of the evaluations of other providers?

25 A    And it does consist of evaluations of others.

EXAMINATION OF LEWIS JONATHAN PEIPER

1  Q    And so leading up to the February 17th, 2022, DTARC

2  meeting, you were coordinating communications with UNC

3  Transhealth, correct?

4  A    Yes.

5  Q    And you understood that providers at UNC Transhealth

6  believed Mrs. Zayre-Brown was an appropriate candidate for

7  surgery based on the WPATH criteria; is that correct?

8  A    Yes, I was aware.

9  Q    Okay.  And you noted in your case review that, in your

10 review of the patient's related mental health and behavioral

11 health record, it indicates the criteria identified by the UNC

12 Transhealth program for --

13      (Reporter seeks clarification.)

14         MS. MAFFETORE:  I'm sorry.

15 Q    "Review of patient's related mental health and behavioral

16 health record indicates the criteria identified by NCU's

17 Transhealth program for appropriateness for surgery have been

18 met.  The patient has a well-documented, persistent transgender

19 identity with a commitment for bottom surgery."  Did I read

20 that correctly?

21 A    You are correct.

22 Q    And additionally, in conjunction with your review, you

23 spoke with Jennifer Dula, MSW, correct?

24 A    LCSW, but yes.

25 Q    And she's one of Mrs. Zayre-Brown's direct mental health

1  care providers, correct?

2  A    She was at the time.

3  Q    And in order to -- you solicited a letter from Mrs. Dula

4  to help fulfill one of WPATH's criteria, correct?

5  A    That is correct.

6       MS. MAFFETORE:  I'd like to show you now what will be

7  marked -- or what is marked as Plaintiff's 9.

8       And I'm happy to hand one up to the Court if the Court

9  would like one, and I'm happy to hand one to defendant, as

10 well.  May I approach?

11      THE COURT:  Are you all agreed these can go in, too?

12      MR. RODRIGUEZ:  Yes.

13      MS. MAFFETORE:  Yes, your Honor.  Several of our

14 exhibits overlap, so to the extent that they do, for ease of

15 reference, I'll just refer to the ones that defendants have

16 already introduced.

17      THE COURT:  All right.  And this one is one they

18 haven't introduced or have introduced?

19      MS. MAFFETORE:  They have not yet introduced it, your

20 Honor, so at this time I'd seek to admit Plaintiff's Exhibit 9.

21      THE COURT:  That will be admitted pursuant to the

22 agreement of the parties.  Thank you.

23      (Plaintiff's Exhibit No. 9 was received in evidence.)

24 Q    Dr. Peiper, is this the -- what ultimately ended up being

25 the letter that Jennifer Dula submitted regarding a request

EXAMINATION OF LEWIS JONATHAN PEIPER

1  that she draft some things so that Mrs. Zayre-Brown could meet

2  the WPATH criteria?

3  A    I believe it is.  If this is the transgender accommodation

4  summary in the medical record, which it looks like it is, that

5  was the documentation pathway that Ms. Dula took to get that

6  into the record.  So if this is that, which it seems to be,

7  then absolutely, yes.

8  Q    Do you recognize the DAC stamp on the bottom of this piece

9  of paper?

10 A    I see it.

11 Q    Do you recognize that that means this was produced to

12 plaintiffs in discovery as a part of Mrs. Zayre-Brown's medical

13 record?

14 A    Okay.  Then that would seem to be the same.

15 Q    Okay.  Thank you.  So if you'll look to me, where I'm

16 pointing, "based on" --

17 A    Uh-huh.

18 Q    -- "Per your request for a letter, Ms. Dula concluded

19 that, based on the review of her records and the current

20 assessment, it appears the next appropriate step for Ms. Brown

21 is to undergo trans-feminine bottom surgery.  The surgery will

22 help her make significant progress in further treatment of her

23 gender dysphoria."  Did I read that correctly?

24 A    You read that correctly.

25 Q    And this transgender accommodation summary was a document

EXAMINATION OF LEWIS JONATHAN PEIPER

1 that was available to be reviewed by the DTARC, correct?

2 A    Yeah.  Yeah.  This would have been before it.

3 Q    All right.  And so this would have been one of the records

4 before the DTARC's consideration --

5 A    Yes.

6 Q    -- of February 17th, 2022?

7       In the preceding paragraph that starts with "despite,"

8 Ms. Dula also wrote, "Despite these interventions, Ms. Brown

9 continues to report clinically significant anxiety, depression,

10 and distress associated with her gender dysphoria that has been

11 documented consistently throughout her mental health

12 treatment."  Did I read that correctly?

13 A    You did.

14 Q    Okay.  And so that information would have been before the

15 DTARC's consideration?

16 A    Yeah.

17 Q    On February 17th of 2022, you believed that

18 Mrs. Zayre-Brown still met the diagnostic criteria for gender

19 dysphoria, correct?

20 A    Yeah, yeah.

21 Q    And one of those diagnostic criteria is clinically

22 significant distress, correct?

23 A    That is correct.

24 Q    And so now I'd like to show you a document that is

25 contained in DX8 that defendants have provided for us.  It is

EXAMINATION OF LEWIS JONATHAN PEIPER

1  going to be page 370, but I'll also show it to --

2  A    Thank you.

3  Q    I'll try to show it to you on the projector for ease of

4  your reference.

5  A    Thanks.

6  Q    Okay.  And so first, looking at the top of this record,

7  this is a mental health progress note, correct?

8  A    Yes, it is.

9  Q    And it's dated February 7th, 2022; is that correct?

10  A    Uh-huh.

11  Q    And that would be 10 days before the DTARC's consideration

12  of Mrs. Zayre-Brown's request?

13  A    Right.

14  Q    And in this record, under "progress towards goals," it

15  notes, "Offender is reporting increased dysphoria and

16  associated anxiety," correct?

17  A    Yes.

18  Q    Okay.  "She reports feeling increased distress over not

19  having updated information on her gender-affirming surgery."

20  A    Yeah, yeah.  There was -- that was -- that's consistent,

21  yeah.

22  Q    Okay.  And so this would have been one of the records

23  before the DTARC's next consideration of Mrs. Zayre-Brown on

24  February the 17th of 2022?

25  A    Yeah, this is in the record.

EXAMINATION OF LEWIS JONATHAN PEIPER

1 Q    On February 17th, 2022, you believed that vulvoplasty

2 would help Mrs. Zayre-Brown make significant progress in

3 further treatment of her gender dysphoria, correct?

4 A    Who are you asking wrote that?

5 Q    You believed that on February 17th, 2022, correct?

6      (Indicating.)  Sorry about that.

7 A    Where are you reading that?

8 Q    Did you have a deposition in this case -- two depositions

9 in this case?

10 A    I did have.

11 Q    Okay.  Do you recall testifying that, on February 17th,

12 you believed that vulvoplasty would help Mrs. Zayre-Brown make

13 significant progress in further treatment of her gender

14 dysphoria?

15 A    I don't know that I recall those words, but yes.

16 Q    Would it refresh your recollection if I showed you those

17 words?

18 A    I mean, it might, but I can tell you right now that, yes,

19 that's part of her -- so during the deposition, we talked about

20 the gender journey and that it is part of her journey.  And so

21 to the extent that that is part of her journey in that

22 transition process -- okay.  I'm sorry.

23 Q    No.  You believed, on February 17th, 2022, that

24 vulvoplasty would reduce Mrs. Zayre-Brown's gender dysphoria,

25 correct?

EXAMINATION OF LEWIS JONATHAN PEIPER

1  A    So the two components of the gender dysphoria diagnosis

2  are the incongruence and the dysphoria, the clinically

3  significant distress.  So by eliminating the incongruence,

4  then, yes, you've eliminated the first step, the first test

5  of that diagnostic criteria.  So to that extent, I can say

6  yes now.

7  Q    And you also believed, on February 17th, 2022, that

8  vulvoplasty would reduce Mrs. Zayre-Brown's anxiety, correct?

9  A    So these all seem to have context to the questions.

10  Q    Would you like for me to refresh your recollection

11  regarding your prior testimony?

12  A    Yeah, that would help.

13       MR. RODRIGUEZ:  Jaclyn, which one is this?

14       MS. MAFFETORE:  This is his individual deposition

15  dated --

16  Q    Do you see your name at the top there, Dr. Peiper, Louis

17  Peiper, M.D.?

18  A    Ph.D. -- (inaudible)

19  Q    (Laughter.)  They let you be an M.D.

20  A    Yeah, if you could hold on one second.

21       MR. RODRIGUEZ:  Could you tell me what page you're on.

22       MS. MAFFETORE:  Sure.  We are on 63 of your individual

23  deposition, which was taken on May 1st of 2023.  Let me know

24  when you all are ready.

25       MR. RODRIGUEZ:  Ready.

EXAMINATION OF LEWIS JONATHAN PEIPER

1  Q    Okay.  And so, Dr. Peiper, looking at lines 13 here -- and

2  please bear with me with this technology.  Counsel, who is

3  sitting next to me, Mr. Davidson, asked you, "Do you believe

4  that receiving vulvoplasty likely would reduce her experience

5  of anxiety?"  Did I read that correctly?

6  A    Yeah.  So what was the --

7  Q    And your answer there --

8       (Reporter seeks clarification.)

9           THE WITNESS:  Apologies.

10          THE COURT REPORTER:  That's okay.

11  Q    My question was, did I read that correctly?

12  A    I was wondering about the context that is -- I can't see

13  the top of that.

14  Q    (Indicating.)

15  A    Further up.  4.

16      Okay.  So during the deposition -- and I don't know if

17  this was you and me or somebody else.

18          MR. DAVIDSON:  (Indicating.)

19          THE WITNESS:  Yeah, okay.  It's nice to see you in

20  person, by the way.

21  A    There was discussion about the anxiety that was being

22  referenced somewhere.

23  Q    Right.  And you'll see here that the prior question my

24  counsel, to my left here, says, "No, no.  Just in general, when

25  we talked previously about her experiencing symptoms of anxiety

EXAMINATION OF LEWIS JONATHAN PEIPER

1 related to gender dysphoria, and I'm trying to understand what

2 you believe.  I'm going to try a yes-or-no question."

3     So this is in general --

4 A    Okay.

5 Q    -- and the question was, "Do you believe that receiving

6 vulvoplasty likely would reduce her experience of anxiety?"

7 Did I read that correctly?

8 A    You are, yes.

9 Q    Okay.  And then your answer was, "Yeah, and I recall us

10 having those discussions during that particular set of

11 questions.  I don't know that we got to a point of saying one

12 symptom or the other, but, as it relates to kind of a general

13 consideration, she's wanting it, she's waiting for it, it's

14 part of her transition.  I mean, I could certainly see her

15 finding, you know, this is a positive relief from having it.

16 So yeah, I could say yes."  Did I read that correctly?

17 A    Yeah.  That sounds very similar to what I just said, as

18 well.

19 Q    All right.  So then, Dr. Peiper, did you believe, on

20 February 17th, 2022, that vulvoplasty would reduce

21 Mrs. Zayre-Brown's anxiety?

22 A    The context in which you just gave it, I can give that an

23 absolute qualified yes.  To the extent that you're taking it in

24 other directions, I don't know.  We'd have to discuss that --

25 Q    The only direction I'm taking it, sir, is the question

1 that I'm asking you right now.

2      And on February 17th, 2022, you believed that

3 Mrs. Zayre-Brown met all of the WPATH criteria for surgery,

4 correct?

5 A    Yes, absolutely.

6 Q    All right.  Now I'd like to go back to the case summary

7 with you --

8 A    Okay.

9 Q    -- which we were previously discussing as Defendants'

10 Exhibit 6.  I'm going to show you this one because it's not in

11 a binder, and I think that will be easier.

12 A    All right.

13 Q    It also happens to be Plaintiff's Exhibit 6.

14 A    Okay.

15        THE COURT:  And this one is one that's already in?

16        MS. MAFFETORE:  Yes, your Honor.

17        THE COURT:  Okay.

18        MS. MAFFETORE:  And has already been admitted as

19 Defendants' Exhibit 6.

20        THE COURT:  Plaintiff's Exhibit 6?  No.  I'm sorry.

21 Defendants' Exhibit 6.  Okay.  Very good.

22 Q    Okay.  So, Dr. Campbell, the -- I'm showing you -- or

23 sorry -- Dr. Peiper, I'm showing you the medical analysis

24 portion of the case summary, which is on the second page, which

25 is DAC 3400.

EXAMINATION OF LEWIS JONATHAN PEIPER

1  A    Uh-huh.

2  Q    It's gone blurry on me.

3  A    Yeah.  I can see it on my paper.

4  Q    Great.  The medical necessity determination in this case

5  summary document is contained in this medical analysis,

6  correct?

7  A    There is -- in this case summary, there's description of

8  the medical necessity, and there's description of the medical

9  review, the literature review.

10 Q    So the medical necessity determination is contained in the

11 medical analysis, correct?

12 A    Yes, under that heading.  You are correct, yeah.

13 Q    Thank you.  Dr. Campbell was responsible for drafting the

14 medical analysis, correct?

15 A    Yeah.  To a large extent I would say yes.

16 Q    Okay.  Dr. Campbell was the only person who presented to

17 the DTARC regarding the medical literature regarding

18 gender-affirming surgery, correct?

19 A    The medical literature?

20 Q    Yes.

21 A    Yes.

22 Q    All right.

23 A    Well, I referenced some stuff, as well, but yeah, this

24 here, this presentation, was Dr. Campbell's.

25 Q    Okay.  So do you recall testifying previously that

1 Dr. Campbell was the only person who presented to the DTARC

2 regarding the literature review?

3 A    Yes.  That's what this literature review is and, yes,

4 Dr. Campbell presented that.

5 Q    Thank you.  So Dr. Campbell is the medical authority,

6 correct?

7 A    Chief medical officer, yes.

8 Q    Okay.  And so in the second paragraph there, where it

9 says, "Based on this review, it is the determination of the

10 medical authority," "medical authority" would be referring to

11 Dr. Campbell; is that correct?

12 A    Likely.

13 Q    Okay.

14 A    I can't say for certain, but yeah.

15 Q    And so Dr. Campbell -- being the author of the medical

16 analysis, it was Dr. Campbell's decision to include a

17 discussion of de-transition within this document.  Would that

18 be correct?

19 A    Yeah.

20 Q    Okay.  You do not have any concerns about de-transition as

21 it relates to Mrs. Zayre-Brown, correct?

22 A    De-transition?  No.  And that's kind of part of the -- we

23 used the term "journey" before.

24 Q    Okay.

25 A    There's ebbs and flows in people's process.

EXAMINATION OF LEWIS JONATHAN PEIPER

1  Q    Okay.  So these paragraphs that span from 3402 to 3403 of

2  this document, beginning with "there is a growing body of

3  research" and then flowing into the next page regarding young

4  people --

5  A    Okay.

6  Q    -- the decision to include those five -- those five

7  paragraphs in this case summary, that was Dr. Campbell's

8  decision, correct?

9  A    I'm sorry.  Can you repeat that?

10  Q    The decision to include that discussion of de-transition

11  was Dr. Campbell's decision, correct?

12  A    I would assume it was his decision.  He provided the

13  information.

14  Q    And it's your belief that that is not of any concern

15  regarding Mrs. Zayre-Brown; is that correct?

16  A    I don't think the age range would be relevant to adults.

17  And also, I'm not particularly concerned about Ms. Zayre-Brown

18  having any regrets about her transition process.

19  Q    Okay.  So you would consider that discussion in the case

20  summary to be irrelevant to Mrs. Zayre-Brown's request?

21  A    To her specifically, yeah.  But to the medical literature

22  broadly, it seems that that was part of the medical literature.

23  Q    Okay.  Nobody on the DTARC disagreed with Dr. Campbell's

24  interpretation of the literature; is that correct?

25  A    Yeah.

EXAMINATION OF LEWIS JONATHAN PEIPER

1  Q    And you personally accepted Dr. Campbell's interpretation

2  of the literature?

3  A    Of the medical literature review?  I did.

4  Q    Okay.  And you testified previously with my counsel across

5  the aisle that you did not do any independent medical

6  literature review of your own; is that correct?

7  A    That is correct.

8       MS. MAFFETORE:  I don't have any further questions for

9  this witness at this time.

10       THE COURT:  All right.  Thank you.

11     Any redirect?

12       MR. RODRIGUEZ:  No, your Honor.  No redirect.

13       THE COURT:  All right.  Thank you, sir.  You may come

14  down.

15       THE WITNESS:  Thank you, sir.  Do I leave this up

16  here?

17       THE COURT:  Yes, sir.

18       THE WITNESS:  Okay.  Thanks.

19     (Witness excused.)

20       MS. BRENNAN:  Your Honor, may we call the next

21  witness?

22       THE COURT:  Yes, ma'am.

23       MS. BRENNAN:  At this time we would call Dr. Arthur

24  Campbell, and we're just going to step out and get him.

25       THE COURT:  Okay.  Very good.

EXAMINATION OF LEWIS JONATHAN PEIPER

1    (Witness sworn.)

2        **ARTHUR L. CAMPBELL, III, DEFENDANTS' WITNESS,**

3        **DIRECT EXAMINATION BY MS. BRENNAN:**

4  Q    Good afternoon, Dr. Campbell.

5  A    Good afternoon.

6  Q    Could you please state your full name and introduce

7  yourself to the Court.

8  A    Yes, sure.

9        So I am -- good afternoon, your Honor.  I'm Arthur L.

10 Campbell, III, the last Campbell.  I am a North Carolina

11 native, been married to my high school sweetheart for a little

12 over 40 years now, proud father of four -- two social workers,

13 an elementary school teacher, and a probation/parole officer.

14       I'm a third generation soldier, having served 35 years in

15 the active Army, multiple combat deployments in support of both

16 Iraq and Afghanistan, several other overseas deployments in

17 support of other military operations.

18       In addition to my operational and combat experience, I

19 also served as a dean of the Joint Special Operations Medical

20 Training Center, and I'm an associate professor of the

21 Uniformed Services University of health sciences.  I culminated

22 my career as a colonel and a commander of a special operations

23 medical group.

24       I am a flight surgeon and a board-certified family

25 physician with over 25 years of clinical practice, and I

EXAMINATION OF LEWIS JONATHAN PEIPER

1  currently serve as the chief medical officer for the North

2  Carolina Department of Adult Corrections.

3  Q    Dr. Campbell, you should have a notebook in front of you.

4  Do you have access to that?

5  A    Yes, ma'am.

6  Q    I'm going to be referring to some exhibits that are

7  contained in the notebook, and they're -- they have some tabs,

8  so I'll let you know where we're going.

9      Could you please turn to Defendants' Exhibit 2, just

10 behind the 2 tab.

11 A    Yes, ma'am.

12 Q    Do you recognize this as a version of your CV that you

13 provided during this case?

14 A    I do.

15 Q    And was this an accurate representation of your CV as of

16 the point that you provided it?

17 A    Yes, ma'am.

18 Q    Okay.  And it looks like, if you look at pages 2 through 4

19 of the document, that details some of your professional work

20 experience as it relates to the military in particular.  Is

21 that right?

22 A    Yes, ma'am.

23 Q    Okay.  And if you look at page 1, flip backwards to

24 page 1, where the heading says "Professional Work Experience,

25 Civilian," that details your civilian work experience; is that

1 right?

2 A     Yes, ma'am.

3 Q     And the position at the top -- it says "10/20 to present,

4 chief medical officer, North Carolina Department of Public

5 Safety Prisons."  Does that contain a description right there

6 of your current position?

7 A     Yes, ma'am.

8 Q     Is that an accurate description of your current position?

9 A     It is.

10 Q     Could you just very briefly in your own words talk about

11 what you currently do in your role?

12 A     Yes, ma'am.

13     So, your Honor, as the chief medical officer for the

14 Department of Adult Correction, I'm responsible for the

15 comprehensive medical care -- so that's merged into acute and

16 routine and chronic -- for more than 32,000 individuals

17 incarcerated at 53 prisons, including two very large inpatient

18 hospital facilities, across 46 counties in North Carolina.

19     In that regard, I'm responsible for the recruiting,

20 credentialing, and professional practice of more than

21 150 licensed, independent practitioners, more than 400 nurses,

22 and several administrative medical support staff.

23 Q     Doctor, I'd like to now ask you some questions about

24 whether individualized consideration is provided to those

25 seeking gender-affirming surgery by the Department.

EXAMINATION OF LEWIS JONATHAN PEIPER

1  A    Okay.

2  Q    Are you familiar with what we've been calling the EMTO

3  policy?

4  A    Yes, ma'am.

5  Q    And if you look at Exhibit 4, is that the EMTO policy?

6  A    It is.

7  Q    Does the Department policy require individualized

8  consideration of requests for gender-affirming surgery?

9  A    Yes, ma'am, it does.

10 Q    And is that something that you have understood to be the

11 case since you came to the Department?

12 A    It is.

13 Q    Is it your impression that other members of the DTARC also

14 understood this requirement?

15 A    Yes, ma'am.

16 Q    And has it always been the case, since you joined the

17 DTARC, that this policy has called for this individualized

18 review?

19 A    It has.

20 Q    Does the DTARC follow this requirement in the policy?

21 A    Yes, ma'am, we do.

22 Q    Can you please explain to the Court the way in which

23 review is individualized for all requests?

24 A    Yes, ma'am.

25      So, your Honor, the -- what generally happens is that we

EXAMINATION OF LEWIS JONATHAN PEIPER

1 receive notification from the Facility Transgender Accomodation

2 Review Committee of cases that are being forwarded to us at the

3 division level, the DTARC.  We receive those in advance of the

4 committee meeting.

5      And each of us, each member of the committee, has a

6 respective area that they are required to review in preparation

7 for that meeting so that it -- the operations security

8 individual on the committee will review all of those

9 appropriate documents.

10      We have a PREA -- the Prison Rape Elimination Act --

11 director who also sits on that committee, will review all

12 pertinent aspects of each individual's record in that regard.

13 We have both psychologists and psychiatry that are going to

14 focus on their particular area of expertise, mainly the mental

15 health and behavioral health notes.

16      And myself, as a medical officer, I will not only review

17 the mental health and behavioral health notes, but I also

18 review all of the medical notes associated with that particular

19 individual in preparation for the committee meeting.

20 Q    I now want to ask you some questions about your review of

21 Ms. Zayre-Brown's case.

22 A    Okay.

23 Q    Did you review Ms. Zayre-Brown's medical and mental health

24 records in preparation for the DTARC meeting at which her

25 request was discussed?

EXAMINATION OF LEWIS JONATHAN PEIPER

1 A    Yes, ma'am.

2 Q    Okay.  And if you could turn to Exhibit 8.  It's a large

3 document there.  It's two-sided.

4      Are these records that you would have reviewed in

5 preparation for the meeting?

6 A    Yes, ma'am.

7 Q    Did you review all of the records?

8 A    I did.

9 Q    And are there any records that you ignored or didn't

10 consider as part of your review?

11 A    No, ma'am.

12 Q    Were you aware of any indications of distress in these

13 records?

14 A    Yes, ma'am.  There were episodic periods of time where

15 Ms. Brown would have some episodes of distress.  From my review

16 of those records, they seemed to be often situational and

17 generally short-lived without any severe implications.

18 Q    Did you make an overall assessment of the state of

19 Ms. Zayre-Brown's mental health prior to the DTARC?

20 A    Yes, ma'am, I did.

21 Q    And what was your individual assessment?

22 A    So, your Honor, my individual assessment was that, from

23 review of all the notes that I reviewed, that Ms. Brown was

24 psychiatrically and emotionally stable and actually had very

25 good indications of adapting well.

EXAMINATION OF LEWIS JONATHAN PEIPER

1    There were indications in the record that she was very

2 forward-thinking.  She was actively planning and making plans

3 for endeavors that she was going to pursue upon release from

4 prison.  She was actively engaged in both occupational and

5 academic endeavors for careers once she leaves prison.

6    And I also reviewed the appropriate medical notes that

7 occurred around the same time as the DTARC.  So I reviewed a

8 note from her primary care manager that was completed about two

9 weeks before the DTARC.  And the concluding diagnosis of the

10 primary care manager at the facility was that her gender

11 dysphoria was chronic, stable, and improved.

12    I also reviewed the last endocrinology note from

13 Dr. Carracio, who's the UNC endocrinologist, that occurred a

14 few months before the DTARC.  And his concluding diagnosis on

15 his note was her that gender dysphoria was chronic, stable, and

16 markedly improved.

17    All of those things together led to my conclusion that, at

18 this point, the current treatment plan seemed to be

19 sufficiently addressing the underlying condition of dysphoria

20 for Ms. Brown, and, therefore, there was no indication that

21 additional treatment or accelerated treatments were indicated

22 at that current time.

23 Q    Did anyone else on the DTARC share with the DTARC their

24 assessments of Ms. Zayre-Brown's mental health?

25 A    Yes, ma'am, they did.

EXAMINATION OF LEWIS JONATHAN PEIPER

1  Q    Who would that be?

2  A    So each member of the committee would do that.  For

3  behavioral health and mental health, it would be Dr. Brian

4  Sheitman and Dr. John Peiper.

5  Q    And did Dr. Peiper and Dr. Sheitman share their own

6  assessments?

7  A    They did.

8  Q    And what did they share with the DTARC?

9  A    So their assessments really mirrored those that I had

10  independently come to in my review.  And they felt that --

11  again, that Ms. Brown was stable, adapting well and, again, all

12  the things I mentioned, was actively planning and certainly was

13  having no acute episodes of distress or other indications of

14  additional treatment being needed.

15  Q    And how did these reviews of Ms. Zayre-Brown's mental

16  health and medical records factor into the decision that was

17  made by the DTARC?

18  A    So there are the primary consideration in every case that

19  we review.

20  Q    And we're going to get to your assessment of the medical

21  literature in just a moment in more detail, but could you

22  briefly sum up what you had concluded prior to the DTARC

23  regarding the medical literature?

24  A    Yes, ma'am.

25       So, your Honor, I came to two general conclusions when I

1 reviewed the medical literature.  The first was that, of all

2 the evidence that I was able to review, there is no studies

3 that definitively conclude that gender-affirming surgery will

4 consistently alleviate or eliminate the symptoms of gender

5 dysphoria.

6      The second conclusion I came to was that the majority of

7 the studies that are referenced in support of gender-affirming

8 surgery are generally going to be retrospective, qualitative

9 studies.  On the evidentiary scale of evidence that we use to

10 determine treatment recommendations for our patients, that is

11 incredibly low on that scale.

12      And of the studies that are available, the variables used

13 within each study are significantly different.  So none of

14 those studies really consistently examine the same factors.  So

15 you get variable variables that are in each of those studies.

16 And the results of all those studies, quite frankly, are mixed

17 when it comes to this particular aspect of treatment.

18 Q     Did you share that with the DTARC when it had its

19 discussion of Ms. Zayre-Brown's case this February of 2022?

20 A     I did.

21 Q     And how did that assessment of the state of the literature

22 factor into the DTARC's decision?

23 A     So, your Honor, when we -- in every patient encounter,

24 whether it's on the DTARC or I'm reviewing a patient before the

25 DTARC or any patient that I see in clinic or anywhere, there

EXAMINATION OF LEWIS JONATHAN PEIPER

1 are two factors we consider: that individual's current clinical

2 status and the medical literature or the status of that medical

3 literature as it currently exists.  So that's the same thing

4 that applies in this case.

5 Q    And is that something that would also be considered in

6 other cases?

7 A    Yes, ma'am.

8 Q    So something that's not as individualized, is that fair?

9 The medical literature.

10 A    Correct.  They can be individual -- so you may have

11 particular studies are more appropriate for particular

12 patients, but in general the studies are going to really

13 support that procedural intervention that you're evaluating.

14 Q    And was your assessment of the medical literature a bar to

15 surgery in Ms. Zayre-Brown's case?

16 A    It was not.

17 Q    Why not?

18 A    So, your Honor, there are -- there are always exceptions

19 to any procedure or any intervention that we do.  There are

20 many procedures in prison that -- surgical procedures, for

21 instance, that are -- we consider medically not necessary.  But

22 there can be times when those can become medically necessary.

23      A good example I like to give is inguinal hernias.  So

24 generally, inguinal hernia is not a medical necessity that

25 needs to have surgery.  However, if that hernia is

EXAMINATION OF LEWIS JONATHAN PEIPER

1 incarcerated, is causing significant impairment, then it can

2 become medically necessary.  The same thing applies in this

3 particular surgery.

4 Q    And did the concerns that you saw and the mixed evidence

5 that you saw in the medical literature make denial a forgone

6 conclusion in any of the cases that the DTARC has reviewed?

7 A    No, ma'am.

8 Q    Okay.  I'd like to now turn to talk about your position

9 statement.

10 A    Okay.

11 Q    If you could can look at Exhibits 9, 10, and 11, my

12 question is whether these are all variations of the position

13 statement, as we've been referring to it.

14 A    Yes, ma'am.

15 Q    So if you look at Exhibit 9, it looks likes this is a

16 version that you sent to Dr. Peiper the evening after the

17 DTARC.  Is that right?

18 A    Yes, ma'am, that's correct.

19 Q    And if you look at Exhibit 10, this is an e-mail that

20 you sent to the members of the DTARC in March -- I would say

21 March 22nd, 2022, with an attachment that was the DTARC

22 position statement or something that you called the DTARC

23 position statement.  Do you see that?

24 A    I do.

25 Q    And then the third one, is this another version of the

EXAMINATION OF LEWIS JONATHAN PEIPER

1 position statement?

2 A    Yes, it is.

3 Q    That's DX11?

4 A    That's correct.

5 Q    Okay.  Could you please explain generally what this

6 position statement was?

7 A    Yes, ma'am.

8       So, your Honor, this position statement -- I think the

9 first thing worth emphasizing is that this was a draft, and

10 more accurately a rough draft.  I need to go back just briefly,

11 if I may, in history as to how this document emerged.

12      In my capacity as the chief medical officer, we make

13 medical-necessity determinations all the time.  We get upwards

14 of a hundred thousand referrals a year that we need to review.

15 And medical necessity is at the base of every single one of

16 those consults.

17      So some -- not long after I assumed my position, I began

18 to try to understand what encapsulates medical necessity.  What

19 are the tenants?  What are the things that determine medical

20 necessity?  And as I was doing that and I was doing my work on

21 the DTARC, I took those tenants and those basic principles and

22 applied them specifically to gender-affirming surgery.

23      So this was meant to be -- it was not meant to be a peer

24 review journal article.  It was not meant to be a comprehensive

25 assessment of every study out there.  It was really to provide

EXAMINATION OF LEWIS JONATHAN PEIPER

1  the members of the DTARC a common operating picture or a common

2  baseline understanding of the medical literature as it exists

3  today.

4  Q    And in your position statement, what did you conclude

5  generally regarding medical necessity of gender-affirming

6  surgery?

7  A    So generally speaking, there -- again, if you're treating

8  -- you're treating dysphoria.  So generally speaking, if an

9  individual's symptoms are adequately controlled with the

10 current treatment regimen -- we do a risk-benefit analysis of

11 every patient that we see.  And if their treatment is adequate

12 and they're doing well, then that risk-benefit analysis does

13 not necessarily tip to the point of making this a medical

14 necessity.

15 Q    So there is a conclusion in the position statement that,

16 generally speaking, gender-affirming surgery is not medically

17 necessary; is that right?

18 A    That's right.

19 Q    Okay.  Did you intend for there to be any exceptions to

20 that?

21 A    No, ma'am.  Oh, yes, ma'am.  I did intend for there to be

22 exceptions.

23 Q    And I just want to be clear on this because there's strong

24 language in the position paper.

25      Did you mean to suggest that surgery could never be

1 medically necessary for someone with gender dysphoria?

2 A     No, ma'am.

3 Q     Can you talk about what type of exceptions there could be

4 to your general conclusion?

5 A     Yes, ma'am.

6     So, your Honor, the underlying condition that we're

7 treating is the dysphoria, which the -- probably the easiest

8 way to succinctly characterize that is a profound unhappiness

9 or dissatisfaction.

10     So when you're evaluating a patient that has dysphoria of

11 any sort, not just gender dysphoria, you want to evaluate the

12 things that -- the way that could be manifested in that

13 particular patient.

14     So you want to look at things like their sleep habits.

15 Are they at an extreme of having sleep disturbances?  You

16 ascertain if they continue to maintain interest in activities

17 that they normally enjoy doing.  You ask if they spend a lot of

18 time perseverating or focusing on things, blaming themselves or

19 feeling guilty about things that are not their fault.  You ask

20 about their energy level.  Is it at either extreme of the

21 energy level?

22     You ask about concentration.  Are they able to focus?  And

23 they able to stay on-task?  You ask about their appetite, again

24 in either extreme.  You ask about psychomotor agitation.  So

25 are they anxious or agitated or are there -- do they have

EXAMINATION OF LEWIS JONATHAN PEIPER

1 feelings of aggression?  You also look at any suicidal ideation

2 or any kind of self-injurious behavior.

3      All of those factors together allow you to make an

4 assessment of what I would say is the severity of their

5 illness.  And the way you capture that is, are those symptoms

6 disabling or impairing enough that they -- that they impair

7 some social or occupational or other important area of function

8 in their life?  If that's the case, then you can determine that

9 their gender dysphoria is significant enough to require some

10 kind of intervention.

11 Q    If that were the case, if you saw those debilitating

12 symptoms, would you support surgery?

13 A    Yes, ma'am, conceptually.

14      So I think the first thing you do when you determine that

15 a patient is not responding as you would expect based on the

16 current treatment regimen, then -- you first look at your

17 current treatment regimen.  Are there modifications you can

18 make within that current treatment regimen to be effective, to

19 meet your therapeutic goal?  And if there are not, you need to

20 step up to the next level of treatment, which in this case

21 would potentially be gender-affirming surgery.

22 Q    Did you see Ms. Zayre-Brown's case as a case that

23 presented that kind of debilitating, severe symptoms?

24 A    No, ma'am.

25 Q    And has that case ever been presented to the DTARC?

EXAMINATION OF LEWIS JONATHAN PEIPER

1 A    Not yet, no, ma'am.

2 Q    Okay.  If it was presented, would you be open to surgery?

3 A    I would.

4 Q    I want to ask you about the exhibits we just looked at

5 where you were sharing this document.  You had sent it to other

6 members of the DTARC.  Why did you do that?

7 A    So I -- I guess I'll go back to the first -- that would be

8 Exhibit 9.  So that was the e-mail to Dr. Peiper.

9     So I had initially verbally presented my basic

10 understanding of this document, you know, to the DTARC at that

11 particular meeting.  If I'm not mistaken, this may have been

12 the same night, after that.  As Dr. Peiper and I both serve as

13 co-chairs of that committee, I sent it to him for his initial

14 review.

15 Q    And then you later, it looks like, in March sent it to the

16 entire DTARC.  Why did you share it with the group that is the

17 DTARC?

18 A    Yes, ma'am.  So after Dr. Peiper and I had both viewed

19 this document, the plan next was to provide this to the DTARC

20 so that they have a -- at least a copy of this rough draft as

21 we had presented it verbally at that committee.  So again,

22 getting back to them having a baseline understanding of the

23 status of the medical literature.

24 Q    Was any version of this position paper ever adopted?

25 A    No, ma'am.

EXAMINATION OF LEWIS JONATHAN PEIPER

1 Q    Why not?

2 A    So as you stated -- and I have to admit there was very

3 strong language in this that could have been interpreted as a

4 prohibition against surgery.  Again, this was a rough draft.  I

5 have to again emphasize that.

6     Had this document been proceeded, there would have been

7 multiple edits and clarifications and modifications of this

8 document before it finally reached what would be its final

9 version.  But because we never proceeded with those things, it

10 never progressed past this point that you see here.

11 Q    And did you have intentions with respect to changing the

12 process?

13 A    So one aspect of this -- one of my goals with this, your

14 Honor, was that -- that -- I was really attempting kind of --

15 as I referenced about the medical-necessity statement, to

16 standardize this process, to try to develop some criteria that

17 could be utilized in a uniform basis across the board.

18     And ultimately -- and I -- because we didn't work through

19 this, I never really fully developed what this could include,

20 but my concept was that we could develop efficiencies in how we

21 review these cases so that we would review these cases more

22 analogous to how we review requests for exceptions to other

23 surgeries which we generally consider to be not medically

24 necessary.  But because it was a draft, we never progressed to

25 that point.

EXAMINATION OF LEWIS JONATHAN PEIPER

1 Q    And if you look at DX10 -- this is the cover e-mail when

2 you sent it out to the DTARC -- if you look in the middle of

3 that page, you made a statement, "If approved, the position

4 statement would be forwarded to our FTARCs and no further

5 consideration would be given to GRS within our system."  What

6 did you meet mean by that?

7 A    So I think so that's referencing back to what I just

8 referenced, your Honor, is that my -- the concept I had in my

9 head at the time, which never got to come to fruition, is that,

10 if -- just as we do with other surgery cases, if we felt that

11 an individual had criteria that would qualify or, you know,

12 make them approved for an exception to a surgery that's not

13 normally medically necessary, we may be able to avoid some of

14 the current processes we currently have in place.  So this

15 could be processed more analogous to how we process other

16 surgical cases.  So that was the intent of the statement.

17 Q    Was there ever an e-mail vote on this statement that you

18 recall?

19 A    No, ma'am.

20 Q    And was the Department's position on individualized review

21 ever changed?

22 A    No.  It's always been the same.

23 Q    And did you accept that this position paper would not be

24 adopted?

25 A    Of course.  Yes, ma'am.

1  Q    And have you continued to follow the EMTO policy as it

2  relates to providing individualized review?

3  A    I have.

4  Q    Would you do that even if you disagreed with the policy?

5  A    Yes, ma'am.

6  Q    Do you still have concerns about the quality and

7  conclusions of the medical evidence for gender-affirming

8  surgery?

9  A    I do.  Although this document was never adopted, I think

10 that the research -- as I discussed, with the quality of

11 studies and the conclusions of those studies, particularly when

12 you look at the efficacy towards the treatment of

13 gender-affirming surgery, especially in the intermediate and

14 long term, those concerns are valid.

15      And it constantly requires that -- when you have a

16 situation where a condition has mixed results and there's no

17 definitive data, and it's clear that additional research is

18 needed in that area, that raises the threshold to where that

19 risk-benefit analysis tips towards having to proceed with that

20 particular intervention.

21 Q    And was it true in February of 2022 that, if a case had

22 been presented of severe or debilitating gender dysphoria that

23 was not adequately controlled by other treatments, that you

24 would have voted to approve surgery?

25 A    Yes, ma'am.

EXAMINATION OF LEWIS JONATHAN PEIPER

1  Q    And is that true now?

2  A    It is.

3  Q    I want to turn now and ask you some questions about the

4  WPATH.  Are you familiar with the WPATH standards of care?

5  A    Yes, ma'am, I am.

6  Q    How are you familiar with them?

7  A    So as I assumed my duties on the DTARC, that was the first

8  reference that I -- that I went to.  That is the most broadly

9  utilized reference out there.  So I immediately began reading

10 that document at that time.  And I think it was Standard of

11 Care 7 was the version that we were operating under.

12 Q    And do you read the WPATH standards to provide sufficient

13 criteria for a medical-necessity determination?

14 A    No, ma'am.

15      Your Honor, the WPATH does not -- does not provide what I

16 would consider an articulable or operational definition for

17 medical necessity that we, at the primary-care level as

18 providers, can utilize.

19      The WPATH operates under a presumption that all

20 gender-affirming care is not medically necessary, and it's

21 based on the patient's goals and desires.  What they list as

22 criteria or eligibility requirements for the surgery are what

23 are traditionally in medicine considered to be

24 contraindications, or reasons you don't proceed with surgery.

25 But they don't provide a clearly articulable list of criteria

EXAMINATION OF LEWIS JONATHAN PEIPER

1 that would make this medical necessity.  Again, they have the

2 presumption that it is.

3 Q    And how was the WPATH guidance then used, if at all, by

4 the DTARC?

5 A    So it's absolutely used.  It is the primary reference to a

6 lot of folks that are involved in this treatment, so it has to

7 be considered.

8 Q    And in your view, is the way that it was used consistent

9 with WPATH?

10 A    Yes, ma'am, it was.

11      Your Honor, the WPATH, at several points in their

12 standards of care, state that this is -- that this is -- these

13 -- the -- first of all, they call them "standards of care," but

14 they really identify them as guidelines.  They specifically say

15 that they are -- that they are flexible, that they need to be

16 adaptable to the particular situation.

17      So in their defense, they do say that individuals

18 providing this care should take those as guidelines and adapt

19 them accordingly to their situation and their particular

20 patient.

21 Q    Dr. Campbell, having been through this entire series of

22 events and part of this process, what is your view on whether

23 Ms. Zayre-Brown received the individualized consideration that

24 she was entitled to under the EMTO policy?

25 A    I have no doubt that she did.

EXAMINATION OF LEWIS JONATHAN PEIPER

1       MS. BRENNAN:  Thank you.

2       THE WITNESS:  Yes, ma'am.

3       THE COURT:  Cross-examination.

4       MS. MAFFETORE:  Just one moment, please.  It's a lot

5   of paper.

6                **CROSS-EXAMINATION BY MS. MAFFETORE:**

7   Q    Good afternoon, Dr. Campbell.

8   A    Good afternoon.  Good to see you again.

9   Q    I was going to say, we've met before at your deposition,

10  correct?

11  A    Yes, ma'am.

12  Q    You are DAC's chief medical officer, correct?

13  A    Yes, ma'am.

14  Q    And another way to say that is that you're DAC's medical

15  authority; is that correct?

16  A    That's correct.

17  Q    Okay.  And you have no training -- you had no training in

18  the evaluation of gender-affirming surgery prior to 2022,

19  correct?

20  A    No, ma'am.  That's not correct.

21  Q    Do you recall testifying at a deposition in this case?

22  A    I do.  I remember at my deposition I said that I had had

23  training both in my residency -- now, at the time it was a

24  different term.  It was transgenderism, and it was later

25  transitioned to transgender identity disorder, but it's the

1 same condition.  So as a family physician, we are trained in

2 those and what would be that today.

3 Q    So my question was no training in the evaluation of

4 gender-affirming surgery.

5 A    I am not a surgeon, if that's what you mean.  No.

6 Q    Have you ever -- prior to 2022, you had never given an

7 evaluation for a patient for gender-affirming surgery; is that

8 correct?

9 A    That's correct.

10 Q    Okay.  Thank you.  And in your role as chief medical

11 officer, we've been discussing a position statement that you

12 developed regarding gender-reassignment surgery, as it's

13 phrased in that position paper.  Is that correct?

14 A    That's correct.

15 Q    And I'm going to show you that exhibit, but I'm going to

16 show you one with my sticker on it so I don't have to do the

17 binder situation that I just did again, if that is all right

18 with you.

19 A    Yes, ma'am.

20 Q    And so this is what --

21        MS. MAFFETORE:  Can you make the screen come back for

22 me?  Thank you.

23 Q    This is what we've been previously discussing as

24 Defendants' Exhibit 11, correct?

25 A    Yes, ma'am.

EXAMINATION OF LEWIS JONATHAN PEIPER

1 Q    And if I zoom that out to here, can you see that all right

2 on the screen?

3 A    I can.

4 Q    Okay.  Thank you.

5     And now 3045 of this document, in that middle paragraph,

6 you noted that "After extensive and analysis of hundreds of

7 studies and other publications, it has been determined that

8 gender-reassignment surgery as a treatment for gender dysphoria

9 is not medically necessarily."  That's what you wrote there,

10 correct?

11 A    Yes, ma'am.

12 Q    Okay.  And then, if we look at page 3414 of this document,

13 which is right about at the end, you've concluded there in the

14 final paragraph on this page, "Accordingly, to support these

15 procedures given all these concerns would be in conflict with

16 the most critical imperative in medicine, primum non nocere,

17 first do no harm."  Did I read that correctly?

18 A    You did.

19 Q    Okay.  And then the last sentence of this same paragraph

20 states, "The evidence regarding GCS does not provide sufficient

21 confidence that the procedure should be undertaken without

22 concern for having violated that oath."  Correct?

23 A    That's correct.

24 Q    Okay.  And so you're stating there that the evidence

25 regarding gender-affirming surgery is not sufficient for you to

EXAMINATION OF LEWIS JONATHAN PEIPER

1 allow it without violating your oath.  That's what that states?

2 A    That is what that states, but --

3 Q    Okay.  Thank you.

4 A    Sorry.  I would add that, again, it goes back to what I

5 said.  There is a risk-benefit analysis that we are obligated

6 to provide for every patient.

7 Q    Okay.  And so you were discussing a prior draft of that

8 same position statement, correct, with my opposing counsel?

9 A    Correct.

10 Q    Okay.  And I'm going to again show you a different version

11 just for ease of not using the binder.

12      And so this was previously shown to you as part of DX9.

13 Do you recall looking at DX9 just a moment ago?

14 A    Yes, ma'am.

15 Q    Do you recall that it was attached to an e-mail dated

16 February the 17th, 2022?

17 A    I do.

18 Q    And so this -- you testified it was an early iteration of

19 that same position-statement document that we were just looking

20 at just a moment ago?

21 A    That's correct.

22 Q    Okay.  And the first paragraph under "Summary Statement"

23 states, "Primum non nocere, first do no harm, is the

24 underpinning of the oath all physicians take.  The evidence

25 regarding GCS does not provide sufficient confidence that the

EXAMINATION OF LEWIS JONATHAN PEIPER

1 procedure should be undertaken without concerning for

2 violating" -- "having violated that oath."  Correct?

3 A    That's correct, with the caveat I previously stated.

4 Q    Okay.  And that's the same position that was reflected in

5 the ultimate case summary, correct?

6 A    It is.

7 Q    Okay.  And so it was your idea to try to introduce this

8 document as a position statement for the DTARC as a whole,

9 correct?

10 A    That's correct.

11 Q    Okay.  And you testified previously that this document

12 reflected your concerns and considerations regarding

13 gender-affirming surgery as of February 17th, 2022, correct?

14 A    Yes, ma'am.

15 Q    Okay.  And you testified previously that your proposal was

16 that there'd be a standardized approach to evaluating requests

17 for gender-affirming surgery, correct?

18 A    That's correct.

19 Q    Okay.  And you were the DTARC co-chair on February 17th,

20 2022; is that correct?

21 A    Yes, ma'am.

22 Q    Okay.  And you considered Mrs. Zayre-Brown's request for a

23 vulvoplasty on that same day, correct, February 17th, 2022?

24 A    We did.

25 Q    Okay.  And at that time you determined that it was not

EXAMINATION OF LEWIS JONATHAN PEIPER

1 medically necessary, correct?

2 A    That's correct.

3 Q    And you've never met Mrs. Zayre-Brown, correct?

4 A    No, ma'am.

5 Q    And you've never spoken with her?

6 A    No, ma'am.

7 Q    Okay.  And you just reviewed her medical records while

8 considering her request; is that correct?

9 A    That's correct.

10 Q    All right.  And you testified previously that you reviewed

11 Dr. Carracio's recommendation that gender-affirming surgery was

12 medically necessary for Mrs. Zayre-Brown, correct?

13 A    Yes, I did review that note.

14 Q    You did not reach out to Dr. Carracio regarding that note,

15 correct?

16 A    No, ma'am.

17 Q    You did not seek any elaboration from Dr. Carracio about

18 when he met -- when he stated that he believed it to be

19 medically necessary for Mrs. Zayre-Brown?

20 A    No, ma'am.

21 Q    And you reviewed Jennifer Dula's recommendation that

22 gender-affirming surgery was the appropriate --

23        (Reporter seeks clarification.)

24        MS. MAFFETORE:  I'm sorry.

25        THE COURT:  You are a fast talker.

EXAMINATION OF LEWIS JONATHAN PEIPER

1     (Laughter.)

2          MS. MAFFETORE:  I am a fast talker, your Honor.  I
3  apologize.

4          THE COURT:  And you could emphasize things better in
5  terms of going through things and -- not for today.  It doesn't
6  matter to me.  But for future reference, you -- sometimes you
7  speed over important --

8          MS. MAFFETORE:  Yes, your Honor.  Thank you so much.

9  Q    You reviewed Jennifer Dula's recommendation that
10  gender-affirming surgery was the appropriate next step for
11  Mrs. Zayre-Brown, correct?

12  A    Yes, ma'am, I did.  I think that her note stated something
13  to the effect of it seems that that -- I have to look at her
14  note, but it was -- it was not a definitive.  It was that
15  the -- it appears the next appropriate step may be gender --
16  and she actually termed it trans-feminine bottom surgery, is
17  what she put in her note.

18  Q    And you didn't seek any elaboration from Jennifer Dula,
19  correct?

20  A    No, ma'am.

21  Q    And you testified that you reviewed Dr. Figler's
22  recommendation following his surgical consult with
23  Mrs. Zayre-Brown that gender-affirming surgery was the
24  appropriate next step for Mrs. Zayre-Brown?

25  A    Yes, ma'am, I did.

EXAMINATION OF LEWIS JONATHAN PEIPER

1 Q    And you didn't seek any elaboration from Dr. Figler,

2 did you?

3 A    No, ma'am.

4 Q    You didn't consult any of Mrs. Zayre-Brown's clinical

5 providers regarding the decision to deny her request for

6 gender-affirming surgery, correct?

7 A    No, ma'am.

8 Q    So I'd now like to look at, once again, what has already

9 been introduced as Defendants' Exhibit 6, which is also

10 Plaintiff's Exhibit 6, the case summary.

11     And so this case summary was developed both before and

12 after February 17th, 2022, correct?

13 A    Yes, ma'am.

14 Q    Okay.  And you are the sole author of the medical analysis

15 contained in this document, correct?

16 A    Yes, ma'am, that's correct.

17 Q    And this medical analysis contains the medical-necessity

18 determination?

19 A    It does.

20 Q    Okay.  And you concluded in the medical analysis that,

21 based on this review, it is the determination of the medical

22 authority that gender-reassignment surgery, as requested by

23 this offender, is not medically necessary; is that correct?

24 A    Yes, ma'am, that's correct.

25 Q    In your medical analysis, you followed your own view of

EXAMINATION OF LEWIS JONATHAN PEIPER

1 the criteria for medical necessity, correct?

2 A    Yes and no.  So there is a generally accepted view of

3 that, which is what we follow in all cases.  But I -- again, I

4 added some clarifications to what I considered to be medical

5 necessity.

6 Q    Okay.  In your medical analysis, you note that you

7 considered WPATH to be unreliable based on your concerns about

8 objectivity and conflicts of interest; is that correct?

9 A    Yes, ma'am, that's correct.

10 Q    And you utilized the standardized approach that you had

11 proposed in your position statement in considering

12 Mrs. Zayre-Brown's request for gender-affirming surgery,

13 didn't you?

14 A    Yes, ma'am.

15 Q    In fact, the medical analysis represents a summary of your

16 position statement, correct?

17 A    Portions of it, yes, ma'am.

18 Q    Okay.  In fact, there are several completely identical

19 passages, correct?

20 A    That's correct.

21 Q    Okay.  The decision not to adopt the policy statement took

22 place after your decision was made with respect to

23 Mrs. Zayre-Brown, correct?

24 A    That's correct.

25 Q    On February 17th, 2022, you had no reason to believe that

EXAMINATION OF LEWIS JONATHAN PEIPER

1 surgery would lead to increased suicidality for

2 Mrs. Zayre-Brown, correct?

3 A     Not specifically, no, ma'am.

4 Q     Okay.  And you had no reason to believe that

5 Mrs. Zayre-Brown would experience regret following

6 gender-affirming surgery?

7 A     No, ma'am.

8 Q     You had no reason to believe that Mrs. Zayre-Brown would

9 be at risk for a de-transition, correct?

10 A     No, ma'am.

11 Q     You testified previously that you did not recall

12 discussing any surgical risks or benefits specific to

13 Mrs. Zayre-Brown at the February 17th, 2022, DTARC meeting,

14 correct?

15 A     That's correct.

16 Q     Looking at your medical analysis, it does not contain

17 any discussion of Mrs. Zayre-Brown's specific medical

18 circumstances, correct?

19 A     That's correct.  Not in the -- not in the medical summary,

20 but there is a some of that included at the -- in the

21 biographic information prior to that in that document.

22 Q     Okay.  And when you refer to the demographic information

23 prior to that document, are you referring to this timeline on

24 the first page?

25 A     Yes, ma'am.  And there's medical information contained in

EXAMINATION OF LEWIS JONATHAN PEIPER

1  that.

2  Q    Okay.  So your position is that the timeline represents

3  the specific information as to Mrs. Brown in the medical

4  analysis?

5  A    It is a portion of it yes, ma'am.

6         MS. MAFFETORE:  Okay.  I have no further questions for

7  this witness at this time.

8         THE COURT:  Any redirect?

9         MS. BRENNAN:  Very briefly, your Honor.

10        **REDIRECT EXAMINATION BY MS. BRENNAN:**

11 Q    Dr. Campbell, could you please turn to Exhibit 7.

12 A    Yes, ma'am.

13 Q    And this is the final note that was entered into

14 Ms. Zayre-Brown's chart regarding the determination by the

15 DTARC?

16 A    Yes, ma'am.

17 Q    And does this set forth the bases for the denial?

18 A    It does.  This is the actual document that is produced

19 that is in the medical record for the patient.

20 Q    Does this discuss the individualized review of

21 Ms. Zayre-Brown's mental health and behavioral health record?

22 A    Yes, ma'am, it does.

23 Q    Okay.  Does it also make a reference to the literature?

24 A    Yes, it does.

25 Q    In weighing those two things, which was the primary factor

EXAMINATION OF LEWIS JONATHAN PEIPER

1 in this determination?

2 A    It's always the individualized determination.

3 Q    Okay.  You were also asked some questions about clinical

4 providers and whether you actually spoke to them.  Did you

5 believe it was necessary to do so?

6 A    No, ma'am.  Unless I have some reason to believe that

7 their conclusions are not appropriate, then there's no reason

8 for me to question them.  They -- their notes were very clear

9 by my understanding.

10 Q    And if you look at Exhibit 8, which is the really thick

11 document in the binder, for one of those providers, Ms. Dula,

12 for example, would that contain multiple examples of her

13 contemporaneous notes documenting her actual encounters with

14 Ms. Zayre-Brown?

15 A    It contains multiple notes from her, yes, ma'am.

16 Q    And would it contain notes from all the treating

17 providers?

18 A    It would.

19 Q    And was that all the information that you had available

20 to you and that you considered in doing your review of

21 Ms. Zayre-Brown's case?

22 A    Yes, ma'am.  It has to be a comprehensive review.  You

23 can't base a decision off any single note or entry.

24          MS. BRENNAN:  Nothing further, your Honor.

25          THE COURT:  All right.  Thank you.

EXAMINATION OF BRIAN SHEITMAN

1    Any cross, further cross?

2         MS. MAFFETORE:  No, your Honor.

3         THE COURT:  Okay.  Thank you, Doctor.

4         THE WITNESS:  Thank you, your Honor.

5    (Witness excused.)

6         MR. RODRIGUEZ:  Your Honor, we have one additional

7    witness, Dr. Brian Sheitman.

8         THE COURT:  Why don't we take about a 15-minute break.

9         MR. RODRIGUEZ:  Thank you, your Honor.

10        THE COURT:  And we can hear that witness, and I think

11   then the plaintiffs have one witness.  Is that right?

12        MS. MAFFETORE:  (Ms. Maffetore nodded her head up and

13   down.)

14        THE COURT:  Okay.

15        MS. MAFFETORE:  That is correct, your Honor.  We have

16   one witness.

17   (A recess was taken.)

18        THE COURT:  All right.  Call your next witness.

19        MR. RODRIGUEZ:  Thank you, your Honor.  We'll call --

20   the defendants call Dr. Brian Sheitman to the stand.

21   (Witness sworn.)

22   **BRIAN SHEITMAN, DEFENDANTS' WITNESS, DIRECT EXAMINATION**

23                    **BY MR. RODRIGUEZ:**

24   Q    Good afternoon, Dr. Sheitman.  Can you please introduce

25   yourself to the Court.

EXAMINATION OF BRIAN SHEITMAN

1  A      Sure.  My name is Brian Sheitman.  I'm the chief

2  psychiatrist for the North Carolina Department of Adult

3  Correction.  I've held that job since December 2018.  I came to

4  North Carolina in 1996 and took a job with the University of

5  North Carolina, Chapel Hill, the psychiatry faculty, and I was

6  at that job till I left to take this job.

7  Q      Thank you.  Can you turn there -- you should have a

8  notebook up on your desk.

9  A      Yes.

10 Q      Can you turn to Exhibit 3, DX3.  And is that an accurate

11 copy of your CV up until the time that it was created?

12 A      It looks like it is, yes.

13 Q      Can you describe to the Court what you did as the chief of

14 psychiatry in preparation for the February 17, 2022, DTARC

15 meeting wherein the committee discussed Mrs. Zayre-Brown's

16 request?

17 A      I reviewed her medical record, which included -- so the

18 behavioral-health section, the medical section, and there's

19 this other section, an administrative section called OPUS which

20 has some clinical and other information in it.  So I tried to

21 go through those records.

22 Q      Okay.  And is that a review that you do before the

23 meeting?

24 A      Yes.

25 Q      And how comprehensive is that review?

EXAMINATION OF BRIAN SHEITMAN

1  A    I try to go through all the behavioral-health notes, the

2  medical notes.  If I see something that's described that I

3  would see as completely irrelevant, I would probably not read

4  it.  And I scan through the OPUS administrative records,

5  looking at certain sections.

6  Q    Okay.  Can you turn to Exhibit 8 there in the binder.  So

7  it's the document that starts after the 8 tab.

8  A    I've got it.

9  Q    Are you familiar with these records here?

10 A    These look like the type of records that I reviewed.

11 Q    Okay.  And if you take a moment to flip through them

12 briefly, what types of records are you seeing here?

13 A    So this one is a clinical encounter, which is nursing

14 notes.  That would be in the medical section.  And there's a

15 mental-health assessment, then there's another

16 clinical-encounter note, mental-health progress note.

17 Q    And are these an accurate representation of the records

18 you would have had access to to review before the DTARC

19 meeting?

20 A    I think so.  I don't remember the specifics, but I would

21 assume yes.

22 Q    And in reviewing the records, what is your purpose?

23 A    My -- to inform the committee about the person's overall

24 psychiatric stability.  How are they doing?  How would you

25 describe this person's level of functioning at that time?

EXAMINATION OF BRIAN SHEITMAN

1 Q    And how do you come to that assessment by reviewing
2 records?
3 A    Well, I try to sort out -- I try to look at symptoms, what
4 the person reports, signs, so mostly more objective measures.
5 I'll look at a medication administration record.  Is this
6 person taking their medicine?  Are they not taking their
7 medicine?  How -- are they going to appointments?  Just sort of
8 a general overview of what they're saying, what they're doing,
9 and as much other collateral information as I can get.
10 Q    Why is that kind of assessment important, from your
11 perspective, on the DTARC?
12 A    I think you're trying to get a whole, more accurate
13 picture of someone.  Sometimes people may say one thing, and
14 the records may look the other way.  Sometimes they're exactly
15 the same.  Sometimes it could be reversed.  So I just want to
16 try to get as much as information as I can to make as informed
17 a decision as I can by looking at records.
18 Q    Did you conduct a record review in the case of
19 Mrs. Zayre-Brown's request?
20 A    Yes.
21 Q    Did you arrive at an assessment of Mrs. Zayre-Brown's
22 overall mental health after that review?
23 A    I did.
24 Q    And what was that assessment?
25 A    I thought she was doing relatively well.  Looking at her

EXAMINATION OF BRIAN SHEITMAN

1  record, I thought she looked like a -- sort of a -- mostly an

2  energetic, forward-thinking person who is determined.  She was

3  sort of unhappy with her current state, and she was going to do

4  everything that she could and figure out ways to sort of move

5  forward, to get what she wanted.  She didn't strike me as sort

6  of depressed.

7      The issue that I focus on is dysphoria.  Is the person

8  unhappy?  Is the person depressed?  And not to sort of joke

9  about it, but it's gender dysphoria.  Dysphoria is a broad

10 concept to me.  So I wanted to look at the different pieces

11 that I would include in someone who's dysphoric, not just

12 unhappy.

13 Q    Okay.  And were there instances in her record based on

14 your review where she appeared to, perhaps, not be doing as

15 well as other times?

16 A    There were.  There were a number of times wherein her

17 symptoms -- there was a blip in her symptoms.  What I

18 interpreted from that, there was always something external that

19 was going on that she was upset about, and that -- then she

20 has -- whether it was going to the emergency department or the

21 hospital.

22     So each time I looked at that, it was something what -- I

23 don't remember the details off the top of my head, but I know

24 she was unhappy with her prison camp, and she wanted to get out

25 of the camp, and that was raising her overall symptoms.  And

EXAMINATION OF BRIAN SHEITMAN

1 then, when I looked later on, she did get out, and then her

2 symptom severity went way down.

3     So that would be more the way I look at it, is it's more

4 of a reaction to external events other than an internal

5 process.  That's how I saw it.

6 Q    Did you have -- arrive at an assessment of whether

7 Mrs. Zayre-Brown's symptoms were well-controlled?

8 A    I would say I didn't see severe symptoms.  You know,

9 again, I always struggle, too, because everybody in prison is

10 unhappy and depressed.  And prison is horrible.  So whenever I

11 go through a chart, I try to factor in sort of their overall

12 environment, which is -- you know, very rarely does somebody

13 say they're doing really well when they're in prison.

14     So I try to sort that out from co-morbidities to -- being

15 in prison to having this other problem.  And I'm not sure I'm a

16 hundred percent right.  I do the best I can.

17 Q    Did you provide your overall assessment on the overall

18 state of Mrs. Zayre-Brown's mental health to the DTARC?

19 A    I did.

20 Q    And so is it fair to say that you did not defer to

21 Dr. Campbell or anyone else when arriving at that conclusion?

22 A    No, absolutely not.

23 Q    I'm going to ask again.  I don't know that we heard your

24 -- did you defer to any other individuals --

25 A    No.

EXAMINATION OF BRIAN SHEITMAN

1  Q     -- in arriving at your conclusion on her overall mental

2  state?

3  A     No.  I did it basically on my own.

4  Q     And is that something you do with respect to other DTARC

5  cases that come up?

6  A     I -- you know, I don't remember the details, but I have a

7  process I go through all the time.  The process is always the

8  same.  I go through the records.  I find some time to go

9  through all the records.  I sit by myself.  I go through them.

10 If something comes up that I'm not sure about, I could reach

11 out.  Most of the time, I don't.  I just go by what's in the

12 record.

13 Q     In that process, in reviewing medical records, if you came

14 upon a patient's chart that, based on your review, you

15 concluded that the patient did have severe symptoms associated

16 with gender dysphoria that were not responsive to existing

17 interventions and were not related to comorbid conditions,

18 would you have determined in that instance that surgery would

19 be medically necessary?

20 A     Yes.

21 Q     And was -- that situation that I just described, was that

22 Mrs. Zayre-Brown's situation?

23 A     I didn't think it was.  I didn't think her symptoms were

24 that severe.  That was my opinion.

25 Q     And if you came across a situation where a patient's --

EXAMINATION OF BRIAN SHEITMAN

1 review of a patient's chart indicated that they had severe

2 symptoms that were not well-controlled by existing

3 interventions, that were related to their gender dysphoria and

4 not some other comorbid condition, would your assessment be

5 that surgery might be medically necessary for them, regardless

6 of the state of the medical literature?

7 A    Yes.  I might have some additional questions.  Having

8 spent much time in a prison, a lot of things go on in prison

9 that people aren't really aware of.  So I would -- may have

10 other questions to be sure that I'm right.

11 Q    And if you had those other questions addressed and still

12 believed that gender-affirming surgery would be medically

13 necessary for the patient, would you recommend it regardless of

14 the state of the medical literature?

15 A    Yes.

16 Q    Now, with respect to the medical literature, did you

17 conduct your own review of available literature on the topic of

18 gender-affirming surgery?

19 A    Yes.

20 Q    And did you arrive at a conclusion as to the general state

21 of that literature?

22 A    The literature was much more robust than I first thought.

23 I'm really not -- honestly, wasn't an expert in this in any

24 way, shape, or form.  So I went through the literature.  It was

25 overwhelmingly a lot of literature in it.  So I looked through

EXAMINATION OF BRIAN SHEITMAN

1  the reviews.

2      In psychiatry, I had been part of these reviews.  I think

3  it was the AHRQ reviews where they set up standards.  They pull

4  out the studies that meet the standards, and you go through,

5  and you rate all -- you have an expert panel rate the studies.

6      So I looked at -- that was the one I really spent the most

7  time looking at because I thought it would save me time, it

8  would be more efficient, and I had respect for what they did.

9  So yes.

10 Q    And what was the -- you said that it was H -- AHRQ?

11 A    I think it's A -- American Hospital Research and Quality,

12 I think is the one.

13 Q    And what was the overall determination or takeaway from

14 that review?

15 A    It was inconclusive, really.  There was no clear evidence

16 that this is an evidence-based procedure.

17 Q    So you didn't defer to Dr. Campbell --

18 A    No.

19 Q    -- with respect to the medical literature you reviewed?

20 A    No.

21 Q    Now, with respect to Dr. Camera's position statement, at

22 the time that the DTARC met to consider Mrs. Zayre-Brown's

23 request -- so February 17, 2022 -- had you seen -- at that

24 time, had you seen a copy or version of Dr. Campbell's position

25 statement?

EXAMINATION OF BRIAN SHEITMAN

1  A    No.

2  Q    Now, the position statement was subsequently circulated --

3  A    Yes.

4  Q    -- to you and other members of the DTARC?

5  A    Yes.

6  Q    What happened to that position statement after it was

7  circulated?

8  A    Someone told me -- I don't really remember who it was --

9  that it was just shelved because the administration does not

10  want to have any blunt -- even perception of some blanket

11  approach to this, and it should be taken case by case.  So that

12  was the end of it.

13  Q    And has the DTARC -- had the DTARC utilized a case-by-case

14  review process?

15  A    Yes.

16  Q    Does it continue to do so?

17  A    Yes.

18  Q    Did Dr. Campbell's position statement in any way impact

19  how or whether the DTARC utilized an individualized review

20  process?

21  A    I mean, I can't speak for everybody else.  I can

22  truthfully speak for myself, but no.

23         MR. RODRIGUEZ:  No further questions.

24         THE COURT:  Cross.

25  ///

EXAMINATION OF BRIAN SHEITMAN

**CROSS-EXAMINATION BY MS. LI NOWLIN-SOHL:**

Q    Hi, Dr. Sheitman.  My name is Li Nowlin-Sohl.  I'm an attorney for plaintiff.

    You were a member of DTARC on February 17th, 2022, correct?

A    The correct.

Q    Okay.  And DTARC made a recommendation against Mrs. Zayre-Brown receiving gender-affirming vulvoplasty at that meeting?

A    I believe so.

Q    And you participated in that decision-making?

A    Yes.

Q    You are a psychiatrist?

A    Yes.

Q    Other than participating in a training for DPS employees provided by an expert from NCU Chapel Hill, you have no training in the treatment of gender dysphoria, correct?

A    No specific training.  There was a recent six -- not so recent now, but six articles came out in one of the correctional journals, and I read through them.  I didn't think any of them were that great.  But I don't have any more formal training, no.

Q    Okay.  So other than that DPS training and the articles that you read, you have no other training in the treatment of gender --

EXAMINATION OF BRIAN SHEITMAN

1  A    No formal training, correct.

2  Q    Okay.  Thank you.

3       And when you've worked with patients who have gender

4  dysphoria, your focus has been on their psychiatric

5  co-morbidities, not on treating their gender dysphoria?

6  A    That's correct.

7  Q    You had never met nor spoken with Mrs. Zayre-Brown?

8  A    That's correct.

9  Q    And you never personally evaluated Mrs. Zayre-Brown for

10 gender-affirming surgery?

11 A    That is correct.

12 Q    So you relied entirely on the reports for other providers

13 for your consideration of Mrs. Zayre-Brown's request for

14 surgery, correct?

15 A    Other providers and other information, yes.

16 Q    As part of your consideration, you reviewed Jennifer

17 Dula's transgender accommodation surgery -- or summary --

18 A    Yes.

19 Q    -- that was dated October 20th, 2021?

20 A    Yes.

21 Q    Okay.  And just for the clarity of the record, I'm going

22 to ask you that you let me finish the question before answering

23 just for the sake of our court reporter.

24 A    Apologize.

25 Q    And so I'm going to just show you what -- well, I'll ask

EXAMINATION OF BRIAN SHEITMAN

1 the question first.

2      And Ms. Dula stated in that summary that "Ms. Brown

3 continues to report clinically significant anxiety, depression,

4 and distress associated with her gender dysphoria that has been

5 documented consistently throughout her mental-health

6 treatment."  Do you recall that in Ms. Dula's summary?

7 A    I don't, but I believe it if you're saying it.

8 Q    So I'm going to show you what's been marked as Defendants'

9 Exhibit 8, and I'm showing you the portion that was at your

10 deposition, just for ease of the binder, on the Elmo.

11      Okay.  Let's see.  And so in the middle there's a

12 highlighted portion that says "despite these interventions."

13 Do you see that?

14 A    Yes.

15 Q    Okay.  And so you read that highlighted portion and were

16 aware of that at the February 17th DTARC meeting?

17 A    Again, I don't truthfully remember exactly, but I did read

18 them.

19 Q    Okay.  And Ms. Dula also continues that -- in the

20 highlighted paragraph below.  "Based on the review of her

21 records and the current assessment, it appears the next

22 appropriate step for Ms. Brown is to undergo trans-feminine

23 bottom surgery.  The surgery will help her make significant

24 progress in further treatment of her gender dysphoria."  Did I

25 read that correctly?

EXAMINATION OF BRIAN SHEITMAN

1 A    I think so.

2 Q    Okay.  And you were aware from Mrs. Zayre-Brown's medical

3 records that she had previously engaged in self-harm toward her

4 phallus?

5 A    Could you be more specific?  Like I don't mean to be

6 voyeuristic or anything, but I'm not --

7 Q    So were you aware that Mrs. Zayre-Brown had previously

8 engaged in self-harm?

9 A    It was one instant, I think, with -- where she wrapped

10 something around her penis.  Is that the one?

11 Q    Yes.

12 A    Okay.

13 Q    And you were aware of that at the -- okay.

14     And you considered that an attempt at self-harm?

15 A    I don't know.

16 Q    Okay.  You were aware from her medical records that she

17 had four self-injury risk assessments since 2017?

18 A    I know she's had some episodes, but -- I don't know the

19 risk assessments, but I -- probably.  But I know there were

20 episodes she went to the emergency department.  She was

21 admitted to the inpatient unit.  I am aware of that.

22 Q    Okay.  So at the top here, where it's highlighted -- this

23 is still Ms. Dula's transgender accomodation summary.  It says,

24 "There has been some crisis intervention required, including

25 four SIRAs and one inpatient placement since 2017."

EXAMINATION OF BRIAN SHEITMAN

1    What does SIRA stand for?

2  A    Self-injury risk assessment.

3  Q    Okay.  And so from this record, you were aware at the time

4  that Ms. Zayre-Brown had had four?

5  A    Yes.

6  Q    And as part of your consideration of her request for

7  surgery, you also reviewed Dr. Figler's medical notes from his

8  July 12th, 2021, visit with Mrs. Zayre-Brown?

9  A    I assume I did.  I don't know off the top of my head.

10 Q    Okay.  So this is also previously marked as Defendants'

11 Exhibit 8.  It is on page 313 of that exhibit.

12    Okay.  And is this the notes from Dr. Figler and --

13 actually, no.  This has a --

14    (Discussion off the record.)

15 Q    And does this look like a note from a Dr. David Figler,

16 Bradley David Figler?

17 A    Yes.

18 Q    Okay.  And does this look like an evaluation for

19 gender-affirming surgery?

20 A    Yes.

21 Q    Okay.  And on the next page, where it says "plan," can you

22 read that first bullet point for me?

23 A    "Proceed with vulvoplasty per WPATH criteria pending."

24 Q    And you were aware of these records at the time of the

25 DTARC meeting?

EXAMINATION OF BRIAN SHEITMAN

1  A    Yes.

2  Q    And as part of your consideration for

3  Mrs. Zayre-Brown's request for surgery, you also reviewed

4  Dr. Bowman's December 6th, 2021, mental health progress note?

5  A    It would -- yes.  If it was in that list, sure.

6  Q    Okay.  At the very bottom of this note, it says, "Progress

7  towards goals."  Do you see that?

8  A    Yes.

9  Q    Okay.  And flipping to the next page -- and this is

10 page 357 of Defendants' Exhibit 8.  Sorry.  Now I'm on 358.

11     It says, "Today Offender Brown reported a level of 11 on a

12 gender-dysphoria scale from 0 to 10."  Is that correct?

13 A    Yes.

14 Q    Okay.  And what does a Level 0 mean on that scale?

15 A    No dysphoria.

16 Q    And what does a Level 10 mean on that scale?

17 A    Extreme dysphoria.

18 Q    And so you were aware that, on December 6th,

19 Mrs. Zayre-Brown had rated her gender-dysphoria level as an 11?

20 A    Yes.

21 Q    Okay.  And you were also, therefore, aware the listed

22 treatment goal for Mrs. Zayre-Brown was to get her to a Level 5

23 or below?

24 A    Yes.  I'm reading it.

25 Q    And as part of your consideration, you also looked at

EXAMINATION OF BRIAN SHEITMAN

1 Dr. Bowman's December 20th mental-health progress note,

2 correct, as part of her records?

3 A    It should be, yes.

4 Q    Okay.  And so this was, what, approximately two months

5 before the FTARC meeting?

6 A    Yes.

7 Q    Okay.  And again, at the bottom it says, "Progress towards

8 goals."  I'm going to flip to the next page, which would be

9 362, of Defendants' Exhibit 8.

10    And can you tell me what Mrs. Zayre-Brown -- what level

11 she rated her gender dysphoria at on this date?

12 A    A 10.

13 Q    Okay.  And I'm now going to show you Ms. Dula's notes from

14 January 5th, 2022, that were also part of the record.  If they

15 were part of her medical record, you testified earlier that you

16 would have reviewed this, as well, correct?

17 A    Yes.

18 Q    Okay.  And I'm going to point you to the highlighted

19 portion, where it says Mrs. Zayre-Brown -- she describes her

20 current level of dysphoria as "off the charts."  Did I read

21 that correctly?

22 A    Yes.

23 Q    Okay.  And it also says that Mrs. Zayre-Brown asks to be

24 seen every two weeks due to her gender-dysphoria level being

25 off the charts, correct?

EXAMINATION OF BRIAN SHEITMAN

1 A    Yes.  And if I could say some -- I would read the full

2 note.  So if you read like "mental status behavior

3 observation," "the defendant was appropriately dressed in the

4 prison attire, demonstrated adequate hygiene and grooming.  The

5 defendant was fully oriented.  Her memory, attention, and

6 concentrate were unimpaired.  She spoke in a clear, manageable

7 speech of a normal rate, tone, and volume.  Affect was

8 mood-congruent, euthymic" -- meaning that you don't see any of

9 this -- "no overt evidence of psychosis or mania.  Her thoughts

10 are logical and goal-oriented.  She denied any current

11 destructive, homicidal, or suicidal ideation.  Offender does

12 not report any concerns with sleep, appetite, or energy level.

13 Insight and judgement" --

14 Q    Dr. Sheitman, my question was just about that specific

15 portion, so --

16 A    I was just -- I'm sorry.

17        THE COURT:  I think he needs to -- I think he can

18 answer it that way.  In other words, what he's saying is that

19 that is at odds with the earlier -- with the statement below --

20        MS. NOWLIN-SOHL:  Okay.

21        THE COURT:  -- as to being off the charts.

22 Q    At the very bottom, where it's highlighted, did Ms. Dula

23 agree to increase her visits with Mrs. Zayre-Brown due to her

24 high level of dysphoria?

25 A    Yes.

EXAMINATION OF BRIAN SHEITMAN

1  Q    Okay.  Of the medical providers' records that you

2  reviewed, none of them recommended against Mrs. Zayre-Brown

3  receiving surgery, correct?

4  A    I think so.  I'm not a hundred percent sure on that.

5  Q    You're not sure?  Do you recall any provider recommending

6  against surgery in those medical records?

7  A    Again, I know Dr. Hahn worked with her and Dr. Bowman.  I

8  don't know if they said exactly that they recommended surgery.

9  They could have, but I don't remember.  That's -- I'm just

10 being honest.

11 Q    But none of them recommended against surgery, correct?

12 A    I think that's probably true.

13 Q    Okay.  And none of the providers said that surgery was

14 unnecessary for Mrs. Zayre-Brown?

15 A    Not that I can remember, no.

16 Q    Okay.  And I'm going to show you one more record that was

17 in Mrs. Zayre-Brown's records.  It's Defendants' Exhibit 8,

18 page 370.  Can you read the date on this record?

19 A    2/7/22.

20 Q    Okay.  And so this is 10 days before the DTARC meeting,

21 correct?

22 A    Yes.

23 Q    All right.  And can you read the first sentence under

24 "progress towards goals?"

25 A    "Offender is reporting increased dysphoria and associated

EXAMINATION OF BRIAN SHEITMAN

1 anxiety."

2 Q    Okay.  Thank you.

3      And of the medical records that you reviewed, none of them

4 described Mrs. Zayre-Brown as having achieved her therapy goal

5 of a gender-dysphoria level of under 5 or below, correct?

6           THE WITNESS:  Am I allowed to answer more fully?

7           THE COURT:  Yes, you can.

8 A    Yes, but, again, that's a self-report.

9 Q    Okay.  But none of them said that she'd achieved that

10 goal?

11 A    I honestly don't remember, but I'll say yes just because

12 I'll take your word for it.

13 Q    And none of the medical records you reviewed said that she

14 no longer expressed distress at having a phallus, correct?

15 A    Could you ask that again?  Sorry.

16 Q    So none of the medical records you reviewed said that she

17 no longer expressed distress at having a phallus or penis,

18 correct?

19 A    I don't remember seeing that.

20 Q    Okay.  And you have concerns that Mrs. Zayre-Brown might

21 engage in self-harm if she did not receive her gender-affirming

22 surgery?

23 A    I mean, my job is to worry about everything, so of course

24 I'm going to worry about it because it's possible.  So I --

25 it's always on my mind about everybody.  I mean, I'm supposed

EXAMINATION OF BRIAN SHEITMAN

1 to worry about things, and I do.

2 Q    Okay.  But you had that specific worry for

3 Mrs. Zayre-Brown?

4 A    I didn't have it -- it wasn't a high-level concern for me,

5 but it's certainly in the deferential.  When I looked at her

6 records, she didn't really have a history that I was that

7 worried about.

8       And I also thought she -- like I said, she was very

9 goal-directed, she was really future-oriented, she wanted to do

10 things.  She wasn't someone I was really worried about based on

11 her history.  But certainly, yes, I worry about it because you

12 just don't know, and I can't be a hundred percent certain.

13 Q    Okay.  So I'm going to show you what's been previously

14 marked as Defendants' Exhibit 11, which is titled "DTARC

15 Position Statements, Gender-Reassignment Surgery."  I think you

16 testified earlier that you've seen this document before.

17 Correct?

18 A    Yes.

19 Q    Okay.  And was this document discussed at the

20 February 17th DTARC meeting?

21 A    No.

22 Q    No?

23 A    Not to my recollection.

24 Q    Okay.  And so you received this document via e-mail on --

25 in March of 2022?

EXAMINATION OF BRIAN SHEITMAN

1  A    That's my understanding, yes.

2  Q    Okay.  And at a DTARC meeting, the members of DTARC

3  unanimously supported this position statement, correct?

4  A    I don't know about that.  I think there was some questions

5  about that.  I don't remember unanimously supporting it.

6  Q    Okay.  Would your deposition help you maybe recall that?

7  A    What did I say?

8  Q    So you were deposed in this matter, correct, Dr. Sheitman?

9  A    You know, I don't remember, but I was -- on this topic,

10  yeah, but I don't remember exactly -- whatever I said was the

11  truth, so what did I say?

12  Q    But you do recall being deposed, correct?

13  A    Yes, absolutely.

14  Q    Okay.  And that deposition was under oath?

15  A    Yes.

16  Q    Just give me one moment.

17      All right.  So this is a question that says, "Exhibit 27

18  is entitled 'Division Transgender Accomodation Review Committee

19  (DTARC) Position Statement, Gender-Reassignment Surgery.'"  Did

20  I read that correctly?

21  A    Looks like you did, yes.

22  Q    And that's the document we were just discussing?

23  A    Yeah.

24  Q    Okay.  So I'm going to move down a little bit to line 13.

25  And it says, "Okay, so looking then at Exhibit 26 -- Exhibit 26

EXAMINATION OF BRIAN SHEITMAN

1  -- sorry.  You said you didn't recall the bit here about voting

2  buttons.  Do you recall whether or not DTARC ever voted on the

3  position statement that was attached to this e-mail?"  Answer,

4  "Yes, I think" -- and there's a little bit of crosstalk, and it

5  says, "Yes, I think it was supported."

6       Question, "It was supported?  Okay.  Did that take place

7  at a DTARC meeting?"  Answer, "I believe it did."

8       Question, "Okay.  And do you have any recollection as to

9  when that DTARC meeting was?"  Answer, "No.  I apologize.  I

10 don't."

11      Question, "It's okay.  And do you recall, was it supported

12 unanimously by everyone?"  Answer, "And it may not be a DTARC

13 meeting, but I'm sure there was some kind of -- it was like a

14 conference with the players.  It may not have been a meeting.

15 I don't remember, but it was discussed, and I remember

16 discussing it."

17 A    Right.

18 Q    Moving down a little bit to line 15.  Question, "And was

19 -- was -- you said it was supported.  Was that support

20 unanimous among the people at the meeting?"  Answer, "Yes."

21      Did I read that correctly?

22 A    Yeah.  So, I mean, it was -- I think -- I'm not sure when

23 it happened, but yeah.

24 Q    Okay.  But at some point the DTARC committee unanimously

25 supported that position statement?

EXAMINATION OF BRIAN SHEITMAN

1  A    Again, I don't know if it was the DTARC committee.  So I
2  don't know who would have been at the other meeting because the
3  DTARC committee pulls people in -- we have sort of like a
4  regular remote meeting as to different people like that.  I
5  don't know if it was everybody at the meeting, so I can't say
6  for sure.
7  Q    Okay.  And you agreed with the position statement's
8  conclusion that gender-affirming surgery is not medically
9  necessary?
10 A    I think it was for this case because if -- I remember
11 asking, if we're going to have this, then why do we even need
12 to have -- why do we need people -- to send them for a surgery
13 consults, and why do we need to discuss this at a DTARC meeting
14 if it's going to be every case?
15     And I remember asking that question because, if you read
16 it this way -- and I kind of read it a little bit like that,
17 too -- that, if that's a plausible read of this, then why are
18 we having this -- why are we going through this?
19     And that's when -- I don't remember -- again, I don't
20 remember exact details, but then it was just shelved and
21 said, no, that's not what they want.  So that's my recollection
22 of it.
23 Q    Okay.  And before it was shelved, though, you agreed with
24 the position statement's conclusion that gender-reassignment
25 surgery is not medically necessary?

EXAMINATION OF BRIAN SHEITMAN

1  A    For this person.

2  Q    Okay.  So I'm going to show you a few more pages on your

3  deposition.

4  A    Because then I went to do the literature review, and it

5  was equivocal.  So my thinking was that, you know, it should be

6  case by case.  But it shouldn't be a routine procedure, and

7  that's -- a hundred percent, I do think that.

8  Q    Okay.  So going back to your deposition, Dr. Sheitman,

9  this is page 141 of your deposition.  And looking -- starting

10 at line 15, we're still talking about Exhibit 27, which is the

11 same document.

12      It says, Question, "And is it your understanding that this

13 -- Exhibit 27 -- was something written by Dr. Campbell?"

14 Answer, "It -- it looks like a lot of stuff that he's written,

15 and I believe -- and his name is on it, so I would assume that

16 he did write it."

17      Question, "You're right.  His name's there on the first

18 page.  Do you agree with Dr. Campbell's conclusion, stated here

19 on page 2, that GRS treatment -- GRS as a treatment for gender

20 dysphoria is not medically necessary?"  Answer, "I would say

21 overall I think the literature would support that."

22 A    Like the literature is supporting that overall, it's not

23 medically necessary.  I stand by that.

24 Q    Okay.  But generally, Exhibit 27 is the position statement

25 that is not specific to Mrs. Zayre-Brown, correct?

EXAMINATION OF BRIAN SHEITMAN

1 A    You know, I would have to ask Dr. Campbell on that one.  I

2 don't know.

3 Q    Okay.  This is the position statement that you received

4 and that we were discussing in the deposition?

5 A    Correct.

6 Q    And this was -- you did not see this until March of 2022?

7 A    To the best of my recollection.

8 Q    And that was after DTARC had made the determination?

9 A    Yes.

10 Q    Okay.  And, Dr. Sheitman, your view is that

11 gender-affirming genital surgery would only be justified in

12 cases where the gender dysphoria is severe and debilitating?

13 A    It would have to have some impact on the person.  If the

14 person said, well, once in a while I feel upset about this, but

15 most of the time I'm fine, I would say it wouldn't meet the

16 criteria for medical necessity.

17 Q    Okay.  But I think earlier you asked -- you were asked

18 about severe and debilitating.  Is that your understanding of

19 the standard?

20 A    No.

21 Q    What is your understanding of the standard?

22 A    I think it's persistent dysphoria, is what I think.

23 Q    Okay.  If Mrs. Zayre-Brown had been psychiatrically

24 unstable at the time of the February 17th DTARC meeting, that

25 would have disqualified her from surgery, correct?

EXAMINATION OF BRIAN SHEITMAN

1  A     Correct.

2          MS. NOWLIN-SOHL:  No further questions, your Honor.

3          **REDIRECT EXAMINATION BY MR. RODRIGUEZ:**

4  Q     Opposing counsel just referenced the contraindication

5  about the psychiatric instability precluding surgery.  Is it

6  your understanding that that is a contraindication that's

7  referenced in an older version of the WPATH standard?

8  A     I've seen it.  You know, now I'm a little nervous, and I'm

9  not exactly sure, but I've seen it.

10 Q     Okay.  And so the reference there to psychiatric

11 instability precluding surgery -- for gender-affirming surgery,

12 is that instability with respect to a comorbid psychiatric

13 condition or is it with respect to the person's gender

14 dysphoria?

15 A     No.  There's comorbid psychiatric conditions and there's

16 gender dysphoria.  Sometimes they do overlap, and it's tricky,

17 but what I'm thinking is it's separate for someone with a

18 psychotic disorder who's having hallucinations.  And you'd say,

19 well, that person's probably not free to make that decision.

20 You'd want to treat the hallucinations and get that under

21 control.  If that's okay, then the person has dysphoria, that's

22 a separate -- so it's separate.

23 Q     Okay.  So the instability that you just referenced would

24 be a preclusion for surgery, is that in reference to a comorbid

25 psychiatric condition?

EXAMINATION OF RANDI ETTNER

1 A    Yes.

2         MR. RODRIGUEZ:  No further questions, your Honor.

3         MS. NOWLIN-SOHL:  No further questions, your Honor.

4         THE COURT:  Thank you.

5     You may come down.  Thank you.

6     (Witness excused.)

7         MR. DAVIDSON:  Your Honor, the plaintiff at this time

8 would like to call Dr. Randi Ettner, and she'll be testifying

9 via video.

10     Good afternoon.

11     Do you want to swear her?

12         THE WITNESS:  Good afternoon.

13         THE CLERK:  Dr. Ettner, I'm going to give you an

14 affirmation.

15     (Witness affirmed.)

16     **RANDI ETTNER, PLAINTIFF'S WITNESS, DIRECT EXAMINATION**

17                  **BY MR. DAVIDSON:**

18 Q    Dr. Ettner, what's your professional occupation?

19 A    I'm a clinical and forensic psychologist.

20 Q    And how long have you been doing that?

21 A    Oh at least 30 years.

22 Q    Dr. Ettner, do you -- have you ever held any positions at

23 the World Professional Association For Transgender Health, also

24 known as WPATH?

25 A    Yes.  I served 12 years on the board of directors, two

1 terms as a secretary on the executive committee.  I chaired the

2 Committee For Institutionalized Persons, and I was a -- one of

3 the development over the curriculum of mental health for their

4 gender-education initiative.

5 Q    Dr. Ettner, what version of the WPATH Standards of Care

6 was in effect on February 17th, 2022?

7 A    That would have been the seventh version of the Standards

8 of Care.

9 Q    And did you play any role in the creation of the seventh

10 version of the WPATH Standards of Care?

11 A    I'm one of the authors of that version.

12 Q    And what version of the WPATH Standards of Care is in

13 effect today?

14 A    The eighth version.

15 Q    And did you play any role in the creation of that

16 document?

17 A    Yes.  I was also an author of that document.

18 Q    Dr. Ettner, are you a member of the medical staff of any

19 hospital?

20 A    I'm on staff at Weiss Memorial Hospital in Chicago.

21 Q    Can you see what's been marked as Plaintiff's Exhibit 1?

22 A    Yes.

23 Q    Does that appear to be a true and correct copy of your

24 current CV?

25 A    Yes.

EXAMINATION OF RANDI ETTNER

1      MR. DAVIDSON:  And, your Honor, I believe we've

2  stipulated that all of the exhibits can be admitted into

3  evidence, so I'll -- that's --

4      THE COURT:  It will be admitted.

5    (Plaintiff's Exhibit No. 1 was received in evidence.)

6  Q    Have you ever evaluated, diagnosed, or treated individuals

7  with gender dysphoria?

8  A    Twenty-four hundred.

9  Q    In your work, do you ever make determinations about

10  whether gender-affirming surgery is medically necessary to

11  treat an individual's gender dysphoria?

12  A    Yes, I routinely make those assessments.

13  Q    And in what parts of your work do you make those

14  assessments?

15  A    In my own clinical practice, in my forensic work, in the

16  supervision I do, and in my consultation at the hospitals.

17  Q    Have you published any medical texts related to the

18  treatment of individuals with gender dysphoria?

19  A    In 2007, I published "Principles of Transgender Medicine

20  and Surgery."  In 2016, I published the second edition of their

21  textbook, and I'm currently under contract to produce a third

22  edition.

23  Q    And have you written any book chapters related to the

24  treatment of individuals with gender dysphoria?

25  A    I have.  I'll name just two:  "Preoperative Evaluation For

EXAMINATION OF RANDI ETTNER

1  the Surgical Management of the Transgender Patient" in a

2  surgical atlas, and also "Surgical Treatments For the

3  Transgender Population in Lesbian, Gay, Bisexual, Transgender,

4  and Intersex Healthcare, a Clinical Guide to Preventative,

5  Primary, and Specialty Care."

6  Q    And have you in the past evaluated gender-dysphoric

7  individuals who are incarcerated?

8  A    Yes, I have, in 20 different states and in over

9  37 different institutions.

10 Q    And have you been qualified by courts as an expert to

11 testify regarding the medical necessity of gender-affirming

12 surgery?

13 A    Yes.

14 Q    Have you been appointed by a federal court as an

15 independent expert regarding the evaluation of whether an

16 inmate with gender dysphoria needed surgery?

17 A    Yes, I have.

18 Q    And did you personally meet with and examine

19 Mrs. Zayre-Brown to evaluate her need for gender-affirming

20 surgery?

21 A    Yes.  I could only determine that through an interview,

22 not solely by a review of records.  And that was in May of '22

23 for four hours.

24 Q    And have you -- did you ever follow up with her after

25 that?

EXAMINATION OF RANDI ETTNER

1  A    In January '23, I had a phone conversation with

2  Mrs. Zayre-Brown.

3  Q    And about how long did that last?

4  A    Approximately 30 minutes.

5  Q    And did you review any of Mrs. Zayre-Brown's medical

6  records?

7  A    I reviewed all of the medical records that were provided,

8  yes.

9          MR. DAVIDSON:  Your Honor, we'd move that Dr. Ettner

10 be qualified as an expert in the treatment of gender dysphoria

11 and be able to testify on that subject and her examination of

12 Mrs. Zayre-Brown.

13         MR. RODRIGUEZ:  No objection, your Honor.

14         THE COURT:  All right.  I'll so find.

15         MR. DAVIDSON:  Thank you.

16 Q    Dr. Ettner, I want to ask you about the concept of medical

17 necessity, but before I get there, I want to ask you about the

18 criteria for the eligibility for gender-affirming genital

19 surgery identified in the WPATH Standards of Care.

20         Could you please explain the difference between an

21 individual with gender dysphoria being eligible for such

22 surgery and it being medically necessary for them?

23 A    Yes.  It's necessary that individuals who are considered

24 for surgery meet certain eligibility criteria.  Meeting those

25 criteria does not mean that surgery is medically necessary for

EXAMINATION OF RANDI ETTNER

1  an individual.  That is an assessment that has to be undertaken

2  by a qualified mental-health professional with experience and

3  who meets the qualifications that are outlined in SOC-7, in

4  Section 7.

5  Q    So do the WPATH Standards of Care provide that all medical

6  and surgical procedures that a patient is eligible for are also

7  medically necessary for that patient?

8  A    No.

9        MR. DAVIDSON:  Okay.  I'd like to call your attention

10 to page 105 of Version 7 of the WPATH Standards of Care.

11      Actually, could you go back one page -- oh, no, that was

12 it.

13 Q    That highlighted portion, that says -- is that -- it says,

14 "Criteria for genital surgery, two referrals."  So is this

15 going to discuss the WPATH Version 7 criteria for surgery --

16 for patients with gender dysphoria for genital surgery?

17 A    Yes.

18        MR. DAVIDSON:  And if we could scroll down to the next

19 page.

20 Q    And what's underlined there, it says, "metoidioplasty or

21 phalloplasty in FtM patients and vaginoplasty in MtF patients."

22 What is an MtF patient?

23 A    A patient who was assigned male at birth, but has

24 transitioned to their affirmed female gender.

25 Q    So would that be like Mrs. Zayre-Brown?

EXAMINATION OF RANDI ETTNER

1  A    Exactly.

2  Q    And this described vaginoplasty, the criteria for that --

3  to be eligible for that, are the criteria for vulvoplasty the

4  same as the criteria for vaginoplasty?

5  A    They are, yes.

6  Q    Okay.  Looking at those six criteria listed there -- we

7  don't have to run through them all one by one, but if you could

8  look at them and let me know -- February 17th, 2022, did

9  Mrs. Zayre-Brown meet all of those criteria to be eligible for

10 gender-affirming genital surgery?

11 A    Mrs. Zayre-Brown met and exceeded the criteria for

12 eligibility.

13 Q    And was that also the case when you last consulted with

14 her in 2023?

15 A    Yes.

16 Q    And would that also be true with respect to the criteria

17 required to be an acceptable candidate for gender-affirming

18 genital surgery that are in the eight version of the WPATH

19 Standards of Care?

20 A    Yes, that would also be true.

21 Q    So having discussed Mrs. Zayre-Brown's eligibility for

22 gender-affirming surgery, which you said is necessary but not

23 sufficient for such surgery to be medically necessary, I want

24 to move to the topic of medical necessity itself.

25      Do the WPATH Standards of Care discuss the concept of

1 medical necessity?

2 A    Yes.

3 Q    And do the WPATH Standards of Care themselves define

4 medical necessity?

5 A    They refer to the American Medical Association's

6 well-accepted standard of -- and definition of what is medical

7 necessity.

8          MR. DAVIDSON:  Okay.  I'd like to show you a page of

9 the eighth version of the WPATH Standards of Care.  It's been

10 marked here at Plaintiff's Exhibit 2.  And I'd like to turn

11 your attention to page S-16.

12        Scroll down a little.  Yes, there.

13 Q    In -- under Statement 2.1, after the bolded material in

14 the right-hand column, it says, "Medical necessity is a term

15 common to healthcare coverage and insurance policies globally.

16 A common definition of medical necessity as used by insurers or

17 insurance companies is" -- quote -- "healthcare services that a

18 physician and/or healthcare professional exercising prudent

19 clinical judgment would provide to a patient for the purposes

20 of preventing, evaluating, diagnosing or treating an illness,

21 injury, disease, or its symptoms and that are, A, in accordance

22 with generally accepted standards of medical practice, B,

23 clinically appropriate in terms of type, frequently, extent,

24 site, and duration, and considered effective for the patient's

25 illness, injury, or disease" -- below -- sorry.  It's continued

1 on to the next page.  "And, C, not primarily for the

2 convenience of the patient, physician, or other healthcare

3 provider and not more costly than an alternative service or

4 sequence of services at least as likely to produce equivalent

5 therapeutic or diagnostic results as to the diagnosis or

6 treatment of that patient's illness, injury, or disease."

7      Is that what you were referring to as the AMA definition?

8 A    Yes.

9 Q    And at the end of that paragraph, it says "American

10 Medical Association," comma, "2016."  Does that mean that what

11 the WPATH Standards of Care is quoting from is the AMA

12 definition of medical necessity?  Correct?

13 A    Yes.

14 Q    And is that a definition of medical necessity that is only

15 about gender dysphoria and gender-affirming surgical treatments

16 or is it about all forms of treatment?

17 A    It's a broad umbrella encompassing all forms of treatment.

18 Q    And are you aware of the current AMA definition of medical

19 necessity?

20 A    Yes, I have read the current definition.

21 Q    And are there any substantive differences between the AMA

22 2016 definition of medical necessity quoted here and the AMA

23 definition currently in place with regard to the provision of

24 gender-affirming surgery to individuals with gender dysphoria?

25 A    No, no substantive difference.

EXAMINATION OF RANDI ETTNER

1  Q    And in your experience, is the AMA definition quoted here

2  consistent with how the term "medical necessity" is generally

3  understood in the field of medicine?

4  A    Yes, that's my understanding.

5  Q    So could you please summarize, what are the central

6  components of whether a particular treatment is medically

7  necessary for a particular patient at a particular time?

8  A    If a -- on a case-by-case basis, an individual is

9  suffering from a healthcare condition, and there is a treatment

10 that a prudent physician believes is to be medically indicated

11 for that patient, then that -- and that physician or that

12 provider considers that to be vital for that particular

13 patient, that would be medical necessity.

14 Q    So in your expert opinion, based on your review of

15 Mrs. Zayre's medical records and your in-person and telephonic

16 examinations and consultations with her, would a healthcare

17 provider exercising prudent clinical judgment have to conclude

18 that gender-affirming genital surgery is medically necessary

19 for Mrs. Zayre-Brown for the purpose of treating her gender

20 dysphoria?

21 A    Yes, that is my opinion.

22 Q    And would, in your expert opinion, a surgeon providing

23 Mrs. Zayre-Brown gender-affirming genital surgery to treat her

24 gender dysphoria be in accordance with generally accepted

25 standards of medical practice?

EXAMINATION OF RANDI ETTNER

1 A    Yes.

2 Q    And would it be effective for treating her gender

3 dysphoria?

4 A    Absolutely effective.

5 Q    And would it be primarily for her convenience or the

6 convenience of her healthcare provider?

7 A    No.

8 Q    Is there an alternative service or sequence of services at

9 least as likely to produce equivalent therapeutic results with

10 regard to her gender dysphoria as gender-affirming genital

11 surgery would be?

12 A    There's no alternative intervention.  Mrs. Zayre-Brown is

13 a woman.  She lived as a woman in the community for years

14 before her incarceration.  She is a wife.  She is a mother.

15 She lives among women now, and she has the same hormones as

16 women who are of her same age, her peers, her female peers.

17      And yet she has this male organ, this detested organ,

18 which causes her intractable distress.  And nothing other than

19 removal of the phallus and the creation of typical,

20 female-appearing genitals, which would be accomplished with

21 vulvoplasty, would not only attenuate her gender dysphoria, but

22 it would cure her gender dysphoria.

23 Q    So in your expert opinion, according to the definition of

24 medical necessity cited by the WPATH Standards of Care, was the

25 provision of vulvoplasty to Mrs. Zayre-Brown medically

EXAMINATION OF RANDI ETTNER

1 necessary on February 17th, 2022?

2 A    Yes.

3 Q    And that's also true according to the general

4 understanding of medical necessity in the field of medicine,

5 correct?

6 A    Yes.

7 Q    And was that also true at the time of your last contact

8 with Mrs. Zayre-Brown in 2023?

9 A    Yes.

10 Q    I want to ask you some questions about whether certain

11 circumstances must exist for treatment to be considered

12 medically necessary.

13     As the term "medically necessary" is defined in the AMA

14 definition that was contained in WPATH's Standards of Care 7,

15 is -- is -- are -- I'm sorry.

16     Is actively having plans to commit suicide required for

17 gender-affirming genital surgery to be medically necessary for

18 a patient with gender dysphoria?

19 A    No.

20 Q    How about suicidal ideation?

21 A    No.

22 Q    Is engaging in self-harm required under that definition of

23 gender-affirming genital surgery --

24 A    No.

25 Q    -- for the surgery to be medically necessary?  Sorry.

EXAMINATION OF RANDI ETTNER

1  A    No.

2  Q    Is ideation about engaging in self-harm required?

3  A    No.

4  Q    Is evidence of depressive or destructive behaviors

5  required?

6  A    No.

7  Q    Is it required that the individual not be able to work or

8  pursue an education or socialize with others?

9  A    No.

10  Q    Is it required, under the definition of medical necessity

11  cited in the WPATH Standards of Care, for an incarcerated

12  individual to fail to be well-adapted to the environment of

13  their incarceration for such surgery to be medically necessary

14  for them?

15  A    There's not a requirement, no.

16  Q    And is it required, under the definition -- the AMA

17  definition referred to by the WPATH Standards of Care, for a

18  patient's gender dysphoria to be severe for it to be medically

19  necessary for them to obtain gender-affirming genital surgery?

20  A    No, it is not.

21  Q    Is it required that it be debilitating?

22  A    That is not a requirement under the Standards of Care.

23         MR. DAVIDSON:  And if you look again at what we --

24  we're looking at on page -- is --

25         Scroll up.

EXAMINATION OF RANDI ETTNER

1 Q    At 16 and 17 -- if you look at that again, the quote

2 there, it has to be that a physician or health professional

3 exercising prudent clinical judgment would use this and that

4 that would be in accordance with generally accepted standards

5 of practice and clinically appropriate and not for the

6 convenience.  Does it reference there at all that the symptoms

7 had to be severe?

8 A    No, it doesn't reference it.

9 Q    But in any event, was Mrs. Zayre-Brown's gender dysphoria

10 severe on February 17th, 2022?

11 A    Yes.  Ten days prior to that, it was -- there was a note

12 stating that her gender dysphoria was at a 10 out of 10 and

13 that she was very anxious and experiencing a lot of anatomical

14 distress around her phallus.

15 Q    And was it the case that her gender dysphoria was severe

16 when you last spoke with her in 2023?

17 A    Yes.

18 Q    And what leads you to conclude that, despite the treatment

19 she'd received, Mrs. Zayre-Brown's gender dysphoria was severe?

20 A    Well, in addition to my assessment with her, one of the

21 barometers of severe gender dysphoria is when an individual

22 thinks about removing their genitals or actually harms their

23 genitals because they experience so much distress about having

24 this inappropriate organ that they must look at when they

25 urinate, when they shower.  It's a constant reminder that they

EXAMINATION OF RANDI ETTNER

1  are what we used to call trapped in the wrong body.

2      And Mrs. Zayre-Brown did attempt to injure her phallus.

3  She tied a band around the base of the penis to strangulate the

4  penis and stop the blood flow, which could have been a serious

5  condition.

6      And she -- her medical records are peppered with her

7  gender distress.  Her -- at one point in 2021, she says that

8  she's losing her ability -- her coping skills.  She's beginning

9  to show an erosion of her resilience.

10     She's basically a well-adjusted woman, but gender

11 dysphoria intensifies with time and with age.  And as time goes

12 on, the gender dysphoria becomes more intense, and an

13 individual has no way to resolve it on their own absent

14 surgery.

15 Q    You said that over time, gender dysphoria increases with

16 age.  Why is that?

17 A    As people age, they secrete -- they begin to secrete more

18 cortisol, and that degrades the DHEA and some other hormones,

19 sex steroid hormones, causing a destabilization not unlike what

20 happens to some non-transgender women at menopause.  There's a

21 change in the hormonal regulation as gender dysphoric

22 individuals age.  And so we see this exacerbation of the

23 distress as time goes on.

24 Q    So was Mrs. Zayre-Brown's gender dysphoria well-controlled

25 on February 17th, 2022?

EXAMINATION OF RANDI ETTNER

1  A    No, it was not.

2  Q    And in your consultation evaluation of her when you met

3  with her and talked to her on the phone and in view of her

4  medical records, had she attempted suicide in the past?

5  A    She had, and she had four episodes of being put on suicide

6  watch.

7  Q    And did those records in her evaluation -- your evaluation

8  of her when you met with her and spoke with her on the phone,

9  did they show she was suffering from severe gender dysphoria?

10  A    Yes, they did.

11  Q    And --

12  A    She had severe gender dysphoria.

13  Q    And that it appeared she had severe anxiety, as well?

14  A    She had anxiety that we talked about on the phone

15  conversation.  And yes, there is evidence of the dysphoria and

16  the anxiety that are attendant to the dysphoria, not comorbid

17  conditions.

18  Q    And if Mrs. Zayre-Brown does not receive gender-affirming

19  genital surgery, will she continue to suffer?

20  A    She will continue to suffer, yes.

21        MR. DAVIDSON:  No further questions, your Honor.

22        THE COURT:  Cross.

23            **CROSS-EXAMINATION BY MR. RODRIGUEZ:**

24  Q    Dr. Ettner, can you hear me?

25  A    Yes.

EXAMINATION OF RANDI ETTNER

1  Q    You can't see me -- or maybe you can see me.  I'm not

2  sure.  I'm Orlando Rodriguez, one of the lawyers for the

3  defendants.  We met up in Chicago in the summertime.  How are

4  you doing?

5  A    I'm okay.  Thank you.  I recall meeting you then.

6  Q    I want to just ask you a couple of very brief questions.

7       We talked -- I think you mentioned earlier that the

8  Standards of Care, either 7 or 8, they themselves don't provide

9  for a definition of medical necessity, but rather refer to the

10 AMA's definition.  Is that right?

11 A    That's right, although they produced, in 2008 and in 2016,

12 policy statements concerning medical necessity.  But yes, they

13 do use the definition that was referenced earlier.

14 Q    Okay.  And that definition that was referenced earlier

15 that was in Statement 2.1 of SOC-8, correct, that Mr. Davidson

16 asked you some questions about, that statement, that

17 definition, that framework for medical necessity, it requires

18 an individual, case-by-case application, does it not?

19 A    Yes.

20 Q    And that application is to be done by the medical

21 providers that are charged with either approving or providing

22 the care, correct?

23 A    It's typically done by a mental-health professional who

24 makes that assessment and not by a committee of individuals,

25 but by what the Standards of Care call a qualified

EXAMINATION OF RANDI ETTNER

1 mental-health professional.  And in SOC-7, they specified the

2 criteria that one must meet in order to be qualified to opine

3 on this specialized area of medicine.

4 Q    And that's to be qualified as far as WPATH concerns itself

5 as to considering folks to be qualified?

6 A    Correct.

7          MR. RODRIGUEZ:  I don't have any further questions,

8 your Honor.

9          THE COURT:  Okay.

10          MR. DAVIDSON:  Nothing further, your Honor.

11          THE COURT:  All right.  Thank you, Doctor.

12      (Witness excused.)

13          THE COURT:  Anything further?

14          MR. RODRIGUEZ:  No, your Honor.

15          THE COURT:  Okay.  Brief argument.

16          MR. RODRIGUEZ:  Yes, your Honor.  I was about to

17 request that, if your Honor permitted.  I will be -- I will be

18 brief.

19      Your Honor, at the top of the hearing this afternoon, you

20 mentioned that this hearing was -- you were concerned about the

21 process, the process that was followed, whether there was a

22 process, and whether that process was a genuine process.

23      And I believe that the evidence that you heard today, your

24 Honor, confirms what was demonstrated throughout discovery and

25 the depositions, and that is that there was a process, there is

1  a process, and that process is and has been that individuals

2  who request gender-affirming services receive a case-by-case

3  review by a committee of qualified medical professionals.

4      A chief psychiatrist, a chief medical officer, a chief

5  psychologist, and other nonclinical individuals convene to --

6  after reviewing individuals' records, a comprehensive review of

7  those records, and they make their own determinations.

8      The position statement that we spent a good bit of time

9  examining the witnesses about, it's a distraction, your Honor.

10  The position statement was a draft that was never formalized

11  and never adopted.  It was a -- it did not -- it was not

12  intended by Dr. Campbell -- as he testified here to today, it

13  was not intended to eliminate or foreclose the individualized

14  consideration that the DTARC had been doing, was doing, and

15  continues to do.  It was, in fact, shelved because of the

16  perception that it could be eliminating that individualized

17  consideration.  And that is the very reason why the Department

18  did not proceed in further discussions with respect to that

19  position statement.

20      Each one of the defendants that testified today --

21  Dr. Peiper, Sheitman, and Campbell -- they each testified as to

22  their individual work reviewing comprehensive medical records

23  and coming to their own determinations based on their own

24  professional education, background, and training.

25      That determination, whether your Honor or anyone else

1  disagrees with it, was arrived at in good faith and pursuant to
2  a process that is individualized and case by case.

3      And that process is what the WPATH standard refers to.
4  When it refers to the AMA standard as -- for medical necessity,
5  that AMA standard is a general statement. It doesn't provide a
6  set of rules that are to be followed in any one given case.
7  They are a set of aspirational statements about what should be
8  looked at when a provider is determining medical necessity.

9      And that's what the DTARC does. It brings together two
10 chief mental-health professionals and a chief medical officer
11 to conduct that analysis.

12     THE COURT: But nobody is an expert in this particular
13 area. In other words, there's nobody -- North Carolina has not
14 put anybody on that committee that's an expert in this very new
15 type of area in terms of, you know, people in prison asking for
16 this kind of surgery. It's a -- it's one in which there is --
17 there's -- there's a lot of different sorts of feelings.

18     But, I mean, Dr. Campbell even put something about
19 teenagers in there and some personal concern, I guess, about
20 the fact that there may be some attempt to -- and I think there
21 are some elements of the movement that would push for children
22 to -- to be -- children don't even know what they want to do
23 until they -- I mean, you can't -- people change all the way
24 through puberty and into adulthood. So that -- that's a whole
25 different thing.

1    But it's obvious Dr. Campbell has a problem with that.
2 And I'm wondering whether -- does he have a blind spot about it
3 or something?  I don't know.  What --

4         MR. RODRIGUEZ:  Well, your Honor --

5         THE COURT:  I mean, that's a -- that's a -- and the
6 others -- you know, the others have found -- all the medical
7 information is Dr. Campbell.  And the others are -- they're in
8 the committee, but, you know -- I'm not saying the committee is
9 just a bunch of fakers up there.  These are people who are
10 working for North Carolina.

11    But they're handed a very -- a situation in which some
12 people are uncomfortable with what this whole thing is, whether
13 or not they -- the -- when you're cutting off working body
14 parts that are otherwise healthy, except for the mental aspect
15 of it.

16         MR. RODRIGUEZ:  Yes, your Honor.  And I think, with
17 respect to Dr. Campbell, I can't speak to his intentions.  He
18 was here today to provide his testimony to the Court and
19 address questions that were posed to him from both sides.

20    What I can say is that the record is quite clear that the
21 position statement itself was not shared or circulated until
22 after the decision was made, and that each of the witnesses
23 testified that the medical literature review that Dr. Campbell
24 did author in that position statement, that that wasn't the
25 driving factor in the determination to not approve the request.

 1     What was the driving factor was the review of the records,

 2 which Dr. Peiper and Dr. Sheitman and Dr. Campbell each did

 3 independent of one another and arrived at their own assessment.

 4     THE COURT:  Well, he did share -- he did share with

 5 Dr. Peiper.  He did just -- just between the two of us.

 6     MR. RODRIGUEZ:  He did, and that was the evening after

 7 the DTARC meeting, and it was for the purpose of including the

 8 background information on the medical-literature review as part

 9 of the case summary.  And that was also referenced in the final

10 -- in the final -- in the final record that was put into her

11 health chart.

12     And I think the point there to harp on, your Honor, is

13 that it was not the medical literature that determined that she

14 should not have this surgery because each one of them testified

15 that, if their review, irrespective of the literature,

16 indicated that the symptoms were such that warranted further

17 intervention, they would have counseled in that direction,

18 regardless of the literature.

19     That's what I meant when I said that the literature review

20 in the position statement is a distraction.  It's an

21 unfortunate distraction, and we have spent a lot of time

22 discussing -- and one I recognize --

23     THE COURT:  They both -- everybody had the literature.

24 I mean, the last -- the second-to-the-last doctor that got up

25 here read the literature on it.  And the literature comes

1 out -- you know, comes out sort of half and half about that.

2     And then you -- but North Carolina has -- has North

3 Carolina sent them and gotten the opinion of some transgender

4 experts, and then they -- the transgender people come in and

5 say it's necessary, and they go no, no, it's not.

6     MR. RODRIGUEZ:  So I'm glad your Honor raised that

7 point.  I didn't mean to interrupt.

8     THE COURT:  No.  Go ahead.  That's okay.

9     MR. RODRIGUEZ:  Your Honor, as to that point, there's

10 two things I want to discuss about that.

11     Your Honor is correct in the committee currently does not

12 have what would be considered a WPATH-certified type of --

13     THE COURT:  I mean, that would seem to me to be

14 something you'd want to do.  This is very different than an

15 appendectomy or a -- or -- or a -- any other kind of surgery.

16 This is a -- this is a one-out kind of thing.  This is

17 something that is very, very different because the medical

18 necessity comes from a mental problem with regard -- with

19 gender identity.  This is -- it's a totally -- one thing.  And

20 then we got these guys in there who are making this call and

21 going -- and then you've got that position paper.  I -- anyway.

22     MR. RODRIGUEZ:  Your Honor, if I may briefly address

23 that point.

24     The DTARC -- the multidisciplinary aspect of the DTARC is

25 meant to address the novelty and complexity of this particular

1  situation. I'm not going to stand up here and say that it's a

2  perfect process, but --

3       THE COURT: And it's tough because they're in prison.

4  And if they were out of prison, they could go to Chapel Hill --

5       MR. RODRIGUEZ: Right.

6       THE COURT: -- and get the surgery. But they're in

7  prison, and they want the taxpayers to pay for it. And, of

8  course, you don't want people going to prison so they can get

9  their surgery paid for.

10       MR. RODRIGUEZ: And the Department has made efforts,

11  which it's documented throughout this case, to learn about this

12  particular issue. They referred her out to UNC Transhealth for

13  a consultation so that they can get input. And the input they

14  received was, according to WPATH, she meets the criteria.

15    We've never disputed that point that she meets the

16  criteria for surgery. What WPATH, however, does not supply is

17  the next step of the analysis, which is, in this particular

18  case, is it medically necessary?

19       THE COURT: And the Court -- you know, where the Court

20  is right now is trying to figure out -- the Court can't come up

21  with -- is not in a position to decide that aspect of it,

22  whether it's medically necessary or this testimony from this

23  doctor that says it is. I've heard what this committee said,

24  that it's not.

25    What this Court is trying to find out is, was there enough

of a fair process?  Were the members of the committee as it was
constituted so open-minded that, if they were judges on this
court, that the litigants in front of it would feel like they
were getting a fair shake?  If not, then that's not the way --
then it shouldn't go that way.

That's what the Court is looking at.  If I was going in
front of that Court, would I feel like I had a good, fair shake
of it or was I going in front of a Court that had already made
a decision?  I mean, we got courts like that.  I mean, you can
go on up the ladder, and I can point out some that I think
don't -- are -- have already made decisions on certain things.

So it's not just -- that's not just to committees and
stuff.  But that's what I'm wrestling with.  It's obvious
Dr. Campbell has served the country.  He's been a -- he may be
perfectly well for a thousand different things.  My question is
if he's the right guy on this.  I don't know.  I got to think
about it.

MR. RODRIGUEZ:  Yeah.  And, your Honor, just the last
word I would say is that we would submit that it's been a
pleasure representing these three individuals and the other
members of the DTARC that are doing the best that they can with
the information they had.  And there's no reason in my mind to
believe that they did nothing but give a fair assessment of
this situation and provided their best clinical judgment at the
time with the information they had.

1          THE COURT:  Thank you very much.  Appreciate -- and

2     good presentation by both sides, by the way.  I'm not

3     criticizing any of the presentation.

4          Let me hear from you.

5          MS. MAFFETORE:  Thank you, your Honor.

6          Much as has been made about the fact that Dr. Campbell's

7     position statement was not ultimately adopted by the DTARC, but

8     the fact remains that, at that time Mrs. Zayre-Brown's case was

9     under consideration on February 17th, 2022, that position

10    statement represented his views, his concerns, and

11    considerations as he testified regarding gender-affirming

12    surgery at that time.  It reflected what he believed at that

13    time, that, based on the state of the literature, it would be a

14    violation of his professional oath to first do no harm to

15    approve a surgery.

16         Regardless of whether or not the DTARC ultimately adopted

17    that position, sometime later in March, when that decision was

18    before the DTARC, that is the position that Dr. Campbell held.

19    And that is the position that he boiled down into paper nearly

20    verbatim into Mrs. Zayre-Brown's case summary when he

21    determined gender-affirming surgery was not medically necessary

22    for her.

23         THE COURT:  I know that a lot of things -- in Social

24    Security cases and lots of things they look at the -- they look

25    at the record and they look at what the records are.  And in

1 trying to explain it, they look at what the evidence of it is.

2 And at that times that -- it appears that many of the

3 times -- maybe not all the times, but many of the times when

4 Ms. Brown was opining that she was having 10 and 11 dysphoria

5 levels at that, that the observation of the person who was

6 putting that down was saying, look, she seemed to be calm and

7 fine and dressed appropriately and all of those things and not

8 -- not displaying any type of mental acute -- mental acuity in

9 terms of trouble, anxiety. She was saying she was, but they

10 were looking at her and going, well . . .

11 MS. MAFFETORE: And, your Honor, in certain

12 circumstances, maybe Mrs. Zayre-Brown was able to hold it

13 together in front of her providers while she was conveying the

14 degree of her distress that she felt between the incongruence

15 between the body she has and who she knows to be.

16 But we have other evidence in the record, your Honor, that

17 you -- you noted in your order of instances where she was not

18 able to hold it together, where she did present to her

19 providers that she was not doing well. She had to be placed in

20 inpatient treatment. She was placed on self-injury risk

21 assessments multiple times.

22 And it is not the case that any person who is suffering

23 from any kind of disability is having their worst day all the

24 time.

25 THE COURT: And we -- and I'm not saying it from the

1  standpoint -- I'm not making -- I'm not making a call in this

2  case right now as to whether or not there's medical necessity

3  here.  What I'm trying to determine is how that applies with

4  regard to their -- their decision, the State of North

5  Carolina's decision through this committee, to deny the

6  gender-affirming surgery in this case.

7         MS. MAFFETORE:  Right, your Honor.  And so what we see

8  is, to the extent that the WPATH Standards of Care are the

9  authoritative standards of care in this circuit, those

10  standards of care were largely rejected throughout this process

11  because the individual charged with applying them believed that

12  they -- they lacked foundation, that they were not credible.

13  But what we know from the WPATH Standards of Care is that

14  somebody is not required to be constantly at the brink of

15  suicidality in order for surgery to be medically necessary for

16  them.

17     The review of the medical records and individualized

18  assessment shows that Mrs. Zayre-Brown was consistently

19  struggling with her gender dysphoria and consistently

20  experiencing clinically significant distress.

21         THE COURT:  Right, but then -- but then what do you

22  say about the doctors?  I mean, we know what Dr. Campbell is

23  saying, and then you got the other two.  Talk about that.

24     Again, what I'm trying to look at is the process that's

25  here because it's not -- I'm not making a call on this -- on

1 the -- on whether this is necessary or not.

2          MS. MAFFETORE:  Understood, your Honor.

3          THE COURT:  I'm trying to just determine whether there

4 was a -- whether there was a fair process because, if there is,

5 then -- you know, you can't have the State coming in and having

6 to battle experts every time.  And if we go every -- every --

7 everybody looking for something in terms of a surgery that they

8 want the State to pay for, a judge has to make the call on all

9 of that.

10     The question is -- in this particular case is to whether

11 or not this particular process was of a nature that the Court

12 can have confidence in it, that they -- that it had the

13 earmarks of a fair hearing because people need to understand,

14 when they go in front of tribunals and judges and such, that

15 they're getting a fair hearing.

16          MS. MAFFETORE:  And, your Honor, I believe the

17 evidence --

18          THE COURT:  I'm not talking about those other two

19 because there's two other -- it's not just Campbell in here.

20 It's these other guys.

21          MS. MAFFETORE:  I believe the evidence before you

22 shows that it wasn't a fair process because the standard was an

23 un-meetable standard that was put forward by both Dr. Peiper

24 and Dr. Sheitman as they testified before you today.

25     The standard they held Ms. Zayre-Brown to was that she had

1  to be constantly experiencing severe, debilitating gender

2  dysphoria in order for them to consider giving her surgery.

3  They testified repeatedly, had she been in a situation where

4  her gender dysphoria were debilitating and were so severe that

5  she was on the brink of suicidality, that they would have

6  considered looking past the mixed nature of the literature, and

7  they would have approved her surgery in that circumstance.

8  That is too high a standard.  That is not a fair tribunal, as

9  your Honor put it.

10       And I believe your Honor has recognized repeatedly that

11  someone need not be on the brink of suicidality in order to

12  receive care, and there is no other condition for which that is

13  the standard.  So making that the standard for gender

14  dysphoria, for receiving gender-affirming surgery, is not a

15  fair standard.

16       Even to the extent that this is considered individualized

17  as applied to Mrs. Zayre-Brown, the standard is nonetheless

18  unfair.  It is nonetheless not a fair tribunal because they

19  were holding her to that standard.

20       And they were overlooking all the instances in which she

21  did present that level of a risk because it wasn't a constant

22  risk.  That flies in the face of the WPATH Standards of Care,

23  which are authoritative here, but it also flies in the sense of

24  common sense.  And it flies in the face of what you heard from

25  Dr. Ettner regarding medical necessity generally speaking.

1    So to apply a different standard just to gender dysphoria,
2  that was not a fair process for Mrs. Zayre-Brown.  She has been
3  suffering and she has been seeking care from the State for six
4  years now.  She has been stalwart and incredible in the way she
5  has held herself in trying desperately to seek this care, but
6  that does not mean that, because she was able to hold her
7  selves in composure sometimes, that she does not desperately
8  need this care that she has been fighting for the entire time
9  that she's been incarcerated, your Honor.

10        THE COURT:  Okay.  Thank you.

11    All right.  Thank you --

12        MS. MAFFETORE:  And I'm sorry.  One more thing.  I
13  would just like to note that, as you mentioned, your Honor,
14  they did refer her out to experts that do apply the standards.

15        THE COURT:  I know they did.  Her papers are clear
16  about all that.  I just brought that up on this --

17        MS. MAFFETORE:  Thank you, your Honor.

18        THE COURT:  All right.  Yeah.

19    All right.  Thank you all.  Thank you very much.

20      (End of proceedings.)

21

22

23

24

25

```
 1                    C E R T I F I C A T E

 2

 3

 4

 5          I, DEBORAH COHEN-ROJAS, Federal Official Court

 6   Reporter for the United States District Court for the Western

 7   District of North Carolina, a Registered Diplomate Reporter,

 8   Certified Realtime Reporter, and Federal Certified Realtime

 9   Reporter, do hereby certify that I reported by machine

10   shorthand the foregoing proceedings contained herein on the

11   aforementioned subject on the date herein set forth, and that

12   the foregoing pages constitute a full, true and correct

13   transcript.

14

15          Dated this 21st day of February, 2024.

16

17

18

19

20   _____

21          DEBORAH COHEN-ROJAS
            RDR, CRR, FCRR
22          Federal Official Court Reporter

23

24

25
```