IN THE UNITED STATES DISTRICT COURT-
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
No. 3:22-cv-191

| | |
|---|---|
| KANAUTICA ZAYRE-BROWN,<br><br>Plaintiff,<br><br>v.<br><br>NORTH CAROLINA DEPARTMENT OF ADULT CORRECTION, et al.,<br><br>Defendants. | **MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' RENEWED MOTION FOR SUMMARY JUDGMENT** |

**Introduction**

The testimony presented at the February 20, 2024, evidentiary hearing confirmed two key factual points. First, WPATH does not set a standard that can be used to determine medical necessity in this case. Second, the North Carolina Department of Adult Correction (the "Department") does not now have, and has never had, a blanket ban on gender-affirming surgery—instead, each request, including Plaintiff's, is reviewed on a case-by-case basis. Therefore, this Court should grant Defendants' renewed motion for summary judgment on all claims and dismiss this matter with prejudice.[1] Alternatively, Defendants request that this Court send any remaining factual issues to a jury for determination.

**A. WPATH Does Not Provide A Workable Medical Necessity Framework.**

By its plain language, WPATH sets out eligibility criteria for surgery. (*See* DE 104-2 at 58-60, 105-106; DE 104-3 at 258) On direct, Plaintiff's expert, Randi C. Ettner, Ph.D., referred to

---

[1] Defendants respectfully incorporate, renew, and seek to preserve all of the arguments made and facts set forth in their previous filings and all supporting materials, including but not limited to their Memorandum in Support of Summary Judgment and exhibits thereto (DE 60, DE 61), Memorandum in Opposition to Plaintiff's Request for Partial Summary Judgment and exhibits thereto (DE 64, DE 65), and Reply in Support of Summary Judgment (DE 69). Defendants also incorporate and rely upon the arguments and facts set forth in briefs and supporting materials submitted in response to Plaintiff's three motions to exclude experts. (DE 86, DE 87, and DE 88)

these as "eligibility criteria" and conceded that "[m]eeting those criteria does not mean that surgery is medically necessary for an individual." (DE 104-7 106:20-107:1) Dr. Campbell also testified that WPATH does not provide criteria for determining medical necessity. (DE 104-7 at 61:12-14) Like Dr. Ettner, Dr. Campbell notes that the WPATH provides "criteria or eligibility criteria for surgery," which are "traditionally in medicine considered to be contraindications, or reasons you don't proceed with surgery." (DE 104-7 at 58:21-24) Thus, while it is undisputed that Plaintiff meets the WPATH criteria for surgery (DE 104-7 at 37:2-5), Plaintiff's own expert agrees that this does not answer the question of whether the surgery is medically necessary for her.

Rather, Dr. Ettner acknowledged, as she must, that the WPATH does not provide its own standard for determining medical necessity. Instead, WPATH references the American Medical Association's (AMA) definition of the phrase. (DE 104-7 at 109:3-110:8) The AMA defines medical necessity as:

> "Health care services that a physician and/or health care professional, exercising prudent clinical judgment, would provide to a patient for the purpose of preventing, evaluating, diagnosing or treating an illness, injury, disease or its symptoms, and that are: (a) in accordance with generally accepted standards of medical practice; (b) clinically appropriate, in terms of type, frequency, extent, site and duration, and considered effective for the patient's illness, injury, or disease; and (c) not primarily for the convenience of the patient, physician, or other health care provider, and not more costly than an alternative service or sequence of services at least as likely to produce equivalent therapeutic or diagnostic results as to the diagnosis or treatment of that patient's illness, injury or disease."

(DE 104-3 at 18-19) When asked to describe the "central components of whether a particular treatment is medically necessary for a particular patient at a particular time," Dr. Ettner replied that "[if] [] on a case-by-case basis, an individual is suffering from a healthcare condition, and there is a treatment that a prudent physician believes is to be medically indicated for that patient, then that -- and that physician or that provider considers that to be vital for that particular patient, that would be medical necessity." (DE 104-7 at 111:5-13)

Based on this testimony and the undisputed text of the WPATH guidance, it is clear that WPATH does not set out a standard for medical necessity. Rather, WPATH merely refers to the AMA's general conceptual definition of medical necessity. And that definition itself requires individualized application akin to a risk/benefit analysis. (*See* DE 104-3 at 18-19) As explained at the hearing and as shown more fully in Defendants' brief supporting their first motion for summary judgment (*see* DE-60 at 8-13), the record evidence demonstrates that the DTARC did exactly that—conducted an individualized risk-benefit assessment of Plaintiff's request. Therefore, it cannot be established that Defendants deviated in any way from a controlling standard set by WPATH (or otherwise).

### B. The Department Does Not Have A Blanket Ban And Instead Reviews Each Case Individually.

Despite her present contentions, in her response to Defendants' motion for summary judgment, Plaintiff acknowledged that her Eighth Amendment claim is not framed "in terms of the state having a 'blanket ban' on gender-affirming surgery" but rather is "based exclusively on her individual medical needs." (DE-66 at 21) This is for good reason. The evidence throughout this case, including the testimony of the three clinical members of the DTARC, Drs. Campbell, Peiper, and Sheitman, demonstrates that the denial of Plaintiff's request was not the product of some rote application of a shadow blanket ban, but rather the result of careful, individualized consideration. Testimony at the hearing further confirmed this.

#### 1. All Requests Are Reviewed Individually.

The Department's policy for evaluating requests for interventions by transgender patients requires an individualized, case-by-case review. (DE 104-7 at 10:12-11:8, 45:2-15) This individualized, case-by-case review is carried out by an inter-disciplinary committee (*i.e.*, the DTARC) wherein the various members bring forth their own individualized assessment, which

Page 3 of 13

Case 3:22-cv-00191-MOC-DCK   Document 111   Filed 03/21/24   Page 3 of 13

includes a comprehensive records review. (DE 104-7 at 11:9-14) More specifically, ahead of a DTARC meeting, the members receive a list of cases that are going to be reviewed and discussed. (DE 104-7 at 45:22-46:4) From that list, each member of the DTARC conducts their own discipline-specific review in advance of the meeting. (DE 104-7 at 46:5-19)

As the Director of Behavioral Health, Dr. Peiper reviews records that would provide insight into a patient's mental health, like mental health assessments, mental health assessment updates, referrals, or outside care. (DE 104-7 at 12:7-18) As the Chief Medical Officer, Dr. Campbell reviews the mental health and behavioral health notes, and all other pertinent medical notes associated with the patients. (DE 104-7 at 46:16-19) And as the Chief of Psychiatry, Dr. Sheitman reviews records to ascertain a patient's symptoms, subjective reporting of the patient, and other objective measures, like medication administration records, compliance, and other collateral information. (DE 104-7 at 78:1-9) This type of comprehensive assessment is essential to determine a complete picture of a patient's symptomology and any impact on their daily activities. (DE 104-7 at 13:4-21, 77:22-25)

This individualized approach is followed for all gender-affirming surgery requests. (DE 104-7 at 23:16-22) As of December 2022, the DTARC had considered a total of 25 requests for gender-affirming surgeries made by 15 people (not including Plaintiff). (DE 104-7 at 22:20-23:12; Defs.' Hr'g Ex. 12) While, for a range of reasons (including specific contraindications to surgery in some cases), none of those requests were approved, each received individualized review and consideration. (DE 104-7 at 23:23-24:16; Defs.' Hr'g Ex. 12) Plaintiff's counsel has not presented any evidence to refute this fact.

### 2. Plaintiff's Request Received Individualized Review.

Drs. Peiper, Campbell, and Sheitman each conducted their own individual review of Plaintiff's records, and each came to the same independent conclusion regarding the overall state of her mental health—that her symptoms were adequately controlled by existing interventions.

#### a. Dr. Peiper

Dr. Peiper testified that the DTARC followed the individualized review process when it evaluated Plaintiff's request. (DE 104-7 at 11:15-19) Dr. Peiper reviewed records ahead of the DTARC's February 17, 2022, meeting. (DE 104-7 at 11:20-24) Dr. Peiper had access to and would have reviewed the more than four hundred pages of records contained in Defendants' Hearing Exhibit 8. (*See* DE 104-7 at 12:1-25) In reviewing those records, Dr. Peiper was looking for broad indications of mental health symptoms and any impact those mental health symptoms were having on Plaintiff's general functioning. (DE 104-7 at 13:4-10) Dr. Peiper testified that these impacts could manifest themselves "in some of the activities the person's engaged in, sleeping, eating patterns[,] anhedonia[,]" or a "[loss of] interest in things that they otherwise would have interest in." (DE 104-7 at 13:11-21) After reviewing these records, Dr. Peiper concluded that while "there were moments of crisis, moments of instability[,] [o]verall[,]" Plaintiff was generally stable, "[a]nd any of the mental health symptoms appeared reasonably well-controlled." (DE 104-7 at 13:22-14:3) Thus, Dr. Peiper testified that he determined that Plaintiff did not have severe symptoms associated with gender dysphoria that would not be responsive to other interventions. (DE 104-7 at 19:21-25)

Dr. Peiper did not defer to anyone else in reaching this conclusion regarding Plaintiff's mental health. (DE 104-7 at 14:13-16) The DTARC documented its review process and its conclusion in three documents. (DE 104-7 at 15:11-16:4; DE 104-4; Defs.' Hr'g Ex. 7) Dr. Peiper

specifically noted the portion of these documents wherein the DTARC makes reference to its assessment of Plaintiff's mental health. (DE 104-7 at 16:5-18:10)

    b. **Dr. Campbell**

Dr. Campbell also reviewed Plaintiff's medical records in preparation for the DTARC's February 17, 2022, meeting, including all of the records contained in Defendants' Hearing Exhibit 8. (DE 104-7 at 46:23-47:11) Moreover, Dr. Campbell did not ignore or fail to consider any other relevant records. (DE 104-7 at 47:2-11) Dr. Campbell noted that Plaintiff experienced "episodic periods" of "distress," which "seemed to be often situational and generally short-lived without any severe implications." (DE 104-7 at 47:12-17) However, Dr. Campbell's overall assessment was that Plaintiff "was psychiatrically and emotionally stable and actually had very good indications of adapting well." (DE 104-7 at 47:18-25) He elaborated that this was because of indications in her records that "she was very forward-thinking[,] [a]ctively planning [] for endeavors [] upon release from prison[,] [a]ctively engaged in both occupational and academic endeavors for careers once she leaves prison." (DE 104-7 at 48:1-5)

Moreover, approximately three months before the DTARC meeting, Plaintiff's endocrinologist concluded that her "gender dysphoria was chronic, stable, and markedly improved[,]" and two weeks before that meeting, Plaintiff's primary care manager noted that her gender dysphoria was "chronic, stable, and improved." (DE 104-7 at 48:6-16) Thus, Dr. Campbell testified, he concluded that "the current treatment plan seemed to be sufficiently addressing the underlying condition of dysphoria for Ms. Brown, and, therefore, there was no indication that additional treatment or accelerated treatments were indicated at that current time." (DE 104-7 at 48:17-22) Dr. Campbell further testified that Drs. Peiper and Sheitman shared their own

assessments of Plaintiff's mental health with the DTARC, and that those assessments generally mirrored his own. (DE 104-7 at 48:23-49:14)

### c. Dr. Sheitman

Like Drs. Peiper and Campbell, Dr. Sheitman also reviewed Plaintiff's medical records before the February 17, 2022, DTARC meeting. (DE 104-7 at 77:13-21) Through his review of Plaintiff's records, Dr. Sheitman identified times when Plaintiff appeared to struggle, but he noted that these instances seemed be reactions to "external events" or factors rather than some "internal process." (DE 104-7 at 79:13-80:5) Overall, Dr. Sheitman concluded that Plaintiff was doing relatively well, and that she appeared to be energetic, forward-thinking, and not depressed—and that he did not see severe symptoms. (DE 104-7 at 78:18-80:8) Dr. Sheitman did not defer to Dr. Campbell or anyone else in reaching this conclusion. (DE 104-7 at 80:20-81:3)

### 3. The DTARC's Assessment Of The Medical Literature Was A Secondary Factor.

During the DTARC meeting, Dr. Campbell also discussed his general conclusions based on his review of the medical literature. (*See* DE 104-7 at 14:17-15:10DE 104-7 at 49:20-50:20) First, Dr. Campbell concluded that based on "the evidence that [he] was able to review, there [were] no studies that definitively conclude that gender-affirming surgery will consistently alleviate or eliminate the symptoms of gender dysphoria." (DE 104-7 at 50:1-5) Second, Dr. Campbell concluded that "the majority of the studies that are referenced in support of gender-affirming surgery are generally going to be retrospective, qualitative studies[,]" which "[o]n the evidentiary scale of evidence that we use to determine treatment recommendations for our patients, that is incredibly low on that scale." (DE 104-7 at 50:6-11)

Dr. Sheitman testified that he did his own literature review and that his overall takeaway was that the literature was inconclusive on the efficacy of surgery. (DE 104-7 at 82:16-83:16) Dr.

Sheitman did not defer to Dr. Campbell with respect to the literature review. (DE 104-7 at 83:17-20)

Regardless, the DTARC's assessment of the medical literature was not the driving factor that resulted in the denial of surgery. Dr. Campbell testified that, as with all clinical considerations, "there are two factors" to "consider: that individual's current clinical status and the medical literature or the status of that medical literature as it currently exists." (DE 104-7 at 50:21-51:7) Dr. Campbell further testified that, in weighing these two factors, the individual patient-specific consideration is always the primary factor. (DE 104-7 at 73:20-74:2) Plaintiff's case followed this norm: Dr. Campbell testified that the DTARC's assessment of her mental health and medical records were the "primary consideration[.]" (DE 104-7 at 49:15-19) Dr. Peiper testified that the discussion of the medical literature did not impact his assessment of the state of Plaintiff's mental health. (DE 104-7 at 15:7-10)

### 4. There Is No Evidence That Any Concerns About The Medical Literature Resulted In The Denial Of Plaintiff's Request.

Drs. Peiper, Campbell, and Sheitman each testified that the DTARC would approve gender-affirming surgery as medically necessary if warranted by a patient's clinical presentation, regardless of any concerns about the medical literature.[2] Dr. Peiper testified that if his record review indicated that a patient was experiencing symptoms that were severe, debilitating, and interfering with life activities and were not well-controlled, he would conclude that surgery would be necessary from a psychological perspective—regardless of the literature. (DE 104-7 at 18:12-19:20)

---

[2] As discussed in Defendants' prior filings, there is a factual dispute regarding the validity of these concerns and the state of the medical literature that does not preclude summary judgment in Defendants' favor under the deliberate indifference standard, but that does preclude summary judgment in Plaintiff's favor.

Dr. Campbell explained that a patient could present with symptoms (as indicated by sleep habits, appetite, perseveration, energy levels, suicidal ideation, psychomotor agitation, and other factors) that are severe, disabling, or impairing some critical area of functioning, and are not improved by current treatments, so as to require the next level intervention, including surgery. (*See* DE 104-7 at 55:6-57-3) Dr. Campbell further testified if this sort of case were presented to the DTARC, it could be approved as medically necessary. (DE 104-7 at 56:25-57:3)

Dr. Campbell further testified that his assessment of the medical literature was not a bar to surgery in Plaintiff's case. (DE 104-7 at 51:14-16) This is because, as with other procedures, there are interventions that are generally considered not to be medically necessary but that can become medically necessary in light of a patient's particular symptoms. (DE 104-7 at 51:17-52:3) Therefore, Dr. Campbell testified that the concerns that he had with the mixed evidence in the literature did not make the denial of a request for gender-affirming surgery a forgone conclusion. (DE 104-7 at 52:4-7)

Dr. Sheitman testified that if he reviewed a chart of a patient with severe symptoms associated with gender dysphoria that were not responsive to existing interventions and were not related to comorbid conditions, he would have recommended surgery as medically necessary—regardless of the medical literature. (DE 104-7 at 81:13-82:15)

Ultimately, however, Drs. Peiper, Campbell, and Sheitman each testified that their review of Plaintiff's records did not indicate that her symptoms were severe, worsening, or uncontrolled, such that further intervention was warranted. (DE 104-7 at 19:9-20, 56:22-25, 81:13-24) Dr. Campbell further testified that a patient with those kinds of symptoms had not yet come before the DTARC, which is why the DTARC has not approved gender-affirming surgery as medically necessary in any case thus far. (DE 104-7 at 56: 25-57:1) However, if that case were presented to

the DTARC, Dr. Campbell would be open to approving surgery as medical necessary. (DE 104-7 at 57:2-3)

### 5. The Position Statement Was Not A Factor In the DTARC's Determination.

The testimony is clear—at the time that the DTARC considered Plaintiff's request, Dr. Campbell had not circulated any version of the draft position statement to other DTARC members. Dr. Peiper first saw the text of what would eventually become Dr. Campbell's position statement after 9:00 pm on February 17, 2022, the day the DTARC considered Plaintiff's request. (DE 104-7 at 20:25-21:16) Similarly, Dr. Sheitman was first made aware of Dr. Campbell's position statement after the DTARC considered Plaintiff's request. (DE 104-7 at 83:21-84:1) Thus, by the time Drs. Peiper and Sheitman received the draft position statement, they had each already completed their review of Plaintiff's file and discussed their assessments of her mental health with the DTARC. Moreover, Drs. Peiper, Campbell, and Sheitman each testified that the position statement did not affect the DTARC's practice of reviewing all requests for gender-affirming interventions on an individualized basis. (DE 104-7 at 22:15-19, 59:20-22, 84:13-22)

The origin and nature of the position statement is also relevant. Early in his tenure as the Chief Medical Officer, Dr. Campbell began working on a document that was intended to capture the basic tenets of "medical necessity" more broadly. (DE 104-7 at 52:8-20) As he worked on that document, he decided to apply those general concepts of medical necessity to gender-affirming surgery. (DE 104-7 at 52:20-22) Thus, Dr. Campbell testified, the position statement was not intended to be a peer-reviewed article, or a comprehensive review of all studies, but rather it was intended to provide the DTARC with a general articulation of the concept of medical necessity and a baseline understanding of the existing medical literature. (DE 104-7 at 53:21-54:3)

In his draft position statement, Dr. Campbell concluded that generally gender-affirming surgery would not be considered medically necessary. (DE 104-7 at 54:4-18) Dr. Campbell testified that he never intended the position statement to foreclose surgery in every instance and that he did intend for there to be exceptions. (DE 104-7 at 54:19-55:2) For example, Dr. Campbell explained that a patient could present with symptoms (as indicated by sleep habits, appetite, perseveration, energy levels, suicidal ideation, psychomotor agitation, and other factors) that are severe, disabling, or impairing some critical area of functioning, and are not improved by the current treatment regimen, so as to require the next level intervention. (DE 104-7 at 55:6-56:21) Without allowing for an individualized review, there would be no way to assess the patient's symptoms, the effectiveness or the existing treatments, and whether the patient presents as that exceptional case.

No version of Dr. Campbell's position paper was ever adopted. (DE 104-7 at 57:24-25) The position statement was a rough draft, which would have gone through further edits and revisions to clarify and modify various aspects. (DE 104-7 at 58:4-9) One of the things that Dr. Campbell would have addressed if the position statement had been refined further would have been to modify the review process for requests for gender-affirming surgeries, to bring it more in line with how the Department considers requests for other surgeries that are generally not considered medically necessary. (DE 104-7 at 58:11-59:16)

Dr. Peiper testified that after the position statement was circulated to all the members of the DTARC, it was subsequently discarded because it was pointed out that the statement could be read as a blanket ban, which would not be consistent with the DTARC's practices or the Department's policy. (DE 104-7 at 22:5-15) Similarly, Dr. Sheitman testified that after the position statement was circulated, it was shelved because the paper gave the perception of a categorical

Page **11** of **13**
Case 3:22-cv-00191-MOC-DCK   Document 111   Filed 03/21/24   Page 11 of 13

prohibition on gender-affirming surgery. (DE 104-7 at 84:6-12) Dr. Campbell testified that it was not his intent to craft a policy that barred any consideration of gender-affirming surgery. (DE 104-7 at 54:19-55:2) Dr. Campbell understood and respected that his position statement was not adopted. (DE 104-7 at 59:23-25)

Although the draft position statement contains strong language, as Dr. Campbell concedes, (DE 104-7 at 54:23-), nothing in the position statement reasonably calls into question Dr. Campbell's unrefuted testimony that he afforded Plaintiff individualized review and consideration.

### C. Defendants' Decision To Deny The Surgery Was Not Deliberate Indifference.

The testimony at the February 20, 2024, hearing confirms that Defendants thoroughly considered all of Plaintiff's pertinent records (compiled in Defendants' Hearing Exhibit 8), and conducted a risk/benefit assessment as part of their medical necessity determination. The consistent testimony that there was a thorough and comprehensive review of Plaintiff's entire set of records not only rebuts her counsel's contention that Defendants cherry-picked records, but it also stands in contrast to Plaintiff's counsel's attempt at the hearing to cherry-pick isolated text from a single document (suggesting distress) and prevent the witness from referencing other parts of the same document (refuting the presence of distress) in his answer. (*See* DE 104-7 at 91:7-92:21)

Based on their comprehensive review of Plaintiff's records, Drs. Campbell, Peiper, and Sheitman concluded that Plaintiff's mental health symptoms were adequately controlled, such that the next step-up intervention was not needed. Drs. Campbell, Peiper, and Sheitman each testified that their assessment of Plaintiff's mental health was the primary factor in the DTARC's decision not to approve Plaintiff's request. This testimony was bolstered by the unrefuted testimony that Dr. Campbell's position statement did not affect the way in which the individualized review

process was conducted. Thus, Plaintiff's request for gender-affirming surgery was evaluated and decided upon on an individualized basis and was not the product of a categorical ban on such procedures. Plaintiff's contention that Defendants' actions constituted deliberate indifference amounts to a disagreement over the proper course of medical care and thus is not sufficient to support her Eighth Amendment claim. Nor can she establish her other asserted claims.

## Conclusion

For these reasons, and those arguments and legal authorities set forth in their first motion for summary judgment and in opposition to Plaintiff's first motion for summary judgment. (*See* DE 60-61, 64-65, 69), Defendants respectfully request that the Court enter summary judgment in their favor on all claims. Alternatively, Defendants request that all factual issues that remain be submitted to a jury.

This the 21st day of March 2024.

**JOSHUA H. STEIN**
**Attorney General**

/s/ Orlando L. Rodriguez
Orlando L. Rodriguez
Special Deputy Attorney General
NC Bar No. 43167
orodriguez@ncdoj.gov

Stephanie A. Brennan
Special Deputy Attorney General
NC Bar No. 35955
sbrennan@ncdoj.gov
NC Department of Justice
PO Box 629
Raleigh, NC 27602-0629
(919)716-6900

***Attorneys for Defendants***