## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA

KANAUTICA ZAYRE-BROWN,

        Plaintiff,

    v.

THE NORTH CAROLINA
DEPARTMENT OF ADULT
CORRECTION, *et al.*,

        Defendants.

No. 3:22-cv-00191-MOC-DCK

## BRIEF IN SUPPORT OF PLAINTIFF'S MOTION
## FOR ATTORNEY'S FEES

Plaintiff Kanautica Zayre-Brown successfully challenged the North Carolina Department of Adult Correction's ("DAC") evaluation and denial of her request for gender-affirming surgery, exposing a *de facto* ban on medical treatment that violated the Eighth Amendment. The Court granted Plaintiff summary judgment on her Eighth Amendment claim, declaring the ban unconstitutional and entering a permanent injunction requiring Defendants to adopt a different process. Accordingly, Plaintiff is a prevailing party entitled to an award of her reasonable attorney's fees and expenses under 42 U.S.C. § 1988.

The costs and fees sought by counsel are reasonable. Plaintiff is represented by counsel with extensive experience in civil rights litigation. Her rights were vindicated, and her victory paves the way for a constitutionally compliant process for all transgender prisoners who seek gender-affirming surgery after her. Plaintiff's

counsel expended a reasonable amount of time achieving this result and defending it on appeal, and, in the exercise of billing judgment, counsel have significantly reduced the total hours for which they seek compensation.

As detailed below, the Court should grant Plaintiff's motion.

## BACKGROUND

Plaintiff is a transgender woman who has long suffered from gender dysphoria. In 2010 she transitioned socially to living as a woman and began receiving gender-affirming care, including psychotherapy, hormone therapy, and gender-affirming surgeries. (Doc. 92 at 1–2). But Plaintiff continued to experience dysphoria related to her lower body, and once incarcerated, she began seeking gender-affirming genital surgery from Defendants. (*Id.*). DAC's Division Transgender Accommodation Committee (DTARC), responsible for evaluating requests for gender-affirming surgery, confirmed Plaintiff's gender dysphoria diagnosis in 2017. (*Id.* at 3). However, DTARC ultimately denied Plaintiff's repeated pleas for gender-affirming surgery, despite her documented ongoing distress and the conclusions of contracted specialists. (*Id.* at 4 & n.3, 5).

After nearly four years of self-advocacy, Plaintiff filed suit seeking declaratory and injunctive relief under the Eighth Amendment, the Americans with Disabilities Act (ADA), and the Rehabilitation Act of 1973. Plaintiff sought a declaration that "Defendants' practices in obstructing and denying [her] . . . adequate and necessary medical treatment and accommodations for gender dysphoria. . . ." violated the Constitution, as well as a "permanent injunction[] requiring Defendants to provide

2

Plaintiff with necessary medical care[.]" (Doc. 1 at 46). She also sought damages under two federal statutory claims and the North Carolina Constitution. (*Id.*).

Following the Court's denial of Defendants' motion to dismiss (Doc. 25 at 11), extensive discovery confirmed that contracted UNC health providers and DAC providers alike believed that Plaintiff needed gender-affirming surgery to treat her gender dysphoria. (Doc. 92 at 4 & n.3). Defendants filed a Rule 35 motion seeking to have two of their expert witnesses examine Plaintiff, which Plaintiff successfully opposed in part. (Doc. 47 at 1).

Following the limited evaluation, Defendants' expert Sarah Boyd similarly concluded that she believed gender-affirming surgery was "necessary" to cure Plaintiff's gender dysphoria. (Doc. 62-1 at 166:21-26, 167:12-21). Discovery further revealed that Defendant Campbell—DAC's Chief Medical Officer responsible for evaluating requests for gender-affirming surgery—authored a "position statement" in which he asserted "that gender-affirming surgery is <u>never</u> medically necessary" to treat gender dysphoria. (Doc. 92. at 3).

Following two rounds of briefing cross-motions for summary judgment and two hearings, this Court held that Plaintiff satisfied the elements of her Eighth Amendment claim. The Court held "that Defendant's denial caused Plaintiff to suffer significant injury is beyond genuine dispute," (*Id.* at 8), and that "[n]o reasonable jury could find that Defendants lacked subjective awareness that denying[her] request carried some risk of harm." (*Id.* at 10). Moreover, the Court found that Dr. Campbell's position statement evidenced a de facto ban on gender-affirming surgery. (Doc. 116

3

at 5–7). "[C]onsidering Dr. Campbell's authorship of the position statement, other DTARC members' deference to his medical judgment, and the DTARC's track record of denying dysphoric prisoners' requests for gender-affirming surgery, the Court [could not] credit Dr. Campbell's testimony" to the contrary. (*Id.* at 5).

The Court thus concluded that "Defendants' review of Plaintiff's accommodation request violated Plaintiff's Eighth Amendment rights insofar as Defendants denied Plaintiff the individualized medical evaluation the Eighth Amendment requires." (*Id.* at 6). The Court entered a permanent injunction that provided Defendants with two options: "either (1) give Plaintiff the surgery that Plaintiff's experts contend remains medically necessary; or (2) within 30 days from entry of this order form a new committee, subject to this Court's approval, to re-assess Plaintiff's accommodation request, that committee to contain at least two medical doctors with gender dysphoria expertise." (*Id.*).

Defendants refused to comply with the Court's order. On the eve of the Court's deadline for compliance, and less than six months from Plaintiff's projected release date, Defendants filed their notice of appeal of the Court's injunction. (Doc. 117). The next day, instead of submitting proposed committee members, Defendants moved the Court to stay its injunction pending appeal. (Doc. 118). Plaintiff opposed the motion and this Court denied it, noting that "Defendants ha[d] apparently taken no steps to comply with the Court's injunction." (Doc. 126 at 2). Defendants renewed their stay motion with the Fourth Circuit, which Plaintiff opposed on an expedited basis. (4th

Cir. ECF Nos. 17, 18, 19-1). The Fourth Circuit denied Defendants' stay motion as well. (4th Cir. ECF No. 20).

While briefing was underway at the Fourth Circuit, this Court received briefing and held a hearing on how Defendants would comply with the permanent injunction. (Docs. 128, 129, 131, 132, 134). In response to the injunction, Defendants selected two doctors to re-evaluate Plaintiff for surgery. (Doc. 128 at 2). The results of that re-evaluation were filed with the Court on November 6, 2024. (Doc. 140). However, Plaintiff was released from custody on November 2, 2024. Nevertheless, Plaintiff objected to the adequacy of Defendants' "Notice of Compliance" (Doc. 144), and on November 22, 2024, the Court held that Defendants had failed to comply with "basic requirements" of its order and made "legally irrelevant" submissions, and the Court required Defendants to submit a complaint report within ten days. (Doc. 146 at 2-4).

Meanwhile, on November 4, 2024, two days after Plaintiff's release from custody, the Fourth Circuit requested supplemental briefing regarding whether her release would render the appeal moot. (4th Cir. ECF No. 43). Plaintiff argued that it did and moved to dismiss the appeal on November 19, 2024. (4th Cir. ECF Nos. 44, 45). The Fourth Circuit dismissed the appeal and directed that the decision below be vacated as moot on December 2, 2024.[1] (Doc. 149). Thus, Plaintiff was released from prison and her Eighth Amendment claim became moot before the Court could

---

[1] Plaintiff filed a bill of costs associated with the dismissed appeal, which was granted. (Doc. 157).

consider Defendants' resubmitted report for compliance. Ultimately, Defendants never fully complied with the permanent injunction, having run out the clock on Plaintiff's sentence.

A jury trial on damages in this case has been repeatedly delayed while the parties litigated the appeal in this matter and complied with this Court's orders to engage in mediation. Settlement efforts resulted in an impasse and Plaintiff ultimately decided to dismiss her remaining claims without proceeding to trial. (Docs. 159, 162). Plaintiff now moves for her reasonable attorney's fees associated with her successful Eighth Amendment claim.

## LEGAL STANDARD

In civil rights actions brought under 42 U.S.C. § 1983, a court may award a "reasonable attorney's fee" to the "prevailing party." 42 U.S.C. § 1988(b). "The fee-shifting provisions of civil rights statutes encourage competent counsel to take on cases that will vindicate civil rights and discourage future violations." *Bone v. Univ. of N.C. Health Care Sys.*, No. 1:18CV994, 2024 WL 1014164, at *6 (M.D.N.C. Mar. 8, 2024) (citing *Hensley v. Eckerhart*, 461 U.S. 424, 429 (1983); *City of Riverside v. Rivera*, 477 U.S. 561, 574-75 (1986)). In service of the statutes' purpose, "a prevailing plaintiff should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust." *Hensley*, 461 U.S. at 429 (citation modified).

Calculating a reasonable attorney's fee award "involves a three-step process." *Doe v. Kidd*, 656 Fed. App'x. 643, 651 (4th Cir. 2016). First, the court must "determine [the] lodestar figure by multiplying the number of reasonable hours expended times

6

a reasonable rate." *Robinson v. Equifax Info. Servs., LLC*, 560 F.3d 235, 243 (4th Cir. 2009). The court is guided by the twelve *Johnson* factors in determining what constitutes reasonable hours and rates. *Id.* at 243–44 (noting Fourth Circuit's adoption of factors from *Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974)). Once calculated, the lodestar figure is presumed reasonable. *Daly v. Hill*, 790 F.2d 1071, 1078 (4th Cir. 1986). Next, the court "should subtract fees for hours spent on unsuccessful claims unrelated to successful ones." *Robinson*, 560 F.3d at 244 (citation modified). Finally, the court should award "some percentage of the remaining amount, depending on the degree of success enjoyed by the plaintiff." *Id.*

## ARGUMENT

### I. Plaintiff is the prevailing party on her Eighth Amendment claim.

Plaintiff won summary judgment on her Eighth Amendment claim, and the Court permanently enjoined Defendants to alter their behavior for Plaintiff's benefit. She is therefore a prevailing party entitled to an award of costs and fees.

"The touchstone of the prevailing party inquiry must be the material alteration of the legal relationship of the parties in a manner which Congress sought to promote in the fee statute." *Texas State Tchrs. Ass'n v. Garland Indep. Sch. Dist.*, 489 U.S. 782, 792–93 (1989). Under this "generous formulation," *id.* at 792, a plaintiff need only obtain "*some* relief on the merits of" a claim. *Hewitt v. Helms*, 482 U.S. 755, 760 (1987) (emphasis added). The analysis "does not turn on the magnitude of the relief obtained." *Farrar v. Hobby*, 506 U.S. 103, 114 (1992).

7

Here, Plaintiff asked the Court to declare unconstitutional "Defendants' practices in obstructing and denying [her] . . . adequate and necessary medical treatment and accommodations for gender dysphoria. . . ." (Doc. 1 at 46). Plaintiff obtained that relief—the Court granted summary judgment to Plaintiff on her Eighth Amendment claim because Defendants' process for evaluating gender-affirming surgery requests did not permit any individualized consideration of Plaintiff's need for surgery. (Doc. 116 at 6).

Plaintiff also sought a permanent injunction (Doc. 1 at 46), which the Court granted. As a result, Defendants had to engage qualified doctors to provide an individualized, meaningful evaluation of Plaintiff's medical needs, and that evaluation would be subject to further review by the Court. (*See* Docs. 116, 134). Defendants' attempts to have the permanent injunction stayed pending appeal ultimately failed. (*See* Docs. 126, 127). The evaluation occurred, but Plaintiff was released from custody shortly thereafter.[2]

In sum, Plaintiff won a final judgment on the merits of her Eighth Amendment claim, obtaining a material alteration in her relationship with Defendants that required them to alter their behavior. Defendants' appeal of that judgment was dismissed as moot. *Zayre-Brown v. N.C. Dep't of Adult Corr.,* No. 24-6477, 2024 WL 4925046, at *1 (4th Cir. Nov. 25, 2024). Therefore, Plaintiff is a prevailing party entitled to a fee award. *See Hewitt,* 482 U.S. at 761 (a party prevails when the court

---

[2] Shortly after Plaintiff was released, the Court acknowledged that Defendants had failed to comply with basic aspects of the injunction. (Doc. 146)

8

resolves a "dispute which affects the behavior of the defendant towards the plaintiff" (emphasis omitted)).

Finally, while the Fourth Circuit vacated the permanent injunction on mootness grounds, that does not affect Plaintiff's entitlement to costs and fees. The Fourth Circuit has held that where a plaintiff wins a permanent injunction against a government defendant, that plaintiff remains a prevailing party under 42 U.S.C. § 1988 even when the injunction is vacated as moot while the defendant's appeal is pending. *Grabarczyk v. Stein*, 32 F.4th 301, 306 (4th Cir. 2022); *see also Doe v. Rumsfeld*, 501 F. Supp. 2d 186, 191 (D.D.C. 2007) (plaintiffs who won permanent injunction were prevailing parties at both trial level and appeal where the government's appeal was dismissed as moot and the injunction was vacated).

## II. The hourly rates sought by Plaintiff's counsel are reasonable.

An hourly rate is reasonable if it is "in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation. *Blum v. Stenson*, 465 U.S. 886, 895 n.11 (1984).

The Prison Litigation Reform Act (PLRA), 42 U.S.C. § 1997e(d)(3), caps attorney's fees for injunctive relief claims brought under 42 U.S.C. § 1983 at 150 percent of the hourly rate authorized by the Judicial Conference under the Criminal Justice Act (CJA), 18 U.S.C. § 3006A, for paying appointed counsel. The current non-

9

capital maximum hourly rate authorized by the CJA is $175.[3] Therefore, the current PLRA maximum rate is $262.50.[4]

"[T]he PLRA rate virtually always replaces the prevailing market rate as the presumptively reasonable rate in the court's determination of the lodestar figure because actual prevailing rates are very unlikely to be as low as the PLRA rate." *Kelly v. Wengler,* 822 F.3d 1085, 1103 (9th Cir. 2016). Further, the PLRA rate sought is substantially below rates that have been considered appropriate for attorneys with Plaintiff's counsel's experience level in North Carolina federal courts. *See, e.g., Bone*, 2024 WL 1014164 at *17–18 (finding that sought rates ranging from $300 to $375 for North Carolina non-profit attorneys to be "well within the prevailing rates in this legal community"); *Hebb v. City of Asheville*, 1:22-cv09222-MR-WCM, 2025 WL 256999, at *5 (W.D.N.C. Jan. 21, 2025) (finding that sought rates for private counsel in civil rights litigation ranging from $350 to $425 to be "reasonable and in keeping with the prevailing rates in this particular market").

---

[3] *See* Guide to Judiciary Policy, Vol. 7, Chapter 2, § 230.16(a), https://www.uscourts.gov/administration-policies/judiciary-policies/guidelines-administering-cja-and-related-statutes-6#a230_16 (Jan. 1, 2025).

[4] Application of the current PLRA rate is appropriate to account for the delay in payment to Plaintiff's counsel while the litigation was pending. *See, e.g., Missouri v. Jenkins,* 491 U.S. 274, 282 (1989) ("enhancement for delay in payment" including by "basing the award on current rates" is "part of a reasonable attorney's fee,"); *Reaching Hearts Intern., Inc. v. Prince George's Cnty.*, 478 Fed. App'x. 54 (4th Cir. 2012); *Skinner v. Uphoff*, 324 F. Supp. 2d 1278, 1283 (D. Wyo. 2004) (applying current PLRA rate for all work performed); *Edmo v. Idaho Dept. of Corr.*, No. 1:17-cv-00151-BLW, 2025 WL 605467, at *1 (D. Idaho Feb. 25, 2025) (allowing fee multiplier to PLRA maximum).

Here, Plaintiff's counsel have considerable experience litigating civil rights claims on behalf of prisoners and the LGBTQ community, and without the PLRA's cap they would be entitled to significantly higher market rates. (Davidson Decl. ¶ 12; Siegel Decl. ¶ 7). The Court should therefore use an hourly rate of $262.50 for each attorney in calculating the lodestar amount.

### III. The hours sought by Plaintiff's counsel are reasonable.

Following nearly three years of litigation, Plaintiff's counsel now seek to recover for 2,004.6 hours of work expended to achieve success on Plaintiff's Eighth Amendment claim. As exhibits to this motion, Plaintiff's counsel have included billing records detailing the litigation tasks performed on a daily basis, logged contemporaneously in tenth-of-an-hour increments. (Davidson Decl. ¶ 10; Siegel Decl. ¶ 8). The American Civil Liberties Union Foundation ("ACLU National") seeks to recover for 447.1 hours, and ACLU of North Carolina Legal Foundation ("ACLU-NC") seeks to recover for 1,557.5 hours. At the rates discussed above, ACLU National's lodestar is $117,363.75. (Davidson Decl. ¶ 13). ACLU-NC's lodestar is $408,843. (Siegel Decl. ¶ 13). In light of the factors enumerated in *Johnson* and the billing judgment exercised by Plaintiff's counsel, the attorney's fee award sought is reasonable. *See Rum Creek Coal Sales, Inc. v. Caperton*, 31 F.3d 169, 175 (4th Cir. 1994).

### a. Consideration of the relevant *Johnson* factors support Plaintiff's counsel's requested hours

In determining the reasonableness of counsel's requested hours, courts are guided by the twelve *Johnson* factors:

(1) the time and labor expended; (2) the novelty and difficulty of the questions raised; (3) the skill required to properly perform the legal services rendered; (4) the attorney's opportunity costs in pressing the instant litigation; (5) the customary fee for like work; (6) the attorney's expectations at the outset of the litigation; (7) the time limitations imposed by the client or circumstances; (8) the amount in controversy and the results obtained; (9) the experience, reputation and ability of the attorney; (10) the undesirability of the case within the legal community in which the suit arose; (11) the nature and length of the professional relationship between attorney and client; and (12) attorneys' fees awards in similar cases.

*Robinson*, 560 F.3d at243-44. The relevant factors here support Plaintiff's counsel's requested hours.

**The time and labor expended**. Plaintiff's counsel began investigating this case in 2019, long before the time period for which they seek fees. The relevant portion of the litigation spanned nearly three years, and involved significant client communication, medical record review, motions practice (including several motions filed by Defendants against which Plaintiff had to defend), a lengthy discovery period including fifteen depositions (two of which were 30(b)(6) depositions), two rounds of summary judgment briefing and associated hearings, two stay motions, and full briefing at the Fourth Circuit.

Plaintiff's counsel also request their reasonable hours associated with preparing this motion. "Time spent defending entitlement to attorney's fees is properly compensable in a § 1988 fee award." *Daly*, 790 F.2d at 1080. ACLU-NC requests $5,853.75 for 22.3 hours spent preparing this petition. (Siegel Decl. ¶ 13 n.1). ACLU National requests $1,496.25 for 5.7 hours spent preparing this petition. (Davidson Decl. ¶ 13). This time spent is reasonable when compared to awards made

by North Carolina district courts for time spent on fee petitions. *See, e.g.*, *Mercer v. Duke Univ.*, 301 F. Supp. 2d 454, 470 (M.D.N.C. 2004) (awarding $11,450), *aff'd*, 401 F.3d 199 (4th Cir. 2005).

**The novelty and difficulty of the questions raised.** The Court has noted from the outset "the myriad novel legal and factual issues at play in this case." (Doc. 25 at 5). This case involved complex issues without significant precedent in this circuit regarding healthcare for a transgender incarcerated person, a prison system's fledgling accommodation policy, and the requirements of the Eighth Amendment. Other courts encountering such issues have considered them "novel." *See, e.g.*, *Edmo v. Idaho Dept. of Corr.*, 679 F. Supp. 3d 993, 1015 (D. Idaho 2022), *rev'd in part on other grounds*, *Edmo v. Corizon, Inc.* 97 F.4th 1165 (9th Cir. 2024). This factor further justifies the fee award sought.

**The skill, experience, and reputation of counsel.** As detailed in the attached declarations, Plaintiff's counsel have significant experience with civil rights litigation, particularly on behalf of incarcerated persons and members of the LGBTQ community. (Davidson Decl. ¶¶ 5-8; Siegel Decl ¶¶ 3-6). Moreover, courts in North Carolina and across the country have acknowledged the reputation of the ACLU and ACLU-NC in civil rights cases. *See, e.g.*, *Orr v. Trump,* No. 1:25-CV-10313-JEK, 2025 WL 1695941, at *7 (D. Mass. June 17, 2025) (referencing the lengthy experience of the ACLU "litigating claims pertaining to transgender individuals' civil rights and civil liberties"); *Progeny v. City of Wichita, Kansas,* No. 621CV01100EFMADM, 2023 WL 6597768, at *9 (D. Kan. Oct. 10, 2023) ("the ACLU ... is [a] well-known entit[y]

with significant experience litigating civil rights claims"); *M.E. v. T.J.*, 854 S.E.2d 74, 111 (N.C. Ct. App. 2020) ("The public interest in the resolution of Plaintiff's appeal is in part demonstrated by the fact that, on appeal, Plaintiff is represented by attorneys representing ACLU of North Carolina . . . ."); *Carcano v. Cooper*, No. 1:16CV236, 2019 WL 3302208, at *6 (M.D.N.C. July 23, 2019) ("Plaintiffs are well-represented by several major nonprofit legal organizations [including] the American Civil Liberties Union of North Carolina . . . .").

**Counsel's opportunity costs.** The ACLU and ACLU-NC are non-profit public interest legal organizations in high demand, but with limited resources. They must be judicious in selecting cases. (Davidson Decl. ¶ 15; Siegel Decl. ¶ 11). Especially with respect to lead counsel, this litigation required a significant outlay of attorney time over the course of years which severely limited counsel's ability to take on other matters litigating important civil liberties issues. (*Id.*).

**The time limitations imposed by the client or circumstances.** Although Plaintiff's struggle to get necessary care while incarcerated endured over many years, her prison term was nonetheless fixed and operated as a constant time constraint to be considered in this litigation. (*See, e.g.* Doc. 42 (opposing motion for extension of dispositive motions deadline); Doc. 133 (noting Plaintiff's release date and urging resolution of remedial proceedings "as soon as practicable.")). Achieving a permanent injunction before Plaintiff's release was of the utmost importance.

**The undesirability of the case within the legal community.** Fee awards in civil rights cases help incentivize competent counsel to take on unpopular clients

who have meritorious claims. *See, e.g.*, *Kelly*, 822 F.3d at 1104 ("Improving the quality of prisoner suits requires that plaintiffs with meritorious civil rights cases be able to secure competent counsel."). This litigation involved advocacy on behalf of two politically unpopular minorities in North Carolina: incarcerated people and transgender people.

Litigation on behalf of prisoners is generally considered "undesirable" given the stigma attached to this population and the PLRA's cap on recoverable fees. (Davidson Decl. ¶ 16; Siegel Decl. ¶ 12). What's more, North Carolina has often targeted transgender individuals by denying them access to benefits or excluding them from aspects of public life. *See Kadel v. Folwell*, 100 F.4th 122 (4th Cir. 2024) (regarding North Carolina exclusions of gender-affirming care from state employees health plan); *Carcaño v. McCrory*, 203 F.Supp. 3d 615 (M.D.N.C. 2016) (regarding North Carolina law restricting bathroom usage based on biological sex). Cases challenging such harms face substantial challenges in this climate, which has persisted and, in some circumstances, worsened throughout the course of this litigation. (Davidson Decl. ¶ 16). The fee award here should incentivize competent counsel to take on meritorious cases on behalf of these politically disfavored groups.

**The nature and length of the client relationship.** ACLU-NC has maintained a relationship with Plaintiff since before her transfer to a women's prison, and current lead counsel has maintained a relationship with her since starting at ACLU-NC in late 2019. (Siegel Decl. ¶ 6). Plaintiff's counsel have maintained close contact with Plaintiff while she was incarcerated through letters, prison phone calls,

communications with family members, and visitations, and since her release from prison through regular email and cell phone contact (*Id.*). This included complaint and declaration review and witness preparation as well as regular updates and strategy discussions regarding her case and transmission of all major filings through legal mail. (*Id.*).

**Attorney's fees awards in similar cases.** The costs and fees sought here are reasonable when compared with awards to other civil rights litigants. *See Johnson,* 488 F.2d at 719 ("The reasonableness of a fee may also be considered in the light of awards made in similar litigation within and without the court's circuit.").

For example, in *Bone*, the plaintiffs sought relief against the UNC Health Care System to "vindicate the rights of . . . patients who suffer from a sight-related disability" under the ADA and Rehabilitation Act, among other claims. No. 1:18CV994, 2024 WL 1014164 at *24. Over four years of litigation, Plaintiffs were partially successful on cross-motions for summary judgment, achieved a permanent injunction, and ultimately declined to pursue their damages claims at trial. *Id* at *3. The Middle District of North Carolina determined that a fee award of $1.1M for nearly 5,000 hours of work by attorneys and paralegals was justified in that case. *Id.* at *17-19, *25.

In *Edmo*, a transgender prisoner litigated for three years and ultimately succeeded on her Eighth Amendment claim resulting in a permanent injunction that provided her with gender-affirming surgery. No. 1:17-cv-00151-BLW, 2025 WL 605467, at *1. Claims under the Equal Protection Clause and the Affordable Care Act

were either settled or abandoned, and so the court only awarded fees that were "directly and reasonably incurred in proving an actual violation of the plaintiff's rights" under the Eighth Amendment. *Id.* at *1, *8 (quoting 42 U.S.C. § 1997e(d)(1)). Though the PLRA maximum cap controlled, the court awarded plaintiff's counsel $2.4M for 5,283.4 billable hours, based on the application of fee multipliers of 1.7 to 2.0 in light of the *Johnson*[5] factors and the excellent result. *Id.* at *9.

Here, Plaintiff's counsel only seek $526,207.50 for 2,004.6 billable hours.

**The results obtained.** As discussed above, Plaintiff obtained (1) a declaratory judgment that DAC's process for evaluating gender-affirming surgery requests violated the Eighth Amendment and (2) a permanent injunction against Defendants requiring them to take steps to reevaluate Plaintiff's need for surgery that they would not have otherwise taken. The Court's order concluding that the Eighth Amendment requires an individualized process for transgender prisoners is published and will serve as precedent for other transgender prisoners. *See Zayre-Brown v. N.C. Dep't of Public Safety*, No. 3:22-cv-191-MOC-DCK, 2024 WL 1641795 (W.D.N.C. April 16, 2024). Additionally, the Court's opinions discredit Dr. Campbell as an appropriate decisionmaker and address DAC's process for *anyone* who may need gender-affirming care. So, for all practical purposes, Plaintiff's suit will impact other transgender prisoners in DAC custody.

---

[5] These factors are referred to as the *Kerr* factors in *Edmo*, as that is the Ninth Circuit case that adopted the use of the *Johnson* factors. *See Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 70 (9th Cir. 1975).

### b. Plaintiff's Counsel have exercised sound billing judgment.

Plaintiff's counsel have already cut several timekeepers and many hours as a matter of billing judgment. Though there were several attorneys on this case, Plaintiff has not sought fees for counsel who withdrew from representation or assisted in the suit but never filed a notice of appearance (Davidson Decl. ¶ 9), or for her private pro bono counsel with Patterson Harkavy. Additionally, of the remaining five attorneys, the bulk of hours sought are for the lead counsel at ACLU-NC (Jaclyn Maffetore), with significantly fewer hours sought for supporting counsel. Further, Plaintiff's counsel have eliminated entries for largely administrative tasks and, as a result, do not seek fees for work performed by paralegals or law student interns. (Davidson Decl. ¶ 9; Siegel Decl. ¶ 9)

Because "[c]ounsel for the prevailing party should make a good faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary," *Hensley*, 461 U.S. at 434, Plaintiff's counsel have already cut a significant number of hours in review of their billing entries. (Davidson Decl. ¶ 9; Siegel Decl. ¶ 9). Plaintiff's counsel culled hours where attorney work could be perceived as vague or duplicative, restricting hours sought in many circumstances to primary authors of written work product where reasonable, or to first chairs of depositions only. (*Id.*)

Moreover, in recognition that Plaintiff voluntarily dismissed her remaining claims for damages, Plaintiff's counsel have discounted as much attorney time as could be readily identified as pertaining solely to those unsuccessful claims. (*Id.*).

The self-imposed cuts by the timekeepers with records before the court amount to approximately 1,450 total hours – representing a roughly 42% overall reduction in total hours now sought before this court. (*Id.*). Given that Plaintiff's counsel has already engaged in this exercise of sound billing judgment, and in light of the factors considered *supra* § II, this Court should award Plaintiff's counsel the full amount of $526,207.50 that they seek.

### IV.    Plaintiff is entitled to recover reasonable litigation expenses.

As the prevailing party, "plaintiff is entitled to compensation for reasonable litigation expenses under § 1988." *Daly*, 790 F.2d at 1084. "A prevailing party in a civil rights action is entitled . . . to recover those reasonable out-of-pocket expenses incurred by the attorney which are normally charged to a fee-paying client, in the course of providing legal services." *Spell v. McDaniel*, 852 F.2d 762, 771 (4th Cir. 1988). Here, Plaintiff seeks $4,138.94 to compensate ACLU-NC for reasonable travel expenses of counsel to prison visitations and hearings in this matter, as well as the cost of postage. Plaintiff seeks $6,246.35 to compensate ACLU National for travel and lodging expenses for counsel to attend hearings and to take or defending depositions in this case. (Davidson Decl. ¶ 14; Siegel Decl. ¶ 14). Because these expenses were necessary to litigate Plaintiff's claims and to keep her reasonably informed of her case, they should be fully compensated.

Plaintiff separately seeks $21,617.90 in taxable costs, through her contemporaneously filed bill of costs and supporting documents. Because she is the

prevailing party in this matter, these costs should be allowed. *See* Fed. R. Civ. P. 54(d)(1).

## CONCLUSION

For the foregoing reasons, Plaintiff requests that the Court award $536,592.79 in reasonable attorneys' fees and expenses.

Respectfully Submitted this the 21st day of July, 2025.

> */s/ Jaclyn A. Maffetore*
> Jaclyn A. Maffetore
> NC Bar No. 50849
> Daniel K. Siegel
> NC Bar No. 46397
> Michele Delgado
> NC Bar No. 50661
> ACLU OF NORTH CAROLINA
> LEGAL FOUNDATION
> jmaffetore@acluofnc.org
> dsiegel@acluofnc.org
> mdelgado@acluofnc.org
> (919) 354-5070
>
> Christopher A. Brook
> NC Bar No. 33838
> PATTERSON HARKAVY LLP
> cbrook@pathlaw.com
>
> Jon W. Davidson*
> (admitted only in California)
> L. Nowlin-Sohl*
> (admitted only in Washington)
> AMERICAN CIVIL LIBERTIES
> UNION FOUNDATION
> jondavidson@aclu.org
> lnowlin-sohl@aclu.org

*admitted *pro hac vice*

*Counsel for Plaintiff*

## CERTIFICATE OF COMPLIANCE

Pursuant to the Court's standing order on the use of artificial intelligence, Docket No. 3:24-mc-104, I hereby certify that no artificial intelligence was employed in the research for the preparation of the foregoing document except for such artificial intelligence embedded in Westlaw. I further certify that every statement and citation to authority in the foregoing document has been checked by an attorney in this case or a paralegal working at their direction as to the accuracy of the proposition for which it is offered and the citation to authority provided.

Respectfully submitted this the 21st day of July, 2025.

*/s/ Jaclyn A. Maffetore*
Jaclyn A. Maffetore

*Counsel for Plaintiff*

22

## <u>CERTIFICATE OF SERVICE</u>

I certify that on July 21, 2025 I filed the foregoing with the Clerk of Court using the CM/ECF system which will effect service on all counsel of record.

Respectfully submitted this the 21st day of July, 2025.

<u>*/s/ Jaclyn A. Maffetore*</u>
Jaclyn A. Maffetore

*Counsel for Plaintiff*